UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | |
|---|---|
| DAVID LEE JACKSON, | ) |
| *Movant,* | ) |
| | ) |
| v. | ) CASE NO. 1:09-CV-01039-RC |
| | ) (Judge Clark) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| *Respondent.* | ) |

---

**Petitioner David Lee Jackson's Motion for Leave to Compel Production of Records
In the Custody of the United States Bureau of Prisons**

---

**<u>URGENT</u>:
Mr. Jackson's statute of limitations for seeking relief under 28 U.S.C. § 2255 is
running.  Accordingly, immediate action is respectfully requested.**

---

I.    **<u>MOTION</u>**

David Lee Jackson, by undersigned counsel, respectfully moves the Court to compel certain discovery, as set forth in detail below.  Discovery sought is authorized by Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6").  The discovery Mr. Jackson seeks, including the production of records and evidence, is necessary for the presentation of the constitutional claims raised in his 28 U.S.C. § 2255 motion.  The requested discovery is essential to guarantee Mr. Jackson a full and fair opportunity to develop his petition under 28 U.S.C. § 2255 and to ensure that this Court reviews and resolves Mr. Jackson's claims for relief in light of a fully developed factual record.

## II.   MEMORANDUM OF LAW

Under Habeas Rule 6(a), "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."[1]  "Good cause" for discovery in habeas proceedings exists "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'"  *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997) (quoting *Harris*, 394 U.S. at 300).  The policies favoring discovery are even stronger in capital cases than in non-capital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures.  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland v. Scott*, 512 U.S. 849, 855 (1994).

For the reasons discussed below, there exists good cause to grant Mr. Jackson leave to obtain the discovery he seeks.  Specifically, Mr. Jackson seeks a subpoena to compel the Bureau of Prisons ("BOP") to produce no later than September 15, 2010 the materials detailed in the body of this motion, and also enumerated in letters sent to the BOP under the Freedom of Information Act ("FOIA") on April 13 and May 19, 2010. (*See* Craig Decl., Exs. A & C.)  Such discovery is indispensable to the development of the material facts needed for the consideration and accurate resolution of the claims for relief in Mr. Jackson's forthcoming § 2255 petition.

---

[1] Rule 6 is silent as to whether discovery requests are permitted prior to the filing of a petition under 28 U.S.C. § 2255.  Some courts have ruled such discovery improper.  *See, e.g., Calderon v. United States District Court for the Northern District of California*, 98 F.3d 1102 (9th Cir. 1996).  In light of the Supreme Court's decision in *Mayle v. Felix*, 545 U.S. 644 (2005) (prohibiting amendment of a post-conviction petition to introduce new claims subsequent to the one-year statute of limitations in AEDPA), however, restricting discovery to the post-petition period would prevent the timely discovery of new, relevant claims.

### A.        Need for Discovery from the Bureau of Prisons

In his pending petition, Mr. Jackson intends to argue, *inter alia*, that his trial counsel was ineffective in presenting his case during both the guilt and penalty phases of trial.  In addition, there is a possibility of *Brady* evidence in the Bureau of Prisons' files, in light of the unusual chronology of this case: the death of Daryl Brown on December 16, 1999; the filing of charges against Mr. Jackson and Arzell Gulley in 2003 for only "possession of a weapon by a prisoner"; the dismissal of those charges; *the release of Mr. Jackson from* custody on March 9, 2004; Mr. Jackson's re-arrest on May 6, 2004 for a subsequent unrelated offense; and the filing of capital charges against Mr. Jackson culminating in his being sentenced to death for an offense with which he was not even charged prior to his release from prison.  Given that the underlying incident occurred in 1999, and the BOP investigated and chose to release Mr. Jackson, it is reasonable to believe that the BOP may have relevant investigative files suggesting that Mr. Jackson had less culpability in the death of Daryl Brown than was argued at trial in 2006, at which time the Government sought his execution.  Such evidence from the Bureau of Prisons could undermine the government's case for first degree murder, and the appropriateness of the death penalty in a case that was not charged prior to Mr. Jackson's release from custody.

