UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| DAVID LEE JACKSON,<br>　　　*Petitioner,* | ) | |
| | ) | |
| | ) | |
| 　　　v. | ) | CASE NO. 1:09CV-01039-RC |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA,<br>　　　*Respondent.* | ) | |
| | ) | |

---

**PETITION FOR COLLATERAL RELIEF**

**FILED UNDER SEAL**

**REDACTED VERSION**

---

i

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT AND SUMMARY OF PETITION..........................................1

    A.   Introduction.........................................................................................................1

    B.   David Jackson ....................................................................................................5

    C.   Mr. Jackson's Capital Trial................................................................................8

       1.   The Extraordinary Chronology of the Charging Decision, Including Mr. Jackson's Release from Prison Without Being Prosecuted *at all* for the Death of Daryl Brown...........................................................................................................8

       2.   The Guilt Phase Trial ...............................................................................9

       3.   The Penalty Phase Trial .........................................................................11

       4.   New Exculpatory and Mitigating Evidence that Would Have Resulted in Different Guilt-Innocence and Penalty Phase Outcomes.......................................................13

       5.   Appeal ....................................................................................................16

    D.   Jurisdiction.......................................................................................................17

II. CLAIMS FOR RELIEF ...............................................................................................17

CLAIM 1  THE DEATH SENTENCE IMPOSED ON MR. JACKSON VIOLATES  THE FEDERAL DEATH PENALTY ACT, THE RULE OF LENITY  AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.....................................................17

    A.   Basic Principles of Statutory Interpretation Require that a Previous Conviction Occur Prior to the Underlying Offense.................................................................20

    B.   Allowing a Previous Conviction to Occur Any Time Prior to Sentencing Would Render the Statute, and Mr. Jackson's Conviction Thereunder, Unconstitutional............22

       1.   Failure to Satisfy the Retributive or Deterrent Justifications for Capital Punishment............................................................................................................23

       2.   Failure to Justify Reasonably the Imposition of the Death Penalty..............................24

       3.   *Ex Post* Expansion of Liability Under the FDPA .........................................................25

    C.   Trial And Appellate Counsel Were Ineffective In Failing To Raise The Unconstitutionality Of Capitally Charging Mr. Jackson By Relying On An Aggravating Factor Based On An Offense That Occurred More Than Four Years After The Alleged Capital Homicide ...............................................................................27

CLAIM 2  MR. JACKSON IS INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA,* AND TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO RAISE *ATKINS* AS A DEFENSE ON HIS BEHALF,  IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS...............28

    D.   Mr. Jackson Meets The Criteria for Mental Retardation/ Intellectual Disability and

He is Ineligible for The Death Penalty ..................................................................29

1.    Significantly Sub Average Intellectual Functioning......................................31

2.    Limitations in Adaptive Functioning in at Least Two Areas........................34

a.    Evidence of Adaptive Deficits Prior to the Age of 18...............................34
b.    Functional Academics................................................................................36
c.    Language/Communication..........................................................................37
d.    Social/Interpersonal Skills ........................................................................38
e.    Self-Direction..............................................................................................39
f.    Use of Community Resources ...................................................................42
g.    Self-Care ....................................................................................................43
h.    Work ...........................................................................................................44
3.    Onset Prior to the Age of 18 .............................................................................44

4.    The Findings of Dr. Victoria Swanson, Expert in Mental Retardation/Intellectual Disability..............................................................................................................44

E.    Trial Counsel Unreasonably Failed To Establish Mr. Jackson's  Ineligibility For The Death Penalty On The Basis Of *Atkins*...............................................45

1.    Pretrial - Dr. Milam's Evaluation and Assessment.......................................45

2.    Trial -- Dee Dee Halpin, Educational Consultant..........................................50

3.    Trial -- Kate Allen..............................................................................................52

F.    Mr. Jackson's Trial Counsel Were Ineffective In Failing To Prove His Mental Retardation And Ineligibility For The Death Penalty......................................54

CLAIM 3  MR. JACKSON WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE OF HIS MENTAL ILLNESS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS .....................................55

A.    Deficient Performance ...............................................................................................55

1.    Pretrial................................................................................................................55

a.    Dr. Milam....................................................................................................56
b.    Dr. Roberts.................................................................................................56
2.    Trial....................................................................................................................59

B.    Prejudice ......................................................................................................................63

CLAIM 4  MR. JACKSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE GUILT-INNOCENCE PHASE OF TRIAL ...............................................................................................83

A.    Failure to Thoroughly Investigate and Present Evidence of Self-Defense.......................84

B.   Failure to Develop Sudden Quarrel ..................................................................95

C.   Failure to Raise Imperfect Self-Defense...........................................................96

D.   Failure to Retain and Use Relevant Experts .....................................................98

E.   Failure to Seek Necessary Discovery from the Bureau of Prisons ....................99

F.   Failure to Cross Examine Offense Witnesses with Prior Inconsistent Statements.........100

G.   Failure to Prepare Defense Witnesses...............................................................102

H.   Counsel's Failure To Seek Discovery Of Daryl Brown's Personal Items, To Request Further Toxicology Results From Brown's Autopsy And To Cross Examine Trial Witnesses Concerning Their Knowledge Of These Important Potentially Exculpatory Matters. ..................................................................105

I.   Failure to Investigate Interference with the Testimony of Defense Witnesses ...............107

J.   Failure to Object to Improper Jury Instructions................................................110

   1.   Unbalanced Instructions.........................................................................110

   2.   Acquittal First Instruction ......................................................................111

K.   Failure to Disclose and Waive Conflict of Interest in Prior Representation of Shannon Agofsky.............................................................................................112

L.   Failure to Object to Improper Witness Testimony and Improper Closing Arguments During the Guilt Phase.................................................................................113

M.   Prejudice .........................................................................................................115

CLAIM 5   MR. JACKSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND THE FIFTH, SIXTH AND EIGHTH AMENDMENTS OF THE CONSTITUTION AT THE PENALTY PHASE OF TRIAL...............................................................................116

A.   Mr. Jackson's Lawyers' Penalty Phase Performance Was Objectively Unreasonable ...116

   1.   The Mitigation Case Put On By Trial Counsel.........................................119

      a.   Pam Morrison.................................................................................121
      b.   Dee Dee Halpin..............................................................................121
      c.   Kate Allen .....................................................................................122
      d.   Dr. Elizabeth Pelz .........................................................................123
      e.   David Jackson ...............................................................................123

   2.   The Mitigation Case Trial Counsel Failed to Present................................124

      a.   Mr. Jackson's Siblings and Cousins Never Testified ...........................124
      b.   Trial Counsel Only Called One Witness Who Knew Mr. Jackson Before His Capital Murder Charge ........................................................125

   3.   Trial Counsel's Failures Prejudiced the Outcome of Mr. Jackson's Capital

Sentencing...........................................................................................................127

4.  Mitigating Factors That Effective Counsel Would Have Presented............................128

    a.  Mr. Jackson's Developmental Delays and Intellectual Disabilities.......................129
    b.  Mr. Jackson's Other Signs and Symptoms of Mental Illness ...............................136
    c.  Mr. Jackson's Inability to Succeed in School........................................................137
    d.  Exposure to Crime, Addiction, and Sex at a Tender Age......................................138
    e.  The Jackson Family's Multigenerational History of Poverty and Trauma.............143
    f.  The Impact of Multigenerational Poverty and Trauma on Mr. Jackson and the Other Jackson Children...........................................................................................153
    g.  Neglect ..................................................................................................................160
    h.  Mr. Jackson's Likely Exposure to Neurotoxins.....................................................161
    i.  The True Extent of Leroy Jackson's Abuse of His Wife, David, and His Other Children...................................................................................................................161
    j.  Mrs. Jackson's Participation in Abusing and Neglecting Mr. Jackson and the Other Children and Evidence of Her Own Mental and Intellectual Limitations ....170
    k.  Mr. Jackson's Positive Character Traits ................................................................173
    l.  Mr. Jackson's Remorse  for Daryl Brown's Death.................................................174
5.  Trial Counsel's Failure to Proffer This Mitigating Evidence Prejudiced Mr. Jackson...............................................................................................................................175

B.  Failure to Depose Sammie Lee Jackson ..........................................................................178

C.  Failure to Properly Investigate The Mitigation Case.......................................................182

D.  Trial Counsel's Presentation of Mr. Jackson as a Witness at the Penalty Phase was Unreasonable and Prejudicial. ........................................................................................183

E.  Failure to Fully Investigate the Harold "Pop" Jone Allegation ......................................191

F.  Failure To Call a Prison Expert, and to Meaningfully Investigate and Put on Evidence Related to Violence at USP Beaumont .............................................................194

G.  Trial Counsel Were Ineffective For Failing To Explain The Significance of Mitigation Questions Posited To The Jury On the Special Verdict Form and For Failing To Object to An Improper Jury Charge on Mitigation.......................................197

    1.  Trial Counsel Failed to Explain the Significance of Mitigation Factors on the Special Verdict Form.....................................................................................................198

    2.  The Special Verdict Form Resulted In An Improper Charge to the Jury ....................199

H.  Trial Counsel Was Ineffective For Failing to Object To Improper Jury Instructions at the Penalty Phase .......................................................................................................200

    1.  Aggravating Factors Must Outweigh Mitigating Factors Beyond A Reasonable Doubt...........................................................................................................................200

    2.  The Two-Step Mitigation Finding Process..................................................................201

3.    Jury is Never Required to Impose Death ...................................................................202

4.    "May" vs. "Must" ...................................................................................................203

5.    Mitigating Factor is Different from Affirmative Defense .........................................203

6.    Discrepancy Between Verdict Form and Instructions re: Individual Findings on Mitigation...................................................................................................................203

7.    Death Sentence "Justified" ......................................................................................204

8.    Multiple Errors With the Jury Instructions Prejudiced Mr. Jackson .........................204

I.    Trial Counsel Was Ineffective In Failing To Investigate and Meaningfully Challenge Mr. Jackson's Involvement In The 2004 Ohio Robbery ...............................204

1.    Failure to Investigate the Circumstances of the Robbery ..........................................205

2.    Failure to Meaningfully Challenge Ms. Laub's Uncorroborated Eyewitness Identification ...........................................................................................................207

J.    Trial Counsel Were Ineffective In Failing To Adequately Prepare For And Argue Mr. Jackson's Case Before The Attorney General's Review Committee On Capital Cases ......................................................................................................................208

1.    Deficient Performance ..............................................................................................208

2.    Trial Counsel's Failure to Prepare Was Prejudicial, As Mr. Jackson Was Deprived of an Opportunity to Avoid Having the Government Seek the Death Penalty Against Him..............................................................................................................210

K.    Trial Counsel Unreasonably Neglected to Make Use of the Fact that Daryl Brown's Mother was Opposed to Sentencing Mr. Jackson to Death ...........................................211

L.    Trial Counsel were Ineffective in their Closing Argument at the Penalty Phase ............212

M.    Mr. Jackson Was Denied His Right To The Effective Assistance Of Counsel By His Attorneys' Failure To Object To Grossly Improper Closing Argument At The Penalty Phase In Violation Of His Rights Under The Fifth, Sixth And Eighth Amendments ..............................................................................................................215

1.    Arguing Matters Not in Evidence and Misstating the Evidence..................................215

2.    Misstating the Law...................................................................................................218

3.    Injecting the Prosecutor's Own Opinion about Witness Credibility ..........................219

4.    Suggesting the Jury will Bear Responsibility for Future Acts of Violence.................220

5.    Urging the Jury to Disregard or Ignore Legitimate Mitigating Evidence....................221

Claim 6  MR. JACKSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEYS' UNREASONABLE ERRORS AND OMISSONS IN SELECTING HIS CAPITAL JURY, IN VIOLATION OF HIS

     RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.............223

A. Failure To Object to the Government's Racially Discriminatory Excusal of Minority Jurors.....................................................................................................223

 1. Prima Facie Evidence of Discrimination ....................................................224

 2. Trial Counsel's Failure to Object Prejudiced Mr. Jackson ........................226

B. Trial Counsel Failed to Identify and Exclude Mitigation-Impaired Jurors......................226

C. Mr. Jackson's Appellate Counsel Was Ineffective For Failing to Raise Voir Dire Issues...................................................................................................................229

CLAIM 7 MR. JACKSON WAS DENIED HIS CONSTITUTIONAL RIGHT  TO BE PRESENT DURING ALL PHASES OF JURY SELECTION,  AND TRIAL AND APPELLATE COUNSEL FAILED  UNREASONABLY TO EFFECTUATE THAT RIGHT.................................................................................229

A. Mr. Jackson was Denied his Constitutional Right to Be Present During the Exercise of Peremptory Strikes, in Violation of the Fifth, Sixth, and Eighth Amendments..........229

 1. The Peremptory Strike Procedure...............................................................230

 2. Mr. Jackson's Objection and the Trial Court's Response............................231

B. Trial and Appellate Counsel's Failure to Object to the Denial of Mr. Jackson's Right to Presence Constituted Ineffective Assistance Of Counsel .................................235

 1. Deficient Performance .................................................................................235

 2. Prejudice ......................................................................................................236

Claim 8 MR. JACKSON HAS BEEN SENTENCED TO DEATH, ULTIMATELY, FOR BANK ROBBERY IN VIOLATION OF THE fifth and  EIGHTH AMENDMENTs................................................................................................237

A. Mr. Jackson Has Been Sentenced To Death For Bank Robbery .................................237

 1. The Government Released Mr. Jackson From Prison Without Charging Him For the Murder of Daryl Brown ...........................................................................238

 2. The Government Reverses Course and Indicts Mr. Jackson for Murder.....................238

B. A Death Sentence for Bank Robbery Violates the Fifth and Eighth Amendments.........240

C. The Decision to Capitally Charge Mr. Jackson was Arbitrary and Capricious in Violation of the Fifth and Eighth Amendments.................................................241

CLAIM 9 MR. JACKSON'S DUE PROCESS RIGHTS WERE VIOLATED BY THE GOVERNMENT'S USE OF FALSE TESTIMONY TO CONVICT HIM AND SENTENCE HIM TO DEATH IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.................................................................243

A. Prosecutorial Misconduct - Sponsoring False Testimony of Raymond Chopane ..........243

B.   Mr. Jackson's Conviction And Sentence Were Tainted By False Testimony Elicited By The Prosecution in Violation of The Fifth, Sixth and Eighth Amendments ..............252

Claim 10  THE GOVERNMENT WITHHELD EXCULPATORY EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS ..............257

A.   Withholding Material Evidence ..................................................................................257

1.   The Yard Video ...................................................................................................257

2.   51 Pieces of Evidence ........................................................................................259

B.   The *Brady v. Maryland* Line of Cases ........................................................................260

C.   Brady Materials Likely Remain Outstanding ...............................................................261

Claim 11  mr. jackson's due process rights were  violated by Prosecutorial Misconduct ...........262

A.   Improper Statements During Closing Arguments - Guilt Phase ..............................................262

B.   Improper Statements During Closing Argument - Penalty Phase ................................262

CLAIM 12  MR. JACKSON'S RIGHT TO A FAIR TRIAL WAS INFRINGED Upon BY JUROR MISCONDUCT IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS ..............................................................................263

A.   Several of The Jurors Who Sat in Judgment of Mr. Jackson Failed to Disclose Important Information, Violating Mr. Jackson's Right to a Fair Trial under the Fifth, Sixth, and Eighth Amendments to the Constitution ..............................................263

1.   Factual Background .............................................................................................263

a.   Clara Shaffer ................................................................................................264
b.   Carolyn Wilkinson ........................................................................................265
2.   Mr. Jackson Had A Right To A Fair And Impartial Jury. ..........................................265

3.   The Eighth Amendment's Mandate of Heightened Reliability Prohibits Upholding a Death Sentence Rendered By These Jurors. ....................................267

4.   The Jurors' Misconduct Requires Reversal of Mr. Jackson's Conviction And Sentence. ............................................................................................................268

B.   The Introduction Of Extraneous Evidence Or Information Into The Jury's Punishment-Phase Deliberations Violated Mr. Jackson's Rights Under The First, Fifth, Sixth, And Eighth Amendments ........................................................................269

1.   Improper influence from Media and Family/Friends .................................................270

2.   Improper Extraneous Evidence .............................................................................271

3.   Use of Religion ...................................................................................................272

CLAIM 13  MR. JACKSON WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL BY HIS APPELLATE ATTORNEYS' FAILURE TO RAISE MERITORIOUS CLAIMS ON

APPEAL, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS .............................................................................275

A.    Mr. Jackson's Appellate Counsel Were Ineffective For Not Appealing The Government's Violation of Mr. Jackson's Rights to Due Process and a Speedy Trial ...275

1.    Mr. Jackson's Prior Counsel Were Ineffective For Not Raising This Issue on Appeal ..............................................................................................................276

2.    Elements of a Speedy Trial Claim Based on Pre-Indictment Delay ............................276

3.    The Government's Pre-Indictment Delay Prejudiced Mr. Jackson .............................277

B.    The Failure To Raise As Fundamental Error Prosecutorial Misconduct In The Government's Closing Argument At The Penalty Phase. ...............................................279

CLAIM 14  MR. JACKSON WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BECAUSE THE FEDERAL DEATH PENALTY, AS ADMINISTERED, IS DISPROPORTATELY AND UNCONSTITUTIONALLY APPLIED ACCORDING TO THE RACE OF THE DEFENDANT, AND TRIAL AND APPELLATE COUNSEL MADE NO OBJECTION BASED ON THIS FACT ..................................................................280

A.    Use of the Federal Death Penalty is Biased Against Minority Defendants ....................280

B.    Mr. Jackson's Counsel Was Ineffective For Failing to Litigate the Influence of Racial Bias in These Proceedings ...................................................................................281

III. CONCLUSION/PRAYER FOR RELIEF...............................................................................282

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Allen v. United States*,
164 U.S. 492 (1896).................................................................................................91

*Apprendi v. New Jersey*,
530 U.S. 466 (2000).............................................................................................. 192

*Arizona v. Fulminante*,
499 U.S. 279 (1991)........................................................................................ 255, 258

*Atkins v. Virginia*,
536 U.S. 304 (2002)................................................................................ 3, 28, 55, 126

*Barclay v. Florida*,
463 U.S. 939 (1983)............................................................................................... 257

*Bates v. Bell*,
402 F.3d 635 (6th Cir. 2005) ......................................................................... 210, 211

*Batson v. Kentucky*,
476 U.S. 79 (1986)......................................................................................... 214, 222

*Beck v. Alabama*,
447 U.S. 625 (1980)............................................................................................... 257

*Berger v. United States*,
295 U.S. 78 (1935)....................................................................... 206, 210, 252, 268

*Bifulco v. United States*,
447 U.S. 381 (1980)........................................................................................... 17, 26

*Blakely v. Washington*,
542 U.S. 296 (2004)............................................................................................... 192

*Bouie v. City of Columbia*,
378 U.S. 347 (1964)................................................................................................. 25

*Boyde v. California*,
494 U.S. 370 (1990)............................................................................................... 190

*Brady v. Maryland*,
363 U.S. 83 (1963).......................................................................... 248, 249, 250

*Brown v. United States*,
256 U.S. 335 (1921)................................................................................................. 80

*Burton v. Johnson*,
948 F.2d 1150 (10th Cir. 1991) ............................................................................. 256

*Butler v. Quarterman*,
576 F. Supp. 2d 805 (S.D. Tex. 2008) .................................................................... 32

*Cargle v. Mullin*,
317 F.3d 1196 (10th Cir. 2003) ............................................................................. 109

*Carruthers v. State*,

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

528 S.E.2d 217 (Ga. 2000)........................................................................... 261

*Chandler v. Epps*,
2010 WL 1979673 (N.D. Miss. 2010) ............................................................ 92

*Cohen v. Senkowski*,
290 F.3d 485 (2d Cir. 2002)................................................................... 223, 224

*Cummings v. Polk*,
No. 5:01-HC-910-BO, 2006 WL 4007531 (E.D.N.C. Jan. 31, 2006) .................................. 32

*Cunningham v. California*,
549 U.S. 270 (2007)................................................................................ 192

*Darden v. Wainwright*,
477 U.S. 168 (1986)................................................................................ 109

*DePew v. Anderson*,
311 F.3d 742 (6th Cir. 2002) ...................................................................... 212

*Driscoll v. Delo*,
71 F.3d 701 (8th Cir.1996) ......................................................................... 96

*Duncan v. Louisiana*,
391 U.S. 145 (1968)................................................................................ 226

*Duncan v. Walker*,
533 U.S. 167 (2001)................................................................................. 20

*Dyer v. Calderon*,
151 F.3d 970 (9th Cir.) .............................................................. 255, 256, 258

*Eddings v. Oklahoma*,
436 U.S. 921(1978)........................................... 60, 61, 190, 211, 219, 257

*Edmonson v. Leesville Concrete Co.*,
500 U.S. 614 (1991)................................................................................ 263

*Faretta v. California*,
422 U.S. 806 (1975)................................................................................ 226

*Farmer v. Brennan*,
114 S. Ct. 1970 (1994).............................................................................. 93

*Furman v. Georgia*,
408 U.S. 238 (1972)................................................................................ 232

*Giglio v. United States*,
405 U.S. 150 (1972)................................................................................ 235

*Glover v. United States*,
531 U.S. 198 (2001)................................................................... 27, 28, 202

*Gov't of the Virgin Islands v. Forte*,
865 F.2d 59 (3d. Cir. 1989)........................................................................ 216

*Gray v. Mississippi*,

**TABLE OF AUTHORITIES**
(continued)

**Page**

481 U.S. 658 (1987)................................................................255, 258

*Green v. Johnson*,
No. CIVA 2:05CV340, 2006 WL 3746138 (E.D. Va. Dec. 15, 2006)................................32

*Gregg v. Georgia*,
428 U.S. 153 (1976)..............................................................................232

*Harris v. Artuz*,
288 F.Supp.2d 247 (E.D.N.Y. 2003) ...................................................96

*Harris v. Reed*,
894 F.2d 871 (7th Cir. 1990) ...............................................................97

*Holladay v. Allen*,
555 F.3d 1346 (11th Cir. 2009) ...........................................................32

*Illinois v. Allen*,
397 U.S. 337 (1970)............................................................................220

*In Re Hicks*,
375 F. 3d 1237 (11th Cir. 2004) .........................................................32

*In Re Salazar*,
443 F.3d 430 (5th Cir. 2006) ..............................................................32

*Jackson v. United States*,
130 S. Ct. 51 (2009).............................................................................16

*Jeffries v. Wood*,
114 F.3d 1484 (9th Cir. 1997) ...........................................................259

*Kennedy v. Louisiana*,
128 S. Ct. 2641 (2008)..................................... 17, 19, 23, 228, 230, 231

*Kimmelman v. Morrison*,
477 U.S. 365 (1986)..............................................................................27

*Le v. Mullin*,
311 F.3d 1002 (10th Cir. 2002) .........................................................212

*Lockett* v. *Ohio*,
438 U. S. 586 (1978)..................................................................... 61, 211

*McCoy v. Goldston*,
652 F.2d 654 (6th Cir. 1981) .............................................................256

*McDonough Power Equipment, Inc. v. Greenwood*,
464 U.S. 548 (1984)............................................................................255

*McGill v. Duckworth*,
944 F.2d 344 (7th Cir 1991) ................................................................93

*Middleton v. McNeil*,
541 U.S. 433 (2004)........................................................................10, 92

*Miller v. Lockhart*,

**TABLE OF AUTHORITIES**
(continued)

**Page**

65 F.3d 676 (8th Cir. 1995) ............................................................................... 208

*Mitchell v. Rendell,*
2008 WL 5411068 (M.D. Pa Dec. 29, 2008) ...................................................... 187

*Moore v. Marr*,
254 F.3d 1235 (10th Cir.2001) ........................................................................... 96

*Morgan v. Illinois*,
504 U.S. 719 (1992) .............................................................................. 217, 218

*Napue v. Illinois*,
360 U.S. 264 (1959) ...................................................................... 240, 242, 246

*Near v. Cunningham*,
313 F.2d 929 (4th Cir. 1963) ............................................................................ 224

*Nixon v. Newsome*,
888 F.2d 112 (11th Cir. 1989) ............................................................................ 97

*Oliver v. Quarterman*,
541 F.3d 329 (5th Cir. 2008) ............................................................................ 262

*Paulina v. Castro*,
371 F.3d 1083 (9th Cir. 2004) .......................................................................... 216

*Penry v. Johnson*,
532 U.S. 782 (2001) .......................................................................................... 211

*Penry* v. *Lynaugh,*
492 U. S. 302 (1989) .................................................................................. 61, 111

*Perez v. United States*,
297 F.2d 12 (5th Cir. 1961) .............................................................................. 104

*Porter v. McCollum*,
130 S. Ct. 447 (2009) ........................................................................................ 110

*Riley v. Jeffes,*
777 F.2d 143 (3d Cir. 1985) ............................................................................. 187

*Ring v. Arizona,*
536 U.S. 584 (2002) .......................................................................................... 192

*Rivera v. Dretke,*
No. Civ. B-03-139, 2006 WL 870927 (S.D. Tex. Mar. 31, 2006) ....................... 32

*Rogers v. McMullen*,
673 F.2d 1185 (11th Cir. 1982) ....................................................................... 256

*Romine v. Head*,
253 F.3d 1349 (11th Cir. 2001) ....................................................................... 261

*Rompilla v. Beard*,
545 U.S. 374 (2005) .......................................................................................... 197

*Sandoval v. Calderon*,

**TABLE OF AUTHORITIES**
(continued)

Page

241 F.3d 765 (9th Cir. 2000) ............................................................................ 261

*Sears v. Upton*,
561 U.S. 130 S. Ct. 3259 (2010) ........................................................................ 61

*Sechrest v. Ignacio*,
549 F.3d 789 (9th Cir. 2008) ........................................................................... 211

*Sinisterra v. United States*,
600 F.3d 900 (8th Cir. 2010) ........................................................................... 212

*Skilling v. United States*,
130 S. Ct. 2896 (2010) ..................................................................................... 22

*Skipper v. South Carolina*,
476 U.S. 1 (1986) ............................................................................................ 211

*Smith v. Phillips*,
455 U.S. 209 (1982) ........................................................................................ 259

*Snyder v. Com. of Mass.*,
291 U.S. 97 (1934) .......................................................................................... 226

*Snyder v. Louisiana*,
552 U.S. 472 (2008) ........................................................................................ 216

*Sparman v. Edwards*,
26 F.Supp.2d 450 (E.D.N.Y.1997) ................................................................... 96

*Stephens v. Zant*,
462 U.S. 862 (1982) ........................................................................................ 257

*Strickland v. Washington*,
466 U.S. 668 (1984) ......................................................... 3, 27, 28, 29, 89, 200

*Swann v. United States*,
648 A.2d 928 (D.C. Cir. 1994) .......................................................................... 92

*Tenn. Secondary School Athletic Ass'n v. Brentwood Acad.*,
127 S. Ct. 2489 (2007) .................................................................................... 263

*Thomas v. Allen*,
614 F. Supp. 2d 1257 (N.D. Ala. 2009) ............................................................. 32

*Thompson v. Cain*,
161 F.3d 802 (5th Cir. 1998) .......................................................................... 241

*Tucker v. Kemp*,
762 F.2d 1496 (11th Cir. 1985) (*en banc*) ...................................................... 211

*United States v. Agofsky*,
8 F.3d 369 (5th Cir. 2006) .............................................................................. 107

*United States v. Agurs*,
427 U.S. 97 (1976) .................................................................................. 240, 250

*United States v. Anderson*,

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

201 F.3d 1145 (9th Cir. 2000) ....................................................................... 92

*United States v. Angel*,
   355 F.3d 462 (6th Cir. 2004) ..................................................................... 216

*United States v. Arzell Gulley*,
   Tr. 1233 (Ex. 49) ......................................................................................... 81

*United States v. Bagley*,
   473 U.S. 667 (1985) ................................................................................... 250

*United States v. Bascaro*,
   742 F.2d 1335 (11th Cir. 1984) ................................................................. 223

*United States v. Bishawi*,
   272 F.3d 458 (7th Cir. 2001) ............................................................. 260, 261

*United States v. Blackburn*,
   9 F.3d 353 (5th Cir. 1993) ......................................................................... 241

*United States v. Blakely*,
   14 F.3d 1557 (11th Cir. 1994) ................................................................... 208

*United States v. Boney*,
   977 F.2d 624 (D.C. Cir. 1992) ................................................................... 255

*United States v. Brownlee*,
   454 F.3d 131 (3d Cir. 2006) ...................................................................... 199

*United States v. Buitrago*,
   919 F.2d 348 (5th Cir. 1990) ............................................................... 17, 26

*United States v. Carroll*,
   678 F.2d 1208 (5th Cir. 1982) ................................................................... 209

*United States v. Chrisco*,
   493 F.2d 232 (8th Cir. 1974) ............................................. 223, 224, 225, 227

*United States v. Colombo*,
   869 F.2d 149 (2d Cir. 1989) ...................................................................... 256

*United States v. Crouch*,
   84 F.3d 1497 (5th Cir. 1996) ..................................................................... 266

*United States v. Crutcher*,
   405 F.2d 239 (2d Cir. 1968) ............................................................... 225, 227

*United States v. Davis*,
   611 F. Supp. 2d 472 (D. Md. 2009) ............................................................. 32

*United States v. Delaney*,
   732 F.2d 639 (8th Cir. 1984) ..................................................................... 259

*United States v. Fell*,
   372 F.Supp.2d 766 (D. Vt. 2005) ............................................................... 219

*United States v. Fields*,

vi

**TABLE OF AUTHORITIES**
(continued)

**Page**

483 F.3d 313 (5th Cir. 2007) .................................................................... 192

*United States v. Gaffney*,
676 F. Supp. 1544 (M.D. Fla. 1987)......................................................259, 260

*United States v. Gagnon*,
470 U.S. 522 (1985).............................................................................. 220

*United States v. Gonzales*,
121 F.3d 928 (5th Cir. 1997) .................................................................... 258

*United States v. Guerrero*,
546 F.3d 328 (5th Cir. 2008) .................................................................... 106

*United States v. Haynes*,
143 F.3d 1089 (7th Cir. 1998) .................................................................... 82

*United States v. Higgs*,
353 F.3d 281 (4th Cir. 2003) ..................................................................... 18

*United States v. Jackson*,
549 F.3d 963 (5th Cir. 2008) ..................................................... 16, 105, 265

*United States v. Jernigan*,
492 F.3d 1050 (9th Cir. 2007) ................................................................... 199

*United States v. Johnson*,
366 F.Supp.2d 822 (N.D. Iowa 2005)........................................................ 219

*United States v. Jones*,
527 U.S. 373 (1999)........................................................................ 194, 263

*United States v. Kimbrel*,
532 F.3d 461 (6th Cir. 2008) .................................................................... 216

*United States v. Lewis*,
492 F.3d 1219 (11th Cir. 2007) ................................................................. 223

*United States v. Littrell*,
478 F. Supp. 2d 1179 (C.D. Cal. 2007) ...................................................... 232

*United States v. Loud Hawk*,
474 U.S. 302 (1986)............................................................................... 266

*United States v. Milk*,
447 F.3d 593 (8th Cir. 2006) ..................................................................... 92

*United States v. Molina*,
934 F.2d 1440 (9th Cir. 1991) .................................................................. 208

*United States v. Molina-Guevara*,
96 F.3d 698 (3d Cir. 1996)....................................................................... 209

*United States v. Murrah*,
888 F.2d 24 (5th Cir. 1989) ..................................................................... 209

*United States v. Ortiz*,

**TABLE OF AUTHORITIES**
(continued)

**Page**

315 F.3d 873 (8th Cir. 2002) ........................................................................ 217

*United States v. Parker*,
566 F.2d 1304 (5th Cir. 1978) ...................................................................... 104

*United States v. Perkins*,
748 F.2d 1519 (11th Cir. 1984) .................................................................... 256

*United States v. Pressley*,
359 F.3d 347 (4th Cir. 2004) .......................................................................... 20

*United States v. Rattenni*,
480 F.2d 195 (2d Cir. 1973).......................................................................... 259

*United States v. Rodriguez*,
581 F.3d 775 (8th Cir. 2009) ........................................................................ 211

*United States v. Sampson,*
335 F. Supp. 2d  166 (E.D. Mass.)................................................................. 57

*United States v. Scott*,
854 F.2d 697 (5th Cir. 1988) ........................................................................ 256

*United States v. Shields*,
2009 WL 1353722 (N.D. Ala. 2009) .............................................................. 32

*United States v. Smith*,
10 F. Supp. 2d 578 (E.D. Va. 1998) ............................................................... 19

*United States v. Soto Hernandez*,
849 F.2d 1325 (10th Cir.1988) .................................................................... 106

*United States v. Stitt,*
No. 2:98-cr-47 (E.D. Va., April 1, 2005)........................................................ 57

*United States v. Talley*,
16 F.3d 972 (8th Cir. 1994) ............................................................................ 21

*United States v. Taylor*,
320 F. Supp. 2d 790 (N.D. Ind. 2004) ........................................................... 57

*United States v. Thomas*,
463 F.2d 1061 (7th Cir. 1972) ...................................................................... 260

*United States v. Tsanas,*
572 F.2d 340 (2d Cir. 1978).......................................................................... 105

*United States v. Young*,
464 F.2d 160 (5th Cir. 1972) ................................................................. 104, 210

*Vergara v. State*,
657 S.E.2d 863 (Ga. 2008)............................................................................ 262

*Vernonia School Dist. 47J v. Acton*,
515 U.S. 646 (1995)...................................................................................... 263

*Wainwright v. Witt*,

**TABLE OF AUTHORITIES**
(continued)

**Page**

469 U.S. 412 (1985) ................................................................. 218

*Walker v. True*,
399 F.3d 315 (4th Cir. 2005) ...................................................... 32, 45

*Walton v. Johnson*,
407 F.3d 285 (4thCir. 2005) ......................................................... 32

*Weaver v. Bowersox*,
438 F.3d 832 (8th Cir. 2006) ................................................... 108, 109, 211, 251

*Whalen v. U.S.*,
445 U.S. 684 (1980) .................................................................. 26

*Wiggins v. Smith*,
539 U.S. 510 (2003) ....................................... 5, 12, 53, 61, 79, 111, 118, 198

*Wiley v. Epps*,
668 F. Supp. 2d 848 (N.D. Miss. 2009) ............................................... 32

*Williams v. Campbell*,
No. 04-0681-WS-C, 2007 WL 1098516 (S.D. Ala. Apr. 11, 2007) ...................................... 32

*Williams v. Oklahoma*,
358 U.S. 576 (1959) .................................................................. 25

*Williams v. Taylor*,
529 U.S. 362 (2000) ............................................. 27, 53, 61, 79, 110, 112

*Witte v. United States*,
515 U.S. 389 (1995) ............................................................... 25, 26

*Wood v. Georgia*,
450 U.S. 261 (1981) ................................................................ 106

*Woods v. Dugger*,
923 F.2d 1454 (11th Cir.), *cert. denied*, 502 U.S. 953 (1991) ........................................ 257

*Zant v. Stephens*,
462 U.S. 862 (1983) ...................................... 17, 18, 22, 24, 230

**STATUTES**

18 U.S.C. § 3592(c) ................................................................. 17

18 U.S.C. § 3592(c)(2) ................................. 2, 17, 18, 19, 20, 22, 24, 25, 230

18 U.S.C. § 3593(e)(2) ............................................................... 17

18 U.S.C. § 921 ..................................................................... 17

18 U.S.C. § 924(e) .................................................................. 21

28 U.S.C. § 2255 ......................................................... 1, 16, 17, 26

**OTHER AUTHORITIES**

American Bar Association, *Guidelines for the Appointment and Performance of*

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Defense Counsel in Death Penalty Cases* ............................................................ 5, 27, 28, 111

*American Psychologist*, 58:778-790; Kanaya & Ceci ................................................................ 33

Anders Kaye, Dangerous Places: The Right to Self-Defense in Prison and Prison Conditions Jurisprudence, 63 U. Chi. L. Rev. 693, 695-696 (1996) ..................................... 93

*Beaumont Enterprise*, November 21, 2006 .............................................................................. 203

Becker, Kirk A., "History of the Stanford-Binet Intelligence Scales: Content and Psychometrics," in *Stanford-Binet Intelligence Scales, Fifth Edition: Assessment Service Bulletin Number 1*, Riverside Pub. (2003) at 2 ..................................... 31

Brandon Sample, *Violence on the Rise in BOP Facilities,* 20 PRISON LEGAL NEWS (Aug. 2009) ............................................................................................................... 10, 186

Bureau of Justice, *Census of State and Federal Correctional Facilities,* 2000 ........................ 186

Colbert I. King, *A Witness Pays the Price in Prison,* WASHINGTON POST May 21, 2005 ....................................................................................................................................... 187

Craig Haney, *On Mitigation as Counter-Narrative:  A Case Study of the Hidden Context of Prison Violence,* 77 UMKC L. REV. 911 .............................................................. 10

Edens, Colwell, Deforges and Fernandez, *The Impact of Mental Health Evidence on Support for Capital Punishment: Are Defendants Labeled Psychopathic Considered More Deserving of Death?*, (Ex. 62) Behav. Sci. Law 23:603-625 (2005) ........................................................................................................................................ 57

Federal Bureau of Prisons*, HOMICIDES -- FY1996 THRU 2009*, Received Aug. 24, 2009 ............................................................................................................................ 185, 186

Freedman, D., False Prediction of Future Dangerousness: Error Rates and the Psychopathy Checklist-Revised, 29 J. AM. ACAD. PSYCH. & L. 89, 92 (2001) .................... 57

Heather Ann Thompson, WHOSE DETROIT?: POLITICS LABOR, AND RACE IN A MODERN AMERICAN CITY, (Cornell University Press 2001) .............................................. 143

http://www.freep.com/article/20100516/NEWS01/100514031/Interactive-map-shows-lead-levels-in-Detroit-neighborhoods-over-time ...................................................... 154

*Intellectual Disability*: *Definition, Classification, and Systems of Supports* (AAIDD, 2010) (11th ed. Of AAIDD Definitional Manual) .................................... 29, 32, 49

James E. Robertson, The Constitution in Protective Custody: An Analysis of the Rights of Protective Custody Inmates, 56 U Cin. L. Rev. 91, 93-94 (1987) ........................ 93

Jody E. Frampton, *Can a Jury Believe My Eyes, and Should Courts Let Experts Tell Them Why Not: The Admissibility of Expert Testimony on Cross-Racial Eyewitness Identification in New York After People v. Young*, 27 PACE L. REV. 433, 436–438 (2007) ........................................................................................................ 199

John P. Rutledge, *They All Look Alike: The Inaccuracy of Cross-Racial Identifications*, 28 AM. J. CRIM. L. 207, 210 (2001) ............................................................ 199

*Journal of Psychoeducational Assessment,* 1-12, May 19 2010

**TABLE OF AUTHORITIES**
(continued)

Page

(http://www.iapsych.com/iqmr/fe/LinkedDocuments/kanaya2010.pdf) .............................. 33

Kanaya, T., Scullin, M.H., & Ceci, S.J. (2003) ........................................................... 33

Kevin M. Carlsmith, *The Roles of Retribution and Utility in Determining Punishment*, 42 J. Experimental Soc. Psych. 437 (2006) ...................................... 23

*Kyles v. Whitley*,
514 U.S. 419 (1995)................................................................................................... 250

McGrew, Kevin S., *Is the Flynn Effect a Scientifically Accepted Fact?*, Institute for Applied Psychometrics (June 30, 2010).......................................................... 32

*Mental Retardation: Definition, Classification and Systems of Supports* (9th ed. 1992) ......................................................................................................... 28, 29

*Michigan: Decline in Detroit*, TIME MAGAZINE Oct. 27, 1961........................................ 143, 144

Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause,* 83 Iowa L.Rev. 499, 525 (1998)................................... 264

Ryan Meyers, *Hardcore Cons Move Out*, BEAUMONT ENTERPRISE,  Apr. 6, 2008 available at Lexis ..................................................................................... 186

SA Marc D. Skinner, Investigation Report, Transcribed on May 9, 2005 (CNTRL00682)...................................................................................... 101, 247

Sanderford, D,  *The Sixth Amendment, Rule 606(B), And The Intrusion Into Jury Deliberations Of Religious Principles Of Decision*, 74 TENN. L. REV. 167 (2007) ....................................................................................................... 262

Terrence T. Egland, *Prejudiced by the Presence of God: Keeping Religious Material Out of Death Penalty Deliberations,* 16 Cap. Def. J. 337, 359-60 (2004) ....................................................................................................... 263

The American Association on Mental Retardation (Luckasson et al. 1992) ............................. 49

Thomas J. Sugrue, THE ORGINS OF THE URBAN CRISIS: RACE AND INEQUALITY I POSTWAR DETROIT, (Princeton University Press 2005) (1996) ......................................... 143

U.S. CONST. amend. VI ....................................................................................... 106

U.S. Department of Justice -- Office of Inspector, *The Federal Bureau of Prisons' Drug Interdiction Activities,* 2003 at 12, Table 6 ................................................. 186

U.S. Department of Justice, Federal Bureau of Prisons, United States Penitentiary Beaumont, *Memorandum for Ernest V. Chandler, Warden*, March 3, 2000....................... 249

United States Dept. of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000), (Sept. 12, 2000) at 28–35.............................................................. 270

*User's Guide* (Schalock et al., 2007) ............................................................... 31

USSG § 2K2.1 .................................................................................................... 21

USSG § 4B1.1..................................................................................................... 21

USSG § 4B1.2..................................................................................................... 21

## <u>PETITION FOR COLLATERAL RELIEF</u>

The Petitioner, David Lee Jackson, through counsel and pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing section 2255 Proceedings, requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. In making these requests, he asserts the following grounds:[1]

### I.
### <u>PRELIMINARY STATEMENT AND SUMMARY OF PETITION</u>

### A.  <u>Introduction</u>

In February 2004, the United States Government released Mr. Jackson from prison.  He had served fourteen years of a fifteen-year federal sentence—done his time, paid his debt—and was now free to return home, an unskilled ex-convict, to pick up the pieces of his life.  Hobbled by a history of abuse, addiction, and mental disability, Mr. Jackson proceeded to make a colossally bad decision:  Three months after his release, he robbed a bank, and again found himself committed to federal custody, this time until 2015.

If that were the extent of Mr. Jackson's story, it would be sadly familiar.  But the Government injected an extraordinary dimension to the case—a twist as constitutionally infirm as it is bizarre—and one that without the intervention of this Court will wrongly lead to Mr. Jackson's execution.

As soon as Mr. Jackson pleaded guilty to armed robbery, the Government charged him with capital murder.  This new allegation had nothing to do with the holdup; no shots were fired at the bank and nobody was injured.  Instead, it involved the stabbing of a fellow inmate at United States Penitentiary Beaumont ("USP Beaumont"), an

---

[1]    In accordance with Rule 2 of the rules governing Section 2255 proceedings, this Motion sets forth only the facts and claims entitling Petitioner to relief.  It does not contain full legal argument or citation.  Petitioner will shortly file a separate motion seeking permission to file a memorandum in support of the motion.

incident that occurred in 1999—four years *before* Mr. Jackson's release.  Setting aside for the moment the ample evidence that Mr. Jackson did not initiate the fatal encounter, consider that the Government had Mr. Jackson in custody, that the Government had all the time reasonably needed to investigate his actions, and if warranted hold him accountable, and yet the Government willingly granted Mr. Jackson his freedom without prosecuting him for the attack.  In short, the Government chose to seek society's severest punishment for Mr. Jackson *after* it had deemed him worthy of release into the general public.

To prove that Mr. Jackson was eligible for the death penalty, the Government asserted that he previously had committed a violent felony with a firearm, one of the statutory aggravators that must be proven before a defendant can be sentenced to die.  Because the Government appeared to make a mistake about Mr. Jackson's arrest record, this assertion transformed the Government's case against Mr. Jackson from one that was belated and arbitrary to one that was retroactively engineered.  Although the Government originally cited two aggravating offenses, one that occurred before and one that occurred after Daryl Brown died, the Government later realized that the aggravating offense that occurred before Daryl Brown's death did not involve a firearm.  Thus, the violent felony that the Government cited as the prior, aggravating offense was Mr. Jackson's bank robbery—an offense that occurred four years *after* the stabbing at USP Beaumont and *after* the Government released Mr. Jackson from prison without prosecuting him for the attack.  In other words, to "prove" that Mr. Jackson was eligible for death, the Government hinged its case on an after-the-fact crime, essentially back-dating Mr. Jackson's record by four years.  As such, in 2006, when a jury sitting in this district sentenced Mr. Jackson to death, they were voting to end his life for what amounted to a bank robbery.  Under 18 U.S.C. § 3592(c)(2), the statute the Government relied on, the aggravating offense must have been committed *before* the offense for which

2

the death penalty is sought.  Thus, as a matter of law, to say nothing of basic fairness and rationality, Mr. Jackson was not (and could not be) eligible for the death penalty.

Even if the chronology were different—if the Government had been able to file a capital case against Mr. Jackson without rearranging the order of the offenses—Mr. Jackson would still be ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002).  As set forth in *Atkins*, the Government is prohibited from imposing a death sentence on an intellectually disabled defendant, and Mr. Jackson, based on a multitude of assessments, meets the criteria for mental retardation.   Mr. Jackson's adaptive deficits, which have been verified by test scores, family testimony, and expert psychiatric evaluation, should have caused the jury to question the appropriateness of condemning someone with his impairments to die.  Unfortunately, the jury never learned the extent of Mr. Jackson's impairments.  Trial counsel failed to even put on an *Atkins* defense, relying on erroneous or improperly conducted assessments that left the false impression that Mr. Jackson fell short of the *Atkins* criteria.  To end the life of Mr. Jackson without an adequate inquiry into his mental disabilities would violate the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

Similarly, Mr. Jackson was convicted and condemned to death not, as the law and Constitution require, on the basis of a meaningful and reliable "adversarial testing" process, *Strickland v. Washington,* 466 U.S. 668, 685 (1984), but due to ineffective capital defense representation.  Evidence submitted with this Petition, and that was available to be presented at trial, shows that counsel's ineffectiveness extended from pretrial investigation and basic discovery through jury selection, trial, and a penalty phase presentation that fell far below "the wide range of professionally competent assistance" required by the Sixth Amendment.  *Strickland,* 466 U.S. at 690.

As set forth below, and as Mr. Jackson will prove at an evidentiary hearing on his claims, trial counsel failed to elicit testimony and proffer evidence that would have demonstrated to the jury that Mr. Jackson, due to both inherited and environmental

factors, suffered from mental illness and intellectual disability to a degree that he was unable from an early age to develop rudimentary life skills or make rational appraisals of the world around him.   Such testimony and evidence will also demonstrate that Mr. Jackson, because of his mental illness and disability, was especially vulnerable to the predatory, "kill or be killed" environment that the Government had allowed to fester at USP Beaumont, and that however culpable he may or may not be for the December 16, 1999, stabbing death of inmate Daryl Brown, Mr. Jackson believed he acted in self-defense or in the heat of a sudden quarrel.  In addition to trial counsel's failure to mount an adequate challenge to the Government's allegations against Mr. Jackson, trial counsel failed to present an affirmative counter-narrative in the penalty phase of Mr. Jackson's trial that would have provided compelling mitigating evidence.  Had the jury been presented with testimony about the unconscionable abuse and deprivation visited upon Mr. Jackson as a child—the drugs, the neglect, the beatings, the exhortations from his own father to be "the best damn criminal" he could be—they would have had a reasonable basis for sparing Mr. Jackson's life.  But that true portrait of Mr. Jackson's life was never presented, and therefore, the result of his trial "is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696.

Finally, as demonstrated below, Mr. Jackson's death sentence is constitutionally unsound due to prosecutorial misconduct, which ranged from asserting improper arguments to proffering false testimony to either withholding, losing, or destroying potentially relevant and exculpatory evidence.  Because of the capricious manner in which charges were brought—and the Government's insidious and unprecedented characterization of Mr. Jackson's 2004 bank robbery as a "prior" offense—imposing the death sentence on Mr. Jackson for what was essentially a bank robbery constitutes cruel and unusual punishment.

4

The result here was both improper and unfair, and Mr. Jackson urges this Court to provide the remedy of granting him a new trial and sentencing.

**B.     David Jackson**

In *Wiggins v. Smith*, the Supreme Court reaffirmed that in capital cases, defense counsel should strive "to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  539 U.S. 510, 524 (2003) (citing American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, "ABA Guidelines").  Here, had Mr. Jackson's defense counsel done so, they would have discovered and presented to the jury a story far different than the one the jury heard at trial.  The absence of this true story of Mr. Jackson's life left the jury with a slanted, and damaging, view of Mr. Jackson that prevented the jury from making a fair and informed decision when asked to end his life.

From the moment he was born, David Jackson has been presented with a series of obstacles while simultaneously being failed by the people who might have helped him.  Injuries began almost immediately.  Before he was one, he is said to have fallen out of his crib and hit his head.  His parents did not take David to a doctor.  Medical care was virtually nonexistent in the Jackson home.

Mr. Jackson's development was retarded; he could not reach important developmental milestones as an infant, toddler, or child.  Although he started walking at around nine months, David fell often.  His family members recount basic functions that David could not accomplish at the appropriate age, such as dressing himself, tying his shoes, following directions, and caring for himself.  *See infra* Claim 2.A.

Once David began attending school, he had trouble learning.  IQ tests in the second and fourth grade show David to be within the range for diagnosing mental retardation.  David's elementary school diagnosed him as "mildly mentally retarded."

On top of David's intellectual disability, he also exhibited some of the symptoms of mental illness that have plagued his family for at least three generations. The available evidence suggests that David's mother, Sammie Lee, was illiterate, superstitious, and paranoid and that his father, Leroy, also exhibited symptoms of mental illness. Several of David's peer relatives (his sister and first cousins) have been diagnosed with mental illnesses, such as bipolar disorder, schizo-affective disorder and schizophrenia, and some of David's nieces have been diagnosed with mental illnesses.

Exacerbating these issues, David's home life lacked the structure any child needs for proper development. According to everyone who knew the family, David's father was a violent, abusive, manipulative tyrant who regularly drank and frequently beat David, his mother, his siblings, and the four cousins who lived with him. In addition to the physical abuse he inflicted on Mrs. Jackson and the children, Leroy regularly threatened to kill or hurt Mrs. Jackson and the children, and at one time or another kicked each of the children out of the house to live on the streets. Significantly, one of the ways that Leroy regularly threatened Mrs. Jackson and the children was with a knife. Even though Leroy rarely made enough to support his family, he was habitually unfaithful to Mrs. Jackson and deprived the family of money so that he could support his philandering ways. And, Leroy, who had spent time in prison prior to David's birth, openly encouraged David and his siblings and cousins to be "the best damn criminals" they could be.

David's mother, in addition to exhibiting signs of mental illness, was barely able to care for herself, let alone David and his siblings and cousins who lived in the Jackson home. Although a frequent victim of Leroy's abuse, often in front of David, Mrs. Jackson was abusive herself, verbally and physically abusing David, his siblings, and his cousins. Mrs. Jackson was also incapable of controlling the children in the Jackson household. After Leroy moved out, the Jackson home became the go-to place for teenagers, including David, to drink alcohol, use drugs, and have sex. And, like

Leroy, Mrs. Jackson negatively influenced David, recruiting him as a teenager to be her delivery boy for the marijuana she sold out of her home after Leroy left. This was contrary to the testimony the jury heard at trial that Mrs. Jackson was a kind woman and a loving mother.

Several older cousins who lived in the home whom David looked up to were also a debilitating influence. Three of these older cousins introduced David to alcohol and illegal drugs—and a life of crime to support such drug use. Before he was even a teenager, David was addicted to heroin and regularly used other drugs and alcohol.

David's younger siblings were not a source of support either. His only sister and both brothers also became addicted to drugs and involved in crime. Even worse, and unlike David, they modeled Leroy's behavior and were abusive towards Mrs. Jackson. This was especially hard on David as he was very devoted to his mother.

In the end, of the eight children who lived in the Jackson home, seven, including David, became addicted to drugs and/or spent time in prison. Only one cousin, who had the love and care of a neighbor to support her, graduated from high school and avoided a life of addiction and crime.

Trial counsel had a duty to prepare and present a thorough, accurate account of Mr. Jackson's background for the penalty phase of his trial. Had they done that, they would have given the jury a basis for not sentencing Mr. Jackson to death. But trial counsel, like those who came before them, failed David. Trial counsel ignored available witnesses, like David's surviving siblings and cousins and childhood friends and neighbors who not only could provide first-hand accounts of Mr. Jackson's life, but could also demonstrate to the jury that people cared about Mr. Jackson. Instead, they put on a minimal mitigation case consisting of one ill-prepared witness who knew Mr. Jackson as a teenager, and three other professionals, only one of whom had even met Mr. Jackson. Thus, trial counsel failed to present anything close to a true depiction of Mr. Jackson's life.

7

**C.    Mr. Jackson's Capital Trial**

From the moment Daryl Brown pulled a homemade knife on Mr. Jackson in the yard of USP Beaumont on December 16, 1999, until seven years later, when Mr. Jackson was sentenced to die as a result of the incident, Mr. Jackson's case was highly unusual.  The handling of the case by prison investigators was far outside the normal protocols.  The belated decision to charge Mr. Jackson with capital murder, in light of intervening events, including Mr. Jackson's release from prison, was extraordinary.  And the failure of Mr. Jackson's lawyers to mount an effective defense either at the guilt-innocence or penalty phases of trial deprived his jury of critical information essential to Mr. Jackson's culpability and was remarkably deficient.

1.    **The Extraordinary Chronology of the Charging Decision, Including Mr. Jackson's Release from Prison Without Being Prosecuted *at all* for the Death of Daryl Brown.**

Following the death of Daryl Brown, Mr. Jackson was transferred for the next four years to a more restrictive federal prison in Colorado. Although the Brown homicide occurred in December 1999, Mr. Jackson was not criminally charged in connection with the incident until November 2003.  At that time, he was charged only with the unlawful possession of a weapon by a prisoner.  He was not charged with assault, let alone any degree of homicide.  The weapon charge was dropped later that month.

As described above, Mr. Jackson was then released from prison, having served his federal sentence, in February 2004, with no further charges whatsoever arising from the incident.  In May 2004, Mr. Jackson was arrested for bank robbery in Mississippi.  It was only after he pled guilty to that robbery, and more than five years after Daryl Brown's death, that Mr. Jackson found himself facing capital murder charges for the very incident that had hitherto been regarded as unworthy of any charges prior to his release from prison in February 2005.

Unfortunately for Mr. Jackson, his jury never got this full picture. The bizarre chronology—(1) homicide, (2) prison transfer, (3) weapons charge, (4) dismissal of weapons charge, (5) release from prison, (6) re-arrest and guilty plea on unrelated charge, (7) capital murder charges—was never fully explained to the jury. For example, the jury never appreciated the fact that Daryl Brown's death was not even seen as worthy of criminal prosecution until more than five years later, and only then due to Mr. Jackson's arrest on a wholly unrelated charge. Nor was the jury informed that the Government could have charged Mr. Jackson before releasing him, but opted not to.

2.      **The Guilt Phase Trial**

The trial evidence established that the "offense" began when Daryl Brown accosted Mr. Jackson in the prison yard one evening. (Tr. 834-35, 849-850, 942.) Brown was described as perpetually drunk and/or high and prone to violent behavior, especially with "shanks," prison jargon for makeshift knives. (Tr. 736-38, 778, 799, 831, 941.) Five witnesses, including associates of Brown's, testified that Brown had informed them earlier that day of his intention to attack Mr. Jackson. (Tr. 738, 766, 798, 802, 817, 832-34, 846-47, 937.) Three witnesses identified the murder weapon as belonging to Brown, and stated that they had seen Brown with the weapon earlier that day. (Tr. 740, 777-78, 801, 804, 807.) There was also testimony that Mr. Jackson, unlike Brown, was not known to carry a knife.

Most of the prisoner witnesses used at Mr. Jackson's trial were initially found and interviewed by investigators working for Mr. Jackson's co-defendant, Arzell Gulley, whose case was severed from Mr. Jackson's, and four of Mr. Jackson's most important guilt-phase witnesses had also testified at Gulley's trial a few months earlier. Mr. Jackson's lawyers did little more, however, to interview these crucial witnesses for testimony that might have helped *their* client, Mr. Jackson, and they did virtually nothing to prepare the witnesses for testifying at Mr. Jackson's trial. Decl. of Darrell Evans ¶ 12-13 (Ex. 21). This failure is partially attributable to the fact that their offense investigator

9

had surgery in December 2005 and was strongly medicated for a considerable portion of the pretrial investigation period.

Although Mr. Jackson's counsel advanced something akin to a "self-defense" theory at trial, they presented little to support such a defense or to establish a case of "imperfect self-defense" whereby a killing occurs due to fear of imminent peril— even if the fear is unreasonable. *Middleton v. McNeil*, 541 U.S. 433 (2004). Likewise, counsel did little or nothing to establish grounds for the jury to convict Mr. Jackson of a degree of guilt less than first-degree murder. Trial counsel failed to impeach Government witnesses stating at trial that Mr. Jackson was armed, and Mr. Brown unarmed, with prior inconsistent statements from the immediate aftermath of the event. Trial counsel failed to prepare its own defense witnesses, which caused the *defense* witnesses to provide motive and premeditation evidence that the prosecution seized on at closing, though it was contradictory to evidence in the Government's own files. Moreover, trial counsel failed to present any expert testimony about Mr. Jackson's mental health, although such testimony would have shown that Mr. Jackson's emotional and intellectual impairments made him incapable of premeditation.

As set forth below and as will be proved, effective representation of this case would have included the presentation of readily available evidence that the use of force "reasonably necessary" to defend or protect one's self in an extremely violent prison is quite different from what would be reasonable in the free world. Jurors would not know or understand this, however, without the benefit of credible evidence, whether from prison officials and corrections experts or from articulate capable inmate witnesses who could convey the unique life-and-death aspects of prison life. *See e.g.,* Decl. of Mark Bezy (Ex. 4); Decl. of Reginald Carr (Ex. 22); DVD: *Harlow v. Abbott (*Ex. 34); Craig Haney, *On Mitigation as Counter-Narrative:  A Case Study of the Hidden Context of Prison Violence,* 77 UMKC L. REV. 911 (Ex. 33). Mr. Jackson's jurors were not sufficiently apprised of the especially treacherous conditions at USP Beaumont. Trial

counsel failed to present readily available evidence that "Bloody Beaumont" was known as an "out of control" institution and one of the most violence plagued and mismanaged prisons in the federal system. *See* Brandon Sample, *Violence on the Rise in BOP Facilities,* 20 PRISON LEGAL NEWS (Aug. 2009) (Ex. 31). Had the jury known that Beaumont prisoners could not rely on the institution for protection or assistance and that they were effectively required to take security matters into their own hands, the jury would better have understood how and why this death occurred and why Mr. Jackson's degree of culpability was reduced and mitigated.

       3.      **The Penalty Phase Trial**

In arguing that Mr. Jackson was unfit to live even in prison and deserving of execution, the Government focused the jury's attention on his criminal background and various prison infractions. The defense did nothing to contextualize these incidents or to explain that what may have appeared to be a pattern of disciplinary lapses was in fact the result of Mr. Jackson's efforts to survive a lifetime of incarceration in violent prisons (particularly USP Beaumont) despite his intellectual and practical limitations. Moreover, the defense failed to show that a handful of altercations during nearly thirty years of incarceration is not terribly unusual.

In addition, as readily available evidence that trial counsel failed to discover has now shown, Mr. Jackson's death sentence was based on at least one major aggravating factor that was demonstrably false. The Government posited as a key aggravator Mr. Jackson's alleged threat to kill another inmate, Harold "Pop" Jones, who was being placed in his cell. A prison employee testified that Mr. Jackson stated, "I'm through playing games. Look at the tapes. I've killed before. I'll kill again." (Tr. 681-82.) The overarching importance of this devastating allegation to Mr. Jackson's fate is evident from its prominence as the closing words of the prosecutor's penalty phase argument for the death sentence. (Tr. 1916.) Mr. Jackson herein proffers evidence and is prepared to prove that this damning allegation was totally false and concocted and that

11

the damning incident *never happened.*  Decl. of Harold Jones (Ex. 20); Evans Decl. (Ex. 21).

For the defense case at the life-and-death penalty phase, Mr. Jackson's attorneys presented only four witnesses, not counting Mr. Jackson himself, who was called to the stand at the last minute and who testified without any preparation by his attorneys.  The four witnesses other than Mr. Jackson were a childhood girlfriend of his, Pamela Little Morrison; an "educational consultant," Dee Dee Halpin; a social worker, Kate Allen; and a criminal justice professor, Elizabeth Pelz.

Ms. Morrison testified mostly about some of the conditions in Mr. Jackson's childhood home, which included financial hardship and violence at the hands of his father, Leroy Jackson.  Ms. Halpin testified that despite his very low IQ and achievement test scores, Mr. Jackson - for reasons she failed to explain - did *not* meet the criteria for mental retardation.  Dr. Allen attempted to explain the effects of Mr. Jackson's traumatic childhood on his development; and Dr. Pelz told the jury that there are prisons secure enough to safely house someone like Mr. Jackson without posing a threat to other inmates or staff.

The failure of the defense presentation to spare Mr. Jackson's life can be assessed, among other ways, by the number of readily apparent and verifiable facts that *not a single juror* found proven and/or mitigating.[2]  Those "unproven" assertions included the fact that Mr. Jackson was: (i) "late in meeting developmental milestones;" (ii) "diagnosed in the mentally retarded range throughout school;" (iii) placed in special education classes; and (iv) some forty-seven other mitigating factors submitted by trial

---

[2]  The way the defense allowed the special verdict form to phrase the questions left jurors with no choice but to decline to find the existence of even unrebutted facts if they did not also find those facts mitigating.  As explained further below, it was unreasonable and prejudicial for Mr. Jackson's trial counsel to allow those questions to limit the jury's consideration of evidence that the Supreme Court has found to be central to an appraisal of a capital defendant's moral culpability.  *See Wiggins v. Smith,* 539 U.S. 510, 513, 535 (2003).

12

counsel.  Special Verdict Form, pp. 7-16 (Ex. 37).  Only four jurors found it proven and/or mitigating that Mr. Jackson was regularly beaten by his father with "bed slats, his fists, and other items."  Indeed, of the sixty factors submitted for consideration as reasons to spare Mr. Jackson's life, *only four* were found by a majority of jurors to have been proved and/or mitigating, including: No. 33: "the defendant does not go around looking for someone to kill;" No. 57: "prisoners with worse criminal records and disciplinary records . . . are not sentenced to death"; and No. 15: "he has no positive role model in his life as a child."  *Id.*

Finally, as described more fully below, the defense penalty phase presentation culminated with testimony from Mr. Jackson that was unprepared and proved extremely detrimental to his case.

4.  **New Exculpatory and Mitigating Evidence that Would Have Resulted in Different Guilt-Innocence and Penalty Phase Outcomes.**

As set forth below and as will be amply proven at an evidentiary hearing, there was much that trial counsel could and should have done at both phases of trial that would have changed the outcomes.

At the first phase, reasonably effective counsel would have demonstrated that Mr. Jackson, once confronted by Brown's knife, had virtually no option other than to respond to the threat with equal or greater force.  Especially in the confined atmosphere of "Bloody Beaumont," Mr. Jackson's failure to quash Brown's aggression would have been interpreted as weakness—an invitation to Brown or other inmates to exploit, or again attempt to kill, Mr. Jackson.  It was basic and imperative to his trial defense to describe these conditions to jurors, denizens of a gentler world, for whom the exigencies Mr. Jackson faced that fateful evening would otherwise be incomprehensible.  Mr. Jackson proffers here the type of evidence and testimony that would have explained these conditions and enabled the jury to understand exactly what he was facing and why he reacted as he did.  Mr. Jackson demonstrates herein that reasonable capital counsel would

13

have established his entitlement to a verdict less than first degree murder, given the circumstances of Brown's death, the context in which it occurred, and Mr. Jackson's own experience with abuse, intimidation, and threats of violence, especially in relation to a knife-wielding assailant.

With regard to counsel's deficient performance at the penalty phase, Mr. Jackson proffers herein substantial, previously undiscovered and unused mitigating evidence that would have been central to the jury's appraisal of whether he deserved a death sentence. There is a reasonable probability that at least one juror would have voted for a sentence of life without parole if the jury had heard the true circumstances of Mr. Jackson's life history, including the multigenerational history of mental illness in his family and the violence, abuse, addiction and intellectual disabilities from which Mr. Jackson suffered. The Appendix to this Petition contains declarations from more than a dozen witnesses to Mr. Jackson's life in Detroit, only three of whom were contacted by the trial mitigation specialist, and only one of whom was contacted by Mr. Jackson's capital trial lawyers.[3] These witnesses, each of whom was available to testify at Mr. Jackson's trial, detail the extraordinarily harsh and debilitating circumstances of his early life, including: a household of ten people struggling to survive in the dire and diminishing economic conditions of 1960s-era Detroit; a brutish, domineering father who delighted in the unconscionable physical and emotional abuse of his children, especially young David; an illiterate, mentally challenged mother who was unequipped to protect, nurture, and guide David in healthy directions; and older cousins who introduced him to alcohol and heroin by the time he was just eleven.

The Appendix also contains declarations from mental health experts who were available at the time of Mr. Jackson's trial to explain to the jury that, contrary to what the jury heard from trial counsel's incomplete presentation, Mr. Jackson is, in fact,

---

[3]     During the entire pretrial investigation, the mitigation specialist only met with four individuals who knew Mr. Jackson.

mentally retarded.  This conclusion is based on IQ scores that are firmly within the range of mental retardation, including two scores before the dispositive age of 18 that place his IQ accurately in the low to mid-60's, and on the testimony of numerous individuals who knew Mr. Jackson during his childhood and who can attest to his substantial deficits in a number of key areas of "adaptive functioning" consistent with a diagnosis of mental retardation.  These declarations provide detailed descriptions of Mr. Jackson's impairments and inabilities to perform basic and normal daily life functions such as his lifelong tribulations with reading and writing and counting change; his manifest delays in key developmental milestones; his significant problems in his language and communication skills into adulthood; his gullibility and inability to read social cues; and his strong tendency to follow the lead of others to mask his deficiencies and mental vulnerabilities.  All of this evidence establishes that Mr. Jackson is mentally retarded.  Decl. of Victoria Swanson, Ph.D. (Ex. 6).

Moreover, each of these facts is independently mitigating.  The jury never had an opportunity to hear that the person they were sentencing to death was the same person with low IQ scores, a second-grade reading level, and an inability to perform many of the basic functions that the members of the jury took for granted.  This presentation also would have countered the Government's aggravating case that suggested that Mr. Jackson was a highly functioning prisoner.  And, it would have demonstrated the absurdity of Mr. Jackson's own bizarre testimony that he ran a clothing "factory" at USP Beaumont, operated a soda store in each building at the prison, and somehow managed to orchestrate a complex, high stakes gaming operation.  These missing pieces of evidence would have been central to the jury's evaluation of Mr. Jackson's culpability for Brown's death.

Mr. Jackson's substantial intellectual impairments are compounded by psychiatric conditions and symptoms that rendered his life further at risk for serious dysfunction.  Decl. of Richard G. Dudley, Jr., M.D. (Ex. 1).  The traumatic violence and

chaos that permeated his childhood caused significant mental health problems with direct and dire consequences for the course of his life.  Between the intellectual impairments he was born with and the psychologically debilitating effects of his childhood trauma, Mr. Jackson was beset with serious, chronic life problems.  Through no fault of his own, he was never exposed to normal or healthy ways of dealing with stresses or obstacles, let alone threats of imminent violence.

Remarkably, despite these enormous hardships and challenges, Mr. Jackson has retained the qualities of compassion, generosity, and kindness, as attested to by people who knew him throughout his life, whether in or out of prison.  His jurors heard nothing about this David Jackson, the devoted son, the loyal brother and cousin and friend, a man whom for all his afflictions was still loved, appreciated, and valued by others.  The Appendix documents for the first time in this case that many individuals would gladly have come forward and given the jurors reason to spare Mr. Jackson's life by describing the David Jackson they knew—a person nothing like the antisocial monster depicted by overzealous prosecutors and unrebutted by defense counsel.

Had the jury been told the real story of the offense and of the man whose life was suddenly and inexplicably at stake years later for committing it, there is little question that there is a reasonably probability that this case would have turned out differently and that it would not be before this Court today.

5.  **Appeal**

Mr. Jackson was represented on his direct appeal by the same lawyers who represented him at trial.  This dual representation created something of a conflict for counsel when it came to considering and raising potential appellate issues that had not been properly preserved for appeal with an objection (*e.g.*, Mr. Jackson's absence during juror challenges, basing a capital prosecution on a subsequent conviction, and the *Atkins'* prohibition against execution of the mentally retarded.)  The District Court's verdict and sentence were affirmed on November 17, 2008.  *See United States v. Jackson*, 549 F.3d

16

963 (5th Cir. 2008).  Mr. Jackson's petition for a writ of certiorari was denied by the Supreme Court on October 5, 2009.  *Jackson v. United States*, 130 S. Ct. 51 (2009).

## D.      Jurisdiction

This Court has jurisdiction over this Petition pursuant to 28 U.S.C. § 2255. Mr. Jackson is currently in federal custody at the USP Terre Haute, Indiana.

## II.
## CLAIMS FOR RELIEF

## CLAIM 1

## THE DEATH SENTENCE IMPOSED ON MR. JACKSON VIOLATES THE FEDERAL DEATH PENALTY ACT, THE RULE OF LENITY AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS

Mr. Jackson is not eligible for the federal death penalty because the sole statutory aggravating factor presented to and found by his jury was based on a "previous" conviction that occurred over four years after the death of Daryl Brown.  Mr. Jackson's death sentence must be vacated because it is "in excess of the maximum authorized by law," 28 U.S.C. § 2255; was imposed in violation of the principle of separation of powers; and violates the Fifth, Sixth, and Eighth Amendments.  *Bifulco v. United States*, 447 U.S. 381 (1980) (granting § 2255 Petition and vacating sentence not authorized by statute); *United States v. Buitrago*, 919 F.2d 348, 350 (5th Cir. 1990) (same).

Under the Federal Death Penalty Act ("FDPA") and the Sixth Amendment, a jury must unanimously find beyond a reasonable doubt that at least one statutorily enumerated aggravating factor exists before imposing a death sentence for homicide.  18 U.S.C. § 3593(e)(2); 18 U.S.C. § 3592(c).  Due process and the Eighth Amendment's prohibition on the infliction of cruel and unusual punishment require that these aggravating factors be applied in a manner that genuinely and reasonably narrows the class of death-eligible murders to those for which the evolving standards of decency call

17

for death.  *Zant v. Stephens*, 462 U.S. 862, 877-78 (1983); *Kennedy v. Louisiana*, 128 S. Ct. 2641 (2008).

The only statutory aggravating factor submitted to Mr. Jackson's jury was that he had "previously been convicted of a federal offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person."  Special Verdict Form at 4 (Ex. 37) (quoting 18 U.S.C. § 3592(c)(2)).  The only offense offered in support of this aggravating factor was Mr. Jackson's conviction for the May 6, 2004, robbery of the Union Planters Bank in Collinsville, Mississippi.[4]  Because a "previous" conviction under section 3592(c)(2) must occur prior to the underlying offense, the 2004 conviction does not meet the statutory criteria, Mr. Jackson is not eligible for the federal death penalty, and his sentence must be vacated.  Mr. Jackson's rights to a jury determination of death-eligibility, and to equal protection of the law, were violated when the jury was not instructed that it had to find, beyond a reasonable doubt, that the 2004 conviction was previous to the homicide it was intended to aggravate.

Whether a previous conviction under the FDPA must occur prior to the underlying offense is an issue of first impression in this circuit.[5]  But Mr. Jackson's case is unique in another respect.  Based on research compiled by the Federal Death Penalty

---

[4]    Mr. Jackson pleaded guilty to the Collinsville bank robbery on November 4, 2004.

[5]    Petitioner is aware of only one other court to address the issue.  *See United States v. Higgs*, 353 F.3d 281, 318 (4th Cir. 2003) (holding that a similar aggravator "encompasses all predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges").  While the holding in *Higgs* is incorrect for the reasons discussed herein, it is also distinguishable.  In *Higgs*, the court concluded that even if its statutory interpretation was incorrect the error was harmless because the jury had found that six other aggravating factors existed.  *Id.* at 319.  Here, the *only* statutory aggravating factor submitted to and found by the jury, and thus the *only* basis for capitally prosecuting Mr. Jackson, was his "previous" conviction for a bank robbery committed four years after the underlying offense.  Thus, the *Higgs* court was never confronted with the unique constitutional issues presented by a "narrowing" aggravator that makes a defendant eligible for the death penalty.  *Zant v. Stephens*, 462 U.S. 862, 874–80 (1983).

Counsel Resource Project, Mr. Jackson appears to be one of only two individuals in the sixteen year history of the FDPA to be made eligible for the death penalty based solely on a "previous" conviction occurring after the offense.  (Ex. 29).[6]  And Mr. Jackson is the only person to be capitally charged under the FDPA based solely on a "previous" conviction occurring after the offense date.[7]

This was not the Government's original intent.  Indeed, this issue is before the Court because of a mistake.  The Notice of Intent to Seek the Death Penalty against Mr. Jackson alleged two prior convictions under section 3592(c)(2): the 2004 bank robbery and a 1977 state conviction for Aggravated Robbery.  (Ex. 54 at 2).  But the Government did not do its homework.  Had the Government read the presentence report prepared for the 2004 bank robbery (which it later submitted as an exhibit) prior to filing its Notice of Intent, it would have realized that Mr. Jackson's 1977 conviction did not involve a firearm.  Rather, it involved a "13 inch fiberglass nightstick partially covered with newspaper to give the appearance of a sawed-off shotgun."  (Ex. 63 at 3).

As a result of this Government oversight, this Court will now be the first in the nation to consider whether a defendant can be made eligible for the death penalty under the FDPA based solely on a post-offense conviction.  And as applied to the facts of

---

[6]  This exhibit documents the statutory aggravators alleged in every case under the FDPA through September 11, 2009.  Petitioner is aware of no federal capital case after that date in which the defendant was made eligible for the death penalty based solely on a "previous" conviction.

[7]  In the only other case in which the defendant was made eligible for the death penalty based on exclusively "previous" convictions, the defendant was convicted of only second degree murder, thus making him ineligible for the death penalty. *See United States v. Smith*, 10 F. Supp. 2d 578 (E.D. Va. 1998).  One of Smith's two prior convictions in that case was for first degree murder; the other was for assault with a deadly weapon based on shooting one man in the head and wounding three others.  All of Smith's previous convictions occurred prior to his offense date. *Id.* at 579–81.

In one other recent case, several statutory aggravating factors were charged, but only previous conviction aggravators were found by the jury.  Over a strong dissent, a Fourth Circuit panel majority recently concluded that this did not constitute cruel and unusual punishment. *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010).  Both of Caro's previous convictions occurred prior to his offense date.

this case, the Court must decide whether an unrelated bank robbery Mr. Jackson committed four years after the underlying offense (and after he was released from prison with no charges pending) is sufficient under the FDPA to qualify him as an "offender[] who commit[s] a narrow category of the most serious crimes and whose extreme culpability makes [him] the most deserving of execution." *Kennedy v. Louisiana*, 128 S. Ct. at 2650 (internal quotation marks omitted).

A.    <u>**Basic Principles of Statutory Interpretation Require that a Previous Conviction Occur Prior to the Underlying Offense**</u>

It is clear from the text of the FDPA that a previous conviction under section 3592(c)(2) must occur prior to the capital *offense*, not merely the capital *sentencing*. To hold otherwise would render the word "previously" superfluous. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are . . . reluctant to treat statutory terms as surplusage in any setting.") (internal quotation marks and citations omitted).

Aggravating the homicide solely with a remote-in-time conviction for a remote-in-time, unrelated offense, both of which occurred after the underlying offense, is inconsistent with other provisions of the FDPA, and Congress's intention to comply with constitutional requirements of fair notice, regularity, and genuine narrowing. Under the FDPA, the Government may only seek the death penalty if it "believes that the *circumstances of the offense* are such that a sentence of death is justified . . . ." 18 U.S.C. § 3593(a) (emphasis added). A defendant's actions years after the underlying offense cannot rationally be considered a circumstance of that offense. Yet, if a previous conviction can occur any time after the offense, the Government could bring capital charges on that basis alone, in plain contradiction of section 3593(a). On the other hand, a previous conviction occurring prior to an offense might legitimately be considered a "circumstance" of that offense—*i.e.*, the offense was committed by someone who had already been punished for another crime and given a chance to reform. When read in

light of section 3593(a), it is clear that a previous conviction under section 3592(c)(2) must occur prior to the underlying offense.

This interpretation of the FDPA is in line with similarly constructed federal recidivist statutes and sentencing guideline provisions. *See, e.g.*, *United States v. Pressley*, 359 F.3d 347, 349 (4th Cir. 2004) (holding that previous convictions under the Armed Career Criminal Act must predate the underlying offense; "[I]f we were to adopt the Government's interpretation-that any convictions obtained prior to sentencing qualify as 'previous convictions'-we would be violating a cardinal rule of statutory construction by reading the term 'previous' out of the statute."; "Unlike the sentencing date, the violation date is not subject to the whims of the court's docket nor vulnerable to manipulation by either party."); *United States v. Talley*, 16 F.3d 972, 975-76 (8th Cir. 1994) (same); USSG § 4B1.1 (defining a "career offender" for purposes of sentencing enhancement as one who, *inter alia*, "has at least two prior felony convictions of either a crime of violence or a controlled substance offense"); USSG § 4B1.2 (defining "two prior felony convictions" as meaning that "the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense"); USSG § 2K2.1 (providing for an increased base offense level "if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense").

In light of Congress's and the courts' clear mandate that "previous" convictions must predate the underlying offense in recidivist and sentencing enhancement statutes, a contrary reading of the FDPA would have perverse consequences. For example, Mr. Jackson's bank robbery conviction could not be used as a prior conviction for purposes of the career offender sentencing enhancement, USSG § 4B1.2; could not be used to increase his base offense level, USSG § 2K2.1; could not be used as a previous conviction for purposes of the fifteen-year minimum sentence for armed career criminals,

21

18 U.S.C. § 924(e); yet could be used to make him eligible for the most severe punishment authorized under federal law.  Indeed, Mr. Jackson's bank robbery was undoubtedly not used for purposes of calculating his offense level and career offender status on Count 2 in this case.  Congress could not have intended such a nonsensical result.

**B.      Allowing a Previous Conviction to Occur Any Time Prior to Sentencing Would Render the Statute, and Mr. Jackson's Conviction Thereunder, Unconstitutional**

Interpreting section 3592(c)(2) to allow Mr. Jackson to be convicted of capital murder based solely on his conviction for an armed robbery committed over four years after the underlying offense would render the statute unconstitutional. This novel interpretation would lead to the imposition of the death penalty in situations where, as here, it serves neither the retributive nor deterrent justifications for capital punishment and thus constitutes cruel and unusual punishment.  Under this interpretation, either on its face, or as applied to this case, the statute would fail to "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  In addition, such an *ex post* construction would, and here did, violate Mr. Jackson's right to due process of law.  Last, this construction would inevitably lead, as it did here, to the imposition of duplicative punishment in violation of the Double Jeopardy Clause of the Fifth Amendment.

When interpreting federal law, the Supreme Court has "instructed the federal courts to avoid constitutional difficulties by adopting a limiting interpretation if such a construction is fairly possible." *Skilling v. United States*, 130 S. Ct. 2896, 2929–30 (2010) (internal quotation marks and alterations omitted).  To save section 3592(c)(2) from constitutional infirmity, a previous conviction must occur prior to the underlying offense.

22

1.     **Failure to Satisfy the Retributive or Deterrent Justifications for Capital Punishment**

Mr. Jackson's case demonstrates why allowing a previous conviction under section 3592(c)(2) to be based on post-offense conduct constitutes cruel and unusual punishment. "Capital punishment is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes." *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2661 (2008). Making Mr. Jackson's eligibility for the death penalty hinge solely on a crime he committed *after* his alleged capital crime fails the deterrence prong of the Supreme Court's test—"Assuming [Mr. Jackson] behaves in a rational way, as one must to justify the penalty on grounds of deterrence," the threat of the death penalty could not possibly have deterred him from committing the underlying offense if he was not eligible for the death penalty at the time. *Id.* at 2664.

In addition, by making the previous homicide death-eligible solely based on the after-occurring bank robbery, the statute achieves the opposite of deterrence; it incentivizes murder. If the mere use of a firearm in a latter offense makes a previous, uncharged homicide eligible for the death penalty, there is no disincentive for using violence in the latter offense. On the contrary, this novel interpretation of the statute incentivizes lethal violence in the latter-occurring offense by creating circumstances in which the offender has infinitely more to lose if he is apprehended.

Making an after-occurring offense and conviction the basis for imposing death in a case that was not charged prior to the after-occurring offense also subverts the retributive purpose of the death penalty, in part by adding an element of unfairness to the decision to seek death. *See* Kevin M. Carlsmith, *The Roles of Retribution and Utility in Determining Punishment*, 42 J. EXPERIMENTAL SOC. PSYCH. 437 (2006) (Ex. 57) (noting the importance of mitigating factors and fairness in assessing retributive value of punishment). Here, the Government determined that the circumstances of Mr. Brown's

death following his attack on Mr. Jackson were not sufficiently serious to merit a charge of murder, much less the death penalty, and the Government released him from custody without charge. Indeed, the Government showed no interest in prosecuting Mr. Jackson until he committed a bank robbery. Only then did the Government conclude that the "circumstances of the offense," § 18 U.S.C. 3593(a), warranted the death penalty.

Interpreting section 3592(c)(2) and 3593(a) to allow the Government to retroactively reassess the "circumstances" of an offense it has already passed judgment on based on an after-occurring conviction sanctions precisely what happened here— imposition of death for a bank robbery. This is disproportionate punishment under the standards of our society. In combination, or individually, these circumstances impugn the Government's position and deprive the death sentence in this case of a retributive justification that satisfies constitutional standards.

2.        **Failure to Justify Reasonably the Imposition of the Death Penalty**

Statutory aggravators "play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant,* 462 U.S. at 878. To meet constitutional requirements, they "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.* at 877. There is no reasonable justification for imposing the death penalty on those who commit an offense involving the use of a firearm years after committing a murder.

Mr. Jackson's case illustrates the lengths to which this statutory interpretation can be taken. Mr. Jackson has been categorized as among the worst of the worst offenders based on a bank robbery committed four years after the death of Daryl Brown. But there is no limit, other than the length of the Government's delay, to the amount of time that could elapse before a defendant becomes eligible for the death penalty if previous convictions can occur after the underlying offense. This is so even if,

24

as here, the Government shows no interest in a speedy prosecution and even *releases* the defendant from confinement. Such a scenario fails *Zant's* requirement that a narrowing aggravator reasonably justify imposition of the death penalty.

### 3. *Ex Post* Expansion of Liability Under the FDPA

Imposition of a death sentence based solely on an after-occurring, unrelated offense is extraordinarily rare, if not unique, and inconsistent with the evolving standards of decency against which the Eighth Amendment's prohibition is measured. The novel interpretation of the FDPA to reach this situation years after either of Mr. Jackson's offenses would, and here did, violate his right to due process of law. *Bouie v. City of Columbia*, 378 U.S. 347 (1964). This judicial, *ex post* expansion of the FDPA undermines the Act's ability to satisfy the Eighth Amendment's narrowing requirement.

Mr. Jackson appears to be the only individual to have been sentenced to death under the FDPA based solely upon a *post-hoc* interpretation of the "previous conviction" aggravator to encompass a single, unrelated offense and conviction, both of which occurred years after a homicide in which the defendant was known to be involved, but was uncharged. No case had interpreted the statute in this way prior to the homicide, and Mr. Jackson had no notice of any such interpretation prior to the subsequent "previous" offense. No court with jurisdiction over either offense had interpreted the statute in this way prior to either offense. The interpretation is inconsistent with the meaning given similar federal penal statutes.

### 4. Double Jeopardy Violations

The Supreme Court has consistently recognized that enhancement of punishment above the authorized statutory limits via a "previous" offense violates the Double Jeopardy Clause where no recidivism exists. *Witte v. United States*, 515 U.S. 389, 403–04 (1995); *Williams v. Oklahoma*, 358 U.S. 576, 586 (1959). Allowing "previous" convictions under section 3592(c)(2) to post-date the underlying offense would sanction the imposition of punishments above the authorized statutory maximum

25

where the recidivist justification for enhancement is entirely lacking.  This interpretation of the statute would inevitably lead, as it did here, to violations of the Double Jeopardy Clause.  Indeed, Mr. Jackson's case perfectly illustrates the Double Jeopardy concerns underlying this rule.  Given that the Government took no meaningful steps to prosecute the underlying offense for years, released Mr. Jackson from prison, and only evinced an interest in prosecuting the offense after Mr. Jackson became eligible for an enhanced sentence by virtue of his bank robbery conviction, it can truly be said that the enhancing conviction "has become a tail which wags the dog of the substantive offense."  *Witte*, 515 U.S. at 403.

*    *    *

For the reasons discussed above, Mr. Jackson's death sentence is "in excess of the maximum authorized by law" and must be vacated.  28 U.S.C. § 2255; *Bifulco v. United States*, 447 U.S. 381 (1980); *United States v. Buitrago*, 919 F.2d 348, 350 (5th Cir. 1990).  Mr. Jackson's death sentence under this incorrect interpretation of the law violates the Fifth, Sixth and Eighth Amendments for the reasons stated above.

Executing Mr. Jackson despite his statutory ineligibility for the death penalty would also violate the Eighth Amendment's ban on cruel and unusual punishment and would result in a fundamental miscarriage of justice.  Furthermore, the trial court's imposition of this illegal sentence violated the principle of separation of powers.  *Whalen v. United States*, 445 U.S. 684, 689 (1980) ("[T]he legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress. . . . If a federal court exceeds its own authority by imposing [] punishments not authorized by Congress, it violates . . . the constitutional principle of separation of powers in a manner that trenches particularly harshly on individual liberty.").

26

**C.**     <u>**Trial And Appellate Counsel Were Ineffective In Failing To Raise The Unconstitutionality Of Capitally Charging Mr. Jackson By Relying On An Aggravating Factor Based On An Offense That Occurred More Than Four Years After The Alleged Capital Homicide**</u>

Mr. Jackson has raised above a freestanding challenge to his death sentence because he is ineligible for the death penalty under the FDPA. Trial and appellate counsel's failure to do the same constitutes ineffective assistance of counsel. Trial and appellate counsel (who were one and the same) completely overlooked the vital legal issue of Mr. Jackson's eligibility for the death penalty.

Reasonably competent counsel would have challenged Mr. Jackson's statutory eligibility for the death penalty because his only "previous" conviction occurred over four years after the underlying offense and because of the constitutional implications of that interpretation raised herein. The record demonstrates that the prosecutors recognized the problems inherent in relying upon the after-occurring bank robbery. (Tr. 1142.) Counsel had a duty to know and understand the law in this area, and use that knowledge to assert Mr. Jackson's constitutional and statutory rights. *Strickland*, 466 U.S. at 688; *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (finding deficient performance where counsel failed to raise issue due to misunderstanding of law); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (same); ABA Guidelines, Guideline 10.11. Similarly situated attorneys were raising the same issue in other cases.

Trial and appellate counsel's failure to raise these issues was patently below reasonable standards of performance, and prejudiced Mr. Jackson by improperly subjecting him to the ultimate punishment. As the enforcement of Mr. Jackson's statutory and constitutional rights would have resulted in no death sentence, for the reasons stated *supra*, counsel's performance prejudiced Mr. Jackson. *See Glover v. United States*, 531 U.S. 198 (2001).

# CLAIM 2

## MR. JACKSON IS INELIGIBLE FOR THE DEATH PENALTY UNDER *ATKINS V. VIRGINIA*, AND TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO RAISE *ATKINS* AS A DEFENSE ON HIS BEHALF, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS

Mr. Jackson is intellectually disabled; he has the condition formerly known as mental retardation.  Due to this intellectual disability, the death sentence imposed on him violates the Eighth Amendment.  He is ineligible for the death penalty.  *Atkins v. Virginia,* 536 U.S. 304 (2002).  Diagnoses of significantly impaired intellectual functioning were made during Mr. Jackson's childhood, and evidence of his longstanding adaptive deficits was readily available at the time of trial.  When he was tried in October-November 2006, reasonably diligent capital trial counsel would have raised *Atkins* and the Eighth Amendment as an absolute bar to imposition of the death penalty on Mr. Jackson.  *Cf.* ABA Guidelines, Guideline 10.7 (Investigation), Guideline 10.8 (Duty to Assert Legal Claims) (2003); American Bar Association, *Standards for Criminal Justice*, Standard 4-4.1 (Duty to Investigate) (3d ed. 1993) ("ABA Standards") (Ex. 87).  Had counsel raised such a defense, Mr. Jackson could not and would not have been sentenced to death.  Mr. Jackson was thus prejudiced by this unreasonable attorney error and his death sentence must be vacated.  *Strickland v. Washington,* 466 U.S. 668 (1984); *Glover v. United States*, 531 U.S. 198 (2001) (reasonable probability of even small change in non-capital sentence sufficient to establish prejudice under *Strickland*).  The judgment of death imposed in this case also violates the Sixth Amendment.

In *Atkins*, the Supreme Court applied the definitions of mental retardation utilized and promulgated by the American Association on Mental Retardation (AAMR) (now the American Association on Intellectual and Developmental Disabilities, AAIDD) and the American Psychiatric Association (APA) as published in their diagnostic manuals *Mental Retardation: Definition, Classification and Systems of Supports* (9th ed. 1992) and the *DSM-IV-TR* (4th ed. 2000), respectively.  The three criteria are set out succinctly

28

in AAIDD, *Intellectual Disability*: *Definition, Classification, and Systems of Supports* (11th ed. 2010) (11th ed. AAIDD Definitional Manual) (Ex. 28):

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

*Id.* at 5. But for the substitution of "intellectual disability" for "mental retardation," this definition is identical to the definition of "mental retardation" set forth in the previous edition of the organization's diagnostic manual, *Mental Retardation*: *Definition, Classification, and Systems of Supports* (AAMR, 2002 10th ed.), at 1 (Ex. 71).

Mr. Jackson herein proffers evidence that he is ineligible for the death penalty under the above criteria and *Atkins*. He also seeks an opportunity to further develop this evidence at an evidentiary hearing. His rights under the Fifth, Sixth and Eighth Amendments were violated by the failure of his trial lawyers to raise this issue and thereby preclude imposition of the death penalty, and his death sentence must be vacated.

This claim is divided into two sections: Section A, which establishes that Mr. Jackson meets the criteria for intellectual disability/mental retardation and demonstrates that he cannot be subjected to the death penalty pursuant to *Atkins*; and Section B, which describes counsel's failure to raise *Atkins* in Mr. Jackson's trial proceedings and the resultant prejudice in violation of *Strickland*, 466 U.S. 668.

D.    **Mr. Jackson Meets The Criteria for Mental Retardation/ Intellectual Disability and He is Ineligible for The Death Penalty**

Mr. Jackson has recently been evaluated by Victoria Swanson, a leading expert in the field of mental retardation. *See* Curriculum Vitae of Victoria Swanson, Ph.D. (Ex. 6). It is Dr. Swanson's opinion that Mr. Jackson meets the criteria for a diagnosis of mental retardation. Her findings are discussed below, and rely extensively

29

on childhood testing data found in Mr. Jackson's school records and on interviews with individuals who knew him before the age of 18, the dispositive period for a diagnosis of intellectual disability/mental retardation.  As discussed in Section B, trial counsel were aware of the school records and testing data, but they failed to read the data in a manner consistent with prevailing professional norms, failed to understand its probative value in establishing ineligibility for the death penalty under *Atkins*, and thus failed to effectively utilize this death-disqualifying evidence for the benefit of their capital client.

The process that Dr. Swanson followed in conducting her evaluation is standard protocol for assessing mental retardation, but was not conducted by trial counsel or their experts before their experts ruled out mental retardation.  Dr. Swanson's findings provide strong and compelling support for the *Atkins*/retardation criteria, both in his intellectual functioning as measured by IQ tests and his "adaptive behavior" as evidenced by numerous intimate first-hand descriptions of his functional limitations, especially prior to the age of 18.

Dr. Swanson's declaration contains a thorough explanation of how mental retardation is assessed and determined by people in her specialized profession, i.e., by psychologists trained to evaluate patients for mental retardation/intellectual disability.  Her declaration outlines the criteria for diagnosing mental retardation.  Her explanations are comprehensive and central to this claim for relief.  Rather than duplicate the entire declaration here in the Petition, however, Mr. Jackson hereby incorporates Dr. Swanson's entire declaration into this pleading by specific reference.  *See generally* Swanson Decl. (Ex. 6).

In addition, the Appendix to this Petition contains lay evidence that was readily available at the time of trial and which supports Mr. Jackson's claim that he is ineligible for the death penalty under *Atkins*.  The information contained in the declarations of Mr. Jackson's family and childhood acquaintances was indispensable for any experts considering whether Mr. Jackson met the applicable retardation criteria and

30

yet was not provided to any of the witnesses trial counsel hired to evaluate Mr. Jackson's mental health and/or testify about his background. The absence of this information makes it impossible for any expert to accurately evaluate a person for mental retardation. In this case, the professionals trial counsel presented at trial were not qualified to assess anyone for mental retardation and were in any event not given enough information to provide an accurate assessment even if they were qualified. Their testimony made that clear. ((Tr. 1552) (Halpin: "[T]here would have to be other information to go along with that diagnosis")); ((Tr. 1572) (Dr. Allen: "[W]e don't have enough information").)

Evidence that was readily available to trial counsel in 2006 and that is cognizable today in demonstrating Mr. Jackson's ineligibility for the death penalty, includes the following:

### 1. Significantly Sub Average Intellectual Functioning

Mr. Jackson was given IQ tests when he was in 2nd and 4th grades, at the ages of 7 years, 8 months; and 10 years, 1 month old. On November 28, 1967, at age 7, David scored 76 on the Stanford-Binet LM (1960 ed., based on 1937 norms).[8] *See* David Jackson School Records (Ex. 84). On April 13, 1970, at age 10, David scored 67 on the Wechsler Intelligence Scale for Children (WISC) (1947 ed.). *Id.* Based on the 67 score on the WISC, David was classified by the school system as "mildly retarded." *Id.*

The AAIDD/AAMR explains in its diagnostic manuals that IQ scores should be adjusted for potential "Flynn Effect," to account for increases in IQ scores over time based on the use of obsolescent norms:

As discussed in the *User's Guide* (Schalock et al., 2007) that

---

[8] *See* Becker, Kirk A., "History of the Stanford-Binet Intelligence Scales: Content and Psychometrics," in *Stanford-Binet Intelligence Scales, Fifth Edition: Assessment Service Bulletin Number 1*, Riverside Pub. (2003) at 2 (Ex. 70) ("In the 1950's Merrill took the lead in revising the Stanford-Binet, selecting the best items from Forms L and M to include in a new version of the test. The two forms from 1937 were combined to create Form L-M. This form was published in 1960 (Terman & Merrill, 1960) and was later renormed in 1973.")

accompanies the 10th edition of this *Manual*, best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score.  As suggested in the *User's Guide* (Schalock et al., 2007), pp. 20, 21:

The main recommendations resulting from this work [regarding the Flynn Effect] is that intellectual assessment must use a reliable and appropriate individually administered intelligence test.  In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times.  In cases where a test with aging norms is used, a correction for the age of the norms is warranted.

AAIDD, *Intellectual Disability* (2010) at 37 (Ex. 28) (alteration in original).

The Flynn Effect is widely accepted in the scientific community.[9]  The Flynn Effect has similarly been accepted in a number of district courts in addressing *Atkins* cases.[10]

Adjusting IQ scores to account for the Flynn Effect requires that IQ scores be adjusted .30 to .33 points downward for every year between the norming of a given IQ

---

[9]  *See e.g.*, McGrew, Kevin S., *Is the Flynn Effect a Scientifically Accepted Fact?*, Institute for Applied Psychometrics (June 30, 2010) (Ex. 23) (reviewing all 113 articles that address the Flynn effect of which 95 took a position on its validity; finding that 86 of the articles were favorable as to the validity of the Flynn effect and 9 were not supportive; concluding that the Flynn effect is "overwhelmingly recognized as a fact by the scientific community."  The failure to take Flynn Effect into account was found to be error in *Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005); *Walton v. Johnson*, 407 F.3d 285, 296-97 (4th Cir. 2005); see *also In Re Hicks*, 375 F. 3d 1237 (11th Cir. 2004) (Birch., J., dissenting) (no mention of Flynn in majority; dissent would invalidate inflated IQ scores due to Flynn Effect); *Holladay v. Allen*, 555 F.3d 1346, 1358 (11th Cir. 2009) (acknowledging possibility of "elevated scores because of Flynn Effect.")

[10]  *Green v. Johnson*, No. CIVA 2:05CV340, 2006 WL 3746138 (E.D. Va. Dec. 15, 2006); *Williams v. Campbell*, No. 04-0681-WS-C, 2007 WL 1098516 (S.D. Ala. Apr. 11, 2007); *Butler v. Quarterman*, 576 F. Supp. 2d 805 (S.D. Tex. 2008); *Thomas v. Allen*, 614 F. Supp. 2d 1257 (N.D. Ala. 2009); *United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009); *Wiley v. Epps*, 668 F. Supp. 2d 848 (N.D. Miss. 2009). Other cases have acknowledged the Flynn Effect but found it unnecessary to address its applicability where IQ scores were above the range of mental retardation even when accounting for the effect.  *In Re Salazar*, 443 F.3d 430 (5th Cir. 2006); *Cummings v. Polk*, No. 5:01-HC-910-BO, 2006 WL 4007531 (E.D.N.C. Jan. 31, 2006).

test and the date on which the test was administered.  Applying this formula to Mr. Jackson's IQ scores in elementary school, his more accurate Flynn-adjusted scores are 66 on the Stanford-Binet at age 7 and 60 on the WISC at age 10.[11]

In her declaration, Dr. Swanson analyzes in detail the impact of the Flynn Effect on Mr. Jackson's IQ scores from the ages of 7 and 10.  Applying the more conservative .30 conversion factor (*cf.* use of .33 conversion described by AAIDD in *Intellectual Disability*, at 37) (Ex. 28), Dr. Swanson finds a possible Flynn Error of 10 points in David's 76 IQ score at the age of 7, and a Flynn Error of 8 points in his 67 IQ score at the age of 10.[12]  Swanson Decl. p. 8 (Ex. 6).  In 1974 and 1975, when David was 14 and 15 years old, he was given standardized Achievement Tests while at the W. J. Maxey School.  His median scores in the eight academic areas tested were 2.7 grade level at age 14 years, 4 months old and 2.6 grade level at age 15 years, 6 months old.  *See* David Jackson School Records (Ex. 84).  His scores in language were at the 1.9 and 2.2 grade levels.  *Id.*  His reading and spelling were at a 2nd grade level.  *Id.*

Mr. Jackson's Achievement Test scores were entirely consistent with his IQ score in the mildly retarded range and corroborate the diagnosis of the school system that he was mentally retarded.  Swanson Decl. pp. 8-9 (Ex. 6).  Taking into account all of Mr.

---

[11]    The Flynn Effect has been shown to be as valid in scores at the lower end of the spectrum as in those at the middle or upper range, especially on the WISC exam.  *See e.g.* Kanaya, T., Scullin, M.H., & Ceci, S.J., *The Flynn Effect and U.S. Policies: the impact of rising IQ scores on American society via mental retardation diagnoses*, American Psychologist, 58:778-790 (2003) (Ex. 66); Kanaya & Ceci, *The Flynn Effect in WISC Subtests Among School Children Tested For Special Education Services*, J. OF PSYCHOEDUCATIONAL ASSESSMENT, May 19, 2010 at 1-12 (Ex. 26).

[12]    Dr. Swanson also addresses the administration of a WAIS-III intelligence test to Mr. Jackson by Dr. Daneen Milam in 2006 that determined his IQ to be 81.  As discussed more in Section B, *infra*, Dr. Swanson, as well as Dr. Dale Watson, a neuropsychologist, have reviewed the testing data from 2006 and they both conclude that the testing and score are not valid due to numerous methodological errors and breaches of testing protocol.  Swanson Decl. p. 8 (Ex. 6); Watson Decl. ¶¶ 4, 6 (Ex. 3).  In addition, Dr. Milam now acknowledges that her finding of 81 should be considered a 77 or 78 with the Flynn Effect, which she did not take into account when using a testing instrument that was eleven years old.  Milam Decl. ¶7 (Ex. 2).

Jackson's test scores, i.e., all available objective contemporaneous documentation of Mr. Jackson's intellectual functioning prior to the age of 18, it is evident, to a reasonable degree of scientific certainty, that he manifested significantly sub-average intellectual functioning, consistent with mild mental retardation.  Swanson Decl. pp. 7-9 (Ex. 6).

2. **Limitations in Adaptive Functioning in at Least Two Areas**

The second criterion for mental retardation is "significant limitations in adaptive behavior."  AAIDD, *Intellectual Disability* (2010), at 43-44 (Ex. 28).  Adaptive behavior is multi-dimensional and includes the following:

- Conceptual skills: language; reading and writing; and money, time and number concepts

- Social skills:  interpersonal skills, social responsibility, self-esteem, gullibility, naivete (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving

- Practical skills: activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone

*Id.*

Prior to the age of 18, Mr. Jackson manifested limitations in his adaptive functioning in more than two of the eleven areas established by the AAMR and APA for assessing mental retardation, and the three areas of functioning utilized by the AAIDD in its latest manual.  Swanson Decl. pp. 1-2 (Ex. 6).  Indeed, he manifested limitations in almost all areas of adaptive functioning, most notably in the areas of functional academics, language/communication, social/interpersonal skills, self-direction, use of community resources, self care, work, health and safety, and home-living skills.  *Id.* at pp. 5-6.  Dr. Swanson finds that Mr. Jackson's adaptive deficits prior to the age of 18 are significant and are indicative of mental retardation:

a. **Evidence of Adaptive Deficits Prior to the Age of 18**

Available records reviewed by this examiner indicate

34

significant adaptive deficits in the adaptive behavior areas of conceptual, social, and practical prior to the age of 18. . . . A declaration given by Brenda Boyd, Mr. Jackson's older first cousin who was raised by his mother, notes that Mr. Jackson had more trouble in school than any of his siblings. Self-care deficits (i.e., putting shoes on wrong feet, inability to tie shoes, inability to button shirt correctly, inability to bathe himself) were still evident in the 2nd grade. According to Ms Boyd, he was still wetting the bed at 10 years of age and nursed a pacifier and bottle until he started school and sucked his thumb long after he entered school. Communication deficits were evident and Ms Boyd references words he had difficulty articulating and his inability to speak in complete sentences. Ms Boyd's declaration also notes deficits in domestic skills, ability to understand and act on instructions, and poor social skills. The declaration of Larry Anderson, Ms Boyd's brother who also resided in the Jackson home, confirms that Mr. Jackson experienced developmental delays and academic, communication, and self-care deficits. He confirmed Mr. Jackson nursed a bottle and wore a diaper until he was 4 or 5 years of age, did poorly in school, was unable to learn how to wash dishes, and could not read or write when he was a teenager. Marcos Martinez, a neighborhood friend from childhood, noted in his declaration that, even as a teenager, Mr. Jackson could not make change accurately and required others go with him when he left his neighborhood. He would say he was too ill to go into a store and give Mr. Martinez a list of items to pick out. Pamela Little Morrison, a childhood friend, noted in her declaration that Mr. Jackson could not read or write and often asked her to count his change. He could not obtain a driver's license because he could not read. He could find his way about the neighborhood but would get lost if he tried to leave the neighborhood. Alfred Little, a childhood friend in the neighborhood, noted that Mr. Jackson had obvious learning problems in school who was "gullible and easy to manipulate".

Swanson Decl. p. 9 (Ex. 6).

This examiner completed an adaptive functional assessment by using a variety of life skill training materials to determine Mr. Jackson's repertoire of basic skills, and, when skills were lacking, what supports and adjustments needed to be put in

35

> place to guarantee success. Training scenarios included (a) posing a question and asking him to identify the correct picture from offered choices, (b) showing a pictorial task (i.e., machine dials, clocks, monetary amounts, receipts, checks, banking statements) and asking him to either identify the appropriate item or response among several pictured choices, (c) asking him to demonstrate basic functional academic skills (i.e., reading various measuring devices, identifying basic cleansers, reading medicine labels, and choosing appropriate tools and/or cleansers for a specified task), and (d) completing an informal academic assessment that included word recognition). These assessments indicated significant adaptive deficits in conceptual, social, and practical skills that would meet the criteria for a diagnosis of mental retardation.

*Id.* at p. 10 (Ex. 6).

Mr. Jackson's deficits and functional limitations were evident to those who knew him during childhood.  His impairments are described and detailed in the declarations of numerous individuals who knew him before he turned 18.

b.    **Functional Academics**

As discussed above, Mr. Jackson functioned only at a 2nd grade level when he was 13-14 years old.  His academic limitations are also addressed in several of the attached declarations:

> He could not read or write and he would ask me to count change for him.  He could not get a driver's license back then because he could not read.

Decl. of Pam Morrison ¶ 15 (Ex. 16).

> David fell through the cracks at Sampson [Elementary School].  He did very poorly in school and needed special attention. . . . Even if his learning problems were obvious, teachers did not help him.  His parents did not even know what David was doing in school so they were no help at all. A group of my school friends used to single out three guys we knew who stood out as especially dumb.  David was one of

36

them.

Decl. of Al Little ¶ 2 (Ex. 9).

> David could not read or write as a teenager.

Decl. of Larry Anderson ¶ 17 (Ex. 18).

> David was not at all sharp mentally.  He was a terrible drug businessman.  He did not know the basics, like how much powder was in a gram, so he could only operate at the lowest level of whatever was going on.

Decl. of Dave Wallace, III ¶ 7 (Ex. 12).

### c.    **Language/Communication**

Mr. Jackson's achievement test scores when he was 13 and 14 years old reflect that his language skills were at the level of a typical first and second grader. These limitations are attested to by those who knew Mr. Jackson as a child:

> David had a speech problem as a child.  He could not pronounce or say certain words correctly. He often could not say words that began or contained the letter "B."  He would say "blably" instead of "baby."  His sentences were not clear. Instead of saying, "The baby is crying," he would say, "The blably is clying."  When he should have been old enough to speak in sentences, he would still use just one word to express himself, for example just "water," instead of "I want some water."  When he wanted to go outside he would say "outside," instead of "I want to go outside."
>
> David had to be told three and four times to do a chore. . . . He was easily confused and frustrated because he could not understand simple things. He could not do things at a normal pace, was slow to learn and he didn't have the ability to reason like a normal person.  David would sit on the floor and cry and moan for hours.  He would make long, bleating sounds.  It seemed very retarded.   He would sit in the middle of the floor and cry – even into his teen years.

Decl. of Brenda Boyd ¶¶ 29-30 (Ex. 19).

37

He could only focus on one thing at a time. When you talked to David you had to break things down into small parts. I would tell him to do something and he would just look at me. I had to tell him two or three times before he understood.

. . . [W]hen something was not funny he would laugh, but then would not understand a simple joke. When he didn't understand what you were trying to explain he would get frustrated and just shut down and not talk.

Anderson Decl. ¶¶16 and 19 (Ex. 18).

We picked on him because he was not able to defend himself verbally and he was not quick or clever enough to come up with an alibi or excuse or blame someone else.

A. Little Decl. ¶ 2 (Ex. 9).

### d.    **Social/Interpersonal Skills**

Mr. Jackson is generally described as conspicuously lacking in social and interpersonal skills:

David had problems understanding the truth from a lie, so he was gullible and easy for people to manipulate or trick. His thinking was one-dimensional. He would get fixated on a thought and not be able to let it go. It was like his brain just got stuck. He never seemed able to analyze a situation or see the big picture.

Boyd Decl. ¶¶ 30-31 (Ex. 19).

He didn't seem to care about making friends his own age.

David would laugh at odd times. He did not have an appropriate sense of timing . . .

. . . He didn't have good social skills. He couldn't work with other people on planning things. When he talked he would jump from one subject to another. He would just sit on the couch and say incoherent things.

Anderson Decl. ¶¶ 17, 19, 20 (Ex. 18).

38

> It was the same way with people.  He would stick with what he knew.  David was okay if he knew somebody, but he was not comfortable around crowds or around people he didn't know.  He did not like bars at all.  He did not have good social skills and he mostly preferred to avoid social situations.

Morrison Decl. ¶16 (Ex. 16).

### e.    **Self-Direction**

Due to his mental limitations Mr. Jackson has always been dependent on others to assist him with basic functions and to help him navigate life.  He was not a "self-starter" and tended to follow others' leads and initiative.  Individuals who have known Mr. Jackson since childhood describe these pronounced deficits in his functioning:

> David had to be told three and four times to do a chore.  He might start a task but could not complete it.  He would attempt to clean up but couldn't finish.  He was easily confused and frustrated because he could not understand simple things. He could not do things at a normal pace, was slow to learn and he didn't have the ability to reason like a normal person

> David would give Michael whatever little money he may have had and he would depend on Michael to make the decisions on how to spend it.  If they would go to McDonald's, Michael would always order for David.  David did not make a lot of decisions for himself.  He just went along with the crowd and followed whoever was telling him what to do.

> David has always been easily influenced.  For example, he got involved in Islam in prison so he would be accepted by other prisoners he wanted to impress.  It was just a phase.  He is insecure and wants people to like him and has always wanted more than anything to be accepted.

> David was locked up in 1992 when Michael died and in 2005 when Joan died, and he took their deaths very hard.  He had depended on both of them heavily when he was young and he had strong feelings for them.  Joan was only two months

older than David so she took care of him a lot, and Michael was his hero. He called them his "road dogs" – his right and his left hands.

Boyd Decl. ¶¶ 30, 35, 38, 49 (Ex. 19).

Sammie Lee sold marijuana out of her house. She would bag it up in "nickel" and "dime" bags. David would deliver it for her. David could not have had his own operation without a lot of help. He was not smart enough to figure out different quantities and how to keep from getting cheated. If someone owed David $200 and they paid him back, he would stuff the money in his pocket without even counting it. He could easily have been repaid just $70 but he would not even know. If David owed someone money and he came up short, I knew it wasn't because he was trying to steal it but it was because someone else had shorted David and he didn't even know it. He did not have the mental ability to even keep track of his own money.

David could not plan anything. Whenever there was any sort of breaking and entering activity among our friends, he would just go along with what everyone else was doing. He never made any decisions for himself. He did not know how to figure out logistics. He would just do what he was told. He was definitely a follower, one to follow the crowd. He was not a leader at all.

When David had to go anywhere, nine times out of ten, he would take someone with him. He would try to hide the fact that he didn't know his way around or did not know how to do something simple. He would act like he could do it but you could tell he really could not. One time when I was there, his mother asked him to go to the store. He got me to go along with him because he needed help. When we got to the store, David said he did not feel like going in. He said he didn't feel well and he gave the list to me to do the shopping. I knew it was because he could not do it himself and he did not want to ask someone in the store for help in front of me.

David was never one to start a fight or get violent with someone. He might react to a threat or a provocation but he would not start something. That was not his nature.

40

Decl. of Marcos Martinez ¶¶ 10-13 (Ex. 10).

> By these teenage years I stopped trying to figure him out. He just didn't make sense. He didn't make good decisions for himself. For instance, he would just give money to anyone who asked him for it.

> David helped me rob stores to pay for our habits. He could not plan these things. I would have to instruct him. I would tell him all he needed to do was watch my back and let me do the talking. I didn't want him to mess it up because he didn't know what he was doing.

Anderson Decl. ¶¶ 17, 26 (Ex. 18).

> He knew his way around the neighborhood, but if he was in an unfamiliar place he would have a hard time finding his way around. If he knew the exact route by heart, he could get from point A to point B, but if it was new to him, he would not be able to find it. David pretty much would stick to what he knew.

Morrison Decl. ¶ 15 (Ex. 16).

> He would just go along with what was happening. He would never initiate anything or come up with any ideas on his own, and if he did, it would probably not be a good one. Even the little crimes he would commit were simple and poorly thought out, never any more complicated or sophisticated than something a kid would think of.

Wallace Decl. ¶ 7 (Ex. 12).

> We could get David to do anything. He was gullible and easy to manipulate. David was the fall guy if it came to pinning something on somebody.

A. Little Decl. ¶ 2 (Ex. 9).

> He seemed like my younger brother because he couldn't do the same things I could do.

41

Decl. of Patricia Jackson ¶ 18 (Ex. 15).

> David is what I call a gentle giant.  He was mostly a very mild-mannered and passive type of person.  He didn't bother anyone and just went along with the crowd.  I've never known David to hurt anyone.

Decl. of Lionel Bass ¶ 11 (Ex. 17).

### f.    **Use of Community Resources**

A number of the deficits previously discussed made it difficult for Mr. Jackson to avail himself of community resources appropriately and competently.  Several of the declarations describe specific examples of Mr. Jackson's disability in this key area of adaptive functioning:

> When David was out of prison I would recommend various services to help him get on his feet but he just didn't seem to know how to take advantage of those community resources. It took him forever but he finally got it together to sign up for food stamps.  He had a lot of trouble with things that should have been pretty easy to do.  I took David to an Alcoholics Anonymous meeting.  He stood up and said, "I am not an alcoholic."  He did not get it.

Anderson Decl. ¶ 40 (Ex. 18).

> At some point when David was home, Sammie Lee gave him her money to put down on a house for her to buy and live in. I told Sammie Lee not to give her money to David because he would not know how to manage or spend it properly for the house. He had no idea how to make such a transaction and the house he found for her needed a whole lot of work.  David and his nephew, Craig (Patricia's son), started painting the place and trying to make it look better.  They moved all of Sammie Lee's things into the house, even though I kept warning them they were going to get into trouble moving her there without the proper documentation.  David did not have the common sense to get the basic necessities taken care of. He did not know how to make sure he was not getting ripped off.  He had not gotten the paperwork.  David did not even

> ever think of that. It did not even occur to him that he needed
> to make sure the house was legally theirs. Even a month later
> he was doing nothing to make sure Sammie Lee actually
> owned the house. The guy David bought it from could not
> produce the deed, so they could not get the electricity, gas or
> water turned on. Anyone should know enough to check out
> the electricity and plumbing in a house before buying it and
> that a legitimate seller would leave the utilities on so that they
> can show a buyer that everything is in good working order. It
> turned out David had gotten scammed on the sale of the
> house.

Boyd Decl. ¶ 52 (Ex. 19).

> One thing I noticed when David was out here is that he would
> have a real hard time dealing with basic everyday tasks, like
> getting a state identification card. He would not let on that he
> did not know how to do certain things for himself, so he
> would ask me to do things for him. I know it was because he
> got frustrated and overwhelmed by such things and needed
> help with them.

Decl. of Yvette McCaskill ¶15 (Ex. 14).

g. **Self-Care**

From the time Mr. Jackson was a toddler, it was apparent to those around him that he was not normal and that he had special needs. He was slow in meeting the "developmental milestones" that mark young children's growth and progress. His two older cousins, who lived under the same roof with Mr. Jackson from the time he was an infant, describe Mr. Jackson during his early formative period:

> David was more dependent on Sammie Lee than any of the
> other kids. He would put his shoes on the wrong feet and
> would button up his shirt incorrectly. He could not dress
> himself or tie his shoes until he was in at least second grade.
> He did not bathe himself until he was seven years old. He
> wet the bed until he was ten years old. Sammie Lee and
> Leroy told us that whenever we got up at night to go the
> bathroom we had to wake up David and take him with us. He
> sucked a bottle and pacifier until he went to school and

> sucked his thumb long after he was going to school.

Boyd Decl. ¶ 28 (Ex. 19).

> David was very slow in developing. It always seemed like
> there was something short-circuited in his brain. He drank
> from a bottle until he was five years old, wore diapers until he
> was four or five, sucked his thumb until he was seven or
> eight, and couldn't tie his shoes. He didn't do well in school
> so he stopped going when he was about ten years old.
> Sammie Lee was always doing little things for him because
> he didn't take care of himself.

Anderson Decl. ¶ 15 (Ex. 18).

### h.   **Work**

Mr. Jackson is unable to work due at least in part to his intellectual impairments. He has never been able to acquire practical job skills or hold a job. According to the Social Security Administration, Mr. Jackson has reported earnings, during his entire life, totaling $243.24. *See* David Jackson Total Earnings, Social Security Administration (Ex. 27).

### 3.   **Onset Prior to the Age of 18**

Based on the foregoing elementary and junior high school records and the declarations from numerous individuals who knew Mr. Jackson during childhood, it is well established that Mr. Jackson's intellectual limitations and deficits in his adaptive functioning were manifested prior to the age of eighteen.

### 4.   **The Findings of Dr. Victoria Swanson, Expert in Mental Retardation/Intellectual Disability.**

Dr. Swanson summarizes her findings as to Mr. Jackson's intellectual and adaptive functioning as follows:

> Based on my experience as a licensed psychologist and an
> expert in the field of mental retardation, I have concluded
> that, to a reasonable degree of scientific certainty, intellectual

44

> tests and academic assessments, administered prior to the age of 18 and assessments made during this evaluation, a review of declarations and testimony from family and friends that knew him well during the developmental period, and a review of available records indicate Mr. Jackson meets the intellectual, adaptive, and age of onset criteria for a diagnosis of Mental Retardation.

Swanson Decl. p. 10 (Ex. 6).

## E.      Trial Counsel Unreasonably Failed To Establish Mr. Jackson's Ineligibility For The Death Penalty On The Basis Of *Atkins*

Trial counsel were aware that mental retardation was a potential defense against imposition of the death penalty on Mr. Jackson. Prior to trial, counsel moved for the appointment of a neuropsychologist to evaluate Mr. Jackson for the presence of brain damage and to render an opinion on whether he had mental retardation. In addition, counsel moved for the appointment of an "educational consultant" to interpret and explain the significance, if any, of Mr. Jackson's school records.

### 1.      Pretrial - Dr. Milam's Evaluation and Assessment

There were strong indications in Mr. Jackson's school records that he has mental retardation, including a straightforward diagnosis of Mr. Jackson as mentally retarded by his school. *See* David Jackson School Records (Ex. 84). Pretrial interviews with his mother and cousin confirmed the possibility. This led the mitigation specialist to suggest to trial counsel that they explore the issue further. Counsel enlisted a neuropsychologist, Daneen Milam, to conduct a battery of neurological tests and an intelligence test, the WAIS-III (1995). Dr. Milam concluded that Mr. Jackson's IQ was 81 and that he did not have brain damage. Based on her findings, she told defense counsel that Mr. Jackson did not have mental retardation. However, as explained below, Dr. Milam's methods were easily recognizable as faulty such that trial counsel should have known better than to rely on them without further investigation before ruling out

45

mental retardation, a condition which would have exempted their client from the death penalty.

At the time of Mr. Jackson's trial, prevailing professional norms of capital defense practice included an understanding of IQ testing and its application to cases under *Atkins*. This knowledge included an understanding of the need to ensure that scores obtained in a forensic setting were consistent with the AAIDD protocols discussed in *Atkins*. *See*, *e.g.*, *Walker v. True*, 399 F.3d 315, 322 (4th Cir. 2005) (remanding for evidentiary hearing on *Atkins* where Flynn correction was argued). Mr. Jackson's trial counsel unreasonably lacked this prevailing basic understanding of forensic IQ evaluations, and their performance in that regard was deficient.

In fact, Dr. Milam herself has acknowledged that her testing of Mr. Jackson was flawed and has since revised her opinion based on evidence that was readily available to trial counsel but that they failed to discover or present to her. First, as to Mr. Jackson's IQ, Dr. Milam acknowledges that her score of 81 did not take into account the standard scoring factor known by experts in the field as the "Flynn Effect." Consistent with AAIDD protocols, she believes the effect must be considered and that an adjustment must be made for the eleven-year period between the norming of the WAIS-III in 1995 and the testing of Mr. Jackson in 2006. Making the correction, she now states "it is likely that Mr. Jackson's true IQ score was closer to 77 or 78." Decl. of Daneen Milam ¶ 7 (Ex. 2).

In addition to adjusting Mr. Jackson's score on her 2006 test in light of the Flynn Effect, Dr. Milam has reviewed the scores on tests Mr. Jackson was given in childhood. She states, "I did not take the Flynn Effect into account in considering Mr. Jackson's two low childhood IQ scores" of 76 and 67. Milam Decl. ¶ 8 (Ex. 2). Of these scores, she states that it is likely that those two childhood scores are significantly inflated. Appropriate adjustment of those scores of 76 and 67 would bring them considerably lower and even more firmly within the range of mental retardation. *Id.*

Prevailing norms of capital defense practice also informed Mr. Jackson's trial counsel of the need to collect background information regarding their client's development, particularly where, as here, they recognized the need for intelligence testing. ABA Guidelines, Guideline 10.7. Mr. Jackson's defense counsel unreasonably failed to collect information related to the second-prong of the *Atkins* test: deficits in adaptive functioning.

Dr. Milam also attests that the lack of information at the time of her 2006 evaluation concerning Mr. Jackson's "adaptive behavior," especially prior to the age of eighteen, precluded her from making an accurate diagnosis concerning mental retardation. Based on the additional information defense counsel reasonably should have marshaled in their background investigation, Dr. Milam believes that Mr. Jackson indeed manifested significant deficits in his developmental period:

> At the time I assessed Mr. Jackson, I was provided with little information concerning his adaptive functioning before the age of 18. I have now had the opportunity to review statements from a number of individuals who knew Mr. Jackson during his developmental period, i.e., before the age of 18. It is my opinion that these statements indicate Mr. Jackson did have significant deficits in his adaptive functioning before the age of 18.

Milam Decl. ¶ 9 (Ex. 2).

Most important, in light of her revised IQ score from 2006, the correct adjustment for the childhood IQ scores, and the availability of information concerning Mr. Jackson's adaptive functioning, Dr. Milam has reversed her prior opinion that Mr. Jackson does not have mental retardation:

> Based on the appropriate adjustment of Mr. Jackson's IQ scores in elementary school and his IQ score in 2006 to account for the Flynn Effect, and based on additional information I have received concerning Mr. Jackson's adaptive deficits before the age of 18, I do not believe I could

47

> rule out the possibility that Mr. Jackson has mental retardation.

Milam Decl. ¶ 10 (Ex. 2).

Moreover, the validity of Dr. Milam's IQ testing and neurological assessment are seriously called into question in the declarations of Dr. Swanson and Dr. Dale Watson, a highly qualified and eminent neuropsychologist.  Both doctors have reviewed Dr. Milam's administration of the WAIS-III test to Mr. Jackson and find it to be so fraught with methodological errors and breaches of protocol that it can not be considered valid.  Dr. Watson has reviewed the data from Dr. Milam's battery of neurological tests and finds it, too, to be invalid due to various procedural errors and improprieties.  Specifically, Dr. Watson states:

> It is my opinion that the number of methodological errors in the IQ testing is significant enough that the test cannot be considered a valid assessment of Mr. Jackson's intellectual functioning.  Furthermore, the limited number of neuropsychological tests administered in 2006 do not provide a sufficient basis to form opinions regarding Mr. Jackson's neuropsychological functioning within the context of capital litigation.

Watson Decl. ¶ 4 (Ex. 3).  Error #1:  The omission of neurological tests indispensable for evaluating executive functioning:

> First, the examination utilized an insufficient battery of tests, in giving only a partial administration of the Halstead-Reitan battery, and in omitting  several crucial and indispensable tests of executive functioning, e.g.,  the Category Test and the Wisconsin Card Sort.  While the battery did include a modified Trailmaking and Stroop Color and Word test, these are merely screening devices that do not adequately assess executive functioning.  Executive functioning is primarily regulated by the frontal lobes of the brain and includes planning and decision-making, the ability to navigate dangerous or difficult situations, and controlling inhibitions

48

or impulses.  Tests of executive function are especially important in a capital case where such brain functions or dysfunction often play a role in the offense in question.  The omission of an array of executive function tests, including the Category Test and the Wisconsin Card Sort, means that important tests of executive functioning were not performed.

Due to the absence of key components of a full and complete battery of neuropsychological testing and other errors in administration, it is my professional opinion that the testing performed in 2006 does not provide a sufficient basis for concluding that Mr. Jackson does not have brain damage.  That is, I believe it would be a mistake to rule out the presence of brain damage based on this data.

*Id.* at ¶¶ 4-5.  Error #2:  Improper administration of the WAIS-III intelligence test:

With regard to the administration of the WAIS-III IQ test, there are two areas of significant concern that invalidate the test results.  First, it is my opinion that five of the eleven subtests are "spoiled" due to errors in administration that make it impossible for these subtests to be accurately scored and thus invalidating them.  Specifically, the Vocabulary, Similarities, Block Design, Picture Arrangement and Comprehension subtests were spoiled.  For example, the Picture Arrangement test is designed to be given in a set sequence and is supposed to be given that way every time.  When the test was given to Mr. Jackson, the items were apparently given in the wrong order which is absolutely contrary to the requirements of standardized administration – making the results invalid.

*Id.* at ¶ 6.  Error #3:  Scoring errors:

In addition to what I consider to be invalidating errors in this administration of the WAIS-III, there are also a substantial number of actual scoring errors in the computation of the subtest scores.

*Id.*  Conclusion:  The neurological and IQ testing is not valid:

Based on all of these problems, it is my opinion that this

49

administration of the WAIS-III is not valid and that it should
be discounted as an accurate or meaningful measure of Mr.
Jackson's intellectual functioning.

*Id.*; *see also* Swanson Decl. p. 8 (Ex. 6) (identifying 14 errors in the administration of the

WAIS-III in 2006, and determining that four subtests were "spoiled" and should therefore

be "voided" calling into question the validity of the results.

2.    **Trial -- Dee Dee Halpin, Educational Consultant.**

Ms. Halpin testified that she is a "self-employed education consultant,"

which she described as: "I work with families and help them make educational decisions

about their children." (Tr. 1544.)  Trial counsel's files contain Ms. Halpin's 3-page

Curriculum Vitae.    Nothing in Ms. Halpin's credentials indicates that she possesses the

qualifications for making, or ruling out, a diagnosis of mental retardation.  She possessed

no credentials in psychology or diagnostic experience with mental retardation.  Her only

experience with mental retardation was when she worked during the summer of 1978 as

"Production Supervisor for Dal-WORC Rehabilitation Facility for Mentally Retarded

Adults." *See* Dee Dee Halpin, M.S., Curriculum Vitae (Ex. 56).

Her trial testimony demonstrated her lack of experience in this area.  Ms.

Halpin testified about Mr. Jackson's school records, beginning with his IQ scores at the

age of seven and ten of 76 and 67, respectively, before accounting for the Flynn effect,

which Ms. Halpin did not apply.  (Tr. 1551.)  She testified on direct examination that

"seventy is usually the benchmark line for mental retardation," so his "scores would have

to be below seventy," *id.*, which is inaccurate because: (1) even the strictest standards

place the cut-off at "*seventy or* below," not "below seventy," and (2) the AAIDD cautions

that "A fixed point cutoff score for I.D. is not psychometrically justifiable. . . . [I]t is

important to use a range as reflected in the test's standard error of measurement."

*Intellectual Disability,* at 40 (Ex. 28).[13]  Ms. Halpin misleadingly testified that his 67

---

[13]    This concept was not new in the 11th (2010) edition of the *Manual*.  *See* 10th edition at
58 (2002) (Ex. 71), noting that the DSM-IV "defined *significantly subaverage* as an IQ

score did not meet the definition for retardation by "current standards," because "there would have to be other information to go along with the diagnosis." (Tr. 1552.) Trial counsel did not adduce that Mr. Jackson's IQ was within the mental retardation range, two standard deviations below the norm, or that the "other information" related to Mr. Jackson's adaptive functioning, one of the three criteria that needs to be evaluated before a diagnosis of mental retardation can be ruled out.

Dr. Halpin went on to address the young Mr. Jackson's Stanford Achievement Test scores when he was in seventh grade. His median score in seventh grade was a 2.7 grade level. (Tr. 1553.) His language skill was at a 1.9 grade level. She testified that he was in remedial English and Math classes and was passing them. (Tr. 1554-55.) She further testified that in ninth grade, his median score on the achievement test was 2.6. Again, inexplicably, she stated that this indicated "he's being successful in the program that he's in. . . because of his grades." (Tr. 1556.) She made no reference at all to the fact that his actual grade level on standard testing had gone *down* from 2.7 to 2.6 from seventh to ninth grade. On the contrary, she said "he's making a little bit of academic progress, not falling behind. He's not just stagnant, he's making some progress." (Tr. 1556.)

Asked to summarize her conclusions about "David's educational background," Ms. Halpin testified, in whole part:

> Well, he was behind from the very beginning. Obviously somebody noted that and got testing done very early. So he presented in some way, you know that he received some attention because of the learning problem.
>
> And it looks like he was in some programs that were designed to help him and that he got something out of those, but without all of the special ed records, it's really difficult to

score of about 70 or below and added a statement concerning measurement error . . . The American Association on Mental Retardation (Luckasson et al. 1992) defined it as approximately 70 to 75, taking into account measurement error."

51

know exactly what those programs were.

(Tr. 1557-58.)

On cross-examination, Ms. Halpin testified somewhat remarkably and without substantiation:

> Q      In fact, back at that time it was quite common that they would – a significant portion, perhaps as many as ten to fifteen percent of the students in those early grades would be left back, isn't that right?
>
> A      Often, uh-huh.

(Tr. 1559.)   She repeated her view that in his latter years in school, Mr. Jackson "was passing, making B's and C's" and that "it appears he was successful, so . . . yes, he must have made some improvement."  Asked whether there was any indication "that when he left the Maxey school he wasn't functioning as a normal sixteen-year old boy," Ms. Halpin stated "he was passing his classes."  And so her ultimately misleading testimony concluded.  (Tr. 1564.)  As demonstrated below, her assessment of Mr. Jackson's educational history was superficial and inaccurate and she presented a false picture of Mr. Jackson's academic and intellectual ability to his capital sentencing jury.  In fact, Mr. Jackson was failing school, was unable to make progress despite being placed in special education, and his academic performance was worsening, not improving. Moreover, far from the impression Ms. Halpin gave the jury that Mr. Jackson was somewhat normal in that he was among 10-15 percent of his classmates who might have been held back, he had been set apart from his classmates in that the school had diagnosed him with mental retardation.

3.      **Trial -- Kate Allen**

The bulk of social worker Kate Allen's testimony addressed parts of Mr. Jackson's abusive childhood, but it also touched briefly on his intellectual functioning. First, as Dr. Allen herself acknowledged when she testified, she was not qualified to

evaluate anyone for mental retardation because she is not a psychologist.  In addition, even if she had been qualified, because trial counsel had not provide her with the basic information anyone would have needed to evaluate someone for mental retardation, any opinion she rendered on the issue was uninformed and invalid.

Given her lack of qualifications and lack of basic information, then, it is unsurprising that on direct examination from defense counsel, she was essentially led to say Mr. Jackson did not meet the criteria for mental retardation.

> Q      Now, we find in the records, and we can see this in this exhibit, that they did say at some point that he was diagnosed in a mental retardation range, but *that's not mental retardation* as we know it now, it's not the term of art that we know, *correct*?
>
> A      *No.*  There are three factors, and we don't have enough information to meet all of those three factors in this.

(Tr. 1571-72) (emphasis added.)

It is important to note that Dr. Allen acknowledged that she did not have enough information to know whether Mr. Jackson met all three factors establishing mental retardation.  Moreover, on cross examination, Dr. Allen acknowledged that she did not "determine whether or not Mr. Jackson was mentally retarded" when she talked to him:

> A      Well, that isn't my specialization.  *I can't do that.*

(Tr. 1615) (emphasis added.)

However, given the fact that by this time the jury had heard two people presented to them as experts opine that they could not conclude that Mr. Jackson was mentally retarded, trial counsel gave the jury no reason to believe that their client was mentally retarded and every reason to believe that two qualified experts had concluded that he was not.

53

**F.**     **Mr. Jackson's Trial Counsel Were Ineffective In Failing To Prove His Mental Retardation And Ineligibility For The Death Penalty**

As pled above, Mr. Jackson is ineligible for the death penalty due to his intellectual disability.  He meets the criteria for ID/mental retardation and for relief from his death sentence on the basis of *Atkins.*  Under *Atkins*, he cannot be executed.  In addition, his trial counsel were ineffective for failing to discover and present readily available evidence of Mr. Jackson's mental retardation.  In fact, trial counsel's performance was unreasonably deficient in several respects, including their failure to pursue a thorough investigation of the evidence needed to prove that Mr. Jackson was mentally retarded; their failure to identify qualified experts; their failure to provide those witnesses who they did present as experts with adequate information; their failure to insure that the testing administered to Mr. Jackson was valid; and their presenting testimony to the jury that actually misled the jury into believing that no one could actually determine that Mr. Jackson was mentally retarded.

The pretrial and trial records demonstrate that Mr. Jackson's defense counsel recognized they possessed potentially important mitigation evidence related to their client's intellectual disabilities.  *Cf. Wiggins*, 539 U.S. at 526-27, 531-33.  Defense counsel obtained Mr. Jackson's school records and later presented evidence of his low IQ scores, although the evidence was inaccurate and misleading.  They retained Dr. Milam to conduct intelligence testing, and wrote verdict questions aimed at the issue.  They even seemed to recognize the deficiency in their own preparation when they adduced from Ms. Halpin that she lacked information related to one criterion for a diagnosis of mental retardation.  In general, defense counsel in a capital case have a duty to conduct a thorough investigation of their client's background.  *Williams*, 529 U.S. at 415 (O'Connor, J., concurring).  Where evidence points to potentially important mitigation evidence it is constitutionally deficient performance for counsel to stop investigating before the evidence has been fully developed.  *Wiggins*, 539 U.S. at 527-28.

54

Mr. Jackson was prejudiced by his lawyers' deficient performance. As shown herein, there was much counsel could and should have done to advance a case for *precluding* the death sentence in light of the considerable evidence of mental retardation that was available. Their failure to do so prejudiced the outcome of Mr. Jackson's trial. The cumulative weight of the evidence adduced at trial and proffered with this Petition establishes a reasonable probability that Mr. Jackson's low IQ and adaptive behavior deficits before he turned 18 would have produced a finding that he suffers from mental retardation, and his death sentence would violate the Eighth Amendment. In light of the strength and abundance of this evidence, the Court should conduct an *Atkins* hearing at which Mr. Jackson is given the opportunity to prove his ineligibility for the death penalty because of his intellectual disabilities.

## CLAIM 3

### MR. JACKSON WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE OF HIS MENTAL ILLNESS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS

**A.** **Deficient Performance**

1. **Pretrial**

Trial counsel appear to have been aware of the strong possibility that Mr. Jackson suffers from some form of mental illness or impairment based on communications between counsel and the mitigation specialist and judging from their retention of four mental health professionals to assess him. Counsel retained: (i) a neuropsychologist, Dr. Daneen Milam; (ii) a clinical psychologist, Dr. Dan Roberts; and (iii) a developmental psychologist, Dr. Oney Fitzpatrick. A fourth expert, psychiatrist Ed Gripon, was originally retained by the defense but was discharged after counsel learned that he had also been retained by the Government. None of these experts testified at Mr.

55

Jackson's trial or penalty phase, however, so their involvement in the case was of no benefit whatsoever to Mr. Jackson's defense.

There are several explanations for why trial counsel failed to call any mental health witnesses in Mr. Jackson's defense. For one, Mr. Jackson's trial counsel poorly prepared the experts and issued assignments without adequate background information with which to render professionally sound mental health assessments. For another, some of the experts lacked the requisite qualifications and expertise to provide the kind of assistance that was needed. Finally, the experts were not charged with the proper or appropriate referral questions, *i.e.*, they were not asked to assess the right issues: What are his psychiatric symptoms? What is the history of mental illness in his family? Why is his functioning so impaired? What is wrong with his brain and the way it works?

### a.    **Dr. Milam**

Dr. Milam's assessment is addressed more fully in Claim 2, which addresses the failure of counsel to establish Mr. Jackson's ineligibility for the death penalty on the basis of *Atkins v. Virginia.* This should be part of any comprehensive mental health assessment, but as described in Claim 2, it was mishandled by trial counsel.

### b.    **Dr. Roberts**

Dan Roberts, a clinical psychologist, was retained by trial counsel Doug Barlow to evaluate Mr. Jackson. Dr. Roberts knew Mr. Barlow in high school in Beaumont, where he was a few years ahead of him. To the best of his recollection, Mr. Barlow has used Dr. Roberts in approximately ten capital cases, going back to the 1980's, with all but one resulting in a death verdict. Consistent with his customary role for Mr. Barlow, Dr. Roberts was asked to do a "risk assessment," *i.*e., to prognosticate as to the extent to which Mr. Jackson would pose a danger in the future should the jury see fit to grant him life in prison. In addition, Dr. Roberts assessed Mr. Jackson for the presence of mitigating factors that might be presented on his behalf in arguing for mercy.

56

Dr. Roberts attempted to visit Mr. Jackson twice to evaluate him. The first visit was unsuccessful because unacceptable visiting conditions would have required them to conduct the clinical interview through a glass window. On his second visit, Dr. Roberts met with Mr. Jackson for three hours. This visit took place on October 20, 2006, during Mr. Jackson's trial.

In advance of his interview of Mr. Jackson, Dr. Roberts received prison and jail records, criminal case files and prior presentence reports, some documents pertaining to Mr. Jackson's mother's unsuccessful insurance claim on a house that burned down, and a summary of Mr. Jackson's life written by the trial mitigation specialist, Pam Stites, based on her limited interviews with four family members. In addition, Dr. Roberts was provided with a couple of emails from Ms. Stites and notes of her interview with Mr. Jackson; a summary of Mr. Jackson's school records prepared by Dee Dee Halpin, the education consultant who testified at trial; and an "eco-map" of Mr. Jackson's life circumstances prepared by the other penalty phase witness, social worker Kate Allen.

Based on Dr. Roberts' review of the materials and his interview with Mr. Jackson, he reported to trial counsel that his "risk assessment" of Mr. Jackson was not favorable, and the lawyers concluded it would be better for Dr. Roberts not to testify. Ultimately, as described by Dr. Roberts to present counsel, "there was not much the attorneys felt the jury could latch onto by way of mitigation that would be helpful." As detailed elsewhere in this Petition, this conclusion was largely attributable to trial counsel's failure to investigate and develop mitigating evidence.

A major component of Dr. Roberts' risk assessment was his administration to Mr. Jackson of the Hare Psychopathy Checklist-Revised (PCL-R), a lengthy questionnaire in booklet format. Dr. Roberts is a strong proponent of the PCL-R, as evidenced by a handwritten 2-page fax sent to trial counsel literally on the eve of the penalty phase, on November 6, 2006, containing "some ideas" Dr. Roberts had "about the opposing psychology experts testimony." Fax from Dr. Roberts to Doug Barlow (Ex.

57

38).   Dr. Roberts informed counsel that the Government expert would be "tough to counter" if he used the PCL or Violence Risk Assessment Guide (VRAG) in his evaluation of Mr. Jackson.  Dr. Roberts went on to advise counsel that an opinion "regarding prediction of violence" based on the VRAG or PCL would be "tougher to defend against because they are pretty fair predictors."  *Id.*

Interestingly, counsel had filed a pre-trial *Daubert* motion seeking to bar the Government from using the PCL-R to assess Mr. Jackson's "future dangerousness" based on a wealth of authority discrediting the test as unreliable and unscientific.  Motion *In Limine* (Ex. 48).  In their Motion *In Limine* to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness and accompanying Memorandum of Law, counsel cited a variety of legal opinions and scholarly articles addressing the inaccuracy of predictions of violence, in particular when based on the PCL.  Counsel asserted:

> The PCL-R is unreliable primarily because of its very high
> false-positive rates.  The PCL-R has been estimated to predict
> violent behavior with a false positive rate between 54.3 and
> 75%.  This indicates that the PCL-R predicts violence at a
> rate worse than chance.

*Id.* (citing Freedman, D., False Prediction of Future Dangerousness: Error Rates and the Psychopathy Checklist-Revised, 29 J. AM. ACAD. PSYCH. & L. 89, 92 (2001).[14]  Yet, they

---

[14]   It is hard to fathom why counsel would rely on an expert whose philosophy on this crucial issue was so contrary to the position espoused in their motions and in other well-known authorities and case law condemning the very approach of their chosen mental health expert.  *See also* Edens, Colwell, Deforges and Fernandez, *The Impact of Mental Health Evidence on Support for Capital Punishment: Are Defendants Labeled Psychopathic Considered More Deserving of Death?*, (Ex. 62) Behav. Sci. Law **23:603-625** (2005) ("Given the limited probative value of the PCR in capital cases and the prejudicial nature of the effects noted in this study we recommend that forensic examiners avoid using it in these trials."); *United States v. Stitt,* No. 2:98-cr-47 (E.D. Va., April 1, 2005), Memorandum Order and Opinion, at 32 ("Dr. Ryan's testimony was erroneous . . . . At the time of Petitioner's trial, Dr. Ryan did not realize that the PCL-R was not an accurate predictor of prison violence as opposed to future dangerousness in the community at large.  (Decl. Dr. Ryan par. 3, 5, 8.)  Dr. Ryan indicates that the scientific literature has come to reflect the view that the PCL-R is not a reliable predictor of future dangerousness of individuals confined in a federal prison and the Government has not presented any evidence to refute this claim."); *United States v. Taylor,* 320 F.

failed to question the assertion by their chosen expert that the PCL-R or VRAG would be "difficult to counter" because of his belief in their general reliability.

Dr. Fitzpatrick.  Oney Fitzpatrick, Ph.D., is a developmental psychologist on the faculty of Lamar University in Beaumont.  His resume is available on the university's website, http://dept.lamar.edu/psychology/Fitzpatrick.html, and indicates that his research has been in the areas of college students' perceptions of Islam, eating disorders, Ritalin, HIV/AIDS and sexuality.

Dr. Fitzpatrick was asked by trial counsel Douglas Barlow to visit Mr. Jackson as the lawyers were putting the case together in the final stages before trial.  He saw Mr. Jackson on October 20, 2006, the same day that Mr. Jackson was interviewed by Dr. Roberts, one day after jury selection was concluded.  Dr. Fitzpatrick prepared a short report on his interview of Mr. Jackson.  Dr. Fitzpatrick wrote to Mr. Barlow on November 6, 2006, in the middle of the penalty phase, stating:

> I feel that there is sufficient evidence in Mr. Jackson's background that would warrant special consideration in the matters of his trial.  If I may be of further assistance, feel free to let me know.  I remain willing to pursue this further if you deem it necessary.

Letter from Dr. Fitzpatrick to Mr. Barlow (Nov. 6, 2006) (Ex. 39).

Despite Dr. Fitzpatrick's opinion that Mr. Jackson's background might be useful for trial, he was not utilized any further in the case.

2.    **Trial**

The defense presented no psychologist or psychologist at trial.  Counsel did present two quasi-mental health witnesses, specifically an "education consultant" to

Supp. 2d 790, 794 (N.D. Ind. 2004) ("Thus, due to the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings, the Government and any of its experts is prohibited from utilizing this test in evaluating Defendant Thomas."); *United States v. Sampson,* 335 F. Supp. 2d  166, 219-224 (E.D. Mass.) (discussion of pitfalls of "future dangerousness" assessments and prejudicial effect of using term "psychopath").

describe Mr. Jackson's school records and a doctor of social work to discuss his childhood development.

Dorothy Halpin, Educational Consultant.  Ms. Halpin's testimony is discussed in Claim 2, *supra*.  In short, she walked through Mr. Jackson's elementary school IQ scores and his junior high and high school standard achievement test scores and despite all of the scores being within the range of mild mental retardation, and a finding in 4th grade that Mr. Jackson was "mentally retarded," Ms. Halpin found that he did *not* meet the criteria for mental retardation because "other information" was required and because, ultimately, he passed his classes – albeit in special education.

Kate Allen, Social Worker.  Dr. Allen testified about some of the traumatic experiences of Mr. Jackson's childhood.  She described what she had heard about his background from Mr. Jackson and from the mitigation specialist, who in turn had heard it from other individuals.  On cross examination, Dr. Allen agreed that some her information was "four levels of hearsay."  (Tr. 1605.)

Dr. Allen concluded that Mr. Jackson meets the criteria for post-traumatic stress disorder in an adult.  (Tr. 1579, 1587, 1595.)  Rather than explaining to the jury the mitigating importance of Mr. Jackson's traumatic childhood, defense counsel permitted the issue to boil down to whether Mr. Jackson indeed met the clinical criteria for PTSD, without further description of the relevance of such a diagnosis or why it would matter in a capital case.  Moreover, Dr. Allen's diagnosis was flatly contradicted by Government rebuttal witness Dr. Richard Coons who minimized Mr. Jackson's childhood trauma and asserted that Mr. Jackson assuredly did *not* have PTSD.  Dr. Coons testified:

> And so in his situation, as I understand it, there's some statements about his father drinking and fighting with his mother, and hitting the kids and so forth.
>
> Well, if you look at him these days, he's no stranger to violence, and if he had PTSD, he would be afraid of it.  He would be – you know, back away from it.  So . . . he doesn't

60

have it now.

I imagine everybody in here could come up with something that scared them when they were a child or some unfortunate incident or whatever.

(Tr. 1796-97.)[15]

Dr. Allen's testimony that Mr. Jackson suffers from PTSD was further discredited by Dr. Coons' testimony concerning her lack of qualifications for making such a diagnosis:

Q    And this is a diagnosis that can only be made by a psychiatrist, is that correct?

A    Well, or a psychologist . . .

(Tr. 1797.)

In closing argument, the government assailed the PTSD diagnosis insisting:
He doesn't have post-traumatic stress syndrome from his childhood.  He has – he is antisocial.  He is an antisocial personality.

(Tr. 1888.)  The prosecutor mocked the notion that Mr. Jackson was "traumatized" by his violent childhood suggesting that his childhood friend, penalty phase witness Pam Morrison, who spent a lot of time in Mr. Jackson's home, "doesn't seem to be traumatized by that.  She's certainly not out committing violent crimes or murdering people."  He argued:

"*It's a facade*.  It's a house of cards that should come crumbling down.

---

[15]    *Cf.* Declaration of Dr. Dudley: "even now, he cries when exposed to things that remind him of the violence he was exposed to during his childhood years."  Dudley Decl. ¶ 19; ¶¶ 37-40 (Ex. 1).

(Tr. 1910-11.)  The prosecutor again emphasized Kate Allen's relative lack of qualifications compared to Dr. Coons, a psychiatrist:

> The psychiatric testimony?  Their family sociologist came in and said that he had post-traumatic stress disorder.
>
> A psychiatrist came in here and told you, no, that was not the case.

(Tr. 1913.)

In some respects, Dr. Allen's testimony might as well have been for the prosecution.  During her direct examination testimony, she described in detail the 22 "risk factors . . . for being a criminal" identified by the U.S. Department of Justice in a 1995 "megastudy."  (Tr. 1598.)   She determined that Mr. Jackson met 16 to18 of those factors, "or at least 16."  (Tr. 1601.)  Among the factors she found Mr. Jackson to meet is "early and persistent anti-social behavior."  (Tr. 1600.)  Conversely, Dr. Allen found that Mr. Jackson met none of the fourteen factors that "inhibit violence or delinquency."  (Tr. 1602.)

As discussed below in the "Prejudice" section of this claim, Mr. Jackson endured a severely traumatic childhood, a fact that is mitigating regardless of any formal psychiatric diagnosis. *Eddings v. Oklahoma,* 436 U.S. 921(1978), *Williams v. Taylor,* 529 U.S. 362 (2000), *Wiggins v. Smith,* 539 U.S. 510 (2003); *Sears v. Upton,* 561 U.S. 130 S. Ct. 3259 (2010).  It was a terrible mistake for trial counsel to permit the Government to define this issue as (1) whether Mr. Jackson met the clinical criteria for a diagnosis of PTSD and (2) which side's experts were more qualified to make that specific diagnosis. Fighting over a "label" was a distraction and a very costly one when it came time to the sentencing decision.[16]  The real issue was that Mr. Jackson is a survivor of horrific childhood abuse and trauma.  What was not presented and explained to the jury was the

---

[16]    *See* Dkt # 328, p. 15, (Ex. 37) (proposed mitigating factor #49; *no jurors* finding that Mr. Jackson "suffers from Post Traumatice Stress Disorder as a result of his background and this factor is mitigating."

profound impact that formative experience had on his life and its importance as a reason for the jury not to vote for Mr. Jackson's death.  *See Wiggins v. Smith*, 539 U.S. at 535.[17]

Counsel thus failed both to effectively investigate and discover evidence of abuse and trauma and to utilize mental health expertise in explaining the importance of these developmental factors to the jury as mitigation against a death sentence.  To the contrary, much of Mr. Jackson's social history that was known to counsel and Dr. Allen was presented to the jury as evidence of his risk of anti-social behavior, an aggravating factor, when the kind of poverty, abuse, and neglect that Mr. Jackson suffered is actually textbook mitigation that the Supreme Court has recognized should be presented to capital sentencers.  Had trial counsel effectively investigated, they would have found a wealth of evidence to present at the penalty phase utilizing the witnesses and evidence described in Claim 4, *infra.*

## B.    Prejudice

A full and competently performed and informed mental health assessment of Mr. Jackson would have disclosed that he has mental retardation and that his cognitive impairments are compounded by other mental disorders and factors, including pervasive family mental illness and cognitive impairments, drug and alcohol addiction at a very young age, and profound childhood and adult trauma.  A thorough and appropriate assessment of his mental status provides a wealth of mitigating factors which would have resulted in a different sentencing outcome had the jury known of them. Most notably, Mr. Jackson's violently traumatic childhood, followed by an adult life spent mostly in

---

[17]    "Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.  *Penry* v. *Lynaugh,* 492 U. S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse"); see also *Eddings* v. *Oklahoma,* 455 U. S. 104, 112 (1982) (noting that consideration of the offender's life history is a "part of the process of inflicting the penalty of death"); *Lockett* v. *Ohio,* 438 U. S. 586, 604 (1978) (invalidating Ohio law that did not permit consideration of aspects of a defendant's background)."

violent life-threatening correctional institutions was both independently mitigating and, in this case, affected the way he reacted to the threat of imminent violence in the offense at issue here.  No evidence was presented on this crucial issue.

In addition, as discussed in detail *infra,* Mr. Jackson's jury did not know that Mr. Jackson's family has been "plagued with mental illness."  McCaskill Decl. ¶ 6, (Ex. 14).  *See infra.*  The jury was given no information about what effect it had on Mr. Jackson – above and beyond his own impairments – to grow up in a household with mentally ill parents, cousins and siblings and to carry the genetic burden and related risks resulting from such pervasive multigenerational mental illness.  The jury was likewise not informed as to the mitigating significance, and underlying causes, of Mr. Jackson's resorting to self-medication at the tender age of ten or eleven and his use of powerful and dangerous substances like alcohol and heroin to blot out the extreme pain of his early life.

No one explained to the jury the devastating confluence of all of these factors and the debilitating impact on Mr. Jackson's functioning of these forces.  On the contrary, marginal efforts to explain some of these pieces of Mr. Jackson's social history through testimony by one unprepared lay witness (a childhood friend) and by underinformed and unqualified experts were ridiculed by Mr. Jackson's prosecutors as unproven based either on the sheer lack of supporting evidence or the lack of qualifications and credibility of the witnesses addressing them.

An effective mental health investigation and penalty phase presentation would have included a comprehensive picture of Mr. Jackson's psychosocial history and makeup.  Such an assessment has now been performed by psychiatrist Richard G. Dudley.  *See* Dudley Decl. (Ex. 1) and Curriculum Vitae of Dr. Richard G. Dudley (Ex. 1).

In his declaration, Dr. Dudley presents his conclusions as to Mr. Jackson's mental status and the basis for those conclusions.  It is Dr. Dudley's opinion that Mr.

Jackson suffers from a combination of serous psychiatric difficulties and cognitive impairments:

> Mr. Jackson has suffered from serious psychologically-based and physiologically-based trauma-related psychiatric difficulties. . . . Mr. Jackson has also suffered from intellectual and/or other cognitive deficits that. . . . made it all the more difficult for him to understand and cope with the traumas that caused his above described trauma-related psychiatric difficulties. . . . these deficits have also compromised his ability to understand and address his trauma-related psychiatric difficulties.  In addition, as a result of the intellectual and/or other cognitive deficits, Mr. Jackson's attempts to mask these deficits and his other psychiatric difficulties are very immature and transparent; essentially, these attempts involve posturing and attempts to present himself as more competent and less anxious/afraid than he really is; but given that these attempts/defensive maneuvers are so immature and fragile, it is not surprising that they regularly break down/fail to work, causing him to deteriorate emotionally.  Furthermore, Mr. Jackson's genetic vulnerability to both psychotic and mood disorders likely also contribute to his becoming paranoid and depressed when under stress.

Dudley Decl. ¶ 42 (Ex. 1).

> The psychological and physical abuse and neglect that Mr. Jackson endured during his childhood years could be considered mitigating in and of itself.  However in addition, as noted above, that same history contributed to the development of his major psychiatric difficulties; it is at least in large part because of that chaos and neglect within his family home that his major psychiatric difficulties were never identified and addressed back when he was a child or young adolescent. . . .

*Id*. at ¶ 44.

65

Dr. Dudley believes that Mr. Jackson's behavior and reactions during the offense at issue were significantly influenced by his mental problems, both psychiatric and cognitive.

> Finally, it is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Jackson's above-described mental health difficulties significantly influenced his behavior at the time of the crime for which he was convicted and sentenced to death.  More specifically, Mr. Jackson's above described mental health difficulties influenced his perception of danger/risk of being harmed; his impulsivity severely compromised his decision-making ability with regard to how he should respond to the danger that he perceived; and his over-reactivity further influenced the nature of his impulsive response.  As further explained above, it is my opinion that at the time of the crime the impact of Mr. Jackson's mental health difficulties was such that he was unable to premeditate or even consider options that might have been available to him.

*Id*. at ¶ 46.

Dr. Dudley addresses a number of specific psychiatric factors that have profoundly influenced Mr. Jackson's functioning.  These factors are heavily mitigating and bear directly on the life-or-death sentencing determination that faced Mr. Jackson's jury.  Had these factors been properly presented to the jury, as required in a minimally effective capital penalty phase, there is a reasonable probability that the sentencing outcome would have been different, *i.e.*, that at least one jury would have voted to spare Mr. Jackson's life.  Certainly, "confidence in the outcome is undermined," given the wealth of additional mental mitigation discussed below.  These factors include the following:

Trauma - Domestic Violence and Child Abuse.  Counsel were aware of Petitioner's abusive and traumatic childhood, yet they failed to investigate and develop evidence to demonstrate the significance of this factor to the jury.

66

Dr. Dudley explains the extent of the trauma:

> David Jackson was born on ▮▮▮▮▮▮▮ with the vulnerabilities noted above. Then, during his entire childhood, he was repeatedly exposed to severe trauma inside his family home. . . . Mr. Jackson's father, Leroy Jackson, was an alcoholic who totally controlled and repeatedly, severely physically abused Mr. Jackson's mother often to the point where she was seriously injured, right in front of Mr. Jackson, his siblings and the other children who were in his home. He reported to me, for example, that he clearly remembers an incident when he was about 8 or 9 years old, where his father beat his mother over her head with a hammer; while doing this, his father threatened to kill his mother; and his father left his mother covered in blood. This incident is also referred to by his sister Patricia who reports that all the children observed the assault and that it was extremely upsetting and scary to them. Others report that Leroy would throw Ms. Jackson against the wall, threaten to kill her and on one occasion broke the leg off a table and was swinging it at her. He was known to "drag Sammie Lee around by her hair and beat her right in front of everyone."
>
> [H]his approach to "discipline" was so severe that even back then it would have been considered child abuse, because Mr. Jackson and the others were regularly severely injured during the course of being disciplined by his father. The abuse that they endured was far out of proportion to anything that they had done. Indeed, it was often the case that they had no idea why they were being beaten.

Dudley Decl. ¶¶ 16-17 (Ex. 1).

Leroy Jackson beat the children and their mother with dangerous objects and threatened them with guns and knives:

> Mr. Jackson's siblings and cousins describe being beaten by Leroy Jackson with extension cords and bed slats, and being threatened with guns and razor blades. He was also known to use "bottles, bricks and shoes." Cousin Brenda recalls: "He would make us take our clothes off and he would hold us down or between his legs . . . and beat us until we bled or he

67

> became exhausted." He was known to chase David and the others down the street or down an alley, in some cases armed with weapons or objects. "He would pull out his knife at the drop of a hat." Neighbors and others describe Mr. Jackson's father as "a cruel abusive man," "mean and brutal," "scary and intimidating." "He was known in the neighborhood as a very dangerous person and someone to fear and avoid." "He would cuss them out, throw things at them and generally terrorized the whole household."

*Id.* at ¶ 18.

These experiences had a profound effect on Mr. Jackson. His older siblings describe him getting so upset at his father's attacks that he would rock on the floor, crying and sucking his thumb, even into his teens. The traumatic effects of this continue to have an effect:

> Mr. Jackson reported to me, and others have confirmed that when his father would physically abuse his mother, he/Mr. Jackson would just sit there and cry; this crying at even just the thought of such violence continued well into his adolescence; and he reported to me that even now, he cries when exposed to things that remind him of the violence he was exposed to during his childhood years. He reported that although his mother would at times at least try to stop his father from beating him and his siblings, his mother was totally unable to stop his father, and more often than not, her efforts would result in his beating her again too.

*Id*. at ¶ 19.

> The above-described constant traumatization that Mr. Jackson endured would be enough to cause such a trauma response. However in Mr. Jackson's case, his impaired cognitive functioning made it all the more difficult for him to understand and cope with what was happening to him, which in turn made the impact of the traumas on him all the more severe.

*Id*. at ¶ 27.

68

Mr. Jackson's trauma-related psychiatric problems were compounded by significant cognitive deficits, the intellectual disabilities discussed in Claim 2:

> Then, in addition, based on the reports of Mr. Jackson and others, he didn't have anyone who could provide him with a safe space/a respite from the violence and/or the type of parental nurture and care that might have helped mitigate against the impact of the trauma.

*Id.*

Trauma victims and survivors like Mr. Jackson tend to develop physiological as well as psychological responses to extreme threats, especially where there has been an absence of parental care and protection:

> It is important to note that survivors of the type of ongoing violence that Mr. Jackson experienced during his childhood and early adolescent years, especially those who have inadequate parental nurture and care, not only have a psychological trauma response but also tend to develop an additional physiologic trauma response.

*Id.* at ¶ 28.

It is even harder for the trauma victim who never learned skills for managing his responses to extreme threats:

> All humans have a physiologic response to extremely threatening situations, commonly known as the "fight or flight" response; children eventually learn to manage this response with the help of parents who calm and protect them; but in the absence of such parental nurture, care and protection, especially when the trauma is frequent/ongoing, a child never learns to manage the physiological response; and so eventually the child becomes constantly physiologically stimulated/over-reactive, a state which continues into adult life.   Therefore, in Mr. Jackson's case, the above described symptoms of trauma that Mr. Jackson started to exhibit back when he was a child have both a psychological and physiological component.

*Id.* at ¶ 28.

Starting with his early experiences in juvenile centers and continuing into his adult incarcerations, Mr. Jackson learned to mask his vulnerabilities:

> Mr. Jackson was then further negatively influenced by the fact that he was institutionalized when he was so young and then continued to be institutionalized for most of the rest of his life.  More specifically, because he was institutionalized he grew up and continued to live with males who were involved in criminal activity.  In order to survive, he had to mask vulnerabilities that resulted from his above described mental health difficulties; he reported, for example, that although he was able to hide and cry when he was in juvenile detention, when he was placed in adult facilities he had to force himself to stop crying; and he reported, for example, that he couldn't let anyone know that he couldn't really read, etc.  Then in addition, the real dangers and perceived dangers in such institutions only exacerbated his hypervigilance, impulsivity and over-reactivity, and he described in some detail how one had to be public about one's willingness to fight back/protect one's self.

*Id.* at ¶ 37.

Mr. Jackson's traumatization included living in fear of parents who wielded knives and who used them on each other.  And Mr. Jackson had been stabbed by a fellow prisoner only a few years before this incident.

> To understand Mr. Jackson's reaction to being assaulted with a knife, specifically, as relates to his current offense, it is important to note that his above described trauma-related symptoms were at least in part developed in response to traumatic personal encounters with knife-involved threats and injuries.  His father was known to carry and wield knives and to threaten family members with knives and his mother was known to have attacked his father with a large kitchen knife. Not only was Mr. Jackson exposed to this type of threatening conduct in his childhood home, he was actually stabbed in the rear shoulder during a disturbance at the federal prison in Marion, Illinois when he was incarcerated there in the mid-

70

> 1990's.  This is important because for persons who suffer from trauma-related psychiatric difficulties there are usually things that symbolize the traumas that they have endured, which when re-experienced, exacerbate their difficulties, and for Mr. Jackson, knives are likely such a symbol.

*Id.* at ¶ 38.

At Beaumont, an especially violent and out-of-control institution, Mr. Jackson's defense systems had to be on full alert:

> Then in addition, at the time of the offense, the very real threat of being stabbed was superimposed on Mr. Jackson's pre-existing state of hypervigilance due to his developmental trauma mixed with the alertness to potential violence that is part of the fabric of life in a prison like USP Beaumont. Given Mr. Jackson's above noted experiences with knives, his reaction to the threat of a knife was much more an impulsive, reflexive action than any sort of premeditated act. Moreover, once the confrontation began, his state of hyper-arousal and fear dictated his behavior and subsequent actions until the threat was finally removed.

*Id.* at ¶ 39.

Dr. Dudley explains that Mr. Jackson's prison disciplinary record can also be seen more as a function of his mental problems than of his being aggressive or "just a bad and dangerous guy." Dudley Decl. ¶45 (Ex. 1).  Dr. Dudley could have explained to the jury far better than Mr. Jackson himself could that the prison disciplinary incidents urged by the Government as a reason to impose a death sentence were better understood as reactive symptoms of his mental illness:

> This same sort of arousal response to threats and to emotionally-triggering external stimuli would tend to explain a number of Mr. Jackson's disciplinary incidents and infractions in prison.  A number of these incidents, especially the more seemingly serious ones that were used against him as aggravating factors, appear in some cases to be more reactive than proactive, based both on the circumstances as

71

reported as well as Mr. Jackson's own perceptions, which he attempted to explain during his trial testimony.

Dudley Decl. ¶¶ 37-40 (Ex. 1).

All of the following witnesses were available to testify and to provide information to the jury and to mental health experts concerning Mr. Jackson's traumatic childhood:

Marcos Martinez, childhood friend:

David had a very rough childhood. His father, Leroy Jackson, was a cruel abusive man who was known in the neighborhood as a very dangerous person and someone to fear and avoid. Leroy would often jump on David's mother, Sammie Lee Jackson, and beat her. I have seen it myself. He was also terribly abusive, verbally and physically to David and his siblings and cousins who lived with the Jacksons. This situation created a lot of stress in David's home and David had a very hard time handling it. You could always tell he felt a lot of pressure inside from all that stress.

Martinez Decl. ¶ 3 (Ex. 10).

Patricia Jackson, sister:

My father was extremely abusive to all of us kids and to my mother. He was often drunk and would hit us all the time. He would beat us with an extension cord doubled up. He would make us pull our pants down and would hit us as hard as he could. We were butt [sic] naked. We would bleed down our legs and arms. We had big welts that kept us from going to school because we didn't want anyone to know what my father was doing. I still have scars on my back. One time I tried to run away from him and busted my knee open.

One night when I was about nine years old my father came home drunk. He turned over a table. I looked up and saw that he had a hammer in his hand. He hit my mother in the face with the hammer. Her face swelled up and he may have broken her jaw. All of us saw this happen. It was extremely upsetting and scary to all of us to watch him be so cruel to our mother.

72

My father kept chasing David away with his abuse. He chased David and my cousins down the street, trying to hit him with the bed slats that go under a mattress. He caught them and beat them with the slats. David had nowhere to turn but the streets.

One time my father chased me down an alley with a gun. I ran into the back door of the neighbor's house to get away. He came after me, straight through the house. I had already run out of the front door and got away. The neighbors called the police and they took him to jail and took the gun. My mother took me to a youth home to protect me from getting killed by him. She told them not to let my father see me. They protected me from him.

My mother asked for foster care because she couldn't handle all the responsibility of all of her own kids and my four cousins. The police told her there was no care or help available for her.

I was fourteen when I had my first child Joanna. The father was a boy from down the street. When I was four or five months pregnant my father whipped me. I was sent to a home for girls to have my baby. When I found out they were going to make me give her up for adoption I ran away from the home.

P. Jackson Decl. ¶¶ 3-10 (Ex. 15).

Brenda Boyd, cousin:

Leroy was extremely cruel and physically and emotionally abusive to Sammie Lee and all of us kids. By the time Leroy and Sammie Lee's youngest child Stanley was born, things had gotten even worse. Leroy beat us and Aunt Sammie Lee more and more. He would chase Sammie Lee through the house with a knife. He would beat her with his fists and would tell her he was going to kill her.

Boyd Decl. ¶ 20 (Ex. 19).

Sometimes when Leroy was drunk, but even if he was not drunk, he would beat us with anything he could get his hands

73

on – his belt or even extension cords.  I have permanent scars from Leroy's beatings.  The scars are in the shape of a "double horseshoe" because he would double over the cord and hit me.  He would make us take our clothes off and he would hold us down or between his legs so we could not get away and would beat us until we bled or he became exhausted.  Sometimes he didn't even know he was drawing blood.  He would just keep going and would not know he had hurt us that severely until he saw the wounds later.

Sometimes Sammie Lee would also beat us.  She would make one kid hold another kid's legs so the first kid could not get away from her.  She would tell the kid holding the legs that if they did not hold tight enough or let go that they would get beat too, so it made them hold tighter.  That was not only bad for the kid getting beat but also for the kid who had to help with the beating.  She would say ugly things to us like, "You ain't never going to graduate," "You're a dumbass," "You're going to get pregnant," "You're just dumb and stupid," "You're not worth the salt I put in your food."  She would say, "You're weak-minded."  She did nothing to prevent Leroy from beating the children.

Leroy was also psychologically abusive and totally controlling and he had Sammie Lee trained to do whatever he said to do.  She would even dress him up to go out with other women.  He was a gambler and a womanizer.  Leroy and Sammie Lee often fought about Leroy staying out all weekend and not leaving Sammie Lee enough money to take care of all the kids.  He supposedly had another family in New Orleans and he would go there sometimes.

Leroy did not permit our friends to come over to the house.  They would only come when he was not there.  He had a rule that no one could ever talk about what went on in the house to anyone outside the home.  He kept us isolated and tightly controlled so other kids and their parents would not know the full extent of his and Sammie Lee's abuse.

*Id.* at *¶¶* 22-25 (Ex. 19).

Larry Anderson, cousin:

From the very beginning Leroy was cruel and abusive.  He

74

created ridiculous jobs for me for no reason at all.   There were times he would make me shovel the neighbors' snow every single day at 4 a.m.  I had to clean up after Leroy's dogs.  Fortunately he left every Friday night and would be gone until Sunday.  Sammie Lee and all of us kids would make popcorn and watch movies on TV.  It was the only time we could relax in our own home.

I moved in with the Jacksons not too long after Leroy got home from prison.  He seemed to have a punishment mentality.  Often he was drunk and got very physically abusive, but he beat us even when he was sober.  He often beat me with an extension cord.  Leroy always carried a gun.  He made it clear that he would kill us if he felt like it.  He would punish me for a month at a time.

Anderson Decl., ¶¶ 11-12 (Ex. 18).

One day Leroy came home after having been gone for quite a few days.  He had been staying with another woman.  When he got home he started arguing with Sammie Lee.  He was beating on her and said to her, "I'm gonna kill you m-f!"   He threw her against the wall and shoved her all over the place.  He picked up the coffee table and broke the leg off to use against her.  He was swinging at Sammie Lee with the table leg.  It had a four-inch screw in the end of it, sticking out from the wood.  He kept screaming "I'm gonna kill you!"  All the children, including David, were watching this happen.  It was terrifying.  Sammie Lee grabbed a boning knife but Leroy was still going at her.  Sammie Lee told Leroy, "The only one going to die tonight is you!"   I was trying to stop him from hitting her with the table leg.  She told me to let Leroy come in to the kitchen.  I had grabbed Leroy's right arm with my right hand and had grabbed him around the chest with my left arm and was trying to pull him back.  Sammie Lee started to stab at him.  She accidentally got me and stabbed me all the way through my hand.  My blood was spurting all over Leroy and me.  I had to have surgery and still have a big scar.  As Leroy left he said he was going to kill us.  A few weeks later I was at the store.  When I walked out, Leroy was there.  I turned and was walking away when someone shouted, "He's got a gun!"  I turned around and Leroy shot me in the groin with a .38 revolver.  The force of

75

the shot knocked me over and I landed on my back. I rolled to my feet and ran away as fast as I could. I was gushing blood. I ran to Sammie Lee's house and then an ambulance took me to the hospital. I was in intensive care. They could not remove the bullet because it was too close to an artery so the bullet is still in me. I was very lucky Leroy did not paralyze or kill me.

*Id.* at ¶ 29. For Mr. Jackson to have witnessed such incidents was deeply disturbing and traumatic. *See* Dudley Decl. ¶ 19 (Ex. 1) ("[W]hen his father would physically abuse his mother, he/Mr. Jackson would just sit there and cry . . .even now, he cries when exposed to things that remind him of the violence he was exposed to during his childhood years.")

Lionel Bass, Patricia's boyfriend:

Before I actually lived in the Jackson home I would go there, especially if Leroy was not there. Sometimes I would be there when Leroy got home and I would see first-hand his extreme abuse of Sammie Lee and all the kids in the house. Leroy was very mean and brutal. I know it was very damaging to David and the rest of his family to have to deal with that man. He was scary and liable to go off at any minute, especially if he was drinking.

L. Bass Decl. ¶ 4 (Ex. 17).

Harriet Bass, family friend:

The Jackson family was well known in the neighborhood as the scene of domestic violence perpetrated by David's mean and vicious father, Leroy Jackson. Leroy Jackson was extremely abusive to David's mother, Sammie Lee, and to all the kids who grew up in that house. He would cuss them out, throw things at them and generally terrorized the whole household. As the boys came of age they would not allow Leroy to abuse their mother (or, in Larry and Michael's case, their aunt) so in time Sammie Lee had more security and protection. There was a lot of shame within the family about Leroy's abuse of Sammie Lee and the kids, and about the struggles they had growing up. They tried to make it their secret but a lot of us knew about it and we felt real bad for all

76

of them.

Decl. of Harriet Bass ¶ 5 (Ex. 13).

> <u>Dave Wallace, friend</u>:
>
> David's father Leroy was a hustler and gambler who would get drunk and put his own kids out of the house.  He would scream, "Get the f--- out of my house!"  The whole neighborhood knew Leroy could just blow up at any second.  He was a scary and intimidating figure.  Some days he might say hello and other days if you said hello to him he would growl, "F--- off kid."

Wallace Decl. ¶ 4 (Ex. 12).

> <u>Pam Little Morrison, childhood friend and trial witness</u>:
>
> Leroy would get drunk and bring other women to the house.  He had all kinds of women and all ages.  He even went with a friend of ours, a girl named Melissa who was younger than me and David. He would let teenagers drink at his apartment on Dexter Street.  David's sister Patricia and I would go over to his apartment when I was 16 years old to drink and smoke weed.  He was known for sleeping with young and underage girls and for giving them money to have sex with him.  I considered him to be a pedophile.  When he was drinking, he would put his hands all over us.  I have seen him grabbing at his niece, Joan, and his own daughter Patricia.

Morrison Decl. ¶ 12 (Ex. 16).

Had counsel thoroughly investigated Mr. Jackson's background and discovered the above witnesses and information, and had counsel provided mental health experts with this material, they could have explained the significance of these developmental experiences in a far more sympathetic and favorable way.  For example, trial counsel presented *no evidence* about the extensive history of mental illness in Mr. Jackson's family.  As Dr. Dudley states in his declaration and as he could have explained to the jury:

> Mr. Jackson was born into a family with a significant history of serious mental illness, including psychiatric disorders for which genetic transmission is a well- established part of the etiology of the disorder.  More specifically, there is a significant family history of major mood disorders such as depression and bipolar disorder; a significant family history of schizophrenia and other psychotic disorders; and a significant family history of alcoholism and other substance abuse and dependence.  This family history is significant both because it rendered Mr. Jackson genetically vulnerable to the development of these and/or related disorders, and also because it means that he was raised by/surrounded by persons suffering from such severe mental illnesses.

Dudley Decl. ¶ 8 (Ex. 1).

The jury did not know that Mr. Jackson's mother was mentally ill and in all probability had mental retardation, and that her sister was mentally ill, which is why Mr. Jackson's four cousins lived with him from early childhood on.

> Mr. Jackson's mother, Sammie Lee is described by family members and neighbors as suffering from serious depression. She did not read or write or drive, rarely left her house, and showed little interest in anything.  She talked to herself and "saw things that were not happening."  She would write curses on slips of paper, presumably with symbols, given her illiteracy, "stuff them in jars" and ask her niece Brenda to bury them in the back yard.  Her sister, Emma, was reportedly unfit to raise children due to her own mental infirmities, which is how Emma's daughter, Brenda, originally came to reside with the Jackson family.

*Id.* at ¶ 9.

The jury did not know that Mr. Jackson's sister is a lifelong psychiatric patient, as are two of her daughters.  All are on medication.

> Mr. Jackson's sister, Patricia, has a documented history of psychiatric illness and symptoms and reports being diagnosed

78

> at various times with schizophrenia and bipolar disorder.  She is prescribed Zoloft, lithium and Seroquel which are used to treat such mood and psychotic disorders.  Patricia's oldest daughter, Joanna, has been diagnosed with schizophrenia and is a lifelong psychiatric patient.  Patricia's other daughter, Yvette, reports being diagnosed with bipolar disorder and anxiety disorder and "episodes of severe depression."  She is "supposed to take lithium" but does not like the side effects. She has been hospitalized for psychiatric care.

*Id*. at ¶ 10.

The jury did not know that Mr. Jackson's first cousin, Joan, his strong genetic cohort, was diagnosed with mental illness.

> Mr. Jackson's first cousin Joan, his genetic cohort in the first degree, was also diagnosed with bipolar disorder and is reported by her siblings to have been "mentally ill" and completely unable to care for her four children who were "bounced in and out of foster care," or given up for adoption and lost track of.

*Id.* at ¶ 11.

Nor did the jury know that Mr. Jackson's first cousin, Larry, one of his childhood mentors, was receiving disability for his mental illness and has been diagnosed with a schizo-affective disorder.

> Mr. Jackson's first cousin, Larry, has been diagnosed as suffering from a schizo-affective disorder and has been awarded disability payments by the Social Security Administration from January 2004 to the present.

*Id.* at ¶ 12.

In addition to being totally unaware of the psychiatric illnesses that pervade Mr. Jackson's immediate family, the jury did not know that other members of the family also manifest significant cognitive impairments.

> Additionally, some of Mr. Jackson's biologically related

family members suffer from intellectual deficits and/or other cognitive difficulties. As noted, his mother was completely illiterate and is described as being "very limited mentally." Only one of the eight children who grew up under Mr. Jackson's roof made it through high school and most of them did poorly in school. None of his three siblings graduated from high school. The school records of his sister, Patricia, reflect that she was in the 3rd to 5th percentile in reading on standardized achievement tests in grades 4 through 6. His brother, Stanley, received almost nothing but D's and E's (failing) in the same grades.

*Id.* at ¶ 13.

And critically important, especially for the jury's understanding of who Mr. Jackson was and why they should not put him to death, they were not told what effect all of this mental illness and impairment in his immediate world had on him. Someone like Dr. Dudley should have been utilized to explain to them how ill-equipped that family was to provide the support needed to enable a child with Mr. Jackson's impairments to be functional. Jackson's family was anything but:

> Although such a significant family history of intellectual deficits and/or other cognitive difficulties might be at least in part due to the fact that so many of Mr. Jackson's family members were raised in environments that did not foster healthy cognitive development and/or that they endured various types of brain trauma, such impairments are sufficiently common in his family that a genetic basis for such difficulties must also be considered. This aspect of Mr. Jackson's family's mental health history is significant because it means that his mother's capacity to parent him was compromised by her intellectual and/or other cognitive difficulties. It also means that Mr. Jackson was at risk of having similar difficulties, because he too was raised in an environment that did not foster healthy cognitive development and that placed him at risk of physical harm to his brain. Additionally, he was genetically vulnerable to the development of such difficulties.

*Id.* at ¶14.

80

Likewise, counsel presented no evidence to explain the significance of Mr. Jackson's exposure to powerful dangerous drugs as a pre-teen. While the damage of such exposure may be, to some extent, self-evident, it was not enough simply to mention or refer in passing to this extraordinary aspect of their capital client's childhood. Indeed, without a psychiatric explanation and mitigating context in which to consider such information, the jury might not know why this would be a reason to find him less blameworthy. There is certainly a reasonable probability that such evidence might well have convinced at least one juror not to condemn him to death. Dr. Dudley discusses the significance of drug and alcohol dependency in Mr. Jackson's life and its mitigating importance. Mr. Jackson was addicted to drugs and alcohol as a mere child:

> Mr. Jackson also reported to me that even before he was 13 years old he had discovered that the use of various drugs helped him feel better/calmer. He noted that it was not until many years later, and then only in retrospect that he realized that he had developed a drug addiction by his early teenage years. Then, once he was essentially out on the street, his involvement in robberies allowed him to support himself and his already existing drug addiction. Other family members and friends report that Mr. Jackson was introduced to alcohol and drugs as a child. His sister states that he started drinking alcohol at the age of nine or ten. His cousin Larry states that Mr. Jackson started using marijuana and heroin at the age of twelve, and his friend Marcos Martinez reports that Mr. Jackson was injecting heroin at the age of thirteen or fourteen.

*Id.* at ¶ 32.

Exposure to these powerfully harmful substances at such a tender age has drastic consequences for a child's brain development. Someone with Dr. Dudley's expertise was needed to explain to the jury that in all likelihood, Mr. Jackson's brain did not develop normally due to his exposure to these dangerous drugs as a child.

> The use of such debilitating and addictive substances at that age almost inevitably engenders significant adverse long term

81

> consequences for proper brain development since the brain is still developing rapidly during those critical formative years. In addition, to experience chemical dependency on alcohol and heroin at such a young age is highly likely to lead to other persistent psychological problems. These powerful forces, especially when combined with Mr. Jackson's cognitive impairments and his chaotic and destructive home environment, created challenges for Mr. Jackson that were all but insurmountable.

*Id.* at ¶ 33.

Finally, Mr. Jackson's jury never knew that Mr. Jackson was not alone among his siblings and cousins. Due to forces that were clearly much greater than any of them, all but one of the eight children from the Jackson home became addicted to drugs:

> According to the statements of Mr. Jackson's family members and others, all but one of the eight children raised in the home with Mr. Jackson responded similarly to the trauma and chaos in the family home. Seven of the eight children became addicted to drugs and alcohol, all by the time they were in their teens. Mr. Jackson's cousins Larry and Brenda state that Brenda is the only one of the eight children in the Jackson home who did not become addicted to drugs. They report that their sister Joan and their brother Michael, both deceased, were addicted to drugs throughout their lives. Larry states that he started drinking at a young age and was using drugs in his early teens, including injecting heroin. Mr. Jackson's sister Patricia states that she started drinking when she was twelve years old and has been addicted to heroin and crack cocaine for most of her life.

*Id.* at ¶ 34.

Trial counsel failed unreasonably to utilize mental health expertise in preparing the case for sparing Mr. Jackson's life. The jury never had anything close to a sufficient picture of that life because counsel never painted it for them. An accurate and complete picture of that life is required in a capital case, as the Supreme Court has emphasized repeatedly. *Williams v. Taylor,* 529 U.S. 362 (2000), *Wiggins v. Smith,* 539

82

U.S. 510 (2003); *Sears v. Upton,* 561 U.S. 130 S. Ct. 3259 (2010). A true picture of Mr. Jackson's life was impossible without testimony from an expert in mental health to explain how his formative experiences shaped him and influenced him. Such a picture would have enabled the jury to better understand the human being whose worthiness to live was the issue before them in the penalty phase. Equally important, it would have provided a crucial explanation for how and why he reacted as he did at the time of the prison incident that culminated in the death of Daryl Brown. There is more than a reasonable probability that such evidence would have convinced at least one juror that Mr. Jackson should not be put to death.

## CLAIM 4

## MR. JACKSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE GUILT-INNOCENCE PHASE OF TRIAL

The weight of the evidence at trial supported the theory that, on December 16, 1999, Daryl Brown attacked Mr. Jackson outside of unit 3-B-1 of the United States Penitentiary, within the Federal Correctional Complex in Beaumont, Texas. On the special verdict form used during the penalty phase, nine of twelve jurors found that Daryl Brown was the initial aggressor, confirming the weight of these facts. *See* Special Verdict Form (Ex. 37.) Significant evidence from defense witnesses also suggested that Brown was the first to pull a knife in the initial confrontation. (*See, e.g.,* Tr. 778, 834, 850, 942–43.) Only one prosecution witness, Raymond Chopane, claimed to see Mr. Jackson wielding a knife outside. Yet the prosecution repeatedly emphasized the testimony that Mr. Jackson had a knife, while Brown was unarmed. (*See, e.g.,* Tr. 1032; 1038–1039; 1088; 1089; 1721.)

It is not disputed that, after Mr. Brown initiated the incident, Mr. Jackson and Arzell Gulley pursued Brown across a courtyard and into unit 3-B-1, where Brown ran into cell 125 and was fatally stabbed. This basic fact pattern allowed for several

83

plausible defenses at trial, including imperfect self-defense, manslaughter, and second-degree murder.  Very shortly before trial, however, counsel chose to advance self-defense as their only theory, and requested a jury instruction on self-defense alone, though, as described below, they had also been considering presenting defenses of innocence and also "mere presence" at the scene.  *See* 1:06-CR-0051-MAC-ESH, Document 225-1, (Ex. 44.)[18]

Justice Holmes once remarked that "[d]etached reflection cannot be demanded in the presence of an uplifted knife."  *Brown v. United States*, 256 U.S. 335, 343 (1921).  Despite considerable evidence that Mr. Jackson, a man with substantial intellectual deficits and mental disorders, had been attacked by a man with an uplifted knife in a treacherous prison, trial counsel failed to adequately investigate their primary theory of self-defense, failed to investigate alternative defense theories, and failed to present available evidence to support the justification defenses available under the circumstances.[19]

## A.    Failure to Thoroughly Investigate and Present Evidence of Self-Defense

Shortly before jury selection began on October 2, 2006, and without evident consideration or research, trial counsel decided to focus their efforts on self-defense.  Although there was a considerable dispute regarding what happened outside on the yard, there was no dispute that Mr. Brown attacked first,[20] and that Mr. Jackson and

---

[18]    Though only 10 days before trial began, the defense also requested an instruction on "mere presence," which suggests counsel were still debating a defense that Gulley was solely responsible for the death at that late point in trial preparation.  At trial, however, they did not argue "mere presence."  As discussed *infra,* as late as a month before trial, counsel were still planning to contend that Mr. Jackson was completely innocent of the stabbing.

[19]    Trial counsel was ineffective, and this ineffectiveness prejudiced Mr. Jackson, in respect to both Count One and Count Two of the Government's indictment, as effective trial counsel, not having made the errors enumerated in this claim, would have convinced at least one juror to vote not guilty on both counts.

[20]    There has never been a clear explanation of why Mr. Brown attacked, though even government witnesses did not dispute that Brown began the fight.  Several defense witness testified that Brown had threatened to stab Jackson earlier in the day over his

Mr. Gulley eventually pursued Mr. Brown into cell 125 and stabbed him there, resulting in Mr. Brown's death.[21]  Other theories, such as imperfect self-defense, or a lack of premeditation and malice aforethought, were a better fit for these undisputed facts, but were unexplored.  Once trial counsel decided to present self-defense, however, they had a duty to investigate all facts that would support that theory.  Although counsel is entitled to make strategic decisions about the defense after reasonable investigation, records show that trial counsel had not considered the viability of their primary theory as late as seventeen days before the beginning of jury selection.  On September 15, 2006, in an email from Robert Morrow to Doug Barlow, Mr. Morrow asked, "Can we possibly ask for self defense when our argument is that he didn't do it?  If so, please tell me how."  Email from Morrow to Barlow (Sept. 15, 2006) (Ex. 46).  There is no response from Mr. Barlow in trial counsel's files.  Despite the fact that this central question apparently remained unanswered and investigation supporting self defense was incomplete, one week later, on September 22, 2006, trial counsel filed its proposed jury instructions with the court, including the instruction on self defense that was adopted at trial.  06-cr-0051-MAC-ESH, Docket No. 225, (Ex. 44).  This instruction stated that:

> "Use of force is justified when a person reasonably believes
> that it is necessary for the defense of oneself or another
> against the immediate use of unlawful force.  A person acting

gambling ticket (*see, e.g.*, Tr. 739–740; 802–803), but this issue has never been thoroughly investigated, and the Bureau of Prisons chose not to investigate by conducting inmate interviews after the incident (*see United States v. Arzell Gulley,* Tr. 1233 (Ex. 49)), despite the fact that this should have been standard protocol in a BOP killing. (*See* Decl. of Mark Bezy ¶¶ 3–6 (Ex. 4)).  Trial counsel did not investigate this motive evidence, although the Government's own trial exhibits (*see* Ex. 88) show that this motive was implausible given the minute size of the bets Mr. Jackson was taking—he had only around $75 in stamps, and there was no evidence of any bet over $5.  As will be discussed below, the motive evidence presented at trial was largely a product of defense counsel's own mistakes.

[21]  As detailed in the August 19, 2010 Motion to Compel, Mr. Jackson has been hampered in his investigation of the circumstances of the offense by the refusal of the BOP to produce records in response to April 13, 2010, and May 19, 2010, requests for relevant materials under the Freedom of Information Act.  Mr. Jackson will renew his request to compel discovery of these materials shortly.

> in self defense, however must use no more force than appears reasonably necessary under all of the circumstances.  Forces [*sic*] likely to cause death or great bodily harm is justified in self-defense only if a person reasonably believes that such force is necessary in order to prevent death or great bodily harm."  (*Id.*)

Again, self-defense was a poor fit for the facts at hand, but once counsel had decided on self-defense as the theory of the case, they should have presented testimony from inmates and corrections experts addressing the very point used against Mr. Jackson by the prosecutor – the way self-defense works in a prison.  (Tr. 1087.)  The self-defense instruction explicitly referred to the use of force "reasonably necessary *under all of the circumstances*" where the defendant "reasonably believes that such force is necessary in order *to prevent death or great bodily harm*."  Under all the circumstances here, it was reasonable for Mr. Jackson to believe that extreme force was necessary to prevent great bodily harm to him or others at the hands of Daryl Brown, who was armed and under the influence of drugs, even after Daryl Brown fled.  The circumstances here were a violent prison where death or great bodily harm were ever-present dangers, especially once the threat of armed violence was unleashed.  Even if Mr. Jackson's attacker had not succeeded in killing him on his first attempt, it was reasonable for him to believe that Brown would finish off the job at the first opportunity.[22]  The reasonableness of Mr. Jackson's belief, however, required significant exploration and inquiry into the realities of prison life, and an expert to testify to those realities.  In later Beaumont prison cases, such as *United States v. Snarr*, 1:09-CR-0015, Mr. Jackson's trial counsel did hire such experts, casting doubt that there was any strategy involved in foregoing such experts

---

[22]    There is no controlling case law on whether self-defense is applicable under these facts. In *United States v. Haynes*, 143 F.3d 1089 (7th Cir. 1998), the court ruled that self defense was not a valid defense where an inmate had threatened the defendant on other occasions, and had a general reputation as a bully, but does not address a situation where, as here, an inmate pulls a knife on the defendant, demonstrating the seriousness of his threat, and the defendant shortly thereafter responds with violence.

in the defense of Mr. Jackson, particularly where they relied on self-defense as their principal first-phase theory.[23]

Seven prisoners testified for the defense regarding events surrounding the incident: George Rivera, Matt Lindsey, James Larkin, Gerald Miller, Andres Aguiar, William Daniels, and Shannon Agofsky. They testified that Mr. Brown was carrying a knife and threatening to stab Mr. Jackson earlier in the day and that Mr. Brown initiated the confrontation by pulling the knife on Mr. Jackson. George Rivera testified that on December 16, 1999, he gave Mr. Brown the knife—Government's Exhibit 24—that was later used to stab Mr. Brown (Tr. 708), and that Mr. Brown had this knife in his hand when the fight with Mr. Jackson and Mr. Gulley began (Tr. 712). Matt Lindsey testified that on December 16, 1999, Mr. Brown tried to solicit his participation in the assault on Mr. Jackson, and that when Mr. Lindsey refused, Mr. Brown pulled a knife on him. (Tr. 738, 739–40.) James Larkin testified that Mr. Brown made it known at dinner on December 16 that he wanted to get rid of Mr. Jackson (Tr. 776), and that Brown appeared to have a weapon, similar to Government's Exhibit 24, out on the yard (Tr. 778.) Gerald Miller further confirmed that Brown had a motive to attack Mr. Jackson—a desire to rob him and take over his sports betting business (Tr. 799–800); that Brown had threatened to attack Mr. Jackson prior to the fight on December 16 (Tr. 802–03); and that Brown was carrying a weapon similar to Government's Exhibit 24 on December 16, and threatened to use that weapon on Mr. Miller (Tr. 803–04). Andres Aguiar also testified that Brown threatened an attack on Mr. Jackson (Tr. 832), and then did attack him on the yard with a knife (Tr. 834). Aguiar also testified that four or five other inmates joined Brown in chasing and attacking Mr. Jackson and Mr. Gulley. (Tr. 836.) William Daniels also confirmed that Mr. Brown was carrying a weapon, and had threatened to attack Mr.

---

[23] The facts in this case were more amenable to testimony about prison life. In the Snarr and Garcia trial, by contrast, a justification defense was out of reach, as the defendants attacked two guards and used their keys to murder a Government witness in confinement at the prison.

Jackson earlier in the day on December 16. (Tr. 847.) He also confirmed Miller's testimony that Brown's motive was to take over Mr. Jackson's gambling operation. (Tr. 848.) Lastly, he confirmed that Mr. Brown attacked Mr. Jackson with a knife in front of 3-building. (Tr. 850.) Shannon Agofsky, the final defense witness to testify during the guilt phase, also confirmed the same basic details about Mr. Brown and the beginning of the fight on the yard, i.e.: that Mr. Brown had a knife that he was threatening to use against Mr. Jackson (Tr. 937), and that he attacked Mr. Jackson on the yard with a knife (Tr. 942–943). Agofsky also testified regarding Mr. Jackson's state of mind prior to Brown's attack, noting that Mr. Jackson told him that he did not really know Brown, and did not have any problems with him. (Tr. 940–41.)

Investigation during the preparation of this Petition has provided important new facts as well as key corroboration of the basic facts presented at trial. Reginald Carr, who was never contacted prior to trial, attests in his attached declaration that he witnessed the beginning of the fatal altercation, that he saw Brown attack Mr. Jackson initially with two knives and that Brown was heavily intoxicated at the time. Carr Decl. ¶ 3 (Ex. 22). This testimony would have corroborated Daniels' trial testimony that Brown appeared drunk on the day of the attack (Tr. 863), and Agofsky's testimony as to Brown's erratic and frenzied behavior prior to his attack on Mr. Jackson. (Tr. 935–36.) Counsel relied too heavily on the investigation conducted by Gulley's defense team and failed to adequately conduct their own independent investigation. Had they done so, they would have found and presented Reginald Carr, who could have explained for the jury the nature of the conditions at USP Beaumont. The failure to do so was unreasonable and prejudicial.

The Government did present some evidence to dispute the testimony of the defense witness at trial, both from an informant witness given a deal to testify and from correctional officers. The officers claimed to be positioned close enough to observe what was in the hands of Mr. Brown, Mr. Gulley, and Mr. Jackson, and yet said they were too

far away to interfere, or even summon help in time to prevent the three from running more than the length of a football field (Tr. 1088) from the recreational area to the open doors of a maximum security prison complex, past the very guards who claimed to have observed Mr. Jackson with a knife (Tr. 175; 179[24]; 199–8; 208[25]).  Trial counsel could have done much more to dispute the Government's presentation of this evidence by highlighting major internal contradictions and demonstrating the sheer implausibility of the officers' having seen the onset of the altercation, or purportedly being close enough to see Mr. Jackson with a knife after sunset, yet not close enough to even slow down inmates running through a maximum security prison, past the posts of the guards whose job was to stop them.

Trial counsel essentially stipulated that Jackson and Gulley chased Brown into cell 125 and killed him.  Although it would have been difficult to dispute these facts, that made self-defense an ill-fitting theory.  Having chosen that theory, it was essential for defense counsel to show, first, that the testimony of the prison guards was unreliable, and that defense testimony that Brown pulled a knife, while Jackson was unarmed, had not been reliably contested.  As discussed below,[26] there were glaring unexplained inconsistencies in the guards' testimony that made their key observations improbable, but defense counsel missed or ignored them.  Second, counsel had to show that Mr.

---

[24]    Officer Chopane was purportedly standing directly in front of the unit into which Brown, Jackson, and Gulley ran, and saw the fight begin, but then purportedly moved out of the way of the inmates in order to assist Officer Vann, who was running from Building 2, further away.  Somehow in this process, Chopane apparently got behind Officer Vann, despite purportedly starting from a position directly in front of Building 3, to which the inmates and Officer Vann were all running.  Officer Vann managed to make it inside Building 3 coming all the way from Building 2, while Officer Chopane did not.  (*See* Tr. 155.)  Trial counsel did not address these discrepancies in cross examination of Officer Chopane.  (Tr. 188–195.)

[25]    Counsel failed to ask Officer Devereaux how he responded to the incident, or how he failed to stop the inmates from running into a building that was directly in front of him, or why he failed to make it inside, despite being considerably closer to the entrance than Officer Vann.

[26]    *See* Claims 4E and 9A, *infra*.

Jackson acted reasonably, within the prison environment, in chasing and stabbing Brown. Failing to do so prejudiced Mr. Jackson, as AUSA Batte hammered in his closing argument at the idea that the realities of life in prison made self-defense a plausible theory:

> The way self-defense works, not in the prison -- See, the laws we work with here are your laws, not their laws, not Shannon Agofsky's and Gerald Miller's laws, but our laws. And our laws of self-defense say that if David Jackson got the knife out on the yard and then chased Daryl Brown into cell 125 and killed him, he committed first degree murder. You don't have the right to chase an unarmed man a hundred and some yards into a cell and butcher him. That's not self-defense, even if you thought he might come back sometime the next day and try to do it to you. That's not self-defense.

(Tr. 1087–1088.)

Trial counsel did nothing to address this point. The unique and compelling exigent circumstances in prison, and particularly in USP Beaumont, are addressed, however, in the attached declarations of prisoner and prison official alike. As Reginald Carr states:

> In a place like Beaumont, once somebody comes at you with a knife, you don't have a lot of choices. You can't go to the guards or the administration because you get branded as a snitch and your life might as well be over. Then you're even worse off because you can't ever leave your cell without looking over your shoulder constantly and never knowing if today may be your last. You can't check into protective custody for the same reason. Besides, going to the guards is just a waste of time. They won't do anything anyway. You can't back down because then it is just a matter of time before he comes at you again or gets someone else to do it, except next time you might not be so lucky. You may get creeped while you're taking chow or in the shower and before you know it you're laying in a pool of blood or dead. It could be that day, or the next day or the next week, but it will come, and if you don't take care of it then, you'll come out on the

90

losing end.  Even if you don't start it, you have to be the one to end it because if you don't you're as good as dead.  That's just the way it is at a place like Beaumont.  Beaumont is the most violent federal prison I have ever been in.

Carr Decl. ¶ 6 (Ex. 22).

Former Federal Bureau of Prisons Warden Mark Bezy agrees:

Inmates have a right to protect themselves from other inmates, and I would advise prisoners of that.  Mr. Jackson's response to the initial confrontation was to defend himself.  In prison, if you do not fight back you are labeled as weak and you can become a permanent victim.  Within the prison community, a prisoner has to maintain a reputation with his peers.  Once branded as weak, he is doomed to spend his time looking over his shoulder and/or he may consigned to protective custody.  This is seen by the vast majority of prisoners as an unacceptable fate.  In addition, facing an attack from someone like Mr. Brown, even to disarm him does not end the matter because there is always the possibility that he has another weapon somewhere or can easily obtain one and it is only a matter of time until he attacks again perhaps when it is unexpected or when the person attacked is in a more vulnerable position.

Bezy Decl. ¶ 8 (Ex. 4).

The prejudice caused by trial counsel's failure to develop such evidence is apparent from the record.  During voir dire, at least one juror put trial counsel on notice that testimony about prison life would be central to his decision on self-defense.  Juror Rodney Stutes stated, when first asked about self-defense,

"I never have been in prison, I don't really know what goes on, but I hear there are a lot of people who are taken advantage of and their life threatened if they don't agree to certain things, and that would have a lot of influence, I mean, not influence, but have a lot to do with the situation.  You know, like if somebody is threatened, their life is threatened, or if they're hurt in any kind of way, I mean, you know, you've got to weigh all the facts why he did commit the

91

crime."

Later, upon revisiting the subject, Mr. Stutes further explained, "Well, like I said, I don't know if all this goes on, but you hear of abuse to the prisoners. . . . Their lives threatened. You have gangs who say 'either you do it or our gang will hurt you.' It just depends on all the circumstances, what goes on. I don't really know what goes on in a prison...." (J.S. Tr. 561.) At minimum, the effective presentation of evidence about the circumstances at USP Beaumont would have changed Mr. Stutes's decision on first-degree murder.

Moreover, although defense counsel again failed to present this information to the jury, Mr. Jackson knew first-hand the dangers another inmate, armed with a knife, could present. Just two years prior, while serving at USP Marion—the institution from which he was transferred to USP Beaumont—Mr. Jackson had been stabbed by another inmate. *See* United States Department of Justice, Discipline Hearing Officer Report and Inmate Injury Assessment and Follow-up, dated Feb. 22, 1997 (Ex. 77). As here, the guards who witnessed the incident insisted that Mr. Jackson's assailants were using only "closed fists." (*See id.* at pp. 2, 9.) No one noticed that Mr. Jackson's assailants had weapons; instead, Mr. Jackson was given a disciplinary violation for defending himself. Only later did prison staff notice that, in fact, Mr. Jackson had been stabbed—*four times*. (*See id.* at p. 11, noting "[l]ater in the hospital I saw what appeared to be four small puncture wounds to the upper back across both shoulders," ████████████████ ████████████████████████████████ ) This incident demonstrates how Mr. Jackson was conditioned to react by his recent prison experience. At the time Brown pulled a knife, he was conditioned to react to violence, because the guards would not help him—at best they would later say that Brown was unarmed to cover their mistakes. Yet because of the failure of Mr. Jackson's trial counsel—who had this information in their own files—the jury never learned this fact, which was critical to explaining Mr.

92

Jackson's conditioned response to Mr. Brown's attack, and would have been relevant even to trial counsel's own chosen theory of self-defense.

Counsel failed unreasonably to inform Mr. Jackson's jury about the unique and special circumstances, both those that exist generally in many prisons including Beaumont and those specific to Mr. Jackson's recent experience in prisons, in which Mr. Jackson was attacked. Counsel also failed to show the jury that Mr. Jackson merely responded to Mr. Brown's attack based on his prison-conditioned survival instincts. Had the jury known, as described by Reginald Carr, that in a place like Beaumont, you may not start it but "you have to be the one to end it," there is a reasonable probability that at least one juror would have seen Mr. Jackson's reaction as one of understandable and justifiable self-defense. Failure to make this point prejudiced Mr. Jackson.

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a showing of ineffectiveness requires a defendant to show that "counsel's representation fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." The prejudice prong requires that defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. In a capital murder trial, where a unanimous verdict is required, this requires a showing that, but for counsel's errors, one cannot be confident that *every juror* would have chosen a guilty verdict.

As the Court noted in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690–91. The Court went on to note that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. As the *Strickland* Court makes clear, there is no justifiable strategy in choosing a primary defense theme without researching the requirements of that theme, or in examining potential

93

alternatives.  Counsel here failed to perform a reasonable investigation into the legal requirements of its primary guilt-phase theory, or into potential alternatives that would have fit more readily into the facts of the case.

Moreover, as is explained elsewhere in this Petition, Mr. Jackson has severely diminished capacity due to a lifetime of complex trauma as well as mental retardation.  As will also be explained later in this Petition, Mr. Jackson was placed in the environment of "Bloody Beaumont," where violence was so common that the institution was later downgraded to medium security, although not before violent incidents there had led to the capital convictions of five Beaumont prisoners—a full eight percent of the fifty-nine men now living on federal death row, and more capital sentences than the rest of the federal prison system combined over the post-*Gregg* history of the federal death penalty.[27]  By the time of Mr. Jackson's trial, there had been seven inmates killed at USP Beaumont: Stanley Moseley on September 10, 1998, Luther Plant on January 5, 2001, Harry Hunt on December 24, 2003, Keith Barnes on May 7, 2005, Jose Jaimes-Martinez on August 13, 2005, Johnnie Holmes on December 30, 2005, and Mr. Brown.  None of this picture was placed before the jury and counsel's failure to explain Mr. Jackson's response to Brown's violent attack in the proper context severely prejudiced his defense. This information would have shown the jury that Mr. Jackson's reaction was appropriate under the violent conditions in which he was kept, particularly once he was attacked.  At least one juror would have found Mr. Jackson had committed only a lesser offense, if not an outright acquittal.[28]

---

[27]    Five of the sixty individuals on Federal death row are there because of killings committed in USP Beaumont.  Of the sixty-eight federal capital sentences since 1988, only three involve crimes committed in other prisons.  *See* http://www.deathpenaltyinfo.org/federal-death-row-prisoners.

[28]    Evidence of the conditions at Beaumont prison would have also been important mitigation during the penalty phase, and trial counsel also unreasonably failed to present such evidence at that stage, which also prejudiced Mr. Jackson.

94

**B.      Failure to Develop Sudden Quarrel**

While trial counsel did not fully ignore possible alternative theories to self-defense, these alternative theories were, at most, glossed over and no explanations were offered to explain their import or how the facts of the case specifically warranted acquittal or a lesser conviction.  In closing, Mr. Barlow argued, "[t]hat's what this case is really about.  This case is really about whether or not Mr. Jackson is guilty of manslaughter or whether or not it's self-defense.  If it's self-defense, he's not guilty of all of the counts, all of the charges.  If you don't believe that it's self-defense, then the only thing you could possibly consider would be a killing after a sudden quarrel.  And when you read the charge, you'll see that's what manslaughter is, a killing after a sudden quarrel.  There's no question there was a sudden quarrel.  It was a sudden quarrel that Daryl Brown started with his weapon, and Mr. Jackson responded in self-defense, and that's why he's actually not guilty of all of the counts."  (Tr. 1048.)  There was no jury instruction on the meaning of "sudden quarrel," however, and nor did defense counsel explain this concept.  Merely naming a defense without explanation or legal guidance was not effective and left the jury in the dark as to the most important elements of its mission.  Moreover, defense counsel failed to raise, or apparently even consider, alternatives such as "imperfect self-defense" that would have fit more closely with the facts of the case.

In their proposed jury instructions, trial counsel submitted an instruction on voluntary manslaughter requiring that the Government prove that Mr. Jackson killed Daryl Brown "upon a sudden quarrel or heat of passion . . . ."  (Ex. 44.)  The trial court instructed the jury that, to find Mr. Jackson guilty of voluntary manslaughter, it must find "that the defendant did so with [*sic*] malice, that is, upon a sudden quarrel or heat of passion . . . ."  (Tr. 1021.)  Aside from presumed errors in transcription, this instruction comes from the Fifth Circuit pattern jury instruction on voluntary manslaughter.  *See* FIFTH CIRCUIT CRIMINAL JURY INSTRUCTIONS § 2.57 (2001).  Trial counsel, however,

never explained the term "sudden quarrel" to the jury.  His statements involving sudden quarrel were limited to only cursory references.  (Tr. 1048, 1052, 1057, 1073, 10778, 1079–80, 1084.)

Although Mr. Barlow uttered the term "sudden quarrel" repeatedly in his closing argument, not once did he offer a definition, or explain how the facts fit that definition.  Trial counsel's statements and records suggest that he had no meaningful way of orienting the jury to this key concept, beyond its mention in the pattern instructions, though explanations of the concept go back more than a hundred years.  *See Allen v. United States*, 164 U.S. 492, 496-97 (1896).  Without an explanation of this defense, however, the jury was left with no reasonable basis for concluding that sudden quarrel fit the facts of the crime.  As such, the jury thought it faced a false-dichotomy: find self-defense, or find first-degree murder—the sole capital charge facing Mr. Jackson.  Particularly given the inadequate presentation of self-defense, this was no choice at all.

## C.    Failure to Raise Imperfect Self-Defense

In addition to inadequately investigating and presenting self-defense and sudden quarrel, Mr. Jackson's counsel failed to raise the theory of imperfect self-defense, which brings a charge of murder down to manslaughter.  This defense is widely recognized and, with adequate investigation, could have been more easily proven in Mr. Jackson's case than straight self-defense.  *See, e.g., Middleton v. McNeil*, 541 U.S. 433, 434 (2004); *Chandler v. Epps*, No. 1:08-CV-093-SA-JAD, 2010 WL 1979673 at *5 (N.D. Miss. 2010) ("Lastly, the [lower] court noted that the jury was instructed as a whole, not only on the murder charge, but also on imperfect self-defense manslaughter…"); *United States v. Milk*, 447 F.3d 593, 599 (8th Cir. 2006) ("[Imperfect self-defense] may be proven by evidence that: (1) the defendant unreasonably but truly believed that deadly force was necessary to defend himself, or (2) the defendant inadvertently caused the victim's death while defending himself in a criminally negligent manner.") (citing *United States v. Anderson*, 201 F.3d 1145, 1151 (9th Cir. 2000));

96

*Swann v. United States*, 648 A.2d 928, 931 (D.C. App. 1994) ("[A] defendant's actual belief both in the presence of danger and the need to resort to force, even if one or both beliefs be objectively unreasonable, constitutes a legally sufficient mitigating factor to warrant a finding of voluntary manslaughter rather than second-degree murder.").

In imperfect self-defense, the reasonableness inquiry is evaluated *subjectively*. If a defendant genuinely, but unreasonably, believed that he was in imminent danger of harm, he is entitled to imperfect self-defense. Although, as described above, trial counsel should have presented evidence showing that Mr. Jackson's actions and fear of Mr. Brown were reasonable and were justified by self defense, in light of the unchecked violence at Beaumont, had trial counsel presented a defense of imperfect self-defense, the jury would have had an alternative to first-degree murder even had it found Mr. Jackson's fear real and legitimate, but nevertheless unreasonable. In light of Mr. Jackson's prior stabbing at Marion, his significant intellectual limitations, history of severe trauma and related mental disorders, as well as his stunted development of life and social skills—none of which were presented to the jury—there would have been ample evidence that Mr. Jackson genuinely believed that Mr. Brown presented an imminent threat. Many courts recognize that prisons are uniquely violent places and that assault in prison is inevitable. *Farmer v. Brennan*, 114 S. Ct. 1970, 1990 (1994) ("prisons are necessarily dangerous places . . . .") (citing *McGill v. Duckworth*, 944 F.2d 344, 345 (7th Cir. 1991)); *see also* Anders Kaye, Dangerous Places: The Right to Self-Defense in Prison and Prison Conditions Jurisprudence, 63 U. CHI. L. REV. 693, 695-96 (1996) (Ex. 79). According to some calculations, the murder rate in prison is eight times as high as on the outside and the rate of assault is twenty times higher than that of the prison murder rate. *See* James E. Robertson, *The Constitution in Protective Custody: An Analysis of the Rights of Protective Custody Inmates*, 56 U. CIN. L. REV. 91, 93-94 (1987) (Ex. 80). Even if a jury found that prisons were not different, if presented with proper evidence of the circumstances of the offense, of Mr. Jackson's history of trauma, and of his

intellectual disabilities and mental illness and how those would have affected his perception of the events, at least one juror would have found genuine Mr. Jackson's belief that Mr. Brown presented an imminent harm.

**D.      Failure to Retain and Use Relevant Experts**

In addition to trial counsel's failure to retain a relevant prison expert to explain prison life and the reasonableness of Mr. Jackson's fear of and reaction to Mr. Brown's armed attack, trial counsel also unreasonably failed to utilize testimony about Mr. Jackson's background, intellectual disability, and mental health.  Such testimony, however, could have negated the element of premeditation, thereby prohibiting a conviction for first-degree murder.

As Dr. Richard Dudley has stated, in light of Mr. Jackson's "noted experiences with knives, his reaction to the threat of a knife was much more an impulsive, reflexive action than any sort of premeditated act."  Dudley Decl. ¶ 39 (Ex.1). In fact, in Dr. Dudley's opinion:

> Mr. Jackson's above-described mental health difficulties significantly influenced his behavior at the time of the crime for which he was convicted and sentenced to death.  More specifically, Mr. Jackson's above described mental health difficulties influenced his perception of danger/risk of being harmed; his impulsivity severely compromised his decision-making ability with regard to how he should respond to the danger that he perceived; and his over-reactivity further influenced the nature of his impulsive response.  *As further explained above, it is my opinion that at the time of the crime the impact of Mr. Jackson's mental health difficulties was such that he was unable to premeditate or even consider options that might have been available to him.*

Dudley Decl. ¶ 46 (Ex. 1) (emphasis added).

The prejudice of trial counsel's failure is clear.  The Supreme Court has referred to Dr. Dudley as a "well-credentialed" expert, and relied on his mental health

testimony in granting habeas relief.  *See Sears v. Upton*, 130 S. Ct. 3259, 3263 (2010). Had at least one juror had the same opinion of Dr. Dudley as the Supreme Court, the jury could not have returned a guilty verdict on first-degree murder.

**E.**     **Failure to Seek Necessary Discovery from the Bureau of Prisons**

Trial counsel unreasonably failed to seek discovery from the Bureau of Prisons ("BOP") about USP Beaumont and the death of Daryl Brown.  Trial counsel should have sought discovery regarding: (1) USP Beaumont policies, including: all Institutional Character Programs pursuant to Program Statement ("PS") 1070.08, Administrative Remedy Programs pursuant to PS 1330.16, Special Housing Review Reports, duty logs and staff rosters, SORT team reports, reports on other homicides at USP Beaumont, and any other materials that could have illuminated whether USP Beaumont was following proper procedures on December 16, 1999, both in failing to prevent the death of Daryl Brown and in investigating the incident; (2) any and all reports, reviews or  investigations of the death of Daryl Brown and its causes, such as "After Action Reviews," "Board of Inquiry" reports, or any other materials related to the incident; (3) the correctional officers who served as witnesses at trial, including personnel records on such witnesses and permission from the BOP to interview such witnesses; (4) Inmate Central Files, pursuant to PS 5800.11, on all inmate witnesses, both for preparation of defense witnesses and cross-examination purposes; and (4) BOP protocols regarding the safety of inmates, including protocols for keeping Mr. Jackson secure and away from other inmates.

The record suggests that trial counsel put no thought into possible discovery.  Other than Mr. Jackson's central file and medical records, obtained by Pamela Stites, the mitigation specialist at trial, trial counsel failed to seek any relevant records from the BOP.  Trial counsel's only motions for discovery were a single-page "Motion for Evidence Favorable to the Defendant," (CR 1:06-CR-51, Docket No. 162) which failed to specify any materials requested, and a one-page and six-line "Motion to Require

the Government to List Witnesses and Provide Criminal Histories," (CR 1:06-CR-51, Docket No. 151).  As the Court suggested in its orders on these motions (Docket Nos. 194 and 206), these perfunctory requests were largely superfluous in light of previous orders and statements by the Government that it would produce witness lists, criminal history evidence, and exculpatory evidence.[29]  Trial counsels' failure to seek discovery was unreasonable and prejudiced Mr. Jackson in two ways: first, it prevented Mr. Jackson from demonstrating that, due to the environment at Beaumont, he had a reasonable belief that it was necessary to use force to protect himself from Daryl Brown; second, it prevented Mr. Jackson from demonstrating at the penalty phase that the Bureau of Prisons could house him securely if the jury returned a life sentence.

Mr. Jackson will pursue this further in his forthcoming discovery motions.

**F.    Failure to Cross Examine Offense Witnesses with Prior Inconsistent Statements**

Trial counsel failed to cross-examine multiple critical Government witnesses with prior inconsistent statements.  Most of the guards who testified at trial substantially changed their stories from what they initially reported in the aftermath of the incident, but trial counsel failed to raise this for the jury.  For example, Correctional Officer Everett Gordon testified that he saw Mr. Brown outside of his unit just a few minutes before the attack on December 16, and that Mr. Brown appeared normal.  (Tr. 237–239.)  The Government spun this as evidence that Mr. Brown could not have had a knife or been planning to attack Mr. Jackson.  (Tr. 1095.)  Officer Gordon, however, did not write down the encounter with Mr. Brown at the time of the incident on his initial report in 1999.  *See*, United States Government Memorandum for Lieutenant Tims (Dec. 16, 1999) (Ex. 76)  Rather, as he was cross-examined at Mr. Gulley's trial, it was only six years later that Officer Gordon "remembered" this encounter.  *See* Gulley Tr. 519-24,

---

[29]    To the extent the Government failed to produce this information, this claim is alternatively asserted as a *Brady* violation.

1308-10 (Ex. 49). Mr. Jackson's trial counsel, however, failed to cross Mr. Gordon on this fact. (Tr. 240-42.)

As trial counsel's primary theory of the case was that Mr. Jackson was defending himself from an armed attack by Mr. Brown, failure to challenge Mr. Gordon's testimony was unreasonable and prejudicial. Whether Mr. Brown was armed was incidental to Mr. Gulley's primary defense, which was that he was not an active participant in the stabbing. To the theory of self-defense advanced by Mr. Jackson's trial counsel, however, establishing whether Mr. Brown was initially armed was critical. Officer Gordon's trial testimony undermined this theory. Yet only Mr. Gulley's lawyers apprised the jury that Mr. Gordon had failed to note the prior encounter with Mr. Brown in his report on the day of the incident, and first mentioned it only six years later. As Mr. Gulley's trial was first, and Mr. Jackson's lawyers were close associates with Mr. Gulley's attorneys, and watched much of the trial, they were well aware of this evidence, and no strategy can justify their failure to present it.

As detailed below in Claim 9A, *infra*, regarding repeated false statements by Officer Raymond Chopane suborned by the prosecution, this failure to cross-examine Government witnesses was endemic to the guilt phase. A number of courts have found counsel ineffective for failing to challenge witnesses with prior inconsistent statements. *See Harris v. Artuz*, 288 F. Supp. 2d 247, 259–60 (E.D.N.Y. 2003) (finding counsel ineffective where counsel failed to impeach the credibility of witnesses with evidence that would have aided defense's theory of misidentification); *Sparman v. Edwards*, 26 F. Supp. 2d 450, 454-55 (E.D.N.Y.1997) (finding counsel ineffective when he "failed to cross-examine [child sexual abuse victims] about ... inconsisten[t] ... statements that they made to the police"); *Moore v. Marr*, 254 F.3d 1235, 1241 (10th Cir. 2001) (noting that "counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls outside the wide range of professionally competent assistance") (internal quotation and citation omitted); *Driscoll v. Delo*, 71 F.3d 701, 710 (8th

101

Cir.1996) (failure to question witness with prior inconsistent statement made to investigators constituted deficient performance since there was "no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony ... took on such remarkable detail and clarity over time"); *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) (failure to call witnesses to contradict eyewitness identification of defendant was deficient performance); *Nixon v. Newsome*, 888 F.2d 112, 115–16 (11th Cir. 1989) (failure to impeach with prior inconsistent testimony "sacrificed an opportunity to weaken the star witness' inculpatory testimony).

### G.    Failure to Prepare Defense Witnesses

Mr. Jackson's crucial defense witnesses were inadequately prepared for their trial testimony to the extreme detriment of the case.  Darrell Evans, a witness for the defense at trial states in his recently-obtained declaration, "[t]hey went ahead and called me as a witness without talking to me about my testimony or discussing what they were going to ask me and what my answers. [*sic*] would be.  I just got up and testified without any preparation from the lawyers."  Evans Decl. ¶ 6 (Ex. 21).

Counsel's failure with regard to witness preparation and relations is epitomized in a letter from inmate George Rivera to trial Judge Crone written on October 11, 2006, after the trial had already begun:

> I am writing you in regards to my being called as a witness in the criminal case against David Jackson in which you are the presiding judge.  Your honor, unbeknownst to me I was moved from U.S.P. Pollock in Louisiana to Beaumont Texas because I was to be a witness for the defense.  *I was never notified or made aware of defense counsel's interest in me, so this is a total surprise to me*.  My father, the late George Rivera St., passed away while I was in USP Marion.  When Marion closed down my mother and other family members took vacation leave for November in order to come and see me.  We just had a loss in the family your honor.  Now all of a sudden I'm in Texas, in a trial counsel had knowledge as to

102

who they would be calling as witnesses.  Counsel came to see me here at USP Beaumont and I expressed my concerns relating to my visit, I even gave them my families phone number so counsel can call and maybe reschedule their flight.  It's been well over a week and *I just found out counsel lied to me and never called my family.*  Your honor I expressed this extensively to counsel and apparently they don't care, and nothing means more to me than my family.  I am asking your honor to 1) either have counsel for the defense and the government take my disposition [*sic*] and release me; 2) send me back to Pollock and have a camera and monitor placed in the court room and interview me (cross examine [*sic*]) via camera, or just release me all together cause counsel has now placed an unwarranted burden on me and my family.

Letter from inmate George Rivera to Marcia Crone (Oct. 11, 2006) (Ex. 42) (italics added).

Witness preparation is obviously a vital part of effective trial representation.  The failure of Mr. Jackson's lawyers to properly perform this basic function is manifest and the prejudice to Mr. Jackson was nothing short of overwhelming.  In a case like this, where the events happened rapidly, in a chaotic and distracting environment, it was imperative for counsel to thoroughly and carefully discuss with prospective witnesses exactly what they saw and heard.  It is basic trial preparation to have a plan for explaining any important discrepancies rather than to proceed unprepared and allow the other side to exploit every contradiction and inconsistency.  Counsel here failed completely in this regard, leaving discrepancies hanging and providing the Government with loopholes and vulnerabilities to exploit, to the detriment and prejudice of Mr. Jackson's defense.  With proper preparation, the inconsistencies could have been resolved and explained and the defense case would have been far stronger.  For example, Andres Aguiar testified that four or five other inmates joined Mr. Brown in chasing and attacking Mr. Jackson and Mr. Gulley.  (Tr. 836.)  This testimony was inconsistent with the testimony of all the other defense witnesses, and negatively impacted the credibility of defense counsel and defense witnesses before the jury.  This inconsistency was

103

hammered by the Government in closing arguments, and trial counsel presented no rebuttal. (*See*, *e.g.*, Tr. 1039, 1040-41, 1041-42, 1094.) AUSA Jenkins, for example, exclaimed, "You know, if Brown and his crew were chasing Jackson and Gulley, then where did the crew disappear to? You know, you could call this case, members of the jury, the case of the disappearing crew, because where did that crew go? None of the guards saw any crew. None of the guards saw Brown and other people chasing Jackson and Gulley. They saw simply Brown being chased by Jackson and Gulley because Jackson and Gulley were the assailants." (Tr. 1040-41.)

Reasonable counsel typically spends a day preparing an employee for a deposition in a civil suit. Mr. Jackson's trial counsel spent no time at all preparing the only witnesses who could confirm that Mr. Brown was armed, that he was the initial aggressor, and that Mr. Jackson was put in the position of having to protect himself with extreme force. For a trial that would determine whether Mr. Jackson would live or die, this was unreasonable. Without this preparation, trial counsel were unable to determine which witnesses should be called, and failed to determine the best witnesses to elicit key facts, such as Mr. Brown's inebriation and possession of a shank. Without such preparation, and in light of the minor inconsistencies that emerged in the inmate testimony as a result, the Government was able to effectively discredit the testimony of the inmate witnesses during closing arguments. (Tr. 1039-41.) As this testimony constituted the entirety of Mr. Jackson's guilt-phase defense case—Mr. Jackson's counsel presented only inmate witnesses in his defense—failing to prepare those witnesses, as reasonably required in a case of this magnitude, decimated trial counsel's sole strategy for avoiding conviction on first-degree murder.

AUSA Batte highlighted the prejudice caused by the defense's failure to prepare its witnesses in his closing arguments. He argued that defense witness Gerald Miller provided the evidence of Mr. Jackson's motive and premeditation: namely, that Mr. Jackson wanted to prevent Mr. Brown from "trying to move in on his action." (Tr.

104

1093.)  As AUSA Batte proclaimed for the jury, "Mr. Barlow gave that to you."  (*Id*.) This was an accurate presentation of Mr. Miller's testimony, however, in this aspect Mr. Miller's testimony was misleading or false.  The Government's own exhibits—stamps and betting slips confiscated from Mr. Jackson's cell—proved that Mr. Jackson's gambling operation was, in fact, *de minimis*.  (Ex. 88.)  None of the slips introduced as exhibits show a transaction greater than $5, and only 232 stamps *total* were confiscated from Mr. Jackson, which at the 1999 rate translates to only $76.56.  (*Id*.)  AUSA Batte did not, and probably could not, have introduced evidence of such minimal transactions to show motive or premeditation.  What this evidence most accurately showed was that Mr. Jackson's role in the prison was exaggerated by witnesses throughout the trial, contrary to the evidence available.  Yet by presenting Mr. Miller—an unprepared witness who emphatically stated from the stand, "I don't know what they're going to ask me… I'm going to speak what I know… I don't care who it hurts or who it helps" (Tr. 791–792)—trial counsel provided the Government with what its own closing argument acknowledged was the best evidence it had of motive and premeditation.

**H.    Counsel's Failure To Seek Discovery Of Daryl Brown's Personal Items, To Request Further Toxicology Results From Brown's Autopsy And To Cross Examine Trial Witnesses Concerning Their Knowledge Of These Important Potentially Exculpatory Matters.**

There is no record of any defense discovery request for reports or documentation regarding the recovery of Daryl Brown's personal items found in his cell, on the yard, or in the unit where he died.  Given Brown's reputation for possessing knives, making wine in his cell and consuming drugs and alcohol,[30] counsel should have

---

[30]    Multiple guilt-phase witnesses testified that Darryl Brown was known to carry a shank at all times, participate in the gambling ring, was constantly high on marijuana and other drugs, and was often drunk on the wine that he made in his toilet. (*See e.g.* Tr. 736-738, 778, 799, 831, 941.)

aggressively sought to learn what was included among his personal effects, *e.g.*, contraband, weapons, drugs, alcohol, or other substances. If such substances were found, Mr. Jackson would have been able to offer evidence to corroborate trial testimony that Brown was under the influence of mind- and behavior-altering substances at the time he attacked Mr. Jackson in the prison yard. "Intoxicated prisoners are a very serious danger to staff and other prisoners." Bezy Decl. ¶ 9 (Ex. 4). Defense counsel's failure to seek such evidence was unreasonable under the circumstances.

In light of testimony by guards and inmates that weapons were common at Beaumont (Tr. 84), and that Brown was known to always have a shank (Tr. 706), the absence of a shank in his cell could have been used to corroborate testimony that Brown had in fact pulled a shank on Mr. Jackson at the outset.

Similarly, defense counsel failed to investigate whether any of Brown's personal belongings, such as his clothing, had been found at the crime scene. In his incident report, BOP Investigating Officer Rivera only listed a few of what he considered the "most significant" items from among the 51 items of evidence that he had collected. Conspicuously missing was any mention of Mr. Brown's clothing, which was a glaring omission in light of the fact that the Government contended that Brown removed his shirt at the beginning of his confrontation with Mr. Jackson. *See* SA Marc D. Skinner, Investigation Report, Transcribed on May 9, 2005 (Ex. 61); (Tr. 150.)

In addition to their failure to request access to Brown's personal items and reports about what was found in his cell, counsel also failed to cross-examine the Government witnesses who investigated his death about whether they had found any such evidence either at the crime scene or in Brown's cell. For example, Jason Marten testified that he took numerous photos of the crime scene as evidence (Tr. 101), yet defense counsel failed to question him as to whether he had captured any of Brown's personal items in the photos or seem the items anywhere. (Tr. 118-120.)

106

Most remarkably, defense counsel conducted no cross-examination of Government witness Richard Brawley, the crime scene investigator who gathered evidence and completed the evidence chain-of-custody log. (Tr. 334.) Counsel did not inquire whether he had found any of Brown's personal items on the yard or in Unit 3-B-1, nor whether he had searched Brown's cell. Indeed, counsel asked no questions at all of Mr. Brawley, implying to the jury that the evidence collection in the case was impeccably handled. The failure to question the individual with the most knowledge about the collection of evidence surrounding this event was unreasonable. Defense counsel missed this opportunity to show deficiencies in the Government's investigation and raised questions in the jury's mind about the circumstances of Brown's death.

Defense counsel also failed to seek adequate discovery on the post-mortem toxicology report on Mr. Brown. They never investigated whether there were any other drugs in his system other than THC. Although there was testimony that Brown was known for using drugs (Tr. 728), counsel does not appear to have requested additional testing of Brown's blood samples that had been collected from the toxicologist at the time of his autopsy. Furthermore, counsel did not explore the implications of the drugs found in Mr. Brown's system; and they did not effectively cross-examine the toxicologist, Dr. Brown, about whether Mr. Brown could have been tested for drugs other than THC or whether he noticed any other bodily evidence of drug use during the autopsy. (Tr. 374-77.)

Counsel's omissions were unreasonable and prejudiced Mr. Jackson's defense. Mr. Jackson will be pursuing these matters in his post-filing discovery request to the Court.

I.     **Failure to Investigate Interference with the Testimony of Defense Witnesses**

Counsel's disregard for the safety of Mr. Jackson's critically important prisoner witnesses was prejudicial to the case. These men were stepping forward at considerable inconvenience and personal risk, facing retaliatory transfers, disciplinary

107

repercussions, losses of privileges and other adverse consequences for their willingness to tell the truth about what they saw, even if it meant the disfavor of their institutional keepers.  Such witnesses needed and deserved counsel's respect and protection.

These hardships are documented in a letter from defense witness James Larkin to Judge Crone:

> I am a witness for defendant David Jackson and I am being held at the U.S. Penitentiary in Beaumont, TX under a writ for the U.S. Marshals.  Here I am exposed to harassment, mistreatment and hostility by the prison administration in an effort to intimidate and discourage my testimony for the defense.
>
> By housing the defendant's witnesses here, we are exposed to undue hardships and mistreatment and harassment by prison officials who have an interest in the outcome of Mr. Jackson's case.
>
> As of now, I am very hesitant to testify for Mr. Jackson because as the trial nears the treatment is getting worse. Under these conditions I feel I cannot testify in this case. Please have me removed from this prison or removed from Mr. Jackson's witness list.

Letter from James Larkin to Judge Crone (Ex. 55) (spelling errors corrected).

Counsel's failure to investigate Mr. Larkin's concerns was part and parcel with their wholesale failure to get their witnesses ready for trial.  Trial witness Darrell Evans describes a similar experience in his declaration:

> I knew that David Jackson's trial was coming up in October of 2006.  Very shortly before the trial, I believe in October, I got transferred out of Beaumont to USP Big Sandy in Kentucky.  I thought that was very strange since I was supposed to be a witness at Jackson's trial in Beaumont.  I was brought down from Kentucky to Beaumont to testify during the trial.  The next morning the marshals took me to the courthouse and put all the prisoner witnesses in the bullpen.  One of Jackson's lawyers came to see me and told

108

> me he did not know if they would use me or not.
>
> They went ahead and called me as a witness without talking to me about my testimony or discussing what they were going to ask me and what my answers would be. I just got up and testified without any preparation from the lawyers.

Evans Decl. ¶¶ 12–13 (Ex. 21).

Although Evans testified at trial, by failing to interview him or discuss his testimony, trial counsel failed to learn, and so failed to present to the jury, Evans' later encounter with Officer Rice. At this encounter, Mr. Evans learned of the falsity of the "Pop" Jones incident, during which Mr. Jackson allegedly threatened to kill another inmate in the Special Housing Unit while also inculpating himself in the death of Daryl Brown. As discussed in more detail below, Evans has detailed a conversation with Officer Rice in which Rice stated that prison officials had encouraged him to lie about the Pop Jones incident. *See* Evans Decl., ¶¶ 6–8 (Ex. 21). This was crucial information, and the failure to uncover it highly prejudicial, given that Jackson's purported threat to Pop Jones was a centerpiece of the Government's case for guilt and indeed became the prosecution's final statement during closing arguments at both the guilt-innocence phase (Tr. 1100) and the penalty phase. (Tr. 1916.) Although the defense presented Evans' testimony that Mr. Jackson did not threaten Pop Jones, as AUSA Batte suggested to the jury on cross, Evans could have been confused about the incident (Tr. 926), failed to remember Mattes (Tr. 929), or even have missed the incident. In other words, the jury could have believed both Evans' and Mattes' testimony without contradiction, and had no suggestion from Evans that Mattes' testimony should be discredited. We now know, however, that Mattes and Rice may have been encouraged to testify untruthfully about the Pop Jones evidence. Counsel this missed this crucial testimony from Evans as well as important material for cross-examining Mattes.

**J.      Failure to Object to Improper Jury Instructions**

   1.      **Unbalanced Instructions**

At trial, the Court was required to give balanced instructions to the jury. *See United States v. Parker*, 566 F.2d 1304, 1305 (5th Cir. 1978) ("In deciding this case we must look at the facts in the light most favorable to defendant, since defendant is entitled to jury instructions relating to a theory of defense for which there is any foundation in the evidence. *United States v. Young*, 464 F.2d 160, 164 (5th Cir. 1972); *Perez v. United States*, 297 F.2d 12, 15-16 (5th Cir. 1961).")  Here, however, the guilt-phase jury instructions were not balanced, and trial counsel were deficient for not objecting to the imbalanced instructions or for not requesting that the same instruction for the prosecution be given for the defense.

In discussing the charge on the counts against Mr. Jackson, the Court stated:

> You should consider all the facts and circumstances preceding, surrounding and following the killing which tend to shed light upon the condition of mind of the defendant before and at the time of the killing.  No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the question of malice aforethought and premeditation should escape your careful consideration.

(Tr. 1017.)  The court gave the identical instruction when instructing on the lesser included offense of murder in the second degree.  (Tr. 1021.)

However, when instructing on self-defense, the court did not urge the jury to marshal all the evidence – no matter how small or trivial – which bears upon the question of the defendant's state of mind at the time that he acted in self-defense, *i.e.*, whether "it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat."  (Tr. 1018.)

110

2.      **Acquittal First Instruction**

The court instructed the jury that it could not consider any of the lesser included offenses until it first unanimously found that the defendant was not guilty of first degree murder.  (Tr. 1019.)  Trial counsel should have objected to this "acquittal first" charge.  There is no rule that requires an "acquittal first" process under Federal Rule of Criminal Procedure 31(c), and by instructing the jury that it must find an "acquittal first," it coerces the jury to find the defendant guilty of a death eligible offense without first considering a conviction on a lesser-included (and non-death eligible) offense.  *See United States v. Tsanas,* 572 F.2d 340 (2d Cir. 1978); *United States v. Jackson,* 726 F.2d 1466 (9th Cir. 1984).

The Court's improper use of an "acquittal first" charge also diminished the "reasonable efforts" charge the Court gave.  ((Tr. 1019) ("if, after reasonable efforts have been unsuccessful, the jury is unable to reach a verdict as to whether or not the Government has proved each element of [first degree murder]," the jury should then consider whether the defendant is guilty or not guilty of second degree murder.))  The two instructions conflict.  The first instruction informs the jury that they cannot consider a lesser included offense unless they first unanimously acquit on first degree murder, while the latter informs the jury that they *do not* have to unanimously acquit on first degree murder (they just have to be "unable to reach a verdict") in order to move onto lesser included offenses.

Moreover, at the end of instructions, the Court gave a general unanimity charge:  "To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the first superseding indictment."  (Tr. 1026); *see also* ((Tr. 1028) ("The presiding juror will write the unanimous answer of the juror (sic) in the space provided for each count of the first superseding indictment, either guilty or not guilty."; "Bear in mind that you are never to reveal to anyone, not even to the court, how the jury stands, numerically or otherwise, on any count of the first

111

superseding indictment until after you've reached a unanimous verdict.")) Taken as a whole, it's reasonable to believe that the jurors would have believed that they could not consider the lesser included offenses until they first unanimously acquitted on the first degree murder charge, and trial counsel were ineffective for failing to object to these contradictory, and prejudicial instructions.

**K.**     **Failure to Disclose and Waive Conflict of Interest in Prior Representation of Shannon Agofsky**

The Sixth Amendment guarantees a criminal defendant the right to representation that is free from conflict. *See* U.S. CONST. amend. VI; *see also Wood v. Georgia,* 450 U.S. 261, 269-71 (1981); *United States v. Guerrero*, 546 F.3d 328, 332 (5th Cir. 2008). This right is "not limited to cases involving joint representation of codefendants at a single trial, but extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person." *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir.1988); *Wood*, 450 U.S. at 268-72.

In the present matter, Mr. Jackson was denied his Sixth Amendment right to conflict-free representation as a result of Mr. Barlow's prior representation of testifying defense witness, Shannon Wayne Agofsky, in Mr. Agofsky's capital trial before the U.S. District Court in the Eastern District of Texas. Similar to Mr. Jackson, Mr. Agofsky was charged with capital murder related to the death of a fellow prisoner incarcerated at USP Beaumont. *United States v. Agofsky*, 8 F.3d 369 (5th Cir. 2006). Mr. Barlow's prior representation of Mr. Agofsky, in a case involving remarkably similar facts and circumstances, and his continued obligations to Mr. Agofsky, constituted a conflict of interest which Mr. Jackson never knowingly waived and adversely affected Mr. Barlow's performance at Mr. Jackson's trial.

112

**L.**    **Failure to Object to Improper Witness Testimony and Improper Closing Arguments During the Guilt Phase**

Mr. Jackson's trial counsel unreasonably failed to make proper objections at numerous points during the guilt phase.  Counsel allowed the prosecutors and Government witnesses to make improper and prejudicial comments without objecting or requesting curative instructions.  There were many such instances, but a few examples are presented here to illustrate the lack of effective advocacy and the prejudice resulting from counsel's failure to object when necessary to protect Mr. Jackson's fair trial rights.

Derric Wilson, a federal Bureau of Prisons' employee, testified that injuries on Mr. Jackson's hand were consistent with wielding a homemade shank.  (Tr. 77–78.) Such testimony improperly crossed the line into the realm of expert witness testimony governed by Rule 702, and should have been objected to by defense counsel.  *See* Fed. R. Evid. 702.  Due to counsel's failure to object to this harmful and unqualified testimony the jury was permitted to view a lay witness as the authority on the nature of the injuries to Mr. Jackson's hand.

Wilson's testimony on this point was relevant to one of the most crucial factual issues in the case.  Mr. Jackson's defense relied heavily on other testimony that Mr. Brown was armed with a knife and attacked Mr. Jackson—who was unarmed—and that Mr. Jackson succeeded in getting the knife away from Brown in the course of the struggle.  Significantly, the prosecution called a forensic pathologist, Dr. Tommy Brown, who did *not* opine about the nature of the wounds to Mr. Jackson's hand, except to note that injuries to the palm were often consistent with a *defensive* wound.  (Tr. 357–380.)

Defense counsel should have required the prosecution to qualify Derric Wilson through the means set out in Rule 702, rather than allow a prison investigator to provide expert medical testimony without objection.

During the guilt-phase closing arguments, AUSA Jim Jenkins urged the jury to punish Mr. Jackson for the fact the USP Beaumont had a reputation for violence. He argued that the jurors had

> "heard about violence at the USP, you've heard about violence at the penitentiary at the Federal Correctional Complex, and you've probably asked yourself 'well, why don't those people do something about violence in our federal penitentiary?' Well, members of the jury, today you are those people, because under the law and under the evidence you have the power to do something about violence in our penitentiary.

(Tr. 1045–46.) This argument deprived Mr. Jackson of his right to due process and an individualized determination on guilt and sentencing under the Eighth Amendment, yet defense counsel failed to object. *Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006) (*cert. dismissed sub nom.*). Mr. Jackson's attorneys should have objected on the grounds that the prosecution's attempt to blame Mr. Jackson for the wide-spread violence plaguing USP Beaumont violated his Fifth Amendment due process guarantee. They should have also objected that AUSA Jenkins' arguments were misleading, as the history of violence at the federal penitentiary pre-dated Mr. Jackson's arrival and should have been viewed in light of multiple, complex causes, rather than attributed to Mr. Jackson.

Trial counsel should have further objected to AUSA Jenkins' suggestion that the jury had a responsibility to address the violence at Beaumont. To argue that the jury should do anything other than weigh the evidence as instructed by the court was improper and highly objectionable. Exhorting the jury to perform other duties, such as serving as an arm of law enforcement or as a protector of society, undermined the true role of the jury as fact-finder and likely caused confusion about the proper considerations in determining the issue of guilt. The function of the jurors is "impartial arbitration between the defendant and the government," not "law enforcement." *United States v. Caro*, 597 F.3d 608, 626 (4th Cir. 2010) (direct appeal of federal death sentence); *see*

114

*also Cargle v. Mullin*, 317 F.3d 1196, 1222-23 (10th Cir. 2003) ("extremely improper" for prosecutor to suggest to jurors they "are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant"); *Weaver v. Bowersox*, 438 F.3d 832, 840-41 (8th Cir. 2002) (argument that the death penalty was "necessary to sustain a societal effort as part of the 'war on drugs'" is improper as it "prevents an individual determination of the appropriateness of capital punishment," and is "unfairly inflammatory" because it "invok[es] a jury's general fear of crime to encourage the application of the death penalty in a particular case") (citations omitted).

Additionally, trial counsel should have objected to AUSA Batte's statement during guilt-phase closing arguments that the Government video inside 3-B-1 "looked like one of those shows you see on the wildlife channel, where two lions are chasing an antelope, … and they chased him and chased him and chased him just like a couple of lions on the high plains, and when they got him cornered and got him in the cell, they killed him with just the same intent that those wild animals would have." (Tr. 1097–98.) The Supreme Court has noted that arguments comparing a defendant to an animal are improper, and deserve condemnation. *See Darden v. Wainwright*, 477 U.S. 168, 179-181, n.13 (1986). These various statements by the prosecutors during closing arguments combined to deprive Mr. Jackson of a fair trial, *see Bates v. Bell*, 402 F.3d 635, 636 (finding reversible error where, *inter alia*, the prosecution compared defendant to a "rabid dog"), yet trial counsel failed to object.

Objecting to improper and prejudicial testimony and argument is a key part of a capital defense attorney's function. The failure of Mr. Jackson's lawyers to perform that function was unreasonable and prejudiced his case.

## M.   **Prejudice**

What happened on December 16, 1999, is that Daryl Brown, under the influence of alcohol and drugs, and after repeatedly threatening to "take out" David Jackson, attacked Mr. Jackson with a knife, out of view of any of the guards at USP

Beaumont.  David Jackson, mentally retarded and living in what may have been the most dangerous and violent prison in America, and having been stabbed and ignored by federal prison guards just two years earlier, wrestled away the knife of this dangerously intoxicated man, and, with the help of Arzell Gulley, ended the threat Mr. Brown posed—and would have otherwise continued to pose—to Mr. Jackson and other Beaumont inmates.  What the jury heard, due to trial counsel's ineffectiveness, is that Mr. Jackson pulled a knife and chased-down an unarmed man in order to protect a vibrant prison gambling business.  What actually happened was at most manslaughter.  What the jury heard was first-degree murder.

## CLAIM 5

### MR. JACKSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006A AND THE FIFTH, SIXTH AND EIGHTH AMENDMENTS OF THE CONSTITUTION AT THE PENALTY PHASE OF TRIAL

### A.    Mr. Jackson's Lawyers' Penalty Phase Performance Was Objectively Unreasonable

As the Supreme Court recently reiterated, capital defense counsel has an "obligation to conduct a thorough investigation of the defendant's background."  *Porter v. McCollum*, 130 S. Ct. 447, 452-53 (2009) (*quoting Williams v. Taylor*, 529 U.S. 362, 396 (2000)).  Similarly, the ABA guidelines provide that mitigation investigations "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines, Guideline 11.4.1(C) (Ex. 68); *see also Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (the ABA guidelines are guides to what is reasonable).

The *Wiggins* Court referred to the Guidelines as "well-defined norms" three years before Mr. Jackson's trial began.  The *Williams* decision quoted in *Porter* was handed down six years before Mr. Jackson's trial began.  Thus, at the time of Mr.

116

Jackson's trial it was well-settled that Mr. Jackson's trial counsel had to conduct a searching and thorough investigation of potentially mitigating evidence for Mr. Jackson. The underlying importance of this thorough investigation is seen in the Supreme Court's observation more than twenty years ago that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks omitted).

Notwithstanding these well-settled norms and the Supreme Court's recognition that capital defendants have a constitutional right to have their lawyers investigate reasonably available mitigating evidence relevant to a capital sentencer's evaluation of the defendant's moral culpability, Mr. Jackson's trial counsel were deficient in their investigation, preparation and presentation of Mr. Jackson's mitigation case. First, the members of Mr. Jackson's legal team charged with investigating his background were unable to perform their work, and trial counsel did nothing to insure that the work was completed by some other means. Counsel retained both a mitigation investigator, Pam Stites, and a fact investigator, David Brooks, but failed to use most of the mitigating evidence uncovered during their investigations and failed to uncover a wealth of other readily available evidence about Mr. Jackson's background, all of which would have been centrally relevant to his capital jury's appraisal of the appropriate sentence.

Moreover, both the mitigation specialist and the fact investigator experienced serious personal problems that limited their ability to properly perform their critical defense functions. Ms. Stites' father was gravely ill during her investigation, which limited her availability to Mr. Jackson's case during the several months leading up to trial. *See* Decl. of Pamela Stites ¶ 40 (Ex. 5). As a result, she only spoke to a few family members and one childhood friend, and she did not conduct an investigation of

117

reasonably available witnesses that is required for a thorough mitigation case.  *Id.* at ¶ 4. Similarly, Mr. Brooks had surgery early in the case and he, too was unavailable for most of the pre-trial period.  *See* E-mail Correspondence with David Brooks (Ex. 86).  Thus, he met with only a handful of inmate witnesses, and failed to speak with several witnesses who would have been essential to rebut key points of the Government's aggravation case.

Even despite their limitations, the investigators' initial leads were promising and should have prompted any reasonable attorney to investigate further.  Yet, Mr. Jackson's lawyers ignored these leads.  They failed to interview the siblings and cousins who grew up in Mr. Jackson's home.  They failed to present any testimony from these witnesses with first-hand knowledge of the poverty, neglect, violence, and drug abuse that permeated the Jackson household.  Trial counsel failed to depose Mr. Jackson's mother even though they knew she was gravely ill and the trial court had granted the defense motion to depose Mrs. Jackson.  Because Mrs. Jackson passed away prior to the trial, trial counsel's negligence precluded Mrs. Jackson from providing extremely valuable testimony in support of her son's life.  And, trial counsel failed to provide their experts with adequate materials and background information with which to render reliable opinions concerning Mr. Jackson's mental health and intellectual functioning.

Because of their failure to investigate even the most basic aspects of Mr. Jackson's life, as set forth below, Mr. Jackson's trial counsel put on a meager case that was haphazardly presented without adequate investigation.  As also set forth below, the prejudice resulting from trial counsel's failure to conduct even a basic investigation is apparent from an assessment, as required by *Williams v. Taylor*, of the mitigation evidence presented at trial record and the newly discovered evidence in mitigation presented herein.  Trial counsel failed to present evidence from witnesses with the most direct knowledge of Mr. Jackson's early life.  As a result, the sole witness who testified at

the penalty phase who knew Mr. Jackson before he was charged with capital murder, Pamela Morrison, was discredited as presenting second-hand and uncorroborated testimony about the conditions in which Mr. Jackson spent his formative years. Similarly, the social history testimony of social worker Kate Allen was dismissed by the prosecution as being the product of "four levels of hearsay." (Tr. 1605.) As a result, powerful mitigating evidence was never uncovered or was overlooked, and Mr. Jackson's jury was deprived of relevant mitigating evidence that likely would have persuaded at least one juror to vote against sentencing Mr. Jackson to death. By contrast, the case that trial counsel presented resulted in jurors unanimously rejecting fifty of the sixty purportedly mitigating factors that trial counsel submitted to the jury for consideration. Special Verdict Form (Ex. 37).

1.     **The Mitigation Case Put On By Trial Counsel**

The defense's penalty phase consisted of only four witnesses: Pam Morrison, a childhood friend and neighbor of Mr. Jackson's; Dorothy (Dee Dee) Halpin, an educational consultant who reviewed Mr. Jackson's education test scores; Kate Allen, a social worker; and Dr. Elizabeth Pelz, an expert on prisoners and adapting to prison life. Additionally, at the last minute, and with no preparation, trial counsel called Mr. Jackson to the witness stand. His unprepared testimony proved more aggravating than mitigating, with AUSA Batte using much of Mr. Jackson's testimony to make his aggravation case in the penalty phase closing argument.

Ms. Halpin, Dr. Allen and Dr. Pelz touched only briefly on Mr. Jackson's background, his family's poverty, his parents' neglect of the children, and Leroy Jackson's abuse of David and his mother and the other children. All of their testimony was second or third hand from information they received from the mitigation specialist. Trial counsel offered no testimony concerning the extraordinary extent to which the family was mired in mental illness and drug addiction. The witnesses provided some

119

facts pertaining to Mr. Jackson's academic history and school performance.[31] Without adequate accounts of the true picture of pervasive abuse by both Jackson parents, neglect of the children by both parents, stark poverty, and rampant drug addiction, the jury was presented with a false depiction of Mr. Jackson's life. They were thus led to conclude, despite these glimpses into his background that would have prompted any reasonable attorney to investigate further, that Mr. Jackson's offense was unmitigated and his life was not worth sparing.

Mr. Jackson's lawyers also failed to prepare themselves or their witnesses adequately for his penalty phase, and the quality of the evidence presented to the jury suffered for it. Counsel utilized only one lay witness, Pam Morrison. As noted, she was the *only* penalty phase witness who had even *met* Mr. Jackson prior to a few months before trial and one of only two witnesses that had met him *at all*. As discussed above, the decision to call Ms. Morrison was made at the start of the penalty phase, as she had been initially told that she would not be testifying. Morrison Decl. ¶ 4 (Ex. 16).

The preparation of the other mitigation witnesses was similarly inadequate. For example, trial counsel asked Dr. Allen, the social worker, to be the proxy for Mr. Jackson's family, testifying to all of the horrific things that Mr. Jackson and his siblings/cousins endured as children and teenagers. But she testified based on information she had obtained indirectly from the mitigation specialist. As a result, Dr. Allen was vulnerable on cross-examination, and the Government was able to discredit most of her testimony, thereby torpedoing most of the social history.

Finally, as noted above, the last minute decision to call Mr. Jackson as the final defense witness at the penalty phase -- and the complete lack of preparation for it -- provided very little by way of mitigation and was wielded effectively by the prosecutors

---

[31]    As there are several "Mr. Jackson's" relevant to the discussion of David Jackson's childhood home and experiences, for clarity this section will generally use "David" in place of "Mr. Jackson."

in their arguments for death.  Mr. Jackson's unprepared and, for all intents and purposes, uncounseled, testimony served only to provide fodder for the Government's assault on his personhood.

        a.     **Pam Morrison**

Upon being suddenly told she was needed to testify with only a few days notice, Ms. Morrison immediately flew to Beaumont where she spent less than an hour meeting with trial counsel concerning her imminent life-and-death testimony on behalf of Mr. Jackson.  *See* Morrison Decl. ¶ 7 (Ex. 16).  Counsel did not do anything to prepare her for cross-examination.  *Id.* at ¶¶ 5-7.

Because of the failure to prepare Ms. Morrison, her testimony failed to give a true picture of Mr. Jackson's traumatic life and his positive attributes.  And, because she was not well-prepared, on cross-examination, she became confused and testified that Mr. Jackson appeared to be "normal" (Tr. at 1534, 1542), when in fact Ms. Morrison knew and believed exactly the opposite.  Morrison Decl. ¶¶ 15-16 (Ex. 16).

Compounding the poor preparation, trial counsel made no effort whatsoever to explore further with Ms. Morrison any of the areas or issues that came out during cross-examination.  He simply declined to ask her anything on redirect.  (Tr. 1543.)  This failure came back to haunt Mr. Jackson, as the jury apparently did not believe Ms. Morrison, discarding her testimony and finding that Mr. Jackson's impoverished, abusive, and neglectful childhood was not a mitigating factor.

        b.     **Dee Dee Halpin**

Ms. Halpin was an educational consultant who reviewed Mr. Jackson's school records and testified about his test results, grades and scholastic progress. The sum and substance of her testimony was that despite his low IQ scores, low standardized test scores and placement in special education, she could not say he had mental retardation because she did not have enough information, a statement which on its face suggests that trial counsel failed in their duty to investigate basic mitigation—and in the case of mental

retardation, an issue that could have precluded a death sentence.   Moreover, Ms. Halpin also provided false information to the jury that suggested the Mr. Jackson was showing academic improvement, (Tr. at 1555), and that he was "successful" in school.  (Tr. at 1556.) *See also* discussion of Ms. Halpin's testimony in Claim 2.B.2.  In fact, as evidence presented here establishes, Mr. Jackson showed a decline in academic ability even when he was in special education programs, and he suffers from mental retardation. Other evidence that was readily available at the time of trial establishes that counsel's failures allowed the jury to hear testimony suggesting that Mr. Jackson was not mentally retarded and by the same token deprived testifying experts and the jury of a wealth of evidence that was independently mitigating, regardless of whether it proved that Mr. Jackson is mentally retarded.

> c.   **Kate Allen**

Dr. Allen was a social worker who testified about family background, some of the physical abuse that occurred in the Jackson home, Leroy's failure as a role model; and her opinion that Mr. Jackson met 16 or 18 of the 22 "risk factors" identified by the U.S. Department of Justice for "being a criminal."  She, like Pamela Morrison, spoke to some of the violence and neglect that Mr. Jackson endured when he lived with his family and mentioned his developmental delays.  (Tr. at 1569.)  Dr. Allen, however, noted that the investigators' report lacked information about Mr. Jackson's parents other than Mrs. Jackson's statement that Mr. Jackson "grew up very poor."  (Tr. at 1569.)  Though Kate Allen testified that Mr. Jackson was not an accurate reporter of his background (Tr. 1614-15), even she testified that Mr. Jackson "was often spoiled" by his parents.  (Tr. 1573.) Nothing could be further from the truth.

The Government was able to exploit the lack of corroboration for Dr. Allen's superficial testimony.   Because most of her testimony was second, third and even, by her own admission *fourth* hand, the prosecutor discredited it and urged the jury to give it little weight.  Dr. Allen opined that Mr. Jackson suffered from PTSD (Tr. at

1587) and suggested that he might have brain damage, (Tr. at 1598). However, the Government made much of the fact that Dr. Allen was neither a psychiatrist nor a psychologist, and thus was not qualified to give any opinion on mental retardation or other mental illness. (Tr. at 1604-05.) The Government also made certain the jury knew that Dr. Allen's opinions were only as good as the three or four underlying interviews by Ms. Stites that she relied on to form them, and that she had not conducted any interviews with Mr. Jackson's family members herself. (Tr. at 1604).

### d.    **Dr. Elizabeth Pelz**

Dr. Elizabeth Pelz was an expert on prisoner "subcultures" who opined on Mr. Jackson's ability to serve life in prison peacefully. Dr. Pelz, however, did not provide direct testimony about life in USP Beaumont, the problems that pervaded that institution or the failure of USP Beaumont to follow standard procedures to ensure prisoner safety, all factors that could have been deemed mitigating in relation to the underlying offense.

### e.    **David Jackson**

After presenting its four intended witnesses, as a veritable afterthought, trial counsel presented Mr. Jackson as a witness. Despite its monumental importance, trial counsel put no time into preparing Mr. Jackson or discussing the subjects on which he would testify. Once Mr. Jackson took the stand, there was little or no attempt to direct or focus Mr. Jackson's testimony. Instead, he was asked open-ended questions to which he gave long, rambling, sometimes incoherent answers. Some of his answers covered several pages of the trial transcript without interruption or questioning by trial counsel. Even worse, trial counsel spent no time with Mr. Jackson preparing him for cross-examination.

The damage to Mr. Jackson from this hasty and ill-conceived decision was apparent from the fact that AUSA Batte used much of Mr. Jackson's testimony against him in arguing that Mr. Jackson should be sentenced to death. The patent

unreasonableness and prejudice from this decision and its presentation are discussed *infra* in Claim 5.A, *infra.*

Mr. Jackson's penalty phase case thus consisted of testimony by ill-prepared witnesses who presented superficial and misleading accounts of his background. As shown below and as set forth in the declarations accompanying this Petition, there was a great deal trial counsel could have done had they conducted a proper capital case investigation.

### 2. The Mitigation Case Trial Counsel Failed to Present

#### a. Mr. Jackson's Siblings and Cousins Never Testified

Despite their availability and willingness to testify, no members of David Jackson's family were presented on his behalf. Pam Stites met briefly with David's cousins, Larry and Brenda, and his sister, Patricia, but trial counsel never contacted them or made the slightest efforts to call them as witnesses at trial. In addition, David's brothers Roger and Stanley were also available to testify on behalf of David. *See* Anderson Decl. ¶ 43 (Ex. 18); Boyd Decl. ¶ 60 (Ex. 19); Jackson Decl. ¶ 19 (Ex. 15); Stites Decl. ¶ 37 (Ex. 5). The failure to call these important family witnesses was especially costly when David's mother died several months before trial, leaving David with no family witnesses. Indeed, when Ms. Morrison was contacted at the start of the penalty phase, she was told by the mitigation specialist that one of the reasons her participation was so critical was because David's mother had died and that the defense did not have anyone else to testify for him. Morrison Decl. ¶ 4 (Ex. 16); ((*see also* Tr. 1910.) (AUSA suggesting that second or third-hand testimony of social worker about the family was not credible.)) David's siblings and cousins, like Mrs. Jackson, could have provided first hand accounts of David's life as a child and teenager. This would have corroborated and proven the abuse and violence allegations that trial counsel advanced ineffectively. Presenting testimony from Mr. Jackson's family members would have also precluded the Government's argument that Dr. Allen's testimony was not credible

124

because she relied on second-hand interviews of family members who were not testifying.

David's siblings and cousins could have provided critical testimony as to the enormously high risks facing the eight children who lived in the Jackson home. No evidence of what happened to David's siblings was provided to the jury, and such evidence would have demonstrated the devastating effects of David's childhood on the course of his life.

David's cousins and siblings could have also testified about the effect on David of losing his older cousins Michael and Joan. David was very close to both of these cousins, and their deaths impacted him greatly. Boyd Decl. ¶ 49 (Ex 19).

David's family members could have also provided positive testimony about David's devotion to his mother and could have communicated something to the jury that was totally absent at his penalty phase -- that people cared about David and wanted his life spared. Testimony showing David in a positive light would have helped the jury see his worthiness for a merciful sentencing decision.

b.    **Trial Counsel Only Called One Witness Who Knew Mr. Jackson Before His Capital Murder Charge**

Aside from David's mother, sister and two cousins, the mitigation specialist met no other individuals who knew David. Similarly, other than one call to Pam Morrison before she was belatedly called as a witness at the start of the penalty phase, neither the mitigation specialist nor trial counsel ever contacted any other friends, class mates or neighbors who knew David Jackson. Had trial counsel investigated further, they would have found numerous other witnesses from David's past who were happy to talk about their recollections of him and who would have been willing to testify on his behalf, including Al Little, Dave Wallace, Marcos Martinez, Lionel Bass, Harriet Bass, Yvette McCaskill, Chiketa Palmore-Bryant and Marion Jordan. Declarations from these individuals are in the Appendix to this Petition. *See* (Exs. 8-14, 17).

125

Even with Ms. Morrison trial counsel failed to elicit all of the relevant mitigating testimony she could have provided.  For example, Ms. Morrison could have provided extensive testimony about David's life, including: (i) a wealth of first-hand details of the extreme abuse and violence that David's father, Leroy, inflicted on David, David's mother, and his siblings and cousins; (ii) David's easy access to alcohol and addictive drugs while he was still a child; (iii) the extent of the poverty in the Jackson home; and (iv) the intellectual disabilities and adaptive deficits that affected Mrs. Jackson, David and his sister Patricia.  Morrison Decl. ¶¶ 8, 12-16 (Ex 16).  As her declaration makes clear, she could have told the jury much more about David's life had trial counsel properly interviewed and prepared her.

Moreover, because no other witnesses with first-hand knowledge were called to describe the abuse, neglect, poverty, and addiction that pervaded the Jackson home, the prosecutor ridiculed her testimony and questioned why she spent time at the Jackson home if it was so awful.  Had counsel sufficiently prepared Ms. Morrison, they would have known that her own home life was also very chaotic and troubled and that by spending time with David she was able to escape her own home which included a heroin-addicted mother, a drug-dealing father, and two sisters who were teenage mothers.  *Id.*

David's other childhood friends and neighbors could have provided important mitigating testimony including evidence of David's adaptive deficits, such as how he would easily be confused or lost, how he needed help with simple tasks, and how he could not find his way to places outside his immediate neighborhood.  *See* Morrison Decl. ¶ 15 (Ex. 16); Wallace Decl. ¶ 7 (Ex. 12); Martinez Decl. ¶¶ 10-12 (Ex. 10); A. Little Decl. ¶ 2 (Ex. 9).  Some of these childhood friends would have also testified how they would intentionally take David with them on various escapades because he was easily led about, and if they were caught doing something wrong, they could blame David, as he was not able to think quickly and defend himself.  *See* A. Little Decl. ¶ 2 (Ex. 9); Wallace Decl. ¶ 7 (Ex. 12); Martinez Decl. ¶ 10 (Ex. 10).  They also could have

126

testified about how David could not count money and was easily taken advantage of.  *See id*.

Finally, these friends could have provided additional corroborating testimony about the out-of-control Jackson home that produced David.  Some of these friends were participants in the teen parties held in the Jackson basement.  L. Bass Decl. ¶¶ 3, 7 (Ex. 17); Martinez Decl. ¶ 9 (Ex. 10); Wallace Decl. ¶ 5 (Ex. 12); H. Bass Decl. ¶ 8 (Ex. 13).  These important individuals in David's life were eyewitnesses to the chaos, abuse, neglect and poverty that were the fabric of the Jackson household.  *See* A. Little Decl. ¶ 2-3 (Ex. 9); Wallace Decl. ¶ 4 (Ex. 12); Martinez Decl. ¶ 3 (Ex. 10).

Mr. Jackson's jury was deprived of all of this mitigating information due to trial counsel's failure to conduct the requisite capital mitigation investigation and prepare adequately for the proceeding that would determine whether their client lived or died.  Due to counsel's unreasonable errors and omissions in this regard, David's jury never knew there were plenty of people who have known David most of his life and cared about him enough to travel to Beaumont and testify on his behalf.

3.  **Trial Counsel's Failures Prejudiced the Outcome of Mr. Jackson's Capital Sentencing**

As detailed below, the trial mitigation bears little resemblance to the true story of David's that could and should have been presented to his capital jury.  The absence of critically important, readily available mitigation evidence is demonstrated by the fact that *no jurors found* that David was the victim of abuse and violence or that it was mitigating.[32]  (Tr. at 1924-25.)  This is just one of many mitigating factors proffered by the defense that fell completely flat due to the absence of evidentiary support.

---

[32]   As discussed in Sections G & H, *infra*, this result is also attributable to poor wording used in the special verdict form which precluded the jurors from finding a fact was proven unless they also found it was mitigating.

127

4. **Mitigating Factors That Effective Counsel Would Have Presented**

An accurate description of Mr. Jackson's remarkable life story was never told to the jury that voted to extinguish him. His jury really had no conception of the full account of David's inauspicious origins and his painful early years, including: his hopelessly inept and incapable parents; his viscously brutal and abusive father, his abusive, mentally deficient mother; his exposure and addiction to drugs and alcohol before he was a teenager; his modeling himself in the footsteps of his equally troubled and drug-addicted older cousins; his serious mental impairments. Nor did the jury hear about his family of eight siblings and first cousins that miraculously hung together through almost unimaginable adversity. Had the jury known all this, there is more than a reasonable probability that he would have received the vote of at least one juror to grant him mercy in the form of life in prison.

Reasonably effective capital trial counsel would have discovered this readily available evidence and presented the following categories of mitigation about Mr. Jackson's life: (1) Mr. Jackson's developmental delays and intellectual disability; (2) Mr. Jackson's other signs and symptoms of mental illness; (3) Mr. Jackson's inability to succeed in school; (4) Mr. Jackson's being surrounded from a tender age by crime, addiction, and sexual exposure; (5) the Jackson family's multigenerational history of poverty and trauma; (6) the impact of the multigenerational poverty and trauma on Mr. Jackson and the other Jackson children; (7) neglect; (8) Mr. Jackson's likely exposure to neurotoxins; (9) the true extent of Leroy Jackson's abuse of his wife and his children; (10) Mrs. Jackson's participation in abusing and neglecting him and the other children and evidence of her own mental and intellectual limitations; (11) Mr. Jackson's positive character traits; and (12) Mr. Jackson's remorse for Daryl Brown's death.

a.  **Mr. Jackson's Developmental Delays and Intellectual Disabilities**

David lived his life in a household riddled with violence inflicted by both parents on the children; and characterized by extreme poverty even by the standards of inner-city 1970s Detroit.  He was raised by an illiterate mother who by a number of descriptions was utterly unable to perform basic life tasks.  In addition to having to carry the baggage of his family's problems David himself had to deal with developmental shortcomings and learning disabilities.  This is all information that should have been conveyed to the jury in David's trial but that trial counsel neglected to discover or present.

As a child David was very slow to reach key developmental milestones that reflect whether a child is growing at a normal and healthy pace.  David's development was noticeably abnormal even to his older cousins:

- he could not dress himself or tie his shoes until he was in the second grade;

- he put his shoes on the wrong feet and would button up his shirt incorrectly;

- he could not bathe himself until he was seven years old;

- he continued to wet the bed until he was ten years old;

- he sucked a bottle and pacifier until he went to school and sucked his thumb long after her was in school;

- he had speech problems;

- he could not understand simple directions;

- he became easily confused and frustrated;

- he could not learn at a normal pace, was slow to learn and was unable to reason like a normal person;

- he would cry and moan for hours at a time into his teen years;

129

- he made long bleating noises;

- he had problems distinguishing a truth from a lie;

- he was gullible and easily manipulated or tricked for lack of understanding;

- he had one dimensional thinking, became fixated on things and had trouble letting things go;

- he was unable to analyze situations or see the big picture.

*See* Boyd Decl. ¶ 28-31 (Ex. 19). David's cousin Larry also recalls that David was slow in developing, "it always seemed like there was something short-circuited in his brain" Anderson Decl. ¶ 15 (Ex. 18). David drank from a bottle until he was five years old, wore diapers until he was four or five, sucked his thumb until he was seven or eight, and could not tie his shoes. *Id.* Mrs. Jackson was always doing little things for him because he couldn't take care of himself. *Id.* Brenda would try to discipline him, provide some structure and teach him right from wrong because no one else, including his parents, gave him that kind of valuable attention. *See* Anderson Decl. ¶ 15 (Ex. 18). David never received the special attention he desperately needed.

Although David was the oldest of Sammie Lee and Leroy's children he was often treated like the younger brother because of his inability to do certain basic things for himself. Mrs. Jackson and Leroy instructed the rest of the children that whenever they got up at night to go to the bathroom to wake up David and take him with them. Boyd Decl. ¶ 28 (Ex. 19). Patricia, David's younger sister by two years, recalls that it seemed like David was her younger brother because he stayed babyish longer than most children and could not do the same things that she could do. P. Jackson Decl. ¶ 18 (Ex. 15).

David often had trouble expressing himself as a child. He could not pronounce certain words correctly and would often say words that began or contained a "B" incorrectly. For instance he would say "blably" instead of "baby." Boyd Decl. ¶ 29 (Ex. 19). Even as a teenager he could not pronounce certain words or phrases. He would

130

want to say, "You're an imbecile," but it would come out like, "You're an instabiblical." Anderson Decl. ¶ 17 (Ex. 18).  When he should have been old enough to talk in sentences he would still use just one word to express himself, saying just "water" instead of "I want some water" or "outside" instead of "I want to go outside." Boyd Decl. ¶ 29 (Ex. 19).

David had to be told multiple times to complete a simple chore and would start tasks but not complete them such as attempting to clean up.  *Id*. at ¶ 30.  "When David washed dishes they would not be clean, no matter how many times you showed him what to do.  When David was twelve and thirteen he would take the garbage out but he just couldn't seem to get it in the can." Anderson Decl. ¶ 16 (Ex. 18).  When talking with David, his cousins and those around him would have to break things down into small parts for him to understand.  *Id*.  Larry recalls having to tell David things two or three times before he could understand.  "I would tell [David] to do something and he would just look at me." *Id.* When David did not understand what you were trying to explain he would get frustrated and just shut down and not talk.  Some days he would be friendly and talk to his family, but other days he would seem depressed and not say anything at all.  *Id.* at ¶ 19.  David also did not work well with other people on planning things.  Instead, he would jump from one subject to the next without warning.  *See id*. at ¶ 20.

David was unable to manage his money or make even simple decisions for himself.  "David would give Michael whatever little money he may have had and he would depend on Michael to make decisions on how to spend it.  If they would go to McDonald's, Michael would always order for David." Boyd Decl. ¶ 35 (Ex. 19).  When with Pam Morrison, David would rely on her to count change for him.  Morrison Decl. ¶ 15 (Ex. 16).  In other instances with money, David did not make good decisions for himself; he would just give money away to anyone who asked for it.  Anderson Decl. ¶ 17 (Ex. 18).

131

David could not read or write as a teenager and didn't make eye contact with people.  Anderson Decl. ¶ 17 (Ex. 18).  David talked and walked very slowly.  "He called it his 'cool walk' but it looked more like he just couldn't do things at a normal speed."  *Id*.  David also didn't seem to care about making friends his own age.  By his teenage years his cousin Larry stopped trying to figure him out because David just didn't make sense.  Anderson Decl. ¶ 17 (Ex. 18).)  Some days he would just sit on the couch and say incoherent things.  *Id*. at ¶ 20.  David would also laugh at odd times because he did not have an appropriate sense of timing. *Id*. at ¶18.  When something was not funny he would laugh, but then would not understand a simple joke.  *Id.*

Dr. Victoria Swanson, an expert in mental retardation, has performed an evaluation of Mr. Jackson that includes a review and assessment of his "adaptive functioning" that utilizes information provided by the individuals cited above who knew him before the age of 18.  This assessment is discussed more fully in Claim 2 in the context of Mr. Jackson's ineligibility for the death penalty pursuant to *Atkins v. Virginia* and the failure of trial counsel to assert *Atkins* as a basis for precluding the death penalty in 2006.  Dr. Swanson found significant adaptive deficits prior to the age of 18, including:

> Mr. Jackson had more trouble in school than any of his siblings.
>
> Self-care deficits (i.e., putting shoes on wrong feet, inability to tie shoes, inability to button shirt correctly, inability to bathe himself) were still evident in the 2nd grade. . . .
>
> he was still wetting the bed at 10 years of age and nursed a pacifier and bottle until he started school and sucked his thumb long after he entered school.
>
> Communication deficits were evident . . . he had difficulty articulating . . .
>
> Mr. Jackson nursed a bottle and wore a diaper until he was 4 or 5 years of age, did poorly in school, was unable to learn

> how to wash dishes, and could not read or write when he was a teenager.
>
> . . . even as a teenager, Mr. Jackson could not make change accurately and required others go with him when he left his neighborhood.
>
> . . . Mr. Jackson could not read or write and often asked [Pam Morrison] to count his change.
>
> He could not obtain a driver's license because he could not read.
>
> He could find his way about the neighborhood but would get lost if he tried to leave the neighborhood.

Swanson Decl. p. 9 (Ex. 6).

David also often had trouble accomplishing small tasks that required him to go to unfamiliar places because he was not comfortable with spatial relationships. He knew his way around his own neighborhood, but if he was in a new place he would have a hard time finding his way around. *See* Morrison Decl. ¶15 (Ex. 16). When David was sent on an errand or told to go somewhere he would usually take someone with him because he did not know how to figure out where to go. David has always attempted to mask his deficiencies. Martinez Decl. ¶ 12 (Ex. 10); see also Morrison Decl. ¶ 15 (Ex. 16). Instead of telling people that he did not know his way around or how to do something he would pretend like he did know where he was going or what to do but it was obvious to those around him that he really could not act alone. *See* Martinez Decl. ¶ 12 (Ex. 10); see also McCaskill Decl. ¶ 15 (Ex. 14). David's childhood friend Marcos Martinez recalls:

> One time when I was there, [David's] mother asked him to go to the store. He got me to go along with him because he needed help. When we got to the store, David said he did not feel like going in. He said he didn't feel well and gave the list to me to do the shopping. I knew it was because he could not do it himself and he did not want to ask someone in the store

133

for help in front of me.

Martinez Decl. ¶12 (Ex. 10).

"[I]ndividuals with intellectual deficits . . . have a strong tendency to acquiesce and attempt to hide or mask their disabilities (Schalock et al., 2007; Everington & Olley, 2008)." Swanson Decl. p 6 (Ex. 6). Dr. Dudley also noted this tendency in Mr. Jackson:

> [A]s a result of the intellectual and/or other cognitive deficits, Mr. Jackson's attempts to mask these deficits and his other psychiatric difficulties are very immature and transparent; essentially, these attempts involve posturing and attempts to present himself as more competent and less anxious/afraid than he really is.

Dudley Decl. ¶ 42 (Ex. 1).

David's niece Yvette who has always loved her uncle also attests to David's inability to do simple tasks alone:

> One thing I noticed when David was out here is that he would have a hard time dealing with basic everyday tasks, like getting a state identification card. He would not let on that he did not know how to do certain things for himself, so he would ask me to do things for him. I know it was because he got frustrated and overwhelmed by such things and needed help with them.

McCaskill Decl. ¶ 15 (Ex. 14).

Even once David was older and followed in the only footsteps he had before him, those of his father and his older cousins' into petty crime, David was never a sophisticated criminal. Wallace Decl. ¶ 7 (Ex. 12). Anything requiring a higher level of cognitive thinking was beyond David's ability.

> [David] was not smart enough to figure out different quantities [of drugs] and how to keep from getting cheated. If someone owed David $200 and they paid him back, he would

134

> stuff the money in his pocket without event counting it.  He
> could easily have been repaid just $70 but he would not even
> know.  If David owed someone money and he came up short,
> I knew it wasn't because he was trying to steal it but it was
> because someone had shorted David and he didn't even know
> it.  He did not have the mental ability to keep track of his own
> money.

*See* Martinez Decl. ¶ 10 (Ex. 10).  Childhood friends of David's describe him as a

follower of the crowd and unable to plan anything or figure out any logistics himself.  *See*

*id.* at ¶ 11.  Whenever there was any sort of "breaking and entering activity" among

David and his friends he was never the leader of the operation, but a follower, just going

along with what everyone else was doing.  *Id.*  Alfred Little explains that David was used

as the "fall guy" to blame things on because those around him could tell he was gullible

and easy to manipulate:

> A group of my [Alfred's] school friends used to single out
> three guys we knew who especially stood out as being pretty
> dumb.  David was one of them.  We could get David to do
> anything.  He was gullible and easy to manipulate.  David
> was the fall guy if it came to pinning something on
> somebody.  We picked him because he was not able to defend
> himself verbally and he was not quick or clever enough to
> come up with an alibi or excuse or blame someone else.  One
> time, when we were around twelve or thirteen years old,
> during the summer between 7th and 8th grades, three of us
> stole a car.  It was David, another kid named Zollie and me.
> Zollie and I had agreed in advance that if we got caught we
> would blame it on David because he was not too bright and
> we could easily pull this over on him.

*See* A. Little Decl. ¶ 2 (Ex. 9).

On one occasion when David was older and living at home, Mrs. Jackson

gave him money to put down on a house for her to buy and live in.  Because Mrs.

Jackson loved David, she entrusted him with her money despite the warning from Brenda

that David would not know how to manage or spend the money earmarked for the house

properly.  Boyd Decl. ¶ 52 (Ex. 19).  Brenda was in fact right, David had no idea how to make such a transaction and the house he found for his mother needed a lot of work.  *Id*.  David and his nephew, Craig (Patricia's son), started painting the house and moved all of Mrs. Jackson's belongings into the house although David had not procured the necessary documentation on the house to do so.  David lacked the common sense to get the basic necessities taken care of.  The man David bought the house from could not produce the deed, so David could not get the electricity, gas or water turned on.  David did not even think of these things before buying the house and had no idea how to make sure he was not being swindled out of his mother's savings.  It did not even occur to him to take the basic steps to ensure that the house was legally theirs.  *See* Boyd Decl. ¶ 52 (Ex. 19).  It turned out that David had gotten scammed on the sale of the house and there was nothing he could do about it.  *Id*.

b.      **Mr. Jackson's Other Signs and Symptoms of Mental Illness**

David, like other family members, also exhibited paranoid behavior while growing up.  He generally didn't trust anyone but his mother.  Anderson Decl. ¶ 21 (Ex. 18).  When he was a young teenager he would hear people walking around upstairs in the house when there was no one there.  *Id*.  When David was about thirteen he told his cousin Larry that some woman "ran over his feet and woke him up" but no woman was actually there.  *Id*.  He would ask people what was going on because he thought he heard noises when there was nothing going on at all.  Larry describes David's odd behavior in his declaration:

> Sometimes he would accuse Sammie Lee or me of doing things we didn't do.  You could hear a rat peeing on cotton it was so quiet in Leroy's house, but David still thought there was something going on he didn't know about.  Sometimes he would look at me for no reason as if I was going to do something to him.

Anderson Decl. ¶ 20 (Ex. 18).

136

Dr. Dudley notes this tendency in his declaration and relates it to Mr. Jackson's underlying mental illness:

> Mr. Jackson has suffered from serious psychologically-based and physiologically-based trauma-related psychiatric difficulties characterized by hypervigilance that at least at times reaches the level of paranoia, and impulsivity and over-reactivity with regard to his response to real or perceived threats of danger/harm.

Dudley Decl. ¶ 42 (Ex. 1).

### c.    Mr. Jackson's Inability to Succeed in School

At trial, Dee Dee Halpin testified that it appeared that Mr. Jackson was relatively successful once he was placed in special education classes, (Tr. 1555-56), and Kate Allen testified that he functioned at a "low average" level. (Tr. at 1615.) The truth is that Mr. Jackson failed to learn, even in special education. David's cousin Brenda notes that all four of Mrs. Jackson's children had trouble with school but that David had the most trouble of all. Boyd Decl. ¶ 28 (Ex. 19). Because David did very badly in school he stopped going consistently when he was about ten years old. Anderson Decl. ¶15 (Ex. 18). David was in special education classes at Sampson Elementary School but never did homework; nor did he read or write at home. Boyd Decl. ¶32 (Ex. 19).

Although it was obvious that David needed special attention in school teachers ignored his needs and did not help him, and his parents paid no attention to what he was doing in school or whether he was attending school at all. *See* A. Little Decl. ¶ 2 (Ex. 9); Morrison Dec.¶ 14 (Ex. 16); Decl. of Chiketa Palmore-Bryant ¶ 5 (Ex. 11). Even when enrolled in all special education classes at Sampson, David failed. He was eventually removed from Sampson and referred to Winger Elementary, a school dedicated to special education, where he fared no better academically. ██████

██████ *see also* David Jackson's School Records, (Ex. 84).

137

Evidence of Mr. Jackson's academic failures and the poverty and neglect David suffered is provided by Marion Jordan, one of the Jackson's neighbors and an employee of Sampson Elementary School where David and his siblings and cousins attended.  Ms. Jordan remembers that the Jackson children were often absent or late to school.  *See* Jordan Decl. ¶ 2 (Ex. 8).)  She also recalls that Leroy and Mrs. Jackson took absolutely no interest in their children's education or academic problems.  *Id.*  In fact it appeared that the Jacksons did nothing to encourage school attendance or the completion of school work.  *Id.*  The Jackson children were so obviously neglected by their parents that the school's staff would try and do little things to help the children fit in better such as provide them with change to buy snacks or give them chips and food for lunch time since they had been sent to school without food.  *Id.*  They stood out even in a poor neighborhood of Detroit.

It was also apparent that the Jackson children were neglected and poorly kept and when they did attend school they seemed to have only two or three changes of clothes that they had to wear over and over.  *Id.*  Ms. Jordan's declaration establishes that even by the standards of their community, Mr. Jackson and his siblings were easily identifiable as particularly impoverished and neglected.  Ms. Jordan was available at the time of David's trial and could have provided all of the information then that she provides here about David's profoundly troubled childhood.

d.    **Exposure to Crime, Addiction, and Sex at a Tender Age**

One thing that David did not lack growing up in the Jackson household was negative influences.  David lived with older cousins and a father who introduced him to drugs, burglaries, sexual exploits, and gambling, positioning him for a downward spiral of a life.  The people that David looked up to were either on drugs, selling drugs, in prison, had been to prison, or on their way to prison.  As Dr. Dudley notes:

> Seven of the eight children became addicted to drugs and
> alcohol, all by the time they were in their teens.  Mr.

138

> Jackson's cousins Larry and Brenda state that Brenda is the only one of the eight children in the Jackson home who did not become addicted to drugs.  They report that their sister Joan and their brother Michael, both deceased, were addicted to drugs throughout their lives. Larry states that he started drinking at a young age and was using drugs in his early teens, including injecting heroin.  Mr. Jackson's sister Patricia states that she started drinking when she was twelve years old and has been addicted to heroin and crack cocaine for most of her life.

> [Mr. Jackson] noted however that his father never said that any of his behavior was wrong/never told him *not* to do it; the fact that his father was selling pills was a model for him and his brothers for selling other drugs; and once he ended up in a Federal prison, it seemed to him that his father was proud of that fact. . . .

> by all reports, Mr. Jackson's father constantly lied, cheated, swindled, philandered and otherwise encouraged criminality; he sold drugs and ran gambling schemes; and he had his own criminal history.  As a young boy, Mr. Jackson's father was his primary role model, who not only totally failed to teach him right from wrong, but actually encouraged and even rewarded wrong-doing.  In other words, Mr. Jackson was taught and learned this behavior at a time when he was so young that he still idealized his father and was far too young to know on his own whether the behavior was right or wrong.

Dudley Decl. ¶¶ 35-36 (Ex. 1).

Brenda recounts in her declaration "[a]lthough I love [David's cousin] Michael very much, he was a bad influence on David as far as drugs and crime, since he was older and David looked up to him." Boyd Decl. ¶ 36 (Ex. 19).  Due to Leroy's influence, David was nine or ten when he started drinking alcohol.  *See* P. Jackson Decl. ¶ 14 (Ex. 15).  David started using marijuana and heroin around the age of twelve.  Anderson Decl. ¶ 25 (Ex. 18).  Drugs were in the house and by that time all of the Jackson children were using the basement to party.  *Id.*  David's cousin Larry also admits to being a negative influence for David.  Larry would solicit David's help to rob stores to

pay for their drug habits.  *Id.* at ¶ 26.  David's ability to plan was very limited.  He could not plan a robbery on his own.  Larry would have to instruct him.  "I [Larry] would tell him all that he needed to do was watch my back and let me do all the talking.  I didn't want him to mess it up because he didn't know what he was doing." *Id.*

Leroy was also known for throwing gambling parties in the basement of the Jackson house.  He had his nieces Brenda and Joan sell and serve food that Mrs. Jackson made and serve drinks to the men there gambling.  The other children would have to clean up after the parties.  At the time Brenda, the oldest girl in the household was fifteen or sixteen years old.  Boyd Decl. ¶ 17 (Ex. 19); *see also* Anderson Decl. ¶ 24 (Ex. 18); P. Jackson Decl. ¶ 14 (Ex. 15).  Leroy would let the boys drink at these parties, regardless of age.  Patricia recalls: "there was plenty of liquor around and no one was paying attention to all of us kids, so we drank all the alcohol we wanted.  I had to sneak but Leroy gave all the boys in my family alcohol because they were boys and that was supposed to make them men."  P. Jackson Decl. ¶ 14 (Ex. 15).  These parties and the free flowing alcohol provided to the Jackson children likely started each of them on their addictions to alcohol and drugs.

The Jackson children were also exposed to sexual activity at a very young age, and Leroy Jackson was known to fondle young girls.  Two declarations provide evidence that Leroy sexually abused David's cousin Joan and may have also abused his own daughter.  Morrison Decl. 12, (Ex. 16); Boyd Decl. ¶47 (Ex. 19).  This behavior necessarily had painful and traumatic consequences for the entire family, and especially for David, as he was very close to Joan.  Boyd Decl. ¶ 49 (Ex. 19).  Dr. Dudley explains the impact of the absence of sexual limits and boundaries on David:

> Mr. Jackson's father was also a sexual predator; he even fondled young adolescent girls in public, including his daughter and his niece; and it is at least suspected that he might have sexually abused some of these young girls.  Such absence of limits and boundaries only adds to the chaos in the

> home, and severely impairs the eventual development of
> reasoned, adult decision-making.

Dudley Decl. ¶ 30 (Ex. 1).

Not long after Leroy left, the Jackson household became infamous for providing an environment for young teens, including David, to engage in whatever illegal or reckless activities they wanted, which was consistent with the traditions Leroy started of encouraging children to drink, use drugs, and gamble alongside adults in his home. There were people coming and going from the house constantly and at all hours of the night. *See* Palmore-Bryant, Decl. ¶ 3 (Ex. 11). It was clear that there was no curfew for the children in the Jackson household and they were allowed to stay out in the streets as long as they wanted. *Id.* Inspired by the basement gambling parties Leroy would throw for his friends, the older Jackson cousins took his absence from the house as an opportunity to turn the basement into a party room for all the younger kids in the neighborhood. *See* Boyd Decl. ¶ 17 (Ex. 19).

> After Leroy moved out, the parties turned into our own
> parties and anyone of any age could come over and do
> whatever they wanted to. Sammie Lee never stopped the kids
> from drinking, smoking pot, using heroin and having sex. It
> was wide open.

Anderson Decl. ¶ 24 (Ex. 18).

> The house became a place where all the kids in the
> neighborhood who wanted to take drugs and have sex would
> hang out. Sammie Lee was not a strong or forceful person
> and she would let us do whatever we wanted . . . .
>
> At Sammie Lee's house it was 'anything goes.' No one cared
> who was having sex there, no matter how young you were.

L. Bass Decl. ¶¶ 3, 7 (Ex. 17).

> After Leroy moved out, there was no control or supervision at
> all over what went on in the house. Sammie [Lee] did not

141

> even try to keep any control and all the kids did whatever they wanted to do all the time.  There was constant partying at the house: drinking, marijuana, hard drugs, sex.  No adult in the house cared, so all the local kids hung out there.  My mother was busy working and she did not know what was going on over at the Jackson house.  When she finally did find out, she was devastated, but it was too late.  The bad influences had already taken root in me, too.

Martinez Decl. ¶ 9 (Ex. 10).

> Sammie Lee liked to drink and smoke marijuana and her house became like an "after hours" house.  If you were a young teenager and wanted to be an adult you could go to her house and smoke, drink and have sex… I [Dave Wallace] and many other twelve, thirteen and fourteen-year olds from the neighborhood learned to play cards and dice in the Jackson's home.  I would go with David's sister or cousin into a back room and have sex and Sammie Lee would not stop it.

Wallace Decl. ¶ 5 (Ex. 12).

Having sex at a young age became a normal occurrence for the Jackson children and there were no attempts made to hide their behavior or even keep their sexual escapades private.  Harriet Bass, a family friend and the sister of Patricia's boyfriend describes the scene:

> Lionel [Patricia's boyfriend] would sleep in Patricia's bed in the room all the girls shared.  David's cousin, Joan, who was a mid-teenager then, slept in the bed next to Patricia.  No one seemed to care that she was probably very aware of Patricia and Lionel's sexual activity.  I cannot say that there were not other kids around sometimes when I was having sex with Michael.  No one cared if there were little kids within earshot of us older kids having sex.  Sammie Lee did not seem to care.

H. Bass Decl. ¶ 8 (Ex. 17).

142

Due to counsel's ineffective penalty phase investigation, Mr. Jackson's jury did not know about this strongly mitigating evidence in his background.

### e.    The Jackson Family's Multigenerational History of Poverty and Trauma

Both sides of David's family were very poor as far back as anyone could remember, and the legacy of that poverty and hardship has endured through every generation. Trial counsel never investigated this crippling history or attempted to explain its impact on David and why it should matter in the decision of whether to spare his life. In fact, it is a very mitigating story if adequately researched, understood and conveyed.

David was born in Detroit, Michigan in 1960. His family, however, had no roots in Michigan. Rather, his parents migrated from the fields of Arkansas by way of Mississippi in the early 1950s as part of the second great migration from the rural south to the industrial north. Like the first great migration of the 1930s, the second great migration during the late 1940s and 1950s was motivated by a desire for a better life. The migrants sought to avoid the overt racism, segregation and economic hardship of the South where Jim Crow laws were still in full force.

David's parents, Sammie Lee (Newby) Jackson and Leroy Jackson were part of this second great migration. Both came from impoverished sharecropper families working in the cotton fields of Arkansas. Despite their desire to escape the poverty, racial discrimination and limited opportunities available to poor, uneducated families in the South, Leroy and Mrs. Jackson merely transported that legacy and its challenges with them as they settled into a new set of equally difficult obstacles in the declining industrialized North. Yet in the North, they lacked even the extended family and other social supports available to them in the South. *See generally* Dudley Decl. (Ex. 1). Dr. Dudley explains the significance of this history for the Jackson family and its ultimate impact on David's life:

143

> It is also important to note that unlike other members of Mr. Jackson's extended family who continued to live in Arkansas, years before he was born his parents migrated to Detroit, thereby leaving behind the support that might have been available from their extended families.   Given all of the problems that his parents faced (described above and below) and their resultant limited capacities to take care of themselves or their children, the support traditionally provided by extended family members in this ethno-cultural group could have made a critical difference in the lives of Mr. Jackson and his siblings.  While this might appear rather speculative, many of Mr. Jackson's cousins who were raised in Arkansas have always functioned much better than Mr. Jackson and his siblings, and even those cousins who have suffered from serious mental health problems have functioned better, in that unlike Mr. Jackson and his siblings they were evaluated and treated for their mental health difficulties.

Dudley Decl. ¶ 15 (Ex. 1).

David's maternal grandparents, Jessie and Josie Newby were sharecroppers who worked the cotton fields of rural Arkansas.  They had seven children: David's mother Sammie Lee, twins Junior and Emma, Cleester "Bull" McDowd, Forrest, Tommie and Ammalie (who died young of polio).  The Newby children worked in the field from a very young age.  They earned very little money and sometimes did not have enough food to eat.  Boyd Decl. ¶5 (Ex. 19).  Their home had no running water.  Although many tenant farmers and their families tried to move to Little Rock in the 1920s and 1930s for better job opportunities and schools, the Newbys stayed out in the country, between Coy and Gethsemane, Arkansas.

Violence was commonplace.  Jessie Newby, Mr. Jackson's grandfather, was murdered in a fight before the twins Junior and Emma were born in June of 1933.  Newby Decl. ¶ 4 (Ex. 24).  David's uncle. Cleester was shot and murdered by a girlfriend of his and another man in the 1940s in Pine Bluff, Arkansas.  Spousal abuse was also common.  *Id.*

144

David's mother, Sammie Lee Newby Jackson was born in 1927. She barely attended school and went through life unable to read or write. She only learned to scratch out her name later in life. As a young child Mrs. Jackson worked in the cotton fields with her parents and siblings. Mrs. Jackson's own father was murdered when she was six years old. When she was a teenager, Mrs. Jackson saw her older brother Cleester lying in a pool of his own blood and developed a lifelong fear of blood because of it. Boyd Decl. ¶ 6 (Ex. 19).

In her late teens or early twenties, Mrs. Jackson met Leroy Jackson who was then living in a nearby sharecropper shack. Stites Decl. ¶ 11 (Ex. 5). They married soon thereafter. They first lived briefly in Milwaukee before returning to the South where they lived in Mississippi for a short while before moving permanently to Detroit in the early 1950s. Soon thereafter, Leroy was arrested for armed robbery and served seven and one-half years in Michigan state prison.

After turning 30 and not having had any children of her own, Mrs. Jackson began to believe she could not have children.[33] Thus, sometime around 1958 or 1959, Mrs. Jackson returned to Arkansas and took her sister Emma's child, Brenda Newby, back to Detroit to be her child. Boyd Decl. ¶ 7 (Ex. 19). Soon thereafter, Leroy was released from prison and Mrs. Jackson became pregnant with David.

As noted above, David was born ▮▮▮▮▮▮▮. Mrs. Jackson gave birth to three more children: Patricia in 1963, Roger in 1965 and Stanley in 1967.

Mrs. Jackson apparently never really worked. In the 1970s, after Leroy had moved out and lacking many skills or any work experience, Mrs. Jackson began selling small amounts of marijuana from her home in an effort to survive.

---

[33]    Although this belief is an entrenched part of Jackson family lore and history, *see infra,* it has never been explained how or why this belief would have taken root while her husband was incarcerated.

145

Mrs. Jackson's sister, Emma Newby, bore five children: Stanley, Larry, Brenda, Michael and Joan. Stanley died as an infant before Larry was born. All the children were born in Arkansas. As discussed above, the last four of Emma's children are the cousins who grew up in Mr. Jackson's home in Detroit. Emma was known for having a "wild streak" and living a fast life from an early age. She partied and started having babies before she was married. Mrs. Jackson told Brenda later in life that Stanley died as a baby of pneumonia because Emma would take him with her when she went "running around in the streets." *See* Boyd Decl. ¶ 5 (Ex. 19). Emma's five children had at least four different fathers. Emma was about sixteen when she had her second child, Larry. Emma's mother, Josie, knew that Emma was too young and irresponsible to take care of Larry and would be unfit as a mother so she took care of Larry as her own child. *See* Newby Decl. ¶ 12 (Ex. 24); *see also* Anderson Decl. ¶ 3 (Ex. 18).

Brenda, Emma's third child, was born on ███████████ Mrs. Jackson and Leroy Jackson had already moved to Detroit in the early 1950s and Mrs. Jackson was living there at the time. Anderson Decl. ¶ 5 (Ex. 18). Leroy was serving seven years in prison for armed robbery for most of the 1950s leaving Mrs. Jackson alone in Detroit. *Id.*; *see also* Boyd Decl. ¶ 7 (Ex. 19). As noted above, when Brenda was about two years old, Mrs. Jackson went down to Arkansas and took Brenda from her mother and grandmother and brought her back to Detroit to live with her. Anderson Decl. ¶5 (Ex. 18); *see also* Boyd Decl. ¶¶ 3, 7 (Ex. 19); Newby Decl. ¶12 (Ex. 24). Brenda did not want to be taken away from her mother, grandmother and two brothers and remembers being extremely homesick. "[She] would sit in the window and sing 'Blue bird, blue bird, in and out the window.'" Boyd Decl. ¶ 7 (Ex. 19).

Larry and Michael stayed in Arkansas with Emma and their grandmother Josie, who was starting to take ill. A year or so later when Larry was about eight years old, he and Jose moved to Detroit as well. Larry stayed with his grandmother rather than his mother because Josie had raised Larry. Not long after Josie and Larry arrived in

Detroit, Josie became ill with tuberculosis.  She went to the hospital and never came home.  Josie died of tuberculosis around 1961.

About a year after Josie died, Larry went back to Arkansas to live with his mother Emma and two younger siblings, Michael and Joan.  About two years later, in 1963, Emma suddenly got very sick.  She suffered from a nose bleed that continued to get worse until blood was pouring out of her nose and mouth.  Larry ran to a neighbor's house to call an ambulance.  Emma was still alive when the ambulance took her away but the white ambulance drivers decided that she was going to die so they did not rush her to the hospital as they should have.  *See* Anderson Decl. ¶ 8 (Ex. 18).  The doctors later told her family that a tumor had burst in her brain and that had she made it to the hospital sooner they could have saved her.  *Id.*  Larry was only eleven or twelve years old at the time of his mother's death but he was left alone for several days to take care of Michael and Joan.  After that, Larry, Michael and Joan also moved to Detroit to live with their aunt Sammie Lee, cousin David and sister Brenda.

Not much is known about David's paternal heritage.  His maternal grandmother, Josie Newby, told family members that Leroy Jackson was born in the Cummins unit at the Arkansas state prison.  Newby Decl. ¶ 6 (Ex. 24).  Leroy Jackson was known to be dishonest, "controlling" and a bully.  For example, after Josie passed away, Leroy claimed that he paid for her funeral but David's aunt, Juanita Newby, believes the state paid for the funeral cost and that Leroy used the funeral to bilk other family members out of the funeral costs.  *Id*. at ¶ 12.

Another anecdote demonstrating Leroy Jackson's disregard for his family and control over his wife, Mrs. Jackson, took place when Mrs. Jackson, Leroy and their friend Queen Neal traveled to Little Rock for Emma's funeral, Leroy did not even bother to attend the service.  Nor did he allow Mrs. Jackson to dress Emma in decent clothing for her own funeral, although she owned nice clothes that she could have been buried in.

147

At Emma's funeral people asked the undertaker why there was a closed casket and shamefully he had to reply that it was because Emma was wrapped in a sheet. *Id*. at ¶ 14.

Leroy apparently resented having to care for Mrs. Jackson's nieces and nephews, and only did so for money. For example, prior to her death, Emma had saved up some money for her children Michael and Joan to have. She had given the money to her boyfriend's father, Papa D, because he was supposedly Michael and Joan's grandfather, and because she thought he would take Michael and Joan after she passed. Leroy found out about the money and made Papa D give the money to him. Papa D told Leroy that if he took the money he would have to take Michael and Joan as well. *Id.* at ¶ 13. Leroy reluctantly agreed to take Michael and Joan.

After returning to Detroit, Leroy and Mrs. Jackson received money from the Government for taking in Emma's children. To witnesses, it was always clear that Mrs. Jackson and Leroy did not really want to take in Emma's four children and that they only did so in return for the checks they received from the Government. *See* Boyd Decl. ¶ 11 (Ex. 19).

> They [Sammie Lee and Leroy] got Aid to Families with
> Dependent Children (AFDC) checks, and food stamps. They
> did not even have to adopt us – they just had to become our
> legal guardians to get the money.

*Id.*

> Right after the funeral they took me [Larry], Michael and
> Joan back to Detroit with them. They did not want us –
> especially Leroy – but they got checks from the state and
> welfare for taking us in.

Anderson Decl. ¶ 9 (Ex. 18).

> Leroy took the kids, but he really wanted them because he
> knew he could get a check for becoming their legal guardian.

Newby Decl. ¶ 13 (Ex. 24).

Leroy and Mrs. Jackson left immediately after Emma's funeral and took the children with them without even going by Emma's house first to collect their things. *Id*. at ¶ 14.

In Detroit, the Jackson household was impoverished. The only regular income was the little money that Leroy and Mrs. Jackson received from AFDC for taking in Larry, Brenda, Michael and Joan. Work was sporadic. Leroy worked in construction when he could, but his income never exceeded $1,000 per month, and was usually a lot less. L. Jackson Soc. Sec. Records (Ex. 25). Mrs. Jackson supposedly worked as a maid occasionally and collected welfare. Anderson Decl. ¶ 10 (Ex. 18).

Throughout David's childhood and early teenage years, Detroit, like many other industrial cities in the Midwest, was going through a period of steady decline, losing jobs, and with them, the tax base that provided social services to so many of Detroit's citizens. *See generally* Thomas J. Sugrue, THE ORGINS OF THE URBAN CRISIS: RACE AND INEQUALITY IN POSTWAR DETROIT (Princeton University Press 2005); Heather Ann Thompson, WHOSE DETROIT?: POLITICS LABOR, AND RACE IN A MODERN AMERICAN CITY (Cornell University Press 2001). For example, an article in Time Magazine in 1961 entitled "*Michigan: Decline in Detroit* (Ex. 83)," discussed the nearly 10% drop in population from 1950 to 1960, the shrinking number of high-paying auto jobs, the decreasing tax base and the increasing number of residents on welfare. *See Michigan: Decline in Detroit*, TIME MAGAZINE Oct. 27, 1961 (Ex. 83). It was in this environment that David's father, Leroy, was trying to find work as an ex-convict.

In 1950, right around the time that Leroy and Mrs. Jackson moved to Detroit, it had nearly 1.9 million citizens and was the fourth largest city in the U.S. But the city peaked during the time Leroy was in prison from 1951 to 1958. By the time he was released during the end of a recession, unemployment in Detroit stood as high as 20%. *See id*. In 1960, the year David was born, the population had fallen nearly 10% to

approximately 1.67 million people.  The 60s saw another nearly 10% decline, with the population falling to 1.5 million people.  And the 70s were even worse, with the population falling 20% to approximately 1.2 million people.[34]

Social security records for Leroy show that during the early 60s, *i.e.* during the critical first five years of David's life, Leroy only earned between $4,500 and $6,000 per year.  (Ex. 25).  While Leroy's income increased slightly in the late 60s and early 70s, he still only earned between $7,800 and $12,000 per year.  *Id.*  And Leroy purportedly did not spend all that money on his family, supposedly supporting other women throughout most of this time.  *See* Boyd Decl. ¶ 24 (Ex. 19).  Mrs. Jackson's social security records only show income of $1,400 in 1974.  (Ex. 25.)  In short, the family did not have enough money.

By way of comparison, in 1960, families receiving relief assistance were given food allowances of $10.60 per week for adults and $5.50 per week for children.  *See Michigan: Decline in Detroit.*  Thus, if the Jacksons were receiving general relief, they would have received a food allowance of $65 per week.  This is approximately $260 per month, or more than 50% of Leroy's average monthly income from 1960-65.  Accounting for the cost of housing, Leroy's income left the family living on the same amount of money as a family on welfare.

And this lack of money showed.  While Leroy hoarded food (Boyd Decl. ¶ 16 (Ex. 19)), there was not always enough for all the kids to eat.  Jordan Decl. ¶ 2 (Ex. 8).)  Medical care was virtually nonexistent.  Boyd Decl. ¶ 13 (Ex. 19), and there was barely any furniture in the home.  Morrison Decl. ¶ 8 (Ex. 16).  The children often did not go to school, perhaps not wanting to because of a lack of clothes.

---

[34]  This decline was never reversed.  By the time David returned to Detroit in 2004, the population had fallen below 1 million, and the long-term effects of falling population, reduced tax base and decreasing social services left Detroit a hollow shell of its former self.  Unemployment in Detroit has always been higher than the national average, and David, with no training or skills faced bleak economic prospects upon his return.

The west side of Detroit in the sixties and seventies was an asphalt jungle and the odds were stacked heavily against poor kids like David, his siblings, and cousins. Crime and drugs were pervasive, and most of the role models for a kid like David were criminals in trouble with the law or dodging it. *See* Wallace Decl. ¶ 3 (Ex. 12). Violent crime was abundant and it was a success to simply survive. Dave Wallace, a childhood friend and neighbor of David's growing up recalls, "Somebody in the neighborhood buried a sibling every year." *Id.*

Harriet Bass, childhood neighbor and friend of the Jacksons, recalls the devastating landscape in which they all grew up:

> Detroit went through terrible changes throughout our childhood. The riot in 1967 changed everything. Before the riot, although our neighborhood was already economically challenged by drastic cutbacks in the auto industry, there were still resources like food stores and places to get what you needed and a feeling of community and neighborhood. The riot was terrifying. We watched as everything was being burned down and torn down, block by block. I remember hearing sirens all the time and being very afraid. There was no security and we were all deeply traumatized. After all the destruction there was no longer corner supermarkets. Access to local food was a thing of the past. After that, people had to somehow get to the supermarkets, which were all far away. Many people did not have transportation and this caused a great hardship and made our neighborhood fall apart even more. My father's siblings shipped food to us from the south in barrels and buckets that we would store in our deep freezer. Most families, including the Jacksons, were not this fortunate.

H. Bass Decl. ¶ 11 (Ex. 13).

Trial counsel did nothing to present the traumas that those closest to David suffered, and the effects those family events had on David. Mrs. Jackson's father was murdered when she was only six years old, (Newby Decl. ¶ 4 (Ex. 24)), and as a young teen she found one of her older brothers in a pool of blood. Boyd Decl. ¶ 6 (Ex. 19).

151

Mrs. Jackson was uneducated, and may have suffered abuse as a child, especially given that she appeared to accept the abuse as an adult. By way of comparison, Mrs. Jackson's sister-in-law, Juanita, refused to submit to similar abuse, left her husband and made the difficult choice of raising her children on her own. Newby Decl. ¶ 10 (Ex. 24). Perhaps not coincidentally, whereas seven of the eight children who grew up in Mrs. Jackson's home ended up addicted to drugs, in prison, or both, Juanita's children graduated from high school and generally stayed out of trouble. *Id.* ¶ 8.

Similarly, Larry, who David looked up to, witnessed his mother bleed out and die when he was 13 years old. Anderson Decl. ¶ 8 (Ex. 18). After this traumatic experience he was thrown to relatives who had little interest in him. Once back in Detroit and forced into the Jackson household, Larry was a frequent target of Leroy's abuse, and then a forced accomplice in Leroy's cheating on Mrs. Jackson. *Id.* ¶ 27. These events led Larry to a life of drugs and prison, and he influenced David heavily, as David went down the same path.

David was perhaps closest to his cousin Michael. Boyd Decl. ¶¶ 34-35, 49 (Ex. 19). Michael had enormous trouble adjusting to life in the Jackson home, and opted for life on the streets instead of the Jackson household on many occasions. *Id.* ¶ 33-34 (Ex. 19). Like Larry, Michael too ended up addicted to drugs and in a life of crime. David, with no other options, affectionately followed Michael, his closest older brother, down the same bad path.

Again, Mr. Jackson's trial counsel did not provide any of this evidence to the jury. There was no valid basis for depriving the jury of these relevant, mitigating facts. And had the jury not been deprived of this evidence, it is conceivable that at least one juror would have decided that David should not be sentenced to death.

### f.     The Impact of Multigenerational Poverty and Trauma on Mr. Jackson and the Other Jackson Children

Eight children grew up in the Jackson household.  All the children were exposed to unrelenting violence.  They were all neglected and deprived of any adult guidance or supervision.  The children were all introduced to criminal activity, alcohol, illegal drugs, and sexual activity starting in their early youth.  Out of these eight children, only Brenda was able to lead a relatively functional life, i.e., without ending up in prison, addicted to drugs or turning to prostitution.  Brenda's survival was not an accident.  She was the only one of the eight children in the Jackson household who had the love and support of a responsible adult figure outside of the household.  It is only because of this intervention that Brenda was able to survive the nightmarish circumstances that David and his siblings/cousins endured day in and day out.  As discussed in other sections of this Petition, David suffered and witnessed a number of traumatic events as a child.  There was the violence that Leroy inflicted on David, his mother and his siblings.  Boyd Decl. ¶ 15, 20, 22 (Ex. 19); Anderson Decl. ¶ 12, 29 (Ex. 18); P. Jackson Decl. ¶ 3-7 (Ex. 15); Stites Decl. ¶ 19-23, 26 (Ex. 5).  There was also the early exposure to drugs, alcohol and sex. *See generally* Anderson Decl. ¶ 25 (Ex. 18); P. Jackson Decl. ¶ 14 (Ex. 15); H. Bass Decl. ¶ 8 (Ex. 17).  As a teenager, he was sent to juvenile detention centers. *See* Stites Decl. ¶ 28, 30 (Ex. 5); *see also* Presentence Investigation Report (Ex. 63).

And, perhaps most relevant to the events that transpired at USP Beaumont on December 16, 1999, approximately two years earlier, David had been stabbed with a homemade shank while serving his sentence at USP Marion. *See* United States Department of Justice, Discipline Hearing Officer Report and Inmate Injury Assessment Follow-Up (Feb. 22, 1997) (Ex. 77).

The other children besides David who lived in the Jackson household and a brief description of their particular challenges follows:

153

**Larry Anderson:** Larry was born in England, Jefferson County, Arkansas on ▮▮▮▮▮▮▮▮, and is the oldest of Emma Newby's children. He witnessed her death from a burst brain tumor that spurt blood out of her nose. Shortly after that traumatic event, Larry came to live with the Jacksons permanently once Leroy and Mrs. Jackson realized they could receive more financial assistance for taking him in after the death of his mother Emma.

Larry started drinking and smoking marijuana in his early teens. His habits quickly escalated to injecting heroin because it was "all over the place and everyone was doing it." Anderson Decl. ¶ 23 (Ex. 18). He battled drug and alcohol addiction for most of his life.

He started robbing stores around the same time to support his drug and alcohol habits. Larry was incarcerated several times in the Michigan State prison system between the years of 1970 and 1989 for various property crimes. He spent time in federal prison from 1989–2002, sentenced under the federal "Gemini" program used to lock up ex-felons on federal gun charges.

Since 2002 Larry has been able to successfully turn his life around. He currently works for a janitorial maintenance company. *Id.* ¶¶ 28, 42. At the time of David's trial, he had been out of prison for four years and was collecting disability after being diagnosed with schizo-affective disorder. Larry believes he was able to finally turn his life around because of the seed of love planted by his grandmother Josie in the first years of his life when he lived with her in Arkansas. *See id.* ¶ 6. Larry acknowledges that she is the only one who ever truly loved him and having that unconditional love for the first eight years of his life may very well have made all the difference in his own circumstances.

When David was on trial in 2006, Pam Stites went to Detroit and interviewed Larry about David's life. She told him that David's lawyers might want him to testify at the trial. Larry told her that he was ready, willing and able to testify, but he

never heard back from anyone about it.  Anderson Decl. ¶43 (Ex. 18).  Larry was in fact available when David went to trial and all of the information that Larry has provided in his declaration, including testimony about David's developmental problems, his exposure to alcohol and drugs, and his modeling Larry's criminal behavior could have been presented to the jury.

**Brenda Boyd:**  Brenda was born in Pulaski County, Arkansas on ███████  ███████  As described above, Brenda was uprooted from her home by her maternal aunt, Mrs. Jackson, at the age of two.  Brenda is the only one of the children who grew up in the Jackson household who has not spent her life in and out of prison or addicted to drugs.  Brenda is the only one of the eight children to have graduated from high school.  She also attended some college, and worked as a paralegal for a number of years.  She is currently studying to become a nurse.

Brenda believes her ability to make it out of the Jackson household without the problems that plagued her siblings and cousins is due to the fact that she was able to spend much of her childhood with her godmother, Elizabeth, who provided a positive influence.  When Brenda was small, Mrs. Jackson attended the Apostolic Church of God in Christ.  Elizabeth also attended the church and took notice of Brenda and wanted to help her.  Elizabeth became Brenda's godmother and took Brenda under her wing and had a very significant role in raising her.  Brenda recalls:

> [Elizabeth] saved me by showing me that things could be
> different from the situation I had at home with Leroy and
> Sammie Lee.  She showed me what it was like to be loved
> and cared for in a safe environment.  I spent most of my time
> growing up with Elizabeth, who is now 71 years old.  There is
> no question in my mind that this opportunity saved me from
> the tragic lives my cousins and sibling have led.

Boyd Decl. ¶ 59 (Ex. 19).

155

When David was getting ready to go to trial in 2006, Brenda told the mitigation specialist about his very abusive and traumatic childhood as well as his slow early development as a child. *See generally* Boyd Decl. ¶ 14-39 (Ex. 19). Yet trial counsel never followed up and investigated these red flags or sought to develop Brenda as a witness for trial. Brenda would have been a particularly effective first-hand witness to Mr. Jackson's life history in that she was steeped in the Jackson household and yet maintained some perspective on its extreme dysfunction because of her exposure to another way of life. Brenda was available and willing to testify on David's behalf but she was not asked to do so. *Id.* ¶ 60. Brenda would have provided testimony concerning David's life circumstances that his capital jury either never heard, or heard only superficially, including: David's developmental problems, the violence and abuse in the Jackson home, the poverty and Mrs. Jackson's inability to effectively parent David or the other children in the home.

**Michael Perry:** Michael was born █████████ and spent the first few years of his life in Little Rock, Arkansas being raised by his mother, Emma Newby. When Emma died, Michael was taken into the Jackson home along with Larry and Joan for the Government welfare money that Leroy and Mrs. Jackson would receive for taking him in. Michael responded to the mental and physical abuse of Leroy by regularly running away and living on the streets in railroad sheds. Although Michael got into trouble early on, David looked up to him and would follow him around. In junior high school, David would go off with Michael during the day and evening and would want to stay out with Michael, but Michael always took David home at night. Boyd Decl. ¶ 34 (Ex. 19). Although both David and Michael desperately wanted to escape the chaos of the Jackson household, Michael knew it would be unsafe for David to stay out on the streets with him all night.

Michael became addicted to heroin and eventually went to prison because of it. Anderson Decl. ¶ 36 (Ex. 18). Despite his early problems with drugs and petty

156

crimes, by the time Michael was in his 30's he was attending church and trying to turn his life around. In the midst of his attempt to regroup his life Michael was diagnosed with lymphoma cancer. He then applied for social security insurance benefits to help him with his medical needs but was denied. Deflated and discouraged, Michael fell back into his old habits and started using drugs again. Boyd Decl. ¶ 37 (Ex. 19). Michael's inability to stay away from drugs ultimately cost him his life. On October 16, 1992, during a drug deal that went awry, Michael stabbed a drug dealer with a screwdriver and the dealer shot Michael in the chest, killing him. *Id.* As noted above, David idolized Michael when he was younger, and learning of his cousin's death was hard on David, who was in prison at the time. *Id.*

**Joan Perry:** Joan was born in Arkansas on ▮▮▮▮▮▮▮▮▮▮ and was the last of Emma's children. As a child, Joan was known as a sweetheart. David was close to Joan, who was near his age. Boyd Decl. ¶ 49 (Ex. 19).

After years of growing up in the Jackson household suffering from neglect and abuse she developed into a serious drug addict at an early age. Anderson Decl. ¶ 37 (Ex. 18). Joan, like Michael, was always trying to get away from and escape Leroy's oppressive abuse. *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Joan and Patricia were drug buddies, and both started having sex at very young ages. Leroy sexually abused Joan when she was in her early teens. Boyd Decl. ¶ 47 (Ex. 19); see also Morrison Decl. ¶ 12 (Ex. 16). This, and Leroy's physical and emotional abuse, contributed to the problems she later encountered in life. Joan ended up being pulled into a life of prostitution when she was still a young teenager. *Id.*

Already addicted to drugs, Joan was swept away to Chicago by a man named "General" from the neighborhood the Jacksons lived in. General made Joan so dependent on drugs that she became a prostitute and he was her pimp. Larry and Brenda twice tried to go to Chicago and convince Joan to come home. The first time she refused.

157

She was eighteen and could not psychologically escape. The second time General gave them an address and it turned out to be a funeral home. It was a cruel joke, as Joan was not dead, but also a message to leave her in Chicago to work for him. *See* Boyd Decl. ¶ 47 (Ex. 19); *see also* Anderson Decl. ¶ 37 (Ex. 18).)

Again, all of this was very hard on David. Joan was the closest in age to David, and after Michael, was his second favorite sibling/cousin. Thus, witnessing the problems Joan endured was very difficult for David.

██████████████████████████████████████████████████████████████ This is further evidence of the mental illness that plagued the Jackson family. Joan had four children: Rashidah, LaTasha, James and Brianna. Because of her drug addiction James was born as a crack baby with a heart defect. McCaskill Dec. ¶ 10 (Ex.14). All of Joan's children were shifted between foster care and Mrs. Jackson—except Brianna, who was immediately given up for adoption. Her whereabouts remain unknown to the rest of the family to this day.

Although Joan was not able to testify at David's trial, as she passed away in March 2005, either Larry or Brenda could have testified about how close David was to Joan and how difficult it was for him to see her suffer as they were growing up.

**Patricia Jackson:** Patricia was born ████████ in Detroit, Michigan. She was the wildest of the Jackson children. Martinez Decl. ¶ 6 (Ex. 10); Morrison Decl. ¶ 13 (Ex. 16); A. Little Decl. ¶ 5 (Ex. 9). ██████████████████████████████████████████████████████████████ Those closest to Patricia characterize her as wild and mentally unstable. *See* Anderson Decl. ¶ 33 (Ex. 18); *see also* Morrison Decl. ¶ 13 (Ex. 10); Martinez Decl. ¶ 6 (Ex. 10); A. Little ¶ 5 (Ex. 9). Even when she was a little child she caused a lot of trouble and would go "crazy" for no

158

reason at all. *See* Anderson Decl. ¶ 33 (Ex. 18). Those who grew up in the neighborhood with the Jacksons knew to keep their distance from Patricia as she was prone to violent acts like throwing rocks through windows and starting fights. *See* A. Little Decl. ¶ 5 (Ex. 9); Palmore-Bryant Decl. ¶ 3 (Ex. 11).

Patricia started drinking when she was twelve years old. By the time she was a teenager she was hanging around with the wrong crowd and known as a drug addict and thief. Anderson Decl. ¶ 33 (Ex. 18); *see* Morrison Decl. ¶ 13 (Ex. 16); Martinez Decl. ¶ 6 (Ex. 10). She was under the domination of pimps and drug dealers by the time she was a teenager, and she had her first child at the age of fourteen. By the age of nineteen, she had three children: Joanna, Yvette and Craig. P. Jackson Decl. ¶ 9 (Ex. 15). Due to Patricia's mental illness and drug addictions, she was never able to take care of her own children and they were bounced around between Mrs. Jackson and different foster families. McCaskill Decl. ¶ 4 (Ex. 14). Patricia and Joan's children represent yet another generation raised primarily at the hands of Mrs. Jackson. All of the moving around and inconsistent care took its toll on them as well. All of Patricia and Joan's children have been in trouble at one time or another. *Id.*

Joanna, Patricia's oldest child started having grand mal seizures when she was a teenager, could not control her aggression, and has been diagnosed with paranoid schizophrenia and bipolar disorder. *See* McCaskill Decl. ¶ 7 (Ex.14); P. Jackson Decl. ¶ 16 (Ex. 15). Yvette, like her mother Patricia, has been diagnosed with bipolar disorder and also suffers from anxiety disorder. McCaskill Decl. ¶ 9 (Ex. 14). She has been prescribed lithium but does not take it because of the negative effects the drug has on her. *Id.* Yvette currently has 7 children and has been pregnant 11 times.

Patricia became a heavy drug user very early in life and has been addicted her entire life. ███████████████████████████████████████████████ ████████████████████████████████████ At the time of her declaration Patricia was serving time at Oakland County Jail in Michigan.

**Roger Jackson:** Roger Jackson was born ████████ in Detroit, Michigan and is known as the quiet one of the Jackson kids. Roger had learning disabilities throughout school. He has had a lifelong struggle with drugs and alcohol and has spent most of his adult life in prison.

**Stanley Jackson:** Stanley Jackson was born on ████████ in Detroit, Michigan and is the youngest of the children who grew up in the Jackson household. Stanley, too, had learning disabilities and has had lifelong problems with addiction to drugs and alcohol. Stanley, like his brothers, has spent most of his adult life in prison.

g.   **Neglect**

Soon after Leroy and Mrs. Jackson took Larry, Michael and Joan back to Detroit they were informed by their landlord that they would have to move because too many people lived in their apartment. The Jacksons moved four different times in a short period of time – to Stanford, Parksdale, Grand Boulevard, and Epworth -- before they ended up in a two-family house. All ten people comprising the Jackson household lived downstairs, which had two bedrooms. Mrs. Jackson and Leroy had one bedroom, the five boys slept in the other bedroom and the three girls slept in the dining room. This is how it remained for many years. Boyd Decl. ¶ 12 (Ex. 19). As noted earlier, even by the standards of inner-city 1970s Detroit where a good number of families were struggling, neighbors remarked that the Jackson children stood out as particularly neglected. Jordan Decl. ¶ 3-4 (Ex. 8); Palmore-Bryant Decl. ¶ 5 (Ex. 11).

The children went without medical attention. Brenda recalls that the "older people" always had home remedies, such as sardine oil for the mumps, and turpentine and sugar for stomachaches. Boyd Decl. ¶ 13 (Ex. 19). On one occasion, everyone in the household went to the hospital after they all returned from Emma Newby's funeral in Arkansas because they had all been exposed to tuberculosis. Other than that, Brenda cannot recall a time when she was taken to the doctor as a child. Mrs. Jackson has

160

always said that David fell out of his crib as an infant, among other injuries, but he was never taken to the doctor.

### h.    Mr. Jackson's Likely Exposure to Neurotoxins

A recent study showed the hot zones in Detroit where the incidence of lead paint was the highest.[35]  David's childhood home on Northfield Avenue was in the middle of one of the worst lead paint zones in Detroit, and was likely built during the time when lead-based paint was commonly used.  As discussed *supra*, David has an IQ in the mentally retarded range and suffered from learning disabilities, and very well may have had brain damage.  Additionally, as his cousin noted, David frequently heard things that were not there.  Anderson Decl. ¶ 21 (Ex. 19).  In other words, David suffers from many of the side effects of exposure to lead paint.  Yet, again, even though the information was readily available to trial counsel, this mitigating evidence was not presented to the jury.

There has been a growing body of research showing that children exposed to lead paint suffer from a variety of mental and physical disabilities, including reduced IQ, learning disabilities, hearing loss and brain damage.  Lead paint was commonly used as a drying agent before the 1950s, and older homes, such as homes in northern cities, have a high incidence of homes with lead paint.  Yet, trial counsel never explored this potentially relevant evidence.

### i.    The True Extent of Leroy Jackson's Abuse of His Wife, David, and His Other Children

Pam Morrison and Kate Allen touched on Leroy Jackson's physical and psychological abuse of his wife and their children in their trial testimony.  Yet, because trial counsel failed to present any first-hand witnesses to the abuse over the years, the true

---

[35]    *See* http://www.freep.com/article/20100516/NEWS01/100514031/Interactive-map-shows-lead-levels-in-Detroit-neighborhoods-over-time

161

extent of the violence and degradation remained unknown to the jury that sentenced Mr. Jackson to death.  If trial counsel had investigated, the jury would have heard that:

Leroy "ran his home like a prison."  Boyd Decl. ¶ 14 (Ex. 19).  He demanded total quiet and kept all of the children on very strict routines under the threat of severe beatings.   Brenda was made to clean the bathroom every single day and iron Leroy's clothes.  *Id.*  The children were treated like servants.  "I feel like I spent my childhood ironing Leroy's clothes… I had to draw his bath so that it would be ready for him the minute he got home.  Dinner had to be prepared and waiting for him after his bath.  Everyone had to wait on him."  *Id*.  Because Leroy grew up hungry he was obsessed with food and would hoard it in an attempt to never go hungry again.  *Id*. ¶ 16.

Larry, the eldest child in the Jackson household, recalls that it was not long after Leroy got home from prison that he moved in with the Jacksons and that Leroy had a "punishment mentality."  Anderson Decl. ¶ 12 (Ex. 18).  Larry was made to do such tasks as shovel the neighbor's snow daily at 4 a.m. and clean up after Leroy's St. Bernard that he kept locked in the basement.  *See* Anderson Decl. ¶ 11 (Ex. 18); *see also* Boyd Decl. ¶ 18 (Ex. 19).  Leroy kept the dog inside in the dark basement and it eventually went blind because it was never allowed outside.  After Larry left home, the unenviable chore of cleaning up after the dog became Brenda's.  Boyd Decl. ¶ 18 (Ex. 19).  Once Brenda left, there was no one there to clean up after the dog and the dog was moved to the back porch and chained to a railing.  Since the dog was blind, he accidentally stepped off the porch and hung himself.  *Id.*

Leroy's tyranny was severe.  For minor transgressions, the children were put on severe and onerous restrictions and not allowed to leave there room for 30 days—akin to prison lock-up"  Boyd Decl. ¶ 14-15 (Ex. 19).  To simulate "the hole" sometimes Leroy would put a child in a room with all of the windows nailed shut.  P. Jackson Decl. ¶ 5 (Ex. 15).

162

Leroy also brutally beat the children to the point of being bruised and bloodied.  Often they would have to miss school lest their wounds be visible to the outside world.  Stories of Leroy's cruelty are legion, and the painful and traumatic memories persist to this day.  Even neighbors and David's friends knew about Leroy's cruel and abusive behavior and that he could just blow up at any second.  *See* Wallace Decl. ¶ 4 (Ex. 12); Martinez Decl. ¶ 3 (Ex. 10).  "He would scream, 'Get the f--- out of my house!' for the entire neighborhood to hear."  Wallace Decl. ¶ 4 (Ex. 12).

Leroy called all of the children names, but David may have received it the worst.  Leroy threatened each of the children with violence and abandonment.  Anderson Decl. ¶ 12 (Ex. 18), Boyd Decl. ¶¶ 20-22 (Ex. 19), P. Jackson ¶¶ 3-7 (Ex. 15).  For example, he kicked his daughter Patricia out of the house for staying on the porch until 9 p.m. when she was thirteen years old.  P. Jackson Decl. ¶ 5 (Ex. 15).  On top of this, after being told by David's elementary school administrators that David was mildly retarded, Leroy regularly called David "retard."  Stites Decl. ¶ 25 (Ex. 5).

Leroy did not encourage any of the children.  As Larry was growing up and expressed interest in doing something positive with his life Leroy made sure to vocalize his doubts in Larry's ability to succeed.  Larry had many hopes and dreams as a child.  Initially he wanted to be a boxer but was told by his uncle Leroy that "there was no way he could succeed." Anderson Decl. ¶ 13 (Ex. 18).  When Larry expressed an interest in joining the military he was told he "couldn't hack it." *Id.*  In his mid-teens Larry worked for the police youth corps but again Leroy shot down his hopes of becoming a policeman with criticism and lack of support. *Id.*

The one pursuit that Leroy encouraged in the children, including David, was hustling.  Leroy would tell David and the other boys to "be the best damn criminal you can be." Anderson Decl. ¶ 14 (Ex. 18).  Leroy would also show David how to be a hustler and criminal and taught David that following that path of illegal activity was how to make his father proud. *Id.*; s*ee also* Dudley Decl. ¶ 36 (Ex. 1).  As Dr. Dudley notes,

163

David was injured not only by the lack of a positive role mode but by the inescapable presence of a powerfully negative one.  David's father "not only totally failed to teach him right from wrong, but actually encouraged and even rewarded wrong-doing."  *Id.*

The Jackson household also lacked a sense of any emotional support.  If one of the children needed help, advice or a way to deal with their anger or frustration they were told to "chill out." Anderson Decl. ¶ 14 (Ex. 18).  If depressed, they were told to "cheer up."  *Id*.  No one took the time to show the children how to deal with everyday life problems or find constructive outlets for the emotions that stemmed from their chaotic, neglectful, and violent lives.

Moreover, contrary to the depiction of her at Mr. Jackson's trial as a sweet, kind lady, Mrs. Jackson herself verbally abused the children, telling them they were not "worth the salt I put in your food" when she was mad at them.  Boyd Decl. ¶ 23 (Ex. 19).

Thus, David had no nurturing adult to turn to when at home.  Dr. Richard Dudley has described the impact of this lack of any nurturing adult on Mr. Jackson's development and functioning:

> [I]n Mr. Jackson's case, his impaired cognitive functioning made it all the more difficult for him to understand and cope with what was happening to him, which in turn made the impact of the traumas on him all the more severe.  Then, in addition, based on the reports of Mr. Jackson and others, he didn't have anyone who could provide him with a safe space/a respite from the violence and/or the type of parental nurture and care that might have helped mitigate against the impact of the trauma.
>
> It is important to note that survivors of the type of ongoing violence that Mr. Jackson experienced during his childhood and early adolescent years, especially those who have inadequate parental nurture and care, not only have a psychological trauma response but also tend to develop an additional physiologic trauma response.  All humans have a physiologic response to extremely threatening situations, commonly known as the "fight or flight" response; children

164

> eventually learn to manage this response with the help of
> parents who calm and protect them; but in the absence of such
> parental nurture, care and protection, especially when the
> trauma is frequent/ongoing, a child never learns to manage
> the physiological response; and so eventually the child
> becomes constantly physiologically stimulated/over-reactive,
> a state which continues into adult life.   Therefore, in Mr.
> Jackson's case, the above described symptoms of trauma that
> Mr. Jackson started to exhibit back when he was a child have
> both a psychological and physiological component.

Dudley Dec ¶27-28 (Ex. 1).

Leroy Jackson intimidated and terrorized the Jackson house.  Even as a very young child Brenda remembers being afraid of her Uncle Leroy.  "He was very stern and he made me extremely uneasy, even at a young age.  When he came home I would run and throw my arms around Sammie Lee's legs."  Boyd Decl. ¶ 9 (Ex. 19).  Leroy's physically and emotionally abusive behavior was directed towards Mrs. Jackson and all of the children in the household.  Dudley Decl. ¶¶ 16-20 (Ex. 1).  By the time Mrs. Jackson's youngest child Stanley was born, things had gotten worse.  Boyd Decl. ¶ 20 (Ex. 19).  Leroy would chase Mrs. Jackson through the house with a knife and beat her with his fist telling her that he was going to kill her.  *Id.*  He would also drag Mrs. Jackson around by her hair and beat her in front of everyone including neighbors.  *See* Morrison Decl. ¶ 1 (Ex. 16).

Leroy came close to killing Mrs. Jackson and other members of the Jackson household several times:

> One day Leroy came home after having been gone for quite a
> few days.  He had been staying with another woman.  When
> he got home he started arguing with Sammie Lee.  He was
> beating on her and said to her, "I'm gonna kill you m-f!"   He
> threw her against the wall and shoved her all over the place.
> He picked up the coffee table and broke the leg off to use
> against her.  He was swinging at Sammie Lee with the table
> leg.  It had a four-inch screw in the end of it, sticking out
> from the wood.  He kept screaming "I'm gonna kill you!"   All

165

the children, including David, were watching this happen. It was terrifying. Sammie Lee grabbed a boning knife but Leroy was still going at her. Sammie Lee told Leroy, "The only one going to die tonight is you!" I [Larry] was trying to stop him from hitting her with the table leg. She told me to let Leroy come in to the kitchen. I had grabbed Leroy's right arm with my right hand and had grabbed him around the chest with my left arm and was trying to pull him back. Sammie Lee started to stab at him. She accidentally got me and stabbed me all the way through my hand. My blood was spurting all over Leroy and me. I had to have surgery and still have a big scar. As Leroy left he said he was going to kill us. A few weeks later I was at the store. When I walked out, Leroy was there. I turned and was walking away when someone shouted, "He's got a gun!" I turned around and Leroy shot me in the groin with a .38 revolver. The force of the shot knocked me over and I landed on my back. I rolled to my feet and ran away as fast as I could. I was gushing blood. I ran to Sammie Lee's house and then an ambulance took me to the hospital. I was in intensive care. They could not remove the bullet because it was too close to an artery so the bullet is still in me. I was very lucky Leroy did not paralyze or kill me.

Anderson Decl. ¶ 29 (Ex. 18).

One night when I was about nine years old my father came home drunk. He turned over a table. I looked up and saw that he had a hammer in his hand. He hit my mother in the face with the hammer. Her face swelled up and he may have broken her jaw. All of us saw this happen. It was extremely upsetting and scary to all of us to watch him be so cruel to our mother.

P. Jackson Decl. ¶ 4 (Ex. 15).

One time my father chased me down an alley with a gun. I ran into the back door of the neighbor's house to get away. He came after me, straight through the house. I had already run out of the front door and got away. The neighbors called the police and they took him to jail and took the gun. My mother took me to a youth home to protect me from getting

166

> killed by him.  She told them not to let my father see me.
> They protected me from him.

*Id*. ¶ 7.

Leroy was a heavy drinker and often would be gone all weekend and come home so drunk that he would fall asleep at the kitchen table or fall out of his chair. Frequently during his drunken episodes, but even when he was not drunk, he would get very physically abusive and beat the children in the house with anything he could find, including objects like bed slats and extension cords.  Leroy's beatings were severe enough to leave permanent scars.  As noted previously, Brenda has permanent scars in the shape of a "'double horseshoe' because [Leroy] would double over the cord" to beat her.  Boyd Decl. ¶ 22 (Ex. 19).  He would beat the children until they bled or he became exhausted.  *Id.*

> My father was extremely abusive to all of us kids and to my
> mother.  He was often drunk and would hit us all the time.
> He would beat us with an extension cord doubled up.  He
> would make us pull our pants down and would hit us as hard
> as he could.  We were butt [sic] naked.  We would bleed
> down our legs and arms.  We had big welts that kept us from
> going to school because we didn't want anyone to know what
> my father was doing.  I still have scars on my back.  One time
> I tired to run away from him and busted my knee open.

P. Jackson Decl. ¶ 3 (Ex. 15).  Patricia also described David at times bearing the brunt of the abuse.

> My father kept chasing David away with his abuse.  He
> chased David and my cousin down the street, trying to hit him
> with the bed slats that go under a mattress.  He caught them
> and beat them with the slats.  David had nowhere to turn but
> the streets.

*Id*. at ¶ 6.

Pamela Morrison has provided much more detailed descriptions of the abuse she witnessed in the Jackson household than she did in her unprepared trial testimony:

> If he [Leroy] got mad or got into an argument, he would draw his gun or pull out his knife at the drop of a hat. I [Pam] have seen him do this plenty of times. I have seen him pistol whip his own sons and nephews. He would pull out a razor blade and threaten, "I'll cut you from a-- hole to earlobe." I have seen David right after he was beaten by Leroy with a black eye or a busted up lip. Leroy would beat Sammie Lee and those kids with anything he could get his hands on – bottles, bricks, shoes. He would kick them, jump on them and beat them with his fists.

Morrison Decl. ¶ 11 (Ex. 16).

Leroy had a rule that no one could ever talk about what went on in the house to anyone outside of the Jackson household. Friends were not allowed to come over to the Jackson household and would only come over when he was not there. *Id*. at ¶ 25. "[Leroy] kept us isolated and tightly controlled so other kids and their parents would not know the full extent of his and Mrs. Jackson's abuse." *Id*.

Leroy's abuse took many forms and was directed at the children as well as his wife. He was psychologically abusive and completely controlled Mrs. Jackson. Leroy had Mrs. Jackson trained to do whatever he said to do. Knowing that he was a gambler and womanizer, Mrs. Jackson would dress him up to go out with other women. Boyd Decl. ¶ 24 (Ex. 19). It was even rumored that Leroy had another family in New Orleans that he would go to visit. *Id*. Mrs. Jackson and Leroy would often fight about him going out all weekend and not leaving Mrs. Jackson with enough money to take care of all the kids. *Id*. Despite being neglected and left without enough food to eat, as noted above, it was only during these times when Leroy would leave for the weekend that the

children and Mrs. Jackson could enjoy themselves without being fearful in their own home.  *See* Anderson Decl. ¶ 11 (Ex. 18).

At one point Leroy allowed a woman named Marie to live in his house with Mrs. Jackson and the children.  Leroy claimed she was his sister but Mrs. Jackson believed she was another girlfriend of his.  Boyd Decl. ¶ 19 (Ex. 19).  As if flaunting another woman in front of his wife and children were not enough, Marie had tuberculosis making her a hazard to all that she came in contact with.  Mrs. Jackson would cook food for Marie and take it to her with a mask on.  *Id.*  Mrs. Jackson hated this woman living in her house, but Leroy insisted on it.

Leroy also involved Larry in his philandering and marital infidelity.  Larry would be made to drive Leroy and a different girlfriend, Brenda, around Detroit. Anderson Decl. ¶ 27 (Ex. 18).  Brenda had a sister and Leroy thought it was a good idea for all four of them to go out to a hotel together.  He thought it would make Larry "a man."  *Id.*  Larry was only seventeen at the time.

In the late 1970's, Leroy left Mrs. Jackson, but he continued to stay with different girlfriends in the same neighborhood, for all to see.  Boyd Decl. ¶ 50 (Ex. 19); *see also* Martinez Decl. ¶ 8 (Ex. 10).  Leroy made a habit of dating and sleeping with girls much younger than himself and sometimes younger than his children.  "He was known for sleeping with underage girls and for giving them money to have sex with him. I considered him a pedophile."  Morrison Decl. ¶12 (Ex. 16).  Although Leroy saw the financial trouble Mrs. Jackson and the children were in, he refused to give her any help and in fact did what he could to make their situation worse.  When he left Mrs. Jackson and the children he took all of what little furniture was in the house with him.  He left them with absolutely nothing and they never had any furniture after that.  *See* Morrison Decl. ¶ 8 (Ex. 16).  Mrs. Jackson had no income, and she and the children were left in deeper poverty.  *See* Boyd Decl. ¶ 50 (Ex. 19).  What made matters worse was that Leroy

169

would still come around every once in a while *but* only when he was drunk and looking for someone to beat up on and abuse.  *See* Martinez Decl. ¶ 8 (Ex. 10).

> j.    **Mrs. Jackson's Participation in Abusing and Neglecting Mr. Jackson and the Other Children and Evidence of Her Own Mental and Intellectual Limitations**

Again, contrary to the trial depiction of Mrs. Jackson as a kind and sweet, if embattled mother who generally cared for her children, it turns out that she played a significant role in abusing them herself.  Brenda recalls Mrs. Jackson's abuse:

> Sometimes Sammie Lee would also beat us.  She would make one kid hold another kid's legs so the first kid could not get away from her.  She would tell the kid holding the legs that if they did not hold tight enough or let go that they would get beat too, so it made them hold tighter.  That was not only bad for the kid getting beat but also for the kid who had to help with the beating.  She would say ugly things to us like, "You ain't never going to graduate," "You're a dumbass," "You're going to get pregnant," "You're just dumb and stupid," "You're not worth the salt I put in your food."  She would say, "You're weak-minded."

*Id.* at ¶ 23.

Mrs. Jackson was also neglectful.  She was not able to provide her children with a safe or healthy environment and contributed increasingly to the debilitating chaos in her own home.  Mrs. Jackson was completely illiterate.  Boyd Decl. ¶ 26 (Ex. 19).  For many years she signed her name with an "x" until she finally learned to write her own name, which was all she was ever able to write.  Brenda took responsibility for paying all of the bills and read everything to Mrs. Jackson.  *Id.*  She was not able to pick up small things such as tying Leroy's tie, even after multiple tries.  She was incapable of explaining anything.  Although she cooked, she was not able to give directions or recipes.  *Id.*  It was also apparent to those outside the Jackson household that Mrs. Jackson had severe mental limitations and could easily be taken advantage of.  *See* Morrison Decl. ¶

170

14 (Ex. 16); Martinez Decl. ¶ 7 (Ex. 10).  Mrs. Jackson's intellectual impairments prevented her from mingling and having a normal social life, and she was very private about her life and the abuse she and the children endured from Leroy.  Boyd Decl. ¶ 26 (Ex. 19).   Opportunities for healthy development and sense of security for David were severely impaired because Mrs. Jackson's "capacity to parent him was compromised by her intellectual and/or other cognitive difficulties."  Dudley Decl. ¶ 14 (Ex. 1).

> It also means that Mr. Jackson was at risk of having similar difficulties, because he too was raised in an environment that did not foster healthy cognitive development and that placed him at risk of physical harm to his brain.  Additionally, he was genetically vulnerable to the development of such difficulties.

*Id.*

Mrs. Jackson was superstitious and believed in curses and spells.  *See* Boyd Decl. ¶ 27 (Ex. 19).  She would scratch symbols onto pieces of paper as curses and ask Brenda to bury them in the backyard.  Mrs. Jackson also used to talk to herself. Anderson Decl. ¶ 30 (Ex. 18).  Larry recalls that Mrs. Jackson heard and saw things that were not actually happening and also remembers that everyone in the family except Brenda heard things that were not really happening.  "Everyone was paranoid." Anderson Decl. ¶ 30 (Ex. 18).

After Leroy left the family, poverty became an understatement for the Jackson household.  Mrs. Jackson and the children never had enough food and were always scraping by.  *See* Boyd Decl. ¶ 50 (Ex. 19).  Without furniture or food the household the eight children grew up in became even more sparse and dysfunctional.  *Id.* With everything weighing down on her Mrs. Jackson was depressed and was often seen sitting on the floor of her house sobbing uncontrollably.  *See* Morrison Decl. ¶ 14 (Ex. 16); Martinez Decl. ¶ 7 (Ex. 10); A. Little Decl. ¶ 4 (Ex. 9).

171

Mrs. Jackson, depressed and unable to provide for her family, started to drink heavily. The house completely fell apart. She did not have enough money to get by and began to sell marijuana out of the back of her house as a means of supporting herself. Due to her limited intelligence, she could not run the operation herself and had to get others to help her with the practical aspects of the business such as weighing the drugs and figuring out how much money to charge. L. Bass Decl. ¶ 8 (Ex. 17). Mrs. Jackson had a friend named "Dangerous Dan" who supplied her with the marijuana she sold. *See* Anderson Decl. ¶ 32; L. Bass Decl. ¶ 8 (Ex. 17). The Jackson house became known as the place to "score" drugs and during the winter there were tracks in the snow from every direction leading to Mrs. Jackson's back door. L. Bass Decl. ¶ 8 (Ex. 17). Mrs. Jackson even enlisted David's help and would have him deliver marijuana for her introducing him to additional illegal behavior as a drug dealer. Martinez Decl. ¶ 10 (Ex. 10). Mrs. Jackson was eventually arrested for her drug dealing. *See* Marijuana Arrest of Sammie Lee Jackson (Ex. 7).

Mrs. Jackson was also the butt of abuse at the hands of her own children. Patricia and Stanley were highly disrespectful. Brenda recalls an occasion when Patricia was calling Mrs. Jackson names and threatening to hit her with a brick, but Larry grabbed the brick to keep her from hurting Mrs. Jackson. Anderson Decl. ¶ 34 (Ex. 18). Brenda states: "Patricia and Stanley were abusive to [Sammie Lee] and she needed David. David was very protective of his mother and did not like it when they were mean to her. He would tell them to be respectful of her." Boyd Decl. ¶ 55 (Ex. 19).

Towards the end of Mrs. Jackson's life, while David was in prison, she lived directly across the street from her doctor's office yet none of her own children who depended on her for housing and to help take care of their kids would even bother to take her to the doctor. Boyd Decl. ¶ 53 (Ex. 19). Brenda took her to the doctor once and was told that Mrs. Jackson was very sick with diabetes. *Id*. The doctor was shocked and angry to hear that the other Jackson children would not even bother to take their mother

172

across the street for care.  *Id*.  This fact is even more appalling since Mrs. Jackson's daughter Patricia would go to see the same doctor to get prescriptions for herself, but she could not be bothered to bring her mother there for the care she needed.  *Id*.

Mrs. Jackson was no longer able to keep up with paying rent on her apartment, so she was evicted after owing $1,500 in back rent.  She had nowhere to live, so she moved in with a man across the hall.  Boyd Decl. ¶ 54 (Ex. 19).  The living conditions were filthy and worse than where she had been living before.  *Id*.  It was around this time that David returned to Detroit after being released from prison in February 2004.

When Mrs. Jackson was about 78 years old, her niece Brenda found a nursing home for her because she was too sick and frail to live on her own.  Boyd Decl. ¶ 57 (Ex. 19).  Brenda had her taken to Henry Ford Hospital and from there she was transferred to Henry Ford nursing facility.  Id.  In 2006, she wanted to go to David's trial and was planning on testifying, but as the trial date approached it became clear that she was in no physical condition to be able to travel to Beaumont to testify.  Mrs. Jackson died on June 4, 2006, at the age of 79.  At the time of her death David's trial lawyers knew of his mother's worsening medical condition and that she was already extremely sick but they failed to preserve her testimony in a deposition, even though they had permission to do so.  Due the trial attorneys' negligent failure to take her deposition, Mrs. Jackson never had the chance to speak on behalf of her son and David was deprived of the opportunity to present a singularly important witness.  In fact, the trial Judge, Marcia Crone, chastised David's trial counsel for not obtaining a deposition from Mrs. Jackson before her death.  (Pre-Trial Hearing Tr. at 26-30.)

k.     **Mr. Jackson's Positive Character Traits**

By the conclusion of the penalty phase, the jury at Mr. Jackson's trial had heard almost nothing positive about him except brief testimony that he was devoted to his mother.  (Tr. 1535, 1575, 1592.)  Due entirely to his lawyers' failure to include anything

for the jury's consideration that might have cast their capital client in a favorable light, the jury was given very little reason to spare his life. Counsel presented only *one* person from his past, from which a juror might reasonably have concluded that Mr. Jackson had no other friends and no one who cared about him.

There were plenty of positive things to introduce about Mr. Jackson, and the failure of his lawyers to present him as a human being with good qualities was a serious dereliction of their duty as capital counsel.

According to those family members closest to Mr. Jackson, he has always been a sweet, good-hearted, thoughtful and compassionate person. Mr. Jackson always sends birthday, Christmas and Easter cards to his family members and often will send cards for no special reason at all. Boyd Decl. ¶ 58 (Ex. 19). Mr. Jackson has always and continues to care deeply about all of his family members and their well being. Any time he is given an opportunity, despite his own circumstances, he inquires about all of his siblings with sincere and genuine love and interest.

David's niece, Yvette, says it best in her declaration:

> My Uncle David has always been a very special person in my life, even though he has been incarcerated most of the time. There were several periods when David was out of prison and I got to spend time with him. He is a very caring person and he was always concerned about whether we had enough food and whether we were being taken care of. Family is very important to David and we have always had a special love for each other.

McCaskill Decl. ¶ 13 (Ex. 14). As Yvette states in her declaration, she, too, was available to testify at David's trial.

l.        **Mr. Jackson's Remorse for Daryl Brown's Death**

Mr. Jackson has always been apologetic about his role in Daryl Brown's death. The fact that he believed he had no recourse but to fight back when attacked does

174

not diminish his remorse for the way the incident tragically ended.  When he took the stand at his trial, the first thing he said was that he was sorry for what happened and for the pain he caused Daryl Brown's mother.  (Tr. 1675.)

> Dr. Dudley could have testified about Mr. Jackson's remorse:
>
> Mr. Jackson appeared to be genuinely remorseful about what happened between him and the decedent in this case.  He described the incident as one in which he was basically reacting to very threatening and frightening circumstances. He bears and bore no particular malice towards Mr. Brown and was truly sorry for the effect the incident had on the man's family.  This sentiment is entirely consistent with his apology to Mr. Brown's mother during his testimony.  He regrets that at the time, no other defense was available to him, and feels he had no other recourse given the circumstances and the environment in which it took place.

Dudley Decl. ¶ 47 (Ex. 1).

Remorse is a factor the jury should have taken into consideration in its sentencing determination.  Mr. Jackson's remorse was one of the few positive things counsel could have taken from his testimony at the penalty phase.  Counsel's failure to highlight his remorse was unreasonable, prejudicial and ineffective.  Had the jury appreciated the depth and sincerity of his remorse, there is a reasonable probability a juror would have voted to spare his life.

5. **Trial Counsel's Failure to Proffer This Mitigating Evidence Prejudiced Mr. Jackson**

Mr. Jackson's capital jury heard brief testimony that the Jacksons were poor and that Leroy Jackson was violent with his wife and children.  They also heard that Mrs. Jackson was a sweet, kind lady who loved her son David.  They heard additional testimony touching on Mr. Jackson's purported success in special education and uncorroborated testimony that he might have suffered from PTSD and brain damage. They also heard briefly that prisons are dangerous, without any specific testimony

describing the realities of life at Beaumont where the incident that led to the capital trial took place.  Trial counsel's failure to investigate, discover, or present evidence beyond these surface depictions, which were easily undermined by the Government, prejudiced the outcome of Mr. Jackson's capital sentencing.

The jury never heard the vast amount of mitigating evidence described above that was available.  Without knowing of the extent of the violence, poverty, neglect, and intellectual and mental deficits that beset Mr. Jackson's life, his jury could not have been expected to render a fair decision.

An expert like Dr. Dudley could have explained to the jury how the mitigating details of Mr. Jackson's background affected the course of his life and made him who he is.  With his expertise in human development and behavior, he could explain to the jury why these forces beyond Mr. Jackson's control were indeed "mitigating," *i.e.,* how and why they lessened his culpability for the offense he was charged with, at least enough to justify his being allowed to live.  Indeed, Dr. Dudley could even have explained how the convergence of many of these factors contributed to Mr. Jackson's response to the incident at the heart of this capital case.  Such explanations probably would have contributed weightily to that side of the scale that gives a modicum of value to Mr. Jackson's life.  In summarizing the forces that shaped Mr. Jackson and explaining how they mitigate what he did during a frightening episode in a very dangerous prison, Dr. Dudley concludes:

> . . . Mr. Jackson has suffered from serious psychologically-based and physiologically-based trauma-related psychiatric difficulties characterized by hypervigilance that at least at times reaches the level of paranoia, and impulsivity and over-reactivity with regard to his response to real or perceived threats of danger/harm. . . . Mr. Jackson has also suffered from intellectual and/or other cognitive deficits [and] . . .; that these deficits made it all the more difficult for him to understand and cope with the traumas that caused his above described trauma-related psychiatric difficulties . . .

176

Dudley Decl. ¶ 42 (Ex. 1).

Notably, Dr. Dudley emphasizes how Mr. Jackson's life history was independently mitigating and also had an impact on his behavior at the time of Daryl Brown's death:

> The psychological and physical abuse and neglect that Mr. Jackson endured during his childhood years could be considered mitigating in and of itself.  However in addition, as noted above, that same history contributed to the development of his major psychiatric difficulties; it is at least in large part because of that chaos and neglect within his family home that his major psychiatric difficulties were never identified and addressed back when he was a child or young adolescent; and it is also because of the chaos, the neglect and the overall lack of basic parenting, which would include the negative things taught to him by his father, that he started on the road to institutionalization at such an early age, which then further exacerbated his trauma-related difficulties.
>
> It is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Jackson has never had the opportunity to address his psychiatric difficulties and otherwise develop the skills required to function outside of an institution.  It is the understanding of this psychiatrist that Mr. Jackson's institutional record has been used to suggest that he is just a bad and dangerous guy within the institution, and that this perception of him was at least in part fostered by his testimony at trial.  However, a review of his institutional record indicates that there is not the pattern of behavior that this characterization of him might suggest, and indicates that the behavioral problems that he has had are of the type one might expect given his psychiatric difficulties.  His behavior at trial is also better understood in light of his psychiatric difficulties and his above described attempts to mask such difficulties.
>
> Finally, it is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Jackson's above-described mental health difficulties significantly influenced his behavior at the time of the crime for which he was convicted and sentenced to death.  More specifically, Mr.

> Jackson's above described mental health difficulties influenced his perception of danger/risk of being harmed; his impulsivity severely compromised his decision-making ability with regard to how he should respond to the danger that he perceived; and his over-reactivity further influenced the nature of his impulsive response. As further explained above, it is my opinion that at the time of the crime the impact of Mr. Jackson's mental health difficulties was such that he was unable to premeditate or even consider options that might have been available to him.

Dudley Decl. ¶¶ 44-46 (Ex. 1). Had trial counsel provided this mitigating evidence to the jury, it is likely that at least one juror would have declined to sentence Mr. Jackson to death. Thus, trial counsel's failure to put on the available mitigating evidence prejudiced Mr. Jackson, and his death sentence must be vacated.

### B.    Failure to Depose Sammie Lee Jackson

When the Government indicted Mr. Jackson in April 2005 after a delay of more than five years, David's mother, Mrs. Jackson, was still alive. As noted, however, at the time she was 78 years old, and her health was failing. Trial counsel did obtain an order permitting a video deposition of Mrs. Jackson so that she could testify on behalf of her son at the penalty phase, if necessary. Motion (Ex. 51); Order (Ex. 50).

As described above, Pam Stites, the mitigation specialist, interviewed Mrs. Jackson in January 2006. After her interviews, Ms. Stites recommended to trial counsel that they promptly depose Mrs. Jackson because of her failing health. Trial counsel, however, never did.

Pam Stites addresses this in her declaration:

> David Jackson's lawyers were well aware of Mrs. Jackson's tenuous health situation and the need for traveling to Detroit to preserve her important mitigating testimony. I told them she was in bad bad shape. Regrettably, that was never done.

Stites Decl. ¶ 34 (Ex. 5).

178

Trial counsel's failure to depose Mrs. Jackson prejudiced David, as Mrs. Jackson passed away in June 2006, a few months before trial. As a result, trial counsel's failure deprived Mr. Jackson of pertinent mitigation testimony that could have altered the jury's decision to sentence Mr. Jackson to die. Because trial counsel neglected to take Mrs. Jackson's deposition, the best, but necessarily incomplete, evidence of what Mrs. Jackson could have testified about is set forth in the Declaration of Pamela Stites, the mitigation specialist who met with Mrs. Jackson twice and who has constructed her potential testimony from interview memos she prepared at the time of her interviews. Stites Decl. ¶ 5 (Ex. 5).

Trial counsel were admonished by the trial judge for failing to take Mrs. Jackson's deposition after being granted permission by the court. In a hearing on August 29, 2006, the court's frustration with counsel is palpable, even on the face of the record. At the outset, trial counsel acknowledged the paramount importance of Mrs. Jackson as a potential witness, contending "There's nothing that matches the testimony of a mother for a jury . . . in determining whether to spare someone's life. And no one is in a better position to supply that." (Transcript of Hearing), at 26 (Aug. 29, 2006).) After counsel acknowledged "the court had granted a motion for us to take a deposition of his mother . . . where she lived, around Detroit," (*id.*), the court responded:

> THE COURT:   So you didn't exactly jump right on getting the deposition.
> THE COURT: So you kind of sat on it for a long time, and then she got too ill I guess.

(*Id.* at 27.) The Court continued to chide counsel for failing to preserve the testimony of a witness it considered so essential:

> THE COURT: You might kind of know when somebody is that old, seventy-eight, you might want to go ahead and get a deposition.

(*Id.* at 28.)

179

THE COURT: Well, I think you had enough information and at least the kind of information that you know would be appropriate in this kind of case to take the deposition pretty much right after you were appointed.

(*Id.* at 29.)

THE COURT: I mean, you didn't rush out there to Detroit then either.

(*Id.* at 30.)

The prejudice flowing from this failure was particularly harmful to the outcome of Mr. Jackson's capital trial.  Mrs. Jackson was a wealth of information about Mr. Jackson's childhood and earlier, starting with her own childhood working the cotton fields in a poor sharecropping family in Arkansas, through her and Leroy's migration through Mississippi where Leroy was run out of town as a murder-robbery suspect for fear of being lynched (Stites Decl. ¶ 12 (Ex. 5)); to Leroy's imprisonment for robbery not long after they got to Detroit, (*id.*); and Leroy's release after serving 7 ½ years in prison the year before Mr. Jackson was born; how they took in her sister's four young ones, somehow thinking that would be financially advantageous; through Mr. Jackson's head injury as an infant, his delayed development in key areas and all the way through Mr. Jackson's entire life.   All of this was lost when counsel failed unreasonably to take Ms. Jackson's deposition despite red flags in Pamela Stites' report pointing up the need to investigate these facts and depose Mrs. Jackson.  Mrs. Jackson could have provided first-hand, and poignant, testimony about life in the Jackson household, including the extreme violence and abuse she suffered at the hands of Mr. Jackson's father, Leroy Jackson.  *See generally* Stites Decl. ¶ 19-23, 25-27 (Ex. 5).  As the most frequent target of Leroy's abuse, Mrs. Jackson would have been the most salient witness on this issue.

Second, Mrs. Jackson could have provided first-hand testimony of the physical abuse that Leroy inflicted on Mr. Jackson, her and on Mr. Jackson's siblings and cousins.  *Id.* at ¶ 19, 21-23, 26.  Such first-hand testimony would have been essential to

180

making a proper mitigation case.  But trial counsel's failures prevented Mr. Jackson from benefitting from this important testimony.

Third, Mrs. Jackson could have provided testimony about the pervasive drug and alcohol addiction in the household.  Stites Decl. ¶¶ 28-29 (Ex. 5).

Fourth, Mrs. Jackson could have provided pertinent testimony about Mr. Jackson's slow development, problems in school, and inability to care for himself.  Stites Decl. ¶ 25, 27 (Ex. 5).  This testimony would have supported the *Atkins* claim that trial counsel failed to present, and that is set forth above in Claim 1.   For example, Mrs. Jackson could have testified first-hand to David's slow early development compared to his siblings and cousins; she could have described the problems David had handling money, following directions, and accomplishing basic tasks.  *Id.* at ¶ 27.  She could have described her strong feelings for David and the fact that in many ways he was her favorite because he was the kindest to her of all her children.  Deposing Mrs. Jackson would have also permitted the jury to see that Mrs. Jackson herself was illiterate and uneducated, and would have enabled them to better understand the limitations of her ability to care for David and the other children as well as the impact of her deficits on David's genetic and social makeup.  *See generally id.*

Fifth, Mrs. Jackson could have provided testimony about David being a loyal and loving son.  Stites Decl. ¶ 31.  In other words, trial counsel's ineffective assistance deprived David of the opportunity to have a witness portray David in a positive light.  The importance of such testimony is self-evident.  Indeed, it is why the Government called Daryl Brown's mother to the stand.  Here, however, Mr. Jackson did not have that powerful support.  Indeed, as noted, the mitigation case that trial counsel did put on was almost entirely bereft of any evidence that showed Mr. Jackson in a positive light.  Thus, the jury only saw the negative side of Mr. Jackson, especially in his own testimony.

There was simply no valid reason for trial counsel to have failed to have

taken Mrs. Jackson's testimony.  The failure to do so was unreasonable and enormously

prejudicial.  There is a reasonable probability that the testimony of Mr. Jackson's mother

would have changed one juror's mind about voting to sentence him to death.  At a

minimum, the failure to utilize her "undermines confidence in the outcome" of Mr.

Jackson's penalty phase.

## C.    Failure to Properly Investigate The Mitigation Case

Trial counsel retained a mitigation specialist, Pam Stites, and a fact

investigator, David Brooks, to assist in preparing Mr. Jackson's defense.  These

individuals are essential parts of a capital defense team.  However, to be effective,

mitigation specialists and fact investigators must investigate.  Here, that did not happen to

the extent necessary, because of personal problems experienced by both Ms. Stites and

Mr. Brooks.  The personal problems experienced by Ms. Stites and Mr. Brooks, by

themselves, do not render trial counsel's performance deficient.  Rather, it was the fact

that, after knowing these specialists were experiencing personal problems that interfered

with performance of their jobs, trial counsel did not seek to replace them.

As Pam Stites admits, during the pre-trial period for Mr. Jackson's trial, her

father was very ill, and the need to care for her father and her concern for her father,

prevented her from doing the thorough mitigating investigation required by the applicable

guidelines and case law.  Stites Decl. 40 (Ex. 5).  Thus, as noted above, Ms. Stites only

interviewed five people as part of her investigation, even though there were a dozen more

who knew Mr. Jackson and were willing to testify to help Mr. Jackson, as demonstrated

by the Declarations submitted with this Petition.  (*See* Exs. 8–19).

The problems faced by David Brooks were even more debilitating to Mr.

Jackson's case.  Early on, Mr. Brooks had abdominal surgery, and during the lengthy

recovery, he was unable to investigate facts relevant to Mr. Jackson's defense.  *See* E-

mail Correspondence with David Brooks (Ex. 86).  But, again, trial counsel made no

effort to replace him. Failing to conduct a thorough investigation does not meet the minimum standards for effective assistance of counsel.

Moreover, as with the dearth of mitigation witnesses, the absence of a fact investigator prejudiced Mr. Jackson. For example, even though the Government relied heavily on the "Pop" Jones Incident, Mr. Jackson's trial counsel never interviewed Mr. Jones. He was available, and could have provided the testimony set forth in his declaration here, *i.e.* that Mr. Jackson never threatened Mr. Jones. Given that the Government used Mr. Jackson's alleged words as the final statement of closing argument, it is clear how critical the "Pop" Jones Incident was to the Government's case. Had trial counsel conducted a through investigation, they could have uncovered the evidence that would have undermined the "Pop" Jones Incident. Without those haunting words that Mr. Jackson never actually said, it is probable that at least one juror, if not more, would not have sentenced Mr. Jackson to the death penalty.

The failure to conduct a thorough investigation also left trial counsel helpless when Mr. Jackson gave his highly damaging penalty phase testimony. For example, Mr. Jackson claimed to have run the clothing factory at Beaumont and to have run a high-stakes gambling operation. (Tr. 1681-1684.) Even a minimal investigation would have revealed that neither was true. Bezy Decl. ¶ 12 (Ex. 4). Thus, trial counsel again failed to effectively assist Mr. Jackson, and had they done so, it is conceivable that at least one juror would not have sentenced him to die.

D.    **Trial Counsel's Presentation of Mr. Jackson as a Witness at the Penalty Phase was Unreasonable and Prejudicial.**

The planned portion of Mr. Jackson's penalty phase case consisted of four witnesses: his childhood friend, Pam Morrison; Dee Dee Halpin, the educational consultant; Dr. Kate Allen, retired social worker; and Dr. Elizabeth Pelz, criminal justice professor. At the conclusion of the planned portion, a spontaneous on-the-spot decision

183

was made to put Mr. Jackson on the witness stand.  Virtually no time was spent preparing Mr. Jackson to testify.

For obvious reasons, Mr. Jackson was a uniquely important witness, and his testimony warranted the utmost care and attention.  Instead, he was called to testify with no plan and was left on his own to freely associate about everything from prison exploits to prior offenses to self-incriminating details about the homicide itself.  He was given little direction or guidance from his attorneys, so Mr. Jackson was at liberty to go wherever he wanted, even if it was contrary to his best legal interests and to his cause.  There was very little in his testimony that was helpful to the ultimate penalty phase objective and a great deal that was affirmatively harmful.  Much of Mr. Jackson's testimony would have to be described as catastrophic, attributable not to Mr. Jackson, who is mentally ill and intellectually disabled, but to his lawyers who should have known better.

Today, some four years after Mr. Jackson took the witness stand, the defense attorney who examined him has no recollection whatsoever of preparing Mr. Jackson to testify.  The prospect of Mr. Jackson's testifying was never mentioned to the trial level mitigation specialist.  It was not even "in the realm of possibility."  Had it been raised, she "would have advised strongly against it," as she states in her declaration:

> I do not recall the possibility of David's testifying ever being considered or coming up.  I certainly would have advised strongly against it, but I never even believed it to be in the realm of possibility, so it was never discussed. From my experience, it would be an extraordinary situation where you would put the defendant on the stand and expose him to the rigors of cross examination.  This would be especially true in the case of someone like David, who had tested as low as 67 on an IQ test.  I could not imagine pitting him against a skilled and savvy prosecutor.

Stites Dec. ¶ 38 (Ex. 4).

184

A basic and highly probative way of assessing the overall effectiveness of Mr. Jackson's testimony is to see how it was used by the defense and the Government in their penalty phase summations to the jury. Defense counsel did not mention Mr. Jackson's testimony a single time in his closing argument – no reference whatsoever to the testimony of the final and longest witness for the defense, the defendant in the case, and the man whose life was at stake. Counsel's silence spoke loudly about the effectiveness, or lack of effectiveness, of his putting Mr. Jackson on the stand.

The prosecutor, meanwhile, had a field day with Mr. Jackson's words, using them as fodder for new and stronger arguments that were otherwise not available to the Government. The unprepared testimony of Mr. Jackson handed the prosecutors their closing argument on a silver platter, and the prosecution quoted Mr. Jackson's bold admissions about his role in the homicide and imputing from it his "intent" to kill Daryl Brown (Tr. 1912), condemning his "attitude" on the witness stand (Tr. 1887, 1993), and exploiting his extravagant claims of power and prestige within prison. (Tr. 1914.)

Had counsel spent adequate time with Mr. Jackson going over his crucial prospective testimony, getting some idea of what he was going to say, asking him tough questions, investigating his unlikely claimed accomplishments, preparing him for cross examination and competently assessing his suitability as a witness, counsel could not conscionably have considered using Mr. Jackson as a witness. The harm from their doing so is further evidenced by statements from jurors in post trial interviews that Mr. Jackson was the most memorable witness in the trial and that his testimony "hurt" his case.

One of the more counterproductive parts of Mr. Jackson's testimony was his claims to have "run" the clothing factory at USP Beaumont. His claims to have been in charge of "nine shops in the factory" created an aura of power and competence that was completely false. Mark Bezy, the former warden at USP Terre Haute, has read Mr. Jackson's testimony and characterizes it as **"delusional."** Bezy Decl. ¶ 12 (Ex. 4).

In response to questions from defense counsel, Mr. Jackson testified:

185

Q    What sort of work did you do?

A    Well, first I started out as a -- they make army clothes there.  I started out making clothes.

I moved up from there and I became a clerk.

*Then I started running the whole entire factory.*

(Tr. 1679.)

Q    All right.  Tell us about that work at the factory. . . .

A    Yes, I wound up becoming a clerk, and the clerk – the position that I had pertained to running the entire factory.  So I had – it was me that was responsible for the daily income and the daily outcome of that factory right here, which is right here. (Indicating)

(Tr. 1681.)

Q    All right.  Well, let me ask you –
You talked about some of the things that you were able to accomplish within the system at Beaumont, running the factory and that sort of thing, with your eyes focused on your getting out.

A    Yeah.  I did tacticians, what you call tacticians on the computer, and a tactician is running each shop.  They have nine shops in that factory, and from – I ran each one of them.  That means I took in the daily count of what was coming – what they made, the daily count of what was going out, and then I did assignments, and I did WordPerfect, I did all that.  Everything that needed to be done, I could do it all right there in that computer.

(Tr. 1704.)

Counsel should have known that Mr. Jackson's testimony was preposterous, yet counsel went back to the subject three times. Truth is, Mr. Jackson's claims of running the factory were "delusional," as former BOP administrator and warden attests:

I have reviewed the testimony of Mr. Jackson at his trial.

186

> Based on my thirty years in prisons as a line officer all the way up to Warden, his testimony as to his accomplishments and position within USP Beaumont appears to me to be delusional. There is absolutely no way that he "ran" the UNICOR operation as he claimed. Prisoners do not "run" UNICOR, especially a prisoner with a record like Mr. Jackson's who has only been in that particular prison for several months. There is nothing about him that would make him suitable for the high level position of responsibility that he described, essentially having total operating control over a factory. The functions he described such as ordering and receiving materials and supplies are generally performed by free world employees or by inmate clerks who have limited office responsibilities and who have no authority or control over another prisoner.

Bezy Decl. ¶ 12 (Ex. 4).

Before putting Mr. Jackson on the witness stand, counsel should have had a better idea of what he was going to say, whether his claims of great power within the prison were true or not. Mr. Jackson said many other things that inflated his apparent competence and functionality, but that were not true, that his lawyers should have known about, for example:

> A    . . . I opened up a ticket.
>
> Q    And a ticket means --
>
> A    A gambling ticket. I opened it up to establish money on the side, to build up money.

(Tr. 1682.)

> A    But what I did was, I just opened up the entire ticket and made it a real ticket, just like Vegas. See what I'm saying? You could pick one team, two teams, three teams. It was just like the streets.

(Tr. 1684.)

> A    The only way you can play with me personally, *you had to have a thousand dollars or better*.

187

(Tr. 1687.)

> What happened was, when I was in [U.S. Penitentiary] Atlanta, I had accumulated a lot of money.  I accumulated like about maybe eighty or ninety thousand dollars, and I had it saved up. And so what happened was, the girl that I was with at that particular time, I was taking care of her and her daughter.  I took care of her.  I raised her, put her through college.  She's in college in England right now.

(Tr. 1708.)

This testimony was harmful to Mr. Jackson's case in a number of ways.

First, it created the misimpression that Mr. Jackson was a very powerful figure and a man of great ability.  Although it was all, like running the prison factory, "delusional," the prosecutor put it to maximum use characterizing Mr. Jackson as Mr. Big:

> So what if he gets a life sentence?  Where is he going to be? . . . Every time he's been in lockdown he's been *smart enough to figure out how to get out* . . . and he's going to be the C.E.O. *of whatever compound he gets back on*. He's to be back in that starting lineup on that *B.O.P. All-star team*.  He's going to have the biggest ticket on the pound.

(Tr. 1914.)  Second, it gave the impression to the jury that Mr. Jackson is much smarter than he actually is, totally undermining his mitigation case of low intellectual functioning.  In reality, no one needed "a thousand dollars to play" in Mr. Jackson's penny-ante football pool or numbers game.  The refutation of this absurd claim was right in the Government's own evidence, Govt. Ex. #32-A, consisting of a handful of scraps of paper recovered from Mr. Jackson's holding cell denoting such sums as "Keith - $1.25" "Shick - $2.50" - hardly Vegas, hardly big stakes.  (Ex. 88) (Admitted into evidence at Tr. 329-30.)  Third, this testimony and the following excerpts made Mr. Jackson seem like an unsavory and unlikeable character, obviously not a good thing for a penalty phase. Further illustrative of the abysmal lack of planning for this critically important testimony, Mr. Jackson's lawyers elicited the following from their capital client:

> Is this the best that you can do, is to show you that I'm violent by me having a fight? Probably every last one of y'all have had a fight at one time in your life. You follow what I'm saying?

(Tr. 1712.)

> A    It eliminates problems of people owing you and you having to hit them across the head because they owe you or they run you in the hole.
>
> .        .        .
>
> Now it might have been a lot of men who hated me for having a ticket, because I did what they call – I broke the rules, and the rule was that I changed the economy in the institution.

(Tr. 1683.)

> Yeah, I robbed, yeah, I took from people, and in the process of taking, intentionally –
>
> Now, this is what I call premeditated. When I intentionally want to hurt you – you follow? If I approach you and say "Listen, I'm not here to hurt you" – you follow what I'm saying? -- "But today I just need what it is that you've got, that you can help me," you see? And that's it.

(Tr. 1713.)   Mr. Jackson's monologue continued for *five more pages* of trial transcript, interrupted *only once* with only one brief question interjected by counsel (Tr. 1714), ending mercifully at Tr. 1718, at which point defense counsel stated, simply, "Thank you, Mr. Jackson. I'll pass the witness, Your Honor." (*Id*.)

When defense counsel handed Mr. Jackson over to the prosecutor, matters went from bad to worse. Within minutes of taking over on cross examination, the prosecutor got Mr. Jackson to say that Gulley did not do the killing, that he, Mr. Jackson did:

> Now, I'm not saying he killed him though. He didn't kill him.
>
> Q    Okay. You killed him?

189

> A    Yes.

(Tr. 1723.)  Although his claiming credit and covering Gulley's back may also have been braggadocio or delusional, the prosecutor soon had Mr. Jackson describing the entire stabbing incident blow by blow.  Of course, this was emphasized in the Government's closing argument.  (*See* Tr. 1878 ("And we know which one was stabbing.  *By the defendant's own admission,* he was the one who was doing the stabbing."))  Then the prosecutor questioned Mr. Jackson about the crime used to aggravate him, the bank robbery in Mississippi.  Again reflecting that he had received no preparation for cross examination, instead of resting on his guilty plea and his written apology for the robbery, Mr. Jackson was easily goaded into digging a bigger hole for himself:

> A    I robbed the bank.  I robbed that bank.  I robbed that bank and I had a legitimate reason for robbing it.

(Tr. 1736.)  Towards the end of cross examination, Mr. Jackson told the jury that he would be back in Beaumont someday, another statement that trial preparation could have averted:

> I eventually – I eventually plan on coming back here.
>
> Q    Okay.
>
> A    You know what I'm saying?
>
> Q    Coming back here, you mean to Beaumont?
>
> A    Yes, I eventually plan on coming back here and eventually getting this overturned.

(Tr. 1752.)  This statement stuck at the heart of the jurors' apprehension about a life sentence, their fear – however baseless, that "life doesn't mean life" and that his sentence might someday be reduced.

The harm from trial counsel's decision to put Mr. Jackson on the witness stand was summarized by the prosecutor:

> Well, you saw his attitude when he testified, members of the jury. You saw his narcissistic personality disorder, his antisocial personality disorder, you know. These aren't mitigating factors. These show what his attitude is, that he is a danger, because, you know, he doesn't care about other people. It's me, me, me. That's what it's about.

(Tr. 1887.)

Effective capital counsel would not have exposed their client to such harm. Counsel's mitigation specialist knew better:

> I was shocked to find out that the attorneys had put David on the witness stand at the end of his penalty phase. . . . I could not imagine pitting him against a skilled and savvy prosecutor. In addition, given some of David's quirks and personality traits, I would foresee some very serious problems in putting him on the stand. Due to his various defense mechanisms and lifelong efforts to appear more capable than he really is, I would be afraid he might come across to the jury as perhaps arrogant or self-serving. Although these perceptions of David would not be accurate or correct, the risk that a jury would see him that way was great. He tends to be grandiose about his abilities and accomplishments, perhaps even deluded, and I would have assumed that this, too, would come across very badly to a jury. David's attorneys certainly knew all of this from their direct dealings with David as well as our many discussions, so I was truly stunned to find out they had put him on the stand.

Stites Dec.¶ 38 (Ex. 5).

In permitting Mr. Jackson to testify, and without preparation, counsel sealed his fate. Their conduct in this regard was unreasonable and overwhelmingly prejudicial.

**E.    Failure to Fully Investigate the Harold "Pop" Jone Allegation**

One of the most damaging parts of the Government's case was testimony from a member of the prison's counseling staff that two months after the death of Daryl Brown, Mr. Jackson had threatened to kill another prisoner who was being placed in his

191

cell.  The counselor, Michael Mattes, testified that Mr. Jackson told him he did not want the other prisoner, Harold "Pop" Jones, put in his cell.  According to Mattes, Mr. Jackson stated, "I'm through playing games, and if you don't believe me, look at the tapes.  I'll kill again."  (Tr. 681–82, 686.)  The Government highlighted this testimony in its closing arguments at both phases of trial.  At the guilt phase, it was referred to in the Government's final statement in closing argument—where it was characterized as, "the one piece of evidence that the defense couldn't touch, other than to just ignore it… ." (Tr. 1100.)

At the penalty phase, this was literally the last word from the Government as the prosecutor beseeched the jury to put Mr. Jackson to death:

> And last, what did he tell – what did he tell Michael Mattes?  "I'm through playing games.  Look at the tapes.  I've killed before, I'll kill again."
>
> Do any of you really have any doubt about that?
>
> Those are his words.  He's telling you, he's telling you he deserves it, and so does the evidence.  Now you need to go in there and do your job.

(Tr. 1916.)

Mattes testified that Pop Jones was present for these threats (Tr. 681–682; 686), yet Jackson's trial attorneys never contacted Pop Jones.  See Decl. of Harold Jones (Ex. 20).  In his recently-obtained declaration, Mr. Jones states, "I did not know David Jackson well, but I knew him enough to know that he not only did not threaten me in the SHU that evening, he never did threaten me and never would threaten me.  …For someone to say that David Jackson threatened me is an outright lie….  If David Jackson's lawyers or an investigator had come to ask me about this alleged incident in the SHU back in 2005 or 2006, before he went to trial, I would have told them that no such thing happened and that it is some sort of fabrication."  Jones Decl. ¶¶ 7-9 (Ex. 20).

192

Although trial counsel called both Darrell Evans and Raphael Porsche, III, regarding the "Pop Jones incident," neither could testify with the same level of authority and certitude as Jones himself.

Moreover, Darrell Evans received no preparation for his trial testimony from defense counsel, as he avers in his declaration, at (Ex. 21). In a declaration provided in connection with this proceeding, Mr. Evans states, "They went ahead and called me as a witness without talking to me about my testimony or discussing what they were going to ask me and what my answers. [*sic*] would be. I just got up and testified without any preparation from the lawyers." Evans Decl. ¶ 13 (Ex. 21). Further, Mr. Evans states in his declaration that Correctional Officer Steven Rice said to him in July 2005 that "he was pressured to lie about what happened when he brought Pop Jones to our cell back in February 2000. He said they wanted him to lie and say that Jackson had said that if they tried to put Pop in the cell, he would kill him." Evans Decl. ¶ 9 (Ex. 21).

More remarkable, Mr. Evans states in his declaration that when he was interviewed by a defense investigator for Mr. Jackson some months before trial, he told the investigator about his encounter with Officer Rice and Rice's statement that he was being pressured to lie about the whole Pop Jones affair. *Id.* at ¶ 9. Despite this, Evans was never asked about it during his trial testimony.

Had counsel interviewed Mr. Jones and properly prepared Mr. Evans, a cloud of serious doubt would have been cast over the allegations that Mr. Jackson threatened Jones. Indeed, with testimony from Jones himself that it never happened, this highly damaging and much-cited aggravating evidence would have been discredited. Thus, but for counsel's unreasonable failure to disprove Mattes' allegations, there is a reasonable probability the outcome of the penalty phase would have been different. Certainly, confidence in that outcome is undermined.

193

**F.**     <u>Failure To Call a Prison Expert, and to Meaningfully Investigate and Put on</u>
<u>Evidence Related to Violence at USP Beaumont</u>

Despite an abundance of readily accessible evidence related to the exceptionally high incidence of violence at the U.S. Penitentiary in Beaumont, Texas, Mr. Jackson's trial counsel failed to meaningfully investigate this information and present such evidence at trial. Documented incidents of guard misconduct, widespread drug use, and deficiencies in inmate safety measures all contributed to USP Beaumont's failure to adequately protect its inmates from harm and contributed to a violent and deadly prison culture. *See* Federal Bureau of Prisons*, HOMICIDES -- FY1996 THRU 2009*, Received Aug. 24, 2009 (Ex. 30). This evidence, had it been introduced at trial, would have shown the violent prison environment that existed at the time of Mr. Jackson's unfortunate encounter with Daryl Brown, providing greater context and support for Mr. Jackson's self-defense claim. Moreover, the failure to present this evidence deprived the jury of the opportunity to consider this relevant mitigating evidence during the penalty phase of trial.

From the time the prison opened until Mr. Jackson's trial in 2006, seven inmates were killed while incarcerated at the federal penitentiary in Beaumont, Texas. *See* Federal Bureau of Prisons*, HOMICIDES -- FY1996 THRU 2009*, Received Aug. 24, 2009 (Ex. 30). But the rate of prison homicides is only one of many indicators of the violent nature of USP Beaumont -- commonly referred to as "Bloody Beaumont" by inmates and guards alike. *See* Brandon Sample, *Violence on the Rise in BOP Facilities*, 20 PRISON LEGAL NEWS No. 8 (2009) (Ex. 31). There have also been countless assaults and other violent incidents during this same time frame. *Id.* This notably high rate of violence -- even high by comparison to other federal institutions -- ultimately forced the Bureau of Prisons to downgrade the facility from a high security penitentiary to a medium security institution. *See* Ryan Meyers, *Hardcore Cons Move Out*, BEAUMONT ENTERPRISE, Apr. 6, 2008 available at Lexis (Ex. 35) (According to Bureau

194

of Prisons spokesperson, Traci Billingsley:  "Incidents at the USP over the last few years have required us to consider alternatives for managing that institution.").

One factor contributing to the high rate of violence is inadequate staffing at federal prisons.  According to a 2000 report by the Bureau of Justice, the number of inmates per correctional officer in a federal prison was 9.0 in 2000 (nearly twice as high as the state ratio of 4.5).  Bureau of Justice, *Census of State and Federal Correctional Facilities,* 2000 (Ex. 67).  Without adequate staffing, prisoners have little choice other than to self-police the institution, something inmates are ill-equipped to do.  At USP Beaumont specifically, even the prison guards who are on duty are often corrupt or engaged in illicit activities.  *See* U.S. Department of Justice -- Office of Inspector, *The Federal Bureau of Prisons' Drug Interdiction Activities,* 2003 at 12, Table 6 (Ex. 69).  Numerous correctional officers have been charged in connection with their attempts to smuggle drugs into the USP Beaumont over the past fifteen years.  *Id.* at 14 (For example, "In FY 2000, a correctional officer attempted to deliver approximately 109 grams of crack cocaine, 73 grams of black tar heroin, and 25 grams of white heroin into USP Beaumont, Texas.").  And the result of this misconduct is widespread drug use among inmates.  *Id.* at 8, Table 3.  In fact, in 2001, USP Beaumont had the highest percentage of positive drug tests and drug misconduct rate of the *entire* federal prison system.  *Id*.  This is particularly relevant in light of Former Warden Mark Bezy's statement that "Intoxicated prisoners are a very serious danger to staff and other prisoners."  Bezy Decl. ¶ 9 (Ex. 4).

Even prisoners who are placed in "protective custody" -- which, as the name suggests, is expected to provide greater protection for certain high-risk inmates -- are not safe.  In 2005, an editorial in the Washington Post revealed the details of the horrific and untimely death of inmate Keith Barnes.  Colbert I. King, *A Witness Pays the Price in Prison,* WASHINGTON POST May 21, 2005 (Ex. 60).  Barnes was transferred from USP Coleman to USP Beaumont as a "safety measure," after Barnes testified

against his co-defendant and received multiple death threats.  Nonetheless, despite being in protective custody at USP Beaumont, he was dead within 24 hours of his arrival to the prison, the victim of 68 stab wounds.  *Id.*  This evidence clearly demonstrates that USP Beaumont has failed to perform its basic function of policing prisons thereby depriving prisoners of their constitutional rights.  *See Mitchell v. Rendell,* 2008 WL 5411068 (M.D. Pa. Dec. 29, 2008) ("Under the Eighth Amendment, prison officials have a duty to protect prison inmates from violence at the hands of other inmates) (citing *Riley v. Jeffes,* 777 F.2d 143, 147 (3d Cir. 1985).  As importantly, the fact that violence was allowed to go unchecked at USP Beaumont meant simply that prisoners, like Mr. Jackson, knew they had no choice but to protect themselves if they were to be protected at all.

While trial counsel rested its entire case on self-defense -- a claim they chose to focus on the eve of trial -- they failed to provide a much needed context to Petitioner's self-defense claim.  Furthermore, even at trial, when the Government introduced general evidence about prison conditions at Beaumont, Barlow and Morrow failed to perform any meaningful cross examination on the issue of the widespread violence at USP Beaumont.  At trial, the Government elicited testimony about prison fights at USP Beaumont from Derric Wilson, a special instigative agent at USP Beaumont.  Wilson provided lengthy testimony about the layout of USP Beaumont and opined about typical inmate behavior preceding any prison fight.  Wilson even touched on the incidence of violence at USP Beaumont, but even at this mention, Mr. Jackson's trial counsel failed to capitalize on this testimony and confront the witness about violence at USP Beaumont.

To counter this testimony, Mr. Morrow and Mr. Barlow could have called their retained prison expert, Charles Pelz, a former warden from the Texas State Prison system to provide an alternative viewpoint on prison altercations.  Instead, Mr. Jackson's trial counsel called Warden Pelz's wife, Dr. Pelz, a *professor of criminal justice* with less than three years of experience in a prison, who merely opined on prisoner adaptation and

Mr. Jackson's ability to serve life in prison without any meaningful discussion of prison violence.

Had Mr. Jackson's trial counsel called a qualified prison expert—either Warden Pelz or any one of the number of prison experts who were available at the time to testify on Mr. Jackson's behalf—that expert could have testified about the dangers presented by intoxicated inmates and the necessary response of inmates confronted with violence while incarcerated. Further, such an expert could have provided context for Mr. Jackson's disciplinary record. Bezy Decl. ¶¶ 7-10 (Ex. 4). Moreover, this prison expert could have dispelled any notion of Mr. Jackson's self-asserted "power" and "responsibility" within the prison. Bezy Decl. ¶ 12 (Ex. 4) ("[Mr. Jackson's] testimony as to his accomplishments and position within USP Beaumont appears to me to be delusional").

Overall, Mr. Jackson's trial counsel were ineffective in failing to present easily accessible information related to USP Beaumont's rate of violence, and on account of their failure to call a qualified prison expert. This failure deprived the jury of important information during the jury's deliberation at the guilt and penalty phases.

## G.   Trial Counsel Were Ineffective For Failing To Explain The Significance of Mitigation Questions Posited To The Jury On the Special Verdict Form and For Failing To Object to An Improper Jury Charge on Mitigation

At the conclusion of the penalty phase, the jury was presented with a special verdict form that contained sixty mitigation items that trial counsel wanted the jury to decide. *See* Special Verdict Form (Ex. 37). But, trial counsel did virtually nothing to explain the significance of those factors, failed to proffer appropriate medical and lay witnesses to establish those factors, and left the jury in the dark as to the relevance or meaning of most of the factors. Moreover, the form itself was poorly conceived, as the jury could only find that a factor had been established if the jury also found the factor was mitigating.

197

1.    **Trial Counsel Failed to Explain the Significance of Mitigation Factors on the Special Verdict Form**

The list of mitigating factors varied from Mr. Jackson's delay in reaching developmental milestones to factors about Mr. Jackson's childhood, such as the lack of furniture in the home. *See id.* But, trial counsel did not proffer any expert witnesses to explain the significance of many of the factors. For example, one of the "mitigating" factors was that David sucked his thumb as a teenager. *See id.* On its own, this seems irrelevant to a jury asked whether a man they have just convicted of murder should be sentenced to death. However, if trial counsel had called a qualified mental health expert, such as a psychiatrist or a psychologist, he or she could have explained that teenage thumb sucking is indicative of mental illness, developmental problems, and trouble coping with a stressful environment. *See, e.g.,* Dudley Decl. (Ex. 1). Such testimony, which the jury never heard, prevented the jury from understanding the importance of many of the factors on the special verdict form.

Additionally some of the factors simply were not mitigating. For example, trial counsel included as "mitigating" factors that Mr. Jackson was a polite robber or that he did not intend to hurt people when he committed crimes. It is not clear how this was mitigating at all. If anything, it appears to be aggravating evidence, as it shows that Mr. Jackson committed other crimes, a theme repeatedly addressed by the Government in its case.

The most peculiar supposed "mitigating factors" proposed by defense counsel were that Mr. Jackson "suffers from antisocial personality disorder," "suffers from narcissistic personality disorder," and "suffers from mixed personality disorder." These are hardly "mitigating" characterizations. Indeed, as the prosecutor argued in closing, "Those aren't mitigating factors, ladies and gentlemen, they're aggravating factors." (Tr. 1913.)

Helping the Government make its aggravation case is not within the scope of effective assistance of counsel required by the Sixth Amendment.

2.  **The Special Verdict Form Resulted In An Improper Charge to the Jury**

The format of the special verdict form was also an example of trial counsel's failure to effectively assist Mr. Jackson.  The form listed the two statutory mitigating factors and then 58 non-statutory mitigating factors.  For the two statutory mitigating factors, the jury was asked to write down the number who so find.  Special Verdict Form (Ex. 37).

For each of the non-statutory mitigating factors, however, the jury was asked a two part question, *i.e.*, did the defense prove the non-statutory mitigating factor by a preponderance of the evidence and was that factor mitigation.  Thus, in answering the number who so found, the jury had to find that a factor had been proven by a preponderance of the evidence **and** that the factor was mitigating.  This, however, conflicted with the charge to the jury, and with settled law, and trial counsel were ineffective for not objecting to the manner in which the Special Verdict form was prepared.  Once any juror finds that the defense has established a mitigating factor by a preponderance of the evidence, he or she is required to consider and give the factor whatever weight he or she deems appropriate.  *See, e.g., Boyde v. California*, 494 U.S. 370, 377-78 (1990) (once the threshold for relevance has been met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration").  However, given the manner in which the Special Verdict form was prepared, mitigating factors could be screened out at the second step if a juror determined that the factor was not mitigating.  Thus, a juror might improperly fail to consider and give effect to a

199

mitigating factor found to exist because he or she improperly concluded at the second step that the factor was not mitigating, *i.e.*, not relevant to whether or not a life sentence was more appropriate than a death sentence.

Mitigation is a balancing process.  The Government puts on its aggravation case.  If the Government meets its initial burden, then the defense puts on its mitigation case.  No one factor need be dispositive.  Instead, the jury is to weigh all of the evidence.  Here, however, because of the deficient manner in which the Special Verdict form was created, the jury was not able to weigh all of the factors that were established by the defense.  Instead, each factor stood or fell on its own, and only if it was found to be mitigating was it considered by the jury.  Of course, the jury only found a handful of the factors were mitigating, and obviously these few factors were not enough to tip the scales in favor of Mr. Jackson.  Thus, by failing to object to a deficient Special Verdict form, trial counsel interfered with the jury's ability to find that the mitigating factors outweigh the aggravating factors, potentially costing Mr. Jackson his life.  This is ineffective assistance of counsel.

**H.** **Trial Counsel Was Ineffective For Failing to Object To Improper Jury Instructions at the Penalty Phase**

At the close of the penalty phase, the Court read the charge to the jury.  Prior to reading the charge, the Court asked counsel if they had any objections to the proposed charge.  While Mr. Jackson's counsel objected to the Court's exclusion of certain instructions, including one about residual doubt as a mitigating factor and that the jury does not have to sentence Mr. Jackson to death, trial counsel failed to object to other errors in the instructions that the Court read to the jury.

**1.** **Aggravating Factors Must Outweigh Mitigating Factors Beyond A Reasonable Doubt**

Trial counsel should have requested an instruction that the "beyond a reasonable doubt" standard applies to the determination of whether aggravators

sufficiently outweigh mitigators.  Such an instruction was required under *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  In *Apprendi*, the Court reversed a defendant's enhanced "hate crime" sentence because the facts enhancing the sentence were found by a judge and not a jury. In so holding, the Court stated that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

In *Ring v. Arizona*, 536 U.S. 584, 609 (2002), the Court applied its holding in *Apprendi* to capital sentencing. The Court held that capital defendants have a right to a jury finding with respect to any fact that must be proven before a death sentence may be imposed under the jurisdiction's law. *Ring* would appear to compel the conclusion that a jury must find that the aggravating factor outweighs the mitigating factors, and it must make such a finding beyond a reasonable doubt. *Id.* (Scalia, J., concurring) ("whether or not the States have been erroneously coerced into the adoption of 'aggravating factors,' wherever those factors exist they must be subject to the usual requirements of the common law, and to the requirement enshrined in our Constitution, in criminal cases: they must be found by the jury beyond a reasonable doubt").[36]

2.      **The Two-Step Mitigation Finding Process**

As noted in the previous Section, the Special Verdict form distinguishes between statutory and non-statutory mitigating factors by asking the jury to determine that each non-statutory mitigating factors is mitigating.  This difference was then highlighted by the Court during the jury charge, as the Court stated after reading the statutory factors: "If you so find, I instruct you that it ***is*** a mitigating factor, and you ***must***

---

[36]     Although a 5th Circuit case that came down after Mr. Jackson's trial rejects the requirement that the Court should instruct the jury that aggravating factors must outweigh mitigating factors beyond a reasonable doubt (*see United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007)), that was not the case at the time of Mr. Jackson's trial. Moreover, subsequent decisions since 2007 call *Fields* into doubt.  *See Blakely v. Washington, 542 U.S. 296* (2004) & *Cunningham v. California, 549 U.S. 270* (2007) (confirming that whether a sentencing determination is subject to *Apprendi* is a functional test).

201

consider it in your deliberations as a factor weighing against imposition of the death penalty." ((Tr. 1842) (emphasis added).)  However, when the judge instructed the jury on the non-statutory mitigating factors, she omitted that instruction.  This discrepancy in the charge could have reinforced the notion that the alleged non-statutory mitigating factors weren't really mitigating factors at all, even if found.

Trial counsel should have requested that the court give a single instruction as to all mitigating factors that said that all these things before you are all mitigating factors and if you find them, you must consider them in your deliberations.  There was no basis for the judge to distinguish between the statutory and non-statutory mitigators in the way that she did in her jury instructions.  This is especially true given that the Court reviewed the proffered mitigating factors prior to submitting them to the jury, and struck those factors the Court determined were not appropriate or relevant mitigating factors. (Tr. 1825-28.)  In other words, there was already a judicial determination that the mitigating factors that were ultimately submitted to the jury were, as a matter of law, proper and relevant mitigating factors.  Therefore, it was improper to ask the jury to make a similar independent legal determination as to each factor, as the jury's only legitimate role is to find facts, not to make rulings of law.  While the jurors are allowed to give whatever weight they want to a particular mitigating factor, they can't simply say a factor, if found, isn't mitigating when congress (or the court) has already made a determination otherwise.

3.    **Jury is Never Required to Impose Death**

Trial counsel did seek an instruction from the Court that the jury is never required to impose death.  The Court denied the instruction, agreeing with the prosecution that it was a "mercy" instruction (which is different).  (Tr. 1826.)  It was ineffective of trial counsel to ask for an instruction that could be characterized as a mercy instruction, as Mr. Jackson was entitled to an instruction that they jury was not required to impose death.  *See, e.g., United States v. Jones*, 527 U.S. 373, 384 (1999) (jury

instructed that "regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence").

### 4.    "May" vs. "Must"

Throughout the instructions, the Court stated that if a juror finds a mitigating factor, that juror "may" consider it, rather than "must" consider it.  (Tr. 1837, 1843, 1861-62.)  Trial counsel should have objected to that instruction.  As noted above, if a juror finds a mitigating factor established by a preponderance of the evidence, the juror must consider the factor, even if the juror ultimate determines to give the factor little or no weight.  While the Court also gave the correct instructions at times, because the Court gave inconsistent instructions, the confusion could have led jurors to improperly ignore mitigating factors.

### 5.    Mitigating Factor is Different from Affirmative Defense

Trial counsel was also ineffective for not asking for an instruction that clearly and explicitly stated that a mitigating factor is different from an affirmative defense.  Jurors often have trouble with this distinction, and that is more so here as the guilt phase case was based on the affirmative defense of self-defense.  Without an instruction clarifying that mitigating factors are not justifications or excuses for the defendant's actions, the jury could have improperly shifted the burden to Mr. Jackson to prove that he did not deserve to be sentenced to death.

### 6.    Discrepancy Between Verdict Form and Instructions re: Individual Findings on Mitigation

On the Special Verdict form there was an instruction that stated: "Further, any juror may also weigh a mitigating factor found by another juror, even if he or she did not also fins that factor to be mitigating."  Special Verdict Form (Ex. 37). (Tr. 1862.)  However, when actually instructing the jurors, the Court did not give the instruction.  This discrepancy between the instructions and the verdict form would have been confusing for the jury, and trial counsel should have asked for that instruction to be given

when the judge charged the jury on statutory and non-statutory mitigating factors.  Their failure to do so is ineffective assistance of counsel.

### 7. **Death Sentence "Justified"**

Throughout the charge, the Court talks about when a death sentence is "justified."  While this echoes the statutory language of the FDPA, it can create conflicts when the evidence demonstrates that both a sentence of death and a sentence of life without parole are justified.  A proper instruction using the word "justify" must make clear that the death penalty is only "justified" if the jury finds that it more justified than, and thus should be imposed instead of, life imprisonment without possibility of release.  Thus, again, trial counsel was ineffective for failing to object to the absence of this language.

### 8. **Multiple Errors With the Jury Instructions Prejudiced Mr. Jackson**

The foregoing errors combined to prejudice Mr. Jackson at the penalty phase of his trial.  Rather than consider any proven mitigating factors, Mr. Jackson's jurors were asked to determine if they were mitigating, which is improper. And, Mr. Jackson's jurors were not properly instructed on several other areas, creating confusing instructions.   A confused jury cannot be expected to render a constitutionally valid verdict.  Because of the conflicting, or lacking, instructions given to his jury, Mr. Jackson was deprived of his rights under the Fifth, Sixth and Eighth Amendments, and had the jury been properly instructed, it is likely that they would not have sentenced Mr. Jackson to death.

## I. <u>Trial Counsel Was Ineffective In Failing To Investigate and Meaningfully Challenge Mr. Jackson's Involvement In The 2004 Ohio Robbery</u>

Only a handful of incidents were presented to Mr. Jackson's jury in support of the Government's non-statutory aggravating factor of "future dangerousness."  The most damaging and inflammatory of these was, by far, the Government's allegation that Mr. Jackson had robbed two young women at the Holiday Inn Express hotel in Findlay,

Ohio on April 30, 2004.  Yet, trial counsel did not investigate and therefore did not discover that Mr. Jackson did not commit this crime.  Compounding the prejudice from their failure to investigate, trial counsel failed to adequately challenge the reliability of the sole, uncorroborated eyewitness identification tying Mr. Jackson to the crime.

### 1.   Failure to Investigate the Circumstances of the Robbery

The Ohio robbery evidence was central to the Government's penalty phase argument.  (Tr. 1142–43, 1732, 1733, 1885, 1889, 1906–07, 1911–12.)  Four witnesses testified about the robbery, including one of the two victim witnesses, Amy Laub (the other victim witness, Wendy Durain, did not testify).  The testimony describing the robbery was highly inflammatory.  Ms. Laub recounted that she was forced at gunpoint to give the perpetrator money from the hotel's safe and cash register.  (Tr. 1225–26.)  The perpetrator then moved Ms. Laub and her co-worker, Ms. Durain, into a back office, told them to remove their clothes, and had Ms. Laub sit under her desk and Ms. Durain sit on the floor.   (Tr. 1233–34.)  Ms. Laub testified that she was "praying he wasn't going to rape [her]" and "hoping he wasn't going to shoot [her] through the desk."  (Tr. 1234.)  The Government repeatedly focused on the inflammatory nature of the crime when cross-examining Mr. Jackson[37] and again in its closing argument.[38]

Trial counsel conducted no independent investigation at all into the Ohio robbery.  This failure to investigate one of the Government's major aggravating factors fell below an objective standard of reasonableness and rendered trial counsel's

---

[37]   Tr. 1732 ("And so as a result of that changed life, a month after you got out of jail you went to that hotel in Findlay, Ohio, and you pulled a gun on those two young ladies and made them strip and took their money?  Was that the changed life you're talking about, Mr. Jackson?"); 1733 ("So that young lady that looked you right in the eye and pointed you out to this jury and said you're the person that pulled the gun on her and made her strip naked and made her get under the table, you're telling this jury that she's lying?");

[38]   Tr. 1907 ("Well, I think the testimony was he got out in March, and here it is April 30th, and he's putting a gun to Amy Laub's face.  He's having her and her friend strip naked. He's having them get underneath the table.  And he didn't apologize to her about that, did he?  Well, he hasn't been convicted, so I guess there's no reason to apologize."); (Tr. 1911–12.)

performance deficient.  *Rompilla v. Beard*, 545 U.S. 374 (2005).  Indeed, trial counsel never even *discussed* the incident with Mr. Jackson, despite having ample notice that the Government intended to use the robbery as a non-statutory aggravator.  (Ex. 47).  Had trial counsel bothered to speak with Mr. Jackson, they would have learned that he consistently and vehemently denies any involvement in the robbery.  Instead, trial counsel first learned Mr. Jackson's side of the story when he stood up in open court and proclaimed his innocence, a statement that without any corroboration likely sounded foolish and self-serving in the ears of the jury. [39] (Tr. 1229–31, 1732–36.)

Trial counsel's failure to investigate was particularly unreasonable given that Ms. Durain was unable to positively identify Mr. Jackson as the perpetrator in a photo lineup (Tr. 1288) (Ex. 64); surveillance video of the perpetrator was too grainy to make a positive identification (Tr. 1288); latent fingerprints taken from a phone handled by the perpetrator were not matched to Mr. Jackson (Tr. 1273; Ex. 64); and the Findlay police department's evidence against Mr. Jackson had not been subjected to meaningful adversarial testing because the case was not pursued.  (Tr. 1288.)

Trial counsel has an obligation to conduct a reasonable investigation, particularly when "the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see also Rompilla v. Beard*, 545 U.S. 374.  Mr. Jackson is at this time unable to demonstrate facts that would have been uncovered had trial counsel investigated this incident because he was specifically denied funding to conduct such investigation by order of this Court on August 12, 2010. [40] Mr.

---

[39]    Indeed, post-trial interviews with Mr. Jackson's jurors confirm that his objection to the Ohio Robbery evidence was one of the most impactful moments of the entire trial, turning many jurors against Mr. Jackson.  Had trial counsel done their job, Mr. Jackson never would have been put into the position of having to assert his innocence in open court.

[40]    As stated in this Court's order:

Experience teaches that canvassing police officers and prosecutors six years after the event is not likely to result in finding someone that is not only willing to talk, but who will provide testimony that casts more doubt on Jackson's guilt.  The jury was informed

Jackson hereby renews his request for reasonably necessary funding to investigate this meritorious claim so that he may demonstrate the prejudice resulting from trial counsel's failure to investigate the facts attendant to this incident that the Government relied on to obtain Mr. Jackson's death sentence.

2.      **Failure to Meaningfully Challenge Ms. Laub's Uncorroborated Eyewitness Identification**

Trial counsel's failure to investigate the circumstances of the Ohio robbery was compounded by their failure to challenge the reliability of the sole eyewitness identification tying Mr. Jackson to the crime.  As noted above, while Ms. Laub did identify Mr. Jackson in a photo lineup, Ms. Durain was unable to do so.  This fact alone—and certainly in light of Mr. Jackson's assertion of his innocence and the thin, almost nonexistent evidence otherwise tying Mr. Jackson to the crime—would have led any reasonable attorney to introduce testimony and evidence demonstrating the inherent unreliability of eyewitness identifications, particularly cross-racial identifications.

There was a wealth of available evidence that trial counsel could have, and should have presented.  The inherent unreliability of eyewitness identification, and in particular cross-racial eyewitness identification, is well established.  *See, e.g.*, *United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006) ("[W]hile science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury's common knowledge, and often contradicts jurors' commonsense understandings.") (internal quotation marks and citations omitted); *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) ("Cross-racial identifications . . . are particularly suspect.")

---

that he was not being prosecuted for the robbery.  The appellate court found no error in allowing this evidence to be submitted and considered.  Mr. Jackson's counsel can, at best, argue that more evidence could have been presented that might have raised a little more doubt that Mr. Jackson committed this crime.  That may be true, but it does not come close to meeting the ineffective assistance of counsel standard, or to showing that interviewing these witnesses is reasonably necessary.

(8/12/10 Sealed Order Granting In Part Petitioner's *Ex Parte* Motions for Funds, at 14.).

(citing authority); John P. Rutledge, *They All Look Alike: The Inaccuracy of Cross-Racial Identifications*, 28 AM. J. CRIM. L. 207, 210 (2001) ("[A]s fallible as eyewitness IDs can be in a general sense, cross-racial IDs . . . are especially so.  About this fact, prosecutors, defense attorneys, and members of the judiciary agree."); Jody E. Frampton, *Can a Jury Believe My Eyes, and Should Courts Let Experts Tell Them Why Not: The Admissibility of Expert Testimony on Cross-Racial Eyewitness Identification in New York After People v. Young*, 27 PACE L. REV. 433, 436–438 (2007) ("The testimony of an expert witness is often necessary to educate the jury on the types of factors that can affect eyewitness memory and perception"; "The cross-racial phenomenon has been studied by many investigators over the years, both in a laboratory and a real-world setting, with the conclusion that witnesses identify suspects of their own race more accurately than those of another race.")

Had trial counsel effectively questioned Ms. Laub's eyewitness identification of Mr. Jackson by presenting evidence of its inherent unreliability, there is a reasonable probability that the outcome of his penalty phase hearing would have been different.  As discussed above, the Ohio robbery evidence was highly prejudicial and inflammatory. The robbery was the central component of the Government's case for "future dangerousness."  In light of the thin evidence tying Mr. Jackson to the crime, it is reasonably probable that evidence impugning the reliability of Ms. Laub's uncorroborated eyewitness identification would have convinced the jury that Mr. Jackson was indeed being truthful when he proclaimed his innocence of the robbery.

J.   **Trial Counsel Were Ineffective In Failing To Adequately Prepare For And Argue Mr. Jackson's Case Before The Attorney General's Review Committee On Capital Cases**

1.   **Deficient Performance**

Counsel for defendants facing the possibility of federal capital charges are given a unique opportunity to present their case in mitigation to the Department of

Justice.  While this opportunity may be a mere formality in the most egregious cases, in a borderline case such as Mr. Jackson's it afforded trial counsel a critical chance to save their client's life.  Indeed, it would appear that the Justice Department had previously decided Mr. Jackson's case was not even worth *prosecuting*, let alone prosecuting capitally.  But in a pattern that began at this early stage of the case and continued throughout, trial counsel provided constitutionally deficient representation in presenting Mr. Jackson's case to the Attorney General's Review Committee on Capital Cases (the "Committee").  *Strickland v. Washington*, 466 U.S. 668 (1984).

On October 7, 2005, trial counsel Robert Morrow wrote the following to mitigation specialist Pamela Stites:

> **Doug and I have to go to Washington on Oct. 31 to see the Attorney General's panel.  We know we have not had enough time to mine all these records.**  We also are aware that the AG is more likely to use any information against us than to actually decide not to seek death.  However, if you could, with access to the records you have, send a bullet point summary of your findings so that we can possibly include that information in our presentation.  We would need this in the next two weeks or so.  **Again, I realize we have not been given adequate time to do this and there is much more to do to prepare our case.**  We expect trial will not be before April.  **Please send us a short summary** so that we can review if before we leave for Washington. (Ex. 58) (emphasis added.)

As Mr. Morrow's email makes clear, trial counsel had not reviewed Mr. Jackson's records despite having been appointed over two months prior.  More troubling, trial counsel only felt the need to review a "short summary" of these records despite having over three weeks to prepare for their meeting with the Committee.

Trial counsel had ample notice that they would be given a chance to present Mr. Jackson's case to the Committee.  The publicly available United States Attorneys' Manual ("USAM")—which trial counsel had in their files—makes clear that "[c]ounsel

209

for the defendant shall be provided an opportunity to present to the Committee, orally or in writing, the reasons why the death penalty should not be sought." (Ex. 78 at 3)[41] Trial counsel's apparent decision to present only a "short summary" in mitigation is inexplicable in light of the USAM's statement that "any mitigating factor reasonably raised by the evidence should be considered in the light most favorable to the defendant." (*Id.*) As detailed above, there was a wealth of readily available mitigating evidence that trial counsel could have presented, including evidence demonstrating that Mr. Jackson is mentally retarded and thus ineligible for the death penalty.

Trial counsel's most glaring deficiency, however, was their failure to point out the questionable basis for finding Mr. Jackson statutorily eligible for the death penalty. The indictment against Mr. Jackson—initially filed on April 20, 2005—alleged 18 U.S.C. § 3592(c) as a statutory aggravator. Had trial counsel reviewed their client's criminal history, they would have realized that the only conviction he had sustained involving "the use or attempted or threatened use of a firearm against another person" was his 2004 conviction for bank robbery. As discussed above, this conviction cannot be used to make Mr. Jackson eligible for the death penalty under the FDPA. Basic further diligence on trial counsel's part would have shown that, in the sixteen year history of the FDPA, the Government had only brought capital charges based exclusively on a "previous conviction" statutory aggravator in one other case involving far worse facts and prior convictions that predated the offense. *See supra* Claim I and Ex. 29.

2. **Trial Counsel's Failure to Prepare Was Prejudicial, As Mr. Jackson Was Deprived of an Opportunity to Avoid Having the Government Seek the Death Penalty Against Him**

The prejudice from trial counsel's failure in this respect might be more attenuated if the record suggested that the Government was aware of this fact and

---

[41] The document included in the Appendix accompanying this Motion is the version of the USAM found in trial counsel's files.

intended to use Mr. Jackson as a "test case."  But the opposite is true.  The Government was operating under a false assumption that trial counsel easily could have corrected: that Mr. Jackson's 1977 conviction involved the use of a firearm.  It did not.  Had trial counsel pointed out this simple fact to the Government in October 2005, Mr. Jackson's case likely never would have been capitally prosecuted.  Trial counsel's deficient performance thus prejudiced Mr. Jackson by subjecting him to a greater punishment than he otherwise would have received had he been adequately represented before the Committee.  *Glover v. United States*, 531 U.S. 198 (2001).

K.      **Trial Counsel Unreasonably Neglected to Make Use of the Fact that Daryl Brown's Mother was Opposed to Sentencing Mr. Jackson to Death**

The mother of Daryl Brown was opposed to sentencing Mr. Jackson to death. Trial counsel should have known this important fact and utilized it in defending Mr. Jackson against capital charges.

During the trial, Mr. Jackson's childhood friend, Pam Morrison met and conversed with Daryl Brown's mother and her twin sister.  Morrison Decl. ¶ 17 (Ex. 16). After Ms. Morrison's testimony on behalf of Mr. Jackson, she was crying outside the courthouse and Ms. Brown came to her side and comforted her.  Ms. Brown then told the media that she was opposed to Mr. Jackson receiving the death penalty.  *See Beaumont Enterprise* (Nov. 21, 2006) (quoting Ms. Brown as being against the death penalty for Mr. Jackson) (Ex. 36.)  Had counsel contacted Ms. Brown and become aware of her opposition to sentencing Mr. Jackson to death there were a number of avenues counsel could have pursued to avert imposition of the death penalty on him.

First, counsel could have utilized Ms. Brown's opposition in lobbying the Department of Justice not to seek the death penalty.  At an evidentiary hearing, and with full discovery, Mr. Jackson can prove that a number of capital prosecutions were not authorized and/or de-authorized by DOJ after the feelings of the victim's family were made known.  That could and should have happened here.

211

Second, Ms. Brown could have made her feelings known to the jury, either in testimony or in a written statement opposing Mr. Jackson's execution.

Mr. Jackson requests the opportunity to present further evidence in support of this claim at an evidentiary hearing.

**L.      Trial Counsel were Ineffective in their Closing Argument at the Penalty Phase**

Closing argument is a critical part of trial, especially at a capital penalty phase where it affords the last opportunity to convince the jury that the defendant should not be put to death.  Guideline 10.11 of the ABA Guidelines for capital attorneys specifically addresses this critical part of counsel's job:

> Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.

ABA Guidelines, Guideline 10.11 at 106 (Ex. 68).  The Commentary to this guideline cautions against the use of generic arguments against capital punishment:

> Personal argument by counsel in support of a sentence less than death is important. Counsel who seeks to persuade a decision maker to empathize with the client must convey his or her own empathy.  While counsel may also stress the gravity of the sentencer's life and death decision, the fact that the jury will have been death-qualified  means that categorical arguments against the death penalty are unlikely to be effective.

Commentary to Guideline 10.11, "The Defense Case Concerning Penalty," ABA Guidelines p. 114 (2003) (Ex. 68).

The closing argument by Mr. Jackson's lawyer at the conclusion of the penalty phase was far below the range of reasonable attorney conduct in a capital case. Comprising less than fourteen pages of transcript, the argument dealt *only* with generalities, reiterated the judge's legalistic instructions, made analogies to notorious

212

mass murderers, and devoted a grand total of *one page* to actually talking about David Jackson.  The argument was so thoroughly devoid of meaningful relevant argument, it is useful to summarize here the content and substance of counsel's last effort on behalf of Mr. Jackson's life, in order for the Court to fully appreciate what counsel's performance at this crucial juncture consisted of:

Tr. 1889-90  Discusses how long the jury instructions are, 40 pages.

1890-91  Discusses Saddam Hussein and Timothy McVeigh.

1891-1896  Discusses pages 1-8 of the jury instructions; burden of proof; preponderance of evidence; and other general legal principles.

1897  Mentions Mr. Jackson for the first time, stating "I think the Government proved that Mr. Jackson jerked away handcuffs on occasion, or that he yelled improperly, or that he was rude or spoke back." Compares it to "hearing a bad report about your kid at school" and being "called into the principal's office."

1898  Returns to pages 9-10 of jury instructions

1899  Discusses co-defendant Gulley.

1900-1901  Devotes thirty-six seconds, to mitigating evidence from the penalty phase, without mentioning Mr. Jackson.

1902  Tells jury "You'll be glad to hear I've gotten" to page 18 in the instructions.  Adds, "Let me try to get to the end here so that I won't take too much more of your time."

1903  Again mentions the 40 pages of "deliberations" [instructions] two times and concludes with, "This is not a death penalty case."

Counsel thus *devoted less than one page* of trial transcript, and less than *two minutes*, to talking about David Jackson.  Not one word was said about the little boy

being beaten by a cruel father or watching his mother get beaten regularly, growing up in terror, traumatized; not one word about developmental delays or low IQ or mental retardation or a mother who could not read or write anything but her own name; nothing about poverty or drug addiction before he was even a teenager; nothing about six siblings/cousins on drugs or in prison.  Counsel's argument was devoid of mitigation and failed to give twelve "death qualified" pro-capital punishment jurors what was required: reasons to spare David Jackson's life.

Even with the meager mitigating evidence that the defense presented, defense counsel could have made a stronger mitigating case in Mr. Jackson's favor.  For example, counsel had submitted sixty different factors that were posited as mitigation, yet counsel did not even mention any of them specifically or argue why they mattered and why the jury should weigh them in favor of sparing Mr. Jackson's life.

Defense counsel did not even use all the time allocated to him for arguing on behalf of his client's life.  By contrast, the prosecutor, in the first of two Government closing arguments at penalty phase, was notified by the clerk when he had used twenty minutes.  (Tr. 1887.)  No such notification appears during defense counsel's argument.

As the above Guideline instructs, counsel "must convey his or her own empathy" if he expects the jury to feel it and act accordingly.  There was no personal conviction or persuasion in counsel's closing here, only rote generalities.  Indeed, *the name of any defendant* could have been substituted and 99 per cent of the argument would have been exactly the same.  Mr. Jackson deserved better and the Sixth and Eighth Amendments demand better.  Counsel's closing argument was deficient and prejudiced Mr. Jackson by not giving any juror a reason to spare Mr. Jackson's life.  An effective closing argument, highlighting even the few mitigating factors that defense counsel did present, could have resulted in at least one juror determining not to sentence Mr. Jackson to death.

214

**M.**   **Mr. Jackson Was Denied His Right To The Effective Assistance Of Counsel By His Attorneys' Failure To Object To Grossly Improper Closing Argument At The Penalty Phase In Violation Of His Rights Under The Fifth, Sixth And Eighth Amendments**

The duty of the U.S. Attorney's office is to "do justice," not merely to obtain a conviction or to extract the maximum sentence. *Berger v. United States,* 295 U.S. 78, 88 (1935). In closing argument at Mr. Jackson's penalty phase, the Government repeatedly crossed the line into improper and unacceptable arguments to the jury – without objection from counsel. Unchallenged, the Government continued pushing the envelope. These improper arguments were very damaging to Mr. Jackson's case and timely objection and a request for admonishment were imperative. Zealous advocacy required no less. As shown below, counsel's failures to object were unreasonable and prejudicial.

The improprieties included argument on matters that were not in evidence, misstating the evidence, misstating the law, giving personal opinions about the credibility of witnesses, disparaging and asking the jury not to consider legitimate mitigating evidence, and urging the jury to vote for death because it was their duty. Individually, these violations were harmful; cumulatively, they were prejudicial.

1.   **Arguing Matters Not in Evidence and Misstating the Evidence.**

Several times, the prosecutors referred to alleged evidence in the case that was not in the record. For example, the prosecutor referred to the testimony of one witness who claimed to have observed Mr. Jackson tearing up slips of paper after the incident, adding

> I submit those betting slips had Brown's name on them, that he owed him a debt and that's why.

215

(Tr. 1882.)  This was improper speculation unsupported by the evidence and the Government used that speculation to imply a motive for the homicide.  ((*See also id.*) (extra-record pronouncement on the same theme, that the only "duress" Mr. Jackson faced was "Brown honing in on his gambling territory.")

Violating prosecutorial ethics, the AUSA went so far as to tell Mr. Jackson's jury that *he knew* that Mr. Jackson was more culpable than his co-defendant, Arzell Gulley, because *he had prosecuted Gulley*.  The court would be hard-pressed to find an example of more improper and prejudicial argument.  Mindful that defense counsel had submitted as mitigating factors the fact that Gulley received a life sentence and was "equally culpable" and stood "convicted for the identical offense," the prosecutor wielded his unique authority and specialized knowledge with a vengeance in telling the jury:

> Well, the first mitigating factors, if you look through them, mitigating – the two statutory ones are, one, Gulley was equally culpable.
>
> *Now, I prosecuted Arzell Gulley.  He went to trial right here,* you know that, and he got a life sentence.  And he was just as guilty under the law as that man.  But there's a difference between guilty and culpable.  There's a difference.  *Culpability speaks to the role in the offense.*
>
> This man was more culpable and is more culpable.

(Tr. 1908) (emphasis added.)

Reasonably effective capital trial counsel would have objected and moved for a mistrial after such egregious misconduct.  For the prosecutor to tell the jury that Mr. Jackson was "more culpable" based on the prosecutor's *own* experience in an entirely separate trial, implying that he was privy to all sorts of information the jury did not and would not know, was the height of impropriety.  Counsel's failure to object to this abuse of prosecutorial power deprived Mr. Jackson of effective assistance of counsel.

216

Similarly, the prosecutor knew that the imposition of a life sentence on Mr. Jackson would require him to serve the rest of his life in prison with no chance of parole. Yet, in closing argument, he implied otherwise. First, he misstated the peculiar chronology whereby Mr. Jackson was released from prison without ever being charged in this homicide:

> And, of course, even after the killing, he was sent to the control unit in Florence, Colorado, and he was released out of that control unit *because he had served his time for that killing.*

(Tr. 1883-84.) Mr. Jackson was indeed released from prison, but it was not "because he had served his time *for that* killing." Mr. Jackson was released from prison in 2004 because he had concluded his sentence for possession of a weapon by a convicted felon. The prosecutor further implied that Mr. Jackson's release from prison would be part of some endless "cycle":

> And then he was sent to the control unit, and obviously that didn't work, *because he's been released* – you know, if you give him a life sentence, he's going to be released back into the general population, *and this cycle is just going to go on and on.*

(Tr. 1884.)

References to matters that are not in evidence are improper and forbidden. Reference by Mr. Jackson's prosecutor to co-defendant Gulley's trial and his specialized knowledge as the prosecutor that Mr. Jackson was "more culpable" was the height of impropriety. *See, e.g.*, *United States v. Molina*, 934 F.2d 1440, 1446 (9th Cir. 1991) ("The prosecutor's assertions that there were as many as nine other law enforcement officials who would support testimony is an improper reference to inculpatory evidence not produced at trial."); *United States v. Blakely*, 14 F.3d 1557, 1560 (11th Cir. 1994) (reversal based on prosecutor's arguing facts not in evidence, namely, that the defendant was a career criminal); *Miller v. Lockhart*, 65 F.3d 676, 682, 684-85 (8th Cir. 1995)

217

(granting habeas corpus relief in death penalty case where, among other things, the prosecutor argued that the defendant had a history of escape, where no such evidence was introduced during the trial); *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996) (reversal on appeal where prosecutor told jurors that a Government agent who did not testify would have given inculpatory testimony; violation of Confrontation Clause); *United States v. Murrah*, 888 F.2d 24, 226-27 (5th Cir. 1989) (reversing conviction in case in which, among other things, the prosecutor told jurors that he could have called another prosecution witness to supply important facts about the crime but did not do so because it would have been "cumulative"); *United States v. Carroll*, 678 F.2d 1208, 1210 (5th Cir. 1982) (district attorney violated defendant's Confrontation Clause rights by suggesting in closing argument that the defendant had to have been at the scene of the crime because he knew more about pictures than his lawyer did).

2.    **Misstating the Law**

It is improper for an attorney to argue what the law means or how it should be interpreted.  It is far worse for an attorney to *misstate* the law.  But that is precisely what Mr. Jackson's prosecutors did, again without objection and again to the substantial prejudice of the defendant.

The prosecutors repeatedly misstated the law on how the jury was supposed to weigh mitigating factors.  The issue of aggravating and mitigating factors, statutory and non-statutory, considering and weighing was confusing enough without the prosecutors' blatant attempts to muddy the waters further.  In its first closing argument, the prosecution told the jury:

> . . . and you have to weigh those [mitigating factors] and you have *to determine if the death penalty is sufficient*.

(Tr. 1881.)  The Government returned to this contorted theme in its rebuttal argument:

> Well, let's remember, folks, when you look at mitigating factors, you've got three questions to ask yourself.

218

> One, "Does the evidence that I've heard support that these actually happened?"
>
> Two, "If they did, are they mitigating, in other words, is that factor significant enough that it weighs against the death penalty?"

(Tr. 1909.)  This was a gross distortion of the law and of the instructions the jury had received on weighing the mitigating and aggravating factors.  *Nowhere* in the instructions was the jury told that in order to consider a factor in mitigation, it had to be "significant enough to weigh against the death penalty."

> On the contrary, the jurors were instructed by this Court:
>
> If there are any such mitigating factors, whether or not specifically argued by defense counsel, which are established by a preponderance of the evidence, *you are free to consider them in your deliberations.*

(Tr. 1850.)  There was no requirement that any factor be "significant enough" in order to be considered.  The prosecutor's stating such a requirement was a distortion of the law.  Remarkably, defense counsel did not object to this damaging attempt to steer the jury wrong in the way it considered Mr. Jackson's mitigating factors, the evidence that might save his life.  This failure is further evidence of trial counsel's deficient performance on behalf of Mr. Jackson.

### 3. Injecting the Prosecutor's Own Opinion about Witness Credibility

The prosecutor improperly also injected his own opinion about the credibility of Mr. Jackson as a witness, telling the jury, "Now, he said a lot of other *things that I don't think are true.*"  (Tr. 1876-77.)  "The prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  *United States v. Young*, 470 U.S. 1, 18-19 (1985) (*citing Berger v. United States*, 295 U.S. 78, 88-89 (1935)).  *Bates v. Bell*, 402 F.3d 635, 644-45 (6th Cir. 2005) (finding a prosecutor's statements to be improper

219

where he stated, when discussing the testimony of mitigation witnesses, "You don't believe that, and I don't believe it [either].").

Giving his opinion on the credibility of any witness would have been improper. To do so about the defendant's testimony was especially wrong.

4. **Suggesting the Jury will Bear Responsibility for Future Acts of Violence**

The prosecutor exhorted the jury to vote for the death sentence because it was their duty to protect people who work in prisons:

> Here's a man who is convicted of capital murder inside a federal penitentiary where inmates, guards, counselors, teachers work, and where *they deserve to be protected* from someone like David Jackson.

(Tr. 1887.)

> He's going to be around other inmates. He's going to be around other guards, counselors, teachers, everybody who works in the federal penitentiary. *You're going to have* a capital murderer out there in the general population.

(Tr. 1888.) In concluding its first closing argument, the prosecution repeated this theme.

> Now it's time to *give the prison community a chance*, the guards a chance, the press workers and other inmates a chance *not to be victimized by the defendant.*

(Tr. 1889.)

It is improper for prosecutors to put the jury in the position of being the "conscience of the community" or society's protector. *Tucker v. Kemp*, 762 F.2d 1496, 1508, 1509 (11th Cir. 1985) (*en banc*); *Weaver v. Bowersox,* 438 F. 3d. 832, 840-41 (8th Cir. 2002); *Bates v. Bell*, 402 F.3d 635, 642, 644, 648-49 (6th Cir. 2005); *Sechrest v. Ignacio*, 549 F.3d 789, 808, 811 (9th Cir. 2008).

5.    **Urging the Jury to Disregard or Ignore Legitimate Mitigating Evidence**

Jurors must consider and give effect to any and all relevant mitigating evidence offered in support of a sentence less than death, *see, e.g., Penry v. Johnson*, 532 U.S. 782, 797 (2001); *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), and they must be aware of their obligation to do so.

Accordingly, "[a] prosecutor errs by directing the jury to ignore a proposed mitigating factor." *United States v. Rodriguez*, 581 F.3d 775, 800-01 (8th Cir. 2009) (direct review of federal death sentence) (citations omitted); *see also Sinisterra v. United States*, 600 F.3d 900, 909 (8th Cir. 2010) ("To ensure the reliability of the determination that death was the appropriate punishment, a prosecutor may not argue that [meaningful] consideration [of potentially relevant mitigating evidence] is forbidden.") (citation omitted); *DePew v. Anderson*, 311 F.3d 742, 749 (6th Cir. 2002) (granting habeas relief and ordering resentencing from state death sentence, where prosecution's inadmissible, inflammatory, and misleading comments "were designed to keep the jury from properly considering and weighing the mitigating evidence offered by the defendant"); *Le v. Mullin*, 311 F.3d 1002, 1018 (10th Cir. 2002) (prosecutor may not imply that "the jury had the ability to ignore the legal requirement that it must consider mitigating evidence").

Here, too, the Government crossed the line, urging the jury to ignore legitimate mitigating factors and mocking the notion of mitigation in general. For example, the prosecutor told Mr. Jackson's jury, with reference to a juror's ability to consider any factor it deems to be mitigating:

> And then you have to consider the nonstatutory aggravating factors, the nonstatutory mitigating factors, and any other mitigating factors that the defendants have submitted or *that you can pull out of the air essentially,* and you have to weigh those, and you have to determine if the death penalty is sufficient.

221

(Tr. 1880.)

The prosecutors disparaged Mr. Jackson's mitigation witnesses, especially Dr. Allen, a social worker whose testimony addressed the child abuse inflicted on Mr. Jackson as a child and described his "risk factors" for a very difficult life. The prosecutor referred to Dr. Allen sarcastically as a "their sociologist" (Tr. 1910) and "their family sociologist" (Tr. 1913) distorting her field of expertise and mocking her testimony as to the mitigating circumstances of Mr. Jackson's childhood.

The prosecutor urged the jury to discount and reject the mitigating factors submitted by Mr. Jackson by comparing them to "grains of rice":

 . . . . It mitigates about the weight of a grain of rice.

So go ahead if you want and put those fifteen mitigators on his side. Put fifteen grains of rice on that scale for the mitigating side.

 . . . . You give them the weight of the size of a grain of rice, and go ahead and put them on their side of the ledger.

(Tr. 1911.)

All these alleged mitigators are nothing more than little grains of rice on their side of the scale against these three giant boulders that weigh in favor of a death sentence.

(Tr. 1914.)

The above-quoted arguments were improper and should have been met with timely objections and judicial admonishment. In the case of the prosecutor's reference to his specialized knowledge about the co-defendant's trial, a mistrial was warranted, yet no objection was even made, let alone a motion for a mistrial. These arguments were not appropriate appeals to reasoned judgment. Rather, they appealed to emotion and sought only to inflame passions. The arguments of prosecutors have inherent persuasive power and force. Here, it cannot be said that these improper comments did not cause jurors to vote for the death penalty. Indeed, that was the clear and intended purpose of the

222

comments.  Due to trial counsel's acquiescence and failure to be effective advocates, the prosecutors' purpose was achieved.  Thus, trial counsel's failures prejudiced Mr. Jackson.

### CLAIM 6

### MR. JACKSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEYS' UNREASONABLE ERRORS AND OMISSONS IN SELECTING HIS CAPITAL JURY, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

A.  **Failure To Object to the Government's Racially Discriminatory Excusal of Minority Jurors**

Mr. Jackson's trial counsel unreasonably failed to object to an apparent pattern of prosecution strikes against minority women veniremembers, in particular female African-Americans.  Based on the known evidence and on information and belief, it appears that the prosecution peremptorily challenged three out of four (75%) African-American veniremembers and the only Hispanic veniremember (100%) that they had an opportunity to strike.[42]  These strikes accounted for four out of the twelve strikes discernable based on the known evidence.  All four of these peremptorily challenged veniremembers were women.  These are disproportionate rates as compared to the striking of white jurors.

While it appears that trial counsel never received a copy of the prosecution's strike list, the documents needed to determine who the prosecution struck were in trial counsel's possession for three days prior to their opportunity to make a *Batson* challenge.  (Exs. 40, 41A).  Indeed, it appears that trial counsel even re-created the prosecution's strikes.  (Ex. 41B).  Trial counsel's re-created list demonstrates the discriminatory nature of the prosecution's strikes.  As discussed below, a brief review of the voir dire for the

---

[42]   The Petitioner is able to determine this by comparing the list of jurors struck by defense counsel (Ex. 41A) with the list of final jurors (Ex. 40) and inferring that, until the last regular and alternate jurors were seated, any juror not seated and not struck by the defense was struck by the prosecution.  In light the off-the-record peremptory strike procedure adopted by the trial court, Mr. Jackson must have discovery to definitively determine whether the prosecution exercised its peremptory strikes in a racially discriminatory manner.

challenged minority women jurors would have led trial counsel to the conclusion that there was no immediately discernible race-neutral reason for these strikes. Notwithstanding this clear evidence of a prima facie case of a *Batson* violation, trial counsel made no objection. Trial counsel's unreasonable failure prejudiced Mr. Jackson by depriving him of his right to a jury selected on a racially neutral basis.

### 1. Prima Facie Evidence of Discrimination

Under *Batson v. Kentucky*, 476 U.S. 79 (1986), the prosecution may not use its peremptory challenges to strike a potential juror on the basis of race. *Batson* challenges are a three step process. First, a defendant must establish a "prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 94. The burden then shifts to the prosecution to offer race-neutral reasons for striking the potential juror. *Id.* In the third step, the defendant may offer additional evidence to show that the proffered justification was pretextual or otherwise establish that the strike was motivated by a discriminatory purpose.

A review of the factual record reveals that the African-American and Hispanic veniremembers struck by the prosecution were facially qualified and possessed characteristics that were either neutral or pro-prosecution. Thus, there is no immediately discernable race-neutral reason for their removal from the venire:

> **Juror 5**: Melanie Fowler, an African-American woman, was an engineer and line supervisor at Exxon. Her husband was a witness in a case that Mr. Batte had previously prosecuted, and also a friend of his. Ms. Fowler specifically stated that her husband's friendship with Mr. Batte would not affect her decision in the case. Ms. Fowler believed the death penalty can be a fair punishment, depending on the facts. (J.S. Tr. 107–119.)
>
> **Juror 26**: Valerie Reed, an African-American woman, worked as a letter carrier. She stated that she was opposed to the death penalty, but would

224

ultimately follow the law and vote in favor of death if necessary.  (J.S. Tr. 365–378.)

**Juror 31:** Virginia Escamilla, a Hispanic woman, stated that she thought the death penalty was sometimes proper, depending on the facts.  Ms. Escamilla also agreed with Mr. Batte that premeditation could occur in "minutes."  She also stated that she believes self defense is only a defense if someone is advancing toward the defendant.  (J.S. Tr. 422–429.)

**Juror 39:** Helen Steverson, an African-American woman, stated that she believed in the death penalty if it fit the crime.  Ms. Steverson's daughter was a former prison guard.  (J.S. Tr. 507–519.)

As noted above, these represent only the strikes the Petitioner believes to have occurred from the limited evidence available.  Other potentially race-based strikes may become known following discovery.  Yet even on this limited record, there is prima facie evidence of a *Batson* violation.  A *Batson* claim may be based on the discriminatory striking of a single juror.  *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).  Here, it appears from the available evidence that the prosecution struck 75% of the female African-American jurors it had an opportunity to strike and 100% of the Hispanic jurors.  Based on the record, there is no immediately discernible race-neutral reason for these strikes.  This is sufficient prima facie evidence of discrimination.  *Paulina v. Castro*, 371 F.3d 1083, 1090–1092 (9th Cir. 2004) (holding that prima facie case for *Batson* violation was made out where prosecution struck five out of six possible African-American jurors).

Notwithstanding this prima facie case, Mr. Jackson's trial counsel failed to raise any *Batson* challenge.  In fact, Mr. Jackson himself was the first to raise this issue with the trial court.  (J.S. Tr. 1123–1124 ("*Batson versus Kentucky*…. My whole entire jury wasn't even racially balanced . . . .").)  When the court pointed out that this objection had not been raised earlier, Mr. Jackson emphatically responded: "Well, I'm saying my lawyers didn't do it but I'm doing it here today."  (JS. Tr. 1125.)  Trial counsel's failure

225

to do what Mr. Jackson himself was ultimately compelled to do—raise a *Batson* challenge in the face of clear evidence of discrimination—fell below reasonable standards of performance. *Gov't of the Virgin Islands v. Forte*, 865 F.2d 59, 63–64 (3d. Cir. 1989) (holding that trial counsel's failure to raise a *Batson* challenge constituted ineffective assistance of counsel).

2.    **Trial Counsel's Failure to Object Prejudiced Mr. Jackson**

A *Batson* violation is a structural error not subject to harmless error analysis. *United States v. Kimbrel*, 532 F.3d 461, 469 (6th Cir. 2008) ("*Batson* errors represent structural errors."); *United States v. Angel*, 355 F.3d 462, 471 (6th Cir. 2004) ("[A]ny racial discrimination in jury selection constitutes structural error that requires automatic reversal."). Where, as here, a prima facie case for a *Batson* violation has been made and the record is silent on the trial court's findings, the appropriate remedy is a new trial. *Snyder*, 552 U.S. at 485.

At the very least, this Court should "require[] the prosecutor to come forward with a neutral explanation" for his strikes. *Forte*, 865 F.2d at 64 (explaining that the appropriate remedy for ineffectively failing to raise a *Batson* challenge is "to give [the defendant] what he should have gotten in the first place, an explanation from the prosecutor as to why [he] used [his] peremptory challenges and a ruling by the court on whether [the defendant] has established that there was purposeful discrimination").

**B.    Trial Counsel Failed to Identify and Exclude Mitigation-Impaired Jurors**

Voir dire is essential to affording a criminal defendant a fair and impartial jury. As the Eighth Circuit has explained:

> "The Sixth Amendment guarantees the criminally accused a fair trial by a panel of impartial, indifferent jurors. Voir dire serves the purpose of assuring a criminal defendant that this right will be protected. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of

226

> adequate voir dire impairs the defendants' right to exercise peremptory challenges."

*United States v. Ortiz*, 315 F.3d 873, 888 (8th Cir. 2002) (quotation marks and internal citations omitted).

After *Morgan v. Illinois*, 504 U.S. 719 (1992), among the responsibilities of trial counsel is to ask, or request that the court ask, "life qualifying" or "reverse-*Witherspoon*" question, which seek to determine whether a prospective juror will automatically vote for death. Due process requires that the Court allow such questions. *See Morgan*, 504 U.S. at 738-39. General questions regarding whether a juror will "follow instructions" are insufficient to protect a defendant's right to exclude jurors who would automatically vote for the death penalty. *Id.* at 734-35.

Here, trial counsel often failed to address prospective jurors' views on mitigation at all. ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ trial counsel failed to ask Ms. Jones any questions regarding mitigation evidence. (J.S. Tr. 569–574.) The Government asked Ms. Jones generic questions, such as "You wouldn't automatically vote either way?" (J.S. Tr. 568), but such questions failed to provide any insight into Ms. Jones's view of mitigation evidence. At that stage, she had no basis to distinguish capital and non-capital cases, and so may have been categorically opposed to mitigation evidence, and so disqualified from serving on a capital jury, and yet still able to state honestly that her vote would not be automatic in light of her stated willingness to consider evidence of pre-meditation or self-defense. Further, the relevant standard for juror exclusion is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citation omitted). It is not merely whether a juror would automatically vote for or against death. As such, even if trial counsel was

willing to abdicate its responsibility for mitigation voir dire in light of the Government's questions, such questions did not adequately probe the issue.

Trial counsel's failure to conduct proper voir dire of Ms. Jones prejudiced Mr. Jackson, as she was ultimately empanelled as a juror, and voted to sentence Mr. Jackson to death. As the Court stated in Morgan, "[i]f even one [mitigation impaired] juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729.

Moreover, even where trial counsel asked general voir dire questions about mitigation, trial counsel uniformly failed to ask specific questions to probe jurors' views about potential mitigation evidence in Mr. Jackson's case. The Court made clear in Morgan that general inquiries are insufficient to probe jurors' attitudes about imposing a sentence other than death. *See Morgan*, 504 U.S. at 734–36. In order to protect Mr. Jackson's right to an impartial jury, trial counsel should have inquired of all jurors whether they could find mitigating factors relevant to Mr. Jackson's trial. Such case-specific questions are essential to detecting bias, provided they do not require jurors to pre-commit to voting on particular facts. *See, e.g., United States v. Fell*, 372 F.Supp.2d 766 (D. Vt. 2005); *United States v. Johnson*, 366 F.Supp.2d 822 (N.D. Iowa 2005). Here, the prejudice caused by trial counsels' failure to conduct adequate mitigation voir dire is clear, as the Special Verdict Form (Ex. 37) yields repeated instances where few or no jurors voted for a mitigating factor, though some evidence had presented. Even where a mitigating factor was stipulated to by the parties, as in question 60, only three jurors found the factor mitigating. (Ex. 37 at 16.) "The sentencer … may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982). Yet the special verdict form shows that the jurors often gave no weight to mitigating factors, despite that such factors were deemed relevant by the court. This

228

demonstrates that Mr. Jackson was prejudiced by trial counsels' failure to conduct adequate voir dire, as several mitigation-impaired jurors were clearly empanelled.[43]

## C. Mr. Jackson's Appellate Counsel Was Ineffective For Failing to Raise Voir Dire Issues

Appellate counsel unreasonably failed to raise the ineffectiveness of trial counsel in not questioning and excluding mitigation-impaired jurors.[44]  This failure prejudiced Mr. Jackson by depriving him of a retrial before a fair and impartial jury.

## CLAIM 7

## MR. JACKSON WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT DURING ALL PHASES OF JURY SELECTION, AND TRIAL AND APPELLATE COUNSEL FAILED UNREASONABLY TO EFFECTUATE THAT RIGHT

## A. Mr. Jackson was Denied his Constitutional Right to Be Present During the Exercise of Peremptory Strikes, in Violation of the Fifth, Sixth, and Eighth Amendments

Mr. Jackson was denied his constitutional right to be present during all critical stages of the impaneling of his jury. *Illinois v. Allen*, 397 U.S. 337, 338 (1970); *United States v. Gagnon*, 470 U.S. 522, 526 (1985).  The exercise of peremptory strikes at Mr. Jackson's trial was conducted completely off the record.  Based on what can be gleaned from the record and trial counsel's files, both the prosecution and defense faxed lists of their peremptory strikes to chambers.  It can only be assumed that the trial court then proceeded down the list of available jurors, removing those that were struck by one or both sides.  This procedure denied Mr. Jackson the opportunity to consult with his attorneys as they were deciding who to strike.  Compounding this error, the trial court

---

[43]  The two-step special verdict form was improper as well, as is discussed *infra* in Claim 5.H.

[44]  Trial and appellate counsel were, of course, the same.  That did not free appellate counsel of the duty of raising appropriate errors, however, and if appellate counsel felt unable to address such errors, it was their duty to withdraw based on this conflict of interests.

229

failed to read the peremptory strikes on the record.  These circumstances amount to a denial of Mr. Jackson's constitutional right to presence.  Mr. Jackson never waived this right, and indeed personally objected to his exclusion upon learning of the procedure at the outset of the penalty phase.

Because the denial of this right defies harmless error analysis, prejudice must be presumed.  Even in the absence of presumed prejudice, Mr. Jackson was specifically prejudiced by the striking of jurors he wanted to keep in the venire and by causing the denial of his right to be tried by a jury selected in a racially neutral manner.

1.    **The Peremptory Strike Procedure**

Voir dire in Mr. Jackson's trial concluded on Thursday, October 19, 2006, at approximately 11:00 a.m.   Rather than conduct peremptory challenges on the record, the trial court asked both defense counsel and the prosecution to submit "strike lists." Both sides were allowed twenty strikes each for the pool of regular jurors and three strikes each for the pool of alternate jurors.  (J.S. Tr. 1316.)  The court required both parties to submit their strike lists by 2:00 p.m. the following day.  (J.S. Tr. 1317.)

Mr. Jackson's trial counsel decided which jurors to strike in a conference room in Mr. Barlow's office.  (Tr. 1122–23; Tr. 1393.)  Mr. Jackson was not present when trial counsel filled out their strike list.  (Tr. 1126 ("Judge, it's true, he didn't participate physically in the striking process.  We did that as Mr. Barlow has described.").)  By 11:29 a.m. on Friday, October 20, both sides had submitted their strike lists and the court notified the parties of the presumptively seated jurors.  (Ex. 40).  Mr. Jackson was never asked whether he waived his right to be present during the exercise of peremptory challenges

On October 23, 2006, the proceedings began as follows:

(OPEN COURT, DEFENDANT PRESENT, JURY PRESENT)

THE COURT: Good morning.  We'll begin by having the jury seated in the jury box the best we can.

230

THE CLERK: As I call your names, will you come forward and be seated as the security officer directs?

Juror number one, Michael Lebreton
Juror number two, Carolyn Wilkinson
Juror number three, Clara Shaffer
Juror number four, Myrtle Hergemueller
Juror number five, Donald Westmoreland
Juror number six, Josephine Jacquet
Juror number seven, Linda Clavijo
Juror number eight, Holly Dickson
Juror number nine, Rodney Stutes
Juror number ten, Virginia Jones
Juror number eleven, Toby Toney
Juror number twelve, Leonard Chatagnier

And these next names I call will be alternate jurors

The first alternate, Cathy Savoie
The second alternate, Stephen Gilbert
The third alternate, Kenneth Rothkamm
The fourth alternate, Pamela Kay
The fifth alternate, Tim Rainbolt
And the sixth alternate, Vicki Martinez

THE COURT: Are there any objections to the jury as empanelled?

MR. BATTE: No, your honor.

MR. BARLOW: No, your honor.

THE COURT: All right.  Please swear in the jury. (Tr. 3–4.)

The above is the entirety of the discussion regarding the seating of the final jurors.  At no point did the trial court read onto the record which jurors were peremptorily struck by each party.

2.     **Mr. Jackson's Objection and the Trial Court's Response**

At the outset of the penalty phase of his trial on November 2, 2006, Mr. Jackson addressed the trial court as follows:

I would like to get on the record, your honor, that during the first phase of this trial, under Rule 43(a), I was eliminated from the striking process of the jury, for what reason I have no understanding. I should have been here, I should have been a part of that, and I was not a part of that.  My lawyers wasn't even a party to my understanding, something about they sent in a slip of paper or something about strikes or something that I had no knowledge of.  I wanted for the record for my purposes, you know, that it violated my

constitutional rights right under your own rules and regulations.  (Tr. 1122.)

Mr. Jackson also noted that he "never waived" this right to be present.  (Tr. 1122.)

Mr. Jackson later attempted to explain why his absence from the striking process was harmful:

> Well, I'm entitled to be a part of that procedure and I wasn't a part of it.  That's what I'm saying.  Do you follow what I'm saying?  And as a result of that, it caused me to come up with this—with Batson versus Kentucky.  And this is something else, but I'm just saying that this—where this here come involved is because my whole entire jury wasn't even racially balanced for that matter of fact, if we're going to get into it that far.

(Tr. 1123–1124.)

The trial court indicated that any objections under *Batson v. Kentucky*, 476 U.S. 79 (1986), were waived, but did not squarely address the issue of Mr. Jackson's absence from the peremptory strike process.  (Tr. 1124–28.)

The following day the trial court returned to the issue of Mr. Jackson's absence, this time when Mr. Jackson was not in the courtroom.  The court noted that Mr. Jackson's objection "seems to revolve upon just that he wasn't present he claims for the time it was actually—the strikes were done."  (Tr. 1392.)  The court then asked for "some explanation about how—the procedure that defense counsel used and what kind of input they got from him."  (*Id.*)

In response, Mr. Barlow explained that he and Mr. Morrow would ask for Mr. Jackson's "reflections" during the voir dire process.  Mr. Barlow also noted that they used a "grading system" that he believed Mr. Jackson saw, but he admitted that he was "not certain that [Mr. Jackson] understood the grading system."  (Tr. 1392–93.)  Notably, neither Mr. Barlow nor Mr. Morrow contended that they had consulted with Mr. Jackson on October 19th or 20th as they were preparing their strike list.  This is consistent with Mr. Jackson's representation to the court the previous day.  (Tr. 1126 ["They didn't consult anything with me about doing the strikes, no, they didn't."].)

232

Though it is not entirely clear from the record, it appears that the trial court deemed Mr. Jackson's objection to his lack of presence waived. (Tr. 1394–1395 ["I mean, he didn't indicate any opposition when the jury was impaneled at the time, and, I mean, I never heard anything from him until after the jury came back with a guilty verdict on the first part of the case. I mean, I didn't hear any expression of discontent on the part of Mr. Jackson."].) The trial court again ruled that any objections under *Batson* were waived.

*      *      *

A defendant has a constitutional right to be present during the impaneling of his jury, and this right "necessarily extend[s] to that phase of the jury selection process involving the exercise of peremptory strikes." *United States v. Bascaro*, 742 F.2d 1335, 1349 (11th Cir. 1984), abrogated on other grounds by *United States v. Lewis*, 492 F.3d 1219 (11th Cir. 2007); *accord*, *United States v. Chrisco*, 493 F.2d 232, 236 (8th Cir. 1974); *Cohen v. Senkowski*, 290 F.3d 485, 490 (2d Cir. 2002). In order to protect the right to presence during the exercise of peremptory challenges, the Constitution requires that a defendant be "given an opportunity to register his opinions with counsel after juror questioning and [be] present when the exercise of strikes is given formal effect." *Cohen*, 290 F.3d at 490 ("Cohen's rights in this respect were sufficiently preserved by his presence during the questioning of jurors, *his opportunities to confer with counsel, and the formal announcement of the stricken and seated jurors in open court*.") (emphasis added); *see also Chrisco*, 493 F.2d at 236–237 (holding that the right to presence was satisfied where defendants "both observed the strikes being read off and registered their opinions of the venire with their counsel").

Here, the peremptory strikes were never "read off" or "given formal effect." Rather, the trial court simply identified the final jurors and seated them. Furthermore, the off-the-record striking procedure used by the trial court effectively prevented Mr. Jackson from consulting with his counsel as they prepared their strikes. *See Chrisco*, 493 F.2d at

233

237 ("[T]he trial court has a responsibility to make sure that defendants are given an ample opportunity to confer with their counsel during all phases of the jury selection process including the exercise of peremptory strikes.")  Because the trial court never read the strikes on the record in Mr. Jackson's presence, and because the trial court failed to ensure that Mr. Jackson would be present during the exercise of peremptory strikes, his Fifth and Sixth Amendment right to be present during all critical phases of his trial was violated.

Mr. Jackson never waived his right to presence.  Indeed, in a capital case, the right to presence is "[s]o fundamental . . . that it may not be waived."  *Near v. Cunningham*, 313 F.2d 929, 931 (4th Cir. 1963).  Immediately upon learning from his counsel that the striking process had been conducted off the record outside his presence, Mr. Jackson personally objected at the outset of the penalty phase.  (Tr. 1124 ["Well, what I'm saying is that my lawyers never presented anything . . . well, what I'm saying, I just found out about it."].)

The denial of this constitutional right severely and irreparably prejudiced Mr. Jackson.  As trial counsel observed, Mr. Jackson "had opinions" about which jurors to strike and which not to strike, opinions that he was never able to voice due to the peremptory strike procedure used at trial.  (Tr. 1393.)  Indeed, prejudice must be presumed under these circumstances:

> There is no way to assess the extent of the prejudice, if any, a defendant might suffer by not being able to advise his attorney during the impaneling of the jury. . . . We can only speculate as to what suggestions the defendant might or might not have made, since it would be his prerogative to challenge a juror simply on the basis of the sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another.

*Chrisco*, 493 F.2d at 237 (quoting *United States v. Crutcher*, 405 F.2d 239, 244 (2d Cir. 1968)) (internal quotation marks and alterations omitted).

Finally, it is apparent from the record that Mr. Jackson's absence directly resulted in the denial of his right to be tried by a jury selected in a racially neutral manner.  Had Mr. Jackson been involved in the process, he would have objected to the obvious prosecution pattern of striking female African American veniremembers. (Tr. 1123–1125; 1128; 1395.)

**B.** **Trial and Appellate Counsel's Failure to Object to the Denial of Mr. Jackson's Right to Presence Constituted Ineffective Assistance Of Counsel**

1. **Deficient Performance**

Trial counsel never raised any objection to the peremptory strike procedure implemented by the trial court, even though it deprived their client of his constitutional rights for the reasons discussed above.  It appears that trial counsel failed to object to this procedure because they agreed with it.

When the trial court asked Mr. Barlow for an explanation of their procedure for compiling the strike list, he made clear that Mr. Jackson played no role in the process:

> Normally, your honor, we do the jury selection process as part of what we do as the attorneys, and the defendant has rights to decide how he pleads, whether he's going to testify, things of that matter, and we actually do it by laying all of our juror information questionnaires and photos and all of the information we have out in a conference room at my office.  Mr. Jackson I'm sure couldn't be at my office to do that.  **And we're the ones that make the decisions about the strikes anyway.  That's the way we normally do it, and so that's what we did.  We prepared our strike list and turned it in**.

(Tr. 1122–23) (emphasis added).

The following day, Mr. Barlow again explained his view of Mr. Jackson's role in the striking process:

> We compiled the list, as I've done in previous cases, of what our peremptory strikes were and submitted those to the court.  **And in fairness, I think Mr. Jackson had opinions about some of the jurors, but the actual decisions that were made about which ones to select were made by Mr. Morrow and myself**, who together have probably over fifty years of experience in capital murder litigation.

(Tr. 1393–1394) (emphasis added.)

Contrary to trial counsel's plain misunderstanding of the law, it is in Mr. Jackson's "power, if present, to give advice or suggestion *or even to supersede his lawyers altogether.*"  *Snyder v. Com. of Mass.*, 291 U.S. 97, 106 (1934) (emphasis added), overruled on other grounds by *Duncan v. Louisiana*, 391 U.S. 145, 154-55 (1968); *Faretta v. California*, 422 U.S. 806, 820 (1975) ("The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally.  To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.")

Trial counsel's blatant disregard for their client's role in the process of deciding who will ultimately sit in judgment of him is inexplicable, and their failure to protect his right to do so falls well below reasonable standards of performance.  Trial counsel's performance was particularly unreasonable given that they may have had an opportunity to cure the constitutional violation by preparing their strike list in Mr. Jackson's presence.

Given the views they expressed at trial, it is wholly unsurprising that, acting as appellate counsel, Mr. Barlow and Mr. Morrow failed to raise this obvious constitutional error.   Here as well, Mr. Barlow and Mr. Morrow's performance was objectively unreasonable and fell far short of professional standards for appellate counsel.

2.    **Prejudice**

As explained above, because the denial of the right to presence during the exercise of peremptory challenges defies harmless error analysis, prejudice must be presumed.  *Chrisco*, 493 F.2d at 237; *Crutcher*, 405 F.2d at 244.  Even in the absence of

236

presumed prejudice, Mr. Jackson was specifically prejudiced by (1) the loss of his opportunity to keep certain jurors that his counsel challenged in the venire, and (2) the denial of his right to be tried by a jury selected in a racially neutral manner.

## CLAIM 8

## MR. JACKSON HAS BEEN SENTENCED TO DEATH, ULTIMATELY, FOR BANK ROBBERY IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS

> [L]et's face it, Mr. Jackson got out of prison, then he committed armed robbery.  If he hadn't done that, the dismissal had already happened, it might just—the whole thing might have gone away. But he committed armed robbery.  That was the big factor that changed things before and after.  I don't think you can ignore that fact.

Statement by Trial Judge Marcia Crone at Pre-Trial Motion Hearing (8/29/06 Tr. at 31.)

### A.    Mr. Jackson Has Been Sentenced To Death For Bank Robbery

As discussed above, the procedural history of this case is extremely unusual, including excessive pre-indictment delay, an initial indictment for a lesser charge that was subsequently dismissed, Mr. Jackson's release from prison more than four years after the death of Daryl Brown, his arrest for bank robbery and his being charged with murder more than five years after the fact in April 2005.

In reviewing this history, it is difficult to ignore the fact, as even the trial judge seemed to recognize, that Mr. Jackson was capitally tried and then sentenced to death for bank robbery.  The unusual history here suggests that if Mr. Jackson had not robbed the Union Planters Bank in May 2004, he never would have been charged with Daryl Brown's murder.  Thus, the Government is ostensibly imposing a death sentence on Mr. Jackson for the death of Daryl Brown, but as a practical matter, Mr. Jackson is being condemned to death for bank robbery.  But, bank robbery is not one of the enumerated crimes for which a sentence of death is permissible.  Moreover, such a sentence would be patently unconstitutional because the offense did not involve the

237

killing of a human being.  *Kennedy v. Louisiana,* 128 S. Ct. 2641 (2008).  As such, carrying out Mr. Jackson's sentence of death would be cruel and unusual punishment in violation of the Eighth Amendment.  It was also a violation of the Double Jeopardy Clause.

1.    **The Government Released Mr. Jackson From Prison Without Charging Him For the Murder of Daryl Brown**

As discussed above, the Government had everything it needed to indict Mr. Jackson in connection with Daryl Brown's death prior to February 2004.  However, the only charge the Government ever sought against him in connection with Daryl Brown's death was the subsequently dismissed weapons charge.  After the weapons charge was dismissed, but before Mr. Jackson was released, the Government contemplated filing murder charges, but did not.  (Ex. 65) (note in attorney's file for the weapons charge stating in February 2004 that "1:03CR222-2 was dismissed but murder charges will be filed soon.")

Thus, it appears that in February 2004 the Government had no intention of pursuing any further charges against Mr. Jackson in connection with Daryl Brown's death.  If, as the Government later claimed at trial, it believed Mr. Jackson was so dangerous that he was deserving of death, the obvious question is: why did the Government release him from prison in February 2004?

2.    **The Government Reverses Course and Indicts Mr. Jackson for Murder**

In April 2005, after waiting more than five years, the Government indicted Mr. Jackson for the murder of Daryl Brown.  Eight months after indictment, in January 2006, the Government gave Notice of Intent to Seek the Death Penalty.  Thus, as of February 2004, the Government apparently had no intention of seeking a murder indictment against Mr. Jackson in connection with Daryl Brown's death and considered him safe enough to be released into society.  Less than two years later, the Government

238

had not only indicted Mr. Jackson, but claimed he represented such a future threat that he should be given the death penalty.

There was no new evidence concerning Daryl Brown's death, as the investigation had been concluded for several years.  Indeed, the Government likely obtained its indictment based on evidence from the investigation that was completed in March 2000.  So, the capital prosecution of Mr. Jackson was not based on any new evidence or information about Brown's death or a break in the case.  Rather, the only thing that changed between February 2004 and April 2005 was that Mr. Jackson tried unsuccessfully to rob a bank in Mississippi and pled guilty to three counts of a four count indictment related to that robbery.

As discussed above, Mr. Jackson was subsequently sentenced to approximately 11 years in prison for that robbery, and that prison term will run through July 2015.  However, in addition to the sentence directly related to the robbery, now he also faces the death penalty because of the robbery, as that appears to be the sole reason that, five years after the fact, the Government suddenly elected to indict him for the murder of Daryl Brown and seek the death penalty.  Based on the present record, there does not appear to be any other plausible explanation.

If there is a plausible explanation for how a non-charged prison incident became a capital offense, the Government is keeping it a secret.  Mr. Jackson sought the Government's files in connection with the decision to charge him with Daryl Brown's murder and to seek the death penalty through a pre-filing Freedom of Information Act request.  *See* FOIA Request (Ex. 30).  The Government refused to provide any material, invoking a number of questionable privileges.  If those privileges are valid, and the Government chooses to continue to assert them,[45] then the only plausible explanation

---

[45]    David will seek post-filing discovery on this issue pursuant to Habeas Rule 6.

based on the undisputed events set forth above is that Mr. Jackson is under sentence of death because of a bank robbery.

**B.      A Death Sentence for Bank Robbery Violates the Fifth and Eighth Amendments**

As bank robbery is not, by itself, a death penalty eligible crime, Mr. Jackson's right to be free from cruel and unusual punishment under the Eighth Amendment is being violated by the present sentence of death imposed by this Court. "[C]apital punishment must 'be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Kennedy v. Louisiana*, 128 S. Ct. at 2642 (2008) (internal quotation marks omitted). The death sentence should be vacated.

Mr. Jackson has argued that 18 U.S.C. § 3592(c)(2) must be interpreted to require that previous convictions predate the underlying offense. One of the reasons for this interpretation is to avoid the constitutional issue of whether making a defendant eligible for the death penalty based solely on post-offense conduct constitutes cruel and unusual punishment and a violation of the Double Jeopardy Clause. Mr. Jackson's death sentence constitutes cruel and unusual punishment because: (1) it serves neither the deterrent nor retributive justifications for the death penalty, *Kennedy v. Louisiana*, 128 S. Ct. at 2661, and (2) the statutory aggravator used to make Mr. Jackson eligible for the death penalty fails to "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, at 462 U.S. at 877.

Under the FDPA, the Government may only seek the death penalty if it "believes that the *circumstances of the offense* are such that a sentence of death is justified . . . ." 18 U.S.C. 3593(a) (emphasis added). Thus, by its plain text, the FDPA precludes the Government from seeking death because of Mr. Jackson's bank robbery conviction, which occurred four years after the death of Daryl Brown and following his release from prison. Mr. Jackson's subsequent bank robbery did not change the

*circumstances* of the death of Daryl Brown. Rather, as Judge Crone observed, it was the bank robbery that was "the big factor that changed things." (8/29/06 Tr. at 31.)

Additionally, a sentence must be proportionate to the crime. *See Kennedy*. 128 S. Ct. at 2641 ("Capital punishment is excessive when it is grossly out of proportion to the crime . . . .") As stated above, there are no circumstances where bank robbery warrants a death sentence. Indeed, after pleading guilty to the bank robbery, Mr. Jackson was sentenced to eleven years in prison.

Nor does sentencing Mr. Jackson to death ultimately because of bank robbery serve the purposes of retribution or deterrence that are often cited in support of the death penalty. *See id.* The Government was completely uninterested in retribution for Daryl Brown's death when they released Mr. Jackson in 2004. If Mr. Jackson had not been convicted of the Mississippi bank robbery, it is likely the Government *never* would have sought retribution for Daryl Brown's death.

And, sentencing Mr. Jackson to death for Daryl Brown's death based on a crime that Mr. Jackson committed four years later has no deterrent effect. It is absurd to even contemplate such an effect, *i.e.* that a person would consider not committing a crime today because he or she might commit another crime in the future which would be used to increase his or her potential punishment for the crime today. Sentencing Mr. Jackson to death on the basis of a subsequently committed from does nothing to deter the commission of the underlying crime.

## C.    The Decision to Capitally Charge Mr. Jackson was Arbitrary and Capricious in Violation of the Fifth and Eighth Amendments

Arbitrary and capricious imposition of the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).

Similarly, the "Fifth Amendment requires that every aspect of the process by which the Government seeks to put a defendant to death is consistent with due process

of law. At a bare minimum, the protections of the Fifth Amendment must guarantee that the Government's decision to seek the death penalty is rational. When the Government's decision to seek death is wholly divorced from reason and arbitrarily disregards the totality of the relevant evidence, a capital prosecution based on that decision would be repugnant to the Constitution." *United States v. Littrell*, 478 F. Supp. 2d 1179, 1186-87 (C.D. Cal. 2007).

Here, both of these protections have been violated. First, the decision to seek the death penalty against Mr. Jackson does appear to be arbitrary and capricious. As noted above, for nearly four years, Mr. Jackson was not charged at all in connection with Mr. Brown's death, and then was only charged with possession of a weapon. While the Government contemplated filing murder charges against Mr. Jackson in 2003, they did not. Then, in April 2005, the Government files the charges. But nothing happened in the investigation of Daryl Brown's death between November 2003 and April 2005 to warrant the change. Rather, the only change was Mr. Jackson's intervening release from prison, arrest and conviction for bank robbery.

It was likely embarrassing, or worse, for the AUSA who did not charge Mr. Jackson for murder in connection with Daryl Brown's death before February 2004. Indeed, it appears in many ways that the decision to seek the death penalty against Mr. Jackson was to compensate for the AUSA's negligence, embarrassment and/or poor decision making in not filing charges against Mr. Jackson *before* he was released from prison. Compensating for the AUSA's mistakes, or even worse, a personal vendetta because of embarrassment, is an arbitrary and capricious reason to seek the death penalty against Mr. Jackson.

For the same reasons, the Government's decision-making process appears to be anything but rational. Rather, the decision-making process appears to be contradictory and irrational. In February 2004, even though the Government could have charged Mr. Jackson in connection with Daryl Brown's death and kept him in prison, the

242

Government concluded that Mr. Jackson was safe enough to release into society.  Two years later, because Mr. Jackson committed a bank robbery out of desperation to help his ailing mother, the Government did an about-face and argued that Mr. Jackson was not fit to live.  The Government's actions here are not rational, and thus upholding Mr. Jackson's death sentence violates his Fifth and Eighth Amendment rights.

**CLAIM 9**

**MR. JACKSON'S DUE PROCESS RIGHTS WERE VIOLATED BY THE GOVERNMENT'S USE OF FALSE TESTIMONY TO CONVICT HIM AND SENTENCE HIM TO DEATH IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS**

**A.**   **Prosecutorial Misconduct - Sponsoring False Testimony of Raymond Chopane**

The prosecution presented only one witness—Correctional Officer Raymond Chopane—who could testify that Mr. Jackson was carrying a knife outside on the yard when Darryl Brown attacked him on December 16, 1999.  No other witness could confirm this testimony, and it was probably false.  Although other evidence confirmed that Mr. Jackson stabbed Brown inside cell 125, the case for premeditated, first-degree capital murder was substantially stronger with Chopane's singularly damning testimony.  At the time of the incident, and according to Chopane's initial report and his subsequent statements to the FBI, however, Chopane knew only that "two unidentified inmates" were involved in the incident with Brown.  Federal Bureau of Prisons Memorandum for Lieutenant Tims (Dec. 16, 1999) (Ex. 76).  Nonetheless, at trial AUSA Batte solicited the following false testimony from Chopane:

> Q.   Okay.  Do you know who were the individuals that were involved?
> A.   Yes.
> Q.   Who were they?
> A.   Daryl Brown, Arzell Gulley and David Jackson.
> Q.   Okay.  Now, were any of those individuals assigned to your unit, the 3-B-1 unit, at that time?
> A.   No, they wasn't [*sic*].

243

> Q.     Did you know the defendant, David Jackson, prior to that day?
> A.     I knew him by his last name, Jackson.
> Q.     Okay.  And the person that you're talking about as David Jackson or that you knew as Jackson, is that the individual seated at this table in the light tan jacket?
> A.     Yes it is.
>        Mr. Batte: Your Honor, I would ask the record to reflect he's identified the Defendant, David Jackson.
>        The Court: Yes, the record will so reflect.
> By Mr. Batte:
> Q.     So you knew who Mr. Jackson was before December 16, 1999?
> A.     Yes.  (Tr. 176–177.)

This testimony flatly contradicts Mr. Chopane's statements both to the BOP on the date of the incident, and to the FBI the week after the incident.  These reports were within Mr. Batte's possession; he sent the FBI 302 to Mr. Barlow on July 27, 2005.  (*See* Ex. 59, Letter from Joseph R. Batte to Gerald E. Bourque and Douglas Barlow, dated July 27, 2005.)  These statements make it clear that Mr. Chopane could not identify Mr. Jackson prior to, or at the time of, the incident.  In his initial report on the fight, submitted on the day of the incident, Chopane noted only that:

> On Dec. 12, 1999 at about 6:02 p.m. inmate Daryl Brown #05803-053 was on the yard getting into a verbal argument *with two unidentified inmates* [emphasis added] in front of unit three.  Inmate Brown was backing up taking off his coat. He then started running into unit 3B1 with the same two unidentified inmates chasing him with weapons in their hands.  At that time the units sliding door closed with the the [*sic*] three inmates inside the unit.  The sliding door was opened for responding staff.  I proceeded into the unit and begun [*sic*] securing the inmates in their cell.

Federal Bureau of Prisons Memorandum for Lieutenant Tims (Dec. 16, 1999) (Ex. 76).

This statement provides a far more cursory overview of events than what Chopane offered at trial seven years later.  Yet it makes clear that, contrary to his statement on the witness stand, Chopane did not know Mr. Jackson before December 16, 1999—or, even more damaging to Chopane's trial testimony, knew Mr. Jackson, but

244

could not identify him that evening.  Nonetheless, Batte said nothing to correct the jury's misimpression caused by this false testimony.  "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"  *Giglio v. United States*, 405 U.S. 150, 153 (1972).  Batte had knowledge of this report.  Despite this, however, Batte suborned Mr. Chopane's perjury, and made no effort to correct this misstatement.[46]

A few days later, on December 23, 1999, Chopane revised his version of events slightly when talking to the FBI, this time calling into even greater question whether he witnessed Jackson having any substantial role in the events of December 16, 1999:

> CHOPANE related that on December 16 he was on the yard when he noticed inmate DARYL BROWN walking out of the sally port of Unit 3 3B1 Building and talking to another inmate (further described as a b/m, about 6'1"-6'2" tall, wearing a gray sock cap, gray pants, gray sweater, and tennis shoes). CHOPANE *saw the other inmate walk away* [emphasis added] and BROWN suddenly took off his coat and ran into 3B1. Another inmate, carrying what appeared to be a screwdriver, chased after BROWN into 3B1. CHOPANE saw the sliders close and Officer VANIN caught in the sally port area.

*See* Ex. 75, FBI 302 Report of Interview of Raymond Chopane.

Although on December 16, 1999, Chopane had stated that both inmates chasing Brown had weapons in their hands, by December 23, 1999, Chopane noted that one of the inmates initially backed-off, while another inmate, "carrying what appeared to be a screwdriver," chased after Brown.  At trial, Chopane stated that Gulley was carrying the screwdriver-like weapon (described as an "ice-pick type weapon," *see* Tr. 178), suggesting that on December 23, 1999, his recollection was that the other inmate—who

---

[46]     Further showing the ineffectiveness of trial counsel, Mr. Morrow also did not address this inconsistency during cross examination of Mr. Chopane.

at that time he could not identify as Jackson or place with a weapon—walked away from Brown.  This testimony not only contradicts Chopane's testimony at trial—it suggests that Jackson's version of events, in which he saw Brown with a knife, and initially backed off because he was unarmed (Tr. 1695), was the true picture of what initially happened on the yard on December 16.  Once again, however, Batte did nothing to correct the jury's false impression when Chopane, seven years later, revised his statement to note that he had observed Jackson make "a quick hand motion" and draw out a "triangle-shaped" weapon.  (Testimony of Raymond Chopane, Tr. 177–178.)

Mr. Chopane's recollection of events may be somewhat muddled because, in recounting events, he was also eliding another critical fact: he was the officer in charge of securing the entrance to Unit 3-B-1, the cellblock that Mr. Jackson, Mr. Gulley, and Mr. Brown entered without hindrance after the quarrel began.  The Government's own trial witnesses confirmed that it was Chopane's duty to secure this entrance:

> Q.      And back on December 16th of 1999, were you working as a
> correctional officer then?
> A.      Yes.
> Q.      And what were your duties on that particular day?
> A.      I was assigned as unit officer in unit 3-B-1.

(Tr. 175.)

Officer Larry Devereaux confirmed that one of the duties of a unit officer was to secure the entrance to his unit:

> Q.      Is part of your assignment to make sure that inmates who
> don't belong in a particular unit don't get into the unit that you're
> assigned to?
> A.      Yes, sir.

(Tr. 200.)

It is therefore clear—though it went unmentioned by the Government, and unexamined by Mr. Jackson's trial counsel—that Chopane failed to perform his duty to secure the entrance to Unit 3-B-1 on December 16, 1999, while purportedly witnessing the

development of Brown's attack on Jackson and Gulley, focusing intently enough to observe specific weapons in their hands.[47]

In light of Mr. Chopane's failure to secure the entrance to 3-B-1 at the time of the fight, when his duty should have placed him in the middle of the action, it should be noted that no other report filed on December 16, 1999 even mentioned Chopane's presence at the scene. United States Government Memorandums of Kelvin Tims, Larry Devereaux, Raymond Chopane, Everett Gordon, Gary Vann and Danny Wilhite (Ex. 76). Neither do any of the other FBI 302s, drafted shortly thereafter, mention Chopane. *See* FBI 302 Reports of Interviews of Larry Deveraux, Gary Vanin, Kelvin Tims and Raymond Chopane (Ex. 75). On the contrary, Chopane's absence from the other reports submitted on December 16, 1999 is conspicuous. Officer Danny Wilhite, arriving at the scene, specified the names of the correctional officers waiting outside the slider doors to Unit 3-B-1, but did not mention Officer Chopane:

> On December 16, 1999, at approximately 6:00 pm, I

---

[47] Mr. Chopane's brief attempt to explain his location on direct examination is unconvincing. His testimony on direct includes the following exchange:

Q.   Did they have to run passed [*sic*] you to get into 3-B-1?

A.   If I would have been still standing there, they would have to run passed [*sic*] me.

Q.   But you weren't still standing there?

A.   I had stepped out to assist the other officer that was responding out there.

Q.   So you began to move away from where you were and towards them?

A.   Yes.

Q.   Okay. Do you recall who the other officer was that you moved to assist?

A.   Officer Gary Vann.

(Tr. 179.)

As will be discussed further below, if Mr. Chopane moved to assist other officers, no one ever saw him do so. It defies common sense to believe that Mr. Chopane could have been guarding the entrance to 3-B-1, then saw a commotion from a short enough distance to have observed specific weapons in the hands of two inmates, then moved towards that commotion without the inmates running by him, then fell behind Officer Gary Vann, coming from further away, who ran into unit 3-B-1 while Mr. Chopane was purportedly stuck outside—again, at the time unnoticed by anyone.

247

> responded to a fight in from of Unit #3. As I ran across the compound, I saw several black inmates run into Unit 3B-1. When I arrived at Unit 3B-l, the exterior slider door was closed. *Officers Devereaux and Gordon were standing outside,* [italics added] and Officer Vann was inside. The Control Center then opened the slider door and I entered the Unit.

*See* United States Government Memorandum (Dec.16, 1999) (Ex. 76).

At trial, Chopane insisted that Officer Larry Devereaux was "like right on the other side of me."  (Tr. 176.)  In his initial report, however, Devereaux made no mention of Chopane, or at least had managed to stand "right on the other side" of Chopane without having any awareness of who Chopane was; the better reading is that, once again, Chopane testified falsely, and prosecutors made no attempt to correct this false impression, despite contrary evidence:

> On December 16, 1999 at approximately 6:02 pm I witnessed a verbal altercation between two black inmates that turned into a physical altercation. At that point I made an emergency call to control and compound that there was a fight in front of Unit 3 and that a weapons [*sic*] were involved. I then witnesses [*sic*] inmate Brown, Daryl Reg. No. 05803-055 remove his shirt and attempt to engage in a fight with two inmates, one being inmate Jackson, David Reg. No. 13567-039 who stated to another inmate 'lets get this mother fucker.' At that point inmate Jackson and another inmate started chasing inmate Brown who ran into unit 3B-l then the sliders started closing and Officer Vann managed to get between the slider door before it closed.  He stopped before entering the unit itself due to the lack of staff available.  Once additional staff arrived I *with several unknown staff members* [italics added] entered the unit and began ordering inmates to rack up and I witnessed inmate Gulley, Arzell Reg. No. 18249-039 lying face down on the floor and Officer E. Gordon standing over him and I placed restraints on inmate Gulley and advised Officer E. Gordon to stay with the inmate while I went over to place inmate Brown Reg. No. 05803-055 on the stretcher and help transport him to medical.

*See* United States Government Memorandum (Dec. 16, 1999) (Ex. 76).

By the time of trial, either Officer Devereaux's memory showed marked improvement after seven years, or he corrected his testimony to corroborate Chopane's own false statements, with the support of Batte's direct questioning:

> Q.    And do you recall an incident happening around 6:00 o'clock involving three inmates, including the Defendant, David Jackson.
> A.    I do.
> Q.    Okay.  Where were you at that time?
> A.    Well, I was standing outside of 3-A-1.  It's adjacent to 3-B-1 next door.
> Q.    Okay.  Now was Officer Chopane in the area, the same area that you were in?
> A.    Yes, sir.
> Q.    Was he standing there right next to you or was he assigned at a different spot?
> A.    He was standing next to me.

(Tr. 199.)

Again, this testimony is unsupported by the statements made to the BOP and the FBI at the time of the incident, and in the possession of AUSA Batte at the time of trial.  These statements created an impression in the minds of the jury that Batte knew, or should have known, to be false, and yet he failed to say anything to correct this false impression.

Officer Gordon, too, only remembered Chopane—and only dimly—with seven years of hindsight.  On December 16, 1999, he merely noted his observations out on the yard:

> On 12-16-99 at 6:15 p.m. I was working as the 3B3 Unit Officer, when a call came over the radio of a fight in front of Unit Three with weapons involved.  I secured my Unit, and responded to the front of Unit 3B1 with other staff.  At this time Operations Lieutenant K. Tims gave the order for Control to the Open [*sic*] Unit 3B1 slider.  (

*See* United States Government Memorandum (Dec. 16, 1999) (Ex. 76).

Then at trial, Gordon was asked, "[d]o you recall who was there on the outside of the sliders when you got down there[,]" and he responded, "I believe Officer Chopane was

249

there, because that was his unit, and I know officer Vann was inside the sliders." (Tr. 230.)  This statement suggests that Gordon did not so much remember Chopane being present, as that he thought Chopane should have been present, given that 3-B-1 was his unit.

Meanwhile, in his own statement on December 16, 1999, Officer Gary Vann—who was seen by other correctional officers, as he managed to get inside the unit Chopane was supposed to be guarding—noted:

> On Thursday, December 16, 1999, I was assigned as Compound #2 Officer. At approximately 6:02 pm I observed a black inmate close to the horse shoe pit in front of unit 3B1 backing up and removing his coat.  I then observed him removing his shirt. I also observed two black inmates walking towards this inmate at a fast pace.  At this time I called for assistance in front of unit 3B1.  I observed all three inmates run towards unit 3B1.  At this time I observed one of the inmates had a weapon in his hand.  I called over the radio that the inmates were running into unit 3Bl and that weapons were involved.  I ran into unit 3B1 and observed that the inmates were fighting inside of the unit.  I observed all three inmates run into cell 125.  When additional staff arrived at the unit we went into the unit and began securing the unit.
>
> *See* Ex. 76, Federal Bureau of Prisons Memorandum to K. Tims, From: G. Vann, Dated Decl. 16, 1999.

If Chopane moved from the entrance to 3-B-1 to assist Vann when the incident began, it is remarkable that Vann managed to get past Chopane, and into 3-B-1, before the sliders closed, and without noticing Chopane's apparent attempt to assist him.

Under *Napue v. Illinois*, 360 U.S. 264 (1959), Batte's failure to correct the perjured testimony of Raymond Chopane denied Mr. Jackson due process of law in violation of the Fifth Amendment.  "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the

250

jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).  Under Fifth Circuit law, a new trial is required on a *Napue* claim if: "(1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material." *Thompson v. Cain*, 161 F.3d 802, 808 (5th Cir. 1998) (citing *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993)).

That Chopane's testimony was material is confirmed by the emphasis on that testimony during the Government's closing arguments.  AUSA Jenkins, when delivering his closing statement, argued that:

> "Mr. Chopane, who was closest to the incident -- Mr. Devereaux admitted that Mr. Chopane was closer than he was and had a better opportunity to see.  Mr. Chopane said that he was -- from the witness stand to that back door was how far he was away from the incident, from that witness stand to that back door.  And what did Mr. Chopane see?  He saw Mr. Gulley with that ice-pick like weapon.  He saw Mr. Jackson with a flat-bladed shank.  But he didn't see Mr. Brown with any weapon because Mr. Brown didn't have a weapon.  The two assailants, Mr. Jackson and Mr. Gulley, had the weapons.  They're the ones who initiated the chase out in the yard and then proceeded to chase Mr. Brown inside Unit 3-B."

 (Tr. 1038–1039.)

> Jenkins further highlighted Chopane's testimony again later:
>
> "Remember, Mr. Chopane saw Jackson with the flat-bladed knife.  According to Dr. Tommy Brown, the flat-bladed shank made all the wounds, and certainly made the fatal wound.  In his opinion the flat-bladed shank made all the wounds.  He said that the ice-pick-like weapon could have made maybe two or three superficial wounds, but the flat-bladed shank definitely made the fatal wound."

(Tr. 1042.)

251

The Government, however, knew that much of Chopane's testimony was false. Seven years after the incident, Chopane provided testimony that flatly contradicted his own statements at the time of the incident, as well as the statements of the other correctional officers present on December 16, 1999. All of these statements were in the possession of the Government, and yet Batte and Jenkins allowed Chopane to testify falsely, and then relied heavily on his perjury during closing arguments. That Mr. Jackson's attorneys failed to draw attention to clear impeachment evidence is itself disturbing, and further evidence of their ineffective assistance. Notwithstanding the failures of Mr. Jackson's trial counsel, however, the prosecutors had an independent duty not to present false testimony—a duty they manifestly failed in regards to the testifying of Raymond Chopane.[48]

**B.**    **Mr. Jackson's Conviction And Sentence Were Tainted By False Testimony Elicited By The Prosecution in Violation of The Fifth, Sixth and Eighth Amendments**

As discussed *supra* in Claims 4 & 5, prison employee Michael Mattes, a Code Treatment Specialist in the psychology division at USP Beaumont, gave damaging testimony concerning an alleged threat by Mr. Jackson to kill an inmate who was being put in his cell. The clear intent of this testimony was to mislead the jury as to both Mr. Jackson's culpability and future dangerousness. This testimony, which was false and misleading, violated Mr. Jackson's constitutional right to due process as set forth in the Fifth Amendment, and as explained by the Supreme Court in *Napue v. Illinois*, 360 U.S. 264 (holding that a prosecutor's failure to correct false testimony violates the right to due process).

---

[48]    Again, to the extent the Court finds that trial counsel knew or should have known the above facts, this claim is asserted alternatively as a claim of ineffective assistance of counsel. Further, the Government's violations here tainted both Count One and Count Two of the indictment, as Officer Chopane's false statements impugned Mr. Jackson's case for self-defense, which, if proven, would have required acquittal on both claims.

During the guilt phase of the trial, Mattes testified that around 9:00 p.m. on February 24, 2000, Mr. Jackson, who was in the segregated housing unit, asked to speak with him. (Tr. 680.) Mattes stated that Mr. Jackson "was basically upset that he had to take a cellee. . . He wanted to be single-celled." (Tr. 681.) According to Mattes, in an attempt to prevent an inmate named Harold "Pop" Jones from being placed into his cell, Jackson threatened "that if they didn't take this guy out of here, he was going to kill him." (Tr. 681.) He also claimed that Jackson said "I'm through playing games, and if you don't believe me, look at the tapes. I'll kill again." (Tr. 681-82.)

It is now known that Mattes' testimony was false and that the entire "Pop Jones incident" was fabricated. At trial, two prisoners testified that they were present when Pop Jones was brought to the cell in question and that Mr. Jackson, in fact, made no such threats. One of the prisoners, Raphael Porsche, admitted that he made some negative comments about the addition of Jones to the already overcrowded cell, but he said nothing threatening and certainly nothing about killing anyone.

The other prisoner who testified at trial, Darrell Evans, has recently provided a declaration stating that he was told by a correctional officer, in no uncertain terms, that the Government *knew* the "Pop Jones incident" was a concocted ruse. In his declaration, Evans states:

> In February of 2000, I was incarcerated at USP Beaumont, in Beaumont, Texas. I was in a two-man cell in the Special Housing Unit (SHU) with two other prisoners, Raphael Porsche and David Jackson. Late one afternoon, an officer came to our door to ask us to take another prisoner in our cell. It was considered Porsche's cell because he was the first one of us in there, so it was his call. Porsche told the officer he didn't want another man in our cell. It was already pretty crowded with three of us in a two-man cell. When they said it was "Pop" Jones, I knew Pop was an old guy and no problem so I asked the officer, "why not put him next door where the guy has an empty bottom bunk?" I think it was Wormley next door. Wormley said, "Yeah, put him in here.

He can have the bottom bunk over here."

Porsche still did not want another inmate coming in our cell but I knew "Pop" Jones and I wanted to find out what was going on out on the compound so I told Porsche that Pop was okay, so Porsche said it was okay to let him in our cell. They brought Pop in and put him in our cell. One of the guards was an officer named Rice. Then they brought one or two more guys in, so we had five or six of us in there that night, a couple of them had to sleep on the floor. As I recall, it was two guys named Lindsay and Larkin. The next day they moved all three of them back out and put them somewhere else.

The whole time this was going on, David Jackson just laid up on his bunk quietly. At no point did he voice any objection to any of the guys coming into the cell. He did not seem to have any problem with any of it.

I never saw Mr. Mattes, a counselor with the Challenge Program come to our cell concerning any of the events I just described.

More than five years later, in approximately July of 2005, I came out of my cell one morning in the AB unit at USP Beaumont and Officer Rice called to me, "Let me holler at you." I went over to him and he asked me, "Did you know David Jackson escaped last night?" I said, "I heard it was somebody named Johnson." He said, "No, it was Jackson. Do you think he'll come and get me?" I asked him, "Why would he do that?" Officer Rice said, "They got me lying on him." I asked him, "What do you mean, man? What you lying about?" Mr. Rice said he was pressured to lie about what happened when he brought Pop Jones to our cell back in February 2000. He said they wanted him to lie and say that Jackson had said he that if they tried to put Pop in the cell, he would kill him. I told Officer Rice, "That would be telling a lie alright, because I was in the cell with Jackson that day and you'd be lying on the man because you know he never said nothing like that." Mr. Rice said, "I know he didn't say it, but they are trying to get me to say he said it – and now he's out and he might come and get me for lying on him." I told Mr. Rice, "He's not coming after you."

254

> I do not know why Officer Rice believed that Jackson would have known he was lying on him or how Jackson would have known, but he said Jackson knew.  He was scared all day that Jackson was going to come after him.  He was truly worried about it and said, "if he comes on my property, I'll shoot him."

> The next day, Officer Rice came to work and said that Jackson had been caught.  Mr. Rice was very relieved about it.  He was smiling and happy that Jackson had been picked up.

Evans Decl. ¶¶ 2-8 (Ex. 21).

In addition to the newly obtained statement from Mr. Evans, this Petition also presents a statement from Harold "Pop" Jones.  Mr. Jones has never before made a statement or even been asked to make a statement concerning the incident.  According to Mr. Jones as well, *it never happened*.  Indeed, the first time Mr. Jones ever *heard* about this alleged incident was in July of 2010.  Jones asserts in his attached declaration that he was brought to an overcrowded cell that evening in early 2000 containing Mr. Jackson and several other prisoners but he states that no threats were made against him and certainly not by Mr. Jackson of whom Jones says: "he never did threaten me and never would threaten me.  He was always respectful and nice to me in whatever little dealings we had with each other.  For someone to say that David Jackson threatened me is an outright lie and totally ridiculous.  Jones Decl. ¶¶ 7-8 (Ex. 20).

Mr. Jones himself recalls the night that he spent in segregated housing with Mr. Jackson and is certain that "David Jackson did not say one word about my coming in the cell." Jones Decl. ¶4. (Ex. 20).  Interestingly, Mr. Jones himself had told the guards that he didn't want to go into the cell because it was already too crowded, but the guards put him in anyway.  Jones Decl. ¶3 (Ex. 20).  Mattes' testimony portrayed Mr. Jackson as someone who was ready to prey on this elderly inmate.  The prosecution never corrected this misleading testimony by informing the jury that Mr. Jones was in fact placed in the

cell, indicating that Mattes' superiors did not feel there would be any problems. Interestingly, the prosecution failed to call any of the other guards who were present in the segregated housing unit on that night. They also chose not to tell the alleged "victim" of this incident, most likely because Mr. Jones would have testified that he never felt threatened and was never harmed.

Despite the fact that Mattes' testimony was known to be false, the prosecution used his testimony to lead the jury into believing that Mr. Jackson was callously boasting about killing Daryl Brown. Prosecutor Jenkins ended his twenty-minute closing arguments by contending that Mr. Jackson had been "loose lipped" about his role in the crime and that it "wasn't any secret that Jackson had killed him." (Tr. 1045.) Prosecutor Batte ended closing arguments by again quoting Mattes' fabricated paraphrase of Mr. Jackson's words that "I've killed before and I will kill again." (Tr. 1100.) In his closing words at the penalty phase, Batte again quoted Mattes' testimony in exhorting the jury to put Mr. Jackson to death. (Tr. 1916). That both prosecutors utilized Mattes' testimony to sear a final image into the jurors' mind demonstrates the critical role they knew it would play in the jury's decision to convict him of premeditated, first degree murder and to sentence him to death.

Mattes' false and misleading testimony tainted Mr. Jackson's conviction and sentence. This is particularly egregious because the prosecution stressed more than once that the testimony of USP employees should be given more credibility than the testimony of inmates. Given the Government's condonation of Mattes' misleading testimony and reliance upon it, Mr. Jackson's right to due process and right to be free from false testimony as established in *Napue* were violated.

The Supreme Court has established "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction…" *Napue*, 360 U.S. at 269. This principal holds true even in cases where the falsehood bears on the credibility of a witness rather than the defendant's guilt. As the

256

Supreme Court put so succinctly "A lie is a lie no matter what its subject." *Id.* at 270. In Mr. Jackson's case, Mr. Mattes' testimony bore not only his own credibility as a witness, but also on Mr. Jackson's guilt and sentencing. Even if just one witness gives misleading or false testimony, the defendant's constitutional rights are violated—here, at least Mattes and Chopane provided false testimony that was central to the Government's case. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269. Because Mr. Mattes' testimony was a focal point of the prosecution and influenced the juror's decision to convict and impose death, Mr. Jackson's conviction and sentence should be vacated.

## CLAIM 10

### THE GOVERNMENT WITHHELD EXCULPATORY EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

**A.    Withholding Material Evidence**

1.    **The Yard Video**

The Government relied heavily on closed-circuit prison videotapes as purported conclusive evidence of Mr. Jackson's guilt, yet it withheld from the defense what was arguably the most critical video of all. A videotape of the prison yard, which would have shown the beginning of the altercation between Mr. Jackson and Darryl Brown, and corroborated the testimony that Brown initiated the fight by threatening Mr. Jackson with a shank was never produced to the defense. This video would have given Mr. Jackson demonstrative evidence to show the jury that he had acted in self-defense by wresting the shank from Brown, and that he had a reasonable fear he was in continuing danger when he followed Brown into Unit 3.B.1.

References to the yard video strongly suggest that it was accessible to the prosecution. In a telephone interview of correctional officer Orlando Rivera, taken by

257

Special Agent Marc D. Skinner on May 9, 2005 as part of the FBI's investigation of Brown's death, Rivera explained that "Inmate Terryonto McGrier . . . was observed on video in close proximity to Brown, Jackson and Gulley when the incident first began. McGrier advised he was going to sick call for medicines and that he walked with a cane due to surgery." *See* SA Marc D. Skinner, Investigation Report, Transcribed on May 9, 2005 (Ex. 61). Given that McGrier does not appear in any of the videos recorded from the inside of Unit 3.B1 and that he was on his way to sick call, Rivera must have been seen a video of McGrier standing with Mr. Jackson, Brown, and Gulley while they were on the yard during recreation.

Withholding the yard video, whether purposefully or inadvertently, both prejudiced Mr. Jackson and benefitted the prosecution. In the absence of the video, the testimony of the prison guards and inmates became the sole source of information the jury received regarding the incident at the heart of this trial. Despite the fact that the guards were standing far from Mr. Jackson and Brown, the prosecution emphasized that the guards' testimony about the beginning of the altercation was to be believed over the testimony of numerous prisoners, including associates of Brown, that Brown was armed and Mr. Jackson was not. (Tr. 1037–38.) Had the yard video been available, however, the jury would have been able to draw their own conclusions about the beginning of the fight, based on physical evidence rather than basing their verdict on a credibility battle between two distant guards and a number of prisoners in close proximity to the events. There is a reasonable likelihood that this would have swayed at least one of the jurors to change his or her vote.

Although there is reference to eighteen video cameras in the cell unit (Tr. 33–34), there is a conspicuous absence of any reference to video surveillance on the yard. The yard is a large open area where prisoners often roamed freely in large numbers and without staff supervision, as established by testimony from the nearest officers that they were as much as one hundred yards away from the beginning of the incident. (Tr. 170.)

Given that USP Beaumont clearly had video surveillance in place when Daryl Brown assaulted Mr. Jackson, it is doubtful that the only location *not* under video surveillance on December 16, 1999 was the yard. A video of the yard could have undermined the prosecution's theory of the case. Officer Rivera's reference to such a video in his report to the FBI provides strong evidence that video surveillance of the yard existed and that a video of the incident was not provided. As explained in subsection B below, regardless of whether the prosecution acted in good or bad faith, its failure to produce the video of the yard violated Mr. Jackson's due process rights. *See Brady v. Maryland*, 363 U.S. 83, 87 (1963).

     2.     **51 Pieces of Evidence**

The prosecution has also improperly withheld numerous potentially exculpatory items of evidence. In a memorandum prepared for Warden Ernest V. Chandler on March 3, 2000, Special Investigative Agent O. Rivera, reported that "[t]he Special Investigative Supervisor's office obtained approximately 51 items of physical evidence." U.S. Department of Justice, Federal Bureau of Prisons, United States Penitentiary Beaumont, *Memorandum for Ernest V. Chandler, Warden*, Mar. 3, 2000. (Ex. 74) The report does not describe each specific item, and only lists those items which Rivera deemed important, such as the closed circuit video of the inside of the cell, two shanks, and postage stamps. Given that Rivera later described a video that showed the beginning of the fight, it is likely that this video was one of the unlisted 51 items that the Special Investigative Supervisor's office obtained. Additionally, because the memorandum to the warden also contains statements of staff members, such as Officer Devereaux, who observed Darryl Brown "remove his shirt and attempt to engage in a fight . . ." it is reasonable to believe that Brown's shirt would also be among the 51 collected evidence items. *Id.* This shirt was never turned over to the defense, despite the fact that it certainly may contain exculpatory evidence, such as knife tears or blood from Mr. Jackson.

Finally, given the fact that the prison officers searched the cells of all prisoners involved in the altercation, the officers should have also searched Brown's cell. The Government's failed to provide the results of that search to the defense.  Brown's autopsy report revealed the presence of THC metabolites.  Thus, a search of his cell likely resulted in the discovery of marijuana or other illegal substances.  The prosecution had a duty to provide this evidence to the defense, but failed to do so.[49]

**B.    The *Brady v. Maryland* Line of Cases**

Through the seminal case *Brady v. Maryland* and its progeny, the United States Supreme Court has established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*." *Brady v. Maryland*, 373 U.S. 83, 87(1963) (emphasis added).  It matters not whether the prosecution purposefully, negligently, or inadvertently failed to turn over favorable evidence in its possession.  Even if the defense does not specifically demand a certain piece of evidence, due to ignorance or otherwise, "there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request."  *United States v. Agurs*, 427 U.S. 97, 110 (1976).

The prosecution's duty to turn over favorable evidence is not limited to those items which are potentially exculpatory, but extends to all material evidence including impeachment evidence, "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).   Rather than evaluating each item of evidence in isolation,

---

[49]    To the extent that the prosecution destroyed samples of Brown's blood and other bodily fluid in bad faith, it also violated Mr. Jackson's rights under *Arizona v. Youngblood*, 488 U.S. 51 (1988).

the Government's obligation to disclose favorable evidence depends upon the cumulative effect of all suppressed evidence as gauged by the prosecutor. *Kyles v. Whitley*, 514 U.S. at 421 (holding that the prosecutor remains responsible for gauging the effect of suppressed evidence regardless of any failure by the police to bring favorable evidence to the prosecutor's attention.)

As explained above, the items of evidence suppressed by the prosecution, including the yard video, Brown's clothing, the report on the search of Brown's cell, and the other pieces of the evidence collected by the SIS, but not disclosed to the defense, constitute the type of favorable evidence that the prosecution was obliged to turn over to the defense. The suppressed evidence would have enabled the jury to more accurately evaluate the veracity of guards who claimed that Brown was unarmed and only wanted a fistfight. The jury might have been able to determine whether Brown was under the influence of substances at the time, as reported by fellow prisoners, and they would have been able to see for themselves that Mr. Brown initially attacked Mr. Jackson with a knife. There is a reasonable probability that the withheld evidence would have resulted in a different verdict. Because the suppression of favorable material evidence violated Mr. Jackson's constitutional right to due process, a new trial, with disclosure of all favorable evidence, is necessitated.

## C.    Brady Materials Likely Remain Outstanding

Due to the paucity of investigation materials produced by the Government at trial (*see* Bezy Decl. ¶ 3), the unusual chronology of the charging decision in this case (see Claim 1, *supra*), and the numerous other abnormalities highlighted herein, we believe that Government failed in its *Brady* obligation to produce all exculpatory materials, and that this failure prejudiced Mr. Jackson. Mr. Jackson's forthcoming discovery motions will pursue remaining missing evidence.[50]

---

[50]    Again, the Government's violations here tainted both Count One and Count Two of the indictment.

## CLAIM 11

### MR. JACKSON'S DUE PROCESS RIGHTS WERE VIOLATED BY PROSECUTORIAL MISCONDUCT

**A.    Improper Statements During Closing Arguments - Guilt Phase**

The Fifth Amendment's due process guarantee includes a guarantee that any determination of guilt and sentencing will be on an individual basis, and a defendant will not be held accountable for the crimes of others. *Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006).

During closing arguments, Assistant United States Attorneys Joe Batte and Jim Jenkins asked jurors to send a message about violence in prisons through their verdict. For example, in his final statement during closing arguments at the guilt phase, AUSA Jenkins stated, "you've heard about violence at the penitentiary at the Federal Correctional Complex, and you've probably asked yourself 'well, why don't those people do something about violence in our federal penitentiary?' Well, members of the jury, today you are those people, because under the law and under the evidence you have the power to do something about violence in our penitentiary." (Tr. 1045–1046.) This line of argument deprived Mr. Jackson of his Fifth Amendment right to due process and an individualized determination on guilt and sentencing under the Eighth Amendment. *See Weaver*, 438 F.3d at 841.[51]

**B.    Improper Statements During Closing Argument - Penalty Phase**

As discussed in Claim 5.M, the Government made numerous improper statements and argument during their penalty phase closing arguments. Among the improper statements and argument were references to evidence not in the record, misstating the evidence, the AUSA discussing his prosecution of another case entirely, misstating the law, providing personal opinions on the credibility of witnesses,

---

[51]    Once again, the Government's violations here infringed Mr. Jackson's rights with respect to both Count One and Count Two of the indictment.

misleading the jury on its obligation to consider mitigating evidence and urging the jury to impose the death penalty as their duty.

For the reasons set forth in Claim 5.M, trial counsel were ineffective for not objecting to such improper argument by the Government. Additionally, however, given the Government's duty to do justice, *Berger v. United States,* 295 U.S. 78, 88 (1935), the Government's improprieties in the closing argument at the penalty phase also constitute prosecutorial misconduct in violation of Mr. Jackson's Fifth, Sixth and Eighth Amendment rights.

## CLAIM 12

### MR. JACKSON'S RIGHT TO A FAIR TRIAL WAS INFRINGED UPON BY JUROR MISCONDUCT IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

**A.      Several of The Jurors Who Sat in Judgment of Mr. Jackson Failed to Disclose Important Information, Violating Mr. Jackson's Right to a Fair Trial under the Fifth, Sixth, and Eighth Amendments to the Constitution.**

1.      **Factual Background**

Several of the jurors who were selected to be on Mr. Jackson's jury withheld information during voir dire that was relevant to their ability to serve impartially on Mr. Jackson's case and would have permitted a valid excusal for cause. As described below, the fact that the jurors withheld the information is itself evidence of bias. In this case, the evidence withheld is particularly significant to a juror sitting in judgment on this case and includes failing to admit a prior arrest and failing to inform the Court that one of Mr. Jackson's trial counsel had previously represented a family member who served time in state prison in the case in which trial counsel represented him.

263

### a.    Clara Shaffer

Ms. Clara Shaffer served on the jury which convicted Mr. Jackson of capital murder and sentenced him to death. ███████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████    Ms. Shaffer was asked about these answers during voir dire and clarified that Albert Smith was her father and he was in and out of prison "[her] entire life" for "hot checks." (J.S. Tr. at 203-04.)

Although Ms. Shaffer acknowledged that her father and son had been in prison, she failed to admit that she herself had been arrested and charged with a crime. In the fall of 1985, the Port Neches Police Department arrested Ms. Shaffer for harboring and concealing a suspect, her father Albert Smith, who was wanted for auto theft, a more serious charge she never mentioned when she characterized his criminal offenses as relating to "hot checks." *See* Shaffer Information (Ex. 85). Ms. Shaffer was charged by the Jefferson County District Attorney's Office, a warrant was issued for her arrest and she posted bond. *Id.* The case was pending in court for approximately five months

before it was dismissed when Ms. Shaffer apparently agreed to a deal and pleaded to an offense in Justice of the Peace court. *Id.* Despite numerous opportunities ███████ ████████████ during voir dire, Ms. Shaffer never mentioned her arrest, charge or plea. Moreover, based upon the information in the probable cause affidavit, it appears that Ms. Shaffer deliberately minimized the extent of her father's life-long troubles with the law.

   b.  **Carolyn Wilkinson**

   Upon information and belief, Ms. Wilkinson knew, yet failed to disclose, that her brother-in-law was represented by trial defense counsel, Douglas Barlow. During voir dire, Ms. Wilkinson explained that her brother-in-law had served time in the Texas Department of Corrections for "some little embezzlement, some hot checks that sort of thing." (J.S. Tr. at 179); ███████████ ███. She was asked who prosecuted her brother-in-law but she could not remember. *Id.* She further responded that she would harbor no ill-will against the prosecution because of her brother-in-law's case. *Id.* Although the lawyers were obviously seeking to learn if anything related to her brother-in-law's prosecution could have a bearing on her jury service, Ms. Wilkinson (even while being questioned by Mr. Barlow himself) never informed the Court that Mr. Barlow had been her brother-in-law's attorney

   2.  **Mr. Jackson Had A Right To A Fair And Impartial Jury.**

   Ms. Shaffer and Ms. Wilkinson's failure to reveal crucial information about their ability to serve fairly raises the inference that they sought to conceal these facts because they had an actual bias in the case.

   In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court set out the federal standard for evaluating claims that a party had been denied his constitutional right to an impartial jury. The defendant must demonstrate: (1) that a juror failed to answer honestly a material question on *voir dire*; and (2) that a correct response would have provided a valid basis for a challenge for cause. *Id.* at 556.

The Supreme Court has made clear that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.  The right to an impartial adjudicator, be it judge or jury, is such a right."  *Gray v. Mississippi*, 481 U.S. 658, 668 (1987) (citations and internal quotation marks omitted).  Accordingly, the presence of a biased juror can never be harmless, and "the error requires a new trial without a showing of actual prejudice."  *Dyer v. Calderon,* 151 F.3d 970, 972 n. 2 (9th Cir.) (en banc), *cert. denied*, 119 S.Ct. 575 (1998) (citing *Arizona v. Fulminante*, 499 U.S. 279, 307-310 (1991)).

The fact that the juror was not forthcoming is itself indicative of bias.  "[I]n most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial."  *McDonough Power Equipment, Inc.*, 464 U.S. at 556 (Blackmun, J., concurring); *see also United States v. Boney*, 977 F.2d 624, 633-34 (D.C. Cir. 1992) (hearing into possible bias required where juror failed to acknowledge prior felony conviction on juror qualification form; juror's lack of candor "presents serious concerns," because it "raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality"); *Dyer*, 151 F.3d at 979  (juror's "lies give rise to an inference of implied bias on her part."); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) ("Mrs. G. was dishonest in her response to questions on voir dire – this is true whether or not she simply did not, or could not respond properly because of her own emotional distress. This dishonestly, of itself, is evidence of bias."); *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989) ("Willingness to lie about [potentially disqualifying fact] exhibited an interest strongly suggesting partiality"); *United States v. Scott*, 854 F.2d 697, 699-700 (5th Cir. 1988) ("certainly when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's right to a fair trial."); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984) (juror's "dishonesty, in and of itself, is a strong indication that he was not

266

impartial."); *Rogers v. McMullen*, 673 F.2d 1185, 1189 (11th Cir. 1982) ("a state criminal defendant who can demonstrate that a member of the jury which heard his case was biased ... is entitled to federal habeas corpus relief"); *McCoy v. Goldston*, 652 F.2d 654, 659 (6th Cir. 1981) ("A district judge shall presume bias where juror deliberately concealed information").

As one court explained:

> If a juror treats with contempt the court's admonition to answer voir dire questions truthfully, she can be expected to treat her responsibilities as a juror – to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions – with equal scorn.  Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process.  How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity?  Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Dyer* at 983.

3. **The Eighth Amendment's Mandate of Heightened Reliability Prohibits Upholding a Death Sentence Rendered By These Jurors.**

While a juror's misconduct is always of concern to courts, it takes on added significance in the context of a death penalty case.  Because the penalty of death is qualitatively different from any other punishment, the Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring).  One of the most important and consistent themes of the Supreme Court's death penalty jurisprudence is the "emphasis on procedural protections that are intended to ensure that the death penalty will be imposed

267

in a consistent, rational manner." *Barclay v. Florida*, 463 U.S. 939, 960 (1983) (Stevens, J., concurring); *see Beck v. Alabama*, 447 U.S. 625, 638 (1980) (noting that, because death is different, "we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination"). Accordingly, the severity of the sentence that Mr. Jackson faces demands that this Court apply "careful scrutiny in the review of any colorable claim of error." *Stephens v. Zant*, 462 U.S. 862, 885 (1982). This admonition is especially true when the claim of error involves the right to a fair trial, one of the primary means of ensuring that a jury renders its verdict "based only on the evidence subjected to the crucible of the adversarial process." *Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir.), *cert. denied*, 502 U.S. 953 (1991).

    4.       **The Jurors' Misconduct Requires Reversal of Mr. Jackson's Conviction And Sentence.**

"[S]ome constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error. The right to an impartial adjudicator, be it judge or jury, is such a right." *Gray v. Mississippi*, 481 U.S. 658, 668 (1987) (citations and internal quotation marks omitted). Accordingly, "the presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice. Like a judge who is biased, the presence of a biased juror introduces a structural defect not subject to harmless error analysis." *Dyer v. Calderon,* 151 F.3d at 972 (*en banc*) (citing *Arizona v. Fulminante*, 499 U.S. 279, 307-10 (1991)).

Under separate cover, Mr. Jackson will move for discovery and a hearing on this claim. If Ms. Shaffer and Ms. Wilkinson in fact deliberately concealed this information during jury selection, Mr. Jackson was denied his constitutional right to a fair and impartial jury and is entitled to relief from his conviction and death sentence.

268

**B.**    **The Introduction Of Extraneous Evidence Or Information Into The Jury's Punishment-Phase Deliberations Violated Mr. Jackson's Rights Under The First, Fifth, Sixth, And Eighth Amendments**

Upon information and belief, the jury in Mr. Jackson's case was exposed to, and improperly influenced by, extraneous evidence and information. Some jurors failed to abide by the Court's instructions to refrain from reading media and discussing the case with family and friends. One juror, who had some familiarity with the operation of prisons, shared extraneous information about prison life that affected the jury's verdict. Several jurors, who were teachers, introduced extraneous evidence in deliberations about how to determine whether a person had mental retardation.

These facts establish a *prima facie* case that outside influences affected the jury's sentencing decision, influences which are presumptively prejudicial. As the Fifth Circuit observed in *United States v. Gonzales*, 121 F.3d 928, 944-45 (5th Cir. 1997):

> This court takes a dim view of permitting jurors to consider items that were not properly admitted into evidence. "It is firmly established in this circuit that a defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room 'unless there is no reasonable probability that the jury's verdict was influenced by the material that improperly came before it.'" [Citations omitted.] There is a rebuttable presumption of prejudice; consequently, the conviction must be reversed unless the government establishes that the error was harmless.

An impartial jury must be capable and willing to decide the case solely on the evidence before it. *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Improper conduct on the part of any juror which damages his or her impartiality effectively destroys an accused's right to a fair trial. *United States v. Gaffney*, 676 F. Supp. 1544, 1556 (M.D. Fla. 1987) ("[I]f just one juror receives prejudicial off-the-record information the prejudicial effect spills over and is viewed as having tainted all jurors"). Therefore, if a

269

single juror votes for death based on consideration of improper evidence or information, then such misconduct is harmful.  *See Gaffney*, 676 F. Supp. at 1556*; United States v. Delaney*, 732 F.2d 639, 643 (8th Cir. 1984); *United States v. Rattenni*, 480 F.2d 195, 198 (2d Cir. 1973) (defendant entitled to twelve fair and impartial jurors).

Moreover, courts have recognized that extraneous influences on a jury need not originate with third-party contact but can arise from improper comments and discussion amongst the sitting jurors themselves.  *See, e.g., Jeffries v. Wood*, 114 F.3d 1484 (9th Cir. 1997) (holding improper communication need not come from source outside jury to require reversal); *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) (murder conviction, in which battering and abuse issues prominent, reversed in habeas where juror did not acknowledge own sexual abuse during voir dire and then discussed own experiences with other jurors).

### 1.    **Improper influence from Media and Family/Friends**

Upon information and belief, several of the jurors, during Mr. Jackson's trial, read media reports and searched the internet for information relating to Mr. Jackson's case.  Some of the jurors discussed their findings with other members of the jury in violation of this Court's instructions.  In addition, at least one juror discussed the case with family and/or friends.

This improper influence upon Mr. Jackson's jury must result in the reversal of the convictions and sentences in his case.  *See, e.g., United States v. Gaffney*, 676 F.Supp. 1544 (M.D. Fla. 1987) (media influence when jurors read and discussed newspaper articles of the trial during their service as jurors on the case); *United States v. Thomas*, 463 F.2d 1061 (7th Cir. 1972) (jurors had prejudicial news accounts containing references to inadmissible evidence in their possession and some jurors used this information to convince other jurors of the defendant's guilt).

Given that Mr. Jackson has learned of only the outlines of the content of the *ex parte* communications, further discovery and an evidentiary hearing is necessary.

270

> Where, as here, the record is void of any specific information regarding the occurrence and nature of, as well as the circumstances surrounding the *ex parte* contacts, the impact thereof upon the jurors, and whether or not the juries were prejudiced, a hearing in which all interested parties are permitted to participate is not only proper but necessary.

*United States v. Bishawi*, 272 F.3d 458, 462 (7th Cir. 2001).

2.  **Improper Extraneous Evidence**

Mr. Jackson alleges, upon information and belief, that his jury was improperly influenced by the introduction of extraneous evidence during deliberations. One of the jurors in Mr. Jackson's case professed to have special knowledge and expertise regarding prisons and prison life. The information this juror shared with the others during deliberations—information not gleaned from the witness stand or subjected to cross-examination—improperly influenced the decision of other members of the jury.

Similarly, several teachers on the jury explained, based on extraneous evidence not adduced at trial, that Mr. Jackson was not a person with mental retardation because he had allegedly "taught himself to read." These jurors also asserted, based upon extraneous evidence, that they could tell that Mr. Jackson's low IQ scores were a result of school absences and not intellectual deficiencies. This evidence, derived from evidence not presented in court, directly affected various special mitigation issues and prejudiced Mr. Jackson's jury. *See e.g.* Special Verdict Form at 8-9 (Ex. 37) (#8 "He was diagnosed in the mentally retarded range throughout school, with a full scale IQ score of 67 in the 4th grade, and this factor is mitigating" (0 jurors so found); #9 "He was diagnosed with a full scale IQ score of 73 at age 24 while in Folsom Prison and this factor is mitigating" (0 jurors); #10 "He was placed in special education classes and this factor is mitigating" (0 jurors)).

271

Mr. Jackson has established a prima facie showing that he suffered prejudice from his jury's improper consideration of extraneous evidence. Further discovery and an evidentiary hearing is necessary. *See Bishawi*, 272 F.3d at 462.

3.     **Use of Religion**

Several of the jurors in Mr. Jackson's case improperly and prejudicially introduced, and relied upon, their religious beliefs to convince other jurors to vote for death. Upon information and belief, one juror who was in favor of a death sentence, informed several other jurors (whom the juror knew to be Christians like herself) that she had prayed and learned that sentencing Mr. Jackson to death was acceptable in the eyes of God. After discussion about whether the tenets of Christianity supported a death sentence for Mr. Jackson, the holdout jurors felt able to change their position and vote for a death sentence.

Courts have recognized that due process specifically prohibits the reliance upon Biblical text to determine whether a particular individual should be condemned to death. *See, e.g.*, *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001); *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000); *see also Carruthers v. State*, 528 S.E.2d 217, 221 (Ga. 2000) ("The problem is that biblical references inject the often irrelevant and inflammatory issue of religion into the sentencing process and improperly appeal to the religious beliefs of jurors in their decision on whether a person should live or die. Moreover, many passages in the Bible, Talmud, and other religious texts prescribe or command a sentence of death for killing. By quoting these texts during closing arguments, prosecutors may 'diminish the jury's sense of responsibility and imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.") (*overruled on other grounds by Vergara v. State*, 657 S.E.2d 863 (Ga. 2008).

The introduction of religious doctrine during the jury's deliberations raises several distinct legal violations. First, as with the improper evidence discussed above,

272

biblical doctrine constitutes extraneous evidence and can have a prejudicial effect on the jury's verdict. The Fifth Circuit in *Oliver v. Quarterman*, 541 F.3d 329 (5th Cir. 2008) surveyed the circuit case law on whether use of a Bible during deliberations was an external influence. Noting that the Fourth Circuit was the only circuit court to hold that it was not an external influence, the *Oliver* Court found Fourth Circuit Judge Robert B. King's dissent persuasive and ruled that the Bible was indeed an external influence. *Id*. at 338-39.[52] Because Mr. Jackson's jury relied upon religious doctrine as support of a death sentence, his sentence must be vacated.

Second, admission and discussion of Christian principles during the jury's deliberations also violated the jury's admonition to decide Mr. Jackson's case solely on the evidence presented in court and the law instructed by the judge. As Judge King of the Fourth Circuit noted in the opinion favorably cited by the Fifth Circuit, when principles such as "an eye for an eye" intrude into the jury room, the danger is that the jury may decide the defendant's "fate by reference to a dictate that is contrary to what our Constitution mandates, and that derives from what many consider to be a divinely

---

[52]    In *Oliver,* the Fifth Circuit left open whether biblical discussions or personal examination of biblical text, absent the physical presence of a Bible, was an external influence. *Oliver* at 340 ("The question before us is not whether a juror must leave his or her moral values at the door or even whether a juror may consult the Bible for his or her own personal inspiration during the deliberation process. This case is also not about whether jurors must forget that, generally, the Bible includes the concept of an 'eye for an eye.' *See Burch,* 273 F.3d at 591 (noting that the 'Bible quotes, whether stated from memory or read from the book, were ... statements of folk wisdom or of cultural precepts'). Therefore, we need not address these issues."). As commentators have recognized, however, this distinction has no difference: "It makes no difference to a defendant sentenced to death on the basis of an eye for an eye whether his jury read directly from the Bible or based its decision solely on religious discussion. In either case, the jury, by basing its verdict on a principle of decision other than the law as instructed by the court, has abdicated its responsibility to decide the case on the basis of the law and facts and has deprived the defendant of his Sixth Amendment right to an impartial jury. Thus, there is no Sixth Amendment justification for the distinction Rule 606(b) draws between religious text and religious discussion." Sanderford, D, *The Sixth Amendment, Rule 606(B), And The Intrusion Into Jury Deliberations Of Religious Principles Of Decision*, 74 TENN. L. REV. 167 (2007).

273

inspired source of law." *Robinson v. Polk*, 444 F.3d 225 (4th Cir. 2006) (King, J., dissenting to denial of en banc rehearing).  Such a result is plainly inconsistent with the Sixth Amendments guarantee that Mr. Jackson's jury will decide his case in accordance with the law as instructed by the Court.

Finally, Mr. Jackson's jury violated his *constitutional* protection against state establishment of religion by relying upon an improper external influence—explicitly discussed religious tenets—when deciding whether to impose a sentence of death.  The First Amendment directs that "Congress shall make no law respecting an establishment of religion ...." U.S. Const. amend. I.  The Establishment Clause is not limited to Congress but applies to all state actors, a wide-ranging group including an athletic association, school officials, and even doctors treating prisoners.  *Tenn. Secondary School Athletic Ass'n v. Brentwood Acad.,* 127 S. Ct. 2489, 2493 (2007); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995); *West v. Atkins,* 487 U.S. 42, 55 (1988).  Juries, acting with the power of the Government, fall squarely within this category.  *See* Terrence T. Egland, *Prejudiced by the Presence of God: Keeping Religious Material Out of Death Penalty Deliberations,* 16 CAP. DEF. J. 337, 359-60 (2004); *see also Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 626 (1991) (referring to a jury as a "governmental body"); *United States v. Jones*, 973 F.2d 928, 367-68 (D.C. Cir. 1992) (Mikva, J., concurring in part and dissenting in part) ("The 'inconsistency' that my colleagues imagine flows from the fact that they characterize the cases at a sweeping level of generality, and ignore the Court's careful distinctions between different state actors (judges, juries, and prosecutors) and the different contexts in which they act (before, during, and after trial)."); Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause,* 83 IOWA L. REV. 499, 525 (1998) ("We do not normally require that a party be protected against an amorphous risk that a state actor—in this case the jury—will violate its legal obligations.").

The jury's reliance on Christian principles when deliberating the possible imposition of the death penalty in Mr. Jackson's case is an unconstitutional establishment of a religious creed by the Government, through the state sanctioned actions of the jury. A jury's reliance on the edicts of the Bible, or any other religious text, improperly uses religion to assist with the decision to impose a death sentence and unconstitutionally establishes religion in the jury room. The Court should grant relief from Mr. Jackson's death sentence.

## CLAIM 13

### MR. JACKSON WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL BY HIS APPELLATE ATTORNEYS' FAILURE TO RAISE MERITORIOUS CLAIMS ON APPEAL, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

**A.**     **Mr. Jackson's Appellate Counsel Were Ineffective For Not Appealing The Government's Violation of Mr. Jackson's Rights to Due Process and a Speedy Trial**

Pre-indictment delay can, under certain circumstances, violate a defendant's due process rights under the Fifth Amendment and/or a defendant's speedy trial rights under the Sixth Amendment. Here, the Government violated those rights, as Mr. Jackson was not indicted for the murder of Daryl Brown until April 2005, more than four years after the incident occurred. This substantial delay appears to have been intentional, as the Government first filed, and then dismissed, weapons charges against Mr. Jackson and co-defendant Arzell Gulley when it was apparent that neither Mr. Jackson nor Mr. Gulley would plead guilty to the weapons charges. Then, after Mr. Jackson had been released from prison and arrested on wholly unrelated charges, the Government indicted Mr. Jackson for the murder of Daryl Brown, and, benefitting from the delay, used Mr. Jackson's subsequent arrest as the statutory aggravator for seeking the death penalty against Mr. Jackson. Had the Government not intentionally delayed

275

indicting Mr. Jackson for Daryl Brown's murder, Mr. Jackson would never have been released from prison in 2004 and the Government would not have had the grounds for seeking the death penalty against Mr. Jackson.  This is clearly prejudicial to Mr. Jackson.

1. **Mr. Jackson's Prior Counsel Were Ineffective For Not Raising This Issue on Appeal**

Mr. Jackson's prior counsel did raise a speedy trial claim at trial and on appeal.  *See Jackson*, 549 F.3d at 969-71.  However, prior counsel only focused on the delay from the subsequently dismissed weapons indictment in November 2003 through the October 2006 trial.  For most of that "delay," however, there was no indictment pending and Mr. Jackson was not otherwise under restraint related to the death of Daryl Brown.  Additionally, some of the "delay" was due to motions that Mr. Jackson's prior counsel filed.  These arguments lost.

Mr. Jackson's prior counsel did not focus at all on the extensive pre-indictment delay before the weapons indictment, the intentional nature of that delay, and the tactical nature of that indictment.  Nor did they focus on the fact that, but for the delay, Mr. Jackson never would have been released, and never would have had the opportunity to commit the crime that the Government used to satisfy the statutory aggravator requirement for seeking the death penalty.  Given the extremely prejudicial result of this delay, Mr. Jackson's prior counsel were ineffective in failing to raise the intentional pre-indictment delay.  Thus, the fact that Mr. Jackson's prior counsel did raise a different, unrelated speedy trial claim does not bar Mr. Jackson from raising this claim now.

2. **Elements of a Speedy Trial Claim Based on Pre-Indictment Delay**

As a general rule, pre-indictment delay does not give rise to a speedy trial claim in violation of the Sixth Amendment, as the right to a speedy trial attaches when a defendant is indicted or is arrested and held pending a criminal charge.  *See United States v. Loud Hawk*, 474 U.S. 302, 310-11 (1986).  Here, however, Mr. Jackson can

276

demonstrate that he was held pending charges related to the death of Daryl Brown, as Mr. Jackson was removed from general population and placed into administrative detention in December 1999, where he remained, first at Beaumont and then at the ADX, until his release in February 2004.

Where a defendant has been restrained pre-indictment, the elements of a pre-indictment delay claim are that the Government intentionally delayed indicting the defendant for the purpose of gaining a tactical advantage, and in so doing, caused substantial prejudice to the defendant. *See United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996). For purposes of a pre-indictment delay claim, the prejudice must be more than mere speculation.

3.   **The Government's Pre-Indictment Delay Prejudiced Mr. Jackson**

As discussed above, following the incident, Mr. Jackson was removed from his cell in the general population and placed in administrative detention. Soon after USP Beaumont's completion of its investigation into the incident in March 2000, the Government transferred Mr. Jackson to the Administrative Maximum Facility ("ADX") in Florence, Colorado. Mr. Jackson served the remainder of his sentence arising from his 1990 arrest, *i.e.* nearly four years, at ADX.

In February 2004, when Mr. Jackson was released from ADX, he had been in administrative detention as a result of the incident for nearly 50 months. Although the Government could have charged Mr. Jackson with the murder of Daryl Brown at any point after the completion of the investigation in March 2000, the Government did not.[53]

In May 2004, Mr. Jackson was arrested for attempting to rob the Union Planters Bank in Collinsville, Mississippi. Mr. Jackson pled guilty to three counts of the

---

[53]   As previously noted, in November 2003, Mr. Jackson and co-defendant Arzell Gulley were indicted for possessing a weapon, *i.e.* in David's case the shank that Daryl Brown pulled on Mr. Jackson on December 16, 1999. When neither Mr. Jackson nor Mr. Gulley agreed to plead guilty the indictment was dismissed.

four-count indictment related to the Mississippi bank robbery and was sentenced to prison for approximately eleven years.

In April 2005, the Government indicted Mr. Jackson and co-defendant Arzell Gulley for the murder of Daryl Brown in December 1999.

In January 2006, the Government gave notice of its intent to seek the death penalty against Mr. Jackson for the murder of Daryl Brown.  The Government cited the 2004 Mississippi bank robbery as its statutory aggravator for seeking the death penalty.

As a result of the Government's intentional and tactical delay, Mr. Jackson suffered extreme prejudice.  That the Government's delay was intentional is clear. Although USP Beaumont concluded its investigation in March 2000, no charges of any kind related to the death of Daryl Brown were brought until November 2003, right around the time Mr. Jackson was scheduled to be released from prison for his 1990 weapons charge.  This timing is not coincidental.

Similarly, the Government's actions show an attempt to gain a tactical advantage.  When charges related to Daryl Brown's death were originally brought, the Government only obtained indictments for possession of a weapon.  The Government likely hoped that Mr. Jackson would plead guilty to that charge, then freeing the Government to use that plea to bootstrap its way to more serious charges.  When Mr. Jackson would not plead guilty, rather than prosecute the charge, the Government dismissed it.  This again shows the tactical nature of the Government's actions.

Finally, the Government's actions resulted in substantial prejudice to Mr. Jackson in two ways.  First, had the Government, as it should have, indicted Mr. Jackson for Daryl Brown's murder at any time before Mr. Jackson's release in February 2004, Mr. Jackson would not have been released from prison.  If Mr. Jackson had never been released from prison, he never would have returned to Detroit, saw his mother living in squalor, and out of desperation to help his ailing mother, attempted the crime that the Government used as the statutory aggravator for seeking the death penalty.

278

Second, if Mr. Jackson's appointed counsel defending him against the Mississippi bank robbery had been apprised of the possibility that a conviction in the Mississippi bank robbery would be used as a statutory aggravator to seek the death penalty against Mr. Jackson in connection with Daryl Brown's death, Mr. Jackson never would have pled guilty to any of the charges. Although Mr. Jackson may still have been convicted had the matter gone to trial, such a conclusion is speculative, and Mr. Jackson's due process rights are violated if his death sentence is upheld based on a speculative result. Thus, the Government's intentional and tactical delay prejudiced Mr. Jackson.

**B.      The Failure To Raise As Fundamental Error Prosecutorial Misconduct In The Government's Closing Argument At The Penalty Phase.**

As discussed in Claim 5.M, *supra*, the Government's closing argument at penalty phase included serious improprieties and violations of prosecutorial ethics and the Constitution. The Government's duty is to "do justice," not win at all costs. *Berger v. United States,* 295 U.S. 78, 88 (1935). As set forth in Claim 5.M, the improper argument at the penalty phase closing included: (i) referring to matters not in evidence and misstating the evidence; (ii) misstating the law; (iii) the AUSA giving personal opinions about the credibility of witnesses; (iv) disparaging and asking the jury not to consider legitimate mitigating evidence; and (v) urging the jury to vote for death because it was their duty.

Perhaps the most glaring violation by the Government that trial counsel did not object to at trial or raise on appeal was AUSA Batte talking about his knowledge of the Arzell Gulley trial, referencing evidence not proffered to the jury or subjected to the adversarial process in Mr. Jackson's trial. During closing arguments at the penalty phase, AUSA Batte said:

279

> Well, the first mitigating factors, if you look through them, mitigating – the two statutory ones are, one, Gulley was equally culpable.
>
> ***Now, I prosecuted Arzell Gulley. He went to trial right here,*** you know that, and he got a life sentence. And he was just as guilty under the law as that man. But there's a difference between guilty and culpable. There's a difference. ***Culpability speaks to the role in the offense.***
>
> This man was more culpable and is more culpable.

((Tr. 1908.) (emphasis added))  For the prosecutor to tell the jury that Mr. Jackson was "more culpable" based on the prosecutor's *own* experience in an entirely separate trial, implying that he was privy to all sorts of information the jury did not and would not know, was the height of impropriety.

These examples of improper argument were so fundamental to Mr. Jackson's fair trial rights that they were cognizable on direct appeal even without a contemporaneous objection or motion for mistrial from defense counsel. But, continuing the ineffective representation they provided at trial by not objecting to the Government's improper argument, on appeal trial counsel failed to raise these errors on appeal as fundamental or plain error. The failure of appellate counsel to raise the issues was unreasonable and prejudicial to Mr. Jackson.

## CLAIM 14

### MR. JACKSON WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BECAUSE THE FEDERAL DEATH PENALTY, AS ADMINISTERED, IS DISPROPORTATELY AND UNCONSTITUTIONALLY APPLIED ACCORDING TO THE RACE OF THE DEFENDANT, AND TRIAL AND APPELLATE COUNSEL MADE NO OBJECTION BASED ON THIS FACT

**A.    Use of the Federal Death Penalty is Biased Against Minority Defendants**

Although Texas is 71% white, according to the 2000 census, 90.9% of federal death sentences have been imposed on minorities. In other words, only one of eleven federal death sentences in Texas has been pronounced on a white defendant. This

280

selective prosecution of minority defendants exceeds even the high rates found in *The Federal Death Penalty System: A Statistical Survey (1988-2000)* (Ex. 73), which found that 79%, or 15 of 19 defendants under a federal sentence of death as of July 20, 2000, were minorities. *See* United States Dept. of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000)*, at 28–35 (Sept. 12, 2000) (Ex. 73).

Racial bias permeates every aspect of federal capital prosecutions. For example, from 1988 to 1994, 52 defendants were submitted for consideration for capital prosecution, and all but 7 of these (13%) were minorities. *Id*. at 6. From 1995 to 2000, 682 defendants were reviewed by the Department of Justice for a potential capital charge under revised procedures, and all but 134 (20%) were minorities. *Id*. Although a racially disproportionate pattern of capital charging and sentencing, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions, particularly in light of the relative rarity of federal capital prosecutions of prison homicides, and the unique facts of this case, including the Government's initial failure to investigate or prosecute the killing of Daryl Brown, the fact that Mr. Brown initiated the fight even under the Government's theory, and that Mr. Jackson was initially released from prison without charge.

## B.    Mr. Jackson's Counsel Was Ineffective For Failing to Litigate the Influence of Racial Bias in These Proceedings

Trial and appellate counsel failed to move for any discovery information regarding racial bias in the selective prosecution of Mr. Jackson, or to object to the proceedings based on the unconstitutional application of the Federal Death Penalty based on the race of the defendant. Trial and appellate counsel also failed to pursue or object to racial disparities in the proceedings against Mr. Jackson. For example, despite the fact that Beaumont is 45.8% black (according to the 2000 census) and Mr. Jackson's jury was 91.7% white, counsel failed to raise *Batson* challenges to the racial composition of the

281

jury.  As such, this claim is asserted alternatively as a claim of ineffective assistance of counsel.

### III.
### CONCLUSION/PRAYER FOR RELIEF

Wherefore, Mr. Jackson prays for the following:

A.      That Petitioner be permitted to file a brief in support of this Petition within 120 days;

B.      That the Government be required to answer this Petition and file a responsive brief;

C.      That the Court permit such discovery as will be requested in Petitioner's to-be-filed Motions for Discovery;

D.      That upon such discovery Petitioner be permitted to amend this Petition;

E.      That this Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

F.      That the Court permit oral argument as appropriate and required; and

G.      That at the conclusion of the proceedings that the Court vacate Petitioner's conviction and sentence and order that appropriate retrial and/or new sentencing hearings be conducted.


Dated:  October 5, 2010                              RESPECTFULLY SUBMITTED,


/s/ STEVEN J. OLSON _____ _          /s/ JAMES C. LOHMAN _____ _
STEVEN J. OLSON (Cal Bar #182240)       JAMES C. LOHMAN (Fl Bar #0570214)
STEVEN H. BERGMAN (Cal Bar #180542)     1806 East 39th Street
O'MELVENY & MYERS LLP                    Austin, TX 78722
400 S. Hope St.                          Attorneys for Defendant/Petitioner
Los Angeles, CA 90071                    DAVID LEE JACKSON


282

## Certificate of Service

I hereby certify that on this 5th day of October, 2010, I sent a true and correct copy of the foregoing instrument, using the Court's CM/ECF, to Kerry M. Klintworth, AUSA, U.S. Attorney's Office -- Beaumont, 350 Magnolia, Suite 150, Beaumont, TX 77701.

/s/ *Steven H. Bergman*

STEVEN H. BERGMAN

## Certificate of Filing Motion to Seal

Pursuant to Local Rule CV-5(a)(7)(A) of the United States District Court for the Eastern District of Texas, I hereby certify that on the 4th day of October, 2010, Petitioner David Lee Jackson filed a Motion to Seal the foregoing Petition for Collateral Relief and Exhibits thereto.

/s/ *Steven H. Bergman*

STEVEN H. BERGMAN (Cal Bar #180542)
O'MELVENY & MYERS LLP
400 S. Hope St.
Los Angeles, CA 90071