# EXHIBIT 1

## DECLARATION OF RICHARD G. DUDLEY, JR., M.D.

I, RICHARD G. DUDLEY, JR., declare as follows:

1.    I am a physician with a specialty in psychiatry, who is licensed to practice medicine in the State of New York, and board certified in psychiatry by the American Board of Psychiatry & Neurology.   I received my medical degree from Temple University School of Medicine in 1972, and then completed an internship and residency in psychiatry at Northwestern University Medical Center in December 1975.

2.    I was previously Deputy Commissioner of what was then the New York City Department of Mental Health, Mental Retardation & Alcoholism Services, and then later I was Medical Director of the Washington Heights-West Harlem Community Mental Health Center.  In addition, I was previously a Visiting Associate Professor and director of the Behavioral Sciences Department at the City University of New York Medical School at City College, and an Adjunct Assistant Professor at the New York University School of Law.

3.   Since 1984, I have been engaged full-time in the private practice of psychiatry in New York City, with a practice equally divided between a clinical practice focused primarily on the evaluation and treatment of African-American men, and a forensic practice.  With regard to the forensic part of my practice, I have been retained for both civil and criminal proceedings, and I have testified as an expert in psychiatry in both State and Federal courts throughout the United States.  The criminal proceedings I have been involved in have included capital cases at both the trial level and post-conviction;

01-001

my teaching at the law school has included the use of mental health experts in capital litigation; and so I believe that I am well aware of the nature of, purposes of and rules that govern the work required of mental health experts involved in capital litigation, as well as the standard of practice for such experts and the attorneys who retain them.

4.  A copy of my curriculum vitae is attached.

5.  At the request of the attorneys who are currently representing David Jackson, I performed a psychiatric evaluation of him in connection with a prospective challenge to his first degree murder conviction and death sentence.  It is my understanding that in 2006, Mr. Jackson was convicted and sentenced to death for killing a fellow inmate while incarcerated in Federal prison.  It is my understanding that the focus of the evaluation was to be on whether or not there is mental health evidence that could have been developed and presented at Mr. Jackson's trial that wasn't presented, especially with regard to mental health mitigation at the penalty phase of the trial.

6.  As part of performing my psychiatric evaluation of Mr. Jackson, I reviewed the penalty phase testimony from his 2006 trial for murder, several psychiatric reports and assessments that were performed at that time and earlier in his life, school records, prison records, several other materials that describe his childhood and background, including declarations from family members and others who have known Mr. Jackson over the course of his life, and various medical records of and other documents pertaining to various biologically-related family members.  It should be noted that these are the

2

types of materials that are normally used to develop a 'social history' for defendants involved in capital proceedings, and such materials/a 'social history' is not only regularly relied upon by mental health professionals who perform evaluations in connection with capital proceedings but such is also critical/central to the performance of a competent mental health evaluation in connection with capital proceedings. In addition, I performed my own psychiatric examination of Mr. Jackson in March 2010.

7. The following impressions and opinions are based on information currently available to me:

8. Mr. Jackson was born into a family with a significant history of serious mental illness, including psychiatric disorders for which genetic transmission is a well-established part of the etiology of the disorder. More specifically, there is a significant family history of major mood disorders such as depression and bipolar disorder; a significant family history of schizophrenia and other psychotic disorders; and a significant family history of alcoholism and other substance abuse and dependence. This family history is significant both because it rendered Mr. Jackson genetically vulnerable to the development of these and/or related disorders, and also because it means that he was raised by/surrounded by persons suffering from such severe mental illnesses.

9. Mr. Jackson's mother, Sammie Lee is described by family members and neighbors as suffering from serious depression. She did not read or write or drive, rarely left her house, and showed little interest in anything. She talked to herself and "saw things that were not happening." She would write curses on slips of paper, presumably

3

01-003

with symbols, given her illiteracy, "stuff them in jars" and ask her niece Brenda to bury them in the back yard. Her sister, Emma, was reportedly unfit to raise children due to her own mental infirmities, which is how Emma's daughter, Brenda, originally came to reside with the Jackson family.

10. Mr. Jackson's sister, Patricia, has a documented history of psychiatric illness and symptoms and reports being diagnosed at various times with schizophrenia and bipolar disorder. She is prescribed Zoloft, lithium and Seroquel which are used to treat such mood and psychotic disorders. Patricia's oldest daughter, Joanna, has been diagnosed with schizophrenia and is a lifelong psychiatric patient. Patricia's other daughter, Yvette, reports being diagnosed with bipolar disorder and anxiety disorder and "episodes of severe depression." She is "supposed to take lithium" but does not like the side effects. She has been hospitalized for psychiatric care.

11. Mr. Jackson's first cousin Joan, his genetic cohort in the first degree, was also diagnosed with bipolar disorder and is reported by her siblings to have been "mentally ill" and completely unable to care for her four children who were "bounced in and out of foster care," or given up for adoption and lost track of.

12. Mr. Jackson's first cousin, Larry, has been diagnosed as suffering from a schizo-affective disorder and has been awarded disability payments by the Social Security Administration from January 2004 to the present.

01-004

13.    Additionally, some of Mr. Jackson's biologically related family members suffer from intellectual deficits and/or other cognitive difficulties. As noted, his mother was completely illiterate and is described as being "very limited mentally." Only one of the eight children who grew up under Mr. Jackson's roof made it through high school and most of them did poorly in school. None of his three siblings graduated from high school. The school records of his sister, Patricia, reflect that she was in the 3rd to 5th percentile in reading on standardized achievement tests in grades 4 through 6. His brother, Stanley, received almost nothing but D's and E's (failing) in the same grades.

14.    Although such a significant family history of intellectual deficits and/or other cognitive difficulties might be at least in part due to the fact that so many of Mr. Jackson's family members were raised in environments that did not foster healthy cognitive development and/or that they endured various types of brain trauma, such impairments are sufficiently common in his family that a genetic basis for such difficulties must also be considered. This aspect of Mr. Jackson's family's mental health history is significant because it means that his mother's capacity to parent him was compromised by her intellectual and/or other cognitive difficulties. It also means that Mr. Jackson was at risk of having similar difficulties, because he too was raised in an environment that did not foster healthy cognitive development and that placed him at risk of physical harm to his brain. Additionally, he was genetically vulnerable to the development of such difficulties.

5

15.   It is also important to note that unlike other members of Mr. Jackson's extended family who continued to live in Arkansas, years before he was born his parents migrated to Detroit, thereby leaving behind the support that might have been available from their extended families.   Given all of the problems that his parents faced (described above and below) and their resultant limited capacities to take care of themselves or their children, the support traditionally provided by extended family members in this ethno-cultural group could have made a critical difference in the lives of Mr. Jackson and his siblings.  While this might appear rather speculative, many of Mr. Jackson's cousins who were raised in Arkansas have always functioned much better than Mr. Jackson and his siblings, and even those cousins who have suffered from serious mental health problems have functioned better, in that unlike Mr. Jackson and his siblings they were evaluated and treated for their mental health difficulties.

16.   David Jackson was born on ▮▮▮▮▮ 1960, with the vulnerabilities noted above.  Then, during his entire childhood, he was repeatedly exposed to severe trauma inside his family home.  More specifically, Mr. Jackson reported to me, and others have confirmed that Mr. Jackson's father, Leroy Jackson, was an alcoholic who totally controlled and repeatedly, severely physically abused Mr. Jackson's mother often to the point where she was seriously injured, right in front of Mr. Jackson, his siblings and the other children who were in his home.  He reported to me, for example, that he clearly remembers an incident when he was about 8 or 9 years old, where his father beat his mother over her head with a hammer; while doing this, his father threatened to kill his

6

mother; and his father left his mother covered in blood. This incident is also referred to by his sister Patricia who reports that all the children observed the assault and that it was extremely upsetting and scary to them. Others report that Leroy would throw Ms. Jackson against the wall, threaten to kill her and on one occasion broke the leg off a table and was swinging it at her. He was known to "drag Sammie Lee around by her hair and beat her right in front of everyone."

17. Leroy Jackson also assumed the responsibility for disciplining Mr. Jackson, his siblings and his cousins who his mother had brought into their home when they were young children. However, his approach to "discipline" was so severe that even back then it would have been considered child abuse, because Mr. Jackson and the others were regularly severely injured during the course of being disciplined by his father. The abuse that they endured was far out of proportion to anything that they had done. Indeed, it was often the case that they had no idea why they were being beaten.

18. Mr. Jackson's siblings and cousins describe being beaten by Leroy Jackson with extension cords and bed slats, and being threatened with guns and razor blades. He was also known to use "bottles, bricks and shoes." Cousin Brenda recalls: "He would make us take our clothes off and he would hold us down or between his legs . . . and beat us until we bled or he became exhausted." He was known to chase David and the others down the street or down an alley, in some cases armed with weapons or objects. "He would pull out his knife at the drop of a hat." Neighbors and others describe Mr. Jackson's father as "a cruel abusive man," "mean and brutal," "scary and intimidating."

7

"He was known in the neighborhood as a very dangerous person and someone to fear and avoid." "He would cuss them out, throw things at them and generally terrorized the whole household."

19.    Mr. Jackson reported to me, and others have confirmed that when his father would physically abuse his mother, he/Mr. Jackson would just sit there and cry; this crying at even just the thought of such violence continued well into his adolescence; and he reported to me that even now, he cries when exposed to things that remind him of the violence he was exposed to during his childhood years.  He reported that although his mother would at times at least try to stop his father from beating him and his siblings, his mother was totally unable to stop his father, and more often than not, her efforts would result in his beating her again too.

20.    Mr. Jackson also reported to me that throughout the neighborhood his father was known to be unpredictable and violent, and he remembers seeing his father do violent things outside of the home as well throughout the course of his childhood and adolescence.  One of the most dramatic incidences that he described to me occurred when he was a young adolescent; his father confronted him and his older male cousin on the street; and his father then shot his cousin in the groin, and then turned the gun on him/Mr. Jackson.

21.    During his first years of his life, Mr. Jackson is reported to have progressed very slowly in terms of the developmental "markers"  or "milestones" by which early

01-008

childhood development is assessed, e.g., walking, speaking, tying shoes, thumb-sucking, crying, etc. His two older cousins describe David's early years in their declarations:

> . . . David was more dependent on Sammie Lee than any of the other kids. He would put his shoes on the wrong feet and would button up his shirt incorrectly. He could not dress himself or tie his shoes until he was in at least second grade. He did not bathe himself until he was seven years old. He wet the bed until he was ten years old. Sammie Lee and Leroy told us that whenever we got up at night to go the bathroom we had to wake up David and take him with us. He sucked a bottle and pacifier until he went to school and sucked his thumb long after he was going to school.

Declaration of Brenda Boyd, paragraph 28.

> David was very slow in developing. It always seemed like there was something short-circuited in his brain. He drank from a bottle until he was five years old, wore diapers until he was four or five, sucked his thumb until he was seven or eight, and couldn't tie his shoes. He didn't do well in school so he stopped going when he was about ten years old. Sammie Lee was always doing little things for him because he didn't take care of himself.

Declaration of Larry Anderson, paragraph 15.

