# EXHIBIT 6

## SWANSON & SWANSON CONSULTATION
### P.O. BOX 80966
### LAFAYETTE, LOUISIANA 70598

Victoria Swanson, Ph.D.
LA Licensed Psychologist #864
National Health Service Provider in Psychology #50400
Voice: _REDACTED_    FAX: ( _REDACTED_
Email: VSwanson1( _REDACTED_

Terry D. Swanson, M.S.
Examiner, Behavior Analyst
Voice: _REDACTED_    FAX: ( _REDACTED_
Email: TSwanson1( _REDACTED_

**Name**: David Jackson          **Date of Birth**: REDACTED/60          **Assessment Date**: 09/10/10
**Report Date**: 09/24/10

I, Victoria Swanson, declare as follows.

### REFERRAL
David Jackson was referred by his attorneys for a psychological evaluation to determine whether he meets the diagnostic criteria for Mental Retardation as specified in both the Diagnostic Statistical Manual, Fourth Edition, Text Revised (DSM-IV-TR), and the American Association for Intellectuals with Developmental Disabilities (AAIDD) 11th Edition definition and classification system most recently published in the Mental Retardation: Definition, Classification, and Systems of Supports, 11th Edition. My evaluation consisted in a review of forwarded medical, court, and school records as well and psychological test data collected by another expert in this case in 2006. This evaluation was conducted in accordance with diagnostic codes and guidelines of best practice established by the Division 33 of the American Psychological Association (APA), Intellectual and Developmental Disabilities (formerly known as Mental Retardation and Developmental Disabilities) and the AAIDD (formerly known as AAMR) to be used in making retrospective diagnoses in adult, forensic cases.

### CRITERIA USED
### DSM-IV-TR (2000)
The DSM-IV-TR diagnostic criteria for Mental Retardation are as follows: ( a ) significantly subaverage intellectual functioning (IQ of approximately 70 or below on an individually administered IQ test), ( b ) concurrent deficits or impairments in present adaptive functioning (his effectiveness in meeting the standards expected for his age by his cultural group) in at least two of the following areas: communication, self-care, home living, social /interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and ( c ) onset before the age of 18. Criteria A notes that clinical judgment should only be used in assessing the intellectual functioning of infants. The manual notes that intellectual functioning is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests and significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean). The manual further notes there is a measurement error of approximately 5 points in assessing IQ, with this standard error of measurement (SEM) varying from instrument to instrument and gives as an example that a Wechsler IQ of 70 is considered to represent a range of 65 to 75. "Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior (APA, 2000)". The manual also notes that differentiating between Mild Mental Retardation (50-55 to approximately 70) from Borderline Intellectual Functioning (generally 71 to 84) requires careful consideration of all available evidence.

### QUALIFICATIONS OF EXAMINER
I am a licensed psychologist with more than 35 years of experience in the assessment, diagnosis, and treatment of individuals with mental retardation. I have attached my curriculum vita, which outlines my qualifications to perform this examination.

### AAMR, 11th Edition (2010)
As noted above, the American Association on Mental Retardation (AAMR) changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD) after it published the 10th Edition of its classification system in 2002. By 2007, the organization was publishing under its revised name, AAIDD. In 2010, the organization published the 11th edition of its diagnostic and classification system. The term "AAMR" will be used when referring to texts under the previous name and the term "AAIDD" will be used when referring to texts published under the current name of that organization.

The Mental Retardation: Definition, Classification, and Systems of Supports, 11th Edition defines Mental Retardation as significant limitations both in both (1) intellectual functioning and (2) adaptive behavior as expressed in conceptual, social, and practical adaptive skills with (3) the disability originating before age 18. The AAMR 11th indicates intellectual functioning is best represented by IQ scores obtained from appropriate assessment instruments with the criterion for diagnosis being approximately two standard deviations below the mean, considering the standard error of measurement (SEM) for the specific assessment instruments used and the instruments' strengths and limitations (AAMR, 2010). For a diagnosis of mental retardation, the AAMR 11th indicates significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population and operationally defined as performance that is at least two standard deviations below the mean of either ( a ) one of the three types of adaptive behavior (conceptual, social, or practical) or ( b ) an overall composite score on a standardized measure of conceptual, social, and practical skills. Thus, the collection of eleven skills noted in AAMR 9th and DSM-IV-TR are collapsed into three areas in order to better obtain standardized measures of adaptive skills. The AAIDD 11th notes that adaptive skill limitations often coexist with strengths in other adaptive skill areas, and therefore, a person's strengths and weaknesses

06-001

should be documented within the context of community and socio-cultural environments typical of his or her age peers and tied to individualized needs for supports or what level of assistance the person needed to be given either environmentally or by other people to guarantee success.

The AAIDD 11th includes guidelines, first published in 2007 to supplement the AAMR 10th, that indicate adaptive behavior must be assessed in relation to the four dimensions of ( a ) intellectual abilities, ( b ) participation, interactions, and social roles, ( c ) health, and ( d ) context. Schalock et al. (2007) define context as the interrelation between the social setting and the broader cultural environment that provides a natural system of family, neighborhood, and community supports that ensure the individual's performance of adaptive skills in that setting but not necessarily in a broader or more complex context. Thus, an individual may function fairly well within his familiar neighborhood with the supports of family and friends but may not be able to meet those same adaptive expectations in another setting without those inherent supports that exist in the original context of home, neighborhood, community, or work. The expert is charged with determining what supports existed or what level of assistance needed to be provided within the context of work, home, school, etc., to guarantee that adaptive criteria were met. Context is difficult to assess with standardized measures and is, therefore, a necessary component of clinical judgment and integral to understanding the individual's functioning.

## Similarities Between the DSM-IV-TR and the AAMR Classification Systems

The DSM-IV-TR mental retardation diagnostic code is based on the AAMR 1992 classification system (9th Edition). Both the DSM-IV-TR and the AAMR 2002 classification system use the same three criteria (i.e., significantly subaverage intellectual functioning, limitations in adaptive skills, and onset prior to age 18). The DSM-IV-TR requires a standard IQ score of approximately 70 or less on an individually administered IQ test that takes into account the standard error of measurement (SEM) of plus or minus 5 points. The AAMR system similarly requires significantly subaverage intellectual functioning as defined as a standard IQ score approximately two standard deviations below the mean (an IQ score of approximately 70 or less when the mean of the standardized measure is 100 and the standard deviation is equal to 15 points) and considering the standard error of measurement (SEM) for the test used. The DSM-IV-TR defines adaptive functioning as how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of individuals in their age group. Similarly, the AAMR system defines adaptive behavior as the collection of conceptual, social, and practical skills that have been learned by people in order to function in their every day lives. The DSM-IV-TR notes that there are standardized measures that "provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains" but bases its adaptive criteria on the AAMR 1992 classification system that extended the concept of adaptive behavior from a global description to the specification of the specific adaptive skills noted in the DSM-IV-TR adaptive criteria. The AAMR 2002 classification system recommends a standardized, comprehensive assessment be made to determine if the person has adaptive deficits in one of three domain areas or an overall standard score of greater than two standard deviations below the mean for the measure used.

## GUIDELINES FOR MENTAL HEALTH PROFESSIONALS INVOLVED IN *ATKINS* HEARINGS

In 2002, the United States Supreme Court ruled in *Atkins v. Virginia* that the execution of individuals diagnosed with mental retardation is unconstitutional. The decision is framed in the language of clinical diagnosis with the definitive criteria left to the states (DeMatteo, Marczyk, & Pich, 2006). Essentially, in *Atkins* and post-*Atkins* hearings, a psychodiagnostic assessment based on scores on psychological tests and associated diagnostic findings is used to determine if the defendant is exempt from the death penalty (Bonnie, 2004). Since 2002, experts in the field of Mental Retardation have sought to establish guidelines for mental health professionals in those circumstances that require a retrospective diagnosis for mental retardation.

The two leading agencies in establishing the best practices in the field of mental retardation are the American Psychology Association Division in Intellectual and Developmental Disabilities (APA Division 33), formerly the Division in Mental Retardation and Developmental Disabilities, and the American Association on Intellectual and Developmental Disabilities (AAIDD), formerly known as the American Association on Mental Retardation (AAMR). Both agencies consider that best practices are based on professional ethics, professional standards, research-based knowledge, and clinical judgment. Since the 2002 *Atkins* decision was made, both APA Division 33 and the AAIDD have established study groups to address specific issues related to mental retardation evaluations in capital cases. These study groups have generated a body of research and recommendations aimed at assisting mental health professionals to provide the best possible information to courts faced with making these decisions. As this examiner followed the guidelines and recommendations made by these two organizations in answering the referral questions noted above, a short explanation of the recommendations advocated by each agency is warranted.

## AAIDD Guidelines

AAIDD has been the primary agency charged with collecting available research to give a clear understanding of the condition of mental retardation and best practices to be used by clinicians, educators, disability program managers, and policy makers in the areas of diagnosis, classification, and supports planning. Toward this end, AAIDD has supported research groups that have updated the definition of mental retardation eleven times since 1908 with each update reflecting the then-current understanding of the condition of mental retardation. The 1992 Mental Retardation: Definition, Classification, and Systems of Supports, 9th Edition moved the diagnostic process away from identifying intelligence test score deficits as the sole definitive criteria and toward contextualizing diagnosis and classification within a system of individualized supports while emphasizing designing programs based on providing individualized support. While previous definitions looked only at the individual, the 9th Edition looked at how the individual functions with and interacts within his or her environments (home, work, leisure, etc.) and expanding the definition by ( a ) establishing that mental retardation is a state of functioning, ( b ) reformulating what needed to be classified (intensities of supports), ( c ) viewing mental retardation as an interaction between an individual with limited intellectual functioning and his environment, and ( d ) extending the concept of adaptive behavior from a global description to a specification of particular adaptive skills. Thus, the 9th Edition represented a paradigm shift in the conceptualization of mental retardation and both the DSM-IV (1994), the text revision of that code (DSM-IV-TR, 2000), and the *Atkins* decision (2002) are based on the 1992 definition.

The 10th Edition integrated 10 years of experience, research, and commentary to more clearly operationally define the multidimensional nature of mental retardation and present best-practice guidelines for diagnosing, classifying, and planning supports. The 10th Edition differs from the 1992 version in that it ( a ) adds a standard deviation criterion to both the intellectual and adaptive behavior components, ( b ) applied a factor analytic approach to adaptive behavior and collapsed the 11 adaptive skill areas detailed in the 9th Edition into three conceptual factors (conceptual, social, practical), ( c ) expanded the discussion of clinical judgment and the circumstances in which it is required, and ( d ) gave a broader discussion of the relationship between the 2002 system and other classification systems, i.e., DSM-IV-TR, International Statistical Classification of Diseases and Related Health Problems (ICD-10), and International Classification of Functioning, Disability, and Health (ICF).

In 2007, the AAIDD published the User's Guide: Mental Retardation Definition, Classification, and Systems of Supports --10th Edition (Schalock et al., 2007) to better explain the implications of the 2002 system to the clinicians (i.e., psychiatrists, psychologists, social workers, and other health providers), educators, disability program managers, and policy makers who use it as well as addressing issues, such as Atkins-related diagnoses, that had arisen since the 2002 publication date. The 2007 guidelines specifically addressed the diagnostic criteria and guidelines as they relate to intelligence, adaptive behavior, and age of onset in challenging diagnostic conditions and situations with the four most problematic for clinicians noted as ( a ) dual diagnosis of mental retardation and mental illness, ( b ) diagnosis of individuals in the mild mental retardation range, ( c ) retrospective diagnoses, and ( d ) diagnosing in situations in which formal assessment is restricted by less than optimal conditions (i.e., complex medical or behavioral conditions, legal restraints, linguistic factors, or the legal proscription of intelligence tests).

The 11th Edition of the Manual builds on the information presented in the 1992 and 2002 editions summarized the research completed since the 2002 publication and incorporated the 2007 guidelines into the classification system.

## APA Division 33 Guidelines
Due to its concerns about making Atkins-related diagnoses, the APA Division 33 formed an Ad Hoc Committee on Mental Retardation and the Death Penalty (2005) to describe the role of psychologists in these types of cases and to establish professional standards for assessment and diagnosis in cases where the individual may be mentally retarded. The Ad Hoc Committee pursued a consensus of standards around the issues of the definition of mental retardation, retrospective diagnosis, measuring intelligence and adaptive behavior, assessing malingering, and the role of the psychologist in educating the court about characteristics of mild mental retardation (Baker, 2006). At the annual meeting of the American Psychological Association in Boston, Massachusetts (August, 2008), the Ad Hoc Committee met with a panel of experts in the fields of mental retardation, law, psychometrics, and forensic psychology to address the issue of standards of practice in Atkins cases. The panel reviewed results of several unpublished surveys regarding professional practice in Atkins cases and proposed position statements regarding guidelines for best practice. The initial findings of the Ad Hoc Committee have been published in the official newsletter of the APA Division 33, Psychology in Mental Retardation and Developmental Disabilities, and those references are cited at the end of this report. Official position statements and guidelines for assessment in Atkins hearings are pending.

## Specific AAIDD and APA Division 33 Recommendations
The AAIDD and APA Division 33 have tried to ( a ) define the differences and commonalities in the definitions of mental retardation, ( b ) establish standards in the areas of qualifications of experts in the field of mental retardation, ( c ) define the role of archival information and social history in collaborating conceptual, social, and practical adaptive difficulties, and ( d ) consider specific issues regarding assessment of cognitive and adaptive skills that have greater impact in legal situations – including the choice of instruments, consideration of the expertise of the examiner in administering the chosen test, the Flynn Effect, practice effects, and the standard error of measurement (SEM) for the specific assessment instrument used as well as the instrument's strengths and limitations, and the confidence interval of the obtained score. Core strategies recommended by both AAIDD and APA Division 33 to deal with these issues are ( a ) use multiple sources of information (school, work, social, medical, etc.), ( b ) choose robust standardized instruments broadly recognized in the field, ( c ) use multiple informants, ( d ) conduct an examination of adaptive behavior in two or more environments, ( e ) conduct a longitudinal study of adaptive behavior that begins in childhood, ( f ) understand that adaptive and problem/maladaptive behaviors are independent constructs and not opposite poles of a continuum, ( g ) realize adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning, ( h ) recognize the appropriate respondents and instruments in prison settings, and ( i ) be aware of the cautions against using self-report and directly administered standardized adaptive tests in prison settings. While all of these guidelines impact on Mr. Jackson's case, some issues are critical, and are therefore discussed in greater detail in this section.

## Standard error of measurement (SEM) and confidence interval. 
An obtained IQ score is only an estimate of a person's "true" IQ score. All test scores have some measure of error or assessment imprecision that may be related to several factors such as ( a ) errors within the instrument itself (i.e., faulty test construction, normative sample error, norm obsolescence, etc.) ( b ) error within the testing environment (i.e., less than optimal testing situation), ( c ) examiner error (i.e., examiner was ill or distracted, inexperienced examiner, failure to follow standardized procedures, etc.), and ( d ) error within the examinee (i.e., examinee was ill or distracted, examinee had previous experience with test, etc.). Test error is the standard error of measurement (SEM) or statistical estimate of the amount of error in a person's observed test score. The SEM varies across test instruments and age ranges. When a score is reported for a psychological test, the examiner also reports how certain or confident one can be that an interval around the examinee's obtained score contains his or her true score. Thus, an obtained IQ score must be interpreted within a confidence interval (i.e., a band or range of scores around the obtained score) that likely includes the examinee's true score, and that precision range or interval is based on the reported range of error for that test instrument.

Most experts use the 95% confidence interval as the precision range in which one will find an examinee's true score 95% of the time, and the statistical chances are only 5 in 100 that an examinee's true score lies outside this confidence interval. For example,

according to the manual for the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), the 95% confidence interval for an IQ of 70 would be 67 to 75. When multiple measures have been given over time, the overlapping confidence intervals help determine the true score, particularly when there are "outliers" (i.e., atypically high or low scores). For these reasons, both the APA and AAMR definitions allow for a diagnosis of mental retardation based on an IQ score of 75 or below as long as there is evidence of concurrent, related deficits in adaptive behavior prior to the age of 18 (AAMR, 1992, 2002, 2010; APA, 2000).

**Standardized intellectual tests recommended for use in *Atkins* hearings.** Generally speaking, the more reliable the test, the smaller the SEM, and examiners should indicate test limitations in their reports. For example, scores from short-form or abbreviated scales such as the Wechsler Abbreviated Scale of Intelligence (WASI), the Slosson Intelligence Test, and the Kaufman Brief Intelligence Test have a larger SEM and should only be used as a supplementary measure. The tests that are generally acceptable in the field for diagnosing mental retardation are the current adult and children editions of the Wechsler Intelligence Scales (currently the WAIS-IV, WISC-IV) and the current edition of the Stanford-Binet Intelligence Scales (currently the SBIS-5). The SBIS-5 and the WAIS-IV as well as the previous editions used to assess adults (WAIS-III, WAIS-R, WAIS, SBIS-4, SBIS-LM) and children (WISC-III, WISC-R, WISC, SBIS-4, SBIS-LM) are considered the "gold standards" for the intellectual assessment of adults suspected of having cognitive deficits (Schalock et al., 2007). The results of these tests are frequently noted in *Atkins*-related hearings as supporting a diagnosis of Mental Retardation. Screening instruments, experimental measures used only in research, regression equations, prorated scores, etc., are not recommended for use in *Atkins*-related hearings as the primary measurement of intellectual functioning (MacVaugh III, & Cunningham, 2009; Schalock et al., 2007).

**Flynn Effect**
The Flynn Effect is a well-established phenomenon that refers to an upward trend in IQ scores as the norms on which the intelligence test is based age. In simple terms, psychological measurement experts typically describe the Flynn Effect as resulting from a "softening" of IQ test norms with the passage of time. This is one of the reasons that test publishers must "freshen" norms via the collection of new nationally representative sample data for intelligence test batteries and the generally accepted rule in the industry is to renorm tests at least every 10 years. The phenomenon is based on group statistical studies on the normal distribution of intellectual scores that indicates the normal curve distribution (the bell curve) gradually shifts to the right of the original mean. In short, the individual's raw score or actual tested performance (number of correct responses across all parts of the IQ test) does not change, but the reference or normative comparison group used to derive an estimate of the person's relative standing in the distribution of IQ scores does change.

The accepted research-based Flynn Effect is a change of approximately 3 IQ points for each decade that a test's norms are older than the date when an individual is tested. The anticipated Flynn Effect of a given test is one of the strengths or weaknesses of that instrument that must be considered by the examiner. The Flynn Effect is generally accepted in the scientific community and experts in the field of mental retardation recommend that both the obtained score and any upward shift that might have occurred due to the Flynn Effect be reported in *Atkins*-related cases (Schalock et al., 2007; Greenspan, S., 2006, 2007; Gresham, 2009). Statisticians have computed a formula for estimating the Flynn Effect on an obtained IQ score. AAIDD and the APA Division 33 have recommended that clinicians in *Atkins* hearings clearly outline for the courts the extent of the Flynn Effect on the normative sample and note that it becomes more important when trying to analyze scores that were obtained across an extended period of time or with tests normed at different intervals. AAIDD recommends adding 0.33 points per year from the time the test is normed. Greenspan (2006, 2007) and Flynn (2006, 2007) recommend adjusting for the Flynn Effect at the rate of 0.3 points per year is a useful, and valid, method for increasing the likelihood that a psychologist will correctly diagnose mental retardation in someone deserving that label. Both methods are commonly used in *Atkins*-related cases, but there continues to be conflict in the psychometric field on how to acknowledge the possibility of a Flynn Effect in an individual score. Hagan, Drogin, and Guilmette (2010) point out that the Flynn Effect is based on group data, and "altering obtained IQ scores based on the Flynn Effect does not comport with the standard of forensic psychological practice. The authors point out there is "no legal mandate to make adjustments", but psychologists should identify data limitations that are attributable to the test. Thus, there appears to a a conflict among experts as to how to interpret the Flynn Effect, but the consensus is the clinician conducting an *Atkins* related evaluation must clearly illustrate the limitations of the tests used as well as the obtained scores.

**Tree Stump Effect.** As noted above, examiners are obligated to report an instrument's strengths and limitations, and the confidence interval of the obtained score when assessing cognitive functioning. This requirement is particularly relevant when addressing scores obtained through the WAIS-III due to a reported sampling error. Many experts have noted a "tree stump" phenomenon exists with the WAIS-III where an examinee is able to obtain an IQ score in the 40s without giving a single correct answer. When stratifying the normative sample for low ability, too many low score examinees were included and, therefore, the norms overstate the IQ by 2.34 points (Greenspan, 2007; Flynn, 2007). For example, as calculated by Flynn (2007), a WAIS-III score obtained in 2008 and interpreted with norms collected in 1995 and 1996 could be reduced as much as 4 points to account for 13 years of obsolescence (.3 x 13), and then further reduced 2.34 points to account for the sampling error unique to the WAIS-III (i.e., a total IQ reduction of 6 points). In such a case, the examiner should caution the true IQ score for this individual most likely falls at the lower end of the confidence interval for that score.

