# EXHIBIT 33

# ON MITIGATION AS COUNTER-NARRATIVE: A CASE STUDY OF THE HIDDEN CONTEXT OF PRISON VIOLENCE

Craig Haney[*]

## I. INTRODUCTION

A television anchorwoman began the evening newscast with the report of a late-breaking, shocking story: "A Middle State corrections officer is stabbed to death with a homemade knife. It is the first prison guard killed in the line of duty in Middle State in 25 years. Good evening. It happened this morning at the Riverside Prison in Farmland County in one of the main housing units, following an argument." She went on to describe the corrections department's rapid response to the attack: "The stabbing sparked a series of actions throughout the state's corrections community. Officials immediately ordered a lockdown of all prisons; they remain locked down at this hour." And she acknowledged a potential political issue that the tragedy brought to the fore: "The guard's death has sparked anger from the officers' union. Today's second shift was ordered to stay home until all corrections officers are supplied with body armor. Late today the Governor ordered the immediate purchase of such protective gear. Then the union told officers to report to work."[1]

The anchorwoman turned to the station's on-site reporter. With the prison grounds serving as a backdrop, he began his report by posing the key question: "What caused this attack? Prison officials here are looking for answers." Then he cut to the state's assistant corrections commissioner for clarification. The commissioner minced few words in describing the lethal encounter. Looking directly into the camera he told viewers: "It was an unprovoked, malicious, savage, deadly attack on one of our officers. There was no rhyme or reason [to it]."

The on-site reporter described what happened after the attack itself: "Immediately after the incident, every inmate was ordered locked in their cells. Authorities then began a meticulous cell-to-cell search for the weapon. A Special Operations Group was then brought in to maintain control. Officers in

---

[*] Craig Haney is a Professor of Psychology at the University of California, Santa Cruz. Haney has studied the backgrounds and social histories of capital defendants for more than 25 years, has conducted research on and written extensively about the nature of capital jury decision-making process, and has served as a consultant and expert mitigation witness in death penalty trials and capital habeas proceedings in state and federal courts. He also has done extensive research and writing on the psychological effects of incarceration.

[1] All of the explicitly quoted media material in this article is reported verbatim from television news broadcasts and newspaper accounts and has been cite checked by the University of Missouri-Kansas City Law Review to ensure accuracy. However, the sources themselves are not identified in the article because of confidentiality considerations. They are on file with the author. The remainder of the quoted material—including statements by correctional officers and inmates—is taken directly from trial transcripts, court documents, investigative reports filed in the case, and face-to-face interviews conducted between the author and principals in these events. Here, too, in the interests of privacy, identifying citations have been deleted and the names of all persons, as well as the state where the case occurred, have been changed in the text.

full riot gear immediately surrounded this and every one of the thirteen major prisons in the state."

Switching back to the station, the anchorwoman reassured viewers that prison officials were acting with the utmost professionalism and already had reestablished control: "All of the state's prisons are locked down tonight. The corrections commissioner ordered all prisoners to remain in their cells as a precautionary measure. The statewide order was issued out of what was termed "'extreme caution'." She told viewers that a "lockdown" meant that all inmates would be kept in their cells or housing units "until further notice." She went on to explain the other elaborate steps that were being taken: "At a roadblock leading into Northern Prison in Industry City today guards were checking vehicles with weapons ready. At prisons across the state, classes, visitation, and non-emergency medical trips are suspended and prisoners are being fed in their cells."

She then noted that the station's news crew had "caught up with one guard reporting to work today in the state capital." The camera cut to a guard who was about to enter one of the state's maximum security prisons. With a somber expression, he told viewers that: "The danger is always there but we have a job to do. We are professionals and we are trained and qualified to carry out that job."

The news anchor was joined on the air by the state's corrections commissioner, whom she immediately asked: "How is the investigation into the stabbing proceeding at this point in time?" He answered first that "[t]he governor has ordered protective vests for all the guards, as you mentioned earlier." And then he said:

> Right now I have some things I can tell you in addition to what was said by your reporter on site. We do have a suspect that has not been charged yet but is a prime suspect in this case. His name is Carl Burling, and he is from Walkland City, and he is doing a ten-year minimum and twenty-year max for aggravated assault. And as of right now he is the prime suspect in this case.

The next day the media reported that Burling—who was indeed the prime and only suspect—was being held in isolation. Reporters speculated that, given the nature of the crime, it was likely that the state would seek the death penalty. The media also provided a summary of Burling's long criminal record, noting that it included a conviction for aggravated assault for which he was currently serving a lengthy prison sentence. In the photograph that would be included in many of the television and newspaper stories, Burling appeared to be a powerfully built, fearsome-looking African American man; his facial expression was blank and vaguely scowling. The accompanying photograph of the slain officer, Don Carter, on the other hand, showed the smiling face of a handsome, clean cut, middle-aged White man who looked exactly like the person the news stories described: a friendly, well-liked co-worker and devoted family man. Virtually all of the news accounts mentioned the sad fact that Officer Carter had left a wife and two children behind to mourn his loss, a tacit reminder that the victim's family would suffer unspeakably in the wake of his tragic death. In one of the newspaper articles the slain officer's son was quoted as asking, in words

that were painful to read: "I have a question for the killer. Why did you kill my dad? What was going through your mind when you killed my father?"

As the public account of this terrible killing continued to unfold, the media provided a stream of consistent, unqualified, and unchallenged details. The basic outline and elements of the story conformed almost perfectly to an often-repeated tale about the nature of violent crime in our society: a truly bad man had inexplicably taken the life of a truly good and innocent one. Except for the individual-level depravity that, by implication, seemed to be the cause of it, this horrible, violent crime—like most others—was depicted, in the precise words of the Middle State corrections official, as "unprovoked, malicious, savage," as if it had "no rhyme or reason."

Although details vary from crime to crime and case to case, the core elements of this scenario form what I will call in this article a dominant or "master" narrative about the nature of violent crime in our society. Master narratives are official frameworks for understanding human events. Contemporary historians have described master narratives as cultural frameworks that are institutionalized and legitimizing. They are widely shared and unquestioningly accepted in part because they come from authoritative, institutional sources that confer legitimacy (and, therefore, apparent truth). Author Tony Morrison observed that these kinds of narratives or "official stories" assist in the "manufacture of a public truth" by "control[ling] the presumptions and postulates of the discussion" in ways that "reinforce the narrative and truncate alternative opinion."[2]

Although the conferred legitimacy with which master narratives are cloaked creates widely accepted public truths that are often resistant to change and crowd out other points of view, official frameworks can be successfully challenged. Social scientific and other forms of knowledge that are based on more systematic empirical data, logic, or theory may form competing perspectives—alternative "counter-narratives" that employ very different frameworks for interpreting or understanding the same phenomena or set of events. An especially persuasive and credible counter-narrative that appears to better account for the facts at hand may be used to debunk, neutralize, or even supplant the master narrative with which it is competing.[3]

---

[2] Toni Morrison, *The Official Story: Dead Man Golfing*, in BIRTH OF A NATION'HOOD: GAZE, SCRIPT, AND SPECTACLE IN THE O.J. SIMPSON CASE, at xvi (Toni Morrison & Claudia Brodsky Lacour eds., 1997).

[3] *See, e.g.,* Jane Adams & D. Gorton, *Southern Trauma: Revisiting Caste and Class in the Mississippi Delta*, 106 AM. ANTHROPOLOGIST 334, 335 (2004); Richard Delgado, *Storytelling for Oppositionists: A Plea for Narrative*, 87 MICH. L. REV. 2411, 2412 (1989); Aída Hurtado, *Theory in the Flesh: Toward an Endarkened Epistemology*, 16 INT'L J. QUALITATIVE STUD. EDUC. 215 (2003); Joyce Marie Mushaben, *Memory and the Holocaust: Processing the Past Through a Gendered Lens*, 17 HIST. HUM. SCI. 147 (2004); Angela Valenzuela, *Voice, Presence and Community: Challenging the Master Narrative*, 18 INT'L J. QUALITATIVE STUD. EDUC. 139, 140-41 (2005). *See generally* UNDER THE COVERS: THEORISING THE POLITICS OF COUNTER STORIES (Michelle Fine & Anita Harris eds., 2002) [hereinafter UNDER THE COVERS] (a collection of "counter stories" from groups which seek to challenge dominant discourses in society).

For example, feminist scholars effectively critiqued the master narratives that were once routinely applied to women's lives and used to describe them in confining, distorting, and oppressive ways.[4]  The feminist counter-narrative demonstrated the many ways that these previously unquestioned sexist master narratives were deeply flawed, especially because they omitted complex facts and nuanced interpretations that would contradict or pose challenges to the prevailing male-dominated power structure.[5]  Absent such a systematic and sustained critique, however, master narratives stand as the presumptive, default point of view; they are only (if ever) dislodged by a persuasive alternative framework that offers compelling reasons to reject the institutionally legitimated one.

In the case of the crime master narrative that now dominates American society, criminal behavior is understood as an individual-level phenomenon that lacks an explanatory social context.  Thus, as depicted in media accounts, political discourse, and public discussion, individual lawbreakers are seen as the primary or exclusive causal locus of criminal behavior; they alone are responsible for their actions and, collectively, for the overall magnitude of the "crime problem."  The crime master narrative portrays their lawbreaking as the product of their entirely free choices, ones exercised by persons unencumbered by background and circumstance.  These choices are commonly regarded as having been willfully and selfishly made, despite the perpetrators' full knowledge of their hurtful consequences.  As a result, criminal behavior is seen as a reflection of the inherent "badness" of those who engage in it.

There is a great deal of synergy between the crime master narrative and traditional legal doctrines of responsibility that are applied in typical criminal trials.  As two legal commentators have put it: "The individualism of the badness model parallels the criminal law's individualistic approach to punishment."[6]  Because lawbreakers are regarded as fully responsible for their bad behavior, the master narrative defines "justice" in individual cases as nothing more or less than punishing wrongdoers for what they have done.  This narrowly individualistic view also has important implications for crime control policy in general.[7]  It implies that criminal behavior can only be controlled in the aggregate by making individual perpetrators pay dearly for the bad choices that they have made.

This means that when the overall amount of crime in society is perceived as unacceptably high, there is no alternative but to intensify criminal sanctions—to

---

[4] *See generally* MARY ROMERO & ABIGAIL J. STEWART, WOMEN'S UNTOLD STORIES: BREAKING SILENCE, TALKING BACK, VOICING COMPLEXITY (1999) (a collection of essays describing accounts outside the master narrative that were suppressed, ignored, or difficult to express).

[5] *See id.*

[6] Stephanos Bibas & Richard A. Bierschbach, *Integrating Remorse and Apology into Criminal Procedure*, 114 Yale L. J. 85, 89 (2004).

[7] *See, e.g.*, KATHERINE BECKETT, MAKING CRIME PAY: LAW AND ORDER IN CONTEMPORARY AMERICAN POLITICS 75 (1997); Richard C. Boldt, *Restitution, Criminal Law, and the Ideology of Individuality*, 77 J. CRIM. L. & CRIMINOLOGY 969, 973 (1986); Moira Peelo & Keith Soothill, *The Place of Public Narratives in Reproducing Social Order*, 4 THEORETICAL CRIMINOLOGY 131, 131-32 (2000).

make punishments "tougher." Because of the common perception that crime rates are always on the rise—or are about to be—crime control policies tend to become harsher and more punitive over time.[8] In this way the crime master narrative provides an overarching rationale for capital punishment, in general and for its use in individual cases. That is, because the very worst crimes are presumed to have been committed by the very worst people, they should result in the very worst punishment—the death penalty. Alternative approaches to crime control that target criminogenic situations and circumstances—for example, child abuse prevention programs or widespread socioeconomic reforms—are inconsistent with the crime master narrative and, as a result, are largely excluded from public and political discussions and debate over crime policy.

In this article I argue that the crime master narrative overlooks and, increasingly, is at odds with what behavioral scientists now understand about the social historical and immediate contextual causes of criminal behavior.[9] In addition to its lack of empirical or scholarly support in general, the crime master narrative often substitutes in the media for any careful case-specific investigation or in-depth analysis that might illuminate the underlying structural causes or interpersonal dynamics that are at the root of a particular crime. Instead, an account of the crime is routinely fashioned that closely follows (and seems to validate) the crime master narrative, one based on partial and incomplete information that no one typically questions because it appears to reflect a "commonsense" account that "everyone knows" to be true.

These seemingly commonsense accounts that appear in the media are often based on "subsidized news"—primarily, official police and other governmental sources. Largely because of the very specific, limited purposes for which such information is assembled by law enforcement agencies and organizations, some details are repeatedly made salient while others are systematically ignored.[10]

---

[8] *See, e.g.,* Christopher Jencks, *Is Violent Crime Increasing?* AM. PROSPECT, Winter 1991, at 98, 99, *available at* http://www.prospect.org/cs/articles?article=is_violent_crime_increasing. In the mid-1990s, for example, amid news that crime rates had dropped for several years in a row, a panel of conservative policymakers argued in favor of tougher prison sentences in anticipation of a crime wave that had not yet happened but that they predicted—incorrectly, it turned out—was on the horizon: "Despite recent reports that crime is decreasing, violent crime in the United States is a 'ticking time bomb' that will explode in the next few years as the number of teenagers soars, an organization of prosecutors and law-enforcement experts said in a report yesterday." *Crime Panel Fears New Wave of Violence*, S.F. CHRON., Jan. 6, 1996. The author of the report, conservative criminologist John DiIulio, expressed the concern that recent drops in violent crime rates were nothing more than the "lull before the crime storm," and advocated more "aggressive" crime fighting tactics to ward off the crime wave yet to come. *Id.*

[9] *See, e.g.,* Craig Haney, *Making Law Modern: Toward a Contextual Model of Justice*, 8 PSYCHOL. PUB. POL'Y & L. 3 (2002); Craig Haney, *Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation*, 36 HOFSTRA L. REV. 835 (2008) [hereinafter *Evolving Standards*].

[10] *See* Dan Berkowitz, *Assessing Forces in the Selection of Local Television News*, 35 J. BROADCASTING & ELECTRONIC MEDIA 245, 245 (1991); TIMOTHY E. COOK, GOVERNING WITH THE NEWS: THE NEWS MEDIA AS A POLITICAL INSTITUTION (2005); Ray Surette & Alfredo Richard, *Public Information Officers: A Descriptive Study of Crime News Gatekeepers*, 23 J. CRIM. JUST. 325, 326-27 (1995).

916                        *UMKC LAW REVIEW*                        [Vol. 77:4

Communication analysts have criticized the news media for such heavy reliance on these narrow and sometimes biased sources, and for their tendency to represent this one version as the whole story, as if it were objectively and neutrally told. But the practice is still widespread. Crime news reporting continues to overrepresent the official—that is, law enforcement—version of events. Moreover, because citizens have little or no access to alternative points of view that are more balanced and complete, they are hard-pressed to develop an independent critique or challenge the status quo interpretation of criminality. The crime master narrative has become a public truth that is continually reinforced, frequently internalized, and commonly carried into voting booths and jury deliberation rooms by citizens who lack more valid and comprehensive perspectives.

