# EXHIBIT 44

## **Instructions for Count I**

The law permits the jury to determine whether the government has proven the guilt of a defendant for any other offense which is, by its very nature, necessarily included in the crime of murder in the first degree that is charged in Count I of the indictment.

If the jury should unanimously find that the government has proven each of the essential elements of the offense of murder in the first degree that is charged in Count I of the indictment beyond a reasonable doubt, the foreperson should write "guilty" in the space provided and the jury's consideration of that court is concluded.

If the jury should determine unanimously that the government has not proven each element of the offense of murder that is charged in Count I of the indictment beyond a reasonable doubt, the foreperson should write "not guilty" in the space provided and the jury should then consider the guilt or innocence of Defendant David Lee Jackson for the other offenses necessarily included in the offense of murder in the first degree charged in Count I of the indictment.

If, after reasonable efforts have been unsuccessful, the jury is unable to reach a verdict as to whether or not the government has proven each element of the offense charged in Count I of the indictment, the jury should then consider whether Defendant David Lee Jackson is guilty or not guilty of the crime of murder in the second degree which is necessarily included in the offense of murder in the first degree charged in Count I of the indictment.

If, after reasonable efforts have been unsuccessful, the jury is unable to reach a verdict as to whether or not the government has proven each element of the offense of murder charged in Count I of the indictment, the jury should then consider whether Defendant David Lee Jackson is guilty or not guilty of the crime of manslaughter which is necessarily included in the offense of murder charged in Count I of the indictment.

44-001

Case 1:06-cr-00051-MAC-ESH Document 225-1 Filed 09/22/06 Page 2 of 23

If, after reasonable efforts have been unsuccessful, the jury is unable to reach a verdict as to whether or not the government has proven each element of the offense of manslaughter, the jury should then consider whether Defendant David Lee Jackson is guilty or not guilty of the crime of involuntary manslaughter which is necessarily included in the offense of murder charged in Count I of the indictment.

The crime of murder in the first degree, which is charged in Count I of the indictment in this case, necessarily includes the offenses of murder in the second degree, voluntary manslaughter and involuntary manslaughter.

44-002

**COUNT I**
**Murder (First Degree)**
**Title 18 U.S.C. § 1111**

Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought, if it is perpetrated by wilful, deliberate, malicious and premeditated conduct.

For you to find the defendant guilty of the crime of murder in the first degree, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: That the defendant unlawfully killed Daryl Brown;

Second: That the defendant killed Daryl Brown with malice aforethought;

Third: That the killing was wilful, deliberate, malicious, and premeditated; and

Fourth: That the killing took place within the territorial jurisdiction of the United States; and

Fifth: That the defendant did not act in self defense.

**COUNT I**
**Murder (Second Degree)**
**Title 18 U.S.C. § 1111**

Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with malice aforethought.

For you to find the defendant guilty of murder in the second degree, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: That the defendant unlawfully killed Daryl Brown;

Second: That the defendant killed Daryl Brown with malice aforethought;

Third: That the killing took place within the territorial jurisdiction of the United States; and

Fourth: That the defendant did not act in self defense.

To kill "with malice aforethought" means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice

44-003

aforethought, you need not be convinced that the defendant hated the person killed, or felt ill will toward the victim at the time.

In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument and the manner in which death was caused.

A killing is "premeditated" when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent.

"Murder" is the unlawful killing of a person with malice aforethought.

You should consider all the facts and circumstances preceding , surrounding, and following the killing which tend to shed light upon the condition of mind of the defendant, before and at the time of the killing.

No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the questions of malice aforethought and premeditation, should escape your careful consideration.

44-004

## COUNT I
### Voluntary Manslaughter
### Title 18 U.S.C. § 1112

Title 18, United States Code, Section 1112, makes it a crime for anyone to unlawfully kill another human being, without malice.

For you to find a defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: That the defendant unlawfully killed Daryl Brown;

Second: That the defendant did so upon a sudden quarrel or heat of passion; and

Third: That the killing took place within the territorial jurisdiction of the United States; and

Fourth: That the defendant did not act in self defense.

The term "heat of passion" means a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances that would provoke such a passion in an ordinary person, but which did not justify the use of deadly force.

44-005

# COUNT I
## Involuntary Manslaughter
### Title 18 U.S.C. § 1112

Title 18, United States Code, Section 1112, makes it a crime for anyone to unlawfully kill another human being, without malice.

For you to find a defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First:       The defendant committed an unlawful act not amounting to a felony, or committed a lawful act, done either in an unlawful manner or without due caution and circumspection, which might produce death;

Second:      The defendant's act was the proximate cause of the death of the victim.  A proximate cause in one which played a substantial part in bringing about the death, so that the death was the direct result or a reasonably probable consequence of the defendant's act;

Third:       The killing was unlawful;

Fourth:      The defendant either knew that such conduct was a threat to the lives of others or knew of circumstances that would reasonably cause the defendant to foresee that such conduct might be a threat to the lives of others; and

Fifth:       That the killing took place within the territorial jurisdiction of the United States; and

Sixth:       That the defendant did not act in self defense.

44-006

Case 1:06-cr-00051-MAC-ESH Document 225-1 Filed 09/22/06 Page 7 of 23

## Self-Defense

Defendant David Lee Jackson has offered evidence of that he was acting in self-defense.

Use of force is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force. A person acting in self defense, however must use no more force that appears reasonable necessary under all of the circumstances.

Forces likely to cause death or great bodily harm is justified in self-defense only if a person reasonably believes that such force is necessary in order to prevent death or great bodily harm.

The government must prove beyond a reasonable doubt that Defendant David Lee Jackson did not act in self defense as described in this instruction.

44-007

Case 1:06-cr-00051-MAC-ESH Document 223-1 Filed 09/22/06 Page 8 of 23

## DEFENDANT'S REQUESTED INSTRUCTION

## ROLE OF THE JURY

In any jury trial there are, in effect, two judges. I am one of the judges; the other is the jury. It is my duty to preside over the trial and to decide what evidence is proper for your consideration. It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

First, I will give you some general instructions which apply in every case, for example, instructions about burden of proof and how to judge the believability of witnesses. Then I will give you some specific rules of law about this particular case, and finally I will explain to you the procedures you should follow in your deliberations.

You, as jurors, are the judges of the facts. But in determining what actually happened, that is in reaching your decision as to the facts, it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

44-008

Case 1:06-cr-00051-MAC-ESH Document 225-1 Filed 09/22/06 Page 9 of 23

**DEFENDANT'S REQUESTED INSTRUCTION**

**PRESUMPTION OF INNOCENCE, BURDEN
OF PROOF, REASONABLE DOUBT**

A "reasonable doubt" is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the accused has been proven guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

The jury must never convict an accused on mere suspicion or conjecture. The burden of proof is always upon the government to prove the accused guilty beyond a reasonable doubt. The burden never shifts to the accused; the law never imposes upon an accused in a criminal case the burden or duty of calling any witnesses or producing any evidence.

44-009

**DEFENDANT'S REQUESTED INSTRUCTION**

**EVIDENCE**

As I told you earlier, it is your duty to determine the facts. In doing so, you must consider only the evidence presented during the trial, including the sworn testimony of the witnesses and the exhibits. Remember that any statements, objections, or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you.

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

So, while you should consider only the evidence in the case and not speculate on matters which are not in evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

In considering the evidence you should not be concerned about whether the evidence is direct or circumstantial. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating that the defendant is either guilty or not guilty. The law makes no distinction between the

44-010

weight you may give to either direct or circumstantial evidence.  It requires only that you weigh all of the evidence and be convinced of the defendant's guilt beyond a reasonable doubt before they can be convicted.

Case 1:06-cr-00051-MAC-ESH Document 225-1 Filed 09/22/06 Page 12 of 23

## DEFENDANT'S REQUESTED INSTRUCTION

### WITNESSES

I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given the witness' testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case. You should decide whether you believe what each person had to say, and how important that testimony was. In making that decision I suggest that you ask yourself a few questions: Did the person impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the government or the defense? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness' testimony differ from the testimony of other witnesses? These are a few of the considerations that will help you determine the accuracy of what each witness said.

In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point. Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony. Two or more persons

44-012

witnessing an incident or a transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

44-013

**DEFENDANT'S REQUESTED INSTRUCTION**

**EXPERT WITNESSES**

During the trial you heard the testimony of witnesses who were presented to you as experts. The rules of evidence provide that if scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify and state an opinion concerning such matters.

Merely because an expert witness has expressed an opinion does not mean, however, that you must accept this opinion. The same as with any other witness, it is up to you to decide whether you believe this testimony and choose to rely upon it. Part of that decision will depend on your judgment about whether the witness' background or training and experience is sufficient for the witness to give the expert opinion that you heard. You must also decide whether the witness' opinions were based on sound reasons, judgment, and information.

44-014

## DEFENDANT'S REQUESTED INSTRUCTION
## CONSIDER ONLY CRIME CHARGED

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the Indictment. Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

44-015

## DEFENDANT'S REQUESTED INSTRUCTION
## SINGLE DEFENDANT -- MULTIPLE COUNTS

A separate crime is charged in each count of the Indictment.  Each count and the evidence pertaining to it should be considered separately.  The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other.

44-016

Case 1:09-cv-01080-MJT   Document 49-3   Filed 10/05/10   Page 18 of 117 PageID #:
6245
Case 1:06-cr-00051-MAC-ESH   Document 223-1   Filed 09/22/06   Page 17 of 23

**DEFENDANT'S REQUESTED INSTRUCTION**

**IMPEACHMENT BY PRIOR INCONSISTENCIES**

The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.

If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves. I remind you that a defendant has the right not to testify. When the defendant does testify, however, his testimony should be weighed and his credibility evaluated in the same way as that of any other witness.

44-017

**DEFENDANT'S REQUESTED INSTRUCTION**

**CHARTS AND SUMMARIES IN EVIDENCE**

Certain charts and summaries have been received into evidence to illustrate facts brought out in the testimony of some witnesses. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

44-018

# DEFENDANT'S REQUESTED INSTRUCTION

## ACCOMPLICE - INFORMER - IMMUNITY

The testimony of an alleged accomplice, and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received either financially or as a result of being immunized from prosecution. You should keep in mind that such testimony is always to be received with caution and weighed with great care.

You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

44-019

## DEFENDANT'S REQUESTED INSTRUCTION

## MERE PRESENCE

Merely being present at the scene of a crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct to find that the defendant committed that crime.

In order to find the defendant guilty of the crime, the government must prove, beyond a reasonable doubt, that in addition to being present or knowing about the crime, the defendant knowingly (and deliberately) associated himself with the crime in some way as a participant -- someone who wanted the crime to be committed -- not as a mere spectator.

44-020

## DEFENDANT'S REQUESTED INSTRUCTION

## CONFESSION - STATEMENT - VOLUNTARINESS

In determining whether any statement, claimed to have been made by a defendant outside of court and after an alleged crime has been committed, was knowingly and voluntarily made, you should consider the evidence concerning such a statement with caution and great care, and should give such weight to the statement as you feel it deserves under all the circumstances.

You may consider in that regard such factors as the age, sex, training, education, occupation, and physical and mental condition of the defendant, his treatment while under interrogation, and all the other circumstances in evidence surrounding the making of the statement.

You should remember that a statement is involuntary, if it is obtained by any direct or implied promises of leniency, however slight, by law enforcement or by agents of the government, or by the exertion of any improper influence.[1]  The test is whether, considering the totality of the circumstances, the government obtained the statement by improper inducement so that the suspect's will was overborne.[2]  If you determine that the statement was not voluntarily given because it was induced by promises of leniency, you should not consider the statements for any reasons during your deliberations.

---

[1]Hutto v. Ross, 429 U.S. 28, 30 (1976); Miller v. Fenton, 796 F.2d 598, 608 (3d Cir.) cert.denied, 749 U.S. 989 (1986).

[2]Haynes v. State of Washington, 373 U.S. 503, 513-14 (1963).

44-021

## DEFENDANT'S REQUESTED INSTRUCTION

## CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.    the opportunity and ability of the witness to see or hear or know the things testified to;
2.    the witness' memory;
3.    the witness' manner while testifying;
4.    the witness' interest in the outcome of the case and any bias or prejudice;
5.    whether other evidence contradicted the witness' testimony;
6.    the reasonableness of the witness' testimony in light of all the evidence; and
7.    any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

44-022

## DEFENDANT'S REQUESTED INSTRUCTION
## IMPEACHMENT EVIDENCE–WITNESS

You have heard evidence that a Government witness has been convicted of a felony. You may consider this evidence, along with other pertinent evidence, in deciding whether or not to believe this witness and how much weight to give to the testimony of that witness.

# EXHIBIT 45



**U. S. Department of Justice**

*United States Attorney*
*Eastern District of Texas*

---

*350 Magnolia Avenue, Suite 150*
*Beaumont, Texas 77701-2248*

*Commercial/FTS*
*(409) 839-2538*
*Fax (409) 839-2550*
*(409) 839-2557*

September 19, 2006

Mr. Douglas Barlow
Attorney at Law
485 Milam
Beaumont, Texas  77702

  RE: *USA. v.David Lee Jackson; 1:06-CR-51*

Dear Mr. Barlow:

  Please find enclosed the following discovery in the above referenced case:

1.  1 CD containing Government's Exhibit #30
    (Video #3 with color-coded images)

2.  1 VHS tape of the Findlay, Ohio hotel robbery.

  Should you have any questions or comments concerning this material, feel free to contact me at your earliest convenience.

      Sincerely,

      Joseph R. Batte
      Assistant United States Attorney

Enclosures

45-001

# EXHIBIT 46

**Barlow Law Firm**

| | |
|---|---|
| **From:** | "Robert Morrow" <rmorrow@    REDACTED |
| **To:** | "'Doug Barlow'" <BarlowLawFirm@    REDACTED |
| **Sent:** | Friday, September 15, 2006 10:54 AM |
| **Subject:** | Jury Instructions - self defense and Agofsky issues |

Doug:
In looking at this some more, and stealing from Agofsky, you guys submitted a lot of good lessers and such – voluntary manslaughter – involuntary manslaughter – self defense. Also in the elements themselves for the 1st count it says the Govt must negate self defense. I realize some of this might not translate from Agofsky but some might.
We can talk about this next week. Looks to me like we can steal some of this.
RM

---

**From:** Robert Morrow [mailto:rmorrow@   REDACTED
**Sent:** Friday, September 15, 2006 10:39 AM
**To:** 'Doug Barlow'
**Subject:** Jury Instructions - self defense

Doug:
 Can we possibly ask for self defense when our argument is that he didn't do it? If so, please tell me how. We will show that Brown was the aggressor, a bad bad guy, and dangerous, but that Gulley did it. So what other charges do we want?
 I'd like to be more help but I feel like I am lost in the swamp without a bow and arrow or a .22 to shoot the gators. I have to rely on my charm.
Robert

9/19/2006

CNTRL021746

46-001

# EXHIBIT 47

U.S. Department of Justice

United States Attorney
Eastern District of Texas

---

| | |
|---|---|
| 350 Magnolia Ave., Suite 150 | 409/839-2538 |
| Beaumont, Texas 77701-2237 | Fax 409/839-2550 |
| | 409/839-2557 |

September 12, 2006

Mr. Douglas M. Barlow
Attorney at Law
485 Milam.
Beaumont, TX 77701

RE: *USA v. David Lee Jackson*, No. 1:06-CR-51 (01)

Dear Mr. Barlow,

This letter is to serve as an outline of the evidence the government intends to use at the punishment phase of the above styled and numbered cause should it reach that stage;

1. A certified copy of the Judgment and Sentence in Cause No. 4:04cr24L, Mr. Jackson's Bank Robbery conviction in the Southern District of Mississippi.

2. The government intends to offer into evidence the Pre-Sentence Report filed in Cause No. 4:04cr24L, which was accepted into the record in support of Mr. Jackson's Bank Robbery conviction.

3. Certified copies of Mr. Jackson's convictions for the following;

      a. Armed Robbery, 6th Circuit Ct, Madison Heights, Mi., 3/22/97

      b. Burglary, Attempted Robbery, False Imprisonment, and Assault with a Deadly Weapon, Placer County, Ca., 9/29/83

      c. Felon in Possession of a Firearm, U.S. Dist. Ct, Eastern District of Michigan, 6/7/90

(These will provided as soon as they are obtained by the government.

4. Evidence surrounding Mr. Jackson's alleged armed robbery of the Holiday Inn Express in Findlay, Ohio on April 30, 2004. (Discovery of offense reports has been previously provided, copies of a surveillance video, photo lineups, and a temporary id card in Jackson's name used to rent a hotel room nearby the previous night will be provided when received by the government).

5. Evidence surrounding the commission of the armed robbery of Union Planters Bank in Collinsville, Ms., described in ¶¶ 2 and 3 above, committed on May 6, 2004. (Discovery of offense reports has been provided, copies of crime scene photos and a bank surveillance video will be provided when received by the government.

6. Evidence surrounding Mr. Jackson's escape from the Correctional Service Corporation jail facility in downtown Beaumont on July 10, 2005. (Copies of offense reports and photos already provided).

Evidence of the following incidents of conduct of Mr. Jackson while incarcerated in the Bureau of Prisons;

A. Possession of a Weapon--USP- Atlanta, April 5, 1995

47-001

B.  Assault of Staff--USP-Atlanta, July 29, 1995

C.  Fighting with Another Inmate---USP-Lewisburg, Feruary 29, 1996

D.  Assault on Inmate---USP- Lewisburg, March 7, 1996

E.  Assault of Staff, Threats---USP-Marion, January 3, 1997

F.  Engaging in Group Demonstration,---USP-Marion, February, 13, 1997

G. Fighting with Another Inmate,--- USP-Marion, February 22, 1997

H. Assault on Corrections Officer---USMCFP-Springfield, September 21, 1997

I.  Threatening Staff---USP-Beaumont, January 14, 2000

J.  Assault on Staff---USP-Beaumont, January 19, 2000

K. Assault on Officer, ---USP-Beaumont, January 23, 2000

L.  Possession of a Weapon,---USP-Beaumont, August 8, 2000

(Copies of the incident reports for these offenses have been previously forwarded to defense counsel)

As of now, this is the sum of the government's expected evidence in case-in-chief.  A list of the witnesses, *Jencks,* and *Giglio,* material, if applicable, will be provided in accordance with the Court's Revised Scheduling Order.

If you have any questions concerning this letter, please contact me at your earliest convenience.

