# EXHIBIT 62

Behavioral Sciences and the Law
Behav. Sci. Law 23: 603–625 (2005)
Published online in Wiley InterScience (www.interscience.wiley.com). DOI: 10.1002/bsl.660

# The Impact of Mental Health Evidence on Support for Capital Punishment: Are Defendants Labeled Psychopathic Considered More Deserving of Death?

John F. Edens, Ph.D.,* Lori H. Colwell, Ph.D.,[†] Donna M. Desforges, Ph.D.[†] and Krissie Fernandez, M.A.[†]

Controversy surrounds the use of the Hare Psychopathy Checklist—Revised (Hare, 1991, 2003) in capital murder cases, where it has been introduced to support prosecution claims that a defendant represents a "continuing threat to society." Although widely presumed to have a prejudicial impact (e.g., American Psychological Association, 2004), little is known about how the lay public reacts to data derived from ostensibly stigmatizing assessment instruments such as the PCL-R. The present study examined the effect of psychopathy data on layperson attitudes by having 203 undergraduates review a capital murder case where the results of the defendant's psychological evaluation were experimentally manipulated. When expert testimony described the defendant as psychopathic, a much larger percentage of participants supported a death sentence (60%) than when testimony indicated that he was psychotic (30%) or not mentally disordered (38%). Interestingly, participant ratings of how psychopathic they perceived the defendant to be—regardless of the testimony condition to which they had been assigned—also predicted support for a death sentence. Given the limited probative value of the PCL-R in capital cases and the prejudicial nature of the effects noted in this study, we recommend that forensic examiners avoid using it in these trials. Copyright © 2005 John Wiley & Sons, Ltd.

*Correspondence to: John F. Edens, Ph.D., Associate Professor, Department of Psychology, Southern Methodist University, Dallas, TX 75275, U.S.A. E-mail: jedens@smu.edu
[†]Sam Houston State University.

Portions of this research were completed while Dr Edens was a faculty member in the Department of Psychology at Sam Houston State University.

Copyright © 2005 John Wiley & Sons, Ltd.

604    J. F. Edens *et al.*

# INTRODUCTION

The construct of psychopathy, typically operationalized by the Psychopathy Checklist—Revised (Hare, 1991, 2003), is increasingly being used by mental health examiners to inform legal decision-making in an array of contexts and jurisdictions in North America and Europe (Edens & Petrila, in press; Fitch & Ortega, 2000; Hare, Clark, Grann, & Thornton, 2000; Ogloff & Lyon, 1998). Perhaps nowhere is the applied use of the PCL-R more controversial than in U.S. capital murder trials, where psychopathy has been used to support expert testimony that a defendant will be a "continuing threat to society," even if incarcerated for the remainder of his or her life (Bersoff, 2002; Cunningham & Reidy, 1998, 1999, 2002; Edens, 2001; Edens, Buffington-Vollum, Keilen, Roskamp, & Anthony, 2005; Edens, Petrila, & Buffington-Vollum, 2001). As we will demonstrate later, such assertions are particularly troubling in the context of death penalty cases, given that the probative value of the PCL-R in these trials appears to be quite limited at this time (see *Psychopathy and Expert Testimony* below).

Despite the apparent widespread applied use of the PCL-R in settings where the results are provided to non-mental-health professionals (e.g. judges, jurors, parole boards), it is interesting to note that very little is known about whether or how it influences the decisions made by these individuals. In the context of death penalty cases, where jurors are literally making a life or death decision, the relative absence of knowledge regarding the "face validity" of psychopathy measures seems to be a serious gap in our knowledge base, particularly given that the admissibility of evidence hinges both on its probative value and on its potential to prejudice jurors. As such, the present study investigated how laypersons react to expert testimony describing psychological assessment data in the context of a mock capital murder trial, focusing in particular on the effects of violence risk testimony that is based on the assessment of psychopathy. Before describing the methodology of this study in further detail, we provide a brief overview of the role of mental health evidence in capital murder cases and describe specific concerns about the utility of "future dangerousness" testimony in these trials.

## Violence Risk and Capital Sentencing

In an effort to reduce the amount of discretion available to jurors in capital trials (see *Furman v. Georgia*, 1972), jurisdictions have developed specific criteria regarding the factors appropriate for jurors to consider in determining whether a convicted defendant should be put to death. In *Jurek v. Texas* (1976), the U.S. Supreme Court upheld the constitutionality of a Texas statute that required jurors to consider the likelihood that a defendant will commit future acts of criminal violence such that he or she would represent a "continuing threat to society" if not put to death. Although not necessarily the primary issue, several other jurisdictions allow at least for the consideration of "future dangerousness" as an aggravating factor in capital cases. Regardless of statutory guidelines related to this issue, social science research also suggests that a defendant's perceived dangerousness is given considerable weight in jurors' sentencing decisions in capital trials (Blume, Garvey, & Johnson, 2001; Costanzo & Costanzo, 1992).

Copyright © 2005 John Wiley & Sons, Ltd.    Behav. Sci. Law 23: 603–625 (2005)

Although many factors can typically be presented to jurors to inform their opinions regarding whether a capital defendant represents a continuing threat to society, the introduction of violence risk testimony by mental health experts has arguably been one of the most controversial types of evidence admitted (Cunningham & Reidy, 1999, 2002; Ewing, 1983). This is at least in part because of the questionable validity of these risk assessments in many instances, such as the landmark *Barefoot v. Estelle* (1982) decision in which an examiner claimed he was 100% certain that a defendant would kill again. Even though the type of unstructured clinical opinion testimony offered in that case has been widely criticized, the courts have upheld the constitutionality of this and other types of violence risk testimony. As such, examiners appear to have considerable latitude in terms of what factors they consider when conducting risk assessments on capital defendants.

## Psychopathy and Expert Testimony

Although clinical opinion testimony has a long history of controversy, it is only recently that the PCL-R (Hare, 1991, 2003) has been introduced into the sentencing phase of capital murder trials (Bersoff, 2002; Edens et al., 2005; Cunningham & Reidy, 1998, 1999, 2002; Edens, 2001; Edens et al., 2001; Hare, 1998). The primary concern expressed by its critics in these cases is that, despite the general link between psychopathy and violence risk (see, e.g. Hemphill, Hare, & Wong, 1998), the PCL-R actually provides little if any probative information to jurors in these cases and also is likely to have a highly prejudicial effect on perceptions of the defendant (see, for example, the recent American Psychological Association (2004) Amicus brief in the case of Christopher Simmons). More specifically, it has been argued (Edens et al., 2005; Edens, Desforges, Fernandez, & Palac, 2004; Edens, Guy, & Fernandez, 2003; Edens et al., 2001) that the PCL-R as of yet has not been demonstrated to be associated with the more specific forms of "dangerousness" at issue in a capital trial, where the (already convicted) defendant will reside in prison for at least the next 30 years if not put to death.[1] Support for this claim comes from several sources.

First, in relation to those few jurisdictions in which life *with* parole is a sentencing option, PCL-R scores typically are *not* associated with an increased risk of violent recidivism in the age range in which capital defendants could be released following completion of their minimum prison term (Hare, Forth, & Strachan, 1992; Hare, McPherson, & Forth, 1988; Porter, Birt, & Boer, 2001; cf. Harris, Rice, & Cormier, 1991; see Edens et al., 2001, for a review). Second, although at present there are no published studies examining the predictive validity of psychopathy in relation to prison violence specifically among capital defendants who have been sentenced to life in prison (without parole as an option), studies have examined this relationship in the most relevant comparison group—adult male U.S. prison inmates. *All* of the published studies have reported modest and non-significant effect sizes between

---

[1]At present, across jurisdictions in the U.S. 30 years is the minimum mandatory sentence for capital murder if the defendant is given "life."

Copyright © 2005 John Wiley & Sons, Ltd.

62-003

606    J. F. Edens *et al.*

the PCL-R total score and measures of physical aggression (Buffington-Vollum, Edens, Johnson, & Johnson, 2002; Edens, Poythress, & Lilienfeld, 1999; Kosson, Steuerwald, Forth, & Kirkhart, 1997; Walters, Duncan, & Geyer, 2003; for a meta-analytic review, see Guy, Edens, Anthony, & Douglas, in press).[2] Moreover, research suggests that, compared with the typical general population inmate, death row and former death row prisoners as a group have a much lower base rate of aggression (see Edens et al., 2005, or Reidy, Cunningham, & Sorensen, 2001, for an overview), even those serving life without parole who ostensibly have "nothing to lose" (Sorensen & Wrinkle, 1996). As such, it seems likely that the weak psycho-pathy/prison violence correlation would be even further attenuated among this particular subgroup of offenders who appear to engage in low rates of institutional violence. Thus, expert witness claims that the presence of psychopathy increases the likelihood that a capital defendant is a "continuing threat to society" at present are contradicted by empirical research on the most relevant forms of violence risk at issue in a capital trial (i.e. likelihood of violence while incarcerated in prison and likelihood of violence if eventually paroled). Therefore, the probative value of introducing testimony regarding psychopathy would appear to be questionable at best at this time (for a more extensive review of these and related issues, see Edens et al., 2005; Edens et al., 2001).

## Mental Health Expert Evidence and Its Impact on Laypersons

Noted earlier, despite the widespread use of psychological data in the legal system and the wealth of research examining the clinical utility of various instruments and procedures (for an overview, see Melton, Petrila, Poythress, & Slobogin, 1997; Otto & Heilbrun, 2002), there is remarkably little empirical research examining whether or how this information influences the decision-making of those who are the "consumers" of forensic evaluations (i.e. judges and jurors), who may know little or nothing about mental disorder or psychometrics. The few studies that have examined the impact of different types of expert testimony in death penalty cases suggest that laypersons do not tend to respond similarly to all types of assessment data. For example, risk assessments based on clinical opinion generally appear to be more influential than those derived from actuarial data (Krauss & Lee, 2003; Krauss & Sales, 2001; cf. Guy & Edens, 2003).

