# EXHIBIT 64

Case 1:09-cv-01039-MJT    Document 50-2    Filed 10/05/10    Page 1 of 41 PageID #: 6429

Case 1:09-cv-01039-MJT     Document 50-2     Filed 10/05/10     Page 2 of 41 PageID #:
6430

# FINDLAY POLICE DEPARTMENT
318 DORNEY PLAZA 207
FINDLAY, OH 45840
Phone 419-424-7194 Fax 419-424-7891
### Incident / Offense Report
**01-04-004558**

Print Date/Tin
6/18/2004  15:

## EVENT INFORMATION

Report No. 01 - 04- 004558 Local Report No:

Type:       49         ROBBERY

Comment:  Hotel Robbery

Disposition: Charged-Felony

Report Date/Time: 4/30/2004 1148

Event Date/Time: 4/30/2004  1018 To: 4/30/2004  1025

## EVENT LOCATION

HOLIDAY INN EXPRESS
941 INTERSTATE DR
FINDLAY, OH 45840

Location Type: Hotel/ Motel
County:   Hancock
Map / Ref:

Intersection:
Beat / District:   Northwest Beat
Zone / Area: Liberty Twp Section

| Post-It® Fax Note | 7671 | Date 6-18-04 | # of pages ▶ 25 |
|---|---|---|---|
| To S.A. ORR | | From DET. MYERS | |
| Co./Dept. FBI | | Co. FINDLAY POLICE | |
| Phone # 1-409-832-8571 | | Phone # 419-424-7168 | |
| Fax # 409-833-6549 | | Fax # 419-424-7891 | |

## ADMINISTRATION
Reporting Officer:  RUSSELL, KEVIN D.
Entered By:  RUSSELL, KEVIN D.
Approved By: WILSON, CHARLES J.

## PROPERTY RELATED TO EVENT:

Property No.:   1                    Type:  Evidence                                 Quantity:   1
Class: Office Equipment                                             Value:        0.00
Make: Teledex                    Model:                    Criminal Mischief:      0.00
Serial Number: GTM0420A-00-118970
Description:  Telephone recovered from trash can in laundry room at Holiday Inn Express
Owner:

## PROPERTY RELATED TO EVENT:

Property No.:   2                    Type:  Evidence                                 Quantity:   1
Class: Office Equipment                                             Value:        0.00
Make:                    Model:                    Criminal Mischief:      0.00
Serial Number:
Description:  Gray phone cord recovered from trash can in Holiday Inn Ex.
Owner:



# FINDLAY POLICE DEPARTMENT
### 318 DORNEY PLAZA 207
### FINDLAY, OH 45840
### Phone 419-424-7194 Fax 419-424-7891
### Incident / Offense Report

**01-04-004558**

Print Date/Time
6/18/2004  155!

**PROPERTY RELATED TO EVENT:**

| | | |
|---|---|---|
| Property No.:  3 | Type:  Evidence | Quantity:  2 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  Cinnamon Hazelnut creamers found in trash at Holiday Inn
Owner:

**PROPERTY RELATED TO EVENT:**

| | | |
|---|---|---|
| Property No.:  4 | Type:  Evidence | Quantity:  2 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  Latent #1 and #2 from phone recovered from trash at Holiday Inn
Owner:

**PROPERTY RELATED TO EVENT:**

| | | |
|---|---|---|
| Property No.:  5 | Type:  Evidence | Quantity:  1 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  coffee stir stick recovered from trash can in lounge at Holiday Inn
Owner:

**PROPERTY RELATED TO EVENT:**

| | | |
|---|---|---|
| Property No.:  6 | Type:  Evidence | Quantity:  1 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  Coffee cup found in trash at Holiday Inn
Owner:

**PROPERTY RELATED TO EVENT:**

| | | |
|---|---|---|
| Property No.:  7 | Type:  Evidence | Quantity:  1 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  Blue Equal Sugar packet opened found in trash in lounge at Holiday Inn
Owner:



# FINDLAY POLICE DEPARTMENT
318  DORNEY PLAZA 207
FINDLAY, OH  45840
Phone 419-424-7194 Fax 419-424-7891
### Incident / Offense Report

**01-04-004558**

Print Date/Tim
6/18/2004  155

## PROPERTY RELATED TO EVENT:

| | | |
|---|---|---|
| Property No.:  8 | Type:  Evidence | Quantity:  2 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  two torn top portions of Equal packets found on plate in trash can in lounge at Holiday Inn
Owner:

## PROPERTY RELATED TO EVENT:

| | | |
|---|---|---|
| Property No.:  9 | Type:  Evidence | Quantity:  1 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  foam plate in trash of Lounge in Holiday Inn
Owner:

## PROPERTY RELATED TO EVENT:

| | | |
|---|---|---|
| Property No.:  10 | Type:  Evidence | Quantity:  1 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  cup found on sink □ ⊐
Owner:

## PROPERTY RELATED TO EVENT:

| | | |
|---|---|---|
| Property No.:  11 | Type:  Evidence | Quantity:  1 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  Large Covington Tag recovered out of trash bag
Owner:

## PROPERTY RELATED TO EVENT:

| | | |
|---|---|---|
| Property No.:  12 | Type:  Evidence | Quantity:  1 |
| Class: Other Property | | Value:  0.00 |
| Make: | Model: | Criminal Mischief:  0.00 |
| Serial Number: | | |

Description:  gray plastic piece
Owner:



# FINDLAY POLICE DEPARTMENT
### 318  DORNEY PLAZA 207
### FINDLAY, OH  45840
#### Phone 419-424-7194 Fax 419-424-7891
#### Incident / Offense Report

Print Date/Tim·

**01-04-004558**                                    6/18/2004  155·

---

**PROPERTY RELATED TO EVENT:**

Property No.:  13              Type:  Evidence                          Quantity:     2

Class: Other Property                              Value:        0.00

Make:                      Model:              Criminal Mischief:       0.00

Serial Number:

Description:  white napkins from trash can room 210 Country Hearth Inn

Owner:

**PROPERTY RELATED TO EVENT:**

Property No.:  14              Type:  Evidence                          Quantity:     1

Class: Other Property                              Value:        0.00

Make:                      Model:              Criminal Mischief:       0.00

Serial Number:

Description:  Covington clothing tag

Owner:

**PROPERTY RELATED TO EVENT:**

Property No.:  15              Type:  Evidence                          Quantity:     1

Class: Other Property                              Value:        0.00

Make:                      Model:              Criminal Mischief:       0.00

Serial Number:

Description:  Paradies Metro venture Inc. Bag collected from trash of room 210 Country Hearth Inn

Owner:

**PROPERTY RELATED TO EVENT:**

Property No :  16              Type:  Evidence                          Quantity:     1

Class: Office Equipment                            Value:        0.00

Make:                      Model:              Criminal Mischief:       0.00

Serial Number: 382051

Description:  Phone from Country Hearth Inn with dusted Latents

Owner:

**PROPERTY RELATED TO EVENT:**

Property No.:  17              Type:  Evidence                          Quantity:     2

Class: Other Property                              Value:        0.00

Make:                      Model:              Criminal Mischief:       0.00

Serial Number:

Description:  Latents #3,#4 from tropicana bottle tag #10019

Owner.

64-004



# FINDLAY POLICE DEPARTMENT
## 318 DORNEY PLAZA 207
### FINDLAY, OH 45840
Phone 419-424-7194 Fax 419-424-7891
**Incident / Offense Report**

01-04-004558

Print Date/Tim
6/18/2004   155

## PROPERTY RELATED TO EVENT:

Property No.:   18          Type:  Evidence                              Quantity:   1
Class: Other Property                              Value:        0.00
Make:                       Model:                 Criminal Mischief:      0.00
Serial Number:
Description:  Tropicana bottle in trash from 210 Country Hearth Inn
Owner:

## PROPERTY RELATED TO EVENT:

Property No.:   19          Type:  Evidence                              Quantity:   1
Class: Other Property                              Value:        0.00
Make:                       Model:                 Criminal Mischief:      0.00
Serial Number:
Description:  Mt. Dew Bottle
Owner:

## PROPERTY RELATED TO EVENT:

Property No.:   20          Type:  Evidence                              Quantity:   1
Class: Other Property                              Value:        0.00
Make:                       Model:                 Criminal Mischief:      0.00
Serial Number:
Description:  Minuite made Bottle
Owner:

## PROPERTY RELATED TO EVENT:

Property No.:   21          Type:  Evidence                              Quantity:   1
Class: Recordings- Audio/ Visual                   Value:        0.00
Make:                       Model:                 Criminal Mischief:      0.00
Serial Number:
Description:  video tape of suspect from Holiday Inn Surveillance Camera
Owner:

## DISPATCH INFORMATION

Call Number:  040000009800  Call Type:  E-911
Received Time: 1018          End Time: 1147                    Elapsed Time:    90

### DISPATCHED UNIT(S)

| Unit Number: | Dispatched: | Enroute: | On Scene | Cleared: | Elapsed: |
|---|---|---|---|---|---|
| 1814 | 1022 | 1022 | 1022 | 1133 | 71 |
| 2506 | 1021 | 1021 | 1021 | 1044 | 23 |
| 421 | 1018 | 1018 | 1022 | 1147 | 85 |
| 468 | 1019 | 1019 | 1022 | 1104 | 42 |



# FINDLAY POLICE DEPARTMENT
318 DORNEY PLAZA 207
FINDLAY, OH 45840
Phone 419-424-7194 Fax 419-424-7891
### Incident / Offense Report
**01-04-004558**

Print Date/Tim
6/18/2004  155'

| Unit Number: | Dispatched. | Enroute: | On Scene | Cleared: | Elapsed: |
|---|---|---|---|---|---|
| 814 | 1019 | 1019 | 1022 | 1053 | 31 |

## OFFENSE INFORMATION

Offense No.:  1  S 2911.01A1  Aggravated Robbery - deadly weapon

Larceny Type:  Other

Location Type:  Hotel/ Motel

Motive:  Theft

Criminal Activity:  No Gang Involvement

Disposition:  Under Investigation

Review Officer:

Attempted / Committed:  C

Degree:  Felony- 1

Theft By Computer: NO

## OFFENSE INFORMATION

Offense No.:  2  S 2905.01A2  Kidnapping - commission of felony,

Larceny Type:

Location Type:  Hotel/ Motel

Motive:  Theft

Criminal Activity:  No Gang Involvement

Disposition:  Under Investigation

Review Officer: DEGRAAF, SCOTT G

Attempted / Committed:  C

Degree:  Felony- 2

Theft By Computer: NO

## PERSON INFORMATION

SUSP  No.: 1  JACKSON, DAVID  LEE

REDACTED  DETROIT, MI.

Date of Birth: REDACTED 1960    Age:  44 YRS

D.L. No.:    State:

Place of Birth:

Gender: M    Race:  B    Hgt: 06'01"    Wgt: 164 To 164

Residential Status:  Tourist

SSN:

Phone: REDACTED

Date of Emancipation:  / /

Exp. Date:  / /

Country:

Hair:  BLK    Eyes  BRO

Marital Status:

Statement Obtained:  Yes

### CHARGE INFORMATION

Charge No.:  1

Charge:  2911.01A1    Aggravated Robbery - deadly we

MM Ticket No.:  2004CR139

Disposition:

Related Offense No.:  1

Count:  1    Degree:

### CHARGE INFORMATION

Charge No.:  2

Charge:  2905.01A2    Kidnapping - commission of fel

MM Ticket No.:  2004CR139

Disposition:

Related Offense No.:  2

Count:  2    Degree:

64-006



# FINDLAY POLICE DEPARTMENT
318  DORNEY PLAZA 207
FINDLAY, OH  45840
Phone 419-424-7194 Fax 419-424-7891
### Incident / Offense Report

**01-04-004558**

Print Date/Tim
6/18/2004  155

---

**BUSINESS INFORMATION**

VBUSS No.:  1    HOLIDAY INN EXPRESS

941  INTERSTATE DR.  FINDLAY, OH. 45840           Phone: 4194201776

**RELATED PROPERTY:**

| | | |
|---|---|---|
| Property No.:  1 | Type:  Stolen/Etc. | Quantity:  1 |
| Class: Money | | Value:  755.07 |
| Make: | Model: | Criminal Mischief:  0.00 |

Serial Number:

Description:  $755.07 in misc. cash (bills & rolls of change) taken from safe and front cash drawer.

Owner:    HOLIDAY INN EXPRESS           941  INTERSTATE DR  FINDLAY, OH  45840

**PERSON INFORMATION**

SSN:  .   . - . .

REDACTED

Date of Emancipation: ___/___/

Exp. Date: 10/15/2006

Country:

Hair:

Residential Status:  Non-Resident

Marital Status: M

Injury Type:  None                    Location:

Severity:   Not Injured

**EMPLOYER/SCHOOL INFORMATION**

Company Info:   Holiday Inn Express

0    Findlay OH 45840                            Occupation: General Labor

Phone: 000-000-0000   Ext:

**PERSON INFORMATION**

SSN:

Date of Emancipation:    / /

Exp. Date:  9/04/2002

Country:

Hair:  BRO       Eyes  BRO

Gender:         Race:  W

Marital Status: N

Residential Status:  Resident

Statement Obtained:  Yes

Injury Type:  None                    Location:

Severity:   Not Injured

# NARRATIVE SUPPLEMENT

| INCIDENT NUMBER |
|---|
| 01-04-004558 |

| INCIDENT DATE / TIME |
|---|
| 4/30/2004   1018 |

---

**Narrative Type:**   Dispatch Narrative                    **Topic: TRANSFERED FROM CAD**

**Narrative Reporting Officer:** RHOADS, HEATHER D     1316   **Narrative Date/Time:** 4/30/2004   1147

BLK AND RED MARABOLO COAT  LOCKED IN OFFICE  HAD  HANDGUN  CP IS ███████████
██████ BLK MALE 6'00 200  GOATEE     HOODED COAT
UNK DIRECTION OF TRAVEL
EMPTIED SAFE
MAKE CLERK AND HER FRIEND DISROBE AND LOCKED THEM IN THE OFFICE
1021 2506 BIGELOW/BROAD

---

**Narrative Type:**   Initial Report                          **Topic: Robbery**

**Narrative Reporting Officer:** RUSSELL, KEVIN D     1814   **Narrative Date/Time:** 4/30/2004   1206

At approximately 1022 hrs. on 04/30/2004 Ptl. Hocanson #814 and Ptl. Douglas #421 were dispatched to the Holiday Inn Express Hotel located at 941 Interstate Dr. in reference to a robbery that just occurred. Dispatch advised officers that the suspect was a tall, thin, black male who was wearing a red hooded shirt. Dispatch stated the suspect had brandished a handgun and then fled the area. It was unknown if the suspect had fled on foot or left in a vehicle.

I was close in the area and responded to assist. I then arrived at the hotel prior to the two dispatched officers. I approached the hotel and entered the front north side entrance doors. Upon entering, I approached the front desk and did not observe anyone. A female, later identified as ███████████ then came around a back wall behind the front desk and approached me. ███ appeared very nervous and scared. ███ advised me that she is the manager of the hotel and was just robbed.

I first asked ███ where the suspect was at. ███ advised me that she did not know. I asked ███ to explain what happened. ███ stated at approximately 1015 hrs. in the morning she was working the front desk inside the hotel. At that time she went over to get a pop from the vending area. She then noticed a black man who was standing in the lobby area with a red and black jacket. The man had the hood up over his head. ███ thought it was odd, and continued to work. She then walked back towards the office. She looked back and noticed that the man had sat on a sofa in the breakfast bar area. This time the man had taken off his hood where she observed that he had short dark hair. The man had never checked himself into the hotel. ███ did not think much about it and went back to work.

Another co-worker, later identified as ███████████, was also present however she was in the back office area behind the front desk. A wall is positioned between the back office and front desk. ███ and ███ then sat beside each other in the back office and started talking.

