# EXHIBIT 68

# American Bar Association
# Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases



## Revised Edition
## February 2003

68-001

*Copyright © 2003 American Bar Association*

All rights reserved.  The materials herein may be reproduced, in whole or in part, provided that such use is for informational, non-commercial purposes only and any copy of the materials or portion thereof acknowledges original publication by the American Bar Association and includes the title of the publication, the name of the author, and the legend "Copyright 2003 American Bar Association. Reprinted by permission." Requests to reproduce materials in any other manner should be addressed to: Copyrights & Contracts Department, American Bar Association, 750 N. Lake Shore Drive, Chicago, IL 60611; Phone: 312-988-6102; FAX: 312-988-6030; E-mail: copyright@abanet.org.

*Library of Congress Control Number: 2003104861*
*ISBN 1-59031-236-8*

The commentary contained herein does not necessarily represent the official position of the American Bar Association. Only the text of the black-letter guidelines has been formally approved by the American Bar Association House of Delegates as official policy.  The commentary, though unofficial, serves as a useful explanation of the black-letter guidelines.

Joint Project of the
American Bar Association
Standing Committee on Legal Aid and Indigent Defendants
Chicago, Illinois
www.abalegalservices.org

And the
American Bar Association
Special Committee on Death Penalty Representation
Washington, D.C.
www.abanet.org/deathpenalty


Printed in the United States of America

# ACKNOWLEDGEMENTS

The American Bar Association gratefully acknowledges the assistance of the members of the Advisory Committee and others who contributed valuable insight and expertise to this endeavor: Barry Alberts, private practitioner, Schiff Hardin & Waite, Chicago, Illinois (Representative from ABA Section of Litigation); Sylvia Bacon, Judge (Retired), Superior Court of the District of Columbia, Washington, D.C. (Representative from ABA Criminal Justice Section); Stephen B. Bright, Director, Southern Center for Human Rights, Atlanta, Georgia (Representative from National Association of Criminal Defense Lawyers); David I. Bruck, private practitioner, Columbia, South Carolina (Representative from Federal Death Penalty Resource Counsel); Mardi Crawford, Staff Attorney, New York State Defenders Association, Albany, New York; Lawrence J. Fox, private practitioner, Drinker Biddle & Reath LLP, Philadelphia, Pennsylvania (Chair, ABA Special Committee on Death Penalty Representation); Stephen K. Harper, Co-coordinator, Capital Litigation Unit, Miami-Dade County Public Defender's Office, Miami, Florida (Representative from National Legal Aid and Defender Association); Randy Hertz, Professor of Law, New York University School of Law, New York, New York; Henderson Hill, private practitioner, Ferguson, Stein, Chambers, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, North Carolina (Representative from ABA Special Committee on Death Penalty Representation); Denise LeBoeuf, Director, Capital Post-Conviction Project of Louisiana, New Orleans, Louisiana; Norman Lefstein, Professor of Law and Dean Emeritus, Indiana University School of Law, Indianapolis, Indiana; Margaret Love, Of Counsel, Asbill Moffitt & Boss, Chartered, Washington, D.C.; Jill Miller, Forensic Social Worker, Madison, Wisconsin;  L. Jonathan Ross, private practitioner, Wiggin & Nourie, P.A., Manchester, New Hampshire (Chair, ABA Standing Committee on Legal Aid and Indigent Defendants); Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; Randolph Stone, Professor of Law, University of Chicago School of Law, Chicago, Illinois (Representative from ABA Standing Committee on Legal Aid and Indigent Defendants); Ronald J. Tabak, private practitioner, Skadden, Arps, Slate, Megher & Flom LLP, New York, New York (Representative from ABA Section of Individual Rights and Responsibilities); Scott Wallace, Director, Defender Legal Services, National Legal Aid and Defender Association, Washington, D.C.; and Denise Young, private practitioner, Tucson, Arizona (Representative from Habeas Assistance and Training Project).

The following ABA staff and ABA entities participated in this project:  Terry Brooks; Rebecca Coffee; Shubhangi Deoras; Judith Gallant; Robin Maher; Melanie Mays; Elisabeth Semel; the Association of the Bar of the City of New York; Criminal Justice Section; the Special Committee on Death Penalty Representation; the Section of Individual Rights and Responsibilities; the Standing Committee on Legal Aid and Indigent Defendants; the Section of Litigation; and the Senior Lawyers Division.

Finally, the ABA thanks Raoul Schoenemann, Chris Spaulding, and Janice Bergmann, who served as consultants to this project, and expresses its special appreciation to the Reporter, Eric M. Freedman, Professor of Law, Hofstra University School of Law, Hempstead, New York.

68-003

# INTRODUCTION

This revised edition of the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* is the product of a two-year long drafting effort. In April 2001, the ABA Standing Committee on Legal Aid and Indigent Defendants and the ABA Special Committee on Death Penalty Representation jointly sponsored the ABA Death Penalty Guidelines Revision Project to update the Guidelines, which were originally adopted by the ABA House of Delegates in 1989. An Advisory Committee of experts was recruited to review and identify necessary revisions, including representatives from the following ABA and outside entities: ABA Criminal Justice Section; ABA Section of Litigation; ABA Section on Individual Rights and Responsibilities; ABA Standing Committee on Legal Aid and Indigent Defendants; ABA Special Committee on Death Penalty Representation; National Association of Criminal Defense Lawyers; National Legal Aid and Defender Association; Federal Death Penalty Resource Counsel; Habeas Assistance and Training Counsel; and State Capital Defenders Association.

Expert capital litigators were retained as consultants to the ABA Death Penalty Guidelines Revision Project to incorporate the decisions of the Advisory Committee into preliminary drafts of revisions. Drafts were considered by Advisory Committee members during several day-long meetings in Washington, D.C. as well as follow-up discussions. The final working draft of the revisions was approved by the ABA Standing Committee on Legal Aid and Indigent Defendants and the ABA Special Committee on Death Penalty Representation. The ABA House of Delegates approved the revised edition of the Guidelines on February 10, 2003.

The final product, this revised edition of the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, is the result of an extensive and conscientious drafting and review process by experts in the field of death penalty litigation. The revised edition provides comprehensive, up-to-date guidance for professionals who work in this specialized and demanding field and helps to ensure effective assistance of counsel for all persons charged with or convicted of capital crimes.

68-004

# TABLE OF CONTENTS

Guideline  1.1          Objective and Scope of Guidelines ............................................................. 1

Guideline  2.1          Adoption and Implementation of a Plan to Provide High Quality Legal

                                 Representation in Death Penalty Cases .................................................... 18

Guideline  3.1          Designation of a Responsible Agency ....................................................... 22

Guideline  4.1          The Defense Team and Supporting  Services ........................................... 28

Guideline  5.1          Qualifications of Defense Counsel ............................................................ 35

Guideline  6.1          Workload ...................................................................................................... 38

Guideline  7.1          Monitoring; Removal................................................................................... 42

Guideline  8.1          Training......................................................................................................... 46

Guideline  9.1          Funding and Compensation ....................................................................... 49

Guideline  10.1         Establishment of Performance Standards ................................................ 55

Guideline  10.2         Applicability of Performance Standards ................................................... 58

Guideline  10.3         Obligations of Counsel Respecting Workload.......................................... 61

Guideline  10.4         The Defense Team ....................................................................................... 63

Guideline  10.5         Relationship with the Client....................................................................... 68

Guideline  10.6         Additional Obligations of Counsel Representing a Foreign National ... 73

Guideline  10.7         Investigation ................................................................................................ 76

Guideline  10.8         The Duty to Assert Legal Claims ............................................................... 86

Guideline  10.9.1       The Duty to Seek an Agreed-Upon Disposition....................................... 91

Guideline  10.9.2       Entry of a Plea of Guilty............................................................................. 97

Guideline  10.10.1      Trial Preparation Overall ........................................................................... 99

Guideline  10.10.2      Voir Dire and Jury Selection.................................................................... 100

Guideline  10.11        The Defense Case Concerning Penalty.................................................... 104

Guideline  10.12        The Official Presentence Report.............................................................. 117

Guideline  10.13        The Duty to Facilitate the Work of Successor Counsel ......................... 119

Guideline  10.14        Duties of Trial Counsel After Conviction .............................................. 121

Guideline  10.15.1      Duties of Post-Conviction Counsel ......................................................... 123

Guideline  10.15.2      Duties of Clemency Counsel.................................................................... 130

68-005

## Guideline 1.1        Objective and Scope of Guidelines

**A.        The objective of these Guidelines is to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction.**

**B.        These Guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, post-conviction review, clemency proceedings, and any connected litigation.**

*Definitional Notes*

Throughout these Guidelines:

1.        As in the first edition, "should" is used as a mandatory term.

2.        By "jurisdiction" is meant the government under whose legal authority the death sentence is to be imposed. Most commonly, this will be a state (as opposed to, *e.g.*, a county) or the federal government as a whole. The term also includes the military and any other relevant unit of government (*e.g.*, Commonwealth, Territory). Where a federal judicial district or circuit is meant, the Commentary will so state.

3.        The terms "counsel," "attorney," and "lawyer" apply to all attorneys, whether appointed, retained, acting *pro bono*, or employed by any defender organization (*e.g.*, federal or state public defenders offices, resource centers), who act on behalf of the defendant in a capital case. When modified by "private," these terms apply to both *pro bono* and retained attorneys.

4.        The term "custody" is used in the inclusive sense of *Hensley v. Municipal Court*, 411 U.S. 345, 350-51 (1973).

5.        The term "post-conviction" is a general one, including (a) all stages of direct appeal within the jurisdiction and certiorari (b) all stages of state collateral review proceedings (however denominated under state law) and certiorari, (c) all stages of federal collateral review proceedings, however denominated (ordinarily petitions for writs of habeas corpus or motions pursuant to 28 U.S.C. § 2255, but including all applications of similar purport, *e.g.*, for writ of error coram nobis), and including all applications for action by the Courts of Appeals or the United States Supreme Court (commonly certiorari, but also, *e.g.*, applications for original writs of habeas corpus, applications for certificates of probable cause), all applications for interlocutory relief (*e.g.*, stay of execution, appointment of counsel) in connection with any of the foregoing. If a particular subcategory of post-conviction proceeding is meant, the language of the relevant Guideline or Commentary will so state.

6.        The terms "defendant," "petitioner," "inmate," "accused" and "client" are used interchangeably.

68-006

7.      The terms "capital case" and "death penalty case" are used interchangeably.

8.      The terms "defender organization," "Independent Authority," and "Responsible Agency" are defined in Guideline 3.1 and accompanying Commentary

9.      The term "Legal Representation Plan" is defined in Guideline 2.1.

***History of Guideline***

The Commentary to the original edition of this Guideline stated that it was designed to express existing "practice norms and constitutional requirements." This thought has been moved to the black letter in order to emphasize that these Guidelines are not aspirational. Instead, they embody the current consensus about what is required to provide effective defense representation in capital cases.

The first edition of this Guideline stated that the objective in providing counsel in death penalty cases should be to ensure the provision of "quality legal representation." The language has been amended to call for "high quality legal representation" to emphasize that, because of the extraordinary complexity and demands of capital cases, a significantly greater degree of skill and experience on the part of defense counsel is required than in a noncapital case.

The Guidelines formerly covered only "defendants eligible for appointment of counsel." Their scope has been revised for this edition to cover "all persons facing the possible imposition or execution of a death sentence." The purpose of the change is to make clear that the obligations of these Guidelines are applicable in all capital cases, including those in which counsel is retained or providing representation on a *pro bono* basis. The definition of "counsel" reflects this change.

The use of the term "jurisdiction" as now defined has the effect of broadening the range of proceedings covered. In accordance with current ABA policy, the Guidelines now apply to military proceedings, whether by way of court martial, military commission or tribunal, or otherwise.

In accordance with the same policy, the words "from the moment the client is taken into custody" have been added to make explicit that these Guidelines also apply to circumstances in which an uncharged prisoner who might face the death penalty is denied access to counsel seeking to act on his or her behalf (*e.g.*, by the federal government invoking national security, or by state authorities exceeding constitutional limitations). This language replaces phraseology in the former Guidelines which made them applicable to "cases in which the death penalty is sought." The period between an arrest or detention and the prosecutor's declaration of intent to seek the death penalty is often critically important. In addition to enabling counsel to counsel his or her client and to obtain information regarding guilt that may later become unavailable, effective advocacy by defense counsel during this period may persuade the prosecution not to seek the death penalty. Thus, it is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible – well before the prosecution has actually determined that the death penalty will be sought.

These Guidelines, therefore, apply in any circumstance in which a detainee of the government may face a possible death sentence, regardless of whether formal legal proceedings have been commenced or the prosecution has affirmatively indicated that the death penalty will be

68-007

sought.  The case remains subject to these Guidelines until the imposition of the death penalty is no longer a legal possibility.  In addition, as more fully described in the Commentary, these Guidelines also recognize that capital defense counsel may be required to pursue related litigation on the client's behalf outside the confines of the criminal prosecution itself.

### *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.2(c) & cmt. ("Role of Defense Counsel in Capital Cases"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.1 (3d ed. 1992) ("Objective").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.2 cmt. (3d ed. 1992) ("Capital Cases").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-6.1 (3d ed. 1992) ("Initial Provision of Counsel").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-6.2 (3d ed. 1992) ("Duration of Representation").

ABA, House of Delegates Resolution 8C (adopted Feb. 5, 2002)

### *Commentary*

Introduction

In 1932, Mr. Justice Sutherland, writing for the United States Supreme Court in *Powell v. Alabama*, a death penalty case, acknowledged that a person facing criminal charges "requires the guiding hand of counsel at every step in the proceedings against him."[1]

More than seventy years later, death penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases.[2]

The quality of counsel's "guiding hand" in modern capital cases is crucial to ensuring a reliable determination of guilt and the imposition of an appropriate sentence.  Today, it is

---

[1]    Powell v. Alabama, 287 U.S. 45, 69 (1932).

[2]    *See* McFarland v. Scott, 512 U.S. 849, 855 (1994) (noting the uniqueness and complexity of death penalty jurisprudence); s*ee also* Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299 (1983); Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 MERCER L. REV. 695 (1991); Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. ILL. L. REV. 323 (1993).

---

68-008

universally accepted that the responsibilities of defense counsel in a death penalty case are uniquely demanding, both in the highly specialized legal knowledge that counsel must possess and in the advocacy skills he or she must master.  At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules.  Counsel must be able to develop strategies applying existing rules in the pressure-filled environment of high-stakes, complex litigation, as well as anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment.

As one writer has explained:

> Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution.  The responsibilities thrust upon defense counsel in a capital case carry with them psychological and emotional pressures unknown elsewhere in the law.  In addition, defending a capital case is an intellectually rigorous enterprise, requiring command of the rules unique to capital litigation and constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law.[3]

Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make "extraordinary efforts on behalf of the accused."[4]   As discussed *infra* in the text accompanying notes 228-29, these efforts may need to include litigation or administrative advocacy outside the confines of the capital case itself (*e.g.*, pursuit of information through a state open records law,[5] administrative proceedings to obtain or correct a military record, a collateral attack to invalidate a predicate conviction,[6] litigation of a systemic challenge to the jury selection procedures of a jurisdiction or district,[7] or to a jurisdiction's clemency process).[8]

---

[3]    Douglas W. Vick, *Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences*, 43 BUFF. L. REV. 329, 357-58 (1995) (footnote omitted).

[4]    *See* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION , Standard 4-1.2(c), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

[5]    *See, e.g.,* McCleskey v. Zant, 499 U.S. 467, 526  (1991)  (Marshall, J., dissenting) (involving successor federal habeas corpus petition based on documents released as a result of new interpretation of Georgia Open Records Act by Georgia Supreme Court).

[6]    For example, the defendant prevailed in Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (disallowing use of prior conviction used in aggravation) only after the same *pro bono* counsel successfully litigated People v. Johnson, 69 N.Y.2d 339, 342 (1987) (vacating that conviction). *See infra* text accompanying note 21.

[7]    *Cf.*  Amadeo v.  Zant, 486 U.S. 214, 219 (1988) (involving federal habeas corpus petitioner who succeeded on jury discrimination claim where factual predicate was discovered in independent litigation against the county).

[8]    *See infra* text accompanying notes 63-64.

---

Structure of the Guidelines

This Commentary provides a general overview of the areas in which counsel must be prepared to perform effectively and be given appropriate governmental support in doing so.  These areas are addressed more specifically in subsequent Guidelines and commentaries.  While there is some inevitable overlap, Guidelines 1.1–10.1 contain primarily principles and policies that should guide jurisdictions in creating a system for the delivery of defense services in capital cases, and Guidelines 10.2-10.15.2 contain primarily performance standards defining the duties of counsel handling those cases.

Representation at Trial

Trial attorneys in death penalty cases must be able to apply sophisticated jury selection techniques, including rehabilitation of venire members who initially state opposition to the death penalty and demonstration of bias on the part of prospective jurors who will automatically vote to impose the death penalty if the defendant is convicted on the capital charge.[9]  Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination.[10]

An attorney representing the accused in a death penalty case must fully investigate the relevant facts.  Because counsel faces what are effectively two different trials – one regarding whether the defendant is guilty of a capital crime, and the other concerning whether the defendant should be sentenced to death[11] – providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation.  Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty.[12]  Counsel must

---

[9]     *See infra* Guideline 10.10.2.

[10]    *See infra* text accompanying notes 88-97.

[11]    *See* Bullington v. Missouri, 451 U.S. 430, 438-446 (1981); Comm. on Civ. Rts., Ass'n of the Bar of the City of N.Y., *Legislative Modification of Federal Habeas Corpus in Capital Cases*, 44  REC. ASS'N OF THE BAR OF CITY OF N.Y. 848, 854 (1989) [hereinafter *Legislative Modification*] ("[For a lawyer], taking such a case means making a commitment to the full legal and factual evaluation of two very different proceedings (guilt and sentencing) in circumstances where the client is likely to be the subject of intense public hostility, where the state has devoted maximum efforts to the prosecution, and where one must endure the draining emotional effects of one's personal responsibility for the outcome.")

[12]    *See infra* text accompanying notes 159-63; *see also* Williams v. Taylor, 529 U.S. 362, 395-396 (2000) (notwithstanding fact that trial counsel "competently handled the guilt phase of the trial," counsel's failure to begin to prepare for sentencing phase until a week before trial fell below professional standards, and counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *id.* at 415 (O'Connor, J., concurring) ("counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances" amounted to ineffective assistance of counsel); ABA STANDARDS FOR CRIMINAL JUSTICE: Standard 4-4.1(a), *in* ABA STANDARDS FOR CRIMINAL JUSTICE:

---

68-010

promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case.[13]  Comprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence,[14] to persuade the prosecution to forego seeking a death sentence at trial, or to uncover facts that will make the client legally ineligible for the death penalty.[15]  At the same time, counsel must consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress.[16]

With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime, and all evidence – whether testimonial, forensic, or otherwise – purporting to inculpate the client. To assume the accuracy of whatever information the client may initially offer or the prosecutor may choose or be compelled to disclose is to render ineffective assistance of counsel. The defense lawyer's obligation includes not only finding, interviewing, and scrutinizing the backgrounds of potential prosecution witnesses, but also searching for any other potential witnesses who might challenge the prosecution's version of events, and subjecting all forensic evidence to rigorous independent scrutiny. Further, notwithstanding the prosecution's burden of proof on the capital charge, defense counsel may need to investigate possible affirmative defenses – ranging from absolute defenses to liability (*e.g.*, self-defense or insanity) to partial defenses that might bar a death sentence (*e.g.*, guilt of a lesser-included offense).  In addition to investigating the alleged offense, counsel must also thoroughly investigate all events surrounding the arrest, particularly if the prosecution intends to introduce evidence obtained pursuant to alleged waivers by the defendant (*e.g.*, inculpatory statements or items recovered in searches of the accused's home).

Moreover, trial counsel must coordinate and integrate the presentation during the guilt phase of the trial with the projected strategy for seeking a non-death sentence at the penalty phase.[17]

---

PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . .  The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.")

[13]     *See infra* Guideline 10.4(C) and accompanying Commentary.

[14]     *See infra* Guidelines 10.9.1-2

[15]     *See, e.g.*, Atkins v. Virginia, 122 S. Ct. 2242 (2002) (mental retardation).

[16]     *See infra* Guideline 10.5 and accompanying Commentary.

[17]     *See infra* Guideline 10.10.1 and accompanying Commentary.  *See also* Stephen B. Bright, *Developing Themes in Closing Argument and Elsewhere: Lessons from Capital Cases*, LITIG., Fall 2000, at 40; Lyon, *supra* note 2, at 708-11; Mary Ann Tally, *Integrating Theories for Capital Trials: Developing the Theory of Life*, THE CHAMPION, Nov. 1998, at 34.

---

68-011

At that phase, defense counsel must both rebut the prosecution's case in favor of the death penalty and affirmatively present the best possible case in favor of a sentence other than death.[18]

If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence. Defense counsel accordingly must comprehensively investigate – together with the defense investigator, a mitigation specialist, and other members of the defense team – the defendant's behavior and the circumstances of the conviction.[19] Only then can counsel protect the accused's Fourteenth Amendment right to deny or rebut factual allegations made by the prosecution in support of a death sentence,[20] and the client's Eighth Amendment right not to be sentenced to death based on prior convictions obtained in violation of his constitutional rights.[21]

If uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it as an integral part of preparing for the penalty phase.[22]

Along with preparing to counter the prosecution's case for the death penalty, defense counsel must develop an affirmative case for sparing the defendant's life.[23] A capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death.[24] This Eighth Amendment right to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present and insist on the consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'"[25] Nor will the presentation be persuasive unless it (a) is consistent with that made by the defense at the guilt phase and (b) links

---

[18]    *See infra* Guideline 10.11 and accompanying Commentary.

[19]    *See infra* text accompanying note 298.

[20]    *See, e.g.*, Simmons v. South Carolina, 512 U.S. 154, 160-61 (1994); Gardner v. Florida, 430 U.S. 349, 362 (1977).

[21]    *See* Johnson v. Mississippi, 486 U.S. 578, 587 (1988). Counsel's obligation to prevent the prosecution from using unconstitutionally obtained prior convictions in support of a death sentence may well require counsel to litigate collateral challenges to such prior convictions in the jurisdictions or Districts where those convictions were obtained. *See, e.g.*, Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 402-04 (2001).

[22]    *See infra* text accompanying notes 299-302.

[23]    *See infra* text accompanying notes 275-89.

[24]    *See* Eddings v. Oklahoma, 455 U.S. 104, 116 (1982); Lockett v. Ohio, 438 U.S. 586, 602-03 (1978) (plurality opinion).

[25]    Louis D. Bilionis & Richard A. Rosen, *Lawyers, Arbitrariness, and the Eighth Amendment*, 75 TEX. L. REV. 1301, 1316-17 (1997) (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, & Stevens, JJ.)).

68-012

the client's behavior to the evidence offered in mitigation.[26]

Finally, trial counsel, like counsel throughout the process, must raise every legal claim that may ultimately prove meritorious, lest default doctrines later bar its assertion. "[T]he courts have shown a remarkable lack of solicitude for prisoners – including ones executed as a result – whose attorneys through no fault of the prisoners were not sufficiently versed in the law . . . [to] consider the possibility that a claim long rejected by local, state, and federal courts might succeed in the future or in a higher court."[27]

The Commentary to the first edition of this Guideline noted that "many indigent capital defendants are not receiving the assistance of a lawyer sufficiently skilled in practice to render quality assistance," and supported the statement with numerous examples. The situation is no better today.[28] Indeed, problems with the quality of defense representation in death penalty cases

---

[26]    *See infra* Guideline 10.11 and accompanying Commentary.

[27]    JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 11.2(a), at 482 (4th ed. 2001). Thus, for example, within a single week in the spring of 2002, the Supreme Court rendered two major rulings favorable to capital defendants. *See* Atkins v. Virginia, 122 S. Ct. 2242, 2252 (2002) (holding that the Constitution bars execution of mentally retarded individuals); Ring v. Arizona, 122 S. Ct. 2248, 2443 (2002) (applying *Apprendi v. New Jersey*, 530 U.S. 466 (2000) to capital cases). In both cases, the Court squarely overruled governing precedent. *See* Penry v. Lynaugh, 492 U.S. 302, 340 (1989) (holding that the Constitution does not bar the execution of mentally retarded individuals); Walton v. Arizona, 497 U.S. 639, 679 (1990) (upholding same statute later invalidated in *Ring* against same challenge); Apprendi v. New Jersey, 530 U.S. 466, 497 (2000) (stating that *Walton* remained good law). It would have been appropriate (and indeed, some Justices might believe, required on pain of forfeiture) for capital counsel to assert these claims at every stage in the proceedings, even though they were then plainly at odds with the governing law. *See infra* Guideline 10.8 and accompanying Commentary.

One current example is the potential categorical unconstitutionality of the execution of juveniles. In light of a growing body of scientific evidence regarding the diminished culpability of juveniles, Eighth Amendment considerations, and international laws and treaties forbidding the execution for crimes committed while under the age of 18, four current Justices have suggested that the Court should absolutely bar the execution of such offenders. *See In re* Stanford, 123 S. Ct. 472 (2002). Counsel would be remiss not to assert the claim, notwithstanding that the Court has previously rejected it. *See* Stanford v. Kentucky, 492 U.S. 361 (1989). A similar example is discussed *infra* at note 350.

[28]    *See generally* James S. Liebman, *The Overproduction of Death*, 100 COLUM. L. REV. 2030, 2102-08 (2000); Spec. Comm. on Capital Representation & Comm. on Civ. Rts., Ass'n of the Bar of the City of N.Y., *The Crisis in Capital Representation*, 51 REC. OF ASS'N OF THE BAR OF CITY OF N.Y. 169, 185-87 (1996) [hereinafter *Crisis in Capital Representation*]; Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 YALE L.J. 1835 (1994); Jeffrey L. Kirchmeier, *Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the* Stickland *Prejudice Requirement*, 75 NEB. L. REV. 425, 427-33 (1996); Note, *The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials*, 107 HARV. L. REV. 1923 (1994). *See also infra* at note 153.

---

68-013

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ▪ February 2003*

have been so profound and pervasive that several Supreme Court Justices have openly expressed concern. Justice Ginsberg told a public audience that she had "yet to see a death case among the dozens coming to the Supreme Court on eve-of-execution stay applications in which the defendant was well represented at trial" and that "people who are well represented at trial do not get the death penalty."[29] Similarly, Justice O'Connor expressed concern that the system "may well be allowing some innocent defendants to be executed" and suggested that "[p]erhaps it's time to look at minimum standards for appointed counsel in death cases and adequate compensation for appointed counsel when they are used."[30] As Justice Breyer has said, "the inadequacy of representation in capital case" is "a fact that aggravates the other failings" of the death penalty system as a whole.[31]

In the past, post-conviction review has often been relied upon to identify and correct untrustworthy verdicts.[32] However, legal changes in the habeas corpus regime,[33] combined with

---

[29]     Anne Gearan, *Supreme Court Justice Supports Death Penalty Moratorium*, ASSOCIATED PRESS, Apr. 9, 2001.

[30]     Crystal Nix Hines, *Lack of Lawyers Hinders Appeals in Capital Cases,* N.Y. TIMES, July 5, 2001, at A1.

[31]     *See* Ring v. Arizona, 122 S. Ct. 2428, 2448 (2002) (Breyer, J., concurring). The "failings" to which Justice Breyer refers are many of the same ones that led the ABA to call for a moratorium on the imposition of the death penalty. *See* ABA, *Report Accompanying Recommendation 107,* *3 (Feb. 3, 1997) ("Today, administration of the death penalty, far from being fair and consistent, is instead a haphazard maze of unfair practices with no internal consistency.").

[32]     *See* ERIC M. FREEDMAN, HABEAS CORPUS: RETHINKING THE GREAT WRIT OF LIBERTY 147-48 (2001) (listing numerous modern examples of injustices in capital cases redressed on federal habeas corpus); LIEBMAN & HERTZ, *supra* note 27, § 11.2(c) (same).

[33]     In 1996, Congress enacted the Anti-Terrorism and Effective Death Penalty Act (the AEDPA), which imposed substantial restrictions on the availability of federal habeas corpus for state prisoners. The AEDPA established strict deadlines for the filing of a federal habeas petition, limits on the scope of review of state court decisions, restrictions on the availability of evidentiary hearings to develop facts in support of constitutional claims, and placed stringent constraints on federal courts' consideration of additional applications for review by the petitioner. *See generally* 28 U.S.C. § 2244-2264. There is significant cause for concern that these provisions may "greatly diminish the reliability of the capital system's review process and of the capital verdicts that the system produces." James S. Liebman, *An "Effective Death Penalty"? AEDPA and Error Detection in Capital Cases,* 67 BROOK. L. REV. 411, 427 (2001). *See also* ABA Panel Discussion, *Dead Man Walking Without Due Process? A Discussion of the Anti-Terrorism and Effective Death Penalty Act of 1996,* 23 N.Y.U. REV. L. & SOC. CHANGE 163, 166-75 (1997); Marshall J. Hartman & Jeanette Nyden, *Habeas Corpus And The New Federalism After The Anti-Terrorism And Effective Death Penalty Act of 1996,* 30 J. MARSHALL L. REV. 337, 387 (1997); Larry W. Yackle, *A Primer on the New Habeas Corpus Statute*, 44 BUFF. L. REV. 381, 386-93 (1996). One reason for this concern is that portions of the legislation seemed to reduce the level of scrutiny that the federal courts could give to state capital convictions. *See* 28 U.S.C. § 2254 (d), (e) (providing that writ may not be granted unless state proceedings resulted in a decision that was "contrary to or involved an unreasonable application of clearly established Federal law," or "was based on an

---

68-014

the Congress' defunding of post-conviction defender organizations (PCDOs) in 1995,[34] make it less likely that such traditional "fail-safes" will continue to operate properly in the future. Under the standards set out by the Supreme Court for reviewing claims of ineffective assistance of counsel,[35] even seriously deficient performance all too rarely leads to reversal.[36] Hence, jurisdictions that continue to impose the death penalty must commit the substantial resources necessary to ensure effective representation at the trial stage.[37] In mandating the provision of high quality legal representation at the trial level of a capital case, this Guideline recognizes the simple truth that any other course has weighty costs – to be paid in money and delay if cases are reversed at later stages or in injustice if they are not.

Post-conviction Review

Ensuring high quality legal representation in capital trials, however, does not diminish the need for equally effective representation on appeal, in state and federal post-conviction proceedings, and in applications for executive clemency. Because each of those proceedings has a unique role to play in the capital process, because both legal and social norms commonly evolve

---

unreasonable determination of the facts").

[34] *See Crisis in Capital Representation, supra* note 28, at 200-05 (presenting state-by-state analysis of impact of defunding of PCDOs); Roscoe C. Howard, Jr., *The Defunding of the Post Conviction Defense Organizations as a Denial of the Right to Counsel*, 98 W. VA. L. REV. 863 (1996) (emphasizing the important role that the former PCDOs played in assuring fairness in habeas corpus review of capital convictions); *see also* Ronald J. Tabak, *Capital Punishment: Is There Any Habeas Left in This Corpus?*, 27 LOY. U. CHI. L.J. 523, 540-43 (1996).

[35] *See* Strickland v. Washington, 466 U.S. 668 (1984).

[36] *See* McFarland v. Scott, 512 U.S. 1256, 1259 (1994) (Blackmun, J., dissenting from denial of *certiorari*) ("Ten years after the articulation of [the *Strickland*] standard, practical experience establishes that the *Strickland* test, in application, has failed to protect a defendant's right to be represented by something more than 'a person who happens to be a lawyer.'") (*quoting* Strickland v. Washington, 466 U.S. 668, 685 (1984)); Adele Bernhard, *Take Courage: What the Courts Can Do to Improve the Delivery of Criminal Defense Services*, 63 U. PITT. L. REV. 293, 346 (2002) ("[A]ll who have seriously considered the subject agree that *Strickland* has not worked either to prevent miscarriages of justice or to improve attorney performance."); William S. Geimer, *A Decade of* Strickland*'s Tin Horn: Doctrinal and Practical Undermining of the Right to Counsel*, 4 WM. & MARY BILL RTS. J. 91, 94 (1995) ("*Strickland* has been roundly and properly criticized for fostering tolerance of abysmal lawyering"); *Legislative Modification, supra* note 11, at 862 n.28 (criticizing "the strong presumptions of attorney effectiveness mandated by *Strickland*" as applied to capital cases: "Whatever benefits counter-factual presumptions may have in other areas of the law, they are certainly out of place when a human life hangs in the balance.").

[37] *See, e.g.*, REPORT OF THE GOVERNOR'S COMMISSION ON CAPITAL PUNISHMENT 177, 179 (Apr. 2002), *available at* http://www.doc.state.il.us/ccp/reports/commission-report (recommending that the Illinois legislature "significantly improve the resources available to the criminal justice system in order to permit the meaningful implementation of reforms in capital cases," including the full funding of the defense, which "should significantly improve the quality of defense representation of capital defendants").

---

10

over the course of a case, and because of "the general tendency of evidence of innocence to emerge only at a relatively late stage in capital proceedings,"[38] jurisdictions that retain capital punishment must provide representation in accordance with the standards of these Guidelines "at all stages of the case." (Subsection B)   Post-judgment proceedings demand a high degree of technical proficiency, and the skills essential to effective representation differ in significant ways from those necessary to success at trial.  In addition, death penalty cases at the post-conviction stage may be subject to rules that provide less time for preparation than is available in noncapital cases.[39]  Substantive pleadings may have to be prepared simultaneously with, or even be delayed for, pleadings to stay the client's execution.[40]  For post-judgment review to succeed as a safeguard against injustice, courts must appoint appropriately trained and experienced lawyers.

### A.    Representation on Direct Appeal

The Constitution guarantees effective assistance of counsel on an appeal as of right.[41]  The "guiding hand of counsel" must lead the condemned client through direct review.  Appellate counsel must be intimately familiar with technical rules of issue preservation and presentation, as well as the substantive state, federal, and international law governing death penalty cases, including issues which are "percolating" in the lower courts but have not yet been authoritatively resolved by the Supreme Court.[42]  Counsel must also be capable of making complex strategic decisions that maximize the client's chances of ultimate success in the event that the direct appeal is resolved unfavorably.[43]

---

[38]    Eric M. Freedman, *Innocence, Federalism and the Capital Jury: Two Legislative Proposals for Evaluating Post-trial Evidence of Innocence in Death Penalty Cases*, 18 N.Y.U. REV. L. & SOC. CHANGE 315, 316 (1991).

[39]    Under the AEDPA, "special habeas corpus procedures" may apply to federal habeas corpus petitions in capital cases if a state's post-conviction procedures satisfy certain prerequisites.  *See* 28 U.S.C. § 2263.  Thus, the deadline for filing of a federal habeas corpus petition by capital prisoners in qualifying "opt-in" states is 180 days, *id.*, in contrast to the one-year limitations period that would otherwise apply.  28 U.S.C. § 2244(d)(1).  In addition, the AEDPA's "opt-in" procedures accelerate the time for review of the case by the district court and the court of appeals, 28 U.S.C. § 2266(b)(1)(A), (c)(1)(A), and restrict a capital habeas corpus petitioner's ability to amend a petition after the state files its response.  28 U.S.C. § 2266(b)(3)(B).  *See also* Michael Mello & Donna Duffy, *Suspending Justice: The Unconstitutionality of the Proposed Six-Month Time Limit on the Filing of Habeas Corpus Petitions by State Death Row Inmates*, 18 N.Y.U. REV. L. & SOC. CHANGE 451, 487-92 (1991) (discussing why a six-month limit does not provide an attorney with adequate time to prepare a habeas petition properly).

[40]    *See infra* text accompanying notes 331-36.

[41]    *See* Evitts v. Lucey, 469 U.S. 387, 395-96 (1985).

[42]    *See* Smith v. Murray, 477 U.S. 527, 536-37 (1986) (holding that appellate counsel in a Virginia capital case had waived a legal issue by not raising it at an earlier stage of appeal; the novelty of the issue in Virginia was no excuse because it had been raised, though unsuccessfully, in an intermediate appellate court of another state).

[43]    *See infra* Guideline 10.15.1 and accompanying Commentary.

68-016

B.    Collateral Review Proceedings

Habeas corpus and other procedures for seeking collateral relief are especially important in capital cases.[44]  Quality representation in both state and federal court is essential if erroneous convictions are to be corrected.[45]

1.    State Collateral Review Proceedings

Counsel's obligations in state collateral review proceedings are demanding.[46] Counsel must be prepared to thoroughly reinvestigate the entire case to ensure that the client was neither actually innocent nor convicted or sentenced to death in violation of either state or federal law. This means that counsel must obtain and read the entire record of the trial, including all transcripts and motions, as well as proceedings (such as bench conferences) that may have been recorded but not transcribed.  In many cases, the record is voluminous, often amounting to many thousands of pages.  Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, again scrutinizing them for what is missing as well as what is present.

---

[44]    *See* McFarland v. Scott, 512 U.S. 849, 855 (1994) ("[Q]uality legal representation is necessary in capital habeas corpus proceedings in light of 'the seriousness of the possible penalty and  . . . the unique and complex nature of the litigation.'") (citation omitted); LIEBMAN & HERTZ, *supra* note 27, § 2.6.

[45]    A recent comprehensive study finds that of every 100 death sentences imposed, 47 are reversed at the state level, on direct appeal or collateral review.  An additional 21 are overturned on federal habeas corpus.  *See* JAMES S. LIEBMAN, ET AL., A BROKEN SYSTEM: ERROR RATES IN CAPITAL CASES, 1973-1995, pt. I, app. A, at 5-6 (2000).  These statistics indicate the importance of providing qualified counsel for both state and federal proceedings.

[46]    Some states provide attorneys at public expense to death-sentenced prisoners seeking state post-conviction relief, but others do not.  *See* Andrew Hammel, *Diabolical Federalism: A Functional Critique and Proposed Reconstruction of Death Penalty Federal Habeas*, 39 AM. CRIM. L. REV.  1, 83-99 (2002) (providing state-by-state list); Jennifer N. Ide, *The Case of Exzavious Lee Gibson: A Georgia Court's (Constitutional) Denial of a Federal Right*, 47 EMORY L.J. 1079, 1099-1110 (1998); Clive A. Stafford Smith & Remy Voisin Starns, *Folly By Fiat: Pretending that Death Row Inmates Can Represent Themselves in State Capital Postconviction Proceedings*, 45 LOY. L. REV. 55, 56 (1999). Moreover, even in those states that nominally do provide counsel for collateral review, chronic underfunding, lack of standards, and a dearth of qualified lawyers willing to accept appointment have resulted in a disturbingly large number of instances in which attorneys have failed to provide their clients meaningful assistance. *See, e.g.*, TEX. DEFENDER SERV., A STATE OF DENIAL: TEXAS JUSTICE AND THE DEATH PENALTY, ch. 7 (2002), *available at* http://www.texasdefender.org/study/study.html (reporting that a review of 103 post-conviction petitions filed by court-appointed counsel in Texas death penalty cases between 1995 and 2000 indicated that 25 percent of the petitions were 15 pages long or less, and that counsel offered no evidence outside the trial record in 40 percent of the cases reviewed).

These considerations suggest that counsel should continue to test the solidity of Marray v. Giarratano, 492 U.S. 1 (1989) (rejecting claim of constitutional right to counsel in state capital post-conviction proceedings).

---

68-017

Like trial counsel, counsel handling state collateral proceedings must undertake a thorough investigation into the facts surrounding all phases of the case. It is counsel's obligation to make an independent examination of all of the available evidence – both that which the jury heard and that which it did not – to determine whether the decision maker at trial made a fully informed resolution of the issues of both guilt and punishment.

Since the reinstatement of the death penalty in 1977, there have been more than 100 known wrongful convictions in capital cases in the United States.[47] As further described *infra* in the text accompanying notes 196-200, these resulted from a variety of causes, including the testimony of unreliable jailhouse informants,[48] the use of dubious or fraudulent forensic scientific methods,[49]

---

[47] *See* DEATH PENALTY INFORMATION CENTER: *Innocence and the Death Penalty*, *available at* http://www.deathpenaltyinfor.org/innoc.html (last visited December 18, 2002) (stating that there are 102 people that have been wrongly convicted of capital crimes). *See generally* JIM DWYER ET AL., ACTUAL INNOCENCE: FIVE DAYS TO EXECUTION AND OTHER DISPATCHES FROM THE WRONGFULLY CONVICTED (2000); C. RONALD HUFF ET AL., CONVICTED BUT INNOCENT 63-82 (1996); NAT'L INST. OF JUSTICE, CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996); Ken Armstrong & Steve Mills, "'Until I Can be Sure:' How the Threat of Executing the Innocent has Transformed the Death Penalty Debate," in BEYOND REPAIR? AMERICA'S DEATH PENALTY (Stephen P. Garvey, ed. 2003); Michael L. Radelet & Hugo Adam Bedau, "The Execution of the Innocent," *in* AMERICA'S EXPERIMENT WITH CAPITAL PUNISHMENT: REFLECTIONS ON THE PAST, PRESENT AND FUTURE OF THE ULTIMATE PENAL SANCTION 223 (James Acker et al., eds. 1998)

[48] *See* Dodd v. State, 993 P.2d 778 (Okla. Crim. App. 2000) (citing "insidious reliability problems" as basis for imposing major procedural restrictions on use of jailhouse informants); CONSTITUTION PROJECT, MANDATORY JUSTICE: EIGHTEEN REFORMS TO THE DEATH PENALTY, at 52 (2001) (A "category of evidence that has a particularly high chance of being an outright lie, exaggerated, or otherwise erroneous is the testimony of jailhouse informants. Their confinement provides evidence of their questionable character, motivates them to lie in order to improve the conditions of their confinement or even secure their release, and often affords access to information that can be used to manufacture credible testimony."). *See, e.g.,* Ted Rohrlich, *Jail House Informant Owns Up to Perjury in a Dozen Cases*, L.A. TIMES, Jan. 4, 1990, at A1 (detailing perjuries committed by Leslie White, an inmate at the Los Angeles County jail who demonstrated to authorities and reporters how he concocted false confessions, and noting confession of another informant, Stephen Jesse Cisneros, to perjury in five murder cases).

[49] *See generally* Brief of Amici Curiae Five Innocent Former Death Row Inmates & Centurion Ministries, Schlup v. Delo, 513 U.S. 298 (1995) (No. 93-7901) (reviewing generally unscrupulous practices by investigators and prosecutors that can lead to false convictions); Paul Duggan, *Oklahoma Reviews 3,000 Convictions*, WASH. POST, May 9, 2001, at A2 (discussing Oklahoma review of 3,000 convictions based on work of Joyce Gilchrist, an Oklahoma City police chemist, who went far beyond what was scientifically knowable in conducting forensic investigations of local crime); Davidson Goldin, *Fifth Trooper Pleads Guilty in Scandal*, N.Y. TIMES, Apr. 8, 1995, at A29 (describing scandal in which New York state troopers transferred fingerprints of potential suspects to crime scenes to enhance their cases); Mark Hansen, *Out of the Blue*, 82 A.B.A. J. 50 (1996) (describing dentist, widely discredited by his peers, who claimed to be able to match bite marks to the teeth that made them); Adam Liptak, *2 States to Review Lab*

68-018

prosecutorial misconduct, and incompetence of defense counsel at trial. Because state collateral proceedings may present the last opportunity to present new evidence to challenge the conviction, it is imperative that counsel conduct a searching inquiry to assess whether any mistake may have been made.

Reinvestigation of the case will require counsel to interview most, if not all, of the critical witnesses for the prosecution and investigate their backgrounds. Counsel must determine if the witness's testimony bears scrutiny or whether motives for fabrication or bias were left uncovered at the time of trial. Counsel must also assess all of the non-testimonial evidence and consider such issues as whether forensic testing must now be performed, either because some technology, such as DNA, was unavailable at the time of trial or because trial counsel failed to ensure that necessary testing took place.[50]

Counsel must conduct a similarly comprehensive reevaluation of the punishment phase to verify or undermine the accuracy of all evidence presented by the prosecution, and to determine whether the decisionmaker was properly informed of all relevant evidence,[51] able to give appropriate weight to that evidence,[52] and provided with a clear and legally accurate set of instructions for communicating its conclusion.[53]

2.    Federal Habeas Corpus

In addition to requiring counsel to undertake all the tasks just described in Section B(1), federal collateral proceedings present another set of obstacles – ones that highlight the importance of quality representation. From 1973 to 1995, capital habeas corpus petitioners obtained relief at many times the rate of non-capital ones[54] and they should continue to do so in the future. But

---

*Work of Expert Who Erred on ID*, N.Y. TIMES, Dec. 19, 2002, at A24 (Montana and Washington reviewing over 100 cases based on questionable forensic testimony of Arnold Melnikoff); Armando Villafranca, *Bradford Cites Lab Furor, Urges Freeze on Death Row*, HOUSTON CHRONICLE, March 7, 2003 (reporting legislative testimony of Houston Police Chief urging that no execution dates be set for seven Death Row inmates whose cases may have been affected by shoddy work of Houston police crime laboratory, which was found in a state audit to have had numerous shortcomings in preservation and testing of DNA evidence; *infra* note 198.

[50]    *See, e.g.*, Eric M. Freedman, *Earl Washington's Ordeal*, 29 HOFSTRA L. REV. 1089, 1098-99 (2001) (*pro bono* counsel on state post-conviction discovered exculpatory semen stain evidence, which "having been appropriately turned over by the government, lay unappreciated in the files of former defense counsel").

[51]    *See* Williams v. Taylor, 529 U.S. 362, 370-71 (2000) (granting habeas corpus relief to petitioner whose trial counsel failed to find and present mitigating evidence).

[52]    *See infra* Guideline 10.10.2 and accompanying Commentary.

[53]    For examples of death sentences overturned for failure to comply with this requirement, see Penry v. Johnson, 532 U.S. 782 (2001), McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988), and Davis v. Mitchell, 2003 WL 222741 (6th Cir. Feb. 4, 2003).

[54]    *See* James S. Liebman, et al., *Capital Attrition: Error Rates in Capital Cases, 1973-1995*,

---

68-019

federal habeas corpus actions are governed by a complex set of procedural rules.[55] Counsel must master these thoroughly.[56] Moreover, restrictions on the availability of federal habeas relief for state prisoners imposed by the AEDPA will continue to raise numerous novel legal issues.

C.    Executive Clemency

Executive clemency plays a particularly important role in death penalty cases, as it "provides the [government] with a final, deliberative opportunity to reassess this irrevocable punishment."[57] Because post-judgment proceedings have traditionally provided very limited opportunity for review of questions of guilt or innocence, clemency is "the historic remedy for preventing miscarriages of justice where judicial process has been exhausted."[58] As the Supreme Court has recognized, "history is replete with examples of wrongfully convicted persons who have been pardoned in the wake of after-discovered evidence establishing their innocence."[59] Recent advances in the use of DNA technologies, combined with restrictions on the availability of post-conviction review, have elevated the important role that clemency has played as the "fail-safe" of the criminal justice system,[60] and increased the demands on counsel.[61] Moreover, wholly apart

---

78 TEX. L. REV. 1839, 1849 (2000) (federal habeas relief was granted in 40 percent of 599 cases between 1973 and 1995 in which the judgment remained intact after direct appeal and state post-conviction review). *Cf.* Eric M. Freedman, *Federal Habeas Corpus in Capital Cases, in* AMERICA'S EXPERIMENT WITH CAPITAL PUNISHMENT: REFLECTIONS ON THE PAST, PRESENT AND FUTURE OF THE ULTIMATE PENAL SANCTION *supra* note 47, at 417, 427 ("By the most generous estimates, the rate in non-capital cases does not exceed 7%, and, if the appropriate statistical methodology is applied, the actual number is less than 1%.").

[55]    *See, e.g.*, Edwards v. Carpenter, 529 U.S. 446 (2000) (limits on asserting ineffective assistance of counsel as "cause" for procedural default); Schlup v. Delo, 513 U.S. 298 (1995) ("fundamental miscarriage of justice" exception to procedural default rule); Teague v. Lane, 489 U.S. 288 (1989) (non-retroactivity of "new rules" of constitutional procedure); Wainwright v. Sykes, 433 U.S. 72 (1977) (limiting review of constitutional claims due to procedural default). Indeed, on the website of the *New York Times*, its Supreme Court reporter, Linda Greenhouse, has described the Court's habeas jurisprudence as "so complex as to be almost theological" (posted July 6, 2001).

[56]    *See Legislative Modification, supra* note 11, at 854 ("The post-conviction handling of capital cases is a legal specialty requiring mastery of an intricate body of fast-changing substantive and procedural law.")

[57]    Daniel T. Kobil, *Due Process in Death Penalty Commutations: Life, Liberty, and the Pursuit of Clemency*, 27 U. RICH. L. REV. 201, 214 (1993). *See infra* Guideline 10.15.2 and accompanying Commentary.

[58]    Herrera v. Collins, 506 U.S. 390, 411-12 (1993).

[59]    *Id.* at 415.

[60]    *See* Kathleen M . Ridolfi, *Not Just an Act of Mercy: The Demise of Post-Conviction Relief and a Rightful Claim to Clemency*, 24 N.Y.U. REV. L. & SOC. CHANGE 43, 68-77 (1998).

[61]    *See, e.g.*, Freedman, *supra* note 50, at 1100-03 (describing detailed oral and written

---

from questions of guilt or innocence, executive clemency has been granted in death penalty cases for a broad range of humanitarian reasons.[62] Recognizing these considerations, the Supreme Court has begun to apply due process protection to clemency proceedings.[63] Thus, in addition to assembling the most persuasive possible record for the decisionmaker, counsel must carefully examine the possibility of pressing legal claims asserting the right to a fuller and fairer process.[64]

## The Imperative of a Systemic Approach

General statements of expectations about what lawyers should do will not themselves ensure high quality legal representation. Indeed, Guidelines confined to such statements would be ones "that palter with us in a double sense, that keep the word of promise to our ear, and break it to our hope."[65] Attorney error is often the result of systemic problems, not individual deficiency.[66] The provision of counsel for indigent capital defendants is too frequently made through *ad hoc* appointment, a system inimical to effective representation.[67] Although defender offices generally have the experience and dedication to provide high quality legal representation in capital cases, they are commonly overworked and inadequately funded. And private counsel often discover too late that they have taken on a task for which they are unqualified[68] or lack sufficient resources. The Guidelines that follow, therefore, not only detail the elements of quality representation, but mandate the systematic provision of resources to ensure that such representation is achieved in fact, whether counsel is individually assigned, employed by a defender office, or privately retained

---

presentations made to two Governors of Virginia by a six-lawyer team to secure DNA testing for death row inmate Earl Washington that resulted in his exoneration). *See also infra* Guideline 10.15.2 and accompanying Commentary

[62]    *See* Michael L. Radelet & Barbara A. Zsembik, *Executive Clemency in Post-Furman Cases*, 27 U. RICH. L. REV. 289, 297-99 (1993) (identifying 29 cases between 1972 and 1993 in which death-sentenced inmates had their death sentences commuted to terms of life imprisonment through executive clemency procedures).

[63]    *See* Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272 (1998);  *see also* Ford v. Wainwright, 477 U.S. 399 (1986)  (invalidating Florida procedure for determining whether inmate was mentally competent to be executed).

[64]    *See, e.g.,* Wilson v. United States Dist. Ct., 161 F.3d 1185 (9th Cir. 1998) (affirming District Court order directing new clemency proceeding on basis that prior one had violated due process).

[65]    WILLIAM SHAKESPEARE, MACBETH act 5, sc. 8.

[66]    *See* Goodpaster, *supra* note 2, at 356.

[67]    *See infra* Guideline 2.1(C) and accompanying Commentary.

[68]    *See, e.g.,* Washington v. Murray, 952 F.2d 1472 (4th Cir. 1991) (failure of retained counsel to appreciate exculpatory significance of scientific evidence produced by prosecution).  *See generally* Cuyler v. Sullivan, 446 U.S. 335, 344 (1980) (guarantee of Sixth Amendment applies equally whether counsel is retained or appointed).

---

68-021

with or without compensation.[69]

## Conclusion

Unless legal representation at each stage of a capital case reflects current standards of practice, there is an unacceptable "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."[70]   Accordingly, any jurisdiction wishing to impose a death sentence must at minimum provide representation that comports with these Guidelines.[71]

---

[69]    *See infra* Guidelines 4.1 and 9.1 and accompanying Commentary.

[70]    Lockett v. Ohio, 438 U.S. 586, 605 (1978).

[71]    *Cf. Legislative Modification, supra* note 11, at 848 ("[F]or so long as the death penalty continues to exist in this country, capital inmates are entitled to procedures – including ones for the provision of competent counsel – that result in the full and fair review of their convictions and sentences.  Correlatively, any state which chooses to impose death sentences must accept the obligation of providing mechanisms for assuring that those sentences are legally and factually correct at the time of their execution.").

68-022

**Guideline 2.1        Adoption and Implementation of a Plan to Provide High Quality Legal Representation in Death Penalty Cases**

A.    Each jurisdiction should adopt and implement a plan formalizing the means by which high quality legal representation in death penalty cases is to be provided in accordance with these Guidelines (the "Legal Representation Plan").

B.    The Legal Representation Plan should set forth how the jurisdiction will conform to each of these Guidelines.

C.    All elements of the Legal Representation Plan should be structured to ensure that counsel defending death penalty cases are able to do so free from political influence and under conditions that enable them to provide zealous advocacy in accordance with professional standards.

*History of Guideline*

The obligation to create a formal "Legal Representation Plan" for provision of representation in death penalty cases was contained in Guideline 3.1 of the original edition. Subsection B is new and is designed to make it easier for jurisdictions to determine the necessary contents of a Plan. Subsection C is drawn from several sections of the original edition.

*Related Standards*

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.2 (3d ed. 1992) ("Systems for legal representation").

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.3 (3d ed. 1992) ("Professional independence").

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.4 (3d ed. 1992) ("Supporting services").

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.5 (3d ed. 1992) ("Training and professional development").

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.6 (3d ed. 1992) ("Funding").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-4.1 (3d ed. 1992) ("Chief Defender and Staff").

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 1 (2002) ("The public defense function, including the selection, funding and payment of defense counsel, is independent").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDSARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.8 (1973) ("Selection of Public Defenders").

68-023

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.9 (1973) ("Performance of Public Defender Function").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 10 (1970) ("Office of Defender General").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.4 (1976) ("State Level Organization with Centralized Administration").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.10 (1976) ("The Defender Commission").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.11 (1976) ("Functions of the Defender Commission").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES Standard 2.18 (1976) (Administration of Defense System Funds").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.2 (1989) ("Independence from Judiciary and Funding Source").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.1 (1989) ("Establishment of a Legal Representation Plan").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES Standard II-1 (1984) ("Policy Board").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES Standard II-2 (1984) ("Members").

### Commentary

Each jurisdiction should take effective measures to formalize the process by which high quality legal representation will be provided in capital cases. This may be done by statute, court order, regulation or otherwise. The critical element is that the plan be judicially enforceable against the jurisdiction.[72] Experience shows, however, that a plan is most likely to succeed if it is embodied in a statute. That route maximizes judicial neutrality in passing on claims of non-compliance, and tends to result in greater transparency and access to public funds than do the other options.

---

[72] *See, e.g.*, Spalding v. Dugger, 526 So. 2d 71, 72 (Fla. 1988) (holding that under statute creating office for post-conviction capital representation, "each defendant . . . is entitled, as a statutory right, to effective legal representation," and may enforce that right in post-conviction proceedings).

68-024

The Legal Representation Plan should provide standards and procedures that apply to capital cases on a jurisdiction-wide basis. National professional groups concerned with criminal justice issues have for decades advocated that defender services be organized on a statewide basis.[73] Specifically, the ABA Criminal Justice Standards endorse statewide organization "as the best means for service provision."[74] Jurisdiction-wide organization and funding can best ameliorate local disparities in resources and quality of representation, and insulate the administration of defense services from local political pressures.[75]

This last item is, of course, of critical concern. "It is essential that both full-time defenders and assigned counsel be fully independent, free to act on behalf of their clients as dictated by their best professional judgment. A system that does not guarantee the integrity of the professional relation is fundamentally deficient in that it fails to provide counsel who have the same freedom of action as the lawyer whom the person with sufficient means can afford to retain."[76]

---

[73]    *See, e.g.*, NAT'L LEGAL AID & DEFENDER ASS'N, NATIONAL STUDY COMMISSION ON DEFENSE SERVICES, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES FINAL REPORT (1976) (calling for a statewide organization with a centralized administration to "ensure uniformity and equality of legal representation and supporting services and to guarantee professional independence for individual defenders"); Nat'l Conf. of Comm'rs on Unif. State Laws, *Prefatory Note* to UNIFORM LAW COMMISSIONER'S MODEL PUBLIC DEFENDER ACT, *in* HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS 267-268 (1970) (approving recommendation of National Defenders Conference that every state establish a statewide public defender system "to assure better coordination and consistency of approach throughout the state, [provide] better consultation with the several branches of state government, [...] reduce the administrative burden on court personnel and provide more efficient and more experienced defense counsel services to needy persons accused of crime"); TASK FORCE ON THE ADMIN. OF JUSTICE, PRESIDENT'S COMM'N ON LAW ENFORCEMENT & ADMIN. OF JUSTICE, TASK FORCE REPORT: THE COURTS 52-53 (1967) (recommending that "each State should finance assigned counsel and defender systems on a regular and statewide basis").

[74]    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES, Standard 5-1.2(c) and cmt. (3d ed. 1992, black letter approved 1990, commentary completed 1992).

[75]    Mississippi, for example, has recently moved from a county-based to a state-based system for the provision of capital defense services. *See* Julie Goodman, *Inmates on Death Row Given Last Hope*, CLARION-LEDGER (Jackson, Miss.), May 13, 2002, at B1 (discussing post-conviction defense office); Emily Wagster, *Capital Defense Job Filled; State Office to Provide Lawyers for Indigent*, SUN HERALD (Biloxi, Miss.), July 7, 2001, at A2 (discussing trial defense office). Similarly, California has adopted statewide qualifications for appointed trial counsel in capital cases effective January 1, 2003. *See* Cal. Rules of Ct., R. 4.117.

[76]    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.3 cmt. (3d ed. 1992). *See also*, ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 1 and cmt. (2002) ("The public defense function, including the selection, funding, and payment of defense counsel, is independent.") ("The public defense function should be independent from political influence and subject to judicial supervision only in the same manner and to the same extent as retained counsel. To safeguard independence and to promote efficiency and quality of services, a non-partisan board should oversee defender, assigned counsel, or

---

68-025

Case 1:09-cv-01039-MJT    Document 50-4    Filed 10/05/10    Page 27 of 274 PageID #:
6523
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ▪ February 2003

Therefore, as Guideline 2.1(C) mandates, any acceptable Legal Representation Plan must assure that individual lawyers are not subject to formal or informal sanctions (*e.g.*, through the denial of future appointments, reductions in fee awards, or withholding of promotions in institutional offices) for engaging in effective representation.[77]  The same principle applies to the overall architecture of the system.  Thus, for example, the head of a public defender office must be subject to judicial supervision only in the same manner and to the same extent as a lawyer in private practice – and not be subject to institutional arrangements that might enable his or her re-appointment to be blocked by judges irked at the zealous advocacy conducted by his or her office.

Moreover, the system must be structured so as to assure that each client receives defense services "in accordance with professional standards." (Subsection C) For example, it is predictable that there will be conflicts of interest among various actors in the criminal justice system (e.g. co-defendants, co-operating witnesses), who may play different roles in different cases, and the plan must provide a mechanism to assure conflict-free representation.[78]

---

contract systems.  Removing oversight from the judiciary ensures judicial independence from undue political pressures and is an important means of furthering the independence of public defense.  The selection of the chief defender and staff should be made on the basis of merit, and recruitment of attorneys should involve special efforts aimed at achieving diversity in attorney staff.").

[77]    For example, under the North Carolina's Indigent Defense Services Act of 2000,  a 13-member Indigent Defense Services Commission (consisting of ten members appointed by, but independent of, the state Bar, the Governor, the Chief Justice, and the legislature, and three members chosen collectively by those ten) appoints a Capital Defender who is responsible only to it.  The Capital Defender supervises a staff of attorneys and also oversees the representation provided by a roster of private lawyers and public defenders who have been certified to provide representation in capital cases. *See* www.ncids.org (last visited March 7, 2003). *Cf. Retarding Due Process*, St. Petersburg Times, Apr. 22, 2002, at A10 (editorial criticizing Florida legislation permanently barring any appointed capital defense attorney seeking compensation in excess of fee schedule from another appointment).

[78]    For instance, although it may not violate the Sixth Amendment for defense counsel to have previously represented the victim, *see* Mickens v. Taylor, 122 S. Ct. 1237 (2002), it certainly violates ethical norms, *see* Brief of Legal Ethicists and the Stein Center for Law and  Ethics as Amici Curiae in Support of  Petitioner, Mickens v. Taylor, 122 S. Ct. 1237 (2002) (No. 00-9285) and would not be permitted by any acceptable plan for capital representation. *Cf. Ex parte McCormick*, 645 S.W.2d 801 (Tex. Crim. App. 1983) (en banc) (reversing two capital convictions because same counsel represented both co-defendants).

---

68-026

## Guideline 3.1          Designation of a Responsible Agency

A.    **The Legal Representation Plan should designate one or more agencies to be responsible, in accordance with the standards provided in these Guidelines for:**

    1.    **ensuring that each capital defendant in the jurisdiction receives high quality legal representation, and**

    2.    **performing all the duties listed in Subsection E (the "Responsible Agency").**

B.    **The Responsible Agency should be independent of the judiciary and it, and not the judiciary or elected officials, should select lawyers for specific cases.**

C.    **The Responsible Agency for each stage of the proceeding in a particular case should be one of the following:**

    <u>Defender Organization</u>

    1.    **A "defender organization," that is, either:**

        a.    **a jurisdiction-wide capital trial office, relying on staff attorneys, members of the private bar, or both to provide representation in death penalty cases; or**

        b.    **a jurisdiction-wide capital appellate and/or post-conviction defender office, relying on staff attorneys, members of the private bar, or both to provide representation in death penalty cases; or**

    <u>Independent Authority</u>

    2.    **An "Independent Authority," that is, an entity run by defense attorneys with demonstrated knowledge and expertise in capital representation.**

D.    **Conflict of Interest:**

    1.    **In any circumstance in which the performance by a defender organization of a duty listed in Subsection E would result in a conflict of interest, the relevant duty should be performed by the Independent Authority. The jurisdiction should implement an effectual system to identify and resolve such conflicts.**

    2.    **When the Independent Authority is the Responsible Agency, attorneys who hold formal roles in the Independent Authority should be ineligible to represent defendants in capital cases within the jurisdiction during their term of service.**

68-027

E.      The Responsible Agency should, in accordance with the provisions of these Guidelines, perform the following duties:

    1.      recruit and certify attorneys as qualified to be appointed to represent defendants in death penalty cases;

    2.      draft and periodically publish rosters of certified attorneys;

    3.      draft and periodically publish certification standards and procedures by which attorneys are certified and assigned to particular cases;

    4.      assign the attorneys who will represent the defendant at each stage of every case, except to the extent that the defendant has private attorneys;

    5.      monitor the performance of all attorneys providing representation in capital proceedings;

    6.      periodically review the roster of qualified attorneys and withdraw certification from any attorney who fails to provide high quality legal representation consistent with these Guidelines;

    7.      conduct, sponsor, or approve specialized training programs for attorneys representing defendants in death penalty cases; and

    8.      investigate and maintain records concerning complaints about the performance of attorneys providing representation in death penalty cases and take appropriate corrective action without delay.

*History of Guideline*

The obligation of the Legal Representation Plan to designate a "Responsible Agency" for the appointment of counsel in death penalty cases was contained in Guideline 3.1 of the first edition. Subsection B makes it clear that the Responsible Agency should be an independent entity, and that lawyer selection should not be performed by the judiciary or elected officials. Subsection C is new and describes the acceptable kinds of Responsible Agencies. Subsection D is new and specifies the obligations of the Responsible Agency in the event of a conflict of interest. Lastly, part of subsection E is new and details the other duties of the Responsible Agency, including the duty to ensure that qualified attorneys are available to represent defendants in death penalty cases, the duty to promptly investigate complaints about the performance of attorneys, and the duty to take corrective action without delay.

*Related Standards*

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.2 (3d ed. 1992) ("Systems for legal representation").

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.3 (3d ed. 1992) ("Professional independence").

68-028

ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-4.1 (3d ed. 1992) ("Chief Defender and Staff").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.8 (1973) ("Selection of Public Defenders").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act Section 10 (1970) ("Office of Defender General").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.10 (1976) ("The Defender Commission").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.11 (1976) ("Functions of the Defender Commission").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.12 (1976) ("Qualifications of the Defender Director and Conditions of Employment").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.13 (1976) ("The Governing Body For Assigned Counsel Programs").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Standard 2.18 (1976) ("Administration of Defense System Funds").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.2 (1989) ("Independence from Judiciary and Funding Source").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.1 (1989) ("Establishment of Legal Representation Plan").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.2.1 (1989) ("Creation of Board").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 3.2.2 (1989) ("Functions of Board").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II-1 (1984) ("Purposes/ Policy Board").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II-2 (1984) ("Members").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II-3 (1984) ("Duties").

68-029

***Commentary***

As indicated in Guideline 2.1(C) and the accompanying Commentary, the Legal Representation Plan must ensure that the capital defense function remains free from political influence. One important mechanism for accomplishing this goal is granting the authority for training, assigning, and monitoring capital defense lawyers to one or more entities independent of the judiciary and wholly devoted to fostering high quality legal defense representation.

This Guideline, based on accumulated experience, contemplates two structures that jurisdictions might employ.

1. In the first structure, the jurisdiction has created (a) a jurisdiction-wide capital trial organization, relying on staff attorneys, and, optionally, members of the private bar, and/or (b) a jurisdiction-wide capital appellate and/or post-conviction defender organization, relying on staff attorneys, and, optionally, members of the private bar. (Collectively, "defender organizations").[79]

In this structure, the defender organizations may both provide representation and perform all the functions listed in Subsection E as appropriate to their portion of the system, with one key exception. No defender organization may perform any function that would involve it in a conflict of interest, *e.g.*, monitoring its own performance under Guideline 7.1 (A), investigating or disposing of a complaint against such a lawyer pursuant to Guideline 7.1 (B) against one of its staff lawyers, or making the appointment of counsel in a situation in which there exists a professional conflict. Thus, for example, if two defendants with antagonistic defenses were charged with a capital crime, the agency could assign itself to defend one of them but could play no role in the assignment of counsel to the other. Similarly, a defender organization could not monitor the quality of its own performance (Subsection E (5)).

Accordingly, this structure also contemplates the existence of an "Independent Authority," which will at minimum deal with conflicts such as these.

2. In the second structure, an "Independent Authority," an entity run by defense attorneys with demonstrated knowledge and expertise in the representation of persons facing the possible imposition or execution of a death sentence, performs all the functions listed in Subsection E but does not itself provide representation.

While serving the organization in a formal role, whether paid or unpaid (*e.g.*, officers, directors, staff members), attorneys should not be eligible for appointment to death penalty cases.

---

[79] For example, in 1995, New York enacted a comprehensive legislative plan for a "capital defender office" (CDO) to provide representation and legal assistance in capital cases. NY. JUD. LAW § 35-b(3) (McKinney 2001). The CDO is authorized to represent capital defendants and also to advise and assist other appointed counsel in such cases. The office assists in determining qualification standards and presenting training programs for attorneys seeking to become certified to accept appointments. Other states have similar programs for providing representation in post-conviction proceedings. *See, e.g.*, CAL. GOV'T CODE § 68661 (West Supp. 2002) (creating California Habeas Corpus Resource Center, which is authorized to provide representation and serve as a resource in state and federal post-conviction proceedings).

68-030

The idea is that attorneys should not be appointed by an entity in whose operations they are playing a material role.  Thus, this provision does not extend to persons who are simply providing occasional advice to the entity.

The agency performing the function in the particular case, whether a defender organization or the Independent Authority, is referred to as "the Responsible Agency."

The Responsible Agency must assess the qualifications of attorneys who wish to represent capital defendants, conducting a meaningful review of each request for inclusion on the roster of qualified counsel in light of the criteria listed in Guideline 5.1.  In order to make informed decisions on eligibility, the Responsible Agency should have sufficient flexibility to gather as much relevant information as possible to secure a fair picture of the applicant's ability and experience.  The Responsible Agency should utilize whatever sources of information it deems appropriate, including in-court observations, writing samples, and information-gathering from the applicant, from judges before whom the applicant has appeared, and from attorneys, supervisors, and former clients who are familiar with the applicant's professional abilities.  The performance standards established pursuant to Guidelines 10.1 *et seq.* should also be used to evaluate the prior performance in capital cases of attorneys seeking to establish eligibility for renewal placement on the roster of qualified counsel.

In assigning attorneys to capital cases, the overriding consideration must always be to provide high quality legal representation to the person facing a possible death sentence.  Adherence to a "strict rotation" system for assigning counsel in the interest of fairness to attorneys should never take precedence over the interests of the capital defendant in receiving the best possible representation.  Rather, in making assignments of counsel to a particular capital case, the Responsible Agency should give careful consideration to counsel's qualifications, skills, and experience; any aspects of the case that make assignment of a lawyer with specific qualifications or skills necessary or particularly appropriate (*e.g.*, counsel's ability to speak the client's native language); and the relative onerousness of prospective lawyers' existing caseloads.  It is also appropriate to give consideration to maintaining continuity of counsel where the defendant has previously been represented by a qualified lawyer at an earlier stage of the proceedings, provided that (a) counsel is also deemed qualified to represent the client at the subsequent stage of the proceedings and (b) counsel's representation of the client at successive stages of the proceedings does not present a conflict of interest.[80]  Given the extraordinary demands and pressures placed on counsel in a capital case,[81] the Responsible Agency should, in accordance with Guideline 4.1 (A)(1), ensure that at every stage of the proceedings the defendant is represented by counsel who are in a position to provide high quality legal representation. This may require the agency to furnish resources, in the form of additional counsel or otherwise,[82] to private counsel.[83]

---

[80]    Of course, any applicable statutory provisions, *e.g.*, 28 U.S.C. § 2261(d), must also be observed.

[81]    *See supra* Guideline 1.1 and accompanying Commentary.

[82]    *See infra* Guideline 4.1 and accompanying Commentary.

[83]    Specifically, the Responsible Agency should in every capital case determine whether retained or *pro bono* counsel meets the qualification standards set forth in Guideline 5.1 *infra* and, if not, provide as many additional qualified attorneys as are appropriate under the circumstances

68-031

The remaining elements of this Guideline reflect the longstanding view of the ABA that "jurisdictions that have the death penalty should establish and fund organizations to recruit, select, train, monitor, support, and assist attorneys involved at all stages of capital litigation and, if necessary, to participate in the trial of such cases."[84]  Several of these functions are described in greater detail in subsequent Guidelines.[85]  The common theme, however, is that the provision of consistently high quality legal representation requires that the duties given to the Responsible Agency by this Guideline be performed by an entity with the authority and resources to discharge them vigorously.

---

of the case.  In accordance with Guideline 4.1(B), the Responsible Agency must also assure that counsel have the necessary support services.

[84]    ABA Criminal Justice Section, Report to the House of Delegates (Feb. 1990), *reprinted in Toward a More Just and Effective System of Review in State Death Penalty Cases*, 40 AM. U. L. REV. 1, 9 (1990).

[85]    *See, e.g., infra* Guideline 7.1 (removal of attorneys from roster); Guideline 8.1 (training programs).

68-032

## Guideline 4.1        The Defense Team and Supporting Services

A.    **The Legal Representation Plan should provide for assembly of a defense team that will provide high quality legal representation.**

    1.    **The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.**

    2.    **The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.**

B.    **The Legal Representation Plan should provide for counsel to receive the assistance of all expert, investigative, and other ancillary professional services reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceedings. The Plan should specifically ensure provision of such services to private attorneys whose clients are financially unable to afford them.**

    1.    **Counsel should have the right to have such services provided by persons independent of the government.**

    2.    **Counsel should have the right to protect the confidentiality of communications with the persons providing such services to the same extent as would counsel paying such persons from private funds.**

*History of Guideline*

This Guideline is based on Guideline 8.1 of the original edition. In keeping the team approach described in the Commentary, Subsection A has been added to provide for the assembly of a "defense team." The first sentence of Subsection B is based on the original version of the Guideline and has been revised to emphasize that the purpose of providing adequate support services is to further the overall goal of providing "high quality legal representation," not merely "an adequate defense." The second sentence is taken from Standard 5-1.4 of the ABA Standards for Criminal Justice: Providing Defense Services. Subsections B (1) and B (2) are new and reflect the decision to include private attorneys in these Guidelines.

*Related Standards*

ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS Standard 7-1.1 (1989) ("Roles of Mental Health and Mental Retardation Professionals in the Criminal Process").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.4 (3d ed. 1992) ("Supporting services").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION Standard 3-2.4 ("Special Assistants, Investigative Resources, Experts"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-4.1 ("Duty to

Investigate"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.14 (1973) ("Supporting Personnel and Facilities").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 2 (1970) ("Rights to Representation, Services, and Facilities").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 12 (1970) ("Personnel and Facilities").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES, Guideline III-8 (1984) ("Support Staff and Forensic Experts").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES, Guideline III-9 (1984) ("Investigators").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES, Guideline III-10 (1984) ("Compensation").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES §3.1 (1976) ("Assigned Counsel Fees and Supporting Services").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES §3.4 (1976) ("Nonpersonnel Needs in Defender Offices").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.6 (1989) ("Support Services").

**Commentary**

Introduction

In a capital case reaffirming that fundamental fairness entitles indigent defendants to the "basic tools of an adequate defense," the United States Supreme Court stated:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the [prosecution] proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.[86]

---

[86] Ake v. Oklahoma, 470 U.S. 68, 77 (1985).

68-034

It is critically important, therefore, that each jurisdiction authorize sufficient funds to enable counsel in capital cases to conduct a thorough investigation for trial, sentencing, appeal, post-conviction and clemency, and to procure and effectively present the necessary expert witnesses and documentary evidence.[87]

The Team Approach to Capital Defense

National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate supporting services, including, "expert witnesses capable of testifying at trial and at other proceedings, personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencing, and trained investigators to interview witnesses and to assemble demonstrative evidence."[88]

This need is particularly acute in death penalty cases. The prosecution commits vast resources to its effort to prove the defendant guilty of capital murder. The defense must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own.[89] Yet investigating a homicide is uniquely complex and often involves evidence of many different types. Analyzing and interpreting such evidence is impossible without consulting experts – whether pathologists, serologists, microanalysts, DNA analysts, ballistics specialists, translators, or others.[90]

In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses.[91] Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings,

---

[87]    *See* ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.4 cmt. (3d ed. 1992).

[88]    *Id.*

[89]    *See* Subcommittee on Federal Death Penalty Cases Committee on Defender Services, Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* at 24 (1998) [hereinafter *Federal Death Penalty Cases*] (discussing federal death penalty cases), *available at* http://www.uscourts.gov/dpenalty/1COVER.htm (reporting that "both the prosecution and the defense rely more extensively on experts in death penalty cases" than in other criminal cases).

[90]    *See e.g.*, Alec Wilkinson, *A Night at the Beat House*, THE NEW YORKER, Feb. 13, 1995, at 68 (discussing how counsel used an expert to show that victim was not killed in the prosecuting jurisdiction but dragged to the crime scene after her death; client eventually exonerated and released).

[91]    *See, e.g.*, Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 SANTA CLARA L. REV. 547 (1995); Dorothy O. Lewis et al., *Psychiatric, neurological, and psychoeducational characteristics of 15 Death Row inmates in the United States*, 143:7 AM. J. PSYCHIATRY 838-45 (1986).

68-035

including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend *Miranda* warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation,[92] making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase.[93] Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process.[94] Counsel must compile extensive historical data, as well as obtaining a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.[95]

Counsel's own observations of the client's mental status, while necessary,[96] can hardly be expected to be sufficient to detect the array of conditions (*e.g.*, post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A (2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs. The demands of each case – and each stage of the same case – will differ. Jurisdictions must therefore construe this Guideline broadly, keeping in mind the superior opportunity of defense counsel to determine what assistance is needed to provide high quality legal representation under the particular circumstances at hand and counsel's need to explore the potential of a variety of possible theories. For example, it might well be appropriate for counsel to retain an expert familiar with the cultural context by which the defendant was shaped, or a professional researcher to track down elusive archival records. While resources are not unlimited, of course, jurisdictions should also be mindful that sufficient funding early in a case may well result in significant savings to the system as a whole.[97]

---

[92]    *See* Atkins v. Virginia, 122 S. Ct. 2242 (2002).

[93]    *See* Goodpaster, *supra* note 2, at 323-24.

[94]    *See* John H. Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, THE ADVOCATE, Aug. 1995, *available at* http://www.dpa.state.ky.us/rwheeler/blume/blume.html.

[95]    *See* Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43-64 (1994).

[96]    *See infra* Guidelines 10.5 and 10.15.1(E)(2) and accompanying Commentary.

[97]    For example, in light of the constitutional prohibition on the execution of the mentally retarded, *see* Atkins v. Virginia, 122 S. Ct. 2242 (2002), significant resources spent at the pretrial phase in investigating and presenting the defendant's retardation status will be amply repaid in future cost savings since the most likely outcomes are (a) the case is taken off the capital track

68-036

Effective Assistance of Experts

Subsections B (1) and B (2) are aimed at insuring that the fact of public funding does not diminish the quality of the assistance that counsel is able to obtain from experts.  Thus, unless counsel agrees otherwise, the defendant is entitled to experts independent of the government; the jurisdiction may not meet its obligations by relegating him to the state mental hospital or the state crime laboratory.[98]  Similarly, doctrines of privilege, work product, and the like should protect the communications between counsel and the experts just as they would if the experts were being paid with private funds.  Procedures for the auditing of public funds should be structured so as to preserve this confidentiality.

The Core Defense Team

In addition to employing the particular nonlegal resources that high quality legal representation requires in each individual case, the standard of practice demands that counsel have certain specific forms of assistance in every case.  This Guideline accordingly requires that those resources be provided.[99]

A.    The Investigator

The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings.  Although some investigative tasks, such as assessing the credibility of key trial witnesses, appropriately lie within the domain of counsel, the prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation.  Counsel lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case.  Moreover, the defense may need to call the person who conducted the interview as a trial witness.[100]  As a result, an investigator should be part of the defense team at stage of a capital proceeding.

---

entirely, very possibly by agreement with the prosecution or (b) the issue is decided against the defendant, thus minimizing the likelihood of it being raised later.  Similarly, it is not only expensive, but also extremely unjust for exculpatory evidence about which trial counsel should have learned from an expert to lie undiscovered until post-conviction proceedings many years later – years during which an innocent person is incarcerated.  *See* Freedman, *supra* note 50, at 1094-95, 1098-99.

[98]    Of course, non-lawyer professionals on the staff of defender organizations are, even if on the public payroll, "independent of the government" for this purpose.

[99]    This Guideline contemplates that defense counsel will be primarily responsible for selection of the remaining members of the defense team.  (Guideline 10.4 *infra* discusses in greater detail the division of this responsibility among the attorneys on the team.)  The Responsible Agency should, however, be prepared to provide assistance in finding qualified individuals to fill these roles.

[100]    *See infra* Guideline 10.7 and accompanying Commentary.

---

68-037

B.    The Mitigation Specialist

A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have.[101] They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (*e.g.*, family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.[102] The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.[103]

The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending. The rapport developed in this process can be the key to persuading a client to accept a plea to a sentence less than death.[104]

For all of these reasons the use of mitigation specialists has become "part of the existing 'standard of care'" in capital cases, ensuring "high quality investigation and preparation of the penalty phase."[105]

---

[101]    *See* Dwight H. Sullivan et al., *Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 CIV. RTS. L.J. 199, 206-11 (2002).

[102]    *See* Vivian Berger, *The Chiropractor as Brain Surgeon: Defense Lawyering in Capital Cases*, 18 N.Y.U. Rev Law & Soc. Change 245, 250 (1990/1991) (Many attorneys make no preparations whatsoever for the sentencing phase; because they believe that a lawyer should try to win rather than plan to lose, they "are devastated when the client is convicted and afterward just throw in the towel"); *See infra* Guideline 10.10.1 and accompanying Commentary; text accompanying notes 271-74.

[103]    *See* Russell Stetler, *Why Capital Cases Require Mitigation Specialists*, Indigent Defense (NLADA July/Aug. 1999); TEXAS DEFENDER SERVICE CAPITAL TRIAL PROJECT, DEATH PENALTY MITIGATION MANUAL FOR TRIAL ATTORNEYS ch. 2 (2001) ("The Mitigation Specialist and the Team Approach") [hereinafter TEXAS DEATH PENALTY MITIGATION MANUAL].

[104]    *See infra* text accompanying note 178.

[105]    *See Federal Death Penalty Cases*, *supra* note 89, at 24. Numerous death penalty

---

68-038

Counsel Not Compensated by Public Funds

Finally, in the relatively rare case in which a capital defendant retains counsel, jurisdictions must ensure that the defendant has access to necessary investigative and expert services if the defendant cannot afford them. "Inability to afford counsel necessarily means that a defendant is unable to afford essential supporting services, such as investigative assistance and expert witnesses. The converse does not follow, however. Just because a defendant is able to afford retained counsel does not mean that sufficient finances are available for essential services. . . . . Supporting services [should] be made available to the clients of retained counsel who are unable to afford the required assistance."[106] Of course, the same observations apply where counsel is serving *pro bono* or, although originally retained, has simply run out of money.

---

jurisdictions routinely authorize the payment of funds for mitigation experts pursuant to state statute, court rule, case law or defense motion, *e.g.,* South Carolina, S.C. Code Ann. § 16-3-26(c) and State v. Bailey, 424 S.E.2d 503, 507 (S.C.1992) ("In today's capital trial, the defendant is entitled to produce mitigation evidence concerning his childhood and family background in mitigation of his criminal conduct, so that the jury may impose life imprisonment as an alternative to the death sentence. In preparing this evidence, the attorney must employ investigators in the course of thoroughly researching the defendant's entire life."); Tennessee, Tenn. Code. Ann. § 40-14-207(b) and Tenn. S. Ct. R. 13, § 5; Illinois, 725 Ill. Comp. Stat. 124/10 (West 2002); Washington; Kentucky, Ky. Rev. Stat. Ann. § 31.31.110; New York; Colorado, New Jersey; and Georgia, Ga. Code Ann. § 17-12-90 et seq. In federal capital trials, mitigation experts are routinely appointed and compensated under 21 U.S.C. § 848(q).

[106]    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.4 cmt. (3d ed. 1992). *See also* Edward C. Monahan & James J. Clark, *Funds for Resources for Indigent Defendants Represented by Retained Counsel,* CHAMPION, Dec. 1996, at 16.

68-039

## Guideline 5.1      Qualifications of Defense Counsel

A.     The Responsible Agency should develop and publish qualification standards for defense counsel in capital cases. These standards should be construed and applied in such a way as to further the overriding goal of providing each client with high quality legal representation.

B.     In formulating qualification standards, the Responsible Agency should insure:

    1.     That every attorney representing a capital defendant has:

        a.     obtained a license or permission to practice in the jurisdiction;

        b.     demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases; and

        c.     satisfied the training requirements set forth in Guideline 8.1.

    2.     That the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation. Accordingly, the qualification standards should insure that the pool includes sufficient numbers of attorneys who have demonstrated:

        a.     substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

        b.     skill in the management and conduct of complex negotiations and litigation;

        c.     skill in legal research, analysis, and the drafting of litigation documents;

        d.     skill in oral advocacy;

        e.     skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

        f.     skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

        g.     skill in the investigation, preparation, and presentation of mitigating evidence; and

        h.     skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

68-040

### *History of Guideline*

This Guideline has been substantially reorganized for this edition. In the original edition, it emphasized quantitative measures of attorney experience – such as years of litigation experience and number of jury trials – as the basis for qualifying counsel to undertake representation in death penalty cases. In this revised edition, the inquiry focuses on counsel's ability to provide high quality legal representation.

### *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.2 (3d ed. 1992) ("Eligibility to Serve").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 1.2 (1997) ("Education, Training, and Experience of Defense Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II.3 (1984) ("Duties").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.9 (1989) ("Standards for Performance of Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1(b) (1989) ("Establishment and General Operation of Assigned Counsel Roster").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1.1 (1989) ("Qualifications of Attorneys").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.15 (1976) ("Establishing the Assigned Counsel Panel").

### *Commentary*

Under Guideline 3.1, it is the duty of the Responsible Agency to provide capital defendants with attorneys who will give them high quality legal representation. This Guideline amplifies that duty. It is designed to be outcome-focused and to leave the Responsible Agency maximum flexibility. The Guideline sets forth the necessary qualifications for all attorneys (Subsection B (1)), and also requires that "the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation." (Subsection B (2)). The qualification standards set by the Responsible Agency must be such as to bring about this result.

This functional approach is new to this edition.

68-041

As described in the Commentary to Guideline 1.1, the abilities that death penalty defense counsel must possess in order to provide high quality legal representation differ from those required in any other area of law.  Accordingly, quantitative measures of experience are not a sufficient basis to determine an attorney's qualifications for the task.  An attorney with substantial prior experience in the representation of death penalty cases, but whose past performance does not represent the level of proficiency or commitment necessary for the adequate representation of a client in a capital case, should not be placed on the appointment roster.[107]

There are also attorneys who do not possess substantial prior experience yet who will provide high quality legal representation in death penalty cases.[108]  Such attorneys may have specialized training and experience in the field (*e.g.*, as law professors), may previously have been prosecutors, or may have had substantial experience in civil practice.[109]  These attorneys should receive appointments if the Responsible Agency is satisfied that the client will be provided with high quality legal representation by the defense team as a whole.

In order to make maximum use of the available resources in the legal community overall, the Responsible Agency needs to devise qualification standards that build upon the contribution that each lawyer can make to the defense team, while ensuring that the team is of such a size and aggregate level of experience as to be able to function effectively.

---

[107]    *See* Bright, *supra* note 28, at 1871 n.209 ("Standards for the appointment of counsel, which are defined in terms of number of years in practice and number of trials, do very little to improve the quality of representation since many of the worst lawyers are those who have long taken criminal appointments and would meet the qualifications").

[108]    Because, as the second sentence of Subsection A emphasizes, the overriding goal is to provide high quality legal representation to the client in the individual case, it may also be appropriate for the appointing authority to certify an attorney for a limited purpose, *e.g.*, to represent a particular client with whom he or she has a special relationship.

[109]    Superior post-conviction death penalty defense representation has often been provided by members of the private bar who did not have prior experience in the field but who did have a commitment to excellence.  *See, e.g.*, Kelly Choi, *Against All Odds*, THE AMERICAN LAWYER, Dec. 2000, at 98; *Death-Row Rescue by Minnesota Life-Saving Lawyers*, STAR TRIBUNE, Jan. 5, 2001, at 18A.

68-042

## Guideline 6.1          Workload

**The Responsible Agency should implement effectual mechanisms to ensure that the workload of attorneys representing defendants in death penalty cases is maintained at a level that enables counsel to provide each client with high quality legal representation in accordance with these Guidelines.**

### *History of Guideline*

The original edition of this Guideline stated that "attorneys accepting appointments pursuant to these Guidelines . . . should not accept appointment" if their workload would interfere with the provision of "quality representation or lead to the breach of professional obligations."

Although that admonition has been retained in Guideline 10.3, this Guideline, which in accordance with Guideline 1.1 applies to all defense counsel (not just appointed members of the private bar), has been added to make clear that it is the responsibility of the jurisdiction creating the system to establish mechanisms for controlling attorney workloads.

### *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-5.3 (3d ed. 1992) ("Workload").

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.3 ("Delays; Punctuality; Workload") in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 5 (2002) ("Defense counsel's workload is controlled to permit the rendering of quality representation").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS AND GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.12 (1973) ("Workload of Public Defenders").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.1 (1976) (Establishing Maximum Pending Workload Levels for Individual Attorneys").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.2 (1976) (Statistics and Record Keeping").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.3 (1976) (Elimination of Excessive Caseloads").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-12 (1984) (Case and Work Overload").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1(c) (1989) ("Establishment and General Operation of

68-043

Assigned Counsel Roster").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.12 (1989) ("Workload of Attorneys").

**Commentary**

In order to achieve the goal of providing capital defendants with high quality legal representation, the caseloads of their attorneys must be such as to permit the investment of the extraordinary time and effort necessary to ensure effective and zealous representation in a capital case. As the ABA Defense Services Standards note:

> One of the single most important impediments to the furnishing of quality defense services for the poor is the presence of excessive caseloads. All too often in defender organizations, attorneys are asked to provide representation in too many cases. Unfortunately, not even the most able and industrious lawyers can provide quality representation when their workloads are unmanageable. Excessive workloads, moreover, lead to attorney frustration, disillusionment by clients, and weakening of the adversary system.[110]

A numerical set of caseload standards for appointed counsel, standing alone, would not ensure high quality legal representation. While national caseload standards should in no event be exceeded, the concept of "workload" (*i.e.*, caseload adjusted by factors such as case complexity, support services, and an attorney's nonrepresentational duties) is a more accurate measurement of counsel's ability to provide quality representation. In assessing appointed counsel's workload, the Responsible Agency must also consider whether counsel has adequate access to essential support staff such as investigators, mitigation specialists, paralegals, and legal secretaries. Counsel's workload, including legal cases and other work, should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations, and counsel is obligated to decline to undertake additional cases above such levels.[111]

In accordance with these principles, the Responsible Agency should assess the workload of eligible attorneys prior to appointment to ensure that counsel's workload will enable counsel to provide high quality legal representation. To assist in assessing workloads, some defender offices have established workload guidelines that are useful in determining whether the workload of a particular attorney is excessive. These guidelines may be consulted as one measure of appropriate workloads.[112]

---

[110]    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-5.3 cmt. (3d ed. 1992). *See also* MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC 2-30 (1997); MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.3 cmt. 1 (1997) ("A lawyer's workload should be controlled so that each matter can be handled adequately.").

[111]    *See infra* Guideline 10.3 and accompanying Commentary.

[112]    *See* NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guidelines 4.1, 5.1–5.3 (1976); NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.12 (1973). These standards all acknowledge the need to determine acceptable workloads, and all

68-044

Studies have consistently found that defending capital cases requires vastly more time and effort by counsel than noncapital matters. For example, a study of the California State Public Defender revealed that attorneys there spent, on average, four times as much time on capital representation as on cases with any other penalty, including those involving a maximum possible sentence of life imprisonment without parole.[113] In terms of actual numbers of hours invested in the defense of capital cases, recent studies indicate that several thousand hours are typically required to provide appropriate representation. For example, an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,889.[114]

Workloads for lawyers handling direct appeals should also be maintained at levels that are consistent with providing high quality legal representation. Like the responsibilities of counsel at trial, appellate work in a capital case is time-consuming and difficult. A capital trial record, which appellate counsel must review in full and with care, typically runs to thousands or even tens of thousands of pages -- even before, pursuant to Guideline 10.7 (B) (2), counsel investigates the possibility that the record may be incomplete. Once appellate counsel has reviewed the record, he or she must conduct especially wide-ranging legal research, canvassing both state and federal judicial opinions, before drafting the opening brief. Given the gravity of the punishment, the unsettled state of the law, and the insistence of the courts on rigorous default rules, it is incumbent upon appellate counsel to raise every potential ground of error that might result in a reversal of the defendant's conviction or punishment.[115] Further, counsel must aggressively examine the government's brief and research its legal assertions in order to prepare an adequate reply. Preparing for and presenting oral argument requires counsel to invest still more hours. In California, where the Office of the State Public Defender handled capital appeals in the California Supreme Court, a 1989 study concluded that attorneys handling such cases should be responsible for two to three briefs per year.[116]

---

acknowledge within the standards themselves or in commentary the myriad factors that must be considered in weighing workload. Only the National Advisory Commission sets forth suggested numerical maximums for caseloads; those numbers are provided with the caveat "that particular local conditions – such as travel time – may mean that lower limits are essential." The National Advisory Commission standard does not address death penalty workloads.

[113]     Richard J. Wilson & Robert L. Spangenberg, *State-Postconviction Representation of Defendants Sentenced to Death*, 72 JUDICATURE 331, 336-337 (1989) (collecting and reviewing studies).

[114]     *Federal Death Penalty Cases, supra* note 89, at 14. This figure was only for the number of hours expended through the end of trial court proceedings, and did not include any post-conviction representation.

[115]     *See supra* text accompanying notes 41-43. Moreover, counsel must continue to investigate the facts. *See infra* Guideline 10.7 (A).

[116]     NAT'L CTR. FOR STATE COURTS & SPANGENBERG GROUP, WORKLOAD AND PRODUCTIVITY STANDARDS: A REPORT TO THE OFFICE OF THE STATE PUBLIC DEFENDER 82-93 (1989).

---

68-045

Similarly, the workloads of counsel handling collateral proceedings must be carefully limited to allow for high quality legal representation. A 1998 survey of the time and expenses required in Florida capital post-conviction cases concluded that "the most experienced and qualified lawyers at Florida's post-conviction defender office, the Office of Capital Collateral Representation have estimated that, on average, over 3,300 lawyer hours are required to take a post-conviction death penalty case from the denial of certiorari by the United States Supreme Court following direct appeal to the denial of certiorari" through that state's post-conviction proceedings.[117]

It is the duty of the Responsible Agency to distribute assignments in light of each attorney's duty under the Rules of Professional Conduct to "provide competent representation to a client"[118], which requires "the legal knowledge, skill, thoroughness and preparation"[119] necessary for a complex and specialized area of the law. Thus, the Responsible Agency must monitor private counsel in accordance with Guideline 7.1, and provide them with additional assistance as necessary. And the Independent Authority must monitor the defender organizations of the jurisdiction and stand ready to supplement their resources with those of the private bar.

Regardless of the context, no system that involves burdening attorneys with more cases than they can reasonably handle can provide high quality legal representation. In the capital context, no such system is acceptable.

---

[117] THE SPANGENBERG GROUP, AMENDED TIME AND EXPENSE ANALYSIS OF POST-CONVICTION CAPITAL CASES IN FLORIDA 16 (1998).

[118] MODEL RULES OF PROFESSIONAL CONDUCT RULE 1.1 (2002).

[119] MODEL RULES OF PROFESSIONAL CONDUCT RULE 1.1 CMT. 1 (2002); ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.2(d), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993). *See* MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7(b) (1997). The comment to that Rule says that "a lawyer's need for income should not lead the lawyer to undertake matters that cannot be handled competently." MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7 cmt. 6 (1997). *See also* NAT. LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION 1.3(a) (1995).

68-046

## Guideline  7.1        Monitoring; Removal

A.      The Responsible Agency should monitor the performance of all defense counsel to ensure that the client is receiving high quality legal representation.  Where there is evidence that an attorney is not providing high quality legal representation, the Responsible Agency should take appropriate action to protect the interests of the attorney's current and potential clients.

B.      The Responsible Agency should establish and publicize a regular procedure for investigating and resolving any complaints made by judges, clients, attorneys, or others that defense counsel failed to provide high quality legal representation.

C.      The Responsible Agency should periodically review the rosters of attorneys who have been certified to accept appointments in capital cases to ensure that those attorneys remain capable of providing high quality legal representation.  Where there is evidence that an attorney has failed to provide high quality legal representation, the attorney should not receive additional appointments and should be removed from the roster.  Where there is evidence that a systemic defect in a defender office has caused the office to fail to provide high quality legal representation, the office should not receive additional appointments.

D.      Before taking final action making an attorney or a defender office ineligible to receive additional appointments, the Responsible Agency should provide written notice that such action is being contemplated, and give the attorney or defender office opportunity to respond in writing.

E.      An attorney or defender office sanctioned pursuant to this Guideline should be restored to the roster only in exceptional circumstances.

F.      The Responsible Agency should ensure that this Guideline is implemented consistently with Guideline 2.1(C), so that an attorney's zealous representation of a client cannot be cause for the imposition or threatened imposition of sanctions pursuant to this Guideline.

*History of Guideline*

        In the original edition, this Guideline provided that an attorney should receive no additional capital appointments if counsel had "inexcusably ignored basic responsibilities of an effective lawyer, resulting in prejudice to the client's case."  In this edition, the standard has been changed to prohibit future appointment where counsel "has failed to provide high quality legal representation."  The change was made because the former language was considered insufficiently stringent.  Subsection B is based on Commentary to the original edition of the Guideline.  Subsections C–E are taken from Subsections A and C of the original edition of the Guideline.  Subsection F is new and is intended to emphasize the importance of the principle enunciated in Guideline 2.1(C).

68-047

## *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.3 (3d ed. 1992) ("Rotation of assignments and revision of roster").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-6.3 (3d ed. 1992) ("Removal").

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 10 (2002) ("Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.4 (1989) ("Supervision of Attorneys").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.4.2 (1989) ("Monitoring").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5 (1989).

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5.1 (1989) ("Penalties Less Thank Removal").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5.2 (1989) ("Removal from Program Rosters").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.5.3 (1989) ("Reinstatement After Removal").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.4 (1976) ("Supervision and Evaluation of Defender System Personnel").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.5 (1976) ("Monitoring and Evaluation of Assigned Counsel Program Personnel").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III.16 (1984) ("Supervision and Evaluation").

43

68-048

***Commentary***

Consistent with its duty to ensure that high quality legal assistance is afforded to indigent capital defendants, the Responsible Agency should monitor the performance of all capital defense counsel, including defender offices. "Admittedly, this is not an easy task and there obviously are difficulties present in having third parties scrutinize the judgments of private counsel. On the other hand, the difficulty of the task should not be an excuse to do nothing."[120]

While the Responsible Agency should investigate and maintain records regarding any complaints made against assigned counsel by judges, clients and other attorneys,[121] an effective attorney-monitoring program in death penalty matters should go considerably beyond these activities. The performance of each assigned lawyer should be subject to systematic review based upon publicized standards and procedures.[122] Counsel should be removed from the roster when counsel has failed to represent a client consistently with these Guidelines.[123]

In fulfilling its monitoring function, the Responsible Agency should not attempt to micro-manage counsel's work;[124] most lawyering tasks may reasonably be performed in a variety of ways. In order to preserve the nature of the attorney-client relationship, counsel for the accused must have the freedom to represent their client as they deem professionally appropriate. Clients, moreover, should have the right to continue satisfactory relationships with lawyers in whom they have reposed their confidence and trust. Rather, the responsibility of the Responsible Agency is to ensure that, overall, the attorney is providing high quality legal representation. Where counsel fails to do so, whether because of a mental or physical impairment,[125] or for any other reason, the

---

[120] ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.3 cmt. (3d ed. 1992).

[121] *Id.*

[122] *See infra* Guidelines 10.1 to 10.15.2.

[123] The standard for denying additional appointments to death penalty lawyers should be more strictly applied than the standard for denying additional appointments in non-capital cases. In non-capital criminal cases, the standard provides that "where there is compelling evidence that an attorney *consistently* has ignored basic responsibilities, the attorney's name should be removed from the roster after notice and hearing, with the possibility of reinstatement after removal if adequate demonstration of remedial measures is shown." ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.3 cmt. (3d ed. 1992) (emphasis added). As these Guidelines make clear, low quality representation of a capital defendant may have irrevocable consequences. Accordingly, the Responsible Agency should not wait for an attorney to "consistently ignore basic responsibilities."

[124] *See* ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.3 cmt. (3d ed. 1992).

[125] It cannot always be safely assumed that counsel who has been determined to be qualified based on past performance will represent current or future clients satisfactorily. Circumstances can change. For example, the attorney may begin suffering from illness, chemical dependency or other handicap unknown to the appointing authority, the court or the client. *See* Kirshmeier, *supra* note 28, at, 455-60 (discussing cases in which defendants were represented by lawyers who were

---

68-049

Responsible Agency should intervene.  This may occur on the Responsible Agency's own motion or as a result of a request by the defendant or the court.[126]

In keeping with the paramount objective of protecting the rights and interests of the defendant, Subsection E provides that the Responsible Agency should have a regularized procedure for investigating and resolving complaints of inadequate representation.  The procedure should recognize that many people (*e.g.*, family members of the client, witnesses whom the attorney has interviewed or not interviewed) may be in a position to provide important information.  The procedure should be publicized accordingly.

The Responsible Agency must monitor cases, and take appropriate action in the event of any substandard performance.  If the jurisdiction has defender organizations, the Independent Authority monitoring them must review such problems with an eye towards rectifying both deficiencies on the part of individual staff lawyers and any structural flaws that those deficiencies may reveal.  If inadequate training, office workload, or some other systemic problem has resulted in representation of lower quality than required by these Guidelines and the situation is not corrected, the Independent Authority should remove the office from the roster.

Because of the unique and irrevocable nature of the death penalty, counsel or offices that have been removed from the roster should be readmitted only upon exceptional assurances that no further dereliction of duty will occur.  The Responsible Agency should not readmit counsel or the office to the roster unless it determines that the original removal was in error, or finds by clear and convincing evidence that the problem which led to the removal of counsel or the office has been identified and corrected.  It may condition readmission on specific actions (*e.g.*, proof of reduction in workload, proof of additional training and/or experience, substance abuse counseling, or correction of systemic defects in an office).

---

intoxicated, abusing drugs, or mentally ill).

[126]   *See* ABA STANDARDS FOR CRIMINAL JUSTICE: SPECIAL FUNCTIONS OF THE JUDGE Standard 6-1.1(a) (2d ed. 1986) ("The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice.  The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.").

---

68-050

## Guideline  8.1          Training

A.      The Legal Representation Plan should provide funds for the effective training, professional development, and continuing education of all members of the defense team.

B.      Attorneys seeking to qualify to receive appointments should be required to satisfactorily complete a comprehensive training program, approved by the Responsible Agency, in the defense of capital cases.  Such a program should include, but not be limited to, presentations and training in the following areas:

1.      relevant state, federal, and international law;

2.      pleading and motion practice;

3.      pretrial investigation, preparation, and theory development regarding guilt/innocence and penalty;

4.      jury selection;

5.      trial preparation and presentation, including the use of experts;

6.      ethical considerations particular to capital defense representation;

7.      preservation of the record and of issues for post-conviction review;

8.      counsel's relationship with the client and his family;

9.      post-conviction litigation in state and federal courts;

10.     the presentation and rebuttal of scientific evidence, and developments in mental health fields and other relevant areas of forensic and biological science;

11.     the unique issues relating to the defense of those charged with committing capital offenses when under the age of 18.

C.      Attorneys seeking to remain on the roster or appointment roster should be required to attend and successfully complete, at least once every two years, a specialized training program approved by the Responsible Agency that focuses on the defense of death penalty cases.

D.      The Legal Representation Plan should insure that all non-attorneys wishing to be eligible to participate on defense teams receive continuing professional education appropriate to their areas of expertise.

68-051

## History of Guideline

The importance of training was addressed in Guideline 9.1 of the original version of the Guidelines for lawyers seeking to receive appointments in capital cases.  Subsections A and D have been added to this revised edition to emphasize that the Legal Representation Plan must provide for specialized training of all members of the defense team involved in the representation of capital defendants.  Subsections B and C are based on the original edition of the Guideline.  This revised edition of the Guideline has been amended to emphasize that qualified training programs must be "comprehensive" in scope.  Thus the eleven areas of training set forth in Subsection B are new and are intended to indicate the broad range of topics that must be covered in order for an initial training program to meet minimum requirements.  The requirement of participation in a continuing legal education program every two years is also a minimum; many capital defense counsel have discovered that they must attend training programs more frequently in order to provide effective legal representation.

## Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.5 (3d ed. 1992) ("Training and Professional Development").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION Standard 3-2.6 (3d ed. 1993) ("Training Programs") in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 9 (2002) ("Defense counsel is provided with and required to attend continuing legal education").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.16 (1973) ("Training and Education of Defenders").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 10 (1970) ("Office of Defender General").

NAT'L LEGAL AID & DEFENDER ASS'N, DEFENDER TRAINING & DEVELOPMENT STANDARDS (1997).

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR DEFENSE SERVICES § III-17 (1984) ("Professional Development").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.7 (1976) (Training Staff Attorneys In A Defender System").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.8 (1976) (Training Assigned Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF

68-052

ASSIGNED COUNSEL SYSTEMS Standard 4.2 (1989) ("Orientation").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.3.1 (1989) ("Entry-Level Training").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.3.2 (1989) ("In-Service Training").

**Commentary**

As indicated in the Commentary to Guideline 1.1, providing high quality legal representation in capital cases requires unique skills. Accordingly, the standard of practice requires that counsel have received comprehensive specialized training before being considered qualified to undertake representation in a death penalty case.[127] Such training must not be confined to instruction in the substantive law and procedure applicable to legal representation of capital defendants, but must extend to related substantive areas of mitigation and forensic science. In addition, comprehensive training programs must include practical instruction in advocacy skills, as well as presentations by experienced practitioners.

Once an attorney has been deemed qualified to accept appointments in capital cases, the standard of practice requires counsel to regularly receive formal training in order to keep abreast of the field.[128] Continuing legal education, which is required by many state bars as a matter of course for all attorneys, is critically important to capital defense attorneys. As the Commentary to Guideline 1.1 indicates, they must not only have mastery of current developments in law, forensics, and related areas, but also be able to anticipate future ones.[129]

In recognition of the central role that ongoing training plays in the provision of effective capital defense representation, a number of professional organizations, including the National Association of Criminal Defense Lawyers, the National Legal Aid and Defender Association, the Habeas Assistance Project, the NAACP Legal Defense and Education Fund, Inc., the office of the Kentucky Public Advocate, and the Association of the Bar of the City of New York, have regularly devoted significant resources to providing educational programs of the quality contemplated by this Guideline.

---

[127]    *See, e.g.*, New York Capital Defender Office, *Minimum Standards for Lead Counsel and Associate Counsel in Capital Cases, available at* http://www.nycdo.org/35b/35b-std.html (requiring that applicants submit "a description of specialized training programs regularly attended, such as the NITA, the National Criminal Defense College, or bar association criminal justice programs" and specifying that "an attorney shall not be considered eligible to be appointed as lead counsel or associate counsel in a capital case unless the Capital Defender Office shall certify that the attorney satisfactorily has completed a basic capital training program prescribed by the Capital Defender Office").

[128]    As one authority has noted, capital defense counsel must exhibit "constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law." Vick, *supra* note 3, at 358.

[129]    *See supra* text accompanying note 27.

---

48

68-053

## Guideline 9.1          Funding and Compensation

A.      The Legal Representation Plan must ensure funding for the full cost of high quality legal representation, as defined by these Guidelines, by the defense team and outside experts selected by counsel.

B.      Counsel in death penalty cases should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the extraordinary responsibilities inherent in death penalty representation.

      1.      Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases.

      2.      Attorneys employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale of the prosecutor's office in the jurisdiction.

      3.      Appointed counsel should be fully compensated for actual time and service performed at an hourly rate commensurate with the prevailing rates for similar services performed by retained counsel in the jurisdiction, with no distinction between rates for services performed in or out of court.  Periodic billing and payment should be available.

C.      Non-attorney members of the defense team should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the specialized skills needed by those who assist counsel with the litigation of death penalty cases.

      1.      Investigators employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale of the prosecutor's office in the jurisdiction.

      2.      Mitigation specialists and experts employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale for comparable expert services in the private sector.

      3.      Members of the defense team assisting private counsel should be fully compensated for actual time and service performed at an hourly rate commensurate with prevailing rates paid by retained counsel in the jurisdiction for similar services, with no distinction between rates for services performed in or out of court.  Periodic billing and payment should be available.

D.      Additional compensation should be provided in unusually protracted or extraordinary cases.

E.      Counsel and members of the defense team should be fully reimbursed for reasonable incidental expenses.

68-054

## History of Guideline

This Guideline was Guideline 10.1 in the original edition. The express disapproval of flat or fixed fee compensation provisions and statutory fee maximums is new to this edition. The provision is in keeping with Guideline 10.1(A) of the original edition, which mandates that counsel be fully compensated at a reasonable hourly rate of compensation, and follows the Commentary to Standard 5-2.4 of the ABA Standards for Criminal Justice: Providing Defense Services, which observes that "[t]he possible effect of such rates is to discourage lawyers from doing more than what is minimally necessary to qualify for the flat payment." Subsection B (2) is new to the Guideline and has been added to provide for compensation of attorneys employed by defender organizations. Subsection B (3) is based on the original edition of the Guideline, but a provision has been added indicating that there should be no distinction between the hourly rates of compensation for services performed in or out of court. Subsection C is new to this edition and provides for compensation of the other members of the defense team. Subsection D is new to this edition. Subsection E is based on the original edition.

## Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.4 (3d ed. 1992) ("Compensation and expenses").

ABA STANDARDS FOR CRIMINAL JUSTICE Standards 21-2.4, 22-4.3 (2d ed. 1980).

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.7 (1973) ("Defender to be Full-Time and Adequately Compensated").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS AND GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.11 (1973) ("Salaries for Defender Attorneys").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 11 (1970) ("Local Offices").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 13 (1970) ("Court Assigned Attorneys").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.7.1 ("Assigned Counsel Fees"), 4.7.2 ("Method of Compensation"), 4.7.3 ("Payment of Expenses"), and 4.7.4 ("Only Authorized Compensation") (1989).

NAT'L LEGAL AID & DEFENDER ASS'N, NATIONAL STUDY COMMISSION ON DEFENSE SERVICES § 3.1 (1976) ("Assigned Counsel Fees and Supporting Services").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 3.2 (1976) ("Defender System Salaries").

68-055

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-10 (1984) ("Compensation").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-11 (1984) ("Special Case Compensation").

***Commentary***

In order to fulfill its constitutional obligation to provide effective legal representation for poor people charged with crimes,[130] "[g]overnment has the responsibility to fund the full cost of quality legal representation."[131] This means that it must "firmly and unhesitatingly resolve any conflicts between the treasury and the fundamental constitutional rights in favor of the latter."[132]

As Subsection A of this Guideline emphasizes, each jurisdiction is responsible for paying not just the direct compensation of members of the defense team, but also the costs involved in meeting the requirements of these Guidelines for high quality legal representation (*e.g.*, Guideline 4.1, Guideline 8.1).

As a rough benchmark, jurisdictions should provide funding for defender services that maintains parity between the defense and the prosecution with respect to workload, salaries, and resources necessary to provide quality legal representation (including benefits, technology, facilities, legal research, support staff, paralegals, investigators, mitigation specialists, and access to forensic services and experts). In doing so, jurisdictions must be mindful that the prosecution has access at no cost to many services for which the defense must pay. A prosecution office will not only benefit from the formal resources of its jurisdiction (*e.g.*, a state crime laboratory) and co-operating ones (*e.g.*, the FBI), but from many informal ones as well. For example, a prosecutor seeking to locate a witness in a distant city can frequently enlist the assistance of a local police department; defense counsel will have to pay to send out an investigator. Yet funding for defense services usually lags far behind prosecution funding.[133]

---

[130]    *See* Gideon v. Wainwright, 372 U.S. 335 (1963); Powell v. Alabama, 287 U.S. 45 (1932).

[131]    ABA, STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.6 & cmt. (3d ed. 1992).

[132]    Pruett v. State, 574 So. 2d 1342, 1354 (Miss. 1990) (quoting Makemson v. Martin County, 491 So. 2d 1109, 1113 (Fla. 1986), *cert. denied*, 479 U.S. 1043 (1987)).

[133]    Studies indicate that funding for prosecution is, on the average, three times greater than funding that is provided for defense services at both the state and federal levels. ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-1.6 cmt. (3d ed. 1992) (footnote omitted). *See also*, ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 8 (2002) ("There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.") ("There should be parity of workload, salaries and other resources (such as benefits, technology, facilities, legal research, support staff, paralegals, investigators, and access to forensic services and experts) between prosecution and public defense. Assigned counsel should be paid a reasonable fee in

68-056

Case 1:09-cv-01039-MJT    Document 50-4    Filed 10/05/10    Page 58 of 274 PageID #:
6554
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ▪ February 2003

In particular, compensation of attorneys for death penalty representation remains notoriously inadequate.[134]  As Justice Blackmun observed in 1994:

> [C]ompensation for attorneys representing indigent capital defendants often is perversely low.  Although a properly conducted capital trial can involve hundreds of hours of investigation, preparation, and lengthy trial proceedings, many States severely limit the compensation paid for capital defense. . . .  As a result, attorneys appointed to represent capital defendants at the trial level frequently are unable to recoup even their overhead costs and out-of-pocket expenses, and effectively may be required to work at minimum wage or below while funding from their own pockets their client's defense.[135]

Low fees make it economically unattractive for competent attorneys to seek assignments and to expend the time and effort a case may require.  A 1993 study of capital representation in Texas, for example, showed that "more experienced private criminal attorneys are refusing to accept court appointments in capital cases because of the time involved, the substantial infringement on their private practices, the lack of compensation for counsel fees and expert services and the enormous pressure that they feel in handling these cases."[136]  Similarly, a survey of Mississippi attorneys appointed to represent indigent defendants in capital cases found that 82% would either refuse or be very reluctant to accept another appointment because of financial considerations.[137]  A 1998 study of federal death penalty cases reported that "[a]lthough the hourly rate of compensation in federal capital cases are higher than those paid noncapital federal criminal

---

addition to actual overhead and expenses.  Contracts with private attorneys for public defense services should never be let primarily on the basis of cost; they should specify performance requirements and the anticipated workload, provide an overflow or funding mechanism for excess, unusual or complex cases, and separately fund expert, investigative, and other litigation support services.  No part of the justice system should be expanded or the workload increased without consideration of the impact that expansion will have on the balance and on the other components of the justice system.  Public defense should participate as an equal partner in improving the justice system.  This principle assumes that the prosecutor is adequately funded and supported in all respects, so that securing parity will mean that defense counsel is able to provide quality legal representation.").

[134]    *See, e.g.*, Ruth E. Friedman & Bryan A. Stevenson, *Solving Alabama's Capital Defense Problems: It's a Dollars and Sense Thing*, 44 ALA. L. REV. 1 (1992); Anthony Paduano & Clive A. Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43 RUTGERS L. REV. 281 (1991); Vick, *supra* note 3; Albert L. Vreeland, II, *The Breath of the Unfee'd Lawyer: Statutory Fee Limitations and Ineffective Assistance of Counsel in Capital Litigation*, 90 MICH. L. REV. 626 (1991).

[135]    McFarland v. Scott, 512 U.S. 1256, 1257-58 (1994) (Blackmun, J., dissenting).

[136]    THE SPANGENBERG GROUP, *A Study of Representation in Capital Cases in Texas* (1993), at 152.

[137]    Friedman & Stevenson, *supra* note 134, at 31 n.148.

68-057

cases, they are quite low in comparison to hourly rates for lawyers generally, and to the imputed hourly cost of office overhead."[138]

While compensation is generally inadequate for representation at trial, it is even worse – and indeed, in a number of jurisdictions, nonexistent – for representation in state collateral proceedings.[139]  Recent studies have estimated that thousands of attorney hours are required to represent a death-sentenced prisoner in such cases.[140]  Not surprisingly, few attorneys are willing to take on this responsibility for negligible compensation.  As a result, a substantial and growing number of condemned inmates who have completed direct review are without legal representation.[141]

It is such inmates – and the justice system – rather than lawyers (who can always move to more lucrative fields) that are victimized when jurisdictions fail to fulfill their financial responsibilities.  What is "most important [is that] the quality of the representation often suffers when adequate compensation for counsel is not available."[142]  This is not a merely theoretical concern.  It is demonstrably the case that, by discouraging more experienced criminal defense lawyers from accepting appointments in capital cases, inadequate compensation has often left capital defense representation to inexperienced or outright incompetent counsel.  A series of studies in several death penalty states have found that appointed counsel in death penalty cases have been subject to professional disciplinary action at significantly higher rates than other lawyers.[143]

These realities underlie the mandate of this guideline that members of the death penalty defense team be fully compensated at a rate commensurate with the provision of high quality legal representation.  The Guideline's strong disapproval of so-called "flat fees," statutory caps, and

---

[138]    *Federal Death Penalty Cases, supra* note 89, at 28.

[139]    For a survey of state practices regarding appointment and compensation of post-conviction counsel, see Hammel, *supra* note 46, and THE SPANGENBERG GROUP, ABA POSTCONVICTION DEATH PENALTY REPRESENTATION PROJECT, AN UPDATED ANALYSIS OF THE RIGHT TO COUNSEL AND THE RIGHT TO COMPENSATION AND EXPENSES IN STATE POSTCONVICTION DEATH PENALTY CASES (1996).

[140]    As discussed in the text accompanying note 117 *supra*, a 1998 study of time and expenses required in Florida capital post-conviction cases concluded that on average, over 3,300 lawyer hours are required to represent a death-sentenced prisoner in Florida's post-conviction proceedings.  THE SPANGENBERG GROUP, *supra* note 117, at 16.

[141]    *See* Decl. Bryan A. Stevenson in *Barbour v. Haley*, No. 01-D-1530-N (M.D. Ala.) ¶ 17 (stating that there are dozens of death row inmates in Alabama without legal representation because of the $1000 per case cap on compensation for state collateral appeals); Smith & Starns, *supra* note 46, at 106-19 (discussing state provisions for appointment of counsel and states that fail to appoint or compensate counsel).

[142]    ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.4 cmt. (3d ed. 1992).

[143]    Vick, *supra* note 3, at 398 (summarizing studies).

---

68-058

other arbitrary limitations on attorney compensation is based upon the adverse effect such schemes have upon effective representation.[144] Rather, compensation should be based on the number of hours expended plus the effort, efficiency, and skill of counsel.[145] When assigned counsel is paid a predetermined fee for the case regardless of the number of hours of work actually demanded by the representation, there is an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee.[146]

Moreover, any compensation system that fails to reflects the extraordinary responsibilities and commitment required of counsel in death penalty cases,[147] that does not provide for extra payments to counsel when unusually burdensome representation is provided, or that does not provide for the periodic payment of fees, will not succeed in obtaining the high quality legal representation required by these Guidelines.

For better or worse, a system for the provision of defense services in capital cases will get what it pays for.[148]

---

[144]    *See id.*

[145]    ABA CRIMINAL JUSTICE STANDARDS: PROVIDING DEFENSE SERVICES Standard 5-2.4 cmt. (3d ed. 1992).

[146]    *See, e.g.,* Bailey v. State, 309 S.C. 455, 460, 424 S.E.2d 503, 506 (1992) ("[I]t would be foolish to ignore the very real possibility that a lawyer may not be capable of properly balancing the obligation to expend the proper amount of time in an appointed criminal matter where the fees involved are nominal, with his personal concerns to earn a decent living by devoting his time to matters wherein he will be reasonably compensated. *The indigent client, of course, will be the one to suffer the consequences if the balancing job is not tilted in his favor.*") (emphasis in original) (citation omitted).

[147]    *See supra* text accompanying notes 1-8.

[148]    *Cf.* Martinez-Macias v. Collins, 979 F.2d 1067, 1067 (5th Cir. 1992) (granting habeas corpus because "Macias was denied his constitutional right to adequate counsel in a capital case in which actual innocence was a close question. The state paid defense counsel $11.84 per hour. Unfortunately, the justice system got only what it paid for.").

---

68-059

## Guideline 10.1     Establishment of Performance Standards

A.    The Responsible Agency should establish standards of performance for all counsel in death penalty cases.

B.    The standards of performance should be formulated so as to insure that all counsel provide high quality legal representation in capital cases in accordance with these Guidelines. The Responsible Agency should refer to the standards when assessing the qualifications or performance of counsel.

C.    The standards of performance should include, but not be limited to, the specific standards set out in these Guidelines.

*History of Guideline*

This Guideline is former Guideline 11.1 with only stylistic revisions.

*Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.1 ("The Function of the Standards"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-1.1 (3d ed. 1992) ("Objective").

NAT'L LEGAL AID AND DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (1997).

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.1 (1989) ("Provision of Quality Representation").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.9 (1989) ("Standards for Performance of Counsel").

*Commentary*

The Structure of Guideline 10

Guideline 10 mandates the establishment of performance standards designed to insure the provision of high quality legal representation. Compliance with Guideline 10 may therefore be relevant to a determination as to whether a jurisdiction meets the requirements of Chapter 154 of the AEDPA, which provides governments with procedural advantages if they choose to establish effectual mechanisms "for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings" brought by indigent capital prisoners, and "provide standards of competency for the appointment of such counsel."[149]

---

[149]   28 U.S.C. § 2261(b). The standards of other Guidelines, *e.g.*, Guideline 2.1 (Legal Representation Plan), Guideline 5.1 (Qualifications of Counsel), Guideline 7.1 (Monitoring), and

68-060

Guideline 10.1 directs the Responsible Agency to promulgate performance standards. Guidelines 10.2–10.15.1 contain specific standards that should be included in any set of performance standards. They do not constitute a complete set of performance standards, however. They address only those aspects of defense representation in which death penalty cases differ from other types of criminal cases[150] and omit those that are applicable to the defense of criminal cases generally. Such standards should, however, also be included in the set established by the Responsible Agency, with the understanding that in capital cases the acceptable level of adherence to those standards must be higher than in non-capital ones. "Death is different,"[151] and, as discussed in the Commentary to Guideline 1.1, death penalty cases have become so specialized that defense counsel in such cases have duties and functions definably different from those of counsel in ordinary criminal cases. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules, become educated regarding a wide range of mental health issues and scientific technologies, and be able to develop strategies for applying them in the pressure-filled environment of high-stakes, complex litigation. The level of attorney competence that may be tolerable in noncapital cases[152] can be fatally inadequate in capital ones.[153] The standards of performance established under this Guideline should accordingly

---

Guideline 9.1 (Compensation and Funding), should also guide the determination as to whether a jurisdiction has "opted in" to Chapter 154.

[150]    There is a general description of these in the Commentary to Guideline 1.1, *supra.* Guideline 10 should be read against the background provided by that Commentary.

[151]    *See, e.g.*, Gardner v. Florida, 430 U.S. 349, 357-358 (1977) (plurality opinion).

[152]    For general standards regarding the performance of criminal defense counsel, *see* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4, *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993); INSTITUTE OF JUDICIAL ADMINISTRATION/AMERICAN BAR ASSOCIATION JUVENILE JUSTICE STANDARDS ANNOTATED, STANDARDS RELATING TO COUNSEL FOR PRIVATE PARTIES (1979); and NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (1997).

[153]    For example, as discussed in the Commentary to Guideline 1.1, the current Supreme Court standard for effective assistance of counsel, Strickland v. Washington, 466 U.S. 668, 687 (1984), requires the defendant to show that counsel's performance was deficient and that the deficient performance undermined the reliability of the conviction or sentence. However, "[m]yriad cases in which defendants have been executed confirm that *Strickland*'s minimal standard for attorney competence in capital cases is a woeful failure. Demonstrable errors by counsel, though falling short of ineffective assistance, repeatedly have been shown to have had fatal consequences." Randall Coyne & Lyn Entzeroth, *Report Regarding Implementation of the American Bar Association's Recommendations and Resolutions Concerning the Death Penalty and Calling for a Moratorium on Executions*, 4 GEO. J. ON FIGHTING POVERTY 3, 18 (1996). In case after case, attorneys who failed to present any evidence in mitigation of the death penalty, or who presented a bare minimum of such evidence, have been found to satisfy *Strickland. See, e.g.*, Chandler v. United States, 218 F.3d 1305, 1319, 1328 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). Yet "the failure to present mitigation evidence is a virtual invitation to impose the death penalty." White, *supra* note 2, at 341.

68-061

insure that all aspects of the representation conform to the special standard of practice applicable to capital cases.[154]

Consistent with the overall purpose of these Guidelines[155] the specific standards of Guidelines 10.2-15.2 are intended to describe appropriate professional conduct. Compliance with those standards may therefore be relevant in the judicial evaluation of the performance of defense counsel to determine the validity of a capital conviction or death sentence.[156] They should in any event be utilized by the Responsible Agency in determining the eligibility of counsel for appointment or reappointment to capital cases and when monitoring the performance of counsel.[157]

---

[154]    The standards established by the Responsible Agency should clearly state that performance in the capital context should be measured with reference to the special expertise required in capital cases. *See, e.g.,* State v. Davis, 116 N.J. 341, 355, 561 A.2d 1082, 1089 (N.J. 1989); NEBRASKA COMM'N ON PUB. ADVOCACY, STANDARDS FOR INDIGENT DEFENSE SERVICES IN CAPITAL AND NON-CAPITAL CASES. Review by the Responsible Agency should likewise be intensified, compared to the scrutiny that might be given under a system to appoint counsel in non-capital cases. *See, e.g.,* text accompanying note 123 *supra.*

[155]    *See supra* Guideline 1.1(A).

[156]    *See, e.g.,* Williams v. Taylor, 529 U.S. 362, 396 (2000) (citing ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1 cmt. at 4-55 (2d ed. 1980) for proposition that "trial counsel [in a capital case have an] obligation to conduct a thorough investigation of the defendant's background," and concluding that defense counsel performed deficiently in failing to conduct a diligent investigation into his client's background).

[157]    *See supra* Guidelines 5.1 and 7.1 and accompanying Commentary.

68-062

## Guideline 10.2 Applicability of Performance Standards

**Counsel should provide high quality legal representation in accordance with these Guidelines for so long as the jurisdiction is legally entitled to seek the death penalty.**

### History of Guideline

This Guideline is based on Guideline 11.3 of the original edition and has been revised for consistency with Guideline 1.1.

### Related Standards

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 3 (2002) ("Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS AND GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.1 (1973) ("Availability of Publicly Financed Representation in Criminal Cases").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.5 (1989) ("Early Representation").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.6 (1989) ("Duration and Continuity of Representation").

### Commentary

The Supreme Court has stated that the "existence [of a death penalty statute] on the statute books provide[s] fair warning as to the degree of culpability which the State ascribes to the act of murder."[158]  In accordance with Guideline 1.1 (B), once a client is detained under circumstances in which the death penalty is legally possible, counsel should proceed as if it will be sought.

As described in the text accompanying footnotes 12-13 *supra*, early investigation to determine weaknesses in the State's case and uncover mitigating evidence is a necessity, and should not be put off in the hope that the death penalty will not be requested, or that the request will be dropped at a later point.[159]  Moreover, early investigation may uncover mitigating

---

[158]    Dobbert v. Florida, 432 U.S. 282, 297 (1977).

[159]    In a number of cases, courts have found no bar to the prosecution pursuing a death sentence, despite belated notice to the defense.  *See, e.g.*, State v. Lee, 185 Ariz. 549, 555, 917 P.2d 692, 698 (1996) (affirming death sentence where state filed its written notice 87 days later than deadline provided for under state law, because defendant had actual notice that State intended to pursue death penalty); People v. District Court, Gilpin County, 825 P.2d 1000, 1002-03 (Colo. 1992) (concluding defendant received adequate notice of intent to seek death penalty where prosecution never stated death penalty would not be sought and notice was filed forty-one days before trial, even though discovery had been completed and date for filing pretrial motions had

68-063

circumstances or other information that will convince the prosecutor to forego pursuit of a death sentence.[160]

Jurisdictions vary in whether the defense must be formally notified as to whether the prosecution will seek the death penalty.[161]  If required notice has not been given, counsel is under

---

passed).

[160]  *See, e.g.*, State v. Pirtle, 127 Wash. 2d 628, 642, 904 P.2d 245, 254 (Wash. 1995) (noting that under state law, before the death penalty can be sought, "there must be 'reason to believe that there are not sufficient mitigating circumstances to merit leniency,'" and "[i]nput from the defendant as to mitigating factors is normally desirable, because the subjective factors are better known to the defendant") (quoting State v. Campbell, 103 Wash. 2d 1, 24-25, 691 P.2d 929 (Wash. 1984), *cert. denied*, 47 U.S. 1094 (1985)), *cert. denied*, 518 U.S. 1026 (1996); U.S. DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL § 9-10.030 (1998) [hereafter UNITED STATES ATTORNEYS' MANUAL] ("At the time an indictment charging a defendant with an offense subject to the death penalty is filed or unsealed, or before a United States Attorney's Office decides to request approval to seek the death penalty, whichever comes first, the United States Attorney should give counsel for the defendant a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for consideration.").

[161]  Some jurisdictions require the defense be provided formal notice of the government's intent to seek the death penalty well before the guilt/innocence phase.  *See, e.g.*, ARIZ. R. CRIM. P. 15.1(g)(1) (requiring a prosecutor to provide the defendant notice of intent to seek the death penalty "no later than 60 days after the arraignment in superior court"); MD. ANN. CODE art. 27, § 412(b) (2002) (providing that a person convicted of first degree murder must be sentenced to life imprisonment unless the State notifies the person in writing at least 30 days prior to trial that it intends to seek a sentence of death, and of the aggravating circumstances on which it intends to rely) (as part of an ongoing codification of Maryland law, this section has been repealed by 2002 Md. Laws 26, § 1, effective Oct. 1, 2002; an analogous provision has been enacted by 2002 Md. Laws 26, § 2, to be codified as MD. CRIM. LAW CODE ANN. § 2-201(a)); NEV. SUP. CT. R. 250(4)(c) ("No later than 30 days after the filing of an information or indictment, the state must file in the district court a notice of intent to seek the death penalty.  The notice must allege all aggravating circumstances which the state intends to prove and allege with specificity the facts on which the state will rely to prove each aggravating circumstance."); N.Y. CRIM. PROC. LAW § 250.40(1–2) (McKinney 2002) ("A sentence of death may not be imposed upon a defendant convicted of murder in the first degree unless . . . the people file with the court and serve upon the defendant a notice of intent to seek the death penalty . . . within one hundred twenty days of the defendant's arraignment upon an indictment charging the defendant with murder . . . ."); WASH. REV. CODE ANN. § 10.95.040(2), (3) (West 2002) (stating the state is precluded from seeking the death penalty unless written notice is served on the defendant or counsel "within thirty days after the defendant's arraignment upon the charge of aggravated first degree murder unless the court, for good cause shown, extends or reopens the period for filing and service of the notice"); UNITED STATES ATTORNEYS' MANUAL, *supra* note 160, § 9-10.030 ("If the United States Attorney decides to request approval to seek the death penalty, the United States Attorney's Office should inform counsel for the defendant.").  Others do not.  *See, e.g.*, District Court, Gilpin County, 825 P.2d 1000, 1002 (Colo. 1992) ("There is no Colorado statute requiring the prosecutor to give notice of intent to seek the death penalty."); Sireci v. State, 399 So. 2d. 964, 970 (Fla. 1981) ("When one is charged with murder in the first degree, he is well aware of the fact that it is a capital felony

---

59

no duty to invite a death penalty prosecution.  While preparing for a capital case when notice has not been given, counsel should also prepare to challenge any prosecution efforts that should be barred for failure to give notice.[162]

Counsel must continue to treat the case as capital "until the imposition of the death penalty is no longer a legal possibility."[163]

---

punishable by a maximum sentence of death."), *cert. denied*, 456 U.S. 984 (1982); Williams v. State, 445 So. 2d 798, 804 (Miss. 1984) ("Anytime an individual is charged with murder, he is put on notice that the death penalty may result."), *cert. denied*, 469 U.S. 1117 (1985).  In jurisdictions where the prosecutor is not required to give notice of the intent to seek the death penalty, due process requires that the defendant be provided adequate notice.  *See* Lankford v. Idaho, 500 U.S. 110, 119-21 (1991) (holding due process was violated where the trial court imposed a death sentence after the prosecution stated it would not recommend a death sentence and the trial judge was silent following the state's decision).

[162]    *See, e.g.*, Holmberg v. De Leon, 189 Ariz. 109, 112-13, 938 P.2d 1110 (1997) (granting defense motion to strike State's notice of intent to seek death penalty on ground that it violated state court rule requiring notice within 30 days of arraignment); State v. Second Judicial Dist. Court, 11 P.3d 1209, 1211, 1215 (Nev. 2000) (concluding trial court acted within its discretion in denying prosecution motion for leave to file untimely notice of intent to seek death penalty; defense opposed motion).  In accordance with the text accompanying notes 4 through 8 *supra*, counsel should be mindful of the possibility that it may be appropriate to pursue the challenge through some collateral proceeding (*e.g.*, application for a writ of prohibition).

[163]    History of Guideline 1.1, *supra*.

---

68-065

## Guideline 10.3        Obligations of Counsel Respecting Workload

**Counsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines.**

*History of Guideline*

This Guideline is based on Guideline 6.1 of the original edition.

*Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-5.3 (3d ed. 1992) ("Workload").

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-1.3 ("Delays; Punctuality; Workload") *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS AND GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.12 (1973) ("Workload of Public Defenders").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.1 (1976) ("Establishing Maximum Pending Workload Levels for Individual Attorneys").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.2 (1976) ("Statistics and Recordkeeping").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 5.3 (1976) ("Elimination of Excessive Caseloads").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-12 (1984) ("Case And Work Overload").

NAT'L LEGAL AID AND DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 1.3 (1994) ("General Duties of Defense Counsel").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1(c) (1989) ("Establishment and General Operation of Assigned Counsel Roster").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1.2 (1989) ("Workloads of Attorneys").

68-066

**Commentary**

It is each attorney's duty under the Model Rules of Professional Responsibility neither to accept employment when it would "jeopardize the lawyer's ability to render competent representation"[164] nor to handle cases without "adequate preparation."[165]  Applying these professional norms to the special context of defense representation in death penalty cases, this Guideline mandates that attorneys maintain a workload consistent with the provision of high quality legal representation, bearing in mind the considerations discussed in the Commentary to Guideline 6.1

Once having agreed to represent a capital client, counsel should control their overall workload so as to be able to do so effectively.  Counsel who determine, in the exercise of best professional judgment, that accepting new cases or continuing with old ones will lead to providing capital defense representation of less than high quality should take such steps as may be appropriate to reduce pending or projected caseloads, such as seeking assistance from the Responsible Agency, refusing further cases and moving to withdraw from existing cases.

In short, an attorney whose workload threatens to cause a breach of his or her obligations under these Guidelines has a duty to take corrective action.  Counsel in that situation may not simply attempt to muddle through.

---

[164]    MODEL RULES OF PROFESSIONAL RESPONSIBILITY Rule 1.1 note, at 8. (1999).

[165]    *Id.* at Rule 1.1 cmt. 5.  *Cf.* David J. Williams, Letter to the Editor, LA. B. J., Aug./Sep. 2002, at 86 (Letter from counsel to Leslie Dale Martin, who was executed on May 10, 2002, stating,  "[T]he caseload of the lead counsel was such that he only had time to read through the file once before trial. . . .  This case cost me most of the respect that I formerly had for the criminal justice system.").

---

## Guideline 10.4        The Defense Team

A.    When it is responsible for designating counsel to defend a capital case, the Responsible Agency should designate a lead counsel and one or more associate counsel.  The Responsible Agency should ordinarily solicit the views of lead counsel before designating associate counsel.

B.    Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards.

    1.    Subject to the foregoing, lead counsel may delegate to other members of the defense team duties imposed by these Guidelines, unless:

        a.    The Guideline specifically imposes the duty on "lead counsel," or

        b.    The Guideline specifically imposes the duty on "all counsel" or "all members of the defense team."

C.    As soon as possible after designation, lead counsel should assemble a defense team by:

    1.    Consulting with the Responsible Agency regarding the number and identity of the associate counsel;

    2.    Subject to standards of the Responsible Agency that are in accord with these Guidelines and in consultation with associate counsel to the extent practicable, selecting and making any appropriate contractual agreements with non-attorney team members in such a way that the team includes:

        a.    at least one mitigation specialist and one fact investigator;

        b.    at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments; and

        c.    any other members needed to provide high quality legal representation.

D.    Counsel should demand on behalf of the client all resources necessary to provide high quality legal representation.  If such resources are denied, counsel should make an adequate record to preserve the issue for post-conviction review.

*History of Guideline*

This Guideline is new.  It supplements Guideline 4.1.

*Related Standards*

ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS Standard 7-1.1 (1984)

68-068

("Roles of Mental Health and Mental Retardation Professionals In The Criminal Process").

ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS Standard 7-5.7 (1985) ("Evaluation and Adjudication of Competence To Be Executed; Stay of Execution; Restoration of Competence").

ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION Standard 3-2.4 ("Special Assistants, Investigative Resources, Experts") in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-4.1 ("Duty To Investigate") in ABA STANDARDS FOR CRIMINAL JUSTICE:  PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS AND GOALS, REPORT OF THE TASK FORCE ON THE COURTS, Standard 13.14 (1973) ("Supporting Personnel And Facilities").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS AND GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 2 (1970) ("Right To Representation, Services, And Facilities").

NAT'L CONF. OF COMMISSIONERS ON UNIFORM STATE LAWS, Model Public Defender Act, Section 12 (1970) ("Personnel And Facilities").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 3.1 (1976) ("Assigned Counsel Fees And Supporting Services").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 3.4 (1976) ("Nonpersonnel Needs In Defender Offices").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-8 (1984) ("Support Staff And Forensic Experts").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-9 (1984) ("Investigators").

NAT'L LEGAL AID AND DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline III-10 (1984) ("Compensation").

NAT'L LEGAL AID AND DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 4.1 (1997) ("Investigation").

NAT'L LEGAL AID AND DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF

68-069

ASSIGNED COUNSEL SYSTEMS Standard 4.6 (1989) ("Support Services").

**Commentary**

As reflected in Guideline 4.1 and the accompanying Commentary, the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines.[166] The team approach enhances the quality of representation by expanding the knowledge base available to prepare and present the case, increases efficiency by allowing attorneys to delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case,[167] improves the relationship with the client and his family by providing more avenues of communication, and provides more support to individual team members.[168]

This Guideline contemplates that the Responsible Agency will ordinarily[169] begin by designating lead counsel for a particular case and then, in consultation with that counsel, designate one or more associate counsel.[170] As described in Subsection B, the role of lead counsel is to direct the work of the defense team in such a way that, overall, it provides high quality legal representation in accordance with these Guidelines and professional standards. Accordingly, lead counsel is free to allocate the duties imposed by these Guidelines to appropriate members of the defense team, with two exceptions: (1) duties (such as the one contained in Subsection C) that are specifically imposed on "lead counsel," and (2) duties (such as the one contained in Guideline 10.13) that are specifically imposed on "all counsel" or "all members of the defense team."

After designation, lead counsel should assemble the rest of the defense team. The Responsible Agency should give lead counsel maximum flexibility in this regard. For example,

---

[166]    *See* TEXAS DEATH PENALTY MITIGATION MANUAL, *supra* note 103.

[167]    *See* Mahoney v. Pataki, 98 N.Y.2d 45, 54, 772 N.E.2d 1118, 1123 (2002).

[168]    TEXAS DEATH PENALTY MITIGATION MANUAL, *supra* note 103.

[169]    This term is meant to accommodate the variety of exigent circumstances under which the provision of high quality legal representation might require a different procedure. For example, the client may be so situated that the professionally responsible course is to have a relatively junior attorney deal with the immediate situation, designating lead counsel subsequently. Or the client might insist on having a particular retained or *pro bono* attorney involved in the representation.

[170]    *Cf.* N.Y. JUD. LAW § 35-b(2) (McKinney 2002) ("With respect to counsel at trial and at a separate sentencing proceeding, the court shall appoint two attorneys, one to be designated 'lead' counsel and the other to be designated 'associated' counsel."); Cal. Rules of Ct., R. 4.117(c)(1) (effective Jan. 1, 2003) ("If the court appoints more than one attorney, one must be designated lead counsel and . . . at least one other must be designated associate counsel."). Because the Responsible Agency has a continuing duty to monitor the performance of the defense team to insure that it is providing high quality legal representation at every stage of the case (Guideline 7.1), the Responsible Agency may appropriately change these designations to reflect developments in the case (*e.g.*, it moves to a new post-conviction stage, or lead counsel becomes ill).

---

65

counsel should structure the team in such a way as to distinguish between experts who will play a "consulting" role, serving as part of the defense team covered by the attorney-client privilege and work product doctrine, and experts who will be called to testify, thereby waiving such protections.[171]  This may well require, in the words of the Guideline, "appropriate contractual arrangements," Subsection C (2).

However, Subsection C (2) provides that the Responsible Agency may impose standards on the composition of the defense team that are in accord with these Guidelines.  Examples would include a requirement that a staff attorney of a defender organization utilize in-house resources in the first instance, that compensation levels be limited to levels consistent with Guideline 9.1(C), or that non-attorneys meet appropriate professional qualifications.

The defense team should include at least two attorneys, a fact investigator, and a mitigation specialist.  The roles of these individuals are more fully described in the commentaries to Guidelines 1.1 and Guideline 4.1.  In addition, as also described in the Commentary to Guideline 4.1, the team must have a member (who may be one of the foregoing or an additional person) with the necessary qualifications to screen individuals (the client in the first instance, but possibly family members as the mitigation investigation progresses) for mental or psychological disorders or defects and to recommend such further investigation of the subject as may seem appropriate.

The team described in the foregoing paragraph is the minimum. In many cases, more than two attorneys are necessary – for example, a specialist to assist with motions practice and record preservation, or an attorney who is particularly knowledgeable about an area of scientific evidence.[172]  As discussed in the Commentary to Guideline 4.1, because mental health issues pervade capital cases a psychologist or other mental health expert may well be a needed member of the defense team.  As the Commentary to Guideline 4.1 also discusses, additional expert assistance specific to the case will almost always be necessary for an effective defense.

Lead counsel is responsible, in the exercise of sound professional judgment, for determining what resources are needed and for demanding that the jurisdiction provide them.  Because the defense should not be required to disclose privileged communications or strategy to the prosecution in order to secure these resources,[173] counsel should insist on making such requests *ex parte* and *in camera*.[174]

---

[171]    *See* James J. Clark et al., *The Fiend Unmasked: Developing the mental health dimensions of the defense, in* KENTUCKY DEP'T OF PUB. ADVOCACY, MENTAL HEALTH & EXPERTS MANUAL ch. 8 (6th ed. 2002), *available at* http://www.dpa.state.ky.us/library/manuals/mental/Ch08.html; ABA STANDARDS FOR CRIMINAL JUSTICE: MENTAL HEALTH Standard 7-1.1 & cmt., *in* ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS (1989) (mental health and mental retardation experts serving as consultants are agents of the attorney, subject to the attorney-client privilege and the work-product doctrine); *accord id.* Standard 7-3.3 cmt; *see also supra* Guideline 4.1(B)(2).

[172]    *Cf.* Freedman, *supra* note 50, at 1089 n.1 (each of six primary attorneys and eleven other named professionals were "critical to saving Mr. Washington's life").

[173]    *See supra* Guideline 4.1(B)(2).

[174]    Many jurisdictions provide, by statute or case law, that requests for expert assistance may

---

68-071

If such requests are denied, counsel should make an adequate record to preserve the issue for post-conviction review.[175]

---

be made *ex parte* so that indigent defendants are not required to divulge confidential work product or strategy to the prosecution.  *See, e.g.*, Williams v. State, 958 S.W.2d 186, 192-94 (Tex. Crim. App. 1997); *Ex parte* Moody, 684 So. 2d 114, 120 (Ala. 1996); State v. Barnett, 909 S.W.2d 423, 428-29 (Tenn. 1995); *Ex parte* Lexington County, 314 S.C. 220, 228, 442 S.E.2d 589, 594 (1994) (equal protection concerns require hearing to be both *ex parte* and *in camera*); Brooks v. State, 259 Ga. 562, 565-66, 385 S.E.2d 81, 84 (1989) (while state could be heard on fiscal issues, showing of need for expert should be made *ex parte*), *cert. denied*, 494 U.S. 1018 (1990); McGregor v. State, 733 P.2d 416, 416 (Okla. Crim. App. 1987) ("[T]o allow participation, or even presence, by the State would thwart the Supreme Court's attempt to place indigent defendants, as nearly as possible, on a level of equality with nonindigent defendants.");18 U.S.C. § 3006(A)(e)(1) (providing for *ex parte* hearings for requests for investigative, expert or other services for indigent defendants); CAL. PENAL CODE § 987.9(a) (West Supp. 2002); KAN. STAT. ANN. § 22-4508 (1995); MINN. STAT. ANN. § 611.21(a) (West Supp. 2002); NEV. REV. STAT. ANN. § 7.135 (Michie 1998); N.Y. COUNTY LAW § 722-c (McKinney Supp. 2002); S.C. CODE ANN. § 16-3-26(C)(1) (Law. Co-op. 2001);  TENN. CODE ANN. § 40-14-207(b) (1997).

[175]    Under the AEDPA, such a record may be critical to the ability of the client to succeed on federal habeas corpus.  *See* Williams v. Taylor, 529 U.S. 420, 437 (2000); *see generally* Stephen B. Bright, *Obtaining Funds for Experts and Investigative Assistance*, THE CHAMPION, June 1997, at 31, 33; Edward C. Monahan & James J. Clark, *Funds for Defense Experts: What a National Benchmark Requires*, THE CHAMPION, June 1997, at 12.

---

68-072

## Guideline 10.5        Relationship with the Client

A.        Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

B.        1.        Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case.

2.        Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

3.        Counsel at all stages of the case should re-advise the client and the government regarding these matters as appropriate.

C.        Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

1.        the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

2.        current or potential legal issues;

3.        the development of a defense theory;

4.        presentation of the defense case;

5.        potential agreed-upon dispositions of the case;

6.        litigation deadlines and the projected schedule of case-related events; and

7.        relevant aspects of the client's relationship with correctional, parole, or other governmental agents (*e.g.*, prison medical providers or state psychiatrists).

*History of Guideline*

        This Guideline collects, and slightly expands upon, material that was found in Guidelines 11.4.2, 11.6.1, and 11.8.3 of the original edition. The major revisions make this standard apply to *all* stages of a capital case and note expressly counsel's obligation to discuss potential dispositions of the case with the client.

68-073

Case 1:09-cv-01039-MJT    Document 50-4    Filed 10/05/10    Page 75 of 274 PageID #:
6571
*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ▪ February 2003*

***Related Standards***

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-3.1 ("Establishment of Relationship"), Standard 4-3.2 ("Interviewing the Client"), Standard 4-3.8 ("Duty to Keep Client Informed"), and Standard 4-5.2 ("Control and Direction of the Case"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA TEN PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 3 (2002) ("Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 1.3(c) ("General Duties of Defense Counsel"), Guideline 2.2 ("Initial Interview") (1997).

***Commentary***

The Problem

Immediate contact with the client is necessary not only to gain information needed to secure evidence and crucial witnesses, but also to try to prevent uncounseled confessions or admissions and to begin to establish a relationship of trust with the client.

Anyone who has just been arrested and charged with capital murder is likely to be in a state of extreme anxiety. Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence. In fact, the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that "[i]t must be assumed that the client is emotionally and intellectually impaired."[176] There will also often be significant cultural and/or language barriers between the client and his lawyers. In many cases, a mitigation specialist, social worker or other mental health expert can help identify and overcome these barriers, and assist counsel in establishing a rapport with the client.

---

[176] *See* Rick Kammen & Lee Norton, *Plea Agreements: Working with Capital Defendants,* THE ADVOCATE, Mar. 2000, at 31, *available at* http://www.dpa.state.ky.us/library/advocate/mar00/plea.html; *see also* Lewis, *supra* note 91, at 840 (finding 40% of death row inmates to be chronically psychotic); Dorothy O. Lewis et al., *Neuropsychiatric, psychoeducational, and family characteristics of 14 juveniles condemned to death in the United States,* 145 AM. J. PSYCHIATRY 584, 585 (1988) (finding 50% of death sentenced juveniles in survey suffered from psychosis and all were severely abused as children).

---

68-074

Counsel's Duty

Although ongoing communication by non-attorney members of the defense team is important, it does not discharge the obligation of counsel at every stage of the case to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters. Some decisions require the client's knowledge and agreement;[177] others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, as discussed in the text accompanying notes 101-04 *supra*, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.[178] Client contact must be ongoing. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Similarly, a client will not – with good reason – trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls. It is also essential for the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.

Often, so-called "difficult" clients are the consequence of bad lawyering – either in the past or present.[179] Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation.[180]

---

[177]    *See, e.g.*, Nixon v. Singletary, 758 So. 2d 618 (Fla. 2000) (ineffective assistance for counsel to fail to obtain client's explicit prior consent to strategy of conceding guilt to jury in opening statement in effort to preserve credibility for sentencing), *cert. denied*, 531 U.S. 980 (2000).

[178]    *See* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-5.2 & cmt., *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993). *See also* Kevin M. Doyle, *Heart of the Deal: Ten Suggestions for Plea Bargaining*, THE CHAMPION, Nov. 1999, at 68 (counsel should not expect client to accept plea bargain unless opinion is founded on experience and leg work investigating the case); White, *supra* note 2, at 371, 374 (thorough investigation and relationship of trust key to persuading client to accept appropriate plea offer).

[179]    *See* White, *supra* note 2, at 338 ("Often, capital defendants have had bad prior experiences with appointed attorneys, leading them to view such attorneys as 'part of the system' rather than advocates who will represent their interests. Appointed capital defense attorneys sometimes exacerbate this perception by harshly criticizing their clients' conduct or making it clear that they are reluctant to represent them. A capital defendant who experiences, or previously has experienced, these kinds of judgments understandably will be reluctant to trust his attorney.").

[180]    A lawyer can frequently earn a client's trust by assisting him with problems he encounters in prison or otherwise demonstrating concern for the client's well being and a willingness to advocate for him. *See id.*; Lee Norton, *Mitigation Investigation, in* FLORIDA PUBLIC DEFENDER

---

70

68-075

Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation. Even apart from the need to obtain vital information,[181] the lawyer must understand the client and his life history.[182] To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a post-conviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him.[183]

Counsel's Duties Respecting Uncooperative Clients

Some clients will initially insist that they want to be executed – as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision.[184] Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison. A client who insists on his innocence should be reminded that a waiver of mitigation will not persuade an appellate court of his innocence, and securing a life sentence may bar the state from seeking death in the event of a new trial.[185]

---

ASS'N, DEFENDING A CAPITAL CASE IN FLORIDA 25 (2001). Accordingly, such advocacy is an appropriate part of the role of defense counsel in a capital case. Indeed, a lawyer who displays a greater concern with habeas corpus doctrine than with recovering the radio that prison authorities have confiscated from the client is unlikely to develop the sort of a relationship that will lead to a satisfactory legal outcome.

[181] One important example is the fact that the client is mentally retarded – a fact that the client may conceal with great skill, *see, e.g.,* James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 GEO. WASH. L. REV. 414, 484-86 (1985), but one which counsel absolutely must know. *See* Atkins v. Virginia, 122 S. Ct. 2242, 2252 (2002) (holding that mentally retarded defendants may not constitutionally be executed).

[182] *See* Goodpaster, *supra* note 2, at 321.

[183] *See* Norton, *supra* note 180, at 5; White, *supra* note 2, at 374-75 (jury will be less likely to empathize with defendant if it does "not perceive a bond between the defendant and his attorney").

[184] *See infra* Guideline 10.7(A) and accompanying Commentary; Kammen & Norton, *supra* note 176, at 32.

[185] *See* Bullington v. Missouri, 451 U.S. 430 (1981); *see also* Sattazahn v. Pennsylvania, 123 S.Ct. 732 (2003).

---

68-076

Counsel in any event should be familiar enough with the client's mental condition to make a reasoned decision – fully documented, for the benefit of actors at later stages of the case – whether to assert the position that the client is not competent to waive further proceedings.[186]

## The Temporal Scope of Counsel's Duties

The obligations imposed on counsel by this Guideline apply to all stages of the case. Thus, post-conviction counsel, from direct appeal through clemency, must not only consult with the client but also monitor the client's personal condition for potential legal consequences.[187] For example, actions by prison authorities (*e.g.*, solitary confinement, administration of psychotropic medications) may impede the ability to present the client as a witness at a hearing,[188] and changes in the client's mental state (*e.g.*, as a result of the breakup of a close relationship or a worsening physical condition) may bear upon his capacity to assist counsel and, ultimately, to be executed.[189] In any event, as already discussed, maintaining an ongoing relationship with the client minimizes the possibility that he will engage in counter-productive behavior (*e.g.*, attempt to drop appeals, act out before a judge, confess to the media). Thus, the failure to maintain such a relationship is professionally irresponsible.[190]

---

[186] *See generally* Godinez v. Moran, 509 U.S. 389, 399-402 (1993) (setting forth minimum competency standard that the Constitution requires).

[187] *See infra* text accompanying note 338.

[188] *See* Riggins v. Nevada, 504 U.S. 127 (1992) (defendant was constitutionally entitled to have administration of anti-psychotic drugs cease before trial).

[189] *See infra* text accompanying note 339.

[190] *See* ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.4(a) (2002) ("A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.").

68-077

**Guideline  10.6          Additional Obligations of Counsel Representing a Foreign National**

A.      **Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.**

B.      **Unless predecessor counsel has already done so, counsel representing a foreign national should:**

1.      **immediately advise the client of his or her right to communicate with the relevant consular office; and**

2.      **obtain the consent of the client to contact the consular office.  After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.**

a.      **Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.**

*History of Guideline*

This Guideline is new and reflects developments in law and practice since the original edition.

*Related Standards*

Vienna Convention on Consular Relations and Optional Protocol on Disputes, April 24, 1963, art. 36, 21 U.S.T. 77, T.I.A.S. 6820.

*Commentary*

The right to consular assistance is contained in Article 36 of the Vienna Convention on Consular Relations, a multilateral treaty ratified unconditionally by the United States in 1969. Under its provisions, an obligation rests on local authorities to promptly inform detained or arrested foreign nationals of their right to communicate with their consulate.  At the request of the foreign national, local authorities must contact the consulate and permit consular communication and access.

There is considerable evidence that American local authorities routinely fail to comply with their obligations under the Vienna Convention.[191]

---

[191]      *See* Breard v. Greene, 523 U.S. 371, 380 (1998) (Breyer, J., dissenting) (finding Paraguayan national's argument for stay of execution not wholly without merit where the United States government had submitted an *amicus* brief acknowledging that the Vienna Convention had been violated); Sandra Babcock, *The Role of International Law in United States Death Penalty Cases*, 15 LEIDEN J. INT. L. 367, 368 (2002) (describing violations as "widespread and uncontested").  *See also* Case Concerning Avena and Other Mexican Nationals (Mexico v. U.S.A.) (Order on Request for the Indication of Provisional Remedies) (Feb. 5, 2003) (text accessible at http://www.icj-ij.org/icjwww/idocket/imus/imusorder/imus_order_20030205.PDF)

68-078

Any such failure is likely to have both practical and legal implications. As a practical matter, consuls are empowered to arrange for their nationals' legal representation and to provide a wide range of other services. These include, to name a few, enlisting the diplomatic assistance of their country to communicate with the State Department and international and domestic tribunals (*e.g.*, through *amicus* briefs), assisting in investigations abroad, providing culturally appropriate resources to explain the American legal system, arranging for contact with families and other supportive individuals. As a legal matter, a breach of the obligations of the Vienna Convention or a bilateral consular convention may well give rise to a claim on behalf of the client.

Enlisting the consulate's support after obtaining the client's consent to do so should therefore be viewed by counsel as an important element in defending a foreign national at any stage of a death penalty case,[192] and counsel should also give careful consideration to the assertion of any legal rights that the client may have as a result of any failure of the government to meet its treaty obligations.

Subsection B(2)(a) recognizes, however, that cases do vary. A range of considerations may make clients reluctant to have their consular office informed of their detentions. In many circumstances, such as those in which clients simply fear embarrassment if word of their plight reaches home, the attorney should counsel the client to overcome the reluctance. But if the client is a political dissident and the likely effect of informing the consulate would be to cause adverse

---

(ordering United States to take all necessary measures to insure that three Mexican nationals under state death sentences are not executed pending resolution of Mexico's claim "that the United States has systematically violated the rights of Mexico and its nationals under Article 36 of the Vienna Convention").

Furthermore, counsel should be alert to the fact that the United States has bilateral consular treaties with over 50 countries which may impose obligations additional to those under the Vienna Convention, *see* www.travel.state.gov/notification5.html#provisions (listing treaties). One example is Article 16 of the Consular Convention Between the United States and the United Kingdom, 3 U.S.T. 3426 (1952), which currently covers 32 independent countries around the world that were formerly entities within the British Empire.

[192] *See* Valdez v. State, 46 P.3d 703, 710 (Okla. Crim. App. 2002) (granting post-conviction relief because it was ineffective assistance for trial counsel not to "inform Petitioner he could have obtained financial, legal and investigative assistance from his consulate"); *see also* Breard v. Greene, 523 U.S. 371, 380 (1998); Anne-Marie Slaughter, *Editorial: On a Foreign Death Row*, WASH. POST, Apr. 14, 1998, at A15 (noting that under the Vienna Convention on Consular Relations, "[a] citizen is entitled to the protection and advice of his or her government when caught in a foreign legal system and a foreign language," granting that citizen access to "a translator, local counsel and diplomatic pressure if needed"). Foreign governments often have formal assistance programs in place for nationals facing the death penalty in the United States. *See, e.g.,* Ana Mendieta, *Mexico Will Aid Nationals in US; Fund Will Help 45 Death Row Inmates*, CHICAGO SUN-TIMES, Oct. 6, 2000, at 18 (describing creation of legal assistance program to defend the rights of Mexican nationals sentenced to death in the United States and bolster recognition of rights under the Vienna Convention); *Court Blocks Execution of Canadian in Texas*, WASH. POST, Dec. 10, 1998, at A47 ("Canada . . . regularly seeks clemency for Canadians sentenced to death abroad").

68-079

consequences to his relatives without obtaining any assistance with the case, the attorney might reasonably abide by the client's direction to withhold notification. The matter should, however, be kept under continuing review, since conditions may well change over time.

Subsection A is included in the Guideline to emphasize that the determination of nationality may require some effort by counsel. A foreign government might recognize an American citizen as one of its nationals on the basis of an affiliation (e.g. one grandparent of that nationality) that would not be apparent at first glance.

68-080

## Guideline 10.7    Investigation

A.    **Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.**

    1.    **The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.**

    2.    **The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.**

B.    1.    **Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.**

    2.    **Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.**

### History of Guideline

This Guideline is based on portions of Guideline 11.4.1 of the original edition. Changes in this Guideline clarify that counsel should conduct thorough and independent investigations relating to both guilt and penalty issues regardless of overwhelming evidence of guilt, client statements concerning the facts of the alleged crime, or client statements that counsel should refrain from collecting or presenting evidence bearing upon guilt or penalty.

Subsection B (1) is new and describes the obligation of counsel at every stage to examine the defense provided to the client at all prior phases of the case. Subsection B (2) is also new and describes counsel's ongoing obligation to ensure that the official record of proceedings is complete.

### Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-4.1 ("Duty to Investigate"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 4.1 (1997) ("Investigation").

68-081

***Commentary***

At every stage of the proceedings, counsel has a duty to investigate the case thoroughly.[193] This duty is intensified (as are many duties) by the unique nature of the death penalty, has been emphasized by recent statutory changes,[194] and is broadened by the bifurcation of capital trials.[195] This Guideline outlines the scope of the investigation required a capital case, but is not intended to be exhaustive.

Guilt/Innocence

As noted *supra* in the text accompanying notes 47-49, between 1973 and 2002 some 100 people were freed from death row in the United States on the grounds of innocence.[196] Unfortunately, inadequate investigation by defense attorneys – as well as faulty eyewitness identification, coerced confessions, prosecutorial misconduct, false jailhouse informant testimony,[197] flawed or false forensic evidence,[198] and the special vulnerability of juvenile

---

[193]    *See* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-4.1, 4-6.1, *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993); NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 4.1 (1997) ("Investigation").

[194]    *See* 28 U.S.C. § 2254(e)(2), which, as amended by the AEDPA, precludes certain claims from federal habeas corpus review if the petitioner "has failed to develop the factual basis" of them "in State court proceedings." *See also* Williams v. Taylor, 529 U.S. 420 (2000) (construing this section).

[195]    *See generally* Lyon, *supra* note 2; Vick, *supra* note 3.   Numerous courts have found counsel to be ineffective when they have failed to conduct an adequate investigation for sentencing.   *See, e.g.* Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison); Brownlee v. Haley, 306 F.3d 1043, 1070 (11th Circuit 2002) (counsel ineffective for failing to "investigate, obtain, or present *any* mitigating evidence to the jury, let alone the powerful mitigating evidence of Brownlee's borderline mental retardation, psychiatric disorders, and history of drug and alcohol abuse"); *infra* note 203.

[196]    *See* DEATH PENALTY INFORMATION CENTER:  *Innocence and the Death Penalty, available at* http://www.deathpenaltyinfor.org/innoc.html (last visited November 5, 2002) (stating that there are 102 people that have been wrongly convicted of capital crimes).

[197]    *See generally* Dodd v. State, 993 P.2d 778 (Okla. Crim. App. 2000) (canvassing special unreliability of such testimony and restricting its use); *supra* note 48.

[198]    Recent years have seen a series of scandals involving the prosecution's use, knowingly or unknowingly, of scientifically unsupportable or simply fabricated forensic evidence by governmental agents.  *See, e.g.,* U.S. DEPT. JUSTICE, OFF. INSP. GEN., *The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives Related and Other Cases* (1997) (Eighteen-months investigation into charges by whistleblower Frederic Whitehurst that FBI Laboratory mishandled "some of the most significant prosecutions in the recent history of

---

77

68-082

suspects – have contributed to wrongful convictions in both capital and noncapital cases.[199] In capital cases, the mental vulnerabilities of a large portion of the client population compound the possibilities for error.[200] This underscores the importance of defense counsel's duty to take seriously the possibility of the client's innocence,[201] to scrutinize carefully the quality of the state's case, and to investigate and re-investigate all possible defenses.[202]

In this regard, the elements of an appropriate investigation include the following:

1.    Charging Documents:

Copies of all charging documents in the case should be obtained and examined in the context of the applicable law to identify:

a.    the elements of the charged offense(s), including the element(s) alleged to make the death penalty applicable;

b.    the defenses, ordinary and affirmative, that may be available to the substantive charge and to the applicability of the death penalty;

c.    any issues, constitutional or otherwise, (such as statutes of limitations or double jeopardy) that can be raised to attack the charging documents; and

---

the Department of Justice" finds "significant instances of testimonial errors, substandard analytical work, and deficient practices"); Paul C. Gianelli, *The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories*, 4 VA. J. SOC. POL'Y & L. 439, 442-69 (1997) (summarizing numerous cases); *supra* note 49.

[199]    *See* BARRY SCHECK ET AL., ACTUAL INNOCENCE: WHEN JUSTICE GOES WRONG AND HOW TO MAKE IT RIGHT (Signet 2001 ed.).

[200]    *See generally* Atkins v. Virginia, 122 S. Ct. 2242, 2251-52 (2002) ("Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes."); *see also* Jurek v. Estelle, 623 F.2d 929 (5th Cir. 1980) (same), *cert. denied*, 450 U.S. 1001 (1981).

[201]    As this Guideline emphasizes, that is so even where circumstances appear overwhelmingly indicative of guilt.  A recent study that includes both capital and non-capital DNA exonerations has found that in 23 percent of the cases the client had confessed notwithstanding his innocence. *See* SCHECK ET AL., *supra* note 199, at 92.  *See also* Dan Morain, *Blind Justice; John Cherry's Killing Left Many Victims; Was the Accused One of Them?* L.A. TIMES, July 16, 1989, View, at 6 (noting that Jerry Bigelow confessed many times, including to the media and was eventually found to be innocent).

[202]    *See* Steven M. Pincus, *"It's Good to be Free": An Essay About the Exoneration of Albert Burrell*, 28 WM. MITCHELL L. REV. 27, 33 (2001).

68-083

d.      defense counsel's right to obtain information in the possession of the government, and the applicability and validity of any obligation that might arise to provide reciprocal discovery.

2.      <u>Potential Witnesses</u>:

   a.      Barring exceptional circumstances, counsel should seek out and interview potential witnesses, including, but not limited to:

   (1)      eyewitnesses or other witnesses having purported knowledge of events surrounding the alleged offense itself;

   (2)      potential alibi witness;

   (3)      witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), the degree of culpability for the offense, including:

   (a)      members of the client's immediate and extended family
   (b)      neighbors, friends and acquaintances who knew the client or his family
   (c)      former teachers, clergy, employers, co-workers, social service providers, and doctors
   (d)      correctional, probation or parole officers;

   (4)      members of the victim's family.

   b.      Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews. Counsel should investigate all sources of possible impeachment of defense and prosecution witnesses.

3.      <u>The Police and Prosecution</u>:

   Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports, autopsy reports, photos, video or audio tape recordings, and crime scene and crime lab reports. Where necessary, counsel should pursue such efforts through formal and informal discovery.

68-084

4.      Physical Evidence:

Counsel should make a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing. With the assistance of appropriate experts, counsel should then aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence.

5.      The Scene:

Counsel should view the scene of the alleged offense as soon as possible. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (*e.g.*, weather, time of day, and lighting conditions).

Penalty

Counsel's duty to investigate and present mitigating evidence is now well established.[203] The duty to investigate exists regardless of the expressed desires of a client.[204]  Nor may counsel "sit idly by, thinking that investigation would be futile."[205]  Counsel cannot responsibly advise a

---

[203]      *See, e.g.*, Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison); Caro v. Woodford, 280 F.3d 1247, 1255 (9th Cir. 2002) (counsel ineffective for failing to investigate and present evidence of client's brain damage due to prolonged pesticide exposure and repeated head injuries, and failing to present expert testimony explaining "the effects of the severe physical, emotional, and psychological abuse to which Caro was subjected as a child"), *cert. denied*, 122 S. Ct. 2645 (2002); Coleman v. Mitchell, 268 F.3d 417, 449-51 (6th Cir. 2001) (though counsel's duty to investigate mitigating evidence is well established, counsel failed to investigate and present evidence that defendant had been abandoned as an infant in a garbage can by his mentally ill mother, was raised in a brothel run by his grandmother where he was exposed to group sex, bestiality and pedophilia, and suffered from probable brain damage and borderline personality disorder), *cert. denied*, 122 S. Ct. 1639 (2002); Jermyn v. Horn, 266 F.3d 257, 307-08 (3d Cir. 2001) (counsel ineffective for failing to investigate and present evidence of defendant's abusive childhood and "psychiatric testimony explaining how Jermyn's development was thwarted by the torture and psychological abuse he suffered as a child"); *supra* note 195.

[204]      *See* Blanco v. Singletary, 943 F.2d 1477, 1501-03 (11th Cir. 1991) (counsel ineffective for "latch[ing] onto" client's assertions he did not want to call penalty phase witnesses and failing to conduct an investigation sufficient to allow their client to make an informed decision to waive mitigation), *cert. denied*, 525 U.S. 837 (1989); *see also* Karis v. Calderon, 283 F.3d 1117, 1136-41 (9th Cir. 2002), *petition for cert. filed* (U.S. Sept. 13, 2002) (No. 02-434).

[205]      Voyles v. Watkins, 489 F. Supp. 901, 910 (N.D. Miss. 1980); *accord* Austin v. Bell, 126 F.3d 843, 849 (6th Cir. 1997) (counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial, on grounds that he "did not think that it would do any good," constituted ineffective assistance), *cert. denied*, 523 U.S. 1079 (1998).

68-085

client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.[206]

Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant,"[207] "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."[208] In the case of the client, this begins with the moment of conception.[209]  Counsel needs to explore:

(1)     Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2)     Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide

---

[206]     *See, e.g.*, Silva v. Woodford, 279 F.3d 825, 838-39 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 342 (2002); Coleman v. Mitchell, 268 F.3d 417, 447 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1639 (2002); Battenfield v. Gibson, 236 F.3d 1215, 1229 (10th Cir. 2001) ("In addition to hampering [defense counsel's] ability to make strategic decisions, [defense counsel's] failure to investigate [defendant's background] clearly affected his ability to competently advise [defendant] regarding the meaning of mitigation evidence and the availability of possible mitigation strategies."); United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."); Knighton v. Maggio, 740 F.2d 1344, 1350 (5th Cir. 1984) (petitioner entitled to relief if record shows that "counsel could not make a valid strategic choice because he had made no investigation"), *cert. denied*, 469 U.S. 924 (1984).

[207]     Brown v. State, 526 So. 2d 903, 908 (Fla. 1988) (citing Hitchcock v. Dugger, 481 U.S. 393 (1987)).  *See* Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978).

[208]     Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, THE CHAMPION, Jan./Feb. 1999, at 35; *see also*, ABA Criminal Justice Section, Report to the House of Delegates (Feb. 1990), *reprinted in Toward a More Just and Effective System of Review in State Death Penalty Cases*, *supra* note 84, at 63.

[209]     Norton, *supra* note 180, at 2 (mitigation investigation must encompass client's "whole life"); EQUAL JUSTICE INITIATIVE OF ALA., ALABAMA CAPITAL DEFENSE TRIAL MANUAL ch. 12 (3d ed. 1997) [hereinafter ALABAMA CAPITAL DEFENSE TRIAL MANUAL]; Lyon, *supra* note 2, at 703 (observing that "mitigation begins with the onset of the [defendant's] life" because "[m]any [defendants'] problems start with things like fetal alcohol syndrome, head trauma at birth, or their mother's drug addiction during pregnancy"); Vick, *supra* note 3, at 363.

68-086

        necessary services, placement in poor quality foster care or juvenile detention facilities);

(3)     Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4)     Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5)     Employment and training history (including skills and performance, and barriers to employability);

(6)     Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (*e.g.*, by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.[210]

Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:

1.     discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

2.     explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors; and

3.     obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial and repression, as well as other mental or emotional impairments from which the client may suffer. As noted *supra* in the text accompanying note 101, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope

---

[210]     *See supra* text accompanying notes 11-26.

68-087

with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others.[211]  Records – from courts, government agencies, the military, employers, etc. – can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness,[212] and corroborating witnesses' recollections.  Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children.[213]  A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.[214]  The collection of  corroborating information from multiple sources – a time- consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.[215]

---

[211]    Goodpaster, *supra* note 2, at 321; Lyon, *supra* note 2, at 703-04; Vick, *supra* note 3, at 366-67.

[212]    *See* Williams v. Taylor, 529 U.S. 362, 395 (2000) (counsel ineffective where they "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records.  Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.") (footnote omitted);  Jermyn v. Horn, 266 F.3d 257, 307 (3d Cir. 2001) (counsel ineffective for failing to obtain school records that disclosed childhood abuse); *see also* ALABAMA CAPITAL DEFENSE TRIAL MANUAL, *supra* note 209; TEXAS DEATH PENALTY MITIGATION MANUAL, *supra* note 103, ch. 3; Norton, *supra* note 180, at 32-38.

[213]    In order to verify or corroborate witness testimony about circumstances and events in the defendant's life, defense counsel must "assemble the documentary record of the defendant's life, collecting school, work, and prison records "which might serve as sources of relevant facts.  Vick, *supra* note 3, at 367; *see also* Lyon, *supra* note 2, at 705-06.

[214]    Norton, *supra* note 180, at 3 (counsel should "investigate at least three generations" of the client's family).

[215]    *See id.* (advocating "triangulation" of data).

---

68-088

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to:

a.  school records
b.  social service and welfare records
c.  juvenile dependency or family court records
d.  medical records
e.  military records
f.  employment records
g.  criminal and correctional records
h.  family birth, marriage, and death records
i.  alcohol and drug abuse assessment or treatment records
j.  INS records

If the client was incarcerated, institutionalized or placed outside of the home, as either a juvenile or an adult, the defense team should investigate the possible effect of the facility's conditions on the client's contemporaneous and later conduct.[216]  The investigation should also explore the adequacy of institutional responses to childhood trauma, mental illness or disability to determine whether the client's problems were ever accurately identified or properly addressed.[217]

The circumstances of a particular case will often require specialized research and expert consultation.  For example, if a client grew up in a migrant farm worker community, counsel should investigate what pesticides the client may have been exposed to and their possible effect on a child's developing brain.[218]  If a client is a relatively recent immigrant, counsel must learn about the client's culture, about the circumstances of his upbringing in his country of origin, and about the difficulties the client's immigrant community faces in this country.[219]

---

[216]    *See* TERRY KUPERS, PRISON MADNESS: THE MENTAL HEALTH CRISIS BEHIND BARS AND WHAT WE MUST DO ABOUT IT (1999).

[217]    *See* Craig Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 STAN. L. REV. 1447, 1467 (1997) (noting damaging effects of "social conditions and experiences" often inflicted on institutionalized juvenile offenders).

[218]    *See* Caro v. Woodford, 280 F.3d 1247 (9th Cir. 2002), *cert. denied*, 122 S.Ct. 2645 (2002) (described *supra* note 203).

[219]    *See* Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) (positive testimony from defendant's family, combined with expert testimony about difficulty of adolescent immigrants from Hong Kong assimilating to North America would have humanized client and could have resulted in a life sentence for defendant convicted of 13 murders).

68-089

Miscellaneous Concerns

Counsel should maintain copies of media reports about the case for various purposes, including to support a motion for change of venue, if appropriate, to assist in *voir dire* of the jury regarding the effects of pretrial publicity, to monitor the public statements of potential witnesses, and to facilitate the work of counsel who might be involved in later stages of the case.

Counsel must also investigate prior convictions, adjudications, or unadjudicated offenses that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside.[220] Counsel may also find extenuating circumstances that can be offered to lessen the weight of a conviction, adjudication, or unadjudicated offense.[221]

Additional investigation may be required to provide evidentiary support for other legal issues in the case, such as challenging racial discrimination in the imposition of the death penalty or in the composition of juries.[222] Whether within the criminal case or outside it, counsel has a duty to pursue appropriate remedies if the investigation reveals that such conditions exist.[223]

As discussed *infra* in the text accompanying notes 247-59, counsel should consider making overtures to members of the victim's family – possibly through an intermediary, such as a clergy person, defense-victim liaison, or representative of an organization such as Murder Victim's Families for Reconciliation – to ascertain their feelings about the death penalty and/or the possibility of a plea.[224]

---

[220]     *See* Johnson v. Mississippi, 486 U.S. 578, 586 (1988); *supra* note 6.

[221]     *See supra* text accompanying notes 19-22.

[222]     *See, e.g.,* Miller-el v. Cockrell, 2003 WL 431659 ***cite to sec. I(B)*** (U.S. Feb. 25, 2003) (ruling for habeas petitioner in reliance on evidence presented at hearings on jury discrimination claim conducted prior to trial and in state post-conviction proceedings); Sara Rimer, *In Dallas, Dismissal of Black Jurors Leads to Appeal by Death Row Inmate,* N.Y. TIMES, Feb. 13, 2002, at A24 (discussing memoranda and training manuals from prosecutor's office documenting policy of racial discrimination in jury selection); Stephen B. Bright, *Challenging Racial Discrimination in Capital Cases,* THE CHAMPION, Jan./Feb. 1997, at 22.

[223]     *See supra* Guideline 10.10.2; text accompanying note 7.

[224]     *See* Russell Stetler, *Working with the Victim's Survivors in Death Penalty Cases,* THE CHAMPION, June 1999, at 42; *see also* Michael Janofsky, *Parents of Gay Obtain Mercy for His Killer,* N.Y. TIMES, Nov. 5, 1999, at A1 (stating that the prosecutor decided to drop the death penalty in the Matthew Shepard case because the parents of the victim requested him to do so).

68-090

## Guideline 10.8 The Duty to Assert Legal Claims

A. Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

    1. consider all legal claims potentially available; and

    2. thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted; and

    3. evaluate each potential claim in light of:

        a. the unique characteristics of death penalty law and practice; and

        b. the near certainty that all available avenues of post-conviction relief will be pursued in the event of conviction and imposition of a death sentence; and

        c. the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; and

        d. any other professionally appropriate costs and benefits to the assertion of the claim.

B. Counsel who decide to assert a particular legal claim should:

    1. present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction; and

    2. ensure that a full record is made of all legal proceedings in connection with the claim.

C. Counsel at all stages of the case should keep under consideration the possible advantages to the client of:

    1. asserting legal claims whose basis has only recently become known or available to counsel; and

    2. supplementing claims previously made with additional factual or legal information.

### History of Guideline

This Guideline is based on Guideline 11.5.1 (The Decision to File Pretrial Motions) and Guideline 11.7.3 (Objection to Error and Preservation of Issues for Post Judgment Review) of the original edition. New language makes clear that the obligations imposed by this Guideline exist at every stage of the proceeding and extend to procedural vehicles other than the submission of

68-091

motions to the trial court.

In Subsection A (3)(b), the phrase "near certainty" is new and replaces the word "likelihood" from the original edition.  The change reflects recent scholarship indicating that appellate and post-conviction remedies are pursued by almost 100% of capital defendants who are convicted and sentenced to death.

Subsections B and C are new to this edition.

### Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-3.6 ("Prompt Action to Protect the Accused") and Standard 4-4.5 ("Compliance with Discovery Procedure"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (1995), Guideline 5.1 ("The Decision to File Pretrial Motions").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (1995), Guideline 5.3 ("Subsequent Filing of Pretrial Motions").

### Commentary

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.  Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial."[225]  For this reason, trial counsel in a death penalty case must be especially aware not only of strategies for winning at trial,[226] but also of the heightened need to fully preserve all potential issues for later review.

As the text of the first sentence of Subsection A makes clear, this obligation is not limited to trial counsel or to motions made to the trial court.  For example, if a state post-conviction court rules on the merits of a claim for relief, the claim will be available for federal review even if the

---

[225]   Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42-43.  For example, John Eldon Smith was executed by the State of Georgia even though he was sentenced to death by a jury selected from a jury pool from which women were unconstitutionally excluded.  The federal courts refused to consider the issue because Mr. Smith's lawyers failed to preserve it.  Mr. Smith's co-defendant was also sentenced to death from a jury selected from the same pool.  The issue was preserved in the co-defendant's case, and the co-defendant's conviction and death sentence were vacated.  At retrial, the co-defendant was sentenced to life imprisonment. Smith v. Kemp, 715 F.2d 1459, 1476 (11th Cir. 1983) (Hatchett, J., dissenting in part), *cert. denied*, 464 U.S. 1003 (1983).

[226]   *See* NAT'L LEGAL AID AND DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION Guideline 5.1 (1995) (listing potential motions).

---

68-092

state's rules required the issue to be raised at trial.[227]  So, too, it may be appropriate for counsel to proceed on some claims (*e.g.*, double jeopardy) by seeking an interlocutory supervisory writ from an appellate court[228] or by otherwise seeking relief outside the confines of the capital litigation itself.[229]

As discussed in the text accompanying note 27 *supra,* most jurisdictions have strict waiver rules that will forestall post-judgment relief if an issue was not litigated at the first opportunity. An issue may be waived not only by the failure to timely file a pretrial motion, but also because of the lack of a contemporaneous objection at trial, or the failure to request a jury instruction, or counsel's failure to comply with some other procedural requirement established by statute, court rule or caselaw.  Counsel must therefore know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings.

Whether raising an issue specific to a capital case (such as requesting individual, sequestered *voir dire* on death-qualification of the jury) or a more common motion shaped by the capital aspect of the case (such as requesting a change of venue because of publicity), counsel should be sure to litigate all of the possible legal[230] and factual[231] bases for the request.  This will

---

[227]    *See* Ake v. Oklahoma, 470 U.S. 68, 75 (1985); *see also* Stewart v. Smith, 122 S. Ct. 2578 (2002) (*per curiam*).

[228]    *See, e.g.*, Schumer v. Holtzman, 60 N.Y.2d 46, 454 N.E.2d 522, 467 N.Y.S.2d 182 (1983) (granting writ of prohibition sought by non-capital suspect to preclude investigation by improperly designated prosecutor).  *Cf.* Hynes v. Tomei, 92 N.Y.2d 613, 706 N.E.2d 1201, 684 N.Y.S.2d 177 (1998) (invalidating portion of New York death penalty statute in proceeding for writ of prohibition brought by prosecutor), *cert. denied*, 527 U.S. 1015 (1999).

[229]    *See supra* text accompanying notes 4-8.

[230]    Counsel should always cite to any arguably applicable provision of the United States Constitution, the state constitution, and state law as bases for granting a claim.  A reviewing court may refuse to consider a legal theory different from that put forward originally.  *See* Anderson v. Harless, 459 U.S. 4 (1982) (refusing to consider violation of Due Process Clause of federal constitution because defense counsel in state courts relied solely upon due process clause of state constitution).  For example, courts have refused to consider an assertion that a statement was taken in violation of the Sixth Amendment right to counsel because it was argued in earlier proceedings only that the statement was obtained in violation of the Fifth Amendment protection against self-incrimination.  *See* McCleskey v. Zant, 499 U.S. 467 (1991).  Counsel should also present all of the relevant facts at as early as feasible.  *See generally* Bright, *supra* note 225, at 43, 44.

[231]    In this regard, as Subsection C indicates, counsel should bear in mind that in capital litigation the courts tend to be much more responsive to supplemental presentations than they might be in other contexts.  *See, e.g.*, Brooks v. Estelle, 697 F.2d 586 (5th Cir. 1982); Spaziano v. State, 660 So.2d 1363 (Fla. 1995) (granting motions filed by defendant facing fifth death warrant that "seek to open by rehearing an appeal that was finalized more than thirteen years ago and a postconviction proceeding that was terminated with a denial of rehearing more than nine years ago," and ordering a remand that eventually resulted in an in-court recantation by a key witness

68-093

increase the likelihood that the request will be granted and will also fully preserve the issue for post-conviction review in the event the claim is denied.

Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.[232]  As described in the Commentary to Guideline 1.1, counsel also has a duty to preserve issues calling for a change in existing precedent; the client's life may well depend on how zealously counsel discharges this duty.[233]  Counsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices.[234]

Because "[p]reserving all possible grounds can be very difficult in the heat of battle during trial,"[235] counsel should file written motions *in limine* prior to trial raising any issues that counsel anticipate will arise at trial.  All of the grounds should be set out in the motion.[236]  Similarly, requests for rulings during the course of post-conviction proceedings (*e.g.*, for investigative resources) should be made fully and formally.

---

and a life sentence, *see DNA Tests to be Done in '74 Case*, ORLANDO SENTINEL, Dec. 13, 2002 at B3).

[232]    *See* Bright, *supra* note 225, at 43 ("Failure to make an objection for fear of alienating the judge or jury may be a valid consideration in a case in which there is a good chance of acquittal or the length of sentence will be so short that appellate review will be irrelevant to the client.  But in a capital case, it may deprive the client of a life-saving reversal on direct appeal or in habeas corpus proceedings.").

[233]    *See supra* text accompanying note 27.  If a claim, whether then meritorious or not, is being litigated anywhere in the country, counsel is likely to be charged with knowledge that the "tools to construct their constitutional claim" exist and be expected to raise it.  Engle v. Isaac, 456 U.S. 107, 133 (1982).  In Smith v. Murray, 477 U.S. 527 (1986), counsel failed to raise a "losing" issue on behalf of Mr. Smith in one state court because the state supreme court had recently held the issue was meritless.  Mr. Smith raised the issue in all subsequent state and federal proceedings, and, well before these were concluded, the United States Supreme Court ruled favorably on the question.  However, because of counsel's previous decision to forego the presentation of a claim that was then meritless, Mr. Smith was executed.

[234]    For example, execution by electrocution has become *de facto* unconstitutional because state governments have concluded that challenges to the practice have merit, even though the contrary precedent remains in place.  *See* In re Kemmler, 136 U.S. 436 (1890); *compare Alabama: Optional Execution by Injection*, N.Y. TIMES, Apr. 26, 2002, at A20 (discussing how Alabama enacted a law making lethal injection the state's primary method of execution when it looked as if the Supreme Court might rule that the electric chair was cruel and unusual punishment); Sarah Rimer, *Florida Lawmakers Reject Electric Chair*, N.Y. TIMES, Jan. 7, 2000, at A13 (same in Florida).

[235]    Bright, *supra* note 225, at 45.

[236]    *See* ALABAMA CAPITAL DEFENSE TRIAL MANUAL, *supra* note 209, at 53.

---

In accordance with Subsection B (2), counsel should ensure that there is a complete record respecting all claims that are made, including objections, motions, statements of grounds, questioning of witnesses or venire members, oral and written arguments of both sides, discussions among counsel and the court, evidence proffered and received, rulings of the court, reasons given by the court for its rulings, and any agreements reached between the parties. If a court refuses to allow a proceeding to be recorded, counsel should state the objection to the court's refusal, to the substance of the court's ruling, and then at the first available opportunity make a record of what transpired in the unrecorded proceeding.[237] Counsel should also ensure that the record is clear with regard to the critical facts to support the claim. For example, if counsel objects to the peremptory strike of a juror as race-based, counsel should ensure that it is clear from the record not only that the prosecutor struck a particular juror, but the race of the juror, of every other member of the venire, and the extent to which the unchallenged venire members shared the characteristics claimed to be justifying the challenge.[238]

Further, as reflected in Guideline 10.7(B)(2), counsel at all stages of the case must determine independently whether the existing official record may incompletely reflect the proceedings, *e.g.*, because the court reporter took notes but did not transcribe them or because the court clerk does not include legal memoranda in the record transmitted to subsequent courts, or because of official negligence or misconduct.

As the nonexclusive list of considerations in Subsection A (3) suggests, there are many instances in which counsel should assert legal claims even though their prospects of immediate success on the merits is at best modest. Examples of such circumstances (in addition to those in which counsel needs to forestall later procedural defenses (Subsection A (3)(c)), include instances where:

> the claim should be preserved in light of foreseeable future events (*e.g.*, the completion of an investigation, a ruling in a relevant case); or

> asserting the claim may increase the government's incentive to reach an agreed-upon disposition;[239] or the presentation made in support of the claim may favorably influence other relevant actors (*e.g.*, the Governor).

---

[237]    *See* Dobbs v. Zant, 506 U.S. 357 (1993); Robinson v. Robinson, 487 S.W.2d 713, 714-15 (Tex. 1972); 4M Linen Co. v. W.P. Balard & Co., 793 S.W.2d 320, 323 (Tex. App. 1990), *writ denied* (Oct 31, 1990), *rehearing of writ of error overruled* (Jan 9, 1991).

[238]    Bright, *supra* note 225, at 46.

[239]    *See* 3 CAL. ATT'YS FOR CRIM. JUSTICE, 3 CALIFORNIA DEATH PENALTY DEFENSE MANUAL 4 (1993 ed.).

68-095

## Guideline 10.9.1    The Duty to Seek an Agreed-Upon Disposition

A.    Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition.

B.    Counsel at every stage of the case should explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision. Specifically, counsel should know and fully explain to the client:

1.    the maximum penalty that may be imposed for the charged offense(s) and any possible lesser included or alternative offenses;

2.    any collateral consequences of potential penalties less than death, such as forfeiture of assets, deportation, civil liabilities, and the use of the disposition adversely to the client in penalty phase proceedings of other prosecutions of him as well as any direct consequences of potential penalties less than death, such as the possibility and likelihood of parole, place of confinement and good-time credits;

3.    the general range of sentences for similar offenses committed by defendants with similar backgrounds, and the impact of any applicable sentencing guidelines or mandatory sentencing requirements;

4.    the governing legal regime, including but not limited to whatever choices the client may have as to the fact finder and/or sentencer;

5.    the types of pleas that may be agreed to, such as a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere or other plea which does not require the client to personally acknowledge guilt, along with the advantages and disadvantages of each;

6.    whether any agreement negotiated can be made binding on the court, on penal/parole authorities, and any others who may be involved;

7.    the practices, policies and concerns of the particular jurisdiction, the judge and prosecuting authority, the family of the victim and any other persons or entities which may affect the content and likely results of plea negotiations;

8.    concessions that the client might offer, such as:

a.    an agreement to proceed waive trial and to plead guilty to particular charges;

b.    an agreement to permit a judge to perform functions relative to guilt or sentence that would otherwise be performed by a jury or vice versa;

91

    c.    an agreement regarding future custodial status, such as one to be confined in a more onerous category of institution than would otherwise be the case;

    d.    an agreement to forego in whole or part legal remedies such as appeals, motions for post-conviction relief, and/or parole or clemency applications;

    e.    an agreement to provide the prosecution with assistance in investigating or prosecuting the present case or other alleged criminal activity;

    f.    an agreement to engage in or refrain from any particular conduct, as appropriate to the case;

    g.    an agreement with the victim's family, which may include matters such as: a meeting between the victim's family and the client, a promise not to publicize or profit from the offense, the issuance or delivery of a public statement of remorse by the client, or restitution;

    h.    agreements such as those described in Subsections 8 (a)-(g) respecting actual or potential charges in another jurisdiction;

9.    benefits the client might obtain from a negotiated settlement, including:

    a.    a guarantee that the death penalty will not be imposed;

    b.    an agreement that the defendant will receive a specified sentence;

    c.    an agreement that the prosecutor will not advocate a certain sentence, will not present certain information to the court, or will engage in or refrain from engaging in other actions with regard to sentencing;

    d.    an agreement that one or more of multiple charges will be reduced or dismissed;

    e.    an agreement that the client will not be subject to further investigation or prosecution for uncharged alleged or suspected criminal conduct;

    f.    an agreement that the client may enter a conditional plea to preserve the right to further contest certain legal issues;

    g.    an agreement that the court or prosecutor will make specific recommendations to correctional or parole authorities regarding the terms of the client's confinement;

    h.    agreements such as those described in Subsections 9 (a)-(g) respecting actual or potential charges in another jurisdiction.

68-097

**C.**     **Counsel should keep the client fully informed of any negotiations for a disposition, convey to the client any offers made by the prosecution, and discuss with the client possible negotiation strategies.**

**D.**     **Counsel should inform the client of any tentative negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantages, disadvantages and potential consequences of the agreement.**

**E.**     **If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate.  Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.**

**F.**     **Counsel should not accept any agreed-upon disposition without the client's express authorization.**

**G.**     **The existence of ongoing negotiations with the prosecution does not in any way diminish the obligations of defense counsel respecting litigation.**

*History of Guideline*

Guideline 10.9.1 is based on aspects of Guidelines 11.6.1, 11.6.2, and 11.6.3 of the original edition.  New language has been added to clarify the importance of pursuing an agreed-upon disposition at every phase of the case, not just as a substitute for proceeding to trial initially.

This Guideline omits the requirement, which appeared in Guideline 11.6.1 of the original edition, of client consent to initiate plea discussions, in recognition of the possible unintended consequence of premature rejection of plea options by a suicidal or depressed client.  However, the Guideline does require counsel to obtain the client's consent before accepting any agreed-upon disposition.  Moreover, the Guideline requires that counsel enter into a continuing dialogue with the client about the content of any such agreement, including advantages, disadvantages, and potential consequences.

*Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-6.1 ("Duty to Explore Disposition without Trial") and Standard 4-6.2 ("Plea Discussions"), in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: PLEAS OF GUILTY Standard 14-3.2 (3d ed. 1999) ("Responsibilities of defense counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 6.1 (1995) ("The Plea Negotiation Process and the Duties of Counsel").

68-098

**Commentary**

Guidelines 10.9.1–2 both deal with the subject of agreed-upon dispositions. They and their associated commentaries should be read together.

"Death is different because avoiding execution is, in many capital cases, the best and only realistic result possible"; as a result, plea bargains in capital cases are not usually "offered" but instead must be "pursued and won."[240]  Agreements are often only possible after many years of effort. Accordingly, this Guideline emphasizes that the obligation of counsel to seek an agreed-upon disposition continues throughout all phases of the case. As in other sorts of protracted litigation, circumstances change over time and as they do (*e.g.*, through replacement of a prosecutor, death of a prosecution witness, alteration in viewpoint of a key family member of the client or the victim, favorable developments in the law or the litigation, reconsideration by the client) new possibilities arise.[241]  Whenever they do, counsel must pursue them.

In many jurisdictions, the prosecution will consider waiving the death penalty after the defense makes a proffer of the mitigating evidence that would be presented at the penalty phase and explains why death would be legally and/or factually inappropriate. In some states and the federal government, this process is formalized and occurs before a decision is made whether to seek the death penalty.[242]  In other jurisdictions, the process is not formalized and may occur after the prosecution has announced its intention to seek the death penalty. In either event, the mitigation investigation is crucial to persuading the prosecution not to seek death.[243]

---

[240]  Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must be Different, Too*, THE CHAMPION, Mar. 1984, at 8, 15; *see also* Doyle, *supra* note 178.

[241]  Examples of agreed-upon dispositions after extended litigation include the cases of Lloyd Schlup, *see* Tim O'Neil, *Killer Who Escaped Execution Over New "Evidence" Pleads Guilty*, ST. LOUIS POST-DISPATCH, Mar. 25, 1999, at A15 (client pleads guilty to second-degree murder after new evidence appeared) and Paris Carriger, *see* Samuel R. Gross, *ABA's Proposed Moratorium: Lost Lives: Miscarriages of Justice in Capital Cases*, 61 L. & CONTEMP. PROBS. 125, 139-40 (1998) (following affirmance of federal habeas corpus relief by *Carriger v. Stewart*, 132 F.3d (9th Cir. 1997) (en banc), *cert. denied*, 523 U.S. 1133 (1998), client pleaded guilty to lesser offense and was released). Numerous other instances are reported in LIEBMAN ET AL., *supra* note 27, Apps. C, D.

[242]  *See* UNITED STATES ATTORNEYS' MANUAL, *supra* note 160, § 9-10.030. New York law gives the District Attorney a 120-day "deliberative period" to decide whether to file a notice of intent to seek the death penalty. *See* N.Y. CRIM. PROC. LAW § 250.40(2) (McKinney 2002); Francois v. Dolan, 95 N.Y.2d 33, 37, 731 N.E.2d 614, 616, 709 N.Y.S.2d 898, 900 (2000). During that time, with the assistance of the Capital Defender's Office, counsel is appointed and may attempt to persuade the prosecutor not to file a notice. *See* N.Y. JUD. LAW § 35-b (McKinney 2001). The notice may also be withdrawn at any time. N.Y. CRIM. PROC. LAW § 250.40(4) (McKinney 2002). Between 1995 and mid-2002, District Attorneys in New York formally investigated seeking the death penalty against 701 defendants, but only filed notice that they were seeking the death penalty against 43 of these. *See* New York Capital Defender Office home page, *available at* <http://www.nycdo.org>.

[243]  *See* Doyle, *supra* note 178; White, *supra* note 2, at 328-29.

---

94

68-099

Before entering into plea discussions, counsel should have thoroughly examined the quality of the prosecution's case and investigated possible first-phase defenses and mitigation, as discussed in the Commentary to Guideline10.7. Counsel must also consider the collateral consequences of entering a plea. For example, when the resulting adjudication of guilt could be used as an aggravating circumstance in another pending case, counsel should endeavor to structure an agreement that would resolve both cases without imposition of the death penalty.

In some cases, where there is a viable first-phase defense, it may be possible to negotiate a plea to a lesser charge. And if it is trial counsel's perception that the death penalty is being sought primarily to allow selection of a death-qualified (and therefore conviction-prone) jury, counsel should seek to remedy the situation through litigation in accordance with Guideline 10.8 as well as through negotiation. In many capital cases, however, the prosecution's evidence of guilt is strong, and there is little or no chance of charge bargaining. In these cases, a guilty plea in exchange for life imprisonment is the best available outcome.

These considerations mean that in the area of plea negotiations, as in so many others, death penalty cases are *sui generis*. Many bases for bargaining in non-capital cases are irrelevant or have little practical significance in a capital case,[244] and some uniquely restrictive legal principles apply.[245] Emotional and political pressures, including ones from the victim's family or the media, are especially likely to limit the government's willingness to bargain. On the other hand, the complexity, expense, legal risks, and length of the capital trial and appellate process may make an agreement particularly desirable for the prosecution.[246]

A very difficult but important part of capital plea negotiation is often contact with the family of the victim.[247] In some states, the prosecution is required to notify and confer with the victim's family prior to entering a plea agreement.[248] Any approaches to the victim's family should be undertaken carefully and with sensitivity. Counsel should be creative in proposing resolutions that may satisfy the needs of the victim's family, including providing more immediate closure by expressly foregoing appeals or arranging an apology or meeting between the victim's

---

[244]    A number of concessions that the parties might exchange in the capital context appear in Subsection B.

[245]    *See* United States v. Jackson, 390 U.S. 570, 583 (1968) (invalidating provision of federal statute carrying capital punishment on basis that it coerced waivers or jury trial rights); Hynes v. Tomei, 92 N.Y.2d 613, 621, 706 N.E.2d 1201, 1204, 684 N.Y.S.2d 177, 180 (1998) (applying Jackson to invalidate portion of New York death penalty statute), *cert. denied* 527 U.S. 1015 (1999); New York City Bar Committee on Capital Punishment, *The Pataki Administration's Proposals to Expand the Death Penalty* 55 N.Y. CITY BAR REC. 129, 141-43 (2000) (describing mechanisms by which pleas in capital cases were being reached in light of *Hynes*).

[246]    As indicated in note 242 *supra*, plea offers are extended prior to trial in a significant proportion of cases and, as described in note 241 *supra,* also commonly occur after protracted litigation.

[247]    *See* Stetler, *supra* note 224, at 42.

[248]    *See, e.g.,* ALA. CODE § 15-23-71 (1995).

---

family and the client if the client is willing and able to do so.  The defense team may consider seeking the assistance of clergy, a defense-victim liaison, or an organization of murder victims' families in the outreach effort and in crafting possible resolutions.[249]  The victim's family can be critical to achieving a settlement.[250]

Except in unusual circumstances, all agreements that are made should be formally documented between the parties concerned (*e.g.*, in a writing between the client and representatives of the victim).  In any event, counsel has an obligation under Guideline 10.13 to maintain in his or her own files a complete written description of any agreement.

Agreements for action or nonaction by government actors in exchange for a plea of guilty are governed by Guideline 10.9.2(B)(2) and, for the client's future benefit, should be set forth as clearly as possible on the record.[251]

In addition to persuading the prosecution to negotiate a resolution to the case, counsel must often persuade the client as well.  As discussed in the Commentary to Guidelines 10.5 and 10.9.2, a relationship of trust with the client is essential to accomplishing this.  The entire defense team must work from the outset of the case with the client and others close to him to lay the groundwork for acceptance of a reasonable resolution.

If the possibility of a negotiated disposition is rejected by either the prosecution or the client when a settlement appears to counsel to be in the client's best interest, counsel should continue efforts at persuasion while also continuing to litigate the case vigorously (Subsection G).

---

[249]    *See supra* text accompanying note 224.

[250]    *See* McNally, *supra* note 240, at 15; White, *supra* note 2, at 368-69.

[251]    *See* Ricketts v. Adamson, 483 U.S. 1, 5-6 (1987) (where defendant was deemed to have breached terms of plea agreement by refusing to testify against co-defendant at a retrial, double jeopardy did not preclude state from vacating defendant's plea of guilty to second degree murder, trying him for capital murder and sentencing him to death).

68-101

## Guideline 10.9.2   Entry of a Plea of Guilty

A.   The informed decision whether to enter a plea of guilty lies with the client.

B.   In the event the client determines to enter a plea of guilty:

    1.   Prior to the entry of the plea, counsel should:

        a.   make certain that the client understands the rights to be waived by entering the plea and that the client's decision to waive those rights is knowing, voluntary and intelligent;

        b.   ensure that the client understands the conditions and limits of the plea agreement and the maximum punishment, sanctions, and other consequences to which he or she will be exposed by entering the plea;

        c.   explain to the client the nature of the plea hearing and prepare the client for the role he or she will play in the hearing, including answering questions in court and providing a statement concerning the offense.

    2.   During entry of the plea, counsel should make sure that the full content and conditions of any agreements with the government are placed on the record.

### History of Guideline

This Guideline amends Guideline 11.6.4 of the original edition to clarify that the decision regarding whether to enter a plea of guilty must be informed and counseled, yet ultimately lies with the client.

### Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-6.1 ("Duty to Explore Disposition Without Trial") *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-6.2 ("Plea Discussions") *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: PLEAS OF GUILTY Standard 14-1.4 (3d ed. 1999) ("Defendant to be Advised").

ABA STANDARDS FOR CRIMINAL JUSTICE: PLEAS OF GUILTY Standard 14-1.7 (3d ed. 1999) ("Record of Proceedings").

ABA STANDARDS FOR CRIMINAL JUSTICE: PLEAS OF GUILTY Standard 14-3.2 (3d ed. 1999) ("Responsibilities of Defense Counsel").

68-102

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (1995), Guideline 6.3 "The Decision to Enter a Plea of Guilty."

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (1995), Guideline 6.4 "Entry of the Plea Before the Court."

**Commentary**

If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights.

The relationship that the defense team has established with the client and his or her family will often determine whether the client will accept counsel's advice regarding the advisability of a plea. The case must therefore be diligently investigated so that the client will have as realistic a view of the situation as possible. As the Commentary to Guideline 10.5 describes, a client will, quite reasonably, not accept counsel's advice about the case if the attorney has failed to conduct a meaningful investigation.[252]

A competent client is ultimately entitled to make his own choice. Counsel's role is to ensure that the choice is as well considered as possible. This may require counsel to work diligently over time to overcome the client's natural resistance to the idea of standing in open court, admitting to guilt, and perhaps agreeing to permanent imprisonment. Or it may require counsel to do everything possible to prevent a depressed or suicidal client from pleading guilty where such a plea could result in an avoidable death sentence.[253]

Because of the factors described in the text accompanying notes 178-90 *supra*, it will often require the combined and sustained efforts of the entire defense team to dissuade the client from making a self-destructive decision. As noted there, the defense team may also need to call on family, friends, clergy, and others to provide information that assists the client in reaching an appropriate conclusion.

---

[252]    *See supra* text accompanying note 178.

[253]    *See supra* Commentary to Guideline 10.5.

## Guideline 10.10.1   Trial Preparation Overall

**A.      As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory.  Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.**

### History of Guideline

The revisions to this Guideline, which was formerly Guideline 11.7.1, are stylistic.

### Related Standards

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION (1995), Guideline 4.3 "Theory of the Case."

### Commentary

Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case.  In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated.  The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt.[254]  At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer is lost and the defendant's chances for a life verdict reduced.  Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory[255] that will be reinforced by its presentation at both the guilt and mitigation stages.[256]  Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument.[257]

---

[254]      *See* Nixon v. Singletary, 758 So. 2d 618 (Fla. 2000) (ineffective assistance for counsel to fail to obtain client's explicit prior consent to strategy of conceding guilt to jury in opening statement in effort to preserve credibility for sentencing), *cert. denied*, 531 U.S. 980 (2000).

[255]      *See infra* text accompanying notes 271-74; McNally, *supra* note 240, at 8-11; White, *supra* note 2, at 356-58.

[256]      As the text accompanying notes 102-03 *supra* suggests, for counsel to gamble that there never will be a mitigation phase because the client will not be convicted of the capital charge is to render ineffective assistance.

[257]      *See* Bright, *supra* note 225, at 40.

---

## Guideline 10.10.2    Voir Dire and Jury Selection

A.    **Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge.  Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.**

B.    **Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty. Counsel should be familiar with techniques: (1) for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case; (2) for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence; and (3) for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.**

C.    **Counsel should consider seeking expert assistance in the jury selection process.**

### *History of Guideline*

This Guideline is based on Guideline 11.7.2 of the original edition.  Subsection A of the Guideline has been amended to make clear that potential jury composition challenges should not be limited to the petit jury, but should also include the selection of the grand jury and grand jury forepersons.  Subsection B has been amended to reflect recent scholarship demonstrating that the starkest failures of capital *voir dire* are the failure to uncover jurors who will automatically impose the death penalty following a conviction or finding of the circumstances which make the defendant eligible for the death penalty, and the failure to uncover jurors who are unable to consider particular mitigating circumstances.  Subsection C is new.  Its language is derived from NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION Guideline 7.2(a)(7) (1995) ("Voir Dire and Jury Selection"), and the accompanying Commentary.

### *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-7.2 ("Selection of Jurors"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.1 ("Selection of Prospective Jurors"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.2 ("Juror questionnaires"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.3 ("Challenge to the array"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.4 ("Conduct of Voir Dire Examination"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.5 ("Challenges for Cause"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.6 ("Peremptory Challenges"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.7 ("Procedure for Exercise of Challenges; Swearing the Jury"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.8 ("Impermissible Peremptory Challenges"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

ABA STANDARDS FOR CRIMINAL JUSTICE: TRIAL BY JURY Standard 15-2.9 ("Alternate Jurors"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY (3d ed. 1996).

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 7.2 (1995) ("Voir Dire and Jury Selection").

***Commentary***

Jury selection is important and complex in any criminal case.[258]  In capital cases, it is all the more critical.  Counsel should devote substantial time to determining the makeup of the venire, preparing a case-specific set of *voir dire* questions, planning a strategy for *voir dire*, and choosing a jury most favorable to the theories of mitigation that will be presented.  Given the intricacy of the process, counsel should consider obtaining the assistance of an expert jury consultant.[259]

---

[258]  *See* John H. Blume, et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209, 1209 & n.1 (2001) ("The conventional wisdom is that most trials are won or lost in jury selection."); NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 7.2 cmt. (1995) ("Voir Dire and Jury Selection").

[259]  *See* NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 7.2 cmt. (1995) ("Voir Dire and Jury Selection") (noting that the need for jury selection experts is "most obvious in extraordinary cases such as death

Counsel's jury selection strategy should minimize the problem of "death qualified" juries that result from exclusion of potential jurors whose opposition to capital punishment effectively skews the jury pool not only as to imposition of the death penalty but as to conviction.[260]  Caselaw stemming from Supreme Court decisions that address capital jury selection procedures[261] has resulted in a highly specialized and technical procedure.  As a practical matter, the burden rests with defense counsel to "life qualify" a jury.  Counsel should conduct a *voir dire* that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law because they will either automatically vote for death in certain circumstances, or are unwilling to consider mitigating evidence.[262]  Counsel should also develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty.  Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations,[263] counsel should determine whether discrimination is involved in the

---

penalty cases").

[260]      *See* Blume et al., *supra* note 258, at 1232 ("[E]xposure to the death qualification process makes a juror more likely to assume the defendant will be convicted and sentenced to death; more likely to assume that the law disapproves of persons who oppose the death penalty; more likely to assume that the judge, prosecutor, and defense attorney all believe the defendant is guilty and will be sentenced to die; and more likely to believe that the defendant deserves the death penalty."). *See also* Liebman, *supra* note 28, at 2097 & n.164 (discussing studies demonstrating that death qualification process produces juries more likely to convict than non-death-qualified juries, and that repeated discussion of death penalty during *voir dire* in capital cases makes jurors substantially more likely to vote for death).

Nonetheless, the current state of Supreme Court caselaw is that a jurisdiction does not violate the federal Constitution by using the death qualification process.  *See* Lockhart v. McCree, 476 U.S. 162, 170 (1986).

[261]      *See, e.g.*, Morgan v. Illinois, 504 U.S. 719, 729 (1992) (holding "juror[s] who will automatically vote for the death penalty in every case" or are unwilling or unable to give meaningful consideration to mitigating evidence must be disqualified from service); Wainwright v. Witt, 469 U.S. 412, 415-16 (1985) (holding that trial judges may exclude from a capital jury persons with absolutist views on the death penalty, such that they are either in favor of, or opposed to it in every case);  Adams v. Texas, 448 U.S. 38 (1980) (invalidating statute disqualifying any juror who would not swear "that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact"); Witherspoon v. Illinois, 391 U.S. 510, 513 (1968) (holding that persons who have qualms about the death penalty in general, and who might be inclined to oppose it as a matter of public policy, but who can put aside those reservations in a particular case, and in compliance with their oaths as jurors consider imposing the death penalty according to the relevant state law, may not be precluded from serving as jurors in a death penalty case).

[262]      *See* Blume et al., *supra* note 258, at 1247-53.

[263]      *See* Stephen D. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty*, 35 SANTA CLARA L. REV. 433, 439–42 (1995) (examining the historic relationship between racial violence and the death penalty, and describing how racial prejudice continues to influence capital sentencing decisions); William S. Loquist,

jury selection process. Counsel should investigate whether minorities or women are underrepresented on the jury lists from which grand and petit juries are drawn, or if race or gender played a role in the selection of grand jury forepersons.[264] The defense in a capital case is entitled to *voir dire* to discover those potential jurors poisoned by racial bias,[265] and should do so when appropriate. Death qualification often results in the removal of more prospective jurors who are members of minority groups than those who are white, because minority jurors are more likely to express reservations about the death penalty.[266] Neither race nor gender may form a basis for peremptory challenges,[267] but a recent empirical analysis of capital murder cases supports the conclusion that "discrimination in the use of peremptory challenges on the basis of race and gender . . . is widespread."[268] Counsel should listen closely to the prosecutor's *voir dire*, challenges for cause and reasons for exercising peremptory challenges, make appropriate objections, and ensure that all information critical to a discrimination claim is preserved on the record.[269]

---

*Putting Them There, Keeping Them There, and Killing Them: An Analysis of State-Level Variations in Death Penalty Intensity*, 87 IOWA L. REV. 1505, 1535 (2002) (presenting social science data).

[264]   *See* Campbell v. Louisiana, 523 U.S. 392, 395 (1998); Amadeo v. Zant, 486 U.S. 214, 216-17 (1988); Rose v. Mitchell, 443 U.S. 545, 548 (1979).

[265]   *See* Turner v. Murray, 476 U.S. 28, 38 (1986).

[266]   *See* Bright, *supra* note 225, at 20.

[267]   *See* Batson v. Kentucky, 476 U.S. 79, 83 (1986); J.E.B. v. Alabama *ex rel.* T.B., 511 U.S. 127, 128-29 (1994). *See also* Miller-el v. Cockrell, 2003 WL 431659 (U.S. Feb. 25, 2003).

[268]   David C. Baldus, et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. PA. J. CONST. L. 3, 10 (2001). *See also* Jeffrey S. Brand, *The Supreme Court, Equal Protection and Jury Selection: Denying That Race Still Matters*, 1994 WIS. L. REV. 511 (finding persistent widespread discrimination in the use of peremptory challenges and attributing it to unwillingness or inability of the courts to scrutinize manifestly pretextual nonracial justifications). These findings emphasize the duty of counsel to pursue this area energetically, both factually and legally. *See, e.g.*, Douglas L. Colbert, *Challenging the Challenge: Thirteenth Amendment As A Prohibition Against the Racial Use of Peremptory Challenges*, 76 CORNELL L. REV. 1 (1990) (proposing 13th Amendment theory entitling a minority defendant to specific number of minority jurors).

[269]   *See supra* Guideline 10.8(B)(2) and text accompanying note 238.

---

## Guideline 10.11     The Defense Case Concerning Penalty

A.      As set out in Guideline 10.7(A), counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.

B.      Trial counsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between the strategy for the sentencing phase and for the guilt/innocence phase.

C.      Prior to the sentencing phase, trial counsel should discuss with the client the specific sentencing phase procedures of the jurisdiction and advise the client of steps being taken in preparation for sentencing.

D.      Counsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present to the sentencing or reviewing body or individual, means by which the mitigation presentation might be strengthened, and the strategy for meeting the prosecution's case in aggravation.

E.      Counsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing or reviewing body or individual.

F.      In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:

   1.      Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;

   2.      Expert and lay witnesses along with supporting documentation (*e.g.* school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor;

   3.      Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

   4.      Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones;

5.      Demonstrative evidence, such as photos, videos, and physical objects (*e.g.*, trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts, and letters of praise or reference.

G.      In determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense case will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence.  Counsel should pursue all appropriate means (*e.g.*, motions *in limine*) to ensure that the defense case concerning penalty is constricted as little as possible by this consideration, and should make a full record in order to support any subsequent challenges.

H.      Trial counsel should determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof.  If the jurisdiction has rules regarding notification of these factors, counsel at all stages of the case should object to any non-compliance, and if such rules are inadequate, counsel at all stages of the case should challenge the adequacy of the rules.

I.      Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible.

J.      If the prosecution is granted leave at any stage of the case to have the client interviewed by witnesses associated with the government, defense counsel should:

1.      carefully consider

a.      what legal challenges may appropriately be made to the interview or the conditions surrounding it, and

b.      the legal and strategic issues implicated by the client's co-operation or non-cooperation;

2.      insure that the client understands the significance of any statements made during such an interview ; and

3.      attend the interview.

K.      Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence.  Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions.  Post-conviction counsel should pursue these issues through factual investigation and legal argument.

**L.      Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.**

*History of Guideline*

The substance of this Guideline is drawn from Guideline 11.8.3 of the original edition. The principal changes are the expansion of coverage to counsel at all stages of the proceedings, and language changes to underscore the range and importance of expert testimony in capital cases, the breadth of mitigating evidence, and counsel's duty to present arguments in mitigation.

*Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-8.1 ("Sentencing"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 8.1 (1995) ("Obligations of Counsel in Sentencing").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 8.2 (1995) ("Sentencing Options, Consequences and Procedures").

*Commentary*

Capital sentencing is unique in a variety of ways, but only one ultimately matters: the stakes are life and death.

This Commentary is written primarily from the perspective of trial counsel. But corresponding obligations rest on successor counsel. This Guideline has been broadened to include them because of the realities that in capital cases (a) more evidence tends to become available to the defense as time passes,[270] and (b) updated presentations of the defense case on penalty in accordance with Guideline 10.15.1 (E) (3) may influence decisionmakers both on the bench (*e.g.*, an appellate court considering a claim of ineffective assistance of counsel) and off it (*e.g.*, the prosecutor, the Governor).

The Importance of an Integrated Defense

During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation."[271] Consistency is crucial because, as discussed in the Commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant

---

[270]    *See supra* text accompanying note 38.

[271]    Lyon, *supra* note 2, at 711.

did not commit the crime, then attempting to show in the penalty phase why the client committed the crime.[272]  First phase defenses that seek to reduce the client's culpability for the crime (*e.g.*, by negating intent)  rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma.[273]  But whether or not the guilt phase defense will be that the defendant did not commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase.[274]

The Defense Presentation at the Penalty Phase

As discussed in the Commentary to Guideline 10.7, areas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death.[275]  In particular, a mitigation presentation

---

[272]     *See id.* at 708.

[273]     In fact, most statutory mitigating circumstances, which were typically adapted from the Model Penal Code, are "imperfect" versions of first phase defenses such as insanity, diminished capacity, duress, and self-defense.  *See* Carol S. Steiker & Jordan M. Steiker, *Let God Sort Them Out? Refining the Individualization Requirement in Capital Sentencing*, 102 YALE L.J. 835, 856-57 (1992) (reviewing Beverly Lowry, CROSSED OVER: A MURDER, A MEMOIR (1992)).  Of course, the defendant's penalty phase presentation may not constitutionally be limited to statutory mitigating circumstances and the jury must be allowed to give full consideration to any non-statutory ones he advances.  *See* Hitchcock v. Dugger, 481 U.S. 393 (1987); Lockett v. Ohio, 438 U.S. 586 (1978).

[274]     For an example of an argument making an effective transition, see Edith Georgi Houlihan, *Defending the Accused Child Killer*, THE CHAMPION, Apr. 1998, at 23.  Lingering doubt is a permissible mitigating circumstance in some jurisdictions (*e.g.*, California, *see* People v. Sanchez, 12 Cal. 4th 1, 77-78, 906 P.2d 1129, 1178, 47 Cal. Rptr. 2d 843, 892-93 (1995), *cert. denied*, 519 U.S. 835 (1996)), but not in others (*e.g.*, Florida, *see* Way v. State, 760 So. 2d 903, 916-17 (Fla. 2000), *cert. denied*, 531 U.S. 1155 (2001)).

Existing caselaw in the United States Supreme Court holds that a capital defendant has no federal constitutional right to have lingering doubt considered as a mitigating circumstance at the penalty phase.  Franklin v. Lynaugh, 487 U.S. 164, 174-75 (1988).  Given the significant number of death row exonerations, and the degree to which these have plainly troubled many Justices, *see* Atkins v. Virginia, 122 S. Ct. 2242, 2251 n.25 (2002) ("Despite the heavy burden that the prosecution must shoulder in capital cases, we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated."), there is ample reason to doubt the force of this precedent.  *See* MANDATORY JUSTICE, *supra* note 48, at 40-41 (advocating allowing lingering doubt to be considered as a mitigating circumstance); Christina S. Pignatelli, *Residual Doubt: It's a Life Saver*, 13 CAP. DEF. J. 307 (2001).

[275]     *See* Penry v. Lynaugh, 492 U.S. 302, 327-28 (1989) ("[I]t is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense."); Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986) (evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does "not relate specifically to petitioner's culpability for the crime he committed").  Similarly, counsel could appropriately argue to the jury that the death

---

Case 1:09-cv-01039-MJT    Document 50-4    Filed 10/05/10    Page 114 of 274 PageID #:
6610
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ▪ February 2003

may be offered not to justify or excuse the crime "but to help explain it."[276]  If counsel cannot establish a direct cause and effect relationship between any one mitigating factor and the commission of a capital offense, counsel should endeavor to show the combination of factors that led the client to commit the crime.[277]   In any event, it is critically important to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors.[278]

Since an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present.  Expert witnesses may be useful for this purpose and, in any event, are almost always crucial to explain the significance of the observations.[279]  For example, expert testimony may explain the permanent neurological damage caused by fetal alcohol syndrome or childhood abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control.[280]  Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose" expert who may have insufficient knowledge or experience to testify persuasively.[281]  In order to prepare effectively for trial, and to choose the best experts, counsel should take advantage of training materials and seminars and remain current on developments in fields such as neurology and psychology, which often have important implications for understanding clients' behavior.[282]  Counsel should also seek advice and assistance from colleagues and experts in the field of capital litigation.

---

sentence should not be imposed on a client because doing so would tend to incite the client's political followers to avenge him by committing further crimes.  *See, e.g,* Benjamin Weiser, *Jury Rejects Death Penalty for Terrorist*, N.Y. TIMES, July 11, 2001, at B1 (reporting successful use of this argument at trial of defendant convicted of bombing American embassy).

[276]    *See generally* Haney, *supra* note 91, at 560.

[277]    *Id.* at 600.

[278]    *See* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109, 1140-41 (1997) (noting that jurors find expert testimony unpersuasive if it is not tied into other evidence presented in the case).

[279]    *See* White, *supra* note 2, at 342-43.

[280]    *See, e.g.,* Ainsworth v. Woodford, 268 F.3d 868, 876 (9th Cir. 2001) ("the introduction of expert testimony would also have been important" to explain the effects that "serious physical and psychological abuse and neglect as a child" had on the defendant).

[281]    *See* Caro v. Calderon, 165 F.3d 1223, 1226-27 (9th Cir. 1999) (although counsel consulted four experts, including a medical doctor, a psychologist, and a psychiatrist, counsel failed to consult neurologist or toxicologist who could have explained neurological effects of defendant's extensive exposure to pesticides), *cert. denied*, 527 U.S. 1049 (1999).

[282]    High quality continuing legal education programs on the death penalty, such as those noted *supra* in the Commentary to Guideline 8.1, regularly present such information.

---

Counsel should ordinarily use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions.[283]  Community members such as co-workers, prison guards, teachers, military personnel, or clergy who interacted with the defendant or his family, or have other relevant personal knowledge or experience often speak to the jury with particular credibility.[284]

Family members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants.  These witnesses can also humanize the client by allowing the jury to see him in the context of his family, showing that they care about him, and providing examples of his capacity to behave in a caring, positive way, such as attempting to protect other family members from domestic violence or trying to be a good parent and provider.[285]  Similarly, acquaintances who can testify to the client's performance of good works in the community may help the decisionmaker to have a more complete view of him.  None of this evidence should be offered as counterweight to the gravity of the crime, but rather to show that the person who committed the crime is a flawed but real individual rather than a generic evildoer, someone for whom one could reasonably see a constricted but worthwhile future.

In addition to humanizing the client, counsel should endeavor to show that the alternatives to the death penalty would be adequate punishment.  Studies show that "future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials," whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration.[286]  Accordingly, counsel should make every effort to present information on this subject.  Evidence that the client has adapted well to prison and has had few disciplinary problems can allay jurors' fears and reinforce other positive mitigating evidence.[287]  Counsel should therefore always encourage the client not only to avoid any disciplinary infractions but also to participate in treatment programs and/or educational, religious or other constructive activities.

Counsel should emphasize through evidence, argument, and/or instruction that the client will either never be eligible for parole, will be required to serve a lengthy minimum mandatory sentence before being considered for parole, or will be serving so many lengthy, consecutive sentences that he has no realistic hope of release.[288]  In at least some jurisdictions, counsel may be

---

[283]    *See* Sundby, *supra* note 278, at 1163-84.

[284]    *See id.* at 1118, 1151.

[285]    *See id.* at 1152-62; *see also* Wayne A. Logan, *When Balance and Fairness Collide: An Argument for Execution Impact Evidence in Capital Trials*, 33 U. MICH. J.L. REFORM 1, 12-14 (1999).

[286]    *See* John H. Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397, 398-99 (2001).

[287]    *See* Skipper v. South Carolina, 476 U.S. 1, 8 (1986) (jury would "quite naturally" give great weight to the testimony of disinterested witnesses, such as "jailers who would have had no particular reason to be favorably predisposed toward one of their charges"); Sundby, *supra* note 278, at 1147 (juries tend to respond favorably to testimony of prison employees).

[288]    The Supreme Court has held that "when 'a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment

---

allowed to present evidence concerning the conditions under which such a sentence would be served.[289]

Counsel should also consider, in consultation with the client, the possibility of the client expressing remorse for the crime in testimony, in allocution, or in a post-trial statement. If counsel decides that a trial presentation by the client is desirable, and the proposed testimony or allocution is forestalled by evidentiary rulings of the court either disallowing it or conditioning it on unacceptable cross-examination, counsel should take care to make a full record of the circumstances, including the content of the proposed statement. In light of the strong common law underpinnings of allocution and the broad constitutional right to present mitigation that has already been described, any such issue is likely to merit the careful examination of successor counsel.

Finally, in preparing a defense presentation on mitigation counsel must try to anticipate the evidence that may be admitted in response and to tailor the presentation to avoid opening the door to damaging rebuttal evidence that would otherwise be inadmissible.[290]

---

without possibility of parole, due process entitles the defendant "to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.""" Kelly v. South Carolina, 534 U.S. 246, 122 S. Ct. 726, 728 (2002) (*quoting* Shafer v. South Carolina, 532 U.S. 36, 39 (2001) and Simmons v. South Carolina, 512 U.S. 154 (1994)). The precise contours of this rule remain in dispute, *see* Brown v. Texas, 522 U.S. 940 (1997), and counsel may appropriately seek to extend them (*e.g.*, by applying the rule to other alternative sentences than life imprisonment without parole or by requiring that the jury receive the information through instructions).

Some state courts have held that the trial court must resolve, before the capital sentencing hearing, issues such as the length of other sentences the defendant would serve and whether he would be eligible for parole. *See* Clark v. Tansy, 118 N.M. 486, 493, 882 P.2d 527, 534 (N.M. 1994) (trial court must, upon defendant's request, impose sentence for noncapital convictions prior to jury deliberations on death penalty); Turner v. State, 573 So. 2d 657, 674-75 (Miss. 1990) (trial court should determine defendant's habitual offender status before capital sentencing hearing so jury could be accurately informed of defendant's parole ineligibility), *cert. denied*, 500 U.S. 910 (1991).

In other jurisdictions, the defense can at least argue that the defendant is *likely* to receive lengthy, consecutive sentences. *See* Jones v. State, 569 So. 2d 1234, 1239-40 (Fla. 1990) (length of time a defendant would be "removed from society" if sentenced to life imprisonment is relevant mitigating evidence that the jury must be permitted to consider), *cert. denied*, 510 U.S. 836 (1993); Turner v. State, 645 So. 2d 444, 448 (Fla. 1994) (jury could properly consider in mitigation that alternative to death sentences would have been two life sentences with combined minimum mandatory of 50 years).

[289] In the federal capital sentencing of a defendant convicted of bombing American embassies overseas, the defense presented evidence about conditions at the federal "Super Max" prison in Florence, Colorado, where the defendant would be incarcerated if sentenced to life without parole. *See* Benjamin Weiser, *Lawyers for Embassy Bomber Push for Prison Over Execution*, N.Y. TIMES, June 27, 2001, at B4; *see also infra* note 310. The defendant was subsequently sentenced to life without parole. *See* Weiser, *supra* note 275.

---

The Defense Response to the Prosecution's Penalty Phase Presentation

Counsel should prepare for the prosecutor's case at the sentencing phase in much the same way as for the prosecutor's case at the guilt/innocence phase.[291]  Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut.  As discussed in the Commentary to Guideline 10.2, jurisdictions vary in whether the defense must be formally notified as to whether the prosecution will seek the death penalty.  If required notice has not been given, counsel should also prepare to challenge at the sentencing phase any prosecution efforts that should be barred for failure to give notice.[292]

Counsel should carefully research applicable state and federal law governing the admissibility of evidence in aggravation.  Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that fails, rebut the evidence or offer mitigating evidence that will blunt its impact.[293]

If (but only if)[294] the defense presents an expert who has examined the client, a prosecution expert may be entitled to examine the client to prepare for rebuttal.[295]  Counsel should become familiar with the governing law regarding limitations on the scope of expert evaluations conducted by prosecution experts, and file appropriate motions to ensure that the scope of the examination is no broader than legally permissible.[296]  If the examination is not limited as counsel deem

---

[290]    However, as Subsection G suggests, if there is uncertainty as to the scope of how wide this opening would be or if counsel believes that excessive rebuttal is to be admitted, they should object and make a full record on the issue.

[291]    *See* White, *supra* note 2, at 358.

[292]    *See supra* text accompanying notes 161-62.

[293]    *See* Smith v. Stewart, 189 F.3d 1004, 1010 (9th Cir. 1999) (concluding counsel was ineffective in part for failing to challenge the state's use of prior rape convictions in aggravation as prior violent offenses where both of the convictions occurred when Arizona law did not include violence as an element of rape), *cert. denied*, 531 U.S. 952 (2000); Parker v. Bowersox, 188 F.3d 923, 929-31 (8th Cir. 1999) (concluding trial counsel was ineffective for failing to present evidence to rebut the only aggravating circumstances), *cert. denied*, 529 U.S. 1038 (2000); Summit v. Blackburn, 795 F.2d 1237, 1244-45 (5th Cir. 1986) (concluding trial counsel was ineffective for failing to argue the lack of corroborating evidence of the sole aggravating factor when under state law a defendant cannot be convicted based solely on uncorroborated confession and the only evidence supporting the aggravating factor was defendant's confession).

[294]    *See* Estelle v. Smith, 451 U.S. 454 (1981).

[295]    As described *infra* in note 296, several states explicitly confine this right to the penalty phase.

[296]    *See, e.g.* FED. R. CRIM. P. 12.2(c) ("No statement made by the defendant in the course of any [court-ordered psychiatric] examination . . . shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the

appropriate, Subsection J(1) requires them to give careful consideration to their response (*e.g.*, refuse to participate on possible pain of preclusion, participate at the cost of an irretrievable surrender of information, seek relief from a higher court). Counsel must discuss with the client in advance any evaluation that is to take place and attend the examination in order to protect the client's rights (Subsections J(2)-(3)). Counsel may also seek to have the evaluation observed by a defense expert.

Counsel should integrate the defense response to the prosecution's evidence in aggravation with the overall theory of the case. In some cases, counsel's response to aggravating evidence at the penalty stage converges with the defense presentation at the guilt/innocence phase. The prosecutor will offer no additional evidence at the penalty phase but will simply rely on aggravating factors established by the evidence at the guilt/innocence phase, such as that the murder was committed during the course of a felony.[297] In such cases, counsel's rebuttal presentation should focus on the circumstances of the crime, and defendant's conduct as it relates to the elements of the applicable aggravating circumstances.

In other cases, the prosecution will introduce additional aggravating evidence at the penalty stage. If the prosecutor seeks to introduce evidence of unadjudicated prior criminal conduct as aggravating evidence, counsel should fully investigate the circumstances of the prior conduct and determine whether it is properly admissible at the penalty stage.[298]

---

defendant has introduced testimony."); Abernathy v. State, 265 Ga. 754, 462 S.E.2d 615 (1995) (if defendant intends to present expert mental health testimony as mitigating evidence, he must submit to a mental health examination by a State expert, but State expert may only testify in rebuttal to the testimony of a defense expert or of the defendant himself); State v. Reid, 981 S.W.2d 166 (Tenn. 1998) (once defendant files notice of intent to present expert testimony regarding mitigating evidence, State expert may examine defendant, but State expert report will be provided only to the defense until after conviction and after defendant confirms intent to rely on expert testimony as part of case in mitigation); FLA. R. CRIM. P. 3.202(d); Dillbeck v. State, 643 So. 2d 1027, 1030-31 (Fla. 1994) (where defendant plans to use in the penalty phase the testimony of an expert who has interviewed him or her, the State is entitled to examine the defendant only after conviction and after the State has certified that it will seek the death penalty), *cert. denied*, 514 U.S. 1022 (1995). *See also* State v. Johnson, 2003 Ga. LEXIS 12 (Jan. 13, 2003).

[297]    *See, e.g.*, Lowenfeld v. Phelps, 484 U.S. 231 (1988); FLA. STAT. ANN. § 921.141(5) (West 2001) (listing as an aggravating circumstance the fact that the crime was committed while the defendant was engaged in, or an accomplice to, the commission or attempted commission or flight after committing or attempting to commit any one of twelve enumerated felonies). In some states, *e.g.*, New York, the prosecution is essentially limited at the penalty phase to the evidence admitted at the guilt phase. *See* N.Y. CRIM. PROC. LAW § 400.27 (McKinney 2002).

[298]    In some jurisdictions, only criminal conduct for which the client has been convicted is admissible at the penalty stage. *See, e.g.,* FLA. STAT. ANN. § 921.141(5) (West 2001) (listing as aggravating circumstance the fact that the defendant was previously convicted of capital felony or a felony involving violence). In others, no conviction is necessary, but the admissibility of a prior bad act may depend on other factors. *See, e.g.*, CAL. PENAL CODE § 190.3 (West 1999) (allowing admission of evidence of other criminal activity at penalty phase even though the defendant was not convicted for it, unless the defendant was prosecuted and acquitted or it did not involve the use or threat of violence); Pace v. State, 271 Ga. 829, 842, 524 S.E.2d 490, 505 (1999) (prior

---

Case 1:09-cv-01039-MJT    Document 50-4    Filed 10/05/10    Page 119 of 274 PageID #:
6615
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ▪ February 2003

If the prosecution relies upon a prior conviction (as opposed to conduct), counsel should also determine whether it could be attacked as the product of invalid guilty plea,[299] as obtained when the client was unrepresented by counsel,[300] as a violation of double jeopardy,[301] or on some other basis. Counsel should determine whether a constitutional challenge to a prior conviction must be litigated in the jurisdiction where the conviction occurred.[302]

In jurisdictions where victim-impact evidence is permitted, counsel, mindful that such evidence is often very persuasive to the sentencer, should ascertain what, if any, victim-impact evidence the prosecution intends to introduce at penalty phase, and evaluate all available strategies for contesting the admissibility of such evidence[303] and minimizing its effect on the sentencer.[304] In particular, in light of the instability of the caselaw,[305] counsel should consider the federal constitutionality of admitting such evidence to be an open field for legal advocacy.[306]

---

crime without conviction may be used in aggravation unless there is a previous acquittal), *cert. denied*, 531 U.S. 839 (2000). As a matter of constitutional law, the continuing validity of the admission of unadjudicated prior misconduct has been called into further question by Ring v. Arizona, 122 S. Ct. 2248 (2002).

[299]    *See* Boykin v. Alabama, 395 U.S. 238, 242-244 (1969).

[300]    *See* Gideon v. Wainwright, 372 U.S. 335, 338-39 (1963).

[301]    *See* Menna v. New York, 423 U.S. 61, 61-62 (1975).

[302]    *See* Lackawanna County Dist. Att'y v. Coss, 531 U.S. 923 (2001), *see also supra* note 21.

[303]    Limitations on the admission of such evidence exist in a number of jurisdictions as a matter of state law. *See, e.g.*, Bivins v. State, 642 N.E.2d 928 (Ind. 1994), *cert. denied*, 516 U.S. 1077 (1996); People v. Edwards, 54 Cal. 3d 787, 832-36, 819 P.2d 436, 464-67, 1 Cal. Rptr. 2d 696 (1991), *cert denied*, 506 U.S. 841 (1992).

[304]    *See generally* Jeremy A. Blumenthal, *The Admissibility of Victim Impact Statements at Capital Sentencing: Traditional and Nontraditional Perspectives*, 50 DRAKE L. REV. 67 (2001); Randall Coyne, *Inflicting* Payne *on Oklahoma: The Use of Victim Impact Evidence during the Sentencing Phase of Capital Cases*, 45 OKLA. L. REV. 589, 612-15 (1992); Ellen Kreitzberg, *How Much* Payne *Will the Courts Allow?*, THE CHAMPION, Jan./Feb. 1998, at 31; Michael Ogul, *Capital Cases: Dealing with Victim Impact Evidence* (pts. 1 & 2), THE CHAMPION, June 2000, at 43, Aug./Sept. 2000, at 42.

[305]    *Compare* Booth v. Maryland, 482 U.S. 496, 501-03 (1987) (victim impact evidence unconstitutional), *and* South Carolina v. Gathers, 490 U.S. 805, 810-12 (1989) (prosecutorial argument for death based upon laudable characteristics of victim unconstitutional), *with* Payne v. Tennessee, 501 U.S. 808, 825 (1991) (overruling *Booth* and *Gathers* while noting that Due Process clause is violated if such evidence is "unduly prejudicial").

[306]    For example, on the assumption that victim impact evidence in support of the death penalty would be admissible, there is conflicting caselaw in various states on whether the defense can call members of the victim's family to testify in opposition to the client's execution. *Compare* Greene v. State, 343 Ark. 526, 531-36 (2001) (defendant not entitled to present testimony of

---

68-118

Counsel should also evaluate how to blunt certain intangible factors that can be damaging to a capital defendant at sentencing, including the heinous nature of the crime or the sentencer's possible racial antagonism for the client.[307]  In jurisdictions where the alternative to a death sentence is life without the possibility of parole, counsel should consider informing the jury of the defendant's parole ineligibility in order to blunt the concern that the defendant may one day be released from custody.[308]  If they have not done so previously in building their affirmative case for a penalty less than death,[309] counsel should also consider putting on evidence describing the conditions under which the client would serve a life sentence to rebut aggravating evidence of future dangerousness.[310]

Jury Considerations

Personal argument by counsel in support of a sentence less than death is important. Counsel who seeks to persuade a decisionmaker to empathize with the client must convey his or her own empathy.[311]  While counsel may also stress the gravity of the sentencer's life and death decision, the fact that the jury will have been death-qualified[312] means that categorical arguments against the death penalty are unlikely to be effective.

---

surviving spouse that she forgave him and opposed death sentence), Ware v. State, 360 Md. 650, 688 (2000) (victim's family member not allowed to give opinion on whether death penalty should be invoked) and People v. Williams, 161 Ill. 2d 1, 70 (1994) (witness' opinion that defendant should not be sentenced to death is inadmissible) *with* Murphy v. State, 47 P.3d 876 (Okla. Crim. App. 2002) (victim's family allowed to make sentencing recommendation), and Tate v. Matteson, 123 Idaho 622, 625 (1993) (same).

[307]    *See* White, *supra* note 2, at 359-60.

[308]    *See supra* text accompanying notes 286-88.

[309]    *See supra* text accompanying note 289.

[310]    *See* United States v. Johnson, 223 F.3d 665, 671 (7th Cir. 2000) (describing how, to rebut government's assertion of future dangerousness, federal capital defendant put on evidence at penalty phase regarding conditions at "Supermax" prison where defendant would be housed if sentenced to life imprisonment), *cert. denied*, 122 S. Ct. 71 (2001); *supra* note 289.

[311]    *See supra* text accompanying note 183; White, *supra* note 2, at 374-75.  An attorney whose contempt for his client is palpable cannot provide effective representation.  *See, e.g.*, Rickman v. Bell, 131 F.3d 1150, 1157 (6th Cir. 1997) (counsel's hostility to his own client was so patent that defendant was "'functionally . . . totally denied counsel'") (*quoting* Rickman v. Dutton, 864 F. Supp. 686, 701 (1994)), *cert. denied*, 523 U.S. 1133 (1998)); Clark v. State, 690 So. 2d 1280, 1283 (Fla. 1997) ("Counsel completely abdicated his responsibility to Clark when he told the jury that Clark's case presented his most difficult challenge ever in arguing against imposition of the death penalty.").

[312]    *See supra* text accompanying note 260.

---

114

It is essential that counsel object to evidentiary rulings, instructions, or verdict forms that improperly circumscribe the scope of the mitigating evidence that can be presented or the ability of the jury to consider and give effect to such evidence.[313] Counsel should also object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence[314] or equate the standards for mitigation with those for a first-phase defense.[315] At the same time, counsel should request instructions that will ensure that the jury understands, considers, and gives effect to all relevant mitigating evidence.[316] It is vital that the instructions clearly convey the differing unanimity requirements applicable to aggravating and mitigating factors.[317]

If the jury instructions are insufficient to achieve the purposes described in the previous paragraph or are otherwise confusing or misleading, counsel must object, even if the instructions

---

[313] *See, e.g.*, Penry v. Johnson, 532 U.S. 782, 799-800 (2001) (instructions and verdict form prevented jury from giving effect to mitigating evidence of defendant's mental retardation); McKoy v. North Carolina, 494 U.S. 433, 438-40 (1990) (verdict form and instructions suggesting mitigating circumstances must be found unanimously improperly restricted jurors' ability to give effect to mitigating evidence); Mills v. Maryland, 486 U.S. 367, 384 (1988) (same).

[314] Prosecutors will frequently try to argue, for example, that "not everybody" who is abused as a child grows up to commit capital murder or that mental illness did not "cause" the defendant to commit the crime. *See* Haney, *supra* note 91, at 589-602. Both of these arguments are objectionable on Eighth Amendment grounds because they nullify the effect of virtually all mitigation. *Id.* In any event, counsel can seek to counter such arguments by emphasizing the unique combination of factors at play in the client's life and demonstrating that there are causal connections between, for example, childhood abuse, neurological damage, and violent behavior. *See, e.g.*, Phyllis Crocker, *Childhood Abuse and Adult Murder: Implications For*, 77 N.C. L. REV. 1143, 1157-66 (1999) (reviewing scientific literature).

[315] Arguments confusing the standards for a first phase defense and mitigation also violate the Eighth Amendment. *See generally* Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982) (trial court improperly rejected mitigating evidence of defendant's emotional disturbance on ground that defendant "knew the difference between right and wrong"); Phyllis L. Crocker, *Concepts of Culpability and Deathworthiness: Differentiating Between Guilt and Punishment in Death Penalty Cases*, 66 FORDHAM L. REV. 21 (1997).

[316] *See* Blume et al., *supra* note 286, at 398-99. *See also* James Luginbuhl & Julie Howe, *Symposium: the Capital Jury Project, Discretion in Capital Sentencing Instructions: Guided or Misguided?*, 70 IND. L. REV. 1161 (1995) (results of study show that substantial percentage of jurors do not understand instructions concerning aggravating and mitigating evidence, burdens of proof and unanimity); Theodore Eisenberg & Martin T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1 (1993) (results of study showing jury confusion as to meaning of instructions, particularly about the mitigating circumstance burden of proof).

[317] *See* McCoy v. North Carolina, 494 U.S. 433 (1990) (instructions allowing jury to consider only mitigating circumstances found unanimously violated Eighth Amendment); Mills v. Maryland, 486 U.S. 367 (1988) (same result where jury could misinterpret instructions to require unanimity).

---

115

are the standard ones given in the jurisdiction.  If the court does not instruct the jury on individual mitigating circumstances, counsel should spell them out in closing argument.

Record Preservation

   In some jurisdictions, counsel is required or allowed to either proffer to the court or present to the sentencer mitigating evidence, regardless of the client's wishes.[318]  Even if such a presentation is not mandatory, counsel should endeavor to put all available mitigating evidence into the record because of its possible impact on subsequent decisionmakers in the case.

---

[318]   *See, e.g.*, Koon v. Dugger, 619 So. 2d 246, 250 (Fla. 1993) ("When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision.  Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be."); State v. Koedatich, 112 N.J. 225, 329-33, 548 A.2d 939, 993-95 (1988) (mitigating factors must be introduced regardless of the defendant's position), *cert. denied*, 488 U.S. 1017 (1989).

68-121

## Guideline 10.12        The Official Presentence Report

A.     **If an official presentence report or similar document may or will be presented to the court at any time, counsel should become familiar with the procedures governing preparation, submission, and verification of the report.  In addition, counsel should:**

1.     **where preparation of the report is optional, consider the strategic implications of requesting that a report be prepared;**

2.     **provide to the report preparer information favorable to the client.  In this regard, counsel should consider whether the client should speak with the person preparing the report; if the determination is made to do so, counsel should discuss the interview in advance with the client and attend it;**

3.     **review the completed report;**

4.     **take appropriate steps to ensure that improper, incorrect or misleading information that may harm the client is deleted from the report;**

5.     **take steps to preserve and protect the client's interests where the defense considers information in the presentence report to be improper, inaccurate or misleading.**

### *History of Guideline*

This Guideline is based on Guideline 11.8.4 of the original edition.  New requirements in the Guideline include:  (1) counsel's obligation to become familiar with the procedures governing preparation, submission, and verification of official presentence reports, where there is a chance that such a report may be presented to the court at any time; (2) counsel's obligation to provide information that is favorable to the client to the person who is preparing the report; (3) counsel's obligation to prepare the client for and attend an interview with the person preparing the report, provided counsel has first determined such an interview to be appropriate.

### *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-8.1 ("Sentencing") *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 8.3 (1995) ("Preparation for Sentencing").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 8.4 (1995) ("The Official Presentence Report").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 8.5 (1995) ("The Prosecution's Sentencing Position").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 8.6 (1995) ("The Defense Sentencing Memorandum").

***Commentary***

In many jurisdictions, an official presentence report may be prepared prior to the imposition of sentence in a capital case.[319]  How such reports may be used in the sentencing process differs from jurisdiction to jurisdiction, and counsel should become familiar with the statutes, court rules, caselaw, and local practice governing their use.[320]  There are also constitutional limits on the use of presentence reports in capital sentencing.[321]

In some jurisdictions, a presentence report is not prepared unless requested by the defense. Counsel should carefully consider the implications of such a request.[322]  In jurisdictions where a presentence report is prepared regardless of the wishes of the defense, counsel should submit information favorable to the client, including the client's social history and expert evaluations. If the report preparer does not include the defense materials, counsel should consider how they might otherwise be made part of the client's official records.  This information may not only affect the sentencing decision, but also the client's classification, programming and treatment in the prison system following imposition of sentence.  In any event, counsel should make a clear record of any inaccuracies they discern in the report.

---

[319]    *See, e.g.*, Muhammad v. State, 782 So. 2d 343, 363 n.10 (Fla. 2001), *cert. denied*, 122 S. Ct. 323 (2001); State v. Dunster, 262 Neb. 329, 362-65, 631 N.W.2d 879, 906-08 (2001), *cert. denied*, 122 S. Ct. 1210 (2002); *Ex parte* George, 717 So. 2d 858, 859 (Ala. 1998), *cert. denied*, 525 U.S. 1024 (1998).

[320]    For example, in Florida, a presentence investigation report is required in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigating evidence.  Muhammad v. State, 782 So. 2d 343, 363 (Fla. 2001), *cert. denied*, 122 S. Ct. 323 (2001).  In California, although a probation report is prepared prior to the trial court's ruling on a capital defendant's post-trial motion to modify the death verdict, it is error for the judge, in ruling on that motion, to consider information contained in the probation report that was not presented to the jury.  *See, e.g.*, People v. Kipp, 956 P.2d 1169, 1189-90, 18 Cal. 4th 349, 382-83, 75 Cal. Rptr. 2d 716 (1998), *cert. denied*, 525 U.S. 1152 (1999).

[321]    *See* Gardner v. Florida, 430 U.S. 349, 358-62 (1977) (holding that if, in imposing a death sentence, the trial judge relies in part on confidential information in a presentence investigation report, the report must be disclosed to defense counsel or due process is violated).

[322]    For example, in Ohio, a presentence report is prepared only at the request of the defense, and if the defense requests the preparation of a report, the prosecution is allowed to present victim-impact evidence, other crimes evidence, and other information that is not otherwise admissible at penalty phase to the jury.  *See* OHIO REV. CODE ANN. § 2929.03(D)(1) (Anderson 1999); State v. White, 85 Ohio St. 3d 433, 444-46, 709 N.E.2d 140, 153-55, *cert. denied*, 528 U.S. 938 (1999).  Because Ohio provides capital defendants the right to reasonably necessary investigation, experts, or other assistance for trial and penalty phases, *see* OHIO REV. CODE ANN. § 2929.024 (Anderson 1999), capital counsel who request a presentence report instead may be ineffective for doing so.  *See* Glenn v. Tate, 71 F.3d 1204, 1209-10 (6th Cir. 1995), *cert. denied*, 519 U.S. 910 (1996).

---

**Guideline 10.13    The Duty to Facilitate the Work of Successor Counsel**

**In accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client and should cooperate fully with successor counsel. This duty includes, but is not limited to:**

**A.    maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation;**

**B.    providing the client's files, as well as information regarding all aspects of the representation, to successor counsel;**

**C.    sharing potential further areas of legal and factual research with successor counsel; and**

**D.    cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.**

*History of Guideline*

This Guideline is new.

*Related Standards*

NAT'L LEGAL AID AND DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 9.2 (c) (1997) ("Right to Appeal").

*Commentary*

All members of the defense team must anticipate and facilitate the duty of successor counsel, embodied in Guideline 7.1 (B) (1), to investigate the defense presentation at all prior stages of the case. As set forth in Subsection A, this duty includes an affirmative obligation to maintain contemporaneous records that will enable successor counsel to have a factual predicate for the assertion of whatever legal claims may arise. For example, there may be issues as to whether the government produced certain evidence or whether counsel knew of the existence of a particular witness or legal theory. Each counsel's files should be maintained in a manner sufficient to enable successor counsel to answer questions of this sort through appropriate documentation (*e.g.*, notes of client interviews, telephone message slips, etc.).

Even after team members have been formally replaced, they must continue to safeguard the interests of the client. Specifically, they must cooperate with the professionally appropriate strategies of successor counsel (Subsection D). And this is true even when (as is commonly the case) successor counsel are investigating or asserting a claim that prior counsel was ineffective.[323]

---

[323]    *See* David M. Siegel, *My Reputation or Your Liberty (or Your Life): The Ethical Obligations of Criminal Defense Counsel in Postconviction Proceedings*, 23 J. LEGAL PROF. 85, 90-91 (1998/1999) ("While any criminal defense lawyer whose client is convicted is subject to the possibility of a claim for ineffective assistance, lawyers in capital cases are virtually guaranteed such claims.").

As the California Bar has ruled in a formal opinion, "[T]he Rules of Professional Conduct impose a duty upon trial counsel to fully and candidly discuss matters relating to the representation of the client with appellate counsel and to respond to the questions of appellate counsel, even if to do so would be to disclose that trial counsel failed to provide effective assistance of counsel. This decision is in accord with the general rule that the attorney owes a duty of complete fidelity to the client and to the interests of the client."[324]

The duties contained in this Guideline are of enormous practical significance to the vindication of the client's legal rights. "[T]he strategic thinking of the lawyer, and learning this strategic thinking[,] is absolutely critical to the thorough presentation of a post-conviction claim. It should be routinely and openly presented to the post-conviction counsel."[325] To do otherwise is professionally unethical.[326]

---

[324]    State Bar of Cal. Standing Comm. on Professional Responsibility & Conduct, Formal Op. 1992-127 (1992), *available at* http://www.calbar.ca.gov/calbar/html_unclassified/ca92-127.html.

[325]    Siegel, *supra* note 323, at 114.

[326]    *See id.* ("[G]iven the peculiar aspects of the role of counsel whose former client brings a post-conviction action, [it] violates counsel's ethical obligations" to fail to cooperate with successor counsel in "the disclosure to the post-conviction counsel of files and notes from the representation, the volunteering of absences in the record and the volunteering of counsel's strategic thinking in the case."); Mary B. Nelson, Note, *When Clients Become "Ex-Clients": The Duties Owed After Discharge*, 26 J. LEGAL PROF. 233, 241 (2002) ("Essentially, a failure to cooperate with the client's new attorney can constitute the same violations as a failure to cooperate with the actual client under Model Rule 1.16"). *See generally* Ariz. Comm. on Professional Conduct, Formal Op. 98-07 (1998); *Returning Client Files After Termination*, Hawaii Bar J., Sept. 1998.

68-125

Case 1:09-cv-01039-MJT    Document 50-4    Filed 10/05/10    Page 127 of 274 PageID #:
6623
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ▪ February 2003

## Guideline 10.14    Duties of Trial Counsel After Conviction

A.    Trial counsel should be familiar with all state and federal post-conviction options available to the client. Trial counsel should discuss with the client the post-conviction procedures that will or may follow imposition of the death sentence.

B.    Trial counsel should take whatever action(s), such as filing a notice of appeal, and/or motion for a new trial, will maximize the client's ability to obtain post-conviction relief.

C.    Trial counsel should not cease acting on the client's behalf until successor counsel has entered the case or trial counsel's representation has been formally terminated. Until that time, Guideline 10.15 applies in its entirety.

D.    Trial counsel should take all appropriate action to ensure that the client obtains successor counsel as soon as possible.

### History of Guideline

This Guideline is based on Guideline 11.9.1 of the original edition. Subsection B has been revised to require that trial counsel take whatever action(s) will maximize the client's ability to obtain post-conviction relief. Additionally, Subsection D has been revised to require that counsel take all appropriate action to ensure that the client obtains successor counsel as soon as possible.

### Related Standards

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-8.2 ("Appeal"), in ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 9.2 (1995) ("Right to Appeal").

### Commentary

Post-conviction procedures, and therefore the duties of counsel, vary among jurisdictions.[327] Whatever the procedures, the client should be advised of what will happen following the imposition of sentence and potential legal consequences of the client's anticipated actions. For example, if the client will be given any psychological examination or will otherwise be interviewed by prison personnel or others following the court's imposition of sentence, the client should be counseled regarding that interview and advised of the potential legal impact of any statements the client might make there.[328]

---

[327]    E.g., trial counsel in California is given, by statute, certain post-conviction duties and must remain on the case until the record is certified. CAL. PENAL CODE §1239(b), 1240.1(e)(1) (West 1982 & Supp. 2002).

[328]    See CAL. ATT'YS FOR CRIM. JUSTICE & CAL. DEFENDERS ASS'N, CALIFORNIA DEATH PENALTY DEFENSE MANUAL 1-38 to 1-40 (1986).

68-126

The client should also be advised of all available avenues of judicial review[329] and what the client must do to secure review (*e.g.*, sign a notice of appeal or affidavit of indigency). Trial counsel should file the necessary documents and take whatever other steps are needed to preserve the client's right to review, such as ordering transcripts of the trial proceedings and objecting to any governmentally imposed barriers (*e.g.*, failure to provide counsel) to obtaining such review. If there are any further actions available that might expand the scope of review (*e.g.*, filing a motion for a new trial), trial counsel should take them.[330]

In short, trial counsel is responsible for making sure that the client's legal position does not suffer any harm during the period of transition to successor counsel. To avoid prejudice to the client, trial counsel should, in accordance with Subsection D, make every effort to ensure that this period is as short as possible. But, in any event, trial counsel may not cease acting on the client's behalf until successor counsel has entered the case. As Subsection C provides, until that time trial counsel must discharge the duties common to all post-conviction counsel as set forth in Guideline 10.15 (including obtaining a stay of execution if needed).

Trial counsel must also monitor the client's personal condition as set out in Guideline 10.15(E)(2). If the client's mental status deteriorates under the impact of the conviction and death sentence, the client may inappropriately decide to cease efforts to secure review, thereby creating a series of problems for the defense team that might well have been avoided.

Once successor counsel are in place, trial counsel continue to be under the obligation, imposed by Guideline 10.13, to recognize a continuing duty to safeguard the interests of the client and to cooperate fully with successor counsel.

---

[329] Some death penalty states provide for automatic appellate review, *e.g.*, CAL. PENAL CODE § 1239(b) (West 1982 & Supp. 2002); MD. CODE ANN. art. 27, § 414(a) (2002) (this section has been repealed by 2002 Md. Laws 26, § 1, effective Oct. 1, 2002; an analogous provision has been enacted by 2002 Md. Laws 26, § 2, to be codified as MD. CODE ANN., CRIM. LAW § 2-401(a)); MD. R. 8-306(c); N.C. GEN. STAT. § 15A-2000(d)(1) (2001).

[330] This comports with the requirements for counsel in all criminal cases. *See* NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION Guideline 9.2(a), (b) (1995). *Cf.* Mayo v. Cockrell, 287 F.3d 336 (5th Cir. 2002) (denying federal habeas corpus relief where trial counsel was unaware that he remained on case until replaced, appellate counsel was unaware of his appointment until after expiration of time for filing of new trial motion, and a meritorious new trial motion went unfiled), *cert. denied*, 123 S.Ct. 443 (2002).

68-127

## Guideline  10.15.1    Duties of Post-Conviction Counsel

A.    Counsel representing a capital client at any point after conviction should be familiar with the jurisdiction's procedures for setting execution dates and providing notice of them.  Post-conviction counsel should also be thoroughly familiar with all available procedures for seeking a stay of execution.

B.    If an execution date is set, post-conviction counsel should immediately take all appropriate steps to secure a stay of execution and pursue those efforts through all available fora.

C.    Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules.  Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

D.    The duties of the counsel representing the client on direct appeal should include filing a petition for *certiorari* in the Supreme Court of the United States.  If appellate counsel does not intend to file such a petition, he or she should immediately notify successor counsel if known and the Responsible Agency.

E.    Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to:

1.    maintain close contact with the client regarding litigation developments; and

2.    continually monitor the client's mental, physical and emotional condition for effects on the client's legal position;

3.    keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments; and

4.    continue an aggressive investigation of all aspects of the case.

*History of Guideline*

This Guideline is based on Guideline 11.9.3 of the original edition.  Subsections A, B, and D are entirely new.  Subsection C includes new language regarding the manner in which post-conviction counsel must present all arguably meritorious issues.  Subsection E includes new language emphasizing the ongoing obligations imposed by these Guidelines upon post-conviction counsel.

*Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE:  DEFENSE FUNCTION Standard 4-8.5 ("Post-Conviction Remedies") *in* ABA STANDARDS FOR CRIMINAL JUSTICE:  PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

***Commentary***

Almost all of the duties imposed by Guidelines 10.3 et seq. are applicable in the post-conviction context.  Subsection E notes this by way of reminder.  Post-conviction counsel should consult those Guidelines and accompanying commentaries.

<u>The Paramount Duty to Obtain a Stay</u>

No matter how compelling the client's post-conviction case may be, he faces the risk that his execution will moot it.[331]  This is a phenomenon unique to capital litigation and one that must be uppermost in the mind of post-conviction counsel.

When states fail to provide post-conviction counsel entirely or in a timely manner,[332] or request the setting of an execution date to advance the litigation,[333] or impose short periods of time for filing substantive post-judgment pleadings, the result is emergency requests for stays of execution so that substantive pleadings will be considered.[334]  Although the ABA and other

---

[331]    *See* Brooks v. Estelle, 702 F.2d 84 (5th Cir. 1983) (dismissing appeal, which had received certificate of probable cause from district court, as moot since petitioner had been executed following the denial of a stay by Brooks v. Estelle, 697 F.2d 586 (5th Cir. 1982)).

[332]    There is no right to state post-conviction counsel in Georgia.  Gibson v. Turpin, 270 Ga. 855, 513 S.E.2d 186, *cert. denied*, 528 U.S. 946 (1999).  In August 1996, Georgia Supreme Court Justice Robert Benham noted that several persons under sentence of death in Georgia were in "immediate need of legal representation," and asked area law firms to volunteer.  One Atlanta civil firm that volunteered was assigned the case of Marcus Wellons.  Three days after the firm received a copy of the trial transcript, the trial court set an execution date for two weeks later.  The firm rushed to the Georgia Supreme Court and asked for more time to submit a formal post-conviction petition.  Hours before Mr. Wellons's scheduled execution, the Court denied the request by a 4-3 vote.  As guards were about to shave Mr. Wellons's head for that evening's electrocution, the federal district court granted a stay of execution.  State counsel and the federal defender were given ten months to prepare the federal petition.  Bill Rankin, *When Death Row Inmates Go To Court Without Lawyers: In the Late Stages of Their Fight to Stay Alive, Some Must Represent Themselves*, ATLANTA J. & CONST., Dec. 29, 1996, at D5; Bill Rankin & Rhonda Cook, *Death Penalty: Sudden Speed, Then a Delay*, ATLANTA J. & CONST., Dec. 13, 1996, at A1.

[333]    For example, in Kentucky capital cases the Attorney General invariably requests an execution date at the end of direct appeal, and the Governor invariably signs the death warrant.  No stay of execution may be granted until the state post-conviction petition is filed.  As a result, in order to obtain a stay, counsel must often file a state post-conviction petition well before the time allowed under state law because there is an outstanding execution date.  The practice is the same in federal *habeas* proceedings.  *See, e.g., Execution of Killer Delayed*, CINCINNATI ENQUIRER, June 9, 2000, at D1B.

[334]    When a capital case enters a phase of being "under warrant" – *i.e.*, when a death warrant has been signed – time commitments for counsel increase, "due in large part to the necessary duplication of effort in the preparation of several petitions which might have to be filed simultaneously in different courts."  Standing Comm. on Legal Aid & Indigent Defense, ABA Bar Information Program, *Time & Expense Analysis in Postconviction Death Penalty Cases*, Feb.

---

professional voices have repeatedly condemned this system,[335] defense counsel must make the best of it – by seeking stays or reprieves from any available source and challenging the unfairness of any overly restrictive constraints on filing of substantive pleadings and/or stays.

And to the extent that counsel can responsibly reduce the stresses imposed upon the client by this often-nightmarish system, counsel should of course do so (*e.g.*, by reassuring the client of the unlikelihood of the execution actually occurring on its nominal date, notwithstanding the alarming preparations being made by the prison). [336]

Keeping the Client Whole

Even if their executions have been safely stayed, however, the mental condition of many capital clients will deteriorate the longer they remain on death row. This may result in suicidal tendencies and/or impairments in realistic perception and rational decisionmaking.[337] Counsel should seek to minimize this risk by staying in close contact with the client.[338]

Counsel's ongoing monitoring of the client's status, required by Subsection E(2), also has a strictly legal purpose. As described in the text accompanying notes 187-90 *supra*, a worsening in the client's mental condition may directly affect the legal posture of the case and the lawyer needs to be aware of developments. For example, the case establishing the proposition that insane

---

1987, at 10.

[335]    *See,* ABA House of Delegates Res. 15, Rec. 11 (adopted Feb. 13, 1990) (calling for automatic federal stays throughout post-conviction period) *reprinted in Toward a More Just and Effective System of Review*, *supra* note 84, at 38; *Legislative Modification*, *supra* note 11, at 855 ("We agree with the Powell Committee [appointed by Chief Justice Rehnquist to study reform of capital habeas corpus] that the current mechanisms for obtaining stays of execution are irrational and indefensible. At best, they lead to an enormous waste of legal effort by all participants in the system, and at worst they result in inconsistencies that have fatal consequences."); Eric M. Freedman, *Can Justice Be Served by Appeals of the Dead?*, NATL. L.J., Oct. 19, 1992, at 13 (current situation respecting stays is "no way to run a judicial system").

[336]    *See, e.g.*, Williams v. Missouri, 463 U.S. 1301 (1983) (Blackmun, J., in chambers) (executions scheduled for prior to the expiration of the time for seeking *certiorari* on direct appeal would be stayed "as a matter of course"); McDonald v. Missouri, 464 U.S. 1306 (1984) (Blackmun, J., in chambers) ("I thought I had advised the Supreme Court of Missouri once before, in Williams, that . . . I . . . shall stay the execution of any Missouri applicant whose direct review of his conviction is being sought and has not been completed. I repeat the admonition to the Supreme Court of Missouri, and to any official within the State's chain of responsibility, that I shall continue that practice. The stay, of course, ought to be granted by the state tribunal in the first instance, but, if it fails to fulfill its responsibility, I shall fulfill mine.")

[337]    *See* C. Lee Harrington, *A Community Divided: Defense Attorneys and the Ethics of Death Row Volunteering*, 25 LAW & SOC. INQUIRY 849, 850 (2000) (noting that between 1977 and March 1998, 59 condemned inmates had volunteered for execution, compared to 382 executed unwillingly).

[338]    *See supra* text accompanying notes 187-90.

---

68-130

persons cannot be executed[339] was heavily based on notes on the client's mental status that counsel had kept over a period of months.

The Labyrinth of Post-conviction Litigation

A.      The Direct Appeal

Practice varies among jurisdictions as to the limits of the appellate process and the relationship between direct appeals and collateral post-conviction challenges to a conviction or sentence.[340]  Issues that are only partially or minimally reflected by the record, or that are outside the record, should be explored by appellate counsel as a predicate for informed decision making about legal strategy.

As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. "Winnowing" issues in a capital appeal can have fatal consequences.  Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later.[341]  When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.[342]

---

[339]     Ford v. Wainwright, 477 U.S. 399 (1986).

[340]     In some states, there is a unitary appeal system in which direct appeal and collateral challenges such as ineffective assistance of counsel claims are raised simultaneously.  *See, e.g.*, IDAHO CODE § 19-2719 (Michie Supp. 2000).  In other jurisdictions, ineffective assistance of counsel claims generally may not be raised on direct appeal but are reserved for separate post-conviction proceedings.  *See, e.g.*, Lawrence v. State, 691 So. 2d 1068, 1074 (Fla. 1997) (claims of ineffective assistance of counsel not cognizable on direct appeal) *cert. denied*, 522 U.S. 880 (1997).

[341]     For example, in Smith v. Murray, 477 U.S. 527 (1986), appellate counsel failed to assert on direct appeal that the defendant's Fifth Amendment rights had been violated by the testimony of a psychiatrist who had examined the defendant without warning him the interview could be used against him.  The Virginia Supreme Court had rejected such claims at the time of the defendant's direct appeal.  The U.S. Supreme Court reached a contrary result, however, in Estelle v. Smith, 451 U.S. 454 (1981).  In a Catch-22 for the client, the Court concluded appellate counsel was not ineffective, because "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  Murray, 477 U.S. at 536 (citation omitted).  At the same time, the claim was not deemed sufficiently "'novel'" to constitute cause for the procedural default because "forms of the claim he now advances had been percolating in the lower courts for years at the time of his original appeal."  *Id.* at 536-37 (citations omitted).  Mr. Smith was therefore barred from raising the issue in federal habeas proceedings and was subsequently executed.

[342]     It is for this reason that, consistent with the text *supra* accompanying note 27, Subsection C refers to "issues that are arguably meritorious under the standards applicable to high quality capital defense representation."

---

68-131

Appellate counsel must be familiar with the deadlines for filing petitions for state and federal post-conviction relief and how they are affected by the direct appeal. If the conviction and sentence are affirmed, appellate counsel should ordinarily file on the client's behalf a petition for *certiorari* review in the United States Supreme Court. Under the AEDPA, a client's one-year statute of limitations for filing a petition for federal habeas corpus relief generally begins to run upon the denial of *certiorari* or when the 90 days for filing a petition has elapsed.[343] Appellate counsel should therefore immediately inform successor counsel if he or she does not intend to file a petition for *certiorari* or when a petition for *certiorari* is denied; if successor counsel is not yet appointed, counsel should promptly advise the Responsible Agency of the need to designate successor counsel. (Subsection D)

Appellate counsel should also advise the client directly of all applicable deadlines for seeking post-conviction relief and explain the tolling provisions of the AEDPA,[344] emphasizing that a state post-conviction motion should be filed sufficiently in advance of the one-year deadline to allow adequate time to prepare a federal habeas corpus petition. In states in which the direct appeal and state post-conviction review are conducted simultaneously,[345] post-conviction proceedings may be concluded at the same time as, or even before, the direct appeal, effectively rendering the tolling provisions inapplicable.

In light of this mutual dependency among all the post-conviction legal procedures, it is of the utmost importance that, in accordance with Guideline 10.13, appellate counsel cooperates fully with successor counsel and turn over all relevant files promptly.

B.    Collateral Relief – State and Federal

As described in the Commentary to Guideline 1.1, providing high quality legal representation in collateral review proceedings in capital cases requires enormous amounts of time, energy and knowledge. The field is increasingly complex and ever changing. As state and federal collateral proceedings become ever-more intertwined, counsel representing a capital client in state collateral proceedings must become intimately familiar with federal habeas corpus procedures. As indicated above, for example, although the AEDPA deals strictly with cases being litigated in federal court, its statute of limitations provision creates a *de facto* statute of limitations for filing a collateral review petition in state court. Some state collateral counsel have failed to understand the AEDPA's implications, and unwittingly forfeited their client's right to federal *habeas corpus* review.[346]

---

[343]    28 U.S.C. § 2244(d)(1)(A); *see* LIEBMAN & HERTZ, note 27 *supra* § 5.1b.

[344]    28 U.S.C. § 2244(d)(2).

[345]    *See, e.g.*, Policy 3, California Supreme Court Policies Regarding Cases Arising From Judgments of Death (2002) (petitions for writ of habeas corpus to be filed within 90 days of final due date for filing reply brief on direct appeal); 22 OKLA. STAT. ANN. tit. 22, § 1089(D)(1) (West Supp. 2002) (motion for post-conviction relief must be filed within 90 days from filing of reply brief on direct appeal).

[346]    *See, e.g.*, Goodman v. Johnson, No. 99-20452 (5th Cir. Sept. 19, 1999) (unpublished), *cert. denied*, 528 U.S. 1131 (2000); Cantu-Tzin v. Johnson, 162 F.3d 295 (5th Cir. 1998), *cert. denied*, 525 U.S. 1091 (1999). Spencer Goodman was executed by Texas in January 2000, and

---

127

Collateral counsel has the same obligation as trial and appellate counsel to establish a relationship of trust with the client. But by the time a case reaches this stage, the client will have put his life into the hands of at least one other lawyer and found himself on death row. Counsel should not be surprised if the client initially exhibits some hostility and lack of trust, and must endeavor to overcome these barriers.

Ultimately, winning collateral relief in capital cases will require changing the picture that has previously been presented. The old facts and legal arguments – those which resulted in a conviction and imposition of the ultimate punishment, both affirmed on appeal – are unlikely to motivate a collateral court to make the effort required to stop the momentum the case has already gained in rolling through the legal system.[347] Because an appreciable portion of the task of post-conviction counsel is to change the overall picture of the case, Subsection E(3) requires that they keep under continuing review the desirability of amending the defense theory of the case, whether one has been formulated by prior counsel in accordance with Guideline 10.10.1 or not.

For similar reasons, collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation in accordance with Guideline 10.7. (Subsection E(4)). As demonstrated by the high percentage of reversals and disturbingly large number of innocent persons sentenced to death, the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case.[348] That may be because of information concealed by the state, because of witnesses who did not appear at trial or who testified falsely, because the trial attorney did not conduct an adequate investigation in the first instance, because new developments show the inadequacies of prior forensic evidence, because of juror misconduct, or for a variety of other reasons.

Two parallel tracks of post-conviction investigation are required. One involves reinvestigating the capital case; the other focuses on the client. Reinvestigating the case means examining the facts underlying the conviction and sentence, as well as such items as trial counsel's performance, judicial bias or prosecutorial misconduct. Reinvestigating the client means assembling a more-thorough biography of the client than was known at the time of trial, not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing issues to fundamental questions of competency and mental-state defenses.

As with every other stage of capital proceedings, collateral counsel has a duty in accordance with Guideline 10.8 to raise and preserve all arguably meritorious issues.[349] These include not only challenges to the conviction and sentence, but also issues which may arise

---

Andrew Cantu-Tzin was executed by Texas in January 1999.

[347]    *See generally* Russell Stetler, *Post-Conviction Investigation in Death Penalty Cases*, THE CHAMPION, Aug. 1999, at 41, *available at* http://www.criminaljustice.org/public.nsf/ChampionArticles/99Aug06/.

[348]    *See supra* text accompanying note 38.

[349]    *See supra* Guideline 10.8 and accompanying Commentary.

---

subsequently.[350]  Collateral counsel should assume that any meritorious issue not contained in the initial application will be waived or procedurally defaulted in subsequent litigation, or barred by strict rules governing subsequent applications.[351]  Counsel should also be aware that any change in the availability of post-conviction relief may itself provide an issue for further litigation.[352]  This is especially true if the change occurred after the case was begun and could be argued to have affected strategic decisions along the way.

---

[350]    For example, although the Justices disagree on the point, as shown most recently by their varying opinions respecting the *certiorari* petition in Foster v. Florida, 123 S. Ct. 470 (2002), it may well be that after a certain length of time continued confinement on Death Row ripens into an Eighth Amendment violation.

[351]    *See* Mason v. Meyers, 208 F.3d 414, 417 (3d Cir. 2000) (stating that as a result of the strict rules governing successive *habeas corpus* petitions enacted by the AEDPA and codified at 28 U.S.C. § 2244(b), "it is essential that habeas petitioners include in their first petition *all* potential claims for which they might desire to seek review and relief").

[352]    *See, e.g.*, Lindh v. Murphy, 521 U.S. 320 (1997) (discussing the retroactive application of various procedural provisions in the AEDPA to pending cases).

68-134

## Guideline 10.15.2    Duties of Clemency Counsel

A.    Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

B.    Clemency counsel should conduct an investigation in accordance with Guideline 10.7.

C.    Clemency counsel should ensure that clemency is sought in as timely and persuasive a manner as possible, tailoring the presentation to the characteristics of the particular client, case and jurisdiction.

D.    Clemency counsel should ensure that the process governing consideration of the client's application is substantively and procedurally just, and, if it is not, should seek appropriate redress.

### History of Guideline

This Guideline is based on Guideline 11.9.4 of the original edition. Subsection D of the Guideline was added to reflect the effect of the decision in *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998), on the duties of clemency counsel.

### Related Standards

None.

### Commentary

As discussed in the text accompanying notes 57-64 *supra,* a series of developments in law, public opinion, and forensic science suggests that clemency petitions in capital cases will in the future enjoy a greater success rate than they do now, which will place additional demands on clemency counsel.

As Subsection B emphasizes, further investigation is critical at this phase. Beyond that, the manner in which clemency is dispensed in the jurisdiction controls what clemency counsel needs to do.[353]

Counsel should be familiar with the clemency-dispenser, and with the factors the

---

[353]    The states utilize 50 different clemency processes, which can be categorized in the following manner: the Governor has sole authority over the clemency process; the Governor cannot grant clemency without a recommendation from a board or advisory group to do so; the Governor decides clemency after receiving a nonbinding recommendation from a board or advisory group; a board or advisory group makes the clemency determination; or, the Governor sits as a member of the board which makes the clemency determination. The Death Penalty Information Group details the process by state, *available at* http://www.deathpenaltyinfo.org/clemency.htm/#process. For federal death row inmates, the President alone has pardon power. *See* U.S. CONST. art. II, § 2, cl. 1.

---

130

Case 1:09-cv-01039-MJT    Document 50-4    Filed 10/05/10    Page 137 of 274 PageID #:
6633
ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases • February 2003

clemency-dispenser has historically found persuasive.  As possible innocence is the most frequently cited reason for clemency,[354] if there is a possibility that the client is innocent, counsel should mobilize an especially detailed investigation to determine whether confidence in the client's guilt can be undermined.  If doubts about the fairness of the judicial proceedings that produced the death sentence have led to clemency in other cases, counsel should consider whether particular instances of procedural unfairness can be set out as to the client's case.[355]  If personal characteristics of the condemned, such as youth, mental illness,[356] spousal abuse, or cultural barriers, have proven helpful in past clemency proceedings, then counsel should discover and demonstrate examples of the client's similar characteristics to the extent possible.

In any event, the presentation should be as complete and persuasive as possible, utilizing all appropriate resources in support (e.g. relevant outside organizations, the trial judge, prominent citizens), and discussing explicitly why the clemency-dispenser should act favorably notwithstanding the repeated reaffirmation of the client's conviction and sentence by the judicial system.  For example, counsel may be in a position to argue that the underlying claims were powerful ones but procedural technicalities barred the courts from addressing their merits.

As discussed in the text accompanying notes 63-64 *supra*, due process protections apply to clemency proceedings, and counsel should be alert to the possibility of developing the nascent existing law in this area.

---

[354]    The Death Penalty Information Center reports that since 1976, of the 35 death row inmates who have been granted clemency for reasons other than the personal convictions of the governor in opposition to the death penalty, the possible innocence of the condemned inmate was provided as the reason for granting clemency in 16 cases (46%). *Available at* http://www.deathpenaltyinfo.org/clemency.html.

[355]    For example, in 1999 the Governor of Arkansas commuted the death sentence of Bobby Ray Fretwell after receiving a letter from a juror at Fretwell's trial stating that he had been the lone holdout against the death penalty, but had relented for fear that he would be an outcast in the small community where the killing had occurred. *See Arkansas Governor Spares Killer's Life After Juror's Plea*, L.A. TIMES, Feb. 6, 1999, at A19.  In the case of Charlie Brooks, who was executed in Texas in 1982, counsel enlisted the trial prosecutor to argue before the Board of Pardons and Paroles that it would be unfair to execute the client when his co-defendant was serving a term of years and the state did not know who the triggerman had been. *See* Robert Reinhold, *Groups Race to Prevent Texas Execution*, N.Y. Times, Dec. 6, 1982, at A16.

[356]    In 2002, the Georgia Board of Pardons commuted the death sentence of Alexander Williams to life in prison without parole in large part due to Williams's profound mental illness. *See* Rhonda Cook, *Death penalty reduced to life*, ATLANTA J. & CONST., Feb. 26, 2002, at A1.

---

# EXHIBIT 69

# THE
# FEDERAL BUREAU OF PRISONS'
# DRUG INTERDICTION
# ACTIVITIES

## Report Number
## I-2003-002

**January 2003**

69-001

# EXECUTIVE DIGEST

## Introduction

Illegal drugs are present in almost all Federal Bureau of Prisons' (BOP) institutions, as evidenced by inmate drug tests, inmate overdoses, drug finds in the institutions, and criminal and administrative cases lodged against inmates, staff, and visitors. This review by the Office of the Inspector General's (OIG) Evaluation and Inspections Division examines how drugs enter BOP institutions and what the BOP is doing and can do better to stem the flow of illegal drugs into its institutions.

The harm of drugs in BOP institutions is clear. Drugs disrupt the BOP from providing a safe and secure environment for inmates and staff. Drug abuse is associated with serious inmate misconduct, and it also interferes with the rehabilitative potential of BOP drug treatment programs. In addition, inmates with drug problems who have not received treatment while in prison are more likely to continue criminal activity after their release from incarceration, thereby affecting public safety.

The BOP's strategy to prevent drugs from entering its institutions employs two major components: (1) stopping the supply of drugs through various interdiction activities; and (2) reducing the demand for drugs through drug abuse treatment for inmates. To stop the supply of drugs, BOP interdiction activities focus on the institutions' points of entry such as visitors, staff, mail, the receiving and discharge area, the warehouse, the rear gate, volunteers, and contractors. To reduce the demand for drugs, the BOP offers drug abuse treatment to inmates through various institution-based programs, including drug abuse education (classroom instruction), non-residential (out-patient) drug abuse treatment in BOP institutions, and residential (in-patient) drug abuse treatment in BOP institutions.

The OIG found that inmate visitors, staff, and the mail are the three primary ways drugs enter BOP institutions. We found that while the BOP employs a variety of interdiction activities to intercept smuggling attempts by visitors and through the mail, it has failed to take adequate measures to prevent drug smuggling by its staff. In fact, interdiction activities common in many state correctional systems, such as searching staff, limiting the personal property staff are permitted to bring into the institution, and conducting random drug tests of staff, are not used by the BOP.

We also found that an insufficient number of BOP inmates receive drug treatment, partly because the BOP underestimates and inadequately tracks inmates' treatment needs. In addition, non-residential treatment – an important component of

U.S. Department of Justice                                                                                    i
Office of the Inspector General
Evaluation and Inspections Division

69-002

drug treatment – is not adequately provided at BOP institutions due to insufficient staffing, lack of policy guidance, and lack of incentives for inmates to seek drug treatment.

After describing our principal findings in more detail, we summarize the 15 recommendations we offer to make the BOP's drug interdiction and treatment efforts more effective.

## Principal Findings

### Indicators of the Drug Problem in BOP Institutions

The BOP recorded more than 2,800 positive tests for drug use by inmates each year from fiscal year (FY) 1997 through FY 2001. The BOP national rate of positive drug tests declined only slightly during this 5-year period, as did the overall rate of positive drug tests for four of the BOP's five institution security levels.

Analyzing trends among BOP institutions of differing security levels is significant because it allows comparison of institutions with similar inmate populations and security features. We found that despite enhanced perimeter security features and internal operational procedures at the higher security level institutions, drugs are still getting in at rates more than 1½ times the BOP national rate. Specific institutions within each security level have much higher rates of inmate drug use. For example, while the BOP national rate for positive inmate drug tests in FY 2001 was 1.94 percent and the overall rate for high security institutions was 3.04 percent, the high security U.S. Penitentiary in Beaumont, Texas, had a positive inmate drug test rate of 7.84 percent.

Misconduct reports issued by BOP staff against inmates also demonstrate that drugs are present in BOP institutions.[1] For FY 1999 through FY 2001, the BOP drug misconduct rates showed that drugs are smuggled into institutions regardless of their security level. Every BOP institution has issued drug misconduct reports to inmates at some time during the 3-year period reviewed. Similar to the drug test results, several institutions within each security level significantly exceeded the overall rate for that security level for drug misconduct charges. Although misconduct rates may partially reflect the BOP's success in uncovering inmates' prohibited

---

[1] The BOP has specific administrative rules identifying prohibited inmate behavior. If an inmate violates any of these rules, the BOP issues a misconduct report. The prohibited behaviors are divided into four levels: 100, 200, 300, and 400, with the 100 level being the most serious. Four drug-related misconduct charges are listed as 100-level offenses: Refusing to Provide a Urine Sample; Introduction of Any Narcotics; Use of Any Narcotics; and, Possession of Any Narcotics. Across all security levels for the last five fiscal years, drug misconduct charges have comprised approximately 66 percent of all 100-level misconduct charges.

69-003

behavior, the fact that the total number of drug misconduct charges for all BOP institutions exceeds 3,500 annually indicates that drugs are regularly entering its institutions.

In addition, inmate overdoses (50 since FY 1997), drug finds in the institutions (1,100 recorded in evidence logs since FY 2000), and criminal cases prosecuted against inmates, staff, and visitors show that drug use and smuggling occur in almost every institution. From FY 1997 through FY 2001, the Federal Bureau of Investigation (FBI) opened 791 drug-related cases involving BOP inmates (538 cases), visitors (183 cases), and staff (70 cases). The OIG Investigations Division's drug cases from FY 1997 through FY 2001 reflect 34 staff arrests. In addition, from FY 1997 through FY 2001, the BOP sustained drug-related misconduct allegations against 93 employees.

**Stopping Drugs at the Primary Points of Entry**

The BOP staff we interviewed identified inmate visitors, staff, and mail as the three primary points of entry for drugs into BOP institutions. We found that while the BOP employs drug interdiction activities to prevent drug smuggling through visitors and mail, it fails to take adequate measures to prevent staff from bringing drugs into the institutions. The BOP does not employ staff interdiction strategies common in state correctional systems such as limiting the personal property staff are permitted to bring into institutions, searching staff, and random drug testing.

**Inmate Visitors**

According to BOP officials, inmates' visitors represent the predominant source of drugs entering BOP institutions. At the institutions we visited, wardens, department heads, intelligence staff, and correctional officers attributed visitors' success in smuggling drugs to two primary reasons: (1) the availability of contact visits, and (2) insufficient cameras, monitors, and staff to observe visits.

- Contact Visits are a Main Conduit for Drug Smuggling. All inmates are permitted to receive contact visits, including those in disciplinary and administrative segregation.[2] During a contact visit, no physical barriers separate inmates and their visitors, unlike the image portrayed on television where inmates are separated from their visitors by glass and speak through telephones. Inmates sit next to or across from their visitors and are allowed limited physical contact, such as handshaking, embracing, or kissing, at the beginning and end of the visit. In a contact visit, visitors can discreetly hand over the drugs to an inmate, exchange

---

[2] The exception are inmates found guilty of a misconduct related to visiting procedures or otherwise placed on visiting restrictions by the Disciplinary Hearing Officer.

U.S. Department of Justice                                                                 iii
Office of the Inspector General
Evaluation and Inspections Division

69-004

the drugs by mouth when kissing, or place the drugs in a food package or beverage purchased from visiting room vending machines and give the food or drink to the inmate.

As a deterrent to drug smuggling, in 1998 with a $1.8 million grant from the Office of National Drug Control Policy, the BOP began a pilot program in 28 institutions using ion spectrometry technology to randomly scan visitors for drugs as they enter the BOP institutions.[3] After a 2-year test period, the BOP concluded that the ion spectrometry technology was a significant factor in the decrease of drug use by inmates in medium, low, and administrative institutions, but not in the high security institutions. At the institutions we visited with ion spectrometry, the majority of wardens and correctional officers involved in processing visitors and visiting room monitoring believed this technology is an effective deterrent to drug smuggling. However, the cost of the machine is high ($30,000) and the maintenance contract and supplies are also expensive ($3,000-$8,000 per year). Now that the pilot program has ended, BOP institutions must fund the machines from their existing budgets. Those institutions we visited that did not receive the technology during the pilot program are uncertain whether they can afford to purchase it. The BOP currently does not have plans to centrally purchase more machines for other institutions. Rather, the BOP intends to rotate the machines among its institutions.

- Insufficient Cameras, Monitors, and Staff Available for Adequate Monitoring are Vulnerabilities. In several institutions, we observed and correctional officers told us that there were not enough cameras, monitors, and staff to thoroughly observe inmate visiting sessions. Several of the institutions we visited need to install additional cameras in the visiting rooms because the rooms' architecture, such as large pillars, creates blind spots that obstruct the view of BOP staff. Institutions also do not always have enough camera monitors for correctional officers to view what the cameras are recording. In addition to a lack of cameras and camera monitors, correctional officers at several institutions stated that not enough officers are available to view the camera monitors or roam the visiting rooms on busy visiting days. Institutions with adjacent "overflow" rooms for high-volume days do not always assign an additional officer to observe visiting activities in these overflow rooms.

---

[3] Ion spectrometry technology detects the presence of microscopic traces of illegal drugs on persons and their clothing. Currently, approximately 40 BOP institutions have the technology.

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

iv

69-005

**Staff**

The BOP imposes no restrictions on the personal property BOP staff can bring into the institutions, does not search staff or their property when they enter for duty, and does not conduct random drug testing of staff.  The BOP's interdiction activities to prevent drug smuggling by staff consist of background investigations, annual integrity training, and limited drug testing of certain staff.  Background investigations are conducted prior to initial employment with the BOP and are updated every five years.  In addition, the BOP conducts staff drug tests for pre-employment, post-accident, reasonable suspicion, and post-substance abuse treatment.

We found that these limited measures have not been effective.  Drugs continue to enter the institutions through staff, as evidenced by the drug cases involving BOP staff investigated every year by the OIG and the FBI.  While the number of staff who smuggle drugs into BOP institutions is small, they can do more damage to the safety and security of the institutions than visitors who smuggle drugs.  When staff smuggle drugs, the amounts are often larger, they reach more inmates, and more money is involved.  Additionally, smuggling may contribute to a reduction in trust among fellow staff and in public trust and confidence in the BOP.  We believe that additional drug interdiction efforts targeted at staff are needed to reduce drugs in BOP institutions.

- Property is Unrestricted.  The BOP does not restrict the size or content of personal property staff bring into the institutions even though BOP managers acknowledge employees are a primary drug entry point.  Such restrictions on personal property are common in state correctional systems.  At each BOP institution we visited, we observed staff bringing in duffle bags, briefcases, satchels, and large and small coolers.  Institution managers, intelligence officers, and correctional officers expressed serious doubt about the effectiveness of the BOP's efforts to eliminate drugs from its institutions when they have no control over the property staff can bring inside.

- Searches are Rarely Conducted.  The BOP conducts searches of staff only if it has reasonable suspicion of wrongdoing by a specific employee, such as suspicion that an employee is introducing or attempting to introduce contraband into an institution.  However, BOP intelligence staff told us searches rarely occur because wardens fear charges of harassment and discrimination.  Because the BOP does not either routinely or randomly search staff or their personal property, staff can easily hide drugs under their clothes or in the property they bring into the institutions without fear of detection.  BOP staff told us that restrictions on the type and amount of personal property employees may bring into an

institution, along with procedures for searching property and staff, would help deter drug smuggling.  Also, FBI and OIG agents we interviewed who investigate BOP drug cases believed the lack of searches of staff and their property contribute to the staff's ability to smuggle drugs into BOP institutions.  Several of the state correctional systems we surveyed routinely search staff and their property.

- Random Staff Drug Testing Has Not Been Implemented.  We found that despite winning a federal court case in 1993 that permitted random drug testing of BOP staff, and the existence of a written BOP policy that requires drug testing, the BOP conducts no random drug tests of its staff.[4] The majority of staff we interviewed at all levels (managers, supervisors, correctional officers, and drug treatment staff) support random drug testing of staff.  The union representatives we interviewed also support random staff drug testing.  As with other drug interdiction activities directed toward staff, random drug testing is common in both state and local correctional systems.  Additionally, the Department of Justice's other components that have a law enforcement mission (such as the FBI, Drug Enforcement Administration, Immigration and Naturalization Service, U.S. Marshals Service, and OIG) conduct random drug tests on employees.  When we inquired why random drug testing of BOP staff was not instituted, despite the court decision allowing and the BOP policy requiring it, BOP managers were unable to provide a clear reason why the BOP has not done so.

**Inmate Mail**

Inmate mail is the third primary entry point for smuggling drugs into BOP institutions.  The large volume of inmate mail, limited staff training, and inadequate drug detection technology present significant challenges for BOP staff to effectively detect drugs in inmate mail.

- More Controls are Needed for Incoming Mail.  The BOP relies predominantly on manual inspections of mail, but mailroom staff believe these inspections cannot detect all drugs that may be hidden in incoming mail because of the high volume.  Institution mailrooms process up to 3,000 pieces of mail daily, with double that amount or more on a Monday (because there is no mail delivery on weekends) and during holiday periods.  Because the BOP imposes no restrictions on unsolicited mail (such as catalogues and other publications), which comprises 10 percent of the volume, the added workload further burdens mailroom staff, who

---

[4] American Federation of Government Employees, Council 33 v. Roberts, 9 F.3d 1464 (9th Cir. 1993); see also American Federation of Government Employees, Council 33 v. Reno, 1994 WL 22,4570 (N.D.Cal., May 16, 1994) (on remand).

U.S. Department of Justice                                                                                    vi
Office of the Inspector General
Evaluation and Inspections Division

69-007

must borrow correctional officers from other functions to assist in processing mail in a timely manner.  Mailroom staff told us that additional policies are needed to limit the growing volume of unsolicited mail.  For example, some state correctional systems, such as Connecticut, Illinois, and Oklahoma, restrict unsolicited advertisements and publications.

- Training and Technology are Not Adequate.  Drugs may go undetected through all stages of mail inspection because of human error or inadequate technology.  Mailroom staff told us that they need improved drug interdiction training to better inspect mail, including training to familiarize themselves with different types and forms of drugs and the methods used by inmates and outsiders to smuggle drugs.  Mailroom staff also stated that new technology, such as ion spectrometry technology, is needed to help identify drugs concealed in mail.

**Reducing Inmates' Demand for Drugs Through Drug Treatment**

Demand reduction for drugs through drug abuse treatment for inmates is the second component of the BOP's drug interdiction strategy.  However, this component of the strategy has not been implemented as effectively as it could be. We found that an insufficient number of BOP inmates receive drug treatment, partly because the BOP underestimates and inadequately tracks inmates' treatment needs.  In addition, an important component of drug treatment, non-residential treatment, is not adequately provided at BOP institutions due to insufficient staffing, lack of policy guidance, and lack of incentives for inmates to seek drug treatment.

- Inmates' Drug Treatment Needs are Underestimated and Not Tracked. The BOP's Psychology Services Branch, which is responsible for the development, coordination, and monitoring of BOP drug treatment programs, has estimated that 34 percent of all federal inmates need drug treatment.  However, this figure is outdated and we believe underrepresents the number of BOP inmates who need drug treatment. According to drug treatment staff at the institutions we visited and research by other organizations, such as the Bureau of Justice Statistics and the Centers for Disease Control and Prevention, this estimate is too low.  These staff and organizations reported that the percent of federal inmates with drug problems ranges from 50 to 80 percent.  The BOP's 34 percent figure was derived from estimated survey data that was collected in 1994 rather than from actual, real-time diagnoses made at the institutions by psychologists and drug abuse treatment specialists. Therefore, we believe that substantially more BOP inmates need drug treatment than the BOP's official estimate.

In addition, the BOP does not document all inmates' diagnoses or drug treatment needs in SENTRY, the automated database system that maintains an individual file on each inmate.  Without this data, BOP cannot identify and track inmates with drug problems to encourage drug treatment and allocate resources properly.

<u>Non-Residential Drug Treatment is Not Always Available</u>.  The BOP states that non-residential (out-patient) treatment is a major component of its strategy to reduce inmates' demand for drugs.  However, at five of the institutions we visited, non-residential treatment was limited or not available at all.  Senior staff at these five institutions acknowledged that their drug treatment programs were inadequate.  Further, the BOP's internal program reviews have reported ongoing deficiencies in institutions' provision of non-residential treatment.  Non-residential drug treatment in BOP institutions should be part of a continuum of treatment for inmates and should be provided after drug abuse education and before residential drug treatment.  Non-residential treatment is significant to the inmates' rehabilitation and is the only drug treatment available to BOP inmates in the general population while awaiting BOP residential drug placement.  But because inmates are not eligible for BOP residential drug treatment until the last 3 years of their sentences, and because the average sentence is approximately 10 years, many inmates must wait 7 years or more for drug treatment.  We believe that non-residential drug treatment should be provided in the interim.  The BOP provides drug abuse education classes, but these are not an adequate substitute for drug treatment.

We found that non-residential treatment is not always available because the BOP has not staffed its institutions with enough drug abuse treatment specialists to provide non-residential treatment and has not adequately emphasized non-residential treatment in its drug treatment policy.  Finally, while drug abuse education classes and the residential drug abuse treatment program have incentives for completion and sanctions or consequences for non-completion, non-residential treatment does not have any incentives or sanctions.  Because of the lack of incentives and sanctions, inmates do not readily volunteer to participate in non-residential drug treatment.  The result is that not enough inmates participate in needed drug treatment programs.

**Other Opportunities to Improve Drug Interdiction Activities**

We reviewed other points of entry for drugs into BOP institutions – such as the receiving and discharge area, the warehouse, the rear gate, volunteers, and contractors – that BOP staff stated were also vulnerable to drug smuggling.

69-009

Regarding the receiving and discharge area, the warehouse, and the rear gate, we concluded that better technology could supplement manual inspections for drugs by correctional officers.  For volunteers and contractors, we concluded that information about their backgrounds could be more effectively shared among BOP institutions to assist institutions in their selection decisions.  We also reviewed the role of institutions' intelligence staff in drug interdiction activities and concluded that rotation of the Special Investigative Supervisor (SIS) lieutenant is too frequent and that timely investigative and drug training for the SIS lieutenants is needed.  We also reviewed the BOP's only canine unit at the USP Lewisburg, Pennsylvania, and concluded canine units could be a useful drug interdiction technique for other institutions.  Canines trained specifically in drug detection can search for and detect drugs in all areas of the institutions where BOP currently has no drug detecting technology, such as the mailroom, the warehouse, the receiving and discharge area, the rear gate, and inmates' housing, work, and common areas.

## Recommendations

Our report contains 15 recommendations to help improve the BOP's efforts to prevent drugs from entering its institutions.  We recognize that no single interdiction activity or combination of activities may eliminate all drugs from entering BOP institutions, and not every technique may be necessary at every institution.  But we believe the BOP should employ a variety of additional and improved interdiction activities.  We made these recommendations based on our field work, our review of BOP policies and procedures, and our interviews with BOP staff and their experienced judgment of potential solutions to the drug problem in BOP institutions.  We also reviewed information about drug interdiction activities conducted by several state correctional systems.  We incorporated into our recommendations those state activities that we believe could be adopted by the BOP to supplement its existing interdiction activities.

Regarding inmate visits, we recommend the BOP consider restricting or eliminating contact visits for specific inmates or institutions based on an assessment of the inmate's history of drug use or drug smuggling in prison and the institution's overall drug problem.  We also recommend the BOP consider implementing pat searches of visitors.  The BOP also should invest in additional technology such as cameras, monitors, ion spectrometry technology, or other emerging drug detection technology to better screen and monitor visitors.  Finally, the BOP should increase its staffing level in visiting rooms to ensure sufficient direct observation and monitoring of each visit.

Regarding BOP staff, we recommend the BOP implement policies to restrict the size and content of property staff bring into institutions.  We also recommend that the BOP implement a policy regarding the searching of staff and their property when they enter BOP institutions, as well as implement random drug testing for staff.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division                                                    ix

69-010

Regarding mail, we recommend the BOP implement a policy restricting unsolicited mail.  The BOP should provide additional training for staff to help them effectively search mail to detect drugs, and also should test mailroom drug detection technologies.

Regarding inmate drug treatment, we recommend that the BOP maintain in SENTRY complete drug treatment-related data for all inmates and use this data as a basis to better assess the drug treatment needs of inmates and to better allocate resources for drug treatment staff and programs.  The BOP should implement additional non-residential treatment programs for inmates in the general population.  The BOP should provide a curriculum for non-residential treatment and guidance regarding the minimum number of weeks and sessions.  We also recommend the BOP implement incentives for participation in non-residential drug treatment and consequences for non-completion.

We also recommend that the BOP improve drug interdiction activities for the receiving and discharge area, the warehouse, the rear gate, volunteers, contractors, and institution intelligence operations.  The BOP also should consider another pilot test of canines as a drug detection technique for its institutions.

We recognize that some of these recommendations may require additional funds, but we believe these efforts are needed to reduce the problem of drugs entering BOP institutions.

U.S. Department of Justice                                                                                              X
Office of the Inspector General
Evaluation and Inspections Division

# TABLE OF CONTENTS

**INTRODUCTION** ...........................................................................................................1

     Background ................................................................................................1
     Methodology .............................................................................................3

**RESULTS OF THE INSPECTION** ...........................................................................5

     The BOP's Drug Problem
          Inmates' Drug Tests .............................................................................5
          Inmates' Drug Misconduct Charges ...................................................9
          Other Indicators .................................................................................13

     Stopping the Supply of Drugs at the Primary Points of Entry
          Inmate Visitors ..................................................................................16
              Recommendations ...................................................................21
          Staff ...................................................................................................22
              Recommendations ...................................................................27
          Inmate Mail .......................................................................................29
              Recommendations ...................................................................37

     Reducing the Demand for Drugs Through Drug Abuse Treatment ..........38
          Recommendations ............................................................................47

     Other Opportunities for Improving Drug Interdiction
          Receiving and Discharge ...................................................................49
          Institution Deliveries:  The Warehouse and Rear Gate .....................51
          Volunteers and Contractors ...............................................................53
          Institution Intelligence Operations .....................................................55
          Canine Units ......................................................................................58
          Recommendation ...............................................................................61

**APPENDIX I**:     Drug Abuse Treatment Programs ............................................62
**APPENDIX II**:    Contacts and Site Visits ...........................................................64
**APPENDIX III**:   Categories of Inmate Drug Tests ..............................................66
**APPENDIX IV**:   Positive Drug Test Rates by Institution Security Level ............68
**APPENDIX V**:    Definitions of 100-Level Misconduct Charges .........................75
**APPENDIX VI**:   Drug Misconduct Charges by Institution Security Level ..........77
**APPENDIX VII**:  Visiting Policy and Procedures .................................................85
**APPENDIX VIII**: Mail Policy and Procedures ........................................................87
**APPENDIX IX**:   Requirements for Authorizing Volunteers and Contractors .....90
**APPENDIX X**:    Glossary of Acronyms .............................................................94

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

69-012

**APPENDIX XI**:    BOP's Response to the Draft Report........................................ 95
**APPENDIX XII**:   OIG's Analysis of the BOP's Response................................ 106

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

69-013

# INTRODUCTION

The Evaluation and Inspections Division, Office of the Inspector General (OIG), reviewed drug interdiction activities implemented by the Federal Bureau of Prisons (BOP) to prevent drugs from entering BOP institutions.

## Background

From fiscal year (FY) 1992 through FY 2001, the number of sentenced inmates in BOP institutions increased by 103 percent from 59,516 to 120,827, and the number of federal institutions increased from 67 to 100.[5] Throughout this 10-year period, the number of sentenced drug offenders comprised more than 50 percent of the BOP's inmate population.[6]

The BOP is responsible for preventing drugs from entering its institutions because drugs disrupt the BOP from providing a safe, secure environment and from assisting inmates in becoming law-abiding citizens. Drug abuse is typically associated with serious inmate misconduct such as assaults, fighting, and possession of weapons.[7] Fatal and non-fatal drug overdoses also occur in BOP institutions. In addition, continuing criminal activity inside the institutions interferes with the rehabilitative opportunities that drug abuse treatment programs offer inmates. Inmates who have not received drug abuse treatment are more likely to continue criminal activity after release.[8]

---

[5] The BOP's total inmate population consists of offenders who have been convicted but not yet sentenced to a term of incarceration and inmates who are serving their terms of incarceration. The number of sentenced inmates includes inmates in BOP institutions only. As of October 2001, the BOP had a total inmate population of 156,238. Of these inmates, 130,061 were confined in BOP institutions, 12,668 were confined in privately managed secure facilities, and 13,509 were confined in other non-BOP facilities. As of October 2002, the BOP's total inmate population had increased to 163,447 and the number of BOP institutions had increased to 102.

[6] According to the BOP, the percentage ranged from a high of 61.3 percent in September 1994, to a low of 55.5 percent as of October 2001. BOP website, Quick Facts, "BOP Population Over Time/Drug Offenders as a Percentage of All Sentenced Offenders," May 2002.

[7] "Visitor Drug Testing Demonstration Project," BOP Office of Research and Evaluation, May 2001.

[8] According to the National Institute of Drug Abuse, National Institutes of Health, "Principles of Drug Addiction Treatment, A Research-Based Guide," July 2000, research shows that treatment for drug-addicted offenders during and after incarceration can have a significant beneficial effect upon future drug use, criminal behavior, and relapse to drug use. Additionally, in the "BOP TRIAD Drug Treatment Evaluation Project," September 2000, the BOP evaluated its residential drug abuse treatment program and found that offenders who had completed the program and had been released to the community for three years were less likely to be re-arrested or to be detected for drug use.

69-014

To prevent drugs from entering its institutions, the BOP employs a strategy with two major components: stopping the supply of drugs through various interdiction activities and reducing the demand for drugs through drug abuse treatment for inmates.

Stopping the Supply of Drugs.  The BOP's interdiction activities are governed by various BOP national policies and supplemented by local institutional directives. To stop the supply of drugs in its institutions, the BOP gathers intelligence information, investigates criminal activity inside the institutions, and directs specific interdiction activities toward the institutions' potential points of drug entry.  Table 1 lists the potential points of entry for drugs identified by the BOP and summarizes the interdiction activities typically directed toward each point of entry.

**Table 1.  Drug Points of Entry and Interdiction Activities**

| Points of Entry[a] | Drug Interdiction Activities[b] |
|---|---|
| Visitors | Background check for non-family visitors on visiting lists, lockers for personal property, metal detector, ion spectrometry technology,[c] visual search observation of visits by correctional officers, cameras, two-way mirrors |
| Staff | Background investigations; annual integrity training; drug testing for suspicion, post-accident, pre-employment, post-substance abuse treatment; administrative and criminal sanctions |
| Mail | X-ray scanner, visual inspection, mail monitoring |
| Receiving and Discharge | Property and pat searches, x-ray scanner |
| Warehouse and Rear Gate | X-ray scanner; visual search; vendors deliver to warehouse—do not enter secure perimeter; and rear gate inspection of supplies |
| Volunteers | National Crime Information Center (NCIC) database check, fingerprints, and security training[d] |
| Contractors | Pre-contract requirements, drug test annually for re-badging, security training |

Source:  BOP

[a] Interdiction activities also are directed at inmates.  These activities include property searches, pat searches, cell searches, drug testing, telephone and mail monitoring, and administrative and criminal sanctions.

[b] Not all interdiction activities are employed or available at every institution.

[c] The ion spectrometry technology detects the presence of microscopic traces of illegal drugs on persons, clothing, and objects, and is available in approximately 40 BOP institutions.

[d] The NCIC computer system contains databases and an index of computerized criminal justice information maintained by the Federal Bureau of Investigation (i.e., criminal record history information, fugitives, stolen properties, missing persons).  This system is available to federal, state, and local law enforcement and other criminal justice agencies.

To deter drug use in its institutions, the BOP takes administrative and criminal action against inmates, staff, and visitors who engage in illegal drug activity. Administratively, inmates are issued a misconduct report for violating BOP rules prohibiting drug-related activity and face an administrative hearing. If found guilty of a drug charge, an inmate loses "good time" toward service of sentence, is placed in disciplinary segregation, and loses other privileges such as visits, telephone, and commissary for a specified period of time. If circumstances warrant, the BOP refers the matter to appropriate law enforcement authorities to investigate and prosecute the inmate. When a BOP staff member engages in criminal drug activity, the BOP takes disciplinary action (such as removal) and refers the matter for criminal prosecution. If a visitor is caught smuggling drugs into the institution, the BOP takes administrative action to bar that person from the institution and pursues criminal prosecution.

Reducing the Demand for Drugs. The BOP has developed drug abuse treatment programs to reduce inmates' demand for drugs while incarcerated and increase their potential for successful rehabilitation and re-entry into the community. The BOP's drug abuse treatment programs consist of drug abuse education (classroom instruction), non-residential (outpatient) drug treatment, and residential (inpatient) drug treatment. Appendix I provides detailed information about the BOP's drug abuse treatment programs.

## Methodology

We interviewed the BOP Director, senior management officials from the BOP's Central Office, and institution staff. We conducted fieldwork between October 2001 and August 2002. We visited nine institutions selected by region, inmate drug testing results, drug misconduct rates, institution security level, and site of ion spectrometry technology. While at the institutions, we interviewed approximately 100 BOP staff and observed interdiction activities at each of the institutions' points of entry for drugs. We also interviewed Federal Bureau of Investigation (FBI) agents and OIG agents responsible for investigating criminal activity at the institutions. For a list of specific sites visited and staff interviewed, see Appendix II.

We used quantitative and qualitative information to assess the effectiveness of the BOP's drug interdiction activities. We examined inmates' drug testing records, drug misconduct charges, overdose data, records of drug finds, and arrest records for FY 1997 through FY 2001. To examine the drug problem in the BOP and identify trends and patterns, we grouped and analyzed data using the BOP's security level classifications for its institutions – administrative, minimum, low, medium, and high security.[9] In this manner, we could assess the effectiveness of the BOP's drug

---

[9] BOP Program Statement 5100.07, Security Designation and Custody Classification Manual, describes the security levels. Inmates with similar characteristics (e.g., sentence length, criminal history, violence and escape history, and level of supervision required) are housed together based on this system. The institutions within a security level also have similar security features such as staff-

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

3

69-016

interdiction activities in institutions that operate under similar conditions, as well as assess whether the security level affects the presence of drugs in institutions.

We also obtained drug interdiction strategies of 17 state corrections departments via survey or through other reports, and reviewed articles containing information about drugs in federal, state, and local correctional facilities.  We compared the states' drug interdiction activities to the BOP's drug interdiction activities to identify new activities that could be applied within the BOP.

---

to-inmate ratios, mobile patrols, gun towers, perimeter barriers, housing, detection devices, and internal security.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

4

69-017

# RESULTS OF THE INSPECTION

## The BOP's Drug Problem

**Although the BOP conducts interdiction activities at its institutions to prevent the introduction of drugs, inmates' positive drug tests, drug misconduct charges, drug overdoses, drug finds, and drug cases against staff, visitors, and inmates indicate drug use and drug smuggling occur in almost every institution.**

### Inmates' Drug Tests Show Drug Use in Most Institutions

Each year from FY 1997 through FY 2001, more than 2,800 inmates tested positive for drugs.[10]  Table 2 shows the annual number and rate (or percent) of positive urinalysis drug tests for all BOP institutions.  During this 5-year period, the BOP introduced drug detecting technology for use on visitors, increased the number of inmate drugs tests at high security level institutions, and expanded availability of residential drug treatment for inmates.  Despite these interdiction activities, the rates of positive drug tests have decreased only slightly over the 5-year period.

### Table 2.  Number and Rate of Positive Drug Tests for All BOP Institutions

|  | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| **Total Number of Positive Tests** | 2,804 | 2,907 | 3,120 | 3,323 | 3,244 |
| **Total Drug Tests Performed** | 125,456 | 128,646 | 144,096 | 156,747 | 167,105 |
| **Positive Drug Test Rate (%)** | 2.24 | 2.26 | 2.17 | 2.12 | 1.94 |

Source:  BOP
Data for each fiscal year excludes institutions that did not have test results for the entire year.
Data for two high security level institutions, USP Marion and ADX Florence, which have non-contact visits and little or no inmate movement, were excluded.
See Appendix X for a glossary of acronyms.

Although the BOP's national rate of 1.94 percent in FY 2001 represents all positive inmate drug tests as a percent of all drug tests performed in all BOP institutions, it understates the high level of drug use at some individual institutions.  To assess the full picture of inmate drug use, we examined positive drug test rates

---

[10] The BOP tests for the following five illegal substances: methamphetamines, opiates, marijuana, morphine (including heroin), and cocaine.  See Appendix III for more information about the BOP's inmate drug testing program.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

5

69-018

by institution security levels and rates for institutions within those security levels. Analyzing trends within security levels allows comparison of institutions with similar inmate populations and security features. This analysis shows that despite more enhanced security perimeter features and internal operational procedures at the higher security level institutions, these institutions have a greater level of positive drug tests than other BOP institutions.

Figure 1 shows the rates of positive drug tests by each institution security level for FY 1997 through FY 2001, as compared with the positive drug test rate for all BOP institutions.[11]



### Figure 1. Positive Drug Test Rates by Security Level FY 1997 - FY 2001

|  | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| Administrative | 3.16% | 2.68% | 2.41% | 2.52% | 2.24% |
| Minimum | 0.82% | 0.77% | 1.09% | 1.17% | 0.93% |
| Low | 1.34% | 1.61% | 1.36% | 1.28% | 1.44% |
| Medium | 2.66% | 2.54% | 2.25% | 2.30% | 1.93% |
| High | 3.93% | 4.10% | 4.33% | 3.29% | 3.04% |
| All BOP | 2.24% | 2.26% | 2.17% | 2.12% | 1.94% |

Source: BOP
Data for each fiscal year excludes institutions that did not have test results for the entire year.
Data for two high security level institutions, USP Marion and ADX Florence, which have non-contact visits and little or no inmate movement, were excluded.
See Appendix X for a glossary of acronyms.

For the administrative, medium, and high security levels, the FY 2001 overall positive drug test rates declined by less than 1 percent from the FY 1997 rates. The minimum and low security levels increased marginally by 0.11 percent and 0.10

---

[11] The percentage of inmates drug tested varies by institution security level. According to BOP policy effective November 1999, each high security level institution is required to randomly test 10 percent (up from 7 percent) of its total inmate institution. Each medium, low, and administrative security level institution is required to perform random testing on 5 percent of its total population. Each minimum security level institution is required to perform random testing on 3 percent (down from 5 percent) of its total population. The ADX Florence, Colorado, and the USP Marion, Illinois, are required to conduct 5 percent random testing monthly of their total inmate populations.

69-019

percent, respectively.  When comparing the FY 2000 and FY 2001 positive drug test rates, rates for all security levels except the low security level decreased, although slightly.  At the end of FY 2001, the high security level had the highest overall positive drug test rate, followed by the administrative, medium, low, and minimum security levels.  This order of highest to lowest overall positive drug test rate by security level has not changed since FY 1997.

Although the BOP national rate for positive drug tests and overall rates by security level have generally declined, serious drug problems exist at individual institutions.  The inmates' urinalysis drug test results show that every administrative, minimum, low, medium, and high security level institution for which data was available had positive tests for use of illegal drugs at some time during the 5-year period from FY 1997 through FY 2001 (see Appendix IV for a complete list of the rates of positive drug tests for individual institutions).  Even the high security U.S. Penitentiary (USP) Marion, Illinois, and the Administrative Maximum Security Institution (ADX) Florence, Colorado, which do not allow inmates to have contact visits and have extremely limited and controlled movement of inmates, had positive drug tests at some time during the five years reviewed.

Some institutions have positive drug test rates that are much higher than the national rate and their respective overall security level rate.  For example, Table 3 on the next page shows the three institutions for each security level with the highest positive drug test rates for FY 2001.

69-020

**Table 3.  Top Three Institutions With the Highest Rates of Positive Drug Tests Within Each Security Level for FY 2001**

| Institution | FY 2001 Rate (%) |
|---|---|
| **BOP National Rate** | **1.94** |
| **High Security        Overall Rate 3.04[a]** | |
| USP Beaumont | 7.84 |
| USP Lompoc | 6.09 |
| USP Leavenworth | 2.65 |
| **Medium Security        Overall Rate 1.93[b]** | |
| Victorville Medium FCI | 5.52 |
| Tucson FCI | 4.45 |
| Phoenix FCI | 4.10 |
| **Low Security        Overall Rate 1.44[c]** | |
| Taft CI | 5.94 |
| Beaumont Low FCI | 2.69 |
| Dublin FCI | 2.16 |
| **Minimum Security        Overall Rate 0.93[d]** | |
| Phoenix FCI Camp | 6.41 |
| Lewisburg USP ICC | 6.40 |
| El Reno FCI Camp | 3.45 |
| **Administrative        Overall Rate 2.24[e]** | |
| Rochester FMC | 7.61 |
| Springfield USMCFP | 6.27 |
| Los Angeles MDC | 4.19 |

Source:  BOP

See Appendix X for a glossary of acronyms.

See Appendix IV for a complete list of positive drug test rates for individual institutions.

[a] In FY 2001, the rates of positive drug tests decreased for 7 of 9 high security institutions. However, rates for 2 institutions increased from FY 2000, and rates for 3 institutions were above the FY 2001 national rate.

[b] Eleven of the 31 medium security institutions for which data was available had positive drug test rates higher than the overall annual rate for medium security institutions, and 12 institutions' rates increased from FY 2000.

[c] Thirteen of 25 low security institutions for which data was available had annual positive drug test rates higher than their FY 2000 rates.

[d] Twenty-three of 50 minimum security facilities for which data was available had annual positive drug test rates higher than their FY 2000 rates.  The high drug rate at the USP Lewisburg Intensive Confinement Center (ICC), which is a Boot Camp, is attributed to the past practice of drug testing inmates upon admission.  This practice has ceased.

[e] Nine of 19 administrative institutions for which data was available had positive drug test rates higher than their FY 2000 rates.  The high rates at the administrative medical centers could be attributed to authorized prescription drugs for inmates' health conditions.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

8

**Inmates' Drug Misconduct Charges Indicate Drug Use and Smuggling**

Inmates who violate the BOP's rules of conduct receive a misconduct report.[12] The prohibited behaviors are divided into four levels of severity: 100, 200, 300, and 400, with the 100-level prohibited behaviors the most serious (see Appendix V for a complete list of the 100-level misconduct charges). The BOP has four drug-related misconduct charges, all of which are 100-level infractions:

- Refusing to provide a urine sample or to take part in other drug abuse testing;

- Introduction of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff;

- Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff; and

- Possession of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff.

During the last three fiscal years, drug misconduct charges within each security level have comprised more than 50 percent of all 100-level misconduct charges.[13] Across all security level institutions, drug misconduct charges have comprised approximately 66 percent of the 100-level charges. Table 4 on the next page shows drug misconduct charges as a percentage of 100-level misconduct charges from FY 1999 through FY 2001.[14]

---

[12] The BOP Program Statement 5270.07, Discipline and Special Housing Units, sets forth administrative rules against prohibited behavior by which the inmates must abide.

[13] Whenever an inmate has a positive drug test, the BOP should issue a misconduct report for "Use of any narcotics…not prescribed for the individual by the medical staff." However, separate from the "Use" charge, misconduct reports also may be issued for possession or introduction of any narcotic when drugs are found on an inmate, in their cell, or in an area where they can be attributed to a particular inmate, or if an inmate is caught attempting to smuggle drugs into the institution. Inmates also can be charged with "Refusing to provide a urine sample…," which administratively is considered the same as if the urine sample was positive. Thus, the number of drug misconduct charges may be higher than the number of positive drug tests.

[14] Prior to FY 1999, all misconduct charges were aggregated to include the main institution and its satellite camp or other associated security level institution on the main compound. For example, a minimum security camp's misconduct charges were aggregated into the main institution's data even though the main institution was a high security institution, thus mixing data of different security level institutions. Beginning in FY 1999, the BOP began to disaggregate misconduct data so that each institution reports its own data separately.

69-022

**Table 4.  Drug Misconduct Charges as a Percent of 100-Level Misconduct Charges by Institution Security Level**

| Security Level | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|
| High | 62.6 | 60.3 | 57.2 |
| Medium | 76.7 | 68.1 | 63.2 |
| Low | 71.7 | 69.0 | 74.1 |
| Minimum | 81.9 | 88.1 | 80.1 |
| Administrative | 72.6 | 65.7 | 56.1 |

Source:  BOP
Data for each fiscal year excludes institutions that did not have misconduct data for the entire year.
Data for two high security level institutions, USP Marion and ADX Florence, which have non-contact visits and little or no inmate movement, were excluded.

For FY 1999 through FY 2001, the BOP's drug misconduct rates show that drugs are smuggled into the institutions regardless of the security level of the institution.  We found that all BOP low, medium, and high security level institutions and most minimum security level and administrative institutions had drug misconduct reports issued to inmates at some time during the 3-year period reviewed (see Table 5 on the next page).  The total number of misconduct charges for all institutions exceeds 3,500 charges annually and indicates that the BOP's interdiction activities have not been fully successful in preventing drugs from entering its institutions.

U.S. Department of Justice                                                                                      10
Office of the Inspector General
Evaluation and Inspections Division

69-023

**Table 5.  Number and Rate of Drug Misconduct Charges by Institution Security Level**

| Security Level | FY 1999 | | | FY 2000 | | | FY 2001 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Average Daily Inmate Population | Total # of Drug Charges | Drug Charge Rates | Average Daily Inmate Population | Total # of Drug Charges | Drug Charge Rates | Average Daily Inmate Population | Total # of Drug Charges | Drug Charge Rates |
| High | 11,895 | 1,356 | 11.40 | 12,380 | 1,336 | 10.79 | 12,750 | 1,154 | 9.05 |
| Medium | 29,716 | 1,400 | 4.71 | 32,038 | 1,437 | 4.49 | 34,986 | 1,358 | 3.88 |
| Low | 36,126 | 565 | 1.56 | 40,308 | 553 | 1.37 | 44,087 | 580 | 1.32 |
| Minimum | 20,969 | 150 | 0.72 | 22,760 | 233 | 1.02 | 22,776 | 179 | 0.79 |
| Administrative | 16,319 | 311 | 1.91 | 17,889 | 322 | 1.80 | 18,973 | 298 | 1.57 |

Source:  BOP
Data for each fiscal year excludes institutions that did not have misconduct data for the entire year.
Data for two high security institutions, USP Marion and ADX Florence, which have non-contact visits and little or no inmate movement, were excluded.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

11

69-024

For each security level, Table 6 shows the three institutions with the highest drug misconduct rates for FY 2001.

**Table 6.  Top Three Institutions with the Highest Rates of Drug Misconduct Charges Within Each Security Level for FY 2001**

| Institution | FY 2001 | | |
|---|---|---|---|
| | Average Daily Inmate Population | Total # of Drug Charges | Drug Charge Rates (%) |
| **High Security** | **Overall Misconduct Rate 9.05[a]** | | |
| USP Beaumont | 1,372 | 319 | 23.25 |
| USP Lompoc | 1,509 | 238 | 15.77 |
| USP Leavenworth | 1,679 | 213 | 12.69 |
| **Medium Security** | **Overall Misconduct Rate 3.88[b]** | | |
| Phoenix FCI | 1,248 | 142 | 11.38 |
| Victorville Medium FCI | 1,504 | 156 | 10.37 |
| Tucson FCI | 759 | 70 | 9.22 |
| **Low Security** | **Overall Misconduct Rate 1.32[c]** | | |
| Taft CI | 1,862 | 172 | 9.24 |
| Forrest City FCI | 1,818 | 61 | 3.36 |
| Beaumont Low FCI | 1,921 | 59 | 3.07 |
| **Minimum Security** | **Overall Misconduct Rate 0.79[d]** | | |
| Cumberland FCI Camp Unit | 134 | 6 | 4.48 |
| Leavenworth USP Camp Unit | 333 | 10 | 3.00 |
| Memphis FCI Camp Unit | 306 | 8 | 2.61 |
| **Administrative** | **Overall Misconduct Rate 1.57[e]** | | |
| Los Angeles MDC | 818 | 30 | 3.67 |
| Rochester FMC | 789 | 16 | 2.03 |
| San Diego MCC | 772 | 14 | 1.81 |

Source:  BOP
See Appendix X for a glossary of acronyms.
See Appendix VI for the rate and number of drug misconduct charges by individual institution.

[a] Three of 9 high security institutions for which data was available had drug misconduct rates that were higher than the overall high security rate of 9.05 percent for FY 2001.

[b] Ten of 31 medium security institutions for which data was available had drug misconduct rates higher than the overall medium security drug misconduct rate of 3.88 percent for FY 2001.

[c] Ten of 25 low security institutions for which data was available had drug misconduct rates higher than the overall low security drug misconduct rate of 1.32 percent for FY 2001.

[d] Thirty of 62 minimum security institutions for which data was available had drug misconduct rates above the overall minimum security drug misconduct rate of 0.79 percent for FY 2001.

[e] Eight of 20 administrative institutions for which data was available had drug misconduct rates above the overall administrative drug misconduct rate of 1.57 percent for FY 2001.

69-025

**Other Indicators Show Persistent Drug Use and Smuggling**

Data on inmate drug overdoses, drug finds in institutions, and drug cases involving inmates, visitors, or staff are also important indicators of drug problems in BOP institutions.  However, this data only partially reflects the extent of the problem because not all overdoses are documented by the BOP and not all drug smuggling is detected.

Overdoses.  Between FY 1997 and FY 2001, the BOP reported 18 inmate overdose deaths that resulted from ingested illegal controlled substances.  In addition, 32 non-death overdoses occurred from non-prescription drugs or prescription drugs during FY 2000 and FY 2001.[15]  The BOP was not able to provide us with the number of non-death overdoses that occurred from ingesting illegal controlled substances because its Health Services Division does not track this information.

Drug Finds.  The BOP's data on drug finds in its institutions during FY 2000 and FY 2001 shows 1,100 finds, with approximately half of these found on the inmates, in the inmates' belongings, or in the inmates' cells.  The data did not indicate how the inmates obtained the drugs or drug paraphernalia.  Sixteen drug finds were attributed to visitors and 24 drugs finds were attributed to the mail.  For the remainder of the drugs finds, the data showed either they occurred in common areas of the institutions or the locations were not indicated.  The sources of entry for the drugs also were not indicated.

Drug Cases.  From FY 1997 through FY 2001, the BOP has sustained drug-related misconduct allegations against 93 employees.  The cases include introduction of drugs into the institutions, as well as personal drug use.

In addition, from FY 1997 through FY 2001, the FBI opened 791 drug-related cases involving BOP inmates (538 cases), visitors (183 cases), and staff (70 cases) that resulted in 510 convictions or pre-trial diversions.[16,17]

---

[15] One non-death overdose occurred at the Taft Correctional Institution, which is a contract facility.  In another non-death overdose, the inmate ingested bleach.  The BOP does not maintain data prior to these fiscal years.

[16] The number of cases does not reflect whether or not the cases were substantiated.  Each case opened can represent multiple subjects or indictments or both.  The FBI has investigative responsibility for all violations of Title 18, United States Code, Section 13 (Crimes on Government Reservations) and criminal activities at the BOP institutions, including Sections 1791 and 1792 (Irregularities in Federal Penal Institutions).  These criminal activities include any drug-related crimes primarily committed by inmates, visitors, or other civilians.  The OIG shares responsibility with the FBI for investigating criminal allegations against BOP staff.  The proximity of the FBI or OIG field office to the institution is an important factor in the decision on who investigates staff misconduct.

[17] In pre-trial diversions, certain defendants in criminal cases are referred to community agencies prior to trial while their criminal complaints or indictments are held in abeyance.  The defendant may be given job training, counseling, and education.  If s/he responds successfully within a specified period, the charges against him/her are commonly dismissed.

---

U.S. Department of Justice                                                          13
Office of the Inspector General
Evaluation and Inspections Division

OIG data from FY 1997 through FY 2001 shows 34 BOP staff arrests primarily for introduction or attempted introduction of drugs into BOP institutions.

Although the number of drug cases involving BOP staff is less than cases involving inmates and visitors, staff who smuggle drugs can do significant damage to the safety and security of the institutions. At the institutions we visited staff told us repeatedly that while the large majority of staff have high integrity, when staff smuggle drugs into the institutions, the amounts are larger, they reach more inmates, and more money is involved. Several examples of staff arrests in recent years demonstrate the large quantities of drugs staff have introduced or attempted to introduce into BOP institutions.

- In FY 2001, a food service foreman was arrested and pled guilty to bribery and one count of attempting to possess with intent to distribute more than five kilograms (11 pounds) of cocaine into FCI Miami, Florida.

- In FY 2000, a correctional officer attempted to deliver approximately 109 grams of crack cocaine, 73 grams of black tar heroin, and 25 grams of white heroin into USP Beaumont, Texas. To illustrate the effect these large quantities of drugs have on an institution, the 109 grams of crack cocaine could be packaged into approximately 1,090 crack "rocks" and the 73 grams of black tar heroin could be packaged into approximately 300 separate "hits" or capsules of heroin for sale to inmates.[18]

- In FY 2000, a correctional officer attempted to introduce one-half kilo (1.1 pounds) of cocaine into FCI Low, Beaumont, Texas.

- In FY 2000, a cook supervisor attempted to introduce one pound of marijuana and one ounce of cocaine into FCI El Reno, Oklahoma.

- In FY 1999, a correctional officer at FCI Forrest City, Arkansas, confessed to smuggling two pounds of marijuana.

- In FY 1999, a correctional officer on two occasions walked one pound of marijuana into FCI Englewood, Colorado.

---

[18] This information was provided by a special agent with the Drug Enforcement Administration.

Cases investigated by the OIG in FY 2002 further illustrate that drug smuggling by BOP staff remains a problem:

- On June 8, 2002, a correctional officer at USP Pollock, Louisiana, was arrested on charges of providing contraband to an inmate in this high security institution.  The correctional officer possessed one pound of marijuana and $1,000 as payment for introducing the marijuana.

- On May 17, 2002, a correctional officer at Big Spring Correctional Center, Texas, was arrested on charges of introducing contraband, bribery, and possession with intent to distribute cocaine after accepting a controlled delivery of nine ounces of cocaine and $900 in bribe money from an undercover agent.  The officer admitted that he brought cocaine, marijuana, and other prohibited items into the institution over a period of several months.

- On April 30, 2002, a BOP nurse was arrested on charges of possession with intent to distribute two ounces of cocaine to an inmate in FCI Pekin, Illinois.

- On April 8, 2002, a correctional officer was sentenced on bribery and drug charges involving delivery of four ounces of heroin to an inmate in FCI Three Rivers, Texas.

- On December 5, 2001, a UNICOR (Federal Prison Industries) supervisor at FCI Edgefield, South Carolina, was arrested on state charges of possession with intent to distribute six ounces of marijuana to an inmate.

**Conclusion**

The BOP has a continuing problem with inmate drug use and drug smuggling in almost every institution.  The indicators of this problem – inmates' positive drug tests, drug misconduct charges, drug overdoses, drug finds, and drug cases – do not show significant progress in the BOP's efforts to prevent drugs from entering the institutions.  Based on the continued presence of drugs in BOP institutions, we believe that additional interdiction activities are required.

U.S. Department of Justice                                                                  15
Office of the Inspector General
Evaluation and Inspections Division

## STOPPING DRUGS AT THE PRIMARY POINTS OF ENTRY

**BOP staff we interviewed identified visitors, staff, and mail as the three primary points of drug entry. While the BOP employs various interdiction activities to prevent drug smuggling in these three areas, we believe additional interdiction activities are needed to further limit the opportunities for smuggling.**

We examined the points of drug entry (see Table 1 on page 2) identified by the BOP and assessed the effectiveness of the BOP's interdiction activities to keep drugs out of its institutions. The BOP staff we interviewed cited visitors as the main source of drugs but were divided as to whether staff or mail constituted the second greatest source.[19] Regarding visitors and mail, we concluded that better technology is needed to supplement manual inspections and searches for drugs by correctional officers. We also concluded that more correctional officers are needed to observe inmate activities or assist in searches. We found that the most notable gap in the BOP's interdiction activities is its own staff who are not screened or searched before entering the institutions, and there are no restrictions on the size and content of personal property they can bring into the institutions. Furthermore, BOP staff are not randomly drug tested. These types of interdiction activities are common practices in state correctional systems.

## Inmate Visitors

The BOP considers inmate visitors the predominant source of drugs entering its institutions. While the BOP has policies to control visitors' access to the institutions and monitor activities during visits, visitors are still successful in smuggling drugs into the institutions.[20] At the institutions we visited, wardens, department heads, intelligence staff, and correctional officers attributed visitors' success in smuggling drugs into institutions to two primary causes: (1) the availability of contact visits, and (2) insufficient cameras, monitors, and staff for monitoring visits.

### Contact Visits are a Main Conduit for Drug Smuggling

Visitors hide drugs in clothing, on their person (including body cavities), in baby diapers, and in a variety of other places. Although visitors are required to walk through a metal detector and there are restrictions on personal property permitted into the visiting room, visitors are not pat searched at any institution. Metal detectors do not detect the presence of drugs and ion spectrometry technology, which detects the presence of microscopic traces of illegal drugs on persons, clothing, and other

---

[19] In comments to OIG managers on June 19, 2002, the BOP Director stated that she believed visitors were the primary source of drugs smuggled into the institutions and staff was the second greatest source.

[20] See Appendix VII for information about visiting policies and procedures.

69-029

objects, is not available in all institutions. Therefore, contact visits enable visitors to exchange drugs with an inmate by discreetly handing over the drugs, placing them in a food package or beverage purchased from visiting room vending machines, or exchanging the drugs by mouth when kissing.

The BOP considers visitors an important part of an inmate's rehabilitation and encourages visits by family, friends, and community groups.[21] Therefore, all inmates receive contact visits, including those housed in disciplinary and administrative segregation units.[22] The exceptions are inmates charged or found guilty of misconduct relating to visiting procedures or otherwise placed on visiting restriction by the Disciplinary Hearing Officer. With contact visits, no physical barriers exist between inmates and their visitors, unlike the image portrayed on television where inmates are separated from their visitors by glass and speak through telephones. In the visiting room, inmates sit next to or across from their visitors and are allowed limited physical contact, such as handshaking, embracing, and kissing, at the beginning and end of the visit.

On a busy visiting day, an institution's visiting room can be filled to capacity, with some institutions receiving up to 150 visitors at one time. Many diversions are created by the commotion and activity that occur, such as small children playing, visitors walking back and forth to the vending machines, bathrooms, and correctional officer's desk, and inmates walking to and from the bathroom. These diversions make it difficult for correctional officers to fully supervise each inmate visit and prevent passage of contraband.

Many of the institutions' intelligence staff and correctional officers we interviewed believed, at a minimum, contact visits should be replaced by non-contact visits for inmates housed in high security level institutions because these institutions had the highest rates of positive inmate drug tests and drug misconduct charges. The BOP has demonstrated the success of non-contact visits as an effective drug interdiction technique in high security level institutions. Both USP Marion, Illinois, and ADX Florence, Colorado, prohibit contact visits and both institutions have fewer positive inmate drug tests and drug misconduct charges.

---

[21] Visiting is supported by the accreditation standards established by the American Correctional Association (ACA). The ACA standards are the national benchmark for the effective operation of correctional systems throughout the United States.

[22] A few BOP institutions have built non-contact visiting booths for inmates in the segregation unit. For example, USP Leavenworth, Kansas, a high security institution, has non-contact visiting booths for their inmates in one newer segregation unit. USP Beaumont, Texas, a high security institution, also has non-contact visiting booths.

69-030

The institutions' intelligence staff and correctional officers also suggested that all inmates placed in disciplinary segregation for drug misconduct charges should be prohibited from contact visits for the duration of their sentence or, at a minimum, for an extended period of time.

Correctional officers and intelligence officers stated that an additional measure to stop drugs smuggled by visitors would be to remove vending machines from the visiting rooms. They also suggested that ion spectrometry technology (or other drug detection technology) should be used to screen visitors before they enter institutions.

Vending Machines Aid Drug Smuggling. Most correctional officers with visiting room experience recommended that the BOP remove vending machines from the visiting rooms because the exchange of food between the visitors and inmates allows for drug smuggling. Each visiting room has multiple vending machines containing candy, ice cream, drinks, sandwiches, and other items, for the purpose of enabling the visitors, who may travel long distances and stay for many hours, and inmates to share food together.

The correctional officers also told us that some visitors buy items from a grocery store identical to items in the institution's vending machines, place drugs in the package, then smuggle the food package into the institution. The visitor buys the identical item from the institution's vending machine, covertly switches the smuggled item with the vending machine item, and gives the inmate the smuggled item with the drugs inside. Such an incident, referred to as the "burrito caper," occurred at one BOP institution. In that incident, a female visitor purchased a packaged burrito identical to ones offered in the institution's visiting room vending machine. She placed heroin-filled balloons inside the burrito and smuggled it into the visiting room.[23] She purchased a burrito from the vending machine but switched it with the burrito she had smuggled and gave the drug-laden burrito to the inmate, who ingested the burrito and the drugs.[24] The warden at this institution responded to these schemes by removing certain items from the institution's vending machines.

New Ion Spectrometry Technology Lacks Funding. Ion spectrometry technology is designed to detect the presence of microscopic traces of illegal drugs

---

[23] The case also is an example of shortcomings in the search procedures to detect drugs on visitors before they enter the institutions.

[24] This incident was detected through Special Investigative Supervisor (SIS) staff intelligence gathering that included telephone monitoring. The inmate admitted ingesting the drugs received during his visit, which later had to be surgically removed at an outside hospital after the inmate complained of becoming ill from possible internal bursting of the balloons. The doctor surgically removed approximately 23 balloons of heroin (five of which had burst) totaling approximately 63 grams.

---

U.S. Department of Justice                                                    18
Office of the Inspector General
Evaluation and Inspections Division

on persons and their clothing.[25]  The use of ion spectrometry technology to randomly scan visitors for drugs as they enter the BOP's institutions began as a pilot program in 1998 in 28 BOP institutions, funded by a $1.8 million grant from the Office of National Drug Control Policy.  The BOP's pilot program tested the technology on visitors to determine the effect on inmate drug use.  The BOP concluded that the visitor drug testing program was a significant factor in the decrease of drug use by inmates in medium, low, and administrative institutions, but not in the high security institutions.[26]  However, BOP could not determine specifically how much the ion spectrometry technology contributed to the decrease in drug use in relation to the BOP's other drug interdiction activities.  Approximately 40 BOP institutions currently have the ion spectrometry technology.

At the institutions we visited with ion spectrometry technology, the majority of wardens and correctional officers involved in processing visitors and visiting room monitoring believed ion spectrometry technology is an effective deterrent to drug introduction.  However, the cost of the machine is high ($30,000) and the maintenance contract and supplies are also expensive ($3,000-$8,000 per year).  During the pilot program, which ended in September 2001, grant funds paid for all purchase and maintenance costs.  Now, institutions must fund the machines from their existing budgets.  Those institutions that did not receive the technology during the pilot program are uncertain that they can afford to purchase it, and some questioned whether the technology merits the cost when compared to the institutions' other funding needs.

The BOP does not have a strategy to expand the number of ion spectrometry machines.  However, the BOP Director told the OIG that the current ion spectrometry machines would be rotated among institutions.  When machines are rotated, visitors cannot readily predict institutions' screening tactics, and other institutions that cannot afford to purchase machines could receive a loaned machine to use as part of visitor screening for a period of time.

---

[25] At BOP institutions where the ion spectrometry exists, visitors are randomly selected for drug testing and are informed that a hand-held device will be passed over their hands, clothing, and property.  If the ion spectrometry machine shows positive tests results for the presence of drugs, the visitor may be subject to a pat search, may be subject to restricted visiting, or may be denied visitation for 48 hours.  Subsequent positive tests will result in denial of visitation for longer periods, i.e, 30, 90, and 180 days.

[26] In its May 2001 report on the Visitor Drug Testing Demonstration Project, the BOP cited several reasons why drug use in high security institutions did not decrease during the demonstration project: inmate drug testing rates at high security institutions for the 1-year comparison period (prior to the project start date) were already quite low, making any later comparison difficult; high security institutions experienced more difficulties with the ion spectrometry equipment, thus providing more opportunities for visitors to avoid testing and potentially introduce drugs into the institutions; and high security institutions have a greater concentration of drugs due to substantial prison gang involvement in the importation and distribution of drugs.  Another factor cited that affected the overall figures for high security institutions was the emergence of USP Beaumont, Texas, from a new penitentiary that was relatively drug-free to a penitentiary that demonstrated a very high rate of drug misconducts with an increase of 70.3 percent in its drug misconduct rate.

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

19

**Insufficient Cameras, Monitors, and Staff for Monitoring**

To detect drugs being passed to inmates during contact visits, BOP institutions need a sufficient number of cameras in all areas of the visiting room, a sufficient number of monitors to view the activities the cameras are recording, and a sufficient number of staff to observe the monitors and roam the visiting room for drug detection.[27]

In several institutions we visited, we observed and correctional officers told us they did not have enough cameras, monitors, and staff to thoroughly observe inmate visiting. For example:

- Large pillars in one visiting room obstructed the view of correctional officers and the cameras, and the adjacent observation room with two-way glass was not used at all because of lack of staff.

- Camera monitors at another institution were available for viewing by one correctional officer. The monitors were stationed on a rolling cabinet in the hallway outside of the room where inmates are strip searched before their visits. The correctional officer responsible for viewing the monitors is the same officer who strip searches the inmates before and after visits, and escorts and observes the inmates during bathroom breaks. This correctional officer stated that he is so busy with searching and escorting that he views the monitors at most 25 percent of the time. The correctional officer's desk located inside the visiting room does not have a monitor for viewing; thus, while cameras are recording visiting room activities, no correctional officers inside or outside the visiting room may be watching the monitors.

- At one institution that averages 150 visits each day, correctional officers rarely used the observation room with two-way glass and camera monitors. The officers assigned to view the monitors do not have time because they are required to perform other labor-intensive security duties, such as listening to inmates' telephone calls, at different locations in the institution.

- At another institution that averages 100 visits each day, pillars blocked the view of rear areas of the visiting room from correctional officers and from the visiting room's only two cameras.

In addition to blind spots and lack of cameras and camera monitoring, correctional officers at several institutions stated that not enough officers were

---

[27] Video cameras with recording capabilities are placed on the ceilings or walls in all visiting rooms. Monitors are placed either on the visiting room officer's desk or in remote locations and display live images of the visits. Some cameras have the ability to display split screens on the video monitors, some have the ability to rotate, while others are stationary.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

20

69-033

available to roam the visiting rooms on busy visiting days.  Some institutions used adjacent "overflow" rooms on these high-volume days, but did not always assign an additional officer to help roam and observe visiting activities.

**Conclusion**

The BOP officials we interviewed believed that visitors are the main source of drugs entering institutions.  The BOP attempts to control the introduction of drugs by limiting visitor access and property, using available technology, providing direct observation of visits in progress, and searching inmates before and after visits. These procedures are important security precautions, but based on the incidences of positive inmate drug tests and drug misconduct charges, enhancements to the BOP's interdiction activities for visitors are needed.

**Recommendations**

1.  The Director, BOP, should consider restricting contact visits for specific inmates and replace contact visits with non-contact visits for certain inmates or institutions based on an assessment of the individual institution's drug smuggling problem.

2.  The Director, BOP, should consider implementing pat searches of visitors.

3.  The Director, BOP, should invest in technology (such as cameras, monitors, ion spectrometry, or other emerging drug detection technologies) to provide institutions with a greater capability to screen and monitor visitors. The BOP should also ensure that existing technologies, such as ion spectrometry, cameras, monitors, and visitor monitoring rooms are used to their maximum capacity.  Specifically, when ion spectrometry machines break down, they should be repaired in a timely manner.  In addition, they should be used to detect drugs in other areas of the institutions.  Cameras should be positioned to eliminate any blind spots in the visiting room.  BOP should ensure that camera monitors and visitor monitoring rooms are used to view visits in progress.

4.  The Director, BOP, should staff visiting rooms with enough correctional officers so that sufficient direct observation and monitoring of each visit can occur.

## Staff

While we believe the vast majority of BOP staff have high integrity, each year the FBI and OIG investigate numerous cases of staff smuggling drugs into the institutions.[28]  In addition, intelligence officers at the institutions we visited told us the large amounts of drugs found in the institutions are too great to come through the visiting rooms and inmate mail and the most likely source is BOP staff.  In fact, the BOP has stated in legal documents that "employees have substantially greater opportunity to smuggle drugs than do the visitors," because inmates and visitors are searched, but staff are not.[29]  Yet, despite continued cases of staff smuggling drugs, the BOP does not restrict the size or content of personal property staff bring into the institution, does not perform routine searches of staff or their property, and does not randomly drug test staff.[30]

The BOP's current drug interdiction activities directed at staff consist of background investigations, annual integrity training, and selective drug testing.[31]  When asked why additional measures are not directed at potential staff drug smuggling, the officials we interviewed at the BOP's Central Office stated that additional staff drug interdiction activities would erode morale.  However, at each of the institutions visited, the majority of staff we interviewed at all levels – management officials, correctional officers, intelligence officers, and unit management staff – stated that additional interdiction activities are needed to reduce the institutions' drug problems.[32]

---

[28] In an institution setting, the BOP staff have constant contact with inmates.  Inmates, even in high security institutions, are permitted controlled movement inside and outside of their housing units.  Inmates work at jobs throughout an institution, attend program-approved classes, receive medical treatment, engage in recreational activities, and visit with family and friends.  In every situation, staff are present and interact with inmates with the goal of protecting the safety of inmates and staff and the security of the institution.  These interactions allow opportunities for inmates to observe staff, learn about personal and institutional vulnerabilities, and prey upon these vulnerabilities to corrupt staff.  When inmates are successful, the staff corruption may involve the introduction of drugs into the institution.

[29] American Federation of Government Employees, Council 33 v. Roberts, 9 F.3d 1464 (9th Cir. 1993); see also American Federation of Government Employees, Council 33 v. Reno, 1994 WL 22,4570 (N.D.Cal., May 16, 1994) (on remand).

[30] The BOP prohibits objects such as firearms, destructive devices, narcotics, and alcohol, as defined in §511.11(c).  The BOP has the right to search employees when such a search is believed necessary to ensure the security of the institution.

[31] Background investigations are conducted prior to initial employment with the BOP and are updated every five years.  The BOP conducts drug tests for pre-employment, post-accident, reasonable suspicion, and post-substance abuse treatment.

[32] Unit management emphasizes decentralization and delegated authority to a multidisciplinary unit team.  A unit manager supervises the primary unit team members, including case managers, correctional counselors, and unit secretaries.  The team also includes the unit correctional officers, an education advisor, and a psychologist.  The unit manager directs the housing

69-035

**Property is Unrestricted**

The BOP has no policy specifically addressing staff personal property permitted inside institutions.  Most institution staff noted the size and amount of personal property brought into the institution by staff has increased over the years.  Correctional officers, many employed by the BOP for over a decade, stated that in the past employees generally brought in only their lunch bags.  Today, employees bring in any item in any size container.  One manager stated, "They bring in backpacks larger than my grandson."  Unrestricted property presents a security problem to the institution.  Supervisory and management staff told us correctional officers need only wear their uniforms when reporting for duty – anything else the officers need to perform their duties is issued to them by the institution.  At each institution visited, we observed staff bringing in duffle bags, backpacks, briefcases, satchels, and large and small coolers.

Institution managers and intelligence staff expressed serious doubt about the effectiveness of eliminating drugs from institutions when they have no control over the property staff bring inside.  Several wardens at institutions we visited said they wanted to set guidelines for limiting employee personal property, but believed without a national BOP policy local guidelines would be ineffective due to union opposition.  Union officials we interviewed, however, stated they do not oppose placing restrictions on personal property that staff can bring into an institution.  (A summary of the union's views is on page 28.)

Restrictions on employee personal property are common in state correctional systems.  For example, in the Texas Department of Criminal Justice, Adult Prisons Division, employees entering the state prisons are allowed only to possess items issued by the institution to perform their duties or items that their supervisor has permitted.  The Pennsylvania State Department of Corrections provides lockers outside the secure perimeters of institutions for correctional officers to store their personal property.  Similarly, the Connecticut Department of Corrections restricts the amount and type of personal property staff can bring into the institutions and provides lockers.

**Searches are Rarely Conducted**

BOP institution staff told us that property restrictions alone on BOP staff would not stop smuggling.  If staff wanted to bring in drugs, they could hide the drugs under their clothing when they come into the institutions.  They stated that property restrictions in combination with searches of staff and their property would deter drug smuggling.

---

unit activities and is responsible for the unit's operation and quality control of all correspondence and programs.

U.S. Department of Justice                                                              23
Office of the Inspector General
Evaluation and Inspections Division

69-036

The BOP Program Statement 5510.09, Searching and Detaining or Arresting Persons Other Than Inmates, allows for searches of staff for reasonable suspicion. However, BOP intelligence officers told us these searches rarely occur. Wardens and intelligence officers stated that unless they have irrefutable evidence an employee possesses drugs, they fear charges of harassment or discrimination for searching staff.[33]

Many state correctional systems routinely search staff and their property. A 1992 report by the Bureau of Justice Statistics (BJS) states that staff in approximately 50 percent of state correctional institutions were patted down when reporting to work.[34] For example, the Texas Department of Criminal Justice, Adult Prisons Division, searches all hand-carried personal property possessed by staff prior to their entering the institutions. The New Hampshire and North Carolina State Departments of Correction also conduct random searches of their staff. The Alabama Department of Corrections searches staff 2-3 times per year at each institution and randomly searches the parking lots with canine units. In the Pennsylvania State Department of Corrections, random pat searches and property searches are conducted on staff upon entry to institutions. Pennsylvania also uses the ion spectrometry scanning device as part of its staff searches. If the device shows a positive reading for a staff member, that reading can be used as the basis for requiring a urine drug test. The Florida and Kansas State Departments of Correction also use ion spectrometry technology to screen staff. The Maryland Department of Corrections uses canine drug interdiction teams to target staff as well as inmates and visitors.

The BJS report further shows a direct link between interdiction activities focused on staff and reductions in drugs in prisons. The report found that institutions that direct special interdiction efforts toward staff (such as questioning, pat searches, and drug testing of staff) have a lower positive inmate drug test rate (1.0 percent positive for cocaine and 0.9 percent for heroin and methamphetamines) than institutions that made no special efforts to interdict drugs from staff (2.6 percent positive for cocaine, 2.2 percent for heroin, 6.6 percent for methamphetamine).[35]

At the BOP institutions we visited, several managers and correctional officers previously employed with state correctional systems noted that their previous employers searched staff and prohibited personal property in state institutions. The FBI and OIG agents we interviewed who investigate BOP drug cases also

---

[33] Management officials at the institutions also stated that, even though staff may not intentionally bring contraband into the institutions, additional controls are needed to prevent entry of personal items that could be used as weapons by inmates. The officials believed that sometimes staff get complacent and "forget where they are."

[34] "Drug Enforcement and Treatment in Prisons, 1990," BJS, U.S. Department of Justice, Washington, D.C., July 1992.

[35] "Drug Enforcement and Treatment in Prisons, 1990," BJS, U.S. Department of Justice, Washington, D.C., July 1992.

U.S. Department of Justice                                                                 24
Office of the Inspector General
Evaluation and Inspections Division

expressed concern that staff and their property are not searched when staff enter institutions.  The agents believed the lack of property and staff searches significantly contributed to staff's ability to smuggle drugs into BOP institutions.

**Lack of Staff Drug Testing**

The BOP Program Statement 3735.04, Drug Free Workplace, June 30, 1997, states that illegal drug use by staff is counter to the BOP's law enforcement mission and will not be tolerated.  It also requires random drug testing annually on 5 percent of the staff who are in test designated positions (TDP).[36]  However, the BOP does not comply with its own policy and does not randomly test any of its staff.

A previous attempt by the BOP to implement random drug testing met with strong union opposition.  The American Federation of Government Employees (A.F.G.E.) brought an action in the U.S. District Court for the Northern District of California and in the U.S. Court of Appeals, 9th Circuit, contesting this random drug testing for BOP employees as unconstitutional.  The BOP argued that staff drug use and drug smuggling were connected because drug-using staff are: (1) blackmailed by inmates; (2) in need of money to support their drug habit; and (3) indifferent to drug use and dealing as criminal activities.  The BOP also argued that staff drug use causes loss of the public's trust, which leads to the belief the BOP is corrupt or inefficient.  In 1993, the U.S. Court of Appeals ruled in favor of the BOP and held that random drug testing and reasonable suspicion drug testing of BOP employees were constitutional.[37]

Yet, despite that court ruling, the BOP did not implement random drug testing of staff.  When we interviewed the BOP Director, other Central Office officials (Drug Free Workplace Office; Human Resource Management Division, Labor Management Relations; and General Counsel's Office), and union officials, they could not provide specific reasons why the BOP has never implemented random drug testing.

At the institutions we visited, the large majority of more than 100 managers, supervisors, correctional officers, unit managers, and drug treatment specialists we interviewed supported random drug testing of staff.  They also noted that the BOP's law enforcement mission and the detrimental effects of drugs on the safety and security of the institution warranted random drug testing.  A view expressed by many

---

[36] The BOP defines test designated positions (TDP) as those positions in which an employee's use of illegal drugs would pose a significant threat to national security, public safety, patient care, or fellow employees.  Employees having a secret or higher security clearance also are subject to selection for random drug testing.  Wardens, associate wardens, correctional officers, unit managers, human resource managers, and cook supervisors are examples of some positions that should be subject to random drug testing according to the policy.

[37] American Federation of Government Employees, Council 33 v. Roberts, 9 F.3d 1464 (9th Cir. 1993); see also American Federation of Government Employees, Council 33 v. Reno, 1994 WL 22,4570 (N.D.Cal., May 16, 1994) (on remand).

---

69-038

officers is that they do not want to rely on a drug-using officer as back-up in emergency situations.[38]  Emergencies usually involve a fight or assault between inmates.  In these volatile and dangerous situations, officers want assurance that fellow officers are drug free and can respond quickly and appropriately to an emergency.

Random drug testing of staff is a common practice in state correctional systems and in federal agencies.  According to a survey conducted in 2000 by the ACA, 23 of the 44 states that responded conduct random drug testing of their corrections staff.[39]  The Bureau of Justice Statistics (BJS), in a May 2000 article, reported that approximately 49 percent of jail jurisdictions drug test staff, and of these jurisdictions, 63 percent test staff randomly.[40]  Additionally, other DOJ components with law enforcement missions such as the FBI, OIG, Drug Enforcement Administration, the U.S. Marshals Service, and the Immigration and Naturalization Service conduct random drug testing of staff.[41]

**Conclusion**

The BOP's limited interdiction activities directed toward its staff are not fully effective.  Staff continue to smuggle drugs, sometimes in large quantities, into federal institutions.  The BOP does not restrict staff property and searches staff infrequently for reasonable suspicion.  Consequently, staff can exploit this lax policy to introduce drugs and other contraband into the institution.

The BOP developed but never implemented a drug testing program for staff that included random drug testing of 5 percent of its staff in TDP.  The BOP successfully defended a court challenge to its random testing policy in 1993, but has yet to implement the policy.

---

[38] Emergencies can occur frequently in an institution setting.  For example, at five of the nine institutions we visited, while we interviewed staff, officers' personal body alarms sounded somewhere in the institutions, indicating that the officers needed assistance.

[39] Corrections Compendium, September 2000.

[40] "Drug Use, Testing, and Treatment in Jails," BJS, May 2000. The article further stated, "Jail jurisdictions were similar to other employers with regard to testing staff for illegal drug use.  In general, employers nationwide have implemented workplace drug testing programs to comply with federal regulations or insurance requirements, to protect the organization from safety problems and costs associated with illegal drug use on the job, or for a variety of other reasons."

[41] This testing is a result of the 1986 Executive Order 12564, in which the President directed each agency in the Executive Branch to establish a program to test employees in sensitive positions for the use of illegal drugs.

U.S. Department of Justice                                                                                      26
Office of the Inspector General
Evaluation and Inspections Division

**Recommendations**

      5.  The Director, BOP, should implement a policy that restricts the size and content of property staff bring into BOP institutions.

      6.  The Director, BOP, should implement a policy requiring searches of staff and their property when entering institutions.  In addition to manual searches, the BOP should consider using ion spectrometry and all other available technology when searching staff.

      7.  The Director, BOP, should implement random drug testing for staff.

69-040

**Union Views**

We interviewed two union representatives, a national regional vice-president and a local BOP institution president representing the national union, Council of Prison Locals 33, American Federation of Government Employees, American Federation of Labor-Congress of Industrial Organizations (A.F.G.E., AFL-CIO), about the BOP's drug interdiction activities. The representatives believed contact visits are the number one source of drug introduction. They also believed packages coming through the rear gate (via delivery from the warehouse) present vulnerabilities for the institutions. Due to the high volume of packages, the one officer assigned to the rear gate can only randomly search packages for contraband. The union representatives also stated that at some institutions, staff are permitted to pick up small packages from the warehouse and walk them into the institution without being searched.

According to the union representatives, the BOP's background investigations of staff and annual integrity training are insufficient drug interdiction activities. They stated that more aggressive prosecution of staff involved in drug activities represents the best deterrent. According to the representatives, compromised staff are sometimes permitted to resign in lieu of administrative sanctions and prosecution. As a result, the misconduct is undocumented and the number of drug cases involving staff are underreported.

Regarding additional drug interdiction activities needed, the representatives suggested that BOP canine units should be posted at the front entrance and rear gate of every institution. At the front gate, they can search staff as well as visitors, and at the rear gate they can search all packages for drugs. The representatives stated drug dogs are a strong deterrent but they must be present on a daily basis. When drug dogs from outside law enforcement are used, inmates often become aware of these plans in advance and the searches are ineffective. The representatives also support drug testing for staff and are unsure why the BOP Drug Free Workplace policy was never implemented [after the 1993 court ruling].

The union representatives also stated they are not opposed to placing limited restrictions on staff personal property entering institutions, recognizing that staff still need to bring their lunches. However, the representatives are opposed to random searches of staff or their property because they are concerned about potential disparate treatment of staff during searches, how staff would be selected for searching, and the impact on staff morale. The representatives would prefer to see additional interdiction activities directed toward inmates and visitors before searching staff and their property. The union representatives did not oppose the use of advanced technology, such as trace drug detection and imaging technology (walk-through and hands-free) that would be applied equally, not randomly, to all persons entering institutions.

The union representatives recognized that inmates compromise some BOP staff, resulting in the introduction of contraband into the institutions. They stated that staff do not wake up one day and say, "I'm going to bring drugs in today." Some staff get inappropriately involved with an inmate such as granting an inmate a favor or bringing in soft contraband, then they are "hooked." The inmate threatens to report the staff member for the less serious misconduct unless the staff member does what the inmate wants.

The representatives do not believe the BOP views drugs as a top priority. Additional points made by the representatives were: (1) the SIS lieutenant position should be permanent, with an independent reporting structure outside of the institution; (2) more frequent shakedowns of institutions are needed, and (3) more specialized training for staff to update drug interdiction skills is needed.

## Inmate Mail

Officials from the BOP's Central Office and institution staff told us that inmates and their outside contacts also use the mail to smuggle drugs into the institutions.  Most staff interviewed during our visits reported concern about inmate abuse of mail.  However, they reported that inspecting thousands of mail items each day per institution for illegal drugs typically results in only a few drug finds BOP-wide each year.  The BOP's automated evidence records contain only 24 drug finds attributed to inmate mail from FY 2000 through FY 2001.  Given the continued smuggling of illegal drugs in the BOP's institutions, institution staff stated BOP could reduce the mail's vulnerability to drug smuggling by (1) limiting the receipt of certain publications, (2) training staff on drug detection, and (3) screening mail with drug detection technology.

### Volume of Incoming Inmate Mail Challenges Interdiction Activities

At the institutions we visited, Inmate Systems Management Officers (ISOs), who are responsible for the mailroom function, stated that they do not detect all attempts to smuggle drugs through the mail.  The daily volume of mail, especially the increasing volume of unsolicited catalogues and other publications, is too great for thorough manual inspection.  The ISOs often do not have drug detection technology to aid their inspections of the mail.[42]  BOP mailrooms process up to 3,000 pieces of mail each weekday, depending on the size and security level of the institution and the day of the week.[43]  Because the institution's mail is not delivered on weekends, the volume of all mail received on a Monday could represent an increase in volume of up to double the volume received on a typical Tuesday through Friday.  The volume of mail doubles during holiday periods.

---

[42] ISOs inspect inmate mail for contraband (i.e., drugs, weapons, and other prohibited items) and deliver inmate mail to the housing units for distribution to inmates by unit management staff.  In addition to the mail function, other officers assigned to an institution's Inmate Systems Management department also are responsible for receiving and discharge (R&D) of inmates.  The ISOs generally rotate between assignments in an institution's mailroom or R&D functions for a fixed time period.  The duties of the R&D area include processing inmate admissions and releases, including identification (photography and fingerprints) and data entry, and processing incoming and outgoing inmate property with attention to the interdiction of contraband.  See Appendix VIII for information about mail policies and procedures.

[43] The volume of mail increases as BOP's inmate population increases.  The annual estimated population increase is 7,000 to 11,000 inmates as reported by Kathleen Hawk Sawyer, Director, BOP, before the Subcommittee on the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies, Committee on Appropriations, United States House of Representatives, April 18, 2002.

69-042

## *More Controls are Needed Over Incoming Publications*

Inmates have used incoming publications sent from families and friends as a means for smuggling drugs into institutions. In 1999, to minimize opportunities for smuggling, the BOP implemented a policy that allowed inmates to receive hardcover books and newspapers only from a publisher, book club, or bookstore.[44] However, softcover books and magazines still can be sent by families and friends and still are used to smuggle drugs. The BOP recognizes this security vulnerability and is seeking approval from the Office of Management and Budget for a new policy to prohibit inmates' receipt of softcover publications from inmates' families and friends.[45]

The implementation of restrictions on both hard and softcover publications will reduce but not eliminate inmates' use of the mail to smuggle drugs into BOP institutions. The ISOs told us that inmates continue to receive mail disguised by inmates' outside contacts to appear as if it were sent directly from approved sources. For example, Figure 2 below and on the next page shows newspapers containing drugs that were sent to inmates at a high security institution.

**Figure 2.  Newspapers with Marijuana Disguised as Publisher-Sent**

Source: BOP

The inmates' outside contacts affixed counterfeit mailing labels to the newspapers to make them appear as having been sent directly by authentic publishers.

---

[44] Reflected in BOP Program Statement 5266.09, Incoming Publications, dated July 29, 1999, and 28 CFR 540.71.

[45] The policy was not approved for implementation by the Office of Management and Budget as of October 2002.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

30

 

Source: BOP

Packets of marijuana hidden between glued together newspaper pages.


In another scheme, an inmate at an institution we visited arranged for an incoming hardcover publication to be disguised as official institution mail sent directly from an approved supplier to the institution's Facilities Department. The inmate's outside contact created fictitious supplier mailing labels (the address details were provided by the inmate who worked in the Facilities Department) based on previous legitimate mail items sent by the supplier and regularly received by the department. Figure 3 below and on the next page shows the hardcover book that was hollowed out and filled with drugs.

### Figure 3. Hardcover Textbook with One-Half Pound of Marijuana

 



Source: BOP

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division
31

69-044



Source: BOP

The ISOs at the institution where this drug introduction occurred did not detect the presence of the drugs when the book was initially received and x-ray scanned.[46]  Institution staff within the Facilities Department inspected the textbook and discovered the drugs.

Unsolicited Mail Adds to Security Problems.  At the institutions we visited, ISOs stated that policies are needed to limit the growing volume of unsolicited mail, such as catalogs, brochures, and fliers, received by inmates.  This type of mail can comprise 10 percent or more of all daily mail received by an institution.  The continued need for ISOs to process and inspect large quantities of unsolicited mail, in addition to thousands of other general and legal mail items received daily, challenges an institution's ability to interdict drugs.  The ISOs told us drugs enter institutions through the mail because inmates are sophisticated in hiding drugs, and staff hand searching each page of every publication is not feasible given the volume of mail.  Some state correctional systems, such as Connecticut, Illinois, and Oklahoma, prohibit inmates from receiving unsolicited advertisements or publications.

## Special Handling Requirements for Legal Mail Complicate Drug Interdiction Activities

Legal mail, consisting of congressional, judicial, and attorney mail, requires special handling.[47]  BOP Program Statement 5265.11, Correspondence, limits the authority institutions have to inspect incoming inmate legal mail:

---

[46] ISOs reported that official institution mail addressed to a specific staff member or department is often not opened or subjected to thorough inspection after routine x-ray scanning and staff addressee verification.

[47] Legal mail is separated from all other general inmate mail items, and is afforded first priority in processing and delivery in recognition of time deadlines associated with court or other legal proceedings.  The volume of legal mail received by individual institutions varies by the day of the week and by the size of the institution.  Based on estimates obtained during our site visits, large institutions, such as USPs, may receive, process, and deliver up to 60 pieces of legal mail on high-

69-045

> The Warden shall open special [legal] mail only in the
> presence of the inmate for inspection for physical
> contraband and the qualification of any enclosures as
> special mail.  The correspondence may not be read or
> copied if the sender is adequately identified on the
> envelope, and the front of the envelope is marked "Special
> Mail – Open only in the presence of the inmate."

As a result of these requirements, the authorized limited inspection of inbound legal mail for contraband does not occur until the item is opened by staff in the presence of the inmate.[48]  Typically the ISOs transport the legal mail to the individual housing units where the unit management staff open and inspect the legal mail in the presence of the appropriate inmates, and give the mail to the inmates after they sign for its receipt.  At some institutions, inmates receive legal mail at a designated time in the mailroom where ISOs or intelligence officers open, inspect, and turn over the legal mail to the inmates.

The ISOs at the institutions we visited and one Inmate Systems Management official at the BOP's Central Office described inmate legal mail as the weakest link in the ISOs' ability to detect drug contraband.  The ISOs expressed concern about the consistency, quality, and thoroughness of inspections performed on legal mail at BOP institutions, in particular once the legal mail is forwarded to the inmate housing units where inspection for contraband and delivery to inmates takes place.  These inspections may consist of only a brief hand and visual review for obvious contraband.  Often the legal documents are thick and bound together in a way that makes inspection difficult.  These ISOs also stated that some newer and less experienced unit management staff may perform a less rigorous inspection.  They further stated that the unit managements' competing tasks and the distractions that occur on a daily basis within a housing unit may interfere with the thorough inspection of legal mail.  These concerns are heightened because of the BOP's inmate population growth and corresponding complement of newer staff.

The ISOs also stated that verifying the authenticity of incoming legal mail is difficult.  Regular mail has been disguised as legal mail with fictitious legal names and addresses, which may go undetected because the ISOs do not know the legitimate legal representatives for individual inmates.  Figure 4 on the next page shows an attempt to smuggle heroin into a USP using a document disguised as legal mail that was detected during inspection by mailroom staff.

---

volume Mondays and only 10 pieces of legal mail a day for the remainder of the week.  Smaller institutions may handle approximately 5 to 10 pieces of legal mail per day, as compared to 15 pieces on a Monday.  The BOP Program Statement 5800.10, Mail Management Manual, requires that institutions apply every reasonable effort to ensure delivery of legal mail within 24 hours of receipt.  The BOP's mail procedures typically result in the same day delivery of legal mail.

[48] Drug contraband finds in legal mail do occur outside the presence of the inmates.  The ISOs may discover contraband when legal mail is first received, x-rayed, and reviewed for proper legal markings on the envelopes.

U.S. Department of Justice                                                      33
Office of the Inspector General
Evaluation and Inspections Division

**Figure 4.  Heroin Hidden Within the Binding of
a Document Disguised as Legal Mail**







Source:  BOP

Figure 5 on the next page shows an attempt by an outside gang member (also a former inmate) to introduce 11 grams of methamphetamine into a high security institution using a document disguised as legal mail and sent to an inmate.  He concealed the drugs in a hollowed portion of the glued-together binding of the document.  The BOP detected and prevented delivery through intelligence gathered from monitoring the inmate's telephone calls.

U.S. Department of Justice                                                                34
Office of the Inspector General
Evaluation and Inspections Division

### Figure 5.   Methamphetamines Hidden Within Glued Binding of Document Disguised as Legal Mail

 

Source:  BOP

The ISOs also expressed concern about outgoing legal mail, which can be used to facilitate the introduction of drugs.  For example, in a criminal case investigated by the OIG, the U.S. Postal Inspection Service, and the BOP, a cooperating defendant provided investigators with inmate correspondence disguised as outgoing legal mail, which detailed a drug introduction scheme and had been successfully mailed by an inmate from a high security level institution.  The fraudulent legal mail was addressed to an actual attorney, but the postal address was not the attorney's address.  Instead, the postal address was that of the inmate's outside contact.  The inmate's correspondence contained five handwritten pages of instructions on how to use legal mail to hide 16 grams of heroin in balloons in the binding of a legal document.

BOP staff authority for outgoing legal mail is even more restricted than for incoming legal mail, because outgoing legal mail may be sealed by the inmate and is not subject to inspection.[49]  The ISOs are required to stamp outgoing legal mail with the statement:

> The enclosed letter was processed for forwarding to you.
> The letter has neither been opened nor inspected.  If the
> writer raises a question or problem over which this facility
> has jurisdiction, you may wish to return the material for
> further information or clarification.  If the writer encloses
> correspondence for forwarding to another addressee,
> please return the enclosure to the above address.

---

[49] The only exception to the policy of not subjecting outgoing legal mail to inspection is for inmates placed on restricted mail status by the warden, which requires the concurrence of Regional Counsel, after a determination that an inmate has previously abused legal mail privileges.  In such cases, the outgoing mail is inspected for contraband in the presence of the inmate, similar to procedures used with incoming legal mail.

69-048

Staff stated that their limited authority over outgoing (and incoming) legal mail impedes their ability to detect and deter criminal activity. Inmates are aware of this limited authority and therefore use legal mail as a means of introducing drugs and other contraband into BOP institutions.

**Staff Training on Drug Detection is Limited**

The ISOs and unit management staff stated they need, as do all staff, standardized and more rigorous drug interdiction training to better inspect inmate mail for drug contraband. Staff said they need more familiarity with different types and forms of drugs, and the methods used by inmates to bring drugs into institutions. In many cases, staff reported their first exposure to recognizing and detecting certain categories of drugs, such as black-tar heroin, came only after a successful detection by another officer. At one high security institution we visited, an intelligence officer created a picture storyboard using actual drug finds within the institution to help educate other staff. The storyboards are used in local new officer training and annual refresher training for all institution staff.

**Technology in Use is not Suited for Detecting Drugs**

We found that drugs may go undetected through all stages of mail inspection because of inadequate technology or human error. At each institution visited, ISOs stated new technology is needed that will more readily identify drugs concealed in the mail. The BOP Program Statement 5800.10, Mail Management Manual, encourages its institutions to supplement mail inspection activities with modern technology. The BOP Office of Security Technology (OST), which is responsible for identifying new security technologies and evaluating their potential use in the BOP's institutions, describes the use of x-ray devices as "our first defense in the mail drug interdiction effort." In practice, while x-raying mail may produce suspicious images leading to closer staff scrutiny and subsequent drug finds, x-ray scan devices are primarily designed to help the ISOs better detect metal weapons and explosive devices. Even at those sites we visited with more recent generations or upgrades of the x-ray scan technology, many experienced ISOs cautioned against high expectations for this technology for detecting drugs. They said few drug contraband finds actually occur during the x-ray inspection. If drugs are detected, it usually occurs during the subsequent labor-intensive manual inspections performed by ISOs.

The OST evaluated the following drug detection technologies and stated they possessed promise for mailroom application:

- Chemical Trace Detection Wipe and Spray Drug Detection Field Kits. Procedures require wiping a target surface (e.g., inmate mail items) with a test paper and then spraying the test paper with a chemical spray. A chemical reaction occurs changing the color of the test paper when drugs are present. The wipe and spray test, however, requires a separate test paper and use of a

---

69-049

separate spray for each drug test type (i.e., marijuana, cocaine, heroin, and methamphetamine).  The OST reports one test kit (80-100 individual tests) would allow testing for the four basic drug types, at a cost of $500, or $5-$6.25 per test.  Another form of this technology from a competing vendor is reported to cost $8-$10 per test.  While identified as a low-cost technology in limited or targeted applications (e.g., mail for inmates identified by staff as suspect), the OST determined its use on all mail would be expensive and cause significant delays in mail processing.

- Ion Spectrometry Technology.  The OST reports ion spectrometry technology is well suited for mail that already has been identified as suspicious through other search techniques.  While the OST reports many BOP institutions have used existing ion spectrometry machines (purchased originally to scan visitors) to test selected suspicious mail items, the institutions we visited that had ion spectrometry machines did not use the machines on any mail.  Purchase costs for an ion spectrometry machine for mailroom applications range from $20,000 to $70,000 per unit.

According to the OST, the BOP does not have immediate plans to implement or test mailroom drug detection technologies.  The BOP has not deployed additional technologies to its institutions because of concerns over cost and reliability.  During our interviews, the absence of centralized funding for these technologies was cited as the main deterrent to pilot testing or BOP-wide implementation.  Officials at the institutions we visited stated that local funding of drug-screening technology is not always possible because of budget constraints and competing priorities.

**Conclusion**

BOP staff consider the institution's mail system to be a significant point of entry for drugs.  The daily volume of inmate mail, special handling procedures for legal mail, limited staff training, and inadequate technology present specific challenges for effective detection of drugs in the mail.  The BOP manually inspects inmate mail to detect drugs, but ISOs believe these inspections cannot detect all drugs.

**Recommendations**

8.  The Director, BOP, should implement a policy that eliminates unsolicited mail.

9.  The Director, BOP, should require additional training for BOP staff to search mail and detect drugs.

10.  The Director, BOP, should test mailroom drug detection technologies.

69-050

# REDUCING THE INMATES' DEMAND FOR DRUGS THROUGH DRUG ABUSE TREATMENT

**Demand reduction for drugs through drug abuse treatment for inmates is the second component of the BOP's drug interdiction strategy. However, an insufficient number of BOP inmates receive drug abuse treatment because the BOP underestimates the number of inmates that need treatment and inadequately tracks inmates referred for treatment. Furthermore, non-residential treatment is not always available at the institutions due to insufficient staffing and lack of policy guidance. Also we found a lack of incentives for inmates to seek non-residential treatment.**

Drug abuse treatment programs for inmates are a significant part of the BOP's strategy to reduce drugs from its institutions.[50] However, the BOP does not treat all inmates who have drug problems because not all inmates' diagnoses and drug treatment recommendations are recorded in SENTRY. The inmates' treatment needs are therefore inadequately tracked throughout their incarceration. As a result, the BOP is not allocating sufficient resources to meet the recommended treatment needs of all inmates. Moreover, the BOP only treats a portion of the inmates it estimates need treatment. The BOP focuses on drug abuse education (classroom instruction) and the residential (in-patient) drug abuse program (RDAP).[51] The BOP does not ensure inmates have access to BOP non-residential (out-patient) treatment after completion of drug abuse education classes or before admittance to the RDAP.[52] Even if an inmate meets the eligibility criteria for the RDAP, the waiting time for placement can be years.

---

[50] Appendix I contains a description of the BOP's drug treatment programs.

[51] The Drug Abuse Education course is a 30-40 hour course required for inmates who meet certain sentencing criteria. The BOP does not consider the education course as treatment but rather motivation to seek treatment. The RDAP is a 9-month, 500-hour residential program in which inmates are housed in a separate unit of the institution or satellite camp reserved exclusively for this program. For a more complete description of all components of the drug treatment program, see Appendix I.

[52] Non-residential drug treatment requires a minimum of one hour of individual or group contact each month.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

38

**The BOP Underestimates the Drug Abuse Treatment Needs of Inmates**

In its FY 2001 Report to Congress on Substance Abuse Treatment Programs, the BOP states that 34 percent of its inmates have a substance abuse disorder.[53] This 34 percent figure is low compared to other federal, state, and local corrections data. For example:

- In August 2001, the Centers for Disease Control and Prevention and the Substance Abuse and Mental Health Services Administration reported that about 80 percent of inmates in correctional facilities have substance abuse problems; 83 percent of state and 73 percent of federal inmates said that they used drugs in the past, and about 50 percent of both state and federal inmates said that they used drugs in the month before their arrest.[54]

- In May 2000, the BJS reported that over half of jail (55 percent) and state inmates (57 percent) said that they used drugs in the month before their arrest. Two-thirds of convicted jail inmates (67 percent) said that they used drugs regularly before reporting to jail (i.e., at least once a week for at least one month).[55]

- In January 1999, the BJS reported that 58.1 percent of all male federal inmates used drugs regularly at the time of their offense. State corrections officials estimated that between 70 to 85 percent of state inmates need drug abuse treatment.[56]

- Drug Abuse Treatment Specialists (DATS) and unit managers at the institutions we visited estimated that between 50 to 80 percent of their inmate population had a substance abuse problem. Everyone interviewed thought that the BOP's figure of 34 percent did not represent all inmates in need of drug abuse treatment.

---

[53] "Substance Abuse Treatment Programs in the Federal Bureau of Prisons Fiscal Year 2001 Report to Congress," BOP, January 2002. A substance abuse disorder refers to those persons with drug or alcohol abuse or dependency. The BOP's drug abuse treatment programs provide treatment to inmates with a substance abuse (drug or alcohol) or dependency problem.

[54] "Substance Abuse Treatment for Drug Users in the Criminal Justice System," Centers for Disease Control and Prevention and Substance Abuse and Mental Health Services Administration Fact Sheet, August 2001.

[55] "Drug Use, Testing, and Treatment in Jails," BJS, U.S. Department of Justice, Washington, D.C., May 2000.

[56] "Substance Abuse and Treatment, State and Federal Prisoners, 1997," BJS, January 1999.

U.S. Department of Justice                                                                 39
Office of the Inspector General
Evaluation and Inspections Division

To arrive at the 34 percent figure, the BOP administered a Substance Abuse Needs Assessment in the summer of 1991 during a 3-month period. Every inmate entering the BOP completed an Inventory of Substance Abuse Patterns. From these inventory responses, the BOP determined that 30.5 percent of the inmates met the criteria for drug dependence as defined by the DSM-IIIR.[57] In 1997, this figure was updated using the "Survey of Inmates in Federal Correctional Facilities," conducted by the U.S. Bureau of Census, the BJS, and the BOP. Using the DSM-IV criteria published in 1994, the BOP extrapolated drug symptomology data from this survey for drug dependence (most serious drug use) and abuse (recurrent use but less than dependence) and the percentage of inmates it estimated had substance abuse disorders increased to 34 percent.[58]

The BOP is relying on outdated, estimated data to determine the number of inmates with drug abuse treatment needs. We believe the BOP should rely instead on diagnoses made at BOP institutions by psychologists and DATS.[59]

**Tracking Inmates with Drug Abuse Treatment Needs is Insufficient**

The BOP's Central Office (Psychology Services Branch) could not provide us with BOP-wide data (generated from the automated SENTRY database) describing the treatment needs of inmates, referrals for treatment, and actual treatment of inmates. Consequently, without capturing this information in SENTRY, the BOP cannot identify, track, or monitor inmates with diagnosed drug problems to encourage treatment. Nor can the BOP allocate sufficient staff resources to provide the treatment programs. Without the BOP-wide data, the BOP is unable to determine the actual number of inmates in need of drug treatment.

In each institution, a psychologist conducts a psychological assessment within four weeks of an inmate's admission to the BOP. A drug abuse screen is part of that assessment.[60] If drug treatment is indicated, the psychologist sends a paper copy of the recommendation to the inmate's unit manager, but that recommendation is not always recorded in SENTRY. An institution only documents an inmate's drug treatment needs in SENTRY when:

---

[57] The DSM-IIIR refers to the third edition of the Diagnostic and Statistical Manual for Mental Disorders, compiled and published in 1987 (since updated) by the American Psychiatric Association. It is used by psychiatrists for diagnoses and is widely used by other treatment professionals.

[58] The DSM-IV refers to the fourth edition of the DSM, updated and published in 1994.

[59] Each institution has one DATS to provide drug abuse education classes and non-residential drug treatment. The DATS reports to the Drug Abuse Treatment Coordinator, who is a licensed psychologist. The Coordinator does not provide any direct drug treatment to the inmates. Both positions are under the institution's Psychology Services department.

[60] The drug abuse screen consists of a set of questions designed to identify if the inmate has used drugs, if that use is indicative of the need for drug treatment, and what level of treatment is needed.

69-053

- Unit management staff determine that the inmate meets the requirement for mandatory drug abuse education;

- The institution's psychologist refers the inmate for the RDAP and the inmate volunteers to participate, meets the program's other eligibility criteria, and is placed on the waiting list; and

- An inmate referred for non-residential treatment, volunteers for and actually begins treatment.

An institution excludes from SENTRY:

- All referrals for the RDAP for which inmates do not volunteer for treatment, and

- All referrals for non-residential treatment – even when the inmates volunteer for treatment and are on the waiting list.

By not including every diagnosed and recommended drug treatment need in SENTRY, the BOP does not know the accurate number of inmates with drug problems and treatment referrals.

**Non-Residential Drug Abuse Treatment is Not Always Available**

Even though many inmates would benefit from non-residential drug treatment, it is not always available at BOP institutions because of insufficient drug treatment staff, lack of policy guidance, and lack of incentives for inmates to seek drug treatment.  Non-residential treatment is out-patient treatment and includes individual and group therapy for inmates in the general population.  At the institutions we visited, the BOP emphasized drug abuse education and the RDAP, but placed minimal emphasis on non-residential drug treatment.  As a result, only a limited number of general population inmates receive non-residential treatment.

According to the drug treatment staff at the institutions we visited, drug abuse education classes usually were offered continuously and the RDAP was encouraged for those inmates who met the criteria.  However, drug abuse education is not treatment but rather a series of classes designed to provide information about the detrimental consequences of drug use through literature and videos.  Further, the RDAP is not offered at all institutions (none of the institutions we visited offered the RDAP), and where it is offered, inmates are not eligible for participation until the last 36 months of their sentence.[61]  The average BOP inmate sentence length is ten years.  Consequently, an inmate could wait seven years or more before receiving

---

[61] The RDAP was available at three of the satellite camps we visited.  However, the inmates inside the main institutions do not have access to the satellite camps or the programs within the camps.  In FY 2001 the BOP had established 52 RDAP units in 50 institutions.

69-054

residential drug treatment.  In the interim, inmates are dependent on non-residential drug treatment to meet their immediate treatment needs because it is the only drug treatment available in the institution for the general inmate population before admittance to the RDAP.  Yet, non-residential drug treatment programs were not offered at all institutions we visited.  Even at most institutions where it was offered, it was offered irregularly.[62]

The BOP's internal program reviews have reported ongoing deficiencies in providing non-residential drug treatment.[63]   Selected Program Summary Reports containing cumulative findings from individual program reviews conducted from FY 1998 through FY 2001 state the following deficiencies:

- FY 2001:  "Non-residential treatment continues to lack a strong presence in several institutions.  Greater participation and opportunity for access should exist."

- FY 2000:  "In most instances few inmates seek out programming and non-residential programs are underutilized as a result."

- FY 1999:  Psychology Services "must remain cognizant of the appropriate use of drug program funds and drug staff work assignments.  It is important to maintain the integrity of money allotted to drug programming.  Staff assigned to drug programs cannot perform their responsibilities to the fullest if they are utilized for activities unrelated to drug programming."

- FY 1998:  "Inadequate inmate participation in the non-residential drug treatment program…remains an area of weakness.  Concerted effort at enlisting inmate participation should alleviate this weakness."  Additionally, one quarterly summary report showed that non-residential drug abuse programs had the highest number of deficiencies in that quarter.  Specifically, "Individualized treatment plans for inmates participating in non-residential drug abuse programs were absent or inadequate.  Another area of concern was the failure to conduct monthly group or individual sessions for non-residential drug abuse programs."

Associate wardens and unit managers at several institutions we visited acknowledged there were insufficient drug treatment programs for inmates at their institutions.  Drug treatment staff at five of the institutions visited stated their program emphasized residential treatment and not non-residential treatment.  The drug

---

[62] The exceptions were the USP Lewisburg (and its camp) and the FCI Miami where the DATS recognized the inmates' drug treatment needs and developed several ongoing non-residential drug treatment programs.

[63] The Central Office's Program Review Division conducts reviews for all BOP programs.  These reviews examine compliance with laws, regulations, and policy, and analyze program performance trends and other data.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

42

treatment staff stated while drug treatment may be a priority at minimum and low security level institutions, security, not treatment, is the priority at the medium and higher security level institutions.

Of particular note are the low drug treatment rates at institutions with high drug use rates and drug misconduct charges, such as three of the four USPs and one of the two FCIs we visited. For example:

- At the USP Beaumont, Texas, the last non-residential group had only five inmates participating due to limited interest. According to the institution, only seven inmates completed non-residential drug treatment in two years from FY 2000 through FY 2001. For FY 2001, USP Beaumont had a positive drug test rate of 7.84 percent and a drug misconduct rate of 23.25 percent, both of which are the highest rates in the BOP.

- At the USP Lompoc, California, the DATS did not offer non-residential treatment programs, but only taught drug abuse education classes on a full-time basis. Prior to our visit, only 13 inmates had completed non-residential treatment during FY 2000 and FY 2001. For FY 2001, USP Lompoc had a positive drug test rate of 6.09 percent and a drug misconduct rate of 15.77 percent.

- At the USP Leavenworth, Kansas, a total of 32 inmates completed three non-residential group drug treatment programs in FY 2000 and FY 2001. At the time of our visit, the institution was not conducting any non-residential drug treatment for inmates. For FY 2001, USP Leavenworth had a positive drug test rate of 2.65 percent and a drug misconduct rate of 12.69 percent.

- At FCI Memphis, Tennessee, and its satellite camp, the one DATS consistently taught drug abuse education classes. The DATS offered only one non-residential drug treatment program to inmates who completed the RDAP and were required to have transitional counseling prior to release. For FY 2001, FCI Memphis had a positive drug test rate of 2.89 percent and a drug misconduct rate of 8.79 percent.

According to the BOP's Program Statement 5330.10, Drug Abuse Programs Manual, self-help programs such as Narcotics Anonymous or Alcoholics Anonymous are often associated with non-residential treatment and may be offered as part of an institution's non-residential drug treatment program. Although not considered treatment, the BOP recognizes that these self-help groups can be an important intervention in an inmate's recovery. However, even these self-help groups did not exist in all the institutions we visited. Some institutions had not requested assistance from Narcotics Anonymous or other volunteers in the community. Other

69-056

institutions stated the criminal backgrounds of some Narcotics Anonymous volunteers, who are often former drug addicts, preclude their presence in the institutions.

The cumulative effect of limited non-residential treatment, few self-help groups, and the restrictive timeframe (36 months prior to release) for RDAP eligibility is that not enough inmates receive drug abuse treatment.  According to the BOP, in FY 2001 26,268 inmates received drug abuse treatment either through residential treatment (15,441) or non-residential treatment (10,827).[64]  The BOP's outdated and low estimate is that 34 percent of its population needs drug abuse treatment.  Therefore using BOP's estimate of 34 percent, in FY 2001, based on an average daily inmate population of 133,642, approximately 45,438 inmates needed treatment.  As we discussed above, the actual number who need treatment is likely much higher.  Yet, only 26,268 inmates, or 57.8 percent of those inmates with estimated treatment needs, received residential or non-residential drug treatment.  The other 19,170 inmates (42.2 percent) did not receive any treatment.  This low treatment rate is a significant deficiency in the BOP's demand reduction strategy.

### Limited Drug Treatment Staffing Restricts Comprehensive Drug Treatment Programs

The BOP's staffing guidelines suggest each institution needs one DATS per 1-500 inmates, which would equate to two to four DATS for each institution we visited.  The FY 2001 average daily population for the institutions we visited ranged from 1,322 to 2,012 inmates.[65]  However, at these institutions, only one DATS per institution was employed to provide drug treatment programs to inmates.  The DATS stated they were overwhelmed at times with their duties and the number of inmates who need help.  They believed providing drug abuse education several times per week to many groups of inmates at different sites, with all the related paperwork, was a full-time endeavor.  The DATS further believed developing and leading non-residential group or individual counseling, especially if inmate participation increased through incentives, was not feasible without additional drug treatment staff.

The qualifications of a DATS may also affect the availability of non-residential drug treatment because the DATS may not be clinically trained to facilitate a group or individual counseling session.  At one USP with a high drug use rate, the DATS had no counseling background or related qualifications and training skills needed to

---

[64] "Substance Abuse Treatment Programs in the Federal Bureau of Prisons Fiscal Year 2001 Report to Congress," Federal Bureau of Prisons, January 2002.  It is unknown how many of these inmates successfully completed the program versus those who participated without completion.  It is also unknown how many of the 10,827 inmates who participated in non-residential treatment were RDAP graduates in transitional services as an RDAP requirement versus inmates from general population who participated in a separate non-residential drug treatment program.  A portion of these inmates may be RDAP graduates and therefore may have been double-counted.

[65] The average daily population includes satellite camps, which have a population of about 300 inmates, and for which the DATS are also responsible for providing drug treatment.

U.S. Department of Justice                                                                                      44
Office of the Inspector General
Evaluation and Inspections Division

provide individual or group treatment.[66]  With only one DATS per institution (and also serving a satellite camp), having someone with the appropriate counseling qualifications is imperative for providing drug treatment to inmates, not just drug abuse education.[67]

### Policy Lacks Clarity for Non-Residential Drug Abuse Treatment

The BOP's Program Statement 5330.10, Drug Abuse Programs Manual, states non-residential treatment services shall include a minimum of one hour of individual or group contacts each month as indicated by a treatment plan.  It also states that transitional services, a component of non-residential drug treatment, are required one hour per month for RDAP graduates.  At some of the institutions visited, the treatment staff believed that the mandatory transitional services offered to RDAP graduates fulfill the institution's requirement to provide the monthly one hour of non-residential drug treatment.  However, transitional services focus on relapse prevention and aftercare, which may not be appropriate for inmates who have never had any prior drug treatment.  The program statement does not provide clear direction that, besides transitional services, other non-residential drug treatment must be provided for inmates who have not completed the RDAP.

The program statement also does not provide a curriculum or outline for non-residential drug treatment groups, and does not suggest a minimum duration for effective treatment.  Yet, for drug abuse education and the RDAP, specific standardized written curricula and timeframes are provided.  Without clear policy direction for non-residential treatment, DATS have focused their efforts on drug abuse education and the RDAP.  This limited focus leaves many inmates without drug treatment during most of their incarceration.

### Policy Lacks Incentives for Participation in Non-Residential Drug Abuse Treatment

Drug abuse education classes and the RDAP reward inmates for completing the program and impose sanctions for non-completion.  Non-residential drug treatment does not reward or sanction the inmates.  For example, drug abuse education, a 30-40 hour course, is mandatory within the first 12 months for all inmates who meet the criteria (see Appendix I).  Inmates who refuse to participate or fail to complete the drug abuse education classes are held at the lowest pay grade ($5.25 per month) and are ineligible to participate in community programs.  Inmates eligible for RDAP have even stronger incentives for participation and completion of the program.  The incentives include but are not limited to: (1) up to 12 months early

---

[66] This DATS' employment background had primarily been in a business function such as contracting.

[67] One institution drug treatment coordinator stated that his Regional Drug Treatment Coordinator personally reviews all DATS to be assigned in the Region to ensure that they have the proper qualifications and background to provide treatment.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

45

release from prison, (2) limited financial rewards – up to $180, and (3) local institution incentives such as preferred living quarters.  Conversely, inmates who fail to complete the RDAP are no longer eligible for these incentives.

Because there are no incentives or sanctions for non-residential drug treatment, staff stated that inmates do not readily volunteer to participate in that treatment.  At the USPs we visited, drug treatment staff stated that many inmates are "long term convicts and long time addicts" with many years of incarceration to serve and minimal interest in treatment.  Therefore, to motivate these and other inmates to participate in drug treatment, unit management and drug treatment staff believe that the BOP must "use the carrot and stick approach" by developing incentives.  Conversely, if an inmate is referred for non-residential drug treatment but does not volunteer or successfully complete the treatment, staff believe the inmate should face loss of privileges.  Suggestions for incentives included preferred living quarters, additional points for visits, and permission to order a special food item through the institution's commissary.  However, these staff did not favor the incentive of reducing an inmate's sentence because they believe the motivation for treatment would be insincere.  Inmates entering the BOP's institutions often tell the drug treatment staff, "I want the time-off program," referring to the RDAP where inmates can receive up to 12 months off their sentence for successful completion of residential treatment.

Unit managers and drug treatment staff also strongly believed that inmates referred for drug treatment should be rated on their participation through a separate category on the annual Security Designation and Custody Classification Review form.[68]  If an inmate fails to complete recommended drug treatment, then the inmate should receive a score of "zero," which would preclude the inmate from receiving a lower security level designation, being recommended for community programs, or receiving pay above the lowest pay grade.  Under the current review procedures, drug treatment participation is combined with many other factors.  These other factors include interaction with staff and other inmates, misconduct reports, participation in other recommended activities, work reports, and paying court related fines.  Combining drug treatment participation with these other factors minimizes the weight given to whether or not inmates participated in and completed the drug treatment.  Thus the BOP's emphasis on drug treatment becomes diminished when

---

[68] The Security Designation and Custody Classification Review is a two-part process used by the BOP to identify the confinement needs of inmates in its custody.  The initial assessment is completed based upon the evaluation of certain factors such as the inmate's history, behavior, present needs, offense severity, and length of sentence. Through this process, inmates are "screened" so that they are appropriately matched (designated) and housed at institutions with other inmates that possess similar characteristics.  After the inmate has been housed at an institution for a specific amount of time, a reclassification is performed which augments the initial classification and takes into account the inmate's adjustment to incarceration, conduct, and programmatic involvement. This reclassification continues periodically throughout the inmate's confinement and is used to modify the inmate's confinement status.  The entire classification and designation process promotes the orderly operations of a correctional facility by separating inmates that could pose potential operational and security risks.

69-059

mixed with other unrelated factors.  Unit managers stated that they only can score an inmate "zero" on their annual Security Designation and Custody Classification Review if the inmate fails to fulfill the requirements of the Inmate Financial Responsibility Program, (i.e., paying court related fines, penalties, and restitution).  They believe the same should apply to successful completion of drug treatment programs.

**Conclusion**

Reducing inmates' demand for drugs through drug treatment programs is a significant part of the BOP's strategy to eliminate drugs from its institutions.  However, this part of the BOP's strategy has not been fully effective.  The BOP's estimate that 34 percent of inmates need drug treatment is low, according to drug treatment staff at the institutions visited and outside organizations that have gathered data on inmate drug use.  These staff and organizations have stated that the percent of federal inmates with drug problems ranges from at least 50 to 80 percent.  Substantially more BOP inmates may need treatment than recognized by the BOP's 34 percent figure and its associated insufficient drug treatment resources.

Drug treatment and unit management staff at the institutions we visited also stated that the BOP emphasizes and directs resources towards drug abuse education and the RDAP.  But without non-residential drug treatment, inmates must wait until the last 36 months of their sentence for possible admission into the RDAP – a potential waiting time of years.  Thus, a void in drug treatment exists between drug abuse education and the RDAP.  The result is not enough inmates receive drug treatment, even when the BOP's low estimate of 34 percent is used as the baseline of inmates' treatment needs.

**Recommendations**

11.  The Director, BOP, should maintain data, via improved SENTRY tracking, on the number of inmates who are diagnosed with a drug abuse problem and are referred for drug treatment, the number of inmates who participate in drug treatment, and the number who successfully complete drug treatment.

12.  The Director, BOP, should sufficiently staff non-residential drug treatment programs based on a combination of the DATS staffing guidelines and the number of inmates at each institution who have been identified in SENTRY as needing drug treatment.

13.  The Director, BOP, should revise Program Statement 5330.10, Drug Abuse Programs Manual, to require that non-residential drug treatment is provided to inmates in the general population, in addition to transitional services for the RDAP graduates.  The program statement should include a curriculum for non-residential drug treatment and guidance regarding the minimum number of sessions and the minimum number of weeks' duration for the groups.  The Director, BOP, should also

increase emphasis on self-help groups to enhance the overall drug treatment program and the inmates' recovery and rehabilitation.

14.  The Director, BOP, should develop incentives for participation in non-residential drug treatment and consequences for non-completion, with the objective of increasing the number of inmate volunteers for drug treatment.  As part of the incentives and consequences, the Director, BOP, should consider adding a separate score for drug treatment participation in the inmate's annual Security Designation and Custody Classification Review.

69-061

## OTHER OPPORTUNITIES TO IMPROVE DRUG INTERDICTION

We reviewed other potential points of entry for drugs – the receiving and discharge area, the warehouse, the rear gate, volunteers, and contractors – that BOP staff stated were less vulnerable to drug smuggling.  Regarding the receiving and discharge area, the warehouse, and the rear gate, we concluded better technology could supplement manual searches for drugs by correctional officers.  For volunteers and contractors, we concluded that shared information about their backgrounds could assist institutions in their selection decisions.  We also reviewed the role of institutions' intelligence staff in drug interdiction activities and concluded that rotation of the SIS lieutenant is too frequent, and timely investigative and drug training is needed.  Lastly, we reviewed the BOP's only canine unit located at USP Lewisburg, Pennsylvania, and concluded canine units may be a useful drug interdiction technique for other institutions.

### Receiving and Discharge

Although the receiving and discharge (R&D) area is not a primary point of entry for illegal drugs, inmates sometimes attempt to introduce drugs as well as other contraband upon initial commitment, during transfers between BOP institutions, or upon return from external temporary releases, such as emergency medical care or court appearances.[70]  The primary objective of R&D is to ensure inmates are committed and discharged appropriately and all inmate property is processed without introducing contraband.[71]

The ISOs at the institutions we visited cited examples of inmate schemes to conceal contraband inside personal commissary items when transferring from one BOP institution to another.  Inmates are permitted to take unopened commissary items with them when transferring to another institution.  Some inmates take advantage of this privilege by opening their commissary items, hiding contraband, then resealing and disguising the commissary item to make it appear new.  Figure 6 on the next page shows one attempt by an inmate to conceal bomb-making substances in a commissary item.

---

[70] At one detention center we visited, ISOs who perform R&D duties cited an example of a female inmate who was searched when transported to the detention center by outside law enforcement officers and again searched upon admission to the center.  The ISOs found the heel of the inmate's shoe filled with cocaine.

[71] The R&D area, guided by BOP Program Statement 5800.12, Receiving and Discharge Manual, includes processing inmate admissions and releases, and processing incoming and outgoing inmate property.  The receiving and discharge of inmates is performed by ISOs.

69-062

## Figure 6.  Ingredients for Explosive Device Found Hidden Among an Inmate's Personal Commissary Items.





Source:  BOP



While the ISOs stated that most smuggling attempts are discovered during R&D inmate property inspections, they also stated that inmates' demand for drugs and their ingenuity in concealing contraband in commissary items increases the probability that contraband goes undetected.

Thorough R&D inspections for contraband are critical to maintaining the safety and security of each institution.  R&D inspections generally consist of pat and visual or strip searches of inmates, including the use of hand-held metal detectors and x-ray body cavity searches (if technology is available at the institution), as well as manual, visual and x-ray inspections of all inmate property.[72]  The x-ray scan technology for body cavity searches and property inspections recognizes metal objects but not drugs.  Figure 7 on the next page demonstrates the effective use of the body cavity x-ray scan technology for detecting metal contraband and the value of integrating technology with traditional manual interdiction activities.  Figure 7 also illustrates the ingenuity of and risks taken by inmates to introduce contraband.

---

[72] The pat search is an inspection of an inmate's clothing and personal effects that does not require the inmate to remove clothing.  The visual search or strip search is a visual inspection of all body surfaces and cavities and screening with a hand-held metal detector, and is conducted in all but minimum security institutions.

69-063

**Figure 7.  Photographs Showing Metal Contraband Detected Using Body Cavity X-Ray Technology**

 

Source:  BOP

The body cavity x-ray image on the left shows a hacksaw blade and paper clip.
The body cavity x-ray image on the right shows handcuff keys.


BOP encourages the use of x-ray scan devices in R&D to supplement manual and visual inspections of personal property.  All institutions do not have x-ray scanners in the R&D areas, but instead could use the scanners located in the warehouse or at the institution's front entrance.  However, this arrangement does not encourage scanning of inmates' suspicious property because the x-ray scanners available to R&D are inconveniently located outside the institutions' secure perimeter fencing while the R&D area is located within the secure perimeter fencing.

## Institution Deliveries:  The Warehouse and Rear Gate

The institutions we visited use various visual and manual search procedures along with x-ray technology to inspect daily deliveries entering through the institutions' warehouses (dry and cold storage, and UNICOR) and rear gate.

Interdiction activities for incoming deliveries are labor intensive and usually target hard contraband, primarily weapons and explosive devices.  As deliveries arrive at a warehouse receiving dock (usually located just outside an institution's perimeter fence), a standard inspection for the correct quantity and acceptable quality of the delivered items is conducted followed by an inspection for contraband.  To perform the contraband inspection, warehouse staff conduct a complete or random visual and manual inspection of shipments.  While some deliveries consist of individual parcels or packages, most deliveries consist of shrink-wrapped pallets

69-064

containing bulk deliveries of perishable and non-perishable food products and other supplies necessary to support the institution's needs.[73]

Supplemental use of imaging and detection technology to enhance contraband interdiction activities varies by institution. For example, at one USP we visited, inspection of daily deliveries consists primarily of manual and visual inspections and use of a hand-held wand metal detector because the warehouse did not have its own x-ray scan device. The only available x-ray scan device (for small packages) was located in the mailroom in an adjacent building. Both the location of the device and its limited capacity size deterred the use of x-ray technology by warehouse staff.

In contrast, another USP we visited used additional inspection procedures for all of its deliveries. Inbound deliveries at the warehouse receiving dock were subject to visual and manual inspections for contraband. Upon leaving the warehouse, all deliveries were inspected using x-ray technology located in a stand-alone x-ray building positioned midway between the warehouse facility and the rear gate of the USP. This is the only institution we visited equipped with x-ray technology capable of handling pallets or skids weighing up to 500 pounds. The technology allows scanning of the pallets or skids from four sides rather than from only a top view provided by typical x-ray scan devices used in most institutions. The bulk imaging device is equipped with two monitors, which provide enhanced imaging to better identify and distinguish between non-organic materials (weapons) and organic materials (drugs and explosives). While staff reported increased confidence in the improved x-ray scan device, they also emphasized the importance of assigning staff specifically trained and experienced in all methods of contraband detection given the volume of deliveries entering the institution's secure perimeter each day.

At all institutions, after inspecting deliveries at the warehouse, rear gate staff conduct another complete or random inspection for contraband before admitting the shipment within the institutions' secure perimeter fencing. The rear gate inspection is visual and manual; sometimes a hand-held wand metal detector is used to scan the contents of boxes and packages. The delivery vehicles also are searched for hidden contraband.

**Conclusion**

BOP inmates transferring to other institutions through the R&D area may attempt to hide contraband in commissary items disguised as new and unopened. Under the BOP's current policy, these items are not easily detected. Institutions also receive a high volume of deliveries through their warehouse and rear gate areas each day. Inspection of these deliveries is labor intensive and often conducted without the benefit of technology designed for bulky items and large pallets. The limited x-ray devices available do not readily detect the presence of drugs. The R&D

---

[73] The type of search — complete or random — depends on whether the deliveries are individual packages or parcels versus multiple palleted bulk items.

U.S. Department of Justice                                                                                          52
Office of the Inspector General
Evaluation and Inspections Division

area, the warehouse, and the rear gate operations could benefit from advanced imaging and detection technology to supplement current search techniques.

## Volunteers and Contractors

Volunteers and contractors supplement the programs and services BOP provides to inmates. Because of the extended contact volunteers and contractors have with inmates – contact that is not always under direct observation by the BOP staff – volunteers and contractors have the opportunity to develop inappropriate relationships with inmates, which may lead to attempts to smuggle contraband.

According to the BOP, in FY 2001 31,879 volunteers made 152,015 visits to BOP institutions nationwide.[74] During the first two quarters of FY 2002, 24,672 volunteers made 78,018 visits to its institutions. Given the number of volunteers that enter the institutions on a yearly basis, significant opportunities exist for their smuggling drugs into the institutions. Data provided to us by the Volunteer Management Branch at the BOP's Correctional Programs Division showed dismissals of volunteers for drug-related charges are rare.[75] According to the data, which contains dismissal information from 1994 to 2001, only 5 of the 55 volunteer dismissals were related to the introduction of contraband, and only 1 of these 5 dismissals was for smuggling drugs. Inappropriate relationships or contact with inmates, previously undisclosed criminal histories, or previously undisclosed family or personal relationships with inmates prior to volunteering are the reasons for most volunteer dismissals.

The BOP also employs contractors to provide services to its institutions.[76] Similar to volunteers, contractors also have a low rate of substantiated misconduct

---

[74] Volunteers are private citizens who provide a variety of uncompensated services to the BOP. Examples of volunteer services include education, substance abuse prevention (e.g., Alcoholics Anonymous and Narcotics Anonymous), recreation, life-skills counseling, victim-assistance programs, crafts, religious services, and occupational services. Each institution employs a volunteer coordinator responsible for implementing the Volunteers and Citizen Participation Program and managing the recruitment, background investigation, and training of volunteers. See Appendix IX for a more detailed description of the requirements for volunteers and contractors.

[75] The Chief, Volunteer Management Branch, could not verify that all dismissals were captured in the database she maintained. The database relies on information manually reported by the institutions and reporting may not be complete.

[76] Contractors can range from health care staff (nurses, doctors, technicians) and food service staff, who report daily to the institution as their duty station, to construction workers or vendors who enter the institution periodically to perform a specialized or one-time function. Responsibility for oversight of contractors varies by institution. Some institutions assign this responsibility to the business office, others to the department under whom the service falls, while others assign portions of contractor oversight to the institution's volunteer coordinator. The number of contract employees currently employed BOP-wide is not available because the BOP does not centrally collect and track data reflecting each institution's solicitation and use of contractors. See Appendix IX for a more detailed description of the requirements for volunteers and contractors.

---

69-066

charges.  According to the BOP's Office of Internal Affairs Report for FY 2001, the BOP initiated 13 investigative cases as a result of misconduct allegations involving contract staff.  At the close of the fiscal year, eight investigation cases were completed and three of these cases sustained misconduct by contract employees.  The three sustained cases did not involve smuggling drugs into the institutions.  In FY 2000, the Office of Internal Affairs reported two sustained cases of drug smuggling involving contractors.

Regardless of the low numbers of misconduct charges involving volunteers and contractors, the BOP staff at the institutions we visited and at the BOP Central Office stated that both volunteers and contract employees can be susceptible to compromise by inmates and as a result represent a potential point of entry for contraband into BOP institutions.

### Shared Information Can Assist Management of Volunteers and Contractors

The BOP does not have a national automated capability to access and query information about volunteers, such as application, background, or training records, identify volunteers performing multi-institutional programs and services, and access volunteer dismissal or non-renewal records.  Rather, we found that volunteer records are maintained in paper format at each institution.

The BOP also relies on a paper-driven process for documenting and tracking volunteer dismissals.  Each institution's volunteer coordinator provides a memorandum indicating the volunteer's name and reason(s) for dismissal to the Regional Volunteer Administrator, with a copy of the memorandum forwarded to the Chief, Volunteer Management Branch at the BOP's Central Office.[77]  The branch chief enters this dismissal information in a database, but the institution staff do not have access to the database.  We believe that a searchable central database containing volunteer background, investigation records, and volunteer dismissals or non-renewals would help BOP staff better detect unscrupulous volunteers and prevent their approval to enter BOP institutions.

BOP also does not have a searchable database that provides timely and up-to-date access to contractor data.  For example, in 2000 the intelligence staff at a high security institution we visited, aided by the FBI, successfully detected a scheme by inmates to introduce drugs into institutions through a compensated religious services contractor.  The institution's intelligence staff noticed that inmates' positive drug tests increased following each of the contractor's three previous visits.  Based on intelligence gathered from targeted monitoring of inmate telephone calls and

---

[77] The Regional Volunteer Administrator provides guidance for volunteer programs and initiatives, such as data collection, networking, recruitment, strategic planning, technical assistance, and training, to the volunteer coordinator in each institution.

69-067

subsequent inmate interviews, the religious services contractor was arrested inside the institution and prevented from introducing nearly three-quarters of a pound of marijuana.

While this investigation was successful, improved and timely sharing of contractor information may have led to earlier detection of the contractor's prior successful drug introductions during visits to several BOP institutions.  For example, the investigation revealed that the same religious services contractor had visited, planned to visit, or was found listed on the approved telephone lists for inmates in at least six other BOP institutions.  In addition, at the time of arrest the contractor possessed the names and register numbers for six inmates in custody at three other high security institutions, indicating a previously undetected pattern of security breaches.[78]

**Conclusion**

The BOP has controls in place, as described in Appendix IX, to help ensure that volunteers and contractors are not security threats to the institutions.  However, some volunteers and contractors engage in improper conduct.  One improvement that could help in the management of volunteers and contractors is development of an automated database containing volunteer and contractor information, accessible to all institutions, to aid BOP staff in background reviews and approval decisions.

## Institution Intelligence Operations

Intelligence gathering about planned and ongoing criminal activity inside an institution is an important tool to help detect and prevent drug introductions.  The BOP SIS office in each institution is responsible for gathering intelligence and investigating misconduct or crimes committed by inmates and staff.[79]  The SIS staff at the institutions we visited told us that greater continuity of personnel in the SIS

---

[78] We found that the type of contractual agreement used at each institution for this particular religious services contractor did not help identify the contractor as unscrupulous and prevent his hiring.  Although the religious services contractor was providing services to several BOP institutions on a recurring basis, each institution procured religious services from this individual contractor through a short-term contract via purchase order prior to each compensated visit rather than through an individual contractual agreement used for the delivery of services requiring more frequent and unsupervised contact with inmates.  The BOP has fewer requirements for reviewing the background of potential short-term contractors than for the longer-term individual contractors.  See Appendix IX for the BOP's requirements for authorizing contractors.

[79] The SIS office's most common intelligence activities include telephone monitoring of inmates' calls, inmate drug testing, gang monitoring, and maintaining current databases and data files on problem inmates.  The SIS office also serves as a liaison to other law enforcement organizations, such as the OIG and FBI.  The SIS office is supervised by either a permanent Special Investigative Agent (SIA), or a correctional supervisor assigned as an SIS lieutenant for an 18-month rotation.  An SIS office may also be staffed with less senior temporary or permanent SIS technicians and intelligence officers.  The Special Investigative Technician is the one employee permanently assigned to an SIS office position at all the institutions we visited.

U.S. Department of Justice                                                                                55
Office of the Inspector General
Evaluation and Inspections Division

lieutenant position and timely training of newly assigned personnel would enhance the performance of intelligence gathering and investigations.  In addition, correctional officers highlighted the need to receive drug training from the SIS office to enhance drug interdiction activities throughout the institution.

**Too Frequent Rotation of the SIS Lieutenant**

Although the BOP rotates most corrections officers within an institution so that they can learn the duties of different positions, the majority of wardens, SIS office staff, and FBI agents at the institutions we visited disagreed with the 18-month scheduled rotation of the SIS lieutenant.  They stated that frequent rotation disrupts the continuity of the intelligence operation and hinders the lieutenant's ability to develop expertise for optimal performance.  SIS lieutenants told us that just as they become competent in their duties, they are rotated to a different position.  They also told us that drug interdiction activities are hurt because the information received from confidential informants, investigative skills acquired in working drug cases, and the ability to manage the information received from inmates' telephone calls, mail, and drug tests are lost with frequent rotation.  Additionally, SIS staff informed us that it takes time to develop good working relationships with law enforcement organizations, such as the OIG and FBI, to help with the investigative needs of the institution.  Although a warden has the discretion to extend the duration of a SIS lieutenant's assignment, the wardens we interviewed preferred permanent SIS lieutenant positions.

**Improved Training Needed for SIS Lieutenants**

Wardens, Special Investigative Agents (SIA), SIS lieutenants, and FBI agents at the institutions we visited told us newly appointed SIS lieutenants need timely, in-depth criminal investigative training.  The SIS lieutenant must quickly develop investigative knowledge to conduct investigations involving a variety of misconduct cases regarding staff and inmates.

According to the BOP Central Office, the Denver BOP Office of Internal Affairs (OIA) provides investigative technique training to SIS office staff.  By policy, new SIS lieutenants are required to attend a two-week SIS training course within the first six months of their assignment.  The training is usually held several times per year depending on the need.  In recognition of the frequent rotation of SIS lieutenants, OIA finalized a standard training curriculum in May 2002.  The curriculum includes approximately ten hours of investigative training and two hours of training on narcotics testing.  However, some SIS lieutenants told us that they needed the training sooner and would prefer to receive criminal investigative training from the local FBI office or joint training from the FBI and OIG offices.

69-069

**Other Staff can Benefit from Drug Training**

An institution's SIS office can contribute to the BOP's drug interdiction activities by training other staff about drugs.  Because SIS office staff investigate all drug finds in the institution, they have information on the latest drug names, types, forms, packaging, methods of introduction, and hiding places.  Other institution staff, regardless of their assignment, can benefit from this information.[80]  For example, one lieutenant assigned to the Special Housing Unit in a USP told us black tar heroin, which was found smeared on a cell's windowsill and under the frame of an inmate's bed, looks like glue and was not easily recognizable as a drug.  Similarly, an ISO told us that inmate letters may be soaked with methamphetamine and staff may not recognize the paper stain as a drug.

Most institutions we visited made some efforts to share drug-related information with staff.  Some institutions write information in a logbook and make the book available to staff as they enter the institution.  However, obstacles to widespread dissemination exist.  In the past, roll call prior to each shift was one method of disseminating information to staff but the BOP eliminated mandatory roll call in 1996 because it incurred overtime costs.  Drug-related intelligence is sent to staff via some institutions' intranets but not all staff, including some corrections officers, have access to a computer at their duty posts.  Consequently, the staff we interviewed suggested that periodic training about drugs, in addition to annual refresher training, should be provided by the SIS office.

**Conclusion**

The SIS lieutenant is a critical position in the SIS office.  We found that frequent rotation of corrections officers assigned to SIS lieutenant positions may interfere with SIS intelligence gathering and investigative activities.  Without continuity of intelligence operations and well-developed functional expertise, the institution loses an important aspect of its security capability.  Therefore, we believe the BOP should consider designating SIS lieutenant positions as permanent or extending the rotation time beyond 18 months.  The BOP also should provide timely and in-depth training for SIS office staff, especially SIS lieutenants, on how to conduct criminal investigations.

The SIS staff gain first-hand knowledge of drugs through their investigations.  Other institution staff also need such information to perform their duties, but may not acquire this knowledge without periodic formal training.  We believe the SIS staff is an appropriate source for such training.

---

[80] All institution staff are responsible for observing inmate behavior, pat searching inmates, and searching cells and common areas for contraband (to include drugs).

69-070

## Canines for Drug Detection

Some state correctional systems and other law enforcement agencies have had success using canines for detecting drugs. The BOP has only one canine unit in the country located at the USP Lewisburg. At every institution we visited, the majority of staff viewed canine drug detection units as an effective drug interdiction technique and wanted periodic institution searches by drug dogs.[81]  Most institutions we visited had made arrangements with other law enforcement agencies to conduct periodic searches of the institutions using the outside agencies' canine narcotic detection units. The SIS office staff expressed concern about this arrangement because of the limited availability of outside canine units and the training of narcotics dogs by outside law enforcement differs from corrections trained dogs.

We interviewed several BOP Central Office officials about the value of canine units as part of the BOP's overall drug interdiction activities. One official stated that a general perception exists that the training and costs of a canine unit do not match the results. However, the official supported increased use of canines because he believed that they increased the likelihood of finding drugs through other interdiction activities, such as inmates who are drug tested because the canines detected the recent presence of drugs in or around the inmates' property. Another official stated that canines could be used along with other interdiction activities, although he stated that drug finds using outside law enforcement canines have been low. A third official raised some disadvantages to using drug dogs, such as the requirement that inmates be removed from the area searched and the dogs' loss of detection skills if not used or trained on a regular basis.[82]  However, he said the drug dogs have a deterrent effect on drug use and drug introductions. By contrast, the BOP Director and the Assistant Director of the Correctional Programs Division told us they believed that canines were of minimal overall value.

In FY 1990, BOP initiated a pilot project to permit USP Lompoc to evaluate the use of trained dogs for institutional drug searches and pursuit of escapees. The program was expanded to USP Terre Haute and USP Lewisburg. While we did not visit USP Terre Haute, we did visit USP Lompoc and interviewed staff about the institution's pilot canine program. Several correctional officers employed at USP Lompoc at the time of the pilot program cited two reasons for the unit's failure. First, the officer who was assigned as the canine handler was regularly pulled from his position to work other assignments. As a result, neither the dog nor the handler maintained the required training and consequently became less effective. Second,

---

[81] According to the BOP Program Statement 5500.08, Canine Units, "The use of canines by the Bureau and other law enforcement agencies has proven to be an effective method for narcotics detection and for tracking escaped inmates. The presence of a canine unit not only aids in locating drugs, drug paraphernalia and escapees, but also serves as a deterrent."

[82] While other correctional systems conduct canine drug searches with the inmates present, the BOP removes inmates from an area prior to a canine search.

69-071

the supervision of the canine program was insufficient.  Responsibility for the pilot program was assigned to a supervisory correctional officer who did not receive any training or guidance on how to implement and manage the program.

Currently, the one BOP canine unit, USP Lewisburg's canine unit, consists of two dogs and one Canine Enforcement Officer, who is supervised by the USP's SIA.[83]  Both dogs are dual-purpose dogs trained in criminal apprehension and handler protection, with one dog specially trained in drug detection and the second dog specially trained in explosives detection.  The Canine Enforcement Officer uses the narcotics dog in a variety of ways to detect and deter the presence of drugs.  At both the USP Lewisburg and Lewisburg Camp, the dog is used to search the housing units, common areas, mail, warehouse, work details, parking lot, fence perimeter, and other areas.[84]  The officer and the dogs also assist other BOP institutions throughout the Northeast Region, as well as other outside law enforcement agencies.  Because of the frequent number of requests from other BOP institutions, we were told by the Canine Enforcement Officer that one canine unit for the Northeast Region is insufficient to meet the demand.

While at the USP Lewisburg, we observed the canine unit at the warehouse searching the mail for both drugs and explosives and walking through the warehouse aisles searching for drugs in large boxes and packages that had been delivered from outside vendors.[85]  The ISOs responsible for the mail and correctional officers assigned to the warehouse believed the drug dog provides an extra level of security for the institution and has a deterrent effect on inmates.  When we interviewed other institution staff at both the USP Lewisburg and Lewisburg Camp about the success of the dog, all staff believed that the dog has been effective in locating drugs and serving as a strong deterrent to drug use and smuggling.

The USP Lewisburg's Canine Enforcement Officer told us that it is difficult to measure the true success of a drug detection dog in isolation from all other drug

---

[83] The USP Lewisburg's total FY 2001 operational cost for its two dogs was $2,640.33. This cost included canine re-certification tuition for one handler and an alternate; travel, meals, and lodging for a handler and an alternate; and dog food and veterinary expenses for two dogs.  One-time purchase of a dog is approximately $7,500 and includes hip and spine certification, obedience training, handler protection, and three weeks of handler schooling.  Institutions also must consider the cost to construct a suitable kennel to house the dogs and any annual maintenance costs for the kennel. This cost did not include the Canine Enforcement Officer's salary.

[84] The Canine Enforcement Officer told us that a dog cannot work all day and must be rested after a period of time.  However, the handler also can be assigned other security duties in the institution after ensuring the dog's daily training (searching) and exercise needs are completed.

[85] The mail is delivered to the institution's warehouse to pass through an x-ray scanner and, at USP Lewisburg, to get searched periodically by the drug dog prior to delivery to the institution's inside mailroom for further processing.  Deliveries from outside vendors are also delivered to the warehouse for inspection and scanning, and at USP Lewisburg, for searching periodically by the drug dog, prior to transport via institution vehicle inside the institution's secure perimeter.

---

interdiction activities, such as inmate drug testing, cell searches, telephone monitoring, mail inspection, and visitor ion spectrometry screening. The success of a drug detection dog also cannot be measured only in terms of actual drug finds, because inmates often flush their drugs down the toilet when they know a search will be conducted.[86]  In this scenario, however, the dog can detect the recent presence of drugs in a cell and officers can then drug test the inmates who reside in the cell. What can be measured as performance indicators are the USP Lewisburg's drug-related misconduct charges and rates for positive drug tests, which are among the lowest of the high security level institutions for FY 2001.  While staff at the USP Lewisburg credit the intelligence gathering and investigative efforts of their SIS office overall for the lower number of drug misconduct charges and lower positive drug test rates, most staff also stated the presence of the drug dog was a significant factor.

Canine units are frequently used by other state corrections systems as part of their overall drug interdiction strategies.  Drug dogs are used throughout state institutions to search in a variety of ways, including searching visitor and staff parking lots, mail and housing areas, and vendors and their deliveries.  Examples of states that have canine units include: Maryland (31 handlers, 56 dogs), Florida (10 canine units), Arizona (41 dual-purpose dogs), Illinois (8 canine units), Connecticut (currently 6 dogs but training more in 2002), Pennsylvania (21 handlers, 23 dogs, and a canine training academy), Alabama, Texas, California, South Carolina, New York, New Jersey, Kansas, and West Virginia.[87]  Of the states we surveyed, the value of the canine units was not measured solely by the number of drug finds.  For example, the Texas Department of Criminal Justice, which operates canine units out of several Regional Directors' offices, measures the units' success by the low levels of drug use in Texas prisons (via inmate drug tests).[88]  The Maryland Department of Corrections cites the decline in drug finds by the canine unit as an indication of drug interdiction effectiveness.[89]  The Connecticut Department of Corrections measures success by the dogs' detection of the recent presence of drugs, which can then be confirmed by drug testing the inmates.  The Illinois Department of Corrections states

---

[86] The Canine Enforcement Officer provided us with a list of the narcotics detected using his canine unit over the last three years: 375.68 grams of marijuana, 3.82 grams of heroin, 0.2 grams of cocaine, and 0.4 grams of morphine.

[87] In a 3-year project titled the Drug-Free Prison Zone Project, ending in January 2002, Alabama, Arizona, California, Florida, Kansas, Maryland, New Jersey, and New York were each awarded $500,000 as part of a cooperative agreement between the National Institute of Corrections, the BOP, and state prison systems to facilitate the development or enhancement of drug interdiction strategies in adult prison facilities.  All eight states chose to use this money to acquire new narcotic detecting canine units or enhance existing narcotic detecting canine units as part of their overall drug interdiction activities.

[88] Texas Department of Criminal Justice reports a 1.3 percent positive drug test rate for inmates.  This includes random, targeted, and reasonable suspicion testing.

[89] "National Institute of Corrections Drug-Free Prison Zone Project," Alexander M. Holsinger, Ph.D., University of Missouri – Kansas City, Department of Sociology/Criminal Justice & Criminology, May 25, 2002.

that, while every drug find is considered a success, the presence of the canine unit serves as a deterrent to anyone who may be in the possession of narcotics or other contraband.  The South Carolina Department of Corrections, which recently launched a zero tolerance campaign for drugs and other contraband, uses canine drug teams as part of a network of intelligence gathering.

**Conclusion**

The USP Lewisburg, many state correctional systems, and other law enforcement agencies use canine units successfully as part of their drug interdiction activities.  The USP Lewisburg's canine unit demonstrates potential benefits of canines as a drug interdiction activity for use throughout the institution.  Other institutional technology used to search inmates and their property, mail, or warehouse deliveries, such as x-ray scanners or metal detectors, are not capable of detecting drugs.  Therefore, drug dogs could be used to enhance interdiction activities in areas throughout the institutions such as in the mailroom, the R&D area, the warehouse, and the rear gate.  We believe there is ample evidence to support expanding canine units within the BOP, which could help reduce drugs in the institutions.

**Recommendation**

15.  The Director, BOP, should consider the other opportunities to improve drug interdiction activities for the R&D and warehouse areas, the rear gate, volunteers, contractors, and institution intelligence operations.  The BOP also should consider another pilot test of canines as a drug detection technique for its institutions.

69-074

# APPENDIX I:  BOP'S DRUG ABUSE TREATMENT PROGRAMS

The BOP's drug abuse treatment programs consist of drug abuse education, non-residential treatment, and residential treatment.

- Drug Abuse Education.  Drug abuse education is a series of classes totaling approximately 30 to 40 hours designed to provide information about the detrimental consequences of drug use through literature and videos.  The classes, which follow a standardized course curriculum, are not considered treatment by BOP, but a means to motivate inmates to seek treatment.  During the classes, inmates are encouraged to seek treatment through the BOP's other drug program components.  The BOP Program Statement 5330.10, Drug Abuse Programs Manual, requires inmates to take drug abuse education if: (1) there is evidence in inmates' Pre-Sentence Investigation report that alcohol or other drug abuse contributed to their crime, (2) if inmates received a judicial recommendation to participate in a drug treatment program, (3) inmates violated their community supervision as a result of substance abuse, or (4) inmates have a history of abusing alcohol or drugs.  The inmates must complete this course within the first 12 months of their incarceration.  If an inmate refuses to participate in the drug abuse education course, the inmate is not recommended for community programs and will be compensated at the lowest pay grade ($5.25 per month) for any work they perform in the institution.

- Non-Residential Drug Treatment.  BOP Program Statement 5330.10 requires institutions to provide non-residential drug treatment, which can include individual and group therapy.  Non-residential drug treatment within the institution should consist of at least one hour of individual or group counseling each month, following a curriculum developed individually by each institution's DATS.  The program statement does not provide a standardized curriculum for non-residential drug treatment. Inmates must meet all of the following criteria to be eligible for non-residential drug treatment: (1) have a verifiable, documented drug abuse problem, (2) have no serious mental impairment that would substantially interfere with or preclude full participation in the program, and (3) sign an agreement acknowledging their responsibility under the program. Inmates' participation in non-residential drug treatment is voluntary. Inmates receive no incentives to participate and face no consequences if they choose not to participate or fail to complete treatment.

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

62

A component of non-residential treatment is transitional or aftercare counseling, which is required for inmates who have completed the residential drug abuse program and are returned to the general population awaiting their release date.  This can include group or individual counseling and is required for one hour a month for one year or until the inmate's release date, whichever is first.

- Residential Drug Abuse Program (RDAP).  The RDAP is typically a 9-month, 500-hour program in which participating inmates are housed together in a separate unit reserved for drug treatment at a BOP institution.  The inmates participate in a minimum of three hours of drug treatment per day.  In FY 2001, the BOP had established 52 RDAP units in 50 of its 100 institutions.  Five additional units are scheduled to open in FY 2002.[90]  RDAP has a standardized drug treatment curriculum.  An inmate must meet the following eligibility criteria to be admitted into RDAP: (1) sentenced to BOP custody, (2) determined by the BOP to have a substance abuse disorder, (3) sign BOP's "Agreement to Participate in the Bureau's Residential Drug Abuse Program," (4) reside in a BOP institution, (5) serving a sentence with enough time to fully participate in a residential drug abuse program, and (6) willing to participate in a residential drug abuse treatment program.  Upon successful completion of RDAP, an inmate can receive a sentence reduction of up to 12 months, limited financial rewards, and additional privileges within the institution.  If inmates fail to complete the program, they are ineligible to receive these incentives.  Inmates are ineligible for the sentence reduction if their current or past criminal history includes a serious violent offense.

Other Residential Programs.  According to the FY 2000 State of the Bureau, the BOP offers a variety of other residential programs, which focus on "inmates emotional and behavioral responses to difficult situations and emphasize life skills and the development of pro-social values, respect for self and others, responsibility for personal actions, and tolerance."  These specialized programs borrow the cognitive restructuring approach of the RDAP and encourage inmates to become alcohol and drug free, but the programs are not drug treatment programs.  Inmates may be diagnosed as needing drug treatment and may participate in drug treatment, but treatment is separate from the usual curriculum of the specialized programs.  Also, participation in drug treatment is not a prerequisite for participation in these specialized programs.  However, inmates who use or possess alcohol or drugs will be expelled from the programs.

---

[90] "Substance Abuse Treatment Programs in the Federal Bureau of Prisons Fiscal Year 2001 Report to Congress," Federal Bureau of Prisons, January 2002.  This report is required annually.

---

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

63

# APPENDIX II:  CONTACTS AND SITE VISITS

## BOP Central Office Interviews Conducted

Correctional Programs Division
     Correctional Services Branch
     Inmate Systems Management Branch
     Psychology Services Branch
Executive Office
     Internal Affairs
Health Services Division
     Drug-Free Workplace
Human Resource Management Division
     Labor Management Relations and Security
General Counsel and Review
Program Review Division
Information, Policy and Public Affairs Division
     Security Technology
Community Corrections and Detention Division
     Citizen Participation
     Contract Services
Administration Division
     Trust Fund Operations

## Institutions Visited

| | Security Level |
| --- | --- |
| U.S. Penitentiary Beaumont, Texas | High |
| U.S. Penitentiary Leavenworth, Kansas | High |
| U.S. Penitentiary Lompoc, California | High |
| U.S. Penitentiary Lewisburg, Pennsylvania | High |
| Federal Correctional Institution Memphis, Tennessee | Medium |
| Federal Correctional Institution Miami, Florida | Medium |
| Federal Detention Center Miami, Florida | Administrative |
| Low Security Correctional Institution Allenwood, Pennsylvania | Low |
| Federal Prison Camp Lewisburg, Pennsylvania | Minimum |

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

64

## Institution Staff Interviewed

Wardens
Associate Wardens
Captains
Intelligence Staff
Unit Managers
Disciplinary Hearing Officers
ISOs for Mail and Receiving and Discharge
Rear Gate Officers
Drug Treatment Staff
Visiting Room Officers
Canine Enforcement Officer
Commissary Supervisors
Human Resources Staff
Volunteer Coordinators
Business Office Managers
Warehouse Supervisors

## Institution Operational Areas Reviewed

Front Gate Entry
Visitor Processing
Visiting Room Monitoring
Mail Processing
Warehouse Receiving
Rear Gate Processing
Inmate Receiving and Discharge
Commissary Operations
Disciplinary Hearings
Unit Management
Drug Abuse Treatment Programs
Intelligence Gathering
- Drug Testing
- Phone Monitoring
- Canine Unit
Volunteer and Contractor Processing
Human Resources
Business Office
- Inmate Accounts

69-078

# APPENDIX III:  CATEGORIES OF INMATE DRUG TESTS

BOP Program Statement 6060.08, Urine Surveillance and Narcotic Identification, authorizes the following inmate drug tests:

- **Random.**  Each institution is required to perform a specific percentage of random inmate drug tests each month.  The required percentage varies according to the security level of the institution.  Effective November 1999, each high security level institution is required to randomly test 10 percent (up from 7 percent) of its total inmate population.  Each medium, low, and administrative security level institution is required to perform random testing on 5 percent of its total population.  Each minimum security level institution is required to perform random testing on 3 percent (down from 5 percent) of its total population.  The Administrative Maximum Security Penitentiary Florence, Colorado, and the USP Marion, Illinois, are required to conduct 5 percent random testing monthly of the total population.

- **Prior Act** – Inmates sanctioned administratively for specific drug-related charges are tested monthly for 24 continuous months.

- **Suspected** – Inmates identified through intelligence (e.g., telephone monitoring, mail monitoring, or following a specific incident or act of violence) can be required to submit to monthly testing over consecutive months, usually a minimum of three consecutive months.  If an inmate tests positive, the inmate is placed on the Prior Act list for 24 months of consecutive testing.  If an inmate on the Suspected test list does not test positive during the initial three consecutive month testing period, the inmate is typically removed from the list.  However, an institution may continue testing an inmate until BOP determines that the inmate no longer represents a threat to the institution.

- **Disruptive Groups** – Inmates identified and monitored because of gang affiliations are tested.  Specifically, inmates identified as members of one of five monitored gangs are assigned "Disruptive Group" status.  Every disruptive group member undergoes monthly testing indefinitely.  In addition, inmates with known affiliations to other identified gangs are assigned "Security Threat Group" status and are tested monthly.

- **Saturation** – The warden and staff may target specific large groups of inmates for testing, such as an inmate work group or selected housing units.

69-079

- **Community Activities** – At least 50 percent of inmates involved in community activities are tested, including all inmates with a history of drug use.

# APPENDIX IV:  POSITIVE DRUG TEST RATES BY INSTITUTION SECURITY LEVEL

### Table 7.  Positive Drug Test Rates for Individual High Security Level Institutions

| Institution | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| USP Allenwood | 4.55 | 7.30 | 2.94 | 2.32 | 1.82 |
| USP Atlanta | 4.01 | 3.09 | 4.12 | 3.67 | 1.74 |
| USP Beaumont | N/A | 2.86 | 3.03 | 5.70 | 7.84 |
| FCI Edgefield | N/A | N/A | N/A | 1.48 | 1.01 |
| USP Florence | 4.11 | 3.93 | 5.21 | 1.80 | 1.07 |
| USP Leavenworth | 3.30 | 2.44 | 3.48 | 3.95 | 2.65 |
| USP Lewisburg | 4.84 | 3.30 | 3.09 | 1.30 | 1.41 |
| USP Lompoc | 4.39 | 8.01 | 9.88 | 6.61 | 6.09 |
| USP Terre Haute | 2.37 | 2.08 | 2.67 | 1.72 | 1.66 |

Source:  BOP
Data for two high security level institutions, USP Marion and ADX Florence, which have non-contact visits and little or no inmate movement, were excluded.
N/A: Not activated for an entire year during the reporting period.

69-081

## Table 8.  Positive Drug Test Rates for Medium Security Level Institutions

| Institution | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| Allenwood Medium FCI | 1.89 | 1.27 | 0.51 | 2.32 | 0.95 |
| Beaumont Medium FCI | N/A | N/A | N/A | 5.72 | 3.05 |
| Beckley FCI | 0.93 | 2.92 | 3.51 | 3.56 | 2.18 |
| Butner Medium FCI | 1.75 | 0.94 | 3.92 | 2.03 | 0.95 |
| Coleman Medium FCI | 1.32 | 3.13 | 1.58 | 0.77 | 1.42 |
| Cumberland FCI | 0.91 | 0.65 | 1.26 | 2.52 | 1.16 |
| El Reno FCI | 3.30 | 1.62 | 4.54 | 1.29 | 0.69 |
| Englewood FCI | 2.06 | 1.74 | 0.73 | 2.57 | 0.76 |
| Estill FCI | 2.47 | 1.37 | 0.77 | 0.46 | 1.07 |
| Fairton FCI | 1.92 | 1.12 | 0.61 | 1.15 | 0.92 |
| Florence FCI | 0.81 | 1.45 | 3.28 | 1.67 | 1.57 |
| Greenville FCI | 3.41 | 2.28 | 3.24 | 2.48 | 2.74 |
| Jesup FCI | 2.58 | 2.07 | 1.12 | 1.28 | 0.70 |
| Manchester FCI | 1.17 | 2.20 | 1.08 | 1.99 | 0.82 |
| Marianna FCI | 0.13 | 0.99 | 0.88 | 1.67 | 0.96 |
| McKean FCI | 1.14 | 1.03 | 0.99 | 0.89 | 0.92 |
| Memphis FCI | 2.41 | 6.47 | 6.25 | 3.05 | 2.89 |
| Miami FCI | 1.67 | 1.69 | 1.05 | 0.48 | 1.22 |
| Oakdale FCI | 1.75 | 0.58 | 1.15 | 0.93 | 0.95 |
| Otisville FCI | 3.29 | 2.68 | 2.46 | 1.08 | 1.34 |
| Oxford FCI | 0.74 | 0.99 | 1.39 | 0.32 | 0.64 |
| Pekin FCI | 2.15 | 1.78 | 1.01 | 1.78 | 2.77 |
| Phoenix FCI | 1.85 | 4.73 | 3.17 | 7.22 | 4.10 |
| Ray Brook FCI | 4.30 | 4.20 | 1.42 | 1.84 | 0.97 |
| Schuylkill FCI | 5.16 | 2.12 | 0.54 | 0.50 | 0.46 |
| Sheridan FCI | 6.14 | 2.91 | 2.38 | 4.39 | 2.45 |
| Talladega FCI | 0.56 | 0.91 | 0.34 | 0.43 | 1.03 |
| Terminal Island FCI | 5.81 | 7.84 | 7.97 | 4.74 | 1.97 |
| Three Rivers FCI | 4.67 | 3.26 | 1.39 | 0.68 | 2.20 |
| Tucson FCI | 9.87 | 6.88 | 2.96 | 2.76 | 4.45 |
| Victorville FCI | N/A | N/A | N/A | N/A | 5.52 |

Source:  BOP
Data for each fiscal year excludes institutions that did not have test results for the entire year.
N/A: Not activated for an entire year during the reporting period.

69-082

**Table 9.  Positive Drug Test Rates for Low Security Level Institutions**

| Institution | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| Allenwood Low FCI | 0.78 | 0.55 | 0.36 | 0.14 | 0.24 |
| Ashland FCI | 2.46 | 0.33 | 0.79 | 0.74 | 0.71 |
| Bastrop FCI | 1.60 | 2.28 | 1.00 | 1.12 | 0.76 |
| Beaumont Low FCI | 0.60 | 0.83 | 2.74 | 1.28 | 2.69 |
| Big Spring FCI | 2.21 | 5.83 | 2.56 | 0.95 | 1.64 |
| Butner Low FCI | 0.64 | 0.74 | 1.35 | 0.71 | 1.20 |
| Coleman Low FCI | 1.26 | 0.00 | 0.14 | 0.32 | 0.54 |
| Danbury FCI | 0.00 | 0.82 | 2.07 | 1.97 | 0.21 |
| Dublin FCI | 1.66 | 2.40 | 1.76 | 0.69 | 2.16 |
| Elkton FCI | N/A | 1.85 | 1.36 | 0.80 | 1.04 |
| Elkton FSL | N/A | N/A | N/A | N/A | N/A |
| Forrest City FCI | N/A | 1.86 | 1.77 | 2.29 | 1.78 |
| Fort Dix FCI | 1.37 | 0.98 | 0.73 | 1.18 | 0.37 |
| Jesup FSL | N/A | N/A | N/A | N/A | N/A |
| La Tuna FCI | 2.46 | 4.88 | 1.43 | 0.26 | 1.25 |
| La Tuna FSL | N/A | N/A | N/A | N/A | N/A |
| Lompoc FCI | 0.87 | 1.24 | 0.64 | 1.01 | 0.29 |
| Loretto FCI | 0.72 | 0.55 | 0.56 | 0.48 | 0.40 |
| Milan FCI | 3.08 | 2.79 | 3.30 | 3.05 | 1.96 |
| Petersburg FCI | 0.34 | 0.47 | 0.12 | 1.98 | 1.73 |
| Safford FCI | 0.63 | 1.70 | 0.09 | 0.00 | 0.00 |
| Sandstone FCI | 0.14 | 0.14 | 0.54 | 0.49 | 0.66 |
| Seagoville FCI | 1.16 | 1.78 | 1.85 | 1.83 | 1.99 |
| Taft CI | N/A | N/A | 5.68 | 3.89 | 5.94 |
| Tallahassee FCI | 0.54 | 0.97 | 0.29 | 1.69 | 1.21 |
| Texarkana FCI | 1.55 | 1.42 | 0.89 | 0.49 | 1.04 |
| Waseca FCI | 0.42 | 0.00 | 0.72 | 0.08 | 0.35 |
| Yazoo City FCI | N/A | 0.90 | 0.35 | 0.82 | 0.58 |

Source:  BOP
Data for each fiscal year excludes institutions that did not have test results for the entire year.
N/A: Not activated for an entire year during the reporting period.

69-083

**Table 10.  Positive Drug Test Rates for Minimum Security Level Institutions**

| Institution | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| Alderson FPC | 0.85 | 0.85 | 1.25 | 1.00 | 0.42 |
| Allenwood FPC | 0.35 | 0.11 | 0.90 | 1.97 | 0.28 |
| Ashland FCI Camp | 0.92 | 1.92 | 2.85 | 2.46 | 1.30 |
| Atlanta USP Camp | 1.51 | 1.71 | 1.68 | 2.33 | 0.00 |
| Atwater USP Camp | N/A | N/A | N/A | N/A | N/A |
| Bastrop FCI Camp | 0.50 | 0.00 | 2.19 | 3.24 | 0.00 |
| Beaumont USP/FCC Camp | N/A | N/A | 5.26 | 0.00 | No Data |
| Beckley FCI Camp | 0.33 | 0.00 | 0.00 | 2.90 | 1.84 |
| Big Spring FCI Camp | 1.37 | 1.03 | 0.73 | 0.89 | 0.80 |
| Boron FPC | .08 | .37 | 0.00 | N/A | N/A |
| Bryan FPC | 0.09 | 0.42 | 0.68 | 0.62 | 0.73 |
| Bryan FPC ICC | 0.15 | 0.00 | 0.13 | 0.00 | 0.63 |
| Butner Medium FCI Camp | 1.12 | 1.26 | 0.63 | 0.71 | 0.59 |
| Carswell FMC Camp | No Data | No Data | 0.27 | 0.29 | 0.00 |
| Coleman Medium FCI Camp | No Data | 0.00 | 0.99 | 0.70 | 0.88 |
| Cumberland FCI Camp | 0.00 | 0.00 | 0.00 | 1.19 | 0.37 |
| Danbury FCI Camp | 0.00 | 0.00 | 0.96 | 0.00 | 0.00 |
| Devens FMC Camp | N/A | N/A | N/A | No Data | No Data |
| Dublin FCI Camp Unit | 0.39 | 0.00 | 1.30 | 0.85 | 0.00 |
| Duluth FPC | 0.26 | 0.16 | 0.60 | 0.22 | 0.39 |
| Edgefield FCI Camp | N/A | 3.51 | 0.85 | 1.39 | 1.32 |
| Eglin FPC | 1.10 | 0.13 | 0.25 | 0.36 | 0.51 |
| Elkton FCI Camp | N/A | No Data | 1.09 | No Data | N/A |
| El Paso FPC | 0.76 | 0.44 | 0.17 | 0.50 | N/A |
| El Reno FCI Camp | 1.41 | 0.68 | 1.75 | 0.00 | 3.45 |
| Englewood FCI Camp | 0.73 | 0.00 | 1.65 | 0.50 | 1.28 |
| Estill FCI Camp | 0.36 | 0.00 | 0.66 | 0.00 | 2.19 |
| Fairton FCI Camp | 0.00 | 0.00 | 1.12 | 0.00 | 0.00 |
| Florence FCI Camp | 0.49 | 2.54 | No Data | No Data | 2.88 |
| Forrest City FCI Camp | N/A | N/A | N/A | No Data | No Data |
| Fort Dix FCI Camp | No Data | No Data | No Data | No Data | No Data |

U.S. Department of Justice                                                     71
Office of the Inspector General
Evaluation and Inspections Division

69-084

| Institution | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| Greenville FCI Camp | 0.40 | 0.42 | 1.75 | 2.62 | N/A |
| Jesup FCI Camp | 0.33 | 0.53 | 0.33 | 0.59 | 1.23 |
| La Tuna FCI Camp | 1.26 | 0.98 | 0.00 | 0.93 | 0.52 |
| Leavenworth USP Camp | 0.00 | 0.00 | 1.59 | 1.85 | 3.38 |
| Lee USP Camp | N/A | N/A | N/A | N/A | N/A |
| Lewisburg USP Camp | 0.46 | 0.00 | 2.28 | 0.00 | 0.74 |
| Lewisburg USP ICC | 8.88 | 5.49 | 12.30 | 12.68 | 6.40 |
| Lexington FMC Camp | No Data | 0.64 | 0.50 | 0.00 | 0.87 |
| Lompoc FCI ICC | N/A | No Data | No Data | No Data | No Data |
| Lompoc USP Camp | 1.69 | 0.60 | 3.63 | 0.58 | 0.85 |
| Loretto FCI Camp | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| Manchester FCI Camp | 1.50 | 0.51 | 1.17 | 0.31 | 1.12 |
| Marianna FCI Camp | 0.59 | 0.00 | No Data | 0.00 | 0.55 |
| Marion USP Camp | 1.29 | 1.08 | 0.56 | 0.65 | 1.75 |
| McKean FCI Camp | 0.31 | 0.80 | 0.26 | 1.36 | 1.10 |
| Memphis FCI Camp | No Data | 1.33 | 7.79 | 0.00 | No Data |
| Miami FCI Camp | 1.30 | 0.34 | 0.00 | No Data | No Data |
| Montgomery FPC | 0.39 | 1.35 | 1.82 | 1.68 | 1.98 |
| Morgantown FCI | 0.71 | 1.20 | 0.50 | 1.61 | 0.41 |
| Nellis FPC | 0.83 | 1.15 | 0.94 | 1.51 | 0.58 |
| Oakdale FDC Camp | 0.00 | 0.52 | 0.00 | 3.12 | 1.16 |
| Otisville FCI Camp | 1.56 | 0.00 | 3.72 | No Data | No Data |
| Oxford FCI Camp | 2.68 | 2.68 | 3.05 | 3.27 | 1.97 |
| Pekin FCI Camp | 1.01 | 0.61 | 0.96 | 0.52 | 1.38 |
| Pensacola FPC | 0.46 | 0.34 | 0.49 | 1.43 | 0.64 |
| Petersburg FCI Camp | 1.02 | 1.11 | 0.79 | 0.27 | 0.71 |
| Phoenix FCI Camp | 1.09 | 2.22 | 3.85 | 1.72 | 6.41 |
| Pollock USP Camp | N/A | N/A | N/A | N/A | No Data |
| Schuylkill FCI Camp | 1.56 | 0.00 | 0.52 | No Data | No Data |

69-085

| Institution | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| Seymour Johnson FPC | 0.70 | 1.18 | 0.57 | 0.20 | 0.57 |
| Sheridan FCI Camp | 0.50 | 0.58 | 0.95 | 1.55 | 0.34 |
| Taft CI Camp | N/A | N/A | No Data | No Data | No Data |
| Talladega FCI Camp | 0.45 | 0.31 | 1.10 | No Data | No Data |
| Terre Haute USP Camp | 2.22 | 0.70 | 0.81 | 1.65 | 1.72 |
| Texarkana FCI Camp | 0.00 | 0.50 | 0.32 | 0.49 | 0.39 |
| Three Rivers FCI Camp | 1.83 | 3.10 | 1.86 | 2.07 | 1.34 |
| Victorville FCI Camp | N/A | N/A | N/A | N/A | No Data |
| Yankton FPC | 0.43 | 0.00 | 0.17 | 0.90 | 1.23 |
| Yazoo City FCI Camp | N/A | N/A | N/A | N/A | N/A |

Source:  BOP
Data for each fiscal year excludes institutions that did not have test results for the entire year.
N/A: Not activated for an entire year during the reporting period.
No Data: No information was recorded for that fiscal year in the database received from the BOP.
The high drug rates at the USP Lewisburg Intensive Confinement Center (ICC), which is a Boot Camp, is attributed to the past practice of drug testing inmates upon admission.  This practice has ceased.

69-086

## Table 11.  Positive Drug Test Rates for Administrative Institutions

| Institution | FY 1997 | FY 1998 | FY 1999 | FY 2000 | FY 2001 |
|---|---|---|---|---|---|
| Brooklyn MDC | 5.77 | 2.40 | 2.08 | 1.72 | 1.08 |
| Butner FMC | N/A | N/A | N/A | N/A | 0.98 |
| Carswell FMC | 2.91 | 4.23 | 2.79 | 2.20 | 2.40 |
| Chicago MCC | 1.44 | 0.72 | 1.76 | 1.00 | 1.65 |
| Devens FMC | N/A | N/A | N/A | 1.17 | 1.57 |
| Fort Worth FMC | 4.64 | 5.13 | 2.00 | 4.29 | 3.80 |
| Guaynabo MDC | 3.78 | 2.44 | 1.86 | 2.24 | 2.30 |
| Honolulu FDC | N/A | N/A | N/A | N/A | No Data |
| Houston FDC | N/A | N/A | N/A | 0.41 | 0.79 |
| Lexington FMC | 1.28 | 1.94 | 1.01 | 2.71 | 2.18 |
| Los Angeles MDC | 8.33 | 4.60 | 5.66 | 3.95 | 4.19 |
| Miami FDC | 0.39 | 0.68 | 0.71 | 0.48 | 0.38 |
| New York MCC | 1.17 | 1.43 | 1.13 | 0.99 | 0.96 |
| Oakdale FDC | 0 | 0 | 0.16 | 0.16 | 0.14 |
| Oklahoma City FTC | 0.65 | 1.38 | 0.83 | 0.45 | 0.54 |
| Philadelphia FDC | N/A | N/A | N/A | N/A | 0.59 |
| Rochester FMC | 1.66 | 4.36 | 3.54 | 5.85 | 7.61 |
| San Diego MCC | 3.44 | 2.56 | 1.42 | 1.49 | 1.07 |
| SeaTac FDC | N/A | 1.16 | 2.58 | 0.83 | 1.25 |
| Springfield USMCFP | 5.02 | 5.13 | 9.48 | 10.04 | 6.27 |

Source:  BOP
Data for each fiscal year excludes institutions that did not have test results for the entire year.
N/A: Not activated for an entire year during the reporting period.
No Data: No information was recorded for that fiscal year in the database received from the BOP.

69-087

# APPENDIX V: DEFINITIONS OF 100-LEVEL MISCONDUCT CHARGES

| Code | Prohibited Acts |
|------|-----------------|
| 100 | Killing; |
| 101 | Assaulting any person (includes sexual assault) or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or carried out by an inmate); |
| 102 | Escape from escort; escape from a secure institution (low, medium, and high security level, and administrative institutions); or escape from a minimum institution with violence; |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of Greatest Severity, e.g. in furtherance of a riot or escape; |
| 104 | Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive or any ammunition; |
| 105 | Rioting; |
| 106 | Encouraging others to riot; |
| 107 | Taking hostage(s); |

69-088

| | |
|---|---|
| 108 | Possession, manufacture, or introduction of a hazardous tool (tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety, e.g., hack-saw blade); |
| 109 | (Not to be used) |
| 110 | Refusing to provide a urine sample or to take part in other drug abuse testing; |
| 111 | Introduction of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff; |
| 112 | Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff; |
| 113 | Possession of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff; |
| 197 | Use of the telephone to further criminal activity; |
| 198 | Interfering with a staff member in the performance of duties (conduct must be of the Greatest Severity nature.)  This charge is to be used only when another charge of greatest severity is not applicable; |
| 199 | Conduct which disrupts or interferes with the security or orderly running of the institution or the BOP (conduct must be of the Greatest Severity nature.) This charge is to be used only when another charge of Greatest Severity is not applicable. |

69-089

# APPENDIX VI:  RATE AND  NUMBER OF DRUG MISCONDUCT CHARGES BY INSTITUTION SECURITY LEVEL

**Table 12.  Rate and Number of Drug Misconduct Charges for High Security Level Institutions**

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| USP Allenwood | 11.55 | 117 | 12.07 | 122 | 6.33 | 68 |
| USP Atlanta | 10.91 | 229 | 9.96 | 191 | 5.76 | 108 |
| USP Beaumont | 8.39 | 123 | 13.75 | 202 | 23.25 | 319 |
| FCI Edgefield | N/A | N/A | 4.35 | 63 | 3.74 | 57 |
| USP Florence | 16.35 | 166 | 9.36 | 92 | 5.26 | 50 |
| USP Leavenworth | 7.28 | 131 | 15.34 | 258 | 12.69 | 213 |
| USP Lewisburg | 10.79 | 117 | 6.42 | 67 | 3.89 | 46 |
| USP Lompoc | 24.59 | 392 | 17.56 | 281 | 15.77 | 238 |
| USP Terre Haute | 7.38 | 81 | 4.69 | 60 | 4.24 | 55 |
| **Total** | | **1,356** | | **1,336** | | **1,154** |

Source:  BOP
Data for each fiscal year excludes institutions that did not have misconduct data for the entire year. Data for two high security level institutions, USP Marion and ADX Florence, which have non-contact visits and little or no inmate movement, were excluded.

69-090

**Table 13. Rate and Number of Drug Misconduct Charges
for Medium Security Level Institutions**

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| Allenwood Medium FCI | 1.05 | 12 | 3.51 | 42 | 1.37 | 18 |
| Beaumont Medium FCI | N/A | N/A | 7.89 | 125 | 5.54 | 88 |
| Beckley FCI | 6.69 | 103 | 5.89 | 96 | 5.14 | 83 |
| Butner Medium FCI | 4.89 | 37 | 2.68 | 22 | 1.45 | 11 |
| Coleman Medium FCI | 2.87 | 46 | 2.15 | 36 | 2.2 | 37 |
| Cumberland FCI | 1.82 | 21 | 5.45 | 62 | 3.76 | 42 |
| El Reno FCI | 10.25 | 121 | 3.86 | 49 | 1.10 | 16 |
| Englewood FCI | 2.33 | 21 | 3.54 | 32 | 2.25 | 20 |
| Estill FCI | 1.23 | 12 | 1.53 | 18 | 1.12 | 13 |
| Fairton FCI | 0.51 | 6 | 2.26 | 27 | 1.44 | 19 |
| Florence FCI | 9.12 | 109 | 5.81 | 71 | 6.17 | 74 |
| Greenville FCI | 7.96 | 91 | 6.05 | 72 | 5.08 | 60 |
| Jesup FCI | 1.56 | 16 | 1.03 | 11 | 0.94 | 13 |
| Manchester FCI | 2.97 | 33 | 4.64 | 53 | 2.27 | 26 |
| Marianna FCI | 1.35 | 15 | 1.02 | 12 | 0.89 | 11 |
| McKean FCI | 2.93 | 32 | 2.38 | 26 | 2.47 | 27 |
| Memphis FCI | 16.85 | 151 | 8.82 | 83 | 8.8 | 96 |
| Miami FCI | 1.60 | 14 | 1.19 | 11 | 1.83 | 19 |

69-091

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| Oakdale FCI | 1.71 | 21 | 1.87 | 23 | 1.93 | 25 |
| Otisville FCI | 4.14 | 43 | 1.71 | 17 | 1.64 | 16 |
| Oxford FCI | 2.05 | 22 | 0.30 | 3 | 0.60 | 6 |
| Pekin FCI | 2.47 | 29 | 2.83 | 34 | 6.05 | 74 |
| Phoenix FCI | 9.06 | 105 | 20.13 | 253 | 11.38 | 142 |
| Ray Brook FCI | 3.13 | 34 | 3.39 | 37 | 2.34 | 27 |
| Schuylkill FCI | 0.64 | 7 | 0.76 | 8 | 0.53 | 6 |
| Sheridan FCI | 5.05 | 68 | 3.61 | 49 | 2.12 | 29 |
| Talladega FCI | 0.53 | 5 | 0.60 | 6 | 1.62 | 17 |
| Terminal Island FCI | 11.87 | 120 | 7.84 | 79 | 3.69 | 37 |
| Three Rivers FCI | 5.72 | 61 | 3.28 | 33 | 7.66 | 80 |
| Tucson FCI | 5.78 | 45 | 6.20 | 47 | 9.22 | 70 |
| Victorville FCI | N/A | N/A | N/A | N/A | 10.37 | 156 |
| **Total** | | **1,400** | | **1,437** | | **1,358** |

Source:  BOP
Data for each fiscal year excludes institutions that did not have misconduct data for the entire year.
N/A: Not activated for an entire year during the reporting period.

69-092

**Table 14.  Rate and Number of Drug Misconduct Charges
for Low Security Level Institutions**

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| Allenwood Low FCI | 0.54 | 7 | 0.54 | 7 | 0.53 | 7 |
| Ashland FCI | 0 | 0 | 1.76 | 19 | 1.29 | 14 |
| Bastrop FCI | 1.19 | 13 | 0.95 | 11 | 1.12 | 14 |
| Beaumont Low FCI | 2.66 | 45 | 1.5 | 29 | 3.07 | 59 |
| Big Spring FCI | 3.57 | 34 | 1.19 | 13 | 2.12 | 18 |
| Butner Low FCI | 1.72 | 13 | 1.1 | 9 | 2.63 | 20 |
| Coleman Low FCI | 0.47 | 8 | 0.52 | 10 | 0.64 | 13 |
| Danbury FCI | 0 | 0 | 0.59 | 6 | 0.38 | 4 |
| Dublin FCI | 2.76 | 31 | 1.27 | 14 | 1.66 | 18 |
| Elkton FCI | 2.23 | 39 | 0.65 | 12 | .79 | 18 |
| Elkton FSL | N/A | N/A | N/A | N/A | N/A | N/A |
| Forrest City FCI | 2.51 | 43 | 3 | 56 | 3.36 | 61 |
| Fort Dix FCI | 1.19 | 41 | 1.05 | 39 | 0.37 | 14 |
| Jesup FSL | N/A | N/A | N/A | N/A | N/A | N/A |
| La Tuna FCI | 1.6 | 18 | .09 | 1 | .44 | 5 |
| La Tuna FSL | N/A | N/A | N/A | N/A | N/A | N/A |
| Lompoc FCI | 1.32 | 10 | 0.79 | 7 | 0.41 | 4 |
| Loretto FCI | 1.34 | 10 | 1.56 | 12 | 0.47 | 5 |
| Milan FCI | 4.89 | 67 | 4.21 | 62 | 2.74 | 43 |
| Petersburg FCI | 0.27 | 3 | 2.76 | 33 | 1.62 | 20 |
| Safford FCI | 0.26 | 2 | 0 | 0 | 0 | 0 |
| Sandstone FCI | 0.61 | 5 | 0.71 | 6 | 0.82 | 7 |
| Seagoville FCI | 3.51 | 42 | 3.85 | 49 | 2.31 | 26 |
| Taft CI | 5.32 | 93 | 6.81 | 126 | 9.24 | 172 |
| Tallahassee FCI | 0.20 | 2 | 0.51 | 6 | 0.17 | 2 |
| Texarkana FCI | 1.37 | 18 | 0.45 | 6 | 1.47 | 20 |
| Waseca FCI | 0.84 | 7 | 0.56 | 6 | 0.47 | 5 |
| Yazoo City FCI | 0.85 | 14 | 0.74 | 14 | 0.59 | 11 |
| **Totals** | | **565** | | **553** | | **580** |

Source:  BOP
Data for each fiscal year excludes institutions that did not have misconduct data for the entire year.
N/A: Not activated for an entire year during the reporting period.

69-093

**Table 15.  Rate and Number of Drug Misconduct Charges
for Minimum Security Level Institutions**

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| Alderson FPC | 0.35 | 3 | 0.10 | 1 | 0.26 | 2 |
| Allenwood FPC | 1.27 | 9 | 2.06 | 15 | 0.42 | 3 |
| Ashland FCI Camp | 2.94 | 8 | 1.45 | 4 | 0.39 | 1 |
| Atlanta USP Camp | 2.05 | 9 | 3.88 | 19 | 0.20 | 1 |
| Atwater USP Camp | N/A | N/A | N/A | N/A | N/A | N/A |
| Bastrop FCI Camp | 0 | 0 | 3.70 | 6 | 0 | 0 |
| Beaumont USP/FCC Camp | 1.78 | 6 | 3.65 | 14 | 0 | 0 |
| Beckley FCI Camp | 0 | 0 | 3.97 | 11 | 1.85 | 5 |
| Big Spring FCI Camp | 0.60 | 1 | 0.60 | 1 | 0.74 | 1 |
| Boron FPC | 0.32 | 1 | N/A | N/A | N/A | N/A |
| Bryan FPC | 0.48 | 4 | 0.24 | 2 | 0.12 | 1 |
| Bryan FPC ICC | No Data | No Data | No Data | No Data | No Data | No Data |
| Butner Medium FCI Camp | 1.08 | 3 | 2.29 | 7 | 0.98 | 3 |
| Carswell FMC Camp | 0 | 0 | 0 | 0 | 0.46 | 1 |
| Coleman Med FCI Camp | 0 | 0 | 0 | 0 | 0 | 0 |
| Cumberland FCI Camp | 0.72 | 1 | 1.46 | 2 | 4.48 | 6 |
| Danbury FCI Camp | 0 | 0 | 0 | 0 | 0 | 0 |
| Devens FMC Camp | N/A | N/A | 0 | 0 | 1.10 | 1 |
| Dublin FCI Camp | 0.82 | 2 | 0 | 0 | 0 | 0 |
| Duluth FPC | 0.36 | 2 | 0.72 | 4 | 1.60 | 9 |
| Edgefield FCI Camp | 1.09 | 3 | 2.19 | 6 | 1.69 | 6 |
| Eglin FPC | 0.62 | 5 | 0.47 | 4 | 0.99 | 9 |
| Elkton FCI Camp | 1.14 | 3 | 1.04 | 4 | N/A | N/A |

69-094

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| El Paso FPC | 0 | 0 | 1.83 | 4 | N/A | N/A |
| El Reno FCI Camp | 0 | 0 | 1.63 | 4 | 2.26 | 5 |
| Englewood FCI Camp | 1.14 | 0 | 0 | 0 | 1.57 | 2 |
| Estill FCI Camp | 1.75 | 4 | 0.37 | 1 | 2.09 | 6 |
| Fairton FCI Camp | 1.23 | 1 | 0 | 0 | 0 | 0 |
| Florence FCI Camp | 1.76 | 6 | 0.26 | 1 | 0.77 | 3 |
| Forrest City FCI Camp | N/A | N/A | 0.46 | 1 | 0.88 | 2 |
| Fort Dix FCI Camp | No Data | No Data | 0 | 0 | 0.27 | 1 |
| Greenville FCI Camp | 1.64 | 4 | 2.17 | 6 | N/A | N/A |
| Jesup FCI Camp | 0.43 | 2 | 2.43 | 12 | 0.68 | 1 |
| La Tuna FCI Camp | 0 | 0 | 1.90 | 4 | 0 | 0 |
| Leavenworth USP Camp | 2.66 | 9 | 5.30 | 19 | 3.0 | 10 |
| Lee USP Camp | N/A | N/A | N/A | N/A | N/A | N/A |
| Lewisburg USP Camp | 0.37 | 1 | 0 | 0 | 0.38 | 1 |
| Lewisburg USP ICC | 0 | 0 | 0 | 0 | 0 | 0 |
| Lexington FMC Camp | 0.47 | 1 | 0.43 | 1 | 1.36 | 3 |
| Lompoc FCI ICC | 0 | 0 | 0.69 | 1 | 0 | 0 |
| Lompoc USP Camp | 0.73 | 2 | 0 | 0 | 1.34 | 4 |
| Loretto FCI Camp | 0 | 0 | 0.93 | 1 | 0 | 0 |
| Manchester FCI Camp | 0.84 | 3 | 0.42 | 2 | 2.07 | 10 |
| Marianna FCI Camp | 0 | 0 | 0 | 0 | 0.36 | 1 |
| Marion USP Camp | 0.37 | 1 | 0 | 0 | 2.31 | 8 |
| McKean FCI Camp | 2.40 | 6 | 1.69 | 4 | 2.09 | 4 |
| Memphis FCI Camp | 1.04 | 3 | 2.19 | 6 | 2.61 | 8 |

69-095

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| Miami FCI Camp | 0 | 0 | 0 | 0 | 1.05 | 3 |
| Montgomery FPC | 0.95 | 7 | 1.20 | 9 | 0.36 | 3 |
| Morgantown FCI | 0.22 | 2 | 1.65 | 16 | 0.19 | 2 |
| Nellis FPC | 1.84 | 8 | 1.30 | 7 | 0.17 | 1 |
| Oakdale FDC Camp | 0 | 0 | 0 | 0 | 0.78 | 1 |
| Otisville FCI Camp | 0.97 | 1 | 0 | 0 | 0.88 | 1 |
| Oxford FCI Camp | 0 | 0 | 1.12 | 2 | 1.24 | 2 |
| Pekin FCI Camp | 0 | 0 | 0 | 0 | 1.26 | 3 |
| Pensacola FPC | 0.67 | 3 | 1.47 | 7 | 1.05 | 6 |
| Petersburg FCI Camp | 0.70 | 2 | 0.65 | 2 | 1.29 | 4 |
| Phoenix FCI Camp | 0.37 | 1 | 0 | 0 | 1.89 | 3 |
| Pollock USP Camp | N/A | N/A | N/A | N/A | 1.37 | 1 |
| Schuylkill FCI Camp | 0.35 | 1 | 0.75 | 2 | 0.36 | 1 |
| Seymour Johnson FPC | 1.02 | 5 | 0.37 | 2 | 1.45 | 8 |
| Sheridan FCI Camp | 0.65 | 2 | 0.30 | 1 | 0.60 | 2 |
| Taft CI Camp | 0.62 | 3 | 0.38 | 2 | 0 | 0 |
| Talladega FCI Camp | 0.43 | 1 | 0.75 | 2 | 0.93 | 2 |
| Terre Haute USP Camp | 0.66 | 2 | 1.15 | 4 | 2.40 | 10 |
| Texarkana FCI Camp | 0 | 0 | 0.40 | 1 | 0.37 | 1 |
| Three Rivers FCI Camp | 3.11 | 9 | 1.58 | 5 | 0.28 | 1 |
| Victorville FCI Camp | N/A | N/A | N/A | N/A | 0 | 0 |
| Yankton FPC | 0 | 0 | 0.66 | 4 | 0.94 | 6 |
| Yazoo City FCI Camp | N/A | N/A | N/A | N/A | N/A | N/A |
| **Totals** | | **150** | | **233** | | **179** |

Source:  BOP
Data for each fiscal year excludes institutions that did not have misconduct data for the entire year.
N/A: Not activated for an entire year during the reporting period.
No Data: No information was recorded for that fiscal year in the database received from BOP.

69-096

**Table 16.  Rate and Number of Drug Misconduct Charges for Administrative Institutions**

| Institution | FY 1999 | | FY 2000 | | FY 2001 | |
|---|---|---|---|---|---|---|
| | Rate (%) | # of Charges | Rate (%) | # of Charges | Rate (%) | # of Charges |
| Brooklyn MDC | 3.71 | 37 | 2.55 | 30 | 0.91 | 11 |
| Butner FMC | N/A | N/A | N/A | N/A | 0.25 | 1 |
| Carswell FMC | 0.58 | 5 | 1.02 | 11 | 0.54 | 6 |
| Chicago MCC | 0.82 | 6 | 1.36 | 10 | 1.72 | 13 |
| Devens FMC | 0 | N/A | 0.69 | 5 | 0.96 | 10 |
| Fort Worth FMC | 3.13 | 46 | 7.14 | 107 | 5.28 | 83 |
| Guaynabo MDC | 1.51 | 15 | 1.57 | 18 | 1.70 | 21 |
| Honolulu FDC | N/A | N/A | N/A | N/A | 0 | 0 |
| Houston FDC | N/A | N/A | 0.69 | 4 | 0.21 | 2 |
| Lexington FMC | .38 | 6 | 1.61 | 28 | 2.36 | 45 |
| Los Angeles MDC | 7.50 | 76 | 3.25 | 32 | 3.67 | 30 |
| Miami FDC | 0.59 | 9 | 0.52 | 8 | 0.18 | 3 |
| New York MCC | 1.60 | 14 | 0.23 | 2 | 0.68 | 6 |
| Oakdale FDC | 0.33 | 3 | 0.41 | 4 | 0.10 | 1 |
| Oklahoma City FTC | 0.21 | 3 | 0.07 | 1 | 0.08 | 1 |
| Philadelphia FDC | N/A | N/A | N/A | N/A | 0.41 | 4 |
| Rochester FMC | 0.62 | 5 | 0.98 | 8 | 2.03 | 16 |
| San Diego MCC | 3.08 | 28 | 3.17 | 29 | 1.81 | 14 |
| SeaTac FDC | 6.40 | 44 | 1.26 | 9 | 1.79 | 13 |
| Springfield USMCFP | 1.18 | 14 | 1.35 | 16 | 1.51 | 18 |
| **Totals** | | **311** | | **322** | | **298** |

Source:  BOP
Data for each fiscal year excludes institutions that did not have test results for the entire year.
N/A: Not activated for an entire year during the reporting period.

# APPENDIX VII:  VISITING POLICY AND PROCEDURES

BOP Program Statement 5267.06, Visiting Regulations, requires wardens to establish a visiting schedule for their institution.  Visiting schedules among institutions may vary depending on factors such as the security level of the institution, the size of the inmate population, the capacity of an institution's visiting room, and the number of visitors.  For example, most institutions we visited scheduled visiting days during some weekdays and on weekends, while some institutions scheduled visits seven days a week, day and evening hours.  All inmates receive contact visits, unless an inmate has been charged with or found guilty of a prohibited act related to visiting procedures or otherwise has had visits restricted by the Disciplinary Hearing Officer.[91]  If the visiting room is not overcrowded, an inmate may visit the entire day, approximately six hours, or until visiting hours are over.  If a large number of visitors are waiting, inmates may be asked to end their visits to give other inmates the opportunity to visit.  At the institutions we visited, inmates operated on a point system where each inmate receives 30 visiting points per month to be used toward visits.  Each point is equal to one hour of visiting.  On weekends or holidays, each hour is worth two points.

Each inmate has a list of approved visitors, which includes immediate family members and other relatives (numbers are unrestricted), and up to ten friends and associates, but the warden may make an exception to this number.[92]  The inmate must submit a list of proposed visitors to the designated BOP staff member who will conduct a background check on all visitors who are not immediate family.  Generally, the investigation consists of a NCIC criminal background check on all non-family members.  Once visitors are approved, the names are added to an automated list.  Correctional officers who process visitors into the institution and visiting room use the automated list to verify the visitor's identity.  For each approved visitor, the inmate is provided with a copy of visiting guidelines, which the inmate must send to each visitor.

There are restrictions on the items that visitors are permitted to bring into the institution.  The visiting guidelines include notification to the visitor that, "a penalty of imprisonment for not more than 20 years, a fine, or both, can be imposed for providing or attempting to provide any item(s) to an inmate without the knowledge and consent of the warden."  Warnings against attempts to smuggle contraband are also posted in the lobby area and visitors must sign a form that they understand the conditions of their visit.  Some institutions have posted news articles and pictures in

---

[91] ADX Florence and USP Marion do not allow contact visits.

[92] Immediate family members include: mother, father, step-parents, foster parents, bothers, sisters, spouse, and children.  Other relatives include: grandparents, uncles, aunts, cousins, and in-laws.

69-098

plain view of incoming visitors depicting other visitors' arrests and convictions for smuggling drugs. Although visitors are not searched, a correctional officer at the front lobby visually checks the personal property of visitors. All visitors must walk through a metal detector. As part of a pilot project, some institutions use ion spectrometry technology that can detect trace amounts of drugs. At these institutions, visitors are randomly screened by this device as part of the visitor in-processing procedures.

On visiting days, an institution has several officers assigned to perform visiting functions. In general, officers are assigned to:

- Process the visitors into the institution;

- Escort the visitors to the visiting room;

- Pat search or strip search each inmate prior to entering the visiting room, later escort the inmate to the bathroom, as needed, and strip search the inmate upon exiting the visiting room;

- Sit at the visiting room desk to check-in each visitor's name against an automated visiting list; and

- Roam throughout the visiting room to observe the visits.

Video cameras inside the visiting rooms mounted on the walls or ceilings enhance the observation of visits. Video monitoring from these cameras is conducted by the correctional officers assigned to the visiting room or conducted remotely by officers located in other areas of the institution such as in the Control Center or the Intelligence office. Some visiting rooms have two-way glass, which enables officers to covertly observe visiting room activities.

All institutions make available a variety of food items that can be purchased by the inmates' visitors from several vending machines located inside the visiting rooms. Inmates are not permitted to handle any cash inside the institution. Only the inmates' visitors are permitted to handle and place money in the vending machines, although visitors can purchase food items for the inmate and themselves.

The visiting room area has separate bathrooms for visitors and inmates. Visitors use their bathrooms unescorted. Inmates must be escorted by a correctional officer and personally observed while using the facilities.

Once the visit is concluded, each inmate is escorted to a processing area and strip searched to ensure no contraband is introduced into the institution.

69-099

## APPENDIX VIII:  MAIL POLICY AND PROCEDURES

The BOP Program Statements 5266.09, Incoming Publications; 5265.11, Correspondence; and 5800.10, Mail Management Manual, provide guidance to institutions for screening mail for contraband, to include drugs. The BOP encourages correspondence that is directed towards socially useful goals and permits inmates to subscribe to or receive publications without prior approval.  As a result, inmates enjoy access to a wide-range of mail privileges, including first-class mail, packages, books, magazines, newspapers, and unsolicited mail.

The ISOs inspect inmate mail for contraband (e.g., drugs and weapons) and deliver inmate mail to the housing units for distribution to inmates by unit management staff.  Delivery of inmate mail ordinarily is to be accomplished within 24 hours of receipt. [93]  Generally, high security level mailrooms are staffed with at least three ISOs, while medium security level mailrooms are generally staffed with two ISOs.

When the mail initially arrives at the institution, the ISO(s) first x-ray the trays or bins containing inmate mail.  This x-ray inspection occurs outside the institution's perimeter fence, typically in an institution's warehouse facility or at an institution's front entrance.  The primary objective of this x-ray inspection is to detect weapons and explosive devices.  Attempts to introduce drug contraband concealed within mail may be detected during this initial inspection if an x-ray scan produces a suspicious image triggering a further visual and manual inspection.  However, most x-ray scanning technologies in use at the BOP's institutions are better suited to detect weapons and explosive devices rather than drugs.

Inside the institution's mailroom, the ISOs first compare each individually addressed mail item to a current SENTRY inmate roster to both confirm the inmate name and to ensure that they only open and inspect mail for inmates who are presently housed at that institution.  The ISOs are required to open all incoming mail (except legal mail, which must be opened in the presence of the inmate), newspapers, magazines, books, and packages and inspect the material for contraband prior to distribution.  Drug contraband finds typically occur during these visual and manual inspections.  For example, Figure 8 on the next page shows an attempt by an inmate's outside contact to introduce black tar heroin

---

[93] According to the BOP Program Statement 5800.10, Mail Management Manual, "Delivery of letters may not be delayed and shall ordinarily be accomplished within 24 hours of receipt."

---

U.S. Department of Justice                                                                                    87
Office of the Inspector General
Evaluation and Inspections Division

69-100

into an institution by hiding the drug inside a greeting card mailed to the inmate. This attempted drug introduction was detected by the institution's mailroom staff.

**Figure 8.  Black Tar Heroin Hidden Inside a Greeting Card**

 

Source:  BOP

In addition, Figure 9 shows an attempt (also successfully detected by mailroom staff) by an outside contact to introduce morphine into an institution by hiding the drug underneath a postage stamp affixed to a letter addressed to an inmate.  Both Figure 8 and Figure 9 illustrate the need for thorough mail inspection procedures to detect drug introductions into BOP institutions.

**Figure 9.  Morphine Hidden Beneath Postage Stamp**

 

Source:  BOP

69-101

 

Source: BOP

After each mail item is inspected, all mail items are subject to random reading by the ISOs (except legal mail), or held for reading by intelligence officers if the inmate is flagged in SENTRY. The primary objective of an inspection is to detect contraband, while the objective of random reading is to gather intelligence information about inmates' criminal activities and other security concerns within an institution.

Outgoing mail from inmates from low and minimum security level institutions may be sealed by the inmates. Outgoing mail, except legal mail, from inmates in a medium or high security level institution must be left unsealed by the inmates and is subject to inspection and random reading. However, inmates' outgoing mail regardless of the institution's security level may be inspected and read upon approval of the warden, if there is evidence to suggest that criminal activity is occurring or there is a threat to the orderly running of the institution.

69-102

# APPENDIX IX:  REQUIREMENTS FOR AUTHORIZING VOLUNTEERS AND CONTRACTORS

**VOLUNTEERS**

According to BOP Program Statement 5300.20, Volunteers and Citizen Participation Programs, the BOP has two classifications of volunteers:

**Level I Volunteers** are authorized to perform a service four times or less a year for an institution, community correction center, contract detention center, or administrative office.  Ordinarily, a Level I volunteer is an adult 18 years or older (except at high security and administrative institutions where volunteers must be at least 21 years of age).

According to BOP policy, Level I volunteers are normally exempt (at the warden's discretion) from the background requirements discussed below for Level II volunteers.  As a result, the institutions must make appropriate staff arrangements to provide adequate program supervision to these volunteers.

Training for Level I volunteers consists of receipt and completion of a "Notification to Visitors" form, as well as a brief oral orientation provided by a department program manager prior to the visit to provide the volunteer program or service.

Level I volunteers are ordinarily not granted permanent photo identification badges.  Level I volunteers require staff escort to and from the appropriate program department and require constant supervision while inside the institution.

**Level II Volunteers** are authorized to perform service more than four times per year for an institution, administrative office or community corrections or contract detention center.  Ordinarily, a Level I volunteer is an adult 18 years or older (except at high security and administrative institutions where volunteers must be at least 21 years of age).

The following steps must be completed before the volunteer is permitted to engage in the volunteer activity:

- NCIC database check,
- Fingerprint Check.  Policy sets a time frame of 45 work days for completion of background investigation items for volunteer applicants.  However, fingerprint check results do not need to be received prior to allowing volunteers to serve an institution if all other background investigation requirements are successfully completed.
- Application for Volunteer Service,

69-103

- Volunteer Interview Summary,
- Letters of Endorsement,
- Volunteer Agreement Training Certification Form,
- Signature, Certification and Release of Information Form,
- Certification of Receipt for Standards of Employee Conduct, and
- Current documentation of credentials or license for those volunteering to provide professional services.

Level II volunteers are required to complete a total of four hours of program area and orientation training, as well as two hours of annual refresher training each successive year.

Level II volunteers can be issued either an "escorted" or "unescorted" (approved by the warden) institution volunteer photo identification badge. Level II volunteers classified as "escorted" require staff escorts to and from the appropriate program department. Staff are required to make frequent, irregular visual checks while escorted Level II volunteers conduct their programs. The BOP states that the majority of Level II volunteers are assigned "escorted" status. Level II volunteers receiving "unescorted" status are less frequent and only issued to those volunteers with a proven record. This status requires approval by the warden. These "unescorted" volunteers are able to report directly to their program area following front entrance processing.

**Ex-Offenders.** Institutions also may allow ex-offenders to volunteer. In addition to completion of training and background investigations, the following items must be completed:

- Documented period of at least three years of crime-free conduct after release, or a favorable report upon completion of probation or parole,
- Documentation of current employment or academic status,
- Fully completed application for federal employment or resume, and
- Check to ensure the ex-offender has no separatees within the institution.[94]

## CONTRACTORS

The BOP has identified the following three types of contracts that its institutions may initiate: individual, construction and maintenance, and total or partial program services.

**Individual Contracts** include all contracts with individuals delivering compensated services to an institution where delivery of these services requires frequent and unsupervised contact with inmates.

---

[94] Separatees are inmates who are on separation status from each other for security reasons.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

91

The following background investigative procedures and forms are required to be completed prior to authorizing an individual contractor permission to enter an institution:

- NCIC database check,
- Name check,
- Fingerprint check,
- Law enforcement agency checks,
- Vouchering of employers over past five years,
- Completed application for federal employment,
- Completed contractor pre-employment form,
- Release information, and
- Urinalysis test for the detection of drug use.

Short-term contracts for individual services that will last less than 30 days and contractors who will be escorted at all times while inside the institution, or will be outside the institution, are subject only to the following requirements:

- NCIC database check, and
- Completed contractor pre-employment form.

BOP policy allows wardens to exercise discretion in granting exemptions to the required investigative procedures for long-term individual contractors (three or more years), and for consulting physicians who enter an institution on an infrequent basis.

**Construction and Maintenance Contracts** include all contracts involving construction/maintenance projects of institutional facilities, which are advertised and granted competitively through appropriate federal government and contracting regulations. These contracts typically involve major projects where construction and maintenance crews have little or no inmate contact, and are subject to close BOP supervision and monitoring.

The following background investigative procedures and forms are required to be completed for all contractors' crew members prior to authorizing permission to enter an institution:

- NCIC database check,
- Name check,
- Fingerprint check,
- Completed application for federal employment,
- Completed contractor pre-employment form, and
- Release information.

A urinalysis test for the detection of drug use is not required for construction/maintenance contractors and crew members.

BOP policy allows wardens to exercise discretion in granting exemptions to the required investigative procedures for contractors who do not enter the secure perimeters of an institution and do not have inmate contact.

**Total or Partial Program Services Contracts** include the contracting of food and medical services for the delivery of program services (e.g., preparing food for inmates) that require frequent and unsupervised contact between the contractor's employees and inmates.

The following background investigative procedures and forms are required to be completed prior to authorizing individuals involved in the delivery of contracted food and medical services within an institution permission to enter an institution:

- NCIC database check,
- Name check,
- Fingerprint check,
- Law enforcement agency checks,
- Vouchering of employers over past five years,
- Completed application for federal employment,
- Release information, and
- Urinalysis test for the detection of drug use.

BOP policy allows wardens to exercise discretion in granting exemptions to the required investigative procedures for long-term individual contractors (three or more years), and for consulting physicians who enter an institution on an infrequent basis.

# APPENDIX X:  GLOSSARY OF ACRONYMS

| | |
|---|---|
| ACA | American Correctional Association |
| ADX | Administrative Maximum |
| A.F.G.E. | American Federation of Government Employees |
| BJS | Bureau of Justice Statistics |
| BOP | Federal Bureau of Prisons |
| CI | Correctional Institution |
| DATS | Drug Abuse Treatment Specialist |
| DOJ | Department of Justice |
| DSM-IIIR | Diagnostic and Statistical Manual for Mental Disorders (3rd Edition) |
| DSM-IV | Diagnostic and Statistical Manual for Mental Disorders (4th Edition) |
| FBI | Federal Bureau of Investigation |
| FMC | Federal Medical Center |
| FCI | Federal Correctional Institution |
| FDC | Federal Detention Center |
| FPC | Federal Prison Camp |
| FTC | Federal Transportation Center |
| FY | Fiscal Year |
| ISO | Inmate Systems Management Officer |
| LSCI | Low Security Correctional Institution |
| MCC | Metropolitan Correctional Center |
| MDC | Metropolitan Detention Center |
| NCIC | National Crime Information Center |
| OIA | Office of Internal Affairs |
| OIG | Office of the Inspector General |
| OST | Office of Security Technology |
| R&D | Receiving and Discharge |
| RDAP | Residential Drug Abuse Program |
| SIA | Supervisory Investigative Agent |
| SIS | Special Investigative Supervisor |
| TDP | Test Designated Position |
| USMCFP | United States Medical Center for Federal Prisoners |
| USP | United States Penitentiary |

U.S. Department of Justice                                                                              94
Office of the Inspector General
Evaluation and Inspections Division

69-107

## APPENDIX XI:  BOP'S RESPONSE TO THE DRAFT REPORT

U.S. Department of Justice

Federal Bureau of Prisons

---

*Office of the Director*                                        *Washington, DC 20534*

December 6, 2002

MEMORANDUM FOR PAUL A. PRICE
                ASSISTANT INSPECTOR GENERAL FOR EVALUATION AND
                INSPECTIONS

FROM:          (original signed)
                Kathleen Hawk Sawyer, Director
                Federal Bureau of Prisons

SUBJECT:        Response to the Office of Inspector General's
                (OIG) Draft Report: The Bureau of Prisons' Drug
                Interdiction Activities

The Bureau of Prisons has reviewed your draft report entitled,
The Bureau of Prisons' Drug Interdiction Activities.  Although
the report contains some good recommendations, we are unable to
agree with several for reasons which will be more fully explained
within this response.  As always, we wish to work with the OIG in
resolving these issues and look forward to closing this review to
the mutual satisfaction of both our offices.

We were somewhat surprised with the methodology used to conduct
this review.  We fully appreciate the benefit of staff
interviews/opinions in our own research but believe the report
relies too heavily on staff interviews/opinions as primary
evidence in supporting the recommendations.  Our experience with
internal review has shown staff interviews/opinions are not the
best form of evidence and should be used to augment more
statistically sound sources.  Staff opinions naturally reflect a
very parochial view, and though this view is often essential to a
complete understanding of the issue at hand; we consider it ill-
advised to use such testimony as a basis for national policy
making.

95

69-108

There is also an absence of statistical support for many of the recommendations which was disturbing considering the magnitude of changes recommended. Non-contact visitation, and pat searching visitors and staff, involve changes to Bureau culture, practices, and an impact on resources we do not feel are necessary. The report provides no evidence these tactics deter the introduction of drugs in other correctional systems and no testimony is presented by state officials regarding the negative or positive aspects of these approaches on their systems. The absence of statistical support is most striking in the comparisons between selected state systems and the Bureau. Drug testing procedures, and test result reporting, pat search procedures and results, and the uses of such data vary greatly between systems. Without access to the data and sources used to support these recommendations, we cannot verify how similar systems/situations are being compared.

The limited scope of this review and subsequent recommendations provide us with the opportunity to highlight the significant progress we are making in our efforts against drug possession, use and introduction. The Bureau is constantly seeking new and reliable technologies to deploy in this effort, as well as better ways to educate staff and inmates on the dangers drugs pose for their lives and the work place. Although we agree there is room for improvement, we do not believe our efforts are inadequate or illustrate a lack of progress in this area.

**Recommendation #1:** The Director, BOP, should consider restricting contact visits for specific inmates and replace contact visits with non-contact visits for certain inmates or institutions based on an assessment *of* the individual institution's drug smuggling problem.

**Response:** The Bureau agrees with this recommendation and will consider restricting contact visits for specific inmates. The Bureau currently employs non-contact visitation for specific inmates and institutions; however, further restrictions involving non-contact visits could require the Bureau to incur significant costs with regard to staffing and construction. The benefits of this recommendation are considered minimal as inmates found guilty of drug use or introduction of drugs would most likely not be permitted visitation as a result of our imposed progressive loss of visiting sanctions. Additionally, instituting non-contact visiting for those institutions with a higher drug usage rate unfairly subjects the entire inmate population to a sanction applicable to only a small percentage of offenders. The limited scope of this review and the subsequent recommendation fails to recognize the adverse impact non-contact visiting would have for

2

96

69-109

an entire population not sanctioned with a charge associated with the use, possession or introduction of drugs.  Therefore, the Bureau of Prisons does not believe expanding our current policy would provide an acceptable solution for resolving drug smuggling problems without causing significant concerns in other areas of prison management.

The Bureau has consistently sought to encourage family ties by placing inmates as close to home as possible and otherwise facilitating contact with their families and communities through visitation.  Additionally, family members, as a natural support group for offenders have a tremendous potential for assisting in the reintegration of offenders to community life.  Visitation is considered important for maintaining social and family ties, which are in turn important for inmates' success within and outside of correctional facilities.

**Recommendation #2:** The Director, BOP, should consider implementing pat searches of visitors.

**Response:** The Bureau agrees with this recommendation, and will consider pat searching visitors.  The review identified visitors as a primary source of drug introduction.  The Bureau concurs with this observation.  However, the report appears to lack supportive documentation indicating pat searches of visitors would be a successful drug interdiction method.  As we make our determination in consideration of this recommendation, we will analyze the following information in our attempt to make the best decision: additional technologies available to detect drugs; increased staff requirements necessary to implement; and use of more aggressive and proactive investigations, urine surveillance testing, and progressive administrative/legal actions.

**Recommendation #3:** The Director, BOP, should invest in technology (such as cameras, monitors, ion spectrometry, or other emerging drug detection technologies) to provide institutions with a greater capability to screen and monitor visitors.  The BOP should also ensure that existing technologies, such as ion spectrometry, cameras, monitors, and visitor monitoring rooms are used to their maximum capacity.  Specifically, when ion spectrometry machines break down, they should be repaired in a timely manner.  In addition, they should be used to detect drugs in other areas of the institutions.  Cameras should be positioned to eliminate any blind spots in the visiting room.  BOP should ensure that camera monitors and visitor monitoring rooms are used to view visits in progress.

3

97

**Response:** The Bureau agrees with this recommendation.  The Bureau's Office of Security and Technology identifies and tests new technologies which may provide reliable and effective resources in our effort to eliminate the introduction of drugs. Each of the technologies identified in the review are currently approved for use throughout the Bureau.  Timely repairs of malfunctioning equipment will continue to be a priority. Purchase options for drug detection equipment which is low-maintenance, easily transported, and easily operated will be explored to greater enhance narcotics prevention throughout institutions.  The use of observational cameras with recording capabilities has been extremely valuable to visiting room staff, allowing them clandestine zoom/pan observation of suspicious activities. Although blind areas may be present in visiting rooms, staff are authorized to arrange seating assignments of visitors and inmates to meet the agency's security concerns.  The Bureau supports and continues to pursue each of these initiatives but is restricted from broad and universal application of technological enhancements by the funding allocated to the agency.

**Recommendation #4:** The Director, BOP, should staff visiting rooms with enough correctional officers so that sufficient direct observation and monitoring of each visit can occur.

**Response:** The Bureau agrees with this recommendation. Institutions are provided the local discretion to determine the appropriate staffing level of visiting rooms based on use, available intelligence, and should ensure proper monitoring.

**Recommendation #5:** The Director, BOP, should implement a policy that restricts the size and content of property staff bring into BOP institutions.

**Response:** The Bureau agrees with this recommendation.  The agency will develop and negotiate policy with the Union restricting the size and content of staff property allowed inside the institution. The Bureau anticipates completion of this requirement by December 2004.

**Recommendation #6:** The Director, BOP, should implement a policy requiring searches of staff and their property when entering institutions.  In addition to manual searches, the BOP should consider using ion spectrometry and all other available technology when searching staff.

**Response:** The BOP does not agree with this recommendation, however, as noted in #5, we agree with restricting the size and

4

98

69-111

content of property staff bring into the institution. Implementing staff pat searches requires us to consider the overall impact to the agency.  Prior to considering such a major policy change for the agency, the Bureau would request OIG provide formal evaluation data from states who currently have such policies in effect to include pre/post studies of drug urinalysis rates prior to and after implementation of a staff search policy. Without this type of detailed information on which to base a decision, the Bureau strongly opposes this recommendation. This recommendation appears to be based on a limited number of interviews and surveys without considering the impact this would have on the agency or whether it would be a successful solution for the "small" number of drug introductions by staff.  Overall, staff morale will suffer thereby creating unwarranted concerns in areas other than drug detection. Additionally, gender specific issues, the intrusive nature of such a search (comparable to those mentioned when discussing pat searching visitors), as well as issues regarding the impact such searches have in the overall reduction of drug introduction, are raised.  Based on these concerns, the Bureau believes a more effective and productive means to deter staff introduction of drugs would be through the reduction of staff property entering the institution coupled with the processes currently in place, such as background investigations, integrity training, and other investigative procedures.

**Recommendation #7:** The Director, BOP, should implement random drug testing for staff.

**Response:** The Bureau agrees with this recommendation.  On November 7, 2002, correspondence was issued to all institution Chief Executive Officers regarding the impending implementation of the Drug Free Workplace Program.  The approximate implementation date of this program is January 2003.

**Recommendation #8:** The Director, BOP, should implement a policy that eliminates unsolicited mail.

**Response:** The Bureau agrees with this recommendation, and is currently determining what the agency can do legally to limit such mail.  We will pursue the necessary regulatory and policy changes to effect such limits as appropriate.  Based upon research, legal issues, and the implementation of policy to include union review, we expect an implementation date of December 2005.

**Recommendation #9:** The Director, BOP, should require additional training for BOP staff to search mail and detect drugs.

5

99

69-112

**Response:** The Bureau agrees with this recommendation, and has taken steps to ensure training classes for inmate systems officers include additional training.  The Bureau implemented this requirement in November 2002.

**Recommendation #10:** The Director, BOP, should test mail room drug detection technologies.

**Response:** The Bureau agrees with this recommendation.  The Inmate Systems Management Branch will work with the Office of Security and Technology to conduct research on mail room drug detection technology, conduct tests at appropriate locations, determine if technology is applicable Bureauwide, and present their findings to Bureau's Executive Staff.  The Bureau anticipates a completion date of December 2005.

**Recommendation #11:** The Director, BOP, should maintain data, via improved SENTRY tracking, on the number of inmates who are diagnosed with a drug abuse problem and are referred for drug treatment, the number of inmates who participate in drug treatment, and the number who successfully complete drug treatment.

**Response:** The Bureau agrees with this recommendation.  The Bureau currently has plans in place that comply with the intent of this recommendation, though through different procedures than are specified in the recommendation.  The Bureau tracks, via SENTRY, the number of inmates who participate and complete all drug abuse education and treatment components.  In addition, the Psychological Data System (PDS) is used by clinical staff to document a clinical diagnosis for inmates seeking and participating in Bureau psychological services.

Two policy changes are currently under review that will improve the tracking of inmates entering the Bureau with substance use disorders:

First, the Bureau has drafted a proposed regulation that would expand the group of inmates who must participate in the drug education course.  The current categories include: (1) referral by the sentencing judge; (2) a violation of supervised release due to drug use; and (3) evidence that drugs or alcohol contributed to the instant offense. The proposed regulation includes one additional category for inmates with a history of substance use.

6

Second, drug abuse program policy has been revised and submitted for approval to improve the sequence of identification, screening, assessment and referral of inmates with drug use disorders.  This sequence will occur prior to an identified inmate's completion of the drug education course.

With the expansion of the drug education categories, the Bureau will create a PDS database to track inmates with a substance abuse problem, or who receive a diagnosis for a substance abuse disorder, and are referred to the appropriate course of treatment.

The final rule to allow the additional drug education category was forwarded to DOJ on October 26, 2001.  These policy revisions will take between 1 to 3 years to implement.  The Bureau anticipates completion of this requirement by December 2005.

**Recommendation #12:** The Director, BOP, should sufficiently staff non-residential drug treatment programs based on a combination of the DATS staffing guidelines and the number of inmates at each institution who have been identified in SENTRY as needing drug treatment.

**Response:** The Bureau does not agree with this recommendation. The drug abuse program policy (5330.10), establishes staff-to-inmate ratios for residential drug abuse programs only. Residential programs provide intensive, long-term treatment with no less than one group a day with a specified group of participants.

Non-residential treatment is a less intensive effort (see response to recommendation 13).  It is flexible in application, based on the needs of the inmate and the institutional environment.  Non-residential drug abuse treatment requires the institution's drug abuse program coordinator to work closely with the drug abuse treatment specialist in the development of the program structure and content.  Every institution is provided a drug abuse treatment specialist for the sole purpose of providing drug abuse education and non-residential treatment. Additionally, each institution is provided with a drug abuse program coordinator to oversee the programs and their compliance with policy.

To bring the current institution complement to the staffing guidelines for residential drug treatment is cost prohibitive. To do so would add an additional 200 staff to drug abuse programs at an estimated annual cost of $13,463,000, based on 2003 salaries and benefits.  This initiative is not funded.

7

101

69-114

**Recommendation #13:** The Director, BOP, should revise Program
Statement 5330.10, Drug Abuse Programs Manual, to require that
non-residential drug treatment is provided to inmates in the
general population, in addition to transitional services for the
RDAP graduates.  The program statement should include a curriculum
for non-residential drug treatment and guidance regarding the
minimum number of sessions and the minimum number of weeks'
duration for the groups.  The Director, BOP, should also increase
emphasis on self-help groups to enhance the overall drug treatment
program and the inmates' recovery and rehabilitation.

**Response:** The Bureau does not agree with this recommendation.
The Bureau designed its drug abuse treatment strategy based on
literature and research that defines the key elements for
successful drug abuse treatment outcomes.  These elements are the
foundation for the Bureau's residential drug abuse program.  To
ensure the Bureau has effective treatment programming, the
majority of resources are directed to residential treatment
programs that include these evidence-based elements:  a
cognitive-behavioral philosophy of treatment; unit-based programs;
staff-to-inmate ratios of 1:24; comprehensive assessment; program
participation of 9 months and 500 hours minimum; individual
treatment plans; a minimum of 3 hours of drug treatment
programming each day; core group and individual treatment;
criminal lifestyle intervention; lifestyle balance training;
transitional living issues; full team reviews; and treatment
occurring at the end of the offender's sentence, followed by a
comprehensive community transition program.

The non-residential drug abuse treatment program was never
considered to be a parallel program to the residential program.
Non-residential treatment was designed to provide maximum
flexibility to meet the needs of the offender, particularly those
individuals who have a relatively minor or low-level substance
abuse impairment.  These offenders do not require the intensive
levels of treatment needed by individuals with moderate-to-severe
addictive behavioral problems.  A second purpose of the program
is to provide those offenders who have a moderate to severe drug
abuse problem with the supportive program opportunities during the
time they are waiting to enter the residential drug abuse program
or for those who have little time remaining on their sentence and
are preparing to return to the community.

That does not mean non-residential drug abuse treatment and self-
help programs are not of use to many inmates who are recruited
into the program through admissions & orientation or by way of a
staff referral.  By policy, (P.S. 5330.10, Chapter 1, pg. 4), all

8

102

69-115

institutions in the Bureau employ a drug abuse treatment specialist who is responsible for providing drug abuse education and non-residential drug abuse treatment services to the inmate population under the supervision of the drug abuse treatment coordinator.

Guidance for non-residential treatment format, content and structure is provided in policy (P.S. 5330.10, Chapter 4, pg. 1, 4.2).  This includes time frames, clinical topics and formats, and direction in the use of the drug abuse program curriculum.

In 1991 a new drug abuse program curriculum was released offering a facilitator's guide and inmate journals that can be used in non-residential treatment programs.  A further revision to the curriculum now underway, will improve the applicability and guidance for drug abuse treatment specialists and drug abuse program coordinators in the structure and use of the curriculum in non-residential treatment.  Additionally, policy has been revised and submitted for approval to further detail the role of the drug abuse program coordinator in non-residential drug abuse treatment in terms of program design, development, monitoring, oversight, and clinical and administrative supervision.

Self-help groups are offered for Bureau offenders in support of the treatment opportunities that are available.  Self-help volunteers provide services in the institution and offer support in the community, upon the inmate's transfer to the community corrections center.  Of all the Bureau's volunteers, approximately 10 percent provide self-help activities and support to inmates with substance use problems.

The Bureau believes that Program Statement 5330.10, Drug Abuse Programs, Inmate, already addresses each of the recommendations detailed.  However, the policy and the drug treatment curriculum are being revised, and the Bureau will provide further definition for the drug abuse coordinators as it relates to non-residential drug abuse treatment.  The Bureau anticipates issuance of the revised policy and curricula by December 2004.

**Recommendation #14:** The Director, BOP, should develop incentives for participation in non-residential drug treatment and consequences for non-completion, with the objective of increasing the number of inmate volunteers for drug treatment.  As part of the incentives and consequences, the Director, BOP, should consider adding a separate score for drug treatment participation in the inmate's annual Security Designation and Custody Classification Review.

9

**Response:** The Bureau does not agree with the first part of this recommendation.  Creating incentives and sanctions for non-residential treatment, would in essence, be a disincentive to enroll in residential programs for those inmates with the most severe treatment need.  The Bureau concentrates its treatment resources into the residential program, a program that has been proven effective within a correctional environment.  To better identify and treat all inmates who need residential/intensive treatment, rather than just those who volunteer, the Bureau's Executive Staff approved in 1998 a balanced approach of incentives and disincentives to encourage inmate participation in the Bureau's drug treatment programs.  The Bureau is awaiting rules clearance for the incentives and disincentives program from the DOJ prior to implementation.

The implementation plan includes identifying inmates with a substance use disorder, and placing them either directly into (or on the waiting list for) the residential drug abuse program.  Treating inmates with severe drug disorders with a non-residential program is ineffective.  These individuals, who are also criminals, require intensive, long term, structured treatment.  Using a less intensive treatment option does a disservice to the inmate and to the community.  Therefore, the Bureau has concentrated incentives for residential treatment involvement.

The Bureau is in the process of modifying the Security Designation and Custody Classification form to reflect an inmate's participation in all program areas in the Bureau.  This will include an inmate's participation in drug abuse treatment programming.

The Bureau anticipates policy/program implementation will be completed by December 2005.

**Recommendation #15:** The Director, BOP, should consider the other opportunities to improve drug interdiction activities for the R&D and warehouse areas, the rear gate, volunteers, contractors, and institution intelligence operations.  The BOP also should consider another pilot test of canines as a drug detection technique for its institutions.

**Response:** The Bureau partially agrees with this recommendation.  As outlined in the response to Recommendation #3, the Bureau supports the establishment of new initiatives in the pursuit of reducing drugs within the institutions.  Canine units are a resource each region is currently authorized to pursue at one institution.  Although authorization is present to maintain a

10

canine program at one facility per region, we do not believe an expansion of this policy is appropriate at this time. Specifically, canine units require a significant amount of financial and staff resources. Routine expenditures involving training of both staff and the canine, purchase and subsequent care is a major concern when determining the overall effectiveness of the program. Additionally, these resources are usually available within the local community for use upon request. This resource provides a service to the Bureau and also provides local law enforcement the opportunity to train and test their canines. We utilize these valuable resources and believe this cooperation strengthens our efforts of reducing drugs and enhances our relationship with local law enforcement.

If you have any questions regarding this response, please contact Michael W. Garrett, Senior Deputy Assistant Director, Program Review Division, at (202) 616-2099.

11

105

69-118

# APPENDIX XII:  OIG'S ANALYSIS OF THE BOP'S RESPONSE

On October 31, 2002, the Office of the Inspector General (OIG) sent copies of the draft report to the Federal Bureau of Prisons (BOP) with a request for written comments.  The BOP responded on December 6, 2002.  Of the report's 15 recommendations, the BOP agreed with 10, partially agreed with 2, and disagreed with 3 recommendations.  The BOP's disagreements largely concern the report's recommendations for searches of staff and their property when they enter BOP institutions and the increased use of non-residential drug treatment programs.  In addition, the BOP expressed general concerns regarding the methodology upon which our recommendations are based.  Our analysis of the BOP's response follows.

With regard to the methodology, the BOP's response states that while the BOP appreciated the benefit of staff interviews and opinions, our report "relies too heavily on staff interviews/opinions as primary evidence in supporting the recommendations."  The BOP asserts that such interviews "naturally reflect a parochial view."  The BOP's response also states that staff interviews/opinions are not the best form of evidence and "should be used to augment more statistically sound sources…we consider it ill-advised to use such testimony as a basis for national policy making."  The BOP's response states that our recommendations involve changes to BOP culture, practices, and resources, and there is "an absence of statistical support for many of the recommendations which was disturbing considering the magnitude of changes recommended."

We disagree with the BOP's assertions.  Our methodology included not only staff interviews but also direct observation of BOP operations, review of cases involving introduction of drugs into BOP institutions, and interviews of other federal law enforcement officials, such as agents from the Federal Bureau of Investigation (FBI) and the OIG with responsibility for investigating the introduction of drugs into BOP institutions.  We also reviewed information about the practices of 17 state correctional systems that employ various methods of drug interdiction.  In addition, we conducted statistical analyses of existing BOP data in our assessment of its drug interdiction strategy, including an extensive statistical analysis of positive inmate drug tests and drug misconduct charges; data analysis of drug finds in institutions; analysis of drug cases involving visitors, inmates, or staff; analysis of drug overdoses; and analysis of the number of inmates treated in relation to the number of inmates estimated to have drug problems.  We also evaluated the BOP's drug interdiction strategy to identify the activities it uses to reduce the flow of drugs into institutions.  In many cases, we found that interdiction activities used by the states are not employed by the BOP.

69-119

The BOP's response appears to suggest that a recommendation is valid only if it is based on statistical evidence. We believe such a perspective is too narrow. First, the existing data and available statistical studies do not measure the impact of individual interdiction activities. When states have attempted to measure the effectiveness of specific interdiction activities, they have had difficulty isolating the effect of one interdiction activity from another interdiction activity or group of interdiction activities that are employed simultaneously. The BOP experienced this same difficulty when testing the ion spectrometry technology to randomly screen visitors. In its report on the ion spectrometry pilot project, the BOP stated, "Although we conclude that the visitor drug testing program was a significant factor in the decreases [of inmates' positive drug tests], given the research design, we cannot precisely say how much of the decrease was due to the use of ion spectrometry and how much was the result of other programmatic changes in the Bureau's drug policy."

Moreover, although the information from the state correctional systems does not evaluate the effectiveness of each individual interdiction activity, the state information does show that a mix of interdiction activities, many of which are similar to the ones we recommend, can reduce the amount of drugs entering institutions as measured by rates of inmates' positive drug tests. For example, one study measured the impact of the Pennsylvania state correctional system's implementation of its Drug Interdiction Program, which included activities similar to ones we recommend, including searches of visitors and staff. The study found that the combination of interdiction activities Pennsylvania implemented between 1996 and 1998 reduced the percentage of inmates who had drugs in their system, as tested by inmate hair samples, from 7.8 percent to 1.4 percent. See "Reducing Drugs in Prisons," National Institute of Justice Journal, October 1999. While the study did not attempt to differentiate the effectiveness of each interdiction activity because the activities were introduced at around the same time, it did show the overall effectiveness of a group of interdiction activities similar to those we recommend. We believe the BOP should not wait to implement reasonable interdiction activities, such as the ones we recommend, by citing the absence of state data on a specific interdiction activity recommended in our report.

Contrary to the BOP's response, we do not believe that the information provided in interviews we conducted reflected "parochial" views of BOP staff. We interviewed more than 100 BOP managers and staff who are on the front lines in protecting the security of institutions and treating inmates' drug problems. The managers and staff we interviewed had many years of correctional experience at many institutions. We believe that considering the informed views of front-line managers and staff is essential to developing effective recommendations to correct systemic problems.

69-120

Finally, the BOP notes that some of our recommendations would involve changes to the BOP's culture and practices. We agree, but believe that such changes – while they may be difficult – should be made, given the importance of reducing the availability of drugs in BOP's institutions. The BOP's failure to implement new interdiction activities, such as those that we recommend and which have been frequently adopted on the state level, results in significant gaps in the BOP's drug interdiction strategy.

We now turn to each of our recommendations and analyze the BOP's response.

**Recommendation 1:** Resolved – Open

**Summary of the BOP's Response.** The BOP agrees with Recommendation 1 to consider restricting contact visits for specific inmates or institutions based on an assessment of the institutions' drug smuggling problem. The BOP, however, does not believe that expanding its current policy for non-contact visits would provide an acceptable solution to drug smuggling problems and would cause significant concern in other areas of prison management. The BOP states that the benefits of this recommendation are minimal, because inmates found guilty of drug use or introduction of drugs would most likely not be permitted visitation as a result of loss of visiting privileges imposed by the Disciplinary Hearing Officer (DHO). The BOP also notes concerns with staffing and construction costs, and the effect of non-contact visits on inmates not involved in drug use or smuggling.

**OIG's Analysis.** We found that only 2 (USP Marion and AD-MAX Florence) of 102 BOP institutions impose non-contact visits for the entire inmate population due to the high security threat risk of the inmates. At other BOP institutions, contact visits are allowed and are not automatically suspended for inmates' possession or use of drugs. After interviewing eight DHOs during our site visits, we also found that the DHOs' philosophies and sanctions levied for drug misconduct charges varied widely. To suspend contact visits, some DHOs believed that the use or possession of a drug must be linked directly to an incident in the visiting room. Other DHOs do not impose non-contact visits as a sanction because they question its deterrent value when the inmate has infrequent visitors. A few DHOs consistently imposed loss of visiting privileges for a specified period of time (such as 30, 60, 90 days or more) if an inmate is found guilty of a drug misconduct charge. When this sanction is completed, the inmate resumes contact visits. We believe that such wide variance in sanctions should be reviewed by the BOP, and that non-contact visits should be used more widely for inmates who commit drug offenses in BOP institutions.

In addition to inmates who are found guilty of drug-related misconduct charges, we also believe that the BOP should consider establishing non-contact visits for other categories of inmates, such as inmates in disciplinary or

69-121

administrative segregation, inmates who are members of security threat groups or disruptive groups, or inmates on the drug testing suspect list.

For BOP institutions with high rates of positive inmate drug tests, drug misconduct charges, and gang activity (which is often associated with drug smuggling and drug use in institutions), the BOP also should consider implementing non-contact visits on a broader basis to gain control of the drug problem.  Overall, we believe the BOP should develop a systematic strategy for making better use of non-contact visits to reduce the availability of drugs in its institutions and drug use by inmates.

Please provide us with the BOP's decision for implementing broader use of non-contact visits by April 4, 2003.

**Recommendation 2:**  Resolved - Open

**Summary of the BOP's Response**.  The BOP agrees with Recommendation 2 to consider pat searching visitors; however, the BOP believes that the OIG report lacks supporting documentation indicating that pat searches would be a successful drug interdiction method.  In deciding whether to implement this recommendation, the BOP states that it will consider (1) additional technologies to detect drugs, (2) increased staff requirements necessary to implement the recommendation, (3) use of more aggressive and proactive investigations, (4) urine surveillance testing of inmates, and (5) progressive administrative and legal actions.

**OIG's Analysis**.  The BOP views visitors as the primary source of drug introductions into BOP institutions.  We concluded that because existing interdiction activities have not been fully effective, the BOP should implement more aggressive measures to prevent visitors from bringing drugs into BOP institutions.  Pat searching visitors is a logical step to reduce the flow of drugs into the institutions.  Currently, the BOP only conducts limited searches of visitors.  Visitors walk through a metal detector and some of their property (e.g., a purse) undergoes a cursory search; however, other property, clothing, and visitors themselves are not searched.  These gaps in the BOP's search procedures allow drugs to be readily concealed on visitors and brought into institutions.

The BOP states it will consider various factors before deciding whether to implement pat searching of visitors.  However, additional technologies to detect drugs may not be readily available, while pat searches of visitors can be implemented quickly and incrementally at specific institutions, depending on the institutions' drug problem.  While we recognize that additional staff may be required at institutions with large numbers of visitors, or to provide same-sex searches, the additional staff is not required every day and on every shift, because visits generally are allowed only on certain days of the week and during daytime hours.  Finally, while we agree that investigations, inmate drug testing, and administrative and legal

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

69-122

actions are important tools in reducing drugs in BOP institutions, they will not directly stop visitors from bringing drugs through an institution's front entrance.  Pat searches of visitors can be an effective tool to stop drugs from entering institutions.

Please provide us with the BOP's decision for implementing pat searches of visitors by April 4, 2003.

**Recommendation 3:**  Resolved - Open

**Summary of the BOP's Response.**  The BOP agrees with Recommendation 3 to invest in technology (such as cameras, monitors, ion spectrometry, or other emerging drug detecting technologies) to provide institutions with a greater capability to screen and monitor visitors.  The response states that the BOP will explore purchase options for drug detection equipment, which is low-maintenance, easily transported, and easily operated, to enhance narcotics prevention throughout its institutions.  However, the BOP response states that its limited funding does not permit broad and universal application of enhanced technology.  The BOP further states that timely repairs of malfunctioning equipment will continue to be a priority.  To compensate for blind areas in visiting rooms, the BOP states that staff are authorized to rearrange seating.  The BOP response does not address the OIG's concerns that visitor monitoring rooms with two-way mirrors or camera monitors are underused, or that ion spectrometry technology, consistent with existing policy, should be used to detect drugs in other areas of the institutions besides visitor in-processing in the front lobby.

**OIG's Analysis.**  Regarding equipment repair, during our site visits to BOP institutions, we found that a timely equipment repair was not a priority.  We observed institutions that allowed malfunctioning ion spectrometry machines to sit for 3-6 months before repairs were sought.  Regarding blind spots in visiting rooms, the BOP's response did not include an explanation of how it would conduct periodic monitoring and oversight to ensure that cameras and chairs are positioned to compensate for the blind spots.  The BOP also did not address how it will ensure broader use of visiting monitoring rooms, camera monitors, and ion spectrometry technology.

By July 1, 2003, please provide us with (1) information about the drug detection technologies that the BOP has identified for its institutions, and a plan for implementing the technologies in a timely manner; (2) a copy of the BOP's funding request for new drug interdiction technologies; (3) written documentation that restates to the institutions that repairs of malfunctioning equipment are a priority; (4) the BOP's oversight plan for monitoring how institutions compensate for blind spots in their visiting rooms; and (5) information describing how the BOP will ensure broader use of visiting monitoring rooms, camera monitors, and ion spectrometry technology in institutions.

U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division

**Recommendation 4:**  Resolved - Open

 **Summary of the BOP's Response.**  The BOP agrees with Recommendation 4 that visiting rooms should be staffed with enough correctional officers so that sufficient direct observation and monitoring of each visitor can occur.  However, the BOP states that institutions have the discretion to determine appropriate staffing levels to ensure proper monitoring of inmate visits, and therefore implies that the BOP Central Office has a limited role in this issue.

 **OIG's Analysis.**  During our site visits, we found that institutions were not ensuring proper monitoring of visits.  In several institutions, there was insufficient staff to roam the visiting rooms, view camera monitors, or observe visitors from adjacent rooms with two-way mirrors.  These gaps in the monitoring of visitors, who are the primary source of drug introductions, undermine the BOP's drug interdiction strategy.  Please provide us with an explanation as to how the BOP will ensure that local staffing discretion will be exercised to reduce drug introductions in the visiting rooms by July 1, 2003.

**Recommendation 5:**  Unresolved - Open

 **Summary of the BOP's Response.**  The BOP agrees with Recommendation 5 to implement a policy that restricts the size and content of property that staff are allowed to bring into BOP institutions.  The BOP anticipates completion of the policy by December 2004.

 **OIG's Analysis.**  While we appreciate the BOP's agreement to implement this recommendation, we believe that the BOP's completion date of December 2004 – two years from now – is untimely and that the BOP needs to expedite its efforts to stop staff smuggling drugs.  To resolve this recommendation, please provide us with a status update on the policy's development and an expedited implementation date by July 1, 2003.

**Recommendation 6:**  Unresolved - Open

 **Summary of the BOP's Response.**  The BOP does not agree with Recommendation 6 to develop a policy requiring searches of staff and their property when entering institutions.  The BOP states that staff morale would suffer and that staff searches would create unwarranted concerns in areas other than drug detection.  The response further states that searching staff is intrusive and raises gender specific issues, as well as issues regarding the impact such searches have in the overall reduction of drugs in BOP institutions.  The BOP asks the OIG to provide formal evaluation data from states that shows the effectiveness of staff searches in reducing the presence of drugs in institutions.  The BOP states that a more effective means to deter staff introduction of drugs would be to implement

U.S. Department of Justice                  111
Office of the Inspector General
Evaluation and Inspections Division

69-124

property size and content restrictions (see Recommendation 5), along with existing processes, such as background investigations, integrity training, and other investigative procedures.

**OIG's Analysis.**  We recognize that most BOP staff maintain high integrity standards.  But when staff smuggle drugs into BOP institutions the amounts are frequently large, as OIG and FBI cases demonstrate.  A significant factor that allows staff to smuggle drugs into institutions is the complete absence of any searches – including random searches or ion spectrometry searches – of staff or their property when they enter institutions.  BOP staff may enter institutions with unlimited personal property, knowing that no search of their person and property will occur.  While the BOP's agreement to establish a policy restricting the size and content of property that staff can carry into institutions is a positive step, property restrictions alone will not stop drug smuggling.  BOP staff still can hide drugs on their person and in BOP-approved containers (such as lunch boxes) and deliver drugs to inmates, knowing that they will not be searched.

We are not suggesting that searches be required for all staff; nor are we suggesting that the searches must be pat searches.  Rather, we are recommending that the BOP develop a staff search protocol.  The BOP has flexibility in choosing how to comply with this recommendation.  For example, the BOP may conduct random searches of staff and their property, whereby all staff on a particular shift would be searched walking through the front entrance once per week or month.  Another example might be that every fourth staff member on a specific shift would be searched walking through the front entrance once per week or month.  These searches can be conducted manually, via ion spectrometry, canine unit, or a combination of methods.

Although the BOP acknowledges that staff smuggle drugs, the BOP believes that searches would hurt staff morale and would cause [unspecified] concerns in [unspecified] areas other than drug detection.  We disagree with this assessment.  The BOP presented no evidence to support its claim that staff morale would suffer, or how unspecified areas other than drug detection would be affected by staff searches.  To the contrary, approximately 90 percent of the geographically diverse BOP staff we interviewed supported a combination of restricting the size and content of property <u>and</u> searching staff and their property.  BOP staff at every institution visited frequently stated to us that if you have nothing to hide, there should be no concern about being searched.  We believe that staff searches would be – and should be – accepted as a routine and necessary safety measure, as long as there is a clear policy that is universally applied as part of a greater effort to prevent drugs from entering institutions.

The BOP also states that gender specific issues and the intrusive nature of searches may cause concern.  We acknowledge that such searches are somewhat intrusive, but the safety and security of staff and inmates should be the overriding

concern.  Further, after September 11, 2001, searches of persons and property are becoming more commonplace in daily life.  In addition, the BOP can address gender and intrusiveness concerns by assigning a female correctional officer to search female employees, and conducting all searches in the presence of a supervisor to ensure the integrity of the searches.

The BOP further requests that the OIG provide states' formal evaluation data that shows the effectiveness of staff searches in reducing the presence of drugs in state correctional institutions.  The information we collected about the states' drug interdiction strategies is descriptive and does not measure statistically the effectiveness of each interdiction activity used in the strategies.  However, as we noted above, although the state information does not evaluate each interdiction activity, it does show that a mix of activities is effective in reducing drugs in prisons.  In support of this, a 1992 report by the Bureau of Justice Statistics (BJS) shows that institutions that direct special interdiction efforts toward staff (such as questioning, pat searches, and drug testing of staff) have a lower positive inmate drug test rate (1.0 percent positive for cocaine and 0.9 percent for heroin and methamphetamines) than institutions that make no special efforts to interdict drugs from staff (2.6 percent positive for cocaine, 2.2 percent for heroin, 6.6 percent for methamphetamine).[95]  In addition, our recommendation to search staff and their property is not predicated only on the states' activities, but also on the BOP's acknowledgment that staff are a primary source of drugs entering institutions and on documented drug cases involving staff.

The BOP's current limited interdiction activities toward staff – background investigations, integrity training, and investigative procedures – do not proactively stop drugs at their point of entry, and have not been fully effective in deterring staff from smuggling drugs.  The BOP's agreement to develop a policy to restrict property, although a positive first step in response to our report, should be coupled with searches of staff.  The outward appearance of a container is not as important as its contents.  Searching is the only method to determine the contents, and searching staff is the only method to find drugs on their person.

In sum, we believe the BOP should employ an appropriate mix of manual searches, ion spectrometry, and other technology to prevent staff from bringing drugs into institutions.  While the number of staff that bring drugs in may be small, the damage can be large.

To resolve this recommendation, please provide us with how the BOP will implement searches of staff and their property by July 1, 2003.

---

[95] "Drug Enforcement and Treatment in Prisons, 1990," BJS, U.S. Department of Justice, Washington, D.C., July 1992.

U.S. Department of Justice                                                                113
Office of the Inspector General
Evaluation and Inspections Division

**Recommendation 7:** Resolved - Open

      **Summary of the BOP's Response.** The BOP agrees with Recommendation 7 that random drug testing for staff should be implemented. On November 7, 2002, the BOP issued correspondence to all institution Chief Executive Officers (CEOs) regarding the impending January 2003 implementation of the Drug Free Workplace Program.

      **OIG's Analysis.** Please provide us with a copy of the correspondence issued to the institutions' CEOs, as well as a summary of the test results for 5 percent of test designated positions in July and December 2003 for the preceding 6 months.

**Recommendation 8:** Unresolved - Open

      **Summary of the BOP's Response.** The BOP agrees with Recommendation 8 that a policy should be implemented to eliminate unsolicited mail. The BOP anticipates an implementation date of December 2005.

      **OIG's Analysis.** Although the BOP agrees with this recommendation, it suggests it will take three years to implement new policy. We believe that the BOP's implementation date of December 2005 is untimely and that the BOP needs to expedite its efforts to stop drug smuggling through the mail. To resolve this recommendation, please provide us with a status update on the policy's development and an expedited implementation date by July 1, 2003.

**Recommendation 9:** Resolved - Open

      **Summary of the BOP's Response.** The BOP agrees with Recommendation 9 to require additional training for BOP staff to search mail and detect drugs. The BOP stated that it has already taken steps to enhance training for inmate systems officers effective November 2002.

      **OIG's Analysis.** The OIG believes, as stated in our report, that in addition to inmate systems officers, unit management staff who are responsible for opening and searching legal mail on a daily basis should be included in this training. Please provide us with a copy of the revised training curriculum, training schedule and locations, and list of participants by July 1, 2003.

**Recommendation 10:** Unresolved - Open

      **Summary of the BOP's Response.** The BOP agrees with Recommendation 10 to test mailroom drug detection technologies and states that the Inmate Systems Management Branch will work with the Office of Security Technology to conduct

U.S. Department of Justice                             114
Office of the Inspector General
Evaluation and Inspections Division

research and tests and present their findings to the BOP's executive staff.  The BOP anticipates presentation of the research and test findings by December 2005.

       **OIG's Analysis.**  Again, we believe the BOP's completion date of December 2005 is untimely.  The Office of Security Technology should already be familiar with mailroom drug detection technologies.  Inmate systems management officers at the institutions can determine quickly whether the technology is effective, if on-site testing of the technology is required.  To resolve this recommendation, please provide us with information about the drug detection technologies that the BOP has identified for its institutions' mailrooms, and a plan for testing and implementing the technologies in a timely manner by July 1, 2003.

**Recommendation 11:**  Unresolved - Open

       **Summary of the BOP's Response**.  The BOP agrees with Recommendation 11 that SENTRY, the BOP inmate tracking system, should be improved to accurately track the number of inmates who are diagnosed with a drug abuse problem, and who are referred for, receive, and complete treatment.  The BOP states that two policy changes to the drug abuse program policy are under review.  It states that these changes will improve SENTRY tracking of inmates entering the BOP with substance abuse disorders by (1) expanding the category of inmates who are eligible for the drug education course; and (2) improving the sequence of identification, screening, assessment, and referral of inmates with drug abuse disorders.  The BOP further states that with the expansion of the category of inmates eligible for drug abuse education, the BOP will create a Psychological Data System (PDS) database to track inmates with a substance abuse problem or those who receive a diagnosis and referral for treatment for a substance abuse disorder.  The BOP anticipates these policy revisions taking between one to three years to implement, with completion of this requirement by December 2005.

       **OIG's Analysis.**  With the proposed revisions to the screening, identification, assessment, and referral of inmates to drug abuse treatment, and the creation of a PDS database to track these inmates along each of the stages, the intent of our recommendation will be met.  However, we question the length of time BOP anticipates it will take to create the inmate tracking system, particularly when BOP staff already have the capability to enter treatment information in SENTRY (although not diagnosis and referral information).  While the actual policy revisions (expanding the category of inmate eligible for the drug education course and improving the screening and referral processes) may take longer to implement, we believe that the creation of a PDS database, improved SENTRY tracking, or any other tracking system for inmates with an identified drug abuse problem could be completed prior to implementation of the policy revisions.  To wait until December 2005 for a tracking system means that the BOP will not accurately identify for three more years the number and identity of inmates who have drug abuse problems.  Because demand reduction is an important component of the BOP's strategy to reduce drugs in its

U.S. Department of Justice                              115
Office of the Inspector General
Evaluation and Inspections Division

institutions, this is a lengthy timeframe for implementing the tracking system. Without the system, the BOP does not track inmates to ensure that those identified with a drug abuse problem get treatment and does not hold inmates accountable for following through with their treatment recommendations. The tracking system is critical to BOP's demand reduction efforts, and we believe the BOP should implement this initiative more quickly.

To resolve this recommendation, please provide us with an amended timeframe to expedite improved tracking of those inmates with drug abuse problems, as well as a status report on the development of the tracking database and the policy revisions by July 1, 2003.

**Recommendation 12:**  Unresolved - Open

**Summary of the BOP's Response.**  The BOP does not agree with Recommendation 12 that the non-residential drug abuse treatment program should be staffed based on a combination of the drug abuse treatment specialist (DATS) staffing guidelines and the number of inmates needing drug treatment at each institution.  The BOP's response states that this staffing initiative is not funded, and bringing the BOP's current institution complement into compliance with staffing guidelines would be cost prohibitive.  It further states that the drug abuse program policy only provides staffing guidelines for the residential drug abuse program (RDAP) because that is a longer and more intensive program than non-residential treatment.  The BOP also notes that each institution is already provided one DATS and a drug abuse program coordinator.

**OIG's Analysis.**  The BOP's response does not address the lack of non-residential drug treatment in its institutions.  Drug treatment for inmates is a critical part of the BOP's strategy to reduce the demand for and presence of drugs in its institutions.  Yet, the BOP's own internal program reviews have cited on-going deficiencies in providing non-residential drug treatment.

The staffing guidelines we cite in our recommendation and report do not relate only to the RDAP, as implied by the BOP's response.  The staffing guidelines also relate to the BOP's other drug program components:  drug education and non-residential treatment.  The guidelines are BOP-wide psychology services staffing guidelines developed for all institutions regardless of their security level or other operational variables, and are based on the population of the institution (i.e., the guidelines provide for "one DATS for an absolute increment of 500 inmates as a base and one DATS for each additional absolute increment of 500").  It is important to note that the RDAP, although recognized for its successful treatment outcomes, is not provided to inmates until sometime during their last 36 months of incarceration, with the intent that inmates will be drug-free when released into the community.  As a result, we believe the RDAP is not sufficient to support adequately the demand reduction component of the BOP's drug strategy for two reasons:  (1) with an

69-129

average 10-year sentence, many inmates are not eligible for RDAP admission for seven or more years from when they enter the institution.  Therefore, without non-residential treatment, inmates have no drug treatment during this lengthy period; and (2) not all inmates when diagnosed with a drug abuse problem are eligible for or volunteer to attend RDAP.  Without non-residential drug treatment, these inmates have no treatment alternative.

The BOP's response suggests that one DATS and one drug program coordinator per institution are sufficient.  However, the drug program coordinator does not provide drug treatment, and one DATS to provide drug education classes and non-residential drug treatment services to 1500-2000 inmates, the average inmate population at the institutions we visited, is insufficient.  At these institutions, the DATS told us they are overwhelmed with the number of drug abuse education classes they must teach and with the number of inmates who need drug abuse treatment.  It was clear to us that one DATS is not enough to handle the workload.

Moreover, without a continuum of treatment services for inmates, the goal to reduce the inmates' demand for drugs while incarcerated will not be achieved.  We found that, despite the BOP response claiming sufficient staffing, six of eight institutions we visited did not provide any or enough non-residential treatment for inmates with drug problems, primarily due to lack of staff.  Yet, the BOP has not indicated how it will solve this treatment gap so that inmates will not use drugs in the years before they are admitted to the RDAP.

We recognize that increased drug treatment staffing across BOP institutions would require additional resources.  However, we disagree with the BOP's rejection of this recommendation and its unwillingness to seek additional resources for this objective.  For example, the BOP could attempt a measured approach to staff increases by first determining those institutions with the greatest need and seeking additional staff accordingly.  The staff may be obtained through budget requests or reallocations of positions from areas of lower priority.  The BOP also could consider expanding the role of the drug abuse program coordinators to include providing drug treatment to inmates.

We believe an appropriate balance of institutions' drug treatment staffing levels to inmates' non-residential drug treatment needs is key to improving the BOP's strategy to reduce inmates' demand for drugs.  To resolve this recommendation, please provide us with the BOP's plan for ensuring non-residential treatment programs are adequately staffed so inmates have access to treatment by July 1, 2003.

**Recommendation 13:**  Unresolved - Open

**Summary of the BOP's Response**.  The BOP does not agree with Recommendation 13 that the drug abuse program policy should be revised to (1) clarify that non-residential treatment is required in addition to RDAP transitional services, (2) include a curriculum for non-residential drug treatment, (3) provide guidance regarding the minimum number of sessions and weeks' duration for treatment groups, and (4) increase emphasis on self-help groups such as Narcotics (NA) and Alcoholics Anonymous (AA).  The BOP states that the current drug abuse program policy already addresses the OIG recommendation.  The BOP's response also states that the majority of its resources are directed toward the RDAP.  Further, the BOP states that the non-residential treatment program was designed to address those offenders with a low-level substance abuse impairment who do not need the intensity of the RDAP, and to provide inmates with a moderate to severe drug problem with the supportive program opportunities while waiting for RDAP admission or near-term release into the community.

**OIG's Analysis.**  As with Recommendation 12, the BOP's response to Recommendation 13 fails to acknowledge that non-residential treatment is often not available to inmates who need treatment whether they have a low, moderate, or severe drug problem, and that the lack of non-residential treatment undermines the BOP's efforts to rehabilitate inmates and reduce drug use in its institutions.

In contrast to the BOP's response, we concluded, after reviewing BOP policy and interviewing DATS and drug program coordinators, that the current drug treatment policy does not provide sufficient guidance for non-residential treatment in its curriculum, application, or oversight.  Specifically, BOP Program Statement 5330.10, Drug Abuse Programs, Inmate, Chapter 4, page 1, paragraph 4.2, does not provide a sufficient level of assistance to DATS for implementing non-residential treatment.  The policy states, "Non-residential drug abuse services shall include a minimum of one hour of individual or group contacts each month as indicated by a treatment plan."  Most drug treatment staff in the institutions we visited confused this requirement with the requirement for transitional (aftercare) services (a component of non-residential treatment) to RDAP graduates before their release to the community.  Transitional services were provided in lieu of, rather than in addition to, non-residential treatment for inmates in the general population.  The BOP's uneven record of providing non-residential treatment provides further evidence of a program breakdown.  In six of eight institutions' drug treatment programs we reviewed, non-residential treatment was absent or minimal.  In the past two years at these institutions – some with the highest drug use rates BOP-wide – a total of only 7 to 32 inmates received non-residential treatment.  Further, the BOP's own internal program reviews cite on-going deficiencies throughout the BOP in providing non-residential drug treatment.  Yet, the BOP's response does not offer solutions to the treatment void.

69-131

At the institutions we visited, the DATS, drug program coordinators, and unit management staff believed non-residential treatment required stronger and more detailed policy and additional staff.  Although the policy suggests non-residential treatment topics of interpersonal skill building, errors in thinking, post-release survival, and anger management, it does not provide in-depth content information for these topics.  Program Statement 5330.10 hints at the expectations for non-residential treatment, but does not provide a strong foundation for the program, as demonstrated by the absence of treatment in the institutions.

The BOP also references in its response other guidance – a 1991 version of a drug abuse program curriculum (now under revision) – that can be used in non-residential treatment programs.  The BOP Central Office and staff at the institutions visited never mentioned the existence of this decade-old curriculum during our discussions of non-residential treatment.  Because of the BOP's lack of emphasis on non-residential treatment, the curriculum may have limited exposure among treatment staff.  Improvements in this curriculum, along with staff training, could fill some of the guidance gap of Program Statement 5330.10.

The Program Statement 5330.10 does acknowledge self-help programs, such as NA and AA, as useful adjuncts to institutions' drug abuse programs.  But the institutions we visited did not pursue these programs because of inadequate communication between the drug treatment staff and volunteer coordinators to recruit program volunteers from the community, or because of local security prohibitions against NA and AA volunteers who have criminal backgrounds.  We believe the Program Statement should more expressly state that drug treatment staff must ensure that volunteers are solicited for self-help programs and that criminal backgrounds of NA and AA volunteers (who are often former addicts and alcoholics) should not automatically preclude their presence in institutions.

To resolve this recommendation, the BOP must agree to (1) revise Program Statement 5330.10 to clarify the requirement for non-residential drug abuse treatment for inmates in the general population, in addition to the monthly transitional services for RDAP graduates; (2) develop (or enhance) a detailed curriculum and timeframes for non-residential treatment as part of Program Statement 5330.10 or as a separate document (such as the 1991 curriculum referenced by BOP; and (3) re-emphasize to institutions the important role of self-help programs and ensures barriers to their use are removed.  Please provide us with the status of these actions by July 1, 2003.

**Recommendation 14:**  Unresolved - Open

**Summary of the BOP's Response.**  The BOP does not agree with the first part of Recommendation 14 to create incentives for participation in non-residential drug treatment and sanctions for non-completion to increase inmate participation.  The BOP response states that incentives and sanctions would be a disincentive for

inmates with the most severe treatment needs to enroll in the RDAP. It further states that placement of inmates with serious drug problems in non-residential rather than residential treatment would be a disservice to the inmates and the community.

The BOP agrees with the second part of Recommendation 14 to add a separate score for drug treatment participation on inmates' annual Security Designation and Custody Classification form. The BOP states that modifications are currently underway to reflect an inmates' participation in all program areas. These modifications should include an inmates' participation in drug abuse treatment. The BOP anticipates completing and implementing the modifications in December 2005.

**OIG's Analysis.** With regard to the first part of the recommendation, we disagree with the BOP's view that creating incentives for participation and sanctions for non-completion of non-residential treatment would be a disincentive for inmates to participate in the RDAP. Non-residential treatment is the only drug abuse treatment available to inmates in the general population who do not meet the criteria for, choose to not participate in, or are awaiting admission to the RDAP. If inmates are referred to the RDAP, these referrals remain in force regardless of the inmates' participation in non-residential treatment. If inmates ultimately refuse to enter the RDAP, whether or not they attended non-residential treatment in the interim, the inmates should receive a failing score for the referred drug program on the inmates' annual Security Designation and Custody Classification form.

The BOP's response, which focuses on the benefit of the RDAP for those inmates with severe drug disorders, diminishes the importance of non-residential treatment. It also suggests that inmates should have no drug treatment available other than the RDAP. As noted previously, however, inmates are not eligible for the RDAP until the last 36 months of their sentence, which results in a lengthy treatment void for needy inmates.

The BOP should be encouraging inmates, through incentives and sanctions, to participate in *any* accepted drug treatment. One method of treatment provided in the near term does not detract from another method of treatment provided in the longer term. Moreover, the BOP has not presented any evidence that incentives and sanctions for the non-residential treatment program undermine the RDAP. The BOP also has not presented evidence that inmates with severe treatment needs are harmed by participating in non-residential treatment prior to admittance to the RDAP. We believe incentives and sanctions for non-residential treatment are important to increasing inmates' participation in treatment. The BOP also recognizes the importance of incentives and sanctions to treatment participation, as both the drug education course and the RDAP have incentives for participation and sanctions or disincentives for non-completion.

69-133

With regard to the second part of the recommendation, we believe the BOP's date of December 2005 is untimely for completing and implementing modifications to the Security Designation and Custody Classification form.

To resolve this recommendation, please provide us with (1) a copy of the modified Security Designation and Custody Classification form and an expedited implementation date, and (2) the BOP's plan for improving inmates' participation in non-residential treatment through incentives for participation and sanctions for non-completion by July 1, 2003.

**Recommendation 15:**  Resolved - Open

**Summary of the BOP's Response.**  The BOP partially agrees with Recommendation 15 to consider other opportunities to improve drug interdiction activities for the R&D and warehouse areas, the rear gate, volunteers, contractors, and institution intelligence operations.  The BOP does not agree to conduct another pilot test of canines as a drug detection technique for its institutions.

The BOP states that each of its six regions is authorized to have a canine unit at one institution.  The BOP does not believe it is appropriate to expand this policy, citing the significant amount of financial and staff resources involved.  It states that purchasing canines, training staff and canines, and caring for canines are major concerns when determining the overall cost/benefit of the program.  Additionally, the BOP states that canine resources are usually available in the local community for use upon request, and use of these outside canines serves to enhance relationships with local law enforcement.

**OIG's Analysis.**  The OIG recommended (1) using better technology to supplement manual searches for drugs in the R&D and warehouse areas, (2) establishing a volunteer and contractor database to enable timely sharing of information between institutions, (3) establishing the Special Investigative Supervisor (SIS) lieutenant position as a permanent position rather than an 18-month rotation, (4) providing more timely and in-depth training for SIS lieutenants, (5) using SIS staff to train other staff about drug interdiction issues, and (6) pilot testing canines as a drug detection technique for institutions.

Although the BOP agreed to consider the opportunities we presented in our report for improving drug interdiction activities for items 1 through 5 above, the BOP did not provide specific information about its planned actions for each item.  Please provide us with the BOP's planned actions for items 1 through 5 by April 4, 2003.

The BOP response does not agree with item 6 to pilot test canines as a drug detection technique.  Only one region currently has a canine unit (at USP Lewisburg).  During our interviews at the BOP's Central Office, BOP officials strongly opposed expanding the number of BOP canine units.  Therefore, although

U.S. Department of Justice                                                                121
Office of the Inspector General
Evaluation and Inspections Division

authorized, we believe it is unlikely that any region would request establishment of a canine unit.  In fact, we were told that when the current canines at USP Lewisburg die, so too will the canine program.

During our review, the BOP could not locate the results of its original pilot study on canine units initiated in FY 1990.  Therefore, we were unable to determine the factual basis for the BOP's opposition.  The BOP's own policy statement on canine units states, "The use of canines by the Bureau and other federal law enforcement agencies has proven to be an effective method for narcotics detection…The presence of a canine unit not only aids in locating drugs, drug paraphernalia, and escapees, but also serves as a deterrent."  Further, canine units are frequently used by state correctional systems as part of their overall drug interdiction strategies.  Fourteen of 17 states from which we collected drug interdiction strategies use canine units.

The BOP response states that canines are usually available in the community.  However, as pointed out in the OIG report, canine units from local law enforcement in fact are frequently unavailable for use by BOP institutions and are not well-suited or trained for work inside a correctional institution.  By contrast, the BOP's canine unit at USP Lewisburg demonstrates the benefits of canines as a drug interdiction activity throughout the institution.

We believe that drug detecting canines are an underused resource in the BOP.  Regarding cost, the purchase cost of one canine (including cost of training for the handler and canine) is one-quarter the cost of an ion spectrometry machine, and one-sixth to one-third the cost to maintain that machine annually.  As stated in our report, other institutional technology, such as x-ray scanners or metal detectors, used to search inmates and their property, mail, or warehouse deliveries are not capable of detecting drugs.  Therefore, drug detecting canines could be used to enhance interdiction activities in areas throughout institutions, such as in the mailroom, the R&D area, the warehouse, and the rear gate.  Canines are more mobile than some machines and can also be used to search inmates, staff, visitors, all areas of the prison, and parking lots.  With the BOP's concern about being "restricted from broad and universal application of technological advancements by funding allocated to the agency," and its prolonged dates to locate, test, and implement technology, the expanded use of canines, an already proven low-technology alternative in many state correctional systems, appears warranted.  Canines are less expensive, trained specifically to detect drugs (and trained for multiple other uses), serve as a highly visible deterrent, and have low on-going maintenance costs.

We believe the BOP should fully implement its own policy and, at a minimum, establish a drug detecting canine unit for each region as a pilot study, concentrating

on the institution within each region with the highest positive inmate drug test and drug misconduct rates.  Please provide us with your decision to pilot test drug detecting canine units by April 4, 2003.