# EXHIBIT 73

# THE FEDERAL DEATH PENALTY SYSTEM:
## A STATISTICAL SURVEY
### (1988-2000)

**United States Department of Justice**
**Washington, D.C.**
**September 12, 2000**

## INTRODUCTION

This Survey provides information regarding the federal death penalty system since the enactment of the first modern capital punishment statute in 1988. The Survey explains the Department of Justice's internal decision-making process for deciding whether to seek the death penalty in individual cases, and presents statistical information focusing on the racial/ethnic and geographic distribution of defendants and their victims at particular stages of that decision-making process.

The Supreme Court issued a ruling in 1972 that had the effect of invalidating capital punishment throughout the United States – both in the federal criminal justice system and in all of the states that then provided for the death penalty. While many state legislatures revised their procedures relatively quickly to withstand constitutional scrutiny, the federal government did not do so until November 18, 1988, when the President signed the Anti-Drug Abuse Act of 1988. A part of this law, known as the Drug Kingpin Act (DKA), made the death penalty available as a possible punishment for certain drug-related offenses. The availability of capital punishment in federal criminal cases expanded significantly further on September 13, 1994, when the President signed into law the Violent Crime Control and Law Enforcement Act. A part of this law, known as the Federal Death Penalty Act (FDPA), provided that over 40 federal offenses could be punished as capital crimes. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which went into effect on April 24, 1996, added another four federal offenses to the list of capital crimes.[1]

As the law governing the federal death penalty has changed, the Department of Justice has modified its internal decision-making processes in capital cases. With the enactment of the DKA in 1988, the Department instituted a policy that required United States Attorneys in the 94

---

[1]The FDPA promulgated capital sentencing procedures and made them applicable to over 40 separately numbered sections of the United States Code. However, because many of these sections define multiple offenses (either in separately designated subsections or by listing different types of prohibited conduct in a single provision), the precise number of "offenses" to which the FDPA applies depends on the definition of "offense." A list of the 59 separate sections of the United States Code that define offenses currently subject to the death penalty (including the offenses added by the AEDPA) is set forth in Table 6 (page T-23).

73-001

federal districts across the country[2] to submit to the Attorney General for review and approval any case in which the United States Attorney affirmatively wished to seek the death penalty. Under this policy, the decision not to seek the death penalty was left to the United States Attorneys' discretion. From 1988 until the end of 1994, United States Attorneys sought approval from Attorneys General to seek the death penalty 52 times and received it 47 times.

On January 27, 1995, the Department adopted the policy still in effect today – commonly known as the death penalty "protocol" – under which United States Attorneys are required to submit for review all cases in which a defendant is charged with a capital-eligible offense, regardless whether the United States Attorney actually desires to seek the death penalty in that case. The United States Attorneys' submissions are initially considered by a committee of senior Department attorneys in Washington, D.C. known as the Attorney General's Review Committee on Capital Cases (Review Committee), which makes an independent recommendation to the Attorney General. From January 27, 1995 to July 20, 2000 – the close of the reporting period for this Survey – United States Attorneys submitted a total of 682 cases for review and the Attorney General ultimately authorized seeking the death penalty for 159 of those defendants.

While a case progresses through the Department's review process, it simultaneously continues in the United States Attorney's Office and in the court system. Some cases submitted by United States Attorney for review are subsequently withdrawn due to events outside the review process. For example, the defendant and the United States Attorney may enter into a plea agreement that disposes of the case and results in the imposition of a prison term. In other cases, a judicial decision may result in the dismissal of either the entire case or the specific charges that are punishable by death. As a result, the total number of cases considered by the Review Committee is smaller than the total number submitted by the United States Attorneys, and the total number of defendants considered by the Attorney General is smaller still. Furthermore, not all defendants who proceed to trial receive the death penalty. As discussed below, since 1988, federal juries returned death verdicts against fewer than half of the defendants they found guilty of capital crimes. As of the date of this Survey, five defendants who were authorized for the death penalty during the "pre-protocol" period (1988-1994) were subject to a pending sentence of death; fourteen defendants authorized during the "post-protocol" period (1995-2000) were also subject to a pending sentence of death.

Current Department policy provides that bias based on characteristics such as an individual's race/ethnicity must play no role in a United States Attorney's decision to recommend

---

[2]There are 94 separate federal judicial districts in the United States. Twenty-six states, as well as the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and the Northern Mariana Islands, each comprise a single federal district, while each of the remaining 24 states is divided into two or more federal districts. Each district has a United States Attorney who is appointed by the President with the advice and consent of the Senate, with the exception that the District of Guam and the District of the Northern Mariana Islands share a single United States Attorney. Accordingly, there are total of 93 United States Attorneys. A list of the United States Attorneys' Offices showing the locations of the principal offices in each district is provided in Table 4 (page T-10).

73-002

the death penalty.  Also, in some districts, the United States Attorney (as opposed to the particular prosecutors handling a case) is likewise not informed of the defendant's race/ethnicity.  Moreover, the United States Attorney's Office may not provide information about the race/ethnicity of the defendant to Review Committee members, to attorneys from the Criminal Division's Capital Case Unit (CCU) who assist the Review Committee, or to the Attorney General.  As explained below, the only individuals in Washington, D.C. who are ordinarily privy to race/ethnicity information are paralegal assistants in the CCU who collect these statistics under separate cover from the United States Attorneys.[3]  This information forms the pool from which most of the federal data on race/ethnicity reported below are drawn.

This Survey presents a series of statistics regarding the federal death penalty process that are broken down by time period (pre-protocol and post-protocol),[4] by participants in the decision-making process (the United States Attorneys, the Review Committee, and the Attorney General), and by the racial/ethnic groups of defendants and victims.[5]  Part I presents highlights of a statistical overview of the Department's decision-making process.  Parts II to V each presents highlights of data regarding particular stages of the process.  In particular, Part II presents highlights regarding recommendations made by United States Attorneys; Part III presents highlights regarding recommendations made by the Review Committee; Part IV presents highlights regarding decisions made by Attorneys General; and Part V presents highlights regarding post-authorization activity (*e.g.*, plea agreements, jury trials) in all cases in which Attorneys General made decisions to seek the death penalty, with additional case-specific information about the 19 defendants now under a federal death sentence.  Finally, Part VI presents highlights of data regarding the degree of consensus among United States Attorneys, the Review Committee, and the Attorney General.

---

[3]In presenting reasons why the death penalty should not be sought, defense counsel on occasion explicitly provide information about the race/ethnicity of defendants or victims to the United States Attorneys, the Review Committee, and the Attorney General.

[4]As noted above, on January 27, 1995, the Attorney General revised the Department of Justice procedures for deciding whether to seek the death penalty against defendants charged with capital offenses.  This change in policy was made by means of a formal amendment to the United States Attorneys' Manual.  For ease of reference, the "pre-protocol" period, when United States Attorneys submitted for review only recommendations to seek the death penalty against defendants charged with violations of the DKA, is discussed as having lasted from 1988 to 1994, despite the fact that the first 26 days of 1995 were also, strictly speaking within that period.  Likewise, the "post-protocol" period is described, during which United States Attorneys submitted recommendations both for and against seeking the death penalty against defendants charged with a variety of capital offenses, is often described in this Survey as encompassing the years 1995 to 2000.

[5]This Survey refers to defendants and victims as "White," "Black," "Hispanic," or "Other," due in large part to the way in which data regarding the federal death penalty has been collected.  The last category – "Other" – includes any person whose race is Asian, Pacific Islander, Native American, Aleut, Indian, or unknown.  The Survey uses "Hispanic" as a separate category to refer to persons of Hispanic ethnicity, regardless of race.  As a result, the terms "White," "Black," and "Other" as used in this Survey refer only to non-Hispanic members of those racial groups.

73-003

The statistical information presented in the narrative of the Survey is based on the data contained in the tables set forth at pages T-1 to T-355.  For the reader's convenience, those tables have been grouped together at the end of the Survey rather than interspersed within it.  There are a number of important notes accompanying those tables that explain the methods and terms used in compiling the data, as well as the way in which anomalous cases have been treated in presenting overall characterizations of the statistics.  Those notes are set out at the beginning of the tables (pages T-xi to T-xvii).

In evaluating the data presented in this Survey, the reader should bear in mind that the vast majority of homicides in the Untied States, like most violent crimes, are investigated exclusively by local police officers working hand-in-hand with local prosecutors, who file charges against defendants in state courts, either as a capital case or non-capital case.[6]  When a homicide is prosecuted federally – either as a capital or non-capital case – it is often because of the availability of certain federal laws or because of a federal initiative to address a particular crime problem.  Criminal organizations often operate in multiple jurisdictions, making it difficult for any single local prosecutor to investigate or prosecute a case.  Additionally, many states lack the equivalent of the federal witness protection program and the ability to conduct complex long-term investigations using resource intensive investigative techniques such as court-ordered wiretaps and undercover operations.