Evidence from the Bureau of Prisons may also undermine the government's argument during the penalty phase that Mr. Jackson presented a future danger, even to the prison community necessitating his execution.  AUSA Jim Jenkins, for example, in his last line in closing arguments during the penalty phase, argued "now it's time to give the prison community a chance, the guards a chance, the press workers and other inmates a chance not to be victimized by the defendant." (Tr. 1889:16–18.)  However, if the government believed Mr. Jackson was too dangerous even for a prison environment, it is perplexing why it decided to release him into the general public two years earlier.  The records from the Bureau of Prisons will provide not only a comprehensive look at Mr.

Jackson's record during his incarceration, but also the culpability of the BOP in failing to maintain a safe institution.  Under 18 U.S.C. § 3592(a)(8), in determining whether a death sentence is justified, the finder of fact "shall consider … any other circumstance of the offense that mitigate[s] against imposition of the death sentence."  As we have previously informed the Court, the pervasive violent conditions at USP Beaumont were notorious, and extended far beyond the crime for which Mr. Jackson is on death row.  Five of the fifty-nine male inmates on Federal death row are there for homicides committed at USP Beaumont.  Public records confirm that USP Beaumont was so dangerous and unmanageable an institution that its maximum security prisoners were removed and the prison reclassified to a medium security institution in 2008.  *See* Ryan Myers, Hardcore Cons Move Out, *Beaumont Enterprise* (Apr. 6, 2008), *available at* http://www.beaumontenterprise.com/news/hardcore_cons_move_out_06-24-2008_16_32_55.html.  The conditions at Beaumont, if presented by effective trial counsel, would have served as mitigating evidence to put Mr. Jackson's crime in the context of an institution where inmates had to defend themselves from constant violence.  As such, evidence regarding the 1999 crime, as well as other materials regarding USP Beaumont in the custody of the Bureau of Prisons, is relevant to multiple claims that Mr. Jackson will assert in his pending petition.

Mr. Jackson's development of this evidence has been hampered by delays at the Bureau of Prisons in producing relevant files.  We have made multiple requests under the Freedom of Information Act, and have confirmed that the relevant files are in the office of Larry Collins at the South Central Regional Office of the Federal Bureau of Prisons, 4211 Cedar Springs Road, Suite 300, Dallas, Texas 75219.  We first requested these materials, described in detail below, in a letter sent to the Bureau of Prisons four months ago, on April 13, 2010.  (*See* Craig Decl., Ex. A.)  The BOP responded to this letter on April 30, 2010.  (*See* Craig Decl., Ex. B.)  We have been in touch with Mr. Collins directly since April 26, 2010 (*id.*), augmenting the production request with an additional

letter sent directly to Mr. Collins on May 19, 2010.  (*See* Craig Decl., Ex. C.)  Despite regular contact with Mr. Collins since that time, the Bureau of Prisons has yet to produce any files pursuant to these requests.  Mr. Collins has stated repeatedly that he is still reviewing the files, and he has been informed repeatedly of our October 5, 2010 habeas filing deadline, yet he has made no visible progress.  (*See* Craig Decl.)  The most recent effort to contact Mr. Collins, a voicemail left on August 11, 2010 requesting a status update and inquiring whether some portions of the files could be expedited, was ignored. (*Id.*)

**B.    Materials Requested**

In letters sent to the Bureau of Prisons under the Freedom of Information Act on April 13, 2010 and May 19, 2010, Mr. Jackson's legal team has requested the materials in the left-hand column of the succeeding table.  The need for these materials is detailed in the right-hand column:

| Materials | Need |
|---|---|
| 1. Any and all security camera video tapes, including any available audio recordings, made at USP Beaumont on Thursday, December 16, 1999, between and including 1700 Hours and 1900 hours Central Standard Time. | There was a factual dispute at trial regarding whether Mr. Brown initially attacked Mr. Jackson with a homemade knife; video evidence may shed light on the true version of events.  Trial counsel failed to obtain video evidence regarding the beginning of the attack. |
| 2. The Inmate Central File for Mr. Jackson, pursuant to Program Statement ("PS") 5800.11. | These materials may provide mitigating evidence regarding Mr. Jackson or impeach aggravating evidence presented at trial. |
| 3. All medical records regarding Mr. Jackson, pursuant to PS 6090.02. | Potential mitigating evidence regarding Mr. Jackson. |
| 4. All psychological records regarding Mr. Jackson, pursuant to PS 5310.12 | Potential mitigating evidence regarding Mr. Jackson. |
| 5. Any and all "After Action reports" or Board of Inquiry reports related to the December 16, 1999 incident, pursuant to PS 1210.21, as well as all 583s and "shots" related to the incident | These files may suggest alternative theories and/or evidence to the government's argument at trial that Mr. Jackson was primarily culpable in the death of Mr. Brown. |