22. Mr. Jackson's early development and maturation were significantly delayed in virtually all spheres.

23. Then, once in school, Mr. Jackson evidenced very poor academic performance and strong evidence of impaired cognitive functioning. His IQ scores at the ages of 7 and 10 were within the range of mild mental retardation, when applying the "Flynn Effect" to the earlier score. His low performance on intellectual testing combined with his apparent deficits in functional behavior would appear to support such a diagnosis. In addition, his very low scores on achievement tests at the ages of 13 and 14,

01-009

when he was still functioning at a 2nd grade level in most areas, is also consistent with mild mental retardation.

24.    During my examination of Mr. Jackson, he reported, and his school records confirm, that despite the fact that he was placed in special education classes, he still just couldn't comprehend the material that they were trying to teach him in school. In addition, he reported that he also really didn't understand many of the things that were going on in his home or out in the streets. He noted that he doesn't know why he couldn't learn and/or figure out things that others seemed to be able to learn and/or figure out, but he eventually concluded that maybe school just wasn't for him.

25.    Given Mr. Jackson's family history of intellectual and other cognitive deficits, the impact of poverty which included little-to-no prenatal care for his mother and poor health care for him, the chaos and violence in his family home and reports of multiple incidences of head trauma, he may be suffering from both intellectual and other cognitive deficits, the etiology of which is likely multi-factorial. Although other experts will opine on this more fully, what is clear is that Mr. Jackson's intellectual and/or other cognitive deficits date back to his earliest childhood years; they impacted significantly on his development and his ability to understand and cope with the above described stressors and traumas that were a part of his environment; and they continue to impact on his ability to understand and address the psychiatric difficulties that resulted from those stressors and traumas that he endured.

10

01-010

26. The information available to me indicates that as a young child, Mr. Jackson evidenced the signs and symptoms seen in children exposed to the above described type of almost constant traumatization that he was exposed to. More specifically, he reported, and others have confirmed, that he was unable to trust anyone, with the possible exception of his mother; he was always expecting something horrible to happen. His inability to trust was so severe that he often appeared to be paranoid. He was also hyper/over-reactive; he would impulsively act without taking the time to think about the consequences of his actions; and his actions were often much more than the situation warranted.

27. The above-described constant traumatization that Mr. Jackson endured would be enough to cause such a trauma response. However in Mr. Jackson's case, his impaired cognitive functioning made it all the more difficult for him to understand and cope with what was happening to him, which in turn made the impact of the traumas on him all the more severe. Then, in addition, based on the reports of Mr. Jackson and others, he didn't have anyone who could provide him with a safe space/a respite from the violence and/or the type of parental nurture and care that might have helped mitigate against the impact of the trauma.

28. It is important to note that survivors of the type of ongoing violence that Mr. Jackson experienced during his childhood and early adolescent years, especially those who have inadequate parental nurture and care, not only have a psychological trauma response but also tend to develop an additional physiologic trauma response. All humans

11

01-011

have a physiologic response to extremely threatening situations, commonly known as the "fight or flight" response; children eventually learn to manage this response with the help of parents who calm and protect them; but in the absence of such parental nurture, care and protection, especially when the trauma is frequent/ongoing, a child never learns to manage the physiological response; and so eventually the child becomes constantly physiologically stimulated/over-reactive, a state which continues into adult life. Therefore, in Mr. Jackson's case, the above described symptoms of trauma that Mr. Jackson started to exhibit back when he was a child have both a psychological and physiological component.

29.   The above noted neglect is not the only form of parental neglect that Mr. Jackson experienced during this childhood years.  There was also abject poverty and a resultant lack of many of the basic things that children need to grow and thrive; there was the shear chaos caused by his father's behavior; and there was the instability in his environment that is associated with such poverty and chaos.  This extreme level of parental neglect only added to the sense of unpredictability and uncertainty that characterized Mr. Jackson's childhood years, which as he got older made it even harder for him to develop a sense that one could reasonably anticipate outcomes and thereby plan for and work towards the future.

30.   Furthermore, there does not appear to have been any limit setting or clear boundaries in Mr. Jackson's family home, which are critical for the healthy development of children.  For example, reportedly, Mr. Jackson's father was also a sexual predator; he

12

01-012

even fondled young adolescent girls in public, including his daughter and his niece; and it is at least suspected that he might have sexually abused some of these young girls. Such absence of limits and boundaries only adds to the chaos in the home, and severely impairs the eventual development of reasoned, adult decision-making.

31.    Mr. Jackson reported to me that when he was 13 years old he left home in order to escape all of the problems in his home. He reported that when his father wasn't home his mother would help him sneak back into the house to eat and clean up, but that he was otherwise out on the street without supervision and having to find ways to care for/support himself.

32.    Mr. Jackson also reported to me that even before he was 13 years old he had discovered that the use of various drugs helped him feel better/calmer. He noted that it was not until many years later, and then only in retrospect that he realized that he had developed a drug addiction by his early teenage years. Then, once he was essentially out on the street, his involvement in robberies allowed him to support himself and his already existing drug addiction. Other family members and friends report that Mr. Jackson was introduced to alcohol and drugs as a child. His sister states that he started drinking alcohol at the age of nine or ten. His cousin Larry states that Mr. Jackson started using marijuana and heroin at the age of twelve, and his friend Marcos Martinez reports that Mr. Jackson was injecting heroin at the age of thirteen or fourteen.

13

33.    The use of such debilitating and addictive substances at that age almost inevitably engenders significant adverse long term consequences for proper brain development since the brain is still developing rapidly during those critical formative years.  In addition, to experience chemical dependency on alcohol and heroin at such a young age is highly likely to lead to other persistent psychological problems.  These powerful forces, especially when combined with Mr. Jackson's cognitive impairments and his chaotic and destructive home environment, created challenges for Mr. Jackson that were all but insurmountable.

34.    According to the statements of Mr. Jackson's family members and others, all but one of the eight children raised in the home with Mr. Jackson responded similarly to the trauma and chaos in the family home.  Seven of the eight children became addicted to drugs and alcohol, all by the time they were in their teens.  Mr. Jackson's cousins Larry and Brenda state that Brenda is the only one of the eight children in the Jackson home who did not become addicted to drugs.  They report that their sister Joan and their brother Michael, both deceased, were addicted to drugs throughout their lives. Larry states that he started drinking at a young age and was using drugs in his early teens, including injecting heroin.  Mr. Jackson's sister Patricia states that she started drinking when she was twelve years old and has been addicted to heroin and crack cocaine for most of her life.

35.    Upon further exploration about the behavior that initially brought Mr. Jackson into contact with the juvenile justice system and then later the adult criminal system, Mr. Jackson reported that what started as joy riding with peers, escalated to

14

01-014

stealing cars, then further escalated to other robberies once he was out on his own, and then eventually, given his drug use/abuse, continued on into a range of drug-related difficulties. He noted however that his father never said that any of his behavior was wrong/never told him *not* to do it; the fact that his father was selling pills was a model for him and his brothers for selling other drugs; and once he ended up in a Federal prison, it seemed to him that his father was proud of that fact. He again noted that it wasn't until much later, and then only in retrospect that he asked himself 'what type of a father would do these things'; 'what type of a father would give his 16-year old son a gun and say go rob'; and 'why is it that he never had any proper guidance about the right things to do'. He noted that this is in stark contrast to when he was a child, when he thought that that was just his father and his father must be cool. He further noted that much later and only in retrospect did he realize why he never really valued the things that he was able to get with stolen money; he explained, for example, that he might take and use a car and then just give it away; and he noted that he regrets that it took him so long to discover that he might have really valued what he had if he had worked hard for it.

36. Mr. Jackson's above noted response is totally consistent with all reports about his father and also totally consistent with what is known about childhood development. More specifically, by all reports, Mr. Jackson's father constantly lied, cheated, swindled, philandered and otherwise encouraged criminality; he sold drugs and ran gambling schemes; and he had his own criminal history. As a young boy, Mr. Jackson's father was his primary role model, who not only totally failed to teach him right from wrong, but

15

01-015

actually encouraged and even rewarded wrong-doing. In other words, Mr. Jackson was taught and learned this behavior at a time when he was so young that he still idealized his father and was far too young to know on his own whether the behavior was right or wrong.

37.    Mr. Jackson was then further negatively influenced by the fact that he was institutionalized when he was so young and then continued to be institutionalized for most of the rest of his life. More specifically, because he was institutionalized he grew up and continued to live with males who were involved in criminal activity. In order to survive, he had to mask vulnerabilities that resulted from his above described mental health difficulties; he reported, for example, that although he was able to hide and cry when he was in juvenile detention, when he was placed in adult facilities he had to force himself to stop crying; and he reported, for example, that he couldn't let anyone know that he couldn't really read, etc. Then in addition, the real dangers and perceived dangers in such institutions only exacerbated his hypervigilance, impulsivity and over-reactivity, and he described in some detail how one had to be public about one's willingness to fight back/protect one's self.

38.    To understand Mr. Jackson's reaction to being assaulted with a knife, specifically, as relates to his current offense, it is important to note that his above described trauma-related symptoms were at least in part developed in response to traumatic personal encounters with knife-involved threats and injuries. His father was known to carry and wield knives and to threaten family members with knives and his

16

01-016

mother was known to have attacked his father with a large kitchen knife. Not only was Mr. Jackson exposed to this type of threatening conduct in his childhood home, he was actually stabbed in the rear shoulder during a disturbance at the federal prison in Marion, Illinois when he was incarcerated there in the mid-1990's. This is important because for persons who suffer from trauma-related psychiatric difficulties there are usually things that symbolize the traumas that they have endured, which when re-experienced, exacerbate their difficulties, and for Mr. Jackson, knives are likely such a symbol.

39.    Then in addition, at the time of the offense, the very real threat of being stabbed was superimposed on Mr. Jackson's pre-existing state of hypervigilance due to his developmental trauma mixed with the alertness to potential violence that is part of the fabric of life in a prison like USP Beaumont. Given Mr. Jackson's above noted experiences with knives, his reaction to the threat of a knife was much more an impulsive, reflexive action than any sort of premeditated act. Moreover, once the confrontation began, his state of hyper-arousal and fear dictated his behavior and subsequent actions until the threat was finally removed.

40.    This same sort of arousal response to threats and to emotionally-triggering external stimuli would tend to explain a number of Mr. Jackson's disciplinary incidents and infractions in prison. A number of these incidents, especially the more seemingly serious ones that were used against him as aggravating factors, appear in some cases to be more reactive than proactive, based both on the circumstances as reported as well as Mr. Jackson's own perceptions, which he attempted to explain during his trial testimony.

17

41.    As a result of the chronic institutionalization of Mr. Jackson, he also never really had an opportunity to deal with his above noted mental health difficulties in such a way that he could learn to function outside of an institution.  Given his lack of education and job skills, his mental health issues, and his general lack of knowledge about how to function in the outside world, whenever he was released, he always quickly returned to an institution.  Based on Mr. Jackson's reports to this psychiatrist, it appears that at least at this point he realizes that he just didn't know how to manage outside of the institution, and pretty much always gave up trying.  Of course, the fact that despite the problems associated with being institutionalized there is a certain order found within many institutions and an absence of certain responsibilities required for daily living, all of which Mr. Jackson was well aware of, might have also made it easier for him to function within these settings than in the outside world.