**Summary of Issues Relevant in Intellectual Testing.** In summary, it is the consensus of experts in the field that any limitations known about a test (i.e., normative error) or test score (i.e., practice effects, tree stump effect), should be reported in addition to the obtained score. To facilitate comparison, Flynn Effects need to be considered, but there is some dissent on how to best report Flynn Effects in *Atkins* hearings. One view is to report Flynn-adjustmented scores in order to better compare scores obtained at different times in an individual's life so that the court will have a complete understanding of all scientific perspectives in interpreting the IQs reported in *Atkins*-related assessments (Greenspan, 2006, 2007; Gresham, 2009; MacVaugh III, & Cunningham, 2009; Schalock et al., 2007). Another view is to give a narrative account of the aging norms of relevant tests and record the upward shift noted in the literature without actually altering the score (Hagan, Drogin, & Guilmette, in press).

Experts in the field of mental retardation urge mental health experts to employ applicable hypotheses when interpreting score discrepancies in reports and testimony that give IQ scores from previous and current assessments (Schalock et al., 2007; Everington & Olley, 2008). Best practice mandates that clinical judgment should be based on a solid foundation of scientific knowledge and not "gut instinct" or some other idiosyncratic opinion not backed up by psychometric evidence and research.

### Clinical Judgment

Experts in the field of mental retardation urge mental health experts to utilize applicable hypotheses when interpreting score discrepancies in reports and testimony that give IQ scores from previous and current assessments (Schalock et al., 2007; Everington & Olley, 2008). Best practice mandates that clinical judgment should be based on a solid foundation of scientific knowledge and not "gut instinct" or some other idiosyncratic opinion not backed up by psychometric evidence and research.

**Adaptive behavior**. In order to meet the adaptive behavior criteria for a diagnosis of mental retardation, the individual must exhibit deficits in practical daily living skills (i.e., toileting, eating, dressing, bathing, meal preparation, money management, household maintenance) as well as social (i.e., responsibility, rule following, obedience, interpersonal relations, gullibility) and conceptual (i.e., reading, writing, money concepts, receptive and expressive language) skills. The use of standardized measures of adaptive behavior as a required part of a Mental Retardation diagnosis was first recommended by Barclay et al. (1996) and that definition was adopted by APA Division 33. Tassé (2009) notes there are some measures of adaptive behavior that are trademark symptoms of Mental Retardation (i.e., gullibility, naivete), but which are under represented in standardized adaptive behavior measures. Thus, in addition to obtaining standardized measures of crucial adaptive skill areas, it is crucial that the examiner obtain corroborating information from multiple sources (i.e., school, medical, and work records, multiple interviews, etc.) as well as anecdotal information related to gullibility and naivete.

In terms of conceptual skills, the American Psychological Association posits that individuals with mild mental retardation exhibit small delays as preschoolers but are often not referred for assessment until after school entry when academic failure or behavior problems emerge (APA, 1996). Normal language fluency usually emerges by adolescence, but the individual may require more assistance to learn novel tasks and some assistance to maintain mastered tasks. Both the American Psychological Association, Division 33 (1996) and the American Psychiatric Association (2000) have noted that individuals with mild mental retardation exhibit various academic skills at the 1st to 6th grade level.

Several controversies have arisen in *Atkins* hearings regarding adaptive behavior (Tassé, 2009). Adaptive behavior is not a measure of capacity or knowledge but rather a measure of what the individual typically does and what degree of independence he demonstrates in performing those skills. It is important that the examiner evaluate the environment in which the skill is typically demonstrated to determine if there are hidden supports or additional educational opportunities that facilitate his performance and that would not be presence in other environments. Also, the examiner should determine if the skill emerged with developmental delays rather than at the age-appropriate time. For example, individuals with Mild Mental Retardation often exhibit receptive and expressive language delays in early primary and elementary grades in comparison to peers, but are better able to communicate by late adolescence.

Another example is that examiners often select specific behavior examples (driver's license, employment, marriage) as evidence of strengths and proof that significant impairment in adaptive behavior is not present. But, if the person has required ongoing assistance to manage money, maintain relationships, make basic decisions, etc., these limitations are indications of significant impairments in adaptive behavior irrespective of the individual's capacity to obtain a driver's license or get married. Olley, 2006a notes that if adaptive behavior is interpreted as a series of practical skills (e.g., daily living skills) and the conceptual and social skills are overlooked, the individual will be misdiagnosed.

> If the defendant has a job, drives a car, fixes engines, and/or is married, he/she is improperly declared to have no deficits in adaptive skills. The argument is often made that if a person has certain practical skill strengths, the person cannot have mental retardation, when, in fact, all of the major professional definitions of mental retardation allow for intraindividual difference in adaptive behavior (Everington & Olley, 2008).

Thus, having a practical skill strength does not preclude a diagnosis of Mental Retardation. For individuals functioning in the Mild Mental Retardation range, adaptive deficits are often found in social (i.e., high degrees of credulity and gullibility) and conceptual (i.e., functional academic skills, language) skill areas rather than in practical skills. Social limitations in credulity and gullibility are often best assessed by thorough interviews with individuals who have extensive experience with the defendant in a variety of settings. Conceptual limitations can be assessed by standardized measures of the following, among others: academic skills, oral and listening comprehension, receptive and expressive language, self-direction skills on executive functioning, etc.

In *Atkins* cases, two critical issues involving adaptive behavior assessment are (1) determining the cutoff criteria for "significant impairment" in adaptive behavior, and (2) emphasizing the individual's typical performance various skills as opposed to focusing on isolated examples of adequate functioning. Significant impairment is statistically defined as two standard deviations below the mean in the measurement of both intelligence and adaptive behavior. The issue is often pushed when legal or mental health experts differ over what constitutes a specific limitation in an area of adaptive behavior (i.e., leisure, work). Both AAIDD and APA Division 33 have taken the position that the expert, when trying to determine if an adaptive deficit exists, should ( a ) use multiple sources (standardized measures, direct interviews with knowledgeable informants, archival information), ( b ) consider the level of assistance required to carry out age-appropriate activities as well as the length of time it took the individual to master the task, and ( c ) determine what supports must be in place to guarantee the successful completion of that skill. AAIDD's classification system is based on the level of supports needed by the individual to accomplish the activity and also emphasizes independence versus

need for assistance in determining if an individual meets the adaptive criteria for a diagnosis of mental retardation (AAMR, 1992, 2002, Schalock et al., 2007, AAIDD, 2010). Often the expert must look within the context of the work, home, or social environment to determine if the reported performance is independently generated or supported by environmental adaptations or additional supports from family, work supervisors or colleagues, etc.

In *Atkins* evaluations, experts must access as many sources as possible because they are tasked with the responsibility of assessing functioning retrospectively to the crime (Olley, 2006b). To overcome this obstacle, experts in the field of mental retardation recommend that the examiner seek adaptive behavior information from several sources and to look for the convergence of findings. Standardized measures, direct observations, corroborative interviews with the offender and others who knew him well prior to the age of 18, and reviews of relevant information in school, medical, psychiatric, work, military, Social Security, and prison records are recommended.

Individuals who have had the opportunity to observe the offender as he interacted in his home, neighborhood, and community during the developmental period (i.e., prior to or as near the age of 18 as possible) are the preferred informants for adaptive assessments.

**Retrospective Diagnoses**.  Mental health experts often must testify regarding a retrospective assessment of the defendant at the time of or prior to the crime (Tasse, 2009).  A retrospective analysis is common in criminal cases involving mental illness and in civil cases involving contested wills.  A similar issue arises in *Atkins* cases where a determination of intellectual and adaptive functioning prior to the age of 18 is needed to determine a retrospective diagnosis of Mental Retardation (Olley & Cox, 2008). Retrospective diagnoses are required when a person with mental retardation did not receive an official diagnosis of mental retardation during the developmental period but is now being evaluated for eligibility determination, guardianship petitions, competence determinations, or *Atkins*-related sentencing eligibility questions (Schalock et al., 2007).  APA Division 33 and AAIDD have issued guidelines in making retrospective diagnoses. In 2008, the authors of the two most commonly used standardized adaptive behavior scales, the <u>Vineland-II Adaptive Behavior Scales</u> (VABS-II) and the <u>Adaptive Behavior Assessment Scales-II</u> (ABAS-II) recommended using a retrospective approach when using their scales in *Atkins* hearings.

Harrison and Oakland (2008) published a supplementary volume to their initial ABAS-II manual that recognizes the challenges involved in making retrospective diagnoses, and they devote the final chapter of that volume to outlining best practices in the assessment of adaptive behavior in adult forensic cases (Olley and Cox, 2008).  These authors recommend the use of an appropriate standardized measure with an informant knowledgeable about the individual's behavior during the developmental period.  They also recommend that the questions focus on the most recent time near the developmental period that the informant is confident about discussing the individual's behavior.  If the examiner determines the informant has a clear memory of that time period, that date should be considered the date of the defendant's functioning, and scoring should be made using the normative tables for that age.

In the latest manual published in the VABS-II series, Sparrow, Cicchetti, and Balla (2008) note that it is sometimes necessary to determine if an individual exhibited adaptive behavior deficits at an earlier age and, when the individual is an adult, the results are necessary in determining an intellectual disability diagnosis.  Sparow et al. (2008) particularly note that when an adult individual is residing in a restricted environment (i.e., psychiatric facility, prison, etc.) "functioning in the current restricted environment cannot be taken as a valid measure of past adaptive functioning."  At these times, a "retrospective interview" (i.e., an interview regarding the individual's functioning at an earlier age) "is permissible."  The authors also note that even in a standard standardized adaptive behavior scale administration, "there are times when a retrospective diagnosis is used."  Often the informant must rate a behavior that is no longer age-appropriate based on how the individual performed the behavior at some point in the past.  If, for example, a subject engaged in "make-believe activities" when such play behavior was age-appropriate, the informant would give the subject maximum credit for that behavior at the time of the interview even though that behavior was no longer occurring at the time of the interview.

**Using standardized adaptive scales in retrospective diagnoses**. The <u>Vineland-II Adaptive Behavior Scales</u> (VABS-II) published in 2005, the <u>Adaptive Behavior Assessment System-II</u> (ABAS-II) published in 2003, and the <u>Scales of Independent Behavior-Revised</u> (SIB-R) published in 1996 are the three preferred standardized instruments currently used in assessing adaptive behavior with the VABS-II and ABAS-II being the "gold standard" in these types of assessments. Both scales require an experienced administrator with direct knowledge in the assessment and treatment of individuals with mental retardation.

As noted above, experts in the field of adaptive behavior strongly recommend that these instruments be used retrospectively to assess the individual's adaptive behavior prior to or as near as possible to the age of 18 in order to meet the third criterion for a diagnosis of mental retardation (Harrison & Oakland, 2008; Olley & Cox, 2008; Sparrow et al., 2008). The manuals for these tests encourage the use of parents, teachers or care providers who have direct knowledge of how the individual performed in day-to-day activities, and the interviewer should measure a person's typical performance as opposed to knowledge of a skill or estimated potential (Schalock, 1999; Olley et al., 2006; Olley & Cox, 2008). In *Atkins*-related adaptive assessments, the authors of the VABS-II and ABAS-II recommend that a retrospective assessment of adaptive behavior be made by available care providers or other individuals who are aware of the individual's typical performance during or as near the developmental period as possible and recommend that self-report measures and administrations with prison guards not be used (Olley & Cox, 2008). Clinical interviews where the offender is questioned about his abilities are not recommended because individuals with intellectual deficits have difficulty with abstract concepts and hypothetical queries and have a strong tendency to acquiesce and attempt to hide or mask their disabilities (Schalock et al., 2007; Everington & Olley, 2008).

In summary, when conducting a retrospective analysis of adaptive behavior the examiner should ( a ) select an appropriate, well

standardized measure, ( b ) establish a relevant time frame, as near the age of 18 as possible, when the informant knew the defendant well, ( c ) review the general purpose of the assessment and the scoring criteria, ( d ) use that date to determine the normative age to be used in the assessment (i.e., 18-0-0), ( e ) continually reference that date when clarifying the individual's responses, and ( f ) score the informant's responses using that date in order to compare the defendant with the standardization sample of the same age (Sparrow et al., 2008; Olley & Cox, 2008; Tassé, 2009).

Sparrow et al. (2008) note that the respondent ( a ) should have been an adult who was familiar with the everyday behavior of the individual being evaluated when that individual was at the specified age, and ( b ) should have had regular contact with the individual over an extended period of time during the period in question (i.e., multiple opportunities to observe the individual's responses to a variety of environmental demands). The VABS-II manual indicates a parent, spouse, other family member, work supervisor, or any other person meeting these criteria may be qualified as a respondent for a retrospective interview. The authors note that the examiner should ( a ) emphasize that all interview questions are in reference to the individual's functioning at the designated earlier age, ( b ) ascertain if the respondent has a clear memory of the individual's adaptive functioning when the individual was that age, ( c ) use the date on which the individual was that age as the date of functioning and recorded on the front of the record booklet, ( d ) score the results using that date to compare the individual with the standardization sample of the same age (i.e., use chronological age and norms based on the age 15 years, 6 months, 0 days if the respondent reports adaptive functioning as it occurred at the age of 15 ½), ( e ) establish validity by conducting separately administered and scored retrospective interviews with more than one respondent, assuming that more than one suitable respondent can be found. Using multiple respondents for one VABS-II administration is prohibited. Sparrow et al. (2008) note that separately administered and scored retrospective interviews can be considered corroborative evidence for the findings and caution that the examiner must clearly note in his or her report that a retrospective administration was made and list precautions taken to overcome limitations.

**Meeting developmental criteria when diagnosing for mental retardation**. To qualify for a diagnosis of Mental Retardation, concurrent intellectual and adaptive deficits must be show to have existed prior to the age of 18. In many *Atkins* proceedings, the defendants are adults with no prior diagnosis of Mental Retardation. The experts must rely on several sources of information originating prior to the age of 18 (i.e., school, social services, SSA, medical, psychiatric, and psychological records). Reports of individuals who served a significant role in the person's developmental years (i.e., parents, teachers, siblings, classmates, relatives, friends, work supervisors, work colleagues) are also useful.

School records are often a valuable source, but they must be interpreted in reference to the prevailing educational practices in use in that community during that time period (Gresham, 2009; Reschly, 2009). Prior to the 1970s, many school districts did not offer special education services and, when they did, the placement evaluations were provided by other agencies. Often school records will show a history of retention and poor achievement but there will be no corresponding referrals to a special education class. In many districts, social promotions were given in lieu of retention. Sometimes individual school districts had regional or local issues during that time period that affect how the records should be interpreted (i.e., segregrated schools, failure to comply with federal statutes, inability to hire certified professionals). Additionally, there has been a reluctance to diagnose Mild Mental Retardation in school settings (Gresham, 2009; Reschly, 2002). States and school districts have been required by courts to eliminate minority Mental Retardation over-representation, especially among African-American males, and many school systems use the categories of Specific Learning Disability and/or other educational categories in lieu of an educational exceptionality based on a Mental Retardation diagnosis (i.e., Mild Mentally Handicapped, Mild Mental Disabled, etc.). The federal laws that have mandated special education services have had revisions approximately every seven years, and it should not be assumed that the policies and procedures in place today were also being used at the time the individual being evaluated. Additionally, appraisal teams can vary from the procedures and policies if adequate explanations are provided in reports.

## REVIEW OF INTELLECTUAL TESTING ADMINISTERED PRIOR TO THE AGE OF 18

The school records indicate four tests of mental abilities were administered to Mr. Jackson during the developmental period (i.e., prior to the age of 18). These tests were the Primary Mental Abilities Test (PMAT), the California Short-Form (S-F) Test of Mental Abilities (CTMM-SF), the Stanford-Binet Intelligence Scales: Form L-M (SBIS-LM), and the Wechsler Intelligence Scales for Children (WISC). The WISC and SBIS:LM are individually administered, standardized tests that meet the "gold standard" required in *Atkins* hearings, but they have some limitations that will be discussed below. The PMAT and the CTMM-SF are group administered readiness tests that were used in the 1960s to get a general measure of mental readiness and do not meet the "gold standard" for intellectual testing used in *Atkins* hearings. The PMAT and CTMM-SF were often given in large school systems to determine if additional testing was needed and/or if the student needed academic intervention. Therefore, as they were administered prior to the SBIS-LM and WISC, they would be corroborating data for the later testing. It should be noted that the scores are noted as percentiles (%ile) and not national percentiles. It is possible they reflect where this student was performing in relation to other students in that school system, and, therefore, the national percentile would have been lower. Mr. Jackson's age at the time of the administration, the grade he was in when he took the test, the obtained score (IQ or %ile), the confidence interval for that score, and the possible Flynn Effect for that test's norms are noted in the following table.

|  | Date | AGE | GRADE | IQ/SS | CI | Possible Flynn Error |
|---|---|---|---|---|---|---|
| PMAT | :DACT:/67 | 6 years, 10 months | 1 | 11%ile | unknown | Unknown |
| SBIS-LM | REDACTED/67 | 7 years, 8 months | 2 | 76 | 71-81 | 10 points |
| CTMM-SF | DACT/68 | 8 years 9 months | 3 | 14%ile | unknown | unknown |
| WISC | REDACTED/70 | 10 year, 0 months | 4 | 67 | 62-72 | 8 points |

The SBIS-LM 1967 score is in the borderline intellectual functioning range. The WISC (1970) score of 67 is in the mild deficit range and is probably the best estimate of his pre-18 cognitive ability. The SBIS-LM norms were very old and the obtained IQ score most likely over evaluated his cognitive abilities. The PMAT and the CTMM-SF are group-administered ability tests that both indicated borderline ability. As noted above, the group administered tests are considered "screening" tests but do generate a broad estimate of underlying cognitive ability. His performance on both these tests appeared to have alerted school personnel that additional testing would be warranted. Additional information on the individually administered tests is provided below.

### Stanford-Binet Intelligence Scale: Form L-M (SBIS-LM), administered in 11/28/67 at 7 years, 8 months

The Binet-Simon scales were revised by Terman and his associates at Stanford University in 1916. The second Stanford revision was completed in 1937 and its normative data was gathered in the mid-1930s (approximately 1934 to 1937). It had two equivalent forms (Form L, Form M). In 1960, the third Stanford revision was published, the Stanford-Binet Intelligence Scales: Form L-M (SBIS-LM). The SBIS-LM provided a single form (L-M) incorporating the best items from the two 1937 forms. In many ways, the 1960 SBIS-LM was not a true revision. The 1960 SAIS-LM did not involve a re-standardization of the normative scale. In preparing the 1960 SAIS-LM, the authors did an item analysis using the performance of 4,498 examinees aged 2½ to 18 years of age who had taken either or both forms of the 1937 test between 1950 and 1954. The new samples were utilized solely for the purpose of item analysis and the children were grouped according to the mental age they had obtained on the 1937 forms. Thus, mental ages and IQs obtained on the 1960 Form L-M in were still expressed in terms of the 1937 normative sample which was approximately 33 years old (1967 - 1934) and those scores would be anticipated to have a Flynn Effect of 10 points (33 x 0.3 = 9.9). In 1972, the SBIS-LM was republished with new normative data based on the current population census, but the 1972 was not given to Mr. Jackson in 1967.

### Wechsler Intelligence Scale for Children (WISC) administered 04/13/70 at 10 years, 0 months

The WISC was prepared as a downward extension of the adult intelligence test, the Wechsler-Bellevue Intelligence Scale. The WISC norms were gathered over an approximate three-year period preceding its publication in 1949. Thus, mental ages and IQs obtained on the 1949 WISC were based on normative data that was approximately 26 years old (1970 - 1946) and those scores would be anticipated to have a Flynn Effect of 8 points (26 x 0.3 = 7.8).

### INTELLECTUAL TESTING ADMINISTERED AFTER THE AGE OF 18

The Wechsler Adult Intelligence Scale, Third Edition was administered to Mr. Jackson in 2006. No report was finalized but a copy of the protocol and the scores obtained by that examiner were forwarded for review. The actual examiner for this test is not noted on the protocol, and it is not clear if the supervising psychologist had the opportunity to review or analyze the data. The written notes included with the data indicated a Verbal IQ of 81, a Performance IQ of 85, and a Full Scale IQ of 81, but the protocol does not show the test was formally scored or interpreted by the licensed clinician. When this examiner checked the scoring on the protocol, 14 computational or procedural errors were noted. In my opinion, four subtests should be voided for the following reasons:

( a ) The Vocabulary subtest was spoiled (cannot be included in the total score) because the examiner awarded 2 points on 2 entry items and, because of the error, Mr. Jackson was awarded 2 points for two other previous unadministered items that should have been administered.