In addition, by essentializing and exaggerating contrasting qualities of the protagonists in crime stories, the media also simplify the stories themselves, framing them as good pitted against evil.[11] Victims are described in normalizing, endearing terms that connect them emotionally to the public. Perpetrators, on the other hand, are depicted in ways that emphasize their deviance and, in turn, distance them from the audience. The characterization of victims understandably elicits identification and empathy, whereas the characterization of perpetrators typically produces only alienation and anger. As Maria Grabe concluded about the crime news stories she content analyzed, "[b]y virtually ignoring possible structural cause for crime (such as poverty or racism) criminals are portrayed as society's irrational enemies who deserve little sympathy because they presumably act as a result of their own will."[12]

Thus, rather than connecting crime to larger structural forces that may have helped cause it or to the immediate circumstances in which it has occurred—and indirectly teaching important lessons about the potential influence of criminogenic factors such as poverty, inequality, racism, and (in institutional settings) inhumane treatment and debilitating conditions of confinement—the master narrative depicts criminal behavior in what amounts to a social vacuum. Readers and viewers are rarely given the kind of descriptive background information that would allow them to situate criminal defendants in a broader social historical context; instead, perpetrators are described primarily in terms of their criminal records—measured, as the saying goes, by the worst things they have ever done in their lives.

Susan Greene and I identified a number of these biases when we content analyzed several hundred newspaper articles published about a representative sample of capital cases.[13] We concluded that there was a heavy law enforcement and prosecutorial slant to the reporting, and that the stories focused repeatedly on

---

[11] *See generally* SHARON LAMB, THE TROUBLE WITH BLAME: VICTIMS, PERPETRATORS, & RESPONSIBILITY (1996) (discussing victimization in the context of sexual abuse, rape, and domestic physical abuse).

[12] Maria E. Grabe, *Television News Magazine Crime Stories: A Functionalist Perspective*, 16 CRITICAL STUD. MASS COMM. 155, 163 (1999).

[13] *See* Craig Haney & Susan Greene, *Capital Constructions: Newspaper Reporting in Death Penalty Cases*, 4 ANALYSES SOC. ISSUES & PUB. POL'Y, 129 (2004).

33-006

particularistic details of the crimes themselves, to the exclusion of much else.[14] Not surprisingly, perhaps, the most bizarre, heinous, or salacious details of the cases were the ones that received the most attention.[15] We also found that "very little information was reported from which readers could develop a structural or contextual interpretation of the crime or any insight into the social historical roots of the defendant's criminality."[16] Although we speculated that more balanced and complete news accounts of the causes of capital crime—ones that included more accurate information about the influence of traumatic social histories and powerful social conditions—might lead to more informed public debate over the role of capital punishment in our system of justice,[17] this perspective was rarely if ever presented in the stories we analyzed.

However, what Greene and I did not determine or illustrate—because of the nature of the study itself—was exactly how the crime master narrative that dominated the news reporting of the sample of capital crimes that we analyzed deviated from the fuller and more factual accounts that *could have* appeared in the media. That is, we did not identify exactly what information might have been surfaced through an in-depth social historical and contextual account in any particular case, information that arguably might have made a real difference to citizens trying to understand serious violent crime in their communities, including persons who might someday serve as jurors on criminal cases where that understanding could be directly applied.

To fill that gap, the present case study includes a detailed description of the crime master narrative at work in the media reporting of a particular capital case—Carl Burling's killing of Officer Carter—and compares it to an in-depth alternative narrative or "counter story"[18] that addresses the numerous details that were for the most part left out of the news stories and, perforce, largely kept from public awareness. Thus, it provides a rare opportunity to look not only at the nature and consequences of the crime master narrative in a particular case, and the political and legal uses to which it was put, but also to compare it to the counter-narrative that could and should have been—and eventually was—told instead.[19]

---

[14] *Id.* at 147-48.

[15] *Id.* at 143.

[16] *Id.* In part this was because most of the reporting dealt with the early stages of the cases in question—primarily, the crime facts and the defendant's arrests—when more in-depth information was not available and hence could not be reported. *Id.* at 143-44; *see also* Steven Chermak, *Crime in the News Media: A Refined Understanding of How Crimes Become News, in* MEDIA, PROCESS, AND THE SOCIAL CONSTRUCTION OF CRIME: STUDIES IN NEWSMAKING CRIMINOLOGY 95 (Gregg Barak ed., 1994).

[17] *Id.*

[18] *See* UNDER THE COVERS, *supra* note 3.

[19] Social scientists operating in the post-modern world understand that the process of attempting to reach definitive conclusions about "what actually happened" in the course of any complicated series of real world events is a daunting task. I do not intend to minimize those challenges here. Instead, I suggest that, judged by conventional social science criteria, the kind of counter-narratives that are now presented in the penalty phases of many capital cases are far superior to the crime

This contrast between the narrow frame of conventional crime reporting and the broader context of crime causation underscores the central role of counter-narratives in modern capital trial practice, as they are developed, analyzed, and presented as part of the case in mitigation in death penalty cases. It would be difficult to overstate the importance of these mitigating counter-narratives, the unique role they now play in informing capital jurors about the broader context in which a capital defendant's life has unfolded, and the impact they have on the legal process by which his fate is decided. Absent such a mitigating counter-narrative, of course, most capital jurors will have only the master crime narrative to fall back on. Its familiar but often too simplistic assumptions about the nature of violent crime will lead many of them to judge the defendant, and even to condemn him to death, without ever coming to terms with who he is or why. Mitigating counter-narratives are designed to counterbalance and correct for this kind of truncated inquiry and decision making.

In a more specific and limited way, I also want to illustrate the critical importance of delving deeply into the hidden context of prison—a place that even intrepid legal investigators and criminal attorneys sometimes fear to tread—to develop effective capital penalty phase mitigation. Pawel Moczydlowski described what he called the "hidden life" that existed inside several prisons he studied in Poland, focusing on the complex but non-obvious social relations among the prisoners themselves as well as between the prisoners and staff. [20] Although he was interested primarily in how the economic organization of the institution shaped the prisoners' relationships, prison life is "hidden" from most citizens in a variety of different ways. Its realities are hidden by geography (the great distances that often must be traveled to visit prisons), architecture (the walls and other enclosures that keep people from seeing what goes on inside), and prison culture (the premium that is placed on silence and secrecy among both the prisoners and the guards), as well as the tendency for the larger society to ignore the psychological effects of imprisonment and the reluctance of prisoners themselves to discuss these things once released. Yet, in order to properly educate capital jurors about the facts and circumstances that have helped to shape an imprisoned defendant's life course these barriers must be overcome.

Although most capital crime does not occur in prison, mitigating counter-narratives requires attorneys, investigators, and experts to look carefully at *all* of the relevant contexts that have helped to shape the defendant's life and influence

---

master narrative for several reasons. For one, these carefully investigated and properly assembled counter-narratives tend to be far more detailed, in-depth, and comprehensive in scope compared to the crime master narrative. They also typically contain accounts of a wide range of events that are corroborated by numerous independent witnesses, many of whom have been interviewed on multiple occasions by legal investigators and experts, and some of whom expect to (and do) have their recollections and observations tested under oath. In addition, these counter-narratives tend to be supported by a broader range of diverse documentary sources that pertain to various stages in the life of the defendant. Finally, the core intellectual framework on which most such counter-narratives rely and the particular themes that are developed within them are far more consistent with (and are often derived from) contemporary social science theory and data. This last point is developed in more detail in *Evolving Standards, supra* note 9.

[20] *See* PAWEL MOCZYDLOWSKI, THE HIDDEN LIFE OF POLISH PRISONS 164-68 (1992).

his behavior, including (perhaps especially) ones that are extraordinarily difficult to penetrate. Either because a higher number of capital cases are arising from crimes that have occurred in prison settings, or because the myriad ways that juvenile and adult institutions can and often do significantly impact the lives of capital clients are more widely understood, these counter-narratives now increasingly include a close and careful examination of the nature of prison life. In addition, in a certain sense, nowhere is the crime master narrative more forcefully applied than in prison. All the more reason, perhaps, to interpose a more detailed, nuanced counter-narrative that provides a different perspective on events that are typically recounted only in an "official" story.

## II.  "NO RHYME OR REASON": CRIME WITHOUT CONTEXT?

The public version of the events surrounding the killing of Officer Carter conformed in virtually all respects to the crime master narrative. Because it was presented without context, the crime spoke for itself—it could only be vicious and senseless. The abbreviated background information provided about the defendant implied elements of the narrative that were all too familiar and needed no elaboration: the crime had been committed by a violently predisposed, physically aggressive man who freely chose to impose his will on an otherwise law-abiding, upstanding citizen who was just doing his job. The repeated juxtaposition in the photographs of perpetrator and victim—a fearsome, scowling prisoner and a smiling, kindly correctional officer—appeared to visually pit pure evil against pure good.

This stark contrasting of good and evil continued throughout the media coverage that followed the killing. On the same day that the slain officer was buried, and eulogized as "a selfless, good-natured 'hero' who died doing a job he loved," prosecutors at Carl Burling's arraignment vowed to "seek their justice" by announcing that they would ask for the death penalty to be imposed. This meant, of course, that just a few days into their investigation—before they could possibly have known much about Burling's background or character, or gained any in-depth understanding of the circumstances under which he had acted—the state's attorneys had already reached the conclusion that he was not fit to live. The defendant appeared in the media reports of his arraignment as the silent, dangerous figure that he now represented in the public mind's eye, one onto which viewers and readers were invited to project their deepest angers and fears: "Handcuffed, shackled, and surrounded by a half-dozen officers, Burling did not comment during the brief hearing" before the judge.

The fact that Officer Carter was a father and "family man" was continuously featured in the media accounts. News stories noted that family and friends described him "as a big man with a big heart," and one friend was quoted as saying "[h]e was a big pussycat." As for the defendant (who, we would later learn, was also a father), his rap sheet was used to represent his personhood, his life amounting to no more than the list of past crimes he had been convicted of committing. In fact, several newspaper articles were devoted exclusively to his criminal record, with headlines that informed readers that the "suspect's history [was] violent" and that he had a "record" that dated back more than a decade.

33-009

In the days following the killing, the few remaining, sketchy details that trickled out into the press included speculation about the motive for the attack. In one such article the state's corrections commissioner was quoted as saying that Officer Carter had attempted to transfer Burling to another cell and separate him from his cellmate because the two of them had been disruptive and were "involved in arguments with other inmates and prison guards." However, more credible reports soon surfaced that Burling and his cellmate were "sexually involved," and that Burling was upset at the prospect of losing access to his "homosexual lover." No further explanation and no more contextualized account of this alleged motive was provided. Prison officials merely asserted that, if true, the homosexual relationship would be a clear violation of prison policy, and that corrections officers would have been required to separate the men.

Standing alone, the fact that this seemingly aggressive and powerful-looking convict had become violently angry over the threatened loss of his homosexual lover likely did more to deepen his deviance than to explain his conduct for members of the public, who were left to speculate on their own about what kind of sexual practices might be taking place behind the prison walls. Absent any nuanced discussion of the way in which the extreme deprivations of prison life skew the norms of sexuality, and lacking any meaningful analysis of the true nature of the prisoners' relationship or the role that it actually played in the events leading up to the officer's killing, this was just one more salacious detail that—for many people—would serve to further impugn the defendant's character and establish his essential (and essentially deviant) nature.

There was another aspect of the case that the media failed to meaningfully discuss or analyze at all. In fact, notwithstanding the extensive news coverage the case received, it was an obvious issue that the reporters seemed to studiously avoid. The photographs of perpetrator and victim made clear the fact that this was a cross-racial crime—a White corrections officer had been stabbed to death by a Black convict. Although this inescapable fact no doubt invited speculation, no media reports mentioned it explicitly (at least not until it was made a key issue in Burling's trial). Of course, unspoken racial dynamics—in prison and elsewhere—are often at the core of the crime master narrative. The racializing of images of criminality in the United States is integral to the public's fear of crime as well as to the successful political use of this fear in both advancing ideological agendas and setting crime control policies.[21] Keeping the racial dimensions of this high profile criminal case largely implicit allowed members of the public to formulate their own stereotypic speculation about what had transpired and why. And it spared media analysts the otherwise difficult task of delving too deeply into this potentially explosive issue.

The media's choice to ignore this issue was understandable but regrettable. Among other things, it deprived Middle State residents of an opportunity to be educated about an important social problem in their state prison system. In fact,

---

[21] *See, e.g.*, BECKETT, *supra* note 7; Franklin D. Gilliam, Jr. & Shanto Iyengar, *Prime Suspects: The Influence of Local Television News on the Viewing Public*, 44 AM. J. POL. SCI. 560, 561-62 (2000); MICHAEL TONRY, MALIGN NEGLECT – RACE, CRIME, AND PUNISHMENT IN AMERICA 17-28 (1995).

33-010

many prisons in the United States are rife with racial conflict. Although racially motivated mistreatment is damaging and dangerous anywhere it occurs, the tensions and conflicts that it can generate inside prison are particularly explosive. Yet the extraordinarily racialized nature of prison life is often difficult for outsiders to fathom. It reaches these extreme levels in part because there are few if any other places in society where such intense interracial contact occurs under otherwise highly pressurized living conditions. Moreover, there are few if any places where race-based practices and policies are countenanced by so many persons who are in positions of authority. [22]

In any event, a great deal of violence in prison is ignited by racial disputes and conflicts. [23] Surprisingly, perhaps, the problem is not restricted to one geographical area of the United States. In fact, the crime in this case took place in a state known for its otherwise highly educated, comparatively well-off, urbane, and racially diverse citizenry. At the same time, however, the state also had been plagued by allegations of heavy-handed, widespread discrimination in its administration of justice. It was one of many locations where serious allegations were made concerning so-called "racial profiling"—the practice in which police target minority drivers for a disproportionate number of traffic stops which frequently lead to arrests and subsequent criminal prosecutions. [24]

In fact, the Middle State prison system had been the scene of many racially-charged incidents in recent years. Just a few years before Officer Carter's killing, for example, a state agency's internal investigation found that correctional officers in another facility had actually singled out mentally-ill prisoners for physical and emotional abuse, provoked confrontations with prisoners in order to justify the use of force against them, frequently maced prisoners, and mistreated some so badly that they suffered permanent physical and psychological damage. Moreover, the investigators concluded that "racism was a contributing cause of the brutality" that was directed at the prisoners. In another set of incidents, Middle State prison officials had become "so alarmed about guards wearing Confederate flags on their uniforms that a regulation

---

[22] Racially toxic prison environments are maintained in part by the routinely race-based practices and procedures that are employed there. These practices and procedures can become so seemingly normalized for guards and prisoners alike that both groups come to see racial categorization and conflict as natural and may be deeply invested in preserving them. *See, e.g.*, Philip Goodman, *"It's Just Black, White, or Hispanic": An Observational Study of Racializing Moves in California's Segregated Prison Reception Centers*, 42 L. & SOC'Y REV. 735 (2008); CRAIG HANEY, REFORMING PUNISHMENT: PSYCHOLOGICAL LIMITS TO THE PAINS OF IMPRISONMENT (2006) [hereinafter REFORMING PUNISHMENT]; Craig Haney, *Counting Casualties in the War on Prisoners*, 43 U.S.F. L. REV. 87, 126-28 (2008); JOHN IRWIN, PRISONS IN TURMOIL 72-75 (1980).

[23] *See, e.g.*, JAMES G. FOX, ORGANIZATIONAL AND RACIAL CONFLICT IN MAXIMUM-SECURITY PRISONS 3-4 (1982); Jill McCorkel, *Racial Conflict Among Prisoners*, *in* ENCYCLOPEDIA OF PRISONS & CORRECTIONAL FACILITIES 807-11 (Mary Bosworth ed., 2005).