Sincerely,

JOSEPH R. BATTE
Assistant U.S. Attorney

47-002

# EXHIBIT 48

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | Criminal Number 1:06-CR-51 |
| | § | (Judge Crone) |
| DAVID LEE JACKSON | § | |

## MOTION *IN LIMINE* TO EXCLUDE PSYCHIATRIC OR PSYCHOLOGICAL
## TESTIMONY CONCERNING FUTURE DANGEROUSNESS

Pursuant to the 5th, 6th, 8th, and 14th Amendments to the United States Constitution, and Federal Rules of Evidence. 401, 403, 702, 703, and 705, and for the reasons set forth below and in the attached *Memorandum of Law*, defendant respectfully moves this Court to exclude all psychiatric or psychological expert opinion testimony offered by the government as to the probability that defendant will commit future criminal acts of violence or constitute a continuing threat or any similar prediction of "future dangerousness".

I.

1    The Defendant has been indicted by the Grand Jury for the offense of capital murder;

2    The government is seeking the death penalty;

3.    The government seeks to call one or more witnesses to offer psychiatric or psychological expert opinions or predictions as to defendant's eligibility for the death penalty because of perceived aggravating factors such as future dangerousness, or likelihood that defendant would commit future acts of violence.

4.    The opinions proffered will be either scientific in nature or based on personal training and experience.

USCA5 311

48-001

5.    The admissibility of these opinions is governed Federal Rules of Evidence 401, 403, 702, 703, and 705 and *Daubert v. Merrell Dow Pharms*, 509 U.S 579 (1993); *Kumho Tire Co v Carmichael*, 526 U.S. 137 (1999).

## II.

Psychiatric or psychological predictions as to a whether a defendant will commit future acts of violence, or will constitute a continuing threat to society, or a defendant's "future dangerousness," are inadmissible because they do not meet the standards for reliability articulated in the rules of evidence and the common law. Such predictions are unreliable due to (a) their overwhelming rate of error; (b) their lack of acceptance in the relevant scientific community, (c) the subjective, inconsistent, ad-hoc, and standardless manner in which they are formed, (d) the absence of a proper and adequately reliable data source upon which to base them. Any testimony the government seeks to admit incorporating such predictions does not satisfy the reliability requirement of Federal Rule of Evidence 702, and must be excluded

Psychiatric or psychological predictions of a defendant's future dangerousness are further inadmissible because they do not meet the standards for relevance articulated in the rules of evidence and the common law. Such predictions are irrelevant because they do not assist the juror in determining a question of fact

Psychiatric or psychological predictions of a defendant's future dangerousness are further inadmissible because any probative value is substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403.

USCA5 312

WHEREFORE, PREMISES CONSIDERED, defendant respectfully requests that the Court exclude any and all psychiatric or psychological expert testimony offered by the government that incorporates a prediction as to whether defendant is a future danger.

Respectfully submitted,

/s/ Douglas M. Barlow
DOUGLAS M. BARLOW, TBL#01753700
Attorney for Defendant
485 Milam - Beaumont, TX 77701
(409) 838-4259

/s/ Robert Morrow
ROBERT MORROW, TBL#14542600
Attorney for Defendant
6630 Cypresswood Dr., #200
Spring, TX 77379
(281) 379-6901

## CERTIFICATE OF CONFERENCE

Counsel conferred with counsel for the government and the government indicated opposition to this motion.

/s/ Douglas M. Barlow
DOUGLAS M. BARLOW

## CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV(a)(3) on this the 18th day of July, 2006. Any other counsel of record will be served by facsimile transmission and first class mail, return receipt requested, on this the 18th day of July, 2006.

USCA5 313

/s/ Douglas M. Barlow
DOUGLAS M. BARLOW

USCA5 314

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs | § | Criminal Number 1:06-CR-51 |
| | § | (Judge Crone) |
| DAVID LEE JACKSON | § | |

# MEMORANDUM OF LAW
# IN SUPPORT OF DEFENDANT'S
# MOTION IN LIMINE  TO EXCLUDE
# PSYCHIATRIC OR PSYCHOLOGICAL
# TESTIMONY CONCERNING FUTURE
# DANGEROUSNESS

USCA5 315

48-005

## MEMORANDUM OF LAW

Pursuant to the 5th, 6th, 8th, and 14th Amendments to the United States Constitution, and Federal Rules of Evidence 401, 403, 702, 703, and 705, defendant requests that this Court exclude all psychiatric or psychological expert opinion testimony offered by the government as to the probability that defendant will commit future acts of violence, or will constitute a continuing threat to society, or a defendant's "future dangerousness". Defendant respectfully submits that such testimony does not meet the requirements of Rules 702 or 403.

## INTRODUCTION

For expert testimony to be admitted as evidence under Federal Rule of Evidence 702, a trial court must determine whether such testimony is reliable and relevant. The trial court functions in a "gatekeeping role" for the admission of such evidence. *Daubert v. Merrell Dow Pharms.*, 509 U S 579, 597 (1993). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The proponent of expert testimony bears the strict burden of proving both the reliability and relevance of such testimony before it may be admitted into evidence.

Additionally, evidence deemed reliable and relevant must be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Federal Rule of Evidence 403

In the penalty phase of a capital trial, a court must evaluate psychiatric or psychological testimony that predicts a defendant's "future dangerousness," using these reliability, relevance, and

USCA5 315

prejudice considerations. *e.g.* see *Nenno v. State* , 970 S.W.2d 549 (Tex. Crim. App. 1998) (overruled in part on other grounds) (performing a reliability, relevance, and prejudice inquiry for psychiatric testimony in penalty phase of capital murder trial); *Joiner v. State*, 825 S.W.2d 701 (Tex Crim App. 1992) (same). When evaluated for reliability, relevance, and prejudice, the gross impropriety and inadmissibility of psychiatric and psychological predictions of future dangerousness becomes clear The admission of testimony that incorporates these predictions violates the rules of evidence, the constitutional rights of the accused, and the common law.

## ARGUMENT

## I. PSYCHIATRIC OR PSYCHOLOGICAL PREDICTIONS OF A DEFENDANT'S FUTURE DANGEROUSNESS ARE UNRELIABLE, AND MUST BE EXCLUDED UNDER FEDERAL RULE OF EVIDENCE 702.

The reliability of expert testimony rests on a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and may properly be applied to the facts in issue *Daubert*, 509 U.S. at 593-94. A preliminary assessment of reliability is guided by (a) the validity of the underlying scientific theory (b) the validity of the technique applying the theory and (c) the proper application of the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573; *Nenno*, 970 S.W.2d at 561. Questions of validity and proper application are to be guided by certain factors, which include, but are not limited to:

(a) The qualifications, experience, and skill of the person testifying;

(b) The extent to which the reasoning or methodology can be and has been tested;

USCA5 317

48-007

(c) The extent to which the reasoning or methodology relies upon the subjective interpretation of the person testifying;

(d) Whether the reasoning or methodology has been subjected to peer review and/or publication, and whether the theory or technique has been rejected in such literature;

(e) The availability of other experts to test and evaluate the technique;

(f) The potential or known rate of error of the reasoning or methodology;

(g) Whether the reasoning or methodology has been generally accepted as valid by the relevant scientific community;

(h) The non-judicial uses which have been made of the reasoning or methodology;

(i) The clarity with which the underlying theory and technique can be explained to the court.

*Daubert,* 509 U.S. at 593; *Gammill* 972 S.W.2d at 720; *Kelly,* 824 S.W.2d at 573

The above-listed factors [*Daubert* and *Kelly* factors] are germane to evaluating the reliability of both scientific and non-scientific expert testimony, "[w]hether the expert would opine on economic valuation, advertising psychology, or engineering . . ." *Gammill,* 972 S.W.2d at 725  *See also Moore v. Ashland Chem., Inc.,* 151 F.3d 269 (5th Cir. 1998) (holding that clinical medical expert's testimony was not admissible because it did not fulfill the *Daubert* factors);  *American Tourmaline Fields v. International Paper Co* , No. CIV.A.3:96CV3363D, 1999 WL 242690 at 4 (N.D. Tex. April 19, 1999)(same). As such, the above listed principles govern the admissibility of psychiatric and psychological testimony, which is based on a combination of training, experience, and scientific inquiry.  In evaluating "fields of study aside from the hard sciences," courts should tailor the above analysis to examine closely the data collection procedures, such as personal

USCA5 318

interviews, document review, or statistical analysis, conducted by the witness in question.

## PSYCHIATRIC OR PSYCHOLOGICAL PREDICTIONS OF FUTURE DANGEROUSNESS, AS GENERALLY PERFORMED AND OFFERED, FAIL TO MEET THE RULE 702 STANDARDS OF RELIABILITY.

In general, psychiatric or psychological testimony as to a defendant's "future dangerousness," in capital cases is an ad-hoc determination solicited by a hypothetical fact pattern presented to the witness by the prosecutor. Occasionally, a limited record review accompanies the hypothetical fact pattern. The hypothetical fact pattern primarily incorporates the facts of the specific crime for which the defendant has been convicted. Occasionally, the hypothetical fact pattern will incorporate supplemental evidence, such as extraneous offenses, uncharged prior misconduct, and limited character evidence, to be considered in the ad-hoc determination.

Psychiatric or psychological predictions of a defendant's future dangerousness, particularly ad-hoc determinations based on hypothetical fact patterns prepared and presented by the prosecutor, must be excluded because they fail to meet adequate standards for reliability.

### The proponent of the expert testimony bears the burden of proving the reliability of the expert's testimony.

The proponent of psychiatric or psychological predictions of a defendant's future dangerousness bears the burden of proving the reliability of such predictions. In order to satisfy this burden the proponent must demonstrate his experience and skill in a sub-specialty of forensic psychology or psychiatry that addresses the prediction of future dangerousness of criminal defendants in capital cases. A general degree in psychiatry or psychology is not sufficient to establish expertise in the predictions of future dangerousness in capital cases. *See Broders v Heise*, 924 S.W.2d 148, 153 (Tex. 1996)(holding that a testifying expert must have expertise on the very matter

48-009

about which he is to give an opinion and that a medical degree is not sufficient to establish this expertise). The proffered expert also bears the burden of proving his skill in predicting the future dangerousness of criminals. Experience testifying as an expert witness on the issue at hand is not sufficient to establish reliability. In fact, absent a showing of the reliability of the proffered testimony, the Texas Supreme Court has squarely rejected the testimony of those who have had long histories of testifying by noting that "'the only review the plaintiffs' experts' work has received has been by judges and juries, and the only place their theories and studies have been published is in the pages of the federal and state reporters '" *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 726 (Tex. 1997) (quoting *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1318 (9th Cir. 1995)). Furthermore, experience in the field is not sufficient to establish expertise if such experience is not skillful. *See Sosa v. State*, 841 S.W.2d 912, 916 (Tex App.—Houston [1st Dist.] 1992) (rejecting testimony of proffered "graphonalaysis" expert who had been a graphoanalyst for fifteen years and had reviewed thousands of handwriting samples because testimony otherwise not proved reliable).

In order to demonstrate this skill, the expert should be asked to proffer specific publications on the reliability and acceptability of the methodologies employed in predicting future dangerousness. *See Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 794-95 (S.D. Tex. 2000) (rejecting experts' testimony who did not point to medical or scientific literature supporting their conclusions); *American Tourmaline Fields*, 1999 WL 242690 at 3 (rejecting testimony of proffered expert who has not provided court with copies of articles upon which he purported to rely and could not recall the name or citation for any articles that have discussed his technique). Further, the methodologies that the proffered expert employs in predicting future dangerousness must be consistent with the methodologies and principles of predicting future dangerousness that are detailed in those publications the expert brings to the court's attention. *Bennett v PRC Pub. Sector*, 931 F.

Supp. 484, 494 (S.D. Tex. 1996) (rejecting expert's testimony noting that the methodology he employed was not consistent with the methodologies described by experts and literature in the field that he had named).

### Psychiatric or psychological predictions of a defendant's future dangerousness are unreliable, and therefore inadmissible, due to the overwhelming potential rate of error of such predictions

It is generally accepted by the scientific community that psychiatrists and psychologists are more often incorrect in their assessments of future dangerousness than they are correct. The American Psychiatric Association [APA], has consistently maintained that "[t]he unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession." *Barefoot v. Estelle*, 463 U.S. 880, 920 (1983) (Blackmun, J., dissenting) (quoting Brief Amicus Curiae for the American Psychiatric Association, *Barefoot v. Estelle*, 463 U.S. 880 (1983)(No. 82-6080) [hereinafter APA Brief]. *See also Flores v. Johnson*, 210 F.3d 456, 463 (5th Cir. 2000) (Garza, J., specially concurring) (noting that the scientific community's rejection of the reliability of predictions of future dangerousness is "as true today as it was in 1983") Predictions that a person will be dangerous in the future are wrong two out of three times. *Barefoot*, 463 U.S at 920 (citing APA Brief at 9, 13); J. Monahan, The Clinical Prediction of Violent Behavior 47-49 (1981); C. Slobogin, ARTICLE: DANGEROUSNESS AND EXPERTISE, 133 U. Pa. L. Rev. 97, 111-17 (1984) (citing results of the major studies: Baxstrom study: 20% accuracy; Thornberry Study: 20% accuracy; New York study 14% accuracy: Kozol study: 34.7% accuracy; Paxtuxent study: 41.3% accuracy; Wenk study: 8% accuracy). As such, a jury member could more accurately predict dangerousness by flipping a coin rather than relying on an expert psychologist or psychiatrist's testimony Because the conclusions drawn from ad-hoc psychiatric or psychological predictions of

USCA5 321

future dangerousness are more often wrong than right, the amorphous and undefined methodologies they employ should be deemed unreliable. *See GE v Joiner*, 522 U.S. 136, 146 (1997) (holding that "conclusions and methodology are not entirely distinct from one another" and that erroneous conclusions may indicate a faulty underlying methodology).

Even the more generous studies, done under the most controlled settings, indicate that predictions of future dangerousness will be accurate only half of the time. As such, these predictions are no better than chance determinations of who will be dangerous in the future. Randy Otto, <u>On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature</u>, 18 Law & Psych. Rev 43, 64 & n.65 (1994); *See also* Melvin Goldzband, <u>Dangerousness: A Mutating Concept Passes Through the Literature</u>, 26 J Am Acad. Psych. & L 649, 651 (1998) (noting that predictions of dangerousness are increasingly demanded by courts but because of their unreliability such predictions are "inherently fruitless" and "possibly dangerous."); George B. Palermo, et al. <u>On the Predictability of Violent Behavior</u>, 36 J. Forensic Sci. 1435, 1442 (1991) (noting that supportive scientific studies for the accuracy of long-term predictions of violence are lacking); David Freedman, <u>False Prediction of Future Dangerousness: Error Rates and the Psychopathy Checklist-Revised</u>, 29 J. Am. Acad. Psych. & L. 89, 92 (2001) ("The prediction of complex behaviors such as violence remains exceedingly difficult and uncertain, and the plethora of new instruments fails to reach a scientifically reliable or valid standard of performance to be used to make decisions about a person's life or liberty in any setting.").

The reliability of psychiatric and psychological predictions of future dangerousness is tenuous when one considers how courts have treated the admissibility of polygraph evidence. The polygraph technique accurately predicts truth or deception "between seventy and ninety percent of

USCA5 322

the time." *United States v Posado*, 57 F.3d 428, 434 (5th Cir. 1995). The best estimates of the accuracy of future dangerousness predictions indicate that they are correct merely fifty percent of the time. Psychiatric and psychological predictions of future dangerousness, which are both less reliable and more subjective than polygraph tests, should similarly be deemed inadmissible.

Research and literature that may indicate a more accurate prediction rate of future dangerousness is based on methods of prediction that are very different from those used in capital trials. More accurate prediction rates are garnered from studies in which clinicians have the opportunity to observe behavior in a mental health facility over an extended period of time. The procedure used in this trial instead has been an ad-hoc determination of dangerousness based upon a hypothetical scenario provided by the prosecutor

**Psychiatric or psychological predictions of a defendant's future dangerousness are unreliable because they are not generally accepted in the relevant scientific community**

The American Psychiatric Association [APA] has insisted that psychiatrists are not qualified to make determinations of long-term future dangerousness and has consistently urged that expert psychiatric expert testimony on future dangerousness be deemed inadmissible. The APA has urged that "[a]bsent an in-depth psychiatric examination and evaluation, the psychiatrist cannot exclude alternative diagnoses; nor can he assure that the necessary criteria for making the diagnosis in question are met. As a result, he is unable to render a medical opinion with a reasonable degree of certainty." *Flores*, 210 F.3d at 467 (Garza, J., specially concurring) (quoting APA Brief) "The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific." *Flores*, 210 F.3d at 463 (Garza, J., specially concurring). As an indication of the strength of the scientific community's rejection of this sort of ad-hoc psychiatric and psychological determinations, the APA expelled Dr. James Grigson

USCA5 323

because he consistently testified as to a defendant's future dangerousness without personal examination. Bruce Vincent, A Dearth of Work for 'Doctor Death'; the Once Ubiquitous James Grigson Now Finds Little Demand for his Testimony in Texas Capital Murder Sentencings, Texas Lawyer, Dec. 4, 1995, at 4.

A testifying expert cannot establish that his methodologies are accepted in the relevant scientific community through "mere assurances . . . as to the accuracy of his own methods or results, in the absence of other credible supporting evidence." *Castellow*, 97 F.Supp.2d at 792 (citations omitted). Thus, the proffered expert's assertion that the scientific community accepts his methodologies is not sufficient in light of the overwhelming rejection of this testimony by the scientific community

### Psychiatric or psychological predictions of a defendant's future dangerousness, particularly ad-hoc determinations based on hypothetical fact patterns prepared and presented by the prosecutor, are unreliable because they are purely subjective.

Psychiatric or psychological predictions of a defendant's future dangerousness, particularly ad-hoc determinations based on hypothetical fact patterns prepared and presented by the prosecutor, are unreliable because they are "simply subjective testimony without any scientific validity. *Flores*, 210 F.3d at 458 (Garza, J., specially concurring). Each psychiatric or psychological prediction of future dangerousness is determined in a different manner. There is no established and consistent methodology applied or required for psychiatric or psychological analyses of future dangerousness, and "standards controlling the operation of the technique are nonexistent." *Id.* at 465-66; *see also* Kenneth B. Dekleva, Psychiatric Expertise in the Sentencing Phase of Capital Murder Cases, 29 J Am. Acad Psych. & L. 58, 60 (2001) ("'specific' ... guidelines for making dangerousness predictions in forensic populations do not currently exist.").