The negative connotations historically associated with the label "psychopath" in particular may have a prejudicial effect on jurors in capital trials. Humans tend to be cognitive "misers," who utilize simplifying heuristics to economize the information they process (Kahnemahn & Tversky, 1972), particularly when faced with a complex task (Bodenhausen & Lichtenstein, 1987). Once categorized, they may use stereotypes to free up mental resources needed for other decision-making tasks (Fiske, 1989; Gilbert & Hixon, 1991; Heath & Tindale, 1994). In deciding the fate

---

[2] One recent study (Young, Justice, & Erdberg, 2004) reported a significant association between the PCL-R total score and assaults while in psychiatric treatment, but a very weak and non-significant effect while inmates were in general population settings, which we would argue is the more relevant environment to consider in relation to the "future dangerousness" of capital murderers.

Copyright © 2005 John Wiley & Sons, Ltd.

62-004

of a capital defendant, jurors are required to consider any dispositional character-istics that might be considered mitigating circumstances that would favor a life rather than a death sentence (*Jurek v. Texas*, 1976). However, the label of "psychopath" applied by a mental health examiner may generate category-based processing for jurors, triggering stereotypic information associated with a generic mental category or prototype and negating any consideration of the specific facts of the case. In relation to the issue of prejudicial psychopathic prototypes, it is noteworthy that community survey research has found that respondents who were asked to name a "typical psychopath" more than 60% of the time identified one of three specific individuals: Ted Bundy, Jeffrey Dahmer, or Charles Manson (Helfgott, 1997).

Despite the above-noted concerns about the potentially prejudicial effects of psychopathy data, we are aware of only two studies that have specifically examined the impact of such evidence on legal decision-making. Using a mock jury design, Guy and Edens (2003) compared the effects of violence risk testimony based on clinical opinion, actuarial data, or psychopathy diagnoses in the context of a sexual predator civil commitment trial. Psychopathy testimony was associated with more negative perceptions of the defendant compared with the other two risk testimony conditions, but only among female jurors.

The second study (Edens et al., 2004), which focused on a death penalty case specifically, investigated the effects of expert testimony regarding the presence/absence of a mental disorder (psychopathy, psychosis, or no disorder) and violence risk (low or high) on mock jurors' sentencing decisions. As expected, a defendant who was described as psychopathic by a mental health professional was seen as more likely to commit future acts of violence than one whose evaluation results indicated no diagnosis. However, the same pattern was true when the defendant was assessed as being psychotic. When described as psychotic, the defendant was given higher ratings of future dangerousness than in the no disorder condition but did not differ from the psychopathic condition, perhaps indicating a general bias toward indivi-duals with mental disorders rather than a unique bias toward individuals labeled as psychopaths.

Not surprisingly, individuals described during testimony as high risk were rated as more likely to be dangerous in the future than those described as low risk. However, the influence of risk level was not consistent across diagnostic groups. In the "no disorder" condition, those identified as low risk were perceived as significantly less dangerous than those identified as high risk (Cohen's $d = 0.77$). Labeling the defendant a "psychopath," however, appeared to negate somewhat the influence of being identified as low risk, as there were no significant differences in ratings of dangerousness across the two levels ($d = 0.22$). A similar modest effect was noted in the psychosis condition as well ($d = 0.28$).

Despite the impact of psychopathy (and psychosis) testimony on perceptions of dangerousness and the demonstrated positive association between perceptions of dangerousness and death sentences reported in other research (e.g. Blume et al., 2001), regression analyses failed to find a significant relationship between the diagnostic and risk conditions and sentencing determinations in the Edens et al. (2004) study. Although this result may have been caused by a genuine lack of association between these variables, the authors judged those particular analyses to be highly suspect because of exceedingly poor comprehension of the means by

Copyright © 2005 John Wiley & Sons, Ltd.    Behav. Sci. Law 23: 603–625 (2005)

62-005

608    J. F. Edens *et al.*

which the sentencing decisions were derived.[3] Manipulation checks following completion of the protocols indicated that a large percentage failed to (1) understand the requirement that the defendant had to be considered a "continuing threat to society" as a prerequisite for imposing a death sentence, and (2) comprehend the meaning of the term "mitigating evidence" that might be used to justify a life sentence rather than capital punishment. This basic lack of understanding, which unfortunately appears to be a common problem in relation to sentencing guidelines (Blankenship, Luginbuhl, Cullen, & Redick, 1997; Diamond, 1993; Frank & Applegate, 1998; Haney & Lynch, 1997; Luginbuhl, 1992; Luginbuhl & Burkhead, 1994; Lynch & Haney, 2000; Wiener et al., 1998; Wiener, Pritchard, & Weston, 1995), obscured the meaning of results obtained regarding the ultimate sentencing decision.

Using a somewhat different methodology, Edens et al. (2003) also examined the relationship between the presence of psychopathic traits and support for the death penalty. Participants read a newspaper account of a juvenile capital murder case in which the defendant was described at trial as exhibiting either prototypically psychopathic traits or as lacking such characteristics. Although the majority of participants were not supportive of a death sentence after reading the newspaper story, a significantly higher percentage of those in the psychopath condition endorsed this option (36%) compared to those in the non-psychopath condition (21%). An additional finding of interest from the Edens et al. study was that participant ratings of how psychopathic the juvenile defendant was perceived to be in the non-psychopath condition significantly predicted support for the death penalty. That is, participants who believed the defendant to be psychopathic (even though no such direct evidence was provided) were much more likely to support capital punishment. This is generally consistent with surveys of jurors in capital cases (Sundby, 1998), who identified personality traits associated with psychopathy (e.g. remorselessness, arrogance) as influencing their sentencing recommendations, even though the PCL-R was not introduced in these cases.

## The Present Study

Given these earlier findings, the goal of the present study was to attempt to replicate the findings of Edens et al. (2004) in relation to juror perceptions of dangerousness and also employ a more methodologically sound means (see Methods section below) of assessing whether participants believe that a psychopath would be more deserving of a death sentence than a non-mentally-disordered capital defendant or a defendant diagnosed as psychotic. We used the same 3 (no disorder versus psychosis versus psychopathy) $\times$ 2 (low risk for future violence versus high risk for future violence) experimental design to test the impact of diagnosis and level of risk on

---

[3]The sentencing variable used in this study was created by examining responses to the two primary questions that are at issue in Texas capital sentencing hearings (Texas Code of Criminal Procedures, 2000a): (a) is the defendant, beyond a reasonable doubt, likely to commit serious acts of criminal violence in the future that make him a continuing threat to society; and (b) are there any relevant mitigating circumstances that would warrant not imposing a death sentence? If participants answered yes to (a) and no to (b) then they were classified by the sentencing variable as supporting the imposition of a death sentence in this case. Any other combination was classified as supporting a life sentence.

Copyright © 2005 John Wiley & Sons, Ltd.

mock juror sentencing decisions. Given its presumed global association with risk (particularly among laypersons), we predicted that a diagnosis of psychopathy would cause jurors to view the defendant both as more dangerous and as more deserving of a death sentence. The third diagnostic category, psychosis, was used to examine whether such effects (if present) were specific to psychopathy or rather applied to a more global stigma against persons with mental disorders. Although the Edens et al. (2004) study found no significant differences between individuals diagnosed as psychopathic as opposed to psychotic in terms of perceptions of how *dangerous* they were, it seems plausible that differences might still be obtained regarding the sentences imposed. Attribution theory (Lin, 2001; Weiner, 1980a, 1980b) suggests that people typically ascribe more responsibility to individuals whose behaviors appear to be tied to personality traits within their control (e.g. callousness, irresponsibility, lack of remorse) rather than those that are less controllable (e.g. disordered thinking as a result of severe mental illness), which would suggest that psychosis might be less associated with perceived responsibility for one's actions. As such, we predicted that psychopathy would be more strongly related to support for a death sentence than psychosis, even if there were no significant differences in relation to perceptions of dangerousness across the two conditions.

Additionally, given the findings in the juvenile psychopathy study noted earlier (Edens et al., 2003), we were interested in testing the hypothesis that juror *perceptions* of psychopathic traits—separate from whatever testimony they reviewed regarding psychopathy—would predict support for a death verdict. To explore this putative relationship, participants were asked across all conditions to rate the defendant on various characteristics consistent with psychopathy. To ascertain whether a similar effect might be evident for psychotic symptoms, we also had participants rate the defendant on the extent to which they would expect him to exhibit symptoms of schizophrenia, using DSM-IV criteria. We predicted that participants who rated the defendant as possessing more psychopathic traits would be more likely to view him as a deserving a death sentence, regardless of the type of testimony heard. Conversely, similar to our predictions about the impact of psychosis condition testimony on death sentences, we expected that ratings of how psychotic the defendant was presumed to be (separate from testimony itself) would have minimal impact on sentencing decisions. If such ratings were in fact influential, it would again raise questions as to whether any bias related to sentencing decisions was driven more by general stereotypes about mental disorder rather than psychopathy *per se*.

# METHOD[4]

## Participants

Participants were 242 students recruited from psychology courses at a university in the southwestern United States. Of these, 9 (3.7%) were eliminated from further

---

[4] Copies of all stimulus materials and measures are available from the first author. Except where noted, these are the same materials there were used in the Edens et al. (2004) study.

62-007

610    J. F. Edens *et al.*

analyses due to incomplete data on the relevant predictor or criterion variables. Two participants were dropped because they were not of legal voting age (i.e. < 18). The remaining 231 were primarily young ($M$ age = 20.0 years; SD = 2.63), female (64.5%), unmarried (93.5%) and Caucasian (71.4%; 14.3% African American; 10.8% Hispanic; 2.2% Asian/Pacific Islander; 0.4% "other;" 0.9% missing data).

## Stimulus Materials

### Case Summary

Information presented to participants was extracted from *U.S. v. Barnette* (2000), an actual capital case in which testimony regarding psychopathy was introduced during the sentencing phase. Participants read a one-page summary while a graduate research assistant (RA) highlighted key information using overhead slides. Details of the capital crimes (two homicides) and case facts covered during the adjudication phase of the trial were presented (e.g. that Barnette had confessed to both crimes and had been identified by several witnesses). Although jurors were assessed for their opinion regarding Mr. Barnette's guilt or innocence, they were informed that the jury in the actual case had convicted him.