Approximately five minutes later, while ███ and ███ were talking, the same black man who was in the front lobby approached them from behind and held them up at gun point while they were sitting. ███ stated the man must have entered the back office from the side entrance door, because he did not come in from the front. The side entrance door was kept unlocked and opened.

I later observed that the southwest side entrance door enters the west side laundry room, which is directly behind the back office (west side of the room). Another door is placed between the back office and laundry room. This door was also unlocked and opened. It appears that the suspect had entered the southwest side door and walked through the laundry room into the back office where he approached Wendi and Amy.

███ further explained that the man had brandished a small chrome plated pistol. The man had walked up between ███ and ███ and pointed the gun at ███ chest area while she was sitting. Amy did not hear the man approach her. Once the man approached her, he startled ███ where she screamed. The man then reached out and tugged at ███ jacket and told her to "get up". He then said "this is what were going to do". The man asked ███ where the safe was located. ███ then pointed to the safe which is located directly beside the back office desk on the north side of the room.

He then told her to "open it". ███ told the man that she did not have the key for the safe because it was in her desk in her office. ███ office is located on the south side of the room directly beside the back office. ███ then stood up and walked towards her office to get the key while the man followed her. During that time, the man told ███ to lay down on the back office floor face down. ███ did so without incident.

Reporting Officer: RUSSELL, KEVIN D     1814

05/18/2004   15:36   4134247831

## NARRATIVE SUPPLEMENT

**INCIDENT NUMBER**
01-04-004558

**INCIDENT DATE / TIME**
4/30/2004  1018



The man then followed ███ to the safe where she unlocked it. She then opened up both boxes that were inside the safe where the cash was kept. The man then said "that's it?". ███ said "yes". The man then took a mid sized neon green plastic welcome bag that was sitting on a chair nearby. The bag was full of misc. papers. He then dumped out the papers from the bag and told ███ to put the money inside it. He then wanted ███ to check the front cash register for more money. ███ walked up to the front cash register which is located directly behind (west side) of the front desk, while the man followed her. ███ opened up the cash drawer and put the money inside the bag. ███ stated several amounts of rolled coins and cash bills were taken from the safe worth approximately $200.00 to $250.00. Several amounts of coins and cash bills were taken from the front register worth an amount of approximately $300.00.

The man then told ███ to get up where he had both of them go into ███ office. During that time, ███ keys were inside her office door. The man pulled out the door keys and gave them to ███. He then asked ███ how much money she had in her wallet. ███ told him $9.00. He then said "keep it". The man said "this is what were going to do". He then had ███ unplug her office phone which was sitting on the corner of her desk. ███ did so, where she handed the entire phone to him. The man then told both ███ and ███ to "remove all of your clothes, so you don't come out after me". ███ and ███ stripped down to their bra's and panties. They then handed the man their clothes where he held on to them. The man then told ███ and ███ that he wanted them to strip naked, and then said "don't worry I'm not a pervert". Both girls did so without incident. The man told ███ to get under her desk, where she did so. He then told Wendi to lay behind her ███ chair, where ███ did so. The man told both of them "not to get up for five minutes". He then shut the office door which automatically locked him out.

Approximately two minutes later, the man jiggled on the office door handle and said "I'm still here". ███ and ███ waited for approximately five minutes where ███ then dialed 911 from the front office telephone.

I observed that ███ was fully clothed. ███ advised me that she put on an old work suit she had in the back office before calling the police. She stated the man had taken their clothes and she did not know what he did with them. ███ was unsure how the man exited the hotel. ███ described the man as being approximately 6'00" and thin. The man had a goatee, was wearing blue jeans, and appeared to be in his mid thirties. The man was wearing a Marlboro red and black windbreaker hooded coat. The man did not have any gloves on and did not have any identifiable marks. The man never threatened to harm ███ or ███. ███ was not injured during the incident. ███ provided a written statement advising of the incident.

During that time, I advised officers in the area via my radio of the five minute head start the suspect had. I advised officers in the area that the dispatch description of the suspect was the same as what I was advised by the complainant. I advised officers that the direction and means of travel of the suspect was unknown.

I then spoke with ███ who was sitting on a chair in ███ office. I observed that ███ had a sheet and coat over top of her. ███ also appeared very nervous and scared. ███ advised a very similar story as ███ stated ███ and her were sitting down and talking in the back office. During that time, an unknown black man had approached them from behind. ███ did not hear the man until he was right beside them. ███ looked to her left side and saw a small chrome pistol in the man's hand.

The man asked ███ where the safe was. ███ and ███ had to get the safe keys from the main office. The man then told her ( ███ to lay on the floor in the back office. ███ did so and didn't watch the man. ███ then went to the safe. ███ observed that the man emptied a green bag where ███ then put all of the money inside the bag. They then went to the front and emptied the cash drawer. ███ did not see this, because she was still laying on the floor.

The man then had ███ go into her office. The man then kicked her ( ███ ) on the bottom of her foot and told her to "get up". They all then went to ███ office where he asked ███ how much money was inside her wallet. The man then told both of them to strip. During that time, the man unplugged the office phone and took it. The man also took their clothes. He then made ███ get under the desk, and had her ███ crouch down by the file cabinet. He told them not to do anything for about five to ten minutes. He then shut the door. A couple of seconds later, he jiggled the door handle and said "I'm still here". About ten minutes or less, ███ got our of the office and called the police.

There were no shots fired during the incident.

███ was not injured during the incident. ███ described the suspect as wearing blue jeans with a red and white "Marlboro looking" heavier coat with a hood up and tight around his face. She stated the suspect was tall and thin approximately 6'00". She recalled that the man appeared to be in his mid thirties and had a goatee. ███ provided a written statement advising of the incident.

Reporting Officer: RUSSELL, KEVIN D          1814

64-009

## NARRATIVE SUPPLEMENT

INCIDENT NUMBER
01-04-004556

INCIDENT DATE / TIME
4/30/2004  1018

While I spoke with ▬and ▬ I observed a surveillance camera that was located on the south side wall between the back office and Amy's office. ▬advised me that the camera was recording. The camera was recording the front lobby area, including the back of the front desk. Amy attempted to view the black and white tape. ▬advised me that there were no other cameras inside or outside of the hotel.

During that time, Sgt. Doe #468, Detective Sgt. Hohman #856 arrived along with Detective Degraaf #413, Detective Tuttle #2034, Detective Myers #1357, Detective Young #2507, and Detective Dunbar #470 . I advised Sgt. Hohman, Sgt. Doe, and Det. Degraaf of the information I knew. Det. Degraaf and Det. Myers began to process the scene and took several 35 MM photographs.

Shortly after, a detective located ▬ and ▬clothes in a trash can in the laundry room. The telephone taken from Amy's office was also located in the trash can.

The suspected exit point of the suspect was through the same side down where he entered.

I then spoke with the hotel owner who arrived, later identified as Paul M. Whitson. Paul had been telephoned by ▬and was advised of the incident. I explained the incident to Paul and provided him with a business card with the report number.

Ptl. Douglas #421 had arrived and was following several possible leads at a nearby hotel.

Officers were unable to locate the suspect.

I then left the hotel while the detectives continued processing the scene.


Ptl. Kevin D. Russell #1814.

---

Narrative Type:    Investigative Notes            Topic:

Narrative Reporting Officer:MYERS, JAY        1357        Narrative Date/Time:  4/30/2004  1353

1010 hrs on 4-30-04, Det. DeGraaf and I went to Holiday Inn Express on the report of an armed robbery. The suspect was reported to be a black male about 6'00 tall and wearing a red, hooded sweat shirt. After a search of the area with out results we went to Holiday Inn. Ptl. Russell was speaking with the clerks. We were told the suspect had been in the dinning area of the hotel lobby. He was sitting on a couch watching TV. No one saw him touch anything. A cleaning lady was present and we asked her if she saw this man. She said yes. ▬ ▬stated that he was a dark skinned man with a red sweat shirt or coat on. This matched the description given to us. ▬said that this man asked for some coffee creamer while she was in her office. This office is right next to the lounge area. ▬ said that he took some creamers in a blue, plastic case. I looked at where ▬ described and saw two creamer holders. The holder with blue creamers was full, however, the one with burgundy creamers was not. I looked in a trash can next to the this office door and saw two, burgundy creamers, opened and on a plate with stir sticks and blue, sweetener packets.

Det. DeGraaf had spoke with the victims and related to me the events of the morning. He stated that the suspect entered the office area through an open utility room door. The two victims were approached from behind and made to open the safe in this back area. They then went to the front counter area. After this they were led to a back office area and were made to take their cloths off. The suspect then ripped the phone out and took the cloths and dumped them in the trash can in the utility room. The surveillance camera in the front counter pointed to the front door and after viewing for a while, we never saw the suspect leave that way. The hallway by the utility room leads to a west emergency exit. I went out this exit and looked around. There was a grass hill leading down to Country Hearth Inn. As I looked I could see that there was a path leading to Country Hearth. The grass seemed to be laying down, pointing away from Holiday Inn. Det. DeGraaf was with me and suggested officers start to canvas Country Hearth. Ptl. Douglas, Det. Dunbar and Det. Tuttle did this.

I photographed the area and logged the photo's on a photo log.

After photographing the items in the trash can in the lounge they were collected by Det. Sgt. Hohman. I went and collected the items out of the trash can in the utility room. We identified a phone, two phone cords one tan, one gray, and the cloths. I dusted the phone and located two prints, latent one was on the front, latent two on the back. They were photographed with and without a scale and lifted with Microsil. Det. Dunbar came over and advised that information related to Ptl. Douglas was that a black man had just checked out of room 210 at the Country Hearth. This man was seen by a cleaning person to be sitting in his car for a while. The room he was staying in was checked and the officers found that the phone card from the wall to the phone was missing. We

Reporting Officer: RUSSELL, KEVIN D        1814

# NARRATIVE SUPPLEMENT

| | |
|---|---|
| INCIDENT NUMBER | 01-04-004558 |
| INCIDENT DATE / TIME | 4/30/2004 1018 |

checked the phone jack in the office at Holiday Inn and saw that the cord to the ripped out phone was still in the wall. It appears that the phone cord in the trash at the Holiday Inn belongs to room 210 in Country Hearth.

These items were collected as evidence. We left the Holiday Inn at 1208 hrs., and went to Country Hearth. Det. Young and Dunbar were there collecting evidence. Det. Dunbar was photographing the scene. I dusted the bathroom counter and found that it had been wiped down. Ptl. Douglas said that the man who was in this room identified himself as David L. Jackson with a Michigan Temporary ID. Two phone calls were made from this room. I dusted the phone receiver and located several prints on the bottom portion of the phone. They were photographed and the phone was recovered. A trash bag was also collected by Det. Young.

On station we checked the phone numbers from Country Hearth. One number was to Union City, CA and the other was the Atlanta, GA. area. Det. DeGraaf checked those numbers out. I too called the Oakland area one and left a message. A female's voice was on the answering machine, however, no name was said.

5-3-04 @ 0915 hrs., I made contact with the 510-675-0173 number and I spoke with a female. She did not wish to give her name not knowing to whom she was speaking with. I provided her with my name and department phone number. She stated that she was on her way out the door and would call me back as soon as she could. She did state that she did not receive any calls on Thursday evening.

0956 hrs. I received I received a phone message from a man claiming to be the husband of the woman in California. He stated that he wanted to know why I was calling his wife about a robbery, and that he had no idea what this was about. He stated that he lives in Detroit and she lives in California. This would fit in with the details of the suspect giving a Detroit address and having bags from stores in the Detroit Metro Airport.

We did a reverse directory through the phone directory and located a name and address for the Georgia number. 1-678-344-7801 comes back a ██████████████████████████████ Det. DeGraaf made contact with the local police there and arranged for a detective to speak with this person.

I processed the evidence recovered by the other officers and located latent's on one of the orange juice containers and one of the clothing tags. They were photographed and lifted.

1500 hrs. An AMA search was made out to find the number of the man who called me at the station.

1850 hrs... A message was left on my voicemail by ████

2050 hrs... I attempted to call back without success.

5-4-05 @ 0900 hrs., █████ came in and listened to the voice on my voice mail. ████ said that she could not tell as the suspect didn't yell when he spoke to her like he was doing on this message. ████ asked if he had a picture as she would recognize the face.

0920 hrs... I called the phone number that David left Det. DeGraaf. I spoke with a woman who identified herself as ████████████████ She stated that she was David Jackson's mother and that he was not home. I asked when the last time she saw him was and she said Friday. Sammie was not sure of the time, but thinks it was in the afternoon. I asked what David's middle name was and she said he didn't have one. She gave his date of birth as 3-20-1960. This date and name match the Michigan Temp. left by the man at Country Hearth. The address on the temp was 4249 W. Davison St. Sammie could not provide a social security number or what kind of car he had.

1045 hrs... I contacted the Michigan State Police and spoke with Tpr. Stokes. (313-256-2990) He looked up David Jackson with that date of birth and found the that the temp license he used in Findlay was valid. It was issued on 4-29-04, the same date he checked into the Country Hearth. There was no photo available for David. Tpr. Stokes advised that there was also no previous license issued to him in Michigan as far as he could locate.

1400 hrs... IRS Special Agent Terry Lehman located a social security number for David Jackson. It is REDACTED Detroit. Agent Lehman advised that a ████████████████ also uses that social security number.

1415 hrs... I did a CCH on that Social Security Number and found that he was in prison in 12-16-03 down in Beaumont TX. He was charged by the US Marshall's with having a weapon in prison. He had a USM# of 13567-039. I contacted the US. Marshall's in Beaumont and spoke with Dep. Fulcher. He was the agent who charged David in December. Dep. Fulcher said that David was released on 3-9-2004 and he was the agent that put him on a bus to Michigan. Dep. Fulcher said that the release address for David was 3818 Davison St., Detroit. He was able to get me a photograph of David. Our e-mail was down so he sent the image to my home computer.

1945 hrs... I called ███████ nd spoke with her. She stated that she met David about 8 or 9 years ago. He was incarcerated with a brother to a friend of hers. She said that he had called her on Friday and asked to come down. He arrived on Saturday she thinks he got their at about 1600 or 1700 hrs. and stayed only 15 minutes as she had to leave for a show in Atlanta that she had tickets for. I asked if David told her where he was going

Reporting Officer: RUSSELL, KEVIN D     1814

# NARRATIVE SUPPLEMENT

INCIDENT NUMBER
01-04-004558

INCIDENT DATE / TIME
4/30/2004  1018

from there or if he was working anywhere. She stated he was not. I asked what kind of car he had and she said it was a metallic silver, 4 door with blue tags. She didn't know the make or model. I asked what clothing he had and she said she thinks it was a polo shirt and blue jeans. He also had a beard. I asked ▇▇▇ how she got ahold of David after we called her the first time. She stated on the number she gave the Detective down there, 313-469-0496. This number now only answers as being serviced. I advised ▇▇▇ to call with any new information.

5-5-04... I brought the photo in to the police station and compiled a line up. I contacted ▇▇▇ and went to Holiday Inn with Det. DeGraaf and Victim Assistance Coordinator, Drew Bond. ▇▇▇ was shown the line-up and she picked David out after about 37 seconds of contemplation. I had her circle, sign and date a photocopy of the line-up.

▇▇▇ was not present, but had a meeting scheduled with Drew on 5-6-04. The line-up was given to Drew to show ▇▇▇

Not Complete.

---

**Narrative Type:**   Supplement   **Topic: Witnesses**

**Narrative Reporting Officer:** DOUGLAS, BENJAMIN R    421   **Narrative Date/Time:**  4/30/2004  1359

04/30/04  Around 1018 hrs. this morning Ptl. Hocanson #814 and I were dispatched to a robbery at the Holiday Inn Express (941 Interstate Dr.). While en-route we were informed the suspect was a black male, wearing a red hooded shirt, and he was to have a goatee. We were also informed the suspect was to have brandished a handgun. Ptl. Russell #1814 arrived prior to me, and went to the hotel. I then began to canvass the neighboring businesses and parking lots.