Apart from these differences in laws and resources, which often affect whether a particular homicide is prosecuted in state or federal court – either as a capital or non-capital case – state and federal law enforcement officials often work cooperatively to maximize their overall ability to prevent and prosecute violent criminal activity in their respective communities.  Such cooperation is a central feature of current federal law enforcement policy.  In some areas, these cooperative efforts lead to agreements that certain kinds of offenses, particularly violent crimes, will be handled by federal authorities.  In Puerto Rico, for example, the United States Attorney has agreed with his local counterpart that the federal government will prosecute carjackings involving death, which has led to a large number of homicides being handled by that particular United States Attorney's Office.  In some cities, a large number of cases involving multiple murders by drug and other criminal organizations are investigated by joint federal and local task forces and prosecuted federally due to some of the factors cited above, such as the geographic reach of the organization and the availability of a witness protection program.  In other areas, by contrast, these cooperative efforts lead to a federal emphasis on crimes other than homicides.  These decisions are not, however, static ones.  A given homicide that appears to be of purely local interest may, upon further investigation months or years after the offense, prove to be

---

[6]Prior to 1972, capital punishment was available and carried out in both the federal and state systems for acts of murder and a variety of other crimes, such as rape, kidnaping, and treason.  Today, while the vast majority of crimes subject to the death penalty under federal law involve homicides, a few do not.  *See* 18 U.S.C. §§ 794 (espionage); 2381 (treason); 3591(b)(1) (certain aggravated narcotics trafficking offenses).  Nonetheless, the federal government has not sought the death penalty in any such case since 1988 and all defendants now under a sentence of death in the states were convicted of crimes specifically related to homicides.

73-004

related to organized multi-jurisdictional criminal activity that is being investigated by federal law enforcement officials, who may seek to transfer the case from state prosecutors to federal prosecutors. For these and other reasons, the factors that determine whether a particular homicide will enter the state or federal criminal justice systems are complex and difficult to quantify.

Overall, however, the federal government continues to play a relatively small role in administering the death penalty in this country. From 1930 to 1999, state governments executed over 4,400 defendants.[7] During the same time period, the federal government executed 33 defendants and has not carried out any executions since 1963.[8] Furthermore, the Department of Justice's Bureau of Justice Statistics (BJS) reports that by the end of 1998 (the most recent year for which this statistic is available), there were 3,433 defendants with pending death sentences in the States, compared to 19 defendants with currently pending death sentences in the federal system. Thus, despite the expansion of the availability of the federal death penalty since 1988, federal defendants account for approximately one-half of one percent of all the defendants on death row in the United States.

---

[7]*See* Bureau of Justice Statistics, U.S. Department of Justice, Number of Persons Executed in the United States, 1930 – 99, <http://www.ojp.usdoj.gov/bjs/glance/exe.txt>.

[8]*See* Federal Death Penalty Information Center, Executions of Federal Prisoners 1927-1999, <http://www.deathpenaltyinfo.org/fedexec.html>.

73-005

## PART I:  STATISTICAL OVERVIEW

Table Set I (pages T-1 to T-7) provides statistical summaries of the decision-making process at the Department of Justice by its primary participants – the United States Attorneys, the Review Committee, and the Attorney General – and how the decisions of those participants affect members of four different racial/ethnic groups.  Highlights of these summary tables are presented below.

**A.     RACIAL/ETHNIC DISTRIBUTION OF DEFENDANTS SUBMITTED BY THE UNITED STATES ATTORNEYS**

- From 1988 to 1994, a total of 52 defendants were submitted by the United States Attorneys under the Department's former decision-making procedures.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 52 | 7 | 39 | 5 | 1 |
| Percent | 100% | 13% | 75% | 10% | 2% |

- From 1995 to 2000, a total of 682 defendants were reviewed under the Department's current death penalty decision-making procedures.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 682 | 134 | 324 | 195 | 29 |
| Percent | 100% | 20% | 48% | 29% | 4% |

**B.     RATES AT WHICH EACH PARTICIPANT RECOMMENDED/AUTHORIZED THE DEATH PENALTY WITH RESPECT TO EACH RACIAL/ETHNIC GROUP**

Because cases continue to be litigated while the death-penalty decision-making process is proceeding at the Department of Justice, not all of the defendants who are the subject of a recommendation by a United States Attorney are considered by the Review Committee and the Attorney General.  The following highlights – which serve to allow a comparison of the rate at which each participant in the decision-making process recommends or authorizes seeking the death penalty – take that attrition into account by showing, for each racial/ethnic group, the rate at which *each* participant recommended or authorized seeking the death penalty as a percentage of the total number of defendants considered by *that* participant.  Thus, the percentages below

6

reflect the number of defendants in a particular racial/ethnic group for which each participant in the death penalty process recommended/authorized the death penalty, divided by the total number of defendants of that racial/ethnic group that were considered by that participant.

- From 1988 to 1994, the Attorney General agreed with the United States Attorneys in most cases. (The Review Committee was not yet in existence).

| RATES AT WHICH EACH PARTICIPANT RECOMMENDED/ AUTHORIZED SEEKING THE DEATH PENALTY (1988-1994) | | | | | |
|---|---|---|---|---|---|
| | Overall | White | Black | Hispanic | Other |
| U.S. Attorneys | 100% | 100% | 100% | 100% | 100% |
| Attorney General | 90% | 100% | 87% | 100% | 100% |

- From 1995 to 2000, when United States Attorneys submitted defendants with recommendations both for and against seeking the death penalty, each participant in the decision-making process (including the Review Committee) recommended/authorized the death penalty against slightly less than one third of the defendants that each participant considered.

| RATES AT WHICH EACH PARTICIPANT RECOMMENDED/ AUTHORIZED SEEKING THE DEATH PENALTY (1995-2000) | | | | | |
|---|---|---|---|---|---|
| | Overall | White | Black | Hispanic | Other |
| U.S. Attorneys | 27% | 36% | 25% | 20% | 52% |
| Review Comm. | 30% | 40% | 27% | 25% | 50% |
| Attorney General | 27% | 38% | 25% | 20% | 46% |

C.     RATES AT WHICH THE DEPARTMENT OF JUSTICE SOUGHT THE DEATH PENALTY WITH RESPECT TO EACH RACIAL/ETHNIC GROUP

The percentages below reflect the number of defendants in each racial/ethnic group that the Attorney General authorized the death penalty, divided by the total number of defendants in that particular racial/ethnic group that initially entered the Department's review process.

7

73-007

- From 1988 to 1994, the Department of Justice sought the death penalty against 90 percent of the defendants submitted for review by United States Attorneys with recommendations exclusively in favor of seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Total submitted | 52 | 7 | 39 | 5 | 1 |
| Decision to seek DP | 47 | 7 | 34 | 5 | 1 |
| Percent | 90% | 100% | 87% | 100% | 100% |

- From 1995 to 2000, the Department of Justice sought the death penalty against 23 percent of the defendants charged with crimes punishable by death and submitted for review by United States Attorneys with recommendations for or against seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Total submitted | 682 | 134 | 324 | 195 | 29 |
| Decision to seek DP | 159 | 44 | 71 | 32 | 12 |
| Percent | 23% | 33% | 22% | 16% | 41% |

8

73-008

# PART II:  THE UNITED STATES ATTORNEYS

A.    **BACKGROUND**

As discussed above, with the enactment of the DKA in 1988, the United States Attorneys were required to submit to the Attorney General for review and approval only those cases in which the United States Attorney affirmatively wished to seek the death penalty.  With the enactment of the new death penalty protocol on January 27, 1995, United States Attorneys were required to submit to the Attorney General for review "all Federal cases in which a defendant is charged with an offense subject to the death penalty, regardless of whether the United States Attorney intends to request authorization to seek the death penalty."  For the reasons set forth below, this protocol does not require United States Attorneys to submit to the Attorney General *all* potentially capital-eligible defendants in the federal system.

First, United States Attorneys are not required to submit to the Attorney General for review cases in which the United States Attorney initially considered the case for federal prosecution, but ultimately decided to defer prosecution to state authorities.  For example, a federal agent might arrest a defendant for committing a street robbery in which a homicide occurred, but the prosecution might be turned over to the local district attorney because of the lack of a substantial federal interest.[9]

Second, United States Attorneys retain the discretion not to charge defendants facing federal prosecution for a homicide with a capital-eligible offenses if they do not believe such a charge could be sustained.  For example, a United States Attorney might decide at the outset of a particular case (*e.g.*, a vehicular homicide on federal land) that he or she simply could not prove to a jury beyond a reasonable doubt that the defendant had the requisite level of intent to be charged with a capital-eligible offense.

Third, at any time, either before or after indictment, United States Attorneys have the discretion to conclude a plea agreement with a defendant, which has the effect of foreclosing the death penalty.  For example, either before or after indicting several defendants for capital-eligible offenses, a United States Attorney may decide to enter into a cooperation agreement with one of the defendants, under which that defendant agrees to plead guilty to certain crimes and testify against his co-defendants in exchange for consideration – including the dismissal of

---

[9]Under general Department policy, United States Attorneys must determine, in deciding whether to accept a capital or non-capital case for federal prosecution, if there is a "substantial federal interest" in doing so.  In making this determination, United States Attorneys weigh a number of factors, including federal law enforcement priorities, the seriousness of the particular offense, and issues specific to the individual defendant, such as his or her willingness to cooperate in the investigation or prosecution of others.