| | |
|---|---|
| 6. Any and all other reports, statements, memoranda, correspondence, meeting notes, or any other documents of any kind related to the December 16, 1999 incident | These files may suggest alternative theories and/or evidence to the government's argument at trial that Mr. Jackson was primarily culpable in the death of Mr. Brown. |
| 7. The results of any and all drug and alcohol testing, pursuant to PS 6590.07, conducted in response to the incident. | Evidence was presented at trial that Mr. Brown had THC in his system at the time of his autopsy.  Evidence of other drug use, whether by Mr. Brown or others, may be mitigating. |
| 8. Any and all "records," as liberally construed under FOIA, regarding weapons related to the incident, pursuant to PS 5521.05. | Several witnesses, both at trial and during subsequent investigation, have suggested that Mr. Brown was in possession of a knife at the time of the incident; other weapons may have been discovered during the initial investigation, and such evidence may undermine the government's guilt case or be mitigating. |
| 9. Any and all Institutional Character Programs related to the USP or FCC Beaumont facilities, pursuant to PS 1070.08, between and including January 1, 1996 and the date of response to this Request. | This evidence is relevant to the ongoing violence at USP Beaumont, and may provide mitigating context to the death of Mr. Brown. |
| 10. Any and all "records," as liberally construed under FOIA, related to the Administrative Remedy Program at the Beaumont facilities, pursuant to PS 1330.16, between and including January 1, 1996 and the date of response to this Request. | This evidence is relevant to the ongoing violence at USP Beaumont, and may provide mitigating context to the death of Mr. Brown. |
| 11. Monthly Staff Rosters and all other records providing the names, ranks, and former duty stations of all USP Beaumont's employees and contracted agent-staff as regularly produced for Regional and Central Office distribution, between and including July 1, 1999 and June 30, 2000. | This evidence will provide investigative leads concerning correctional officers on duty on the day of the attack, as well as the staffing levels at USP Beaumont, which may provide mitigating context to the death of Mr. Brown. |
| 12. Staff Rosters and all other records providing the names, ranks, and former duty stations of all USP Beaumont's Special Operations and Response Team (SORT) officers, and other units classified | This evidence will provide investigative leads concerning correctional officers on duty on the day of the attack, as well as the staffing levels at USP Beaumont, which may provide mitigating context to the death |

6

| | |
|---|---|
| as "Use of Force" teams, between and including July 1, 1999 and December 31, 2006. | of Mr. Brown. |
| 13. The certified documents including curriculum vitae, demonstrating each correctional officer's training, experience, and qualifications. | This evidence will provide information concerning whether staffing at USP Beaumont was appropriate, which may provide mitigating context to the death of Mr. Brown. |
| 14. Daily duty logs showing present and absent correctional officers at USP Beaumont between and including December 1, 1999 and December 31, 2000. | This evidence will provide information concerning whether staffing at USP Beaumont was appropriate, which may provide mitigating context to the death of Mr. Brown. |
| 15. Daily duty logs showing present and absent staff, inclusive of all positions, at USP Beaumont between and including December 1, 1999 and December 31, 2000. | This evidence will provide information concerning whether staffing at USP Beaumont was appropriate, which may provide mitigating context to the death of Mr. Brown. |
| 16. All logs, reports, and other daily or weekly compilations produced by USP Beaumont staff in the course of their duties between and including December 1, 1999 and December 31, 2000. | This evidence is relevant to the ongoing violence at USP Beaumont, and may provide mitigating context to the death of Mr. Brown. |
| 17. Special Housing Review Reports, including but not limited to Form BP-A295, for USP Beaumont between and including December 1, 1999 and December 31, 2000. | This evidence is relevant to the ongoing violence at USP Beaumont, and may provide mitigating context to the death of Mr. Brown. |
| 18. Staff Rosters and other relevant documents providing the names, ranks, and former duty stations of all USP Beaumont's Medical/Health Services staff between and including December 1, 1999 and December 31, 2000. | This evidence will provide information concerning whether staffing at USP Beaumont was appropriate, which may provide mitigating context to the death of Mr. Brown.  Specifically, it may show that medical staffing was inadequate to provide prompt and adequate treatment for Brown. |
| 19. The certified documents including curriculum vitae and licensure information demonstrating each medical division agent's training, experience, and qualifications for duty on USP Beaumont's Medical Staff. | This evidence will provide information concerning whether staffing at USP Beaumont was appropriate, which may provide mitigating context to the death of Mr. Brown. |
| 20. Monthly Reports of Health Services Staff, including but not limited to Form | This evidence will provide information concerning whether staffing at USP |