42.    Based on the information currently available to this psychiatrist, it is the opinion of this psychiatrist to within a reasonable degree of medical certainty that since his early childhood years and continuing to the present, Mr. Jackson has suffered from serious psychologically-based and physiologically-based trauma-related psychiatric difficulties characterized by hypervigilance that at least at times reaches the level of paranoia, and impulsivity and over-reactivity with regard to his response to real or perceived threats of danger/harm.  It is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Jackson has also suffered from intellectual and/or other cognitive deficits that are being further explored and will be

18

01-018

more specifically described by another expert; that these deficits made it all the more difficult for him to understand and cope with the traumas that caused his above described trauma-related psychiatric difficulties; and that these deficits have also compromised his ability to understand and address his trauma-related psychiatric difficulties. In addition, as a result of the intellectual and/or other cognitive deficits, Mr. Jackson's attempts to mask these deficits and his other psychiatric difficulties are very immature and transparent; essentially, these attempts involve posturing and attempts to present himself as more competent and less anxious/afraid than he really is; but given that these attempts/defensive maneuvers are so immature and fragile, it is not surprising that they regularly break down/fail to work, causing him to deteriorate emotionally. Furthermore, Mr. Jackson's genetic vulnerability to both psychotic and mood disorders likely also contribute to his becoming paranoid and depressed when under stress.

43. It is the opinion of this psychiatrist to within a reasonable degree of medical certainty that although Mr. Jackson's use of drugs appears to have begun as self-medication for his above described psychiatric difficulties, this use quickly became drug abuse and dependence. The transition to abuse and dependence was the result of the combination of the severity of his need to self-medicate, the addiction potential of the drugs he used and his genetic vulnerability to the development of addiction.

44. The psychological and physical abuse and neglect that Mr. Jackson endured during his childhood years could be considered mitigating in and of itself. However in addition, as noted above, that same history contributed to the development of his major

19

01-019

psychiatric difficulties; it is at least in large part because of that chaos and neglect within his family home that his major psychiatric difficulties were never identified and addressed back when he was a child or young adolescent; and it is also because of the chaos, the neglect and the overall lack of basic parenting, which would include the negative things taught to him by his father, that he started on the road to institutionalization at such an early age, which then further exacerbated his trauma-related difficulties.

45.   It is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Jackson has never had the opportunity to address his psychiatric difficulties and otherwise develop the skills required to function outside of an institution. It is the understanding of this psychiatrist that Mr. Jackson's institutional record has been used to suggest that he is just a bad and dangerous guy within the institution, and that this perception of him was at least in part fostered by his testimony at trial.  However, a review of his institutional record indicates that there is not the pattern of behavior that this characterization of him might suggest, and indicates that the behavioral problems that he has had are of the type one might expect given his psychiatric difficulties.  His behavior at trial is also better understood in light of his psychiatric difficulties and his above described attempts to mask such difficulties.

46.   Finally, it is the opinion of this psychiatrist to within a reasonable degree of medical certainty that Mr. Jackson's above-described mental health difficulties significantly influenced his behavior at the time of the crime for which he was convicted

01-020

and sentenced to death. More specifically, Mr. Jackson's above described mental health difficulties influenced his perception of danger/risk of being harmed; his impulsivity severely compromised his decision-making ability with regard to how he should respond to the danger that he perceived; and his over-reactivity further influenced the nature of his impulsive response. As further explained above, it is my opinion that at the time of the crime the impact of Mr. Jackson's mental health difficulties was such that he was unable to premeditate or even consider options that might have been available to him.

47.    Mr. Jackson appeared to be genuinely remorseful about what happened between him and the decedent in this case. He described the incident as one in which he was basically reacting to very threatening and frightening circumstances. He bears and bore no particular malice towards Mr. Brown and was truly sorry for the effect the incident had on the man's family. This sentiment is entirely consistent with his apology to Mr. Brown's mother during his testimony. He regrets that at the time, no other defense was available to him, and feels he had no other recourse given the circumstances and the environment in which it took place.

48.    In more recent years, Mr. Jackson has been doing a lot of thinking about his life in an attempt to understand the course of his life; he is asking himself some very important questions; and it at least appears that he has gained some insight. This indicates that he could benefit from having a mental health professional to talk to, if such a person could be made available to him, and that such professional assistance might

21

01-021

improve his ability to function, even within an institution.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 29th day of September, 2010 in New York, New York.

Richard G. Dudley, Jr.

01-022

# CURRICULUM VITAE

Richard G. Dudley. Jr, M.D.

*REDACTED*

New York, New York 10025

*REDACTED*

**EDUCATION:**

*       Temple University School of Medicine Philadelphia, Pennsylvania
        M.D., 1972

*       Northwestern University Medical Center Chicago, Illinois
        R6 Internship

*       Northwestern University Institute of Psychiatry Chicago, Illinois
        Psychiatric Residency, completed 1975

**LICENSURE AND CERTIFICATION:**

*       License for the Practice of Medicine, State of New York

*       Diplomate, American Board of Psychiatry and Neurology

**PAST ACADEMIC APPOINTMENTS:**

*       Visiting Associate Professor of Medicine, Department of Behavioral Sciences
        City University of New York Medical School at City College

*       Adjunct Assistant Professor of Law, School of Law
        New York University

01-023

**PROFESSIONAL EMPLOYMENT HISTORY:**

\* January '76 to Present:                              Private Practice of Psychiatry

At present, the practice includes a clinical practice primarily focused on adolescents and adults (evaluation, consultation, and both individual and family psychotherapy); a forensic practice (I regularly appear as a psychiatric expert in various types of legal proceedings throughout the United States); and consultation/education (the development and/or presentation of continuing medical education programs, as well as education programs for other health professionals, attorneys, and the public).

\* September '85 to June '05:                          Associate Professor of Medicine
                                                      Behavioral Sciences
                                                      CUNY Med School at City College

From September, 1985 to August, 1992, I was Director of the Department of Behavioral Sciences, at which time my primary responsibility was to direct the full-year/required course in behavioral sciences. The goal of this course was to help students acquire knowledge, skills and attitudes which would assist them in becoming effective primary care physicians, for a range of persons from different cultural backgrounds, through the incorporation of contributions from the fields of psychiatry, psychology, social work, sociology, and anthropology. After I retired from the position of Director, I continued to teach in the course.

\* September '84 to April '05:                         Adjunct Assistant Professor
                                                      School of Law
                                                      New York University

Initially, I team-taught full seminars on "Expert Evidence" and also team-taught Family Law. Then, I transferred to the Law Clinic where I team-taught "Expert Evidence" with various law professors in connection with clinical seminars. Lectures included an exploration of the interface between the behavioral and social sciences and the law, and how lawyers might more appropriately work with psychiatric experts. In other settings I have lectured on various other aspects of law and psychiatry to judges, attorneys, law students and others.

2

01-024

\*   July '82 to June '94:                                          Teaching Attending Physician
                                                                   Department of Psychiatry
                                                                   New York Medical College
                                                                   Lincoln Hospital Division

Responsibilities included course, seminar and case conference teaching, as well as individual psychotherapy case supervision for psychiatry residents, and the direction of the psychotherapy group for psychiatry residents. Previously, through the department's Consultation and Liaison Service, I also taught as part of the Chairman's Rounds for the Department of Internal Medicine.

\*   January '79 to October '84:                                   Assistant Director
                                                                   Professional Services Dept.
                                                                   Roche Laboratories, Div. of
                                                                   Hoffmann-La Roche, Inc.

The principal responsibilities were to actively and creatively participate in the medical aspects of marketing Roche products and services, and to direct the activities of the Professional Services Product Group. As a participant on Marketing Teams, I helped to develop marketing strategies and plans, train Roche Field Representatives and implement various promotional programs. My responsibilities also included the coordination of Phase IV research efforts, and the development of scientific exhibits, medical education films, monographs, and symposia for physicians.

\*   April '76 to July '82:                                        Psychiatric Consultant
                                                                   Mental Health Programs
                                                                   Children's Aid Society of
                                                                   New York City

Responsibilities included teaching, diagnostic evaluations and treatment of selected cases.

\*   December '77 to December '78:                                 Medical Director
                                                                   Washington Heights-West Harlem
                                                                   Community Mental Health Center

Responsibilities included the design, development and then day-to-day operation of a full, twelve service community mental health center. When I accepted this position, the center had just been funded, and every program element and support system had to be developed.  Once the twelve service chiefs and other key administrative staff were hired, and basic support systems were developed and put into place, I supervised the chiefs, developed in-service training programs and

3

01-025

worked towards the development of program elements not covered by the original grant, for example, research programs, transitional housing programs, and vocational rehabilitation programs.

*   January '76 to December '77:                    New York City Department of
                                                    Mental Health, Mental Retardation
                                                    & Alcoholism Services

Assistant to the Commissioner January '76 to November '76

        June Jackson Christmas, M.D. -      Commissioner

Deputy Commissioner            February '77 to December '77

        Primary responsibilities included the development of new clinical programs/services, as well as the ongoing monitoring, evaluating, and upgrading of the existing mental hygiene service system. This system included all of the medical centers, voluntary hospitals and agencies, and the municipal hospitals and public mental hygiene programs in all five boroughs.

        November '76 to January '77:                [On leave from the Department]

        Coordinator/Team Leader
        Carter-Mondale Transition Planning Group

        The focus of this effort was to develop policy options in the areas of mental health, mental retardation, alcoholism, drug abuse and the developmental disabilities for the incoming administration.

*   January '74 to December '75                     Staff Psychiatrist
                                                    Lower North Community
                                                    Mental Health Center
                                                    Chicago Board of Health

Responsibilities included diagnostic evaluations, treatment and some supervision and teaching. In addition, there was primary responsibility for the Center's adolescent program.

4

01-026

**PROFESSIONAL ORGANIZATIONS:**

* American Psychiatric Association - Distinguished Fellow
    Scientific Program Committee, 1998-2001
    Delegate, APA Assembly 1979-1983

* New York County District Branch (APA)
    Committee of Black Psychiatrists 1984-1986
    Committee on Legislation 1980-1983
    Committee on Emergency Psychiatry 1978-1979

* American College of Psychiatrists – Fellow
    Awards Committee 1993-2001
    Nominations Committee 1989-1992

* Black Psychiatrists of America
    Nominations Committee 1985-1987
    Program Committee 1980-1982
    President, Metropolitan New York Chapter 1978-1988

* National Medical Association

* New York Academy of Medicine - Fellow

* One Hundred Black Men  1977-1982
    Health Committee 1979-1981

* American Orthopsychiatric Association 1988-1991
    Program Committee 1989-1990

* American Society for Adolescent Psychiatry 1984-1988

* American Academy of Psychiatry & the Law 1984-1988

* American Medical Association 1970-1976
    Council on Long Range Planning and Development 1973-1975
    Council on Mental Health 1971-1975

* American Medical Student Association Foundation 1979-1980
    Board of Directors 1979-1980

* American Medical Student Association 1970-1973
    Director, Video Journal 1971-1973
    Board of Trustees 1971-1972

* Student National Medical Association 1969-1972

5

01-027

**OTHER PROFESSIONAL ACTIVITIES:**

*   Consultant in creative approaches to medical education, using a variety of media

*   Lecturer/speaker for professional health and/or law related organizations and groups, as   well as non-professional groups throughout the United States and, to a limited extent, abroad -- frequent guest on various television programs, as well as host and guest on radio programs.