( b ) The Similarities subtest was spoiled (cannot be included in the total score) because the examiner awarded 2 points on an entry item that was only worth 1 point and this error awarded Mr. Jackson 5 additional items on previous unadministered items.

( c ) The Block Design subtest was spoiled (cannot be included in the total score because the examiner stopped the subtest following two consecutive zeros when the protocol notes the correct stopping point is at three consecutive zeros. Since he may have earned more points if the proper procedure had been followed, the subtest is spoiled.

( d ) The Picture Arrangement subtest was spoiled because the examiner, as noted on the protocol, administered four card sets out of order. If the items were administered in order but inadvertently not noted on the protocol at the time of the administration, the test is still spoiled because that type of error indicates the examiner did not follow the administration procedures outlined in the manual.

If four subtests are considered spoiled, then only a prorated score could be obtained, and prorated scores do not meet the "gold standard" for *Atkins* hearings. Additionally, a prorated score would be inappropriate because a total of 14 errors were identified on the protocol across 6 subtests. Considering these factors, Mr. Jackson's legal team has at least two options:

( a ) Bring these errors to the attention of the supervising psychologist to determine how he or she would have interpreted the data when the errors were identified.

( b ) Forward this protocol to a third expert. If the errors are confirmed, the test should be confirmed as unreliable and invalid and Mr. Jackson should be re-examined by another neuropsychologist.

### Academic Testing

Academic testing is not used to diagnose Mental Retardation but an individual's academic profile across his or her school career often corroborates a finding of Mental Retardation. A review of Mr. Jackson's records indicates that he always did poorly in school. Following the WISC administration noted above, he was moved into Special Academic classes. His cumulative school record notes that he was enrolled in the 5th grade on 09/09/70 and a note in the eighth column on that page indicates the school was awaiting a special academics evaluation due to his SBIS-LM score of 76. On 10/05/70 he was transferred into Special Academic classes and there is a note of "SP" every year thereafter.

Mr. Jackson's Office of Youth Services records note that he was administered the Stanford Achievement Test (SAT) on 07/74 when he was 14 years of age and on 09/75 when he was 15 years of age. The Office of Youth Services Educational Transcript

David Jackson                    Page 9

notes he was enrolled in the 10th grade at W.J. Maxey School at the Olympic Center in Whitmore Lake, Michigan, but the SAT results indicated he was functioning approximately eight grades below his chronologically appropriate grade. The SAT results are noted in the following table as grade equivalent (G-E) scores.

| TEST/DATE ADMINISTERED | SAT (DACT/74) | SAT (DACT/75) |
|---|---|---|
| CHRONOLOGICAL AGE | 14 years, 4 months | 15 years, 6 months |
| ASSIGNED GRADE | 10 | 10 |
| Word Meaning | 2nd grade, 8th month | 2nd grade, 5th month |
| Paragraph Meaning | 2nd grade, 4th month | 3rd grade, 1st month |
| Spelling | 2nd grade, 5th month | 2nd grade, 9th month |
| Word Study Skills | 2nd grade, 7th month | 2nd grade, 0 month |
| Language | 1st grade, 9th month | 2nd grade, 2nd month |
| Arithmetic Computation | 3rd grade, 2nd month | 4th grade, 5th month |
| Arithmetic Concepts | 2nd grade 6th month | 2nd grade, 6th month |
| Social Studies | 3rd grade 3rd month | 2nd grade, 6th month |
| Battery Median | 2nd grade 7th month | 2nd grade, 6th month |

Notes made in Mr. Jackson's school records (10/03/75) and signed by George Fabbi, Assistant Director, indicated Mr. Jackson was "a dependent learner" and required additional assistance in math and reading. The program recommendation was that he "be placed in a special education setting 9B" and that he "be given an opportunity to pursue some Industrical (sic) Education classes of his interest and ability".

In conclusion, a review of Mr. Jackson's academic records indicate significant academic deficits prior to the age of 18. As there was no current academic testing included in the records reviewed by this examiner, additional testing to determine current academic functioning would be beneficial.

**ADAPTIVE TESTING**
**Assessment of Mr. Jackson**
In accordance with current best practices in the field of Mental Retardation and recommendations that have been made for retrospective assessments and noted above, Mr. Jackson's adaptive behavior was assessed longitudinally using multiple sources of information that included ( a ) historical records from schools, prisons, medical facilities, and social security, ( b ) academic testing, ( c ) a review of declarations and trial testimony of individuals who knew him well during the developmental period, and ( d ) formal and informal direct assessments made with Mr. Jackson to determine skill mastery. The overlying purpose of these assessments were to determine if there was a global accumulation of adaptive deficits and/or specific deficits in the areas of conceptual, practical and social skills. Assessments were made of behavior as it was exhibited in multiple contexts (i.e., home, neighborhood, school, work, medical settings, prison). The information gathered in the standardized assessments and from record reviews were validated by cross referencing the informants' responses with data gathered from informal adaptive probes with Mr. Jackson.

**Evidence of Adaptive Deficits Prior to the Age of 18**
Available records reviewed by this examiner indicate significant adaptive deficits in the adaptive behavior areas of conceptual, social, and practical prior to the age of 18. Declarations and trial testimony of family, friends, and others who had personal knowledge of Mr. Jackson's adaptive behavior indicate significant adaptive deficits were present prior to the age of 18. A declaration given by Brenda Boyd, Mr. Jackson's older first cousin who was raised by his mother, notes that Mr. Jackson had more trouble in school than any of his siblings. Self-care deficits (i.e., putting shoes on wrong feet, inability to tie shoes, inability to button shirt correctly, inability to bathe himself) were still evident in the 2nd grade. According to Ms Boyd, he was still wetting the bed at 10 years of age and nursed a pacifier and bottle until he started school and sucked his thumb long after he entered school. Communication deficits were evident and Ms Boyd references words he had difficulty articulating and his inability to speak In complete sentences. Ms Boyd's declaration also notes deficits in domestic skills, ability to understand and act on instructions, and poor social skills. The declaration of Larry Anderson, Ms Boyd's brother who also resided in the Jackson home, confirms that Mr. Jackson experienced developmental delays and academic, communication, and self-care deficits. He confirmed Mr. Jackson nursed a bottle and wore a diaper until he was 4 or 5 years of age, did poorly in school, was unable to learn how to wash dishes, and could not read or write when he was a teenager. Marcos Martinez, a neighborhood friend from childhood, noted in his declaration that, even as a teenager, Mr. Jackson could not make change accurately and required others go with him when he left his neighborhood. He would say he was too ill to go into a store and give Mr. Martinez a list of items to pick out. Pamela Little Morrison, a childhood friend, noted in her declaration that Mr. Jackson could not read or write and often asked her to count his change. He could not obtain a driver's license because he could not read. He could find his way about the neighborhood but would get lost if he tried to leave the neighborhood. Alfred Little, a childhood friend in the neighborhood, noted that Mr. Jackson had obvious learning problems in school who was "gullible and easy to manipulate".

06-009

According to best practices in retrospective adaptive assessments, additional adaptive assessments made directly with two or more individuals who knew him during the developmental period would be helpful in establishing adaptive deficits. Scheduling these types of assessments in this evaluation was not feasible considering the time constraints placed on the evaluator and the amount of time required to arrange a visit with Mr. Jackson in Indiana. Direct or face-to-face interviews with individuals who knew Mr. Jackson during the developmental period should be scheduled prior to an Atkins hearing, and, if appropriate, standardized assessment scales should be included.

Mr. Jackson was assessed by this examiner on 09/10/11. The evaluation was complicated because the memo left at the prison entry desk did not include all of the evaluation materials that the examiner had requested to bring in. Some of the assessment materials had to be stored in a locker and this prevented the examiner from administrating other tests that required these items. Additionally, Mr. Jackson was placed in arm shackles during the evaluation even though his lawyers had requested he be unshackled. The examiner was not able to administer any test that required him to use his hands. For these reasons, the examiner had to rely solely on a functional assessment and of adaptive skills and an interview.

**Observations Made During Functional Assessment of Mr. Jackson's Conceptual, Social, and Practical Skills**
As noted above, a good adaptive skill assessment includes observing the individual in vivo while performing functional skills in multiple types of settings (i.e., school, work, home, neighborhood, social situations) to determine what the person typically does independently in that environment and what supports, if any, must be in place for that person to compete a task. If it is apparent during these natural observations that the individual lacks skill mastery, the evaluator can manipulate situations to determine how to break the task down into teachable steps and what needs to be put in place to facilitate skill mastery. The amount of supports and assistance required for an individual to perform an age-appropriate task in his or her natural environment is an indicator of whether or not that individual has significant adaptive deficits. When in vivo community observations are not possible in institutional settings (i.e., developmental centers, youth detention centers, community homes, etc.) the examiner can still probe for this information via simulated tasks.

This examiner completed an adaptive functional assessment by using a variety of life skill training materials to determine Mr. Jackson's repertoire of basic skills, and, when skills were lacking, what supports and adjustments needed to be put in place to guarantee success. Training scenarios included ( a ) posing a question and asking him to identify the correct picture from offered choices, ( b ) showing a pictorial task (I. e., machine dials, clocks, monetary amounts, receipts, checks, banking statements) and asking him to either identify the appropriate item or response among several pictured choices, ( c ) asking him to demonstrate basic functional academic skills (I. e., reading various measuring devices, identifying basic cleansers, reading medicine labels, and choosing appropriate tools and/or cleansers for a specified task), and ( d ) completing an informal academic assessment that included word recognition). These assessments indicated significant adaptive deficits in conceptual, social, and practical skills that would meet the criteria for a diagnosis of mental retardation. It should be noted that, due to the problems noted above, the examiner was not able to administer a standardized academic test to determine functional academic skills, determine reading and math fluency, or copying, writing, dictionary, and other practical skills requiring the use of his hands such as looking up numbers in a phone book, finding information in a newspaper, using a ruler, and tape measure.

**SUMMARY**
Based on my experience as a licensed psychologist and an expert in the field of mental retardation, I have concluded that, to a reasonable degree of scientific certainty, intellectual tests and academic assessments, administered prior to the age of 18 and assessments made during this evaluation, a review of declarations and testimony from family and friends that knew him well during the developmental period, and a review of available records indicate Mr. Jackson meets the intellectual, adaptive, and age of onset criteria for a diagnosis of Mental Retardation. It would be helpful if a retrospective assessment could be completed by a mental retardation expert and interviews conducted with individuals who knew Mr. Jackson during the developmental period.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Victoria Swanson, Ph.D.
License# 864

09/24/10

David Jackson                    Page 11

## References

American Association of Mental Retardation. (1992). Mental retardation: Definition, classification, and system of supports (9th ed.). Washington, D.C.: Author.

American Association of Mental Retardation. (2002). Mental retardation: Definition, classification, and system of supports (10th ed.). Washington, D.C.: Author.

American Association on Intellectual and Developmental Disabilities. (2007). User's guide: Mental retardation: Definition, classification, and system of supports. (10th ed.). Washington, D.C.: Author.

American Psychiatric Association. (2000). Diagnostic and statistical manual of mental disorders. (4th ed. Text Revision. Washington, D.C.: Author.

American Psychological Association, Division 33, Mental retardation and developmental disabilities (1996). Manual of diagnosis and professional practice in mental retardation. Jacobson, J.W. & Mulick, J.A. (eds). Washington, DC: Author.

Atkins v. Virginia, 536 U.S. 304, 122, S. CT 2242 (2002).

Baker, Bruce. (2006). Message from the president. Psychology in Mental Retardation and Developmental Disabilities, 31(2), p 1.

Baroff, G.S. (1991). Establishing mental retardation in capital cases: A potential matter of life and death. Mental Retardation, 29 (6), 343-349.

Baroff, G.S. (2003). Establishing mental retardation in capital cases: An update. Mental Retardation, 41, (3), 198-202.

Bonnie, R. J. (2004). The American Psychiatric Associations resource document on mental retardation and capital sentencing: Implementing Atkins v. Virginia. Journal of the American Academy of Psychiatry and the Law, 32, 304-308.

Ceci, S. Sculllin, M., & Kanaya T. (2003). The difficulty of basing death penalty eligibility on IQ cutoff scores for mental retardation. Ethics & Behavior, 13, 11-17.

DeMatteo, D., Marczyk, G., & Pich, M. (2007). A national survey of state legislation defining mental retardation: Implications for policy and practice after Atkins. Behavioral Sciences and the Law, 25, 781-802.

Ellis, J.W. (2003). Mental retardation and the death penalty: A guide to state legislative issues. Mental and Physical disability Law Reporter, 27 (1), 11-24.

Everington, C. & Olley, J.G. (2008). Implications of Atkins v. Virginia: Issues in defining and diagnosing mental retardation, Journal of Forensic Psychology Practice, 8 (1), 1-23.

Flynn, J. R. (2006). Tethering the elephant: Capital cases, IQ, and the flynn effect. Psychology, Public Policy, and Law, 12, 170-189.

Flynn, J. R. (2007). Capital offenders and the death sentence: A scandal that must be addressed. Psychology in Mental Retardation and Developmental Disabilities, 32, 3-7.

Flynn, J.R. ( 2009), The WAIS-III and WAIS-IV: Daubert motions favor the certainly false over the approximately true. Applied Neuropsychology.

Greenspan, S. (2006). Issues in the use of the "Flynn Effect" to adjust IQ scores when diagnosing MR. Psychology in Mental Retardation and Developmental Disabilities, 31(3), p 3-7.

Greenspan, S. (2007). Flynn-adjustment is a matter of basic fairness: Response to Roger B. Moore, Jr. Psychology in Mental Retardation and Developmental Disabilities, 32(3), p 3-7.

Greenspan, S., Switzky, H. J., & Granfield, J.M. (1996). Everyday intelligence and adaptive behavior: A theoretical framework. In J.W. Jacobson & J.A. Mulick (Eds.), Manual of diagnosis and professional practice in mental retardation (pp. 127-136). Washington, DC: American Psychological Association.

Gresham, F. M. (2009). Interpretation of intelligence test scores in Atkins cases: Conceptual and psychometric issues. Applied Neuropsychology.

Hagan, L.D., Drogin, L.D., & Guilmette, T.J. IQ scores should not be adjusted for the flynn effect in capital punishment cases. 28(5), Journal of pysycoeducational assessment (in press, 2010).

Harrison, P.L. & Oakland, T. (2008). Adaptive Behavior Assessment System-II: Clinical use and interpretation. New York: Elsevier Science and Technology.

06-011

Harrison, P.L. & Oakland, T. (2008). Professional and legal issues in adaptive behavior assessment. In P.L. Harrison & T. Oakland (eds.), Adaptive Behavior Assessment System-II: Clinical use and interpretation. New York: Elsevier Science and Technology.

Jacobson, J.W., & Mulick, J.A. (Eds.). (1996). Manual on diagnosis and professional practice in mental retardation. Washington, DC: American Psychological Association.

Kaufman, A.S., & Lichtenberger, E.O. (1999). Essentials of WAIS-III Assessment. New York, NY: John Wiley & Sons, Inc.

Kaufman, A.S. (2003). Practice effects. The clinical café. Bloomington, MN: Pearson Assessments.

MacVaugh, Gil, & Cunningham, Mark. (2009). Atkins v. Virginia: Implications and recommendations for forensic practice. Journal of Psychiatry and Law, 37, 131-187.

McGrew, K. (2010). Applied psychometrics 101: The flynn effect series, #7 is the flynn effect a scientifically accepted fact? Institute for applied Psychometrics (06-30-10)

Olley, J.G. (2006a). The assessment of adaptive behavior in adult forensic cases: Part 1. Psychology in Mental Retardation and Developmental Disabilities, 32(1), 2-4.

Olley, J.G. (2006b). The assessment of adaptive behavior in adult forensic cases: Part 2. The importance of adaptive behavior. Psychology in Mental Retardation and Developmental Disabilities, 32(3), 7-8.

Olley, J.G. (2007). The assessment of adaptive behavior in adult forensic cases: Part 3. Sources of adaptive behavior information. Psychology in Mental Retardation and Developmental Disabilities, 33(1), 3-6.

Olley, J.G. & Cox, A.W. (2008). Assessment of adaptive behavior in adult forensic cases: The use of the Adaptive Behavior Assessment Systems-II. In P.L. Harrison & T. Oakland (eds.), Adaptive Behavior Assessment System: Assessment-II; Clinical Use and Interpretation. New York: Elsevier Science and Technology.

Olley, J.G., Greenspan, S., & Switsky, H. (2006). Division 33 ad hoc committee on mental retardation and the death penalty. Psychology in Mental Retardation and Developmental Disabilities, 31(2), p 11-12.

Reschly, D.J. (2009). Documenting the developmental origins of mild mental retardation in SSI eligibility and death penalty appeals. Applied Neuropsychology.

Reschly, D. J. (2002). Minority overrepresentation: The silent contributor to LD prevalence and diagnostic confusion. In R. Bradley, L. Danielson, & D.P. Hallahan (Eds.) Identification of learning disabilities: Research to practice (pp. 361-368). Mahwah, NJ: Lawrence Erlbaum.

Schalock, R. L. (1999). The merging of adaptive behavior and intelligence: Implications for the field of mental retardation. In R. L. Schalock (Ed.) Adaptive behavior and its measurement: Implications for the field of mental retardation (pp. 43-59). Washington, DC: American Association of Mental Retardation.

Schalock, R.L., Buntinx, W.H.E., Borthwick-Duffy, S., Luckasson, R., Snell, M.E., Tasse, M. J., & Wehmeyer, M.L. (2007). User's guide: Mental retardation: Definition, classification, and system of supports. (10th ed.). Washington, D.C.: AAIDD.

Sparrow, S. S., Cicchetti, D.V., & Balla, D.A. (2008). Vineland-II adaptive behavior scales, second edition (vineland-II), Expanded interview form manual. Minneapolis: NCS Pearson, Inc.

Tassé, M. J. (2009). Adaptive behavior assessment and the diagnosis of mental retardation in capital cases. Applied Neuropsychology, 16, p 114-123.

# CURRICULUM VITAE

## VICTORIA SWANSON, Ph.D.

**CURRENT ADDRESS**
Work:   REDACTED
   Lafayette, LA   REDACTED
   REDACTED   REDACTED   ., FAX   REDACTED
Email:   VSwanson1(   REDACTED

**LICENSURE AND CREDENTIALS**
Licensed Psychologist, Louisiana State Board of Examiners of Psychologists #864
Credentialed, National Register of Health Service Providers in Psychology #50400

**PRESENT PROFESSIONAL ACTIVITIES**
Licensed Psychologist in Private Practice
Qualified Expert Witness in field of Mental Retardation and Psychology in State and Federal Courts
Consultant and educator in psychological and behavioral assessment

**AWARDS, OFFICES, APPOINTMENTS**
AAMR-LA 1999 Award for Research Contributions in Field of Mental Retardation
Region V AAMR 1999 Award for Research Contributions in Field of Mental Retardation
AAMR-LA 2002 Maurice Dayan Memorial Education Award for Significant Contributions in the Dissemination of Information about Mental Retardation
AAMR-LA Board of Directors (1999 to 2008)
LA-QMRP Association Award for Dedicated Service, Education, and Leadership (2003)
AAIDD-LA 21st Helen Thompson Award for Outstanding Service in the Field of Mental Retardation (2005)
President, National Psychology Division, AAMR (2003-to 2005)
President, Psychology Division, AAMR-LA (01/00 to 06/02)
President, Medicine Division, AAMR-LA (07/02 to 07/04)
Vice-President, AAIDD-LA (2004 to 2008)
Planning Committee for Governor's Task Force on Disabilities (2000 to 2003)
Planning Committee for ARC/AAMR-LA/CARC Task Force on Post-Atkins Legislation (2003 to 2004)
DHH/OCDD Behavioral Supports Committee (1999 to 2003)
Chairman DHH/OCDD Committee for the Inservice Training of Behavioral Supports (2002-2003)
DHH/OCDD Planning Committee for Assertive Community Training Teams (2002-2003)
APA Division 33 Ad Hoc Committee on Atkins-related Issues, invited expert (August, 2008)

**EDUCATION**

**APA Internship**
1998-1999
The Louisiana School Psychology Internship Consortium
Human Developmental Center-School of Allied Health Professionals
 LSU Medical Center, 1100 Florida Ave, Building 138, N.O., LA  70119

**Doctoral Degree**
1995-1999
Louisiana State University, Baton Rouge, LA,
Major Professor: John Northup
Dissertation: A Comprehensive Functional Assessment of the Effects of Methylphenidate on the Disruptive Behavior of Children with Severe Mental Retardation

**M.S. 1988-1991**
Northwestern State University, Natchitoches, LA
Major Professor: Robert Breckenridge
Thesis: A Validation of Bailey Ratio Scores with the Vineland Adaptive Behavior Scales (VABS)

**B.S.  1969-1973**
University of Southwestern Louisiana, Lafayette, LA
Major:  Psychology

**Pre-Masters Clinical Externship 12/90-4/91** Associate to a psychologist extern at Pinecrest Developmental Center (PDC) Pineville, LA

06-013

**CLINICAL TRAINING AND EXPERIENCE**
**9/00 to present       Private Practice, Lafayette, LA**
Primary focus is providing psychological services and behavioral consultation to individuals with mental retardation and developmental delays as well as public and private providers of services to this population. Also provide diagnostic and consultative services to state agencies providing services to individuals with mental health disorders and/or developmental disabilities. Currently providing contractual psychological and behavioral services directly to 27 community homes in three ICF-DD provider groups and indirect supervision of psychological and behavioral services to 16 homes in five other ICF-DD provider groups (Sabine Association of Retarded Citizens (SARC), Collwell Industries, William Bell, Inc., New Earth, Inc., Our Lady of Sorrows Community Homes). Provide entry evaluations for individuals seeking services at ResCare ICF-DD community and/or group homes. Serve as Director of Psychological services and provide supervision and clinical oversight to the psychological and behavior staff providing services at St. Mary Training School, Pecan Grove Training Center, and the Louisiana Special Education Center, which are residential facilities (i.e., populations greater than 100) for individuals with developmental disabilities. Provide psychological services and diagnostic testing at two regional offices for individuals with Developmental Disabilities and am a member of their eligibility determination committees. Provide psychological services and diagnostic testing for the differential diagnosis of children and adults at the Lake Charles Regional Mental Health Center. Pupil Appraisal Coordinator and provide psychological services to V.B. Glencoe Charter School in St. Mary Parish.