[24] For general discussions of police racial profiling, *see* Samuel R. Gross & Debra Livingston, *Racial Profiling Under Attack*, 102 COLUM. L. REV. 1413 (2002); Floyd D. Weatherspoon, *Racial Profiling of African-American Males: Stopped, Searched, and Stripped of Constitutional Protection*, 38 J. MARSHALL L. REV. 439 (2004).

prohibiting the practice was instituted." Yet, the results of the investigations were never widely publicized. The press—ever eager to report on individual acts of prisoner violence such as Burling's— failed to delve deeply into any of these broader issues or to diligently inform Middle State residents about the systemic problems that continued to plague their prisons.

Indeed, at roughly the same time that the racially-motivated abuse of mentally ill prisoners was occurring at one facility, a group of African-American correctional officers at another Middle State prison filed a federal civil rights lawsuit claiming that they were "subjected to rampant racism and discrimination" on the job. Their complaint alleged that they had been subjected to racial slurs for the preceding decade and that, when they complained about the racist behavior, their superiors retaliated against them. As the lawsuit progressed, tape recordings of racial epithets being used by White officers were produced along with accounts that graffiti from a notorious racist organization and photos of its members dressed in the well-known "uniform" of the organization had been posted in prominent places at state prisons. The lawsuit would eventually result in a several million dollar settlement by the state sometime before Officer Carter's death. Several years later, however, the judge who had presided over the original class action lawsuit reprimanded the state's corrections department for failing to meet the terms of the agreement. He concluded that the department had failed to provide appropriate race-related training for prison personnel and still had not processed dozens of individual racial discrimination and sexual harassment claims that were pending. The judge characterized these failures as "symptomatic" of the department's lack of demonstrated commitment to truly resolving the issues, and one of the lead plaintiffs in the case described the department's lingering "animosity" and "defiance" toward the settlement itself.

Moreover, just two years before Officer Carter was killed, Riverside Prison itself had been forced to suspend a senior corrections officer for attempting to recruit other guards into the same notorious racist organization that had been cited earlier. A state corrections spokesman was quick to reassure the public that there was "no reason" to believe that this organization was active within Riverside Prison or any other in the state, and the issue of race relations in Middle State's prison system in general received little or no subsequent press coverage. Certainly, reporters and news commentators never highlighted potential connections between the racist atmosphere that led to the recruiting of guards into a hate-filled organization at the prison and the events that helped to precipitate Officer Carter's death or questioned whether or how the prison system's troubled history of race relations might have been implicated in some way.

Indeed, because the realities of prison life are so well hidden from public view, the true nature of the racial dynamics that permeate many correctional institutions is typically well masked. When it surfaces at all, it is often quickly reinterpreted in ways that are consistent with the crime master narrative (e.g., that minorities are concentrated in prison because they are more predisposed to crime and violence, that racial conflicts in prison are "natural" manifestations of pre-existing tensions, and that prison officials do their best to limit these conflicts but

are often outmatched and overwhelmed by the depth of the prisoners' intergroup animosities and their shared commitment to violence).

Thus, the media's devotion to the crime master narrative helps to ensure that many of the most troublesome, problematic aspects of prison life remain hidden. The possibility that adverse prison conditions, strained interpersonal dynamics, and explicitly racialized official policies might combine to intensify or even cause violent conflict in prison is typically given little or no credence by the media. Similarly, they are unlikely to report about the role that individual correctional officers may play in instigating and promoting these kinds of tensions. As a result, the public has only the narrow, restrictive framework of the crime master narrative on which to rely in interpreting these events.

To be sure, the media's handling of the fatal encounter between Carl Burling and Officer Carter did nothing to balance this one-sided view. As is often the case, the incomplete media accounts of the crime that were disseminated ensured that the members of the public had no more than partial (and partially inaccurate) information from which to make inferences about what happened and why. Lacking a more accurate and complete analysis of the event, Middle State's citizens had only the crime master narrative to use as the basis for their preliminary judgments about who was responsible for what had transpired and what kind of punishment should be meted out in response.

## III. MASTER NARRATIVES AND THE POLITICS OF PUNISHMENT

The crime master narrative is more than an abstract conceptual framework. It has far-reaching action implications that can influence the way its adherents respond to crime. As I noted earlier, citizens who have been led to believe that criminal behavior emanates exclusively from the evil of individual criminals often turn to extreme levels of social and institutional control to keep the "dark side" of human nature in check and to press strenuously for harsh crime control measures.[25] Among other things, then, logic of the individualistic crime master narrative leads to "master crime control strategies" that involve "sending messages" to potential criminals. Whenever these messages fail to have their desired effect, there is a perceived need to "get tougher" and, in the case of

---

[25] This is precisely the approach favored by some conservative criminologists who have asserted that criminals are simply "wicked people" or "superpredators" who can and should be handled with the utmost harshness, and have recommended maximizing the number of lawbreakers who receive long-term prison sentences in facilities designed to do little more than "contain" them. *See, e.g.*, John J. DiIulio, Jr., *Let 'Em Rot*, WALL ST. J., Jan. 26 , 1994, at A14; JAMES Q. WILSON, THINKING ABOUT CRIME (1975). In fact, Wilson expressed grave concerns over expert social science testimony that is used to explain a defendant's behavior—"lead[ing] juries to excuse the act or mitigate the punishment." JAMES Q. WILSON, MORAL JUDGMENT: DOES THE ABUSE EXCUSE THREATEN OUR LEGAL SYSTEM? 90 (1997). He urged trial judges to "greet with skepticism any claim that social science can tell a jury much about why something happened," *id.* at 108, in part because he feels social science dilutes the "black and white" categories of law and compromises its moral—"commanding"—authority.

prisons, "increase security"—that is, to intensify control and send clearer and more forceful messages to the bad people confined there.

Indeed, an important corollary to the crime master narrative depicts prisons as places where a dangerously high concentration of violent predators are housed, living in a kind of moral netherworld, and lacking allegiances to anyone or anything, save their own impulses and desires.[26] By this account, such places are held precariously in check by a thin blue line of correctional officers who, in turn, struggle valiantly against the collection of troublesome misfits they oversee, at times barely able to maintain a semblance of order. Since prison violence is assumed to be the product of the inherently dangerous nature of the prisoners, the only reasonable way to respond to it is by increasing control over and protection against this ever present menace.[27]

In the Burling case, the response of the corrections department to the crime itself both incorporated and reinforced the crime master narrative. From the outset, the press dutifully reported the institutionally sanctioned version of events, and never questioned the prison system's use of "lockdowns," roadblocks, "body armor," or the need for "special operations groups" to "maintain order" in the face of what appeared from the outset to be a single, isolated attack. Indeed, despite the absence of any evidence whatsoever to suggest that Officer Carter's killing was part of a larger plan, this one prisoner's violent act directed against one guard immediately led Middle State prison officials to lock down the entire statewide prisoner population. Of course, mass lockdowns are not only among the most extreme measures of social and institutional control that prison authorities can take but also represent a severe form of collective punishment—a punitive message delivered to the entire group of prisoners designed not only to "contain" but to deter and punish them as well.

The master crime control strategy also provides an implicit rationale for the death penalty. Because heightened levels of punishment are seen as the best—perhaps the only—way of responding to crime, the most serious kind of crime requires the most extreme punishment. Accordingly, capital punishment is seen as the only way to protect society against its most dangerous members and the best way to "send a message" to potential killers who are presumably on the verge of making the wrong free choice.

Indeed, this is exactly how the prosecutor in Farmland County explained his reasons for seeking the death penalty against Carl Burling: "We've got to send a

---

[26] For example, see the assertion by two psychologists that "psychopathy abounds in prison," a statement that they regarded as so commonsensical it did warrant documentation or empirical support. Thomas Carnahan & Sam McFarland, *Revisiting the Stanford Prison Experiment: Could Participant Self Selection Have Led to the Cruelty?* 33 PERSONALITY AND SOCIAL PSYCHOLOGY BULLETIN 603-614 (2007). For extreme caricatures of "psychopathy" and "criminals" *see, e.g.,* ROBERT D. HARE, WITHOUT CONSCIENCE: THE DISTURBING WORLD OF THE PSYCHOPATHS AMONG US 33-56 (1999); STANTON E. SAMENOW, INSIDE THE CRIMINAL MIND 6-7 (1984).

[27] The use of increased levels of punishment and deprivation to sanction infractions inside prison can be seen as an extension of the same master narrative that is applied outside. *See* Craig Haney, *A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons,* 35 CRIM. JUST. & BEHAV. 956 (2006).

strong message to inmates. We've got to protect the ladies and gentlemen who are guarding the people we don't want on our streets." Beyond the rationale it provides for the death penalty, this same master crime control strategy operates at other levels as well. Thus, a few months after Officer Carter's killing, the governor presided over the opening of a new prison, located not far from Riverside Prison, by making a similar comment: "This prison will allow us to send the message loud and clear that crime does not pay in Middle State . . . . This prison says that we take very seriously our commitment to keep the people of Middle State safe."

In this way, the crime master narrative ignores those aspects of the broader context or situation that might have instigated or provoked acts of individual violence. Thus, the possibility that aggression or conflict in prison may be the result of *too much* control, overly harsh conditions, or severe deprivation is typically overlooked or ignored. So, too, is the notion that prison violence can occur in response to intense pressures or provocations created by official acts of mistreatment or abuse, or the lingering resentments that stem from them. The mass lockdown of prisoners and the use of other mechanisms to forcefully suppress them assume and imply that they alone are the source of the conflict. In fact, incidents such as Officer Carter's violent death typically—almost automatically—become the occasion to *intensify* and harden the existing disciplinary regime. The increased surveillance, punishment, and control that follow collectively deprive prisoners of even more rights and privileges, irrespective of their lack of direct involvement in the crime in question.

Accordingly, six months after Officer Carter's killing, officials at Riverside Prison cited his death as the reason for making a series of security changes at the institution, ones that were explicitly "aimed at making things safer for guards . . . [and] tougher for inmates." The new procedures were based on implicit assumptions about the dangerous predispositions of prisoners. For example they provided that wherever a large number of prisoners were gathered together, "such as the dining or recreation areas," then there would "no longer be any guards" situated among them. Instead, these areas were placed "under constant supervision," in addition to having "a team of guards suited up with helmets and clubs ready to respond if anything gets out of hand." A prison spokesman forthrightly acknowledged that "the arrangement may prove more dangerous for prisoners."

Because the crime master narrative and its companion crime control strategy have become such powerful cultural frames in American society, their appeal to politicians is nearly universal. "Get tough" policy recommendations are wildly popular with voters, and elected officials who publicly favor increased punishment after a tragic, violent crime has occurred can expect to receive positive media coverage and enhanced stature with their constituents. On the other hand, few politicians feel they can endorse (or even publicly consider) a counter-narrative view of crime—for example, by calling for meaningful analyses of the structural causes of violence or, in the case of a prison killing, openly exploring ways to improve the harsh conditions or address mistreatment by staff that may have contributed to it.

33-015

Recall that within hours after Officer Carter had been killed his death had been used by the correctional officers' union as a political lever to force the governor to fund protective vests for guards throughout the state. In fact, Middle State politicians were later involved in helping to enact a bill that provided federal funding to assist local communities to purchase body armor for their law enforcement personnel across the entire nation, and they cited the death of Officer Carter as an example of why it was needed. The specter of the tragedy also was raised in political debates where it seemed to have little relevance. For example, when residents of the larger area where Riverside Prison was located reacted months later to a set of modest cost-cutting measures that had been proposed in the state's correctional budget (including the privatization of some prison services and the possible elimination of some watchtowers at the local prisons), the press reported that many residents had become fearful that changes at the prisons would "jeopardize their safety." They also noted that security concerns in the community had been "heightened since the killing of corrections Officer Carter."

## IV.  SURFACING HIDDEN SOCIAL CONTEXTS IN CAPITAL TRIALS

Ordinarily, the crime master narrative is the *only* one that the media report and that politicians feature in their discussions of "the crime problem" and its solutions. As a result, it is the only framework available to the pubic with which to understand crime in general or an individual criminal act in particular. Moreover, as I noted earlier, the legal system itself relies on the master narrative's individualistic assumptions—the notion that criminal acts represent little more than the free and autonomous choices of "bad" people who, once identified, must be harshly punished for their actions. For the most part, the criminal law deems social contextual explanations for illegality to be irrelevant; in fact, the determinants of a defendant's behavior play little or no role in the typical criminal trial.[28] We still colloquially say that a crime has been "solved" once a person has been found on whom it can blamed.

And so it likely would have gone in Carl Burling's case. Someone clearly had been found on whom the killing of Officer Carter could be blamed; indeed, the defendant confessed to having done it. The application of the crime master narrative appeared unproblematic: Carl Burling was a bad man who had done bad things in the past and, in this instance, had done an unspeakably and inexplicably bad thing for which he would likely pay with his life. He had, as the case was framed from the outset, engaged in an "unprovoked, malicious, savage, deadly attack," and there was little more that needed to be known. Once assured that

---

[28] As one commentator put it: "The essential background assumption of responsibility is that of the autonomous individual whose decisions are not to be explained by reference to anything other than [himself]." Michael J. Clarke, *The Impact of Social Science on Conceptions of Responsibility*, 2 BRIT. J. L. & SOC'Y 32, 34 (1975). For discussions of the various ways in which the sentencing reforms that occurred over the last several decades rendered broad questions about the defendant's background and motivation even less relevant, *see* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 YALE L.J. 1681 (1992).

33-016

"he acted alone," as a corrections spokesman had informed anxious members of the public very early in the investigation, there was nothing left to do but mete out his individual-level punishment. The media's passing interest in Burling's motives for having committed such a horrible act waned after the initial stages of the case; as the case wound its way through the legal system, speculation about what caused him to commit the crime never became a central focus of the sporadic news coverage that followed.

As the process by which Burling's fate would be decided was set in motion, he was safely locked in isolation, segregated away from the rest of the prison population, where he awaited his trial and final judgment at the hands of a Middle State jury. To most members of the public, the Burling case was simply another tragic example of an all too familiar story. As a result, from the media's perspective, the story warranted little or no further investigation, analysis, or explanation.

However, this case was different—not necessarily in terms of the level of public interest or media coverage it generated, but rather because of its legal status. Ironically, in large part because Middle State was seeking to impose the death penalty on Carl Burling, his attorneys had both a legal authorization and a professional mandate to go well beyond the crime master narrative in their case investigation and trial preparation. More specifically, the fact that this was a *capital* case meant Burling's court-appointed lawyers would be able to prepare an in-depth analysis of who their client was, including insights into how his background and social history had affected the course of his life. In addition, they would have the responsibility and hopefully the resources to carefully investigate and eventually determine whether and how the circumstances surrounding the killing of Officer Carter might help to explain it. His lawyers also knew they would be able to present testimony about all of these issues to Burling's jury, and to argue that its members should use this information as the basis for mitigating or lessening the punishment they decided he should receive. Indeed, capital cases are really the only ones in which the law explicitly provides that an alternative explanation or counter-narrative can and should be painstakingly assembled, carefully analyzed, and effectively presented to a sentencing jury.[29]

---

[29] I should add that, at the time Burling's case was tried, the law *permitted* these things to be investigated and, where appropriate, to be presented to the jury. As always, whether the task of assembling and presenting a challenge to the prevailing crime master narrative is actually undertaken on behalf of any capital defendant depends on the skill, dedication, and resources of the attorneys appointed to represent him. Yet if crime master narrative goes unchallenged and unanswered in a capital case, a death sentence is the likely outcome. The fact that some states still choose to inadequately fund capital cases and refuse to address the scarcity of experienced, well-trained trial lawyers means that default death verdicts continue to occur. *See generally* Stephen Bright, *Neither Equal Nor Just: The Rationing and Denial of Legal Services to the Poor When Life and Liberty Are At Stake*, 1997 N.Y.U. ANN. SURV. AM. L. 783 (1997) (discussing the thin ration of legal services for the poor person accused of a crime). Carl Burling had the good fortune to be assigned highly skilled and dedicated court-appointed attorneys willing and able to labor mightily to assemble and present a counter-narrative account of his life and crime.