An ad-hoc determination of dangerousness is not externally verifiable by other experts. There has been no "testing" of the methodologies used in the predictions of each expert. The factors an

USCA5 324

48-014

expert uses in determining dangerousness are not weighted and do not correspond to any graded scale of factors that would contribute to or predict dangerousness. Other experts looking at the same data are unable to determine whether the testifying expert's particular weighting of such factors is accurate. Thus, peer review of predictions of future dangerousness is rare, and "peer review of making such predictions in general has been uniformly negative." Flores, 210 F.3d at 465 (Garza, J., specially concurring)(citing G. Morris, SYMPOSIUM: Defining Dangerousness: Risking a Dangerous Definition, 10 J. Contemp. Legal Issues 61, 85-86 (1999)). See also, William M. Grove & Paul E. Meehl, Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic Prediction Procedures: The Clinical-Statistical Controversy, 2 Psych Pub. Pol'y & L. 293, 320 (1996) (noting that clinical experiences cannot resolve disputes among psychologists because each can appeal to his own unique clinical experiences which lack an objective referent). Testimony such as this that is subjective and not readily reproduceable by others in the field should not be admissible. Key terms and concepts of the witness' testimony are often amorphous and inexact. The scope of dangerousness and the length of time at issue are not defined. Concepts such as "conscience," "malice," and "evil," upon which determinations of dangerousness rely, are not adequately defined by the testifying witness.

### Ad-hoc psychiatric or psychological predictions are unreliable due to the absence of a reliable data source upon which to base a determination of dangerousness.

As an essential component of assessing the reliability of the proffered testimony, the underlying data should be independently evaluated in determining if the opinion itself is reliable. The data set upon which any testifying expert here rests is not reliable and the expert's opinion should therefore not be admissible The data set upon which the testifying expert would rely was

USCA5 325

48-015

necessarily prepared by the prosecution, and the testifying witness could not have verified the data provided him or her. As such, the data upon which this determination is based have not been compiled objectively, and the data have been specifically compiled to prove dangerousness. Compilation of data in this manner has been held to "give[] rise to a 'common-sense skepticism' regarding the expert's evaluation" which has proved fatal to the reliability of such testimony. *Munoz v. Orr*, 200 F 3d 291, 301 (5th Circ 2000) (citations omitted) *See also Castellow*, 97 F.Supp.2d at 797 (rejecting reliability of proffered expert noting that the "detailed investigation" upon which the witness relied was prepared by Plaintiff's investigator).

Further, ad-hoc determinations based on a hypothetical fact pattern prepared and presented by the government are unreliable because they do not incorporate sufficient personal interviewing, investigation, or background examination. Testimony which relies only on a hypothetical provided by the government decidedly lacks any of the investigation, examination, or interviewing that courts have stipulated as the bedrock of a testifying mental health professional and proper clinical opinion provider. Testifying experts "whose convictions about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests [may] properly be viewed by the district as lacking the objectivity" that is required to assure the reliability of the testimony. *Castellow*, 97 F.Supp.2d at 793 (quoting *Claar v Burlington N R.R.*, 29 F.3d 499, 503 (9th Cir. Mont 1994)). The lack of investigation makes this method particularly unreliable because, without more information the testifying expert is unable to rule out other diagnoses and hypotheses with regard to the defendant. *See* Paul S. Appelbaum, Hypotheticals, Psychiatric Testimony, and the Death Sentence, 12 Bull Am Acad Psych. & L. 169 (1984). The expert is unable to ascertain all the facts that might make these alternate hypotheses or diagnoses more plausible for the defendant's situation. *See Mata v. State*, 46 S W.3d 902, 915 (Tex

USCA5 326

Crim App. 2001) (rejecting expert's testimony that did not take into account facts that the court found salient to the analysis). An expert's inability or failure to rule out other hypotheses for the question at issue has proved fatal to the reliability of his proffered testimony. *See Bennett v. PRC Public Sector, Inc.*, 931 F. Supp. 484, 492 (S.D. Tex 1996) (limited fact collection impeded expert's ability to rule out other causes of Plaintiff's injury and indicated that expert's testimony was unreliable).

**Psychiatric or psychological predictions of a defendant's future dangerousness are unreliable because they are not used outside the judicial/legal context.**

The expert testimony in this case would be decidedly prepared only in the context of litigation and, given its lack of acceptance within the scientific community, would never be relied upon outside of the courtroom. While it is true that determinations of future dangerousness are used in involuntary civil commitment of individuals, psychotherapists' liability for their patients' actions, and post-jail detention of sexual predators, these are all judicial uses of determinations of future dangerousness. Predictions about future dangerousness are non-existent outside of these judicial contexts.

Furthermore, the predictions of future dangerousness in these contexts are predictions of dangerousness in the short term; whereas future dangerousness predictions in capital cases are predictions of behavior in the long term. There is no procedure in either the Texas state system of the Federal system for reevaluating determinations of future dangerousness during the span of the defendant's sentence. Thus, the prediction of future dangerousness may concern behavior that extends for over a decade into the future. Whereas short-term predictions may be made with some degree of accuracy, long-term predictions cannot be made accurately or reliably *See* Grant H. Morris, Defining Dangerousness: Risking a Dangerous Definintion 10 J. Contemp. L. Issues 61, 78

48-017

USCA5 328

48-018

(1999); Douglas Mossman, <u>Dangerous Decisions: An Essay on the Mathematics of Involuntary Hospitalization</u> 2 U. Chi. L. School Round Table 95, 97 (1995).

**The Psychopathy Checklist Revised [PCL-R] is an unreliable method for predicting a defendant's dangerousness in the future.**

In certain instances, the Psychopathy Checklist Revised [PCL-R], a psychiatric tool used to diagnose and assess for the presence of psychopathic traits, is utilized as a basis for predicting a defendant's future dangerousness. High scores on the PCL-R have been used to predict a defendant's "continuing threat to society." J.F. Edens, et al., <u>Psychopathy and the Death Penalty: Can the Psychopathy Checklist-Revised Identify Offenders Who Represent a "Continuing Threat to Society?"</u>, J. Pscyh. L. (Winter 2001).

The PCL-R is both more objective and more accurate than the ad-hoc determinations based on hypothetical fact patterns prepared and presented by the State. It has been held to be the most reliable known indicator of future dangerousness. *Muhammad*, 46 S.W.3d at 506. Despite this comparative reliability, the PCL-R is not reliable enough a basis upon which to admit a proffered expert's testimony. The PCL-R is unreliable primarily because of its very high false-positive rates. The PCL-R has been estimated to predict violent behavior with a false positive rate of between 54.3 and 75%. This indicates that the PCL-R predicts violence at a rate worse than chance. *See* David Freedman, <u>False Prediction of Future Dangerousness: Error Rates and the Psychopathy Checklist-Revised,</u> 29 J. Am. Acad. Psych. & L. 89, 92 (2001). The PCL-R is further unreliable for predicting future dangerousness because it does not evaluate the potential psychopathy as modified by age of the evaluee. Thus, the PCL-R cannot indicate how dangerous an evaluee will be when he is released from prison decades into the future. Edens et al., *supra*. It has been shown that risk of violence decreases significantly with age. J. Sorenson & R. Pilgrim, <u>CRIMINOLOGY: AN ACTUAL RISK</u>

ASSESSMENT OF VIOLENCE POSED BY CAPITAL MURDER DEFENDANTS, 90 J Crim.

L & Criminology 1251, 1266 (2000) Finally, research examining the relationship between psychopathy and violence within institutions and prison settings has indicated that this relationship is, at best, tenuous and weak. Thus, researchers have concluded that "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated clearly is untenable." Edens et al., *supra. See also* Freedman, *supra* at 94

Thus, while the PCL-R is touted as the most reliable indicator of dangerousness, this reliability is merely reliable *comparatively* to the completely inaccurate ad-hoc predictions made by testifying experts. Because of the above listed factors the PCL-R is not a reliable enough tool upon which to admit psychological or psychiatric expert testimony of future dangerousness. Expert psychological or psychiatric testimony that does not rely on the PCL-R and which is instead merely an ad-hoc determination, *a fortiori* should be inadmissible

For the reasons articulated above, psychiatric or psychological predictions of future dangerousness are unreliable. Any expert testimony incorporating such predictions is inadmissible under Federal Rule of Evidence 702

## II. PSYCHIATRIC OR PSYCHOLOGICAL PREDICTIONS OF A DEFENDANT'S FUTURE DANGEROUSNESS ARE IRRELEVANT, AND MUST BE EXCLUDED UNDER FEDERAL RULES OF EVIDENCE 402 and 702.

Even if found to be reliable, expert testimony must be shown to be relevant to a factual issue in question. In determining relevance, expert testimony should be admitted only when it will aid the jury in making inferences regarding fact issues more effectively. *United Blood Servs. v. Longoria,*

48-020

938 S W 2d 29, 30 (Tex. 1997) (affirming trial court's exclusion of expert testimony on blood-banking procedure and industry); *Glasscock v Income Property Servs.*, 888 S W 2d 176, 180 (Tex App —Houston [1st Dist.] 1994) (reversing trial court exclusion of expert testimony regarding security procedures in commercial office buildings because not an area of expertise within knowledge of reasonable juror). Psychiatric and psychological predictions of future dangerousness do not aid the jury in determining questions of fact, and are therefore inadmissible due to irrelevance under Federal Rules of Evidence 402 and 702.

When the jury is equally competent to form an opinion regarding ultimate fact issues, the expert's testimony as to these issues should be excluded. *K-Mart Corp v Honeycutt*, 24 S W 3d 357, 360 (Tex. 2000) ("That a witness has knowledge, skill, expertise, or training does not necessarily mean that the witness can assist the trier-of-fact.").

Psychiatric predictions of future dangerousness are not offered in every capital case. There are many instances in which juries decide the special question of future dangerousness without consideration of psychiatric testimony. *See, e.g., Trevino v. State*, 991 S W 2d 849, 854 (Tex. Crim. App. 1999) (same); *Salazar v. State*, 38 S.W.3d 141, 146 (Tex. Crim. App. 2001) (affirming jury finding of future dangerousness based on facts of offense alone) As such, it is clear that jurors are qualified to answer factors such as future dangerousness, and unreliable psychiatric testimony regarding the same point must be excluded.

For the reasons articulated above, psychiatric or psychological predictions of future dangerousness are irrelevant. Any expert testimony incorporating such predictions is inadmissible under Federal Rules of Evidence 402 and 702.

## III. PSYCHIATRIC OR PSYCHOLOGICAL PREDICTIONS OF A DEFENDANT'S FUTURE DANGEROUSNESS CREATE AN UNACCEPTABE DANGER OF UNFAIR

USCA5 331

48-021

## PREJUDICE AND NEEDLESS PRESENTATION OF CUMULATIVE EVIDENCE AND MUST BE EXCLUDED UNDER FEDERAL RULE OF EVIDENCE 403.

Psychiatric or psychological predictions of future dangerousness are irrelevant and unreliable, and thus, inadmissible under Federal Rules of Evidence 402 and 702. However, even if such predictions were to be found reliable and relevant, they are inadmissible under Federal Rule of Evidence 403, under which reliable and relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Federal Rule of Evidence 403   Presentation to the jury of psychiatric or psychological predictions of future dangerousness creates an unacceptable risk of prejudice and needless cumulative evidence, and is impermissible under Rule 403.

### Because psychiatric predictions of a defendant's future dangerousness are unreliable and irrelevant, they do not make any more or less probable a fact of consequence in capital sentencing proceedings.

Psychiatric or psychological predictions of a defendant's future dangerousness, because of unreliability and lack of relevance alone, as described hreinabove, create an unacceptable danger for unfair prejudice. The flawed underlying methodology and high potential rate of error render psychiatric or psychological future dangerousness predictions insignificant as to whether future danger is any more or less probable.

### Psychiatric or psychological predictions of a defendant's future dangerousness impress the jury in an inappropriate, irrational, and indelible way.

Expert testimony is placed under additional evidentiary constraints because courts have reasoned that jurors are unable to evaluate such testimony thoroughly and, therefore, give it excessive weight regardless of its reliability and veracity. In capital sentencing proceedings, there are four preexisting juror biases that compound the general tendency of unchecked acceptance of

48-022

expert testimony. These biases affect jurors' perceptions of the likelihood of violent recidivism, the opportunities for recidivism, the accuracy of clinical expert testimony in general and the accuracy of expert predictions of future dangerousness specifically. Such biases reduce the effectiveness of traditional methods of adversarial testing in capital sentencing proceedings. The result is unfair prejudice that might not arise in other legal contexts.

(1) Jurors in capital cases have a predisposed tendency to overestimate the likelihood of violent recidivism. Capital jurors estimate the probability that a defendant charged with capital murder, and given a life sentence, will commit another homicide between 25 and 50%, whereas studies show the likelihood to be approximately 0.2% over a forty-year term. J.R. Sorenson & R. Pilgrim, CRIMINOLOGY: AN ACTUAL RISK ASSESSMENT OF VIOLENCE POSED BY CAPITAL MURDER DEFENDANTS, 90 J. Crim. L & Criminology 1251, 1269 (2000). Jurors estimate the probability that a criminal defendant convicted of a violent crime will continue to engage in assaultive behavior between 50 and 85%. Again, studies show this sense to be greatly exaggerated; the risk of additional violent crimes in general is approximately 16%. Sorenson & Pilgrim, *supra* at 1269.

(2) Jurors in capital cases also have a predisposed tendency to overestimate the opportunity defendants will have to commit acts of violence in the outside community. Studies in Texas indicate that, on average, jurors believe a defendant sentenced to life in prison will be paroled after fifteen years, whereas under Texas law, defendants given a life sentence after conviction for a state capital crime must serve forty years before becoming eligible for parole. V.T.C A., Gov't Code § 508.145(b) (2001); Sorenson & Pilgrim, supra at 1255.

(3) Furthermore, jurors also believe clinicians to be capable of predicting future dangerousness at a far more accurate rate than empirical studies have suggested. D.A. Krauss & B.D

USCA5 333

Sales, The Effects of Clinical and Scientific Expert Testimony on Juror Decision Making in Capital Sentencing, 7 Psych. Pub. Pol'y & L. 267, 276, 301 (2001)

(4) Finally, jurors have an extreme predisposition toward acceptance of "clinical" opinion expert testimony, which is based on a subjective, personal assessment of the evaluee. Krauss & Sales, supra at 305. Psychiatric or psychological predictions of a defendant's future dangerousness, particularly those based on an expert's ad-hoc analysis of a hypothetical fact pattern prepared and presented by the government, are clinical determinations. *Id.* Jurors weigh clinical opinion testimony heavily in final decisions and often fail to distinguish between more and less accurate clinical opinion testimony. *Id.* In general, jurors do not scrutinize expert testimony as intensely as lay testimony and the presumption of credibility for expert witnesses is falsely enhanced. "Consequently, a jury more readily accepts the opinion of an expert witness as true simply because of his or her designation as an expert." *Gammill*, 972 S.W.2d at 722 (citing *Robinson*, 923 S.W.2d 549); *See also Flores v. Johnson*, 210 F.3d 456, 465-6 (5th Cir. 2000) (Garza, J., specially concurring) ("the problem here ... is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education (not to mention designation as an 'expert') gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact."); Krauss & Sales, supra at 273; C. Haney, ARTICLE: Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death, 49 Stan. L. Rev. 1447, 1486 & n 113 (1997) ("In this light, capital penalty trials sometimes become forums in which grossly prejudicial and unreliable predictions of future dangerousness [are presented] ... with the imprimatur of state authority.") (citations omitted).

The preexisting tendencies of jurors in capital cases to overestimate the likelihood of violent recidivism, the opportunities criminal defendants have for recidivism, as well as the accuracy of

clinical predictions of future dangerousness and the veracity and reliability of clinical predictions in general, reinforce the disproportionate credence jurors generally give expert testimony. These tendencies combined create a dangerous and unacceptable risk of prejudice in capital sentencing proceedings.

Adversarial testing is not a sufficient safeguard against the prejudicial effect of psychiatric or psychological predictions of future dangerousness. Faulty presuppositions and disproportionate acceptance of expert testimony may cause jurors to discredit expert testimony and cross-examination offered to counter a psychiatric or psychological determination of future dangerousness Krauss & Sales, *supra* at 276; E.H. Mantell, A Modest Proposal to Dress the Emperor: Psychiatric & Psychological Opinion in the Courts, 4 Widener J. Pub. L. 53, 65-66 (1994) ("Given a choice between an expert who says that he can predict with certainty that the defendant, whether confined in prison or free in society, will kill again, and an expert who says merely that no such prediction can be made, members of the jury charged by law with making the prediction surely will be tempted to opt for the expert who claims he can help them in performing their duty, and who predicts dire consequences if the defendant is not put to death."). The "apparent endorsement" of a medical or scientific community can be extremely detrimental to a defendant's substantive rights. *Perez v State*, 25 S.W.3d 830, 831 (Tex. App.—Houston [1st Dist.] 2000) (finding trial court erred in allowing state's expert witness testimony as to "child abuse accommodation syndrome").

Adversarial procedures are generally insufficient to remove the prejudice caused by psychiatric or psychological predictions of a defendant's future dangerousness Krauss & Sales, *supra* at 305. The ability to impeach, or discredit, expert witnesses through cross-examination is limited. Opposing counsel is allowed to question the expert using statements contained in treatises and authoritative scientific materials, however, such cross-examination is limited to publications that

USCA5 335

48-025

the witness recognizes as authoritative or publications upon which the expert has relied. This detracts from the ability to legitimately subject the testimony to the rigors of adversarial testing.

Unreliable psychiatric opinion testimony creates a risk that the jury will be impressed in an irrational and indelible way. The prejudicial potential of such testimony is great and parties confronted with such testimony have limited, if any, means to rebut or remove the prejudicial impact.

**The government has a limited need to present psychiatric or psychological prediction of a defendant's future dangerousness because such evidence is cumulative to other evidence already presented to the jury.**

The governmen has no pressing "need" for the admission of psychiatric or psychological predictions of future dangerousness, because it has a variety of other means available to prove aggravating factors. The predictions, are generally ad-hoc determinations solicited by a hypothetical fact pattern generally limited to the facts of the specific crime for which the defendant has been convicted, occasionally incorporating supplemental evidence, such as extraneous offenses, uncharged prior misconduct, and limited character evidence. The hypothetical fact pattern, with or without the supplemental evidence, and resulting psychiatric or psychological prediction of future dangerousness, needlessly present cumulative evidence, specifically prohibited by Rule 403.