Penalty phase information was then presented and consisted of a one-page description of the expert testimony provided by two psychologists (one for the prosecution and one for the defense) regarding Mr. Barnette's psychiatric diagnosis (none, psychosis, psychopathy) and level of risk (low, high). In the psychopathy condition, the information provided to support this diagnosis was based on Factor 1 items from the PCL-R (Hare, 1991). These items were selected because they are more consistent with historical characterizations of psychopathy (e.g. Cleckley, 1941) than are the remaining PCL-R items and because they have been argued to be the most prejudicial (Edens et al., 2001). In the psychosis condition, symptoms were based on DSM-IV (American Psychiatric Association, 2001) criteria for schizophrenia (e.g. presence of hallucinations, delusions). In the "no disorder" condition, the defendant was described as being without symptoms of mental disorder (see Appendix 1). In relation to risk level, the testimony of the expert retained by the prosecution concluded either that Barnette was at high or low risk to engage in future violent acts. The expert for the defense always concluded that, based on his evaluation, Mr. Barnette was not mentally disordered and was at low risk for future violence.[5]

Following the expert testimony information, participants were provided a half-page jury instruction form outlining a simplified version of the criteria[6] to be used in determining whether to impose a death sentence. Specifically, participants were instructed that in order for them to impose a sentence of death, the state had to prove beyond a reasonable doubt that the defendant had a probability of future

---

[5] As such, our high risk conditions could more accurately be described as "high risk prosecution testimony, low risk defense testimony" and our low risk conditions as "low risk prosecution testimony, low risk defense testimony."

[6] Criteria used were based on the Texas statutes noted earlier (Texas Code of Criminal Procedures, 2000a).

Copyright © 2005 John Wiley & Sons, Ltd.

62-008

criminal violence so high that he would represent a "continuing threat to society" *and* that no mitigating factors were present that would instead warrant a sentence of life imprisonment.

## Measures

### *Death Qualification Questionnaire*

Because the case portrayed was a capital crime, a death qualification process was utilized to exclude those individuals whose attitudes or opinions regarding the death penalty would likely prevent them from serving on a capital jury. A brief questionnaire developed by Edens et al. (2004) identified individuals whose reservations about the death penalty would interfere with their ability to render an impartial verdict or sentence, as well as those individuals who would impose the death penalty in situations in which it was not inappropriate (e.g. when the defendant did not meet the statutory guidelines for such a penalty). Item content was based on criteria consistent with "death qualification" procedures employed in the state of Texas (Texas Code of Criminal Procedures, 2000b).

### *Case Evaluation Forms*

Following the review of all case materials, participants completed a questionnaire that assessed the following variables.

*Death Penalty Decisions.* Participants responded to two dichotomous (yes/no) questions based on the criteria contained in the jury instructions for deciding whether to impose the death penalty. Specifically, participants were asked (1) whether or not Mr. Barnette represented a continuing threat to society and (2) whether or not there were any mitigating circumstances present that would warrant a life rather than death sentence. A response of "yes" to the first question combined with a response of "no" to the second question would warrant a death sentence; all other response combinations would warrant a life sentence. Because the meaning of these questions was so poorly comprehended in the Edens et al. (2004) study, participants were provided specific information regarding what their answers to each question would mean in relation to the sentence given (e.g. an answer of "No" to the first question means that "Mr. Barnette will receive a life sentence."). Appendix 2 provides the specific format used to collect this information.

It is worth stressing that, although the procedures used were somewhat inconsistent with what would likely happen in relation to sentencing instructions in actual capital cases, we were more concerned with learning whether the experimental manipulations resulted in different beliefs as to whether the defendant should be put to death, *not* whether the procedures simulated in exact detail what would occur in a particular capital trial in Texas. That is, we placed a premium on maximizing internal validity in order to test out the theoretical notion that being called a psychopath results in negative perceptions of criminal defendants, and were less interested in the generalizability of our data to a particular set of sentencing

Copyright © 2005 John Wiley & Sons, Ltd.

612    J. F. Edens *et al.*

instructions, particularly when those instructions are already known from prior research to be confusing (see Mook, 1983, for a more general discussion of the merits of "external invalidity").

*Future Dangerousness.* In order to examine the influence of expert testimony on jurors' perceptions regarding the defendant's "future dangerousness," a four-item scale created in a previous study (Edens et al., 2004) was utilized. This scale consists of four items assessing the likelihood (0–100%) that the defendant would commit an act of violence and/or kill again if not put to death or if given life imprisonment without parole. Edens et al. reported that the items of this scale loaded on one factor that accounted for 73.5% of the total variance (each item $\geq 0.80$), with an internal consistency of 0.88. Similarly high internal consistency was found in the current study (alpha $= 0.89$), with item–total correlations ranging from 0.73 to 0.76.

*Ratings of Psychopathic and Psychotic Symptoms.* To assess whether sentencing decisions might be influenced by juror perceptions of the presence of psychopathic traits or psychotic symptoms—independent of the type of testimony provided—participants were asked to rate the extent to which someone such as the defendant would be likely to exhibit traits, behaviors, and/or symptoms similar to the 20 items contained in the PCL-R (e.g. lack of remorse/guilt, glibness/superficial charm, criminal versatility) and five items encompassing specific symptoms of schizophrenia (e.g. delusions, hallucinations, disorganized thoughts). Ratings were made on a 0 (not present) to 2 (likely present) scale. Some of these terms were simplified or expanded upon to improve comprehension (e.g. "shallow affect" was replaced with "shallow emotions;" exemplars of "prone to fighting and aggression" were provided for "poor behavioral controls").

## Post-Test Questionnaire/Manipulation Check

To ensure participants' attention to the protocol and successful manipulation of the independent variables, a brief post-test questionnaire was administered following completion of all other materials. The post-test consisted of several multiple-choice questions, including queries pertaining to the facts of the case (e.g. that the defendant confessed) and to the results of the mental health evaluation (e.g. diagnosis and level of risk).

## Procedures

Data were collected in groups of approximately 20–50 students, and participants were assigned randomly to one of the six experimental conditions. The same graduate RA guided the participants in each group through the process. Following consent disclosure, a brief demographics questionnaire was completed, followed by the death qualification questionnaire. Next, participants were instructed to read over the case summary (which they were informed was from an actual capital case) while the RA highlighted key facts using overhead slides.

Copyright © 2005 John Wiley & Sons, Ltd.

62-010

Because the information presented during the penalty phase differed depending on the experimental condition, participants were instructed to read over silently the information pertaining to sentencing. The RA then reviewed with the participants the jury instructions, and the participants completed the case evaluation forms. After all case relevant material was collected, participants completed the post-test questionnaire and were debriefed before leaving the experiment. Participants received extra credit or course credit for participating in this study.

Protocols were examined and participants excluded for death qualification purposes. Twenty (8.8%) were removed because they had indicated that they could "definitely not" imagine imposing the death penalty or had reservations about the death penalty that would "definitely" make them unable to be objective about the defendant's guilt. Three (1.4%) participants were eliminated as "hanging jurors"— those who indicated that they would "definitely" (i.e. automatically) vote for the death penalty in any case in which a defendant was convicted of a capital crime, regardless of the facts of the case. Additionally, two (1.0%) of the participants responded that they believed that Mr. Barnette was innocent of the crimes and were dropped from further analyses. Therefore, all subsequent analyses are based on a total remaining sample of 203 participants.

# RESULTS[7]

## Perceptions of Dangerousness

To examine the relationship between the two independent variables (diagnostic status and risk level) and participants' perceptions of the defendant's level of dangerousness, we conducted a $3 \times 2$ ANOVA using the composite measure of "future dangerousness" as the dependent measure.[8] As predicted, significant main effects were obtained for both the diagnosis condition, $F(2, 197) = 2.66$, $p < 0.05$, and the risk condition, $F(1, 197) = 3.42$, $p < 0.05$, Cohen's $d = 0.26$. The interaction term was not significant, $F(2, 197) = 0.09$, $p = $ ns. Pairwise comparisons in the diagnosis condition revealed that dangerousness ratings for the psychopathy group were significantly higher than for the no diagnosis ($t[147] = 2.32$, $p < 0.05$, $d = 0.40$) condition but the two mental disorder conditions did not differ significantly from each other ($t[129] = 1.29$, $p = $ ns, $d = 0.23$). This finding is generally consistent with the results of Edens et al. (2004), who also failed to obtain significant differences between the psychopathy and psychosis conditions.

Despite the significant main effect for risk condition, analysis of the simple effects revealed that perceptions of dangerousness across all three conditions were not

---

[7]Due to concerns about participants' attention to and comprehension of the information provided to them (not an uncommon problem in mock jury studies; Blankenship, Luginbuhl, Cullen, & Redick, 1997; Diamond, 1993; Frank & Applegate, 1998; Haney & Lynch, 1997; Luginbuhl, 1992; Luginbuhl & Burkhead, 1994; Lynch & Haney, 2000; Wiener et al., 1998, 1995), we re-ran all the primary analyses reported below after eliminating any cases in which more than one of the post-test items were answered incorrectly. Results were essentially unchanged. A more stringent test was also examined, in which no incorrect answers were allowed, which also resulted in essentially the same pattern of findings. Further information regarding these analyses is available upon request from the first author.

[8]Given that specific directional hypotheses were being examined, one-tailed statistical tests were used in these analyses.

62-011

614    J. F. Edens *et al.*



Figure 1. Means and 95% confidence intervals for future dangerousness ratings across the diagnostic and risk conditions

*significantly* lower in the low risk conditions compared to the high risk conditions ($t$ values ranging from 0.78 to 1.32) although the $d$ values were in the same general range (0.19 to 0.34) as was found for the main effect noted above ($d = 0.26$). Figure 1 provides a graphic display of the results across all six experimental conditions.