At the Country Hearth Inn, (1020 Interstate Dr.), I spoke with ▇▇▇▇▇▇ a member of the housekeeping staff. ▇▇▇ informed me between 0900 - 0920 hrs. she had observed a black male sitting in a "newer, nice, light colored" car. She said the car was parked in front of rooms 107 / 108, this would have been in the northwest corner of the lot. ▇▇▇ said she noticed the male sitting in the car, when she exited one of the rooms she was cleaning. She went back into the room, and upon exiting the second time the male was gone. Later she once again observed the male sitting in the car and twisting his head side to side. ▇▇▇ stated she was unsure of the male's physical build, but that he was wearing a red "coat". She was unsure of the make of the vehicle. ▇▇▇ provided a written statement.

I then went to the front desk where I spoke with ▇▇▇▇▇▇  ▇▇▇ stated two black males had checked out of the hotel this morning. One had stayed in room 218, (Northeast corner of lot), and the other in room 210, (Northwest corner of lot). ▇▇▇ provided me with the sign in sheets that would have been completed before these rooms would have been given out.

The subject from room 218 had registered as ▇▇▇▇▇ and arrived on the 29th, and left early morning on the 30th. The address he provided was ▇▇▇▇▇▇▇▇ His stay was paid for with an American Express card ▇▇▇▇▇▇

Room 210 was registered to David Lee Jackson, of Detroit, MI.. David arrived around 2200 hrs. (29 th), and checked out around 0950 hrs. this morning. Room 210 is located directly above rooms 107 / 108, where ▇▇▇ had seen the male sitting in the vehicle. I viewed the sign in sheet. The home address provided was 4231 Posture Detroit. MI. and a phone number of 313-936-6821 was given. The vehicle information listed for the make of the car was a SAAB with MI Reg. WRZ21, the last number of the registration was either a 4 or 9. Do to the handwriting it could not be determined. The registration was checked both ways through NCIC, but both were to Chevrolet products. A note on the sign in sheet stated a cash sum of $65.40 was collected as payment.

▇▇▇ also provided me with a print out of the rooms activity. The print out read that David had checked in at 2132 hrs., and checked out at 0919 hrs.. It was later learned that the computer clock was approximately one

**Reporting Officer:** RUSSELL, KEVIN D    1814

64-012

## NARRATIVE SUPPLEMENT

| | |
|---|---|
| INCIDENT NUMBER | 01-04-004558 |
| INCIDENT DATE / TIME | 4/30/2004  1018 |

half hour slow. Making check in time around 2200 hrs. (29th), and check out 0950 hrs.. The print out also showed two completed phone calls. The first at 2222 hrs. to ( REDACTED 7801 which lasted 10.82 minutes. The second to REDACTED 0173 which lasted 3.87 minutes. I was informed by ▇▇▇ hat the computer showed the second number had been called once before around 2211 hrs., but that it was not connected. I took note that the address on this print out was 4 REDACTED Detroit, MI. When asked if the subject had provided identification at the time of check in ▇▇ stated yes. She then provided me with a photocopy of the subjects temporary personal identification card, ID #J 250 135 227 0. The date of birth was listed at REDACTED 1960, and the physical stated brown eyes, 6'03 tall, 195 lbs..

I then spoke with ▇▇▇▇▇▇▇ the manager of the hotel. He stated room 210 had not been cleaned, and that he would allow us in before it was. I informed Det. Dunbar #470, Tuttle #2034, and Young #2507 of these details. The room was unlocked by ▇▇▇ and the room was processed by the detectives.

Next I spoke with ▇▇▇▇▇▇▇ a member of the housekeeping staff. ▇▇▇ stated she had seen the male earlier today around 1000 hrs.. ▇▇▇ said she was standing at the north end of the complex in which room 210 is located. This is when a black male approximately 6'00 tall, thin, wearing a red sweater or shirt walked past. The male was carrying a white trash bag, and asked ▇▇▇ if the large plastic bag on her cart was trash. When she responded yes, the male threw his bag inside of the large trash bag. I asked ▇▇▇ where the trash bag was now, and she stated the large bag was still on her cart, and the small bag would be at the very bottom. ▇▇▇ said she knew this because the large bag was just put on the cart prior to the male throwing the trash inside. ▇▇▇ provided a written statement. The information concerning the trash bag was provided to Det. Tuttle, who later retrieved the small trash bag.

While speaking with ▇▇▇ she stated that ▇▇▇▇▇▇ had also seen the subject. ▇▇▇ said she was talking with ▇▇▇ when the black male approached and asked about the trash. She said the male then walked to the front office, where she believes he checked out. The male then went back upstairs for approximately two minutes, before coming down and entering his car. She described the car as a silver 4 door Ford Taurus. She believed the year to be between 1997-2000. ▇▇▇ also provided a written statement.

After returning to station, I attempted to contact the number left on the sign in sheet. A voice recording stated the line was under repair.

Ptl. B. Douglas #421

---

**Narrative Type:**    Investigative Notes                          **Topic:**
**Narrative Reporting Officer:** HOHMAN, MICHAEL E    856    **Narrative Date/Time:**  4/30/2004  1538

At about 1035 hrs I arrived at the Holiday Inn Express to assist on the Robbery. While speaking to Det. Myers we were approached by one of the victim clerks ▇▇▇ She said that shortly before the robbery she came out of the office area and went to the machines to get a soft drink. She said that she saw a black male setting on the couch of the breakfast area watching TV. She said that he matched the description of the suspect and that she didn't recognize him as anyone who had been staying at their business. She said that she got her pop and went back into the office. Shortly after that they got robbed.

Det. Myers and I then saw a lady, ▇▇▇▇▇ cleaning tables in the eating area. She said that she works that area during the breakfast time at the hotel. We asked her if she saw the subject in that area this morning. She said that was in the preparation/storage room, connected to the eating area on the east side by a man door, cleaning up the dishes from the morning. She said that she was at the sink when a male subject came to the door and asked for some creamer. She told told him about the flavored creamer which was in containers on the counter just to the left inside the door. There were two different styles of creamer in two different holders. One style, in a red plastic container, which was cinnamon hazelnut flavor and the other flavor was in a blue container, unknown flavor. The holder with the blue containers appeared to be full and the one with red containers had some missing. ▇▇▇ said that she fills the holders every morning after breakfast in preperation for the next day.

**Reporting Officer:** RUSSELL, KEVIN D    1814

64-013

**NARRATIVE SUPPLEMENT**

INCIDENT NUMBER
01-04-004558
INCIDENT DATE / TIME
4/30/2004  1018

███said that no one else has been in the eating area since she saw the black male subject who asked for the creamer. We then checked the trash bin, which is located just to west of the door leading to the preperation/storage area, in the eating area. Setting on top in the trash bin was a white styrofoam plate. On that plate were two empty cinnamon hazelnut creamer containers, two plastic stirrers, a crumpled up blue sugar substitute packages and the torn off tops to two blue sugar substitute sugar packages. Also on top of the other trash, beside the plate, was a styrofoam coffee cup and the bottom portion of a blue sugar substitute package (uncrumpled). On the possibility that the suspect had handle those items Det. Myers photographed those items in the trash bin and then I collected the items as evidence. The cup, two stirrers, crumpled sugar substitute package and two top portions, cinnamon hazelnut creamer containers, white styrofoam plate and uncrumpled blue sugar substitute package were all collected and placed in seperate paper bags to be checked later for possible DNA and/or fingerprints. After our arrival I stayed in the eating area of the hotel and no one had placed any other trash in the bin prior to us collecting the items from the trash bin.

---

Narrative. Type:    Investigative Notes                    Topic:
Narrative Reporting Officer:DUNBAR, JOHN E          470        Narrative Date/Time:  4/30/2004   1541

04-30-04  Friday
I heard dispatch advise officers that an armed robbery had occurred at the Holiday Inn Express Hotel. Dispatch advised of the suspect's description and that he had a firearm. I went to that location and checked the area to see if I could locate anyone matching the description.

Then I went to the Holiday Inn Express and spoke to Detectives Myers and DeGraaf. They advised me of the information they had learned in regards to the description of the suspect and what had occurred.
Det. Myers had also found some grass that had been walked through going towards Country Hearth Inn.

Officer Douglas was at the Country Hearth Inn and had advised officers via radio that he had information in regards to a black male sitting in a vehicle in the parking lot prior to the robbery. Officer Douglas also advised that he was checking to see about black males that were registered at the hotel.

I went to Country Hearth Inn to see if I could assist Officer Douglas. While walking to the Country Hearth Inn from Holiday Inn Express, I observed the grass that appeared to have been walked on. This grass was from the west side of the building and went toward the parking lot of Country Hearth.

Upon meeting with Officer Douglas, he advised me rooms 218, 107, 108, and 210 had been rented by black males. Upon my inquiry, he stated he did not know if the rooms had been cleaned or not. Officer Douglas believed all of the rooms had been vacated this morning.

Officer Douglas showed me the parking space where the cleaning person had observed the black male sitting in the car. This was in front of room 107 and 108 and room 210 was just above these two rooms. I waited outside the bottom rooms while Officer Douglas checked to see if rooms 107 and 108 had been cleaned.

Officer Douglas returned with hotel personnel who stated she believed both rooms were cleaned. She opened room 108 and it appeared to have been cleaned. I went upstairs to room 210 to see if anyone was inside that room or if it had been cleaned.

Det. Young was with me and we knocked on the door, but got no answer. Officer Douglas was contacted and he was advised to see if room 210 had been cleaned. Officer Douglas advised he believed it had been vacated and would get in contact with someone from the hotel to see about opening the room.

Officer Douglas returned with a subject later identified as ████████. Officer Douglas stated the room had been vacated and the occupant had checked out, but it was unknown if it had been cleaned. ████ knocked on the door

Reporting Officer: RUSSELL, KEVIN D        1814

# NARRATIVE SUPPLEMENT

**INCIDENT NUMBER**
01-04-004558

**INCIDENT DATE / TIME**
4/30/2004   1018

a few times and announced housekeeping. He got no answer. ████opened the door and allowed officers to enter the room.

Upon entering the room, it appeared as if it had not been cleaned. The bed appeared to have been slept in and the covers were turned down. The floor lamp by the window was on. Det. Tuttle had arrived at this time. Murad was present as we entered the room.

Upon checking the room, Det. Young located a paper cup that appeared to have been used sitting on the counter near the sink. I noticed that most of the towels were missing from the room. The bathroom floor mat was laying on the edge of the tub with what appeared to be a wet wash cloth on top of it. The only other towel was a wash cloth on the rack near the sink.

I checked the room and located what appeared to be sales tag from a clothing item. This tag showed brand name "Covington." It also stated "knit top", "size XL", "$28.00" and "010 Heather Gray" on it as well. This was found on the floor between the brown waste basket and the brown wooden clothes dresser.

Also found in the waste basket was two white napkins and some torn clear plastic. The clear plastic appeared to have come from the paper cup as the other two paper cups were still encased in plastic.

Officer Douglas advised he had obtained the name of the subject who rented the room. Officer Douglas also advised the subject paid with cash and he provided the check in times and check out times. It was noticed the check out time was a short time before the robbery at Holiday Inn Express.

Officer Douglas was asked about any phone calls made from the room. He stated he would have to check with ████who was still present. ████was asked about this and he stated he would be able to find out if any calls were made from the room. At this time, it was noticed that the phone cord leading from the phone to the wall jack was missing.

████eft to check about the phone calls and we continued to check the room. ████and Officer Douglas advised that three phone calls had been made from the phone. Officer Douglas noted this information.

The paper cup, white napkins, and clothing tag were recovered due to the information we had learned. I went to Holiday Inn and updated Det. Myers on what we had learned as he was processing the scene at the Holiday Inn.

I returned to the Country Hearth Inn where I met with Det. Tuttle. He updated me on the information from cleaning personnel. A cleaning crew worker advised the resident of room 210 had put a white plastic trash bag into her wheeled trash bin. This bag was tied in a knot and she leaves the white trash bags she recovers untied. I took two 35 MM photos of this white tied trash bag and it was recovered.

Det. Myers went to room 210 and he used finger print powder on the telephone, the stand, and the sink. I took 35 MM photos of these areas. Det. Myers examined these areas for latent prints. The recovered items were transported to the station by Det. Myers. During the time we were in room 210, Murad stated that he wanted to help out in anyway possible to assist the police in solving this crime.

At the station, Det. Tuttle and I examined the items in the white plastic bag and photographed them. Two more Covington clothing tags were found that appeared to be for pants. The size was 34 X 34. All of the items were placed into individual paper bags.

Reporting Officer: RUSSELL, KEVIN D          1814

# NARRATIVE SUPPLEMENT

**INCIDENT NUMBER**
01-04-004558

**INCIDENT DATE / TIME**
4/30/2004  1018

---

**Narrative Type:**    Investigative Notes                    **Topic:**

**Narrative Reporting Officer:TUTTLE, MATHEW D**    2034    **Narrative Date/Time:**  4/30/2004  1545

04/30/04

I went to assist in a robbery of the Holiday Inn Express and was directed towards the Country Hearth Inn to assist there. It had been learned that black males had rented a couple of different rooms at the hotel, a couple of which were already cleaned. Room #210 had not been cleaned and the male who rented the room had already checked out.

The manager had let us in and the room was searched. I noted the items that had been located: a hotel disposable cup that had been located on the left side of the bathroom sink / a clothing tag that was found on the floor between the trash can and the TV cabinet. Both of these items had been collected as evidence at 1115 hrs.

Also of note was that the TV had been on channel 33 and the alarm clock had been set for 0545 hrs. There were towels missing from the hotel room, a washcloth laying on the tub, and a telephone cord that was missing. The bed had been slept in but was not in too bad of shape. The light next to the window had been left on.

In speaking with Officer Douglas, he had spoken with ███████████ about the man who had rented Room #210. She had advised that he had thrown a trash bag into her large trash bag on her cleaning cart as he was walking past. ███████ had been working and her cart was located outside room #109.

███████ advised the large black trash bag that the black male had thrown his white trash bag in to was laying on the ground. I located the black trash bag next to the cleaning cart in front of room #109. In talking with ███████ it was learned that she was the only one who was collecting trash and placing it in the black bag, except for the black male. ███████ does not tie her bags when cleaning rooms and placing them into the large bag.

I started to search through the large black bag and located 1 smaller white bag that was tied. I checked through the rest of the black bag and did not locate any other bags that had been tied. Det. Dunbar arrived a short time later and photographed the trash bags before I opened it. Located inside was McDonald's trash, a couple of clothing tags, a ripped bag with the wording 'paradies metro ventures Inc.' that was tied, three different drink bottles, and some misc. trash. The entire bag was placed into a paper sack and turned over to Det. Myers and was transported to the station by Det. Myers. This was collected at 1155 hrs. Rubber gloves were worn while I was searching through the bags.

I then went to the different businesses around the area to check for clothing or any other evidence. I checked the dumpsters at the Holiday Inn and the Country Hearth Inn and they were both empty. I checked around the hotels and the pond and was unable to locate anything. The dumpsters at the Hampton Inn, Cracker Barrel, and Denny's were full but I was unable to locate anything. The areas around these businesses were checked as well, with nothing located.

Once back at the police station, Det. Dunbar and I separated the individual items from the plastic bags, photographed the items, and placed them into individual paper bags. The items were locked in the north interview room closet of the Detective division for Det. Myers to process later. Rubber gloves were worn as the items were removed.