73-009

certain charges and a promise to inform the sentencing judge about the cooperation – that has the effect of rendering the defendant ineligible for the death penalty. Likewise, United States Attorneys have the discretion to enter plea agreements with a defendant before or after he has been charged with capital-eligible offenses that do not require the defendants' cooperation. Such decisions may be made for a variety of reasons, including eliminating the risk of an acquittal in a difficult case, the unavailability of one or more key witnesses, or an unfavorable evidentiary ruling by the court that significantly weakens the case. If any such plea agreement is reached before a case has been submitted for review, the United States Attorney need not submit it thereafter.[10]

There has been no centralized data collection process in place regarding these three categories of potential capital-eligible cases. As a result, the data regarding submissions by United States Attorneys that are reported in this Survey do not include information regarding the entire pool of potential capital-eligible defendants in the federal system since 1988.

There are, nonetheless, a significant number of cases that United States Attorneys have submitted to the Attorney General for review under the current protocol, namely, all cases in which a United States Attorney charges a capital-eligible offense and does not enter into a plea with the defendant before making a submission to the Attorney General. In submitting these cases, the United States Attorney must recommend to the Attorney General whether he or she believes that the death penalty should be authorized in that case. Prior to doing so, however, the United States Attorney or his or her designee will meet with the defendant's attorneys and allow them to make written and oral presentation as to why the death penalty should not be sought in the case.[11] In addition, many United States Attorneys employ additional decision-making procedures within their own offices; several have standing committees of senior prosecutors to

---

[10]Even when an offender commits an offense punishable by death, there are statutory limits on the categories of persons who can be executed. Specifically, in expanding the scope of offenses for which the death penalty is available, the FDPA added a provision prohibiting the execution of a pregnant woman or any person who is mentally retarded. The same statute also prohibits the execution of any person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person, and further prohibits the imposition of the death sentence on any person who was less than 18 years of age at the time of the offense. *See* 18 U.S.C. §§ 3591, 3596.

[11]Since 1988, federal law has expressly required that, upon the request of an indigent capital defendant, a federal judge shall appoint two attorneys to represent the defendant and make available sufficient funds for reasonable investigative and expert services. The attorneys appointed to represent an indigent defendant must have the "background, knowledge, or experience [that] would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation." *See* 21 U.S.C. § 848(q). Furthermore, a separate provision in effect since 1994 requires that at least one defense attorney be "learned in the law of capital cases" (a prior version of that statute, in effect from 1948 to 1994, provided for all capital defendants to be represented by "learned counsel"). *See* 18 U.S.C. § 3005.

73-010

review all potential capital cases, and others appoint such internal review committees on an ad hoc basis.[12]

Once a United States Attorney decides whether to seek authorization from the Attorney General to pursue the death penalty, he or she is required to submit detailed information about the case to the Criminal Division's CCU. In particular, the United States Attorney must submit a comprehensive discussion of the theory of liability; the facts and evidence relating to the issue of guilt or innocence; the facts and evidence relating to any aggravating factors (including victim impact) or mitigating factors; the defendant's background and criminal history; the basis for federal prosecution; and any other relevant information. The United States Attorney is also required to submit any material received from defense counsel in opposition to the death penalty, and other significant documents such as confessions, key witness statements, and autopsy and crime scene reports.

## B.    STATISTICAL HIGHLIGHTS

The United States Attorneys submitted 52 cases for review during the pre-protocol period and 682 cases during the post-protocol period. Detailed information about these submissions are set forth in Table Set II (pages T-8 to T-126). This section provides highlights of the statistical data regarding these submissions and is divided into three parts. First, drawing on the statistics in Table Set II.A (pages T-9 to T-21), the cases are analyzed in terms of the defendants who were charged by the United States Attorneys and submitted for review. Second, using statistics from Table Set II.B (pages T-22 to T-56), the cases are analyzed in terms of the types of offenses charged. Third, the cases are examined with an emphasis on the race/ethnicity of the victims of the crimes charged against defendants, using the statistical compilations from Table Set II.C (pages T-57 to T-126).

1.    Defendants

a.    Recommendations in favor of seeking the death penalty

- From 1995 to 2000, United States Attorneys recommended seeking the death penalty for 183 defendants, out of a total of 682 submitted for review by the Attorney General (27 percent).

---

[12]In some United States Attorneys' Offices, the United States Attorney, as well as members of the Office's internal committee that advises the United States Attorney on whether to recommend seeking the death penalty, are not informed by the prosecutors handling the case of the defendants' race/ethnicity.

11

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 183 | 48 | 81 | 39 | 15 |
| Percent | 100% | 26% | 44% | 21% | 8% |

● The 183 recommendations to seek the death penalty were made by the United States Attorneys in 49 of the Nation's 94 districts.

● 10 of these 49 districts submitted only recommendations in favor of seeking the death penalty. These 10 districts accounted for 31 of the 183 recommendations against the death penalty in the post-protocol period (17 percent).

b. Recommendations against seeking the death penalty

● From 1995 to 2000, United States Attorneys recommended against seeking the death penalty with respect to 494 defendants, out of 682 submitted for review by the Attorney General (72 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 494 | 85 | 242 | 153 | 14 |
| Percent | 100% | 17% | 49% | 31% | 3% |

● The 494 recommendations not to seek the death penalty were submitted by the United States Attorneys in 62 of the Nation's 94 districts.

● 23 of the 62 districts submitted only recommendations against seeking the death penalty.[13] These districts accounted for 87 of the 494 recommendations against the death penalty in the post-protocol period (18 percent).

● Including the 21 districts that have never submitted a case for review by the Attorney General, with a recommendation for or against the death penalty, there are a total of 40 districts out of 94 that have never recommended seeking the death penalty for any defendant.

---

[13]Of these 23 districts that submitted only recommendations against seeking the death penalty during the post-protocol period, four submitted at least one recommendation in favor of seeking the death penalty during the pre-protocol period.

12

2.    Offenses

During the pre-protocol period, defendants were charged exclusively under the DKA. With the enactment of the FDPA in late 1994, many other federal criminal offenses were punishable by death. The following highlights therefore refer exclusively to the post-protocol period. In considering statistics about the most frequently charged offenses, the reader should bear in mind that a single defendant may be charged with more than one statutory offense punishable by death.

The most frequently charged capital offenses were different for different racial/ethnic groups, although there were some constants. In particular, the use of a gun to commit homicide during and in relation to a crime of violence or drug trafficking crime, 18 U.S.C. § 924(j) ("firearms murder"), was always among the three most frequently charged capital offenses against each group, and both murder in aid of racketeering activity, 18 U.S.C. § 1959(a) ("racketeering murder") and murder in furtherance of a continuing criminal narcotics enterprise, 21 U.S.C. § 848(e)(1)(A) ("CCE murder"), were generally among the most frequently charged. Each of these crimes, and particularly firearms murder, can be charged in a wide array of circumstances, and is therefore more likely to be available as a charging option in a given case than more narrowly defined offenses such as kidnaping-related murder.

- Among the 134 White defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  - Murder within federal jurisdiction, 18 U.S.C. § 1111, which was charged against 28 of the 134 submitted White defendants (21 percent);

  - Firearms murder, which was charged against 22 of the 134 submitted White defendants (16 percent); and

  - Racketeering murder, which was charged against 20 of the 134 submitted White defendants (15 percent).

- Among the 324 Black defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  - Firearms murder, which was charged against 105 of the 324 submitted Black defendants (32 percent);

  - CCE murder, which was charged against 85 of the 324 submitted Black defendants (26 percent); and

  - Racketeering murder, which was charged against 70 of the 324 submitted Black defendants (22 percent).

73-013

- Among the 195 Hispanic defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

    – Racketeering murder, which was charged against 60 of the 195 submitted Hispanic defendants (31 percent);

    – Firearms murder, which was charged against 53 of the 195 submitted Hispanic defendants (27 percent); and

    – Carjacking murder, 18 U.S.C. § 2119(3), which was charged against 34 of the 195 submitted Hispanic defendants (17 percent).

- Among the 29 Other defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

    – Firearms murder, which was charged against 6 of the 29 submitted Other defendants (21 percent);

    – Murder within federal jurisdiction, 18 U.S.C. § 1111, which was charged against 5 of the 29 submitted Other defendants (17 percent); and

    – Kidnaping murder, 18 U.S.C. § 1203(a), which was charged against 5 of the 29 submitted Other defendants (17 percent).

- As a general matter, the offenses most frequently charged against a given racial/ethnic group were also the most frequently charged against the members of that racial/ethnic group for whom United States Attorneys recommended seeking the death penalty.

3. <u>Victims</u>

    a. <u>Victims' race/ethnicity</u>

- From 1988 to 1994, there were a total of 65 identified victims of the capital offenses charged against defendants submitted for review by United States Attorneys (as to whom the recommendation was to seek the death penalty).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 65 | 6 | 49 | 9 | 1 |
| **Percent** | 100% | 9% | 75% | 14% | 2% |

14

73-014

- From 1995 to 2000, there were a total of 894 identified victims of the capital offenses charged against defendants submitted for review by United States Attorneys.[14]

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 894 | 278 | 474 | 118 | 24 |
| Percent | 100% | 31% | 53% | 13% | 3% |

- Of these 894 victims, 590 (66 percent) were victims of defendants for whom United States Attorneys recommended seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 590 | 202 | 345 | 29 | 14 |
| Percent | 100% | 34% | 58% | 5% | 2% |

- Of the 894 victims, 302 (34 percent) were victims of defendants as to whom United States Attorneys recommended against seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 302 | 75 | 129 | 88 | 10 |
| Percent | 100% | 25% | 43% | 29% | 3% |

b.    Intraracial and interracial homicides

- Of the 677 homicide defendants submitted for review from 1995 to 2000,[15] 500 (74 percent) were charged with intraracial homicides (i.e., each was of the same race/ethnicity as all victims).