| | |
|---|---|
| BP-A811.060, between and including January 1, 1996 and December 31, 2000. | Beaumont was appropriate, which may provide mitigating context to the death of Mr. Brown. |
| 21. Any and all reports, statements, memoranda, correspondence, meeting notes, or any other documents, including after action reports or board of inquiry reports, as well as all 583s and "shots," related to assaults or other violent incidents, whether involving inmates or staff, at USP Beaumont between and including January 1, 1996 and December 31, 2006. | This evidence is relevant to the ongoing violence at USP Beaumont, and may provide mitigating context to the death of Mr. Brown. |
| 22. Any and all reports, statements, memoranda, correspondence, meeting notes, or any other documents, including after action reports or board of inquiry reports, as well as all 583s and "shots", related to weapons possession at USP Beaumont between and including January 1, 1996 and December 31, 2006. | This evidence is relevant to the ongoing violence at USP Beaumont, and may provide mitigating context to the death of Mr. Brown. |
| 23. Any and all complaints, grievances, and other documents regarding USP Beaumont filed by any employees' union or other group of organized labor, with any level of the Federal Bureau of Prisons, between and including January 1, 1996, and December 31, 2006. | This evidence will provide information concerning whether staffing at USP Beaumont was appropriate, as well as evidence concerning the ongoing violence at USP Beaumont, which may provide mitigating context to the death of Mr. Brown. |
| 24. Logbooks and any other records recording inmate and staff movements within USP Beaumont on December 16, 1999. | This evidence will provide investigative leads concerning correctional officers on duty on the day of the attack, which may provide mitigating context to the death of Mr. Brown. |
| 25. Any and all reports, statements, memoranda, correspondence, meeting notes, or any other documents, related to the reclassification of USP Beaumont from a high- to a medium-security FCC institution in 2008. | This evidence is relevant to the ongoing violence at USP Beaumont, and may provide mitigating context to the death of Mr. Brown. |
| 26. Logbooks and any other records recording inmate and staff movements within USP Beaumont on February 24, 2000. | Evidence of Mr. Jackson's statements concerning inmate Harold "Pop" Jones in the Special Housing Unit ("SHU") on February 24, 2000 was used to suggest |

| | guilt at trial.  This would confirm who was working at the prison that day. |
|---|---|
| 27. Logbooks and any other records recording inmate and staff movements within the Special Housing Unit at USP Beaumont during the week of February 20 through February 26, 2000. | This evidence would confirm who was in the SHU during the timeframe when Mr. Jackson's purported comments concerning Harold Jones allegedly occurred. |
| 28. All available files and records concerning BOP employees Nick Pasao, Scott Wilson, Michael Mattes, Kelvin Tims, David Kappaeris, Danny Wilhite, Gary Vann, Stephen Rice, Jason Marten, Joel Rogalsky, Raymond Chopane, and Larry Devereaux, during the period when any and all such individuals were working at USP Beaumont. | These BOP employees testified at trial, and may contain impeachment evidence.  Our review shows that such files were not obtained by Mr. Jackson's trial counsel. |

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Mr. Jackson respectfully requests that this Court grant leave for counsel to propound a *subpoena duces tecum* compelling the production by the Bureau of Prisons of the materials enumerated in the April 13, 2010 and May 19, 2010 letters by no later than September 15, 2010.

Dated:  August 19, 2010                                    RESPECTFULLY SUBMITTED,


/s/ STEVEN J. OLSON                     _          /s/ JAMES C. LOHMAN                       _
STEVEN J. OLSON (Cal Bar #182240)          JAMES C. LOHMAN (Fl Bar #0570214)
STEVEN H. BERGMAN (Cal Bar #180542)        1806 East 39th Street
O'MELVENY & MYERS LLP                      Austin, TX 78722
400 S. Hope St.                            Attorneys for Defendant/Petitioner
Los Angeles, CA 90071                      DAVID LEE JACKSON

9