*   Commission on Safety and Abuse in America's Prisons, 2005-2006

*   Housing Works, Inc., Board of Directors 2005-present

*   Vera Institute of Justice, Board of Directors 1989-present

*   Hospital Audiences, Inc., Clinical Advisory Board

*   Examiner in Psychiatry, American Board of Psychiatry & Neurology

*   Highbridge-Woodycrest Center, Inc., Board of Trustees 1991-2004

*   Co-Principal Investigator, Minority Education, Research & Training Institute [New York State Department of Mental Health] 1990-1994

*   Public Member, Fatality Review Panel, Child Welfare Administration (formerly Special Services for Children), NYC Human Resources Admin. 1990-1992

*   Family Court Advisory Committee, First Judicial Department 1987-1989

*   Program Development Committee,   NYU AIDS Mental Health Project (NIMH Contract No. 278-87-005) first 3 years

*   Coordinator of Training for Volunteers Minority Task Force on AIDS 1986-1988

*   Poison Control Advisory Committee, N.Y. City Department of Health 1980-1981

*   Education/Training Consultant, N.Y. State Office of Mental Health 1979

*   Consultant, Conference on Minority Mental Health Manpower, HEW-ADAMHA Minority Advisory Committee 1979

*   Member, Mental Health Committee, Task Force on the New York City Fiscal Crisis 1978

*   Chairperson, Task Panel on the Mental Health of Black Americans, The President's Commission Mental Health 1978

*   Physician Resources, Inc. Board of Consultants 1977-1979

*   Board of Directors, and Chairman of the Ambulance Committee, New York City Regional Emergency Services Council 1977-1978

*   Task Force on Services to Emotionally Disturbed Adolescents, New York City Human Resources Administration 1977

*   Advisory Board, Center for Physician Career Development, American Medical Student Association Foundation 1977

6

01-028

\*        American Bar Association -- Young Lawyer's Section Committee on Mental Health, Physician Member/Consultant, 1974-1975

\*        The Thresholds (rehabilitation program for young psychiatric patients) Board of Directors 1974-1975

## OTHER SELECTED ACTIVITIES:

\*        Walter Nicks Dance Theatre Workshop
        Chairman, Board of Directors 1985-1994

\*        Amistad World Theatre
        Chairman, Board of Directors 1983-1989

\*        National Urban League
        Black Executive Exchange Program 1979-1981
        Committee on Mental Health 1976-1979

\*        National Association for the Advancement of Colored People Advisory Committee, Project Rebound 1977-1978

\*        National Advisory Committee on Ethics 1975-1978

\*        New York City Black Citizens for a Fair Media Psychiatric Consultant 1977-1978

\*        Young Life, Inc. 1968-1972

\*        Big Brothers of America 1970-1972

## SELECTED HONORS:

\*        New Jersey Black Achiever of Business and Education 1982

\*        Award of Merit, Black Psychiatrist of America 1977

\*        "Who's Who in America" 1976–1977

\*        American Biographical Institute
        "Community Leaders and Noteworthy Americans" Ninth Edition

\*        Dictionary of International Biography – Cambridge, England
        "Men of Achievement" Fifth Edition

\*        Solomon Carter Fuller Institute
        Traveling Fellow 1975

\*        Outstanding Young Men of America 1972

\*        National Medical Fellowship Recipient 1969–1971

7

**PUBLICATIONS:**

Dudley R.G., Blume Leonard P: Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment. The Hofstra Law Review, 36 (No 3): 963-988, 2008.

Dudley RG: Offering Psychiatric Opinion in Legal Proceedings When Lesbian or Gay Sexual Orientation Is an Issue in Mental Health Issues in Lesbian, Gay, Bisexual, and Transgender Communities, Jones BE & Hill MJ (eds), APA Review Psychiatry. Vol. 21, American Psychiatric Publishing, Inc., Washington, D.C. 2002

Dudley RG: All alike but each one different: orphans of the HIV epidemic in Orphans of the HIV Epidemic, Levine C (ed) Unit Hospital Fund, New York. 1993

Dudley RG: Serotonin partial agonists in the treatment of anxiety and depression: Introduction. Journal of Clinical Psychiatry, 51:30, 1990.

Bing EG, Nichols SE, Goldfinger SM, Fernandez F, Cabaj R, Dudley RG, Krener P, Prager M, Ruiz P: The many faces of AIDS: Opportunities for intervention. New Directions For Mental Health Services - Psychiatric Aspects of AIDS, 48:69-81, 1990.

Dudley R.G: Blacks in policy-making positions in Black Families in Crisis- The Middle Class, Coner-Edwards AF and Spurlock J (eds), Brunner/Mazel, New York, 1988.

Davis PC, Dudley RG: The black family in modern slavery. The Harvard Blackletter Journal - Harvard School 4:9-15, 1987.

Davis P, Dudley RG: Family evaluation and the development of standards for child custody determination. Columbia Journal of Law and Social Problems, 19 (No. 4):505-515, 1985.

**LECTURES, PRESENTATIONS, AND EDUCATIONAL VIDEOTAPES**

Described upon request

12/08

RGD:dw

8

01-030

# EXHIBIT 2

## Declaration of Daneen Milam, Ph.D.

I, Daneen A. Milam, declare as follows:

1.      I am a neuropsychologist. I live in San Antonio, Texas.

2.      I was enlisted by attorneys for David Jackson in 2006 to administer a battery of neuropsychological instruments to include a measure of intellectual potential to Mr. Jackson. I was asked to give my opinion on whether Mr. Jackson had brain damage and whether he had mental retardation.

3.      I was aware that Mr. Jackson had been given IQ tests in elementary school and that he received a score of 76 on a Stanford-Binet in 1967 and a score of 67 on a Wechsler Intelligence Scales for Children (WISC) in 1970.

4.      I administered a measure of intellectual potential, The Wechsler Adult Intelligence Scale (WAIS-III) to Mr. Jackson in June of 2006. I determined that he had a full scale IQ of 81 at that time and completed a wide range of academic and other neuropsychological instruments over a ten hour period to document Mr. Jackson's areas of strength and weaknesses.

5.      The criteria of mental retardation has been defined as a disability characterized by significant limitations both in intellectual and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability must originate before the age of 18. At that time I was not provided with a set of data that would have indicated adaptive behavioral deficits before the age of 18 nor did the data I gathered support a diagnosis of mental retardation. In addition, many mentally retarded

individuals can hide their deficits and pass for normal in benign settings where few intellectual demands are required for day to day living.

6.    Furthermore, many mentally retarded individuals cannot give an accurate estimate of their abilities and often give unrealistic or distorted memories of their past accomplishments. This was certainly the case with Mr. Jackson. Therefore, the statistical correction of Mr. Jackson's scores were not undertaken when arriving at the Full Scale IQ score of 81 or when his data was presented to his attorney.

7.    The Flynn Effect is widely accepted within my profession as a phenomenon whereby IQ scores increase over time due to the obsolescence of norms that were used in establishing test items and determining scoring. For this reason, IQ tests are regularly revised and renormed to account for the improved skills and knowledge base of the general public over time. It is now accepted within my profession that IQ scores, on average, increase 3 to 3.3 points per decade after the norming of a given IQ test, or .3 to .33 points per year. The professional associations that address mental retardation recommend that IQ scores be adjusted to take the Flynn Effect into consideration when adaptive deficits are present. Because the WAIS-III was issued in 1995, and I tested Mr. Jackson in 2006, the Flynn effect would suggest that his score of 81 was inflated by 3.3 to 3.6 points. Therefore, it is likely that Mr. Jackson's true IQ was closer to 77 or 78.

8.    I did not take the Flynn Effect into account in considering Mr. Jackson's two low childhood IQ scores. The Stanford-Binet and WISC tests that Mr. Jackson was given in 1967 and 1970 were normed in 1937 and 1949 respectively. Because those tests were

2

02-002

thirty and twenty-one years old, the Flynn Effect for those test administrations would have been very great, and it is likely that those two childhood scores are significantly inflated. Appropriate adjustment of those scores of 76 and 67 would bring them considerably lower and even more firmly within the range of mental retardation.

9.    One of the criteria for mental retardation, in addition to "intellectual functioning," as measured by IQ testing, is the presence of "deficits in adaptive functioning." At the time I assessed Mr. Jackson, I was provided with little information concerning his adaptive functioning before the age of 18. I have now had the opportunity to review statements from a number of individuals who knew Mr. Jackson during his developmental period, i.e., before the age of 18. It is my opinion that these statements indicate Mr. Jackson did have significant deficits in his adaptive functioning before the age of 18.

10.    Based on the appropriate adjustment of Mr. Jackson's IQ scores in elementary school and his IQ score in 2006 to account for the Flynn Effect, and based on additional information I have received concerning Mr. Jackson's adaptive deficits before

02-003

the age of 18. I do not believe I could rule out the possibility that Mr. Jackson has mental retardation.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __29__ day of September, 2010, in San Antonio, Texas

Daneen A. Milam, Ph.D., ABPN

02-004

# EXHIBIT 3

## Declaration of Dale G. Watson, Ph.D.

I, DALE G. WATSON, declare as follows:

1.      I am a psychologist licensed in the state of California.  My area of specialization is neuropsychology.  A copy of my Curriculum Vitae is attached to this declaration.

2.      I was asked by current counsel for David Lee Jackson to review neuropsychological and IQ testing that was performed on Mr. Jackson in June of    2006 by Daneen Milam, Ph.D.  Specifically, I was asked to review Dr. Milam's raw test data and render an opinion on the validity of the testing in both areas.

3.      I was informed by counsel for Mr. Jackson that a mental retardation expert working with them on the case had reviewed Dr. Milam's IQ testing data and found a large number of methodological errors that, in her opinion, invalidated the results.  I was asked both for a second opinion on the IQ testing and to provide my assessment of the validity of neuropsychological testing.

4.      It is my opinion that the number of methodological errors in the IQ testing is significant enough that the test cannot be considered a valid assessment of Mr. Jackson's intellectual functioning.  Furthermore, the limited number of neuropsychological tests administered in 2006 do not provide a sufficient basis to form opinions regarding Mr. Jackson's neuropsychological functioning within the context of capital litigation.  First, the examination utilized an insufficient battery of tests, in giving

03-001

only a partial administration of the Halstead-Reitan battery, and in omitting several crucial and indispensable tests of executive functioning, e.g, the Category Test and the Wisconsin Card Sort. While the battery did include a modified Trailmaking and Stroop Color and Word test, these are merely screening devices that do not adequately assess executive functioning. Executive functioning is primarily regulated by the frontal lobes of the brain and includes planning and decision-making, the ability to navigate dangerous or difficult situations, and controlling inhibitions or impulses. Tests of executive function are especially important in a capital case where such brain functions or dysfunction often play a role in the offense in question. The omission of an array of executive function tests, including the Category Test and the Wisconsin Card Sort, means that important tests of executive functioning were not performed.

5.     Due to the absence of key components of a full and complete battery of neuropsychological testing and other errors in administration, it is my professional opinion that the testing performed in 2006 does not provide a sufficient basis for concluding that Mr. Jackson does not have brain damage. That is, I believe it would be a mistake to rule out the presence of brain damage based on this data.