**6/99 to 6/03       Director of Psychological Services, SWLDC, Iota, LA**
Coordinate the psychological services administered to approximately 150 individuals residing in a public ICF-MR residential facility, community homes, or supportive living placements. Responsible for budgetary requests, purchase orders, etc., related to psychological services. Assist the licensed psychologist in providing annual psychoeducational evaluations, intellectual and adaptive assessments, psychiatric assessments for dual diagnosis, and admission and discharge summaries. In accordance with guidelines established by the licensed psychologist, assist masters-level associates in choosing appropriate instruments, administering, scoring, and interpreting test results and recommending treatment with respect for social, educational, personal, and behavioral factors. Provide annual reports for SWLDC interdisciplinary team meetings as well as psychoeducational reports for triennial assessments for those individuals that are school age. Assist in developing IEP. Conduct or assist masters-level associates in completing other psychological assessments as needed (e.g., empirical reinforcement assessment, functional analysis). Assist masters-level associates in training direct support and professional staff in documentation, training, and intervention procedures. Coordinate integrity measures of behavior documentation. Monitor graphs and progress notes completed by subordinate psychological staff.
**Supervisor:** Marilyn Reck, Associate Superintendent

**8/98 - 6/99       Certified School Psychologist, New Orleans Public School System, 3500 DeGualle, N. O., LA**
Certified school psychologist for cluster of nine schools in the NOPS school system. Coordinator for support and appraisal services in three of the nine schools. Internship includes rotations in private ICF-MR, supportive living, and community home facilities in the New Orleans area.
**Supervisors:** Alan Coulter, Ph.D., Darlene Welsh, Ph.D., Scuddy Fontenelle, III, Ph.D.

**4/91 to 6/99       Associate to a Psychologist Pinecrest Developmental Center, Pineville, LA**
Responsibilities included annual psychoeducational evaluations, intellectual and adaptive assessments, psychiatric assessments for dual diagnosis, and admission and discharge summaries for PDC clients who were also students at the PDC Special School District. In accordance with guidelines of supervising psychologist, chose appropriate instruments, administered, scored and interpreted test results and recommended treatment with respect for social, educational, personal, and behavioral factors. Provided annual reports for PDC interdisciplinary team meetings as well as psychoeducational reports for Special School District (SSD) triennial assessments. Assisted in developing IEP. Conducted other psychological assessments as needed (e.g., empirical reinforcement assessment, functional analysis). Designed individual behavior management programs with goals/objectives which include, as a minimum, a clear description of the targeted behavior, specific intervention procedures and preventive strategies, appropriate replacement behaviors, data collection and documentation procedures, evaluation process, success criterion, and recommendations for maintenance of effects. Programs developed primarily through observations, interviews, and record reviews (including previous programming efforts and results), and baseline data. The rationale for each program included possible behavior causes derived from the functional assessment. Trained direct support and SSD staff in documentation, training, and intervention procedures. Maintained program integrity through direct observation in home and school settings and regular review of behavior documentation, including preparing monthly behavior graphs and written progress notes.
**Supervisors:** Kelley Pears, Ph.D., Johnny L. Matson, Ph.D., Randy Logan, Ph.D.

**2//98 to 7//98   Research Coordinator, LSU Research Site, St. Mary's Residential Training School Alex., LA**
Responsibilities included psychoeducational and behavioral assessments of 5 children diagnosed with profound mental retardation and referred for behavioral and educational problems in the classroom. Students were assessed and interventions were conducted in each child's Rapides Parish self-contained classroom. Conducted functional assessments, (structural or A-B-C analysis, direct observations and analogue functional analysis) to determine suitability for medication evaluation with methylphenidate (Ritalin). Conducted parental and teacher interviews, made classroom observations, developed interventions, inserviced relevant staff, and provided follow-up service and/or consultation as needed. Developed analogue functional analysis laboratory, assisted in conducting classroom functional analysis sessions to determine interactive and simple effects of methylphenidate (Ritalin) with eight children diagnosed with ADHD.
**Supervisors:**   John Northup, Ph.D., Joseph C. Witt, Ph.D., Maurice Dayan, Ed.D.

06-014

**8/97 to 5/98    Associate to a Psychologist, Clinical Supervised Practicum,
                        Family Center for MH, OLOL Medical Center, Baton Rouge, LA**
Primary responsibility was to provide psychological/behavioral assessment in a child/adolescent psychiatric clinic. Clinical population includes children with medical, psychiatric, developmental, educational, and behavioral problems (e.g., oppositional disorder, conduct disorder, mental retardation, fetal alcohol syndrome, attention deficit disorder, post traumatic stress disorder, anxiety disorder, and depression). Clinical services include intellectual, emotional, behavioral, and educational assessment, differential diagnosis, intake interviews, and mental status exams. Scales routinely administered include Connors' Rating Scales (CRS), CBCL, CDI, RCMAS, WISC-III, WJ-R (Achievement and Cognitive Batteries), TOPA, LAC, and VABS.
**Supervisors:** William B. Daigle, Ph.D., John Northup, Ph.D.

**6/97-7/97    Researcher, LSU ADHD Summer Program, LSU, Department of Psychology, Baton Rouge, LA**
Responsibilities included psychoeducational and behavioral assessments of 16 children diagnosed with ADHD and referred for behavioral and educational problems. Conducted intake interviews, administered tests (CDI, CBCL, RCMA, CRS, WISC-III, WJ-R, CBM), conducted parental and teacher interviews, made classroom observations, and provided follow-up service and/or consultation as needed. Assisted in conducting classroom functional analysis sessions to determine interactive and simple effects of methylphenidate (Ritalin) with eight children diagnosed with ADHD.
**Supervisors:** John Northup, Ph.D., Joseph C. Witt, Ph.D.

**8/95-5/97    School Psychology Practicum Student, LSU, Department of Psychology, Baton Rouge, LA**
Responsibilities included development and implementation of assessment protocols (e.g., functional analysis), intervention protocols (e.g., differential reinforcement, noncontingent reinforcement, functional communication training), care-provider training protocols (e.g., parent and teacher training) and screening of recently suspended high-school students for interventions. Participant population included children and adolescents, with developmental disabilities complicated by severe behavior disorders including self-injury, aggression, noncompliance, pica, feeding difficulties, and toileting difficulties. Consultation with teachers and administrators at schools in East Baton Rouge Parish. Conducted data collection, data analyses, graphing, report writing, attended school and related meetings, presentations, and manuscript writing.
**Supervisors:** John Northup, Ph.D., Joseph C. Witt, Ph.D., Timothy R. Vollmer, Ph.D.

**6/96    Researcher, LSU ADHD Summer Program. LSU, Department of Psychology, Baton Rouge, LA**
Responsibilities included psychoeducational and behavioral assessments with 10 children diagnosed with ADHD and referred for behavioral and educational problems. Conducted intake interviews, administered tests (CDI, CBCL, RCMA, CRS, WISC-III, WJ-R, CBM), conducted parental and teacher interviews, made classroom observations, and provided follow-up service and/or consultation as needed. Assisted in conducting preference assessments to determine establishing operation properties of methylphenidate (Ritalin) with three children diagnosed with ADHD.
**Supervisors:** John Northup, Ph.D., Joseph C. Witt, Ph.D.

**3/92- 5/98    Behavior Analyst/ Examiner for Evergreen Presbyterian Ministries, Pineville, LA**
Responsibilities include psychological testing, behavioral assessment, treatment and program development (skills training as well as behavior management protocols), report writing, monitoring clients in behavior management programs for a variety of behavior disorders (aggression, self-injurious behavior, property destruction, sexual assault, theft). Provide group and individual counseling with emphasis on anger management and social skills training. Client population includes adults with developmental disabilities living in 2 residential community homes (12 beds). Serve as a member of the Behavior Review Committee, Quarterly Review Committee, Behavior Intervention Team, Individual Educational Planning (IEP) committees.
**Supervisor:** P.J. Chandler, Ph.D. (Licensed Psychologist)

**10/94- 9/98    Examiner and Behavior Program Coordinator/Monitor, OLS Community Homes, Alexandria, LA**
Responsibilities include traditional and behavioral assessment, treatment and program development-skills training as well as behavior management protocols, report writing, monitoring of clients in behavior management programs for a variety of behavior disorders (aggression, self-injurious behavior, property destruction, sexual assault, theft). Conduct group therapy sessions for anger management, social skills training, relaxation training, and individual therapy sessions for a depression, anxiety, career counseling, etc. Client population includes adults and adolescents with developmental disabilities living in 2 community homes (12 beds) and one group home (8 beds). Serve as a member of the Human Rights Committee, Behavior Review Committee, Quarterly Review Committee, Behavior Intervention Team, Individual Educational Planning (IEP) committees.
**Supervisor:** Maurice Dayan, Ed.D. (Licensed Psychologist)

**8/93-5/95    Psychological Examiner for Grant Parish Pupil Appraisal, Grant Parish School Board, Colfax, LA**
Administered intellectual and other psychoeducational tests, scored results, made interpretations, wrote reports with recommendations for treatment in regard to social, educational, and behavioral factors in accordance with LA 1508 and with the guidance and supervision of a contracted licensed psychologist. Designed individual behavior interventions, determined program goals to reduce frequency and severity of problems, evaluated effectiveness of programs, and made recommendations for documentation and follow up in accordance with established guidelines (e.g., LA 1508, IDEA, 504).
**Supervisor:** Maurice Dayan, Ed.D. (Licensed Psychologist)

06-015

David Jackson                    Page 16

**8/92-5/93    Psychological Examiner for Pupil Appraisal, Rapides Parish School Board,  Alexandria,  LA**
Administered intellectual and other psychoeducational tests, scored results, made interpretations, wrote reports with recommendations for treatment in regard to social, educational, and behavioral factors in accordance with LA 1508 under the guidance and supervision of a contracted licensed psychologist. Designed individual behavior management programs, determined program goals to reduce frequency and severity of problems, evaluated effectiveness of programs, and made recommendations for documentation and follow up in accordance with established guidelines (e.g., LA 1508, IDEA, 504).
**Supervisor:** Maurice Dayan, Ed.D. (Licensed Psychologist), John Eubanks, Ed.D.

**8/88-5/91    Clinical Psychology Practicum Student, Northwestern State University, Natchitoches, LA**
Received supervised training in required practical application of psychological services, included clinical interviews, mental status exams, clinical report writing, counseling, and assessment. Training included intake interviews, intellectual assessments (e.g., WAIS-R, WISC-R, WPPSI-R, Stanford-Binet IV, BSID, KABC), achievement assessments (e.g.,WJ-R, PPVT, WIAT, K-TEA), objective personality inventories (e.g., MMPI, 16 P-F), and projective techniques (e.g., Rorschach, TAT, DAP). Supervision included graded protocol and
observations, as well as integrative reports. Counseling included individual, family, and group as practical accompanying academic courses.
**Supervisors:** Rick Adams, Ph.D., Anita Williams, Ph.D.

**11/78-4/91    Division Director, QMRP, Residential Services, Pinecrest Developmental Center, Pineville, LA**
Responsibilities included administration of procedures, directives, and policies related to training, work, social activities for a division of 5 to 12 homes through three subordinate managers and 21 line supervisors. Line authority over service delivery functions in homes. Interviewed job applicants for approximately 150 positions in division, made recommendations for hiring and firing of all subordinate personnel, and developed supervisory plans for subordinate personnel with unsatisfactory work performance. Member and chairperson for IDT, reviewed and responsible for implementation of proposed active treatment programs, consulted with families as requested, attended audit, transfer, and other administrative meetings assigned.
**Supervisor:** Keith Marler, Home Life Director

**11/75-11/78  Social Case Worker, Social Services, Pinecrest Developmental Center, Pineville, LA**
Responsibilities included counseling, case management, and coordination of services for a caseload of females, with moderate to profound developmental disabilities residing in ICF-MR facility. Served as IDT member responsible for social assessment, history, and post-institutional plan. Primary responsibility for communicating recommended plan of care to family. Designated advocate for clients in caseload and primary contact for families.
**Supervisor:** Rodney Richmond, MSW, BCSW

**11/73-11/75  Institutional Programer/Research Assistant, Psychology Research Department**
                    **Central LA State Hospital, Pineville, LA**
Responsibilities included case management, counseling, and coordination of psychological services for caseload of chronically mentally ill individuals. Served as IDT member responsible for intake interview, record review, case history, coordinator for initial psychiatric staffing and subsequent reviews. Implemented and monitored individual habilitation plan designed by IDT, which included counseling, behavior rehearsal, token program, and coordination with community programs. Collected data required for federal grant. Designated advocate for clients in caseload and primary contact for families.
**Supervisors:** Kelley Distefano, Ph.D. and Ronald Pryor, Ph.D.

**PROFESSIONAL AFFILIATIONS**
American Association on Intellectual and Developmental Disabilities (formerly AAMR)
Association for Behavior Analysis
American Association on Intellectual and Developmental Disabilities - LA Chapter
Louisiana AAIDD QMRP Special Interest Group
Louisiana Psychological Association
Louisiana School Psychological Association

**MAJOR AREAS OF RESEARCH INTEREST**
Applied Behavior Analysis
Behavior Pharmacology
Community Living Staff Training
Integration of psychological and psychiatric services
Mental Retardation Developmental Disabilities
Hospital and Residential Facilities
Language Development
Parent, Teacher, Direct Support Worker Training
Severe Behavior Disorders

06-016

## PUBLICATIONS

Marcus, B. A., Vollmer, T.R., **Swanson, V.,** Ringdahl, J.E., & Roane, H.R. (2001). Teaching parents to implement behavior-reduction programs for their children: A step-by-step model. Behavioral Interventions.

Marcus, B. A., Vollmer, T.R., & **Swanson, V.** (2001). Effects of parent training on parent and child behavior using procedures based on functional analyses. DOI 10.1002/BIN.87. (Abstract published online Issn: 1099-078x, 26 Apr 2001).

Marcus, B. A., Vollmer, T. R., **Swanson, V.,** Ringdahl, J.E., & Roane, H.S. (2001). An Experimental analysis of aggression. Behavior Modification, 25, (2) 189-213.

Northup, J., Edwards, S., Gulley, V., Fusilier, I., **Swanson, V.,** & Dunaway, D. (1999). A brief assessment of methylphenidate effects in the classroom. Proven Practice: Preventive and Research Solutions for Schools, 1, 49-54.

Northup, J., Fusilier, I., **Swanson, V.,** Huete, J., Bruce, T., Freeland, J., Gulley, V., & Edwards, S. (1999). Further analysis of the separate and interactive effects of methylphenidate and common classroom contingencies. Journal of Applied Behavior Analysis, 32, (2) (Spring).

Northup, J., Fusilier, I., **Swanson, V.,** Roane, H.S., & Borrero, J. (1997). Evaluating the establishing operation properties of methylphenidate with common classroom reinforcers. Journal of Applied Behavior Analysis, 30, (4) (Winter), 615-625.

Shenoy, R. S., Moore, D.K., Marcus, B. A., & Swanson, V. (Oct., 2001). Mental illness in the developmentally delayed: A multidisciplinary approach. 53rd Institute on Psychiatric Services, APA, Orlando, (proceedings summary).

**Swanson, V.** (2000). Fostering scholarship in psychology. Lagniappe: AAMR-LA Newsletter, 2, (3), 6.

**Swanson, V.** (2000). What is the best way for psychology to influence policy? Lagniappe: AAMR-LA Newsletter, 2, (4), 5.

**Swanson, V.** (2001). Psychology division update: OCDD guidelines for behavioral supports. Lagniappe: AAMR-LA Newsletter, 3, (2) .

**Swanson, V.** (2002). Disruptive behavior and effective early intervention. Lagniappe: AAMR-LA Newsletter, 4, (1), 15.

**Swanson, V.** (2003). OCDD/HDC psychiatric and behavioral resource center workshops. Lagniappe: AAMR-LA Newsletter, 5, (1), 3.

**Swanson, V.** (2006).The prevalence of aggression in persons diagnosed with mental retardation. Lagniappe: AAIDD-LA Newsletter, 8, (1).

## MANUSCRIPTS IN PREPARATION

**Swanson, V.** (In preparation). Best practices and acceptable guidelines in providing evaluations for *Atkins*-related hearings.

**Swanson, V.** (In preparation). The variation of eligibility criteria for individuals with intellectual disabilities across various systems.

**Swanson, V.** (In preparation). Explaining standardized scores in language people understand.

## PAPERS PRESENTED AT PROFESSIONAL MEETINGS

Coor, K. J., **Swanson, V.,** & Swanson, T.D. (July, 1998). Using functional assessment methodologies to meet ICF-MR guidelines. 1998 AAMR Louisiana State Conference, Monroe. (presentation in symposium).

Coor, K.J., **Swanson, V.,** & Swanson, T.D. (Sept., 1998). Using functional assessment methodologies in residential facilities for children with developmental delays. The Eight Annual Virginia Beach Conference, Virginia Beach. (poster presentation).

Fusilier, I., Northup, J., **Swanson, V.,** Roane, H.S., & Borrero, J. (May, 1997). Evaluating the efficacy of common classroom reinforcers for three boys alternatively receiving placebo and methylphenidate. 23rd Annual Convention of the Association for Behavior Analysis, Chicago, (poster).

Edwards, S., Gulley, V., **Swanson, V.,** & Fusilier, I. (May, 1998). A brief classroom-based medication evaluation. 24th Annual Convention of the Association for Behavior Analysis, Orlando. (poster).

Gulley, V., Edwards, S., Fusilier, I., **Swanson, V.,** & Northup, J. (May, 1998). A time-response analysis of the dosage effects of methylphenidate (MPH) on the academic and behavioral performance of students with Attention Deficit Hyperactivity

Disorder. 24th Annual Convention of the Association for Behavior Analysis, Orlando. (poster).

Gulley, V., Fusilier, I., Edwards, S., **Swanson, V.**, Borrero, J., & Francique, N. (Nov., 1996). LSU summer research program for ADHD children: who we are and what we do. 1996 Annual Convention of the Louisiana School Psychologists Association, Baton Rouge. (poster).

LeVelle, J. A., **Swanson V.**, & Mandall, R. (August, 2003). An OCDD symposium: Recent Developments in providing psychiatric, behavioral, and health community supports. AAMR Region V Annual Conference, New Orleans. (symposium).

Logan, J.R., Smiroldo, B., & **Swanson, V.** (July, 2001). Guidelines for behavioral supports: OCDD manual. 2001 Annual LA-AAMR Conference, Lafayette. (workshop).

Logan, J.R., Smiroldo, B., & **Swanson, V.** (July, 2001). Behavioral psychopharmacology: ethical issues. 2001 Annual LA-AAMR Conference, Lafayette. (workshop).

Logan, J.R., Smiroldo, B., & **Swanson, V.** (July, 2001). Psychological peer reviews: Ethical issues. 2001 Annual LA-AAMR Conference, Lafayette. (workshop).

Lott, J. D., & **Swanson V.** (2008). Tools for building continuity of support. AAIDD-LA State CEU Presentation, Baton Rouge (workshop).

Mandall, R., LeVelle, J.A., & **Swanson, V.** (2003). Providing positive behavior supports. AAMR Region V Annual Conference, New Orleans. (workshop).