The legal rationale for permitting capital attorneys to go beyond the crime master narrative—in this one kind of criminal case—is straightforward but crucially important. In death penalty cases, of course, jurors who have found a defendant guilty of a potentially capital crime must then decide his fate—by sentencing him to life or death. Capital defendants are afforded wide latitude in presenting "mitigation"—*any* information that a jury might use to reach a verdict of a sentence less than death. It is now widely understood that mitigation can (and typically should) include testimony about the background or "social history" of the defendant, his or her motivation and "character," as well as the circumstances under which the crime occurred. Because capital jurors must be permitted to engage in an "individualized assessment of the appropriateness of the death penalty"[30] that entails "a moral inquiry into the culpability of the defendant,"[31] capital defense attorneys have not only the opportunity but also the responsibility to present what is, in essence, a mitigating counter-narrative that places the capital defendant—his life and his crime—in a broader social context.[32]

It is now well understood that this mitigating counter-narrative is not offered to "excuse" the crime that the defendant has been convicted of committing. Instead, while acknowledging that most forms of violence are inexcusable, the development and presentation of this unique kind of counter-narrative proceeds on the legal assumption that basic fairness requires the amount of punishment meted out in a capital case to turn on a careful consideration of various psychological factors and forces that help to explain the defendant and his actions. In any reasoned "moral inquiry into the culpability of the defendant," explanations clearly matter. Thus, explanatory evidence about how a person who has had certain life experiences, received particular kinds of treatment, and experienced certain kinds of events in the past and present has been shaped and influenced by them provides jurors with essential information as they make profound moral judgments about blameworthiness and punishment.[33]

---

[30] California v. Brown, 479 U.S. 538, 545 (1987).

[31] *Id.*

[32] For one recent discussion of how and why this is so, see *Evolving Standards, supra* note 9. *See also* Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story,* CHAMPION, Aug. 1985, at 27; William S. Geimer, *Law and Reality in the Capital Penalty Trial,* 18 N.Y.U. REV. L. & SOC. CHANGE 273, 285-86 (1990-1991); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L. Rev. 299, 323-24 (1983); Deanna Logan, *From Abused Child to Killer: Positing Links in the Chain,* CHAMPION, Jan.-Feb. 1992, at 36, 36-39; WELSH S. WHITE, THE DEATH PENALTY IN THE NINETIES: AN EXAMINATION OF THE MODERN SYSTEM OF CAPITAL PUNISHMENT 90-91 (1991).

[33] Under existing death penalty statutes, jurors decide between life and death at the conclusion of a separate "penalty phase" or trial. The great majority of these statutes include capital sentencing instructions that are supposed to guide the discretion of the jurors by requiring them to balance "aggravating circumstances"—things about the defendant, his life, and his crime that favor a death sentence—against "mitigating circumstances"—things about the defendant, his life, and his crime that favor a life sentence.

33-018

This mitigating counter-narrative is also guided by several basic psychological assumptions, all of which are well grounded in contemporary empirical research and theory. The first is that no meaningful account of criminal behavior can begin without some social historical understanding of the life of the perpetrator. It assumes further that because people's actions are influenced in large part by their past experiences, counter-normative behaviors (like crime) are typically rooted—at least in part—in counter-normative social historical experiences.[34]

In addition, mitigating counter-narratives consider the possibility that the immediate social context in which a crime occurs may help to explain it. Unlike the crime master narrative, then, this broader view acknowledges that certain aspects of particular situations can provide important insights into criminal behavior. Analyzing precipitating conditions as well as immediate triggering events helps to explain—and perhaps to mitigate—particular criminal acts. Moreover, mitigating counter-narratives recognize that past experiences and present circumstances may be interconnected; that is, that social contexts are composed not just of immediate situational conditions but also of broader background experiences and expectations. Thus, situations have different psychological meaning to different people based in part on their unique past history and the particular significance that certain situations have acquired over time. Moreover, background and social history play a role in influencing the kind of circumstances and situations that people are likely to encounter later in their lives.

---

[34] For discussions of the "study of lives" in general, *see* Jaber F. Gubrium & James A. Holstein, *Biographical Work and New Ethnography, in* 3 THE NARRATIVE STUDY OF LIVES 45 (Ruthellen Josselson & Amia Lieblich eds., 1995) (discussing the study of ethnography and how it views an individual as the product of his or her background and life experiences); EXAMINING LIVES IN CONTEXT: PERSPECTIVES ON THE ECOLOGY OF HUMAN DEVELOPMENT (Phyllis Moen et al. eds., 1995) (a collection of perspectives on the importance of developmental context over an entire life course); Donald E. Polkinghorne, *Narrative Knowing and the Study of* Lives, *in* AGING AND BIOGRAPHY: EXPLORATIONS IN ADULT DEVELOPMENT 77 (James E. Birren et al. eds., 1996) (discussing narrative data about a person's background and its role in a psychological understanding of that person); Wm. McKinley Runyan, *Idiographic Goals and Methods in the Study of Lives*, 51 J. PERSONALITY 413 (1983) (discussing the various methods of studying the role that past experience plays in influencing human behavior); Abigail J. Stewart & Joseph M. Healy, Jr., *Linking Individual Development and Social Changes*, 44 AM. PSYCHOLOGIST 30 (1989) (discussing studies on the impact of historical context on individual development and proposing a model to incorporate the study of those factors into current research design and interpretation); Robert W. White, *Exploring Personality the Long Way: The Study of Lives, in* PERSONALITY STRUCTURE IN THE LIFE COURSE: ESSAYS ON PERSONOLOGY IN THE MURRAY TRADITION 3 (Robert A. Zucker et al. eds., 1992) (further discussing methods of studying lives by looking at experiences over the life course). For discussions of the way in which past exposure to trauma and "risk factors" affect subsequent development, including adult criminal behavior, *see, e.g.,* Rolf Loeber, *Developmental Continuity, Change, and Pathways in Male Juvenile Problem Behaviors and Delinquency, in* DELINQUENCY AND CRIME: CURRENT THEORIES 1, 1-27 (J. David Hawkins ed., 1996); David C. Rowe & David P. Farrington, *The Familial Transmissions of Criminal Convictions*, 35 CRIMINOLOGY 177, 194-99 (1997); Ann Masten & Norman Garmezy, *Risk, Vulnerability and Protective Factors in Developmental Psychopathology, in* 12 ADVANCES IN CLINICAL CHILD PSYCHOLOGY 3 (Benjamin B. Lahey & Alan E. Kazdin eds., 1985).

## V. SOCIAL HISTORICAL ELEMENTS OF A CRIME COUNTER-NARRATIVE

What about the present case? What could possibly be said about Carl Burling and what he had done that might mitigate his punishment for this seemingly inexplicable, awful crime? The mitigating counter-narrative intended to provide his jury with a more comprehensive and valid framework to understand Carl and what he had done began, as it almost always does, with an in-depth analysis of his social history. Studying the lives of capital defendants underscores the commonalities in their backgrounds and the developmental logic to serious criminal behavior that is missed by legal fictions about free and autonomous choice-making and the misleading and unsupportable assertion that most crime emerges from a social historical and contextual vacuum.[35]

Indeed, Carl Burling's life was sadly consistent with the social histories and life stories that mitigating counter-narratives frequently uncover. The product of an unexpected and unwanted pregnancy, Carl was born to an unmarried young mother who already had two children whom she had difficulties caring for and had to leave with relatives in another town. Carl never knew his father, who died from alcohol-related medical problems several months after he was born. He spent the first few years of his life with his mother, living in a rooming house in Walkland City. Another three children were born in rapid succession, but Carl and his siblings rarely stayed together under the same roof.

Carl's mother was an uneducated woman who, although still only in her twenties, struggled valiantly to overcome chronic poverty and simultaneously meet the daunting responsibilities of trying to care for six children. Not surprisingly, the children often found themselves living in the homes of different family members. Carl, too, bounced from one place to another during his childhood. As one relative would describe things later on, Carl "grew up here and there, nowhere in particular." The chaos and instability had long-term effects

---

[35] The social histories of capital defendants typically play a central role in their penalty trials. Courts authorize experts to compile (and, when appropriate, to testify about) social histories in death penalty cases precisely because the information is legally relevant to the jury's choice between life and death. In this particular case, the information that I was given access to and analyzed was part of this larger undertaking—the construction of a social historical account of Carl Burling's life and an analysis of the influential forces in the immediate situation in which the crime occurred. The goal in each instance is to explain the defendant and his life course to the jury and, in many instances, to shed light on what he did and why. I have discussed the key role of social histories in capital cases in several places. In addition to the articles cited *supra* notes 32-34, see Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation*, 35 SANTA CLARA L. REV. 547 (1995); Craig Haney, *Psychological Secrecy and the Death Penalty: Observations on "the Mere Extinguishment of Life"*, 16 STUD. L. POL. & SOC'Y 3 (1997); Craig Haney, *Mitigation and the Study of Lives: On the Roots of Violent Criminality and the Nature of Capital Justice*, in AMERICA'S EXPERIMENT WITH CAPITAL PUNISHMENT: REFLECTIONS ON THE PAST, PRESENT, AND FUTURE OF THE ULTIMATE PENAL SANCTION 343 (James R. Acker et al. eds., 1998). For the United States Supreme Court's key statements about how and why these social histories are so important to the fair adjudication of death penalty cases, *see* Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510 (2003).

33-020

on Carl's siblings as well as him: At the time he was awaiting trial for the killing of Officer Carter, three of four brothers who had lived with Carl during his early childhood years also were serving prison terms.

Family members reported that, throughout his childhood, Carl's mother had relationships with a number of different men who were abusive to her, and some of whom physically abused Carl as he got older. The poverty-driven chaos and neglect and constant separations began to take an emotional toll on him. Probation records indicated that Carl ran away from home at one point and was placed in a juvenile shelter. Like many young people exposed to abusive and traumatic early lives, he turned to drug use as a way of dulling his emotional pain.[36] Carl reported in an interview that he began to "self medicate" in this way at age eleven and eventually acquired a serious cocaine addiction while still a teenager. School records showed that Carl did poorly in his classes, was frequently truant, and dropped out when he was seventeen. He was prideful at times and had learned to stand up for himself—once, while attending a predominately white high school, he was suspended for fighting with a student who made racially disparaging remarks to him. But mostly he was confused and despondent about the chaos that his early life had brought him, and was unable to rid himself of feelings of sadness, worthlessness, and pain. While still a teenager, Carl attempted to hang himself with bed linens and was committed briefly to the state psychiatric hospital.

Once released from the hospital, Carl was essentially on his own. As a young Black man who lacked an education or marketable job skills, he faced some harsh social and economic realities. Not surprisingly, Carl lived largely at the margins of Middle State society, where unemployment rates were high and transience and criminality commonplace. He moved from one neighborhood to another, got involved in one form of petty criminal enterprise or another, and ended up, at various times, in several different Middle State prisons. All of his crimes were drug-related, a product of the sad fact that people who use drugs, as Carl did, frequently end up deeply immersed in the criminal aspects of the drug culture of which they are a part.[37] Adapting to his day-to-day life on what were often mean and dangerous streets meant there were times Carl became as fearsome as his surroundings. Indeed, he acknowledged in an interview that learning to act as tough as the people with whom he interacted and places where he lived had served him well as a young man inside the adult Middle State prison

---

[36] For discussions of the role of self medication in substance abuse and addiction, *see, e.g.,* Mark J. Albanese & Edward J. Khantzian, *Self-Medication Theory and Modified Dynamic Group Therapy, in* THE GROUP THERAPY OF SUBSTANCE ABUSE 81 (David W. Brook & Henry I. Spitz eds., 2001); Edward J. Khantzian, *The Self-Medication Hypothesis of Addictive Disorders: Focus on Heroin and Cocaine Dependence,* 142 AM. J. PSYCHIATRY 1259 (1985); TRAUMA AND SUBSTANCE ABUSE: CAUSES, CONSEQUENCES, AND TREATMENT OF COMORBID DISORDERS (Paige Ouimette & Pamela J. Brown eds., 2003); P.V. Piazza, & M. Le Moal, *The Role of Stress in Drug Self-Administration,* 19 TRENDS PHARMACOLOGICAL SCI. 67 (1998).

[37] *See, e.g.,* Paul J. Goldstein, *Drugs and Violent Crime, in* PATHWAYS TO CRIMINAL VIOLENCE 16 (Neil Alan Weiner & Marvin E. Wolfgang eds., 1989); Duane C. McBride & Clyde B. McCoy, *The Drugs-Crime Relationship: An Analytical Framework,* 73 PRISON J. 257 (1993).

system where he eventually spent much of his life. There were times in prison when Carl Burling's tough outward demeanor got him into trouble—his prison file contained a number of disciplinary infractions—and doubtless many other times that it protected him from worse things that were taking place around him.

His last prison term began about six years before the fatal encounter with Officer Carter. The only family member with whom Carl had stayed in close contact over the years was his grandmother. She was the source of his only fond childhood memories and he was grateful that she had "stuck by" him during many of the hard times he confronted later on. Carl talked to her on the phone regularly from prison, and they wrote to one another. However, just a few years into this prison term, his grandmother became ill and suddenly died. Because of his poor disciplinary record, prison authorities would not allow Carl to attend the funeral.

Soon after his grandmother's death, Carl became deeply depressed and began seeing a counselor at the Middle State prison where he was housed. Entries in his prison mental health file indicated that he cried uncontrollably to the prison therapist when he talked about how much he missed his grandmother. The therapist diagnosed Carl as suffering from major depression and placed him on psychotropic medication. Unfortunately, instead of providing him with the continuing treatment he apparently needed, prison officials then transferred him to Riverside Prison, where his therapy came to an abrupt halt. His new prison lacked specialized treatment services, and Carl struggled to find guidance and direction.

## VI. CONDITIONS OF CONFINEMENT: THE IMMEDIATE CONTEXT AND DYNAMICS OF PRISON LIFE

Prison is a unique environment, one governed by its own powerful dynamics, intense pressures, and special norms. They profoundly affect the thoughts and actions of the persons who work and live there.[38] Because prison life is "real life" for the people confined inside, long-term prisoners, especially, have no choice but to adapt to the extraordinary contingencies and powerful pressures they confront while incarcerated. Of course, some prison environments are easier to adapt to than others.