Such predictions are needless because they lack validity or reliability and thus, offer nothing to the jury in addition to the mere repeat recitation of the facts of the crime, or other evidence, that has already been presented and made a part of the record. Merely cumulative evidence that serves no additional purpose must be excluded.

The admission of unreliable psychiatric predictions of a defendant's future dangerousness sheds no credible scientific, medical, or other light on the individual circumstances of the defendant at issue. The potential rate of error of such predictions, described hereinabove, shows that a witness providing the opinion is no more qualified to accurately do so than any of the members of the jury

USCA5 336

panel might be. Because the jurors otherwise have access to the underlying evidence presented to the opinion witness in the hypothetical fact pattern, and have the authority to base their determination of future dangerousness on this data alone, the opinion testimony itself is useless except for its prejudicial potential.

Psychiatric testimony offering a prediction of a defendant's future dangerousness is cumulative to other testimony or evidence already presented to the jury. As a result, such testimony, especially given its overwhelming potential for unfair prejudice, indelible and irrational impression on the jury, and consumption of judicial resources and time, must be excluded under Rule 403

**The interests of efficiency, preservation of judicial resources, and the rules of evidence demand the exclusion of psychiatric predictions of a defendant's future dangerousness.**

Because psychiatric and psychological predictions of future dangerousness impress the jury in an irrational and indelible manner, do not serve to make the fact of a defendant's future dangerousness any more or less probable, and do not fill a need of the proponent of such predictions that would not be met otherwise, the predictions consume an unnecessary amount of time in the sentencing phase of a capital trial.

For the reasons articulated above, the minimal, if any, probative value of psychiatric or psychological predictions of future dangerousness is outweighed by the danger of unfair prejudice such predictions cause. Any expert testimony incorporating such predictions is inadmissible under Federal Rule fo Evidence 403.

## CONCLUSION

USCA5 337

48-027

For the foregoing reasons, defendant requests that this Court exclude any and all psychiatric or psychological expert testimony offered by the government that incorporates a prediction as to defendant's future dangerousness.

Respectfully submitted,


/s/ Douglas M. Barlow_____

DOUGLAS M. BARLOW, TBL#01753700

Attorney for Defendant

485 Milam - Beaumont, TX 77701

(409) 838-4259


/s/ Robert Morrow_____

ROBERT MORROW, TBL#14542600

Attorney for Defendant

6630 Cypresswood Dr., #200

Spring, TX 77379

(281) 379-6901


**CERTIFICATE OF CONFERENCE**

USCA5 338

48-028

Counsel conferred with counsel for the government and the government indicated opposition to this motion.

/s/ Douglas M. Barlow

DOUGLAS M. BARLOW

**CERTIFICATE OF SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV(a)(3) on this the 18th day of July, 2006. Any other counsel of record will be served by facsimile transmission and first class mail, return receipt requested, on this the 18th day of July, 2006.

/s/ Douglas M. Barlow

DOUGLAS M. BARLOW

USCA5 339

48-029

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs | § | Criminal Number 1:06-CR-51 |
| | § | (Judge Crone) |
| DAVID LEE JACKSON | § | |

## ORDER GRANTING DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY CONCERNING FUTURE DANGEROUSNESS

**IT IS ORDERED** that Defendant's Motion is in all things:

    **GRANTED**    _____

    **DENIED**     _____

USCA5 340

48-030

# EXHIBIT 49

6-21-06trl

379

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

UNITED STATES OF AMERICA ) CRIMINAL DOCKET NO.
) 1:05-CR-51
)
)
VS ) BEAUMONT, TEXAS
)
)
)
ARZELL GULLEY ) JUNE 21, 2006
DEFENDANT ) 9:00 A.M.

*************************************************************

TRANSCRIPT OF TRIAL
VOLUME 3 OF 8
BEFORE THE HONORABLE MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

*************************************************************

APPEARANCES:

FOR THE GOVERNMENT:          JOE BATTE
                             JIM JENKINS
                             A.U.S.A.
                             350 MAGNOLIA, SUITE 150
                             BEAUMONT, TX 77701

FOR THE DEFENDANT:           GERALD BOURQUE
                             ATTORNEY AT LAW
                             6630 CYPRESSWOOD DRIVE, #200
                             SPRING, TX 77379

                             DAVID CUNNINGHAM
                             ATTORNEY AT LAW
                             808 TRAVIS, 24TH FLOOR
                             HOUSTON, TX 77002

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

380

49-001

6-21-06trl

518

Q.    WHAT STEPS DOES THE -- DO YOU AND THE OTHER CORRECTIONAL OFFICERS TAKE OR DID YOU TAKE BACK IN DECEMBER OF 1999 THAT WOULD PREVENT INMATES FROM CARRYING SHANKS AROUND?

A.    BACK IN '99, AS WELL AS TODAY, WE CONDUCT RANDOM PAT SEARCHES AT ANY TIME, ANY INMATE.  AS WE'RE WALKING BY, WE JUST PULL THEM OVER AND PAT-SEARCH THEM.

WE ALSO CARRY HAND-HELD METAL DETECTORS WE COULD HAVE ON US AS WELL TO SEARCH INMATES FOR THE SAFETY AND SECURITY OF THE INSTITUTION.

Q.    AND IF AN INMATE GETS CAUGHT WITH A SHANK, WHAT PENALTIES ARE THEY SUBJECT TO?

A.    THE FIRST PENALTY IS, THEY'LL BE TAKEN TO THE SEGREGATION UNIT, OR THE SHU AS THEY CALL IT, THE SPECIAL HOUSING UNIT.

IF THEY'RE FOUND GUILTY OF THAT VIOLATION, THEY CAN LOSE THEIR PHONE PRIVILEGES, LOSE VISITATION PRIVILEGES, LOSE COMMISSARY PRIVILEGES.

Q.    CAN THEY BE PROSECUTED?  IS THAT A FEDERAL CRIME?

A.    YES, SIR.

Q.    AND IF THEY'RE CONVICTED, DO THEY GET MORE TIME?

A.    YES, SIR.

Q.    WHAT ABOUT -- WHAT ABOUT DISCIPLINARY TRANSFERS?  DO YOU KNOW WHAT A DISCIPLINARY TRANSFER IS?

A.    YES, SIR.

Q.    CAN SOMEONE RECEIVE A DISCIPLINARY TRANSFER IF THEY GET

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

519

CAUGHT WITH A SHANK ON THEM?

**Page 129**

49-002

6-21-06trl

A.      YES, SIR.

Q.      NOW, BACK IN DECEMBER OF 1999 DO YOU KNOW WHETHER OR NOT THERE WAS A CAMERA MOUNTED IN ANY OF THE TOWERS OR ANYPLACE ELSE ON THE COMPOUND THAT COULD RECORD THE FRONT OF YOUR BUILDING, THE 3 BUILDING?

A.      NO, SIR, I DON'T BELIEVE THERE WAS.

        MR. BATTE:  I'LL PASS THE WITNESS.

                        CROSS-EXAMINATION

BY MR. CUNNINGHAM:

Q.      OFFICER GORDON, I'M APPROACHING YOU WITH WHAT APPEARS TO BE THE REPORT YOU WROTE DECEMBER 19 -- EXCUSE ME -- DECEMBER 16, 1999.

A.      YES, SIR.

Q.      I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THAT.  I WANT TO MAKE SURE THAT YOU HAVE IT HANDY SO YOU CAN LOOK AT IT AND IF NECESSARY REFRESH YOUR RECOLLECTION.  OKAY?

A.      YES, SIR.

Q.      TO START, I JUST WANT TO TALK WITH YOU GENERALLY SPEAKING ABOUT YOUR TRAINING.

        BOTH IN TDC AND THE B.O.P., YOU ATTENDED A TRAINING ACADEMY, CORRECT?

A.      YES, SIR.

Q.      MANY DIFFERENT AREAS OF FIELD -- MANY DIFFERENT AREAS OF TRAINING, BUT ONE AREA COMMON TO BOTH ACADEMIES WAS REPORT

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

520

WRITING, CORRECT?

A.      YES, SIR.

Q.      YOU WERE TAUGHT WHEN THERE'S AN INCIDENT LIKE THIS,

49-003

6-21-06trl

WHICH IN TDC WOULD BE CALLED A MAJOR USE OF FORCE, OR A MAJOR INCIDENT LIKE THIS IN THE B.O.P., THE IMPORTANCE OF A REPORT, CORRECT?

A.    YES, SIR.

Q.    AND IN WRITING THE REPORT, YOU WANT TO BE AS CLEAR AND CONCISE AS YOU CAN BE, CORRECT?

A.    YES, SIR.

Q.    AS SOON AFTER THE EVENT AS POSSIBLE, CORRECT?

A.    YES, SIR.

Q.    PUTTING IN THAT REPORT EVERYTHING THAT YOU CONSIDER TO BE RELEVANT TO THE INVESTIGATION, CORRECT?

A.    YES, SIR.

Q.    OKAY.  THE REASON THAT YOU DO THIS IS BECAUSE SOMEWHERE DOWN THE ROAD YOU MAY HAVE TO GO EITHER TO A DISCIPLINARY HEARING, OR LIKE IN THIS CASE, COME TO COURT, CORRECT?

A.    YES, SIR.

Q.    AND WHAT HAPPENS WITH THESE REPORTS IS, IT HELPS REFRESH YOUR RECOLLECTION ABOUT WHAT WENT DOWN, CORRECT?

A.    YES, SIR.

Q.    NOW, WHEN YOU MADE THIS REPORT THAT NIGHT, YOU WERE AS COMPLETE AND CONCISE AS YOU COULD BE, CORRECT?

A.    YES, SIR.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834



521

Q.    INCLUDING, AS YOU DID IN YOUR TESTIMONY TODAY, EVERYTHING THAT YOU CONSIDERED RELEVANT AND IMPORTANT TO THE INVESTIGATION OF THE INCIDENT INVOLVING BROWN, GULLEY AND JACKSON, CORRECT?

A.    YES, SIR.

Q.    OKAY.  YOU ALSO HAD THE OPPORTUNITY, IF NECESSARY, AM I

Page 131

49-004

6-21-06trl

CORRECT, TO COME BACK AND SUPPLEMENT YOUR REPORTS IF YOU

DISCOVER ADDITIONAL EVIDENCE OR IF THE NEED ARISES TO

SUPPLEMENT YOUR INITIAL REPORT, CORRECT?

A.    YES, SIR, YOU COULD.

Q.    OKAY.  I WANT TO START OUT FIRST BY TALKING ABOUT UNIT 3-B-3.

MR. CUNNINGHAM:  AND IF YOU COULD START -- GO TO GOVERNMENT'S EXHIBIT 10, PLEASE, AND JUST ZOOM UP ONTO THE FRONT OF 3-B.

(VIDEOTAPE PLAYED)

MR. CUNNINGHAM:  IF YOU CAN GO A LITTLE BIT FURTHER.

(VIDEOTAPE PLAYED)

MR. CUNNINGHAM:  BACK IT UP JUST A BIT.  RIGHT THERE.

(VIDEOTAPE PLAYED)

MR. CUNNINGHAM:  NOW, CAN YOU GO JUST A LITTLE BIT FURTHER UNTIL WE SEE CASE MANAGER ROGALSKY COME INTO THE PICTURE?

(VIDEOTAPE PLAYED)

MR. CUNNINGHAM:  RIGHT ABOUT THERE.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

522

BY MR. CUNNINGHAM:

Q.    OKAY.  NOW, SEE THE GENTLEMAN IN THE WHITE SHIRT UP ON THE, WHAT WOULD BE THE THIRD LEVEL?

A.    YES, SIR.

Q.    IF WE FOLLOW THOSE STEPS, THAT WALKWAY AROUND, THAT LEADS TO THE SLIDERS ON 3-B-3, CORRECT?

A.    YES, SIR.

Q.    AND IF WE FOLLOW THE STAIRS DOWN, RIGHT TO THE LEFT OF

49-005

6-21-06trl

THE COLUMN WE CAN SEE THE STAIRS FROM 3-B-3 COMING DOWN OUT INTO THE SIDEWALK AREA, CORRECT?

A.      YES, SIR.

Q.      AND AM I CORRECT, IF I'M STANDING AT THE BOTTOM OF THOSE STAIRS, THE SLIDER DOOR TO 3-B-1 IS RIGHT TO MY LEFT, CORRECT?

A.      NO, SIR.

Q.      OKAY.  I CAN'T GET THIS POINTER TO WORK, AND THAT'S NOT SURPRISING.

        MR. CUNNMINGHAM:  RED BUTTON?

BY MR. CUNNINGHAM:

Q.      OKAY.  IS THAT THE SLIDER DOOR, OR IS IT FURTHER DOWN THE HALL?

A.      NO, SIR.  THAT DOOR YOU'RE LOOKING AT RIGHT THERE IS A FIRE EXIT DOOR.

Q.      OKAY.  THE SLIDERS IT LOOKS LIKE WOULD BE --

A.      TO THE RIGHT.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

❑

523

Q.      BACK IN THIS AREA WHERE WE CAN'T SEE IT?

A.      YES, SIR.

Q.      OKAY.  NOW, YOU TOLD US THAT THAT EVENING YOU WERE WORKING IN THE AREA AROUND THE SLIDERS OF 3-B-3, MONITORING INMATE ENTRANCE AND EXITING FROM THAT UNIT, CORRECT?

A.      YES, SIR.  I WAS IN THE SALLYPORT.

Q.      OKAY.  YOU TOLD US THAT EVENING THAT YOU HAD CONTACT WITH INMATE DARRYL BROWN, WHO LIVED IN 3-B-3, CORRECT?

A.      YES, SIR.

Q.      AND YOU TOLD US, I BELIEVE YOUR WORDS WERE, HE WAS --
YOU NEVER HAD A PROBLEM WITH HIM OR HIM WITH OTHER INMATES?

Page 133

6-21-06tr1

TELL ME AGAIN WHAT YOU SAID.  I DON'T WANT TO PUT WORDS IN YOUR MOUTH.

A.    I'VE NEVER HAD A PROBLEM WITH INMATE BROWN.

Q.    OKAY.

A.    AND I'VE NEVER BEEN INVOLVED IN AN INCIDENT WITH HIM WITH OTHER INMATES PRIOR TO THAT.

Q.    OKAY.  NOW, YOU TELL US THAT THAT EVENING, SHORTLY BEFORE THE CALL WENT OUT THAT THERE'S A FIGHT IN FRONT OF THE UNIT, THAT YOU HAD CONTACT WITH DARRYL BROWN, CORRECT?

A.    YES, SIR.

Q.    NOW, I WANT YOU TO LOOK AT THAT REPORT THAT YOU WROTE THAT NIGHT, THAT YOU JUST TOLD US THAT YOU INCLUDED EVERYTHING THAT WAS RELEVANT ABOUT BROWN, GULLEY AND JACKSON.

MR. BATTE:  I OBJECT TO THAT, YOUR HONOR.  HE NEVER

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

524

SAID THAT.

MR. CUNNINGHAM:  YES, HE DID.

MR. BATTE:  NO, HE DIDN'T.  YOU ASKED HIM IF --

MR. CUNNINGHAM:  I OBJECT TO THE SIDE-BAR, YOUR HONOR.

MR. BATTE:  WELL, MY OBJECTION IS THAT HE NEVER SAID THAT IN THOSE WORDS.

THE COURT:  I THINK THAT'S CORRECT.

MR. CUNNINGHAM:  OKAY.

BY MR. CUNNINGHAM:

Q.    IN THAT REPORT THAT YOU WROTE AFTER, IMMEDIATELY AFTER THE INCIDENT, ABOUT AN INCIDENT INVOLVING GULLEY, JACKSON AND BROWN, YOU NEVER, EVER MADE ANY MENTION IN YOUR REPORT OF

Page 134

49-007

6-21-06trl

INMATE BROWN SPEAKING TO YOU, DID YOU?

A.      NO, SIR.

Q.      OKAY.  THIS TRIAL NOW IS SIX AND A HALF YEARS AFTER THE FACT, CORRECT?

A.      CORRECT.

Q.      YOU HAD THE OPPORTUNITY TO SUPPLEMENT, LIKE YOU JUST TOLD US, BUT YOU NEVER SUPPLEMENTED TO INCLUDE THAT FACT, DID YOU?

A.      NO, SIR.

Q.      OKAY.  YOU --

        MR. CUNNINGHAM:  IF WE CAN GO, JUMP AHEAD TO WHEN OFFICER GORDON APPEARS ON THE VIDEOTAPE WITH LT. MARTEN.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

525

        (VIDEOTAPE PLAYED)

        MR. CUNNINGHAM:  AND STOP IT RIGHT WHEN WE GET TO IT.

        (VIDEOTAPE PLAYED)

BY MR. CUNNINGHAM:

Q.      OKAY.  NOW, WE KNOW BY LOOKING AT YOUR HANDS IN THIS VIDEO, THIS IS AFTER YOU'VE RECOVERED THE PANTS WITH THE I.D. CARD IN IT, CORRECT?

A.      YES, SIR.

Q.      NOW, YOU FELT IT WAS IMPORTANT TO REPORT YOUR FINDINGS ABOUT THE INVESTIGATION TO LT. MARTEN, CORRECT?

A.      YES, SIR.

Q.      OKAY.  YOU HAD THE OPPORTUNITY, DID YOU NOT, TO TELL LT. MARTEN ABOUT YOUR CONVERSATION WITH DARRYL BROWN AT THIS POINT, CORRECT?

A.      YES, SIR, I COULD HAVE.

Q.      OKAY.  THE FACT OF THE MATTER IS, AS AN OFFICER

49-008

6-26-06trl

1051

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

UNITED STATES OF AMERICA            )   CRIMINAL DOCKET NO.
                                    )   1:05-CR-51
                                    )
                                    )
VS                                  )   BEAUMONT, TEXAS
                                    )
                                    )
                                    )
ARZELL GULLEY                       )   JUNE 26, 2006
DEFENDANT                           )   10:00 A.M.