## Death Penalty Decisions

### *Impact of Experimental Manipulations*

To examine the primary hypotheses of this study, we conducted a logistic regression analysis using the enter method, with the risk and diagnosis conditions and their interaction entered on consecutive blocks, to predict the dichotomous sentencing determinations. Given our hypotheses, simple contrasts for the diagnosis condition compared the psychopathy condition with the no disorder condition and with the psychosis condition. Entering risk condition on the first block failed to produce a significant overall model, $\chi^2(1) = 0.51$, $p = $ns. Consistent with our predictions, introduction of the diagnosis condition significantly increased the fit of the model, $\Delta\chi^2(2) = 13.18$, $p = 0.001$, however. As can be inferred from the odds ratios reported in Table 1, participants were significantly more likely to vote for death in the psychopathy condition (i.e., 60% in this condition chose the death penalty) compared with those in the no disorder (38%) and psychosis (30%) conditions. This model correctly classified 64% of the cases overall in terms of life or death sentencing results. Entering the interaction term as

Copyright © 2005 John Wiley & Sons, Ltd.    Behav. Sci. Law 23: 603–625 (2005)

62-012

Table 1. Logistic regression results for the effects of risk and diagnosis on death penalty decisions

| Variable | Beta | SE | Wald | df | $p$ | $R$ | OR (95% CI) |
|---|---|---|---|---|---|---|---|
| Constant | 0.23 | 0.21 | 1.26 | 1 | 0.26 | | |
| Risk | 0.20 | 0.29 | 0.48 | 1 | 0.49 | 0.00 | 1.23 (0.69–2.18) |
| Diagnosis | | | 12.69 | 2 | <0.01 | 0.18 | |
| Psychopath vs. no disorder | 0.91 | 0.35 | 6.77 | 1 | 0.01 | 0.13 | 2.48 (1.25–4.91) |
| Psychopath vs. psychotic | 1.25 | 0.37 | 11.46 | 1 | <0.01 | 0.19 | 3.50 (1.70–7.24) |

SE = standard error; OR = odds ratio; CI = confidence interval.

Table 2. Logistic regression results for the effects of dangerousness and diagnosis on death penalty decisions

| Variable | Beta | SE | Wald | df | $p$ | $R$ | OR (95% CI) |
|---|---|---|---|---|---|---|---|
| Constant | 2.99 | 0.44 | 45.60 | 1 | <0.01 | | |
| Dangerousness | 0.07 | 0.01 | 45.87 | 1 | 0.00 | 0.47 | 1.07 (1.05–1.09) |
| Diagnosis | | | 10.67 | 2 | <0.01 | 0.18 | |
| Psychopath vs. no disorder | 0.70 | 0.43 | 2.71 | 1 | 0.10 | 0.06 | 2.02 (0.88–4.68) |
| Psychopath vs. psychotic | 1.50 | 0.46 | 10.65 | 1 | <0.01 | 0.21 | 4.46 (1.82–10.96) |

SE = standard error; OR = odds ratio; CI = confidence interval.

the third block failed to produce any improvement in the model, $\Delta\chi^2(2) = 1.13$, $p = $ ns.

Next, to examine whether diagnostic condition had an effect on sentencing *beyond* its ostensible relationship with juror perceptions of the defendant's degree of dangerousness, we performed two separate logistic regression analyses. In the first, we entered jurors' dangerousness ratings as a predictor variable in the first block followed by the diagnosis variable in the second block. As can be seen in Table 2, dangerousness ratings alone were strongly associated with death penalty decisions, $\chi^2(1) = 75.28$, $p = 0.001$ (overall classification accuracy = 76%), but diagnostic condition significantly improved the model on the second block, $\Delta\chi^2(2) = 11.46$, $p < 0.01$. Based on the Wald statistic, the contrast between the psychosis and psychopathic condition remained significant, and the contrast between the psychopathic and no disorder condition approached traditional levels of statistical significance.[9] Overall classification accuracy for the model was 77%, $\chi^2(3) = 86.73$, $p < 0.001$.

Jurors' own quantitative ratings of dangerousness would seem to be germane to consider in terms of whether diagnostic information was influencing their decisions beyond their own probabilistic estimates of the likelihood the defendant would commit another violent act. A more legally relevant predictor, however, would be the extent to which the diagnostic variables predicted participants' sentencing decisions beyond their decision regarding whether the defendant specifically met the "continuing threat to society" criterion. To examine this question, we restricted our logistic regression to only those individuals who had already judged the defendant to be "a continuing threat" in order to determine

---

[9]Given the conservative nature of the Wald statistic, some authors suggest using a $p$ value of 0.10 for determining statistical significance (e.g. Mertler & Vannatta, 2001; Tabachnick & Fidel, 1996).

Copyright © 2005 John Wiley & Sons, Ltd.       Behav. Sci. Law 23: 603–625 (2005)

62-013

616    J. F. Edens et al.

Table 3. Logistic regression results for the effects of diagnosis on death penalty decisions for jurors who perceived the defendant to be a "continuing threat to society"

| Variable | Beta | SE | Wald | df | $p$ | $R$ | OR (95% CI) |
|---|---|---|---|---|---|---|---|
| Constant | −0.20 | 0.17 | 1.47 | 1 | 0.23 | | |
| Diagnosis | | | 10.16 | 2 | 0.01 | 0.17 | |
| Psychopath vs. no disorder | 0.50 | 0.41 | 1.48 | 1 | 0.22 | 0.00 | 1.65 (0.74–3.67) |
| Psychopath vs. psychotic | 1.29 | 0.41 | 10.03 | 1 | <0.01 | 0.19 | 3.63 (1.63–8.05) |

SE = standard error; OR = odds ratio; CI = confidence interval.

whether the testimony conditions were predictive within that subset ($n = 155$) who were left to determine whether any mitigating factors were present that would argue against imposing death. Analysis of the Wald statistic indicated that the contrast between the psychopathy condition and the psychosis condition continued to be significant, but the psychopathy and no disorder conditions did not significantly differ (Table 3). More specifically, 69% in the psychopathy condition believed that the defendant should be put to death, whereas 57 and 38% in the no disorder and psychosis conditions, respectively, were so inclined.

## Impact of Juror Perceptions of Mental Disorder

Although mental health testimony was associated with death penalty decisions, there is ample reason to believe that the extent to which jurors view the defendant as psychopathic, separate from the effects of expert testimony, might also influence their sentencing determinations (Edens et al., 2003; Sundby, 1998). To examine this hypothesis, we tested a model in which diagnostic condition was entered first and then followed by the ratings participants made regarding the level of psychopathic traits they attributed to the defendant. Because it is assumed that the "Factor 1" traits of psychopathy (e.g. superficial charm, lack of remorse) are more prejudicial than the "social deviance" factor (Edens et al., 2001), only the sum of these eight items was used in this analysis. Noted earlier, given concerns that any significant effects might be the result of biases against the mentally disordered in general rather than specifically against those diagnosed as psychopathic, the psychosis ratings made by participants also were entered in the second block along with the psychopathy ratings.

Entering the diagnostic condition alone resulted in a significant model, $\chi^2(2) = 13.94$, $p < 0.001$, with an overall rate of predictive accuracy of 64%. The second block significantly improved the model, $\Delta\chi^2(1) = 21.43$, $p < 0.001$, with predictive accuracy increasing to 70%. Examination of the Wald statistic clearly indicated that this was due to the inclusion of the psychopathy ratings, which were strongly associated with sentencing decisions. Psychosis ratings did not significantly predict this outcome, however (see Table 4).[10]

---

[10]As an alternative method of summarizing these relationships that perhaps provides a more straightforward perspective on their magnitude, we computed point biserial correlations for the psychopathy ratings and death sentences across all three diagnostic conditions. Correlations of 0.36, 0.31, and 0.28 were obtained across the no disorder, psychosis, and psychopathic groups, respectively (all $p$ values < 0.05). Similar analyses conducted on the psychosis ratings revealed no such effects ($r$ values of 0.10, −0.04, and 0.12, $p = $ ns), however.

Copyright © 2005 John Wiley & Sons, Ltd.    Behav. Sci. Law 23: 603–625 (2005)

62-014

Table 4. Logistic regression results for the effects of diagnosis and juror perceptions of mental disorder on death penalty decisions

| Variable | Beta | SE | Wald | df | p | R | OR (95% CI) |
|---|---|---|---|---|---|---|---|
| Constant | 2.39 | 0.53 | 20.08 | 1 | <0.01 | | |
| Diagnosis | | | 3.60 | 2 | 0.17 | 0.00 | |
| Psychopath vs. no disorder | −0.26 | 0.46 | 0.32 | 1 | 0.57 | 0.00 | 0.77 (0.31–1.90) |
| Psychopath vs. psychotic | 0.57 | 0.45 | 1.61 | 1 | 0.20 | 0.00 | 1.77 (0.73–4.28) |
| Psychopathy ratings | 0.23 | 0.05 | 17.92 | 1 | <0.01 | 0.25 | 1.25 (1.13–1.39) |
| Psychosis ratings | −0.13 | 0.26 | 0.23 | 1 | 0.63 | 0.00 | 0.88 (0.52–1.48) |

SE = standard error; OR = odds ratio; CI = confidence interval.

Table 5. Logistic regression results for the effects of diagnosis and juror perceptions of mental disorder on death penalty decisions for jurors who perceived the defendant to be a "continuing threat to society"

| Variable | Beta | SE | Wald | df | p | R | OR (95% CI) |
|---|---|---|---|---|---|---|---|
| Constant | 1.45 | 0.59 | 6.05 | 1 | 0.01 | | |
| Diagnosis | | | 3.87 | 2 | 0.14 | 0.00 | |
| Psychopath vs. no disorder | −0.42 | 0.53 | 0.63 | 1 | 0.43 | 0.00 | 0.65 (0.23–1.86) |
| Psychopath vs. psychotic | 0.54 | 0.50 | 1.19 | 1 | 0.28 | 0.00 | 1.72 (0.65–4.53) |
| Psychopathy ratings | 0.19 | 0.06 | 10.41 | 1 | <0.01 | 0.21 | 1.21 (1.08–1.36) |
| Psychosis ratings | −0.29 | 0.29 | 1.01 | 1 | 0.32 | 0.00 | 0.75 (0.42–1.32) |

SE = standard error; OR = odds ratio; CI = confidence interval.