---

**Narrative Type:**    Records Room Comments                    **Topic:** CC OF COUNTRY HEARTH 'S FOLIO

**Narrative Reporting Officer:RHODES, JUDY A**    1808    **Narrative Date/Time:**  5/03/2004  1123

ON DAVID JACKSON SUBMITTED FOR FILING ALONG WITH A CC OF HIS MICHIGAN TEMP ID CARD

---

**Narrative Type:**    Investigative Notes                    **Topic:**

**Narrative Reporting Officer:DEGRAAF, SCOTT G**    413    **Narrative Date/Time:**  5/03/2004  1214

April 2, 2004 Friday

Reporting Officer: RUSSELL, KEVIN D    1814

# NARRATIVE SUPPLEMENT

| | |
|---|---|
| INCIDENT NUMBER | 01-04-004558 |
| INCIDENT DATE / TIME | 4/30/2004  1018 |

Det. Myers #1357 and I responded to the Holiday Inn Express on the report of a Robbery that had just occurred. Dispatch advised that the suspect was wearing a red hooded sweat-shirt and did show a gun to the employees at the hotel. The direction of travel was unknown. After checking the area for several minutes we responded to the hotel. Ptl. Russell was on scene and was speaking with the two employees who had been directly involved with the robbery. ████████████ were working at the time of the robbery. Both females had been sitting at a desk in the rear of the front office. ███ advised that the suspect had entered the office through a common door that connects the front office with the housekeeping area. ███ described that she and ██████ were seated at a desk with their backs to the open door. The man approached ███ and pointed a gun at her. He stated "this is what were gonna do." The suspect then grabbed her arm and helped her out of her chair. He asked where the safe was located. ████ pointed it out to him and then started to go to her private office area. He asked her where she was going and she advised him she was getting the key. She retrieved the key and returned to the area where the safe was located. ████ opened the safe and showed the money to the man. He asked her "that's it?" and she replied yes. He then escorted her around a wall that seperated the back of the office from the front. He had ████ open the cash door at the front desk. She did this and put the money into a bag the suspect had. The suspect then walked her back to the area where ████ was still located. The suspect had ordered ██████ to lay down on the ground while he was walking ███ around to the safe and the cash drawer. When he was finished he ordered the two ladies into ███ private office. He then made both ladies strip completely naked and lay down on the ground in the office. The suspect then told them not to leave or move for ten minutes. A couple of seconds later the suspect rattled the door handle and advised them that he was still there.

████ advised that she had seen the same subject in the lobby and lounge area of the Hotel just prior to him entering the office area. She advised that he was just milling around when she had first made contact with him. He was described as being tall wearing jeans, a red "Marlboro" type jacket. He also had some facial hair possibly a goatee.

While Det. Myers was still checking the Lounge area I viewed the video tape that was recording at the time of the incident. I observed ████ and the suspect walk around the dividing wall and to the cash drawer at the front desk. The subject was wearing a hooded jacket and due to the grainy appearance of the video tape a facial shot was not very clear as the suspect walked past the camera. I continued to watch the video. After a few minutes pass, ████ is seen coming in to camera range. She looked around the lobby and into the lounge area and then retreats out of camera range. At no time did I see the suspect leave through the main lobby doors which is clearly visible on the video.

Det. Myers took photographs of the crime scene with a 35mm. We checked the west exit doors and found foot prints leading to the south. The prints seemed to be fresh as it had rained considerably during the night and that morning. The tracks traveled in the direction of the Country Hearth Inn.

While we were progressing through the scene taking photographs I located a gray telephone cord, tan coiled telephone cord, telephone receiver and telephone base set in a barrel that appeared to be used for the recycling of aluminum cans. The items were partially covered by several clothing items. ████ identified the clothing as being hers and ██████. ███ then recalled that the suspect had removed the phone from the desk in her office. I checked the office were ████ and ██████ had been forced to strip and made to lay down in. The telephone had been removed from the desk and you could still see the markings from the dust on the desk. As Det. Myer's and I continued to process the scene at the Holiday Inn Express, Det. Dunbar, Det. Young, Det. Tuttle and Ptl. Douglas were working at the Country Hearth Inn. We were advised that they had spoke with several people who recognized the description we had given of the suspect. They had possibly tracked a suspect to room 210 at the Country Hearth Inn. They had been allowed in the room and discovered that a telephone cord had been taken from the room. I again checked the items we located in the trash and found a long gray telephone cord. I then checked the office were the telephone was taken from and found that its cord was still plugged in to the wall.

Det. Myers then attempted to lift fingerprints from the telephone that the subject had removed from the room. After all evidence had been collected from the Holiday Inn Express we went to the Country Hearth Inn. They had found that room 210 had been rented to a David L. Jackson of Detroit Mi. he had checked in on April 29 sometime after 2100 hours and checked out that morning prior to 1000 hours. While we were checking the room

Reporting Officer: RUSSELL, KEVIN D        1814

## NARRATIVE SUPPLEMENT

the Hotel manager approached and advised that the clerk who had checked the suspect in was on the hotel's telephone.

I spoke with a subject who identified himself as ███████████ Nathan advised that he was working when the subject had checked in. He advised that the man did not have a picture Id to present when he checked in. He described the man as being tall, he thought around 6'00" to 6'01". He was wearing jeans and a white t-shirt. ██████advised that the subject had some facial hair, particularly around his mouth. ██████described him as being clean cut.

██████ did advise that the subject was a little strange in that he paid for his room in all five dollar bills. When he asked the man if he wanted a phone in his room the man said sure.

██████noted that he observed that the man was wearing an older 80's style Casio watch. He thought this was odd as he had said the man was pretty clean cut looking. The watch was on the suspect's left wrist.

The Country Hearth Inn provided a list of telephone calls that were made from room 210 on the night of April 29. Two different phone number were listed on the hotel bill. The first number was ⟨Redacted⟩ the second was ⟨Redacted⟩ I checked the area codes and found the first number to be from the Atlanta Georgia area and the second number was from the Oakland California area. I checked the numbers on the Internet and found no listing for the second number. The first number showed that it belonged to ██████of Lilburn, Ga. Det. Myers attempted to call both telephone numbers. Det. Myers left messages at both phone numbers.

I contacted the Lilburn Police Department. I was advised that the address that I had was outside of the city limits. They advised that I needed to contact the Gwinnett County Sheriff's office. I contacted the Sheriff's office and advised them of this departments investigation. I was transferred several times and eventually left a voice mail for a Sgt. in the robbery division.

I contacted the Oakland Police department. I was advised that the telephone number that I had from that area was actually an extension for Union City, Ca. I contacted the Union City Police department and advised them of the investigation. I was advised that I would need to send a teletype to the dispatch center. A teletype was sent to Union City PD.

May 3, 2004

I attempted to call ⟨Redacted⟩ The telephone number had privacy block. A message was left for a return call.

I again contacted the Gwinnet County Sheriff's office and advised them of my investigation. They advised that they would send a deputy to the address to attempt contact. They advised that the address that I provided was for an apartment complex known as the "Columns at Paxton". They would attempt to locate the individual I was searching for.

Det. Myers had made contact with a female at the Oakland Ca. telephone number. the woman advised that she could not talk with him at length because she was leaving her residence for work. The woman would not identify herself to Det. Myers.

Several minutes after Det. Myers made the above phone call he found a message on his voice mail. The caller identified himself as the husband of the woman we had attempted to make contact with in California. Det. Myers played the message for me so I could hear the phone message. The male seemed very upset that we had attempted to contact his wife in California. He did not identify himself and did not leave a call back number.

I received a phone call from the Gwinnett County Sheriff's office in Georgia. They went to the apartment complex and found that ██████had moved out of the complex in June of 2003.

Det. Myers and I tried a reverse look up on the phone number using ⟨Redacted⟩ We were advised that the number now belonged to ████████████████

I contacted the Snellville Police Department and spoke with a clerk. She advised that all Detectives were currently out and she would have one call me as soon as possible.

Reporting Officer: RUSSELL, KEVIN D        1814

# NARRATIVE SUPPLEMENT

INCIDENT NUMBER
01-04-004558

INCIDENT DATE / TIME
4/30/2004  1018

I received a telephone call from Det. Seraphine of the Snellville Police Department. He advised that he was familiar with the neighborhood and he would assist in any way possible.

I received a telephone call from an unidentified male. I recognized the voice immediately as the one that was on Det. Myer's voice mail. The male immediately lit in to me about calling around the country looking for him. He described his family as being very upset by us calling them. I tried to calm him and he actually identified himself as David Jay. I spoke with David for a short period of time. He seemed to be trying to gather information as to why we were attempting to locate him. I told him that we were looking to talk to him because there was a robbery at the hotel next to his that morning. He got angry at this and asked why we were singling him out. I found it hard to get a word in edge wise as he continually would ramble on about us harassing him and his family.

He did admit to me that he had been staying in room 210 at the Country Hearth Inn and that he had made a couple of phone calls. He claimed that he was traveling for business but would not elaborate. He also stated that he was traveling with a partner named "uh Henry James, yeah that's his name." David would not give me an address were he lived or if he would be back in Findlay any time soon. I did manage to get a telephone number from him. The number he gave me was     Redacted     David abruptly hung up the phone and ended our conversation.

We did a reverse look up on the telephone number an it came back to a ███████████████of ███████████████████

I received a telephone message from ████████████ She left a call back number which was for her residence. I called the number back within a few minutes and she did not answer the phone.

Det. Seraphine of the Snellville police department called me in regards to ████████ He advised that he finally made contact with████████she told him that she got a call from a guy she knows only as Dee. He is allegedly from Ohio or Michigan she claimed that she was not sure what his last name was or where exactly he was from.  ████ told Det. Seraphine that she had known Dee for about 10 years. She told him that Dee had stopped at her place on Saturday night and that he was now gone. Det. Seraphine advised that he thought ████ was being less than honest about what she knew. He advised that she told him that she was going to call me. I advised him that I did receive a phone message from ████ but when I returned the call less than a half hour later she did not answer her phone. Det. Seraphine advised that ████ is working for a company called Great Brands of Europe which is a branch of Coca-Cola company. Her work telephone number is ███████████

I made contact with ████████ I asked Amy to come in to the division to listen to the voice mail that "David" had left on Det. Myer's telephone. ████advised that she could come in at 0900 hours the next morning (May 4).

May 4, 2004

I received a telephone call from Det. Seraphine of the Snellville Ga. police department. He advised that████████ had contacted him twice on May 3, after hours on his cell phone. He related that she appeared concerned and had admitted to him that she had not been completely truthful with him. Det. Seraphine advised that when he talked with ████ she admitted that the man who had called her on April 29 she knew as David Jackson. She maintained that she was not sure if he lived in Ohio or Detroit. ████ claimed that she met him through a friend of a friend and she had not talked with him in several years. ████ advised that Jackson had called her that night and claimed that he would be traveling through the Atlanta area on Saturday (May 1) She advised that he did stop by her house but only stayed for about fifteen minutes. ████told Det. Seraphine that she had previous plans so she only spoke with him briefly. ████ did tell the detective that Jackson was driving a silver vehicle and that it had blue license plates on it. She did not know what type of vehicle it was other than it was a four door. Det. Seraphine advised that he was not sure if████ was being completely honest about everything but that she told him that she would contact either myself or Det. Myers about the case.

I talked with Det. Seraphine about possible obtaining a court order for████telephone records. He advised that Southern Bell is the major telephone company in that area and he did not believe that he would be able to obtain one himself.

████████came on station to listen to the voice mail. She listen to the message and advised that she

Reporting Officer: RUSSELL, KEVIN D        1814

05/19/2004 15:42 4194247851 PAGE 03

# NARRATIVE SUPPLEMENT

| | |
|---|---|
| INCIDENT NUMBER | 01-04-004555 |
| INCIDENT DATE / TIME | 4/30/2004  1018 |

could not tell if it was the same person or not. She stated that he was not yelling at her when he was at the hotel.

I received a telephone call from Union City police department. They advised that the phone number subscriber was unlisted but they did tie the phone number to an address. The address was ███████████████ ███████████ The departments last encounter with that address was in 2003 and the occupant of the apartment was ████████

May, 5 2004

Det. Myers had put together a photo line-up regarding this incident. We contacted victims assistant ██████ ██████ and she accompanied us to the Holiday Inn Express. ████ looked at the photo line-for a brief period and then eliminated two subjects. I watched her as she looked at the line-up. She continually looked at subject number five. She would then look at another subject and then quickly return to the number five subject. After a few more moments ████ identified number five as the subject who had committed the Robbery at the Holiday Inn Express. She advised that the person who was in the hotel did not have as much facial hair but his features were similar.

We spoke with Dru Bond who advised that ██████████ was coming in to her office on the next day for a meeting. Due to schedule conflicts neither Det. Myers or I could be present to present the line up to her. Dru advised that she could have the County Prosecutor's investigator Dana Dunbar present the line up to ████████

I found the web site for "Southern Bell" telephone company. I sent a request via there web site for telephone records pertaining to ████████ belonging to ████████ I also asked for any information regarding Subpoena service if necessary.

I contacted Hertz car rental at Detroit Metro Airport. A message was left for ████████

May 6, 2004

I received the results from ████████ viewing of the photo line up. According to ████████ "report" ████ could not make a positive identification. She did indicate that subject number five looked the closest to the suspect as his eyes stood out to her.

May 11, 2004

A subpeona was prepared and faxed to Bell South in reference to the telephone records of ████ ████

I made contact with ████████ of Hertz car rental at Detroit Metro Airport. He advised that they had no vehicles rented by David Lee Jackson on April the 29th.

May 13, 2004

I received a fax from Bell South regarding the Subpoena that I had sent in reference to ████████ telephone activities. I contacted Suzette Jackson. She advised that I needed a court order because Findlay was outside the Bell South region.

A court order was prepared and presented to Judge K. Smith of the Findlay Municipal Court. The court order was then faxed to ████████ at BellSouth.

May 24, 2004

I received a fax from BellSouth with some of the requested information. They did not include subscriber information. A cover letter was sent requesting that I choose which numbers I want subscriber information for. I went through the list and found several calls to and from the Detroit area. I made a list of four telephone numbers in the 313 area code and two in the 419 area code.

Reporting Officer: RUSSELL, KEVIN D        1814

05/18/2004  15:42    4194247851    PD    PAGE  10

# NARRATIVE SUPPLEMENT

**INCIDENT NUMBER**
01-04-004558

**INCIDENT DATE / TIME**
4/30/2004  1018

---

**Narrative Type:** Investigative Notes    **Topic:** Photo Log Roll #1

**Narrative Reporting Officer:** DEGRAAF, SCOTT G    413    **Narrative Date/Time:** 5/03/2004  1350

1. ID board
2. Front of Holiday Inn Express
3. Lobby of Holiday Inn Express
4. Lounge of Holiday Inn Express
5. Trash receptacle in Lounge containing two creamer packages and polystyrene plate
6. Hallway from Holiday Inn Express facing west.
7. Entrance to Office/Housekeeping
8. West Hallway exit
9. Looking south from exit to Country Hearth Inn
10. Possible footprints leading to Country Hearth Inn
11. Trash receptacle in office
12. Phone and clothing found in trash receptacle
13. Office
14. Front Desk
15. Video Camera
16. Private office
17. Keys on Desk
18. Close up of keys on Desk
19. Phone overview
20. Lantent print #1 left edge of Phone (macro lens)
21. Lantent print #1 left edge of Phone (macro lens)
22. Lantent print #1 left edge of Phone with scale (macro lens)
23. Lantent print #1 left edge of Phone with scale (macro lens)
24. Overview rear of phone (dusted)
25. Latent print #2 rear of Phone (macro lens)
26. Latent print #2 rear of Phone (macro lens)
27. Latent print #2 rear of Phone with scale (macro lens)

---

**Narrative Type:** Investigative Notes    **Topic:**

**Narrative Reporting Officer:** YOUNG, DAVID L    2507    **Narrative Date/Time:** 5/05/2004  0814

04/30/2004 Friday.....I met with Detective John Dunbar at the Country Hearth Inn at room 210. He advised me that there was a black male that stayed in room 210 last night. He also advised that employee's of the Country Hearth Inn reported a black male sitting in a vehicle in the parking lot of the Country Hearth Inn near room 210 acting suspicious.