---

[14]All of the victim-related statistics in this Survey are skewed to some degree by the large number of victims involved in the bombing of the American embassies in Tanzania and Kenya, which resulted in the indictment of several defendants in the Southern District of New York, and the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, which resulted in the indictment of two defendants in the Western District of Oklahoma. A discussion of how the statistics are affected is set forth in the general explanatory notes to the statistical tables (see page T-57)

[15]Five defendants (all of them White) submitted for review during the post-protocol period were charged with espionage offenses that did not involve any homicide.

15

73-015

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 500 | 109 | 227 | 150 | 14 |
| Percent | 100% | 22% | 45% | 30% | 3% |

- United States Attorneys recommended seeking the death penalty for 24 percent of the defendants charged with intraracial homicides (121 out of 500 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 38 percent of White defendants (41 out of 109 defendants);
  - 20 percent of Black defendants (46 out of 227 defendants);
  - 17 percent of Hispanic defendants (26 out of 150 defendants); and
  - 57 percent of Other defendants (8 out of 14 defendants).

- Of the 677 homicide defendants submitted for review from 1995 to 2000, 177 (26 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).[16]

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 177 | 20 | 97 | 45 | 15 |
| Percent | 100% | 11% | 55% | 25% | 8% |

- United States Attorneys recommended seeking the death penalty for 35 percent of the defendants charged with interracial homicides (62 out of 177 defendants). The rats at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 35 percent of White defendants (7 out of 20 defendants);
  - 36 percent of Black defendants (35 out of 97 defendants);
  - 29 percent of Hispanic defendants (13 out of 45 defendants); and
  - 47 percent of Other defendants (7 out of 15 defendants).

  c. <u>Single- and multiple-victim cases</u>

---

[16]Of the 177 defendants charged in interracial homicide cases, 33 (19 percent) were charged with killing more than one victim. In each of those cases, at least one victim was of the same race/ethnicity as the defendant. Accordingly, if the definition of "intraracial" homicides included those in which at least one victim was of the same race/ethnicity as the defendant, 33 defendants would be reported in the intraracial rather than interracial category.

73-016

- Of the 677 homicide defendants submitted for review from 1995 to 2000, 520 (77 percent) faced capital charges involving only one victim.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 520 | 103 | 240 | 153 | 24 |
| Percent | 100% | 20% | 46% | 29% | 5% |

- United States Attorneys recommended seeking the death penalty for 23 percent of the defendants charged in single-victim cases (117 out of 520 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 31 percent of White defendants (32 out of 103 defendants);
  - 20 percent of Black defendants (49 out of 240 defendants);
  - 16 percent of Hispanic defendants (25 out of 153 defendants); and
  - 46 percent of Other defendants (11 out of 24 defendants).

- Of the 677 homicide defendants submitted for review from 1995 to 2000, 157 (23 percent) faced capital charges involving more than one victim.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 157 | 26 | 84 | 42 | 5 |
| Percent | 100% | 17% | 54% | 27% | 3% |

- United States Attorneys recommended seeking the death penalty for 43 percent of the defendants charged in multiple-victim cases (66 out of 157 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 62 percent of White defendants (16 out of 26 defendants);
  - 38 percent of Black defendants (32 out of 84 defendants);
  - 33 percent of Hispanic defendants (14 out of 42 defendants); and
  - 80 percent of Other defendants (4 out of 5 defendants).

73-017

# PART III:  THE REVIEW COMMITTEE

### A.    BACKGROUND

With the issuance of the new death penalty protocol on January 27, 1995, the Attorney General created a permanent advisory panel, the Review Committee, to assist her in determining whether to seek capital punishment in cases submitted for review by United States Attorneys. The Review Committee currently has five members appointed by the Attorney General (with three members required for a quorum), and includes, as a matter of practice, at least one designee of the Deputy Attorney General and at least one designee of the Assistant Attorney General for the Criminal Division.

For each case submitted by a United States Attorney, the Review Committee receives all of the underlying materials that have been submitted by the United States Attorney, including the materials from defense counsel.  The Review Committee then meets with defense counsel either in person or on video conference, along with attorneys from the United States Attorney's Office and the CCU.  During this meeting, defense counsel are invited to make an oral presentation to the Review Committee as to why the Attorney General should not authorize the United States Attorney to seek the death penalty.   Thereafter, the Review Committee makes its recommendation to the Attorney General (noting any dissenting views) as to why the death penalty should, or should not, be sought in that case.

### B.    STATISTICAL HIGHLIGHTS

From the time of its establishment in 1995 until the close of the reporting period, the Review Committee considered a total of 618 defendants.  Detailed information about the results of this consideration is set forth in Table Set III (pages T-127 to T-197).  This section provides highlights of the statistical data regarding these cases and is organized in the same manner as the preceding Section concerning the United States Attorneys. The analysis of the pool of defendants is based on the statistics in Table Set III.A (pages T-128 to T-132).  The analysis of offense data is set forth in Table Set III.B (pages T-133 to T-162).  Victim-related statistics are set forth in Table Set III.C (pages T-163 to T-197).

1.    Defendants

- Of the 682 defendants submitted for review by United States Attorneys from 1995 to 2000, 15 were still under review as of July 20, 2000, and 49 others had been withdrawn.  The Review Committee considered the remaining 618.

73-018

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 618 | 120 | 300 | 172 | 26 |
| Percent | 100% | 19% | 49% | 28% | 4% |

- From 1995 to 2000, the Review Committee recommended seeking the death penalty for 183 defendants, out of a total of 618 it reviewed (30 percent).[17]

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 183 | 47 | 80 | 43 | 13 |
| Percent | 100% | 26% | 44% | 23% | 7% |

2.    Offenses

The Review Committee's practices with respect to charging practices were virtually identical to the trends reported above with respect to the recommendations of the United States Attorneys.  Accordingly, highlights of the statistical tables presenting information on this topic are not discussed further here.

3.    Victims

a.    Victims' race/ethnicity

- From 1995 to 2000, there were a total of 853 identified victims of the capital offenses charged against defendants considered by the Review Committee.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 853 | 258 | 468 | 104 | 23 |
| Percent | 100% | 30% | 55% | 12% | 3% |

- Of these 853 victims, 600 (70 percent) were victims of defendants for whom the Review Committee recommended seeking the death penalty.

---

[17]There were also 15 defendants as to whom the Review Committee completed its review but did not recommend either for or against seeking the death penalty.  In some of these cases, the Review Committee recommended that the Attorney General defer a decision (either because of the pendency of a state prosecution of the same defendant or because the defendant was a fugitive), and in others the Review Committee was evenly divided as to a recommendation.

73-019

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 600 | 193 | 346 | 46 | 15 |
| **Percent** | 100% | 32% | 58% | 8% | 3% |

- Of the 853 victims, 246 (29 percent) were victims of defendants as to whom the Review Committee recommended against seeking the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 246 | 61 | 120 | 57 | 8 |
| **Percent** | 100% | 25% | 49% | 23% | 3% |

b.      Intraracial and interracial homicides

- Of the 613 homicide defendants the Review Committee considered from 1995 to 2000, 449 (73 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 449 | 94 | 211 | 131 | 13 |
| **Percent** | 100% | 21% | 47% | 29% | 3% |

- The Review Committee recommended seeking the death penalty for 29 percent of the defendants charged with intraracial homicides (129 out of 449 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  – 43 percent of White defendants (40 out of 94 defendants);
  – 23 percent of Black defendants (48 out of 211 defendants);
  – 25 percent of Hispanic defendants (33 out of 131 defendants); and
  – 63 percent of Other defendants (8 out of 13 defendants).

- Of the 613 homicide defendants the Review Committee considered from 1995 to 2000, 164 (27 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).

20

73-020

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 164 | 20 | 90 | 41 | 13 |
| Percent | 100% | 12% | 55% | 25% | 8% |

- The Review Committee recommended seeking the death penalty for 33 percent of the defendants charged with interracial homicides (54 out of 164 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 35 percent of White defendants (7 out of 20 defendants);
  - 36 percent of Black defendants (32 out of 90 defendants);
  - 24 percent of Hispanic defendants (10 out of 41 defendants); and
  - 38 percent of Other defendants (5 out of 13 defendants).

  c.    Single- and multiple-victim cases

- From 1995 to 2000, 468 of the 613 homicide defendants considered by the Review Committee (76 percent) faced capital charges involving only one victim.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 468 | 90 | 221 | 136 | 21 |
| Percent | 100% | 19% | 47% | 29% | 4% |

- The Review Committee recommended seeking the death penalty for 25 percent of the defendants charged in single-victim cases (115 out of 468 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 36 percent of White defendants (32 out of 90 defendants);
  - 20 percent of Black defendants (45 out of 221 defendants);
  - 21 percent of Hispanic defendants (28 out of 136 defendants); and
  - 48 percent of Other defendants (10 out of 21 defendants).