6.     With regard to the administration of the WAIS-III IQ test, there are two areas of significant concern that invalidate the test results. First, it is my opinion that five of the eleven subtests are "spoiled" due to errors in administration that make it impossible for these subtests to be accurately scored and thus invalidating them. Specifically, the Vocabulary, Similarities, Block Design, Picture Arrangement and Comprehension

2

03-002

subtests were spoiled. For example, the Picture Arrangement test is designed to be given in a set sequence and is supposed to be given that way every time. When the test was given to Mr. Jackson, the items were apparently given in the wrong order which is absolutely contrary to the requirements of standardized administration – making the results invalid. In addition to what I consider to be invalidating errors in this administration of the WAIS-III, there are also a substantial number of actual scoring errors in the computation of the subtest scores. Based on all of these problems, it is my opinion that this administration of the WAIS-III is not valid and that it should be discounted as an accurate or meaningful measure of Mr. Jackson's intellectual functioning.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 29th day of September, 2010 in Cleveland, Ohio.

Dale G. Watson

3

03-003

# DALE G. WATSON, PH.D.

**Clinical & Forensic Neuropsychology**

[REDACTED]

**Pinole, CA 94564**

**Office:** [REDACTED] [REDACTED] )

**Email: watson.dale(** [REDACTED]

---

## CURRICULUM VITAE

JUNE 3, 2010

## EDUCATION:

| | | |
|---|---|---|
| 1988 | Ph.D. | California School of Professional Psychology-Berkeley/Alameda<br>Clinical Psychology (APA accredited) |
| 1980 | M.A. | John F. Kennedy University, Orinda, CA.<br>Clinical Psychology |
| 1975 | B.A. | California State College, Sonoma, Rohnert Park, CA.<br>Psychology |

## PROFESSIONAL EXPERIENCE:

**1990-**      **Private Practice**
Pinole, CA.
- Forensic Evaluation/Trial Consultation.
- Comprehensive Neuropsychological/Psychodiagnostic Assessment services.
- Mental Retardation "Atkins" evaluations.
- Adjudicative Competency & to be Executed, Insanity, Mitigation and Future Dangerousness.
- Trial testimony in Superior and Federal District Courts.
- Individual Psychotherapy.

**2000-**      **Clinical Neuropsychologist**
Neurobehavioral Cognitive Services, Dixon, CA.
- Neurocognitive rehabilitation services including consultation and treatment planning.
- Individual and Group Psychotherapy with neurologically impaired patients.
- Neuropsychological and Psychodiagnostic Assessment.

**2007-**
**1994-2000**      **Adjunct Faculty**
The Wright Institute, Berkeley, CA. (APA accredited)
- Teaching 3-trimester courses in Graduate Level Psychodiagnostic Assessment including intellectual and psychological evaluation and neuropsychological screening.
- Dissertation supervision.

**1989-1992**      **Clinical Neuropsychologist**
NeuroCare, Concord, CA.
- Acting program director (July 1991).
- Psychology team leader.
- Supervision of interns and the behavioral technician.
- Post-acute rehabilitation of the brain-injured.
- Neuropsychological evaluation.
- Treatment planning.
- Individual/Couples/Group Psychotherapy.
- Substance Abuse treatment/Cognitive Rehabilitation/Crisis Intervention.

*Licensed Psychologist PSY11899*

03-004

**DALE G. WATSON, PH.D.**                                                    JUNE 3, 2010
**CURRICULUM VITAE**                                                              PAGE 2

## PROFESSIONAL EXPERIENCE (CONTINUED):

**1988-1990    Psychological Assistant**
Supervisor: Virginia Wulf, Ph.D., Pinole, CA.
- Individual/Couples Psychotherapy.

**1988-1989    Psychological Assistant**
Supervisor: Norbert Ralph, Ph.D.
Comprehensive Assessment Services/Sausalito Professional Clinic Sausalito, CA.
- Psychodiagnostic evaluations of hospitalized, adolescent substance abusers.
- Hospital Consultation (New Beginnings - Modesto).

**1986-1989    Staff Psychologist**
Supervisors:  Michael Shore, Ph.D./Harry Noda, Jr., Ph.D.
Specialized Rehabilitation Services
An affiliate of Transitions / Bay Area Recovery Centers, Fremont, CA.

Brain Injury Rehabilitation Program (1986-1987)
- Coordinating the Treatment Team.
- Neuropsychological and Psychodiagnostic Evaluation.
- Cognitive Rehabilitation.
- Individual Psychotherapy/Case Management.

Chronic Pain Management Program
- Individual/Group Psychotherapy.
- Case Management.
- Biofeedback Training.
- Patient education.

**1981-1986    Clinical Coordinator/ Psychological Assistant**
Supervisors:  Sheila Bastien, Ph.D./Ann Hoff, Ph.D.
Spectrum Psychology Associates, Berkeley, CA.
- Clinical Coordination.
- Neuropsychological, Psychodiagnostic and Vocational Evaluation.
- Evaluation of the Developmentally Disabled
- Individual Psychotherapy.
- Forensic psychology.

**1984-1985    Clinical Psychology Intern (Academic Year)**
Supervisor:  Neil Young, Ph.D.
Community Education and Counseling Center, Fremont, CA.
- Individual Psychotherapy within a Control Mastery framework.
- Group and Couples Psychotherapy.
- Community Needs Assessment (Program Evaluation).

**1983-1984    Clinical Psychology Intern (Academic Year)**
Supervisor:  Joan Roth, Ph.D.
Northern California Reception Center,
California Medical Facility, Vacaville, CA.
- Psychodiagnostic Evaluation of court referred criminal offenders.
- Group Psychotherapy with Category "B" inmates (Pre-operational Transsexuals).
- Individual Psychotherapy.

03-005

**DALE G. WATSON, PH.D.**                                                        JUNE 3, 2010

**CURRICULUM VITAE**                                                              PAGE 3

PROFESSIONAL EXPERIENCE (CONTINUED):

**1983**         **Teaching Assistant**
             Neuropsychological Measurement Laboratory
             California Graduate School of Marital and Family Therapy, San Rafael, CA.
             - Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1983**         **Clinical Psychology Intern**
             East Bay Activities Center, Oakland, CA.
             - Milieu therapy in classroom setting with emotionally disturbed children.

**1983**         **Co-Leader: Neuropsychological Assessment - An In-service Training Workshop.  Sonoma County Office of Education.**
             - 1-day in-service training workshop with psychologists and nurses.

**1982**         **Teaching Assistant**
             Neuropsychological Measurement Laboratory
             California School of Professional Psychology, Berkeley, CA.
             - Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1982**         **Teaching Assistant**
             Neuropsychological Measurement Laboratory
             California Graduate School of Marital and Family Therapy
             San Rafael, CA.
             - Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1979-1980**    **Counselor Intern**
             Contra Costa County Alcoholism Information and Rehabilitation Service (AIRS), Antioch, CA.
             - Conducted Alcoholism Education Orientations.
             - Individual, Marital and Group Psychotherapy.

**1978-1979**    **Counselor Intern**
             John F. Kennedy University Community Counseling Center, Concord, CA.
             - Individual, Marital and Family Psychotherapy.
             - Peer Supervision.

**1975**         **Staff Counselor**
             New Horizons Center, Pittsburg, CA.
             - Milieu treatment of developmentally disabled and psychotic adolescents and young adults.
             - Liaison to Consulting Psychiatrist.

RECENT PROFESSIONAL TRAINING:

2010     "Finding Balance: Legal & Ethical Issues of Boundaries & Privacy in Psychotherapeutic Services."  Daniel Taube, J.D., Ph.D.  John F. Kennedy University, March 12, 2010.  Campbell, CA. (6 C.E. credits)

2010     "Neuropsychology and the Death Sentenced Inmate."  Michael B. Charlton, J.D.  Annual Conference of the American College of Professional Neuropsychology, February 27, 2010.  Las Vegas, NV. (3 C.E. credits)

2010     "Introduction to Empirically Based Assessment: Developing an EBA Model for AD/HD."  Steven J. Hughes, Ph.D., LP, ABPnN.  Annual Conference of the American College of Professional Neuropsychology, February 27, 2010.  Las Vegas, NV. (3 C.E. credits)

2010     "Central Auditory Processing in Children and Adolescents."  Teresa Bailey, Ph.D., Ph.D.  Annual Conference of the American College of Professional Neuropsychology, February 26, 2010.  Las Vegas, NV. (3 C.E. credits)

03-006

**DALE G. WATSON, PH.D.**                                                                 JUNE 3, 2010

**CURRICULUM VITAE**                                                                              PAGE 4

**RECENT PROFESSIONAL TRAINING (CONTINUED):**

2010   "What the Forensic Neuropsychologist Needs to Know about Death Penalty Litigation." Thomas J. Reidy, Ph.D., ABPP. Annual Conference of the American College of Professional Neuropsychology, February 26, 2010. Las Vegas, NV. (3 C.E. credits)

2010   "Reitan Society Meeting." Ralph Reitan, Ph.D., Deborah Wolfson, Ph.D., Jim Hom, Ph.D., & Janice Nice, Ph.D., February 24-25, 2010. Las Vegas, NV. (12 C.E. credits)

2009   "WAIS-IV/WMS-IV and the Advanced Clinical Solutions for WAIS-IV/WMS-IV: Clinical Application and Interpretation in Neurological and Psychiatric Disorders." James A. Holdnack, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 14, 2009. New Orleans, LA. (3 C.E. credits)

2009   "Neuroimaging Evidence in the Criminal Trial Process: Recent Developments, the Role of Attitudes, Some Unasked Questions, and Predictions for the Future." Michael L. Perlin, J.D. 29th Annual Conference of the National Academy of Neuropsychology, November 12, 2009. New Orleans, LA. (3 C.E. credits)

2009   "Psychometrics: Making Test Classification Decisions Practical." Richard Frederick, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 12, 2009. New Orleans, LA. (3 C.E. credits)

2009   "Functional Neuroanatomy of Memory: Three Amnesias or One?" Russell M. Bauer, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 11, 2009. New Orleans, LA. (3 C.E. credits)

2008   "Law and Ethics." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, March 10, 2006. Pleasant Hill, CA. (6 APA CE units).

2007   "Useful Clinical Ratings of CT and MRI in the Clinical Practice of Neuropsychology." Erin Bigler, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007   "The Amazing Halstead Finger Oscillation Test." George Prigatano, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007   "Introducing the MMPI-2-RF (Restructured Form)." Yossef Ben-Porath, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007   "Behavioral Teratology: Neuropsychological Effects of Prenatal Exposures. Sarah N. Mattson, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (1.5 CE Credits).

2007   "Releasing Raw Data and Psychological Test Materials: Ethical Dilemmas, Legal Requirements, and Simple Solutions to Discovery Demands." Paul Kaufmann, J.D., Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (1.5 CE Credits).

2007   "The Neurobiology of Antisocial, Violent, and Psychopathic Behavior." Adrian Raine, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007   "Forensic Evaluation." Institute of Law, Psychiatry and Public Policy, School of Medicine & School of Law, University of Virginia under contract for the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services and the Office of the Attorney General, April 30 - May 4, 2007, Charlottesville, VA (30 APA CE Units).