Marcus, B.A., & **Swanson, V.** (Sept., 1998). A model for parent training using function-based interventions. Eighth Annual Virginia Beach Conference, Virginia Beach. (poster).

Marcus, B.A., **Swanson, V.**, & Swanson, T.D. (May, 1999). Using functional analytic procedures to assess the effectiveness of parent training. 123rd Annual Meeting of AAMR, New Orleans. (symposium).

Marcus, B.A., **Swanson, V.**, & Vollmer, T.D. (May, 1999). Training parents to implement interventions using functional analysis. 25th Annual Convention of the Association for Behavior Analysis, Chicago (symposium).

Marcus, B.A., **Swanson, V.**, & Vollmer, T. R. (May, 1997). Training parents to implement interventions using functional analysis. 23rd annual convention of the Association for Behavior Analysis, Chicago. (poster).

Marcus, B.A., **Swanson, V.**, & Vollmer, T. R. (October, 1997). Training care providers to implement interventions using functional analysis. 1997 Annual Convention of the Louisiana School Psychological Association, Alexandria. (poster).

Roane, H.S., Vollmer, T.R., Ringdahl, J.E., Marcus, B.A., & **Swanson, V.** (May, 1997). Evaluation of a brief stimulus preference assessment. 23rd annual convention of the Association for Behavior Analysis, Chicago. (presentation in symposium).

Shenoy, R. S., Moore, D. K., Marcus, B. A., & **Swanson, V.** (October, 2001). Mental illness in the developmentally delayed: A multidisciplinary approach. 53rd Institute on Psychiatric Services, American Psychiatric Association, Orlando (symposium).

Story, A., **Swanson, V.**, Swanson, T., & Bamburg, J. (May, 2000). Implementing a contingency restraint program in an accredited ICF-MR facility. 26th Annual Convention of the Association for Behavior Analysis, Washington, D.C. (presentation in symposium).

Story, A., **Swanson, V.**, & Humbles, F.R. (July, 2000). Using a person-centered approach to implement a contingency restraint program. 2000 AAMR Louisiana State Conference, Lafayette. (presentation)

Swanson, T.D., Coor, K., **Swanson, V.**, & Credeur, L.J. (July, 1998). Developing a behavioral model to determine the behavior and pharmacological intervention needs of individuals with developmental disabilities. 1998 AAMR Louisiana State Conference, Monroe. (symposium).

Swanson, T.D., Coor, K., **Swanson, V.**, & Credeur, L.J. (July, 1998). Meeting the ICF-MR Guidelines in Demonstrating Behavior Intervention Effectiveness. 1998 AAMR Louisiana State Conference, Monroe. (presentation in symposium).

Swanson, T. D., Haraway, K., & **Swanson, V.** (May, 1998). The utility of a desensitization procedure to increase tolerance of oral hygiene procedures. 24th Annual Convention of the Association for Behavior Analysis, Orlando. (poster).

Swanson, T.D., & **Swanson, V.** (May, 2001). Coordinating MR services with psychiatric consultation. 27th Annual Convention of the Association for Behavior Analysis, New Orleans. (symposium discussant).

06-018

Swanson, T.D., **Swanson, V.**, & Humbles, F.R. (July, 2000). Effective behavior consultation in community settings. 2000 AAMR Louisiana State Conference, Lafayette, LA.

**Swanson, V.** (November, 2007). Families coping with behaviors. Annual Meeting of LA State Autism Chapter, Lake Charles, LA (breakout session).

**Swanson, V.** (September, 2001). Determining eligibility for persons with developmental disabilities. Quarterly Meeting of Louisiana United Forum for Families, Lafayette, LA. (workshop).

**Swanson, V.** (June, 2002). Autism: assessment and treatment. Quarterly Meeting of New Iberia ARC, New Iberia, LA. (workshop).

**Swanson, V.** (October, 2002). Providing community-integrative psychological and psychiatric services from a developmental center. American Psychiatric Association: 55th Institute on Psychiatric Services, Chicago. (symposium presentation).

**Swanson, V.** (March, 2009). Identifying and communicating with low cognitive functioning individuals. National Alliance of Sentencing Advocates and Mitigation Specialists 16th Annual Sentencing Advocacy Training, (New Orleans, LA).

**Swanson, V.** (May, 2009). The criminal defendant and mental retardation issues. 14th Annual CJA Panel Training Seminar, Lafayette, LA.

**Swanson, V.**, Fusilier, I., Edwards, S., Northup, J., & Gulley, V. (May, 1998 ). Conducting a summer day treatment program for children with ADHD. 24th Annual Convention of the Association for Behavior Analysis, Orlando. (poster).

**Swanson, V.**, Fusilier, I., Edwards, S., Northup, J., Gulley, V., Huete, J., Bruce, T., & Freeland, J., Gulley, V. (May, 1998). A classroom analysis of the effects of Methylphenidate and placebo on classroom contingencies. 24th Annual Convention of the Association for Behavior Analysis, Orlando. (poster).

**Swanson, V.**, LeVelle, J., & Mandall, R. (November, 2002). OCDD symposia: Recent developments and new psychiatric and behavioral services. Convention, Lafayette. (symposium).

**Swanson, V.**, Nichols, J., & Frazier, R.J. (August, 2007). Resolving best practices - Making them work for human right committees (HRC). 12th Annual Conference of National Association of QMRPs, Atlanta. (symposium).

**Swanson, V.**, Northup, J., Swanson, T.D., & Credeur, L.J. (May, 1999). Assessing effects of Ritalin for children diagnosed with ADHD and MR. 123rd Annual Meeting of AAMR, New Orleans. (symposium).

**Swanson, V.**, & Swanson, T.D. (October, 2002). Ideas for programming for persons with severe and profound disabilities. LA-AAMR/QMRP SIG continuing education workshop, Alexandria, LA. (workshop).

**Swanson, V.**, & Swanson, T.D. (February, 2003). Persons with profound developmental disabilities: assessment and intervention. LA-AAMR/QMRP SIG continuing education workshop, Bossier, LA. (workshop).

**Swanson, V.**, & Swanson, T.D. (March, 2003). The assessment and treatment of persons with profound developmental disabilities. LA-AAMR/QMRP SIG continuing education workshop, Lafayette, LA. (workshop).

**Swanson, V.**, & Swanson, T.D. (April, 2003). Diagnosis and treatment of persons with profound developmental disabilities. LA-AAMR/QMRP SIG continuing education workshop, New Orleans, LA. (workshop).

**Swanson, V.**, Swanson, T.D., Coor, K.J., & Credeur, L.J. (July, 1998). Using behavior pharmacology to determine the effects of methylphenidate for individuals diagnosed with ADHD and developmental disabilities. 1998 AAMR Louisiana State Conference, Monroe. (presentation in symposium).

**Swanson, V.**, Swanson, T.D., & Coor, K.J. (Sept., 1998). An experimental analysis of the effects of methylphenidate for individuals diagnosed with ADHD and developmental disabilities. The Eighth Annual Virginia Beach Conference, Virginia Beach. (symposium).

**Swanson, V.**, Swanson, T.D., Gresham, C., Belgard, A., & Thomas, K. (August, 1997). Pyramidal staff training in the extension of behavior reduction programs in supportive living and residential services. 1997 AAMR Region V Annual Conference, New Orleans (presentation in symposium).

**Swanson, V.**, Swanson, T. D., & Haraway, K. (August, 1996). Integrity issues in providing programming in residential facilities. 1996 Annual Conference of the Louisiana AAMR, Baton Rouge. (presentation in symposium).

**Swanson, V.**, Swanson, T.D., & Humbles, F.R. (October, 2001). The utility of graphic presentations in psychiatric consultations. Institute on Psychiatric Services, American Psychiatric Association Annual Conference, Orlando. (presentation in symposium).

06-019

David Jackson                    Page 20

**Swanson, V.**, Swanson, T.D., & Humbles, F.R. (July, 2002). Assessment and treatment for persons with profound developmental disabilities. 2002 Annual Conference of the Louisiana AAMR, Alexandria. (presentation).

**Swanson, V.**, Swanson, T.D., & Northup, J. (November, 1998). Using functional analysis in analog sessions and in the classroom to assess the effects of Ritalin on Disruptive Behavior. 1998 Annual Convention of Louisiana School Psychological Association, Lafayette. (poster).

**Swanson, V.**, Vollmer, T.R., Marcus, B. A., Roane, H.S., Ringdahl, J.R., & Whitmarsh, E. (October, 1997). Using functional assessment methodologies in school consultation. 1997 Annual Convention of Louisiana School Psychological Association, Alexandria. (poster).

**Swanson, V.**, Vollmer, T.R., Marcus, B. A., Roane, H.S., Ringdahl, J.R., & Whitmarsh, E. (April, 1998). The utility of functional assessment methodologies in school consultation. National Association of School Psychologists 1997 Annual Convention, Orlando. (poster).

**Swanson, V.** & Yackel, J. (March, 2009). Division 33: A national perspective on *Atkins* litigation from the APA. National Alliance of Sentencing Advocates and Mitigation Specialists 16th Annual Sentencing Advocacy Training, (New Orleans, LA).

Van Kleeck, A., & **Swanson, V.** (February, 2004). Using personal outcomes for positive behavior support. AAMR-LA, Lafayette. (workshop).

White, D., Perkins, T., **Swanson, V.**, & Haraway, K. (July, 1998). Introduction of a behavior analytic format for assessing and designing interventions for individuals with developmental disabilities in an ICF/MR facility. 1998 Annual Conference of the Louisiana AAMR, Monroe. (presentation in symposium).

06-020

# EXHIBIT 7



| Home | Issues | Resources | Facts | Reports | Press | Contact | Donate | Search |

Fact Sheet     Executions Database     State by State Info     Lethal Injection

**Federal Death Row Prisoners**

### Updated Sept. 2, 2010

- **List of Death Row Prisoners** (/article.php?scid=29&did=193#list)
- **Synopsis of Cases:** (/article.php?scid=29&did=193#cases)
  - Sentenced under the Anti-Drug Abuse Act of 1988
  - Sentenced Since the Federal Death Penalty Act of 1994
  - Resentenced after clemency or reversal on appeal
  - Sentence to death and executed
- **List of Federal Capital Offenses** (/article.php?scid=29&did=192)
- **List of Federal Executions Since 1927** (/article.php?scid=29&did=149)

## List of Death Row Prisoners

### Total = 60

| Black = 27 | Latino = 8 | Native American = 1 | White = 24 | Unknown = 0 |
| --- | --- | --- | --- | --- |

| Males = 58 | Females = 2 |
| --- | --- |

**68 death sentences since 1988**: 60 on death row; 3 executed; 5 reversed or commuted.

AGOFSKY, Shannon (W)
ALLEN, Billie Jerome (B)
BARNETTE, Marcivicci Aquilia (B)
BARRETT, Kenneth Eugene (W)
BASHAM, Branden (W)
BATTLE, Anthony (B)
BERNARD, Brandon (B)
BOLDEN, Robert (B)
BOURGEOIS, Alfred (B)
BROWN, Meier Jason (B)
CARO, Carlos (L)
CORLEY, Odell (B)
DAVIS, Len (B)
DUNCAN, Joseph (W)
EBRON, Joseph (B)
FELL, Donald (W)
FIELDS, Edward (W)
FIELDS, Sherman Lamont (B)
FULKS, Chadrick (W)
GABRION, Marvin (W)
GARCIA, Edgar (L)
HAGER, Thomas (B)
HALL, Orlando (B)
[HAMMER, David Paul (W)]
HIGGS, Dustin (B)
HOLDER, Norris (B)
HONKEN, Dustin (W)
JACKSON, David Lee (B)
JACKSON, Richard Allen (W)
JOHNSON, Angela (W) - female
JOHNSON, Cory (B)
JOHNSON, Darryl A. (B)
KADAMOVAS, Jurijus (W)
[LAWRENCE, Daryl (B)]
LeCROY, JR., William (W)
LEE, Danny (W)
LIGHTY, Kenneth (B)
MIKHEL, Iouri (W)
MIKOS, Ronald (W)
MITCHELL, Lezmond (NA)
MONTGOMERY, Lisa (W) - female

07-001

NELSON, Keith D. (W)
ORTIZ, Arboleda (L)
PAUL, Jeffrey Williams (W)
PURKEY, Wes (W)
ROANE, JR., James H. (B)
ROBINSON, Julius (B)
RODRIGUEZ, JR., Alfonso (L)
RUNYON, David (W)
SAMPSON, Gary (W)
SANCHEZ, JR., Ricardo (L)
SINISTERRA, German (L)
SNARR, Mark (W)
TAYLOR, Rejon (B)
TIPTON, Richard (B)
TROYA, Daniel (L)
UMANA, Alejandro (L)
VIALVA, Christopher (B)
WEBSTER, Bruce (B)
[WILSON, Ronell (B)]

Note: names in [ ] are defendants whose court ordered conviction or sentence reversal is not yet final. This list may include inmates who have received a verdict of death from the jury, but in which the judge has not yet issued the formal sentence. In the federal system, the judge is obliged to follow a unanimous jury recommendation. (Source: Federal Capital Habeas Project)

## Synopsis of Cases (in chronological order)

### Inmates Sentenced Under the Anti-Drug Abuse Act of 1988:

**Richard Tipton, Corey Johnson, James H. Roane, Jr.** - Members of an inner-city gang in Richmond, VA. These three black defendants were sentenced to death in February 1993 for their participation in a series of drug-related murders.
**UPDATE: Execution dates** were set for the three co-defendants in May 2006, but the executions were stayed because of a challenge to the lethal injection process.

### Sentenced Since the Federal Death Penalty Act of 1994:
(names in brackets had death sentences reversed, but are awaiting final disposition)

**Orlando Hall, Bruce Webster** - Black; charged in Fort Worth, Texas with the abduction, sexual assault and beating murder of a 16-year-old black female. Hall was sentenced to death in November 1995. In a separate trial, Webster was sentenced to death in June 1996.
**UPDATE**: Webster has been scheduled for execution on April 16, 2007. **UPDATE**: Execution was stayed. Webster had joined the lethal injection challenge filed by other inmates.

**Len Davis** - Davis, a black New Orleans police officer who was under investigation in a drug conspiracy case, was sentenced to death on two convictions in April 1996 for ordering the murder of a young black woman who witnessed his beating of a witness in an unrelated incident. A co-defendant, Paul Hardy, also black, was the triggerman in the killing. Hardy was also sentenced to death on two convictions in May 1996. The Fifth Circuit reversed the sentences for both defendants and one of the two capital convictions for each defendant. The court ordered a new sentencing hearing for both defendants. **UPDATE:** A federal jury again recommended a sentence of death for **Len Davis** on August 9, 2005. A judge will formally impose the sentence at a later date. (Associated Press, Aug. 10, 2005). Hardy is not under a sentence of death.

**Anthony Battle** - Black inmate incarcerated in the federal penitentiary in Atlanta, Georgia; history of psychiatric problems; sentenced to death in March 1997 for the murder of a prison guard. An appeal before the Eleventh Circuit is pending.

**Jeffrey Paul** - White; sentenced to death in June 1997 for the robbery-murder of a retired National Parks employee on federal land in Arkansas. An appeal before the Eighth Circuit is pending.

**Darryl Alamont Johnson** - Black; convicted of ordering the murder of two informants in Illinois in connection with the Gangster Disciples drug conspiracy cases. Sentenced to death on November 17, 1997. His co-defendant was sentenced to life in prison.

**Aquilia Barnette** - Black; convicted of murdering a man in North Carolina in a carjacking and a woman in Virginia, who was his former girlfriend. Sentenced to death by a jury on 2/10/98. The Fourth Circuit reversed his death sentence on 5/4/00. Barnette was re-sentenced to death in 2002. On Oct. 3, 2005, the U.S. Supreme Court vacated the judgment against Barnette and remanded the case back to the Fourth Circuit in light of the Court's 2005 ruling in Miller-El v. Dretke.

**Billie Jerome Allen** and **Norris Holder** - Both black; convicted of the fatal shooting of a bank guard during a robbery in St. Louis, Missouri. Allen was sentenced to death by a jury on Mar. 10, 1998. In June 2002, the U.S. Supreme Court vacated Allen's death sentence and remanded the case back to the Eighth Circuit for reconsideration in light of the Court's ruling in *Ring v. Arizona*. Because his federal indictment did not include the aggravating factors necessary to support his death sentence, the 8th Circuit said Allen's sentence should be reduced to life in prison. (February 5, 2004, St. Louis Post-Dispatch). However, in September 2004, the 8th Circuit conducted a rehearing en banc of the earlier decision and reinstated Allen's death sentence. (St. Louis Post-Dispatch, May 3, 2005). Holder was sentenced to death by a jury on April 3, 1998.

**[David Paul Hammer]** - White; convicted after killing of federal prison inmate at the federal penitentiary at Allenwood, PA where Hammer was serving a 1200+ year Oklahoma state sentence. Sentenced to death on July 24, 1998. The third Circuit allowed him to waive his appeal and an execution date of Nov. 15, 2000 was set. Hammer then filed a clemency petition and a request to appeal. The judge stayed his execution date, giving him until Jan. 31, 2001 to file an appeal. Hammer's death sentence was overturned by a federal District Court judge because the prosecution had withheld statements that might have led to a different sentence. (Associated Press, Dec. 27, 2005).

**German Sinistera** and **Arboleda Ortiz** - Hispanic; in May, 2000, a federal jury in Kansas City, Missouri, recommended a death sentence for Sinistera of Houston, Texas, for his role as triggerman in the murder of a drug dealer. Sinistera is a citizen of Colombia. He was convicted along with two co-defendants, Arboleda Ortiz and Plutarco Tello, who are also Colombian nationals. The jury also recommended a death sentence for Ortiz, but not for Tello. The judge sentenced them to death.

**Christopher Andre' Vialva** and **Brandon Am Bernard** - Black* defendants; a federal jury in Waco, TX, convicted the two in June, 2000, of carjacking and the murder of an Iowa couple visiting central Texas. Both defendants were sentenced to death. Vialva was 19-years-old at the time of his arrest, and Bernard was 18. Four younger teen-agers have also pled guilty to federal charges relating to the crime.

07-002

*Mr. Vialva's mother points out that her son is bi-racial, since she is white and Vialva's father is from the West Indies.

**Dustin John Higgs –** Black; Higgs was convicted in October 2000 of ordering the 1996 murder of three Maryland women after arguing with one of them in his apartment. The triggerman, Willis Mark Haynes, was convicted in May 2000 and sentenced to life plus 45 years in prison. Higgs's case is the third death penalty prosecution in Maryland since the federal death penalty was reinstated in 1988, but marks the first time a jury has imposed the death penalty. Under federal law, the judge is obligated to follow the jury's sentencing determination. (Washington Post, 10/27/00)

**Richard Allen Jackson** - White; Jackson was convicted in federal court on May 7, 2001 for use of a firearm on federal property (Bend Creek Recreation Area) during a felony resulting in the death of the victim. He was subsequently sentenced to death. Jackson had earlier been convicted in North Carolina state court for offenses arising from the same actions. He was convicted of the kidnapping and murder of Karen Lynn Styles in 1994. That conviction was overturned and Jackson later pleaded guilty to second degree murder.

**Keith Nelson** - White; Nelson was convicted of kidnapping a girl from her Kansas home and murdering her in Missouri. On November 28, 2001 a jury recommended the death penalty for Nelson, and on March 11, 2002, a federal judge imposed the death penalty.

**Marvin Gabrion** - White; On March 16, 2002, Marvin Gabrion was sentenced to death for a 1997 murder in Michigan's Manistee National Forest. Although Michigan does not have the death penalty, Gabrion was sentenced under the federal system because the victim was killed on federal property. Gabrion's case marks the first federal death sentence imposed on a defendant in a state that does not have the death penalty since the federal death penalty was reinstated.

**Julius Robinson** - Black; Robinson was sentenced to death on March 18, 2002, for the killings of Juan Reyes in May 1999 and Rudolph Resendez in June 1999 in Fort Worth, Texas. Both men were killed drug related incidents. Robinson was formally sentenced by the trial judge on June 5, 2002.

**Daniel Lee** - White; convicted in Arkansas in May, 1999 of a triple murder of a gun dealer and his family. Lee was convicted along with Chevie Kehoe in a plot to set up a whites-only nation in the Pacific Northwest. Kehoe was considered by prosecutors to be the mastermind of the plot, but he was given a life sentence by the same jury. The jury in Lee's case recommended a sentence of death. Lee was formally sentenced to death on May 13, 2002.

**Lezmond Mitchell** - Native American. Mitchell and his co-defendants (including a juvenile) allegedly got a ride from a woman and her 9 year old granddaughter in Arizona. They killed both victims and stole the car supposedly for use in an armed robbery. Each victim was stabbed at a separate location. The Attorney General required a capital prosecution against Mitchell under a carjacking theory -- although the tribe has not "opted in" to the federal death penalty. Attorney General Ashcroft required a capital prosecution. Mitchell was found guilty on May 20, and sentenced to death on September 15, 2003.