At the time of Carl Burling's transfer, Riverside Prison was tense and problem-ridden. Official records confirmed that the prison was very overcrowded, housing nearly doubled the number of prisoners it was designed to hold.[39] It was also understaffed—on the day he was killed, Officer Carter was

---

[38] For more in-depth psychological analyses of the power of prison to affect prisoners and guards alike, *see* REFORMING PUNISHMENT, *supra* note 22. *See also* THE EFFECTS OF IMPRISONMENT (Alison Liebling & Shadd Maruna eds., 2005); HANS TOCH & KENNETH ADAMS, ACTING OUT: MALADAPTIVE BEHAVIOR IN CONFINEMENT (2002).

[39] Severe overcrowding adversely affects all aspects of a prison environment. For example, *see* Craig Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions*, 22 WASH. U. J.L. & POL'Y 265 (2006); PAUL PAULUS, PRISON CROWDING: A PSYCHOLOGICAL PERSPECTIVE (1988).

33-022

the *only* correctional officer present in a unit of approximately 140 prisoners. In addition, the racial makeup of the prison was markedly skewed: approximately two-thirds of the prisoners at Riverside were African-American while over 80% of the correctional staff was White. In addition, the prior allegations that some of the White guards who worked at Riverside might be involved in a racist organization served to increase racial tensions at the prison. Even White inmates—including one who served as Officer Carter's inmate assistant—acknowledged in interviews that there was a group of racist officers at Riverside who had "run of the prison." White officers referred openly at times to Black prisoners as "niggers," and some of the officers displayed "tattoos of swastikas" and other racist insignias on their forearms. Defense investigators learned that one of the ways the racist officers commonly harassed Black prisoners was by targeting them for extra cell searches during which they "trashed" their personal property.

When Carl Burling arrived at Riverside Prison he was still psychologically fragile. Prison records showed that he was receiving anti-depressant medication, and he told people that he was struggling with sadness and instability on a daily basis. He began to reflect on the direction his life had taken and reported feeling "lost." In the midst of these difficult times, Carl was befriended by another prisoner, an openly gay inmate named Johnny Service who had also spent considerable time in prison. They grew close, first as friends and then as intimates. Here, too, the context of confinement helps to explain the nature of this kind of relationship and the importance it can assume in prison.

The crime master narrative teaches that most criminals are callously self-interested and largely incapable of developing genuinely close relationships. This is one of the essential qualities of the stereotypic "psychopathic" personality that is supposed to be responsible for much crime in our society and is presumed to predominate in prison.[40] To outsiders, the unemotional and aloof demeanor adopted by many prison inmates serves as an apparent confirmation of this stereotypic view. In reality, however, the prison context plays a profoundly important role in shaping this behavior.[41] Visible signs of caring, openness, and personal vulnerability are often devalued in harsh prison settings where exaggerated forms of masculinity are all prisoners have with which to protect themselves and keep others at bay. Behavior that is easily mistaken for weakness may also invite exploitation.[42]

Inside this harsh environment, however, a number of prisoners do develop deep personal loyalties and devotion to one another. In a certain sense, the prevalence of gangs in prison can be understood in this way—that is, as an

---

[40] *Id.* For a description of psychopathic personalities (that supposedly "abound" in prisons) as "like the emotionless androids depicted in science fiction," *see* Hare, *supra* note 26, at 44

[41] *See* discussions in references cited *supra* note 39.

[42] For various accounts of the norms of confinement and subjective experience that is created for prisoners, *see, e.g.,* JACK HENRY ABBOTT, IN THE BELLY OF THE BEAST: LETTERS FROM PRISON (1991); JOHN IRWIN, THE FELON (1987); SOLEDAD BROTHER: THE PRISON LETTERS OF GEORGE JACKSON (Bantam Books 1972) [hereinafter SOLEDAD BROTHER]; HANS TOCH, MOSAIC OF DESPAIR: HUMAN BREAKDOWNS IN PRISON (1992).

outgrowth of the human need to connect to others in the face of adversity.[43]  The fact that prison gangs often turn destructive and pervert members' loyalties to nefarious ends does not negate the initial motivation for joining.  Other prisoners reach out to one another in more personal ways.  In addition to the enforced and extreme sexual deprivation that prisons impose, they provide prisoners with few if any opportunities to create or maintain intimate relationships with others.  Because such close bonds are relatively unusual in the harsh and impersonal prison environment, those that do occur can assume special importance.  Indeed, in some cases, loving relationships may develop between long-term prisoners that take on the characteristics of a "marriage," with many of the same long-term emotional bonds and commitments implied.

This is precisely the kind of relationship that eventually developed between Carl Burling and Johnny Service.  According to Carl, Service helped him find better ways of coping with the day-to-day harshness of prison life.  He "tutored" Carl on ways to control his anger and showed him how to avoid conflict with other prisoners and guards.  Because of Service's friendship and guidance, Carl gradually overcame the sadness and grief with which he had struggled since his grandmother's death.  His disciplinary record improved dramatically—he had once been regarded by the prison system as an escape and assault risk, but he was well-behaved now and was described by his correctional supervisors as an "excellent worker."  He attributed his improved outlook and behavior to his relationship with Johnny Service, whom he credited with having helped him "find himself."

In fact, far from being troublemakers in E-Block where they were housed at Riverside Prison, Burling and Service were described as quiet and conforming.  It also was clear to officers and prisoners alike that the two of them were a "couple."  Although they apparently did not show affection openly or flaunt their homosexual relationship, there was no doubt among persons who knew or interacted with them that they not only lived together but also had established an intimate, committed relationship.  As one prisoner put it: "Everyone on E-Block knew that Carl and Johnny were a homosexual couple.  Carl was in love with Johnny.  He was loyal to Johnny."  Correctional officers at Riverside Prison not only knew of this relationship but, in fact, knew of other similar relationships among the prisoners.  Another prisoner said that "officers were fully aware of the homosexual activity going on in E-Block and may have even condoned the activity."

For his part, Carl Burling was proud of the way he was able to take care of Johnny Service, sharing the proceeds of his meager income as an inmate worker to outfit their cell with rugs, curtains, a small television, and other items authorized in the inmate handbook.  Because prisoners typically possess very little in the way of material goods, whatever possessions they do acquire can take on great significance.  In the same sense, a prisoner's cell—often a tiny, cramped, physically deteriorating space not much larger than a small bathroom or

---

[43] *See, e.g.*, Bessel A. van der Kolk, *The Role of the Group in the Origin and Resolution of the Trauma Response, in* PSYCHOLOGICAL TRAUMA 153 (Bessel A. van der Kolk ed., 1987).

king-sized bed—is the only home they have. Prisoners literally refer to their cells as their "houses" and often maintain them with the same care and pride as people on the outside invest in their homes. In fact, Burling and Service were especially proud of the way they had decorated their cell. Other prisoners and correctional officers knew about it and regarded it as something of a "show place"—one that officials and visitors were taken to see when they toured the prison. As Johnny Service boasted, "any officer that worked E-Block would tell you that we had one . . . of the cleanest rooms [there]."

Adaptations to the deprivations of prison life reflect aspects of what Philip Zimbardo and I once termed the "dynamics of desperation"—the various ways in which prisoners adjust to their extremely deprived conditions of confinement.[44] These dynamics can influence the things that prisoners care about and the lengths they will go to maintain them; they help to explain why seemingly "little things" can acquire great significance in prison. So, too, there is a special intensity to some of the dynamics of prison that is brought about by the fact that interactions and events take place within a physically small and psychologically circumscribed area from which there is literally no escape. Prisoners cannot easily leave problematic situations in which they find themselves or completely avoid contact with troublesome persons who inhabit their immediate environment. These aspects of prison life add certain dimensions to many interpersonal interactions there that are not replicated elsewhere in society. The meaning and significance of the events that occur in prison settings are magnified by this inescapable closeness, increasing the likelihood that prisoners will dwell on or ruminate over them.

Moreover, perhaps because prisoners know they cannot escape their immediate situation, they also have learned to safeguard their reputations at all costs. Insults and affronts provoke immediate and sometimes extreme reactions. Prisoners believe that, if they fail to respond forcefully when challenged in this way, then their inaction will be interpreted as an invitation to further mistreatment. Your passivity in the face of an interpersonal affront in prison may be taken as clear evidence that you are not "man enough" to handle your problems on your own. The combination of these interconnected elements of prison life means that conflicts are likely to fester and then escalate if they are not immediately resolved. Prisoners have few spaces to which they can retreat to cool down and regain their composure once a dispute has surfaced openly.

Just as with most things in prison, the stable equilibrium that Carl Burling and Johnny Service had achieved at Riverside Prison was subject to change that was beyond their control. Prisoners know that one of the risks of developing emotional attachments in prison is the fact that people and things can be taken away quickly, and for good; this is one of the reasons many of them resist

---

[44] *See* Craig Haney & Philip G. Zimbardo, *The Socialization into Criminality: On Becoming a Prisoner and a Guard, in* LAW, JUSTICE, AND THE INDIVIDUAL IN SOCIETY: PSYCHOLOGICAL AND LEGAL ISSUES 198 (June Louin Tapp & Felice J. Levine eds., 1977).

connecting closely to others.[45]  In Burling and Service's case, the events that eventually jeopardized their relationship began innocently enough.  After years of substituting on different shifts and working in different parts of the prison, Don Carter, a veteran corrections officer at Riverside, was finally placed in charge of his own housing unit—E-Block, where Carl Burling and Johnny Service lived.

When he had served as a "fill-in" in the past, Officer Carter had developed a reputation as a very decent, mild-mannered, and even-handed staff member. However, once he took over E-Block, prisoners reported to investigators that Officer Carter quickly became confrontational and even punitive.  And, for whatever reason, he singled out Burling and Service for the brunt of his harassment.  No one could say for certain what motivated the change in his demeanor; his provocations may well have stemmed from inadvertence rather than ill will or prejudice.  But Burling and Service certainly interpreted Officer Carter's actions as extremely hostile and highly personal.

Like all prison employees, Officer Carter was undoubtedly influenced by the powerful and pressurized prison environment where he worked.  His new-found assertiveness may have been a reflection of the need to appear clearly "in charge" of what was an intrinsically unstable setting—a single correctional officer responsible for the oversight of well over a hundred men.  The targeting of Black prisoners that I will describe in more detail below may have been his attempt to conform to the perversely racist ethic that had come to dominate Riverside Prison during his tenure there.  That is, it may have been a way of demonstrating that he was no longer a "fill-in" officer, but rather now someone who clearly "fit in" with the power structure at the prison.  His confrontational approach with the homosexual prisoners on his unit may have been, in fact, an honest reaction to a lifestyle that offended him.  Or, it is entirely possible that he was privately tolerant and even supportive of them but felt compelled to make a more decisive "statement" that instead appeared to conform to the views of his colleagues.

Whatever the personal and situational pressures to which he was responding, Officer Carter's behavior on E-Block changed when he took permanent control of the unit.  His on-the-job demeanor seemed at odds with the caring and devoted family man he was in civilian life, and the kind-hearted and generous friend that was described by the persons who knew him well. Obviously, the powerful context of prison changes correctional officers as well as prisoners.  Guards, too, are subjected to many social psychological forces that can elicit abusive and destructive behavior from otherwise good, normal

---

[45] George Jackson acknowledged the importance of controlling and suppressing emotion in prison, in part because of the way that emotional attachments represents points of potential manipulation and vulnerability.  One of his prison letters proclaimed, "I have made some giant steps toward acquiring the things that I personally will need [to survive]. . . . I have completely repressed all emotion . . . ." SOLEDAD BROTHER, *supra* note 42, at 42.

33-026

people.[46]  In any event, whatever the underlying reasons, Officer Carter's actions in E-Block appeared to be inconsistent with the way that he was initially characterized in the media accounts of his death.  They also helped to explain a terrible tragedy that had originally appeared to be so "senseless."

## VII. PRISON PRESSURES AND PROVOCATIONS: MICRO-AGGRESSIONS AND EXPLOSIVE OVERREACTIONS

Problems on E-Block began almost immediately after Officer Carter took over there.  As one inmate put it to investigators, although he had just gotten his regular position, Carter "tried to change the flow of things in the unit" by insisting on compliance with rules and regulations that other officers had not.  Another prisoner indicated that Officer Carter immediately began "enforcing ridiculous and archaic regulations."  As one of them who lived in East Block said:

> Officer Carter began causing a lot of turmoil from the minute he took over the unit.  It appeared as if [he] was enjoying the confrontations with the inmates. . . . [M]any inmates began complaining among themselves of the harassment. . . . Officer Carter "tossed cells around" and liked "pushing his weight around."

Several correctional officers also told investigators that this behavior had created "a general feeling of unrest" in E-Block.  One prisoner added that it seemed like "Officer Carter was repeatedly trying to look for trouble.  He would look for the most trivial things to focus on and then would harass the inmate until the situation escalated into a confrontation."

Indeed, many Black prisoners identified Officer Carter as part of the racist group of officers who were notorious at Riverside Prison.  Prisoners reported that Carter used racial slurs, including calling African-American prisoners "nigger."  Others said he had become arrogant and abusive, and that he clearly favored White prisoners over minorities.  One said that he tried to "make life hell for the Black inmates" and another suggested that he was "particularly mean towards Black and Hispanic inmates."  Even prisoners who themselves did not have problems with Officer Carter acknowledged that he did appear to treat Black prisoners worse than others.

Once he was placed in charge of E-Block, Officer Carter also became unusually focused on homosexual inmates.  Prisoners reported that he began voicing homophobic sentiments, and that he went out of his way to provoke and antagonize homosexual prisoners.  Shortly after he took over E-Block, Officer Carter passed out pamphlets outlining special rules he wanted enforced.  The rule that there will be "no homosexuality between inmates" was one he took the

---

[46] For discussions of how and why this occurs in certain prison contexts, *see* Craig Haney et al, *Interpersonal Dynamics in a Simulated Prison*, 1 INT'L J. CRIMINOLOGY & PENOLOGY 69 (1973); Haney, *supra* note 44.

938                          *UMKC LAW REVIEW*                          [Vol. 77:4

trouble of highlighting in pink. Carter apparently told at least one inmate that he was in the process of moving all of the homosexuals off of E-Block.

On the other hand—and in ways that suggest more complex dynamics at work—Officer Carter appeared ambivalent at times, as if he was trying to decide how to handle what he regarded as a problematic situation in his unit. Thus, inmates reported that he also kidded that he wanted to put all of the homosexual prisoners at Riverside into his unit, and that he wanted to paint the E-Block dayroom pink. There also were accounts that Officer Carter threw rice at two homosexual inmates and acknowledged openly that he understood that they were "getting married."

If Carter was ambivalent about homosexual prisoners in general, he did not appear at all conflicted about Carl Burling and Johnny Service. Numerous witnesses reported to defense investigators and experts that the two of them were targeted for special abuse by Officer Carter shortly after he took over the shift in E-Block. Just a few weeks before their fatal encounter, for example, he stopped at their cell and told Johnny Service: "I'm here to bust your balls." He told them that he intended to move them from his unit and threatened to place them in administrative segregation if they complained to his superiors about him. One inmate reported that:

> Carter made it a point to make Carl Burling's life miserable. . . . Officer Carter on many occasions [would] single out [Burling and Service] for no apparent reason. Carter would order [them] to remove things from their cell, while allowing other inmates the very same objects. Carter constantly talked down to Burling by calling him names and making disparaging remarks to him and his cellmate.