*********************************************************

TRANSCRIPT OF TRIAL
VOLUME 6 OF 8
BEFORE THE HONORABLE MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

*********************************************************

APPEARANCES:

FOR THE GOVERNMENT:         JOE BATTE
                            JIM JENKINS
                            A.U.S.A.
                            350 MAGNOLIA, SUITE 150
                            BEAUMONT, TX 77701

FOR THE DEFENDANT:          GERALD BOURQUE
                            ATTORNEY AT LAW
                            6630 CYPRESSWOOD DRIVE, #200
                            SPRING, TX 77379

                            DAVID CUNNINGHAM
                            ATTORNEY AT LAW
                            808 TRAVIS, 24TH FLOOR
                            HOUSTON, TX 77002

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1052

49-009

6-26-06trl

COURT REPORTER:                    WENDELL R. PARKS, CP/CM
                                   FEDERAL OFFICIAL REPORTER
                                   ROOM 103 FEDERAL BUILDING
                                   300 WILLOW
                                   BEAUMONT, TX 77701


         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;

                TRANSCRIPT PRODUCED BY COMPUTER


              WENDELL R. PARKS, OFFICIAL COURT REPORTER
                        409-654-2834



                                                        1053

                              INDEX

HOUSEKEEPING                   1054

Page 2

6-26-06trl

RIVERA'S TESTIMONY.  IF THE GOVERNMENT COULD ACCOMMODATE US, WE WOULD APPRECIATE IT.

MR. BATTE:  I'LL SEE IF I CAN CALL HIM.  I'M NOT EXACTLY SURE WHERE HE'S AT AND WHAT HE'S DOING RIGHT NOW.

THE COURT:  YOU CAN PROBABLY CALL HIM AND SEE WHERE HE IS.

MR. BATTE:  RIGHT.

THE COURT:  OKAY.  SO WE JUST NEED TO BRING THE JURY IN, RIGHT?

MR. BOURQUE:  YES.

(OPEN COURT, DEFENDANT PRESENT, JURY PRESENT)

MR. BOURQUE:  THE DEFENSE RESTS.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834



1222

MR. BATTE:  WE CALL ORLANDO RIVERA, YOUR HONOR.


ORLANDO RIVERA, GOVERNMENT WITNESS, SWORN


DIRECT EXAMINATION

BY MR. BATTE:

Q.    MR. RIVERA, TELL THE LADIES AND GENTLEMEN OF THE JURY WHO YOU ARE AND WHAT YOU DO FOR A LIVING, PLEASE.

A.    I'M ORLANDO RIVERA.  I AM THE EMERGENCY PREPAREDNESS OFFICER AT FCC PETERSBURG, THE LOW.

Q.    AND WHERE IS FCC PETERSBURG?

A.    THAT'S LOCATED IN THE STATE OF VIRGINIA, PETERSBURG.

Q.    HOW LONG HAVE YOU WORKED FOR THE BUREAU OF PRISONS?

A.    GOING ON THIRTEEN YEARS NOW.

Q.    AND WERE YOU WORKING FOR THE BUREAU OF PRISONS BACK IN

Page 158

49-011

6-26-06trl

DECEMBER OF 1999?

A.      YES, SIR.

Q.      WHERE WERE YOU WORKING AT THAT TIME?

A.      I WAS THE ACTING SPECIAL INVESTIGATIVE AGENT FOR THE UNITED STATES PENITENTIARY IN BEAUMONT, TEXAS.

Q.      OKAY.  AT THAT TIME WHAT DID THE ACTING SPECIAL INVESTIGATIVE AGENT DO?

A.      WELL, WE HANDLED ALL INMATE INVESTIGATIONS, WHETHER IT WAS ASSAULTS WITHIN THE INSTITUTION, GANG VIOLENCE, ANY CRIMINAL ACTIVITY IN THE INSTITUTION.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834



1223


Q.      DID YOU AT SOME POINT BECOME INVOLVED IN THE INVESTIGATION OF THE STABBING DEATH OF AN INMATE BY THE NAME OF DARRYL BROWN THAT OCCURRED ON DECEMBER 16, 1999?

A.      ONLY AFTER IT WAS RELEASED BY THE FBI FOR ADMINISTRATIVE PURPOSES ONLY.

Q.      OKAY.  SO IS THAT A YES?

A.      YES, SIR.

Q.      AT SOME POINT DID YOU INTERVIEW AN INMATE BY THE NAME OF TERRYONTO MCGRIER?

A.      YES, SIR.

Q.      AND DO YOU RECALL THE DATE THAT YOU INTERVIEWED HIM?

A.      THE EXACT DATE I DO NOT RECALL, BUT IT WAS SOMETIME IN MARCH OF 2000.

Q.      WHAT DO YOU RECALL ASKING INMATE MCGRIER AT THE TIME?

A.      I RECALL ASKING HIM WHERE HE WAS IN REFERENCE TO A LOCATION DURING THE INCIDENT AS IT HAPPENED.

Q.      AND DO YOU REMEMBER WHERE HE SAID HE WAS AT THE TIME?

A.      I REMEMBER HIM STATING HE WAS ADJACENT TO UNIT 3-B-3.

Page 159

49-012

6-26-06trl

3-B-3.

Q.    DO YOU RECALL WHETHER OR NOT HE TOLD YOU THAT HE SAW ANY OF THE INCIDENT INVOLVING THE DEATH OF DARRYL BROWN?

A.    NO, SIR.

Q.    NO, YOU DON'T RECALL, OR WHAT DID HE SAY ABOUT THAT?

A.    I DON'T RECALL HIM MAKING ANY REFERENCE TO WITNESSING THE INCIDENT ITSELF.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1224

Q.    DO YOU RECALL WHETHER OR NOT HE TOLD YOU HE EVER ACTUALLY GOT OUT OF UNIT 3-B-3?

A.    NO, SIR.

Q.    NO, WHAT?  DO YOU REMEMBER OR DO YOU REMEMBER HIM NOT SAYING IT?

A.    I DON'T REMEMBER HIM SAYING THAT, THAT HE GOT OUT OF THE UNIT.

Q.    DO YOU RECALL EXACTLY WHAT HE TOLD YOU ON THAT OCCASION?

A.    EXACTLY VERBATIM, I WON'T BE ABLE TO RECALL.  I KNOW HE WAS GOING -- COMING BACK FROM THE PILL LINE TO GET MEDICATION.

MR. BOURQUE:  OBJECTION, NONRESPONSIVE.

BY MR. BATTE:

Q.    DID YOU DO A REPORT AFTER INTERVIEWING MR. MCGRIER?

A.    YES, SIR, I DID.

Q.    WHAT WAS THE PURPOSE OF YOUR REPORT?

A.    AS PART OF THAT INVESTIGATION, ADMINISTRATIVE INVESTIGATION.  IT WAS A STATEMENT FROM THE INMATE AS TO WHAT, YOU KNOW, HE HAD TOLD ME.

Q.    DO YOU THINK IF YOU SAW YOUR REPORT IT WOULD HELP YOUR

Page 160

49-013

6-26-06tr1

RECOLLECTION OF WHAT EXACTLY HE TOLD YOU ON THAT OCCASION?

A.    ABSOLUTELY.

Q.    I'M GOING TO SHOW YOU WHAT I'VE MARKED FOR IDENTIFICATION PURPOSES AS GOVERNMENT'S EXHIBIT 46 AND ASK YOU IF YOU RECOGNIZE THAT DOCUMENT?

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1225

A.    IT'S MY ADMINISTRATIVE INVESTIGATION, PARTIAL, THE INTERVIEW STATEMENTS OF MY INVESTIGATION.

Q.    OKAY.  AND DID YOU PREPARE THIS DOCUMENT?

A.    YES, SIR.

Q.    DID YOU PREPARE THIS DOCUMENT BEFORE OR AFTER YOU INTERVIEWED MR. MCGRIER?

A.    IT WAS AFTER.

Q.    I'LL DIRECT YOUR ATTENTION TO ONE OF THE PAGES HERE, AND THE HIGHLIGHTED PORTION, AND ASK IF YOU WOULD READ THAT TO YOURSELF.

A.    YES, SIR.

Q.    DOES THAT REFRESH YOUR RECOLLECTION OF WHETHER OR NOT MR. MCGRIER TOLD YOU HE WAS ACTUALLY ABLE TO LEAVE UNIT 3-B-3 AT THE TIME OF THE INCIDENT THAT RESULTED IN DARRYL BROWN'S DEATH?

A.    YES, SIR.

Q.    OKAY.  AND WHAT DID HE TELL YOU WHERE HE WAS AT IN REGARDS TO ACTUALLY LEAVING UNIT 3-B-3 AT THE TIME OF DARRYL -- THE INCIDENT INVOLVING DARRYL BROWN?

A.    ACCORDING TO THAT REPORT, HE WAS HELD AT THE DOOR AND WAS NOT ALLOWED TO DEPART THE UNIT.

Q.    AND WHAT DOOR DID YOU UNDERSTAND THAT TO BE, MR. RIVERA?

Page 161

49-014

6-26-06trl

A.      THAT IS THE ENTRANCE TO THE UNIT, THE HOUSING UNIT

ITSELF, UNIT 3-B-3.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834



1226


Q.      AND ARE YOU FAMILIAR WITH THAT EXACT LOCATION THAT HE

WAS TALKING TO YOU ABOUT?

A.      YES, SIR.

Q.      THAT DOOR OF 3-B-3?

A.      YES, SIR.

Q.      AND FROM THAT DOOR OF 3-B-3, CAN YOU SEE OUT ONTO THE

YARD OF 3-B-1?

A.      NO, YOU CANNOT.

        MR. BATTE:  I'LL PASS THE WITNESS.

                        CROSS-EXAMINATION

BY MR. BOURQUE:

Q.      HOW YOU DOING, MR. RIVERA?

A.      I'M DOING FINE, SIR.

Q.      AGENT RIVERA, IS THAT CORRECT?

A.      MR. RIVERA IS FINE.

Q.      OKAY.  ALL RIGHT.  DO YOU RECALL TALKING TO SPECIAL

AGENT MARK SKINNER WITH THE FEDERAL BUREAU OF INVESTIGATION ON

MARCH -- I'M SORRY -- MAY 9, 2005?

A.      OFF THE TOP OF MY HEAD, SIR, I DON'T RECALL, BUT --

Q.      WELL, DO YOU RECALL TALKING TO SPECIAL AGENT MARK

SKINNER ABOUT TERRYONTO MCGRIER ON MARCH 9, 2005?

A.      I'VE HAD CONVERSATIONS WITH AGENT SKINNER.  AS FAR AS

SPECIFICS TO WHO WAS THE INMATE WE TALKED ABOUT OR THE DATE,

SIR, I CANNOT RECALL THAT.

Q.      WOULD IT HELP YOU TO REVIEW MAYBE MARK SKINNER'S REPORT

Page 162

49-015

6-26-06trl
WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1227

OF THAT MAY 9, 2005, INTERVIEW IN ORDER TO REFRESH YOUR RECOLLECTION?

A.      IT'S POSSIBLE.

Q.      OKAY.

        MR. BOURQUE:  JUDGE, MAY I APPROACH?

        THE COURT:  ALL RIGHT.

BY MR. BOURQUE:

Q.      PLEASE DON'T READ IT OUT LOUD, AND, OF COURSE, YOU KNOW THAT.

        LET ME SHOW YOU WHAT IS MARKED FOR THE RECORD PURPOSES, DEMONSTRATIVE PURPOSES ONLY, DEFENDANT'S EXHIBIT NUMBER 4, AND JUST READ THESE ONE, TWO, THREE, FOUR, FIVE PARAGRAPHS TO YOURSELF.

        NOW, AFTER HAVING READ WHAT IS MARKED AS --

        LET ME LEAVE IT DOWN HERE.

        AFTER HAVING READ DEFENDANT'S EXHIBIT NUMBER 4, WHICH IS MARKED FOR DEMONSTRATIVE PURPOSES ONLY, DOES THAT REFRESH YOUR RECOLLECTION THAT YOU DID HAVE AN INTERVIEW WITH MARK SKINNER ON MAY 9, 2005?

A.      YES, SIR.

Q.      ALL RIGHT.  NOW, AFTER HAVING READ THIS, YOU SEE THIS SECTION IN HERE THAT I'VE GOT HIGHLIGHTED FOR YOU?

A.      UH-HUH.

Q.      ALL RIGHT.  NOW, AFTER HAVING READ THIS SECTION, DOES IT REFRESH YOUR RECOLLECTION THAT ON MAY 9, 2005, IN THE

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

49-016

6-26-06trl

1228

INTERVIEW WITH SPECIAL AGENT MARK SKINNER, YOU TOLD HIM --

MR. BATTE:  I'M GOING TO OBJECT, YOUR HONOR.  FIRST OF ALL, HE'S NEVER ASKED HIM IF HE FORGOT THE QUESTION HE'S NOW ASKING IF HE REMEMBERS.

MR. BOURQUE:  THAT'S A GOOD QUESTION.  THAT'S A FAIR OBJECTION.

BY MR. BOURQUE:

Q.    DO YOU RECALL --

MR. BATTE:  I GUESS THAT WOULD BE SUSTAINED THEN?

THE COURT:  WELL, IT WAS FAIR, SO, YES.

MR. BATTE:  OKAY.

MR. BOURQUE:  I'M ACQUIESCING.  I DON'T ALWAYS DO THAT, BUT I'M DOING IT.

BY MR. BOURQUE:

Q.    AFTER HAVING READ THIS REPORT, DOES IT REFRESH YOUR RECOLLECTION TO SOME OF THE THINGS THAT YOU HAD MADE STATEMENTS TO SPECIAL AGENT SKINNER ABOUT?

A.    SOME OF THE THINGS.

Q.    OKAY.  NOW, THIS LAST PARAGRAPH THAT I'VE HIGHLIGHTED, HAS THAT REFRESHED YOUR RECOLLECTION AS TO ONE OF THE THINGS THAT YOU MIGHT HAVE TOLD MR. SKINNER ON MARCH 9, 2005?

A.    PORTIONS OF IT, BUT THE ENTIRE STATEMENT, NO.

Q.    OKAY.  AND I'M NOT ASKING ABOUT THE ENTIRE STATEMENT. I'M TALKING SPECIFICALLY ABOUT WHAT I'VE GOT HIGHLIGHTED HERE. DOES THAT REFRESH YOUR RECOLLECTION AS TO SOMETHING YOU HAD

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1229

TOLD MR. SKINNER ON MARCH 9, 2005?

Page 164

49-017

6-26-06trl

A.      PORTIONS OF WHAT YOU HAVE HIGHLIGHTED THERE, YES.

Q.      OKAY.

A.      OTHER PORTIONS OF THAT HIGHLIGHTED AREA, I DO NOT RECALL THAT.

Q.      OKAY.

A.      CANNOT ATTEST TO.

Q.      ALL RIGHT.  NOW, MY QUESTION TO YOU THEN IS THIS, MR. RIVERA:  DID YOU TELL MARK SKINNER ON MARCH 9, 2005 -- I'M SORRY -- MAY 9, 2005, WHEN HE INTERVIEWED YOU, DID YOU TELL HIM THAT INMATE TERRYONTO MCGRIER WAS OBSERVED ON VIDEO IN CLOSE PROXIMITY TO BROWN, JACKSON AND GULLEY WHEN THE INCIDENT FIRST BEGAN?

A.      NO, I DO NOT RECALL.

Q.      DID YOU TELL HIM THAT OR NOT?

A.      NO.

Q.      OKAY.  WHEN YOU FIRST GOT THIS CASE AND IT WAS RELEASED TO YOU THROUGH THE FBI, WHEN WOULD THAT PERIOD HAVE BEEN AGAIN?

A.      IT IS MARCH, SOMETIME IN MARCH.  THERE'S A LETTER ON THE PORTION THAT MR. BATTE SHOWED ME AS FAR AS IT BEING RELEASED FOR ADMINISTRATIVE PURPOSES BY KEN KINZER, SPECIAL AGENT, MARCH OF 2000.

Q.      MARCH OF 2000?

A.      YES, SIR.

Q.      NOW, WHEN YOU BEGAN YOUR INVESTIGATION, YOU STARTED

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1230

TRYING TO GET YOUR HANDS ON EVERYTHING THAT YOU COULD, CORRECT?

A.      EVERYTHING FEASIBLY POSSIBLE.

Q.      EVERYTHING POSSIBLE?  THAT WOULD INCLUDE ALL OF THE INTERIOR VIDEOS OF UNIT 3-B-1?

Page 165

6-26-06trl

A.      RIGHT.

Q.      CORRECT?

A.      YES, SIR.

Q.      AND THERE'S A GUARD TOWER VIDEO OF THE COMPOUND, YOU GOT A COPY OF THAT FOR YOURSELF AND LOOKED AT IT, DIDN'T YOU?

A.      NOT NECESSARILY.  I DON'T KNOW WHAT VIDEO YOU'RE REFERRING TO, SIR.

Q.      OKAY.

A.      FROM THAT TOWER.

Q.      DID YOU GET THE COPY OF THE TOWER TAPE OUT OF TOWER 8?

A.      THERE IS NO COPY.  THERE WAS NO COPY OF A TOWER.

Q.      NO.  NO.  I'M NOT TALKING --

        LOOK --

           MR. BOURQUE:  CAN WE HAVE UNIT 1 UP, EXHIBIT 1 UP?

BY MR. BOURQUE:

Q.      I'M NOT TRYING TO TRICK YOU.  I UNDERSTAND THAT YOUR TESTIMONY AS YOU SIT HERE TODAY IS THAT THERE'S NO VIDEO OF WHAT'S HAPPENING IN THE COMPOUND OUT IN FRONT OF UNIT 3.  I UNDERSTAND THAT'S WHAT YOU'RE SAYING.  OKAY?  BUT IS YOUR TESTIMONY THAT THERE WAS NEVER ANY KIND OF VIDEOTAPE OF THIS COMPOUND AREA THAT CAME OUT OF TOWER 8?  IS THAT YOUR

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834



1231


TESTIMONY?

A.      NO, I DID NOT SAY THAT.

Q.      WELL --

A.      WHAT'S IN MY REPORT AS FAR AS WHAT WAS RETRACTED, EXTRACTED AS EVIDENCE, THAT WE LABELED AS EVIDENCE, WAS NOT PART OF THOSE VIDEOS.  IF IT'S NOT IN THAT ADMINISTRATIVE

49-019

6-26-06trl

INVESTIGATION, I DIDN'T RECEIVE IT.

Q.    SO YOU DIDN'T LOOK AT WHAT'S VIDEO ONE, TWO, THREE, FOUR, FIVE OR SIX THAT'S OF UNIT 3-B ACTIVITIES?  YOU DIDN'T GET THOSE VIDEOS?