Next, to examine whether these ratings had an impact beyond the "continuing threat" criterion, we again restricted our analyses to only those 155 participants who answered affirmatively to this item. Similar to the preceding results, entering the psychopathy and psychosis ratings as the second block significantly improved the model fit, $\Delta\chi^2(2) = 11.41$, $p < 0.01$, with predictive accuracy increasing from 64 to 67%. This finding seems completely attributable to the inclusion of psychopathy ratings, however (Table 5).[11]

## DISCUSSION

The present results are informative on several levels. First, consistent with prior research (Edens et al., 2004), we found that expert mental health testimony related to symptoms of psychopathy and psychosis resulted in higher perceptions of dangerousness compared with a condition in which the capital defendant was characterized as not mentally disordered. As we have argued elsewhere (Edens et al., 2004, 2003, 2001), we believe such a finding is problematic because extant evidence does *not* actually support the conclusion that a psychopathic inmate in a U.S. prison (which is in essence what the defendant would be if not put to death) is

[11]Recomputing the point biserial correlations after restricting the analyses to those who answered affirmatively that the defendant was a "continuing threat to society" resulted in psychopathy/death sentencing associations that were attenuated somewhat, but in the same general direction as those reported for the entire sample: $r = 0.28$, $p = 0.055$ (no disorder); $r = 0.35$, $p = 0.01$ (psychosis); and $r = 0.12$, $p = $ ns (psychopathy). The small magnitude of this latter correlation may be in part due to range restriction on the psychopathy ratings, where the lowest score reported was 7 on a 0–16 scale, combined with a relatively high base rate of death penalty decisions, where 69% in this condition voted for death (see Nunnally & Bernstein, 1994).

Copyright © 2005 John Wiley & Sons, Ltd.

62-015

618    J. F. Edens *et al.*

appreciably more likely to commit acts of violence than a non-psychopathic inmate, given the negligible correlations reported between PCL-R scores and prison violence in existing studies noted earlier. Given this relatively *non*-probative association, increased perceptions of violence risk would seem to be a prejudicial outcome of the introduction of psychopathy testimony.

Although the influence of expert testimony on perceptions of dangerousness is of theoretical and practical significance, ultimately it would seem that the more important issue is whether the introduction of mental health data impacts attitudes regarding sentencing decisions. In this study expert evidence based on an assessment of PCL-R-defined psychopathy resulted in appreciably higher rates of participants' supporting a death sentence than when testimony suggested that the defendant either was not mentally disordered or was psychotic. The latter result is particularly important because it indicates that it is psychopathy specifically that is associated with greater support for death sentences—even though testimony regarding the presence of *either* form of mental disorder increased juror perceptions of dangerousness. If anything, a diagnosis of psychosis appeared to have a mitigating effect (see below), in that the mock jurors in that condition reported the lowest overall support for the death penalty.

Analyses addressing whether the diagnostic condition was predictive of sentencing decisions *beyond* jurors' beliefs about the defendant's level of dangerousness provided partial support for this claim. Adding the diagnostic variable to the logistic regression equation after entering the dangerousness ratings resulted in a significant model improvement. The contrast between the psychopathy and psychosis condition remained significant, but the Wald statistic for the contrast between the psychopathy and no disorder condition only approached statistical significance, although this is known to be a conservative test. When the legal criterion of whether the defendant was a "continuing threat to society" was used to constrain this analysis to *only* those who must decide whether there were any relevant mitigating factors to consider, the contrast between the psychopathy and no disorder conditions was not significant (rates of death sentences were 69 versus 57% respectively), suggesting that the presentation of psychopathy testimony did not cause participants to be significantly less willing to consider mitigating factors than in the no disorder condition. In contrast, the lower rates of death sentences in the psychosis condition support the conclusion that this testimony did have a mitigating impact.

Our results also support the position that juror perceptions of how psychopathic a defendant is—*separate from* whatever testimony is provided—predict whether they believe a death sentence is appropriate. Across all three diagnostic conditions, rating the defendant as evincing the personality traits historically associated with psychopathy (e.g. callousness, egocentricity) was associated with a greater likelihood of supporting capital punishment. There is no way to discern from our data whether (a) these perceptions caused our participants to be more "death prone," (b) those already more prone to support a death sentence are subsequently more likely to rate a defendant as psychopathic in order to justify their decision, or (c) both effects result from some other factor (e.g. authoritarianism). Regardless of why this is occurring, the result is consistent with earlier research on juror and mock juror perceptions of capital defendants (Edens et al., 2003; Sundby, 1998) and clearly suggests an important link between the *perceived* presence of these personality traits and attitudes about the appropriateness of a death sentence.

Copyright © 2005 John Wiley & Sons, Ltd.    Behav. Sci. Law **23**: 603–625 (2005)

62-016

Moreover, the impact of juror perceptions of psychopathic traits was predictive of death sentences even when the analyses were restricted to those who had already determined the defendant to be a "continuing threat to society," indicating that the level of psychopathic traits attributed to the defendant was having a prejudicial effect. That is, given that the ostensible reason for the introduction of the PCL-R is to inform the "future dangerousness" issue, if it continues to have an effect (i.e. is associated with an increased likelihood of a death sentence) once that issue has been statistically controlled, then it seems that this would be clear evidence of bias. The defendant is not being given a death sentence because of the ostensible relationship between psychopathy and his perceived degree of dangerousness—he is being put to death because he is believed to exhibit psychopathic traits.

## Implications for Clinical Practice

The implication of these results and earlier studies (Edens et al., 2004, 2003) would seem to be that forensic examiners should be exceedingly wary of using the PCL-R to inform violence risk predictions in capital murder trials. Although the courts have typically allowed experts considerable latitude regarding what constitutes admissible evidence in these cases, this by no means obviates experts' ethical responsibility to "use assessment instruments whose validity and reliability have been established for use with members of the population tested" (American Psychological Association, 2002, p. 1060) or the need to "take reasonable steps to avoid harming their clients/patients... and others with whom they work, and to minimize harm where it is foreseeable and unavoidable (p. 1065). Given the minimally probative nature of PCL-R data (Edens et al., 2005; Edens et al., 2001), combined with the likelihood that it would have a prejudicial impact, it is difficult to postulate a scenario in which these two ethical standards would not be in jeopardy if it were introduced (see also the ethical principles of Nonmaleficence, Integrity, and Justice).

One might argue that reliance on PCL-R scores to inform these assessments would at least be an improvement over the types of unstructured clinical judgment that have been offered by many prosecution experts, given that psychopathy scores are moderately associated with violence in the community (Hemphill et al., 1998) and institutional misconduct in some settings—albeit not U.S. prison violence *per se*. As we have argued elsewhere (Edens et al., 2001), this is a false dichotomy that fails to take into account a growing corpus of research that is more relevant than either the PCL-R or clinical judgment in determining the extent to which a criminal defendant will be violent in the future. For example, Cunningham & Reidy (2002) have detailed a structured approach to estimating violence risk in these cases that is heavily wedded to the known base rate of prison violence and various empirically supported risk factors (e.g. age) that might cause one to modify these estimates (see also Cunningham, Sorensen, & Reidy, 2005, for a more statistically driven approach to this issue). Moreover, the empirical risk factors incorporated into these approaches seem much less likely to have the type of prejudicial impact that the PCL-R may have.

## Limitations

Although our results are informative, several limitations of this research should be noted. First, we used a relatively simple experimental design for this admittedly

Copyright © 2005 John Wiley & Sons, Ltd.

62-017

620     J. F. Edens *et al.*

"Stage One" (Diamond, 1997) research. Notably, there are a host of factors that we did not address that could influence the effect that mental health evidence has on juror decision-making. For example, we did not examine or manipulate the effects of cross-examination testimony, other testimony or evidence related to future dangerousness, or the type of information relied upon to make diagnoses, to name just a few issues that might be highly relevant to how laypersons would react to testimony regarding mental heath issues and violence risk. As such, it would be premature to make strong generalizations from our data about what might be expected to occur in an actual capital case (e.g., it would be quite presumptuous to predict based on our results that 30% of jurors would vote for death if a defendant is described as psychotic and 60% will vote for death if he or she is described as psychopathic). A related issue is that we did not ask our participants to deliberate regarding their sentencing decision, so our results are restricted to inferences about how *individuals* might be affected by psychopathy testimony rather than how *juries per se* might be influenced.[12]

Despite these caveats, what we did find is support for the general *hypothesis* that, other factors held relatively constant, the introduction of socially undesirable mental health labels and symptoms appears to cause laypersons to view criminal defendants in a very negative light and that this finding fits with a general theory of stereotyping and category-based processing of information (Bodenhausen & Lichtenstein, 1987; Fiske, 1989; Gilbert & Hixon, 1991; Heath & Tindale, 1994; Jones, 1997). Moreover, it is this theory more than our specific data that is relevant to conceptualizing how laypersons will react to mental health testimony in capital cases, as well as considering whether examiners are engaging in ethically questionable behavior when triggering such stereotypes (see Mook, 1983, for a more detailed discussion of the relative merits of generalizable data versus generalizable theories).

Whether the effects noted here can be attenuated, magnified, or otherwise influenced by other important case facts is of course unknown at present and a worthy topic for future research. Edens et al. (2004) argued that, given the more elaborate types of testimony provided in real cases, it would not be unreasonable to hypothesize that the effects noted in this relatively sterile experimental manipulation of mental health testimony might be more pronounced in a real trial. For example, the prosecution expert in the Barnette case provided considerable detail to the jury about case-specific factors that led him to diagnose Barnette as a psychopath (e.g. nonchalantly describing the murders while eating lunch, failing to be able to define the word "compassion" during an IQ examination). Information of this kind has been argued to be more influential on jurors than the generic type of diagnostic data provided in this study (Hastie, Penrod, & Pennington, 1983). Of course, it is also entirely possible that various factors (e.g. a history of severe physical abuse) might attenuate the effect of psychopathy testimony on juror decision-making.