It was believed that the black male had checked out just before the robbery occurred at the Holiday Inn Express which is right next door.

We knocked on the door at room 210 and there was no answer. There was a light on in the room that you could see through the window next to the door.

Officer Douglas showed up with the manager, ███████ ██████ advised he believed the man in room 210 had checked out. ███████ knocked on the door and announced himself. No one answered. He then used his pass key and open the door. He again announced himself and again no one answered. Detective Tuttle came up to the room and we then entered the room.

The room had not been cleaned yet by the cleaning staff. The cover's were turned down on the bed, but other then that the room was very clean. While looking around in the room Detective Dunbar discovered clothing tags next to the waste basket that was located next to the dresser. The tag appeared to be a shirt tag. It was a Covington brand tag. It is a knit top tag, size extra large, with 010 Heather Gray on it. The price for the tag is $28.00. I discovered a Styrofoam cup on the sink in the bathroom area that appeared to have been used.

In the waste basket was two napkins and a plastic wrapper. The plastic wrapper appeared to have been

**Reporting Officer:** RUSSELL, KEVIN D    1814

64-021

# NARRATIVE SUPPLEMENT

**INCIDENT NUMBER**
01-04-004558

**INCIDENT DATE / TIME**
4/30/2004  1018

wrapped around the cup that was on the sink. There were other cups in the room that were still wrapped in the same clear plastic wrap.

Officer Douglas arrived and stated he confirmed that the occupant that was in room 210 had checked out just before the robbery. The man paid for he room with five dollar bills. Douglas also discovered the man used the phone twice while staying there.

At that time Detective Dunbar discovered that the phone cord was missing from the phone which was sitting on the desk in the room. It is the phone cord that plugs in to the wall and then in to the phone.

I then recovered the clothing tags, cup, plastic wrapper, and napkins as evidence.

While looking around the room it appeared that who ever stayed in the room took the time to clean it up themselves. There was no trash bag in the trash container and the sink top in the bathroom appeared to have been wiped down. The large towels that are usually provided by the motel were missing from the bathroom. The only thing left was a cloth mat for the floor and a wash cloth, both were neatly placed on the side of the bathtub.

Detective Myers arrived at the room and processed the room for any latent prints.

Detective Tuttle discovered in his investigation that the trash bag from room 210 was thrown in the trash that the cleaning personal was using. They thought that it was strange that someone would throw their own trash away. The man that threw it away matched the description of the man from room 210.

Detective Tuttle recovered the trash bag and collected it as evidence. He brought it up to where we were at in room 210. Detective Dunbar opened the trash bag and inside the bag there was a clothing tag for a pair of pants along with other items. The tag was a Covington tag that matched the shirt tag that was found on the floor in the room by Detective Dunbar.

Further investigation revealed that there was a phone cord found at the scene of the robbery that could have been from room 210. None of the phone's near the scene of the robbery were missing their phone cords.

Detective Myers arrived and processed the room for latent prints and the room was then secured.

Detective David L Young #2507

---

**Narrative Type:** Records Room Comments                    **Topic:** SUBMITTED ITEMS
**Narrative Reporting Officer:** EWING, ANITA          520      **Narrative Date/Time:** 5/07/2004  1225
SURVEILLANCE PHOTOS FROM HOLIDAY INN EXPRESS (2), PHOTO OF SUSPECT, LETTER FROM ███
███████████████████████ FAX FROM US MARSHALL'S OFFICE IN TEXAS, LETTER TO AMA
TECHNOLOGY GROUP FROM DET MYERS, JOURNAL ENTRY FOR SUBPOENA TO SBC/AMERITECH. AND
TELETYPE MSG TO UNION CITY, CA.

---

**Narrative Type:** Records Room Comments                    **Topic:** FAX FROM SBC
**Narrative Reporting Officer:** EWING, ANITA          520      **Narrative Date/Time:** 5/12/2004  0934
FAX TO DET MYERS WITH COPY OF JOURNAL ENTRY AND LIST OF PHONE CALLS.

---

**Narrative Type:** Supplement                    **Topic:**
**Narrative Reporting Officer:** MYERS, JAY          1357      **Narrative Date/Time:** 5/17/2004  1016
5-17-04... I mailed the photo negatives of the latent prints on the phone found at Holiday Inn Express to BCI&I Bowling Green via certified mail.

---

**Reporting Officer:** RUSSELL, KEVIN D          1814

# NARRATIVE SUPPLEMENT

**INCIDENT NUMBER**
01-04-004558

**INCIDENT DATE / TIME**
4/30/2004 1018

---

**Narrative Type:** Records Room Comments      **Topic:** Submitted Item
**Narrative Reporting Officer:** EWING, ANITA   520   **Narrative Date/Time:** 5/21/2004 1341

Certified mail receipt for item sent to BCI.

---

**Narrative Type:** Records Room Comments      **Topic:** SUBMITTED ITEMS
**Narrative Reporting Officer:** EWING, ANITA   520   **Narrative Date/Time:** 5/25/2004 1639

FAXED LETTER TO SUZETTE JACKSON OF BELLSOUTH, INFORMATION ON LIST OF PHONE CALLS, FAX TO DET DEGRAAF FROM BELLSOUTH WITH JOURNAL ENTRY RE RECORDS FROM BELLSOUTH, FAX FROM BELLSOUTH REFUSING THE REQUEST, AND ORIG SUBPOENA FROM HANCOCK CO COM PLS COURT.

---

**Narrative Type:** Supplement      **Topic:**
**Narrative Reporting Officer:** MYERS, JAY   1357   **Narrative Date/Time:** 6/16/2004 1235

6-16-04... I brought the photo's of the dusted fingerprints back from BCI. They were unable to locate any prints with sufficient ridge detail for any comparisons.

---

**Narrative Type:** Records Room Comments      **Topic:** Negs
**Narrative Reporting Officer:** OSBORNE, CAROL A   1515   **Narrative Date/Time:** 6/16/2004 1431

negs submitted to records.

---

**Narrative Type:** Records Room Comments      **Topic:** Latent Print Photos
**Narrative Reporting Officer:** EWING, ANITA   520   **Narrative Date/Time:** 6/16/2004 1453

Photos of prints taken from phone submitted in envelope for filing.

---

Reporting Officer: RUSSELL, KEVIN D   1814

64-023

# EXHIBIT 65

CLIENT: David Lee Jackson          CAUSE NO. 1:03CR222-2    ~Dismissed~

OFFENSE: _____

| DATE | COMMENTS: |
|------|-----------|
| 2-9-04 | Rec'vd Paperwork for case, open file Frank Henderson withdrawed. |
| 2-13-04 | CHC picked up Paperwork from Public Defender's office. (In brown folder) |
| 2-23-04 | 1:03CR2222 was dismissed but Murder charges will be filed soon. |
| 6-22-04 | Per CHC - Δ was released - in Michigan - hasn't been arrested yet. |
| 2-2-05 | Per CHC Keep close by. May be reindicted for Murder |

65-001

# EXHIBIT 66

October 2003

# AMERICAN PSYCHOLOGIST

Volume 58
Number 10

**The Flynn Effect and U.S. Policies: The Impact of Rising IQ Scores on American Society Via Mental Retardation Diagnoses**

*Tomoe Kanaya, Matthew H. Scullin, and Stephen J. Ceci* There has been a systematic and pervasive rise in IQ scores. Caution should be used when basing important financial, social, or legal decisions on an IQ score, especially when the test used is at the beginning or the end of its norming cycle.

778

**Unintended Consequences: Ventures and Misadventures in the Education of Professional Psychologists***

*Donald R. Peterson* If we stop thinking of professional psychology as an arcane art and examine it instead as a set of complex professional occupations, the well-tried methods of measuring and improving performance that industrial/organizational psychologists have developed can be applied to the training of psychologists.

791

**Challenges to Professional Psychology Education in the 21st Century: Response to Peterson**

*Mary Beth Kenkel, Patrick H. DeLeon, Judith E. N. Albino, and Natalie Porter* Professional schools have responded to the needs of the changing health care system and to recommendations made by the Pew Health Professions Commission and the Institute of Medicine. These schools reflect the diversity of the U.S. population, teach interdisciplinary competence, and adapt their curricula to prepare professionals for the health care system of the future better than do traditional doctoral training programs.

801

**Editor-in-Chief**

Norman B. Anderson

**Associate Editor-in-Chief**

Samuel M. Turner

**Section Editors**

Wade E. Pickren, *History of Psychology and Obituaries*

Denise C. Park, *Science Watch*

Sandra M. Fowler, *Art Editor*

**Associate Editors**

Leona S. Aiken

Patrick H. DeLeon

Bernadette Gray-Little

William C. Howell

Robert M. Kaplan

Kurt Pawlik

Cheryl B. Travis

Gary R. VandenBos

# The Flynn Effect and U.S. Policies

## The Impact of Rising IQ Scores on American Society

## Via Mental Retardation Diagnoses

Tomoe Kanaya — *Cornell University*
Matthew H. Scullin — *West Virginia University*
Stephen J. Ceci — *Cornell University*

*Over the last century, IQ scores have been steadily rising, a phenomenon dubbed the Flynn effect. Because of the Flynn effect, IQ tests are periodically renormed, making them harder. Given that eligibility for mental retardation (MR) services relies heavily on IQ scores, renormed tests could have a significant impact on MR placements. In longitudinal IQ records from 9 sites around the country, students in the borderline and mild MR range lost an average of 5.6 points when retested on a renormed test and were more likely to be classified MR compared with peers retested on the same test. The magnitude of the effect is large and affects national policies on education, social security, the death penalty, and the military.*

Ever since the introduction of standardized IQ tests in the early 20th century, there has been a systematic and pervasive rise in IQ scores all over the world, including the United States. Known as the *Flynn effect* after James Flynn, the political scientist who has extensively documented this rise, the Flynn effect causes IQ test norms to become obsolete over time (Flynn, 1984, 1987, 1998). In other words, as time passes and IQ test norms get older, people perform better and better on the test, raising the mean IQ by several points within a matter of years. Once a test is renormed, which typically happens every 15–20 years, the mean is reset to 100, making the test harder and "hiding" the previous gains in IQ scores.

Although the Flynn effect is well documented within the average range of the IQ distribution, less is known about its impact on those who score well below the mean, such as those in the mental retardation (MR) and borderline intellectual functioning (borderline) IQ range. Depending on the size of the Flynn effect within this lower IQ range, meeting the IQ criteria for a diagnosis of MR might depend heavily on the IQ test norms being used the year an individual is tested (Flynn, 2000). If true, this could have enormous social implications beyond the incidence of MR because of its impact on various U.S. national policies, including special education financing and eligibility for social security benefits, the death penalty, and military service. In this article, we focus on MR diagnoses among school-age children as a window into related policies that are based on IQ scores. Using archived special education testing records from nine sites around the United States, we explored the impact of the Flynn effect on the Wechsler Intelligence Scale for Children—Revised (WISC–R; Wechsler, 1974) and Wechsler Intelligence Scale for Children—Third Revision (WISC–III; Wechsler, 1991) Full Scale IQ scores of children in the MR and borderline range, as well as its impact on psychologists' special education placement recommendations.

## How Is Mental Retardation Defined?

According to the American Association of Mental Retardation (AAMR; 2002), mental retardation is characterized by significantly subaverage intellectual functioning, existing concurrently with limitations in conceptual, social, and practical adaptive skills (e.g., communication, social functioning, activities of daily living). Additionally, the onset of MR must occur by the age of 18 (hence ruling out instances of brain damage that resulted during adulthood to previously nonretarded individuals). The most commonly used measure of intellectual functioning to determine subaverage functioning is an IQ score of 70, two standard deviations below the mean of 100 used by the standard IQ tests (AAMR, 2002). Allowing for measurement error, AAMR raised the ceiling for its recommended IQ criteria to 75 in 1992.

The MR criteria from the American Psychiatric Association's (1994) *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.; *DSM–IV*) are similar to AAMR's, with a recommended ceiling of an IQ score of 70 for mild MR. The Social Security Administration (SSA; 2002) also requires subaverage intellectual functioning along with deficits in adaptive functioning, which must be demonstrated before the age of 22, to qualify for disability benefits for intellectual impairment. If an individual's Full Scale IQ score is below 60, however, that individual auto-

Tomoe Kanaya and Stephen J. Ceci, Department of Human Development, Cornell University; Matthew H. Scullin, Department of Psychology, West Virginia University.

This research was supported by a grant from the Smith Richardson Foundation to Stephen J. Ceci.

Correspondence concerning this article should be addressed to Tomoe Kanaya, Department of Human Development, Cornell University, Ithaca, NY 14853. Email: tk74@cornell.edu

October 2003 • American Psychologist
Copyright 2003 by the American Psychological Association, Inc. 0003-066X/03/$12.00
Vol. 58, No. 10, 778–790   DOI: 10.1037/0003-066X.58.10.778

66-002



**Tomoe Kanaya**

matically qualifies for disability, regardless of adaptive functioning.

Thus, the "official" definitions vary slightly, although all of them stipulate an IQ of 70 or below as being an important criterion for classification as MR. However, whether a child who meets the IQ score criteria for MR is actually labeled MR can vary substantially between school districts and agencies and even between psychologists within an agency or a school district (Reschly, 1981; Reschly & Ward, 1991). Part of this variability is due to the ambiguity in the definition of *limited adaptive skills*. For example, some psychologists may use subjective judgments to determine limited adaptive behaviors and social skills, whereas others may use a specific cutoff score from a standardized measure, such as the Vineland Adaptive Behavior Scales (Sparrow, Balla, & Cicchetti, 1984). Moreover, adaptive behavioral expectations vary by age, so that it is possible to be subaverage during one epoch of life but not during another.

In addition to variance related to differing definitions and changes in adaptive behavior, psychologists vary in the amount of emphasis they actually place on adaptive functioning measures for the diagnosis of MR. The degree to which adaptive functioning assessments may affect MR placement decisions is unclear due to the fact that IQ scores and scores from adaptive behavior measures (such as the Vineland) are positively correlated in the .4 to .6 range (Bruininks, Woodcock, Weatherman, & Hill, 2000; Kamphaus, 1987). Therefore, although most psychologists agree that children need to be classified MR on the basis of deficits in multiple domains (intellectual and adaptive), in reality an MR diagnosis depends heavily on an IQ score.

## Fluctuating IQ Scores Over Time: The Flynn Effect

Using data from 20 nations, Flynn discovered there have been IQ gains ranging from 5 to 25 points in a single generation (Flynn, 1984, 1987, 1998). Flynn's (1984, 1987) analyses have shown that the Flynn effect is stronger on tests of fluid intelligence (intelligence needed for on-the-spot reasoning, abstraction, and problem solving) rather than on tests of crystallized intelligence (intelligence centered around accumulated knowledge such as vocabulary, arithmetic, and general information).

The most dramatic findings of the Flynn effect—a gain of 21 IQ points in 30 years—has been found using the Ravens Progressive Matrices, a test of fluid intelligence (Flynn, 1987). Because the most commonly used IQ tests in the United States (e.g., the Wechsler and Stanford–Binet series) measure both crystallized and fluid intelligence, IQ gains on these tests in the United States are not as strong as the rise seen on the Ravens Progressive Matrices, but they are still dramatic—approximately 0.311 points a year for a total gain of 14.31 points within just 45 years (Flynn, 1984, 1987). More specifically, when comparing the WISC with the WISC–R, Flynn discovered a 10- to 20-point increase in the Wechsler Performance IQs (more heavily loaded on fluid abilities) and a 9-point increase in the Wechsler Verbal IQs (Flynn, 1984, 1987). In other words, an individual tested on the WISC–R must answer more questions correctly, or must answer harder questions, to obtain the same score as on the WISC. Because the Flynn effect takes effect immediately on the introduction of a new IQ test, the norms are most valid at the time the norms are released. Although there is not a consensus among professionals as to why these gains are occurring or what these gains actually mean (e.g., are we really getting smarter?), all are in agreement that the gains occur and that they hold great theoretical and practical importance (for a review, see Neisser, 1998).