- From 1995 to 2000, 145 of the 613 homicide defendants considered by the Review Committee (24 percent) faced capital charges involving more than one victim.

21

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 145 | 24 | 80 | 36 | 5 |
| **Percent** | 100% | 17% | 55% | 25% | 3% |

- The Review Committee recommended seeking the death penalty for 47 percent of the defendants charged in multiple-victim cases (68 out of 145 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 63 percent of White defendants (15 out of 24 defendants);
  - 44 percent of Black defendants (35 out of 80 defendants);
  - 42 percent of Hispanic defendants (15 out of 36 defendants); and
  - 60 percent of Other defendants (3 out of 5 defendants).

22

73-022

## PART IV:  THE ATTORNEY GENERAL

### A.    BACKGROUND

Before considering a particular case, the Attorney General receives the recommendation of the United States Attorney, the recommendation of the Review Committee, and all of the underlying materials that have been submitted by the United States Attorney, including the materials from defense counsel.  After discussing the case with the Review Committee and the CCU attorneys (and with the United States Attorney for the case when he or she disagrees with the recommendation of the Review Committee), and after careful review of all of the relevant material (including, at times, additional information gathered at the Attorney General's request), the Attorney General signs a letter to the United States Attorney either authorizing the filing of a notice of intent to seek the death penalty or authorizing the United States Attorney not to file such a notice.[18]

### B.    STATISTICAL HIGHLIGHTS

The Attorney General completed the review of 52 defendants submitted during the pre-protocol period and 588 defendants submitted during the post-protocol period.  Detailed information about the results of the consideration of those defendants is set forth in Table Set IV (pages T-198 to T-304). This section provides highlights of the statistical data regarding these cases and is organized in the same manner as the preceding sections concerning the United States Attorneys and the Review Committee.  The analysis of the pool of defendants is based on the statistics in Table Set IV.A (pages T-199 to T107).  The analysis of offense data is set forth in Table Set IV.B (pages T-108 to T-235).  Victim-related statistics are set forth in Table Set IV.C (pages T-236 to T-304).

1.    Defendants

- In the pre-protocol period from 1988 to 1994, the United States Attorneys submitted 52 defendants for review.  Attorneys General decided to seek the death penalty for 47 of these defendants (90 percent).

---

[18]In some instances, the Attorney General does not make a decision on a case submitted for review by a United States Attorney.  For example, the United States Attorney may enter into a plea agreement with a defendant while the case is under consideration by the Attorney General (or the Review Committee).  In other cases, consideration of a given defendant may be indefinitely suspended if the defendant is a fugitive.

73-023

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 47 | 7 | 34 | 5 | 1 |
| Percent | 100% | 15% | 72% | 11% | 2% |

- In the post-protocol period from 1995 to 2000, the United States Attorneys submitted 682 defendants for review. Of these, 31 were still pending review at the close of the reporting period, and 63 had been withdrawn by the United States Attorney. The Attorney General considered the remaining 588 defendants (86 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 588 | 115 | 287 | 160 | 26 |
| Percent | 100% | 20% | 49% | 27% | 4% |

- From 1995 to 2000, the Attorney General decided to seek the death penalty for 159 defendants, out of a total of 588 considered (27 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 159 | 44 | 71 | 32 | 12 |
| Percent | 100% | 28% | 45% | 20% | 8% |

2. Offenses

The Attorney General's practices with respect to charging practices were virtually identical to the trends reported above with respect to the recommendations of the United States Attorneys. Accordingly, highlights of the statistical tables presenting information on this topic are not discussed further here.

3. Victims

a. Victims' race/ethnicity

- From 1995 to 2000, there were a total of 833 identified victims of the capital offenses charged against defendants who were considered by the Attorney General.

24

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 833 | 254 | 462 | 95 | 22 |
| Percent | 100% | 30% | 55% | 11% | 3% |

- Of these 833 victims, 578 (69 percent) were victims of defendants for whom the Attorney General decided to seek the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 578 | 190 | 340 | 35 | 13 |
| Percent | 100% | 33% | 59% | 6% | 2% |

- Of the 833 victims, 252 (30 percent) were victims of defendants as to whom the Attorney General decided not to seek the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 252 | 62 | 122 | 59 | 9 |
| Percent | 100% | 25% | 48% | 23% | 4% |

b.    Intraracial and interracial homicides

- Of the 583 homicide defendants whom the Attorney General considered from 1995 to 2000, 424 (73 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 424 | 90 | 200 | 121 | 13 |
| Percent | 100% | 21% | 47% | 29% | 3% |

- The Attorney General decided to seek the death penalty for 25 percent of the defendants charged with intraracial homicides (108 out of 424 defendants).  The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

25

&ndash;     41 percent of White defendants (37 out of 90 defendants);
&ndash;     21 percent of Black defendants (41 out of 200 defendants);
&ndash;     19 percent of Hispanic defendants (23 out of 121 defendants); and
&ndash;     54 percent of Other defendants (7 out of 13 defendants).

- Of the 583 homicide defendants whom the Attorney General considered from 1995 to 2000, 159 (28 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).[19]

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 159 | 20 | 87 | 39 | 13 |
| Percent | 100% | 13% | 55% | 25% | 8% |

- The Attorney General decided to seek the death penalty for 32 percent of the defendants charged with interracial homicides (51 out of 159 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

&ndash;     35 percent of White defendants (7 out of 20 defendants);
&ndash;     34 percent of Black defendants (30 out of 87 defendants);
&ndash;     23 percent of Hispanic defendants (9 out of 39 defendants); and
&ndash;     38 percent of Other defendants (5 out of 13 defendants).

c.     <u>Single- and multiple-victim cases</u>

- From 1995 to 2000, 448 out of the 583 homicide defendants considered by the Attorney General (77 percent) faced capital charges involving only one victim.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 448 | 86 | 210 | 131 | 21 |
| Percent | 100% | 19% | 47% | 29% | 5% |

- The Attorney General decided to seek the death penalty for 22 percent of the defendants charged in single-victim cases (97 out of 448 defendants). The rates

---

[19]Of the 159 defendants charged in interracial homicide cases, 33 (21 percent) were charged with killing more than one victim. In each of those cases, at least one victim was of the same race/ethnicity as the defendant. Accordingly, if the definition of "intraracial" homicides included those in which at least one victim was of the same race/ethnicity as the defendant, 33 defendants would be reported in the intraracial rather than interracial category.

26

at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

– 34 percent of White defendants (29 out of 86 defendants);
– 19 percent of Black defendants (40 out of 210 defendants);
– 14 percent of Hispanic defendants (18 out of 131 defendants); and
– 48 percent of Other defendants (10 out of 21 defendants).

● From 1995 to 2000, 135 out of the 583 homicide defendants considered by the Attorney General (23 percent) faced capital charges involving more than one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 135 | 24 | 77 | 29 | 5 |
| Percent | 100% | 18% | 57% | 21% | 4% |

● The Attorney General decided to seek the death penalty for 46 percent of the defendants charged in multiple-victim cases (62 out of 135 defendants).  The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

– 63 percent of White defendants (15 out of 24 defendants);
– 40 percent of Black defendants (31 out of 77 defendants);
– 48 percent of Hispanic defendants (14 out of 29 defendants); and
– 40 percent of Other defendants (2 out of 5 defendants).

27

73-027

## PART V:  POST-AUTHORIZATION ACTIVITY

### A.    BACKGROUND

A decision by the Attorney General to seek the death penalty is always subject to reconsideration until the jury has returned a sentencing verdict.  Thus, even after such a decision to seek the death penalty has been made, additional facts or arguments may always be brought to the Attorney General's attention in support of a request to withdraw a notice of intent to seek the death penalty.  Such reconsideration can be sought by defense counsel, the United States Attorney, the Review Committee, or the Attorney General herself.  As explained above, the Attorney General's decision to authorize the seeking of the death penalty can also be changed by means of a cooperation or non-cooperation plea agreement between the United States Attorney and the defendant that forecloses the possibility of capital punishment.  Under Department policy, such agreements do not require the Attorney General's prior authorization.

For those defendants who proceed to trial, there are two phases to the case.  In the "guilt phase," the jury must decide unanimously whether the prosecution proved beyond a reasonable doubt that the defendant has committed the underlying death-eligible offense.  If the jury finds the defendant guilty, the case proceeds to the "sentencing phase."  At the sentencing phase, in order to meet legal requirements for the imposition of the death penalty, the prosecution must prove beyond a reasonable doubt that the defendant committed the capital offense with a certain level of intent.  In addition, the prosecution must prove any aggravating factors beyond a reasonable doubt, and must prove at least one from a list of specific factors set out in the applicable statute.[20]  In recommending a sentence, the jury may only consider aggravating factors that it unanimously finds to have been proven beyond a reasonable doubt.  Mitigating factors can include any of several specific factors listed in the statute, as well as anything else "in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence."[21]  Mitigating factors need only be proven by a preponderance of the evidence, and each juror can make an individual decision as to which factors have been proven to his or her satisfaction.  Both the prosecution and defense may, in the

---

[20]Although the exact list of aggravating factors varies depending on the nature of the offense, the statutory list of factors generally includes: killing multiple victims; committing the capital offense against particularly vulnerable victims or high-level public officials; paying someone else to commit the murder; committing the murder for pecuniary gain; committing the murder while committing other serious crimes; causing a grave risk of death to persons other than the actual victims; committing the offense in a particularly heinous manner; engaging in substantial planning or premeditation in committing the murder; or having previous convictions for other serious offenses.  *See* 18 U.S.C. §  3592(b)-(d); 21 U.S.C. § 848(n).