2006   "Deepening Legal and Ethical Understanding in Clinical Practice." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, March 10, 2006. Pleasant Hill, CA. (6 APA CE units).

2004   "Assessment of Response Bias: Beyond Malingering Tests." Scott R. Millis, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE units).

2004   "Neurochemistry and Medication Management of Aggression in Children, Adolescents, and Adults." Daniel Matthews, M.D. 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

03-007

DALE G. WATSON, PH.D.                                                          JUNE 3, 2010
CURRICULUM VITAE                                                                  PAGE 5

RECENT PROFESSIONAL TRAINING (CONTINUED):

2004    "Constitutional/Judicial Foundations for Criminal Forensic Neuropsychology: Competency to Stand Trial and Confess."
        Robert L. Denny, Psy.D. & James Sullivan, Ph.D., 24th Annual Conference of the National Academy of Neuropsychology,
        November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004    "Professional Issues." Antonio Puente, Leslie Rosenstein, & Patricia Pimental, 24th Annual Conference of the National
        Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (1.0 APA CE Units).

2004    "Pediatric Brain Injury: Neuroimaging, Clinical Presentation, and Neuropsychological Status, Dr. Paul C. Lebby, 24th
        Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE
        Units).

2004    "What neuropathology can teach us about the neurobiology of the self." Todd Feinberg, 24th Annual Conference of the
        National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (1.5 APA CE Units).

2004    "Imaging brain circuitry in the clinical neuropsychology of memory: fMRI, morphometry & DTI. Andrew J. Saykin, 24th
        Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE
        Units).

2004    "Workshop in Clinical Neuropsychology: Significant Developments and Advanced Clinical Issues." Ralph Reitan,
        Deborah Wolfson, Jim Hom et al. Reitan Neuropsychology Laboratories, October 1-3, 2004. Phoenix, AZ (17 APA CE
        Units).

2004    "Spousal/Partner Abuse Assessment and Treatment: Domestic Violence Training." John F. Kennedy University, February
        20, 2004. Pleasant Hill, CA. (7 APA CE unites).

2004    "6-Hour Ethics and the Law." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, February 6, 2004. Pleasant Hill,
        CA. (6 APA CE units).

2003    "A New Anatomical Framework for Neuropsychiatric Disorders: Systems Analysis and Hands-On Dissection of the Human
        Brain." Lennart Heimer, M.D. Saint Louis University School of Medicine Practical Anatomy Workshop, October 31-
        November 2, 2003. St. Louis, MO. (17 APA CE units).

2003    "Practical Issues and Clinical Methods of Practice with the Wechsler Scales." David Tulsky, Gordon Chelune & Josette
        Harris, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA
        CE units).

2003    "New Scores and Methods of Practice with the Wechsler Scales." Gordon Chelune, David Tulsky & Josette Harris, 23rd
        Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003    "Race and Education in Neuropsychological Testing." Jennifer Manly, 23rd Annual Conference of the National Academy
        of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003    "Neuropsychological Impairment and Environmental Risk Factors in Capital Murder Offenders." Robert A. Geffner,
        Elizabeth Lim, Barbara Hart & Robert Owen, 23rd Annual Conference of the National Academy of Neuropsychology,
        October 15-18, 2003. Dallas, TX.

2003    "Functional Neuroanatomy Primer: Clinical Presentation of Patients with Neuropsychological Conditions." Paul Lebby,
        Ph.D., 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX.

2003    "The Atkins Decision and the Forensic Evaluation of Mental Retardation: Roles for the Neuropsychologist and Special
        Educator." J. Randall Price & Kay Stevens, 23rd Annual Conference of the National Academy of Neuropsychology,
        October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003    "Increasing Diagnostic and Predictive Accuracy in Neuropsychology." David Faust, Ph.D., 2003 23rd Annual Conference
        of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

03-008

**DALE G. WATSON, PH.D.**                                                    JUNE 3, 2010

**CURRICULUM VITAE**                                                          PAGE 6

PUBLICATIONS:

Abueg, F., Woods, G.W., & Watson, D.G. (2000). Disaster Trauma. In Frank M. Dattillio & Arthur Freeman (Eds.) Cognitive Behavioral Strategies in Crisis Intervention, Second Edition. New York, N.Y.: Guilford Press.

Bastien, S., Peterson, D. & Watson, D.G. (1996). IQ abnormalities associated with chronic fatigue syndrome in repeated WAIS-R testing (abstract). Journal of Chronic Fatigue Syndrome, 2(2/3).

RECENT INVITED PRESENTATIONS:

2010    "DSM-V: Proposed Changes." Habeas Corpus Resource Center Spring Conference. Habeas Corpus Resource Center. May 17, 2010. San Francisco, CA.

2010    "Neuropsychology of Mental Retardation." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2010. Monterey, CA.

2010    "Model Direct of a Mental Retardation Neuropsychologist." Co-presented with Edward Sousa, J.D. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2010. Monterey, CA.

2009    "Presenting a Reason to Vote for Life via the Testimony of a Neuropsychologist." 2009 Death Penalty Defense Seminar. Oregon Criminal Defense Lawyers Association (OCDLA), October 23, 2009, Bend, Oregon.

2009    "The Neuropsychology of Intellectual Disabilities: Current Research on Intellectual Impairment." 14th Annual Federal Habeas Corpus Seminar. Administrative Offices of the U.S. Courts. August 22, 2009, Pittsburgh, PA.

2009    "The Neuropsychology of Schizophrenia." 14th Annual Federal Habeas Corpus Seminar. Administrative Offices of the U.S. Courts. August 22, 2009, Pittsburgh, PA.

2009    Plenary Presentation: "The Neuropsychology of Intellectual Disabilities: Current Research on Intellectual Impairment." Fifth National Seminar on the Development and Integration of Mitigation Evidence. Administrative Offices of the U.S. Courts. April 18, 2009, Philadelphia, PA.

2009    "Neuropsychological Assessment and Brain Impairment." Life in the Balance 2009. The National Legal Aid & Defender Association. March 7, 2009. New Orleans, LA.

2009    "Mental Health/Mental Retardation Testing." Life in the Balance 2009. The National Legal Aid & Defender Association. March 7, 2009. New Orleans, LA.

2009    Plenary Presentation: "The Neuropsychology of Psychiatric Disorders – Schizophrenia." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2009. Monterey, CA.

2009    "New Developments in Psychological Testing." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2009. Monterey, CA.

2008    "Executive Functioning." 2008 Capital Case Seminar. Los Angeles County Public Defender. October 17, 2008. Los Angeles, CA.

2008    "Recent Developments in the Science of Brain Damage and Observations on Interviewing Experts." Mitigation Workshop. Virginia Capital Representation Resource Center (VCCRC). September 25, 2008. Charlottesville, VA.

2008    "Intellectual Disabilities: IQ and Adaptive Functioning Evaluation." Life in the Balance 2008: Defending Death Penalty Cases. The National Legal Aid & Defender Association. March 8, 2008. Atlanta, GA.

2008    "Neuropsychological Evaluation." Life in the Balance 2008: Defending Death Penalty Cases. The National Legal Aid & Defender Association. March 8, 2008. Atlanta, GA.

**DALE G. WATSON, PH.D.**                                              JUNE 3, 2010
**CURRICULUM VITAE**                                                      PAGE 7

2007    "The Roles of Psychology and Neuropsychology in Forensic Evaluations." Second Annual Solano County Public Defender Felony Transition Seminar. Office of the Solano County Public Defender. September 28, 2007. Fairfield, CA.

2007    "Attacks on Neuropsychological Norms." National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases. Administrative Office of the US Courts. March 30, 2007. Washington, D.C.

2007    "Intelligence Testing." National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases. Administrative Office of the US Courts. March 30, 2007. Washington, D.C.

2007    "Neuropsychological Evaluation: The Impact of Norms." 2007 CACJ/CPDA Capital Case Defense Seminar. February 18, 2007. Monterey, CA.

2007    "Frontal and Temporal Brain Systems and Functions." Co-presented with Karen Froming, Ph.D. 2007 CACJ/CPDA Capital Case Defense Seminar. February 18, 2007. Monterey, CA.

2006    "Neuropsychological Assessment." Making the Case for Life IX: Mitigation and Jury Selection in Capital Cases. National Association of Criminal Defense Lawyers and the Southern Center for Human Rights. September 30, 2006. Las Vegas, NV.

2006    "Foundations of Neuropsychology." First Annual Felony Transition College. Solano County Public Defender's Office. June 23, 2006. Fairfield, CA.

2006    "Psychological and Neuropsychological Testing." Motions, Evidence & Expert Witnesses. The Center for American and International Law. May 21, 2006. Plano, TX.

2006    "Brain, Behavior, and Cognition." Co-Presented with James R. Merikangas, M.D. National Seminar on the Development and Integration of Mitigation Evidence. Administrative Offices of the U.S. Courts. April 28, 2006. Washington, DC.

2005    "Executive Functions." Second National Seminar on Development and Integration of Mitigation Evidence. Administrative Office of the U.S. Courts. April 22, 2005. Salt Lake City, UT.

2005    "Law and the Brain – The Neurobiology of Violence." Washington State Appellate Courts Spring Judicial Conference. April 6, 2005. Walla Walla, WA.

2005    "Mental Retardation." Texas Criminal Defense Lawyers Association. February 23 & 24, 2005. Dallas, TX.

2005    "Neuropsychological Evaluation." 2005 CACJ/CPDA Capital Case Defense Seminar. February 21, 2005. Monterey, CA.

2005    "Mental Retardation." CACJ/CPDA Capital Case Defense Seminar. February 21, 2005. Monterey, CA.

2004    "Developmental Aspects of Executive Functions." 2004 CACJ/CPDA Capital Case Defense Seminar. February 15, 2004. Monterey, CA.

2004    "Advanced Determination of Competency – A Case Study (Workshop)." Co-presented with John Philipsborn and Judge Michael Ryan. 2004 CACJ/CPDA Capital Case Defense Seminar. February 15, 2004. Monterey, CA.

2003    "Update on IQ Testing: Neuropsychology for the 21st Century." Paper presented with George W. Woods, M.D. at the 2003 Annual Meeting of the American Academy of Psychiatry and the Law (AAPL), October 19, 2003, San Antonio, TX.

2003    "The Subtlety of IQ Testing." 8th Annual National Federal Habeas Corpus Seminar. Administrative Office of the United States Courts and Habeas Assistance and Training Counsel. Chicago, IL.

2003    "Mental Retardation." Investigating Capital Cases Seminar. Virginia Capital Representation Resource Center. Charlottesville, VA.

2003    "Intelligence Testing in Mental Retardation." Litigation Training: Investigating and Proving Mental Retardation. Federal Defender Program of Atlanta and the Habeas Assistance and Training Counsel. Atlanta, GA.