**Meier Jason Brown** - Black. A U.S. District judge affirmed the recommendation of a jury for a death sentence against Meier Brown on November 8, 2003. Brown was convicted of the November 2002 murder of a 48-year-old white female-- a Fleming, Georgia postal worker-- during a robbery. Brown had agreed to plead guilty in return for a sentence of life without parole in light of Brown's confession, but federal prosecutors sought the death sentence. (Savannah Morning News, November 8, 2003)

**Wesley Purkey** - White. A jury recommended that Purkey be sentneced to death for the 1998 kidnapping, rape, and murder of a Kansas City, Missouri, teen. While serving life in prison for another 1998 murder in Kansas, Purkey confessed to the Kansas City crime in hopes of being transferred to federal prison. Prosecutors instead chose to seek the death penalty for Purkey under the 1994 federal statute. The judge is required to follow the jury's recommendation. (Kansas City Star, November 19, 2003)

**Gary Sampson** - White. Sampson pled guilty to the carjacking and murder of two Massachusetts men during a weeklong crime spree. A jury sentenced Sampson to death on December 23, 2003. Sampson is only the second federal case tried in Massachusetts since the federal government reinstated the federal death penalty in 1988. (Las Vegas Sun, December 23, 2003) Judge Mark L. Wolf sentenced Sampson to death, but ordered that the execution be carried out in New Hampshire, which has not carried out an execution since 1939. (Boston Globe, January 30, 2004)

**William LeCroy, Jr.** - White. A jury sentenced LeCroy to death in the 2001 carjacking and murder of a North Georgia woman. Attorneys for LeCroy argued that the murder took place inside the victim's house, and thus did not fall under the 1994 federal death penalty statute. The judge is required to follow the jury recommendation. (Atlanta Journal-Constitution, March 11, 2004)

**Alfred Bourgeois** - Black. On March 24, 2004 a jury recommended a death sentence for Alfred Bourgeois for the 2002 murder of his daughter at the Corpus Christi Naval Air Station in Texas, based in part on the testimony of a prisoner housed with Bourgeois. The judge is required to follow the jury's sentencing recommendation. (Department of Justice Press Release, March 24, 2004)

**Sherman Lamont Fields** - Black. A jury sentenced Fields to death for the shooting death of his girlfriend in 2001. Fields was also sentenced to lengthy prison terms for other charges. An U. S. District Judge formalized the sentence in April 2004, and ordered Fields transferred to Terre Haute, IN. The murder took place during Fields' escape from a detention center in Texas while Fields was being held on a federal weapons charge. (Associated Press, April 8, 2004)

**Chadrick Fulks and Branden Basham –** Both White. A jury recommended the death sentence for the 2002 kidnapping and murder of a 44-year-old-white South Carolina woman following Fulks' escape from a Kentucky jail. Fulks' codefendant, Branden Basham, was tried in September 2004 for crimes committed during the escape. Fulks is the first federal death conviction in South Carolina. The judge is required to uphold the recommendation and confirm the death sentence. (The State (Columbia, SC), July 1, 2004). On November 2, 2004, a jury recommended a death sentence for Basham for the murder. The judge is required to follow the recommendation of the jury and impose a death sentence. (Associated Press, November 2, 2004).

**Shannon Agofsky** - White. Agofsky was given a death sentence on July 17, 2004 for the murder of a fellow inmate at the Beaumont Federal Penitentiary in Texas in 2001. The jury was shown a video of the attack that prison officials said was gang-related. Agofsky was originally in prison for a murder that occurred when he was 18. (Associated Press, July 18, 2004).

**Dustin Honken and Angela Johnson** (female) - Both white. On October 27, 2004 a federal jury voted to sentence Honken to death for the murder of two girls in Iowa in 1993. Honken was also given three life sentences: one for the murder of the girls' mother, and two more for the murders of two other adults who were to have testified against Honken in a federal drug case. The children, white girls age 10 and 6, were witnesses to the murder of their mother. The judge is required to uphold the jury's recommendation and impose the death sentence. (Des Moines Register, October 28, 2004). This is the third federal death sentence handed down in a state that does not have the death penalty in its own law. The other two were in Michigan and Massachusetts. On June 21, 2005, a federal jury in Iowa recommended a death sentence for co-defendant Angela Johnson for her role in aiding drug kingpin Honken in 4 of the 5 murders. The judge is obligated to follow the jury's sentencing recommendation. If the sentence is carried out, she would be the first woman executed by the U.S. government since Bonnie Brown in December 1953.

**Naish Ra'id (formerly Odell Corley)** - Black. On October 29, 2004, a jury recommended a death sentence for Ra'id for the murder of two white bank employees during a robbery attempt at a Porter, Indiana bank in 2002. Ra'id's sentence will be the first one in the history of the Northern District of Indiana federal court system. The judge is required to impose the sentence against Ra'id, who was alleged to be the triggerman in the robbery. Two co-defendants pleaded guilty and were given lesser sentences. (Indiana Herald - Argus, October 29, 2004).

07-003

**Ronald Mikos** - White. On May 23, 2005 a jury recommended a death sentence for this 56-year-old Chicago podiatrist who was convicted of fatally shooting Joyce Brannon, a white former patient, to prevent her from testifying in a federal probe of a Medicare fraud scheme in January 2002. (Chicago Tribune, May 23, 2005). In the federal system, a jury's recommendation for either life without parole or death is binding on the judge.

**Donald Fell** - White. On July 14, 2005, a jury in Vermont recommended a death sentence for Fell, 25, for a carjacking in Vermont and subsequent murder of a woman in New York in 2000. He was convicted of carjacking and kidnapping resulting in death. The woman and her car were seized by Fell and a codefendant as they were fleeing Vermont where Fell's mother and a friend were also killed hours earlier. The co-defendant hanged himself in prison in 2003. Prosecutors had originally arranged a plea bargain for Fell in which he would have been sentenced to life without parole, but the deal was rejected by Attorney General John Ashcroft. This was the first capital trial in Vermont in nearly 50 years. (N.Y. Times, July 15, 2005).

**Edward Fields** - White. On July 22, 2005, a jury in the eastern district of Oklahoma recommended a death sentence for Fields, 38, a former prison guard. Fields pleaded guilty to the murder of two white campers in the Ouachita National Forest while wearing his homemade sniper suit. There was some evidence that Fields was mentally ill. A federal judge sentenced him to death on Nov. 8, 2005. (Muskogee Phoenix, July 26, 2005; Associated Press, July 15, 2005).

**Kenneth Lighty** - Black. On Nov. 10, 2005, a federal jury in Maryland recommended a death sentence for Lighty for the kidnapping and murder of Eric Hayes (black), an alleged PCP dealer and son of a D.C. police lieutentant, in 2001. The kidnapping occurred in Washington, DC and the murder was committed in Maryland. Lighty was convicted on October 21. A co-defendant, James Flood was also found guilty but faces a mandatory life sentence. In April, a 3rd defendant, Lorenzo Wilson, was convicted of conspiracy to kidnap and faces a life sentence.

**Kenneth Barrett** - White. On Nov. 18, 2005, a federal jury in Muskogee, Oklahoma, recommended a death sentence for Barrett for the murder of a white police officer, David Eales, on Sept. 24, 1999. The death sentence was for intentionally killing a state law enforcement officer during a drug crime and during the officer's performance of his official duties. Another officer was wounded. Barrett had already been convicted of first-degree manslaughter in state court for the murder of Eales, and he was given a 20-year sentence, followed by 10 years for the wounding. (Muskogee Phoenix, Nov. 21, 2005).

**Robert Bolden** - Black. On May 23, 2006, a federal jury in St. Louis, Missouri, recommended a death sentence for Bolden for the murder of a white bank security guard, Nathan Ley, during an attempted robbery in St. Louis in 2002. Two accomplices pleaded guilty to attempted bank robbery. The formal sentencing will take place on August 25. (St. Louis Post-Dispatch, May 23, 2006).

**[Daryl Lawrence]** - Black. Convicted on Feb. 28, 2006 of the murder of a police officer, Bryan Hurst, during an attempted bank robbery in Columbus, Ohio on Jan. 6, 2005. Lawrence was also convicted of other bank robberies in Ohio. A jury recommended a sentence of death on Mar. 10, 2006. (Press Release, U.S. Attorney's Office for the Southern Dist. of OH, Mar. 10, 2006). His death sentence was overturned by the trial judge, and the decision is being appealed (E-mail from Diane Menashe, Counsel for Daryl Lawrence, on July 3, 2007).

**Alfonso Rodriguez, Jr.** - Hispanic. Convicted on August 30, 2006, of the murder of a college student, Dru Sjodin. Sjodin was kidnapped from North Dakota and her body was found in Minnesota. A jury in North Dakota recommended a death sentence on September 22. The judge formally sentenced Rodriguez to death on Feb. 8, 2007. North Dakota does not have a state death penalty and has not had an execution since 1905. The judge chose South Dakota as the place of execution. South Dakota utilizes lethal injection for executions, though none has been carried out. South Dakota's execution process is being reviewed by the legislature. The U.S. Attorney who prosecuted Rodriguez, Drew Wrigley, commented about the state's distaste for the death penalty: **"It's just not part of the culture up here really at all. We live in the safest state in the the union."** (Associated Press, Sept. 22, 2006; N.Y. Times, Feb. 9, 2007).

**David Lee Jackson** - Black. Case: E.D. TX CR No. 1:05-CR-51 B Jackson was convicted and sentenced to die in the Eastern District of Texas for the 1999 killing of an inmate at the federal prison in Beaumont, Texas. A jury recommended that he receive a death sentence on Nov. 13, 2006. He was formally sentenced on Dec. 15, 2006. Jackson had been incarcerated for a weapons violation. His co-defendant, Arzell Gully, was in prison for drug trafficking. Both were sent to the high security federal prison in Florence, Colorado, after the homicide. Gully did not face the death penalty. Jackson and Gully are black men, as was the victim. (Federal Death Penalty Resource Counsel).

**[Ronell Wilson ]**- Black. This is the first federal death sentence handed down in New York since 1954. Wilson, 24, was convicted of killing two undercover police detectives in Staten Island in 2003. The jury recommended a sentence of death on January 30, 2007. The judge will issue the formal sentence at a later date. (Associated Press, February 1, 2007). If the judge decides that NY does not have the death penalty, then the judge will choose another state with the death penalty to determine the manner and place of execution. **UPDATE:** Wilson was formally sentenced to death in U.S. District Court on Mar. 29, 2007. **UPDATE:** In June 2010, the U.S. Court of Appeals for the Second Circuit overturned Wilson's death sentence because the prosecutor had made arguments in the sentencing phase of the trial that interfered with Wilson's rights to remain silent and have a trial.

**Jurijus Kadamovas and Iouri Mikhel** - White. In Los Angeles, a federal jury recommended the death penalty on Feb. 13, 2007 for two men convicted of murders in a kidnapping-for-ransom scheme targeting Russian immigrants. Prosecutors said the two men kidnapped affluent Russian immigrants from Los Angeles in late 2001 and early 2002 and attempted to extort money from their families and friends. Three co-conspirators pleaded guilty and testified at the trial for the government. The judge has scheduled formal sentencing on March 12. (Associated Press, Feb. 13, 2007). UPDATE: The judge pronounced the death sentence for Kadamovas on March 12 and was scheduled to pronounce the death sentence for Mikhel on the same day. (CBS News, Mar. 12, 2007).

**Carlos Caro** - Latino. A jury in the Western District of Virginia recommended a death sentence for Caro on Feb. 13, 2007 for the murder of his cellmate, Robert Sandoval. Caro was serving a 30-year sentence for drug offenses. Both Caro and Sandoval were reportedly members of a prison gang called the Texas Syndicate. The murder occurred in 2003. A judge will still have to pronounce the formal sentence at a later date. (Roanoke Times, Feb. 14, 2007). UPDATE: Caro was formally sentenced to death in District Court on March 30, 2007.

**Lisa Montgomery** - White/Female. On Oct. 26, 2007, a jury in Kansas City, Missouri recommended a death sentence for Montgomery following her conviction for kidnapping and killing Bobbie Jo Stinnett, also white, and stealing her unborn baby. Montgomery took the baby with her to Kansas and claimed the baby was her child. (Kansas City Star, Oct. 26, 2007). Formal sentencing will occur later, but the judge is required to follow the jury's recommendation. Montgomery will be the third woman on the federal death row. **UPDATE:** Montgomery is to be formally sentenced to death on April 4, 2008 in U.S. District Court. (Topeka Capital-Journal, Apr. 3, 2008).

**Thomas Hager** - Black. On Nov. 1, 2007, a jury in Alexandria, Virginia recommended a death sentence for Hager, 34, after deliberating for 2 days. Hager was convicted of the drug-related murder of Barbara White committed in 1993. Prosecutors said that Hager killed White because she had learned of the safe house where he was staying. Two associates of Hager who were also responsible for White's murder received life sentences and testified against him. The defendant grew up in a poor area of Southeast Washington, DC, and both of his parents were drug addicts who neglected and abused their children. (Associated Press (Va. Daily Press), Nov. 1, 2007). The judge immediately imposed the death sentence on Hager.

**Joseph Duncan** - White. On Aug. 27, 2008, a jury in Idaho returned a unanimous verdict for a death sentence for Duncan after deliberating for 3 hours. Duncan had pleaded guilty to ten federal charges, including the murder and kidnapping of a young boy and the kidnapping of a young girl in May 2005. He insisted on

defending himself, and offered no mitigating evidence and no closing argument in the sentencing trial. (KNDO/KNDU Web site, NBC affiliates; also AP, Aug. 27, 2008). The judge is required to follow the jury's verdict.

**Rejon Taylor** - Black. On Oct. 21, 2008, a jury in Chattanooga, Tennessee recommended a death sentence for Taylor after convicting him of murder, kidnapping and carjacking. The victim was Guy Luck, a white businessman who lived in Atlanta, Georgia. He was brought across state lines and murdered in Tennessee. Taylor's attorney said he was very confident that the verdict would be overturned on appeal. The judge indicated that formal sentencing would take place in about a month. (Chattanooga Times Free Press, Oct. 22, 2008).

**Daniel Troya and Ricardo Sanchez, Jr.** - Both Latino. On Mar. 31, 2009, a jury in West Palm Beach, Florida, recommended a death sentence for Troya and Sanchez for the murder of two children on the Florida Turnpike in 2006. The defendants also were convicted of murdering the children's parents and received life sentences for that crime. All the victims were Hispanic. The father of the children was allegedly killed because of a drug debt. The reputed kingpin of the drug operation did not receive a death sentence. The judge is required to follow the jury's recommendation in imposing the formal sentence. (South Florida Sun Sentinel, April 1, 2009). On May 13, 2009 both Troya and Sanchez were formally sentenced to death.

**Joseph Ebron** - Black. On May 11, 2009, a jury convicted Ebron of the 2005 murder of Keith Davis, also black, in a federal prison in Beaumont, Texas. The District Court judge followed the jury's recommendation and condemned Ebron to death on May 18. Both defendant and victim were said to be members of a Washington, D.C. gang. Ebron is 30 years old and has been incarcerated for most of his life since he was 15. (Beaumont Enterprise, May 19, 2009).

**David Runyon** - White. On August 27, 2009, a jury in Norfolk, Virginia, unanimously recommended a death sentence for Runyon for the murder of Cory Allen Voss, a white Naval officer, in Newport News in 2007. Runyon, a former soldier, was convicted of shooting Voss in a murder-for-hire plot organized by Voss's wife, Catherina Voss, and her boyfriend, Michael Draven. The federal government did not seek the death penalty against the other two defendants. Catherina Voss pled guilty and received a life sentence. Draven was found guilty and faces a life sentence. Catherina hired Runyon to kill her husband in the hope of being the beneficiary of a $500,000 life insurance policy. U.S. District Judge Rebecca Beach Smith will formally sentence Runyon in December. She is obligated to follow the jury's recommendation. (Daily Press, Aug. 27, 2009).

**Alejandro Umana** -Latino. On April 28, 2010, a jury in Charlotte, NC, unanimously recommended a death sentence for Umana, who was reputed to be a member of the gang MS-13. He was found guilty of killing 2 brothers in a Greensboro restaurant in 2007. Both victims were Latino. Umana was one of 26 suspected MS-13 gang members indicted in Charlotte in 2008. Chief U.S. District Judge Bob Conrad is required to follow the jurors' recommendation and impose the death penalty. (Charlotte Observer, Apri 29, 2010). Umana was formally sentenced to death on July 27, 2010.

**Mark Snarr** (White) and **Edgar Garcia** (Latino) - On May 24, 2010, a jury in Beaumont, Texas, recommended death sentences for these two federal prison inmates for the murder of a fellow inmate, Gabriel Rhone. They also stabbed and wounded 2 corrections officers. They were convicted on May 7, 2010, of the murder that occurred in the U.S. Penitentiary in Beaumont. Both inmates were serving lengthy sentences for drug trafficking. (AOL News, May 24, 2010). According to the FBI, the presiding judge sentenced the defendants to death on the same day.

## Reversal of death sentence final or clemency granted:

**John McCullah** - White; sentenced to death for a drug-related kidnap/murder of a Muskogee, Oklahoma auto dealership employee. The 10th Circuit granted McCullah a new penalty hearing in 1996, and in February, 2000, **McCullah was resentenced to life in prison.**

**David Ronald Chandler**- White, marijuana grower in Alabama; sentenced to death in 1991 for the murder for hire of a white male under the drug kingpin statute. Most of the government's witnesses, including the triggerman in the killing, have now recanted their testimony. The Eleventh Circuit overturned his death sentence in October, 1999 because of ineffectiveness of counsel. In December, 1999, the Court voted to rehear the case en banc, and by a 6-5 vote re-affirmed his death sentence. An appeal to the U.S. Supreme Court was filed. **Sentence commuted to life by President Clinton on January 20, 2001.**

**Boutaem Chanthadara** - Asian; sentenced to death in October 1996 for the armed robbery/murder of the female proprietor of a Chinese restaurant in Wichita, Kansas. In November, 2000, the 10th Circuit of the U.S. Court of Appeals overturned Chanthadara's death sentence and remanded his case for a new sentencing hearing. At resentencing, **Chanthadara was sentenced to life in April 2002.**

**Paul Hardy** - black, was the triggerman in a killing in New Orleans along with a co-defendant Len Davis. Hardy and Davis were sentenced to death on two convictions in May 1996. The Fifth Circuit reversed the sentences for both defendants and one of the two capital convictions for each defendant. The court ordered a new sentencing hearing for both defendants. **Hardy is no longer under a sentence of death.** Davis was resentenced to death.

**Richard Thomas Stitt** -Black; convicted of ordering the murder of three people in Norfolk Virginia. He was sentenced to death by a jury in November 1998 after a joint trial with three of the non-capital codefendants, who did not face the death penalty but rather life in prison. Stitt's death sentence was overturned by a federal District Court judge in April 2005 because of ineffectiveness of counsel. In March 2006, the District Court was unanimously upheld by the 4th Circuit, finding that Stitt's attorney did not render effective assistance because of a conflict of interest. (Associated Press, Mar. 25, 2006). **UPDATE**: The federal District Court ruled that **Stitt's sentence should be reduced to life plus 65 years**. The prosecution had requested a new sentencing jury. The government may appeal this ruling. (Virginian Pilot, June 17, 2007). **UPDATE**: The 4th Circuit overturned the District Court's sentence and allowed the government to conduct **a new sentencing hearing**. Attorney General Eric Holder approved the seeking of the death penalty at the new sentencing trial. (Virginian Pilot, Oct. 27, 2009).

## Jury Verdict for Death but No Formal Sentence

**George Lecco and Valerie Friend** (female) - Both White. On May 29, 2007, a jury in Charleston, West Virginia, recommended death sentences for both defendants for the murder of Carla Collins in order to protect their drug ring. Prosecutors maintained that Lecco arranged to have Collins killed and that Friend did the shooting in 2005. These were the first federal death verdicts in West Virginia since the federal law was reinstated in 1988. (Charleston Daily Mail, May 29, 2007). **UPDATE**: Prior to formal sentencing by the judge, Lecco and Friend's convictions were overturned by a federal District Court in May 2009 because a juror at the trial, William Griffith, did not reveal that he was under investigation for allegedly possessing child pornography by the same U.S. Attorney's Office that was prosecuting Lecco and Friend. (Williamson Daily News, May 7, 2009). A new trial date of Oct. 27, 2009 was set for Friend and the prosecution said it intended to seek the death penalty. **UPDATE**: Valerie Friend pleaded guilty on Oct. 1, 2009 to a number of charges, including the murder of Collins. In exchange for her plea and cooperation against her co-defendant, **she will be sentenced to life in prison**. (Assoc. Press, Oct. 1, 2009). **UPDATE**: On May 3, 2010, a federal jury chose not to sentence Lecco to death after finding him guilty. He will be sentenced to life without parole. (Charleston Gazette, May 3, 2010).