Indeed, this same inmate reported that it appeared as if "Carter was trying his hardest to antagonize Burling into doing something." In another incident, Officer Carter and a correctional sergeant ordered Carl and Johnny to remove the rugs they had from their cell, even though the inmate handbook permitted them. The sergeant was overheard saying, "this room looks like a little whore house," as he and Carter walked away laughing.

Johnny Service recalled that Officer Carter "constantly came to our cell to 'stare us down,' as if he wanted to provoke us into doing something." Other prisoners confirmed that he "trashed" their cell during repeated searches, and soiled or destroyed their personal belongings. And, in the week or two before the final confrontation, he intensified his harassment. A number of prisoners said they believed Carter was trying to provoke Carl Burling into some kind of outburst that would justify transferring him and Service out of the unit. However, for his part, Burling tried to respond to these escalating provocations by filing several official grievances in which he complained about Carter's mistreatment and asked the prison administration to put a stop to it.[47]

---

[47] Correctional officials at Riverside admitted that Burling had filed at least two such grievances in the past, but they later reported to the court that Burling's entire grievance file had mysteriously disappeared after Officer Carter's death.

In response to the grievances, however, Carter threatened to place Carl in disciplinary segregation. Carl was worried and he went directly to several other correctional staff members whom he knew, asking for their help to put an end to Officer Carter's harassment. As one prisoner described it:

> [Carl Burling] tried his best to avoid confrontations with Officer Carter. . . . He even tried to get help from several of Officer Carter's superiors and administration officials, but no one would help him. When he complained to a [correctional captain] about Officer Carter's abuse and undue harassment, it got back to Officer Carter. I then heard Officer Carter warn Burling, "You're lucky your con (Johnny Service) is still living."

In fact, no correctional officer intervened and the harassment intensified. Two nights before the fatal incident, Officer Carter tore up their cell again. Again, Burling went to other prison staff members and asked for help to resolve the dispute. The day before the incident, at least one other inmate was present when Carl told several other correctional officers that he was very upset about the way Officer Carter seemed to be going out of his way to harass him, even though he (Burling) and Service were not bothering anyone. He asked them if they would help get Officer Carter "off his back." Remarkably, they did nothing to relieve the tension or prevent the impending confrontation.

I say "remarkably" because prisoners and guards alike generally recognize that this kind of sustained harassment is problematic and potentially dangerous. Prisoners who feel that they have no legitimate way to redress their grievances may become desperate and unpredictable. In fact, many prisoners in the Middle State prison system shared precisely these feelings. Since the mid-1990s, the office of inmate advocacy had been prevented from initiating lawsuits against the state prisons, increasing the overall sense of helplessness among the prisoners. Inmates at Riverside Prison were especially frustrated because the person in charge of investigating complaints against officers throughout the entire Middle State prison system was married to the Superintendent there. Lacking an effective grievance procedure, many Riverside prisoners reported that they felt they had only two options—to tolerate instances of mistreatment, including racial mistreatment, or as a last resort, address them on their own.

Apparently, Officer Carter was not unaware of the effect that his behavior was having on Burling and Service. The night before he was killed he told a personal friend that he was going to move Carl and Johnny the next day. He described them as a homosexual couple who "had been together for so long and no one had bothered them," and he acknowledged that they very much resented being moved. Carter even told his friend that he "expected a lot of trouble because of it." Yet he persisted.

Witnesses to the exchanges that took place on the morning of the killing reported that Officer Carter continued to taunt Carl, who in turn became visibly upset. Carl said that he felt cornered and desperate. He had become in some ways psychologically dependent on Johnny Service for his own stability and sense of purpose and direction, and he believed that the impending cell move would bring their relationship to an end. That morning, Carl became increasingly volatile and, as the prisoners who watched these events unfold recalled, he

appeared to be barely in control of his feelings.  Carl also was convinced that Officer Carter's actions were arbitrary and he believed they were racially motivated.  He felt he had tried everything to avoid the move, and now was powerless to prevent what he dreaded most.

An inmate who witnessed the early exchanges between Officer Carter, Carl Burling, and Johnny Service that morning said that Burling "tried to comply with the order [to move] but Officer Carter kept harassing [them] by constantly walking by their cell area and yelling at them to hurry it up."  One prisoner housed nearby heard Carl respond to a comment Officer Carter made to him that morning by asking: "Are you threatening me?"  Another reported that he heard Officer Carter tell Carl that "both you and your homo lover are out of here!" and then, when Johnny Service approached him, saying "your homo ass is out of here!"

A number of prisoners saw Carl Burling upset, agitated, and angry.  One reported that he "had rage in his eyes," while another reported that he was "obviously upset" approximately five minutes before the fatal incident with Officer Carter.  An inmate who overheard him talking with Johnny Service just a few minutes before the event occurred described them as "talking loud," and "real furious, real upset about something . . ." and another described the final verbal exchange between Burling and Carter as "arguing."  Finally, an inmate heard Officer Carter say to Carl: "That's right you fucking niggers, we're racists."

Prison logs indicated that less than an hour had passed between the point in time that Officer Carter informed Carl that he and Johnny Service were moving and the final encounter between them.  By all accounts, the very last sequence of events transpired rapidly.  Once it was clear to Carl that he and Johnny Service actually would be separated, the two began to pack their belongings.  Carl Burling later told investigators that he tried to appear as calm as possible in order not to further upset or incite Service, who also seemed especially emotional and on the verge of losing control.  But he was fuming at what he regarded as Officer Carter's callous treatment and taunting that morning.  Finally, when he and Johnny Service had run out of containers with which to pack their belongings, Carl approached Officer Carter and asked him for some boxes.  Burling said Carter looked him directly in the eye and told him, "We don't get boxes for niggers."

It is impossible to account—in a precise way—for what happened next.  Social history and context provide a framework for understanding a discrete sequence of actions or events.  But the framework is admittedly broad, rather than a simple formula connecting a single causal influence to a specific outcome.  To Carl, Officer Carter's racist remark was deeply reminiscent of past insults, delivered at earlier times in his life when he felt vulnerable and helpless.  Carl had learned from the violence that he had witnessed as a young boy—and, as he got older, the aggression that he used to defend himself—to strike out when he felt he was under attack.  Although he had struggled to control this learned behavior, this provocation, coming after weeks of what he perceived to be targeted mistreatment, proved to be too much.  All morning, Carl seemed driven by a sense of desperation, perhaps because the one point of stability that

33-030

remained in his life—Johnny Service—was being taken away, just as others about whom he cared had been. Pent up frustrations from years of living in the harsh and arbitrary world of prison—a place where he had little or no control over the things that were important to him—pushed him closer to his limits. With all of these forces at work, the word "nigger"—delivered by a White man in authority who seemed intent on mistreating him, uttered at a moment when Carl's defenses were down and his emotions were high—triggered an uncontrollable reaction. Thus, an explosive mix of powerful factors and influences inside the pressurized context of prison, ignited by a thoughtless remark, brought about a terrible tragedy.

Carl became enraged. Unable to think clearly, he started to walk away. He reported later that, as he left Officer Carter, a rush of anger welled up in him, overwhelming his reason and self-control. Rather than returning to his cell, he headed instead in the direction of the outdoor courtyard area in the center of E-Block, where he knew a knife was buried. Carl would later acknowledge to investigators that he did not think about the consequences of what he was doing, or reflect on the right or wrong of it. He said he reacted only to the rage that he felt. Indeed, he gave no thought to the potentially deadly consequences of the act he was about to take, or the fact that he would permanently forfeit his liberty and perhaps his own life as a result. After he got the knife he returned to the control room where Officer Carter was still standing. Carl walked directly to Officer Carter, who had turned away from him. In plain view of numerous witnesses, he stabbed the officer—just one time—in the back. Mortally wounded, Officer Carter stumbled out of the E-Block entranceway and collapsed. Despite the efforts of a medical emergency team, he died a short time later.

Carl Burling made no attempt to avoid apprehension or escape punishment. After the fatal attack, he threw the knife out into the courtyard and went back to his cell, where he waited for the correctional officers to come for him. As the officers put him in handcuffs and leg restraints and removed him from his cell, Carl he did not deny responsibility for what he had done. He mumbled instead that he had repeatedly asked for help and requested that prison authorities intervene. Carl offered no resistance as he was taken away and placed in isolation.[48]

---

[48] The press also failed to contemporaneously report the whole story of Burling's arrest and his subsequent placement in isolation. Some key details—such as Burling's comments that he had been asking officers to intervene well in advance of the crime—were never reported. Others—such as the circumstances that surrounded his placement in isolation—were only revealed well *after* his criminal trial was completed. Thus, it took more than a year for the public to learn that, despite offering no resistance to the officers who came to get him, Burling was placed in a special device or "restraint chair," a piece of "modern" corrections hardware that completely immobilizes its captive, forcing his bent knees up against his chest while keeping the rest of his body tightly restrained, often cutting off circulation and making it difficult to breathe. A news account of these events was not published until more than a month *after* the verdict was rendered in Burling's trial and well over a year after they had happened. It was only then that the public learned what Burling had told his defense team, namely that right after the killing, officers in riot gear had pinned Burling down, stripped off his clothes, and used thick straps to immobilize him inside the restraint

## VIII.  TRIAL POSTSCRIPT: SOCIAL HISTORY AND CONTEXT MATTER

As I noted earlier, the media rarely surface let alone meaningfully analyze social historical and contextual influences on criminal behavior.  As in the Burling case, most crimes appear to be "solved" in their very early stages, and the news media have little incentive to pursue them further.  Coverage is concentrated on the narrow frame of the crime itself—what happened but rarely why—and the public is deprived of access to a more comprehensive set of facts that would complicate, counterbalance, or outright contradict the crime master narrative.[49]  Like citizens in general, potential jurors approach pending criminal trials with little more than the crime master narrative on which to rely.  Unless they are disabused of the simplistic and often inaccurate premises to which they have been repeatedly exposed, they are likely to render the most severe judgments possible against defendants whom they regard as having freely chosen to commit the worst possible crimes.

In Carl Burling's case, in fact, the media not only failed to do much in-depth reporting of their own, even as his capital murder trial approached, but also scarcely reported the details of the explanatory, mitigating counter-narrative that began to emerge in the preliminary court proceedings or in the course of the trial itself.  In a typical criminal case, as I noted earlier, Burling's jury would have been precluded from considering his social history and learning about its role in shaping his life course and character.  In many such cases, testimony about the influence of the powerful social context of prison or the way in which immediate prison-related events helped to precipitate the violent encounter for which he was being tried might have been greatly restricted or perhaps excluded altogether.

Yet, in part because this was a death penalty case, and because Carl had the good fortune to be represented by two remarkably committed and talented attorneys and several equally skilled investigators, this information was fully developed, carefully analyzed, and attached to compelling legal arguments that established its relevance to both the guilt and penalty phases of his capital trial.  In a courtroom ringed with a security detail of uniformed, often glowering correctional officers who were assigned from the very prison where the tragic crime had occurred—and at which the critical testimony about racist guard behavior was directed—numerous witnesses testified in detail about the facts and circumstances of Carl's life as well as the events that led up to and appeared to immediately precipitate Officer Carter's tragic death.  Indeed, the jurors who were impaneled to decide Carl Burling's fate heard essentially the same story that I have recounted here.

As a result, the group of death-qualified Middle State jurors—who had all expressed a willingness to return a death verdict in any case where they thought it was warranted—used this information as the basis on which to sentence Carl

---

chair where they left him.  He was naked and could hardly move. When he began complaining that the straps were too tight and that he could not breathe he was given no more than brief, perfunctory attention by a nurse.  Despite yelling, begging to see a doctor, and crying, he remained strapped in the chair for some eight hours.

[49] For a discussion of precisely this issue, *see* Haney & Greene, *supra* note 13.

Burling to life in prison instead. The jury unanimously agreed on two "mitigating circumstances" that were taken directly from the detailed counter-narrative that was presented at the trial, and cited these circumstances explicitly as justification for their verdict. Specifically, the jurors found that "the Riverside Prison administration permitted and fostered an environment in which racism flourished," and that the same administration did not properly respond to Carl Burling's complaints "so as to minimize or eliminate the anger and frustrations which caused him to commit the offense."

Not surprisingly, members of the surrounding community were unprepared for the life verdict and were outraged by it. They had long embraced the *only* version of these events that the media had given them—a variation of the crime master narrative that had portrayed the death of Officer Carter as having occurred without any context or explanation beyond the alleged evil of the perpetrator, in a case that lacked any conceivable mitigating circumstances. Because they had no access to a more comprehensive and valid narrative, community members had no framework for understanding the jury's decision to give Burling a life rather than death sentence. Ironically, much like the original crime, the verdict itself was portrayed as shocking and inexplicable—one that came about with "no rhyme or reason."

In a certain sense, the community's reaction to the jury verdict in the Burling case also can be seen as part of a larger, ongoing debate over how our society understands the real causes of crime, including prison violence. Here, too, just as in that larger debate, a politics-laden crime master narrative—one in which the presumably evil predispositions of the perpetrator are all that citizens have been led to believe should matter—continued to be defended in the community, despite a wealth of seemingly inconsistent facts and a jury verdict to the contrary. Because master narratives are given so much conferred legitimacy, repeated so often and typically without question, they become deeply ingrained to readily relinquish. The crime master narrative is sturdy and persistent, and can be remarkably resistant to contradictory information.

Thus, in the aftermath of the verdict in the Burling case, newspaper editorials condemned the outcome, expressing dismay that the guards at Riverside had been "the ones on trial" for merely doing their job, that the verdict itself represented a "staggering blow" to them, and that—despite the jury's life verdict—"[t]his was a clear-cut death penalty case." The correctional officers' association also took out a full-page advertisement praising the character of the slain officer, calling the trial testimony "slanderous," and characterizing the verdict "a travesty of justice." Long after the case was decided, Carl Burling was included in a newspaper article about the worst "bad guys" and "meanest prisoners" in the Middle State prison system.

## IX. CONCLUSION

Although some aspects of the Burling case were unusual and not easily generalized, its basic lessons remain broadly applicable. The development of a valid and effective mitigating counter-narrative requires the careful investigation of every seemingly relevant aspect of a capital defendant's background and

social history as well as the particular circumstances that may help to explain his behavior. In a sense, of course, *every* case ends up being unusual or unique once its individual facts are fully developed and the underlying story compellingly told. On the other hand, absent the sustained effort needed to find, structure, and present a more comprehensive, fact-based, and scientifically-supported account, criminal violence is likely to be depicted—in the media and very often in the courtroom—as one more example of the crime master narrative at work. Just as in the public account of the Burling case, the behavior in question is likely to be characterized as utterly senseless, engaged in "with no rhyme or reason" save the depravity of the perpetrator. Especially when the violence occurs in prison, its larger context is likely to remain hidden.

Thus, even though the particulars vary from case to case, there are many common elements to prison violence that must be systematically analyzed in order to fully understand and explain it. For one, prisoners themselves typically share a powerful set of social historical risk factors that help to account for their sometimes lengthy incarceration histories. Moreover, as the Burling case also illustrated, violence in prison is often situated in a complicated multi-level context. For example, the entire prison system may be plagued with a set of structural problems that contribute to a generally troubled atmosphere or widespread systemic dysfunction. The individual prison where the crime occurred may be in the throes of an unusually tense or conflict-ridden period, or it may be especially badly run. Given the heightened level of surveillance and control that characterizes prison settings, serious violence is unlikely to occur in a correctional environment that is functioning as it should. However, even chronically problematic conditions and dysfunctional prison dynamics do not usually lead to such extreme outcomes absent an idiosyncratic, unpredictable, or especially unfortunate sequence of events—one that may include micro-aggressions or some other immediate and explosive set of precipitants. Obviously, none of these things can be probed and examined until the factual details are unearthed and the hidden context made explicit. As always, the multiple layers of analysis that follow will form the explanatory context for the crime, offered not to excuse but to understand its origins.