A.    INSIDE THE UNIT, YES, BUT NOT FROM A TOWER.

Q.    AND YOU DIDN'T GET ANY OF THE EXTERIOR TOWERS THAT SHOW THIS DARK OUT HERE, AND YOU DIDN'T LOOK AT THAT?  YOU DIDN'T OBTAIN THAT?

A.    AT THAT TIME THERE WAS ONLY ONE VHS -- EXCUSE ME -- ONE TOWER CAMERA.  EVERY TOWER DID NOT HAVE CAMERA CAPABILITY.

Q.    I'M TALKING ABOUT TOWER 8.  THIS IS TOWER 8 RIGHT HERE, ISN'T IT?

A.    YES, SIR.

Q.    OKAY.  I'M ASKING YOU SIMPLY -- IT'S A SIMPLE QUESTION. WE KNOW THAT THERE'S AN AUDIOTAPE BECAUSE IT'S AN EXHIBIT. YOU'VE NEVER HEARD THE AUDIOTAPE AND YOU'VE NEVER SEEN THE VIDEOTAPE OF THE COMPOUND AT THE TIME OF THE INCIDENT WHICH MAKES THE BASIS OF THIS INDICTMENT, EVEN THOUGH IT DOESN'T SHOW UNIT 3, YOU'VE NEVER EVEN SEEN THAT TAPE?

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1232

A.    I'VE SEEN PORTIONS OF A TAPE WITH INMATES RUNNING TOWARDS AN AREA, BUT --

Q.    OUT IN THIS COMPOUND?  IT'S A COMPOUND VIDEO?

A.    YES, SIR.

Q.    ALL RIGHT.  YOU'VE SEEN THAT TAPE?

A.    YES, SIR.

Q.    OKAY.  WHAT YOU'RE --

      I GUESS MAYBE WHERE OUR SEMANTICS ARE IS, I'M SAYING THAT'S A TOWER 8 TAPE AND YOU'RE SAYING IT WOULD BE A TAPE FROM

Page 167

49-020

6-26-06trl

SOME OTHER DIRECTION?  IS THAT WHERE WE'RE HAVING THE

CONFUSION?

A.    NO, SIR.  IT COULD WELL HAVE BEEN FROM TOWER 8.

Q.    OKAY.  ALL RIGHT.  BUT THE POINT IS, YOU TRIED TO GET

WHAT YOU HAD AVAILABLE TO YOU?

A.    YES, SIR.

Q.    AND YOU MADE EVERY EFFORT AT THE TIME YOU BEGAN YOUR

INVESTIGATION TO DETERMINE WHO WAS INVOLVED AND WHEN THEY WERE

INVOLVED AND IF THEY WERE INVOLVED, RIGHT?

A.    YES, SIR.

Q.    OKAY.  AND THAT WOULD INCLUDE, IF THERE HAD BEEN A TAPE

OUT IN FRONT OF UNIT 3, YOU WOULD HAVE OBTAINED IT, IF THERE

HAD BEEN ONE?

A.    YES, SIR.

Q.    IS THAT RIGHT?

A.    YES, SIR.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1233

Q.    OKAY.  AND THEN ONCE YOU LOOKED AT THAT TAPE, YOU WOULD

TRY TO -- IF IT HAD EXISTED, THEN YOU WOULD WANT TO IDENTIFY

WHO WAS ON THE TAPE AND THEN GO TALK TO THOSE PEOPLE, RIGHT?

A.    IN A NORMAL INVESTIGATION, YES, BUT WE HAVE -- WE HAD

STAFF THAT OBSERVED THE INCIDENT.  SO THERE WOULDN'T HAVE BEEN

A NEED TO INTERVIEW INMATE WITNESS.

Q.    OKAY.

A.    WE HAD PROFESSIONAL STAFF THAT OBSERVED THE INCIDENT,

AND THE BUREAU'S POLICY, OF THE FEDERAL BUREAU OF PRISONS, THAT

IF YOU HAVE A INCIDENT WHICH WAS OBSERVED BY STAFF --

Q.    I SEE.

Page 168

49-021

6-26-06trl

MR. BOURQUE:  CAN WE SEE VIDEO THREE, PLEASE?

(VIDTOTAPE PLAYED)

MR. BOURQUE:  STOP RIGHT THERE.  THAT'S FINE.

BY MR. BOURQUE:

Q.    DO YOU SEE THESE TWO FELLOWS RIGHT HERE?

A.    YES, SIR.

Q.    OKAY.  DO YOU KNOW WHO THESE TWO INDIVIDUALS ARE?

A.    NO, SIR.

Q.    DO YOU KNOW WHERE THEY ARE HOUSED ON DECEMBER 16, 1999?

A.    NO.

Q.    DID YOU INTERVIEW EITHER ONE OF THESE INDIVIDUALS --

A.    NO, I DID NOT.

Q.    -- WHEN YOU GOT THE CASE IN MARCH OF 2000?

A.    NO, I DID NOT.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1234

Q.    OKAY.

MR. BOURQUE:  GO AHEAD AND PLAY VIDEO THREE.

(VIDEOTAPE PLAYED)

BY MR. BOURQUE:

Q.    NOW, CAN YOU TELL WHAT'S HAPPENING HERE --

A.    THEY'RE GOING INTO A CELL.

Q.    -- MR. RIVERA?  ALL RIGHT.

A.    THE INMATES RUN IN THAT CELL IN A MINUTE.

Q.    OKAY.

A.    AND THEY'LL RUN OUT.

Q.    OKAY.  RIGHT.  SO YOU RECOGNIZE THAT AS THE CELL OF THE INCIDENT WHICH MAKES THE BASIS OF THIS INDICTMENT, IS THAT RIGHT?

A.    YES, I DO.

Page 169

49-022

6-26-06trl

Q.    DID YOU INTERVIEW THE FIRST MAN THAT'S GOING OFF TO THE LEFT EVER?

A.    NO.

Q.    HOW ABOUT THE MAN WITH THE WHITE HAT AND THE WHITE T-SHIRT THAT'S LOOKING INTO THE VIDEO?

A.    NO, SIR.

Q.    I'M SORRY.  LOOKING INTO CELL 125.

A.    NO, SIR.

Q.    DID YOU EVER INTERVIEW THAT PERSON?

A.    NO, I DID NOT.

Q.    EVEN UP UNTIL TODAY?

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1235

A.    NO, I DID NOT.

Q.    DO YOU EVEN KNOW HIS NAME?

A.    NO, I DID NOT.

Q.    OKAY.

       MR. BOURQUE:  YOU CAN TAKE THAT OFF.

BY MR. BOURQUE:

Q.    YOU WOULD AGREE WITH ME, MR. RIVERA, THAT SPECULATION AND CONJECTURE ABOUT WHAT HAPPENED CAN BE DANGEROUS?  WOULD YOU AGREE WITH ME?

A.    YES.

Q.    OKAY.  AND THAT IF THERE ARE WITNESSES THAT ARE AVAILABLE WHO SAW WHAT WAS HAPPENING, THEY NEEDED TO BE INTERVIEWED, IS THAT RIGHT?

A.    FOR MY INVESTIGATION, FOR ADMINISTRATIVE PURPOSES, I DID NOT NEED TO INTERVIEW AN INMATE WITNESS WHEN I HAD STAFF THAT OBSERVED THE INCIDENT AND HAD VIDEOTAPE FOOTAGE COVERING

Page 170

49-023

6-26-06trl

THE INCIDENT.

AND MY INVESTIGATION WAS MAINLY TO REMOVE THESE INMATES FROM THE SPECIAL HOUSING UNIT.  LIKE I SAID --

Q.      OTHER THAN TERRYONTO MCGRIER, WHO DID YOU INTERVIEW INMATEWISE?

A.      I BELIEVE I INTERVIEWED THE OTHER INMATE'S CELLMATE.

Q.      THE OTHER INMATE'S CELLMATE?

A.      CAN I MENTION THE OTHER SUBJECT'S NAME?

Q.      WOULD THAT BE CEDRIC WORMLEY?

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1236

A.      YES, SIR.

Q.      OKAY.  THAT WOULD BE JACKSON'S ROOMMATE?

A.      YES, SIR.

Q.      YOU INTERVIEWED HIM?

A.      YES, SIR.

Q.      WAS HE AT THE SCENE OF THE INCIDENT WHICH MAKES THE BASIS OF THIS INDICTMENT?

A.      NO, HE WAS NOT.

Q.      OKAY.  AND THAT CONCLUDES PRETTY MUCH YOUR INVESTIGATION OF INMATES AND WHAT THEY MAY OR MAY NOT HAVE OBSERVED?

A.      YES, SIR.

Q.      ALL RIGHT.

MR. BOURQUE:  PASS THE WITNESS.

REDIRECT EXAMINATION

BY MR. BATTE:

Q.      MR. RIVERA, WITHOUT ELABORATING, ARE YOU SAYING THAT THE PURPOSE OF YOUR INVESTIGATION WAS FOR ADMINISTRATIVE PURPOSES AND NOT FOR CRIMINAL PROSECUTION?

Page 171

49-024

6-26-06trl

A.    YES, SIR.

Q.    OKAY.  AND WAS THAT WHAT YOU WERE CHARGED WITH DOING AT THE TIME YOU WERE AN INVESTIGATOR, FOR ADMINISTRATIVE PURPOSES VERSUS AN INVESTIGATOR TO SUBMIT A CASE TO BE PROSECUTED?

A.    I'M GOING TO NEED TO EXPLAIN IT.  I CAN'T ANSWER THAT WITH A YES OR NO ANSWER, BECAUSE --

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1237

Q.    OKAY.  WELL, GO AHEAD AND EXPLAIN IT.

A.    OKAY.  I'LL TRY AND BE BRIEF THOUGH.

AT THE TIME AT THE U.S. PENITENTIARY, SPECIAL HOUSING UNIT --

MR. BOURQUE:  OBJECTION AS NONRESPONSIVE.

THE COURT:  WELL, I AGREE.  JUST ANSWER THE QUESTION THAT YOU'RE ASKED.

ASK THE QUESTION, MR. BATTE.

THE WITNESS:  CAN YOU REPEAT THE QUESTION, SIR?

BY MR. BATTE:

Q.    I'M GOING TO ASK YOU THE SAME QUESTION THAT YOU SAID YOU COULDN'T ANSWER A MOMENT AGO.  WAS YOUR PURPOSE AT THE TIME TO INVESTIGATE FOR ADMINISTRATIVE PURPOSES RATHER THAN FOR CRIMINAL PROSECUTION?

A.    IT WAS FOR ADMINISTRATIVE PURPOSES ONLY.

Q.    OKAY.  AND WHAT WERE THE ADMINISTRATIVE PURPOSES THAT YOU DID YOUR INVESTIGATION FOR?

A.    TO TRANSFER THE INMATE OUT OF THE SPECIAL HOUSING UNIT BECAUSE OF OVERCROWDING, SO THE INMATES WOULDN'T --

MR. BOURQUE:  OBJECTION AS NONRESPONSIVE.

THE COURT:  OVERRULED.

Page 172

49-025

6-26-06trl

BY MR. BATTE:

Q.    OKAY.  THAT'S GOOD ENOUGH.  THAT'S WHAT THE PURPOSE OF YOUR REPORT WAS FOR, RIGHT?

A.    YES, SIR.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1238

Q.    AND IN THAT REPORT, OR AS PART OF THAT REPORT, YOU INTERVIEWED TERRYONTO MCGRIER, IS THAT CORRECT?

A.    YES, SIR.

Q.    DID YOU INTERVIEW MR. MCGRIER --

AND THAT WAS ON MARCH 6TH OF 2000, SO WAS THAT AFTER YOU LOOKED AT THE SIX SURVEILLANCE TAPES, LIKE THE ONE WE JUST SAW?

A.    YES.

Q.    WAS IT ALSO AFTER LOOKING AT THE COMPOUND VIDEOTAPE THAT MR. BOURQUE JUST MENTIONED?

A.    YES.

Q.    NOW, I WANT TO TALK BRIEFLY ABOUT THAT.

THERE WAS A TAPE OF THE COMPOUND AT THE TIME OF THE INCIDENT, IS THAT CORRECT?

A.    YES.

Q.    DID THAT TAPE SHOW THE FRONT OF UNIT 3, THE TWO 3 BUILDINGS, 3-A AND 3-B?

A.    NO, IT DID NOT.

Q.    WHY NOT?

A.    IT DIDN'T HAVE THAT CAPABILITY, SIR.

Q.    AND WHY DIDN'T IT HAVE THE CAPABILITY?  WHAT WAS PREVENTING THAT CAMERA FROM TAPING THE FRONT OF 3 BUILDING?

A.    YOU HAVE A BLIND SPOT IN THAT AREA BECAUSE THE OTHER SIDE OF THE BUILDING IS JUTTING OUT, SO YOU CANNOT SEE THE

Page 173

49-026

6-26-06trl

FRONT ENTRANCE OF THAT BUILDING OR HOUSING UNIT BECAUSE OF

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1239

THAT.

Q.    OKAY.  SO THE TAPE THAT YOU REVIEWED WAS A TAPE FROM TOWER 8, IS THAT CORRECT?

A.    YES, SIR.

Q.    AND WHAT DID THAT SHOW?

A.    IT SHOWED FOOTAGE OF THE INMATES RUNNING TOWARDS THAT AREA, BUT THAT'S ALL YOU COULD SEE.  IT WAS -- YOU COULDN'T SEE ANYTHING REALLY SPECIFIC.  AND I DIDN'T SEE ANY OF THE INMATES. I DON'T RECALL SEEING ANY OF THE INMATES IN THAT FOOTAGE.

Q.    IT DIDN'T SHOW THE FRONT OF THE 3 BUILDING?

A.    NO, IT DID NOT, SIR.

Q.    DID YOU REVIEW THAT TAPE AND THE SURVEILLANCE TAPES BEFORE YOU MET WITH MR. MCGRIER?

A.    YES, SIR.

Q.    WAS THERE ANYTHING THAT YOU SAW ON THE TOWER TAPE OR THE SIX SURVEILLANCE TAPES THAT WAS INCONSISTENT WITH MR. MCGRIER'S STATEMENT THAT HE NEVER LEFT HIS UNIT ON 3-B-3 AT THE TIME OF THIS INCIDENT?

A.    NO, I DID NOT.

Q.    IF THERE WAS ANYTHING INCONSISTENT BETWEEN WHAT MR. MCGRIER TOLD YOU IN MARCH AND WHAT YOU HAD SEEN ON THE SURVEILLANCE TAPES AND THE TOWER TAPE, WOULD YOU HAVE NOTED IT IN YOUR REPORT?

A.    YES, SIR.

          MR. BATTE:  I'M PASS THE WITNESS.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834
Page 174

6-26-06trl

1240

MR. BOURQUE:  I DON'T HAVE ANY QUESTIONS.

THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP DOWN.

IS THIS WITNESS EXCUSED?

MR. BATTE:  YES, YOUR HONOR.

THE UNITED STATES RESTS.

MR. BOURQUE:  THE DEFENSE WOULD CALL SPECIAL AGENT MARK SKINNER.

MARK SKINNER, DEFENSE WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BOURQUE:

Q.    GOOD AFTERNOON, SPECIAL AGENT SKINNER.

MR. BOURQUE:  WITH THE COURT'S PERMISSION.

BY MR. BOURQUE:

Q.    MR. SKINNER, WOULD YOU STATE YOUR FULL NAME, PLEASE, SIR?

A.    IT'S MARK SKINNER.

Q.    AND YOU'RE A SPECIAL AGENT WITH THE FBI?

A.    YES, SIR.

Q.    AND YOU WERE INVOLVED IN THE INVESTIGATION AT SOME POINT INTO THE INCIDENT WHICH MAKES THE BASIS OF THIS INDICTMENT, IS THAT CORRECT?

A.    YES.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1241

Page 175

49-028

6-26-06trl

Q.     ALL RIGHT.  DO YOU RECALL INTERVIEWING AN INDIVIDUAL BY THE NAME OF ORLANDO RIVERA?

A.     LAST YEAR, VAGUELY I REMEMBER.

Q.     DID YOU REVIEW YOUR REPORT BEFORE YOU HAD AN OPPORTUNITY TO COME IN HERE AND TESTIFY TODAY?

A.     I DID NOT REVIEW IT.

Q.     OKAY.  WOULD YOU LIKE TO LOOK AT A COPY OF WHAT LOOKS LIKE A REPORT THAT YOU MADE AFTER YOUR INTERVIEW WITH MR. RIVERA?

A.     YES, SIR.

Q.     DO YOU THINK THAT MIGHT HELP TO REFRESH YOUR RECOLLECTION?

A.     YES, SIR.

Q.     ALL RIGHT.  READY?

A.     YES.

Q.     AFTER HAVING LOOKED AT THAT, DID THAT REFRESH YOUR RECOLLECTION AS TO YOUR NOTES FROM THE INTERVIEW YOU HAD WITH HIM ON MAY 9, 2005?

A.     YES.  I REMEMBER TALKING TO MR. RIVERA ABOUT WHAT INMATES WERE DETAINED AND THE PURPOSE FOR THEM FOR SPECIAL DETENTION.

Q.     OKAY.  NOW, AFTER HAVING REVIEWED WHAT'S MARKED AS DEFENDANT'S EXHIBIT NUMBER 4 FOR DEMONSTRATIVE PURPOSES ONLY, DOES IT REFRESH YOUR RECOLLECTION THAT RIVERA PROVIDED THE FOLLOWING INFORMATION:  INMATE TERRYONTO MCGRIER WAS OBSERVED

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1242

ON VIDEO IN CLOSE PROXIMITY TO BROWN, JACKSON AND GULLEY WHEN THE INCIDENT FIRST BEGAN?

Page 176

49-029

6-26-06trl

A.    WELL, IF --

I DON'T RECALL THE EXACT DETAILS OF THE INTERVIEW.

Q.    YES, SIR.

A.    BUT IF IT'S IN THIS DOCUMENT, WHICH IS CALLED AN

FT-302 --

Q.    YES, SIR.

A.    BASICALLY THE 302 IS JUST A RESTATEMENT OF FACTS OF THE

INTERVIEW.  IF THAT'S WHAT I PUT IN THERE, THEN THAT'S WHAT HE

TOLD ME.

Q.    THANK YOU VERY MUCH.

       MR. BOURQUE:  PASS THE WITNESS.

                      CROSS-EXAMINATION

BY MR. BATTE:

Q.    SPECIAL AGENT SKINNER, YOU AT SOME POINT BECAME CHIEF

CASE AGENT IN THIS CASE, IS THAT CORRECT?