## SUMMARY

Despite the limitations noted above, our findings clearly raise concerns that the introduction of the PCL-R has the potential to cause jurors to respond more

---

[12]Despite this concern, a meta-analysis of prior research examining the impact of expert testimony in mock jury studies suggests that its effect is similar in magnitude regardless of whether deliberations are conducted (Nietzel, McCarthy, & Kern, 1999, Table 2.5, p. 40).

Copyright © 2005 John Wiley & Sons, Ltd.

62-018

negatively towards criminal defendants, and that in the context of capital murder cases in particular we believe these negative perceptions regarding dangerousness are empirically unfounded at present. As such, given the *at best* questionable probative value of psychopathy in these cases (Edens et al., 2005; Edens et al., 2001), we would conclude that the most ethical and judicious response at this time would be for testifying experts to refrain from using this instrument to bolster violence risk claims in order to avoid introducing what has the potential to be highly prejudicial information—particularly when the consumers of this information are making what is literally a life or death decision.

# REFERENCES

American Psychiatric Association. (2001). *Diagnostic and statistical manual of mental disorders* (4th ed., Text Revision). Washington, DC: Author.

American Psychological Association. (2002). Ethical principles of psychologists and code of conduct. *American Psychologist, 57*, 1060–1073.

American Psychological Association. (2004, July). Amicus curiae brief in *Roper v. Simmons*, No. 03–633. Retrieved August 1, 2004, from: http://www.apa.org/psyclaw/ropersimmons.pdf

Barefoot v. Estelle, 463 U.S. 880 (1982).

Bersoff, D. N. (2002). Some contrarian concerns about law, psychology, and public policy. *Law and Human Behavior, 26*, 565–574.

Blankenship, M. B., Luginbuhl, J., Cullen, F. T., & Redick, W. (1997). Juror comprehension of sentencing instructions: A test of Tennessee's death penalty process. *Justice Quarterly, 14*, 325–351.

Blume, J. H., Garvey, S. P., & Johnson, S. L. (2001). Future dangerousness in capital cases: Always "at issue." *Cornell Law Review, 86*, 397–410.

Bodenhausen, G. V., & Lichtenstein, M. (1987). Social stereotypes and information-processing strategies: The impact of task complexity. *Journal of Personality and Social Psychology, 52*, 871–880.

Buffington-Vollum, J. K., Edens, J. F., Johnson, D. W., & Johnson, J. (2002). Psychopathy as a predictor of institutional misbehavior among sex offenders: A prospective replication. *Criminal Justice and Behavior, 29*, 497–511.

Cleckley, H. (1941). *The mask of sanity*. St. Louis, MO: Mosby.

Costanzo, M., & Costanzo, S. (1992). Jury decision making in the capital penalty phase: Legal assumptions, empirical findings, and a research agenda. *Law and Human Behavior, 16*, 185–202.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences and the Law, 16*, 333–351.

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20–43.

Cunningham, M. D., & Reidy, T. J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*, 512–537.

Cunningham, M., Sorensen, J., & Reidy, T. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12*, 40–49.

Diamond, S. S. (1993). Instructing on death: Psychologists, juries, and judges. *American Psychologist, 48*, 423–434.

Diamond, S. S. (1997). Illuminations and shadows from jury simulations. *Law and Human Behavior, 21*, 561–671.

Edens, J. F. (2001). Misuses of the Psychopathy Checklist—Revised in court: Two case examples. *Journal of Interpersonal Violence, 16*, 1082–1093.

Edens, J. F., Buffington-Vollum, J. K., Keilen, A., Roskamp, P., & Anthony, C. (2005). Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel?" *Law and Human Behavior, 29*, 55–86.

Edens, J. F., Desforges, D. M., Fernandez, K., & Palac, C. A. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime, and Law*, 393–412.

Edens, J. F., Guy, L. S., & Fernandez, K. (2003). Psychopathic traits predict attitudes toward a juvenile capital murderer. *Behavioral Sciences and the Law, 21*, 807–828.

Edens, J. F., & Petrila, J. (in press). Legal and ethical issues in the assessment and treatment of psychopathy. In C. Patrick (Ed.), *Handbook of psychopathy*. New York: Guilford.

Copyright © 2005 John Wiley & Sons, Ltd.

62-019

622    J. F. Edens *et al.*

Edens, J. F., Petrila, J., & Buffington-Vollum, J. K. (2001). Psychopathy and the death penalty: Can the Psychopathy Checklist—Revised identify offenders who represent "a continuing threat to society?" *Journal of Psychiatry and Law, 29*, 433–481.

Edens, J. F., Poythress, N. G., & Lilienfeld, S. O. (1999). Identifying inmates at risk for disciplinary infractions: A comparison of two measures of psychopathy. *Behavioral Sciences and the Law, 17*, 435–443.

Ewing, C. P. (1983). "Dr. Death" and the case for an ethical ban on psychiatric and psychological predictions of dangerousness in capital sentencing proceedings. *American Journal of Law and Medicine, 8*, 408–428.

Fiske, S. T. (1989). Examining the role of intent: Toward understanding its role in stereotyping and prejudice. In J. S. Uleman, & J. A. Bargh (Eds.), *Unintended thought* (pp. 253–256). New York: Guilford.

Fitch, W. L., & Ortega, R. J. (2000). Law and the confinement of psychopaths. *Behavioral Sciences and the Law, 18*, 663–678.

Frank, J., & Applegate, B. K. (1998). Assessing juror understanding of capital sentencing instructions. *Crime and Delinquency, 44*, 412–433.

Furman v. Georgia, 408 U.S. 238 (1972).

Gilbert, D. T., & Hixon, J. G. (1991). The trouble of thinking: Activation and application of stereotypic beliefs. *Journal of Personality and Social Psychology, 60*, 509–517.

Guy, L. S., & Edens, J. F. (2003). Juror decision-making in a mock sexually violent predator trial: Gender differences in the impact of divergent types of expert testimony. *Behavioral Sciences and the Law, 21*, 215–237.

Guy, L. S., Edens, J. F., Anthony, C., & Douglas, K. S. (March, 2004). *Psychopathy and institutional misconduct: A meta-analysis.* Paper presented at the biennial meeting of the American Psychology–Law Society, Scottsdale, AZ.

Guy, L. S., Edens, J. F., Anthony, C., & Douglas, K. S. (in press). Does psychopathy predict institutional misconduct among adults? A meta-analytic investigation. *Journal of Consulting and Clinical Psychology.*

Haney, C., & Lynch, M. (1997). Clarifying life and death matters: An analysis of instructional comprehension and penalty phase closing arguments. *Law and Human Behavior, 21*, 575–595.

Hare, R. D. (1991). *The Hare Psychopathy Checklist—Revised manual.* Toronto: Multi-Health Systems.

Hare, R. D. (1998). The Hare PCL-R: Some issues concerning its use and misuse. *Legal and Criminological Psychology, 3*, 99–119.

Hare, R. D. (2003). *The Hare Psychopathy Checklist—Revised technical manual* (2nd ed.). Toronto: Multi-Health Systems.

Hare, R. D., Clark, D., Grann, M., & Thornton, D. (2000). Psychopathy and the predictive validity of the PCL-R: An international perspective. *Behavioral Sciences and the Law, 18*, 623–645.

Hare, R. D., Forth, A. E., & Strachan, K. E. (1992). Psychopathy and crime across the life span. In R. D. Peters, R. J. McMahon, & V. L. Quinsey (Eds.), *Aggression and violence throughout the life span* (pp. 285–300). Newbury Park, CA: Sage.

Hare, R. D., McPherson, L. M., & Forth, A. E. (1988). Male psychopaths and their criminal careers. *Journal of Consulting and Clinical Psychology, 56*, 710–714.

Harris, G. T., Rice, M. E., & Cormier, C. A. (1991). Psychopathy and violent recidivism. *Law and Human Behavior, 15*, 625–637.

Hastie, R., Penrod, S., & Pennington, N. (1983). *Inside the jury.* Cambridge, MA: Harvard University Press.

Heath, L., & Tindale, R. S. (1994). Heuristics and biases in applied settings: An introduction. In L. Heath, R. S. Tindale, J. Edwards, E. Posavac, F. B. Bryant, E. Henderson-King, Y. Suarez-Balcazar, & J. Myers (Eds.), *Applications of heuristics and biases to social issues* (pp. 1–12). New York: Plenum.

Helfgott, J. B. (1997, March). *The popular conception of the psychopath: Implications for criminal justice policy and practice.* Paper presented at the Annual Convention of the Academy of Criminal Justice Sciences, Louisville, KY.

Hemphill, J. F., Hare, R. D., & Wong, S. (1998). Psychopathy and recidivism: A review. *Legal and Criminological Psychology, 3*, 139–170.

Jurek v. Texas, 428 U.S. 262 (1976).

Kahnemahn, D., & Tversky, A. (1972). Subjective probability: A judgment of representativeness. *Cognitive Psychology, 3*, 430–454.

Kosson, D. S., Steuerwald, B. L., Forth, A. E., & Kirkhart, K. J. (1997). A new method for assessing the interpersonal behavior of psychopathic individuals: Preliminary validation studies. *Psychological Assessment, 9*, 89–101.

Krauss, D. A., & Lee, D. H. (2003). Deliberating on dangerousness and death: Jurors' ability to differentiate between expert actuarial and clinical predictions of dangerousness. *International Journal of Law and Psychiatry, 26*, 113–137.

Krauss, D. A., & Sales, B. D. (2001). The effects of clinical and scientific expert testimony on juror decision making in capital sentencing. *Psychology, Public Policy, and Law, 7*, 267–310.

Copyright © 2005 John Wiley & Sons, Ltd.

62-020

Lin, Z. (2001). Attribution theory of responsibility on learning behavior in college students. *Acta Psychologica Sinica, 33*, 37–42.

Luginbuhl, J. (1992). Comprehension of judges' instructions in the penalty phase of a capital trial. *Law and Human Behavior, 16*, 203–218.

Luginbuhl, J., & Burkhead, M. (1994). Sources of bias and arbitrariness in the capital trial. *Journal of Social Issues, 50*, 103–124.