Although the nature of increasing IQ scores and the impact of new norms on changes in IQ have been studied, the repercussions such changes may have on American social policies, particularly special education policy, have rarely been examined (but see Flynn, 2000). Most relevant to the aims of the present study, in a reanalysis of 26 studies compiled by Zimmerman and Woo-Sam (1997), Flynn estimated the mean difference in Full Scale IQ scores between the WISC–R and the WISC–III to be 5.3 points (Flynn, 1998). In practical terms, this means that someone who received a score of 105 on the WISC–R would on average receive a score of 100 on the WISC–III. Assuming that this estimated difference in mean scores between the WISC–R and the WISC–III holds true at other points of the IQ distribution, the same IQ cutoff score of 70 that captured the bottom 2.27% (two standard deviations below the mean) in 1974 under the brand new norms of the WISC–R would only capture the bottom 0.94% 17 years later, right before the newly normed WISC–III was introduced in 1991. Therefore, if the 1974 norms were used to score individuals in 1992, fewer than half as many would be

66-003



**Matthew H. Scullin**

considered as having an IQ score below 70, the usual cutoff for diagnosing someone with MR.

A few studies have noted a decline in IQ scores among children classified as MR once the WISC–III replaced the WISC–R. In a study reported in the WISC–III manual, the mean WISC–R Full Scale IQ in a sample of MR children was 8.9 points greater than the mean WISC–III Full Scale IQ (Wechsler, 1991). Given there is far less variability in performance of MR students compared with students who fall within the average IQ range, this 8.9-point difference is actually larger than the MR populations' entire standard deviation of 7.8 points. This general finding within MR samples has been replicated by other researchers, although the exact difference in Full Scale IQ scores between the WISC–R and the WISC–III varies between 5 and 9 points (Bolen, Aichinger, Hall, & Webster, 1995; Slate & Saarnio, 1995; Vance, Maddux, Fuller, & Awadh, 1996). This suggests that the Flynn effect and changing IQ norms not only affect individuals in the average range of the IQ distribution but also individuals with MR, and that the magnitude of the effect may be even larger among MR children than among children at the mean.

As we address in greater detail later, knowing that the Flynn effect exists among individuals evaluated for MR calls to question the use of fixed IQ cutoff scores to determine eligibility for an MR diagnosis. This, in turn, can have a large impact on many U.S. policies, including educational financing, social security disability benefits, eligibility for the death penalty, and occupations within the military. In other words, fluctuations in IQ scores as a result of aging IQ norms being replaced by new, harder norms could have unexpectedly large public policy implications. We briefly describe some of the potential policy implications below so that readers can judge for themselves the importance of this issue.

## Educational Implications: Who Receives MR Services

Although the exact services a child diagnosed with MR receives vary greatly between school districts, some of the more common services offered to MR students include modified regular classroom assignments (usually making the assignments shorter and/or easier) and direct instructions that explicitly teach the skills necessary to complete assignments such as organizing materials for the student or showing the student exactly where the necessary information is in the text (Burns, 2003). For many MR students, special education services may include more extensive educational interventions, such as removal from regular classrooms for all or part of the day to receive instruction from special education specialists, paid aides, and volunteers (Singer, Butler, Palfrey, & Walker, 1986; U.S. Department of Education, 2002). As IQ norms age, fewer students receive MR services, but when a newly normed test is introduced, the number of students eligible for these services will suddenly increase. Although there are positive benefits to receiving individualized MR services, there are also some negative psychosocial consequences associated with the label *mentally retarded* (e.g., Baroff, 1999; Mercer, 1973).

## Financial Implications: The Costs of MR

The federal Individuals With Disabilities Education Act (IDEA) and its predecessor, P.L. 94-142, mandate that individuals with MR receive educational and other services for their disability (U.S. Department of Education, 2002). Consequently, local, state, and federal governments collectively spend billions of dollars on special education, and drastic fluctuations in the number of students eligible for MR programs due to changing test norms could have dramatic financial implications. These financial implications also hold true for individuals who qualify for social security disability benefits based on MR status.

## Legal Implications: The Flynn Effect and the Law—A Matter of Life or Death

Ever since *Buck v. Bell* (1927), in which the Supreme Court upheld eugenics sterilization laws and Justice Oliver Wendell Holmes Jr., writing for the majority, famously stated that "three generations of imbeciles are enough," MR has had a long and complex relationship with the law. Most recently, the Supreme Court ruled in *Atkins v. Virginia* (2002) that the execution of people who are mentally retarded constituted "cruel and unusual punishment" under the Eighth Amendment. Justice Stevens explained that because of their "disabilities in areas of reasoning, judgment, and control of their impulses [the mentally retarded] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct" (p. 1). Therefore, a diagnosis (or nondiagnosis) of MR could, literally, be the difference between life or death for some prison inmates.

66-004



**Stephen J. Ceci**
Photo by Charles Harrington

## Occupational Implications: The Flynn Effect and the Military

All individuals interested in joining military services must take the Armed Services Vocational Aptitude Battery (ASVAB), an eight-subtest, multiaptitude, multiple-choice exam. The ASVAB is looked on as a measure of trainability and a predictor of job performance within the armed forces. Four of these subtests comprise the Armed Forces Qualification Test (AFQT), which bears resemblance to a truncated form of the Wechsler series and is known to be highly *g*-loaded (Ceci, 1996). Two other ASVAB subtests are then added to the AFQT to determine an individual's Military Career Score. It is this score that determines one's eligibility for various military occupations (and their subsequent pay raises and benefits), as most of these occupations require a minimum score (U.S. Department of Defense, 2001). In peacetime, the United States military imposes a limit on the percentage of low-IQ recruits formerly referred to as "Category 4s," who score in the 10th–30th percentile on the AFQT, it accepts. There is a long history documenting the reasons for this limit (Stitch, 1991). Given the similarity between the AFQT and the Wechsler tests as well as the similarity between "Category 4s" and individuals with borderline intellectual functioning, the impact of the Flynn effect on borderline children will have a significant relevance to occupational policy within the military.

## Exploring the Flynn Effect's Impact on MR Diagnoses

In summary, the role of the Flynn effect on MR diagnoses is understudied, yet appears to have important implications for U.S. national policies. Using a database of the longitudinal testing history of 8,944 students from nine geographically and demographically diverse school districts from around the United States, we sought to address several hypotheses about the impact of the Flynn effect and changing IQ norms. We looked specifically at school children tested and in some cases retested for special education programs on the WISC series who fell in the borderline range, encompassing the standard deviation above the typical IQ 70 cutoff for MR services (i.e., IQ 71–85 on the Wechsler series IQ tests), and in the mild MR range, encompassing the standard deviation below and including the IQ 70 cutoff for MR services (i.e., IQ 55–70). Using this dataset, we examined three hypotheses.

### Hypothesis 1: The Size of the Flynn Effect in the Mild MR to Borderline Range Will Be Large Enough to Have a Significant Effect on Placement Decisions

As mentioned in the introduction of this article, several researchers have already noted that MR children scored lower on the WISC–III than on its predecessor, the WISC–R. All of these previously cited studies had relatively small sample sizes and did not study children who fell in the region critical for our hypotheses, namely, individuals who scored just above the 70 cutoff for MR and who were not placed into an MR program. On the basis of the estimates from these other studies, we anticipated that children in our dataset who are just above and below the 70 cutoff point for MR would exhibit a 5–9 point drop in IQ scores when they were retested on the WISC–III, thus resulting in significant elevations in MR diagnoses—despite controlling for actual cognitive ability. We make this expectation explicit in our second hypothesis.

### Hypothesis 2: The Introduction of a Renormed IQ Test Will Strongly Affect Children in the Borderline Range During Their Triennial Reevaluations

Children who score just above 70 typically fall into a gray area in special education programs. Their IQ scores may be considered too high for MR programs but may also be too low for learning disabled (LD) programs. Some children who score just above 70 will be classified as MR because they have had a history of receiving MR services, have poor adaptive behavior, or have the measurement error for their IQ score taken into consideration. Others may receive special education services for behavior disorders, LD, or other reasons. However, by law, all students receiving special education services must be reevaluated at least every three years to determine if they are still eligible for continuing services. Often, a new IQ test is given, and special education placements are changed when deemed necessary. We hypothesized that more children who initially tested above 70 on a WISC–R would be recommended for MR services after being retested on a WISC–III than would be recommended for MR services after being tested and retested on a WISC–R or tested and retested on a WISC–III. On the basis of our initial estimates, we

66-005

expected that the magnitude of this difference would be quite large.

We further hypothesized that because of normal fluctuations in retest scores and cognitive losses by some special education children, a certain percentage of borderline students who initially score above the cutoff score of 70 will see their scores drop below 70 when tested and retested on the same WISC–R norms, but that the percentage of students who will drop below 70 will be much larger when children are originally tested on the WISC–R but retested on the newer WISC–III norms. However, we expected that the percentage of children who are reclassified as MR will be smaller than the percentage of children whose IQ scores drop below 70. This would occur because psychologists will take children's earlier IQ scores and placement decisions into account when making a determination on whether to classify a child as MR or not. Thus, the impact of the Flynn effect will be somewhat mitigated because the psychologist has some discretion over how much weight to give a low test score.

### Hypothesis 3: The Probability of an MR Diagnosis for Borderline Children Will Increase on the Introduction of New IQ Test Norms

Although on theoretical and measurement grounds we were led to this prediction at the outset to this study, we felt that this was our most controversial expectation. We examined this hypothesis by creating IQ score ranges of children who were administered the WISC–R and the WISC–III that reflected a common metric based on our estimate of the size of the Flynn effect in the MR and borderline range. In other words, an IQ range of children who had been administered the WISC–III were paired with an equivalent IQ range of children who had been given the obsolete WISC–R a mere one to three years earlier. In our comparison of greatest interest, we grouped data from the range of children who scored just above the threshold for MR on the WISC–R with the equivalent range of children who scored just below the threshold for MR on the WISC–III. We predicted that in this comparison, children who were tested on the WISC–III will be much more likely to be classified MR than the equivalent IQ range of children who were tested on the WISC–R. As will be seen, testing this hypothesis requires

certain statistical adjustments to equate the children's cognitive ability across IQ test norms.

## Method

### Sample

IQ data from 8,944 school psychologist special education assessments were collected from nine different school districts across the United States representing a diverse sample of geographical regions (Midwest, Southeast, West, South), neighborhood types (rural, urban, suburban), and participants' socioeconomic status. Data included students' gender, age, testing date, IQ scores, test–testing norms used, and special education placement recommendations (17 mutually exclusive categories as well as a dichotomous MR or not MR category). Information regarding evaluation type (e.g., initial evaluation, retest, triennial reevaluation) was obtained for all testings. Students' ages at the time of the most recent evaluation ranged from 6 to 17 years, and targeted testing dates spanned from 1989 to 1995, covering the WISC–R to WISC–III transition. If children were tested multiple times, all IQ test data available in the children's files were collected, including test data from before and after the target test dates. Data were gathered by traveling to each school district and recording all necessary information from each student's psychological testing file. This usually entailed two people working full time for five to seven days to complete the transcriptions for a single school district.

As a result of collecting longitudinal data on children who were tested during the targeted time frame, the dataset includes students who were repeatedly tested, typically for a required triennial reevaluation. Some were repeatedly tested on the same test (e.g., repeatedly tested either on the WISC–R or on the WISC–III), and some were retested on a different test (e.g., initially tested on the WISC–R but then retested on the WISC–III).

Table 1 shows the exact breakdown of WISC–Rs and WISC–IIIs given per year during this time frame. For samples in which we examined test–retest data, analyses were restricted to records in which students scored between plus or minus one standard deviation from the MR cutoff score—that is, between 55 and 85 on their Time 1 WISC series test—and then were subsequently retested on a WISC series test that was administered less than 48 months

**Table 1**
*Number of Students With IQ Scores Between 55 and 85 Tested on the WISC–R and WISC–III Between 1989 and 1995*

| Test type | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|
| WISC–R | 353 (100%) | 484 (100%) | 498 (88%) | 144 (41%) | 47 (17%) | 27 (10%) | 8 (4%) |
| WISC–III | 0 (0%) | 0 (0%) | 70 (12%) | 210 (59%) | 227 (83%) | 238 (90%) | 217 (96%) |
| Total | 353 | 484 | 568 | 354 | 274 | 265 | 225 |

*Note.* WISC–R = Wechsler Intelligence Scale for Children—Revised; WISC–III = Wechsler Intelligence Scale for Children—Third Revision.

66-006

later. For samples in which we examined single test data, analyses were restricted to children who scored between 55 and 85 on a test, in which case one test per child was randomly selected for inclusion. As will be made clear below, the sample sizes vary depending on the type of analyses conducted. Finally, we note that many of the children in our sample were tested for LD, behavior disorder, or other special education services and had IQs above the range we examined in this study.

## Results

### Hypothesis 1: The Size of the Flynn Effect in the Mild MR to Borderline Range

We initially split the analyses into two different ranges to assess whether the Flynn effect had a similar impact for borderline children who scored between 71 and 85 and for mild MR children who scored between 55 and 70. These ranges approximate the second and third standard deviations below the mean IQ score of 100 on the Wechsler series. Table 2 shows the descriptive variables of the borderline children who initially scored between 71 and 85 when they were both tested and retested on the WISC–R (the WR/WR group), tested on the WISC–R and retested on the WISC–III (the WR/W3 group), and tested and retested on the WISC–III (the W3/W3 group). We calculated difference scores ($d$ scores) between Time 2 testings and Time 1 testings and, as expected, found that the one-way analysis of variance (ANOVA) for $d$ scores by WISC group was significant, $F(2, 523) = 27.19, p < .001$, with a priori post hoc comparisons confirming that children in the WR/W3 group had significantly greater magnitude $d$ scores ($M = -4.48$) than either the WR/WR group or the W3/W3 group ($Ms = 1.17$ and $-0.44$, respectively), who also did not significantly differ from each other.

Similar results are shown in Table 3 when we examined mild MR children who initially scored between 55 and 70 on the WISC series tests. Once again, the one-way ANOVA for $d$ scores was significant, $F(2, 214) = 12.5$,

$p < .001$. The planned follow-up comparisons revealed a similar pattern of results with $d$ scores for the WR/W3 group being significantly more negative ($M = -5.32$) than for the WR/WR and W3/W3 groups ($Ms = .12$ and $.81$, respectively), with the WR/WR and W3/W3 groups again not significantly differing from each other. Thus far, the data are in line with our predictions.

To control for some variables known to affect IQ scores, in Table 4 we conducted a regression analysis in which age at Time 1, number of years between initial testing and retesting, and IQ at Time 1 were all included as covariates and the WR/WR group $d$ scores were used as the reference group. WR/WR $d$ scores were used as the reference group because in most of the school districts we visited, special education policies were changed in the mid-1990s so that if a child's IQ had remained stable for a couple of testings, it was no longer considered necessary to continue administering full IQ tests unless a change in placement was being considered. With these covariates, children who were initially tested with the WISC–R and subsequently retested with the newer WISC–III norms (WR/W3 group) dropped 5.6 IQ points when retested. In contrast, children who were tested and retested on the WISC–III (the W3/W3 group) did not differ significantly from children in the WR/WR group. In sum, the all-important WR/W3 IQ difference was precisely along the lines predicted.

In all three groups, IQ scores in the 55–85 range remained relatively stable from testing to retesting considering the extreme restriction of range of the sample, with test–retest correlations ranging only from .72 to .76. This illustrates the point that major differences in group mean scores are not necessarily associated with changes in correlations if rank ordering remains similar.