[21]The specific mitigating factors listed in the FDPA are impaired capacity, duress, minor participation, equally culpable defendants who will not be punished by death, lack of a prior criminal record, mental or emotional disturbance, and consent by the victim.  18 U.S.C. § 3592(a); *see also* 21 U.S.C. § 848(m) (similar list of mitigating factors under DKA).

73-028

judge's discretion, present information that might not be admissible as evidence in the guilt phase of the trial (such as hearsay, for example); and may also rely on all of the evidence submitted during the guilt phase without having to present it anew during the penalty phase.

At the end of the sentencing phase, the federal judge instructs the jurors that they must each weigh the aggravating and mitigating factors and decide upon a sentence. The judge also instructs the jury that they may not in any way consider the race, national origin, sex, or religious beliefs of the defendant or the victim in reaching a verdict. Jurors are then given at least two sentencing options: death or life in prison without any possibility of release. With respect to certain offenses, jurors are also given a third option – to have the judge impose a lesser sentence authorized by statute. Jurors are never required to return a verdict of death. In reaching a verdict, which must be unanimous, each juror must certify that he or she did not, in fact, consider the race, national origin, sex, or religious beliefs of the defendant or the victim in reaching his or her determination and that his or her determination would have been the same regardless of those factors. In all cases, the jury's decision is binding upon the judge.[22]

After sentencing, a defendant subject to the death penalty is entitled to several forms of review. As with all federal criminal defendants, a defendant subject to a sentence of death may seek direct review of his or her conviction and sentence in the United States Court of Appeals for the circuit in which he or she was convicted. In capital cases, however, federal law explicitly requires the appellate court, in reviewing the case, to review the entire record and to address certain specific issues, including whether the sentence of death "was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the finding of the existence of an aggravating factor . . . ." 18 U.S.C. § 3595(c)(1). If the Court of Appeals affirms the conviction and sentence, the defendant may seek review in the United States Supreme Court by filing a petition for a writ of certiorari (and the government may likewise petition for a writ of certiorari if the conviction or sentence is reversed or vacated on appeal). Although the defendant is entitled to review in the Court of Appeals, the Supreme Court has discretion to decide whether to grant the petition for certiorari and review the case.

If the defendant fails to obtain relief on direct appeal, he or she may also seek collateral review by filing a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255 (which is sometimes described as a petition for a writ of habeas corpus). As with the proceedings in the underlying criminal case, such collateral review goes through three levels of the federal judiciary: the motion is made in the district court in which the defendant was convicted. Regardless of whether the conviction is upheld or vacated, the district court's resolution of the § 2255 motion is subject to direct appeal by the losing party. And, as with direct review, the judgment by the Court of Appeals concerning the § 2255 motion is subject to discretionary review by the Supreme Court.

---

[22]Although federal law requires a judge to impose a sentence recommended by the jury in a capital case, the relevant statutes refer to the jury's sentencing decision as a recommendation. For ease of reference, this Survey refers to the determination made by a jury after a sentencing hearing as a "verdict."

73-029

If the defendant's sentence of death is upheld on both direct and collateral review, an execution date is set.[23]  Under current policy, the Department will provide the defendant at least 120 days' notice of the scheduled execution date.  *See* 65 Fed. Reg. 48379, 48380 (Aug. 8, 2000).  Once judicial proceedings have ended and the defendant has received notification of the scheduled execution date, he or she may petition the President for a grant of executive clemency.  *See* 28 C.F.R. § 1.10 (advisory regulations concerning clemency in capital cases).  The Department reviews the case and makes a recommendation as to how it should be decided, but pursuant to the Constitution, the decision to grant or deny clemency or to stay the execution while a petition is under review is committed entirely to the discretion of the President.[24]

## B.    STATISTICAL HIGHLIGHTS

This Survey does not include separate tables for specific decision-making stages that occur after the Attorney General has authorized seeking the death penalty.  However, information about those stages is set forth in Table Set I (pages T-1 to T-7).

### 1.    Plea Agreements

The statistical highlights regarding plea agreements reported in this Part reflect only those cases in which defendants actually entered into an agreement resulting in a guilty plea after the Attorney General authorized seeking the death penalty.  They do not reflect the number of times that United States Attorneys offered to enter into such agreements but were refused or, conversely, the number of times that United States Attorneys declined to enter into agreements offered by defendants and their counsel.

Moreover, because the decision to offer and accept a plea agreement may be affected by many factors other than the Attorney General's decision about authorizing capital prosecution, United States Attorneys and defendants can also decide to enter into plea agreements *before* the Attorney General makes a decision, either before the case is indicted, or after indictment but before the Department's decision-making process has been completed.  Statistics that focus only on plea agreements after the Attorney General authorizes seeking the death penalty thus may not

---

[23]While there are additional avenues of potential relief available under federal law, direct appeal and § 2255 review are the two most commonly used, and current Department policy is to await the completion of these two forms of review, but not others, to set an execution date in a case in which a defendant has been sentenced to death. A defendant seeking other forms of judicial relief once an execution date has been scheduled may also seek a judicial order staying the execution to allow consideration of the merits of the pending claim.

[24]Federal law provides that indigent defendants are entitled to appointed counsel throughout the appeal, collateral review, and clemency processes.

73-030

accurately reflect the degree to which defendants charged with offenses punishable by death avoid such punishment as the result of guilty pleas.[25]

    a.    <u>Pre-protocol cases</u>

- From 1988 to 1994, the Attorney General authorized United States Attorneys to seek the death penalty for a total of 47 defendants. Of these, 14 defendants (30 percent) entered into plea agreements as a result of which the government withdrew the notice of intent to seek the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 14 | 3 | 10 | 1 | 0 |
| Percent | 100% | 21% | 71% | 7% | 0% |

- The rate at which defendants authorized for the death penalty entered plea agreements was 30 percent. The rates for individual racial ethnic groups were as follows:

    - 43 percent for White defendants (3 out of 7 authorized);
    - 29 percent for Black defendants (10 out of 34 authorized);
    - 20 percent for Hispanic defendants (1 out of 5 authorized); and
    - 100 percent for Other defendants (1 out of 1 authorized).

    b.    <u>Post-protocol cases</u>

- From 1995 to 2000, the Attorney General authorized United States Attorneys to seek the death penalty for a total of 159 defendants. Of these, 51 defendants (32 percent) entered into plea agreements as a result of which the government withdrew the notice of intent to seek the death penalty.[26]

---

[25]The statistics compiled for this Survey do not include the number of plea agreements that occurred in cases after the Attorney General decided *not* to seek the death penalty. Further, as noted above in Part II, this Survey does not account for plea agreements reached before submission by United States Attorneys.

[26]Of the 682 defendants submitted by United States Attorneys for review from 1995 to 2000, a total of 58 entered into plea agreements before the Attorney General made a decision, including 8 (14 percent) who were White, 27 (47 percent) who were Black, 20 (34 percent) who were Hispanic, and 3 (5 percent) who were Other. None of the defendants submitted for review during the pre-protocol period entered into plea-agreements before the Attorney General decided whether to seek the death penalty.

31

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 51 | 21 | 18 | 9 | 3 |
| Percent | 100% | 41% | 35% | 18% | 6% |

- The rate at which defendants authorized for the death penalty entered plea agreements was 32 percent.  The rates for individual racial ethnic groups were as follows:

  – 48 percent for White defendants (21 out of 44 authorized);
  – 25 percent for Black defendants (18 out of 71 authorized);
  – 28 percent for Hispanic defendants (9 out of 32 authorized); and
  – 25 percent for Other defendants (3 out of 12 authorized).

2.     Trial Results

a.     Pre-protocol cases

- Of the 47 defendants as to whom the Attorney General authorized capital prosecution from 1988 to 1994, 20 (43 percent) proceeded to trial.  The notice of intent to seek the death penalty was withdrawn as to 25 defendants, as the result of either a plea agreement (14 defendants) or reconsideration by the Attorney General (11 defendants).  There were 2 defendants as to whom the notice to seek the death penalty was dismissed or the prosecution otherwise terminated by judicial action.

- Of the 20 defendants whose cases were tried, 16 (80 percent) were found guilty beyond a reasonable doubt of at least one offense subject to the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 20 | 3 | 8 | 4 | 1 |
| Percent | 100% | 19% | 50% | 25% | 6% |

- Of the 16 defendants convicted of capital offenses, juries returned non-death penalty verdicts (or no verdicts) for 10 (65 percent).