**DALE G. WATSON, PH.D.**                                                                                    JUNE 3, 2010
**CURRICULUM VITAE**                                                                                          PAGE 8

## LICENSES, QUALIFICATIONS AND CERTIFICATES:

| | |
|---|---|
| 1990-Present | State of California Licensed Psychologist (PSY11899) |
| 4/15-17/2010 | State of Texas Psychology Temporary License No. TLP-10-0019 |
| 2009-2010 | State of Washington Psychology Permit (TE 60072389) |
| 2007-Present | Virginia Qualified Forensic Evaluator |
| 2006 & 2007 | State of Texas Psychology Temporary License No. TLP-07-0009; TLP-07-0014 |
| 2005 | State of Oregon Psychology Permit |
| 2003-2004 | State of Washington Psychology Permit (030503) |
| 2002-2004 | State of Oregon Psychology Permit (LP 077) |
| 2001-2002 | State of Washington Psychology Permit (010903) |
| 1999-2000 | State of Washington Psychology Permit (990903) |
| 1992-1994 | Qualified Medical Examiner / Psychology (State of California Industrial Medical Council # 009321) |

## DISSERTATION:

"Screening for Neurotoxicity: A Comparison of the Neurobehavioral Evaluation System and the California Neuropsychological
        Screening Battery"

## RESEARCH ACTIVITIES:

| | |
|---|---|
| 1989-1992 | Neuropharmacological treatment of brain injuries: Neuropsychological monitoring. Sponsored by NeuroCare. |
| 1990 | Ampligen Clinical Trial (HEM Research): Neuropsychological monitoring of Chronic Fatigue Syndrome patients. |

## HOSPITAL PRIVILEGES:

| | |
|---|---|
| 2000-2003 | Doctors Medical Center – San Pablo Campus |
| 1991-2003 | Doctors Medical Center – Pinole Campus |
| 1992-1997 | East Bay Hospital, Richmond, CA. |
| 1993-1995 | First Hospital of Vallejo |

## PROFESSIONAL AFFILIATIONS:

| | |
|---|---|
| International: | Member, International Neuropsychological Society (2004- present) |
| National: | Member, American Psychological Association (1988-present). |
| | Member, Division 33 (Intellectual and Developmental Disabilities) |
| | Member, Division 40 (Clinical Neuropsychology) |
| | Member, Division 41 (American Psychology - Law Society) |
| | Member, National Academy of Neuropsychology (1995-present) |
| |      Associate Member /1983-1994 |
| | Member, the Reitan Society (1998-2006) |
| | Member, American Association on Intellectual and Developmental Disabilities (2007-present) |
| | Member, Society for Personality Assessment (2009- ) |

REFERENCES ON REQUEST

# EXHIBIT 4

## Declaration of Mark A. Bezy

I, Mark A Bezy, declare as follows:

1.  I live in      REDACTED      Arizona.  I am retired from the Federal Bureau of Prisons.  I worked for BOP for approximately twenty-eight years.  I started as a correctional officer in 1978.  I became a Lieutenant in 1983 and a Captain in 1988.  From 1995 to 1999, I was Correctional Services Administrator at the North Central Regional Office in Kansas City, Kansas.  From 1999 to 2002, I was the Assistant Warden at U.S. Penitentiary in Leavenworth, Kansas.  From 2002 to 2004, I was the Chief Executive Officer (Warden) at Elkton, Ohio.  From 2004 to 2006, I was C.E.O. of the Federal Correctional Complex in Terre Haute, Indiana.  From 2006 to 2008, I was the Warden of a 1,000 bed privately-managed sex offender prison in Florence, Arizona.  From 2008 to 2009, I worked as a consultant for Creative Corrections, LLC, based in Beaumont, Texas.

2.  At the request of counsel for David Lee Jackson, I have reviewed a number of materials pertaining to Mr. Jackson's homicide case, including: the BOP investigation of the homicide; Mr. Jackson's BOP file and institutional record; portions of Mr. Jackson's 2006 trial; declarations of Harold Jones, Darrell Evans and Reginald Carr; and a surveillance video of the end of the homicide incident at USP Beaumont in December, 1999.

3.  Based on my review of the above listed materials, I am struck by the absence of information concerning the investigation of the homicide of Daryl Brown.  It is my understanding that the investigative material provided to me is all that was made available to trial counsel and subsequently to current counsel.  There should be a great

04-001

deal more investigative material than what has been produced to counsel. For example, there is a glaring lack of reports concerning the investigation itself and any follow-up reviews of the incident.

4.      Additionally, in my experience, the lead investigative agency in a prison homicide is the Federal Bureau of Investigation. In this case, from what I can tell, the FBI was very much in the background and the investigation was mostly the work of BOP. This is highly unusual given the severity of the incident.

5.      It is routine after an incident of this severity to interview every inmate in the institution about what they saw or knew about the incident. These are known as "mass interviews." In this particular case, there were large numbers of inmates close to the events, both in the yard where the incident began and inside the unit where the surveillance video shows a number of inmates present in the area at the time. All of these inmates should have been interviewed, and reports of the interviews should be available, or at least referred to, in the report of the investigation. In this case there are very few statements from inmates despite the proximity of so many inmates to the events in question and the fact that the incident occurred during a period of "movement" when there would be the largest number of inmates in the yard and moving from one place to another within the prison. Given the seriousness of this incident, there should have been many interviews with inmates conducted, yet there is no record of them that I am aware of.

04-002

6.    Normally, after a major incident, especially a homicide, the BOP conducts an extensive review of the incident to determine the causes and to make thorough recommendations for preventing the recurrence of such incidents in the future. It is sound correctional policy after an incident of this nature to determine exactly what happened and why. The natural question is: "will there be more incidents?" These reviews are called "After Action" reviews or "Board of Inquiry" reports and they are normally done after a prison homicide. Typically, such reviews would be initiated by the Director of the BOP or the Regional Director and would be conducted by a team of individuals from outside the institution to provide greater objectivity and integrity to the review. It is normal protocol to look into causal factors for the incident and make recommendations for institutional corrective measures. Here, too, I see no reference to any such effort, which I find to be remarkable.

7.    With regard to the incident itself, based on the descriptions of how the incident began, it appears that Mr. Brown initially assumed a posture of aggression when he took off his shirt and called out to Mr. Jackson on the yard. Without getting into the issue of who was armed and who was not at the outset, by initiating the confrontation in that manner, Mr. Brown was clearly drawing a line in the sand and saying "we have something to resolve." In a prison, when such an incident occurs, it is not over until the staff takes control of the situation. The staff did not have control of this situation until after Mr. Brown emerged from the cell with a knife in his hand and was subdued by

3

04-003

officers. There are even contradictory reports as to whether Mr. Brown dropped the knife or had it taken from him.

8.      Inmates have a right to protect themselves from other inmates, and I would advise prisoners of that. Mr. Jackson's response to the initial confrontation was to defend himself. In prison, if you do not fight back you are labeled as weak and you can become a permanent victim. Within the prison community, a prisoner has to maintain a reputation with his peers. Once branded as weak, he is doomed to spend his time looking over his shoulder and/or he may consigned to protective custody. This is seen by the vast majority of prisoners as an unacceptable fate. In addition, facing an attack from someone like Mr. Brown, even to disarm him does not end the matter because there is always the possibility that he has another weapon somewhere or can easily obtain one and it is only a matter of time until he attacks again perhaps when it is unexpected or when the person attacked is in a more vulnerable position.

9.      It is reported in the trial testimony, the declarations and even in the BOP investigation that Mr. Brown was often drunk and some witnesses described him as appearing to be drunk at the time of the incident. Intoxicated prisoners are a very serious danger to staff and other prisoners.

10.      I have reviewed Mr. Jackson's institutional record and disciplinary history. In my capacity as Correctional Services Administrator at the North Central Regional Office, I administered the disciplinary transfer program and reviewed some 4,000 cases. I have also reviewed thousands of other inmate files in the course of making

4

classification decisions and recommendations. While Mr. Jackson has certainly had some disciplinary problems through the years, he appears to me to be someone who could be managed and who was capable of extended periods without incident. He has a proven capacity for adjusting himself and working his way out of disciplinary restrictions and back into open population and less restrictive custody. There are very many prisoners within BOP with comparable institutional profiles to that of Mr. Jackson. Prior to the instant homicide, his record was no different from literally thousands of others and was by no means exceptional.

11.     I have also reviewed testimony and declarations pertaining to an incident in which Mr. Jackson was reported by a staff member to have made verbal threats concerning the placement of another inmate in his cell in the special housing unit (SHU) at Beaumont roughly two months after the homicide. Frankly, the whole episode makes absolutely no sense from an institutional management standpoint. As an initial matter, you have three or four prisoners in a two-man SHU cell. This is in and of itself problematic and inappropriate. Additionally, one of the inmates in this overcrowded cell is under investigation for killing another prisoner two months earlier. That is contrary to sound correctional practice. Indeed, in my experience it would be extraordinary to house anyone in a cell with an individual who was under investigation for homicide. Then, notwithstanding these apparently poor management practices, yet another prisoner is brought to the cell. The whole scenario is hard to imagine.

5

04-005

12.    Finally, I have reviewed the testimony of Mr. Jackson at his trial.  Based on my thirty years in prisons as a line officer all the way up to Warden, his testimony as to his accomplishments and position within USP Beaumont appears to me to be delusional. There is absolutely no way that he "ran" the UNICOR operation as he claimed.  Prisoners do not "run" UNICOR, especially a prisoner with a record like Mr. Jackson's who has only been in that particular prison for several months.  There is nothing about him that would make him suitable for the high level position of responsibility that he described, essentially having total operating control over a factory.  The functions he described such as ordering and receiving materials and supplies are generally performed by free world employees or by inmate clerks who have limited office responsibilities and who have no authority or control over another prisoner.

13.    At the time of Mr. Jackson's penalty phase in November of 2006, there were any number of experts in prisons who could have been called to testify on the issues addressed in this declaration.

14.    The opinions I have expressed are based on a lifetime of experience in this field and my observations are based on correctional principles and policy that are part of the stated mission of the Bureau of Prisons and that are consistent with generally

6

04-006

accepted practices of sound correctional management.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __ day of September, 2010, in Queen Creek, Arizona.

_____

Mark A. Bezy

State of Arizona _____
County of Pinal _____
On this __ day of September, 20__, before me
personally appeared Mark A. Bezy,
whose identity was proved to me on the basis of satisfactory evidence
to be the person whose name is subscribed to this document, and who
acknowledged that he/she signed the above/attached document.

_____
Notary Public

NOTARY PUBLIC
STATE OF ARIZONA
Pinal County
EILEEN M COCHENNIC
My Commission Expires 09/30/13

7

04-007

# EXHIBIT 5

Declaration of Pamela Stites

I, PAMELA STITES, hereby declare:

*PS* 1. I live in            *REDACTED*           Texas. I am a Mitigation Specialist.

*PS* 2. A Mitigation Specialist is an integral part of a capital defense team, assisting the defendant's counsel in researching and investigating the defendant's life and background. The Mitigation Specialist's basic goal is to develop mitigating evidence for presentation to a prosecutor, jury or court in order to avert capital charges or imposition of a death sentence.

*PS* 3. On August 30, 2005, I was appointed by the United States Court for the Eastern District of Texas to be the Mitigation Specialist in the case of *USA v. David Jackson*, a federal capital trial case in Beaumont, Texas. The attorneys in the case were Robert Morrow and Douglas Barlow. I reported directly to them.

*PS* 4. In my role as the Mitigation Specialist for David Jackson, I was primarily responsible for conducting the investigation of potentially mitigating evidence for presentation at the penalty phase of trial should the case go that far. My investigation consisted mainly of requesting numerous background records concerning Mr. Jackson and interviewing people who knew him. As part of this investigation, I traveled to Detroit, Michigan, where I interviewed his mother and sister and two cousins who grew up in the Jackson home.