**John Wayne Johnson** - Black. On May 27, 2009, a jury in New Orleans, Louisiana, unanimously recommended a death sentence for Johnson for the murder of an off-duty sheriff's deputy working as a guard during a bank robbery. There were two other accomplices in the 2004 robbery in which officer Sidney Zaffuto was killed. Johnson admitted he shot Zaffuto, but said it was unintentional. The jury found him guilty on May 19. Johnson's attorneys planned to appeal on several grounds, including an assertion that the federal death penalty is being employed unconstitutionally in New Orleans because all 42 defendants indicted on capital offenses were either black or Hispanic. (Times-Picayune, May 27, 2009). **UPDATE**: The District Court judge delayed formal sentencing until Feb. 3, 2010 to allow more time for a challenge to the trial. **UPDATE**: Prior to formal sentencing, the District Court vacated Johnson's death verdict and remanded the case for a new penalty hearing because of admission of improper victim-impact evidence; a discovery violation related to this victim-impact evidence; introduction of an unadjudicated murder which the jury found was not proven beyond a reasonable doubt, and; improper government argument in the penalty phase which (a)

07-005

compared worth of defendant and victim, (b) compared conditions of a life sentence to the permanency of the victim's death, and (c) pressured the jury into believing that a life sentence would be a capitulation. (Federal Death Penalty Resource Counsel, May 18, 2010).

## Sentence to death and executed

**Timothy McVeigh** - White; sentenced to death in June 1997 for the bombing of the Oklahoma City federal building in 1995. The United States Supreme Court denied review on March 8, 1999. McVeigh was scheduled for execution on May 16, 2001 but was granted a 30 day stay by Attorney General John Ashcroft after it was discovered that the FBI did not disclose over 3,000 pages of document to McVeigh's defense team. **McVeigh was executed on June 11, 2001.** McVeigh's co-defendant, Terry Nichols, was found guilty in a separate trial by the federal government and given a life sentence. Nichols was later tried by the state of Oklahoma for the murder of the 161 non-federal employees in Oklahoma City, found guilty, and again sentenced to life in prison.

**Juan Raul Garza** - Hispanic; marijuana distributor. Garza was sentenced to death in August 1993 in Texas for the murders of three other drug traffickers. Garza was denied review by the U.S. Supreme Court in late 1999 and was facing an execution date of August 5, 2000. The date was postponed until the Justice Department finished drafting guidelines for federal death row inmates seeking presidential clemency, which were issued in early August. Garza was offered the opportunity to apply for clemency under the new guidelines and a new execution date of Dec. 12, 2000 was set. In December, 2000, President Clinton again delayed Garza's execution for at least six months to allow further study of the fairness of the federal death penalty. **Garza was executed on June 19, 2001**.

**Louis Jones** - Black; sentenced to death in November 1995 in Texas for the kidnap/murder of a young white female soldier. The United States Supreme Court granted review of the case and heard arguments on February 22, 1999. The Supreme Court affirmed the conviction on June 21, 1999. Jones, a decorated Gulf War veteran who had no prior criminal record, claimed that his exposure to nerve gas in Iraq and post-traumatic stress from his combat tours contributed to his murder of Pvt. Tracie Joy McBride in Texas. President Bush refused Jones' clemency request. **Jones was executed on March 18, 2003.**

See also, **list of federal prisoners executed since 1927**. (/article.php?scid=29&did=149)

07-006

# EXHIBIT 8

<u>Declaration of Marion Jordan</u>

I, Marion Jordan, declare as follows:

1.      I live in Detroit, Michigan.  During the 1960's and 1970's, my family lived right down the street from David Jackson and his family.

2.      I worked in the office at Sampson Elementary school for 32 years.  Most or all of the Jackson children attended Sampson and I remember that the children were often absent or late to school.  Mr. Jackson worked a lot out of state.  Mr. and Mrs. Jackson showed no interest whatsoever in their children's education or academic problems.  They were not involved in any school activities and from my observations did nothing to encourage their children to attend school at all, let alone to study or do school work.  The staff at the school was well aware that the Jackson children's poor attendance and school performance was not really their own fault, that much of this responsibility was on the parents' shoulders.  Mindful that the kids themselves were doing the best they could with what they had, we would give them a little extra help and attention.  We would give them a little change money to play games or buy snacks and would give them chips and food at lunchtime.

3.      I could see the Jackson home from my front porch, where I would often sit and relax.  You could see there was a lot of chaos and instability in the home – all sorts of activity at all times of day and night.  Truly, I could not imagine raising children in an environment like that.

4.      The Jackson children were clearly neglected and not well taken care of. They seemed to have only two or three changes of clothes.  I would see them wearing the same clothes over and over again.

08-001

5.      I still live on  REDACTED  Street, the same street the Jacksons lived on.  I would have been easy to find for anyone looking for former neighbors of the Jackson family.  I would have been happy to share my recollections of the family to anyone working on David Jackson's case back in 2005-2006 and, if necessary, to provide testimony at his trial.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of July, 2010 in Detroit, Michigan.

Marion Jordan

2

08-002

# EXHIBIT 9

## Declaration of Alfred Little

I, ALFRED LITTLE, declare as follows:

1.      I live in Detroit, Michigan.  I grew up down the street from David Jackson.  We were at Sampson Elementary School together, and spent a lot of time together into our junior high school years.

2.      David fell through the cracks at Sampson.  He did very poorly in school and needed special attention.  Looking back I realize all the adults around him should have made sure he got some guidance so he could succeed.  Even if his learning problems were obvious, teachers did not help him.  His parents did not even know what David was doing in school so they were no help at all.  A group of my school friends used to single out three guys we knew who especially stood out as being pretty dumb.  David was one of them.  We could get David to do anything.  He was gullible and easy to manipulate.  David was the fall guy if it came to pinning something on somebody.  We picked him because he was not able to defend himself verbally and he was not quick or clever enough to come up with an alibi or excuse or blame someone else.  One time, when we were around twelve or thirteen years old, during the summer between 7th and 8th grades, three of us stole a car.  It was David, another kid named Zollie and me.  Zollie and I had agreed in advance that if we got caught we would blame it on David because he was not too bright and we could easily pull this over on him.

3.      When we were in junior high school, I would go by David's house sometimes.  David's father was not around at all.  Mrs. Jackson lived there with some of her kids and their cousins.  Mrs. Jackson did not have any structure in the home.  It was a free-for-all and everyone was allowed to do whatever they wanted.

09-001

4.	Ms. Jackson seemed very troubled and depressed.  I would see her sitting alone on her front porch looking very sad.

5.	Everyone stayed away from David's sister, Patricia.  She was always doing something crazy, like throwing a rock through a window, picking a fight with somebody.  She was bad news.

6.	At the time of David Jackson's trial I would have been readily available to provide all of the above information to the lawyers, to any psychologists or to the court and the jury if the lawyers had simply asked me to.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of July, 2010 in Detroit, Michigan.

_Alfred Little_ (signature)

Alfred Little

2

09-002

# EXHIBIT 10

<u>Declaration of Marcos Martinez</u>

I, MARCOS MARTINEZ, declare as follows:

1.      I live in Detroit, Michigan.  I sell used cars, household appliances and furniture.

2.      I grew up around the corner from David Jackson and his family.  We are close in age and I have known David most of my life.

3.      David had a very rough childhood.  His father, Leroy Jackson, was a cruel abusive man who was known in the neighborhood as a very dangerous person and someone to fear and avoid.  Leroy would often jump on David's mother, Sammie Lee Jackson, and beat her.  I have seen it myself.  He was also terribly abusive, verbally and physically to David and his siblings and cousins who lived with the Jacksons.  This situation created a lot of stress in David's home and David had a very hard time handling it.  You could always tell he felt a lot of pressure inside from all that stress.

4.      David lived with his three siblings and four cousins – eight kids in all. Except for one of them, all the kids in that home ended up having serious drug addictions.  It was understandable with all the fear and stress they all had to put up with living with Leroy.  All the boys had trouble with the law starting when they were very young and they all ended up serving prison time.

5.      By the time David was a young teenager, he had already started using drugs to escape the stress and hardship of his home life.  He was already injecting heroin by the time he was thirteen or fourteen years old.  It was very sad but understandable with what he was going through at home.

6.      David's sister, Patricia, was a very sick person, mentally.  She always had a very bad drug habit and she would constantly steal from everyone to feed her habit.  She would steal from her own family and from the neighbors.  Like her Daddy, Patricia was always mean and

verbally abusive to David's mother.

7.     David's mother, Sammie Lee was a nice person but she was very depressed a lot of the time. She would cry all the time and often would just sit there and do nothing. She could not read or write at all and she was very limited mentally.

8.     By the early 1970's, Leroy was at the house less and less. He had all sorts of women he ran with and stayed with and by the mid 1970's, he was gone from the house for good. Once in a while he would come around drunk looking for someone to abuse and pick on but he stayed with his girlfriend around the corner.

9.     After Leroy moved out, there was no control or supervision at all over what went on in the house. Sammie did not even try to keep any control and all the kids did whatever they wanted to do all the time. There was constant partying at the house: drinking, marijuana, hard drugs, sex. No adult in the house cared, so all the local kids hung out there. My mother was busy working and she did not know what was going on over at the Jackson house. When she finally did find out, she was devastated, but it was too late. The bad influences had already taken root in me, too.

10.     Sammie Lee sold marijuana out of her house. She would bag it up in "nickel" and "dime" bags. David would deliver it for her. David could not have had his own operation without a lot of help. He was not smart enough to figure out different quantities and how to keep from getting cheated. If someone owed David $200 and they paid him back, he would stuff the money in his pocket without even counting it. He could easily have been repaid just $70 but he would not even know. If David owed someone money and he came up short, I knew it wasn't because he was trying to steal it but it was because someone else had shorted David and he didn't even know it. He did not have the mental ability to even keep track of his own money.

2

10-002

11. David could not plan anything. Whenever there was any sort of breaking and entering activity among our ~~out~~ friends, he would just go along with what everyone else was doing. He never made any decisions for himself. He did not know how to figure out logistics. He would just do what he was told. He was definitely a follower, one to follow the crowd. He was not a leader at all.

12. When David had to go anywhere, nine times out of ten, he would take someone with him. He would try to hide the fact that he didn't know his way around or did not know how to do something simple. He would act like he could do it but you could tell he really could not. One time when I was there, his mother asked him to go to the store. He got me to go along with him because he needed help. When we got to the store, David said he did not feel like going in. He said he didn't feel well and he gave the list to me to do the shopping. I knew it was because he could not do it himself and he did not want to ask someone in the store for help in front of me.

13. David was never one to start a fight or get violent with someone. He might react to a threat or a provocation but he would not start something. That was not his nature.

14. I have known David Jackson very well throughout my life. I have always believed that he has serious mental problems. Starting when he was a child, you could tell he had a huge amount of pressure on him and it was very obvious that he just could not handle it. He did not have the coping tools that a lot of us have. And he was definitely slow.

15. No one working on David's case ever came to talk to me about David until this year, 2010. If they had come to me back when he was facing trial in 2005-2006, I would have been happy to tell them what I know about David and would have been available to testify at his trial and explain about his life circumstances and the hardship he faced with his violent and

3

10-003

chaotic home life and his mental problems.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of July, 2010, in Detroit, Michigan.

Marcos Martinez

4

10-004

# EXHIBIT 11

<u>Declaration of Chiketa Palmore-Bryant</u>

I, CHIKETA PALMORE-BRYANT, declare as follows:

1.      I live in Detroit, Michigan.  I am a practicing attorney.

2.      I grew up right down the street from David Jackson and his family.  My mother worked for 32 years at Sampson Elementary school, which is the local school where most of the Jackson children and their cousins and I went to school.

3.      Our neighborhood consisted of predominantly working class African American families and single-family houses. The Jackson home was notorious for being wild.  There were people coming in and out of the house constantly and at all hours of day and night.  There was clearly no curfew for their children.  When the other kids in the neighborhood would be safely indoors at night, the Jackson kids were still out in the streets or coming and going.  We could often hear loud arguments and fights coming from the house.  On one occasion, David's sister Patricia was completely out of control and smashing out many of the windows of the house.

4.      Sometimes, during the hot months of the summer, an 18-wheel truck would park on our street.  On the flatbed of the truck there was a big swimming pool for the neighborhood children to cool off and play in.  I remember that the Jackson kids stood out because they did not have bathing suits and they would swim in their clothes. The neighborhood club paid for the truck to come.  The Jacksons never could pay to belong to the club, but the block club members always let them play in the pool anyway.

5.      I felt sorry for the Jackson kids.   They had a lot of disadvantages even for our neighborhood.  I was fortunate that my home had stability and that my parents placed a high value on education and discipline.  As a result I have been able to pursue a

11-001

successful and satisfying career. David Jackson did not have the opportunities that I had, even though he was only a few houses away from me. His parents did not seem to care whether he went to school, whether he stayed out all night, whether he drank or used drugs or, ultimately, whether he grew and developed in a healthy way. David had quite a few strikes against him from the very beginning. It is not surprising that David and his siblings and cousins have had difficult lives and have had lifelong problems with drugs and alcohol and with the criminal justice system. It was a natural consequence of their home life.

6.    I did not know about David's murder case or that he was standing trial in Texas in 2006. Had I been contacted by his attorneys at the time of his trial, I certainly would have been available to testify about our neighborhood and about my familiarity with David's home life and family background.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of July, 2010 in Detroit, Michigan.

Chiketa Palmore-Bryant

2

11-002

# EXHIBIT 12

<u>Declaration of ~~David~~ Wallace</u>

I, ~~DAVID~~ WALLACE, declare as follows:

1.    I live in Detroit, Michigan.  I grew up in David Jackson's neighborhood and spent time with David, his siblings and his cousins at the Jackson home in my youth.

2.    I am a recovering drug addict.  I have been clean for many years.

3.    I know what it was like to grow up on the west side of Detroit in the sixties and seventies and what the odds were for a kid like David Jackson.  Crime and drugs were an "everyday" thing.   Most of our role models were in trouble with the law or dodging it.  Somebody in the neighborhood buried a sibling every year.   To this day, those of us who survived those years have strong bonds.

4.    The more you were exposed to those negative influences, the more likely you were to get caught up in it.  David was first exposed to powerful addictive drugs when he was still a child, by older guys he looked up to, so he got started down that road before he even knew it.  David did not ever get the benefit of a healthy support system to help him along or push him in the right direction.   In fact, he was subjected to an extreme amount of violence in his home.  He did not have any positive role models.  Everyone he looked up to was either on drugs, selling drugs, in prison or on their way there.  David's father Leroy was a hustler and gambler who would get drunk and put his own kids out of the house.  He would scream, "Get the f--- out of my house!"  The whole neighborhood knew Leroy could just blow up at any second.  He was a scary and intimidating figure.  Some days he might say hello and other days if you said hello to him he would growl, "F--- off kid."

5.    After Leroy left David's mother, Sammie Lee, her house went downhill. Sammie Lee liked to drink and smoke marijuana and her house became like an "after hours" house. If you were a young teenager and wanted to be an adult you could go to her house and smoke, drink and have sex. Most of our parents were busy just trying to get by, working to put food on the table and make ends meet, so they didn't always pay attention to what was going on at Sammie Lee's house. I and many other twelve, thirteen and fourteen-year olds from the neighborhood learned to play cards and dice in the Jackson's home. I would go with David's sister or cousin into a back room and have sex and Sammie Lee would not stop it.

6.    As an early teen, my peers and I were taught to fight by the older boys. The younger boys learned about drug dealing and other hustles from the older ones. David lived with older cousins and a father who introduced him to drugs, burglaries, gambling and that whole way of life.

7.    David was not at all sharp mentally. He was a terrible drug businessman. He did not know the basics, like how much powder was in a gram, so he could only operate at the lowest level of whatever was going on. He would just go along with what was happening. He would never initiate anything or come up with any ideas on his own, and if he did, it would probably not be a good one. Even the little crimes he would commit were simple and poorly thought out, never any more complicated or sophisticated than something a kid would think of.

8.    I was not contacted by anyone working on David's trial in Texas. If anyone had asked me about David at that time, I was available to provide all of the above

2

12-002

information to his lawyers, to psychologists or to the court and the jury.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of July, 2010 in Detroit, Michigan.

_____

~~David~~ Wallace III
DAVE
DWR          DWR

3

12-003

# EXHIBIT 13

## Declaration of Harriet Bass

I, HARRIET BASS, declare as follows:

1.      I live in Detroit, Michigan.  I knew David Jackson throughout my childhood and teenage years.

2.      I am an intake coordinator for Michigan Rehabilitation Service under the Department of Labor.  I am studying to be a paralegal and will complete my bachelor's degree in May 2011.

3.      My brother Lionel and I were friends of David Jackson's family.  I am about two years older than David.  I started dating Michael Perry, David's cousin, when I was still in high school.  Michael grew up in the Jackson home.  I spent many nights with him there.  Michael was always calm, cool and quiet.  He never had any money.  There wasn't much to talk about because all he ever did was either hang out at home or he would be out hustling.  Ours was primarily a sexual relationship.  Michael was the father of my daughter Bonita Marie.  She was born in 1978 when I was nineteen years old.  Michael died in 1992.

4.      I was an honor roll student and I received achievement awards throughout school.  My parents were very aware of our activities and wanted us to do well.  The Jacksons were known to be a very wild family.  Everyone knew they were allowed to "run the streets."  I was not supposed to be with someone like Michael.  I would sneak over to spend the night with him.  He would either be in jail or in the room all the boys shared, which was mostly taken up by a big bed.

5.      The Jackson family was well known in the neighborhood as the scene of domestic violence perpetrated by David's mean and vicious father, Leroy Jackson.  Leroy

Jackson was extremely abusive to David's mother, Sammie Lee, and to all the kids who grew up in that house. He would cuss them out, throw things at them and generally terrorized the whole household. As the boys came of age they would not allow Leroy to abuse their mother (or, in Larry and Michael's case, their aunt) so in time Sammie Lee had more security and protection. There was a lot of shame within the family about Leroy's abuse of Sammie Lee and the kids, and about the struggles they had growing up. They tried to make it their secret but a lot of us knew about it and we felt real bad for all of them.

6. The Jackson house was always chaotic, especially by the time Leroy was gone. They never had sit-down dinners or worked on the yard the way we did at my house. They were all crammed into a two-bedroom flat. There was not much furniture and they had lots of roaches, so I never ate there. It was like a zoo. David's mother, Sammie Lee, was not able to control what went on in her home and anyone who wanted to could stay at her house. There were no rules in that house, so no matter how crowded it was, the kids in the neighborhood who wanted total freedom went to Sammie Lee's. All of her children and nieces and nephews had their own cluster of friends who came and went. There were always kids coming and going. Sammie Lee was selling marijuana out of her house and there were plenty of customers.

7. Around roughly the same period of time, my brother Lionel moved out of my parents' house and moved into the Jacksons' home. Lionel got involved with David's sister Patricia when he was still a teenager and they were together on and off. She was buck wild. There is no telling what was wrong with her mentally but there was definitely

2

13-002

something seriously wrong. She was always causing trouble. She was very cruel to Sammie Lee and was always yelling at her.

8.    When Lionel lived with Patricia in Sammie Lee's house he would sleep in Patricia's bed in the room all the girls shared. David's cousin, Joan, who was a mid-teenager then, slept in the bed next to Patricia. No one seemed to care that she was probably very aware of Patricia and Lionel's sexual activity. I cannot say that there were not other kids around sometimes when I was having sex with Michael. No one cared if there were little kids within earshot of us older kids having sex. Sammie Lee did not seem to care.

9.    Sammie Lee never drove or went to the grocery store. She pretty much never left the house. She didn't have friends and didn't really mingle. She was never interested in current events and what was going on in the outside world. She mostly just sat on the sofa and stared at the television while the kids did whatever they wanted to do. She didn't seem to have the energy or the interest to control anything going on in her house.

10.    Marijuana, heroin, cocaine and then particularly crack-cocaine took a devastating toll on many of us who grew up in the seventies and eighties in this country. The children who grew up on the west side of Detroit fell victim to the horrible nightmare of drug addiction. I was one of the casualties of an addiction that started out slowly and eventually controlled my life. I have been sober for ten years and have completely turned my life around. I am thankful that I was able to escape that lifestyle. I was extremely fortunate to have the support of my family. Many people, like David Jackson, did not have a strong support system to lean on and never escaped that cycle.