Despite the widespread empirical support that exists for this more comprehensive and nuanced perspective on criminality, the barriers that prevent it from gaining broad popular acceptance remain substantial. As I have tried to show, the process of educating the public at large about the role of social historical factors and circumstances in crime causation is impeded by the incomplete, one-sided, and often sensationalized accounts of crime that are so pervasive in the media. More complex and factually-based accounts of the origins of criminal behavior are often belittled as excuse-making and even portrayed as part of a false antinomy that somehow dishonors crime victims. Yet one important way to honor the memory of victims like Officer Carter is to effectively ensure that there are fewer such victims in the future. This, in turn, would require acknowledging the real causes of crime and addressing them

33-034

preventively and preemptively, before they can bring about their criminogenic effects.[50]

For example, the substantial resources that were spent increasing the size of the Middle State prison system in the decades before this crime occurred might have been devoted instead to social programs in urban neighborhoods like the ones in which Carl Burling grew up. The best time to address the problems from which Carl later suffered was at earlier stages in his life, before the childhood traumas and chronic instability to which he was subjected had consigned him and many other poor minority youth to the social and economic margins of the larger society. In this way, Carl's history of repeated incarceration would be viewed as a symptom of a failing system—one that delivered too little help, far too late to truly matter—rather than an unmistakable sign of his fundamentally irredeemable character.

Similarly, some of the resources spent purchasing sophisticated surveillance devices, security-related hardware, and tactical weapons for "special operations groups" inside Middle State prisons might have been diverted for use in establishing effective drug treatment, counseling, educational, vocational, and other programs to maximize the chances that someone like Carl would successfully reenter free society after earlier prison terms. These kind of program-rich and reentry-oriented correctional environments have the potential to reduce recidivism and, in the long run, to shrink the size of perpetually overcrowded and understaffed prison systems.[51] Instead of merely investing in equipment designed to suppress violence or to protect against it once it inevitably broke out, the prison system might also have hired more staff members who were ready and able to provide effective programming for prisoners and required its guards to receive more adequate and racially sensitive training—preventive approaches that would lessen the need for reactive and repressive security and control-oriented measures. It also might have more effectively overseen and sanctioned officers whose behavior was likely to increase tensions and provoke conflicts in the already very stressful context of prison.

The implementation of these and related solutions would require a truly fundamental shift in public understanding of the nature of violent crime that occurs both inside prison and in society at large. It would necessitate, at least, a more critical analysis of and valid alternatives to the crime master narrative being interposed in the media as well as in policy-oriented debates and decision-making. At the same time, of course, the now well-established use of these more valid, nuanced, psychologically-sophisticated mitigating counter-narratives in capital cases must continue. Ironically, the only places where such comprehensive and sophisticated counter-narratives are regularly presented to

---

[50] See, e.g., Chapter 10 in REFORMING PUNISHMENT, supra note 22.

[51] For example, see discussions of some of these issues in, PRISONERS ONCE REMOVED: THE IMPACT OF INCARCERATION AND REENTRY ON CHILDREN, FAMILIES, AND COMMUNITIES (Jeremy Travis, & Michelle Waul eds., 2003); JOAN PETERSILIA, WHEN PRISONERS COME HOME: PAROLE AND PRISONER REENTRY (2003).

946                        *UMKC LAW REVIEW*                        [Vol. 77:4

members of the public is before juries like Carl Burling's, which continue to demonstrate how relevant and persuasive they regard them.

33-036

# EXHIBIT 34



34-001

# EXHIBIT 35



1 of 100 DOCUMENTS

Copyright 2008 The Beaumont Enterprise
The Beaumont Enterprise (Texas)

Distributed by McClatchy-Tribune Business News

April 6, 2008 Sunday

**SECTION:** STATE AND REGIONAL NEWS

**ACC-NO:** 20080406-BE-INMATE-RELOCATION-20080406

**LENGTH:** 1069 words

**HEADLINE:** Hardcore cons move out

**BYLINE:** Ryan Myers, The Beaumont Enterprise, Texas

**BODY:**

Apr. 6--Continued violence at the federal corrections complex outside Beaumont has spurred the Bureau of Prisons to relocate most of the unit's 1,500 high-security inmates to other prisons.

The shift comes after a rash of violence in the past months, including two inmate slayings and the stabbing of two correctional officers. But a prison system official said recent events alone did not cause the bureau to act. "Incidents at the USP over the last few years have required us to consider alternatives for managing that institution," said bureau spokeswoman Traci Billingsley in Washington D.C.

As high-security inmates are transferred to other institutions, medium-security inmates will take their places.

Officials hope the trade will break up a collection of violent inmates and decrease assaults there.

The shift now under way is designed to be temporary, with an eventual repopulation of high-security inmates. There is no timetable for returning high-security inmates.

The president of the local union for federal prison workers said he is hopeful the bureau's plan will increase the safety of correctional officers and remaining inmates.

"It should allow for them to readjust their situation there at the penitentiary, to make the changes they need to to make it safer," said Isaac Ortiz.

Ortiz said understaffing and a lack of incentives for inmates to behave have contributed to the existing situation.

"There was a program change in 2005 that reduced overall staffing," Ortiz said. "And federal sentencing laws don't give them reason to be good. They are more violent. They are more brazen to confront each other and also the staff."

Hardcore cons move out The Beaumont Enterprise (Texas) April 6, 2008 Sunday

Exporting the high-security inmates will not change staffing levels or assignments, said Deborah Denham, spokeswoman for the bureau's south central region.

No correctional officers have been killed at the Beaumont complex. Ortiz said the stabbing of two officers in November represented the most serious injuries suffered by prison staff. Both guards survived, but neither has returned to work.

Gabriel N. Rhone, a high-security inmate, died in the same attack. Before his death, Rhone complained to his mother and sister by telephone of violence at the prison and said he feared he would be killed, family members said in interviews.

The location of the November attacks, in the high-security facility's Special Housing Unit, underscores the danger in the prison, Ortiz said.

"The Special Housing Unit is supposed to be one of the most secure areas in the prison," Ortiz said. "But because of the staff constraints and budget, it is very hard to maintain the type of security necessary."

James Makin, a Beaumont defense attorney who recently defended a man convicted of capital murder in the prison, echoed Ortiz' assessment regarding compromised security in the special housing unit.

"With the murders, the assaults, the violence, I think they realized they had a problem," Makin said. "This is a way they can ship the problem people to other prisons and start over again."

Bureau of Prison officials have been tight-lipped about the transfers, initially denying violence had anything to do with them.

Ultimately the bureau acknowledged that events at the prison in past years led to the change -- a move that has been required in the past at other high-security units.

When the Beaumont Federal Correctional Complex opened in 1996, it was the bureau's largest campus with an inmate population the size of Bevil Oaks, China and Kountze combined. It also was the state's first high-security penitentiary. The overall population since has grown from 4,100 to about 5,100.

In addition to the high-security facility, the federal prison complex south of Beaumont includes a medium-security unit, a low-security unit and a minimum-security unit or camp. Prisoners in other units will not be affected by the shift.

Prisoners are classified in different security levels according to their background.

Less than two years after its completion in 1997, the high-security unit saw its first homicide.

Just two months ago, the September 1998 case resulted in a life sentence for Ellis Joseph Mosher, a Maryland man originally convicted of kidnapping who stabbed Louisiana bank robber and fellow inmate Stanley Moseley.

Since then at least seven inmates have been killed at the prison complex, according to court records and The Enterprise archives.

Prisons nationwide have become more dangerous.

The number of federal prisoners with a history of violence has increased 23 percent in the last decade, according to the bureau. Prisoners convicted of violent offenses have increased by 17 percent in the same period.

"It has been no secret that the Beaumont USP has increasingly become more violent," said Britt Featherston, an assistant United States attorney in Beaumont. "Eventually the prison becomes full or almost full of people doing

Page 3

Hardcore cons move out The Beaumont Enterprise (Texas) April 6, 2008 Sunday

extremely long prison sentences. You have them all together, and those guys don't stop being violent. Their little world becomes a question of 'How do I get over on the next guy?'"

The prison's violence saps federal prosecution resources that Featherston would like to spend on criminals not already incarcerated.

"Our hope is that there will be fewer Moshers, less assaultive crime. It is a severe drain on our resources," he said.

The latest killing at the Beaumont corrections complex to result in an indictment highlights how dangerous prisons can be.

On May 7, 2005, the day after Keith Barnes was transferred to Beaumont from Florida, he was stabbed to death.

According to court filings and reports in the Washington Post, Barnes was killed in retaliation for testifying against co-defendants in a Washington, D.C., murder trial.

The U.S. Attorney's Office has filed a notice to seek the death penalty against the three men indicted in Barnes' death.

"That's three capital murder trials, stacked end to end. That alone could take us to until fall or winter of 2010," Featherston said.

"Hopefully there will be less of these cases now."

To see more of The Beaumont Enterprise, or to subscribe to the newspaper, go to http://www.southeasttexaslive.com. Copyright (c) 2008, The Beaumont Enterprise, Texas Distributed by McClatchy-Tribune Information Services. For reprints, email tmsreprints@permissionsgroup.com, call 800-374-7985 or 847-635-6550, send a fax to 847-635-6968, or write to The Permissions Group Inc., 1247 Milwaukee Ave., Suite 303, Glenview, IL 60025, USA.

**LOAD-DATE:** April 7, 2008

35-003

# EXHIBIT 36




Powered by Clickability

# Man heads to death row in murder of inmate

By SARAH MOORE

**November 21, 2006**
**Posted: June 18, 2008, 5:58 AM CDT**

Share
.horiz-dotted{ border-bottom:2px dotted #cccccc; } div#share-module{ width:230px; height:auto; } .PrintAndEmail-Table{ vertical-align:top; } .ShareTable{ vertical-align:top; } #share-module div{ padding:2px; }

 Print           Email





Top News



UPDATE: Desormeaux gets life in prison for murder of Summer Bourque

- Structure fire off of Tram Road in Beaumont
- Lumberton man pleads guilty to arson of church
- Wreck on I-10 E near downtown slows traffic
- Beaumont man who cut his own throat indicted

State News

Recommend     Be the first of your friends to recommend this.

BEAUMONT - A federal prison inmate was sentenced to death Monday for the 1999 murder of a fellow inmate. A jury deliberated about 2½ hours before sentencing 46-year-old David Lee Jackson of Detroit,

36-001

Case 1:09-cv-01039-MJT    Document 48-5    Filed 10/05/10    Page 46 of 66 PageID #: 5919

for stabbing New York inmate Daryl Brown to death on Dec. 16, 1999, at the U.S. Penitentiary in Beaumont. Jackson's only visible reaction to the sentence was a slight look of disbelief. At the time, Jackson was serving a sentence for felon in possession of a firearm and Brown was in for bank robbery. Jackson and another Detroit inmate, Arzell Gulley, were filmed by surveillance cameras chasing Brown through a housing unit and into a cell. Gulley and Jackson ran from the cell in opposite directions shortly thereafter. Brown, 34, collapsed after staggering from the cell and heading toward Jackson. He died en route to the hospital. Inmates had testified during the trial that Brown had been threatening to rob and stab Jackson earlier on the day of the attack. During the punishment phase of the trial, prosecutors put on evidence of a series of crimes going back to his teens committed by Jackson, and a long disciplinary record while in prison. Jackson also escaped from a holding facility in July 2005 while awaiting a hearing in federal court. Defense attorneys' premitigating evidence included an abusive father who traumatized Jackson and led him into a life of crime. They also presented efforts Jackson made to rehabilitate himself while in prison. During the hearing, Jackson told the victim's mother, Mary Brown, he had tried to contact her after her son's slaying, and it had bothered him for six years that he had been unable to. "I'm sorry for what took place with your son," he said. "It shouldn't have taken place." Mary Brown told Jackson she was not mad at him. "One day I'm going to meet my son again. But if I hold conflict, I won't be able to," she said. Outside the courtroom, Brown said she was not in favor of the death penalty. She said when she first arrived to testify and saw Jackson, the anger she had been fighting for the seven years since her son's death flared up again. But after hearing about Jackson's childhood, she felt she understood him and was better able to forgive him. "I don't wish no child a background like he had," Mary Brown said. She said her son had been a likable person with a good sense of humor. "I'll miss him till the day I die," she added. Pamela Morrison of Detroit cried as Jackson was sentenced to death. Morrison had been Jackson's on-again, off-again girlfriend since they were teenagers. She said Jackson was basically a good person who had made some terrible choices. Defense lawyer Doug Barlow said he was surprised by the jury's decision. "There was more mitigating evidence than I've ever seen in a capital case," he said. Barlow said Jackson was nearly a poster child for a U.S. Department of Justice study of the factors that go into the creation of criminals. "Because of his terrible childhood, Jackson met almost all the criteria set out by the Department of Justice," Barlow said. "It is likely someone raised like this will end up serving life in prison." In a statement, U.S. Attorney Matt Orwig thanked the jurors for their careful consideration of the evidence during the trial. "The jurors acted responsibly in weighing the facts of this case and coming to their decision," Orwig said. "The defendant sealed his own fate when he brutally killed another inmate." Jackson's codefendant, Gulley, was sentenced Oct. 4 to life in prison for the offense. smoore@beaumontenterprise.com
(409) 880-0730

**Find this article at:**
http://www.beaumontenterprise.com/news/man_heads_to_death_row_in_murder_of_inmate_06-25-2008_03_58_42.html

☐ Check the box to include the list of links referenced in the article.

36-002

# EXHIBIT 37

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | NO. 1:06-CR-51 |
| | § | |
| DAVID LEE JACKSON | § | (Hon. Marcia Crone) |

**FILED**
P.M. *November 13* 20*06*
DAVID J. MALAND, CLERK
U.S. DISTRICT COURT
By_____
DEPUTY

**SPECIAL VERDICT FORM—SECTION I**
**DEFENDANT'S AGE**

Instruction: Answer "YES" or "NO."

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

The defendant, David Lee Jackson, was eighteen years of age or older at the time of the offense?

YES _____✓_____
NO _____

_____
Presiding Juror

Instructions: If you answered "NO" with respect to the determination in this section, then stop your deliberations, cross out Special Verdict Forms—Sections II, III, IV, V and VI, and proceed to Special Verdict Form—Section VII. Each juror should then carefully read the statement in Special Verdict Form—Section VII and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the determination in Special Verdict Form—Section I, then proceed to Special Verdict Form—Section II, which follows.

37-001

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
| --- | --- |

| | | |
| --- | --- | --- |
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | NO. 1:06-CR-51 |
| | § | |
| DAVID LEE JACKSON | § | (Hon. Marcia Crone) |

## SPECIAL VERDICT FORM—SECTION II
## REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO." You may consider and find more than one requisite mental state factor.

1.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, David Lee Jackson, intentionally killed the victim, Daryl Brown?

                                                                            YES   ✓
                                                                            NO    ___

_____
Presiding Juror

2.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, David Lee Jackson, intentionally inflicted serious bodily injury that resulted in the death of Daryl Brown?