A.    YES.

Q.    AND YOU ARE AWARE THAT THERE IS NO TAPE AND NEVER WAS

ANY TAPE THAT SHOWED THE FRONT OF THE 3 BUILDING PRIOR TO THIS

INCIDENT, ISN'T THAT RIGHT?

       MR. BOURQUE:  I OBJECT.  THAT CALLS FOR SPECULATION

AND CONJECTURE FROM THIS WITNESS, AND HEARSAY AS WELL.

       MR. BATTE:  IF HE KNOWS, HE KNOWS.

       THE COURT:  RESTATE YOUR QUESTION.

           WENDELL R. PARKS, OFFICIAL COURT REPORTER
                      409-654-2834



                                                          1243


BY MR. BATTE:

Q.    ISN'T IT TRUE, MR. SKINNER, THAT YOU'RE AWARE THAT

THERE NEVER WAS ANY TAPE OF IN FRONT OF THE 3 BUILDING

AVAILABLE IN THIS CASE?

       MR. BOURQUE:  SAME OBJECTION.

                    Page 177

49-030

6-26-06trl

THE COURT:  OVERRULED.

THE WITNESS:  THERE WAS NO VIDEOTAPE OF THE FRONT OF THAT UNIT.

BY MR. BATTE:

Q.    HAVE YOU EVER SEEN A VIDEOTAPE OF THE FRONT OF THAT UNIT?

A.    NO, SIR, I NEVER SAW ANY VIDEOTAPE, NEVER RECEIVED ANY VIDEO.  I WAS TOLD THERE WAS NO VIDEO OR CAMERA FACING THE FRONT OF THAT UNIT AT THE TIME OF THE INCIDENT.

Q.    NOW --

MR. BATTE:  DO YOU HAVE THAT --

MR. BOURQUE:  IT'S UP THERE.

BY MR. BATTE:

Q.    OKAY.  THE STATEMENT MR. BOURQUE READ TO YOU THAT'S IN YOUR 302 SAYS:  INMATE TERRYONTO MCGRIER WAS OBSERVED ON VIDEO IN CLOSE PROXIMITY TO BROWN, JACKSON AND GULLEY WHEN THE INCIDENT FIRST BEGAN, AND YOU SAY THAT MR. RIVERA HAD TO TELL YOU THAT, OTHERWISE IT WOULDN'T BE IN YOUR REPORT?

A.    IF THAT'S WHAT'S IN THE 302, THAT'S WHAT HE TOLD ME AT THE TIME.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1244

Q.    DID YOU ASK HIM WHAT VIDEO HE WAS TALKING ABOUT, MR. SKINNER?

A.    I DIDN'T QUESTION HIM ABOUT IT.  I KNEW WE HAD THE TOWER 8 VIDEO, AND I TOOK HIS WORD FOR IT.  MAYBE I MISSED SOMETHING ON THE TOWER 8 VIDEO, REVIEWED THE TOWER 8 VIDEO, IT DIDN'T SHOW THAT AREA, AND I COULD NOT -- I COULD NOT ASSESS WHAT HE WAS TALKING ABOUT AFTER THAT.

Page 178

49-031

6-26-06trl

Q.      DID YOU GO BACK AND LOOK AT THE SURVEILLANCE TAPES?

A.      YES, I DID.

Q.      DID YOU SEE WHETHER OR NOT MCGRIER SHOWED UP ON ANY OF THE SURVEILLANCE TAPES?

A.      I COULDN'T TELL.  I DIDN'T SEE IT, NO.

Q.      SO YOU LOOKED AT THE TAPES THAT WERE AVAILABLE TO YOU, IS THAT RIGHT?

A.      YES.

Q.      AND MCGRIER WASN'T ON ANY OF THOSE TAPES?

A.      NO.

Q.      AND AS FAR AS YOU KNOW, THERE WEREN'T ANY OTHER TAPES?

A.      NO.

Q.      DID YOU DO ANYTHING ELSE TO DETERMINE WHAT MR. RIVERA MIGHT HAVE BEEN TALKING ABOUT AT THE TIME?

A.      AFTER I TALKED TO MR. RIVERA, I HAVEN'T TALKED TO HIM AGAIN.  I REVIEWED THE TAPES.  I COULDN'T DETERMINE WHAT HE WAS TALKING ABOUT.  I ASSUMED THAT HE MISTOOK THIS INCIDENT FOR MAYBE ANOTHER INCIDENT THAT OCCURRED AT THE PRISON.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1245

Q.      ALL RIGHT.  SO IN YOUR OPINION THEN THERE WAS A MISTAKE MADE SOMEWHERE ALONG THE LINE?

        MR. BOURQUE:  OBJECTION, CONJECTURE AND SPECULATION.

        THE COURT:  OVERRULED.

        THE WITNESS:  YES.  IF THAT VIDEO -- IF I COULDN'T DETERMINE AFTER REVIEWING THE TAPES WHAT MR. RIVERA WAS REFERRING TO, SOMEONE MUST HAVE MADE A MISTAKE.

        MR. BATTE:  PASS THE WITNESS.

                        REDIRECT EXAMINATION

BY MR. BOURQUE:

49-032

6-26-06trl

Q.    WHEN WAS IT THAT YOU STARTED LOOKING FOR THE TAPE THAT MAY HAVE REVEALED WHAT WAS GOING ON IN FRONT OF UNIT 3?  WAS IT IN THE YEAR 2000?

A.    WELL, WE'VE HAD THE TAPE SINCE --

Q.    I'M TALKING ABOUT DID YOU START LOOKING FOR THE --

YOU INTERVIEWED THIS MAN IN MAY OF 2005, THAT BEING RIVERA?

A.    THAT'S CORRECT.

Q.    PRETTY CLOSE TO SIX YEARS LATER?

A.    THAT'S CORRECT.

Q.    RIGHT?

A.    UH-HUH.

Q.    DOES EVIDENCE SOMETIMES GET LOST IN SIX YEARS?  YOU'VE SEEN EVIDENCE GET LOST, HAVEN'T YOU?

A.    IS IT POSSIBLE?  ANYTHING IS POSSIBLE.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1246

Q.    WELL, IS IT POSSIBLE THAT WHEN YOU TALKED TO OFFICER RIVERA THAT HE WAS TRYING TO -- THAT HE WAS LYING TO YOU?  IS THAT POSSIBLE?

A.    I DON'T THINK MR. RIVERA WOULD HAVE LIED TO ME, NO.

Q.    SO WHEN YOU TALKED TO HIM, HE WAS TRYING TO GIVE YOU THE TRUTH?

A.    I BELIEVE SO.

Q.    ALL RIGHT.  AND SO WHEN HE TOLD YOU THAT TERRYONTO MCGRIER WAS OBSERVED NEAR BROWN, GULLEY AND JACKSON WHEN THE INCIDENT JUMPED OFF, IN YOUR OPINION HE WAS BEING TRUTHFUL, IS THAT RIGHT?

A.    I BELIEVE HE WAS RECALLING THE INCIDENT TO THE BEST OF

Page 180

49-033

6-26-06trl

HIS ABILITIES.

Q.    ALL RIGHT.  AND AS A RESULT OF THAT, YOU TRIED TO FIND A VIDEO --

A.    YES.

Q.    -- OF UNIT 3, RIGHT?

A.    YES, SIR.

Q.    AND YOU NEVER FOUND ONE, DID YOU?

A.    I WAS TOLD THAT THERE WASN'T A CAMERA FACING THAT AREA.

MR. BOURQUE:  OBJECT TO HEARSAY.

BY MR. BOURQUE:

Q.    MY QUESTION IS, DID YOU FIND ONE?

A.    NO.

Q.    OKAY.  DID YOU LOOK FOR ONE?

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1247

A.    YES.

Q.    WHY DID YOU LOOK FOR ONE?

A.    BASED ON THIS INFORMATION, WE REVIEWED WHAT TAPES WE HAD --

Q.    OKAY.

A.    -- TO SEE IF THERE WAS INMATE TERRYONTO MCGRIER ON THE VIDEOS.

Q.    AND WHAT THIS LEADS YOU TO BELIEVE ON DEFENDANT'S EXHIBIT NUMBER 4, THAT'S USED FOR DEMONSTRATIVE PURPOSES ONLY, IT TENDS TO INDICATE THAT MCGRIER WASN'T BEING HELD IN UNIT 3-B-3, DOESN'T IT?

A.    I'M SORRY.  COULD YOU REPEAT THE QUESTION?

Q.    IT RUNS COUNTER TO --

WELL, ASSUME WITH ME THAT THERE'S OTHER TESTIMONY THAT MCGRIER IS HELD IN THE DOORWAY OF 3-B-3 AND NOT ALLOWED

Page 181

49-034

6-26-06trl

OUTSIDE.  OKAY?  NOW, DEFENSE EXHIBIT NUMBER 4, AND THIS VIDEO, THIS VIDEO INFORMATION THAT WE'RE TALKING ABOUT, THAT RUNS CONTRARY TO THAT, DOESN'T IT?

A.     YES.

Q.     OKAY.  AND IT ACTUALLY PLACES HIM AT OR NEAR THE INCIDENT WHEN IT JUMPED OFF, DOESN'T IT?

A.     THIS 302 DOES.

Q.     OKAY.  AND THAT WOULD BE A GOOD REASON TO GO TALK TO TERRYONTO MCGRIER, WOULDN'T IT?

A.     YES.

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1248

Q.     TO PLACE A GUY AT OR NEAR THE INCIDENT AT THE TIME IT JUMPS OFF, THAT'S SOMEBODY YOU WANT TO GO TO TALK TO, RIGHT?

A.     YES.

Q.     IT WOULD BE LIKE IN A ROBBERY.  IF THERE'S FIVE PEOPLE INSIDE THE U-TOTE-UM WHEN A ROBBERY OCCURS, YOU WOULD LIKE TO TALK TO THOSE FIVE PEOPLE, RIGHT?

A.     CORRECT.

Q.     NOT JUST FOUR, NOT JUST TWO, YOU WANT TO TALK TO ALL FIVE OF THEM IF YOU CAN GET THEM, RIGHT?

A.     RIGHT.

Q.     OKAY.  ALL RIGHT.

        MR. BOURQUE:  I'LL PASS THE WITNESS.

                RECROSS EXAMINATION

BY MR. BATTE:

Q.     MR. SKINNER, WOULD YOU AGREE WITH ME THAT IT'S POSSIBLE MR. RIVERA WAS MISTAKEN IN HIS RECOLLECTION THAT MCGRIER WAS ON THE VIDEOTAPE?

Page 182

49-035

6-26-06trl

A.    YES.

Q.    WOULD YOU ALSO AGREE WITH ME THAT IT'S POSSIBLE THAT YOU WERE MISTAKEN IN WHAT YOU HEARD ON THE PHONE AND WHAT YOU WROTE DOWN THAT HE SAID?

A.    IT'S POSSIBLE.

Q.    AND WHAT YOU WROTE DOWN IS WHAT YOU PUT IN YOUR REPORT, IS THAT RIGHT?

A.    THAT IS CORRECT.  WHEN I TALKED TO MR. RIVERA --

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1249

MR. BOURQUE:  OBJECTION AS NONRESPONSIVE.

THE COURT:  SUSTAINED.

BY MR. BATTE:

Q.    OKAY.  IT IS POSSIBLE THAT YOU WERE MISTAKEN, JUST AS IT'S POSSIBLE THAT HE WAS MISTAKEN, IS THAT CORRECT?

A.    ANYTHING IS POSSIBLE.

MR. BATTE:  I'LL PASS THE WITNESS.

REDIRECT EXAMINATION

BY MR. BOURQUE:

Q.    I APOLOGIZE.  BUT IT'S POSSIBLE THAT YOU GOT IT RIGHT AND YOU HEARD IT RIGHT, CORRECT?

A.    YES, SIR.

Q.    IT'S POSSIBLE HE GOT IT RIGHT AND HE TOLD YOU RIGHT, ISN'T IT?

A.    YES, SIR.

Q.    ALL RIGHT.

MR. BOURQUE:  PASS THE WITNESS.

MR. BATTE:  I DON'T HAVE ANY OTHER QUESTIONS, YOUR HONOR.

THE COURT:  IS THAT POSSIBLE?

49-036

6-26-06tr1

(LAUGHTER)

THE COURT:  OKAY.  THANK YOU.  YOU MAY STEP DOWN.

IS THIS WITNESS EXCUSED?

MR. BATTE:  YES, YOUR HONOR.

THE COURT:  IS THERE ANYTHING FURTHER?

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1250

MR. BOURQUE:  NO, NOTHING FURTHER FROM THE DEFENSE.

MR. BATTE:  WE'RE DONE, YOUR HONOR.

THE COURT:  OKAY.  SO DO YOU REST?

MR. BATTE:  WE ALREADY RESTED.  THAT WAS THEIR WITNESS.

MR. CUNNINGHAM:  JUDGE, WE WOULD REST AND CLOSE AS WELL.

THE COURT:  RIGHT.  OKAY.  YES, GOING BACK AND FORTH.

ALL RIGHT.  ALL RIGHT.  WE'LL RECESS FOR THE DAY, AND IF YOU'LL COME BACK IN THE MORNING AT 9:00 O'CLOCK, WE'LL BE READY FOR CLOSING ARGUMENTS.

THE CSO:  ALL RISE.

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

THE COURT:  OKAY.  WE NEED TO WORK ON THE CHARGE.

MR. BOURQUE:  YES, MA'AM.  THAT'S THE HEADACHE THINKING PORTION OF --

THE COURT:  YES, IT IS.  WE NEED TO DO THAT.

ARE THERE ANY MORE MOTIONS?

MR. CUNNINGHAM:  WE WOULD RENEW OUR RULE 29 MOTION NOW AT THE CLOSE AND ASK FOR A DIRECTED VERDICT OF ACQUITTAL ON BOTH COUNTS AS TO ARZELL GULLEY.

THE COURT HAS HEARD THE EVIDENCE.  WE ASK FOR A NOT

49-037

6-26-06trl

(OPEN COURT, DEFENDANT PRESENT, NO JURY)

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1365

THE COURT:  ALL RIGHT.  BEFORE I LEAVE, IS THERE ANYTHING ELSE COUNSEL WISHES TO BRING UP?

MR. BATTE:  YOUR HONOR, WE MAY HAVE SOME SUBSTITUTION OF EXHIBITS WITH PHOTOGRAPHS.

I'M GOING TO GET WITH MS. MARTIN AND WE'LL GET WITH MS. WILEY, AND WITH THE COURT'S PERMISSION, WE'LL SUBSTITUTE SOME PHOTOGRAPHS FOR APPELLATE PURPOSES.

THE COURT:  VERY WELL.

COUNSEL FOR THE DEFENSE, IS THERE ANYTHING?

MR. CUNNINGHAM:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.

THE CSO:  ALL RISE.

(ADJOURNMENT)

CERTIFICATE

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

WENDELL R. PARKS, CP/CM                DATE

49-038

6-26-06trl

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1252

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| UNITED STATES OF AMERICA | ) | CRIMINAL DOCKET NO. |
|---|---|---|
| | ) | 1:05-CR-51 |
| | ) | |
| | ) | |
| VS | ) | BEAUMONT, TEXAS |
| | ) | |
| | ) | |
| | ) | |
| ARZELL GULLEY | ) | JUNE 27, 2006 |
| DEFENDANT | ) | 9:00 A.M. |

*****************************************************************

TRANSCRIPT OF TRIAL
VOLUME 7 OF 8
BEFORE THE HONORABLE MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

*****************************************************************

APPEARANCES:

FOR THE GOVERNMENT:        JOE BATTE
                          JIM JENKINS
                          A.U.S.A.
                          350 MAGNOLIA, SUITE 150
                          BEAUMONT, TX 77701

FOR THE DEFENDANT:        GERALD BOURQUE
                          ATTORNEY AT LAW
                          6630 CYPRESSWOOD DRIVE, #200
                          SPRING, TX 77379

                          DAVID CUNNINGHAM
                          ATTORNEY AT LAW
                          808 TRAVIS, 24TH FLOOR
                          HOUSTON, TX 77002

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

49-039

6-26-06trl

INVESTIGATIVE AGENT WITH THE BUREAU OF PRISONS.  HE TESTIFIED FOR A VERY LIMITED PURPOSE ABOUT CHAIN OF CUSTODY.

BRAWLEY INITIALLY GOT UP THERE AND TESTIFIED "I RECOVERED ONE SHANK AND SOME CLOTHES."

MR. BOURQUE WAS DOING THE EXAMINATION AND HE SAYS, "ISN'T IT TRUE THAT YOU ALSO RECOVERED THAT SECOND SHANK?"

AND HE KIND OF PLAYED GAMES WITH MR. BOURQUE UP THERE, BUT ULTIMATELY HE CAME AROUND, AND HE GOES "YOU KNOW, I DID RECOVER THAT SECOND SHANK."

AND WHAT PROMPTED HIS MEMORY IS WHEN THIS KIND LADY PUT UP THE EXHIBIT ON THE STICKERS, THE CHAIN OF CUSTODY FORMS THAT HAD THE SIGNATURES ON IT.

NOW, WHY IS THAT IMPORTANT?  YOU SAW THE PURPOSE OF A REPORT, A DOCUMENT.  FIVE AND A HALF YEARS AFTER A FACT, A REPORT, A DOCUMENT IS NECESSARY TO REFRESH RECOLLECTION, BECAUSE, AS HUMAN BEINGS, WE CANNOT REMEMBER EVERYTHING THAT HAPPENED FIVE AND A HALF YEARS AGO.

AND RICK BRAWLEY NEEDED THAT TO REFRESH HIS

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1308

RECOLLECTION.

THEN AND ONLY THEN DID HE REMEMBER WHAT HE DID THAT DAY.

NOW, I WANT TO TAKE THIS CONCEPT OF A REPORT AND WHY A REPORT IS IMPORTANT AND APPLY IT TO THREE CORRECTIONAL OFFICERS, EVERETT GORDON, LARRY DEVEREAUX AND DAVID KAPPAERIS.

EACH OF THESE WITNESSES WAS MY WITNESS, AND I TALKED TO THEM.  "DID YOU PREPARE A REPORT?  DID YOU DO IT SHORTLY THEREAFTER?  NO ONE RUSHED YOU IN DOING THIS REPORT?  IN YOUR REPORT YOU PUT ALL THE FACTS THAT YOU CONSIDERED TO BE RELEVANT

Page 237

49-040

6-26-06trl

TO THE OFFENSE ON DECEMBER 16TH, AND YOU NEEDED THESE REPORTS TO HELP YOU REFRESH YOUR RECOLLECTION, BECAUSE MANY YEARS LATER IT'S HARD TO KEEP EVENTS STRAIGHT?"