Lynch, M., & Haney, C. (2000). Discrimination and instructional comprehension: Guided discretion, racial bias, and the death penalty. *Law and Human Behavior, 24*, 337–358.

Melton, G. B., Petrila, J., Poythress, N. G., & Slobogin, C. (1997). *Psychological evaluations for the courts* (2nd ed.). New York: Guilford.

Mertler, C. A., & Vannatta, R. A. (2001). *Advanced and multivariate statistical methods: Practical application and interpretation.* Los Angeles: Pyrczak.

Mook, D. G. (1983). In defense of external invalidity. *American Psychologist, 38*, 379–387.

Nietzel, M. T., McCarthy, D. M., & Kern, M. J. (1999). Juries: The current state of the empirical literature. In R. Roesch, S. D. Hart, & J. R. P. Ogloff (Eds.), *Psychology and law: The state of the discipline* (pp. 23–49). New York: Kluwer.

Nunnally, J. C., & Bernstein, I. H. (1994). *Psychometric theory* (3rd ed.). New York: McGraw-Hill.

Ogloff, J. R. P., & Lyon, D. R. (1998). Legal issues associated with the concept of psychopathy. In D. J. Cooke, A. Forth, & R. Hare (Eds.), *Psychopathy: Theory, research and implications for society* (pp. 401–422). New York: Kluwer.

Otto, R. K., & Heilbrun, K. (2002). The practice of forensic psychology: A look toward the future in light of the past. *American Psychologist, 57*, 5–18.

Porter, S., Birt, A. R., & Boer, D. (2001). Investigation of the criminal and conditional release profiles of Canadian federal offenders as a function of psychopathy and age. *Law and Human Behavior, 25*, 647–661.

Reidy, T. J., Cunningham, M. D., & Sorensen, J. R. (2001). From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28*, 62–82.

Sorensen, J., & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. *Criminal Justice and Behavior, 23*, 542–552.

Sundby, S. E. (1998). The capital jury and absolution: The intersection of trial strategy, remorse, and the death penalty. *Cornell Law Review, 83*, 1557–1598.

Tabachnik, B. G., & Fidel, L. S. (1996). *Using multivariate statistics* (3rd ed.). New York: Harper Collins.

Texas Code of Criminal Procedures, Article 37.071 (2000a).

Texas Code of Criminal Procedures, Article 35.16 (2000b).

U.S. v. Barnette, 211 F.3d 803 (4th Cir. 2000).

Walters, G. D., Duncan, S. A., & Geyer, M. D. (2003). Predicting disciplinary adjustment in inmates undergoing forensic evaluation: A direct comparison of the PCL-R and the PAI. *Journal of Forensic Psychiatry and Psychology, 14*, 382–393.

Weiner, B. (1980a). A cognitive (attribution)–emotion–action model of motivated behavior: An analysis of judgments of help-giving. *Journal of Personality and Social Psychology, 39*, 186–200.

Weiner, B. (1980b). May I borrow your class notes? An attributional analysis of judgments of help giving in an achievement-related context. *Journal of Educational Psychology, 72*, 676–681.

Wiener, R. L., Hurt, L. E., Thomas, S. L., Sadler, M. S., Bauer, C. A., & Sargent, T. M. (1998). The role of declarative and procedural knowledge in capital murder sentencing. *Journal of Applied Social Psychology, 28*, 124–144.

Wiener, R. L., Pritchard, C. C., & Weston, M. (1995). Comprehensibility of approved jury instructions in capital murder cases. *Journal of Applied Psychology, 80*, 455–467.

Young, M. H., Justice, J. V., & Erdberg, P. (2004). Assault in prison and assault in prison psychiatric treatment. *Journal of Forensic Sciences, 49*, 1–9.

# APPENDIX 1. DIAGNOSTIC INFORMATION PROVIDED TO PARTICIPANTS

## Psychopathy Condition

Mr. Barnette has a *psychopathic personality disorder*, because he has certain psychological traits and behaviors that are consistent with this diagnosis. More specifically, the defendant is characterized as

Copyright © 2005 John Wiley & Sons, Ltd.    Behav. Sci. Law 23: 603–625 (2005)

62-021

624    J. F. Edens *et al.*

- being superficially charming
- having a grandiose sense of self-worth
- being a pathological liar
- being conning and manipulative
- lacking remorse and guilt for his actions
- having "shallow emotions"
- being callous and lacking empathy for others
- failing to accept responsibility for his behavior.

## Psychosis Condition

Mr. Barnette has a *psychotic disorder (psychosis)*, because he has certain psychological traits and behaviors that are consistent with this diagnosis. More specifically, the defendant is characterized as

- having delusions (i.e. believes that he is receiving secret messages through his TV; believes he has a "special" relationship with God)
- having hallucinations (i.e. hears voices in his head that others do not hear and sees people that are not there)
- having very disorganized thought and speech (i.e. cannot maintain a conversation with others; easily confused; sometimes speaks in rhymes that make no sense)
- engaging in bizarre behaviors and mannerisms (i.e. stands motionless for hours at a time; repeatedly makes very odd gestures with his hands)
- displaying "inappropriate affect" (laughs when told something sad; cries when given good news).

## No Disorder Condition

Mr. Barnette is not mentally disordered, in that he is characterized as

- being in touch with reality (e.g. does not suffer from delusions or hallucinations)
- having the capacity to communicate effectively with others (e.g. thought and speech appear to be unimpaired)
- displaying appropriate and normal emotional reactions to events in his life
- remorseful for his behavior
- accepting responsibility for his actions
- being forthright and candid in his interactions with others.

# APPENDIX 2. QUESTION FORMAT FOR
# DETERMINING SENTENCING DECISIONS

If you were a member of an actual capital jury, on conclusion of the presentation of the evidence, the trial judge would submit instructions to you that are similar to these:

*In making a sentencing determination in this case, the jury must determine whether there is* **a probability that the defendant would commit criminal acts of violence**

Copyright © 2005 John Wiley & Sons, Ltd.

62-022

that would constitute a continuing threat to society, *and whether the state has proven this* beyond a reasonable doubt.

*In deliberating on whether the defendant is a continuing threat to society, the jury shall consider all information provided in the case summary, including evidence of the defendant's background or character or the circumstances of the offense that supports or mitigates/argues against the imposition of the death penalty.*

1) Do you find that, beyond a reasonable doubt, Mr. Barnette is *a continuing threat to society?*

Yes\_\_\_\_\_*(continue on to question 2)*
No\_\_\_\_\_*(stop here; Mr. Barnette will receive a life sentence)*

*If the jury answers "yes" regarding this issue, it shall then decide whether—taking into consideration all of the information, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant—there is a* **sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment** *rather than a death sentence be imposed. Mitigating evidence is evidence that a juror might regard as reducing the defendant's moral blameworthiness.*

*If the jury answers "yes" that a circumstance or circumstances warrant that a sentence of life imprisonment rather than a death sentence be imposed, the court will sentence the defendant to imprisonment for life. If the jury answers "no" that a circumstance or circumstances did not exist that warrant a sentence of life imprisonment, the court will sentence the defendant to death.*

2) Do you find that there are any **mitigating** circumstances that would cause you to give Mr. Barnette a life sentence rather than the death penalty?

Yes\_\_\_\_\_*(Barnette should receive a life sentence)*
No\_\_\_\_\_*(Barnette should receive a death sentence)*

Copyright © 2005 John Wiley & Sons, Ltd.    Behav. Sci. Law 23: 603–625 (2005)

62-023

# EXHIBIT 63

## UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | PRESENTENCE INVESTIGATION REPORT |
| | ) | |
| DAVID LEE JACKSON | ) | Docket No.: 4:04cr24LSu-001 |
| | | (Superseding Indictment) |

**Prepared For:**  The Honorable Tom S. Lee
U.S. District Judge

*Confidential - Disclosure only under Rule 32(c) of the Federal Rules of Criminal Procedure.*

**Prepared By:**  Carolyn M. Romano
Supervising U.S. Probation Officer
(601) 965-4447

**Assistant U.S. Attorney**
Woody Bond
188 East Capitol Street, Suite 500
Jackson, MS 39201
(601) 965-4480

**Defense Counsel**
Frank Campbell
1117 Openwood Street
Vicksburg, MS 39183
(601) 629-9296

**Sentence Date:**  November 5, 2004

**Offense:**

Count 1:  Bank Robbery
18 U.S.C. § 2113(a) & (d) - NMT 25 years and/or $250,000

Count 2:  Brandish Gun in Crime of Violence
18 U.S.C. § 924(c)(1) - 7 years (mandatory/consecutive) and $250,000

Count 3:  Felon in Possession of Firearm
18 U.S.C. § 922(g)(1) - NMT 10 years and/or $250,000

**Date of Arrest:**  May 6, 2004, by local authorities, taken into Federal custody May 27, 2004

**Release Status:**  Detained

**Detainers:**  None known

**Codefendants:**  None

**Related Cases:**  None

**Date Report Prepared:** September 29, 2004    **Date Report Revised:**

Government
Exhibit
#37A
1:06-CR-51

63-001

## Identifying Data:

**Birth Name:**            David Lee Jackson

**Date of Birth:**            Redacted  1960

                      Other DOB used   Redacted   1960

**Age:**                   44

**Race:**                  Black, Non-Hispanic

**Sex:**                   Male

**SSN No:**                Redacted  4491

                      Other SSN used  Redacted  2111

**FBI No:**                197 089 R3

**USM No:**                13567-039

**Other ID No:**           Michigan State ID 910930L, Mississippi State ID MS0410787X

**Education:**             GED (not verified)

**Dependents:**            None

**Citizenship:**           United States                **NO PICTURE AVAILABLE**

**Religious Preference:**   Muslim

**Legal Address:**         Federal Bureau of Prisons Inmate

**Aliases:**               Tony Johnson, Kevin Randell Folkes,
                      Kevin Ronald Folkes,  Larry Anderson,
                      Stanley Jackson, David Jackson, Kevin
                      Ronald Folfes

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (*i.e.*, classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including: deportation proceedings and federal investigations directly related to terrorists activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

2

7.    The defendant prepared a written statement at the time of arrest. The statement is as follows: _On this day I wasn't thinking I'm very sorry for what happen I'm very glad that didn't no one get hurt I did rob the bank with a note that I had wrote in the parking lot I needed the money to take care of my brother and myself what I did was truly spark of the moment and out of desperation Truly I am sorry and I apologize to the Bank and any one I might of offended. Sincerely David Jackson 5-07-04._

---

### Adjustment for Acceptance of Responsibility

10.    During an interview with this writer, the defendant admitted his criminal conduct as charged. The defendant stated he had been out of jail for approximately 54 days and had been unable to secure employment. He advised that a friend loaned him the vehicle he was driving and that he was en route to California where he had a girlfriend. He stated he had no money because he had given it to someone needier than he and, in desperation, he robbed the bank.