Thus, on the basis of the means, medians, and regression estimates of the size of the WR/W3 difference for children in the mild MR and borderline groups, it would

**Table 2**
IQ Scores for Children (N = 526) Who Initially Scored Between 71 and 85 When Retested on the Same and Revised WISC Tests

| T1 test to T2 retest | N | M T1 | | M T2 | | M T2–T1 IQ $d$ score | Median T2–T1 IQ $d$ score |
|---|---|---|---|---|---|---|---|
| | | Age (months) | IQ score | Age (months) | IQ score | | |
| WISC–R to WISC–R | 192 | 117.6 (25.0) | 79.0 (4.6) | 151.3 (25.2) | 80.2 (8.9) | 1.2[a] (7.0) | 1.0 |
| WISC–R to WISC–III | 157 | 113.9 (25.7) | 78.4 (4.4) | 148.5 (25.6) | 73.9 (8.8) | -4.5[b] (7.4) | -5.0 |
| WISC–III to WISC–III | 177 | 117.6 (24.8) | 78.5 (4.2) | 150.7 (25.0) | 78.1 (8.4) | -0.4[a] (7.15) | 0.0 |

*Note.* Standard deviations are in parentheses. T1 = Time 1; T2 = Time 2; WISC–R = Wechsler Intelligence Scale for Children—Revised; WISC–III = Wechsler Intelligence Scale for Children—Third Revision.
[a,b] $d$ scores with different subscripts differ from each other at the $\alpha < .05$ level after a Bonferonni correction.

66-007

**Table 3**
IQ Scores for Children (N = 217) Who Initially Scored Between 55 and 70 When Retested on the Same and Revised WISC Tests

| T1 test to T2 retest | N | M T1 | | M T2 | | M T2–T1 IQ d score | Median T2–T1 IQ d score |
|---|---|---|---|---|---|---|---|
| | | Age (months) | IQ score | Age (months) | IQ score | | |
| WISC–R to WISC–R | 81 | 119.3 (24.1) | 64.1 (5.2) | 154.5 (24.6) | 64.2 (8.1) | 0.12[a] (7.4) | 0.0 |
| WISC–R to WISC–III | 53 | 122.7 (27.5) | 64.2 (4.9) | 157.8 (27.9) | 58.9 (7.9) | –5.3[b] (6.8) | –6.0 |
| WISC–III to WISC–III | 83 | 123.0 (25.8) | 63.5 (4.5) | 155.7 (24.5) | 64.3 (8.2) | 0.81[a] (7.8) | 1.0 |

Note. Standard deviations are in parentheses. T1 = Time 1; T2 = Time 2; WISC—R = Wechsler Intelligence Scale for Children—Revised; WISC–III = Wechsler Intelligence Scale for Children—Third Revision.
[a,b] d scores with different subscripts differ from each other at the $\alpha < .05$ level after a Bonferonni correction.

appear that the size of Flynn effect in these groups is very close to Flynn's (1998) estimate of a 5.3-point difference between the average scores of the older WISC–R and the average scores of the newer WISC–III norms. So, our best estimate is that the Flynn effect falls between 5 and 6 IQ points in the mild MR and borderline ranges, almost exactly the same magnitude that Flynn found in the middle of the IQ distribution.

## Hypothesis 2: Changes in MR Classification Because of the Flynn Effect

Figure 1 depicts the percentage of borderline children who initially scored just above the MR cutoff of 70 (between 71 and 85) on a Wechsler series test but who received a recommendation from the psychologist for an MR classification. Initial classification as MR means that the child was recommended to be classified MR by the school psychologist even though the child scored above the cutoff score of 70. The percentage of children receiving an MR classification was consistently around 9% across groups, $\chi^2(2, N = 526) = 0.29$, ns. Retest classification as MR

reflects the percentage of children who were recommended to be classified as MR after being retested. Whereas only 9.6% of WR/WR children and 8.3% of W3/W3 children were classified as MR on retesting, 19.8% of WR/W3 children were classified as MR, $\chi^2(2, N = 526) = 12.16$, $p < .01$, approximately doubling of the percentage of MR recommendations. Hence, in contrast to students who were retested on the same version of the IQ test on which they had been originally tested, being retested on newer, harder WISC–III norms posed a significantly greater likelihood of MR classification for those originally tested with the older WISC–R norms—as predicted.

There is also evidence that psychologists were reluctant to classify everyone who retested under 70 as MR once the WISC–III was introduced. The "Retest Under 70" bars in Figure 1 reflect the actual percentage of children who scored under 70 when retested. Among WR/WR children, only about 13.0% received Full Scale IQ scores of 70 or lower when retested. This contrasts sharply with the 34.4% of WR/W3 children who received scores of 70 or lower when retested. Among W3/W3 children, 20.3% scored below 70 when retested. The difference in counts between groups was highly significant, $\chi^2(2, N = 526) = 23.46, p < .01$. It is unclear whether the increase in the percentage of children who scored below 70 in the W3/W3 group vis-à-vis the WR/WR group was due to the WISC–III being a more difficult test or due to changes in educational policy in the mid-1990s that reduced the number of children who were administered the WISC–III if their IQ had been stable for a couple of prior testings. Overall, our results suggest that psychologists did not immediately classify all students who dropped below 70 as MR. However, the change in test norms did result in a near doubling of the number of children classified as MR for the children in the WR/W3 group. As will be seen in the next section, in which we analyze single test from children, psychologists often did not classify children as MR even when they tested well below 70.

**Table 4**
Summary of Regression Analysis for Variables Predicting IQ Difference Score (N = 743)

| Variable | B | SE B |
|---|---|---|
| Age in months at first testing | –0.02 | .01 |
| Time between testings | –0.05 | .03 |
| IQ at Time 1 | –0.01 | .03 |
| WISC–III test/WISC–III retest | –0.94 | .63 |
| WISC–R test/WISC–III retest | –5.55* | .67 |

Note. $R^2$ = .10. WISC–R test/WISC–R retest is the reference group. WISC–R = Wechsler Intelligence Scale for Children—Revised; WISC–III = Wechsler Intelligence Scale for Children—Third Revision.
* $p < .01$.

66-008

**Figure 1**

Percentage of Children Classified in the Mental Retardation (MR) Range Who Initially Scored Between 71 and 85 on a WISC Series IQ Test When Tested and Retested on the Same Versus Revised WISC Tests



*Note.* Difference for counts classified MR between retest types, $\chi^2(2, N = 526) = 12.16$, $p < .01$; difference for counts of 70 and below versus 71 and above between retest types, $\chi^2(2, N = 526) = 23.46$, $p < .001$. WISC–R = Wechsler Intelligence Scale for Children—Revised; WISC–III = Wechsler Intelligence Scale for Children—Third Revision.

## Hypothesis 3: Impact of the Flynn Effect on Borderline IQ Ranges

For the following analyses, we used a conservative estimate of the size of the Flynn effect from the WISC–R to the WISC–III among children in the mild MR and borderline range—5 IQ points. We examined the impact on children who would have been on the cusp of qualifying for MR services on the older test using a single test per child (thus including children who were tested once and did not receive special education services as well as children who were tested multiple times). In Figure 2, adjacent bars represent 5 IQ point ranges that could be considered equivalent given the Flynn effect (e.g., a range of 71–75 on the WISC–R is equivalent to a range of 66–70 on the WISC–III). We chose to examine IQ in 5-point ranges because if WISC IQ scores fall in a perfect normal distribution, the number of children in 5-point ranges above IQ 60 increases at a nearly geometric rate. For example, although only 0.4% of children would be expected to have IQ scores below 60, 0.6% would be expected to have scores from 60 to 65, 1.3% from 65 to 70, 2.5% from 70 to 75, and 4.3% from 75 to 80. Thus, among all children who have IQ scores of 75 or lower, mathematically more than half of these children would be expected to have IQ scores between 70 and 75 (2.50% of all children would score

70–75, 2.28% would score 70 or lower). As can be seen by the *N*s for Figure 2, the number of children tested in each IQ range does approximate the geometric progression that would be expected given a normal curve. Note that in the case of the WISC–R, a falloff of IQ test administration in Range 3 (IQ 76–80) would be expected because these children typically do not qualify for special education services.

Of greatest interest to us are the children in Range 2 who had IQ scores of 71–75 on the WISC–R and IQ scores of 66–70 on the WISC–III. There is a nearly threefold increase in the percentage of children in this IQ range classified as MR on the WISC–III when compared with the percentage of children who scored in the equivalent range on the WISC–R. As might be expected given our earlier analyses of children who were tested and retested, the percentage of children who tested between 66 and 70 on the WISC–III who were classified MR was smaller than the percentage of children who tested between 66 and 70 on the WISC–R. In the next IQ range of children who scored 71–75 on the WISC–III compared with children who scored 76–80 on the WISC–R, there continued to be a threefold percentage increase of children classified as MR on the WISC–III when compared with the WISC–R (14.8% vs. 4.8%).

66-009

**Figure 2**
*Percentage of Children Classified in the Mental Retardation (MR) Range by 5 IQ-Point Range on the Wechsler Intelligence Scale for Children—Revised (WISC-R) and the Wechsler Intelligence Scale for Children—Third Revision (WISC-III)*



Note.  Ns for Range 1: WISC-R = 52, WISC-III = 67; Ns for Range 2: WISC-R = 90, WISC-III = 95; Ns for Range 3: WISC-R = 127, WISC-III = 169.

It is interesting to note that only 104 out of 214 children who received either a WISC-R or WISC-III score of 70 or below were classified as MR by the psychologist administering the test. Of the 110 children receiving other special education placement recommendations, nearly half (53) were recommended for LD services. This usually occurred when there was a significant discrepancy between the Verbal and Performance subtests of the WISC. For example, a child with a Verbal IQ score of 64 and a Performance IQ score of 79 could obtain a Full Scale IQ score of 69 on the WISC-III. Even though the Full Scale IQ is within the MR range, the psychologist might consider the Full Scale IQ score to be invalid and recommend LD services. LD services were sometimes also recommended for children with Full Scale IQs in the MR range when a child received an IQ score substantially lower than in prior testings that had placed the child into LD services in the first place. Among children not receiving MR or LD recommendations, an additional 26 were not recommended for special education. Fewer than 10 children were in each of the additional categories of behavior disordered, emotionally disturbed, otherwise health impaired, speech services, and nonspecific special education.

In summary, although psychologists compensated (to some extent) for the harder norms of the WISC-III by not making as many MR recommendations for children who scored just under 71 on the WISC-III as they did for children who scored just under 71 on the WISC-R, the harder norms of the WISC-III nonetheless resulted in a marked increase in the number of children eligible for MR services among children who would have scored between 71 and 75 if they had been administered the WISC-R. Because of this, children of equivalent cognitive abilities were diagnosed differently with regards to MR. And, as predicted, the children who were at the cusp of the IQ cutoff score of 70 were most vulnerable to differential diagnoses.

## Discussion

According to most criteria, the diagnosis of mental retardation consists of a subaverage intellect, usually specified as an IQ score of 70 or below, in addition to evidence of limited adaptive life skills and an onset before adulthood. Because of the systematic increase in IQ scores seen throughout the last 80 years (the Flynn effect), there is reason to believe that many students are diagnosed as MR

based on the year in which they are tested and test norms used rather than on their cognitive ability. More specifically, as norms age, fewer children are diagnosed MR as more children's IQ scores rise above the 70-point cutoff. With the introduction of newer norms, suddenly more children score below the 70-point cutoff. As shown in this report, identical levels of cognitive performance on the Wechsler IQ test led to large disparities in MR classification rates.

Despite its obvious policy relevance, this is the first study to investigate the size of the rise in IQ scores within the population of children who score in the mild MR and borderline range. Although past studies have examined students who were already diagnosed MR on the WISC–R, the present study examined how the Flynn effect influences actual diagnoses of children who are being considered for either new or continuing placement in special education programs (i.e., students who both were and were not diagnosed MR). Using a large, geographically and economically diverse sample of students tested for special education, the present study explored the nature of the Flynn effect within the mild MR and borderline IQ population.

When we examined the mean differences in test–retest scores of MR and borderline students who were tested and retested on the same IQ norms (e.g., tested and retested on either the WISC–R or the WISC–III), we found that IQ scores on average changed by around 1 IQ point or less. In contrast, the mean difference in test–retest scores in which individuals were tested initially on the WISC–R and subsequently retested on the WISC–III was 4.5 points for children in the 71–85 IQ range and 5.3 for children in the 55–70 IQ range. Our regression model estimate for the full 55–85 IQ range after we controlled for factors known to influence performance showed a decline of 5.6 points, which is approximately the same difference found among average intellect individuals reported by Flynn (1998). However, given the smaller standard deviations found within individuals in the tails of the distribution, this difference is over two thirds (72%) of the standard deviation of MR IQ scores. Hence, a 5.6-point mean difference reflects a far larger magnitude effect than it might if it were to occur near the middle of the IQ distribution.

We examined whether a higher percentage of borderline children were classified as MR on retesting when they were initially tested on the WISC–R and retested on the WISC–III (the WR/W3 group), compared with children who were tested and retested on the same test (the WR/WR group and the W3/W3 group). We found that nearly 20% of children in the WR/W3 group were classified as MR on retesting. This was more than double that of children in the WR/WR group or the W3/W3 group. More than a third of the children in the WR/W3 group who had originally tested in the borderline range later scored below 70 on retesting, markedly exceeding the percentage of children in the other two groups who tested below 70.

Our results also show the Flynn effect has an impact on which individuals are diagnosed MR and which are not, regardless of their actual cognitive ability. We used the average difference between the WISC–R and WISC–III in our sample of 5 points to examine the extent to which an MR diagnosis was dependent on an IQ score. For this analysis, we equated scores on the earlier WISC–R norms with lower scores on the subsequent, harder WISC–III norms. As hypothesized, we found that students' probability for an MR diagnosis changed significantly when IQ scores were adjusted to a common metric by comparing ranges of scores on the WISC–R and the WISC–III that could be considered equivalent given the Flynn effect. There was a tripling in the percentage of MR placement recommendations for children who fell in the upper reaches of the mild MR range (IQ 66–70) during the first five years of the WISC–III when compared with MR diagnoses for children who fell in the cognitively equivalent WISC–R IQ range (71–75) during the last five years of the WISC–R.

In addition, simple descriptive statistics showed that a majority (88%) of the students in our sample were given the WISC–R in 1991, the first year of the WISC–III. In other words, 88% of the students tested in our sample were given a test that had already begun to be outdated, whereas 12% were given a harder, newly normed test. In 1992, 59% were tested on the WISC–III, whereas 41% were tested, and thereby diagnosed and classified, on its outdated, easier predecessor. This overlap of the use of different tests often occurs because the purchase of revised versions of the test depends on school district budgets. Not all psychologists and school districts replace their IQ tests immediately after a newly normed test is released because IQ tests are expensive (approximately $1,000 per set including a supply of test record forms), and school budgets are often not able to accommodate providing new test kits to all of a school district's testers at the same time. Also, some psychologists and districts may prefer not to use a newly normed test until all of the older test record forms are used up, so it may take many years before an older IQ test is completely phased out of a school system. In our experience, before an old test is completely phased out, different children may be tested on different norms in the same year—even within the same school district. These IQ test scores are still compared with one another, regardless of the fact that different norms were used, and diagnoses are assigned accordingly. Even by 1995, the WISC–R had not been completely phased out of the school systems, which means that some students may effectively have different IQ cutoff scores for MR diagnoses than others.

For all of the preceding reasons, the introduction of a newly normed IQ test can create havoc among MR diagnoses for several years after a new test is introduced, and two children in the same classroom with the same cognitive ability could be diagnosed differently simply because different test norms were used for each child. The present study provides for the first time evidence that this may occur. Parents of children will undoubtedly want assurance that their children are receiving services based on their cognitive needs rather than an IQ score that may be inflated or deflated by virtue of the vicissitudes of the Flynn effect, progressively making scores go up until new norms arrive when they plummet back toward baseline.