32

73-032

|          | Total | White | Black | Hispanic | Other |
|----------|-------|-------|-------|----------|-------|
| Number   | 10    | 1     | 5     | 3        | 1     |
| Percent  | 100%  | 10%   | 50%   | 30%      | 10%   |

- Of the 16 defendants convicted of capital offenses, juries returned death penalty verdicts for 6 (35 percent).

|          | Total | White | Black | Hispanic | Other |
|----------|-------|-------|-------|----------|-------|
| Number   | 6     | 2     | 3     | 1        | 0     |
| Percent  | 100%  | 33%   | 50%   | 17%      | 0%    |

- The rate at which juries returned death penalty verdicts was 35 percent for all defendants.  The rates for individual racial/ethnic groups were as follows:

    - 67 percent for White defendants (2 out of 3 decided);
    - 38 percent for Black defendants (3 out of 8 decided);
    - 25 percent for Hispanic defendants (1 out of 4 decided); and
    - 0 percent for Other defendants (0 out of 1 decided).

- At the close of the reporting period,  one of the six defendants for whom juries returned death penalty verdicts had his sentence vacated and was subsequently re-sentenced to life in prison.

    b.    Post-protocol cases

- Of the 159 defendants as to whom the Attorney General authorized capital prosecution from 1995 to 2000, 42 (26 percent) had been tried at the close of the reporting period.  The notice of intent to seek the death penalty was withdrawn as to 62 defendants, as the result of either a plea agreement (51 defendants) or reconsideration by the Attorney General (11 defendants).  There were 4 defendants as to whom the notice to seek the death penalty was dismissed or the prosecution otherwise terminated by judicial action.  The remaining 51 defendants were awaiting trial as of July 20, 2000.

- Of the 42 defendants whose trials had been completed at the end of the reporting period, 41 (98 percent) were found guilty beyond a reasonable doubt of at least one offense subject to the death penalty.

33

73-033

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 41 | 11 | 25 | 2 | 3 |
| **Percent** | 100% | 27% | 61% | 5% | 7% |

- Of the 41 defendants convicted of capital offenses, juries returned non-death penalty verdicts (or no verdicts) for 21 (51 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 21 | 7 | 12 | 0 | 2 |
| **Percent** | 100% | 33% | 57% | 0% | 10% |

- Of the 41 defendants convicted of capital offenses, juries returned death penalty verdicts for 20 (49 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 20 | 4 | 13 | 2 | 1 |
| **Percent** | 100% | 20% | 65% | 10% | 5% |

- The rate at which juries returned death penalty verdicts was 49 percent for all defendants. The rates for individual racial/ethnic groups were as follows:

  - 44 percent for White defendants (4 out of 11 decided);
  - 52 percent for Black defendants (13 out of 25 decided);
  - 100 percent for Hispanic defendants (2 out of 2 decided); and
  - 33 percent for Other defendants (1 out of 3 decided).

- At the close of the reporting period, four of the 20 defendants for whom juries returned death verdicts had their sentences vacated and were awaiting further judicial proceedings (which may or may not result in the reinstatement of the death sentence in each case); and two were awaiting the formal imposition of sentence by the trial court.

3.    Federal Defendants Sentenced to Death

Since 1988, federal juries have recommended the death sentence for a total of 26 defendants, of whom six were initially indicted before the protocol took effect on January 27,

34

1995.  The sentences of four of these 26 defendants (one of whom is White, three of whom are Black, and all of whom were indicted under the Department's current protocol) were vacated in subsequent judicial proceedings; they are awaiting further proceedings in which their death sentences may or may not be reinstated.  The sentence of one additional White defendant indicted in the pre-protocol period was vacated; this defendant was subsequently re-sentenced to life in prison. In addition, two Hispanic defendants are currently awaiting formal sentencing following the jury's recommendation of death.  Thus, as of July 20, 2000, there were 19 defendants with pending federal death sentences, including eight who were litigating direct appeals, ten who were litigating collateral claims pursuant to 28 U.S.C. § 2255, and one who had completed both forms of post-verdict litigation and had been scheduled for execution.[27]

---

[27]In the case of the one defendant who had completed litigation of both direct appeal and the initial collateral review (Juan Raul Garza), the President granted a reprieve and set a new execution date after the close of the reporting period.  Also, after the close of the reporting period, one defendant whose case had pending on direct appeal as on July 20, 2000 (David Paul Hammer), successfully petitioned the appellate court to dismiss the appeal and remand the case to the district court for the setting of an execution date.

73-035

Information about the federal defendants who have been sentenced to death is set forth in Table Set V (pages T-305 to T-309). This section provides highlights of the statistical data regarding these defendants.[28]

- As of July 20, 2000, 19 defendants were under a federal sentence of death.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 19 | 4 | 13 | 1 | 1 |
| Percent | 100% | 21% | 68% | 5% | 5% |

- These 19 defendants were prosecuted in 14 separate cases – 10 cases had one defendant convicted of capital charges and sentenced to death, while 4 cases had two or more capital defendants sentenced to death. The 14 cases were prosecuted in 12 different judicial districts in 10 different states. Only two United States Attorneys' Offices have prosecuted more than one capital case resulting in a death sentence, and none has prosecuted more than two such cases.

---

[28]This Survey generally does not attempt to document comparable state statistics regarding the death penalty decision-making process. Nevertheless, to allow a very general comparison of the relative size of the state and federal populations of death row, the following information compiled elsewhere by BJS is provided. As of December 31, 1998, BJS reports that there were 3,433 state defendants awaiting execution after being sentenced to death.

| | Total | White | Black | Other |
|---|---|---|---|---|
| Number | 3,433 | 1,900 | 1,473 | 60 |
| Percent | 100% | 55% | 43% | 2% |

Significantly, these state statistics do *not* distinguish between persons of Hispanic ethnicity and non-Hispanic defendants in counting the total number of White, Black, and Other defendants. However, BJS also reports that 314 defendants of all races (9 percent of the total population of 3,433) were of Hispanics ethnicity.

Furthermore, BJS reports that the states executed a total of 505 defendants from 1988 to 1999.

| | Total | White | Black | Other |
|---|---|---|---|---|
| Number | 505 | 317 | 177 | 11 |
| Percent | 100% | 63% | 35% | 2% |

BJS reports that 27 executed defendants of all races (7 percent of the total population of 505) were of Hispanic ethnicity.

73-036

- 10 of these 19 defendants (53 percent) had capital convictions related to only one victim.  9 of the 19 defendants (47 percent) had capital convictions related to two or more victims.

- 18 of these 19 defendants were sentenced to death for crimes involving a total of 27 victims.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 27 | 7 | 16 | 3 | 1 |
| Percent | 100% | 26% | 59% | 11% | 4% |

- The remaining defendant, Timothy McVeigh, was found responsible for the deaths of 160 individuals of various races/ethnicities in connection with the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma.[29]

- 13 of these 19 defendants (68 percent) were sentenced to death for crimes against victims exclusively of the same race/ethnicity.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 13 | 3 | 8 | 1 | 1 |
| Percent | 100% | 23% | 62% | 8% | 8% |

- 6 of these 19 defendants (32 percent) were sentenced to death for crimes against at least one victim of a different race/ethnicity.  One of these 6 defendants was White and five were Black.[30]

--------

[29]The victim-related data in this Survey is based exclusively on the number of victims set forth in the indictment against each defendant, which in some cases understates the actual number of victims who died as a result of a defendant's crimes.  Thus, for example, although there were a total of 168 victims who died as a result of the bombing in Oklahoma City, the victim statistics in this survey include only 160 victims of that offense who at the time of the indictment were known to have died inside the building.

[30]This Survey reports statistics only relating to implementation of the federal death penalty since its re-introduction in 1988.  Prior to that year, the federal government had not executed any person since 1963.  Information about federal executions before 1963 has been published by the Death Penalty Information Center (DPIC).  Specifically, DPIC reports that there 34 federal defendants were executed between 1927 and 1963.  Of these, 28 (82 percent) were White, 3 (9 percent) were Black, 2 (6 percent) were Other, 1 (3 percent) was of unknown race.  DPIC does not separately report the number of executed federal defendants who were Hispanic.  DPIC further reports that 19 (56 percent) of these defendants were executed for murder, 6 (18 percent) for sabotage, 4 (12 percent) for kidnapping, 2 (6 percent) for espionage, 2 (6 percent) for bank robbery, and 2 (6 percent) for rape.  The total

37

# PART VI:  AGREEMENTS AND DISAGREEMENTS IN THE FEDERAL DECISION-MAKING PROCESS

A.    BACKGROUND

As suggested by the general similarity of the statistics reported about the recommendations and decisions made by each participant in the Department's death penalty review process, the United States Attorneys, the Review Committee, and the Attorney General often come to the same conclusion about whether or not the government should seek the death penalty for a given defendant.  This Section provides information about the extent to which such agreement has and has not occurred under the Department's review procedures.

B.    STATISTICAL HIGHLIGHTS

Detailed information about the degree to which different participants in the federal decision-making process agreed and disagreed with one another is set forth in Table Set VI (pages T-310 to T-355).  The tables first analyze agreements and disagreements among all three participants in the decision-making process, *i.e.*, the United States Attorneys, the Review Committee, and the Attorney General (pages T-311 to T-327); and then focus on the extent to which specific pairs of those participants agreed and disagreed with one another (pages T-328 to T-355).