*PS* 5. I met with Mr. Jackson's mother, Sammie Lee Jackson, on January 18 and 21, 2006. She provided me with a wealth of information about her own background, about her marriage and relationship with Mr. Jackson's father, Leroy; and about David Jackson's life from childhood until the present. I memorialized this information and reported it to Mr. Jackson's lawyers in the form of memoranda, charts, bullet points, as well as a short biographical sketch of

*PS*

05-001

Mr. Jackson's life that relied largely on facts and data provided by Mrs. Jackson.

6. Based on my interviews with Mrs. Jackson and the substantial mitigating evidence she was able to provide, she was considered by trial counsel to be an important potential penalty phase witness.

7. Due to Mrs. Jackson's advanced age (78) and poor health, however, the possibility of her being able to travel from Detroit to Beaumont to testify became very much in doubt. Accordingly, approval from the Court was obtained to travel to Detroit to videotape her testimony. The videotaping was never done and Ms. Jackson died in June of 2006, four months before Mr. Jackson's trial. Mrs. Jackson, of course, would like to have testified and to have given her son's sentencers the benefit of her unique knowledge about his background and life circumstances.

8. I have reviewed the notes, memoranda and other materials I prepared regarding my interviews of Ms. Jackson. On the basis of these contemporaneous reports of Mrs. Jackson's statements to me, and my own recollections of those conversations, I can attest that she would have been able to present the following information had she been given the opportunity to provide videotaped testimony:

9. Mrs. Jackson was born REDACTED 1927, in Corner Stone, Arkansas. Her parents, Jesse and Josie Newby were poor sharecroppers who lived and worked on a plantation owned by the Miner family. She was one of six children. She and her siblings started working picking cotton when they were still children. Her father died when she was 6 years old. Her mother earned 50 cents a day picking cotton.

2

05-002

10. After Jesse Newby died, Mrs. Jackson and the other children had to work even harder to make ends meet and maintain the household, which included caring for one of her younger sister Ammalie, who was very sickly, who never walked or talked and died at the age of five. Life was very hard for Ms. Jackson. She was never able to read or write at all.

11. Sammie Lee met Leroy Jackson through her brother, Forest "Forcey" Newby. Leroy was much older than she was. She married Leroy on May 3 or June 3, 1950. They went to Milwaukee for their honeymoon and stayed there for a couple of months.

12. In approximately October of 1950, Sammie Lee and Leroy Jackson moved to Mississippi. Not long after moving to Mississippi, they heard that Leroy was the suspect in the robbery of a store and the murder of the white proprietor. They immediately left town after receiving word that Leroy was going to be lynched. They moved to Detroit. Not long after their arrival in Detroit, Leroy was arrested for armed robbery. He was sentenced to 7 and ½ years in Michigan state prison.

13. In 1958, Mrs. Jackson went to Arkansas to get her sister Emma's two-year old daughter, Brenda, and take her back to Detroit to live.

14. Leroy Jackson was released from prison in 1959.

15. In March 1960, Mrs. Jackson gave birth to her first child, David.

16. When David was eight months old, he fell out of a crib and landed on his head.

05-003

*PS*    17.  In the early 1960's, Mrs. Jackson's mother and her sister Emma's oldest child, Larry, moved to Detroit to live with the Jacksons.  A short while later, Larry was sent back down to Arkansas to help his mother take care of her other two small children, Michael and Joan.  In 1963, Emma died of a brain tumor, and all her children came to live with the Jacksons in Detroit.  At that time, Emma's children were Larry, 12; Brenda, 7; Michael, 5; and Joan, 3.  Sammie Lee's children were David, 3; and Patricia, 1.

*PS*    18.  Leroy was not happy about Emma's four children living with them.  He would get drunk and scream at everyone.  Leroy started to run around with other women and he would often not come home at night.

*PS*    19.  Leroy became more and more abusive to Mrs. Jackson and the children.  He would beat her with his fists, chase her around the house with knives and hit her with a hammer.  He would beat the children with bed slats, extension cords and his fists.  He would make the children strip down naked and he would hold them between his legs and beat them until they bled or he got tired.  He was known in the neighborhood as "Demon."

*PS*    20.  On one occasion, Leroy took after Patricia with a gun and chased her through a neighbor's house.  On another occasion he shot Larry in the stomach.

*PS*    21.  Sometimes when Leroy would get in his drunken rages he would put Mrs. Jackson and the children out of the house.  He even did this in the winter at night when there was snow and ice on the ground.  On at least one occasion, Mrs. Jackson and the children walked to the police station for shelter.  I measured the distance and found it to be 1.8 miles.  The police would go the house and order Leroy to allow the family back in the house.  Sometimes the police would refuse to get involved and would say it was a "family" matter and not something that required

4

*PS*

05-004

their assistance.

22. On one summer night, Mrs. Jackson's friend, June, and her husband were visiting. The children wanted to go to the neighborhood recreation center and swim, but Mrs. Jackson did not have any money. Her friend June gave the children money to go swimming. Leroy came to the house drunk and got angry at Mrs. Jackson. He followed her into the bathroom and punched her in the eye. Mrs. Jackson got a blood clot in her eye and it was swollen and black and blue around her eye socket.

23. Leroy threatened to kill Mrs. Jackson if she ever left him.

24. Mrs. Jackson gave birth to two more children, Roger, on REDACTED 1963; and Stanley on REDACTED 1968. With the birth of Stanley, there were eight (8) children in the Jackson home.

25. Mrs. Jackson took David to a special education school on Martin Street behind Chassie High school when he was eight years old. Two years later, he was tested and found by the Detroit school system to be "mentally retarded." Mr. and Mrs. Jackson were told by the principal of Sampson Elementary School that David was mentally retarded and after that Leroy would insult David by calling him "retarded."

26. By the time David was eight or nine years old, Leroy was often staying with another woman. One Sunday morning when he did not come home, Mrs. Jackson went to the other woman's house and smashed out the windows in Leroy's car. Leroy came to the house and brutally beat Mrs. Jackson.

27. David was slower in developing than any of the other children. He was slower to talk and he had a harder time doing things like tieing his shoes. He wet the bed for years longer

5

than he should have and he would get beaten for it. Mrs. Jackson bathed David until he was 11 years old. He sucked his thumb into his early teen years, and even as a teenager when he was upset he would sit on the floor and rock and cry, sucking his thumb. He would do this when Mr. and Mrs. Jackson would fight.

28. When he was in his early teens, David started having legal problems of his own and he was sent to various facilities for troubled boys. When he was 13 or 14 years old, his mother would visit him at juvenile centers and would smuggle valiums to him to ease the discomfort he was experiencing from heroin withdrawal.

29. Starting in the mid-1970's, after Leroy left Mrs. Jackson, her living conditions gradually deteriorated. With her very limited job skills and employment opportunities, she became increasingly destitute. She sold marijuana as a means of supporting herself and the children and grandchildren in her home. She was arrested for marijuana possession and placed on probation.

30. When David would get out of juvenile detention or prison, he would always be very concerned about her living conditions and he desperately wanted to help her. Sometimes he would commit burglaries or robberies in order to support Mrs. Jackson and the children in her home.

31. David was, in some ways, Mrs. Jackson's favorite. He was always respectful and devoted to her, unlike some of her other children who were abusive and disrespectful. He would always try to help her in whatever ways he could.

32. The last time David was released from prison, in 2004, he immediately came home to see his mother. He was very upset to see her abject living conditions at that time and he was

6

05-006

determined to provide her with some resources. He left Detroit after about six weeks and a short while later he was arrested for bank robbery in Mississippi and he was returned to prison.

_PS_ 33. Had Mrs. Jackson been deposed or been able to travel to Beaumont for David's trial, I am certain that she would have been able to testify to the above facts about his and her lives.

_PS_ 34. David Jackson's lawyers were well aware of Mrs. Jackson's tenuous health situation and the need for traveling to Detroit to preserve her important mitigating testimony. I told them she was in bad bad shape. Regrettably, that was never done.

_PS_ 35. I was not present for David's trial. I was available to be there and wanted to be there but I was told by the attorneys that I was no longer needed at that point.

_PS_ 36. I had recommended to David's lawyers that they look into the possibility that David had mental retardation and that this might have precluded his eligibility for the death penalty. I was aware that David had two IQ scores from elementary school on the most reputable IQ tests, a WISC and a Stanford-Binet, that placed him within the range of mental retardation. Due to those two significant pre-age 18 scores, I recommended strongly to the attorneys that there was no need to perform further IQ testing of David at the age of 46 and after so many years in prison. There was no reason to do so and no conceivable advantage for David's legal case.

_PS_ 37. There were a number of other family members of David's who were available to testify at his trial and to describe first-hand many of the details of David's difficult early life and the hardship they faced as a family. Both of his brothers, Roger and Stanley, although incarcerated at the time, were willing to be transported to Beaumont to testify on behalf of their brother's life. David's cousin, Larry, very much wanted to testify for him. I was not involved in any decision not to use these family members as trial witnesses.

7

_PS_

05-007

*PS* 38.  I was shocked to find out that the attorneys had put David on the witness stand at the end of his penalty phase.  I do not recall the possibility of David's testifying ever being considered or coming up.  I certainly would have advised strongly against it, but I never even believed it to be in the realm of possibility, so it was never discussed. From my experience, it would be an extraordinary situation where you would put the defendant on the stand and expose him to the rigors of cross examination.  This would be especially true in the case of someone like David, who had  tested as low as 67 on an IQ test.  I could not imagine pitting him against a skilled and savvy prosecutor.  In addition, given some of David's quirks and personality traits, I would foresee some very serious problems in putting him on the stand.  Due to his various defense mechanisms and lifelong efforts to appear more capable than he really is, I would be afraid he might come across to the jury as perhaps arrogant or self-serving.  Although these perceptions of David would not be accurate or correct, the risk that a jury would see him that way was great.  He tends to be grandiose about his abilities and accomplishments, perhaps even deluded, and I would have assumed that this, too, would come across very badly to a jury. David's attorneys certainly knew all of this from their direct dealings with David as well as our many discussions, so I was truly stunned to find out they had put him on the stand.

*PS* 39.  I do not know about the legal admissibility of my testifying at David's trial concerning what I had learned about David's life and background from his mother, but assuming it was admissible, and given the fact that Mrs. Jackson was not available due to her death shortly before trial, I would have been available to testify about everything in this declaration that I was

8

*PS*

05-008

told by Mrs. Jackson.

40. During my performance as the mitigation specialist in the David Jackson case, my stepfather of twenty-five years, who was a second father to me, was diagnosed with terminal cancer. From January until August of 2006, I was needed by my elderly mother to assist her with trips to the hospital and other basic tasks due to her inability to drive on highways. My step-father died in August, two weeks after I was released from David's case. The entire time during my tenure on the case, the tendons in my right shoulder and ACL cuff were ripped. I had surgery one month after being released from the case. All of this impacted on my ability to meet deadlines that were needed by the attorneys. They may have impacted in other ways of which I am not aware. This is the only case in which I had these distractions that could have impacted upon my performance as a mitigation specialist.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 27th day of September, 2010, in Austin, Texas.

Pamela  Stites

9

05-009