3

13-003

11.    Detroit went through terrible changes throughout our childhood. The riot in 1967 changed everything. Before the riot, although our neighborhood was already economically challenged by drastic cutbacks in the auto industry, there were still resources like food stores and places to get what you needed and a feeling of community and neighborhood. The riot was terrifying. We watched as everything was being burned down and torn down, block by block. I remember hearing sirens all the time and being very afraid. There was no security and we were all deeply traumatized. After all the destruction there were no longer corner supermarkets. Access to local food was a thing of the past. After that, people had to somehow get to the supermarkets, which were all far away. Many people did not have transportation and this caused a great hardship and made our neighborhood fall apart even more. My father's siblings shipped food to us from the south in barrels and buckets that we would store in our deep freeze. Most families, including the Jacksons, were not this fortunate.

12.    Through thick and thin, the people from our community still care about each other and still have a lot of compassion for each other's particular struggles and problems. David Jackson had an especially rough childhood but I remember him very well as a good and kind person who just tried to fit in and be accepted. My heart goes out to him.

13.    At the time of David Jackson's trial I was available to provide all of the above information to the lawyers, to any psychologists or to the court and the jury if the

4

13-004

lawyers had contacted me, but they did not get in touch with me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 16th day of July, 2010 in Detroit, Michigan.

Harriet Bass

13-005

# EXHIBIT 14

Declaration of Yvette McCaskill

I, YVETTE McCASKILL, declare as follows:

1. I live in Detroit, Michigan. David Jackson is my uncle. My mother Patricia Jackson is David's sister.

2. I have my own business in my house preparing tax returns. I have seven children and three stepchildren. I am thirty years old.

3. My mother has three children. My oldest sister, Joanna REDACTED , was born REDACTED 1977. I was born REDACTED 1980. My younger brother Craig was born on REDACTED 1981.

4. Due to my mother's mental illness and drug addiction, she was never able to raise us and we were bounced around between my grandmother Sammie Lee Jackson's house and different foster families.

5. Life at my grandmother's house was difficult. She tried to care for us but she suffered from depression and it was hard for her to do very much. My mother was very abusive to my grandmother and that was traumatic for all of us kids who were living with her.

6. My family has been plagued with mental illness. My mother has been diagnosed with bipolar disorder and has been on medication as long as I can remember.

7. My sister Joanna has been diagnosed with schizophrenia and bipolar disorder. To this day she is very sick and is not able to have relationships with anyone in our family. She had a daughter when she was fourteen. She started having grand mal seizures when she was sixteen. Even when we were young children she could not control her aggressions.

Case 1:09-cv-01039-MJT    Document 47-4    Filed 10/05/10    Page 55 of 72 PageID #: 5544

8.    When my sister Joanna was thirteen she was at a hotel with some guys and jumped out of a third-floor window. The guys were going to rape her so she had to jump. She broke her ankles and her back.

9.    I have been diagnosed with bipolar disorder and anxiety disorder. I have episodes of severe depression at least every couple of months. Sometimes I have terrible mood swings and I become very irritable. I am supposed to take lithium but I don't take it because it makes me feel out of it and unaware.

10.    My Aunt Joan, my mother's cousin, was also mentally ill. She had depression and she was addicted to drugs, so she was not able to raise her kids either. I grew up with three of Joan's children: Rashidah (we also call her Shonda), who was born REDACTED 1979, LaTasha (we also call her Monique), who was born REDACTED 1981, and James, who was born REDACTED 1990. James was a crack baby and was born with a hole in his heart. They, too, were bounced in and out of foster care. Whenever there was nowhere for them to go Joan would leave them with our grandmother Sammie Lee. Joan had a fourth child, B REDACTED who was born in 1999. She was immediately given up for adoption and we have no idea where she is now.

11.    All of the moving around and lack of consistent care took its toll on all of my cousins and me. We have all been in trouble at one time or another.

12.    When I was fourteen I was modeling at a lingerie party when I met my husband. A couple of months later I became pregnant with my first child and have been with him ever since. I have actually been pregnant eleven times. I have lost two sets of twins and a baby girl. My seven children range in age from one to fifteen years old.

Case 1:09-cv-01039-MJT    Document 47-4    Filed 10/05/10    Page 56 of 72  PageID #: 5545

13. My Uncle David has always been a very special person in my life, even though he has been incarcerated most of the time. There were several periods when David was out of prison and I got to spend time with him. He is a very caring person and he was always concerned about whether we had enough food and whether we were being taken care of. Family is very important to David and we have always had a special love for each other.

14. When David came home in 2004, he got very upset when he saw his mother's terrible living situation. Her home was barely livable and she was dirt poor. He was very hurt and sad that he could not help her. He told me how he felt helpless and didn't know what to do about it.

15. One thing I noticed when David was out here is that he would have a hard time dealing with basic everyday tasks, like getting a state identification card. He would not let on that he did not know how to do certain things for himself, so he would ask me to do things for him. I know it was because he got frustrated and overwhelmed by such things and needed help with them.

16. At the time of my uncle David Jackson's trial I would have been readily available to provide all of the above information to the lawyers, to any psychologists or to the court and the jury if the lawyers had simply asked me to.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 16th day of July, 2010 in Detroit, Michigan.

*Yvette McCaskill*

Yvette McCaskill

3

# EXHIBIT 15

<u>Declaration of Patricia Jackson</u>

I, PATRICIA JACKSON, declare as follows:

1.    I live in Detroit, Michigan.  David Jackson is my older brother.

2.    My siblings are David, Roger and Stanley.  My cousins, Larry, Brenda, Michael and Joan all came to live with my family when their mother, my mother's sister Emma died in Little Rock.  We all grew up in a side-by-side two-family house on Northfield Street on the west side of Detroit.  David is two years older than me.

3.    My father was extremely abusive to all of us kids and to my mother.  He was often drunk and would hit us all the time.  He would beat us with an extension cord doubled up.  He would make us pull our pants down and would hit us as hard as he could. We were butt [sic] naked.  We would bleed down our legs and arms.  We had big welts that kept us from going to school because we didn't want anyone to know what my father was doing.  I still have scars on my back.  One time I tried to run away from him and busted my knee open.

4.    One night when I was about nine years old my father came home drunk. He turned over a table.  I looked up and saw that he had a hammer in his hand.  He hit my mother in the face with the hammer.  Her face swelled up and he may have broken her jaw.  All of us saw this happen.  It was extremely upsetting and scary to all of us to watch him be so cruel to our mother.

5.    When I was thirteen years old my father put me out for staying on the porch until 9 p.m.  Sometimes he would put us in a room with all the windows nailed.

15-001

6.      My father kept chasing David away with his abuse.  He chased David and my cousins down the street, trying to hit him with the bed slats that go under a mattress. He caught them and beat them with the slats.  David had nowhere to turn but the streets.

7.      One time my father chased me down an alley with a gun.  I ran into the back door of the neighbor's house to get away.  He came after me, straight through the house.  I had already run out of the front door and got away.  The neighbors called the police and they took him to jail and took the gun.  My mother took me to a youth home to protect me from getting killed by him.  She told them not to let my father see me.  They protected me from him.

8.      My mother asked for foster care because she couldn't handle all the responsibility of all of her own kids and my four cousins.  The police told her there was no care or help available for her.

9.      I have three children: Joanna, born in  REDACTED  1977, Yvette, born in 1980, and Craig, who was born in 1981.  Between Yvette and Craig I gave birth to stillborn twins.

10.      I was fourteen when I had my first child Joanna.  The father was a boy from down the street.  When I was four or five months pregnant my father whipped me.  I was sent to a home for girls to have my baby.  When I found out they were going to make me give her up for adoption I ran away from the home.

11.      When Leroy got older he was in a wheel chair.  He would act like nothing ever happened, like he never abused us.

12.      I have had trouble with my eyes since I was a little girl.  I am legally blind, although I can read some things if I hold them very close to my face.

2

13.    When I was about 43 years old I was hit by a truck.  It messed up my whole body.  My skull was damaged and my ribs were broken.  They put a steel plate in my head and steel rods in my back.

14.    I started drinking when I was twelve years old.  My father had gambling parties in the basement and my brothers, cousins and I had to clean up after them.  There was plenty of liquor around and no one was paying attention to all of us kids, so we drank all the alcohol we wanted.  I had to sneak but Leroy gave all the boys in my family alcohol because they were boys and that was supposed to make them men.  David was nine or ten when he started drinking alcohol.  That alcohol in the basement is what got us all started on the road to drug addiction.  I have been addicted to crack and heroin most of my life.  I have been in and out of recovery and have been receiving methadone treatments for about three years.  I have been sober this time for almost a year, although lately I have been chipping away at that, getting high sometimes.

15.    I have been diagnosed with schizophrenia and bipolar disorder.  I take Zoloft, lithium and Seroquel.

16.    My daughter Joanna started having seizures when she was a teenager.  She has been diagnosed with paranoid schizophrenia.  She is on medication and is still very sick.

17.    My second child, Yvette, has been diagnosed with bipolar disorder.  She has seven children.

18.    David stayed babyish longer than most children.  He sucked a pacifier and a bottle until he went to school and he sucked his thumb even longer.  That's why his teeth stuck out.  I am two years younger than David, but all the time we were growing up

3

it felt like I was older.  He seemed like my younger brother because he couldn't do the same things I could do.

19.    Before David's trial, I spoke with a lady who was working on his case and I told her all about my father and how cruel he was.  I was available to testify for David back then and I was available to describe our home life and background to any psychologists who wanted to know about it.   It wouldn't matter where I was at the time, living with my mother, in rehab, in jail or on the streets.  I love David and I would have wanted to help tell his story.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of July, 2010 in Detroit, Michigan.

*Mrs. Patricia Jackson*

Patricia Jackson

4

15-004

# EXHIBIT 16

## Declaration of Pam Little Morrison

I, PAM LITTLE MORRISON, declare as follows:

1. I live in Detroit, Michigan. I am a childhood friend of David Jackson and his family.

2. I testified at David's trial in Beaumont, Texas, in November of 2006. I was contacted right in the middle of David's trial and told to get down to Beaumont immediately because they needed me to testify for him. As I recall, they called me on a Thursday, I got down there two days later on a Sunday, and then I testified two days later on a Tuesday.

3. Before coming to Beaumont, I had a couple of telephone conversations with a woman named Pam who was working with the lawyers. During the phone calls with Pam, I told her what I knew about David's childhood and background. She told me very little about David's case. I did not even realize he was facing the death penalty.

4. Pam had told me that the lawyers did not think they were going to need me to testify and that I probably would not have to come. So, I was surprised when they suddenly called and told me to hurry up and get there. She said they really needed me because David's mother had died and they did not have anyone else to testify for him.

5. I flew to Beaumont on only two days notice and I was still pretty much in the dark about the case or what they needed me for.

6. When I got to Beaumont, one of David's lawyers called and said he wanted to meet me at the hotel to talk about my testimony. He met me and we talked for about 45 minutes. I did not really know anything about David's case until then.

7. When I got on the witness stand at David's trial, I did not feel ready or well-prepared to testify. Of course, I was very nervous. The lawyers did not spend enough time with

16-001

me discussing my testimony, preparing me for the prosecutor's questions or letting me know what to expect.

8.      At trial, I testified that I spent a lot of time at David's house when I was a teenager.  I testified that David's house was quite run down and that they had no living room furniture whatsoever in the house.  David's father was a terribly mean and abusive man and when he left David's mother, he took all the furniture with him and left them with nothing.  No couch, no chair -- nothing.  They never had any furniture after that.  Even after he left, David's father would come around and be cruel and abusive.  He would beat David's mother, break windows and carry on.

9.      One thing I did not get to explain at David's trial because the lawyers did not ask me or talk to me about it, is why I spent time at David's house if it was so chaotic and violent there.  If the lawyers had only asked me, I would have told them that my family had very serious problems, too.  My mother was a heroin addict and my father sold heroin, and my house was not a good place to be.  My oldest sister had a baby when she was only 13 years old, and my next sister had a child when she was 16.  So, really, I would rather have been any place than my house, so I went to David's.

10.      There were quite a few other things I wanted to say at David's trial but the lawyers did not ask me so I did not get a chance.  I had told the investigator these things during our few phone calls, but the lawyer never asked me about it.  The lawyer spent very little time with me and we did not cover a lot of the things I had told the investigator.

11.      There was more I could have said about David's father and what a terrible abusive man he was.  If he got mad or got into an argument, he would draw his gun or pull out his knife at the drop of a hat.  I have seen him do this plenty of times.  I have seen him pistol whip his own

2

16-002

sons and nephews.  He would pull out a razor blade and threaten, "I'll cut you from a - - hole to earlobe." I have seen David right after he was beaten by Leroy with a black eye or a busted up lip.  Leroy would beat Sammie Lee and those kids with anything he could get his hands on – bottles, bricks, shoes.  He would kick them, jump on them and beat them with his fists.  He would drag Sammie Lee around by her hair and beat her right in front of everyone.  Neighbors would call the police   Sometimes the police would come, but they would never do anything.  All the neighbors knew what was going on and would gossip about it, and it was very embarrassing and shameful for David and his family.  I told all of this to the investigator working on David's case.

12.    Leroy would get drunk and bring other women to the house.  He had all kinds of women and all ages.  He even went with a friend of ours, a girl named Melissa who was younger than me and David. He would let teenagers drink at his apartment or   REDACTED   David's sister Patricia and I would go over to his apartment when I was 16 years old to drink and smoke weed.  He was known for sleeping with young and underage girls and for giving them money to have sex with him.  I considered him to be a pedophile.  When he was drinking, he would put his hands all over us.  I have seen him grabbing at his niece, Joan, and his own daughter Patricia.  I have always suspected that Leroy molested them or had sex with them.  I told this to the investigator also.

13.    Leroy's physical and sexual abuse took a heavy toll on Patricia, especially with her other mental problems.  She ended up being just like him, mean and abusive and crazy.  She beat her own kids like Leroy did and she was horribly mean to her mother, just like her father was.  She turned into a real bad drug addict and would steal from everybody.

16-003

14.    David's mother, Sammie Lee, could be a pretty sweet lady but she was definitely not all there mentally.  She had very severe limitations. She could not read or write at all.  She would sign her name with an "x."  She was very dependent and easy to take advantage of.  She did not even make her children go to school.  She was a very depressed person.  Sometimes she would just sit and sob and sob.  I felt so bad for her.  David was the nicest to her of all her kids.  When the older boys, Larry and David, got big enough to defend themselves and to stick up for Sammie Lee, Leroy wouldn't come around as much.  He would just show up once in a while.

15.    I told the investigator about some of David's disabilities.  He could not read or write and he would ask me to count change for him.  He could not get a driver's license back then because he could not read.  I have never known him to have a driver's license.  He knew his way around the neighborhood, but if he was in an unfamiliar place he would have a hard time finding his way around.  If he knew the exact route by heart, he could get from point A to point B, but if it was new to him, he would not be able to find it.  David pretty much would stick to what he knew.

16.    It was the same way with people.  He would stick with what he knew.  David was okay if he knew somebody, but he was not comfortable around crowds or around people he didn't know.  He did not like bars at all.  He did not have good social skills and he mostly preferred to avoid social situations.

17.    While I was in Beaumont for my testimony at David's trial, I met and became friends with Mary Brown, the mother of Darryl Brown, the prisoner David was accused of killing.  Mary was in Beaumont with her twin sister, Margaret.  They were down from Rochester, New York.  I met them in the bathroom of the courthouse one day before I testified and I had a short conversation there with Margaret.  Later, after I testified and the verdict had come down for a

4

death sentence, I was outside the courthouse crying.  News reporters were getting in my face and asking me did I want to make a statement.  Daryl Brown's mother, Mary, told them, "Leave her alone.  Can't you see she's upset?"  She was a very nice lady.  She told the newspaper that she did not think David should get the death penalty.  We had a meal together, took photographs of each other and exchanged phone numbers.  We agreed to stay in touch.  After we both went home, we talked on the phone a few times and she even sent me a gift: two framed pictures she had bought.  I still have them.  Eventually we fell out of touch with each other.  I was recently informed that she passed away shortly after that.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2010.

_Pamela Morrison_

Pam Little Morrison

16-005

# EXHIBIT 17

Declaration of Lionel Bass

I, LIONEL BASS, declare as follows:

1. I live in Detroit, Michigan. I am a drug counselor. I am very active in the Detroit Alcoholics Anonymous community. I have a bachelor's degree in Interdisciplinary Studies and I am a deacon in my church. I am a fourteen-year recovering alcoholic and drug addict.

2. I grew up around the corner from David Jackson on _REDACTED_ Street, between _REDACTED_ I am three years older than David. I lived in the Jackson home in my later teen years and dated his sister Patricia at that time and again when I was in my early twenties. I attended all the same schools David attended.

3. When I was sixteen I left my own home. I sold marijuana to make money for rent and to support myself. My good friend Michael Perry (David's cousin who grew up in David's house) asked me to come live at the Jacksons to help protect the house. David's parents, Sammie Lee and Leroy Jackson, were constantly at odds and Leroy had mostly moved out and was staying with different girlfriends of his. Michael's older brother Larry had also moved out so there were no adult men in the home. I stayed in Sammie Lee's house for three years. The house became a place where all the kids in the neighborhood who wanted to take drugs and have sex would hang out. Sammie Lee was not a strong or forceful person and she would let us do whatever we wanted.

4. Before I actually lived in the Jackson home I would go there, especially if Leroy was not there. Sometimes I would be there when Leroy got home and I would see first-hand his extreme abuse of Sammie Lee and all the kids in the house. Leroy was very mean and brutal. I know it was very damaging to David and the rest of his family to

17-001

have to deal with that man. He was scary and liable to go off at any minute, especially if he was drinking.

5.      David's sister, Patricia, is a lot like their father. She has his violent temper and is unpredictable and prone to go off like he was. She was also extremely abusive to her mother, Sammie Lee. It was obvious she had picked this up from her father.

6.      Patricia got pregnant when she was fourteen. The baby's father was a neighbor, Dick Robinson. He went to prison before the baby, Joanna, was born. After Joanna came, I would sometimes have sex with Patricia. We would fight a lot. We both had abusive fathers and it rubbed off on us. Growing up around that sort of domestic violence, we both copied it. Patricia was very violent and aggressive like her father.

7.      While I was living at Sammie Lee's house, my sister Harriet often came over to spend the night with David's cousin, Michael. It was not like our home where there were rules. Boys and girls were not allowed to spend the night together at our house. At Sammie Lee's house it was "anything goes." No one cared who was having sex there, no matter how young you were.

8.      A guy called "Dangerous Dan" was the loan shark in the neighborhood. Sammie Lee got marijuana from Dan to sell. That's how she supported herself after Leroy left. She was not good with weights or numbers so she would give it to me to sell for her. Their house was known as the place to "score," and there were tracks in the snow from every direction leading to Sammie Lee's back door.

9.      I wanted to try and straighten my life out, so when I was twenty-one I moved to Lansing, Michigan with the goal to become a correctional officer, but it did not work out and I moved back to Detroit. Eventually I got involved with Patricia again and

2

17-002

I was with her for a few years. Patricia was addicted to heroin by then. It was very difficult to escape the drug environment that surrounded us as teenagers. Our lives were governed by feeding our drug habits. Drugs were everywhere and if you did not have a strong stable family, decent steady work and a good positive outlook, it could swallow you up.

10. When Dick Robinson got out of jail in around 1986, Patricia got back with him. Not long after Patricia left me I was attacked in the night while I was asleep. I was robbed and beaten nearly to death. I was in a coma for eighteen days and I went through a forced physical withdrawal from drugs, but I started using again. In early 1989 the police stopped me. I was charged with having two packs of heroin, but due to a technicality I only got probation. I realized if I did not get help I was going to die. I went to one of the missions in Detroit and sobered up. I was clean for five years. I slipped one time but then stopped again completely on January 4, 1996. Since then I have been clean and sober and I go to daily meetings. I have a very strong network of supporters who are always there for me. I went to school and I have a very good life now. I feel very fortunate to have survived drug addiction and the trauma of growing up in such a destructive environment. Many of the people David and I grew up with are either dead or still on the streets. Sometimes I see one of those guys out there, trying to survive. They look years older than their actual age and it is a miracle they are still alive.

11. David is what I call a gentle giant. He was mostly a very mild-mannered and passive type of person. He didn't bother anyone and just went along with the crowd. I've never known David to hurt anyone. He has just tried in his own way to survive which for him was always a struggle due to his lack of education and skills. All he

3

17-003

learned from his father and older family members was how to hustle and get by on the streets. He did not have anyone to teach him how to live any other kind of life. He was locked up from such a young age that was the beginning of the end for him. After that, and with no positive influences, it was extremely difficult for him to stay out of that system.

12.     No one working on David's case contacted me at the time he was going on trial in Texas. Had I been contacted, I would have gladly provided all of the above information to his lawyers, to any psychologists or to the court and the jury. I love David and would have wanted to help if I could. His community in Detroit still cares about him and will always care about him like a brother. I wish his lawyers had gotten in touch with me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 13th day of July, 2010 in Detroit, Michigan.

_Lionel Bass_

Lionel Bass

4

17-004