                                                                            YES   ✓
                                                                            NO    ___

_____
Presiding Juror

3.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, David Lee Jackson, intentionally participated in an act,

2

37-002

contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than a participant in the offense, and the victim, Daryl Brown, died as a direct result of the act?

YES  ✓

NO  _____

_____
Presiding Juror

4.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, David Lee Jackson, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than a participant in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, Daryl Brown, died as a direct result of the act?

YES  ✓

NO  _____

_____
Presiding Juror

Instructions:  If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Special Verdict Forms—Sections III, IV, V and VI, and proceed to Special Verdict Form—Section VII.  Each juror should carefully read the statement in Special Verdict Form—Section VII and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.

If you answered "YES" with respect to one or more of these determinations in Special Verdict Form—Section II, then proceed to Special Verdict Form—Section III, which follows.

3

37-003

Case 1:09-cv-01039-MJT   Document 48-5   Filed 10/05/10   Page 51 of 66 PageID #:
5924
Case 1:06-cr-00051-MAC-ESH   Document 328   Filed 11/13/06   Page 4 of 19

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

UNITED STATES OF AMERICA §
§
*versus* §  NO. 1:06-CR-51
§
DAVID LEE JACKSON §  (Hon. Marcia Crone)

## SPECIAL VERDICT FORM—SECTION III
## STATUTORY AGGRAVATING FACTOR

Instruction: Answer "YES" or "NO."

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, David Lee Jackson, has previously been convicted of a federal offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person?

YES   ✓

NO   _____

_____
Presiding Juror

Instructions:  If you answered "NO" with respect to the Statutory Aggravating Factor in this Special Verdict Form—Section III, then stop your deliberations, cross out Special Verdict Forms—Sections IV, V, and VI, and proceed to Special Verdict Form—Section VII.  Each juror should then carefully read the statement in Special Verdict Form—Section VII and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.

If you answered "YES" with respect to the Statutory Aggravating Factor in Special Verdict Form—Section III, then proceed to Special Verdict Form—Section IV, which follows.

4

37-004

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

UNITED STATES OF AMERICA §
§
*versus* §     NO. 1:06-CR-51
§
DAVID LEE JACKSON §     (Hon. Marcia Crone)

## SPECIAL VERDICT FORM—SECTION IV
## NON-STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO." You may consider and find more than one non-statutory aggravating factor.

1.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, David Lee Jackson, poses a future danger to others based upon the probability that he would commit criminal acts of violence that would constitute a continuing threat to society and that this factor tends to support imposition of the death penalty?

YES     *12* ✓

NO     _____

_____
Presiding Juror

2.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, David Lee Jackson, has a significant history of disciplinary violations while he has been incarcerated and that this factor tends to support imposition of the death penalty?

YES     ✓

NO     _____

_____
Presiding Juror

5

37-005

Instructions:  Regardless of whether you answered "YES" or "NO" with respect to the
Non-Statutory Aggravating Factors in Special Verdict Form—Section IV, proceed to Special
Verdict Form—Section V, which follows.

6

37-006

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

UNITED STATES OF AMERICA §
§
*versus* §    NO. 1:06-CR-51
§
DAVID LEE JACKSON §    (Hon. Marcia Crone)

## SPECIAL VERDICT FORM—SECTION V
## MITIGATING FACTORS

Instructions: For each of the following mitigating factors, you have the option to indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proved by a preponderance of the evidence. Individual jurors may find and consider more than one mitigating factor.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established. Further, any juror may also weigh a mitigating factor found by another juror, even if he or she did not also find that factor to be mitigating. Do any of you find any of the following factors by a preponderance of the evidence?

1.    An equally culpable defendant, Arzell Gulley, did not receive a sentence of death as a result of the offense.

Number of jurors who so find ___/___ .

7

37-007

Case 1:09-cv-01039-MJT    Document 48-5    Filed 10/05/10    Page 55 of 66 PageID #:
Case 1:06-cr-00051-MAC-ESH    Document 328    Filed 11/13/06    Page 8 of 19
5928

2.  The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Number of jurors who so find _____0_____.

3.  He was late in meeting developmental milestones and this factor is mitigating.

Number of jurors who so find _____0_____.

4.  He suffered a head injury from a crib fall when he was 8 months old and this factor is mitigating.

Number of jurors who so find _____0_____.

5.  He experienced persistent falling when trying to walk until he was 5 years old and this factor is mitigating.

Number of jurors who so find _____0_____.

6.  He used single word speech until after he was 3 years old and this factor is mitigating.

Number of jurors who so find _____0_____.

7.  He sucked his thumb until his teen years and this factor is mitigating.

Number of jurors who so find _____0_____.

8.  He was diagnosed in the mentally retarded range throughout school, with a full scale IQ score of 67 in the 4th grade, and this factor is mitigating.

Number of jurors who so find _____0_____.

9.  He was diagnosed with a full scale IQ score of 73 at age 24 while in Folsom Prison and this factor is mitigating.

Number of jurors who so find _____0_____.

8

37-008

Case 1:09-cv-01039-MJT    Document 48-5    Filed 10/05/10    Page 56 of 66 PageID #:
5929
Case 1:06-cr-00051-MAC-ESH    Document 328    Filed 11/13/06    Page 9 of 19

10.    He was placed in special education classes and this factor is mitigating.

      Number of jurors who so find ___*0*___.

11.    His father beat him and his siblings at the slightest infraction and this factor is

mitigating.

      Number of jurors who so find ___*0*___.

12.    His father called him "retard" and often referred to him as "your retarded ass" and

this factor is mitigating.

      Number of jurors who so find ___*0*___.

13.    His father beat him and his siblings with bed slats, his fists, and other items and

this factor is mitigating.

      Number of jurors who so find ___*4*___.

14.    His father put him, his mother, and his siblings out in the cold without coats and

this factor is mitigating.

      Number of jurors who so find ___*0*___.

15.    He had no positive role model in his life as a child and this factor is mitigating.

      Number of jurors who so find ___*12*___.

16.    He grew up in a house with little furniture or food because his father kept it for

himself and his girlfriends and this factor is mitigating.

      Number of jurors who so find ___*0*___.

17.    His father's role was to introduce him into a life of crime and despair as a hustler

and a criminal and this factor is mitigating.

      Number of jurors who so find ___*0*___.

9

37-009

18.   He did not inflict any bodily injury in the commission of any offense for which he was sent to prison and this factor is mitigating.

Number of jurors who so find ____6____.

19.   He was under extreme stress as a result of his childhood, which extended into his prison life and this factor is mitigating.

Number of jurors who so find ____0____.

20.   Regarding the allegation that the defendant possessed a homemade weapon in prison on April 5, 1995, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ____0____.

21.   Regarding the allegation that the defendant was involved in fighting with inmate Acevedo in prison on February 29, 1996, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ____0____.

22.   Regarding the allegation that the defendant assaulted another inmate with a belly chain on March 7, 1996, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ____0____.

23.   Regarding the allegation that the defendant threw his food tray at Correctional Officer Lehman and threatened him on January 3, 1997, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ____0____.

10

37-010

Case 1:09-cv-01039-MJT    Document 48-5    Filed 10/05/10    Page 58 of 66 PageID #:
Case 1:06-cr-00051-MAC-ESH    Document 328    Filed 11/13/06    Page 11 of 19
5991

24.    Regarding the allegation that the defendant yelled and screamed and threw food on February 13, 1997, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ___*0*___.

25.    Regarding the allegation that the defendant was involved in a fist fight with inmate Lee on February 22, 1997, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ___*0*___.

26.    Regarding the allegation that the defendant threatened Correctional Officer Anthony on January 14, 2000, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ___*0*___.

27.    Regarding the allegation that the defendant cursed and spit on Dr. Palmieri during a physical examination in prison on January 19, 2000, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ___*0*___.

28.    Regarding the allegation that the defendant threw food trays out the bean slot and a tray struck Correctional Officer J. Chwaliszewski on April 23, 2000, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ___*0*___.

11

37-011

29.  Regarding the allegation that the defendant possessed a homemade weapon in prison on August 8, 2000, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

Number of jurors who so find ____O____.

30.  Regarding the allegation that the defendant pulled his handcuffs away from Correctional Officer T. Evans and threatened him on September 21, 1997, he inflicted no serious physical injury in connection with the incident and this factor is mitigating.

Number of jurors who so find ____O____.

31.  In commission of the offense of conviction on December 16, 1999, the defendant believed he was defending himself by stabbing Daryl Brown, and he continues to hold this belief and this factor is mitigating.

Number of jurors who so find ____O____.

32.  At the time of the offense of conviction, the defendant was under stress as a result of his background and adaptation to prison and this factor is mitigating.

Number of jurors who so find ____O____.

33.  The defendant does not go around looking for someone to kill and this factor is mitigating.

Number of jurors who so find ____10____.

34.  The fight between the defendant and Daryl Brown was a result of a sudden quarrel and this factor is mitigating.

Number of jurors who so find ____O____.

12

37-012

35. Daryl Brown was the first aggressor in the incident resulting in his death and this factor is mitigating.

Number of jurors who so find ___9___.

36. Daryl Brown had a lengthy disciplinary record in prison and this factor is mitigating.

Number of jurors who so find ___0___.

37. Daryl Brown had a violent disciplinary record in prison and this factor is mitigating.

Number of jurors who so find ___0___.

38. The defendant maintained successful employment in federal prisons other than ADX and this factor is mitigating.

Number of jurors who so find ___0___.

39. He was transferred to a more secure facility, ADX, in Florence, Colorado, in 2000 and this factor is mitigating.

Number of jurors who so find ___0___.

40. He was an orderly while at ADX and this factor is mitigating.

Number of jurors who so find ___0___.

41. He received no disciplinary reports in any prison after leaving the Beaumont facility in 2000 and this factor is mitigating.

Number of jurors who so find ___0___.

13

37-013

Case 1:09-cv-01039-MJT   Document 48-5   Filed 10/05/10   Page 61 of 66 PageID #:
Case 1:06-cr-00051-MAC-ESH   Document 328   Filed 11/13/06   Page 14 of 19
5934

42.    He had no problems while housed at ADX in Florence, Colorado, from 2000 through the time of his preparation for release from prison and this factor is mitigating.

   Number of jurors who so find ___0___.

43.    He has received low risk assessments in the majority of his prison reports and this factor is mitigating.

   Number of jurors who so find ___0___.

44.    In his risk assessments at ADX, prison officials rated him as "low risk" and this factor is mitigating.

   Number of jurors who so find ___0___.

45.    He was released from prison into the community in March 2004 and this factor is mitigating.

   Number of jurors who so find ___0___.

46.    Regarding the allegation that the defendant committed the offense of robbery of a Holiday Inn Express in Ohio on April 30, 2004, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

   Number of jurors who so find ___0___.

47.    Regarding the allegation that the defendant committed the offense of bank robbery of Union Planters Bank in Collinsville, Mississippi, on May 6, 2004, he inflicted no physical injury or bodily harm in connection with the incident and this factor is mitigating.

   Number of jurors who so find ___0___.

14

37-014

Case 1:09-cv-01039-MJT    Document 48-5    Filed 10/05/10    Page 62 of 66 PageID #:
Case 1:06-cr-00051-MAC-ESH   Document 328   Filed 11/13/06   Page 15 of 19
5935

48.    He wrote a letter of apology for the robbery of the bank in Mississippi and this factor is mitigating.

Number of jurors who so find ___0___.

49.    He suffers from Post Traumatic Stress Disorder as a result of his background and this factor is mitigating.

Number of jurors who so find ___0___.

50.    He suffers from Antisocial Personality Disorder as a result of his background and this factor is mitigating.

Number of jurors who so find ___0___.

51.    He suffers from Narcissistic Personality Disorder as a result of his background and this factor is mitigating.

Number of jurors who so find ___0___.

52.    He suffers from Mixed Personality Disorder as a result of his background and this factor is mitigating.

Number of jurors who so find ___0___.

53.    He is trying to write a book to counsel inmates on how to get along in prison and this factor is mitigating.

Number of jurors who so find ___0___.

54.    He taught himself to read and write while in prison and this factor is mitigating.

Number of jurors who so find ___0___.

55.    He earned his GED while in prison and this factor is mitigating.

Number of jurors who so find ___0___.

15

Case 1:09-cv-01039-MJT    Document 48-5    Filed 10/05/10    Page 63 of 66 PageID #:
Case 1:06-cr-00051-MAC-ESH   Document 328   Filed 11/13/06   Page 16 of 19
5996

56. He availed himself of educational opportunities while in prison and this factor is mitigating.

Number of jurors who so find ____0____.

57. There are prisoners with worse criminal records and disciplinary records than his who are in the federal prison system and are not sentenced to death and this factor is mitigating.

Number of jurors who so find ____8____.

58. The Bureau of Prisons can designate a location in prison where the defendant can serve a life sentence where he will not have access to other inmates or guards and this factor is mitigating.

Number of jurors who so find ____3____.

59. The Bureau of Prisons has the capability and facilities to house the defendant safely if he is sentenced to life without the possibility of release and this factor is mitigating.

Number of jurors who so find ____2____.

60. Arzell Gulley was prosecuted and convicted for the identical offense of first degree capital murder for unlawfully killing Daryl Brown, the victim herein, with premeditation and malice aforethought, on December 16, 1999. The United States of America did not seek the death penalty against Arzell Gulley, and he was sentenced to life imprisonment for the offense and this factor is mitigating.

Number of jurors who so find ____3____.

16

37-016

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors.  If none, write "NONE."  If more space is needed, write "CONTINUED" and use the reverse side of this page.

___.   _____

_____

Number of jurors who so find _____.

___.   _____

_____

Number of jurors who so find _____.

___.   _____

_____

Number of jurors who so find _____.

_____
Presiding Juror

Instructions:  Regardless of whether you chose to make written findings for the Mitigating Factors in Special Verdict Form—Section V above, proceed to Special Verdict Form—Section VI, which follows.

17

37-017

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | NO. 1:06-CR-51 |
| | § | |
| DAVID LEE JACKSON | § | (Hon. Marcia Crone) |

## SPECIAL VERDICT FORM—SECTION VI
## DETERMINATION

Based upon our consideration of whether the aggravating factor or factors found to exist, which do not include the defendant's intent, sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of any mitigating factors, whether the aggravating factor or factors alone are sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case:

We determine, by unanimous vote, that a sentence of death shall be imposed as to Count I of the First Superseding Indictment.

YES _____✓_____
NO _____

_____
Presiding Juror

We determine, by unanimous vote, that a sentence of life without the possibility of release shall be imposed as to Count I of the First Superseding Indictment.

YES _____
NO _____

_____
Presiding Juror

Instructions: After you complete Special Verdict Form—Section VI, proceed to Special Verdict Form—Section VII, which follows.

18

Case 1:09-cv-01039-MJT   Document 48-5   Filed 10/05/10   Page 66 of 66 PageID #:
Case 1:06-cr-00051-MAC-ESH   Document 328   Filed 11/13/06   Page 19 of 19
5939

| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

UNITED STATES OF AMERICA §
§
*versus* §   NO. 1:06-CR-51
§
DAVID LEE JACKSON §   (Hon. Marcia Crone)

### SPECIAL VERDICT FORM—SECTION VII
### CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

_____          _____
                                                        PRESIDING JUROR

Date: _11-13-06_

19

37-019