EVERETT GORDON, HE TESTIFIED TWICE, SO LET'S TALK ABOUT WHAT HE SAID THE FIRST TIME.

HE WROTE A REPORT THAT EVENING, AND WE ALSO KNOW HE'S IN GOVERNMENT'S EXHIBIT 10, WHICH IS THE CRIME SCENE VIDEO. SO HE IN EFFECT HAS TWO REPORTS, THE ONE HE WRITES SHORTLY THEREAFTER AND THE ONE HE GIVES ORALLY.

HIS TESTIMONY, MR. GORDON'S TESTIMONY, IS THAT HE SAW BROWN IN 3-B-3 RIGHT BEFORE THE INCIDENT, THEREBY SUGGESTING THAT THE RUN-INS, THE CONFRONTATIONS IN THE YARD ARE FALSE.

I'M GOING TO SUGGEST TO YOU, NOT THAT MR. GORDON IS LYING, I'M JUST GOING TO SUGGEST TO YOU THAT HIS TESTIMONY IS UNRELIABLE, AND IT IS SOMETHING THAT YOU SHOULD REJECT, AND

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1309

HERE'S WHY:

HIS FIRST MENTION OF HIS CONVERSATION WITH DARRYL BROWN IS NOT IN THE REPORT, IT'S NOT ON THE VIDEO, IT WAS HERE, OVER FIVE AND A HALF YEARS LATER ON A WITNESS STAND.

NOW, A COUPLE OF EXCHANGES THAT I THOUGHT WERE IMPORTANT, AND YOU MAY DISAGREE, THIS IS JUST MY THOUGHTS. WHEN I TALKED TO HIM, WHEN I QUESTIONED HIM, BECAUSE HE WAS SO SURE HE HAD THIS CONVERSATION WITH BROWN ON DECEMBER 16TH, I ASKED HIM "WELL, WHEN WAS YOUR CONVERSATION BEFORE?  WHEN DID YOU SPEAK TO BROWN BEFORE THAT?"

"I DON'T REMEMBER."

WHY IS IT HE CAN REMEMBER DECEMBER 16TH, NOT IN A

Page 238

49-041

6-26-06trl

REPORT, NOT IN ANYTHING HE SAID ON THE VIDEO, BUT HE CAN'T REMEMBER WHEN HE TALKED TO HIM AGAIN?

I ALSO ASKED HIM THIS: "ARE YOU AS SURE OF YOUR CONVERSATION WITH BROWN AS YOU ARE ABOUT THE REST OF YOUR TESTIMONY?"

AND HE SAYS YES.

AND THEN THERE'S A PORTION WHERE I TALKED TO HIM, BECAUSE HE TESTIFIED THAT HE WENT OUT -- HE TOOK GULLEY OUT OF THE UNIT, WALKED HIM OUT ON THE GRASS AND TURNED HIM OVER TO LARRY DEVEREAUX. THAT'S WHAT HE TESTIFIED TO.

BUT THEN, YOU KNOW, LARRY DEVEREAUX COMES IN AND SAYS "NO, THAT'S NOT WHAT HAPPENED. THAT'S NOT WHAT HAPPENED."

AND I ASK YOU, IS IT RELIABLE, IS IT BELIEVABLE THAT

WENDELL R. PARKS, OFFICIAL COURT REPORTER
409-654-2834

1310

FIVE AND A HALF YEARS AFTER THE FACT, NOTHING IN A REPORT, NOTHING IN THE VIDEO, THAT HE REMEMBERS, HE, MR. GORDON, REMEMBERS THIS?

AND I WANT TO TALK ABOUT THIS, BECAUSE ONE OF THE THINGS THAT BROWN TELLS YOU, EXCUSE ME, GORDON TELLS YOU IS -- THE INFERENCE IS "MAN, YOU KNOW, I TALKED TO HIM ALL THE TIME, HE WAS A GOOD INMATE, HE SEEMED TO BE A MODEL INMATE."

GORDON DIDN'T KNOW ABOUT THOSE DISCIPLINARY HEARINGS THAT I ASKED HIM ABOUT REGARDING MR. BROWN.

REMEMBER MR. TIMS, LT. TIMS, THE LIEUTENANT? WHAT DID HE TELL YOU ABOUT DARRYL BROWN AND HIS DEALINGS WITH HIM? ALL MENTAL HEALTH DEALINGS.

NOW, THE SUGGESTION IS BROWN IS GETTING UNDRESSED FOR A FIGHT. YOU KNOW, THE FACT OF THE MATTER IS, DARRYL BROWN WAS ERRATIC, HAD A HISTORY OF MENTAL PROBLEMS ACCORDING TO THEIR

Page 239

# EXHIBIT 50

| | |
|---|---|
| **UNITED STATES DISTRICT COURT** | **EASTERN DISTRICT OF TEXAS** |

UNITED STATES OF AMERICA      §
                              §
*versus*                      §      CASE NO. 1:06-CR-51
                              §
DAVID LEE JACKSON             §

## ORDER

Defendant David Lee Jackson's Motion to Allow Video Deposition (#137) is granted.

SIGNED at Beaumont, Texas, this 31st day of May, 2006.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

# EXHIBIT 51

Case 1:09-cv-01039-MJT    Document 49-3    Filed 10/05/10    Page 109 of 117 PageID #:
6636
Case 1:06-cr-00051-MAC-ESH   Document 137   Filed 05/30/06   Page 1 of 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

UNITED STATES OF AMERICA      §

§

vs                           §      Criminal Number 1:06-CR-51

§      (Judge Crone)

DAVID LEE JACKSON     §

# MOTION TO ALLOW VIDEO DEPOSITION

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS:

COMES NOW Defendant DAVID LEE JACKSON, by and through his undersigned counsel of record, and moves the Court to allow him to make and present a video deposition of his mother's testimony that may be used in Court, and would show:

I.

Defendant wishes his mother, Mrs. Sammie Lee Jackson, to testify in the penalty phase of his trial; however, Mrs. Jackson is aged and infirm and, as such, is unable to make the journey from her residency in a Detroit nursing home to the court in Beaumont. The testimony of Mrs. Jackson is essential to the Defendant's presentation of mitigating factors should the punishment stage of trial be reached. As this Court is well aware, the Supreme Court has long held that the Eighth and Fourteenth Amendments to the United States Constitution require that those determining a sentence in a capital case not be precluded from considering as a mitigating factor any aspect of a defendant's character or record that a defendant proffers as a basis for a sentence less than death. *Lockett v Ohio*, 438 U.S. 586, 604 (1978) There are elements of Mr. Jackson's life which can only be reported by his mother. She is a vital witness. United States Attorney, Mr. Joseph Batte, has confirmed that

51-001

Case 1:09-cv-01039-MJT    Document 49-3    Filed 10/05/10    Page 110 of 117 PageID #:
6637
Case 1:06-cr-00051-MAC-ESH   Document 137    Filed 05/30/06   Page 2 of 6

he has no objection to the use of such videotape.

## III

Federal statute 18 U.S.C. Section 3593(c) states that, during presentation of mitigation evidence at trial:

> " . . . Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."

It is the defendant's submission that no prejudice would be caused by the introduction of a videotaped deposition, particularly in light of the fact that the Government does not object to its use. It is at the Honorable Judge's discretion.

Further, a number of authorities have conceded to the use of videotaped interviews in the penalty phase of a capital trial: *United States v. Darryl Johnson* (N.D. IL CR No. 96 CR 379) (children); *United States v. Beckford* (E.D VA CR No. 3:96 CR 66); *United States v. K. Mohamed* (S.D. NY CR No. S6 98 CR 1023) (witnesses in South Africa) and *United States v. Quinones and Rodriguez* (SD NY CR No. 00 CR 761) (friends). The affidavit of Mr. Kevin McNally, Federal Death Penalty Resources Counsel, is attached as further proof that videotaped testimony has been admitted across the country.

## IV.

WHEREFORE, Defendant requests that he be allowed the opportunity to present to the jury the videotaped deposition of his mother, Mrs. Sammie Lee Jackson.

Respectfully submitted,

/s/ Douglas M. Barlow
DOUGLAS M. BARLOW, TBL#01753700
Attorney for Defendant
485 Milam - Beaumont, TX 77701

51-002

Case 1:09-cv-01039-MJT   Document 49-3   Filed 10/05/10   Page 111 of 117 PageID #:
6638
Case 1:06-cr-00051-MAC-ESH   Document 137   Filed 05/30/06   Page 3 of 6

(409) 838-4259

/s/ Robert Morrow
ROBERT MORROW, TBL#14542600
Attorney for Defendant
6630 Cypresswood Dr., #200
Spring, TX 77379
(281) 379-6901

## CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV(a)(3) on this the 30th day of May, 2006. Any other counsel of record will be served by facsimile transmission and first class mail, return receipt requested, on this the 30th day of May, 2006

/s/ Douglas M. Barlow
DOUGLAS M. BARLOW

51-003

## DECLARATION OF KEVIN McNALLY REGARDING
## ADMISSIBILITY OF VIDEOTAPED INTERVIEWS

1.  I currently serve, along with David Bruck of Virginia and Richard Burr of Oklahoma, as Federal Death Penalty Resource Counsel, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal court.  I have served in that capacity since the inception of the Resource Counsel Project in January, 1992.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Division of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases.  This effort includes the collection of data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases under the Criminal Justice Act.[1]

3.  In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information regarding practices in these cases.  I accomplish this by reviewing dockets and downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel.  The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

1

51-004

4. Videotaped interviews with non-testifying indivdiuals have been shown to the jury, without objection, in the following federal capital trials: *United States v. Darryl Johnson* (N.D. IL CR No. 96 CR 379) (children); *United States v. Beckford* (E.D. VA CR No. 3:96 CR 66) (family); *United States v. Dhinsa* (E.D. NY CR No. 97-672 (S-3) (ERK)) (children); *United States v. Higgs* (D. MD CR No. PJM-98-0502) (son); *United States v. Rodney Moore* (D. DC CR No. 1:00CR00157) (children); *United States v. K. Mohamed* (S.D. NY CR No. S6 98 CR 1023) (witnesses in South Africa); *United States v. Quinones and Rodriguez* (SD NY CR No. 00 CR 761) (friends and children); *United States v. Sinisterra and Tello* (W.D. MO CR No. 98-00311-01/05-CR-W-2) (family from Columbia); *United States v. McClure* (D. MD CR No. 01-CR-367-ALL) (second grade teacher); *United States v. Williams* (S.D. NY CR No. 00-CR-1008) (daughter) and *United States v. Ishmael Cisneros* (E.D. VA CR No. 04-CR-283-ALL) (former teacher and school custodian).

5. Videotaped interviews with non-testifying individuals have been shown to the jury in a number of state death penalty trials, including the following states: Arizona (Roseberry, 210 Ariz. 360, 111 P.3d 402 (2005) (mother); Connecticut (Marrero - grandfather from Puerto Rico) (Correa, Hartford No. CR 91-0406234 - family, friends, neighbors from Columbia) (Griffin, Middlesex No. CR 93-0126985 - grandson); Florida (Rodgers, Ninth Judicial Circuit No. CR 01-238 - brother had difficulty traveling) (Frances, Ninth Judicial Circuit No. CR 00-16204 - mitigation witnesses from U.S. Virgin Islands); Maryland (Horn - mother); New Jersey ( David Jones) (Goumnov, Atlantic Co. - 5 year old niece) (Josephs - witness); New York (Bell, Queens County - younger sibling) (Taylor, Queens County - children) (Alvarez, Westchester County - grandmother and aunt in Honduras who were denied visas).

6. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge, ability and belief.

51-005

I declare under the penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed this __10th__ day of May, 2006.


Kevin McNally

x:\topstarter kit pre-noi materials\litigation guides\mitigation\declarations\videotaped penalty witness wpd

51-006

# EXHIBIT 52

ATE _____4-5-06_____   CASE NUMBER _____1:05CR51_____

LOCATION _Beaumont Division_

JUDGE _MARCIA A. CRONE_                USA          _____Joseph Batte_____ Assigned

DEPUTY CLERK _Druann Wiley_           VS     and Sarah Wannarka_____ Appeared

RPTR/ECRO _Wendell R. Parks_

TAPE # _____

USPO _____       ARZELL GULLEY, DAVID LEE JACKSON,

INTERPRETER _____            Defendants

BEGIN _____2:30 p.m._____       _Gerald Ellis Bourque, David P. Cunningham,  for Gulley;_
                                    _Douglas M. Barlow, Robert A. Morrow for Jackson_
                                              Attorneys

---

## HEARING ON DEFENDANTS' MOTIONS TO SEVER
### (Motions 112 and 114)

•⁝.......... Motion hearing held.

☐.......... Motion hearing called.

☐          Rule invoked

.......   Govt          Dft evidence presented
          witlst.       Govt          witlst.  Dft _____

          exhlst.       Govt ☐ exhlst. ☐ Dft _____

.........Defts' motions 112 and 114 to sever
oral order.   • ☒ granted          denied ☐ granted in part   ☐ ADV
              Total time in court:          - contested hrg

.......   Bond      continued  $ _____  or ☐ revoked

☐ kbnd. ...   Dft bond ☐ set or ☐ reset to $_____  ☐ cash ☐ surety ☐ 10% ☐ PR ☐ unsecured

......   Dft REMANDED to custody of USM

•⁝.....   Minutes filed.

Defendant Gulley had forward the court a letter expressing concern about his attorney, and spoke to it, feeling he is not receiving constitutional rights.  The prison is on lockdown, but he feels he should still be able to see his attorneys.  He has not received phone call on attorney-client privileges in 10 months.  His security level, is such he is talking to his attorneys in a conference room.  He does not want prison staff to monitor those calls.  The court stated that can be investigated.  Defendant Gulley stated he was given time to call attorneys, but would not call them on a monitored phone.  Court stated it does not appear he has a problem with his attorneys, but with the prison.  Court stated since he is no longer subject to death penalty he is not entitled to two lawyers.  It appears defendant's concern is with the prison staff rather than the attorneys.  Defendant wants the attorneys to do something about the situation.  The court informed that at this stage changing lawyers would not help, and he would not be entitled to but one lawyer, inasmuch as his case is no longer a death penalty case.  Mr. Bourque spoke and stated he has had some difficulty recently in getting into the prison for visitation, especially on a date in March and after waiting several hours was informed he could not visit with him that day.  On a second occasion, they waited an hour, but instead of being able to visit client in a conference room, they were forced into a confined area with a glass and telephone.  Two booths down, the co-defendant was on the phone with his attorney, Mr. Morrow.  Mr. Bourque did not want to be in position of either attorney hearing what they were each saying to their respective clients.  There are facilities in the visitation rooms where the attorneys could be locked in with clients to confer.  Mr. Bourque spoke about possibility of having Mr. Gulley

CRIM 92-116          ☐  See reverse/attached for additional proceedings 3:30 p.m. _____ Adjourn

52-001

transferred to a facility in Houston, away from people who may be witnesses ins the case. Mr. Barlow expressed he has had similar difficulties visiting with his client, Mr. Jackson. He does not have a problem with traveling to Houston, inasmuch as three of the attorneys in the case are in the Houston area. Mr. Batte stated he has no knowledge of how the prison is handling the matter. Court questioned Mr. Gulley who stated he does not desire his counsel to be replaced. Mr. Gulley stated the staff in the prison keep asking him about the case. Court will try to arrange for better visitation. Court will leave Mr. Bourque and Mr. Cunningham on the case.

The court moved to the motions for severance. Mr. Barlow spoke to the motion which sets out the factual basis as to why there are differences which would prevent fair trial if defendants not severed. There are irreconcilable differences whereby each defendant will contend the other defendant is responsible party. Mr. Barlow also anticipates calling Mr. Gulley as a witness for his client, and Mr. Gulley may be able to claim privilege. Mr. Bourque spoke to the motion for severance and wants to adopt the statements of irreconcilable differences. Would like court to consider additional problem that Mr. Gulley may be willing to take the stand in a separate trial, but may have a fear of reprisal based on his testimony if the case is tried together. Also stated separate trials would be a shorter trial time than if the case was tried together. The court questioned if there was any evidence against one or the other if tried together. Mr. Bourque stated there was possible some evidence by a guard as to statements. Such evidence, if it comes into the trial, would be prejudicial. Mr. Morrow asked for clarification as to ex parte information, and to deny such rights have violated certain constitutional rights. Defense should not have to lay out defense to Government to obtain severance. Mr. Batte spoke on behalf of the Government. Government believes this is a simple case, with simple defenses: Identity, and self-defense. The third defense would be antagonistic defenses, with each defendant saying the co-defendant is the guilty party. Mr. Batte says severance at this time is premature. Believes at a time when each defendant accuses the other would be the appropriate time for severance. Also spoke to balancing of judicial economy. Mr. Batte believes severance is not right at this time. Mr. Batte spoke to Fifth Circuit cases concerning antagonistic defenses. Mr. Barlow responded. What defense's position is the antagonistic defense will be defense strategy. Jury instructions not to consider comments of counsel could be a comment by the court on the evidence. Mr. Bourque spoke to fact that Government seeks the death penalty as to defendant Jackson and not against defendant Gulley. This creates a conflict on voir dire selection, with number of strikes, per side. Mr. Batte spoke about voir dire issue. Believes that could be worked out in this case. Mr. Barlow stated the defense is having some problems getting records. There may be a problem being ready for a death penalty trial in June. Court stated there is a dearth of authority as to whether severance is granted. Court stated ruling on severance should be done in advance. Court stated defendants have made sufficient showing in support of their motions. Court will grant the motions for severance. Will enter separate scheduling orders. Will sever Jackson into another case number.

Mr. Bourque and Mr. Barlow have filed motion to release PSR. Requests the complete document be presented to the court with redactions. The court will order PSR on decedent to be turned over to defendants after court reviews indicated redactions. Mr. Batte wants to have information on expert disclosure. Mr. Morrow stated they believe can work out disclosure of experts with the Government, but are having some time to get records to present to experts. Mr. Batte wants to know who experts will be.

Adjourn to chambers conference at 3:30 p.m

CRIM 92-116          ☐   See reverse/attached for additional proceedings 3:30 p.m. _____   Adjourn