11.    Based on the above statement and the defendant's timely plea, a three level reduction is applicable, pursuant to U.S.S.G. §3E1.1(a) and (b).

## PART B. DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudications

30.    None.

### Adult Criminal Convictions

| | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pnt |
|---|---|---|---|---|---|
| 31. | 09/03/76 | 1) Armed Robbery, 2) Armed Robbery - Madison Heights, Michigan, 6th Circuit Court | 03/22/77: 1) 2 - 15 years, 2) 2 - 15 years, State Prison, Southern Michigan | 4A1.2(e)(3) | 0 |

32.    The defendant was represented by counsel under Oakland County Circuit Court Docket No. 76-30607-fy. This offense involved the defendant and another individual in a stolen car who robbed two gas station attendants. The attendants thought the defendant had a shotgun, but in actuality, it was a 13 inch fiberglass nightstick partially covered with newspaper to give the appearance of a sawed-off shotgun. Jackson was AWOL from Maxey Boy's Training School at the time he committed this offense. The defendant was paroled on October 23, 1979.

3

63-003

| 33. | 03/28/80 | Entering Without Breaking, Detroit, MI, Recorders Court | 05/14/80: 1-5 years State Prison, Southern Michigan | 4A1.2(e)(3) | 0 |

34. The defendant was represented by counsel under Detroit Recorders Court Docket No. 80-02036. The defendant and another individual entered an office at Wayne State University and proceeded to a private area from which they removed a bag, which they later threw away. The defendant was paroled on October 5, 1982, and later absconded from parole supervision.

| 35. | 03/29/80 | Attempted Larceny in a Building - Detroit, MI, Recorders Court | 05/14/80: 1 - 2 years State Prison Southern Michigan | 4A1.2(e)(3) | 0 |

36. The defendant was represented by counsel under Detroit, MI, Recorders Court Docket Number 80-01999. The defendant and another individual entered an unauthorized area of the Detroit Edison Office building and removed a bag from an open office safe. The defendant was paroled October 5, 1982, but as indicated earlier, he absconded supervision.

| 37. | 05/16/83 | 1) Burglary 2nd Degree, 3) Robbery, 5) False Imprisonment, 6) Assault With Deadly Weapon, Placer County, CA, Superior Court | 09/29/83: 1) 8 months custody, 3) 5 years, 5) 1 year stayed, 6) 1 year, (total 7 years, 8 months). 08/14/89: Paroled | 4A1.1(a) | 3 |

38. The defendant was represented by counsel in Placer County Superior Court in California under Docket Number 65915. On May 16, 1983, the defendant and another individual robbed a gas station and were apprehended a short time later after the defendant engaged the police in a high speed chase. The defendant told authorities he was a juvenile and they transported him to Placer County Juvenile Hall from Nevada County where he had been apprehended. The vehicle in which he was traveling had been taken at gunpoint from two female subjects earlier in the day in Sacramento, California. While being held at the Placer County Juvenile Hall, the defendant escaped from this facility on June 4, 1983. In so doing, the defendant grabbed a group counselor in an attempt to get the institution keys. The counselor was able to break free and attempted to summon help without success. In the meantime, the defendant had a "choke-hold" on another counselor and was wielding a coke bottle in the other hand. The first counselor again attempted to summon help and was warned not to or he would harm the female counselor whom he held by the neck. The counselor responded to the defendant's demand for his car keys by denial and the defendant then demanded keys to the department vehicle and the counselor again refused. The defendant verbally threatened that he would "fuck her up right now." In response, the counselor, believing the threats and seeing the distress of the female counselor, gave the defendant the keys. The defendant then fled but was apprehended a short time later. As a result of this escape, the additional charges of attempted robbery, false imprisonment, assault with a deadly weapon and

4

grand theft (Counts 3, 5, above) were filed against the defendant, and he was sentenced as stated above.

The defendant committed this offense while on parole from Michigan. He was classified as an absconder as he did not have permission to travel. The defendant was paroled from the California offense on August 14, 1989.

| 39. | 01/30/90 | Felon in Possession of a Firearm - United States District Court / Eastern District of Michigan | 06/07/90: 15 years custody of the Bureau of Prisons followed by 2 Years Supervised Release. 03/09/04: Released From Custody, Supervised Release began | 4A1.1(a) | 3 |

40. On January 30, 1990, the defendant was observed exiting his residence and entering a 1979 Chevrolet Impala. Agents observed a gun in his waistband as the defendant returned to his vehicle after visiting a party store. Agents executed a stop on the vehicle. The defendant was observed moving toward the center of the passenger seat of the vehicle. The defendant was ordered out of the vehicle and a loaded .32 caliber revolver was located under the passenger seat of the vehicle. A search warrant was obtained for the defendant's premises resulting in confiscation of 45 rounds of .38 caliber ammunition. While represented by counsel, the defendant was sentenced as stated above. Jackson was released from custody on March 9, 2004, and began supervised release in the Eastern District of Michigan. The defendant's term of supervised release is due to expire March 8, 2006. The Eastern District of Michigan plans to pursue a supervised release violation hearing on Jackson once he is sentenced for this instant Federal offense in the Southern District of Mississippi.

5

### Pending Charges

45. The defendant is pending a revocation hearing in the Eastern District of Michigan as he was under a term of supervised release when he committed the instant offense. See paragraphs 47 and 48.

---

## PART C. OFFENDER CHARACTERISTICS

The personal history information was obtained from a Presentence Report prepared on this defendant in 1990 and from an interview with the defendant.

### Personal and Family Data

46. The defendant was born on    REDACTED    1960, in Detroit Michigan to the marital union of Leroy Jackson and Sammie Lee Jackson. He is one of five siblings born to this union. The parents separated in 1977. The defendant's father died while the defendant was serving a term of incarceration with the Federal Bureau of Prisons. The defendant said his mother was moved from her home into a medical facility where she is seeking treatment for diabetes. The defendant has the following siblings: Roger Jackson, Stanley Jackson, Patricia (last name unknown). The defendant has been incarcerated since 1990, with the exception of the brief time he was out prior to the instant offense. He reported having no contact with his siblings. He believes his two brothers are in prison but could offer no additional information. The defendant was unable to provide contact information for his mother as she has moved since his arrest for the instant offense.

47. In the defendant's 1990 presentence report, the mother reported that she feels that as a youngster, the defendant was misguided by a wrong peer group. It was her opinion that since the defendant's release from prison in California, he had matured and exhibited a greater degree of responsibility.

48. The defendant's 1990 presentence report reflects he claimed to have married Carol (nee Stewart) Baker on October 30, 1989, in Wayne County, Michigan, after knowing her for one month (not verified). Mrs. Baker was interviewed in 1990 and confirmed this relationship. The couple had no children together. The defendant did not discuss this relationship with this writer.

49. Jackson advised this writer he has a "common-law marriage" with Memina Phillips. He had reported to pretrial services that he and Phillips had married in 1996. He further stated Phillips has a daughter, Khyrastal Jackson, age 19, who attends Woodbury College, in Burbank, California. The defendant claims her as his step-daughter.

50. The defendant reported his address prior to arrest to be 4294 Davison Avenue, Detroit, Michigan. He claimed, however, that he was in transit to California when he was arrested in the instant offense. Jackson stated that he would prefer not to release to Michigan. He stated that he was unable to integrate into society and would need assistance in doing so after such a lengthy term of imprisonment.

### Physical Condition

51. Jackson described himself as 6 feet 3 inches in height, while weighing 165 pounds. He has black hair and black eyes. He advised that while incarcerated with the Federal Bureau of Prisons he suffered a stomach infection and was prescribed three different antibiotics. He is not currently taking any medication.

### Mental and Emotional Health

52. The defendant advised that he was treated for depression in 1999, while in the custody of the Bureau of Prisons. He stated that he suffered severe stress recently at the Madison County Detention Center in Canton, Mississippi, where he is being held pending sentencing in the instant offense. Jackson stated that he had also been prescribed Prozac in the past for depression.

### Substance Abuse

53. Jackson advised this writer that he began using "any drug I could find" at the age of 13. He stated he spent an average of $100 per day on various substances and used to that degree for approximately 10 years. He claimed that he no longer uses illicit substances and quit on his own accord. His 1990 presentence report reflects that he abused substances from 1975 through 1983.

### Education and Vocational Skills

54. The defendant reported he earned his General Educational Development certificate and two years of college credits through Berkly Community College while incarcerated in California (not verified).

### Employment Record

55. The defendant has spent the majority of the last twenty-five years incarcerated. The only reported employment in his 1990 presentence report was his claim of in-home private care for an individual for which he was paid $100 per month. This was not verified.

### Financial Condition: Ability to Pay

56. The defendant completed a personal financial statement which reflects he has no debts and no assets. The defendant has spent the majority of the past twenty-five years incarcerated. The Internal Revenue Service has no record of filings for Jackson. He has no credit report history.

57. Based on Jackson's financial status, it appears he is unable to pay a fine within the guideline range.

Respectfully submitted,

Gary S. Mann
Chief U.S. Probation Officer

By: _Judy James for_____
Carolyn M. Romano
Supervisory U.S. Probation Officer

Approved:

_Judy James_____
Judy James
Senior U.S. Probation Officer

_October 4, 2004_
Date

8

63-008