66-011

In the introduction we asserted that the impact of the Flynn effect in the lower ranges of IQ appears to be quite significant and may affect many domains. In the following sections, we reexamine these domains and make the numbers more explicit to drive home the pivotal role the Flynn effect has in the educational, social, legal, and military policy domains of the United States.

## Educational Consequences

Each year, nearly two million students are tested for special education services, including MR services. In the 1999–2000 school year, over 600,000 students were receiving MR services (U.S. Department of Education, 2002). Not all of these testings are initial diagnoses, however, as each child receiving special education services must undergo a reevaluation at least every three years to determine if he or she is still eligible for such services. Often, a new IQ test is given during such reevaluations. Therefore, the introduction of new IQ norms could dramatically affect a student's education at the initial diagnosis as well as any subsequent reevaluations.

Some students who would be eligible for MR services under new IQ norms will fail to receive them because the older norms of the IQ test they were given allowed them to score above the cutoff. In addition, students who would not have qualified for MR services had they been tested a year earlier will now do so if they are given an IQ test with newer, harder norms. A very conservative estimate would be that tens of thousands of children tested or retested for MR may be affected by these IQ trends over the course of their school years.

There are also social consequences for children who have been diagnosed as MR. Much research has been conducted on the stigma of classroom labeling (labeling a student at a particular cognitive level such as MR or "low ability") on academic performance and later life outcomes (MacMillan, Gresham, Siperstein, & Bocian, 1996; Mercer, 1973). Many individuals with MR go to great lengths to hide the label and attempt to pass as normal in the community (Mercer, 1973), and many parents are concerned about the negative impact this label will have on their children (Baroff, 1999; Edgerton, 1967). Indeed, the fact that the MR label carries with it an inherent negative stigma is no better illustrated than by the fact that a former label is continually supplanted by newer ones over time. For example, terms such as *imbecile* and *feeble-minded* were considered scientific and acceptable in the first quarter of the 20th century but were replaced after time with successive euphemisms. Even now, some prefer terms such as *general learning disordered*, *developmentally delayed*, or *mentally handicapped* instead of *mentally retarded* or *mentally deficient* to reduce the stigma of the MR label (e.g., Baroff, 1999). Whether escaping the negative consequences of being labeled MR outweighs the benefits of receiving special education MR resources is an interesting empirical question.

## Financial Consequences

The financial implications of the Flynn effect on MR diagnoses go beyond mere total dollars spent but also raise questions about whether these resources are properly allocated. If MR students are underdiagnosed as IQ norms age, then students who would have qualified and benefited from these expensive services under newer norms will be short-changed. The other side of this assertion is that because the new norms are harder and result in lower IQs, one could argue that the resulting increase in diagnoses of MR that accompany these new norms represents an overestimate, with some individuals inappropriately receiving MR services. The present results imply that millions of taxpayers' educational dollars may be misallocated because students are being misdiagnosed every year that an IQ test norm ages.

It is also important to note that many children requiring special education services other than MR have eligibility at least partially determined by an IQ score. LD, for example, is the most common special education diagnosis and is characterized by whether a student's IQ score is sufficiently discrepant from an achievement test score (American Psychiatric Association, 1994). In the case of LD, the introduction of a newly normed test may make it less likely that a child will receive special education because a depressed IQ score will reduce the chance that a significant discrepancy will be found between a child's IQ test score and his or her achievement test scores (e.g., Truscott & Frank, 2001).

The financial impact of a diagnosis or nondiagnosis of MR extends well beyond educational dollars. As mentioned in the introduction, federal social security disability benefits are available for those diagnosed with MR. Those who receive test scores in the borderline range just prior to the introduction of a newly normed IQ test may be denied these benefits.

## Legal Consequences

Our results imply that the year that a capital murder defendant was tested can determine whether she or he is sentenced to die as opposed to life imprisonment. This raises concerns regarding inmates on death row who tested above the 70–75 IQ cutoff on a test that was near the end of its norming cycle (when scores are highly inflated) as well as an inmate who tested in the MR range during the earliest years of a new norm (when the test is hardest). Should the State be permitted to insist on new testing to see if the score can be elevated to avoid the MR diagnosis? It is worth noting that Daryl Renard Atkins (of *Atkins v. Virginia*) was tested on the Wechsler Adult Intelligence Scale—III the year it was released. Because of his low IQ score of 59, he was diagnosed MR without the necessity of having to have poor adaptive behavior under SSA rules and was ultimately found to be ineligible for the death penalty. If he had been tested on an IQ test with older norms, however, it is interesting to speculate on his fate as well as the fate of the Supreme Court decision.

66-012

Although it is unknown exactly how many MR inmates are on death row and, more importantly, how many have been found to have borderline intelligence on the cusp of MR eligibility, there are currently over 3,000 inmates on death row in the 38 states that have the death penalty (24 of them also allow the death penalty for juvenile offenders). According to Amnesty International (2002), 12 out of the 350 people executed since 1990 were known to have IQ scores of 70 or below. Thus, a potentially important implication of the Flynn effect is that some borderline death row inmates or capital murder defendants who were not classified as MR in childhood because they were administered an older version of an IQ test will qualify as MR if they are administered a more recent test. Given the magnitude of the effect (nearly a full standard deviation decrease in IQ is associated with changing norms since the first edition of the WISC was phased out in the early 1970s), the shifts in eligibility for death row inmates could be significant. Once aware of this effect, attorneys on both sides could be expected to "game" the system by ordering reevaluations, locating archival records that coincided with times when the norms would be most favorable to their case, or adjusting IQ scores to compensate for obsolete norms.

### Military Occupational Consequences

For our purposes, the question arises as to whether the Flynn effect is relevant to the AFQT. If its norms become obsolete over time (and given how closely related it is to the Wechsler tests, there is every reason to believe they do), then similar issues would apply to the selection of recruits and their occupations. Specifically, depending on the norms used, a recruit might be eligible or not for military service, and if deemed eligible to enlist whether they will be permitted to enter certain occupations within the armed services and be availed a particular level of pay. This is especially true of those individuals who score in the borderline region, just above or below the cutoff for selection or career placement. Thus, the year that one is tested within AFQT's norming cycle could affect who gets enlisted, selected for training, or deemed to be eligible for certain ranks.

## Caveats and Conclusions

In closing, we bring to readers' attention some strengths and weaknesses of the present analyses. As a result of the fairly large sample size of the present study, we were able to systematically estimate the size of the Flynn effect among mild MR and borderline individuals using both initial testings and later reevaluations. As previously mentioned, Flynn himself did not include the MR (or the gifted) in his large, systematic analyses, and all of the published research done on MR individuals mentioned in the introduction (e.g., Bolen et al., 1995; Slate & Saarnio, 1995; Vance et al., 1996) has used comparatively small sample sizes or solely used children who were already classified as MR as opposed to those who were not. In addition, our data represent a wide array of geographic locations, neighborhood compositions, and average socioeconomic status,

making our results more generalizable than results gathered from previous research.

Against these strengths, however, we frequently only had access to the psychologists' recommendations for each student's placement. Although in most cases psychologists' recommendations are congruent with the final placement recommendations for a student, at times the placement committee may override the psychologist's recommendation or parents or guardians may place pressure onto the committee so that their child does or does not receive services. Such instances, however, occur rarely and would not change the overall trends found within our analyses. In most court cases, such as in *Atkins v. Virginia*, or in a clinical setting, a psychologist's recommendation is sufficient.

Finally, we do not know whether these trends in MR diagnoses are due solely to the Flynn effect and changing IQ norms as opposed to changing special education policies due to amendments in IDEA, funding fluctuations, or other cohort effects. Notwithstanding this caveat, however, the patterns that were found here are exactly what one would predict assuming a yo-yo trend in IQ scores. Fortunately, regardless of these issues, the actual IQ score differences that were observed are unaffected by any of the above potential variables.

Clearly, the main conclusion that can be drawn from these results is that caution should be used when basing important financial, social, or legal decisions on an IQ score. Perhaps the most important times to be particularly cautious are when a test is either at the beginning or at the tail end of its norming cycle. Although test scores are most valid at the beginning of a norming cycle, they run the greatest risk of being compared to highly inflated scores from the waning years of the previous norming cycle. Of course, a score is least valid when taken from an IQ test at the tail end of its norming cycle. These cautions are especially germane when comparing scores between the same tests at different points of the norming cycle (e.g., comparing an individual tested on the WISC–R in 1972 with another individual tested on the WISC–R in 1980). Nowhere are the consequences of IQ score fluctuations due to the Flynn effect more critical than in the determination of whether a death row inmate (or a capital murder defendant) can be considered mentally retarded. There are approximately 3,525 convicts awaiting execution (NAACP Legal Defense and Educational Fund, 2003). With as many as 10% testing in the MR range and many others in the borderline range, psychologists and other practitioners involved in forensic evaluations must exhibit the highest standard and duty of care.

It may also be important to consider the differential impact of the Flynn effect on African Americans facing the death penalty. Although African Americans constitute 12.8% of the population of the United States, they make up 43% of the inmates on death row (Kane, 2003) and 35% of all executed inmates (Death Penalty Information Center, 2003). In addition, African Americans are overrepresented in special education programs (U.S. Department of Education, 2002). Because African Americans score on average

66-013

around 10–15 points lower on IQ tests than Whites (see Jencks & Phillips, 1998, for a review), the percentage of African Americans who fall in the borderline and mild MR IQ range is higher than the percentage of Whites who fall within this range.

Flynn (2000) suggested that a team of qualified psychologists gather a representative sample of MR children based on behavioral criteria and renorm IQ tests every seven years. Although this is a sensible recommendation for the manufacturers of these tests, our concern is more for policymakers and practitioners. Specifically, when psychologists are asked whether someone is MR on the basis of his or her IQ scores (even assuming deficits in adaptive behavior), it may not be sufficient to simply look to see whether the IQ score is below some cutoff point.

## REFERENCES

American Association of Mental Retardation. (2002). *Mental retardation: Definition, classification, and systems of supports* (10th ed.). Annapolis, MD: Author.

American Psychiatric Association. (1994). *Diagnostic and statistic manual of mental disorders* (4th ed.). Washington, DC: Author.

Amnesty International. (2002). *US Supreme Court decision in Atkins vs. Virginia to bring US in line with international standards of decency.* Retrieved August 8, 2002, from http://www.amnestyusa.org/news/2002/usa06202002.html

Atkins v. Virginia, 534 U.S. 1122 (2002).

Baroff, G. S. (1999). General learning disorder: A new designation for mental retardation. *Mental Retardation, 37,* 68–70.

Bolen, L. M., Aichinger, K. S., Hall, C. W., & Webster, R. E. (1995). A comparison of the performance of cognitively disabled children on the WISC–R and WISC–III. *Journal of Clinical Psychology, 51,* 89–94.

Bruininks, R. H., Woodcock, R. W., Weatherman, R. F., & Hill, B. K. (2000). *Scales of independent behavior—revised.* Itasca, IL: Riverside.

Buck v. Bell, 274 U.S. 200 (1927).

Burns, E. (2003). *A handbook for supplementary aids and services: A best practice and IDEA guide "To Enable Children With Disabilities to be Educated With Nondisabled Children to the Maximum Extent Appropriate."* Springfield, IL: Charles C Thomas.

Ceci, S. J. (1996). *On intelligence: A bioecological treatise on intellectual development.* Cambridge, MA: Harvard University Press.

Death Penalty Information Center. (2003). *Race of death row inmates.* Retrieved June 8, 2003, from http://www.deathpenaltyinfo.org/article.php?scid=5&did=184#inmaterace

Edgerton, R. B. (1967). *The cloak of competence: Stigma in the lives of the mentally retarded.* Berkeley: University of California Press.

Flynn, J. R. (1984). The mean IQ of Americans: Massive gains 1932 to 1978. *Psychological Bulletin, 95,* 29–51.

Flynn, J. R. (1987). Massive IQ gains in 14 nations: What IQ tests really measure. *Psychological Bulletin, 101,* 171–191.

Flynn, J. R. (1998). WAIS–III and WISC–III: IQ gains in the United States from 1972 to 1995: How to compensate for obsolete norms. *Perceptual and Motor Skills, 86,* 1231–1239.

Flynn, J. R. (2000). The hidden history of IQ and special education: Can the problems be solved? *Psychology, Public Policy, and Law, 6,* 191–198.

Jencks, C., & Phillips, M. (1998). *The Black–White test score gap.* Washington, DC: Brookings Institution Press.

Kamphaus, R. W. (1987). Conceptual and psychometric issues in the assessment of adaptive behavior. *Journal of Special Education, 21,* 27–35.

Kane, H. (2003). Straight talk about IQ and the death penalty. *Ethics & Behavior, 13,* 27–33.

MacMillan, D. L., Gresham, F. M., Siperstein, G. N., & Bocian, K. (1996). The labyrinth of IDEA: School decisions on referred students with subaverage general intelligence. *American Journal on Mental Retardation, 100,* 161–174.

Mercer, J. R. (1973). *Labeling the mentally retarded.* Berkeley: University of California Press.

NAACP Legal Defense and Education Fund. (2003). *Death row USA, April 1.* Washington, DC: Author.

Neisser, U. (Ed.) (1998). *The rising curve: Long-term gains in IQ and related measures.* Washington, DC: American Psychological Association.

Reschly, D. J. (1981). Psychological testing in educational classification and placement. *American Psychologist, 36,* 1094–1102.

Reschly, D. J., & Ward, S. M. (1991). Use of adaptive behavior measures and overrepresentation of Black students in programs for students with mild mental retardation. *American Journal of Mental Retardation, 96,* 257–268.

Singer, J. D., Butler, J. A., Palfrey, J. S., & Walker, D. K. (1986). Characteristics of special education placements: Findings from probability samples in five metropolitan school districts. *Journal of Special Education, 20,* 319–337.

Slate, J. R., & Saarnio, D. A. (1995). Differences between WISC–III and WISC–R IQs: A preliminary investigation. *Journal of Psychoeducational Assessment, 13,* 340–346.

Social Security Administration. (2002). *Disability evaluation under Social Security.* Washington, DC: U.S. Government Printing Office.

Sparrow, S. S., Balla, D. A., & Cicchetti, D. (1984). *Vineland Adaptive Behavior Scales.* Circle Pines, MN: AGS Publishing.

Stitch, T. G. (1991). Military testing and public policy: Selected studies of lower aptitude personnel. In B. R. Clifford & L. Wing (Eds.), *Test policy in defense: Lessons from the military for education, training, and employment* (pp. 1–76). Boston: Kluwer.

Truscott, S. D., & Frank, A. J. (2001). Does the Flynn effect affect IQ scores of students classified as LD? *Journal of School Psychology, 39,* 319–334.

U.S. Department of Defense. (2001). *Military careers: A guide to military occupations and selected military career paths 1998–2001.* Washington, DC: Author.

U.S. Department of Education. (2002). *Twenty-third annual report to Congress on the implementation of the Individuals With Disabilities Education Act.* Washington, DC: Author.

Vance, H., Maddux, C. D., Fuller, G. B., & Awadh, A. M. (1996). A longitudinal comparison of WISC–III and WISC–R scores of special education students. *Psychology in the Schools, 33,* 113–118.

Wechsler, D. (1974). *The Wechsler Intelligence Scale for Children—Revised manual.* New York: Psychological Corporation.

Wechsler, D. (1991). *The Wechsler Intelligence Scale for Children—III manual.* New York: Psychological Corporation.

Zimmerman, I. L., & Woo-Sam, J. M. (1997). Review of the criterion-related validity of the WISC–III: The first five years. *Perceptual and Motor Skills, 85,* 531–546.

66-014