1.    Three-party comparisons

- From 1995 to 2000, there were a total of 571 defendants who were considered by all three participants in the decision-making process.  The Attorney General, the Review Committee and the United States Attorney all agreed with respect to 501 of these defendants (88 percent),

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 497 | 95 | 250 | 130 | 22 |
| Percent | 100% | 19% | 50% | 26% | 4% |

- The rate of agreement was 88 percent (501 of 571 defendants as to whom the Attorney General made a decision upon recommendations from both of the other

---

exceeds 34 because some defendants were convicted of multiple capital offenses.  *See* Federal Death Penalty Information Center, Executions of Federal Prisoners 1927-1999, <http://www.deathpenaltyinfo.org/fedexec.html>.

38

73-038

participants), including both decisions to seek the death penalty and decisions not to seek it.  With respect to specific racial/ethnic groups, the rates of agreement were:

- 86 percent for White defendants (95 of 110 defendants);
- 89 percent for Black defendants (250 of 280 defendants);
- 83 percent for Hispanic defendants (130 of 156 defendants); and
- 88 percent for Other defendants (22 of 25 defendants).

● The rate of agreement specifically for decisions to seek the death penalty was 84 percent (133 of 159 defendants for whom the Attorney General decided to seek the death penalty).  With respect to specific racial/ethnic groups, the  rates of agreement were:
- 82 percent for White defendants (36 of 44 defendants);
- 89 percent for Black defendants (63 of 71 defendants);
- 69 percent for Hispanic defendants (22 of 32 defendants); and
- 100 percent for Other defendants (12 of 12 defendants).

● The rate of agreement specifically for decisions against seeking the death penalty was 88 percent (368 of 417 defendants for whom the Attorney General decided not to seek the death penalty).  With respect to specific racial/ethnic groups, the rates of agreement were:
- 87 percent for White defendants (59 of 68 defendants);
- 90 percent for Black defendants (191 of 212 defendants);
- 87 percent for Hispanic defendants (108 of 124 defendants); and
- 77 percent for Other defendants (10 of 13 defendants).

● In the 70 instances in which there was not overall agreement, the dissenting view was most often held by the United States Attorney and least often by the Attorney General.

● The United States Attorney held the dissenting view as to 50 defendants out of 70 as to whom there was a lack of consensus (71 percent), including 25 recommendations by United States Attorneys in favor of seeking the death penalty and 25 recommendations against doing so.  Of these 50 defendants:

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 50 | 13 | 17 | 18 | 2 |
| **Percent** | 100% | 26% | 34% | 36% | 4% |

39

- The Review Committee held the dissenting view as to 18 defendants out of 70 as to whom there was a lack of consensus (26 percent), all of which were recommendations by the Review Committee in favor of seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 18 | 2 | 7 | 8 | 1 |
| Percent | 100% | 11% | 39% | 44% | 6% |

- The Attorney General held the dissenting view as to 2 defendants out of 70 as to whom there was a lack of consensus (3 percent), and decided in both cases against seeking the death penalty.  Both of these defendants were Black.

2.      Two-party comparisons

    a.      The United States Attorneys and the Attorney General

- From 1995 to 2000, a total of 575 defendants facing capital-eligible charges were the subjects of both a recommendation either for or against seeking the death penalty by a United States Attorney and a decision by the Attorney General. With respect to 522 of these defendants (91 percent), the United States Attorney and the Attorney General agreed as to whether or not the death penalty should be sought.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 522 | 98 | 263 | 138 | 23 |
| Percent | 100% | 19% | 50% | 26% | 4% |

- The overall rate of agreement was 87 percent (522 of 575 defendants), including both decision to seek the death penalty and decisions not to seek it.  With respect to specific racial/ethnic groups, the overall rates of agreement were:
  - 88 percent for White defendants (98 of 111 defendants);
  - 93 percent for Black defendants (263 of 283 defendants);
  - 88 percent for Hispanic defendants (138 of 156 defendants); and
  - 92 percent for Other defendants (23 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 83 percent (133 of 160 defendants for whom the United States Attorney

73-040

recommended seeking the death penalty).  With respect to specific racial/ethnic groups, the  rates of agreement were:

- 88 percent for White defendants (36 of 41 defendants);
- 84 percent for Black defendants (63 of 75 defendants);
- 73 percent for Hispanic defendants (22 of 30 defendants); and
- 86 percent for Other defendants (12 of 14 defendants).

● The rate of agreement specifically for decisions against seeking the death penalty was 94 percent (389 of 415 defendants for whom the United States Attorney recommended against seeking the death penalty).  With respect to specific racial/ethnic groups, the  rates of agreement were:

- 89 percent for White defendants (62 of 70 defendants);
- 96 percent for Black defendants (200 of 208 defendants);
- 92 percent for Hispanic defendants (116 of 126 defendants); and
- 100 percent for Other defendants (11 of 11 defendants).

● The rate of agreement between the Attorney General and the United States Attorneys as to cases in which the latter recommended seeking the death penalty did not substantially change as a result of the adoption of the review protocol in 1995.  In the pre-protocol period (when the United States Attorneys submitted only recommendations in favor of seeking the death penalty), the cases of 51 defendants facing capital-eligible charges were submitted by the United States Attorneys and decided by the Attorney General.[31]  With respect to 47 of these defendants (92 percent), the Attorney General and the United States Attorney agreed that the death penalty should be sought.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 47 | 7 | 34 | 5 | 1 |
| Percent | 100% | 15% | 72% | 11% | 2% |

b.    The United States Attorneys and the Review Committee

● From 1995 to 2000, a total of 602 defendants facing capital-eligible charges were the subjects of recommendations either for or against seeking the death penalty by both a United States Attorney and the Review Committee.  With respect to 529 of these defendants (88 percent), the United States Attorney and the Review Committee agreed as to whether or not the death penalty should be sought.

---

[31]The Attorney General deferred decision on one defendant, a fugitive who subsequently died.

73-041

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 529 | 98 | 268 | 141 | 22 |
| **Percent** | 100% | 19% | 51% | 27% | 4% |

- The overall rate of agreement was 88 percent (529 of 602 defendants), including both decision to seek the death penalty and decisions not to seek it.  With respect to specific racial/ethnic groups, the overall rates of agreement were:

  – 86 percent for White defendants (98 of 114 defendants);
  – 91 percent for Black defendants (268 of 295 defendants);
  – 84 percent for Hispanic defendants (141 of 168 defendants); and
  – 88 percent for Other defendants (22 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 84 percent (137 of 164 defendants for whom the United States Attorney recommended seeking the death penalty).  With respect to specific racial/ethnic groups, the  rates of agreement were:

  – 88 percent for White defendants (36 of 41 defendants);
  – 84 percent for Black defendants (65 of 77 defendants);
  – 75 percent for Hispanic defendants (24 of 32 defendants); and
  – 86 percent for Other defendants (12 of 14 defendants).

- The rate of agreement specifically for decisions against seeking the death penalty was 89 percent (392 of 438 defendants for whom the United States Attorney recommended against seeking the death penalty).  With respect to specific racial/ethnic groups, the  rates of agreement were:

  – 85 percent for White defendants (63 of 73 defendants);
  – 93 percent for Black defendants (203 of 218 defendants);
  – 86 percent for Hispanic defendants (117 of 136 defendants); and
  – 91 percent for Other defendants (10 of 11 defendants).

  c.    The Review Committee and the Attorney General

- From 1995 to 2000, a total of 572 defendants facing capital-eligible charges were the subjects of recommendations either for or against seeking the death penalty by the Review Committee as well as a decision by the Attorney General.  With respect to 552 of these defendants (97 percent), the Attorney General and the Review Committee agreed as to whether or not the death penalty should be sought.

42

73-042

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| **Number** | 552 | 109 | 271 | 148 | 24 |
| **Percent** | 100% | 20% | 49% | 27% | 4% |

- The overall rate of agreement was 97 percent (552 of 572 defendants), including both decision to seek the death penalty and decisions not to seek it.  With respect to specific racial/ethnic groups, the overall rates of agreement were:

  - 98 percent for White defendants (109 of 111 defendants);
  - 97 percent for Black defendants (271 of 280 defendants);
  - 95 percent for Hispanic defendants (148 of 156 defendants); and
  - 96 percent for Other defendants (24 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 89 percent (158 of 178 defendants for whom the Review Committee recommended seeking the death penalty).  With respect to specific racial/ethnic groups, the rates of agreement were:

  - 96 percent for White defendants (44 of 46 defendants);
  - 89 percent for Black defendants (70 of 79 defendants);
  - 80 percent for Hispanic defendants (32 of 40 defendants); and
  - 92 percent for Other defendants (12 of 13 defendants).

- The rate of agreement specifically for decisions against seeking the death penalty was 100 percent (394 of 394 defendants for whom the Review Committee recommended against seeking the death penalty).  With respect to specific racial/ethnic groups, the rates of agreement were:

  - 100 percent for White defendants (65 of 65 defendants);
  - 100 percent for Black defendants (201 of 201 defendants);
  - 100 percent for Hispanic defendants (116 of 116 defendants); and
  - 100 percent for Other defendants (12 of 12 defendants).

- The Attorney General has never disagreed with a recommendation by the Review Committee that the death penalty should not be sought in a given case.

73-043