# EXHIBIT 79

Westlaw.

63 UCHILR 693                                                                                          Page 1
63 U. Chi. L. Rev. 693

©University of Chicago Law Review
Spring 1996

Comment

**\*693** DANGEROUS PLACES: THE RIGHT TO SELF-DEFENSE IN PRISON AND PRISON conditions jurisprudence

Anders Kaye [FNd]

Copyright (c) 1996 University of Chicago; Anders Kaye

The degree of civilization in a society can be judged by entering its prisons.
Attributed to Fyodor Dostoevsky [FN1]

Prisons are dangerous places.
Judge Frank H. Easterbrook [FN2]

The political character of judicial decisions can be disguised by claims that these decisions are compelled by the logic of the law. A recent decision depriving Indiana prisoners of their right to self-defense illustrates the important role this ruse plays in current prison conditions jurisprudence.

After days of threatening sexual innuendo, Indiana Reformatory prisoner Michael Evans attempted to rape cellblock neighbor John Rowe. Rowe responded by hitting Evans with a hot-pot and calling for help. [FN3] Prison officials found that Rowe had violated prison rules by committing battery, [FN4] and imposed as a punishment one year in disciplinary segregation. [FN5] Rowe was not allowed to plead self-defense. [FN6] In Rowe v DeBruyn, the Seventh Circuit upheld the outcome of the prison hearing, concluding that prisoners may be denied the right to defend themselves against **\*694** violent attacks by other prisoners. [FN7] As a result, prisoners in the Indiana penal system must now submit to violence, even rape, or suffer potentially severe and recurrent punishment for their acts of self-defense.

This Comment argues that prisoners have a constitutional right to self-defense. The Rowe decision epitomizes the worst in prison conditions jurisprudence, ignoring important constitutional doctrines and unnecessarily imperiling prisoners. Section I illustrates the importance of the right to self-defense in the prison context, where violence is ubiquitous, and demonstrates that traditional prison conditions jurisprudence offers little promise of protection. Section II reviews the constitutional jurisprudence regarding self-defense, finding it to be both ambiguous and underdeveloped. Section III argues that there are at least two grounds for finding that prisoners have a constitutional right to self-defense. First, because self-defense has been an indispensable element of Anglo-American criminal justice, it is a fundamental right within the doctrine of due process. Second, the law governing the due process rights of the institutionalized, properly understood, mandates that when the state fails to protect prison ers, they must be allowed to protect themselves.

This Comment concludes that the decision in Rowe reflects not the logic of the law, but an inhumane conception of prisoners' rights. Judges often observe that "prisons are dangerous places," as though this were positive fact.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

79-001

63 UCHILR 693                                                                                Page 2
63 U. Chi. L. Rev. 693

Rowe reveals the fallacy in such an analysis. Judges often determine the conditions of prison life. If prisons are dangerous places, it is, at least in part, because judges make them so.

## I. THE IMPORTANCE OF SELF-DEFENSE IN THE PRISON CONTEXT

It has long been recognized that the rule of law cannot be absolute: there are times when lawbreaking is justified or excusable. [FN8] Of all the justifications and excuses present in the law, *695 none has been more fundamental than the right to self-defense. [FN9] Although Anglo-American law has always deplored violence, for nearly as long it has recognized that victims of unjustified attacks must be allowed to fend off their attackers, even if doing so requires violence. [FN10] It has been said that the self-defense instinct is so irresistible that legal prohibition would be futile, resulting only in punishment detached from culpability, [FN11] and that prohibiting self-defense under the law would undermine notions of security that undergird civil society itself. [FN12] For these reasons, the law declares that violence is wrong, but that violence as a defense against violence is justified.

The modern American prisoner is exposed to tremendous violence. Assault, rape, and murder occur with extraordinary frequency in prison. [FN13] Yet modern prison conditions jurisprudence fails to provide prisoners meaningful protection from each other. This Section describes the pervasive violence encountered by prisoners in the modern American prison and the inadequate protection offered by current law. In this context, the right to self-defense takes on profound importance: nowhere is the need to defend against violence more pressing than amidst the pervasive violence and sparse protections of the modern American prison.

A. Prisons Are Dangerous Places: The Ubiquity of Violence in the Modern American Prison

Academic literature has documented an epidemic of prison *696 violence. James E. Robertson calculates that the murder rate in prison is eight times that outside of prison and that the assault rate is at least twenty times that beyond the prison walls. [FN14] Michael Mushlin speculates that the incidence of homosexual rape and sexual assault is even more disproportionate. [FN15] Thus, while "no one knows for certain how much violence takes place in American prisons since so much of it is not reported," [FN16] the available evidence depicts prison as a place where violence is ubiquitous:

> (T)here are violent persons housed in our nation's prisons. These persons, left unchecked, can make prey of weaker inmates. The explosive mixture of personalities inherent in any prison setting is made even more incendiary by the overcrowding prevalent in numerous prisons, the lack of supervision and control in others, and the rising presence of . . . AIDS, which makes the prospect of sexual assault even more frightening than it already is. The result is that, in all too many prisons, the risk of serious violence is pervasive. [FN17]

Thus, writes Robertson, "a reign of inmate terror has descended upon many prisons." [FN18]

The ubiquity of prison violence demonstrates its crucial role in prison social and institutional dynamics. One author observes that there are several powerful incentives for violence in the prison context:

> (V)iolence . . . (1) provides a reputation for violence that in itself becomes a deterrent against victimization; (2) improves the self-image of the user; (3) gives sexual relief; (4) serves as a means of extortion; (5) enhances the prospect for parole because the staff wishes to be rid of the troublemaker. [FN19]

Violence is also used to establish prison hierarchy: sexual assault becomes "an act whereby one male (or a group of males) seeks testimony to what he considers is an outward validation of *697 his masculinity," [FN20] and "new inmates are usually tested by predators to determine if they will resist exploitation." [FN21] Likewise, violence is an outlet for racial tension; indeed, "racial conflict, including extreme violence and riots, is the reality of institutional life in prisons around the country." [FN22] Finally, some speculate that the extraordinary rate of prison violence reflects its utility in maintaining prison order:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                    Page 3
63 U. Chi. L. Rev. 693

(A)ctions of prison officials make homosexual rape easier to commit. They do not discourage it because rape "facilitates greater control over the inmates (,) . . . divides the prison ers . . . (and) gives them real cause to suspect, fear, fight, and hate each other." [FN23]

Commentators have paid special attention to the gruesome form of violence threatened in Rowe: prison rape. It is now well established that prisoner-on-prisoner rape is a widespread form of prison violence. [FN24] One observer has written that "(s)exual as sault appears to be as common in American prisons as iron bars." [FN25] Another estimates that "of the forty-six million Americans . . . who will be arrested at some time in their lives, ten million will be raped while in prison." [FN26] And Justice Blackmun has observed that:

A youthful inmate can expect to be subjected to homosexual gang rape his first night in jail, or, it has been said, even in the van on the way to jail. Weaker inmates become the property of stronger prisoners or gangs, who sell the sexual services of the victim. [FN27]

*698 Victims of prison rape typically experience severe physical and psychological injury. [FN28] Some are killed during the assault, and others may subsequently commit suicide. Survivors experience the "feelings of shame suffered by anyone who is raped (as well as) . . . a 'loss of manhood,' and a shattering of their self-esteem." [FN29] At least one judge found the psychological harm resulting from prison rape so terrible that he released the victim before the victim's sentence had expired. [FN30]

One of the most disturbing problems posed by rape in the prison context is the unique danger of AIDS transmission associated with this form of violence. As David M. Siegal has written:

The virus that causes this disease is transmitted rapidly through anal intercourse, especially forceful, violent intercourse. . . . The combination of AIDS and rape within our prisons thus poses a dilemma: any man sent to prison con fronts, from the first moment he is incarcerated, the Kafkaesque prospect of brutal attack by another inmate and infection with one of the world's most deadly diseases. [FN31]

Another commentator has suggested that AIDS transmission in prisons is evolving into a new form of the death penalty. [FN32] These descriptions starkly illustrate what was at stake in Rowe. Had Rowe complied with the prison policy against self-defense, he would have risked not just the immediate physical and psycho logical injury associated with rape, but infection with a gruesome and fatal disease. Yet in spite of the frightening frequency with which this scenario arises in the prison context, the Rowe court denied a victimized prisoner the right to resist.

The ubiquity of violence, the pervasive threat of rape, and the potential for infection with the AIDS virus illustrate the importance of protection from violence in the prison context, and thus the importance of the right to self-defense. Moreover, the *699 prevalence of such conditions illustrates the utter failure of the modern American prison system to provide this protection. The next Section shows that this failure follows in large part from the abdication of prisoner protection by modern prison conditions jurisprudence.

B. Prison Conditions Jurisprudence and Prison Violence

The law governing prison conditions substantially relieves prison officials of responsibility for prisoner-on-prisoner violence. As one court recently observed: "(s)ome level of brutality and sexual aggression among (prisoners) is inevitable no matter what the guards do." [FN33] Thus, "no matter how deplorable, prison conditions that are undesired (by prison officials) are not 'punishment'" and, therefore, are not subject to Eighth Amendment challenge. [FN34] Such analysis is typical of modern prison conditions jurisprudence, which erects daunting hurdles for plaintiffs in prison conditions cases. As a result, prison systems have few legal incentives to protect prisoners from violence.

Modern prison conditions jurisprudence is grounded in the Eighth Amendment's prohibition of cruel and unusual punishment. [FN35] As early as 1890, the Supreme Court applied the Eighth Amendment to prohibit punishments involving "torture or a lingering death." [FN36] Still, it was not until the 1970s that the Court recognized that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

"(t)here is no iron curtain drawn between the Constitution and the prisons of this country." [FN37] Although it may seem obvious that egregious prison conditions, such as rampant prison violence, should be evaluated as potentially cruel or un usual punishment, the Supreme Court did not explicitly affirm this connection until 1976, when it decided Estelle v Gamble. [FN38] That case has given rise to a doctrine that in theory requires "civilized" prisons, but in practice rarely punishes even the most egregious failures to meet this standard. [FN39]

*700 In Estelle, a Texas prison inmate alleged that he had been denied proper medical treatment for a back injury, and that this denial amounted to cruel and unusual punishment in violation of the Eighth Amendment. [FN40] The Supreme Court concluded that prisons have an obligation to provide medical care for inmates. [FN41] In the Court's view, "deliberate indifference to serious medical needs constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." [FN42] From this analysis were born the two basic and sometimes incompatible principles of modern prison conditions jurisprudence. First, prison conditions that unnecessarily and wantonly inflict pain violate the Eighth Amendment. [FN43] Second, such an Eighth Amendment violation may be found only in limited circumstances--namely, when prison officials have acted with an egregiously culpable state of mind, which the courts have defined as "deliberate indifference." [FN44]

In Wilson v Seiter, the Supreme Court extended these principles to cover a wide range of "inadequate 'conditions of confinement'" [FN45] understood to fall short of "minimal civilized measure(s)." [FN46] Examples of treatment courts have held violative of the Eighth Amendment include insufficient nourishment, [FN47] failure to allow exercise, [FN48] inadequate shelter, [FN49] poor sanitation, [FN50] environmental hazards, [FN51] overcrowding, [FN52] and excessive use of force by guards. [FN53]

Consistent with this doctrine, courts have recognized that prisoners have an Eighth Amendment right to be free from excessive risk of prison violence. [FN54] The basic right had been recognized*701 by some lower courts even prior to Estelle. [FN55] One judge, surveying particularly horrific prison conditions, wrote that "penitentiary inmates . . . ought at least to be able to fall asleep at night without fear of having their throats cut before morning, and . . . the state has failed to discharge a constitutional duty in failing to take steps to enable them to do so." [FN56]

The Supreme Court also has recognized that the Eighth Amendment provides at least some protection against prisoner violence. As a subsequent court observed, the Court assumed in Davidson v Cannon [FN57] that "the prison system may not ignore prisoners' risk of harm at the hands of other inmates." [FN58] Similarly, in Farmer v Brennan, the Court asserted that "(b)eing violently assaulted in prison is simply not 'part of the penalty criminal offenders pay for their offenses against society."' [FN59]

Nevertheless, it is exceedingly difficult for prisoners to win either prison conditions or prison violence cases. The Supreme Court has read Estelle's deliberate indifference requirement narrowly, thereby limiting Eighth Amendment protection for prison ers. In Whitley v Albers, for example, prison guards panicked during a riot and shot an innocent prisoner, but the Court re fused to find a violation of the Eighth Amendment on the ground that the requisite culpability had not been established: panic could not be equated with deliberate indifference. [FN60] Subsequently, in Wilson, the Court affirmed this understanding of deliberate indifference, reasoning that since "punishment" implied a deliberately administered purpose, the Eighth Amendment is not triggered unless prison officials act with "some mental element" akin to intent. [FN61] In keeping with this emphasis on intent, the Court *702 recently stressed that it is not enough that prison officials should have known about horrific conditions--rather, they must actually have known about them. [FN62]

Beyond the common observation that prisons are not meant to be comfortable places, two justifications have been offered for the use of the deliberate indifference standard. First, courts in general have been reluctant to burden "the legitimate efforts of the states to deal with difficult social problems." [FN63] In the Eighth Amendment context, judicial review has been limited by the concern that "courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system . . . ." [FN64] Second, courts have increasingly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693
63 U. Chi. L. Rev. 693

emphasized that the text of the Eighth Amendment itself limits the Amendment's reach: the Eighth Amendment regulates punishment, and punishment is by definition intentional. Thus, the Eighth Amendment, by its terms, can only apply where government officials act with a state of mind akin to intent--that is, where the officials' indifference may be said to be deliberate. [FN65]

This deliberate indifference standard poses a daunting obstacle for prisoners making prison conditions claims. Severe injuries and deprivations are often caused by official behavior that does not fit within the deliberate indifference paradigm. For example, one commentator has noted that, under the Wilson test, budget- constrained prison officials would not violate the Eighth Amendment even where they had full knowledge of horrible prison conditions because courts are unlikely to find that the officials deliberately imposed the conditions to magnify the inmates' punishment. [FN66] By this reasoning, disinterested ignorance, negligence, *703 and incompetence would be similarly valid defenses to Eighth Amendment liability. [FN67]

The deliberate indifference standard stands as an especially daunting barrier to prison violence claims. When injury is caused by a systematic failure to provide a basic necessity, as when prisons fail to provide heat or adequate nutrition, the resulting injuries will be widespread and traceable to policy decisions made by prison officials. As identical injuries with identical causes mount, prison officials' claims to ignorance of either injury or cause become less credible and allegations of deliberate indifference become more plausible. But when injury is caused by prisoner violence, the causal connection between policy and injury be comes more obscure--an autonomous, aggressive prisoner has interceded. Prison officials may argue that the acts of the aggressive prisoner, rather than their policy, caused the injury. Or they may argue that they had no capacity to foresee the acts of specific, autonomous prisoners, and thus did not know about the risk of violence. By this line of argument, prison officials are absolved of any general duty to try to separate more dangerous inmates from less dangerous ones. [FN68] Indeed, such defenses are particularly viable where courts embrace the assumption that some prison violence is inevitable. The more courts see prison violence as inevitable, the less they will attribute causation to prison officials. Thus, the deliberate indifference standard offers prison officials numerous defenses to claims based on prisoner violence. [FN69]

As a result, prison conditions doctrine allows prisons to leave prisoners perilously vulnerable to the violence of their peers. Yet the Rowe court concluded that a prison may lawfully punish a prisoner for defending himself. This holding is cruel. Given the epidemic of prison violence and the inadequacy of Eighth Amendment protections against such violence, thousands of prisoners *704 inevitably will be faced with a terrible choice: submit to assault, rape, and perhaps infection with the AIDS virus, or suffer serious punishment by the prison system. It is, as one judge has written, "a Hobson's choice." [FN70] The Rowe court concluded that this tragic outcome is compelled by the Constitution. The remainder of this Comment argues the contrary.

## II. SELF-DEFENSE: A NEW CONSTITUTIONAL QUESTION

The Rowe court viewed the law governing Rowe's claim to a right of self-defense as clear and, therefore, disposed of his claim in one short paragraph. The court explained that it could "find no precedent establishing a constitutional right of self-defense in the criminal law context," [FN71] and that it had found one earlier case denying the existence of such a right. [FN72]

In fact, the law before the court was far from clear. The Supreme Court has never directly considered the constitutional status of self-defense. In addition, only a handful of lower courts have considered the issue, and those courts have reached inadequately reasoned and unsatisfactory conclusions. Thus, as dissenting Judge Ripple observed in Rowe, "it is (not) hyperbole to characterize the position of the majority as a novel one." [FN73] No well established law required the Hobson's choice the Rowe court imposed on prisoners.

### A. Supreme Court Analysis of the Right to Self-Defense

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                              Page 6
63 U. Chi. L. Rev. 693

The Supreme Court has never directly considered whether self-defense is a constitutionally protected right. Early Supreme Court self-defense cases were preoccupied with determining the contours of the common law right, [FN74] an effort the Court appears *705 to have abandoned.

Some constitutional self-defense questions have reached the Court. Recently, these have involved the allocation of the burden of proof when a defendant claims that he acted in self-defense. In Martin v Ohio, the Court concluded that a state may place the burden of proving self-defense on the defendant. [FN75] But while Martin addressed an important constitutional question about the place of self-defense in a criminal trial, it did not resolve the issue of whether self-defense is a constitutionally protected right. Requiring defendants to prove that they acted in self-defense (rather than forcing the state to prove that they did not) is different from withholding the defense altogether.

Indeed, the Court has long recognized that while states have broad discretion in the allocation of burdens of proof in criminal trials, there are limits to this discretion. In Speiser v Randall, for example, the Court warned that:

> It is of course within the power of the state to regulate procedures under which its laws are carried out, including the burden of producing evidence . . . "unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." [FN76]

While the Court has never had occasion to apply the Speiser principle to a self-defense case, the principle has often been noted in other cases considering the allocation of burdens in criminal trials. [FN77] Section III of this Comment explores whether taking away the right to self-defense would violate the Speiser principle.

B. Lower Court Constitutional Analysis of the Right to Self- Defense

A handful of lower courts have considered whether there is a constitutional right to self-defense. Unfortunately, their decisions compose an anemic body of constitutional jurisprudence. Two cases prior to Rowe held that there is no constitutional right to self-defense. [FN78] However, these decisions exhibit both a cursory consideration of the issue and a failure to invoke significant sup porting authority. In contrast, two judges have speculated--one in dictum and one in dissent--that the right to *706 self-defense must necessarily be guaranteed in the Constitution. [FN79] Here too, the arguments are cursory and unsupported.

1. Cases denying that there is a constitutional right to self- defense.

The first case to deny that the Constitution guarantees a right to self-defense was Fields v Harris. [FN80] Following her termination for assaulting a coworker, Fields brought a wrongful discharge claim to a federal employment review board. [FN81] After her claim was rejected by the review board, Fields appealed to federal court, where she argued that she had acted in self-defense and that the dismissal therefore violated her constitutional rights. [FN82] Rejecting her claim, the Fields court concluded that self-defense is "not a substantive right conferred directly by the federal Constitution." [FN83]

The discussion of the constitutional question in Fields is thin: two short sentences. The court cited no authority--statutory, common law, academic, or otherwise--in support of its holding. Rather, the court suggested that the constitutional argument was not a serious one, but merely "an effort to circumvent (a) statutory time bar and establish jurisdiction." [FN84] Hence, while the Fields court rejected the constitutional claim in this procedural posture, the opinion does not purport to dispose of the issue of whether there is a constitutional right to self-defense.

*707 The other case cited for the proposition that self-defense is not a constitutional right is White v Arn. [FN85] There, the state placed the burden of proving self-defense on a criminal defendant. Anticipating the ruling in Martin, the White court rejected the claim that this burden allocation was unconstitutional. [FN86] Unlike the plaintiff in Martin, however, White also argued that "there is a constitutional right of self-defense, founded in the Eighth, Ninth, and Fourteenth Amendments, which an accused cannot be required to prove." [FN87] The White court re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693
63 U. Chi. L. Rev. 693

sponded that this argument was foreclosed by the burden allocation analysis of earlier Supreme Court cases: "(T)o hold that self-defense is a constitutional right which a defendant cannot constitutionally be re quired to prove, would be to reject the Supreme Court's established analysis . . . ." [FN88]

White, like Fields, is weak authority for the proposition that there is no constitutional right to self-defense. Like the Fields court, the White court did not cite a single authority regarding the constitutional status of self-defense. More significantly, al though Rowe suggests that White held there is no constitutional right to self-defense, [FN89] this is a mischaracterization of White. In fact, the White court rejected only the proposition that the right to self-defense was constitutionally protected in a way that had bearing on the allocation of the burden of proof. [FN90] Indeed, White expressly reserved the broader question whether the right to self- defense exists at all: "This holding does not reject the notion that a defendant has a limited right to act in self-defense under certain circumstances." [FN91] Therefore, neither White nor Fields is reli able authority regarding the constitutional status of the right to self-defense.

*708 2. Judges arguing that there is a constitutional right to self-defense.

While no court has held that there is a constitutional right to self-defense, at least two judges prior to Rowe argued that the Constitution must incorporate such a right. Judge Merritt first advanced this position in a brief dissent in Isaac v Engle. [FN92] Like White, Isaac was one of numerous pre-Martin cases considering the burden-of-proof issue; the Isaac majority concluded that be cause Ohio had, by statute, effectively made the absence of affirmative defenses an element of the crimes in question, the burden of proving self-defense could not be placed on the defendant. [FN93] Dissenting on procedural grounds, Judge Merritt nevertheless took special care to argue that self-defense is a constitutional right:

> I believe the Constitution prohibits a state from eliminating the justification of self-defense from its criminal law and re quires the state to prove as an element of the crimes of as sault and homicide that no such self-defense justification exists. [FN94]

In Griffin v Martin, [FN95] Judge Murnaghan reached a similar conclusion in dicta. The issue in Griffin was whether trial instructions on the burden of proof issue were so contradictory and misleading as to be unconstitutional. The appellate court held that the instructions were unconstitutional and found for the defendant. [FN96] Murnaghan's opinion, however, went beyond the scope of the case to discuss the constitutional status of the right to self-defense. In a footnote, he reasoned that, because self-defense is a complete exoneration, its absence must be regarded as an element of a crime; accordingly, defendants should not bear the burden of proof on this issue. [FN97] Judge Murnaghan also stat ed that:

> *709 It is difficult to the point of impossibility to imagine a right in any state to abolish self-defense altogether, thereby leaving one a Hobson's choice of almost certain death through violent attack now or statutorily mandated death through trial and conviction of murder later. [FN98]

Given this sparse and inconsistent body of law, it is not sur prising that one federal court recently observed in dicta (without referring to Rowe, Fields, White, Isaac, or Griffin) that the constitutionality of the right to self-defense would "present an important question." [FN99] Neither the Supreme Court cases nor the decisions and dicta in the lower courts employ satisfactory analysis of, or invoke significant authority regarding, the constitutional status of the right to self-defense. Rather, current law comprises a disconnected array of unsupported decisions and musings--a sad basis for a decision with the ramifications of Rowe. The next Section demonstrates that the Constitution offers fertile ground for a more compassionate approach.

III. THE PRISONER'S RIGHT TO SELF-DEFENSE AND JUDICIAL RESPONSIBILITY IN THE PRISON CONDITIONS CONTEXT

A manual for jailhouse lawyers informs prisoners: "It is virtually certain that you retain your right of self-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693
63 U. Chi. L. Rev. 693

Page 8

defense if at tacked by a fellow inmate . . . ." [FN100] Contrary to the arguments in Rowe, the logic of the law does not compel the conclusion that prisoners must submit to violence. Rather, as this Section demonstrates, the Due Process Clause supports a right to self-defense. [FN101] First, it has long been held that due process protects *710 those rights essential to the Anglo-American conception of criminal justice, and self-defense is such a right. [FN102] Second, even if there is not a general right to self-defense, an emerging strand of due process doctrine supports the argument that the state must either protect institutionalized individuals, or allow them to protect themselves. [FN103] This Comment concludes that failure to recognize the right of self-defense is not only unconstitutional, but also a disturbing abdication of judicial responsibility.

## A. Self-Defense as a Fundamental Right in Anglo-American Criminal Justice

In Speiser, the Supreme Court warned that while states may place heavy burdens of proof on criminal defendants, they may not do so if in so doing they "offend( ) some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental." [FN104] Courts have long recognized that certain rights are so essential to the Anglo-American system of criminal justice that, although they are nowhere explicitly enumerated, they are nevertheless guaranteed by the Due Process Clause. Whether entrenched in the common law or recognized as part of our history, these rights have been called "fundamental" [FN105] and necessary to "ordered liberty." [FN106] No right recognized within this doctrine, however, has been more entrenched in the common law, nor more universally recognized, than the right to self-defense.

## 1. The doctrine of fundamental rights.

In Palko v Connecticut, the Supreme Court described the class of rights protected by constitutional due process as those rights without which "neither liberty nor justice would exist"; of which "a pervasive recognition . . . can be traced in our history, *711 political and legal"; and the violation of which would be "so acute and shocking that our polity will not endure it." [FN107] In short, constitutional due process protects "those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.'" [FN108] In Moore v City of East Cleveland, the Court described such rights as those that are "deeply rooted in this Nation's history and tradition." [FN109]

These standards remain controversial. Their vague terms offer courts little guidance when confronted with specific rights. Thus, the Supreme Court has been reluctant to guarantee rights under Palko, Moore, and their progeny: "the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." [FN110] Yet time and again, the Supreme Court has determined that certain rights, not elaborated in the text of the Constitution, are nevertheless inherent in the constitutional conception of due process. [FN111]

*712 The most famous inherent rights case, In re Winship, [FN112] provides some guidance in identifying what constitutes an inherent right. There, the Court held that the reasonable-doubt standard in criminal trials is protected by constitutional due pro cess. [FN113] According to the Winship Court, such a right is indispensable in "a society that values the good name and free dom of every individual" [FN114] and is a "historically grounded right( ) of our system, developed to safeguard men from dubious and unjust convictions." [FN115] To this end, the Court focused on two factors. First, the Court emphasized that the reasonable- doubt standard had long been recognized in Anglo-American criminal justice: "The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation. The 'demand for a higher de gree of persuasion . . . was recurrently expressed from ancient times . . . .'" [FN116] Second, the Court stressed that the reasonable doubt standard was recognized in nearly every contemporary common-law jurisdiction. According to the Court: "Although virtually unanimous adherence to the reasonable-doubt standard in common law jurisdictions may not conclusively establish it as a requirement of due process, such adherence does 'reflect a pro found judgment about the way in which law should be enforced and justice administered.'" [FN117] Thus, the decision in Winship turned on the historical entrenchment and universal acceptance of the reasonable-doubt standard. [FN118]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693

63 U. Chi. L. Rev. 693

While the doctrine of inherent rights is notoriously vague, the more concrete standards of historical entrenchment and universal recognition provide a reliable foundation for identifying fundamental rights. Moreover, legal analysis that derives the meaning of due process from consensus that cuts across time and place has the salutary effect of minimizing the potential for abuse of judicial discretion. [FN119] Under the above standards, courts should consider the right to self-defense to be inherent in due process, for it has been affirmed by a consensus that spans *713 several hundred years of common law and every modern common law jurisdiction.

2. Self-defense as essential to the Anglo-American system of criminal justice.

Some conception of the right to self-defense is as fundamental to the Anglo-American conception of criminal justice as any of the rights affirmed in the line of cases stretching from Palko to Winship to the present. As a brief survey of its history shows, the lineage of self-defense rivals that of the reasonable-doubt standard. Likewise, the right is almost universally recognized today.

The right to self-defense has been entrenched in the English system of criminal justice since the decline of the Saxons. [FN120] As early as the thirteenth century, prototypical conceptions of justification and excuse were emerging in criminal law, and the right to self-defense began to take form. [FN121] At first, the right was recognized in only limited circumstances. Killings committed to pre vent crimes or to fulfill a lawfully mandated punishment became lawful, but only because they were considered an implementation of the state's interest in a safe and secure society. [FN122] As one commentator explains, "(a)t early common law, justification defenses (including self-defense) had a strong public-benefit cast. Conduct was . . . justified (when) it was performed in the public's interest." [FN123]

*714 An alternative understanding of self-defense began to take form in the medieval common law courts. Some came to recognize the right to self-defense as essential to a fair system of criminal justice. Courts observed that acts of self-defense often arose irresistibly from human instinct, and that punishment of such acts would distort the calibration of punishment to culpability. "A medieval English defendant who acted in self-defense was probably presumed to have had no real choice whether to act because of the natural human instinct for self-preservation--an instinct inconsistent with the need for social control." [FN124]

By the seventeenth century, the concept of self-defense had matured and was well established. [FN125] The original social-control account of self-defense had given rise to a more general under standing that acts of self-defense were "justified" because they contributed to the social order. [FN126] Kant, for example, believed that "(s)elf-defense (had) to be understood exclusively as an institution designed to secure the Right, the framework securing the maximum freedom of all." [FN127]

The early conception of self-defense as an irresistible instinct had also taken hold. By the eighteenth century, it was widely recognized that, because the self-defense reaction was irresistible, it was not blameworthy; in legal terms, it became an "excuse" from punishment. [FN128] On this basis, Blackstone declared self-defense a fundamental individual right. In his view, the common law "respect(ed) the passions of the human mind." [FN129] Killing in self-defense was "excusable from the great universal principle of self-preservation, which prompts every man to save his own life preferably to that of another." [FN130] Indeed, Blackstone maintained that society could not take away the right: "Self-defense . . . is justly called the primary law of nature, (and therefore) it is not, neither can it be . . . taken away by the law of society." [FN131]

*715 From these early principles, several modern justifications for the right to self-defense have emerged. Some contemporary theories are rooted in the early understanding of the relationship between self-defense and a stable social order. One utilitarian justification, for example, holds that when choosing between aggressors and victims, the law should favor victims as a class because they are and will be less destructive to society than aggressors.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                                                                    Page 10
63 U. Chi. L. Rev. 693

[FN132] Another common argument is that giving victims the right to act violently against aggressors will reduce the over all level of violence in society: aggressors will be deterred by the threat of defensive violence, and the violence deterred will more than counterbalance the violence resulting from self-defense. [FN133]

Most modern scholars, however, follow Blackstone's argument that the self-defense reaction is irresistible and therefore not blameworthy. They echo Blackstone's assertion that no fair system of criminal law can remove so natural an impulse as self-defense. [FN134] For example, according to Professor Fletcher, self-defense "has its origins in the common-sense view that a person sometimes has 'no choice' but to kill his adversary . . . . (T)he human response is to kill rather than be killed." [FN135] The excuse of self-defense is therefore necessary to the proper calibration of punishment to culpability: it is "our way of making the moral claim that (the defender) is not to be blamed for the kind of choice that other people would make under the same circumstances." [FN136]

*716 Similarly, many modern scholars echo Blackstone's assertion that the right to self-defense is so essential to justice that it can not be denied by the state. According to Professor Kadish, "(t)he individual does not surrender his fundamental freedom to pre serve himself against aggression by the establishment of state authority . . . . (It is a) moral right against the state . . . ." [FN137] Kadish concludes that "(t)he answer is unambiguous in every legal system: the victim may kill to save his own life." [FN138] Dressler makes a similar argument:

> (T)he innocent person may have a right against the government to kill the aggressor. The thesis is that people band together to create a legal system in order to protect themselves against various forms of aggression. Every person has a right, therefore, to the law's protection against aggression; when the law fails to provide protection, the threatened person has a right to resist the aggression. [FN139]

Finally, Fletcher observes that "there are few legal ideas as basic as the principle of legitimate self-defense. . . . Th(is) principle is so deeply ingrained in our legal thinking that it is difficult to imagine a legal system that did not acknowledge it." [FN140]

Every modern American jurisdiction recognizes, in some form, the right to self-defense. [FN141] All states now have statutory provisions establishing a form of the right to self-defense in the general population. [FN142] Similarly, state courts have consistently recognized some form of the common law right to self-defense. [FN143] *717 So too have federal courts, including the Supreme Court. [FN144]

Thus, while it may seem striking that only a few courts have ever considered the constitutional nature of the right to self-defense, the dearth of case law actually attests to the universal acceptance of the right. Because states and courts have always permitted claims of self-defense, the constitutional foundation of this prerogative has rarely ever been at issue. In Winship, the Court paid special note to similar circumstances. As Justice Harlan explained:

> It is only because of the nearly complete and long-standing acceptance of the reasonable doubt standard by the states in criminal trials that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires (the reasonable doubt standard) . . . . [FN145]

Consideration of the constitutionality of the right to self-defense has been foreclosed in much the same way. [FN146]

In sum, the right to self-defense clearly meets the standards established in Speiser, Palko, and Winship. Like the right to proof beyond a reasonable doubt, the right to self-defense has been entrenched in the Anglo-American system of criminal justice for several centuries. Similarly, and again like the right to proof beyond a reasonable doubt, the right to self-defense is now accorded near universal recognition in common law jurisdictions. Indeed, the theories underlying the right suggest that it is indispensable to the calibration of punishment and culpability and that a legal system without a right to self-defense could not achieve justice.

*718 B. Self-Defense as a Due Process Right of the Institutionalized

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

While the doctrine of inherent rights provides a basis for finding that prisoners have a right to self-defense, it is not the only basis. The prisoner's right to self-defense may also be grounded on a narrower rationale, one that emerges at the intersection of the law governing the due process rights of the institutionalized in general and the law of necessity in the prison con text.

The Due Process Clause places substantive limits on the conditions to which the institutionalized may be exposed. Specifically, their "basic human needs" must be met. [FN147] But there is a problem with this doctrine. In deference to the difficulties faced by state-run institutions, courts have injected a culpability requirement into the due process analysis, transforming seemingly absolute limits on the conditions of institutionalization into frail and contingent protections. [FN148] This Section demonstrates that recognizing a necessity defense within the due process doctrine governing the rights of the institutionalized mitigates this problem by reinforcing certain basic rights without unduly burdening state institutions. From this necessity defense arises a prisoner's right to self-defense.

1. Due process rights of the institutionalized.

The Constitution provides special protection to those the state institutionalizes against their will. According to a line of cases culminating in DeShaney v Winnebago County Department of Social Services, [FN149] due process requires that institutions pro vide food, clothing, shelter, medical care, and reasonable safety to the institutionalized. [FN150] While the Court in DeShaney recognized that "nothing in the language of the Due Process Clause itself requires the state to protect the life, liberty, and property of its citizens," [FN151] it also held that due process requirements *719 change dramatically when the state institutionalizes an individual. [FN152] The Due Process Clause is phrased as a limitation on the state's power to act, and incarceration is state action. Thus, "it is the state's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." [FN153]

As the Court has repeatedly recognized, these due process protections require the state to assure that the basic human needs of those it incarcerates are met. As the Court held in DeShaney:

> (If) the state . . . so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by . . . the Due Process Clause. [FN154]

In Youngberg v Romeo, a case involving patients committed to a state-run mental hospital, the Court identified "adequate food, shelter, clothing, and medical care" as the "essentials of the care that the State must provide." [FN155] The Court also declared that the state "has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution." [FN156]

The principle that institutionalized individuals must be assured such basic necessities as food, shelter, and protection from violence serves an important purpose. The absence of such assurance would allow states to render the institutionalized helpless, then forswear responsibility for injuries, even death, suffered by these individuals. Furthermore, this understanding of due pro cess resolves some of the most disturbing hypotheticals posed by critics of Eighth Amendment jurisprudence. [FN157] For example, the Eighth Amendment allows petty thieves to starve, freeze, or be raped when prison officials are handcuffed by budgetary constraints, so long as such conditions do not result from deliberate indifference or intentional punishment. Fortunately, starving *720 thieves have other constitutional recourse--the Due Process Clause.

While the due process principles articulated in DeShaney and Youngberg seem to establish firm limits on the conditions to which the institutionalized may be exposed, these limits are undermined by the injection of a culpabil-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                                         Page 12
63 U. Chi. L. Rev. 693

ity element into the due process analysis. Specifically, under Youngberg, courts must defer to the decisions of institutional officials regarding conditions of confinement in all cases where the decisions are made in good faith. [FN158] Indeed, the Supreme Court has suggested that the particularly daunting deliberate indifference standard applied to the Eighth Amendment should be applied to due process analysis in the prison context. [FN159] However, as in the Eighth Amendment context, the injection of the culpability requirement into due process analysis undermines constitutional safeguards, and transforms the substantive limits of due process into unreliable, contingent protections.

Courts justify the culpability requirement in due process analysis by concerns that are similar to, but crucially distinct from, those invoked in the Eighth Amendment context. As in the Eighth Amendment context, courts are reluctant to impose onerous constitutional burdens on state institutions. [FN160] Courts recognize that such institutions face challenging social problems on limited budgets. The requirement of deference to decisions made in good faith serves to shield institutions from liability for their honest mistakes as they struggle to allocate their limited resources appropriately. Often, however, this means that state institutions escape liability for even the most deplorable conditions unless they act with a culpable mental state.

Although the text of the Eighth Amendment has been interpreted as necessarily including an intent requirement (since *721 "punishment" requires purposeful state action), [FN161] no such element is textually required by the Due Process Clause. [FN162] Thus, unlike the culpability requirement in the Eighth Amendment context, the culpability element of the due process analysis is merely a vehicle for deference to institutional decision making.

In some circumstances, however, such deference is not warranted. The following Section demonstrates that a limited defense of necessity can and should be recognized as a central component of the due process rights of the institutionalized. Recognition of such a defense would revitalize DeShaney's substantive limitations without unduly burdening state institutions. From this limited necessity defense arises a prisoner's right to self-defense.

2. Institutionalization, necessity, and self-defense.

The law governing the due process rights of the institutionalized typically addresses institutional conditions by placing obligations on the state. The institutionalized must be fed, sheltered, and protected, for example. Because these obligations can be so costly, good-faith institutional decisions regarding their fulfillment are protected by the culpability element of the due process analysis. What some courts fail to recognize, however, is that the institutionalized also have rights that do not place corresponding obligations on the state; institutional actions and decisions affecting these rights should not be shielded in the same way. The right to necessary acts of survival is such a right. This right provides a basis for a constitutional right to self-defense in the prison context.

Necessity is a longstanding defense to criminal liability. It is properly invoked by one who has broken a law, but did so because lawbreaking was necessary to avoid a greater evil. Most commonly, necessity is claimed where the lawbreaker's life depended on the lawbreaking. While there is no universally accept definition of necessity, its basic elements are widely agreed upon: "(c)onduct that the actor believes to be necessary to avoid a harm or evil . . . is justifiable, provided that . . . the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law (broken)." [FN163]

*722 Recognizing a limited due process right to perform necessary acts in the institutional context solves some of the problems created by the tension between the basic human needs of the institutionalized and the practical difficulties confronted by state institutions. First, recognizing a right to perform necessary acts places no significant corresponding obligations on state institutions. The right to claim necessity as a defense to a charge of wrongdoing cannot be translated into a right to a given resource that the state must provide. Necessity authorizes an individual to act, but it imposes no concomitant, affirmative performance obligation on the state. Unlike the familiar, concrete rights to food, shelter, and safety--typical of the due process cases--the prisoner's right to perform necessary acts of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                                                Page 13
63 U. Chi. L. Rev. 693

survival does not unduly burden the institution.

Second, recognizing the necessity defense in the prison con text preserves to the institutionalized at least a baseline right to survival. When the individual's survival is jeopardized, he is allowed to act regardless of the institution's culpability or lack thereof. Despite his institutionalization, he is not required to submit to his own destruction. Thus, recognizing a limited necessity defense in the institutional context revitalizes at least the core ideals articulated in DeShaney. [FN164]

Indeed, necessity has a long history in the institutional con text, and in the prison context in particular. As early as 1736, English courts had determined that prisoners escaping from burning prisons could claim necessity as a defense: "(I)f a prison be fired by accident, and there be a necessity to break prison to save his life, this excuseth the felony." [FN165] In 1868, the Supreme Court affirmed this principle in dictum, observing that "he is not to be hanged because he would not stay to be burnt." [FN166] Courts have since struggled to determine just what conditions really make escape from state institutions and prisons necessary, [FN167] *723 but in the last twenty-five years, the basic right to necessary escape has been widely accepted. As the court wrote in People v Lovercamp, the seminal prison escape case:

> (W)e may assume that a prisoner with his back to the wall, facing a gang of fellow-inmates approaching him with drawn knives, who are making it very clear that they intend to kill him, might be expected to go over the wall rather than re main and be a martyr to the principle of prison discipline . . . . [FN168]

Since Lovercamp, the majority of courts that have considered the issue have agreed that recognizing some form of necessity in the prison context is appropriate. [FN169]

As suggested by its historical pedigree, necessity strikes a workable balance between the needs of state institutions and the rights of institutionalized individuals. Claims of necessity do not burden state institutions by requiring them to reallocate precious and scarce resources. Yet the right to claim necessity as a defense to a charge of wrongdoing vindicates the institutionalized individual's right to act when the state fails to meet his basic human needs. Thus, necessity solves the most problematic aspect of the due process doctrine governing the rights of the institutionalized: it assures the survival of the institutionalized in the face of good-faith institutional incapacity.

From this right to claim necessity in the institutional context arises a prisoner's right to self-defense. Self-defense is, at bottom, a variation on necessity. It can only be invoked when danger is imminent, when no other alternative is available, and when the state has failed to intervene. [FN170] When self-defense is invoked, it is because violence is necessary to prevent worse or less-justified violence. Self-defense claims will almost always satisfy the requirements of necessity claims. [FN171]

*724 Thus, a prisoner's right to self-defense may be found at the intersection of the due process rights of the institutionalized and the law of necessity as it has developed in the institutional con text. Courts reluctant to embrace the general right to self-defense suggested by the Palko analysis [FN172] might still recognize this more limited version, and thereby do justice to important due process principles without unduly burdening state institutions. In so doing, they would also avoid the disturbing outcome embraced by Rowe.

## IV. CONCLUSION

If Dostoevsky is right that a society's prisons reflect that society's degree of civilization, then the unrelenting violence that makes the modern American prison such a dangerous place should be cause for concern. And while economic and political realities surely limit the resources available to the prison system, and thus determine in large part the conditions that prevail therein, the decision in Rowe illustrates that courts can and do play a vital role in determining just how dangerous modern American prisons are.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693
63 U. Chi. L. Rev. 693

Page 14

Rowe also illustrates the extent to which legal rhetoric disguises the role of the courts in shaping prison conditions. Despite the availability of a spectrum of legal arguments supporting a constitutional right to self-defense, the Rowe court embraced pallid precedent and made not even passing reference to the rich constitutional doctrines supporting more compassionate out comes. As a result, a decision with cruel ramifications for prisoners was made to seem inevitable.

In fact, courts are entrusted with unusual responsibility in shaping prison conditions doctrine. To a unique degree, prisoners are excluded from the lawmaking process. They are pariahs, [FN173] often disenfranchised, [FN174] and generally despised by much of the *725 public. Politicians distance themselves from prisoner interests and concerns, and often legislate by appealing to the fear, anger, and hatred that broad constituencies feel toward imprisoned criminals. [FN175] Prisoners disproportionately comprise racial and socioeconomic minorities whose access to political representation can already be tenuous. Thus, legislators and policymakers often pay little heed to prisoners' needs.

As a result, the task of safeguarding prisoners' rights falls uniquely to judges. As John Hart Ely has observed, judges have heightened responsibilities where there is reason to fear that "representatives beholden to an effective majority are systematically disadvantaging some minority out of simple hostility . . . ." [FN176] The Supreme Court has long recognized that cases involving the rights of discrete and insular minorities warrant special scrutiny. [FN177] Prisoners epitomize such a minority. Thus, as Justice Brennan observed, courts have a unique role in protecting the rights of prisoners: "Those whom we would banish from society or from the human community itself often speak in too faint a voice to be heard above society's demand for punishment. It is the particular role of courts to hear these voices . . . ." [FN178] For prisoners, then, courts are a crucial check against potential abuse in the democratic process. The responsibility for assuring that prisoners are treated in a civilized manner lies primarily with judges.

Courts should recognize the prisoner's constitutional right to self-defense. Self-defense has been an indispensable element of Anglo-American criminal justice, and it is therefore a fundamental right within the doctrine of due process. Furthermore, the ideals of the law governing the due process rights of the institutionalized can best be realized by recognizing a necessity defense in the institutional context--and this necessity defense likewise provides a sound basis for a prisoner's right to self-defense.

The analysis in Rowe ignored both compassion and the Constitution. Prisoners in modern American prison are exposed to *726 tremendous violence, and Eighth Amendment doctrine offers them little hope of protection. Even so, the Rowe court deprived prisoners of their last line of defense on the basis of a shallow legal analysis, ignoring or failing to recognize constitutional doctrines supporting far more compassionate results. It may be true that prisons are dangerous places, but, as Rowe illustrates, for the modern American prisoner, courts can be dangerous places too.

[FNd]. A.B. 1991, Harvard University; J.D. Candidate 1996, The University of Chicago.

[FN1] Suzy Platt, ed, Respectfully Quoted: A Dictionary of Quotations Requested from the Congressional Research Service 286 (Library of Congress 1989).

[FN2] McGill v Duckworth, 944 F2d 344, 345 (7th Cir 1991). Justice Thomas recently affirmed this description, writing that "prisons are necessarily dangerous places . . . ." Farmer v Brennan, 114 S Ct 1970, 1990 (1994), citing McGill, 944 F2d at 348.

[FN3] Rowe v DeBruyn, 17 F3d 1047, 1049 (7th Cir 1994), cert denied, 115 S Ct 508 (1994).

[FN4] Id at 1048-49.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN5] In the end, the penalty was suspended. Id at 1049.

[FN6] The prison officials did, however, consider self-defense a mitigating factor in sentencing Rowe. Id at 1049.

[FN7] 17 F3d 1047, 1052 (7th Cir 1994), cert denied, 115 S Ct 508 (1994). Specifically, the court stated: "(W)e . . . consider if the right to self-defense is a fundamental constitutional right within the Due Process Clause itself. We conclude that it is not." Id.

[FN8] The doctrines of justification and excuse are the two most important limitations on the reach of the criminal law. Justified conduct is conduct that under ordinary circumstances is criminal but which under the special circumstances that constitute the justification defense is not wrongful, such as when choosing the lesser of two evils, defending another, or defending oneself. Joshua Dressler, Understanding Criminal Law S 16.03 at 182-83 (Matthew Bender 1987). Excused conduct is wrongful and unjustified conduct that causes social harm but for which the actor is not held personally to blame, such as when the actor is insane or under duress. Id.

[FN9] This Comment will not attempt to provide a precise definition of the right to self- defense. There has been extensive debate about the scope and contours of self-defense, but commentators agree on the core elements. Professor Robinson summarizes them neatly: "Conduct constituting an offense is justified if (1) an aggressor unjustifiably threatens harm to any legally-protected interest; and (2) the actor engages in conduct harmful to the aggressor, (a) when and to the extent necessary to protect that interest, (b) that is reason able in relation to the harm or evil threatened." Paul H. Robinson, 2 Criminal Law Defenses S 131(a) at 73 (West 1984). See also Dressler, Understanding Criminal Law S 17.04 at 199 (cited in note 8) ("(D)eadly force is (justified if) the actor reasonably believes that its use is necessary to prevent imminent and unlawful use of deadly force by the aggressor."); Model Penal Code and Commentaries, S 3.04 at 478 (ALI 1985) ("MPC") ("(T)he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.").

[FN10] See note 120 and accompanying text.

[FN11] See text accompanying notes 134-36.

[FN12] See text accompanying notes 137-40.

[FN13] See notes 14-18 and accompanying text.

[FN14] James E. Robertson, The Constitution in Protective Custody: An Analysis of the Rights of Protective Custody Inmates, 56 U Cin L Rev 91, 93-94 (1987).

[FN15] Michael B. Mushlin, 1 Rights of Prisoners S 2.06 at 66 (Shephard's/McGraw Hill 2d ed 1993).

[FN16] Id.

[FN17] Id (citations omitted).

[FN18] Robertson, 56 U Cin L Rev at 93 (cited in note 14).

[FN19] Id at 92 n 9, citing Lee H. Bowker, Prison Victimization 31-33 (Elsevier 1981).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                                                   Page 16
63 U. Chi. L. Rev. 693

[FN20] Michael Graubart Levin, Fight, Flee, Submit, Sue: Alternatives for Sexually Assaulted Prisoners, 18 Colum J L & Soc Probs 505, 508-09 (1985), quoting Anthony M. Scacco, Rape in Prison 3 (C.C. Thomas 1975).

[FN21] Robertson, 56 U Cin L Rev at 92 (cited in note 14).

[FN22] Id at 92 n 11, quoting James B. Jacobs, New Perspectives on Prisons and Imprisonment 81 (Cornell 1983).

[FN23] David M. Siegal, Note, Rape In Prison and AIDS: A Challenge for the Eighth Amendment Framework of Wilson v. Seiter, 44 Stan L Rev 1541, 1546 (1992), quoting Carl Weiss and David James Friar, Terror in the Prisons 27 (Bobbs-Merrill 1974).

[FN24] Carl Weiss and David James Friar, Terror in the Prisons (Bobbs-Merrill 1974); Robertson, 56 U Cin L Rev at 93-94 (cited in note 14).

[FN25] Levin, 18 Colum J L & Soc Probs at 506 (cited in note 20).

[FN26] Weiss and Friar, Terror in the Prisons at 61 (cited in note 24).

[FN27] United States v Bailey, 444 US 394, 421 (1980) (Blackmun dissenting) (citations omitted).

[FN28] Levin, 18 Colum J L & Soc Probs at 510 (cited in note 20).

[FN29] Siegal, Note, 44 Stan L Rev at 1545 (cited in note 23). A newsletter prepared for current and former prisoners by the Fortune Society, a group made up of ex-offenders, refers to prison rape as "the ultimate shame." Levin, 18 Colum J L & Soc Probs at 506-07 & n 12 (cited in note 20), quoting How to Understand Sexual Assaults in Prisons and Jails, Crim Just Newsletter 2 (Apr 28, 1980).

[FN30] People v Insignares, 121 Misc 2d 921, 470 NYS2d 513, 515 (Sup Ct 1983), rev'd, 109 AD2d 221, 491 NYS2d 166 (App Div 1985) (reversed on ground that trial judge abused his discretion in dismissing the sentence).

[FN31] Siegal, Note, 44 Stan L Rev at 1542 (cited in note 23) (citations omitted).

[FN32] Ann F. Hammond, Note, AIDS in Correctional Facilities: A New Form of the Death Penalty?, 36 J Urban & Contemp L 167 (1989).

[FN33] McGill v Duckworth, 944 F2d 344, 348 (7th Cir 1991).

[FN34] Id at 349.

[FN35] See Mushlin, 1 Rights of Prisoners S 2.00 at 21-22 (cited in note 15). The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US Const, Amend VIII. The Eighth Amendment is the only provision of the Bill of Rights applicable by its own terms to prisoners.

[FN36] In re Kemmler, 136 US 436, 447 (1890).

[FN37] Wolff v McDonnell, 418 US 539, 555-56 (1974).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                                      Page 17
63 U. Chi. L. Rev. 693

[FN38] 429 US 97 (1976).

[FN39] See Mushlin, 1 Rights of Prisoners S 2.01 at 21-40 (cited in note 15). For an excellent analysis of the emergence of this tension and its applicability to problems of rape and AIDS in the prison context, see generally Siegal, Note, 44 Stan L Rev 1541 (cited in note 23). See also Candace Ada Mueller, Note, The Evolving Standards in Prison Condition Cases: An Analysis of Wilson v. Seiter and the Cruel and Unusual Punishment Clause, 13 BC Third World L J 155 (1993).

[FN40] 429 US at 101.

[FN41] Id at 103.

[FN42] Id at 104, quoting Gregg v Georgia, 428 US 153, 173 (1976).

[FN43] Estelle, 429 US at 104. See also text accompanying notes 158-60.

[FN44] Wilson v Seiter, 501 US 294, 297 (1991), quoting Estelle, 429 US at 104.

[FN45] 501 US 294, 303 (1991).

[FN46] Id at 298, quoting Rhodes v Chapman, 452 US 337, 347 (1981).

[FN47] Adams v Mathis, 458 F Supp 302, 308 (M D Ala 1978).

[FN48] French v Owens, 777 F2d 1250, 1255 (7th Cir 1985).

[FN49] Henderson v DeRobertis, 940 F2d 1055, 1059 (7th Cir 1991).

[FN50] Young v Quinlan, 960 F2d 351, 363 (3d Cir 1992).

[FN51] Helling v McKinney, 509 US 25, 35 (1993) (exposure to second-hand smoke may violate the Eighth Amendment).

[FN52] Moore v Morgan, 922 F2d 1553, 1556 (11th Cir 1991). See also Rhodes, 452 US at 349 (holding that overcrowding must cause serious hardship before Eighth Amendment violation arises).

[FN53] Whitley v Albers, 475 US 312, 320-21 (1986).

[FN54] See, for example, Farmer v Brennan, 114 S Ct 1970, 1976 (1994); Rhodes, 452 US at 347; Cortes-Quinones v Jimenez-Nettleship, 842 F2d 556, 558 (1st Cir 1988); Villante v Department of Corrections, 786 F2d 516, 519 (2d Cir 1986).

[FN55] See, for example, Woodhouse v Commonwealth, 487 F2d 889, 890 (4th Cir 1973) ("A prisoner has a(n Eighth Amendment) right . . . to be reasonably free from the constant threat of violence and sexual assault by his fellow inmates . . . ."); Holt v Sarver, 442 F2d 304, 308 (8th Cir 1971) (holding that system of armed "trusty" inmates with supervisory authority over other inmates, combined with "open barracks" and other dangerous conditions, violated Eighth Amendment); Roberts v Williams, 302 F Supp 972, 989 (N D Miss 1969) (holding that unprovoked shooting of inmate by "trusty" violated Eighth Amendment).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN56] Holt v Sarver, 300 F Supp 825, 831 (E D Ark 1969), aff'd, 442 F2d 304 (8th Cir 1971).

[FN57] 474 US 344 (1986).

[FN58] McGill, 944 F2d at 347, citing Davidson, 474 US at 350.

[FN59] 114 S Ct 1970, 1977 (1994), quoting Rhodes, 452 US at 347.

[FN60] 475 US 312, 320-21 (1986).

[FN61] 501 US at 299-302. See also Mushlin, 1 Rights of Prisoners S 2.01 at 27-28 (cited in note 15).

[FN62] Farmer, 114 S Ct at 1979. See also McGill, 944 F2d at 351 (observing that in the Eighth Amendment context, deliberate indifference is governed by a subjective standard under which a prison official must actually know of or suspect a dangerous situation before he can be deliberately indifferent to it).

[FN63] Parham v J.R., 442 US 584, 608 n 16 (1979).

[FN64] Rhodes, 452 US at 352.

[FN65] Wilson, 501 US at 299-302.

[FN66] David J. Gottlieb, Wilson v Seiter: Less than Meets the Eye, in Ira P. Robbins, ed, 1 Prisoners and the Law 2-33, 2-37 (Clark Boardman Callaghan 1992). The Supreme Court acknowledged this possibility without distress in Wilson:
(A) state-of-mind inquiry might allow officials to interpose the defense that . . . fiscal constraints . . . prevent the elimination of inhumane conditions. Even if that were so, it is hard to understand how it could control the meaning of 'cruel and unusual punishment' in the Eighth Amendment.501 US at 301. See also McGill, 944 F2d at 349 (suggesting that prison officials should not be found liable for prison conditions for which legislators, architects, judges, and tax payers are all at least partly responsible).
[FN67] "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Wilson, 501 US at 299, quoting Whitley, 475 US at 319.

[FN68] This was the argument approved of in McGill, 944 F2d at 350-53.

[FN69] Not surprisingly, the practical result of these cases has been to shift the burden of protection from prison officials to inmates. "As the opportunities for violence have expanded, and the risks of detection and punishment diminished, more responsibility has had to be taken by the inmate to secure his own safety." Richard C. McCorkle, Personal Precautions to Violence in Prison, 19 Crim Just & Behav 160, 171 (1992).

[FN70] Griffin v Martin, 785 F2d 1172, 1187 n 37 (4th Cir), withdrawn, 795 F2d 22 (4th Cir 1986) (en banc).

[FN71] 17 F3d at 1052. The court devoted subsequent analysis to whether a right of self- defense, if it existed, would apply in the context of a prison disciplinary hearing, and whether the right would outweigh legitimate penal interests. Id at 1052-53.

[FN72] Id at 1052, citing White v Arn, 788 F2d 338 (6th Cir 1986) (holding that in criminal cases there is no constitutional right to self-defense and that a state may allocate the burden of proof on the issue of self-defense to the de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

79-018

63 UCHILR 693                                                                                    Page 19
63 U. Chi. L. Rev. 693

fendant).

[FN73] Rowe, 17 F3d at 1054 (Ripple dissenting).

[FN74] In Beard v United States, for example, the Court decided that at common law a man on his own land need not retreat from an attacker before acting in self-defense, so long as his fears are reasonable. 158 US 550, 560 (1895). Later, in Brown v United States, Justice Holmes broadened the reasonableness standard with the famous admonition that "(d)etached reflection cannot be demanded in the presence of an uplifted knife." 256 US 335, 343 (1921).

[FN75] 480 US 228, 232 (1987) (holding no violation of Due Process Clause when state re quires defendant to prove affirmative defenses).

[FN76] 357 US 513, 523 (1958), quoting Snyder v Massachusetts, 291 US 97, 105 (1934).

[FN77] See, for example, Patterson v New York, 432 US 197, 210 (1977) (noting that Due Process Clause permits states to require criminal defendants to prove affirmative defenses, but that "(t)here are obviously constitutional limits beyond which the states may not go" in relabeling the elements of its crimes).

[FN78] See Fields v Harris, 675 F2d 219 (8th Cir 1982); White v Arn, 788 F2d 338 (6th Cir 1986).

[FN79] See Griffin v Martin, 785 F2d 1172 (4th Cir 1986); Isaac v Engle, 646 F2d 1129 (6th Cir 1980) (Merritt dissenting on other grounds).

[FN80] 675 F2d 219, 220 (8th Cir 1982).

[FN81] Id at 219-20.

[FN82] Id at 220.

[FN83] Id. Fields had attempted to ground this right in the Second, Fifth, and Eighth Amendments. Id.

[FN84] Fields was appealing an adverse ruling by the United States Civil Service Commission, review of which must be filed with the Court of Claims or a Court of Appeals within thirty days. Her constitutional claim was apparently an effort to get into court after the thirty-day period had lapsed. (The court did not comment on whether this ruse would have worked had her constitutional claim been valid.) Id, citing Civil Service Reform Act of 1978, 5 USC S 7703(b)(1) (Supp 1978).

[FN85] 788 F2d 338 (6th Cir 1986).

[FN86] Id at 343-47.

[FN87] Id at 347.

[FN88] Id, citing Patterson v New York, 432 US 197 (1977). Patterson had held that the prosecution in a criminal case is not constitutionally required to prove the nonexistence of all affirmative defenses, and that states may therefore allocate the burden of proving affirmative defenses to the defendant. 432 US at 208-09.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

79-019

63 UCHILR 693
63 U. Chi. L. Rev. 693

[FN89] Rowe, 17 F3d at 1052.

[FN90] White, 788 F2d at 347.

[FN91] Id at 347 n 15. The court specifically limited its holding to the burden of proof issue: "Our holding simply embodies a determination that Ohio's allocation of the burden of proving self-defense does not violate the Due Process Clause." Id.

[FN92] 646 F2d 1129, 1140 (6th Cir 1980) (Merritt dissenting on other grounds).

[FN93] Id at 1134-35. The majority contended that placing the burden of proof on the defendant would be inconsistent with In re Winship, 397 US 358, 364 (1970) (holding that due process requires prosecution to prove "every fact necessary to constitute the crime").

[FN94] Isaac, 646 F2d at 1140 (Merritt dissenting on other grounds).

[FN95] 785 F2d 1172 (4th Cir 1986), withdrawn upon rehearing en banc, 795 F2d 22 (1986).

[FN96] Id at 1173.

[FN97] Id at 1187 n 37. The dissent rejected Judge Murnaghan's reasoning. See id at 1194 (Sneeden dissenting).

[FN98] Griffin, 785 F2d at 1187 n 37.

[FN99] Jackson v Senkowski, 817 F Supp 6, 7 (S D NY 1993). The Jackson court indicated it would ground the right to self-defense in due process:
One might well be deprived of liberty without due process if incarcerated for attempting to defend one's life . . . . All states appear to recognize a defense of self-defense (and) security of the person is an obvious component of the domestic Tranquillity (sic) which was one of the original objectives of the Constitution.
[FN100] Barret L. Brick, The Right to be Free from Assault, 16 Colum Hum Rts L Rev 347, 381 (1985), citing United States v Stahls, 194 F Supp 849 (S D Ind 1961), and State v Boyd, 498 SW2d 532 (Mo 1973) (no mention of whether the right has a constitutional dimension).

[FN101] The Fifth Amendment, which is binding on the federal government, provides: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." US Const, Amend V. Nearly identical language in the Fourteenth Amendment imposes the same restriction on the states: "(N)or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." US Const, Amend XIV. The requirements of these two provisions have apparently converged in the criminal context. "(The Supreme) Court has 'increasingly looked to the specific guarantees of the (Bill of Rights) to determine whether a state criminal trial was conducted with due process of law.'" Benton v Maryland, 395 US 784, 794 (1969) (citation omitted).

[FN102] See text accompanying notes 104-09.

[FN103] See text accompanying notes 164-69.

[FN104] 357 US at 523, quoting Snyder v Massachusetts, 291 US 97, 105 (1934).

[FN105] Palko v Connecticut, 302 US 319, 328 (1937), overruled on other grounds, Benton v Maryland, 395 US 784, 794 (1969); Speiser, 357 US at 523, quoting Snyder, 291 US at 105.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693
63 U. Chi. L. Rev. 693

[FN106] Palko, 302 US at 325.

[FN107] 302 US 319, 326-28 (1937).

[FN108] Id at 328, quoting Hebert v Louisiana, 272 US 312, 316 (1926). The discussion in Palko was confined to rights enumerated in the Bill of Rights. The Court stated that some, like free speech, are fundamental (and therefore binding on the states through the Fourteenth Amendment), and held that double jeopardy is among those that are not. Id at 328. The holding as to double jeopardy was later overruled by Benton v Maryland, 395 US 784, 794 (1969). The idea of fundamental rights implicit in the concept of ordered liberty was, consistent with the quoted language from Palko, later applied to other, nonenumerated rights. See, for example, Moore v City of East Cleveland, 431 US 494, 498 (1977) (right to count grandsons as part of a "single family" for zoning purposes); Griswold v Connecticut, 381 US 479, 496 (1965) (right to marital privacy); Shapiro v Thompson, 394 US 618, 627 (1969) (right to interstate travel).
Other courts have used language different from Palko to convey the notion of fundamental rights. For example, in Rochin v California, the Court stated that substantive due process is violated by state actions which "offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses. These standards of justice are not formulated anywhere as though they were specifics." 342 US 165, 169 (1952) (citation omitted).
[FN109] 431 US 494, 503 (1977).

[FN110] Collins v Harker Heights, 503 US 115, 125 (1992). Justice Black expressed the core concern in dissent in In re Winship: "When this Court assumes for itself the power to declare any law--state or federal-- unconstitutional because it offends the majority's own views of what is fundamental and decent in our society, our Nation ceases to be governed according to 'the law of the land' and instead becomes one governed by the 'law of the judges.'" 397 US 358, 384 (1970) (Black dissenting).

[FN111] See, for example, Mooney v Holohan, 294 US 103, 110-12 (1935) (Knowing use of perjury by a prosecutor inconsistent with constitutional due process.); Napue v Illinois, 360 US 264, 269 (1959) (Failure of the prosecution to correct known, false testimony violates due process.); Brady v Maryland, 373 US 83, 87 (1963) (Prosecutorial suppression of favorable, material evidence requested by defendant violates due process.); Giglio v United States, 405 US 150, 152-54 (1972) (Failure of the prosecutor to disclose agreements with witnesses violates due process.).

[FN112] 397 US 358 (1970).

[FN113] Id at 364.

[FN114] Id at 363-64.

[FN115] Id at 362-64, quoting Davis v United States, 160 US 469, 488 (1895).

[FN116] Id at 361, quoting Charles T. McCormick, Handbook of the Law of Evidence S 321 at 681-82 (West 1954).

[FN117] Id at 361-62, quoting Duncan v Louisiana, 391 US 145, 155 (1968).

[FN118] See also Albright v Oliver, 114 S Ct 807, 825 (1994) (Stevens dissenting) ("In In re Winship, (the Court's holding) relied on history and certain societal interests . . . .").

[FN119] See note 110.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN120] In Anglo-Saxon law prior to the nineteenth century, self-defense was viewed as a mitigating factor--and often the basis for a pardon--rather than a complete justification for homicide. Dolores A. Donovan and Stephanie M. Wildman, Is the Reasonable Man Obsolete? A Critical Perspective on Self-Defense and Provocation, 14 Loyola LA L Rev 435, 442 (1981). As one commentator suggests, the provisions of Saxon law were geared to maximize the power of the ruling class: "Prohibition of any form of self-help allowed early English rulers to control violence and establish obedience to the rule of law." Cathryn Jo Rosen, The Excuse of Self-Defense: Correcting a Historical Accident on the Behalf of Battered Women Who Kill, 36 Am U L Rev 11, 25 (1986). The Anglo-Saxon reluctance to allow self-help gave way between the twelfth and sixteenth centuries to the concept of justifiable homicide, which was rooted in the theory that such killings were done on behalf of the state and benefitted society. Id at 25.

[FN121] Garrett Epps, Any Which Way But Loose: Interpretive Strategies and Attitudes Toward Violence in the Evolution of the Anglo-American "Retreat Rule", 55 L & Contemp Probs 303, 307-08 (1992).

[FN122] Rosen, 36 Am U L Rev at 25-26 (cited in note 120). See also Dressler, Understanding Criminal Law S 16.03 at 182-83 (cited in note 8).

[FN123] Dressler, Understanding Criminal Law S 17.02 at 187 (cited in note 8). See also Mullaney v Wilbur, 421 US 684, 692 (1975) ("At early common law only those homicides committed in the enforcement of justice were considered justifiable . . . .").

[FN124] Rosen, 36 Am U L Rev at 26 (cited in note 120).

[FN125] Mullaney, 421 US at 692.

[FN126] For a discussion of self-defense as a justification, see George P. Fletcher, Re thinking Criminal Law S 10.5 at 857-64 (Little, Brown 1978).

[FN127] George P. Fletcher, Law and Morality: A Kantian Perspective, 87 Colum L Rev 533, 551 (1987), citing Immanuel Kant, The Metaphysical Elements of Justice 331-37 (Bobbs-Merrill 1965) (J. Ladd, trans).

[FN128] For a discussion of self-defense as an excuse, see Fletcher, Rethinking Criminal Law S 10.5 at 856 (cited in note 126).

[FN129] Dressler, Understanding Criminal Law S 18.05 at 208 (cited in note 8), quoting William M. Blackstone, 3 Commentaries *3.

[FN130] Dressler, Understanding Criminal Law S 18.05 at 208 (cited in note 8), quoting William M. Blackstone, 4 Commentaries *186.

[FN131] Blackstone, 3 Commentaries *4 (cited in note 129).

[FN132] Dressler, Understanding Criminal Law S 18.05 at 208 (cited in note 8). See also Sanford H. Kadish, Respect for Life and Regard for Rights in the Criminal Law, 64 Cal L Rev 871, 882 (1976). A similar conclusion is sometimes reached in "principled" or deontological moral argument, where it is said that the victim's claim to safety and life is "superior" to that of the aggressor. Dressler, Understanding Criminal Law S 18.05 at 210 (cited in note 8). Another common argument from moral principle is that the high value of personal autonomy authorizes victims to protect that autonomy even by violence against encroachers. Here again the arguments echo the early "social good" justifications. Fletcher, Rethinking Criminal Law S 10.5.3 at 860-61 (cited in note 126). See also Robinson, 2

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693
63 U. Chi. L. Rev. 693

Criminal Law Defenses S 131(a) at 70 (cited in note 9).

[FN133] Kadish, 64 Cal L Rev at 882-83 (cited in note 132); Dressler, Understanding Criminal Law S 18.05 at 209 (cited in note 8).

[FN134] The crudest version of this account asserts that unlawful attackers forfeit their right to legal protection, at least while engaged in the unlawful attack, because their interests are "discounted . . . by the degree of (their) culpability." Fletcher, Rethinking Criminal Law S 10.5.2 at 858 (cited in note 126). See also Kadish, 64 Cal L Rev at 882 (cited in note 132) (observing that "on the balance of utilities it is better . . . that it be the attacker (who dies) rather than his victim").

[FN135] Fletcher, Rethinking Criminal Law S 10.5.1 at 856 (cited in note 126).

[FN136] Id. See also Rosen, 36 Am U L Rev at 27 (cited in note 120) (The "intentional infliction of physical harm upon another is not culpable when it is inflicted in self-defense.").

[FN137] Kadish, 64 Cal L Rev at 885 (cited in note 132). See also Fletcher, Rethinking Criminal Law S 10.5.4 at 867 (cited in note 126) ("According to this view of necessary defense, the private use of force is tolerated . . . because the state fails in its task of providing protection against aggression.").

[FN138] Kadish, 64 Cal L Rev at 881 (cited in note 132).

[FN139] Dressler, Understanding Criminal Law S 18.04 at 201 (cited in note 8).

[FN140] George P. Fletcher, Self-Defense as a Justification for Punishment, 12 Cardozo L Rev 859, 859 (1991). Fletcher notes that even in legal systems that do not embrace our conception of rights, such as the system elaborated in the Talmud, "self-defense and defense of others emerge . . . as central and unquestioned aspects of legal life." Id. For an interesting counter to these traditional arguments, see Epps, 55 L & Contemp Probs 303, 304 (cited in note 121) (positing that "pure" self-defense is rare--and therefore not a useful concept--because most homicides occur following ambiguous confrontations between persons who know each other and have conflicted before).

[FN141] Robinson, 2 Criminal Law Defenses S 132 at 96 n 1 (cited in note 9) (citing statutory and/or case law recognition of the right to self-defense in "every American jurisdiction").

[FN142] Id (listing self-defense statutes in every state).

[FN143] Id.

[FN144] See, for example, Brown v United States, 256 US 335, 343 (1921) (recognizing right to use deadly force against an attacker if grievous harm reasonably believed imminent); Smith v Lauritzen, 356 F2d 171, 176 (3d Cir 1966) (same).

[FN145] 397 US at 372 (Harlan concurring) (citation omitted).

[FN146] Indeed, courts have occasionally recognized that the question of the constitutionality of the right to self-defense might never arise. The majority in Griffin recognized that "(t)he question is not presented in Griffin's case, and is unlikely to arise." 785 F2d at 1186.

[FN147] See DeShaney v Winnebago County Department of Social Services, 489 US 189, 200 (1989).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN148] See text accompanying notes 158-59.

[FN149] 489 US 189 (1989).

[FN150] Id at 200. DeShaney traced this principle to Youngberg v Romeo, 457 US 307, 315- 16 (1982). Youngberg involved inmates in a state-run mental hospital. The Court there held that substantive due process requires the state to assure the reasonable safety of involuntarily committed mental patients. Id. See also Revere v Massachusetts General Hospital, 463 US 239, 244 (1983) (holding that due process requires provision of medical care to injured suspects in police custody).

[FN151] 489 US at 195.

[FN152] Id at 199-200.

[FN153] Id at 200.

[FN154] Id.

[FN155] 457 US 307, 324 (1982).

[FN156] Id.

[FN157] See text accompanying note 66.

[FN158] 457 US at 324.

[FN159] "(W)e suggested that (deliberate indifference) is required to make out a substantive due process claim in the prison setting." DeShaney, 489 US at 199 n 5, citing Whitley, 475 US at 326-27 (holding that Due Process Clause affords inmate no greater protection than the Cruel and Unusual Punishments Clause).

[FN160] See, for example, Parham v J.R., 442 US 584, 608 n 16 (1979) (procedures for commitment to state mental hospitals); Youngberg, 457 US at 324 (care and safety of committed mental patients); Wolff v McDonnell, 418 US 539, 556 (1974) (prison disciplin ary proceedings). See also text accompanying notes 60-65. Indeed, this may have been what the Rowe court was really getting at. Having held that there is no constitutional right to self-defense, the Rowe court held in the alternative that even if there were such a right, it could be overridden: "The policy purport-edly advances prison security by discouraging all physical violence among inmates . . . . (P)rison security and the reduction of violence are certainly legitimate penological interests." Rowe, 17 F3d at 1053.

[FN161] See text accompanying notes 61-62.

[FN162] For the texts of the Fifth and Fourteenth Amendment Due Process Clauses, see note 101.

[FN163] MPC S 3.02(1). See also Dressler, Understanding Criminal Law S 17.02 at 183 (cited in note 8); Kadish, 64 Cal L Rev at 888-89 (cite in note 132) (discussing the lesser- evil theory of justification).

[FN164] See DeShaney, 489 US at 199 ("(T)he state (must) . . . ensure (institutionalized persons') 'reasonable safety' from themselves and others."), citing Youngberg, 457 US at 314-25.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                                          Page 25
63 U. Chi. L. Rev. 693

[FN165] Levin, 18 Colum J L & Soc Probs at 515 (cited in note 20), quoting People v Whipple, 100 Cal App 261, 279 P 1008, 1009 (1929), quoting Sir Matthew Hale, 1 History of the Pleas of the Crown 611 (1736).

[FN166] United States v Kirby, 74 US 482, 487 (1868).

[FN167] See, for example, People v Lovercamp, 43 Cal App 3d 823, 118 Cal Rptr 110, 111-16 (1974); People v Noble, 18 Mich App 300, 170 NW2d 916, 918 (1969); Whipple, 279 P at 1010; State v Cahill, 196 Iowa 486, 194 NW 190, 192 (1923); State v Davis, 14 Nev 439, 444 (1880). See also Levin, 18 Colum J L & Soc Probs at 514-22 (cited in note 20) (reviewing cases struggling with necessity in prison context).

[FN168] 43 Cal App 3d 823, 118 Cal Rptr 110, 116 (1974). Significantly, the court noted that it was not creating any new judicial doctrine: "We do not conceive that we have created a new defense to an escape charge. We merely recognize, as did an English Court 238 years ago, that some conditions ' excuseth the felony.'" Id at 116.

[FN169] See, for example, People v Unger, 66 Ill 2d 333, 362 NE2d 319, 320 (1977); People v Trujillo, 41 Colo App 223, 586 P2d 235, 236 (1978). See also Levin, 18 Colum J L & Soc Probs at 520-22 (cited in note 20) (collecting cases).

[FN170] See the definitions of the self-defense right in note 9.

[FN171] Indeed, in the context of Lovercamp, recognizing a necessity-based right to self- defense seems to avoid perverse results. If the state cannot require the prisoner to submit to life-threatening violence, which version of prisoner self-help would it prefer--escape or self-defense? To allow escape, but not self-defense, would appear to indicate a preference for escape over self-defense within the confines of the prison walls. Clearly, escape seems to pose more of a threat to prison security and the general welfare of society than does allowing the prisoner to act in self-defense.

[FN172] See text accompanying notes 107-08.

[FN173] For a general discussion of the significance of minority and/or pariah status in constitutional theory, see John Hart Ely, Democracy and Distrust chs 4-6 (Harvard 1980). See also United States v Carolene Products Co., 304 US 144, 153 n 4 (1938).

[FN174] Prisoners are permanently disfranchised in fourteen states. Most other states disfranchise prisoners for the duration of their stay in prison. See Andrew L. Shapiro, Note, Challenging Criminal Disfranchisement Under the Voting Rights Act: A New Strategy, 103 Yale L J 537, 538-39 (1993); Alice E. Harvey, Note, Ex-Felon Disfranchisement and Its Influence on the Black Vote: The Need for a Second Look, 142 U Pa L Rev 1145, 1146 (1994).

[FN175] But see Ely, Democracy and Distrust at 152-54 (cited in note 173) (positing that there may be "perfectly respectable reasons"--relating to differences among voters and their interests--for the isolation of particular political groups).

[FN176] Id at 103 (cited in note 173).

[FN177] See, for example, Carolene Products, 304 US at 153 n 4.

[FN178] McClesky v Kemp, 481 US 279, 343 (1987) (Brennan dissenting).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

63 UCHILR 693                                                                                      Page 26
63 U. Chi. L. Rev. 693


63 U. Chi. L. Rev. 693

END OF DOCUMENT

63 UCHILR 693                                                                                      Page 26

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 80

Westlaw.

56 UCINLR 91                                                                                        Page 1
56 U. CIN. L. Rev. 91

**C**University of Cincinnati Law Review
1987

**\*91** THE CONSTITUTION IN PROTECTIVE CUSTODY: AN ANALYSIS OF THE RIGHTS OF PROTECTIVE CUSTODY INMATES

*James E. Robertson* [FNa1]

Copyright (c) 1987 by The University of Cincinnati; James E. Robertson

*If I was you I'd ask transfer to protection . . . cause . . . if you remain on this floor you're asking to die . . . . . You'll be committing suicide.* [FNaa1]

INTRODUCTION: THE COMMUNITY OF THE FEARFUL

A "community of the fearful" [FN1] resides in prison. It is composed of inmates housed in protective custody, a form of segregated confinement intended to provide enhanced safety for likely targets of inmate violence. [FN2] In exchange for security, protection inmates often experience conditions of confinement similar to those imposed as punishment for disciplinary infractions. [FN3]

"An explosive growth" has occurred in the number of persons residing in protective custody. [FN4] The American Corrections Association**\*92** conservatively estimates that 6.5% of all federal and state inmates have protective custody status, which represents a nearly 300% increase since 1978. [FN5] The dramatic growth of the protective custody population at the Washington State Penitentiary is illustrative. While the total institutional population remained stable at approximately 1,350 inmates, [FN6] the number of protection inmates increased from nine in 1970 to 120 in 1980. [FN7]

Many situations can trigger retreat to protective custody. When first admitted to the general prison population, new inmates are usually tested by predators to determine if they will resist exploitation. [FN8] These "fish" have few options: fight, acquiesce to desires of predatory inmates, or flee to protective custody. [FN9] For inmates who do fight, entry to protective custody may only be delayed. Some inmates seek the sanctuary of protective custody after becoming embroiled in disputes with fellow inmates. [FN10] Other inmates are unable to cope with racial tensions, [FN11] prison gangs, [FN12] or their own fears. [FN13] **\*93** Worse yet, they may be labeled as informants, a deviant status that places them at great risk. [FN14]

The primary reason for the burgeoning size of protection populations is the acute fear of violence within prison. [FN15] Contemporary inmates face a type of violence quite different from that experienced by their forebearers: "[W] hereas in the past prisoners feared brutality by prison guards, today they fear violence at the hands of their fellow prisoners." [FN16] A reign of inmate terror has descended upon many prisons. [FN17] The primary concern of today's prisoner is protection**\*94** from physical and sexual assault; [FN18] incarceration subjects convicts to a murder rate eight times greater than that found outside prison [FN19] and an assault rate exceeding the prison murder rate by twenty-fold. [FN20]

Protective custody and other aspects of prison administration have been historically outside the reach of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91                                                    Page 2

Constitution by virtue of the hands-off doctrine, a judicial policy of nonintervention in the operations of prisons. [FN21] Beginning in the late 1960s, however, federal courts abandoned the hands-off doctrine in an effort to confine the prison within the constraints of constitutional law. [FN22] This Article *95 examines the effects of federal judicial intervention on the administration of protective custody. [FN23]

Part I determines when inmates should be admitted to protective custody by virtue of their constitutional right to reasonable safety and delineates the security measures that must be present in protective custody if that right is to be secured. Part II describes the circumstances that trigger procedural safeguards against arbitrary or erroneous transfers to protective custody and delineates the procedural safeguards required by due process of law. Part III addresses the constitutionality of restrictions commonly imposed on protective custody inmates in exchange for secure housing. Part IV concludes the Article by advancing two propositions: (1) the expansion of prisoners' rights has rendered more inmates vulnerable to assault; and (2) the right of vulnerable inmates to secure housing should be revised to entitle them to the least restrictive means of ensuring their safety.

*96 I. DEFINING A CONSTITUTIONAL ROLE FOR PROTECTIVE CUSTODY: THE RIGHT TO SAFETY IN PRISON

Prisoners frequently request transfer to protective custody; [FN24] however, no right to enter protective custody upon demand exists. [FN25] Exclusion from protective custody acquires constitutional significance only when one alleges the following: first, the protection candidate faces a pervasive risk of assault; and second, failure to segregate the protection candidate denies him or her reasonable safety. [FN26] To establish both elements is to prove "deliberate indifference" to inmate safety, [FN27] a violation of the eighth amendment prohibition against the cruel and unusual punishment of convicted persons [FN28] and the fifth and fourteenth amendment ban on any punishment of pretrial detainees. [FN29]

*97 Part I of the Article first posits objective criteria for determining whether the protection candidate faces a pervasive risk of assault. Part I next examines when reasonable protection of the vulnerable inmate necessitates his or her placement in protective custody. Finally, Part I delineates the minimum security measures that must be incorporated into protective custody if it is to offer reasonable safety to the vulnerable offender.

*A. Determining Who Is Vulnerable: The "Pervasive Risk" Standard*

In concluding that "not every denial of a request for protective custody amounts to a denial of an inmate's right" to safety, the court in *Ballard v. Elsea* explained:

> In order to state a claim, a petitioner must do something more than plead the conclusory allegation that he believes himself to be in danger and believes the custodial response to be inadequate; such an allegation is nothing more than an expression of the petitioner's disagreement with the respondent over the way in which the respondent is discharging his duty. [FN30]

Instead, the petitioner must plead that he or she faces a pervasive risk of assault if left in the general prison population. [FN31] Two rationales support the pervasive risk standard: First, prisons are safe habitats unless contraindications, such as a pervasive risk of assault, can *98 be objectively discerned. [FN32] Second, violence of a lesser quantum or quality evidences no more than simple negligence, [FN33] which falls short of the "deliberate indifference" needed to violate the constitutional restraints on punishment. [FN34]

Inmates can establish that they face a pervasive risk of assault, and thus merit protective measures, when their situation falls within any one of the following categories: (1) they have been threatened with bodily harm; (2) they have been assaulted under circumstances suggesting that a second attack will be forthcoming; (3) they have been repeatedly assaulted; (4) they reside within a prison population experiencing continuing violence; (5) they have been identified as informants; or (6) they have been identified as child molesters. Each of these situational definitions of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

vulnerability is examined in the remainder of this subpart of the Article.

Prisoners who have been threatened with bodily harm are entitled to protective measures. [FN35] When prison authorities are informed of a purported threat, they need not accept the report as true, but they must initiate a timely investigation of the alleged threat to verify the validity or reliability of the report. [FN36] During the investigation, the *99 alleged target should be separated from the general prison population. [FN37] When the investigation fails to reveal an objective risk of assault, the subject of the alleged threat can be returned against his or her will to the general prison population. [FN38]

A single assault does not usually indicate that the victim thereafter faces a pervasive risk of attack. [FN39] An exception arises when the assault occurs amid circumstances suggesting that subsequent attacks upon the victim will likely follow. A sexual assault is one of these circumstances. As the Fourth Circuit Court of Appeals in *Withers v. Levine* observed: "[O]nce a prisoner has been thus victimized, word spreads throughout the prison and he becomes a special target for *100 subsequent attacks." [FN40] An interracial assault comprises a second special circumstance. In *Matzker v. Herr,* the court concluded that the plaintiff's allegation that prison officials should have known of a strong likelihood that the plaintiff would be assaulted after his earlier involvement in an interracial fight was sufficient to state a cause of action. [FN41]

Additionally, evidence that an inmate has suffered repeated assaults indicates that this person will remain under a pervasive risk of attack. In *Spencer v. Staras* the court ruled that the plaintiff stated a cause of action in alleging that prison officials had failed to protect him despite knowing of twenty prior attacks he had endured. [FN42]

A pervasive risk of assault can also be established by showing that the candidate resides within a prison where violence is commonplace, [FN43] even though he or she has escaped victimization. [FN44] For example, the court in *Pugh v. Locke* concluded that all inmates in the Alabama prison system faced an impermissible risk of assault because there existed "rampant violence and [a] jungle atmosphere" in which inmates freely and repeatedly victimized one another. [FN45]

Federal courts have employed several criteria to determine when violence is commonplace. The number of reported assaults is one measure. [FN46] For example, the court in *Palmiagina v. Garrahy* found that the approximately 155 reported major assaults upon inmates *101 during each of 1975 and 1976 "confirmed the [constitutionally intolerable] fear and violence" present at the Rhode Island Adult Correctional Institution. [FN47]

A second measure, described by one court as "[p]erhaps more telling than sheer numbers," consists of inmate testimony. [FN48] The court, in illustrating its point, said:

> The most commonly related stories are of stabbings and rapes. The episodes have on occasion led directly to the death of the victim. For example, inmate Eddie Pitman described a murder by stabbing that occurred in the prison dining room. The same inmate described a fight between two men on the ballfield in which one was armed with a knife and the other defended himself with a baseball bat. [FN49]

The number of inmates residing in a prison's protective custody unit can also evidence rampant violence within the general prison population. [FN50] This third measure of violence is "[p]erhaps one of the most accurate barometers of . . . fear" [FN51] because protective custody is an undesirable form of confinement, which inmates will not seek unless they fear for their lives. [FN52] Rampant violence can be inferred when the number of protection inmates "represent[s] a percentage grossly out of proportion to any prison in America" [FN53] or when the absolute number of protection inmates grows by fifty percent during a two-year period. [FN54]

There exists an unwritten inmate code that prohibits cooperation with prison staff, especially in a criminal investigation. [FN55] Transgression*102 of the code merits severe punishment. [FN56] *Blizzard v. Quillen* extended the pervasive risk standard to situations in which the code of silence is broken. [FN57] Inmate Blizzard had cooper-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91                                                                                                          Page 4
56 U. CIN. L. Rev. 91

ated with a state task force. To safeguard Blizzard, prison officials initially placed him in total isolation from other offenders, but over his objections they later transferred him to less restrictive housing where he came into contact with other inmates. Several offenders assaulted Blizzard within hours after the transfer. The court upheld the magistrate's finding that a prison official had acted in reckless disregard for Blizzard's safety by allowing him to be approached by fellow offenders. [FN58]

Child molesters, "short eyes" in prison argot, represent "the lowest, most despicable kind of criminal." [FN59] Like alleged informants, child molesters confront a presumptive threat of assault. The plaintiff's experiences recounted by the court in *Wojtczak v. Cuyler* illustrate the danger facing imprisoned child molesters: "Plaintiff testified that while he was lodged . . . [at a county jail awaiting trial], other prisoners threw firebombs, burning newspapers, and cigarettes into his cell, and that many verbal threats were directed at him." [FN60] The *Wotjtczak* court determined that the plaintiff's fears regarding*103 his safety in the general prison population were reasonable and that he could remain in protective custody at Pennsylvania's Graterford prison, where inmates were confined to their cells twenty-three hours a day. [FN61]

### B. Protective Custody as Reasonable and Necessary Protection

When a candidate for protective custody is within one of the judicially defined classes of vulnerable inmates, custodians acquire a duty to provide reasonable safety. [FN62] The rationale for the reasonableness standard is that prison staff should not be held to a higher degree of care than mandated by tort law of custodians. [FN63]

While reasonable protection of vulnerable inmates does not invariably require their segregation, [FN64] numerous courts have decreed that they must be housed apart from their likely predators. [FN65] *104 As one means of separating vulnerable from predatory prisoners, protective custody finds its constitutional function; segregation is a legitimate condition of confinement when imposed upon vulnerable inmates in furtherance of the staff's duty to provide reasonable protection. [FN66]

The decision of the District Court of Maryland in *Joyner v. McClellan* illustrates this point of law. [FN67] Joyner, an inmate at the Maryland Penitentiary, argued that either his protective custody restrictions should be eased or that he should be released from protective custody and transferred to another prison. [FN68] Prison employees had removed Joyner from the general population after determining that he faced a continuing danger from assailants who had once attacked him. The court found that prison officials had taken "reasonable steps" to protect an inmate "exposed to a real danger of attack" by transferring Joyner to protective custody. [FN69] While the court regretted that victims rather than assailants experienced the discomfort of segregation, it affirmed the practice of segregating prisoners for purposes of protection. [FN70]

The constitutional function of protective custody is not diminished by a less restrictive means of safeguarding a vulnerable prisoner. In *Dolphin v. Manson*, the District Court for Connecticut posited: "[T]he court must uphold any reasonable measure chosen by the defendants to maintain prison security *even* if less restrictive *105 alternatives may also have been available." [FN71] The *Dolphin* plaintiff had been segregated after certain inmates had threatened him. [FN72] Finding his segregation to be reasonable, the court excused prison officials from improving the overall security of the institution or segregating the plaintiff's enemies. [FN73] These measures might have permitted the vulnerable plaintiff to rejoin the general prison population.

Conversely, a prison staff's failure to place a vulnerable inmate in protective custody does not breach the duty of reasonable safety if it selects a viable alternative. [FN74] While federal courts are insistent that endangered offenders be separated from likely predators, they have accorded prison officers considerable discretion in choosing the manner of separation. [FN75] Indeed, there are significant and legitimate reasons for minimizing the use of protective custody. First, protective custody is a costly form of housing. [FN76] Second, the additional resources needed to maintain an inmate in protective custody detract from the resources available for general population prisoners.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

[FN77] Third, the security measures undertaken in moving protection inmates in and out of their quarters for vocational training result in additional restrictions on the general prison population. [FN78] Finally, entry into protective custody is a stigma in itself, *106 which is detrimental to the offender's rehabilitation and reintegration into the mainstream of prison life. [FN79]

The alternatives to protective custody, however, are limited in number and efficacy. One option is to segregate predatory inmates. Predators, however, can easily evade identification. Victimized inmates rarely name their assailants for fear of being labeled as informants. [FN80] While federal courts permit the segregation of potentially assaultive inmates on the basis of hunch or objective classification instruments, [FN81] the accuracy is suspect. [FN82]

A second alternative to protective custody involves transferring vulnerable offenders to other prisons. The utility of this measure is constrained by two factors. First, vulnerable inmates do not necessarily get a fresh start in a new prison because their reputations often precede them via inmate correspondence. [FN83] Also, the very attributes rendering them vulnerable often reappear at the receiving institutions. [FN84]

A final alternative to protective custody calls for sending vulnerable inmates to "sanctuary prisons" housing solely protective custody *107 candidates. These prisons are few in number [FN85] and some vulnerable inmates, such as child molesters, are so despised that their safety cannot be ensured even by placing them with other vulnerable inmates. [FN86]

Given these constraints, one must concur with the American Correctional Association's "grudging admission that [protective custody] may be necessary." [FN87] Many vulnerable offenders can secure reasonable safety *only* if housed in protective custody units. The alleged informer, for example, confronts not one but many potential assailants in that "snitching" receives widespread, vehement condemnation by the prison population. [FN88] Consequently, prison staff may find it infeasible to segregate the informer's many potential attackers. Furthermore, transferring the informant does not offer escape from his or her reputation: even the sanctuary prison can house inmates unforgiving of "the snitch." [FN89] Custodians then have but one viable response-- housing the inmate in protective custody. Under these constraints, admitting the inmate to protective custody becomes a matter of constitutional duty. [FN90]

### *108 C. Constitutional Minima for a "Secure" Protection Unit

Mere transfer to quarters designated as protective custody does not necessarily provide reasonable safety. For instance, the District Court of Idaho in *Balla v. Idaho State Board of Corrections* concluded that employees of the state prison had not adequately safeguarded protection inmates as evidenced by the occurrence of at least two rapes and the unauthorized entrance of inmates into the protection unit. [FN91] Whereas violence of this magnitude would not inflict a constitutional injury among general population inmates, [FN92] reasonable safety in protective custody requires a higher standard of security; to hold otherwise would negate the function of protective custody--to provide vulnerable inmates with greater security than afforded to the general prison population.

More than good faith efforts on the part of custodians are necessary to ensure that protection inmates find safety. [FN93] Case law suggests that a protective custody unit does not provide reasonable safety when it lacks any of the following attributes: (1) controlled access to the unit; (2) separation of the protection population into appropriate groups; (3) adequate numbers of trained security officers; and (4) defensible space.

In *Balla v. Idaho State Board of Corrections,* the court condemned unauthorized entrance to the protection unit of an Idaho prison. [FN94] To provide enhanced safety, protective custody must be a prison within a prison: just as the prison separates criminal offenders from society, protective custody must isolate vulnerable prisoners from prospective assailants. Controlling access to protective custody is especially difficult when it is part of or adjacent to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91

56 U. CIN. L. Rev. 91

quarters segregating other types of offenders. In response to this problem, the American*109 Correctional Association recommends physical separation of protective custody from the remaining types of segregated housing. [FN95]

Protection inmates must also be separated into appropriate groups. Inmates enter protective custody for various reasons and their admission does not strip them of subcultural values that breed prison violence. [FN96] For instance, the plaintiff in *Blizzard v. Quillen* had been assaulted by other protection inmates presumably because of his deviant status as a "snitch." [FN97] The court found that the prison staff had failed to provide adequate protection when it permitted him to come into contact with other protection inmates despite the "well-known generalized threat" to his safety. [FN98] In accord with the *Quillen* decision, the American Correctional Association urges the division of the protection population into appropriate classes, such as prosecution witnesses, former police officers, victims of inmate assault, and informants. [FN99]

Additionally, a number of federal courts have held that reasonable protection of all inmates requires an adequate number of trained guards. [FN100] The recommended ratio for the prison as a *110 whole is one guard for every six inmates. [FN101] An appropriate number for a protection unit is dependent upon the character and needs of the population in question. [FN102] Furthermore, the guard force must be adequately trained to address the security threats to protection inmates coming from both outside and within protective custody housing. [FN103]

Finally, if a prison should be "the ultimate exemplar of 'defensible space,'" [FN104] so should protective custody as a prison within a prison. Security personnel should not rely on protection inmates to warn them of impending assaults; instead, prison architecture must permit a pro-active response to violence, whereby the guard force can readily detect and respond to potentially dangerous situations. [FN105]

## *111 II. PROCEDURAL PROTECTION FROM PROTECTIVE CUSTODY: THE DUE PROCESS RIGHTS OF INMATES WISHING TO REMAIN IN THE GENERAL PRISON POPULATION

Not all vulnerable inmates desire to enter protective custody. [FN106] Those vulnerable inmates who resist transfer have concluded that the social stigma attached to being in protective custody [FN107] as well as its more restrictive conditions of confinement [FN108] outweigh the dangers awaiting them in the general prison population. Their refusal, however, does not prevent prison administrators from forcing them to enter protective custody. This may be accomplished in a summary manner unless segregation would deny "liberty" protected by the due process clauses. [FN109]

This part of the Article addresses the two principal issues arising from the involuntary transfer of inmates to protective custody. Part II first addresses how one determines if involuntary transfer denies a liberty interest protected by the due process clauses. Part II next *112 explores case law to determine the degree of process due when protective custody denies a liberty interest.

### A. Searching for "Liberty"

Prior to 1976, procedural due process arose whenever custodial decisions inflicted a "grievous loss" upon the affected inmate. [FN110] If such a loss occurred, liberty born from the Constitution had been denied, triggering procedural safeguards defined by the courts. [FN111] Case law established that each basic form of segregation, punitive or nonpunitive, inflicted the requisite "grievous loss" when it imposed conditions of confinement significantly more restrictive than experienced by the general prison population. [FN112] As one court opined, "While these restrictions [in segregation] may seem minor to those in the 'free world,' to an individual already confined to a prison, they represent a significant loss of freedom." [FN113]

The Supreme Court's 1976 decision in *Meachum v. Fano* repudiated the use of this "impact analysis." [FN114] The Court held that transferring inmates to other prisons does not deny liberty issuing from the due process clause.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91                                                                                                                          Page 7
56 U. CIN. L. Rev. 91

[FN115] *Meachum* propounded a new test for determining the scope of due process liberty: only conditions not usually characteristic of imprisonment will deny liberty existing independent of state law. [FN116]

The Supreme Court did not address whether nonpunitive segregation imposes conditions of confinement outside the ordinary scope of a prison sentence until its 1983 ruling in *Hewitt v. Helms*. [FN117] *113 Prison administrators at the Pennsylvania State Correctional Institution had placed an inmate, Aaron Hewitt, in "administrative segregation," [FN118] which state law defined as a generic form of segregation encompassing various nonpunitive uses. [FN119] Hewitt had been segregated for the protection of staff and inmates who might testify against him in a subsequent criminal prosecution. [FN120] Addressing the threshold question of whether Hewitt's segregation triggered procedural safeguards, then-Justice Rehnquist, speaking for the majority, inquired if this transfer implicated a liberty interest arising in and of itself from the due process clause of the fourteenth amendment. [FN121] Concluding that Hewitt's transfer did not implicate such an interest, he wrote: "It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." [FN122]

While Justice Rehnquist did not specifically address the impact of protective custody on liberty born directly from the due process clause, his holding speaks to all "nonpunitive" uses of segregation, which include protection of the vulnerable inmate. [FN123] The Second Circuit Court of Appeals decision in *Deane v. Dunbar* illustrates *Hewitt*'s application to protective custody. [FN124] In *Deane*, several former inmates contended that their involuntary confinement in protective custody had not been accompanied by adequate procedural safeguards. [FN125] Addressing the claim's premise--that protective custody implicates an interest born from the due process clause--the court, citing *Hewitt*, concluded that "the due process clause . . . does not create such a liberty interest" to be free of protective custody and thus to reside in the general prison population. [FN126]

If inmates are to avoid summary transfer to protective custody, they must look to a second type of liberty identified in *Hewitt v. *114 Helms*-- liberty created by the state. [FN127] The *Hewitt* Court held that a liberty interest to be free of "administrative segregation" can arise when statutes and regulations restrict its use. [FN128] Pennsylvania had placed the requisite limitation on the discretionary powers of prison administrators by employing "language of an unmistakably mandatory character" directing the release of inmates from nonpunitive segregation if review procedures failed to disclose "substantive predicates" for the transfer, such as "the threat of a serious disturbance." [FN129] The District Court for the Eastern District of Pennsylvania would later find that this statutory language created a liberty interest against transfer to protective custody. [FN130]

Statutes and regulations, the focus of the *Hewitt* Court's search for a state-created liberty, are not the only measures providing inmates with an entitlement to avoid protective custody. Before [FN131] and after *Hewitt*, [FN132] lower federal courts have ruled that official prison policies can also give rise to state-created liberty. For example, the Tenth Circuit Court of Appeals located a liberty interest in a manual utilized by a state prison warden. [FN133] Function rather than form governs. Regardless of whether the restraints on official discretion are statewide in the form of statutes and regulations or intra-institutional in the form of official policies, they entitle inmates to due process procedures.

*115 Procedural safeguards are also triggered when confinement in protective custody places de facto limits on the accumulation of statutorily authorized good conduct time. *Clark v. Brewer* is illustrative. [FN134] The plaintiff in *Clark* complained of his summary placement in nonpunitive segregation, where limited access to educational and vocational programs hindered exercise of his statutory right to earn five days of good conduct time each month. [FN135] In ordering prison officials to provide the plaintiff with procedural due process, the court reasoned that the plaintiff's segregation denied a state-created liberty interest in accumulating the maximum amount of good conduct time. [FN136]

*B. The Process Due*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

Page 8

Procedural safeguards must accompany a transfer to protective custody when the consequences of segregation infringe on a state-created liberty. [FN137] Although the safeguards are triggered by state statutes and regulations, the nature of the protections is to be determined by the judiciary. [FN138] The Supreme Court in *Mathews v. Eldridge* directed courts to consider the following factors in determining what process is due in a particular situation:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [FN139]

*116 1. Is *Hewitt v. Helms* Controlling?

Prior to the Supreme Court's 1983 ruling in *Hewitt,* several lower federal courts had held that inmates segregated for nonpunitive reasons and protected by a liberty interest must receive safeguards similar to those prescribed by *Wolff v. McDonnell* [FN140] for inmates subject to disciplinary segregation. [FN141] As the district court observed in *Wright v. Enomoto,* these two contrasting uses of segregation merited identical procedural safeguards because the hardships of nonpunitive segregation equaled if not exceeded those of disciplinary segregation. [FN142] *Wolff* procedures provided protection inmates with the following rights: (1) to receive written notice of the impending action; (2) to appear personally at a hearing convened to assess evidence; (3) to receive a lay person's assistance when the affected inmate could not read or faced complex issues; (4) to present documentary evidence and to call witnesses unless prison security would be jeopardized; and (5) to receive a written statement of reasons and their evidentiary basis if the decisionmakers ruled in favor of segregation. [FN143]

Several pre-*Hewitt* decisions also mandated periodic reviews of an inmate's segregation status. [FN144] As one court explained, "[T]he reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation." [FN145] Yet there existed no consensus as to the content of the periodic reviews. For instance, one court called for *Wolff* protections, [FN146] whereas another court merely required a review board to examine objective criteria. [FN147] The frequency of the reviews also varied;*117 for example, the reviews were yearly for New Jersey inmates, but weekly for some Massachusetts offenders. [FN148]

*Hewitt v. Helms* abolished the procedural unification of punitive and nonpunitive segregation. Writing for the Supreme Court, Justice Rehnquist rejected the need for trial-like procedures. [FN149] He chose instead to mandate "an informal nonadversary evidentiary review," to be followed by periodic reviews of one's segregation status. [FN150] Regarding the initial evidentiary review, Justice Rehnquist briefly outlined three components: (1) a notice of the allegations; (2) an opportunity to address the charges, which could normally be accomplished through a written statement; and (3) a review by the decisionmaker of the allegations and evidence. [FN151]

In determining the procedural requirements of Aaron Hewitt's segregation, the Court employed the criteria it propounded in *Mathews v. Eldridge.* [FN152] Justice Rehnquist first examined the inmate's private interest in avoiding nonpunitive segregation. Finding it to be "not one of great consequence," he explained that the transfer had merely taken the inmate from "one extremely restrictive environment to an even more confined situation." [FN153] He further down-played the consequence of Hewitt's situation by emphasizing that unlike a disciplinary transfer, his segregation neither imparted "the stigma of wrong doing or misconduct" nor adversely affected future parole release. [FN154] Justice Rehnquist next evaluated the governmental interest in the inmate's segregation. He found it to be of "great importance" because the safety of inmates and staff might be "the most fundamental responsibility of a prison." [FN155] Finally, the Court turned to the value of procedural safeguards in preventing erroneous segregation. Asserting that trial-like procedures would not significantly improve the quality of segregation decisions because the latter involved "intuitive judgments," Justice Rehnquist concluded that "an informal nonadversary evidentiary review" represented an appropriate reconciliation of the various interests at stake. [FN156]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

Having concluded that *Hewitt* requires protection candidates to look to state-created liberty for triggering due process safeguards,**\*118** [FN157] one must next ask whether *Hewitt* also determines the minimal amount of process due in protective custody transfers. If *Hewitt* is controlling in this regard, the Court's decision *sub silentio* overrules case law extending *Wolff* procedures to protection candidates. [FN158]

The district court ruling in *Crosby-Bey v. District of Columbia* indicates that *Hewitt* does indeed control the procedures due protection inmates. [FN159] In the *Crosby-Bey* case, a prison guard had placed an inmate in segregation after noticing facial injuries on him. [FN160] The inmate subsequently sued, arguing that the procedures accompanying his segregation were constitutionally defective. Ruling against the plaintiff, the court found *Hewitt* to be the controlling authority because the case was interpreted as dictating the process due in *all* nonpunitive uses of segregation. [FN161]

The *Crosby-Bey* court's reading of *Hewitt* is buttressed by the Second Circuit Court of Appeals in *Deane v. Dunbar.* [FN162] In *Deane,* eleven former protection inmates sought damages for their eighteen-month segregation following the 1971 riot at the Attica Correctional Facility. [FN163] They claimed that their due process rights had been violated when prison administrators failed to provide a hearing. [FN164] While it is not clear from the court's opinion as to what procedures would comprise the hearing allegedly denied the plaintiffs, [FN165] the court held that *Hewitt* controlled and that the procedures outlined in *Hewitt* did not call for such a hearing. [FN166] Regarding the process due protection inmates, the opinion quotes *Hewitt:* "We think an informal, nonadversary evidentiary review is sufficient . . . . An inmate **\*119** must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." [FN167]

### 2. Applying *Hewitt* Procedures to Protective Custody Inmates

The Supreme Court Justices' faith in the fairness and expertise of the prison staff is reflected in the minimal procedures given inmates placed in nonpunitive segregation. This subpart of the Article will demonstrate that *Hewitt* procedures provide few traditional safeguards against the evils sought to be prevented by procedural due process-- the erroneous and arbitrary denial of protected interests. [FN168] Indeed, the *Hewitt* procedures represent an archetype of due process, the consultative model, quite different than the traditional adversarial model:

> [The consultative model] differs from more trial-related versions of administrative due process in that lawyers do not appear at the hearing, witnesses are not called, and records are not kept. Moreover, the decisionmaker is not limited to the facts and arguments presented at the hearing. What remains is a direct interchange between the private person and the government decisionmaker, with the opportunity for the private person to present legal arguments and tell his or her version of the facts. [FN169]

#### a. Notice

*Hewitt*'s failure to indicate whether the notice must be written stands in marked contrast to the Court's insistence in *Wolff v. McDonnell* that oral notification would violate the due process rights of inmates accused of serious disciplinary violations. [FN170] An earlier decision by the Supreme Court, *Goss v. Lopez,* indicates that informal procedures of the consultative model do not require written notice. [FN171] The *Goss* decision allowed public school officials to give either written or oral notice to suspended students. [FN172] Although not a prison case, *Goss* shares an analytical lineage with *Hewitt.* Presaging the *Hewitt* ruling, the *Goss* Court introduced informal procedures**\*120** to the lexicon of due process of law. [FN173] As Professor Rubin wrote, "Justice Rehnquist's opinion in *Hewitt v. Helms* . . . may be regarded as a tacit recognition of the *Goss* analysis." [FN174]

*Goss* is also instructive in determining the content of *Hewitt* notice. Speaking for the Court in *Goss,* Justice

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

White required that the notice must inform its recipient of the charges and their basis. [FN175] Circuit Judge Friendly in an influential law review article echoes the *Goss* Court's definition of an effective notice: "It is . . . fundamental that notice be given and that it be timely and clearly inform the individual of the proposed action and the grounds for it." [FN176] In the absence of these features, the functions of notice--allowing the individual to prepare a response and requiring state officials to defend their action on specified contentions-- cannot be achieved. [FN177] The description of the proposed action and its basis should be specific enough to permit the protection candidate to marshall rebuttal arguments and evidence. [FN178]

### b. An Opportunity To Respond

The Supreme Court long ago established that "[t]he fundamental requisite of due process of law is the opportunity to be heard." [FN179] *Hewitt* calls for this opportunity. [FN180] Justice Rehnquist indicated that ordinarily a written statement by the inmate would satisfy due process. Yet he acknowledged that in some instances a written response would be ineffective, and he indicated that prison administrators "may" then allow oral presentations. [FN181] As Justice Stevens observed in his dissent, for many inmates an opportunity to respond in writing would not constitute "a meaningful opportunity to be heard" because of their scant educations. [FN182] Whereas an oral presentation by the protection candidate would be a permissible alternative to a written response, the *Hewitt* majority did not exclude *121 other options, such as providing the illiterate inmate with assistance in composing a response. [FN183]

Permission to make oral presentations does not trigger the traditional adversarial procedures of cross-examination and confrontation. While *Hewitt* failed to indicate why these procedures are omitted from its explication of the process due, there is no reason to believe that the Court has abandoned its position in *Wolff v. McDonnell* that cross-examination and confrontation of persons providing evidence against inmates would result in "considerable potential for havoc inside the prison walls." [FN184]

Similarly, protection candidates are not empowered to call witnesses. Again *Hewitt* fails to explain the omission of this traditional adversarial right. As in *Wolff,* the Court must have concluded that to permit the calling of witnesses would lead to reprisals against testifying inmates and would undermine the authority of custodians forced to give evidence on behalf of inmates. [FN185]

Protection candidates also lack the right to counsel or to assistance from a lay person. While the Court in *Hewitt* gave no explanation for omitting the right to counsel in its enumeration of safeguards, the likely rationale is also expressed in *Wolff v. McDonnell,* in which the Court found the right to counsel to be incompatible with the nonadversarial nature of disciplinary hearings. [FN186] Although *Wolff* did provide for "counsel substitute" for illiterate inmates or for those inmates defending against complex charges, [FN187] *Hewitt's* omission of a right to lay assistance is in keeping with the Court's intent to make *Hewitt* proceedings more informal and less adversarial than *Wolff* hearings. [FN188]

### c. An Evidentiary Review

In determining that trial-like procedures would not improve the quality of segregation decisions, the *Hewitt* Court assumed that the review committee must necessarily employ "intuitive judgments" in *122 evaluating whether an inmate constitutes a security threat. [FN189] Lower federal courts have read this aspect of *Hewitt* as legitimizing subjective evaluations of all candidates for nonpunitive segregation. [FN190] One decision, *King v. Jenkins,* specifically approved of "subjective evaluations and predictions of future behavior" in protective custody decisions. [FN191]

Nevertheless, the review committee should not conclude that it is free to dispense with fact-finding. To prevent procedural safeguards from becoming a mask behind which to hide arbitrary deprivations of protected interests,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

[FN192] case law dictates that administrative findings must be supported by evidence. [FN193] In *Murphy v. Fenton* [FN194] and *Calloway v. Fauver*, [FN195] the only cases to rule on how much *123 evidence is needed to support protective custody decisions, the district courts required showings of substantial evidence. [FN196]

But *Murphy* and *Calloway* lost much of their precedential value in a subsequent Supreme Court case, *Massachusetts Correctional Institute v. Hill*. [FN197] In *Hill*, the Court held that due process required merely "any evidence" to support a disciplinary decision resulting in the loss of good conduct time. [FN198] Although the Court's holding did not address protective custody decisions, it would be incongruous for the Court to require a greater quantum of evidence, such as substantial evidence, for protective custody decisions when the Court views nonpunitive segregation as meriting fewer safeguards against arbitrariness than disciplinary actions. [FN199] Dicta in *Hill* also indicated the Court's willingness to extend the more easily satisfied "any evidence" standard to protective custody decisions: without qualification as to the type of decision, the Court asserted that due process "does not require courts to set aside decisions of prison administrators that have some basis in fact." [FN200]

The review committee retains great leeway in adducing an evidentiary support for segregation. It may look to a broad spectrum of data sources, ranging from specific incidents to institutional characteristics, such as the make-up of the prison population. [FN201] Although the Court in *Hewitt* failed to rule on the use of hearsay, the opinion does speak of the staff's need to consider "rumor" and "reputation" in predicting inmate behavior. [FN202] Furthermore, two circuit courts have deemed hearsay in and of itself to satisfy the "any evidence" standard of review. [FN203]

The review committee is not required to inform protection candidates of the basis for segregation decisions. Whereas the Court required*124 a statement of reasons to accompany parole revocations [FN204] and serious disciplinary punishments, [FN205] *Hewitt's* silence on this matter indicates that the Court decided to dispense with a reasons requirement when segregation is imposed for nonpunitive purposes. Indeed, Justice Stevens' dissent chastised the Court for omitting a reasons requirement, [FN206] one which commentators advocate as means of checking mistake, bias, and arbitrariness in decisionmaking. [FN207]

### d. Periodic Reviews

Protection inmates do not exhaust their procedural safeguards if the initial evidentiary review results in their segregation. In a footnote to the Court's opinion in *Hewitt*, Justice Rehnquist required "some sort of periodic review" in order to ensure that a valid basis for the segregation exists throughout confinement. [FN208] The Court envisioned these reviews to be even more informal and nonadversarial than the initial evidentiary review. As in the initial evidentiary review, the review committee can address "a wide range of administrative considerations," including their "general knowledge of prison conditions and tensions." [FN209] By omission, the Court failed to posit two rights enjoyed in the initial evidentiary review: (1) to notice of an impending review; and (2) to present a written statement to the decisionmakers.

Two district courts have sought to mandate additional review procedures when inmates experience segregation for a much longer period than the two months endured by Aaron Hewitt. [FN210] The District Court for the Western District of Pennsylvania in *Burton v. Shapp* concluded that the plaintiff's five-year segregation greatly heightened his liberty interest, thereby requiring "more substantial *125 procedural safeguards" at periodic reviews of his status. [FN211] The court held that due process for this plaintiff required the use of objective criteria, not the intuitive evaluations permitted by *Hewitt*. [FN212] On appeal, however, the Third Circuit Court of Appeals overturned the district court ruling by holding that *Hewitt* allows "purely subjective evaluations," even after years of segregation. [FN213]

As in *Burton,* the plaintiff in *Clark v. Brewer* had been segregated far longer than the *Hewitt* inmate. [FN214] The District Court for the Southern District of Iowa found the plaintiff's ten-year segregation to require procedural safeguards more extensive than those outlined in *Hewitt*. [FN215] Under the *Clark* ruling, prison administrators

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91                                                                                           Page 12
56 U. CIN. L. Rev. 91

would have to conduct periodic reviews on a detailed schedule established by the court, give notice of a forthcoming review, and permit inmates to call witnesses unless prison security would be jeopardized. [FN216] Once again, appeal to the circuit court undercut the plaintiff's procedural gains. In modifying *Clark v. Brewer*, the Eighth Circuit Court of Appeals ruled that custodians can select the review schedule best suited to their circumstances and can decide whether to permit segregated inmates to call witnesses at their periodic reviews. [FN217] While it did agree that written notice should be provided when new evidence will be presented at periodic reviews, the circuit court dispensed with the need for notice when hearings are regularly scheduled at intervals not exceeding thirty days. [FN218]

## III. WHAT IS THE COST OF SAFETY? CHALLENGES TO CONDITIONS OF CONFINEMENT

Protective custody inmates encounter conditions of confinement far more austere and restrictive than they experienced in the general prison population. [FN219] Professor Hans Toch's description of conditions*126 in a protection unit of a New York prison typifies the high cost of security:

> Protection men lived in seclusion, where they were truly protected from other inmates. In exchange for safety, they sacrificed the freedom of movement that is available to other prisoners, the opportunity to participate in school, and the access to other prison programs. They relinquished their weekly movies and the sports in the yard. In exchange for their safety they lived in quarantine, spending twenty-two hours a day in their cell. [FN220]

Although protection inmates are denied procedural safeguards given inmates accused of disciplinary violations, [FN221] they will usually encounter hardships identical to those inflicted as disciplinary punishments. [FN222]

Part III of the Article addresses the constitutionality of restrictions commonly imposed on protective custody inmates. Part III first examines how federal courts have responded to allegations by protective custody plaintiffs that restrictions exceeding those in the general prison population are per se unconstitutional. Part III then reviews challenges to certain individual restrictions.

*127 *A. The Constitutionality of Restrictions Exceeding Those Encountered in the General Prison Population*

Some protective custody plaintiffs argue that the disparity between their restrictive environment and the comparative freedom of the general prison population is in itself unconstitutional. [FN223] Just twenty years ago their claim, if raised, would have been defeated by the "right-privilege distinction," which defined all prison conditions as mere privileges and thus outside the realm of judicial scrutiny. [FN224] The Supreme Court has since repudiated this distinction. [FN225] Subsequent case law addresses this issue through either the equal protection clause of the fourteenth amendment [FN226] or the eighth amendment prohibition of cruel and unusual punishment. [FN227]

The equal protection clause of the fourteenth amendment provides one basis for evaluating the constitutionality of the severely restrictive lifestyle of protection inmates. [FN228] While the equal protection clause permits the housing of inmates in protective custody, [FN229] it mandates that dissimilar conditions in protective custody must be *128 rationally related to security considerations, [FN230] which include the administrative and fiscal consequences of various security strategies. [FN231] In assessing whether the additional restrictions placed on protection inmates have an adequate nexus with security considerations, courts have accorded "wide-ranging deference" to the judgments of prison officials. [FN232] Consequently, protective custody plaintiffs carry a "heavy burden" in proving their claim: they must present substantial evidence that the complained of restrictions are invidiously dissimilar to those imposed on the general population. [FN233]

The opinion of the District Court for Maine in *Lovell v. Brennan* illustrates equal protection analysis. [FN234] Protective custody plaintiffs at the New Hampshire State Prison alleged that prison officials had arbitrarily denied them programs and facilities enjoyed by the general prison population. [FN235] The court found unequal educa-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

tional, employment, and recreational opportunities to exist. Yet the court did not consider inequity per se to present a constitutional issue: *129 "[T]he Constitution does not require that [p]rotective [c]ustody and general population inmates be treated identically." [FN236] Plaintiffs would have to demonstrate through substantial evidence that the complained of differences were not reasonably related to what the court characterized as "the nature of their confinement in high security, segregated units for their own protection." [FN237] As in most challenges to unequal conditions, the court held that the protective custody plaintiffs had failed to satisfy the burden of proof. [FN238]

The eighth amendment prohibition against cruel and unusual punishment provides a second framework for evaluating the constitutionality of placing protection inmates under conditions more restrictive than those experienced by the general prison population. [FN239] Application of the eighth amendment to this issue proceeds from the premise that protection inmates cannot be denied benefits enjoyed by other inmates simply because they are vulnerable to assault. [FN240] As the district court in *Wojtczak v. Cuyler* explained, to deny benefits in exchange for protection would violate the doctrine of unconstitutional conditions, which prohibits conditioning enjoyment of one's constitutional rights on the surrender of government sponsored benefits. [FN241] Restrictions exceeding those imposed on the general*130 prison population are permissible only if they promote a valid penal objective, [FN242] such as the safety of vulnerable inmates, in light of available resources. [FN243] In applying this analysis, courts have deferred to the security judgments of prison officials unless plaintiffs offer substantial evidence that protective custody conditions stem from an exaggerated response to security concerns. [FN244]

*Calloway v. Fauver* illustrates the use of the eighth amendment in determining the constitutionality of challenged disparities. [FN245] Protective*131 custody plaintiffs at New Jersey's Trenton State Prison complained of conditions acknowledged by the court to be identical to those imposed as a disciplinary punishment. [FN246] The plaintiffs argued that the Constitution prevented their indefinite segregation in protective custody under conditions "substantially more harsh" than those encountered in the general prison population. [FN247] The court began its analysis by positing that the eighth amendment is not offended when the more restrictive conditions of protective custody are born from a reasonable, nonexaggerated response to prison security. The court then found the restrictions imposed on protection inmates to be both reasonable and necessary in light of two findings: (1) the safety of protection inmates necessitated their separation from other inmates as well as from each other; and (2) the provision of individualized programs, a means by which both security and equality of conditions could be achieved, would place a "heavy strain" on available resources. [FN248] Hence, the court ruled that these restrictions could continue indefinitely because limited resources made them "the only practical way to provide security." [FN249]

### B. The Constitutionality of Individual Restrictions

Protective custody plaintiffs also contest individual restrictions, including those at parity with conditions within the general prison population. The most frequently challenged restrictions address: (1) religious services; (2) legal services; (3) employment and rehabilitation programs; and (4) exercise. The remainder of Part III defines the extent to which federal courts have permitted constraints on these desired features of prison life.

Whereas freedom to hold religious beliefs is absolute, [FN250] freedom to practice religion in prison can be limited by security considerations. [FN251] Fearful of the dangers presented by the commingling of offenders, courts have held that prison officials may prohibit protection inmates from attending congregate religious services held *132 within the general prison population [FN252] or within the protection unit itself. [FN253] Should prison officials permit protection inmates of a particular religious faith to engage in group services, an equivalent opportunity must be accorded protection inmates of other faiths. [FN254]

Banning all religious practices by protection inmates, however, will be held unconstitutional. As the district court in *Tyler v. Rapone* observed, "Prison authorities must provide the prisoner with reasonable opportunity for the exercise of his religious tenets." [FN255] Some courts have held that protection inmates enjoy a right to individual religious counseling. [FN256] Only *Wojtczak v. Cuyler* addressed the frequency of the counseling. [FN257] The court held that protection inmates are entitled to meet their counselors as frequently as congregate services are per-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

formed in the general prison population. [FN258] The right to religious counseling does not require that prison authorities provide each protection inmate with the clergyperson of his or her choice. [FN259]

Protection inmates, like other imprisoned offenders, are entitled to meaningful access to the courts for the purpose of challenging the legality of their confinement or the conditions of their confinement. [FN260] In *Bounds v. Smith*, the Supreme Court held that prison officials must take affirmative steps to guarantee meaningful access. [FN261] This can be accomplished by "adequate law libraries or adequate *133 assistance of persons trained in the law." [FN262] In determining whether prison officials have met their obligation to inmates, courts will examine the delivery of legal services "as a whole." [FN263] This standard permits shortcomings in the prison law library to be offset by assistance from trained individuals and vice versa. [FN264]

Like congregate religious services, the prison law library could bring together vulnerable inmates and potential assailants. [FN265] Consequently, some institutions have employed paging services, which deliver requested law books to the cells of protection inmates. But paging services alone cannot provide the "adequate, effective, and meaningful" access required by *Bounds*. [FN266] Paging services are defective because, as one district court concluded, "It is completely unrealistic to expect lay persons to know the names of the law books they will need for research on a legal problem, so that these can be requested from a guard." [FN267]

Prison officials can both safeguard protection inmates and give them direct access to a law library by excluding other potential patrons. [FN268] Because prison officials must also meet the legal needs of the general population, the duration of this direct and exclusive access can be limited as long as protection inmates have adequate time to conduct meaningful legal research. [FN269] Less than two hours a week of direct access to the library triggers judicial reservations about the constitutionality of the regulatory scheme. [FN270] In addition, inmates must receive elementary training in the use of legal materials.*134 [FN271] The library must also contain certain statutes, court reporters, and treatises. [FN272]

The legal needs of protection inmates can also be satisfied by persons trained in the law. [FN273] They can be inmate paralegals working under a lawyer's supervision, law students, volunteer attorneys, or staff attorneys. [FN274] Either alone or in combination with other means of legal assistance, these persons must provide both timely and adequate attention to their clients' concerns. [FN275] For instance, an eighteen-month delay between an inmate's request for assistance and its receipt fails the competency standard. [FN276] Similarly, a paging system that is supplemented by limited telephonic access to inmate legal assistants falls below constitutional minima. [FN277]

The third frequently challenged individual restriction involves work and rehabilitation. Protective custody plaintiffs often experience idleness. [FN278] Their inactivity stems from limited access to *135 prison jobs and rehabilitation programs, such as academic and vocational education. [FN279] Idleness per se [FN280] as well as the absence of prison jobs [FN281] and rehabilitation programs [FN282] do not independently inflict a constitutional violation. But idleness can contribute to a finding that the totality of conditions in protective custody imposes cruel and unusual punishment. [FN283] In *Palmigiano v. Garrahy*, the District Court for Rhode Island observed that the "almost total idleness" [FN284] experienced by protection inmates at the state prison, in combination with "[t]he comprehensive pattern of neglect in every area, and overcrowding," [FN285] violated the eighth amendment. [FN286] The court's remedy included the extension of employment and self-improvement programs to protection inmates. [FN287]

Finally, many courts have held that the indefinite denial of a regular program of exercise imposes cruel and unusual punishment because of the resulting physical and psychological deterioration of *136 prisoners. [FN288] Whereas a segregation stay of a few days without exercise is permissible, longer periods of inactive segregation offend the eighth amendment. [FN289] Recreation programs do not have to be sophisticated, [FN290] but they should allow strenuous exercise. [FN291]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91                                                                              Page 15
56 U. CIN. L. Rev. 91

Less settled in case law is the minimum amount of exercise that must be provided to prisoners per week. For example, *Spain v. Procunier* required one hour of daily exercise for five days of the week, [FN292] whereas *Jordan v. Arnold* held that two hourly periods of exercise per week fell within constitutional minima. [FN293] The preferable analysis is to "proceed from individual facts" [FN294] by considering three variables: (1) the size of protective custody cells; (2) the amount of time spent in the cell; (3) and the duration of segregation. [FN295] For instance, the *Ruiz v. Estelle* court evaluated the recreational needs of segregated inmates residing in cells forty-five square feet, a circumference the court found inadequate to allow meaningful daily exercise when occupied by two prisoners. [FN296] Segregated inmates spent virtually twenty-four hours a day in their cells. The circuit court upheld the district court's prescription of a minimum daily exercise period of one hour for inmates segregated for more than three consecutive days. [FN297]

### *137 IV. CONCLUSION: THE SECOND VICTIMIZATION OF THE VULNERABLE INMATE

It has been said that the victim of crime suffers a second victimization at the hands of an indifferent criminal justice system. [FN298] Protection inmates are victims too, sometimes of attack and almost always of intimidation by a prison society that makes violence a legitimate means of dispute resolution and status acquisition. [FN299] Protection inmates also suffer a second victimization at the hands of prison personnel who have been permitted by courts to exact a considerable price for secure housing. [FN300]

Part IV first asserts that the expansion of prisoners' rights has enhanced the vulnerability of inmates. Part IV then advocates that the federal judiciary should lessen the hardships saddled on vulnerable inmates by providing them a revised right to prison safety.

### *A. The Price of Prisoners' Rights*

Professor Donald Cressey observes that he would prefer to "do time" in the Big House, the traditional, pre-1950 prison, because prisoners had less fear of violence than their contemporaries. [FN301] While the rule of law had yet to penetrate the prison, order and safety were, for the most part, maintained. [FN302] Not only did prison authorities theoretically exercise absolute power over assaultive inmates, [FN303] but a system of accommodation [FN304] and shared values [FN305] *138 also functioned to provide surface order. Of this earlier prison, two scholars write:

> In the traditional prison, conflict among prisoners had two principal sources: predation and distrust. Strong prisoners intimidated and exploited the weak, sometimes for sex, sometimes for improvised stimulants, sometimes for candy bars. Weak prisoners protected themselves by seeking the favor of guards, which could be most easily gained by providing information. Both predator and informer could usually be kept within bounds by the social organization of the prisoners and the powerful controls in the hands of the administration through the manipulation of the indeterminate sentence structure. The informer was never safe from his fellow prisoners, and the too obviously aggressive prisoner exposed himself to the risk of an extended sentence. The system was adequate for the maintenance of control against these kinds of challenge. [FN306]

While contemporary prisoners enjoy a limited Bill of Rights, [FN307] its protections have not brought freedom from fear of violence. The American prison of the 1980s has become "the violent prison," [FN308] in which an inmate's best chance for surviving incarceration is confinement within protective custody. [FN309] Ironically, one factor contributing to the burgeoning size of the protective populations is the expansion of prisoners' rights during the past twenty years. In a provocative law review article, Kathleen Engel and Stanley Rothman articulate several causal relationships between judicial intervention and inmate violence: (1) fear of inmate lawsuits has made prison administrators reluctant to punish inmates who violate disciplinary rules; (2) procedural safeguards have diminished the power of guards to control inmates; (3) judicially mandated prison reforms have lessened the legitimacy of the prison staff; and (4) concern about public charges of racism has inhibited guards from addressing the high incidence of interracial rape. [FN310] "The loss of authority coupled*139 with fear of litigation and negative media coverage has caused a shift in the control which was historically reserved for prison administrators and further threatens the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

lives of inmates and guards," write Engel and Rothman. [FN311]

The courts have not been indifferent to the vulnerable inmate; litigation has resulted in courts articulating the right of vulnerable inmates to secure housing. [FN312] But these same courts have permitted prison officials to place a great burden on the exercise of this constitutional right. Vulnerable inmates are usually segregated while their potential predators often remain in the general prison population. [FN313] Inmates who resist transfer to protective custody have fewer procedural safeguards than accorded their alleged assailants in disciplinary hearings. [FN314] In protective custody, vulnerable inmates encounter an environment no different from disciplinary segregation [FN315] and have had little success in convincing the courts of the unconstitutionality of this similar treatment. [FN316]

### B. A Revised Right to Secure Housing for the Vulnerable Inmate

This Article advocates enhanced judicial scrutiny of the manner in which prison officials safeguard vulnerable offenders. As Justice Stone observed in footnote four of *United States v. Carolene Products*, the judiciary owes a special responsibility to "discrete and insular minorities" whose powerlessness prevents them from safeguarding their interests in the majoritarian processes of government. [FN317] Protection inmates, *as prisoners*, are disenfranchised, poor, and publicly *140 vilified, and on these grounds could be considered worthy candidates for special judicial protection. [FN318] *Among prisoners*, protection inmates are even more worthy heirs to footnote four: they are among the prison's powerless by virtue of their inability to cope with the intimidation and exploitation that are the hallmarks of the contemporary prison. Their confinement has rendered them "nonmen," a status in prison not unlike denationalization in the larger society. [FN319] Once confined in protective custody, vulnerable inmates experience for months upon end [FN320] the most restrictive conditions one can encounter in prison [FN321] simply because they are the victims of the prison experience. [FN322]

This Article calls for a reformulation of a vulnerable inmate's right to reasonable safety. Like its current formulation, [FN323] the revised right would employ objective criteria in determining who could be deemed vulnerable and thus in need of special security measures. Unlike its current formulation, the revised right would require prison officials to provide these measures in a manner no more restrictive than neccessary to safeguard the vulnerable prisoner. Least restrictive alternative analysis permits the government to achieve legitimate ends but not without regard for the competing interests at stake, [FN324] which in this instance are: (1) the state's interest in secure housing; and (2) the vulnerable inmate's interest in safety without being significantly penalized by the stigma and punitive-like *141 restrictions that accompany transfer to many protection units. As one commentator writes, "By focusing on means rather than ends [unlike the current formulation of the right to safety in prison], least restrictive alternative analysis can reconcile important conflicting interests without sacrificing either one." [FN325]

Least restrictive alternative analysis would require prison staff to explore the efficacy of security measures less burdensome to vulnerable inmates than indefinite confinement in protective custody. When vulnerable offenders are threatened by identified predators, the segregation of the latter, not the prey, must become the norm. When predators cannot be identified or should the status of the vulnerable inmate make him or her so despised as to arouse the indignity of inmates in general, transferring the vulnerable offender to another prison must be considered before protective custody is employed.

When protective custody stands as the only effective security measure, least restrictive alternative analysis requires measures designed to minimize the duration and degree of segregation. Measures that can minimize the time one spends in protective custody include: (1) teaching vulnerable inmates how to defend themselves in the general prison population; (2) developing secure subenvironments in the general population, such as work assignments having extensive staff supervision, in which to integrate vulnerable inmates; and (3) counseling and training vulnerable inmates to avoid situations that provoke aggression. [FN326] In addition, prison officials should provide various degrees of protective custody so that vulnerable inmates do not have to choose between unremitting segregation and unlimited exposure to the general prison population. [FN327] For instance, a Massachusetts prison allows protection

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

inmates to venture into the general prison population in order to partake of employment and rehabilitative opportunities and then retreat to protective custody at the end of the day. [FN328]

Inmates requiring round-the-clock confinement in protective custody should reside under conditions similar to those of the general population. [FN329] While security considerations will continue to justify additional restraints on protection inmates, federal courts should no *142 longer give great deference to the staff's predictable security rationales for challenged disparities. Furthermore, exclusion of protection inmates from the programming opportunities accorded the general prison population should no longer be permitted on the basis of added administrative burdens and fiscal limitations. To do otherwise would allow prison officials to continue their practice of shifting the human costs of security onto protection inmates. Indeed, the prospect of significant expenditures for upgrading the protective custody environment could serve as strong incentive for prison managers to seek out less restrictive and less costly alternatives to segregating vulnerable offenders.

Procedural safeguards must accompany confinement in protective custody to ensure that it is used only as a last resort. While these procedural safeguards can remain nonadversarial in the mode prescribed by *Hewitt v. Helms,* [FN330] they must be altered to reflect the enhanced liberty interest arising from the reformulation of a vulnerable inmate's right to safety. In addition to the safeguards outlined in *Hewitt,* protection inmates must be accorded a final statement of reasons why the hearing body found segregation to be necessary. Requiring an explanation will serve as a check against the dangers of mistake, bias, and arbitrariness in making predictions about an inmate's vulnerability in less restrictive settings. [FN331] These safeguards should also be present during the periodic reviews of an inmate's protective custody status.

## C. Summary

This Article has examined various legal issues arising from the use of protective custody housing in American prisons. The constitutional basis for protective custody is located in the right of vulnerable inmates to reasonable protection from assault. Inmates in protective custody are entitled to procedural safeguards outlined in *Hewitt v. Helms* if their segregation violates a state-created liberty interest. In protective custody, vulnerable inmates frequently encounter conditions more onerous than those present in the general prison population. Plaintiffs have challenged this inequity as well as individual aspects of protective custody housing. The Article closes *143 by arguing that vulnerable inmates should be safeguarded through the least restrictive means because they now pay too high a price for safety.

[FNa1]. Associate Professor of Sociology & Corrections, Mankato State University. B.A., *magna cum laude,* University of Washington, 1972; J.D., Washington University, 1975; M.A., California State University, 1979.

[FNaa1]. M. PINERO, SHORT EYES 39 (1975)

[FN1]. Anderson, *The Price of Safety: "I Can't Go Back There,"* CORRECTIONS MAG. 6, 7 (Aug. 1980).

[FN2]. *See, e.g.,* Nadeau v. Helgemoe, 561 F.2d 411, 412 (1st Cir. 1977) ("Protective custody, as the name implies, is for prisoners who fear for their safety if they are housed with the general population."); Balla v. Idaho State Bd. of Corrections, 595 F. Supp. 1558, 1570 (D. Idaho 1984) ("Protective custody is the classification level designed to segregate those inmates subject to sexual assault, or extortion, or who are unable to pay debts to inmates in the prison population at large, and who have provided that information to prison officials.").
The term "administrative segregation" is frequently used to describe all nonpunitive forms of segregation, including protective custody. *See, e.g.,* Hewitt v. Helms, 459 U.S. 460, 463 n.1 (1983) (Pa. imposes administrative segregation when prisoner poses security risk, when disciplinary charges pending, or when inmate requires protection); Deane v. Dunbar, 777 F.2d 871, 876 (2d Cir. 1985) (protective custody referred to as administrative segregation); COMMISSION ON ACCREDITATION FOR CORRECTIONS, MANUAL OF STANDARDS FOR ADULT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

CORRECTIONAL INSTITUTIONS § 4201 (1977) [hereinafter MANUAL OF STANDARDS]. In contrast, disciplinary segregation is imposed as punishment for violation of a prison rule. *See id.* at § 4200.

This Article concentrates on inmate violence in male prisons. Few studies address the violence problem in female prisons. Those that do indicate that violence among women inmates is considerably less frequent than among male inmates. Robertson, *Surviving Incarceration: Constitutional Protection from Inmate Violence,* 35 DRAKE L. REV. 101, 102 n.1 (1985-86).

[FN3]. For examples, see *infra* note 222.

[FN4]. J. JACOBS, NEW PERSPECTIVES ON PRISONS AND IMPRISONMENT 82 (1983); *see also* J. CONRADE & S. DINITZ, IN FEAR OF EACH OTHER 215 (1977) ( "unprecedented numbers of convicts" reside in protective custody); McGee, Warner & Harlow, *The Special Management Inmate* 23 (1985) (survey of 63 institutions found 21 full or overcrowded protective custody units) [[[hereinafter *Special Management Inmate*].

[FN5]. *See* AMERICAN CORRECTIONAL ASSOCIATION, PROTECTIVE CUSTODY 8 & 16 (1982) [hereinafter PROTECTIVE CUSTODY]. This author knows of no comprehensive statistics on the total number of protection inmates confined in various local, state, and federal prisons.

[FN6]. Anderson, *supra* note 1, at 8.

[FN7]. *Id.*

[FN8]. *See* V. WILLIAMS & M. FISH, CONVICTS, CODES, AND CONTRABAND: THE PRISON LIFE OF MEN AND WOMEN 60 (1974).

[FN9]. The appropriate response is to fight and thus prove oneself in a prison society that views violence as an expression of manhood and a source of status and respect. *See* C. BARTOLLAS, INTRODUCTION TO CORRECTIONS 353 (1981); L. BOWKER, PRISON VICTIMIZATION 31-33 (1981).

Professor Bowker states that violence imparts several benefits to its user: (1) provides a reputation for violence that in itself becomes a deterrent against victimization; (2) improves the self-image of the user; (3) gives sexual relief; (4) serves as means of extortion; and (5) enhances the prospect for parole because the staff wishes to be rid of the troublemaker. L. BOWKER, *supra,* at 31-33.

[FN10]. Conflict among inmates is chronic and inmates consider violence to be an appropriate means of settling disputes. *See* H. TOCH, LIVING IN PRISON 218 (1977).

[FN11]. "Racial conflict, including extreme violence and riots, is the reality of institutional life in prisons around the country." J. JACOBS, *supra* note 4, at 80; *see also* J. IRWIN, PRISONS IN TURMOIL 182 (1982) ("Races, particularly black and white, are divided and hate each other"). The majority of protection inmates are Caucasians. *See* PROTECTIVE CUSTODY, *supra* note 5, at 16; J. JACOBS, *supra* note 4, at 83.

Blacks tend to be the sexual aggressors and their victims are frequently white. *See, e.g.,* D. LOCKWOOD, PRISON SEXUAL VIOLENCE 29 (1980) (study of prison rapes in New York reveals 80% interracial); Carroll, *Humanitarian Reform and Biracial Sexual Assault in a Maximum Security Prison,* 5 URBAN LIFE 417, 420 (1977) (at least 75% of sexual assaults in eastern prison pitted black aggressors against white victims); Davis, *Sexual Assaults in the Philadelphia Prison System and Sheriff's Vans,* TRANS-ACTION Dec. 1968, at 8, 15 (blacks victimized whites in 56% of sexual assaults).

[FN12]. Some of the leading gangs are the Mexican Mafia, the Neustra Familia, and the Aryan Brothers. Gang activities are most pronounced in Illinois and California. *See* C. BARTOLLAS, *supra* note 9, at 355; Anderson, *supra* note I, at 9.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN13]. Professor Toch observes that inmates with generic fears fall into three groupings: (1) inmates possessed of "unremitting irritability;" (2) inmates who perceive vague yet imminent danger everywhere; and (3) inmates who internalize fear so as to fear their own capacity for violence. H. TOCH, *supra* note 10, at 220-21.

[FN14]. "Informers in protective segregation are either in extreme danger or combine an evanescent reputation for information with pre-existing psychological fragilities." H. TOCH, *supra* note 10, at 217. Professor Toch classifies informers as either "realistically fearful" or "delusionally fearful." *Id.*

[FN15]. *See* Anderson, *supra* note 1, at 8-9. Violence and the resulting fear of assault is reflected by the composition of protective custody. Staff persons estimate that 16% of the protection population are there because of concern over sexual assaults, 32% because they are thought to be informers, 29% to avoid retaliation, 5% because of mental disturbances, 7% to avoid work, and 10% for other reasons. PROTECTIVE CUSTODY, *supra* note 5, at 24. Similarly, Professor Hans Toch divides protective inmates into the following categories: sex offenders, informers, the mentally deranged, and inmates facing retaliation for their failure to pay debts. H. TOCH, *supra* note 10, at 217-23.

[FN16]. Engel & Rothman, *The Paradox of Prison Reform: Rehabilitation, Prisoners' Rights, and Violence*, 7 HARV. J.L. & PUB. POL'Y 413, 413 (1984).

[FN17]. A youthful inmate can expect to be subjected to homosexual rape his first night in jail, or, it has been said, even on the van on the way to jail. Weaker inmates become the property of stronger prisoners or gangs, who sell the sexual services of the victim. Prison officials either are disinterested in stopping abuse of prisoners by other prisoners or incapable of doing so, given the limited resources society allocates to the prison system. Prison officials often are merely indifferent to serious health or safety needs of prisoners as well.
    United States v. Bailey, 444 U.S. 394, 420 (1980) (Blackmun, J. dissenting).
    Many federal court decisions have involved inmates confronting a pervasive risk of violence perpetrated by their fellow prisoners. *See, e.g.,* Matzker v. Herr, 748 F.2d 1142, 1148 (7th Cir. 1984) (prisoner alleged racial and sexual violence commonplace at jail); Martin v. White, 742 F.2d 469, 471-72 (8th Cir. 1984) (inmate assaults commonplace at jail); Stokes v. Delcambre, 710 F.2d 1120, 1124-25 (5th Cir. 1983) (evidence supported inmates' "reign of terror" at jail); Hoptowit v. Ray, 682 F.2d 1237, 1249-50 (9th Cir. 1982) (high levels of violence found in prison); Ramos v. Lamm, 639 F.2d 559, 572 (10th Cir. 1980) (prison's design and staffing contributed to inmate violence), *cert. denied*, 450 U.S. 1041 (1981); Jones v. Diamond, 636 F.2d 1364, 1373 (5th Cir.) (inmate abuse of each other common), *cert. dismissed sub nom.,* Ledbetter v. Jones, 453 U.S. 950 (1981); Withers v. Levine, 615 F.2d 158, 162 (4th Cir.) (same), *cert. denied*, 449 U.S. 849 (1980); Alberti v. Heard, 600 F. Supp. 443, 450 (S.D. Tex. 1984) (inmate testimony reflected high level of inmate violence in jail); Lee v. Carlson, 564 F. Supp. 1048, 1053 (M.D. Pa. 1983) (prisoner assaulted even in administrative segregation); Grubbs v. Bradley, 552 F. Supp. 1052, 1078 (M.D. Tenn. 1982) (inmate violence way of life in prison); Ruiz v. Estelle, 503 F. Supp. 1265, 1293 (S.D. Tex. 1980) (inmates live in constant fear due to inmate violence), *modified*, 650 F.2d 555 (5th Cir. 1981), *aff'd in part and vacated in part,* 666 F.2d 854 (5th Cir. 1982), *aff'd in part and rev'd in part,* 679 F.2d 1115 (5th Cir.), *cert. denied*, 460 U.S. 1042 (1983); Feliciano v. Barcelo, 497 F. Supp. 14, 32 (D.P.R. 1979) (death haunts prison due to lack of supervision); Palmigiano v. Garrahy, 443 F. Supp. 956, 966 (D.R.I. 1977) (recognizing rampant violence within prison), *remanded*, 599 F.2d 17 (1st Cir. 1979), *aff'd*, 616 F.2d 598 (1st Cir. 1980), *cert. denied,* Garrahy v. Palmigiano, 449 U.S. 839.

[FN18]. *See* President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections 47 (1967); *see also* Lockwood, *The Contribution of Sexual Harassment to Stress and Coping in Confinement*, in COPING WITH IMPRISONMENT 45, 58 (N. Parisi ed. 1982) ("Fear prevails among the general prison population; safety is a dominant concern.").

[FN19]. *See* V. FOX, CORRECTIONAL INSTITUTIONS 108 (1983); *see also* S. SYLVESTER, J. REED & D.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

NELSON, PRISON HOMICIDE 1 (1977) (data on prison deaths sparse and unrefined) [hereinafter PRISON HOMICIDE].

[FN20]. *See* PRISON HOMICIDE, *supra* note 19, at 73; *see also* H. TOCH, POLICE, PRISONS, AND THE PROBLEM OF VIOLENCE 52 (1977) ("Jails and prisons . . . have a climate of violence which has no free world counterpart.").

[FN21]. *See, e.g.,* Banning v. Looney, 213 F.2d 771, 771 (10th Cir. 1954) (per curiam) ("Courts are without power to supervise prison administration or to interfere with the ordinary prison rules or regulations."), *cert. denied,* 348 U.S. 859 (1954); Sarshik v. Sanford, 142 F.2d 676, 676 (5th Cir. 1944) ("The courts have no function to superintend the treatment of prisoners in the penitentiary, but only to deliver from prison those who are illegally detained there.").

The hands-off doctrine was grounded on three rationales: (1) courts lacked expertise in prison matters; (2) if they did intervene, courts could not secure compliance with their directives; and (3) inmate lawsuits addressed privileges, not rights, and thus failed to state claims for which relief could be granted. Berger, *Withdrawal of Rights and Due Deference: The New Hands-Off Policy in Correctional Litigation,* 47 UMKC L. REV. 1, 2-5 (1978) (summary of rise and demise of doctrine).

[FN22]. *See, e.g.,* Battle v. Anderson, 564 F.2d 388, 393 (10th Cir. 1977) (eighth amendment right to protection from degenerative prison conditions); Bonner v. Coughlin, 517 F.2d 1311, 1315-16 (7th Cir. 1975) (limited fourth amendment protection from search and seizure), *cert. denied,* 435 U.S. 932 (1978); Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir. 1973) (per curiam) (reasonable protection from pervasive inmate violence); Sostre v. McGinnis, 442 F.2d 178, 202-03 (2d Cir. 1971) (limited right to freedom of speech), *cert. denied,* 404 U.S. 1049 (1972); Jackson v. Bishop, 404 F.2d 571, 579-81 (8th Cir. 1968) (corporal punishment prohibited); Hamilton v. Covington, 445 F. Supp. 195, 202 (W.D. Ark. 1978) (protection from fire hazards); Wright v. Enomoto, 462 F. Supp. 397, 402-03 (N.D. Cal. 1976) (right to procedural due process before placement in administrative segregation), *aff'd,* 434 U.S. 1052 (1978); Teterud v. Gillman, 385 F. Supp. 153 (S.D. Iowa 1974) (prisoners allowed freedom of religion), *aff'd sub nom.* Teterud v. Burns, 552 F.2d 357 (8th Cir. 1975); Carter v. McGinnis, 351 F. Supp. 787, 791-95 (W.D.N.Y. 1972) (inmates have fifth amendment right against self-incrimination in disciplinary proceedings); Sawyer v. Sigler, 320 F. Supp. 690, 692-98 (D. Neb. 1970) (limited right to medical care), *aff'd,* 445 F.2d 818 (8th Cir. 1971) (per curiam); Note, *Decency and Fairness: An Emerging Judicial Role in Prison Reform,* 57 VA. L. REV. 841 (1971) (justification for and limitation on judicial activism); Note, *Eighth Amendment Challenges to Conditions of Confinement: State Prison Reform by Judicial Decree,* 18 WASHBURN L.J. 288 (1979) (judicial responses and available remedies to correct eighth amendment violations); Comment, *Confronting Conditions of Confinement: An Expanded Role for Courts in Prison Reform,* 12 HARV. C.R.-C.L. L. REV. 367 (1977) (need, authority, and effect of judicial intervention in "totality of conditions" cases).

[FN23]. There are few published scholarly studies of protective custody. *See* Protective Custody, *supra* note 5; *Special Management Inmate, supra* note 4; M. Tellier, J. Wormith & P. Gendreau, *Protective Custody: The Emerging Crisis Within the Prison System* (undated, prepared by the Programs Branch, Ministry Secretariat, Solicitor General Canada, no. 1984-86); H. TOCH, *supra* note 10, at 206-23; Anderson, *supra* note 1 (informal survey of protective custody in various penitentiaries); Barak-Glantz, *A Decade of Disciplinary, Administrative, and Protective Control of Inmates in the Washington State Penitentiary: A Research Note,* 10 J. CRIM. JUST. 481 (1982) (study of solitary confinement at Washington State from 1966-77); Perez & Hageman, *Dilemma in Protective Custody/Some Notes,* 7 J. OFFENDER COUNSELING 69 (1982) (study of protective custody inmates at Kansas State Industrial Reformitory); Note, *The Rights of Gay Prisoners: A Challenge to Protective Custody,* 53 S. CAL. L. REV. 1225 (1980) (constitutional issues regarding protective custody of gay prisoners) [hereinafter Note, *Gay Prisoners*].

[FN24]. Seventy-nine percent of the protection inmates surveyed by the American Correctional Association requested housing in protective custody. PROTECTIVE CUSTODY, *supra* note 5, at 29.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN25]. *See* Lovell v. Brennan, 728 F.2d 560, 565 (1st Cir. 1984) (no right to automatic protective custody upon request), *aff'd*, 728 F.2d 560 (1st Cir. 1984); Ballard v. Elsea, 502 F. Supp. 105, 106 (N.D. Wis. 1980) (not all denials of protective custody are denial of inmates' rights); Schall v. Rowe, 460 F. Supp. 155, 156 (S.D. Ill. 1978) (prisoner found ineligible for transfer request).

[FN26]. The right to protection from inmate assaults is qualified. To determine violations of the right, the court must undertake a two-part inquiry: "[W]hether there is a pervasive risk of harm to inmates from other prisoners, and, if so, . . . whether the officials are exercising reasonable care to prevent prisoners from intentionally harming others or from creating an unreasonable risk of harm." Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir. 1973). *See generally* Robertson, *supra* note 2 (examines causes of inmate violence, parameters of constitutional duty, and judicial remedies).

[FN27]. Deliberate indifference is evidenced by either an intent to deprive one of his or her constitutional rights or a reckless disregard for them. Martin v. White, 742 F.2d 469, 474 (8th Cir. 1984) (per curiam) (quoting Branchcomb v. Brewer, 669 F.2d 1297 (8th Cir. 1982)); *see* Little v. Walker, 552 F.2d 193, 197-98 n.8 (7th Cir. 1977) (defining actual intent and recklessness), *cert. denied*, 435 U.S. 932 (1978).

[FN28]. The eighth amendment declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. Courts have repeatedly found eighth amendment rights for prisoners. *See, e.g.*, Alberti v. Heard, 600 F. Supp. 443, 457 (S.D. Tex. 1984) (totality of conditions resulted in eighth amendment violation of inmates' rights); Fischer v. Winter, 564 F. Supp. 281, 298 (N.D. Cal. 1983) (eighth amendment requires analysis of whether basic human needs adequately fulfilled); Palmigiano v. Garrahy, 443 F. Supp. 956, 979 (D.R.I. 1977) (eighth amendment requires "tolerable living environment" for prison inmates), *remanded*, 599 F.2d 17 (1st Cir. 1979), *aff'd*, 616 F.2d 598 (1st Cir.), *cert. denied*, Garrahy v. Palmigiano, 449 U.S. 838 (1980).

[FN29]. The due process clause of the fifth amendment states: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. The due process clause of the fifth amendment applies exclusively to actions of the federal government. *See* Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 247 (1833). The due process clause of the fourteenth amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV. § 1.

Courts have found due process rights for pretrial detainees. *See, e.g.*, Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977) (state power to punish only after determination of guilt in accordance with due process); Fischer v. Winter, 564 F. Supp. 281, 291-301 (N.D. Cal. 1983) (prison overcrowding violation of pretrial detainees' due process rights); Martino v. Carey, 563 F. Supp. 984, 997 n.4 (D. Or. 1983); McMurry v. Phelps, 533 F. Supp. 742, 761-63 (W.D. La. 1982) (subjecting pretrial detainees to overcrowding and inadequate supervision violative of due process). Acts, omissions, or conditions that impose cruel and unusual punishment also impose prohibited "punishment" upon pretrial detainees because they "retain at least those constitutional rights . . . that are enjoyed by convicted persons." Bell v. Wolfish, 441 U.S. 520, 545 (1979).

[FN30]. Ballard v. Elsea, 502 F. Supp. 105, 106 (W.D. Wis. 1980).

[FN31]. *See* Hickman v. Hudson, 557 F. Supp. 1341, 1344-45 (W.D. Va. 1983) (pervasive risk of harm to inmate puts officials on notice that protection is necessary); Withers v. Levine, 449 F. Supp. 473, 478 (D. Md. 1978) (prisoner's fear of sexual assault creates duty to guard against), *aff'd*, 615 F.2d 158 (4th Cir.), *cert. denied*, 449 U.S. 849 (1980). *See generally* Martino v. Carey, 563 F. Supp. 984, 988-89 (D. Or. 1983) (deliberate indifference shown by nonsegregation of violent and nonviolent prisoners); Pugh v. Locke, 406 F. Supp. 318, 329 (M.D. Ala. 1976) (where vulnerable inmates not segregated, duty to protect inmates from continual threat of violence not met), *aff'd as modified sub nom.* Newman v. Alabama, 559 F.2d 283 (5th Cir. 1977), *rev'd in part on other grounds sub nom.* Alabama v. Pugh, 438 U.S. 781; Alberti v. Sheriff of Harris County, Texas, 406 F. Supp. 649, 658 (S.D. Tex. 1975) (inadequate staff resulted in pervasive inmate violence); Gates v. Collier, 349 F. Supp. 881, 888 (N.D. Miss. 1972) (failure

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91 <span style="float:right">Page 22</span>

to segregate violent prisoners created increased risks to other inmates), *aff'd*, 501 F.2d 1291 (5th Cir. 1974).

[FN32]. *See* Matzker v. Herr, 748 F.2d 1142, 1149 (7th Cir. 1984).

[FN33]. *See* Watts v. Laurent, 774 F.2d 168, 172 (7th Cir. 1985) (negligent conduct insufficient for liability), *cert. denied*, 106 S. Ct. 1466 (1986).

[FN34]. *See, e.g.,* Walsh v. Brewer, 733 F.2d 473, 476 (7th Cir. 1984) (prison officials showing deliberate indifference to violent attacks on inmates violate eighth amendment); State Bank of St. Charles v. Camic, 712 F.2d 1140, 1145 (7th Cir.) (failure to take precautions against detainees' suicidal tendencies does not give rise to callous indifference), *cert. denied*, 464 U.S. 995 (1983); Vance v. Bordenkircher, 533 F. Supp. 429, 434 (N.D. W. Va. 1982) (single allegation that defendant not at post when plaintiff assaulted is isolated negligence; not actionable under § 1983); Murphy v. United States, 653 F.2d 637, 644 (D.C. Cir. 1981) (distinguishing between negligent action that does not violate rights and deliberate indifference that does); Ramos v. Lamm, 639 F.2d 559, 572-73 (10th Cir.) (conditions of confinement evidenced prison officials' deliberate indifference to inmates' safety needs), *cert. denied*, 450 U.S. 1041 (1980); Goka v. Bobbitt, 625 F. Supp. 319, 321 (N.D. Ill. 1985) (while negligence does not violate eighth amendment rights of inmates, deliberate indifference does); Radick v. Hardiman, 588 F. Supp. 932, 935 (N.D. Ill. 1984) (prison officials' deliberate indifference to inmate safety is eighth amendment violation); Schaal v. Rowe, 460 F. Supp. 155, 157 (S.D. Ill. 1978) (to state eighth amendment claim, inmate must show officials deliberately deprived him of rights).

[FN35]. *See* Matzker v. Herr, 748 F.2d 1142, 1150 (7th Cir. 1984) (cause of action when prison official knew prisoner would likely be assaulted); Hanna v. Lane, 610 F. Supp. 32, 34-35 (N.D. Ill. 1985) (no claim for relief by inmate who did not allege a threat by other inmate); Burr v. Duckworth, 547 F. Supp. 192, 196 (N.D. Ind. 1982) (prison officials moved inmate into protective custody upon learning of threat to inmate by other prisoner), *aff'd without op.*, 746 F.2d 1482 (7th Cir. 1984).

[FN36]. The legal ramifications of failing to conduct an investigation, particularly when the inmate repeatedly warns of an impending assault, are illustrated by the decision of the Northern District of Illinois in West v. Rowe, 448 F. Supp. 58 (N.D. Ill. 1978). The plaintiff in *West* had written successive letters to numerous prison officials seeking protection from "a life endangering situation." They failed to answer his letters and apparently did not conduct an investigation. The inmate was later assaulted. *Id.* at 59-61. In finding that the plaintiff's allegations stated a cause of action, the court observed: "[W]hen an inmate's repeated requests for help place the appropriate officials on notice of a life endangering situation, a constitutional duty of care arises, binding such officials to take reasonable measures to ensure that inmate's safety." *Id.* at 60. How long prison officials can permissibly delay an investigation is unclear. In Davidson v. Cannon, 106 S. Ct. 668, 669 (1986), the Supreme Court addressed a situation in which an inmate sent a letter reporting a run-in with another inmate. The first defendant to read the note did not believe the matter to be urgent. He sent a note to another officer, who forgot about the note. Two days after sending his note, the plaintiff was assaulted. The Court held in favor of the defendants. The Court reasoned that the plaintiff had established simple negligence but more than simple negligence must be proven to inflict cruel and unusual punishment. *Id.* at 670. A reading of *Davidson* suggests that the note's failure to convey a sense of urgency influenced the Court's characterization of the defendants' inaction.

[FN37]. *See* Lee v. Carlson, 564 F. Supp. 1048, 1051-53 (M.D. Pa. 1983) (eighth amendment claim without merit when officials placed inmate in segregation upon being informed of threat).

[FN38]. *See infra* note 65 and text accompanying notes 64-65 (no right to protective custody unless only means of providing inmate reasonable safety). Should the target know who is threatening him or her but refuse to identify this individual, prison authorities might be relieved of their duty to separate the target from the unlikely assailant. *See* Matzker v. Herr, 748 F.2d at 1150 (identification of threatener necessary for officials to provide protection); Burr v.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

Duckworth, 547 F. Supp. at 196-97 (protection efforts hampered when inmate not name threatener). For many inmates, however, the danger of reprisal for being an informant can be greater than the danger presented by the threatening inmate. *See infra* notes 55-56 and accompanying text.

[FN39]. *See, e.g.,* Vance v. Bordenkircher, 533 F. Supp. 429, 433 (N.D. W. Va. 1982) (no § 1983 liability when only one assault alleged); Ballard v. Elsea, 502 F. Supp. 105, 106 (W.D. Wis. 1980) (allegation of one instance of inmate assault not deprivation of rights when prisoner moved to another prison unit); Withers v. Levine, 449 F. Supp. 473, 476 (D. Md. 1978) (isolated prisoner attacks not cruel and unusual punishment), *aff'd,* 615 F.2d 158 (4th Cir.), *cert. denied,* 449 U.S. 849 (1980); Pugh v. Locke, 406 F. Supp. 318, 329 (M.D. Ala. 1976) (quoting Woodhous v. Virginia, 787 F.2d 889, 890 (4th Cir. 1973)) (same), *aff'd as modified sub nom.* Newman v. Alabama, 559 F.2d 293 (5th Cir. 1977), *rev'd on other grounds sub nom.* Alabama v. Pugh, 438 U.S. 781 (1978); Mathews v. Henderson, 354 F. Supp. 22, 25 (M.D. La. 1973) (unprotected, isolated occurrence not denial of equal protection rights); Parker v. McKeithen, 330 F. Supp. 435, 437 (E.D. La. 1971) (same), *vacated,* 488 F.2d 553 (5th Cir. 1974).

[FN40]. 615 F.2d 158, 160 (4th Cir.), *cert. denied,* 449 U.S. 849 (1980).

[FN41]. 748 F.2d 1142, 1150 (7th Cir. 1984).

[FN42]. 507 F.2d 554, 557-58 (7th Cir. 1974).

[FN43]. For examples of the type of violence commonly found in prisons, see Martino v. Carey, 563 F. Supp. 984, 988 (D. Or. 1983) (security problems created inmate terrorism of regular assaults); Grubbs v. Bradley, 552 F. Supp. 1052, 1078-79 (M.D. Tenn. 1982) (robbery, rape, stabbings, murder way of prison life); Ruiz v. Estelle, 503 F. Supp. 1265, 1286 (S.D. Tex. 1980) (prison overcrowding contributed to its rampant violence), *modified,* 650 F.2d 55 (5th Cir. Unit A 1981), *aff'd in part and vacated in part,* 666 F.2d 854 (5th Cir.), *aff'd in part and rev'd in part,* 679 F.2d 1115 (5th Cir. 1982), *cert. denied,* 460 U.S. 1042 (1983); Palmigiano v. Garrahy, 443 F. Supp. 956, 966-67 (D.R.I. 1977) (extensive evidence of sexual assault, including gang rape), *remanded,* 599 F.2d 17 (1st Cir. 1979), *aff'd,* 616 F.2d 598 (1st Cir.), *cert. denied,* Garrahy v. Palmigiano, 449 U.S. 839 (1980); Gates v. Collier, 349 F. Supp. 881, 888-89 (N.D. Miss. 1972) (lax prison security resulted in inmates commonly possessing knives and homemade weapons), *aff'd,* 501 F.2d 1291 (5th Cir. 1974).

[FN44]. *See* Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir. 1973) (prisoner need not be assaulted to obtain protection from constant threats of sexual assault and violence).

[FN45]. 406 F. Supp. 318, 325, 329-30 (N.D. Ala. 1976), *aff'd and remanded,* 559 F.2d 283 (1977), *rev'd in part,* 438 U.S. 781 (1978).

[FN46]. *See* Murphy v. United States, 653 F.2d 637, 642 (D.C. Cir 1981) (rate of reported assaults is evidence of level of unreasonable prison violence); Bennett v. Duckworth, 578 F. Supp. 1380, 1382-83 (N.D. Ind. 1984) (court looked at low assault rates to determine whether prison had unreasonable level of violence); Lovell v. Brennan, 566 F. Supp. 672, 686 (D. Me. 1983) (same), *aff'd,* 728 F.2d 560 (1st Cir. 1984). Assault reports undercount the true level of violence because there is an unwritten code of silence that deters inmates from reporting assault. For cases discussing inmate code of silence, see *infra* notes 55-58.

[FN47]. 443 F. Supp. 956, 967 (D.R.I. 1977), *remanded,* 559 F.2d 17 (1st Cir. 1979), *aff'd,* 616 F.2d 598 (1st Cir. 1980), *cert. denied,* Garrahy v. Palmigiano, 449 U.S. 839 (1980).

[FN48]. Grubbs v. Bradley, 552 F. Supp. at 1079; *see also* Alabama v. Pugh, 559 F.2d at 325 (inmate explained his rape in prison and how inmates decided to sell his body to other inmates).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91                                                                                    Page 24
56 U. CIN. L. Rev. 91

[FN49]. Grubbs v. Bradley, 552 F. Supp. at 1079.

[FN50]. *See* French v. Owens, 538 F. Supp. 910, 923-24 (S.D. Ind. 1982).

[FN51]. Ramos v. Lamm, 485 F. Supp. 122, 141 (D. Colo. 1979), *aff'd in part and set aside in part*, 639 F.2d 559 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981).

[FN52]. *Id.* For measures taken by prisoners to protect themselves, see *infra* notes 107-08 and accompanying text.

[FN53]. *See* Palmigiano v. Garrahy, 443 F. Supp. at 967.

[FN54]. Battle v. Anderson, 447 F. Supp. 516, 521-22 (E.D. Okla. 1977), *aff'd*, 564 F.2d 388 (10th Cir. 1977); *see also* French v. Owens, 538 F. Supp. at 923 (85% increase in protective custody population).

[FN55]. *See, e.g.*, Alberti v. Heard, 600 F. Supp. 443, 450 (S.D. Tex. 1984) (inmate code of silence results in most violent acts in prison going undetected). According to E. Sutherland & D. Cressey, informal control of prisoners by prisoners is achieved through an inmate code. One of the tenets of the code is "Don't interfere with inmate interests," which includes the directive "Never rat on a con." Although many aspects of the code have weakened since publication of CRIMINOLOGY, the fate of snitches during the New Mexico riot described in *infra* note 56 indicates that the directive against ratting retains considerable support. CRIMINOLOGY 532-33 (9th ed. 1974).

[FN56]. One commentator described the sentiment demonstrated in a prison riot as follows:

> In almost less time than it takes to tell, the 50 to 150 hardcore and violent men reached the protective custody cellblock [during the Feb. 2, 1981, riot at the New Mexico State Prison in Santa Fe]. In uncontrollable frenzy, using blowtorches, and an assortment of prison fashioned and smuggled weapons, 12 snitches were burned, decapitated, castrated and eviscerated. One unfortunate had a metal rod jammed in one ear and out the other. Another was burned systematically from his legs up. Such was the brutality that many in the protective custody unit were beyond physical identification.

Dinitz, *Are Safe and Humane Prisons Possible?*, 5 AUSTRALIAN & NEW ZEALAND J. CRIMINOLOGY 3, 4 (1981); *see also* Gullatte v. Potts, 654 F.2d 1007, 1009 (5th Cir. 1981) (inmate provided statement to prison staff regarding rape of cellmate and agreed to testify against alleged assailants at future disciplinary proceding; he was later murdered by other inmates, presumably because of status as "snitch"); Martino v. Carey, 563 F. Supp. 984, 988-89 (D. Or. 1983) ("If inmates complain to officials, they are labelled 'snitches' and *will 'pay'* later.") (emphasis added).

[FN57]. 579 F. Supp. 1446 (D. Del. 1984).

[FN58]. *Id.* at 1448-49.

[FN59]. *See* M. PINERO, SHORT EYES 126 (1975).

[FN60]. *See* 480 F. Supp. 1288, 1294 (E.D. Pa. 1979); *see also* P. PRIESTLY, COMMUNITY OF SCAPEGOATS 19 (1980) ("Six of them tried to drown me in the bath. . . . Then they came and broke my jaw. . . . You remember Marlowe, he got the boiling water over his head. He was a hell of a mess.").

[FN61]. Wojtczak v. Cuyler, 480 F. Supp. at 1293-95.

[FN62]. *See, e.g.*, Matzker v. Herr, 748 F.2d 1142, 1149-50 (7th Cir. 1984) (prison officials have eighth amendment duty to protect prisoner upon learning of likelihood of attack); Hopkins v. Britton, 742 F.2d 1308, 1310 (11th Cir.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1984) (prison officials must take reasonable steps to protect inmate upon learning of his danger); Madyun v. Thompson, 657 F.2d 868, 875 (7th Cir. 1981) (inmates have rights to reasonable protection from harm); Murphy v. United States, 653 F.2d 637, 644 (D.C. Cir. 1981) (officials show "deliberate indifference" to inmates' safety when they know of pervasive prison violence and fail to take protective measures); Hanna v. Lane, 610 F. Supp. 32, 34 (N.D. Ill. 1985) (inmates have right to reasonable protection from harm); Toussiant v. McCarthy, 597 F. Supp. 1388, 1415 (N.D. Cal. 1984) (prison officials fail to provide reasonable safety when inadequate number of guards or violent inmates not segregated); Martino v. Carey, 563 F. Supp. 984, 996 (D. Or. 1983) (prison officials have duty to take reasonable action to prevent inmates from being assaulted); Massey v. Smith, 555 F. Supp. 743, 747 (N.D. Ind. 1983) (same).

[FN63]. See RESTATEMENT (SECOND) OF TORTS § 320 (1965):

> One who is required by law to take . . . the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him if the actor a) knows or has reason to know that he has the ability to control the conduct of the third persons, and b) knows or should know of the necessity and opportunity for exercising such control.

[FN64]. For a discussion of the segregation required, see infra note 74 and accompanying text.

[FN65]. See, e.g., Jones v. Diamond, 636 F.2d 1364, 1376 (5th Cir.) (court ordered prison classification to segregate violent and sick prisoners from other inmates), cert. dismissed sub nom. Ledbetter v. Jones, 453 U.S. 950 (1981); Martino v. Carey, 563 F. Supp. 984, 988 (D. Or. 1983) (court condemned lack of classification system in prison); Grubbs v. Bradley, 552 F. Supp. 1052, 1080 (M.D. Tenn. 1982) (classification condemned that mixed violent prisoners with rest of population); Nicholson v. Choctaw County, 498 F. Supp. 295, 314 (S.D. Ala. 1980) (classification system ordered to segregate violent and nonviolent prisoners); Laaman v. Helgemoe, 437 F. Supp. 269, 318-19 (D.N.H. 1977) (discussing importance of separating violent from nonviolent prisoners); Mitchell v. Untreiner, 421 F. Supp. 886, 899 (N.D. Fla. 1976) (ordering pretrial detainees separated from other inmates); Pugh v. Locke, 406 F. Supp. 318, 324, 329 (M.D. Ala. 1976) (prison officials failed to carry out duty to provide reasonable safety), aff'd as modified sub. nom. Newman v. Alabama, 559 F.2d 283 (5th Cir.), rev'd in part and remanded sub. nom. Alabama v. Pugh, 438 U.S. 781 (1977); Alberti v. Sheriff of Harris County, 406 F. Supp. 649, 669 (S.D. Tex. 1975) (mandating inmate classification and segregation by classification); Goldsby v. Carnes, 365 F. Supp. 395, 402 (W.D. Mo. 1973) (same), modified by consent, 429 F. Supp. 370 (W.D. Mo. 1977); Gates v. Collier, 349 F. Supp. 881, 902 (N.D. Miss. 1972) (court ordered isolation of inmates with record of assault and violent activity).

[FN66]. See, e.g., Lee v. Carlson, 564 F. Supp. 1048, 1053 (M.D. Pa. 1983) (officials have right to transfer prisoner from administrative segregation to disciplinary segregation when he causes problems); Calloway v. Fauver, 544 F. Supp. 584, 598-99 (D.N.J. 1982) (safety of inmates in protective custody requires limitations placed on them and does not violate their rights); Deaton v. Britton, 355 F. Supp. 597, 600 (D. Kan. 1973) (segregating inmates who are a threat to themselves or others not unconstitutional); Smith v. Swenson, 333 F. Supp. 1258, 1260-61 (W.D. Mo. 1971) (maximum security confinement permissible to protect inmate or prison population); Krist v. Smith, 309 F. Supp. 497, 500 (S.D. Ga. 1970) (same), aff'd, 439 F.2d 146 (5th Cir. 1971).

[FN67]. 396 F. Supp. 912 (D. Md. 1975).

[FN68]. Id. at 913.

[FN69]. Id. at 914-15.

[FN70]. Id. at 915. Because the inmate at bar was transferred to another facility, his request for injunctive relief was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

considered moot by the court. *Id.* at 913.

[FN71]. 626 F. Supp. 229, 236 (D. Conn. 1986) (emphasis added); *see also* Block v. Rutherford, 468 U.S. 576, 590 n.10 (1984) (due process clause does not require least restrictive security measures); Norris v. District of Columbia, 614 F. Supp. 294, 299 (D.D.C. 1985) (same), *aff'd without op.*, 787 F.2d 678 (D.C. Cir. 1986); Respress v. Coughlin, 585 F. Supp. 854, 861 (S.D.N.Y. 1984) (transfer to maximum security prison permissible even though less restrictive measures would ensure safety).

[FN72]. Dolphin v. Manson, 626 F. Supp. at 232.

[FN73]. *Id.* at 236.

[FN74]. *See* Ballard v. Elsea, 502 F. Supp. 105, 107 (W.D. Wis. 1980). In finding that the plaintiff had failed to allege facts supporting his claim that prison staff had denied him reasonable protection, the *Ballard* court stated that "not every denial of a request for protective custody amounts to a denial of an inmate's rights." *Id.* at 106. The court reasoned that the plaintiff must not only allege an objective basis to fear serious physical assault but also that the staff knew of the danger and failed to take appropriate action. *Id.* at 107.

[FN75]. For examples of cases, see *supra* note 65.

[FN76]. [S]eparate handling [via segregation] is costly--not only do staffing ratios tend to be higher in segregated housing, but special line movements, separate feeding and exercising, increased security measures, and the like add directly to the costs of running the institution. Based on staff costs alone, it has been estimated that segregation is seven times as expensive as a general population unit.
   *Special Management Inmate, supra* note 4, at 3 (footnote omitted).

[FN77]. *Id.*

[FN78]. *Id.*

[FN79]. For an examination of why a stigma attaches to the protective custody inmate, see *infra* note 107.

[FN80]. *See* Alberti v. Heard, 600 F. Supp. 443, 450 (S.D. Tex. 1984) (level of reported inmate violence only "tip of iceberg" as code of silence causes most violent acts to go unreported); Grubbs v. Bradley, 552 F. Supp. 1052, 1078 (M.D. Tenn. 1982) (same); Pugh v. Locke, 406 F. Supp. 318, 325 (M.D. Ala. 1976) (same), *aff'd as modified in sub nom.* Newman v. Alabama, 559 F.2d 283 (5th Cir.), *rev'd in part and remanded sub nom.* Alabama v. Pugh, 438 U.S. 781 (1977).

[FN81]. *See* Hewitt v. Helms, 459 U.S. 460, 474 (1983) (prison administrators may properly rely on types of inmates at institutions, relations between guards and inmates, and intuitive judgment in deciding whether to place particular prisoner in administrative segregation).

[FN82]. Even sophisticated prediction methodologies yield many mistakes regarding dangerousness. *See* Monahan, *The Prediction of Violent Criminal Behavior: A Methodological Critique and Perspectus,* in DETERRENCE AND INCAPACITATION: ESTIMATING THE EFFECTS OF CRIMINAL SANCTIONS ON CRIME RATES, 244 (A. Blumstein, J. Cohen & D. Nagin eds. 1978).
   Critical to the accurate classification of inmates for dangerousness is adequate data regarding the inmate, but that information is rarely available. *See* Laaman v. Helgemoe, 437 F. Supp. 269, 300 (D.N.H. 1977) (discussing inadequacies of prison classification system); *see also* Bidna, *Effects of Increased Security on Prison Violence,* 3 J.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91                                                                                                                    Page 27
56 U. CIN. L. Rev. 91

CRIM. JUST. 33, 44 (1975) ( "Classifications of inmates without adequate information may allow violent inmates to prey upon their non-violent counterparts in the general [prison] population, while prisoners with little proclivity for violence may be subjected unnecessarily to the spartan existence of security units.").

[FN83]. *See* Anderson, *supra* note 1, at 9. As one inmate observed: "I got into a hassle with a couple of guys . . . . We got into a fight, so they shipped me down here. But when I got down here, it turned out that they had some friends here. So I decided to lock up [in protective custody]." *Id.*

[FN84]. *See* M. Tellier, J. Wormith & P. Gendreau, *supra* note 23, at 45 (only older protection inmates successfully reintegrated into general prison population).

[FN85]. *See Special Management Inmate, supra* note 4, at 34-35 (briefly describing three other sanctuary prisons: California's Men's Colony, California Medical Facility at Vacaville, and Oregon State Correctional Institution).

[FN86]. For a discussion of the treatment of child molesters, see *supra* notes 59-61 and accompanying text.

[FN87]. PROTECTIVE CUSTODY, *supra* note 5, at 8; *see also Special Management Inmate, supra* note 4, at 31 ("There is a surprising degree of consistency in the responses of prison administrators to this complex problem [of protecting the vulnerable]. Most seem to be institutionalizing protective custody (PC) as a fixture in the prison setting."). An American Correctional Association survey of protection inmates indicates that they believe that their segregation has given them safety. On a scale from 1 to 5, with 1 indicating that they felt totally safe and 5 indicating their being in constant fear, the surveyed inmates yielded an average rating of 2.22. When asked to assess their safety if returned to the general prison population, the sample yielded a 4.13 average. PROTECTIVE CUSTODY, *supra* note 5, at 29.

[FN88]. For a discussion of this condemnation, see *supra* notes 55-56 and accompanying text.

[FN89]. For an example of this phenomenon, see *supra* note 83. *See also* Simmat v. Manson, 554 F. Supp. 1363, 1370-71 (D. Conn. 1983) (inmate's reputation as an informer provided "ample evidence and good reason to believe" that he would be endangered if placed in prison's protective custody unit); interview with John Ault, Director, Northern Iowa Correctional Facility, May 29, 1986 (protection inmates hold many of the same norms as general population inmates, including hostility toward informants); King v. Jenkins, 607 F. Supp. 54, 56 (E.D. Pa. 1985) (prison staff segregated protection inmate from his fellow protection inmates after he precipitated search of their quarters).

[FN90]. *See* Ross v. Reed, 719 F.2d 689, 697 (4th Cir. 1983) (when prison officials' only immediate means of safeguarding inmate was to place him in protective custody, transfer "may have been constitutionally compelled").

[FN91]. 595 F. Supp. 1558, 1578, 1580 (D. Idaho 1984).

[FN92]. *See* Murphy v. United States, 653 F.2d 637, 642, (D.C. Cir. 1981) (27% assaults in one dormitory not unconstitutionally high); Lovell v. Brennan, 566 F. Supp. 672, 686 (D. Me. 1983) (three assaults among 400 inmates not unconstitutionally high), *aff'd,* 728 F.2d 560 (1st Cir. 1984).

[FN93]. *See* French v. Owens, 538 F. Supp. 910, 926-27 (S.D. Ind. 1982):

> [T]he defendants appear to the [c]ourt to be carrying on a valiant but losing battle to accommodate those persons entrusted to their care. Certainly their failure to carry out the law in their official capacities does not mean that, as individuals, they are callous, indifferent, inept, negligent, or willfully perverse. The contrary is true. They are simply overwhelmed despite their efforts to avoid the present crisis . . . .

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*See also* Robertson, *supra* note 2, at 120 (juxtaposing two models of reasonable protection, discrete vs. structural, with the latter calling for corporate rather than individual responsibility for safety of offenders).

[FN94]. 595 F. Supp. at 1571. For a discussion of court's determination that protective custody unit safeguards inadequate, see *supra* note 91 and accompanying text.

[FN95]. PROTECTIVE CUSTODY, *supra* note 5, at 34. Whereas model standards "do not establish constitutional minima," they "may be instructive in certain cases." Bell v. Wolfish, 441 U.S. 520, 543-44 n.27 (1979). The relevance of model standards developed by the American Correctional Association is expressed in a decision of the Ninth Circuit Court of Appeals. Hoptowit v. Ray, 682 F.2d 1237, 1256-57 (9th Cir. 1982) (wrong to constitutionalize standards of specific association, but they may be a consideration).

[FN96]. *See* Palmigiano v. Garrahy, 443 F. Supp. 956, 967 (D.R.I. 1977) ("Many of the protective security inmates need protection from each other . . . . A review of the justifications for each inmate's protective custody showed approximately an equal number of rapists and rape victims afforded protective custody."), *remanded,* 599 F.2d 17 (1st Cir. 1979), *aff'd,* 616 F.2d 598 (1st Cir. 1980), *cert. denied,* Garrahy v. Palmigiano, 449 U.S. 839. While protection inmates are vulnerable, not all are passive. *See Special Management Inmate, supra* note 4, at 31 ("[T]hose seeking protection also include some otherwise 'heavy' types who have gotten into trouble through harassment of other inmates or failure to pay debts.").

[FN97]. 579 F. Supp. 1446, 1448-49 (D. Del. 1984).

[FN98]. *Id.* at 1450-51.

[FN99]. PROTECTIVE CUSTODY, *supra* note 5, at 35.

[FN100]. *See, e.g.,* Ramos v. Lamm, 639 F.2d 559, 573 (10th Cir. 1980) (recognizing lack of adequate staffing levels contributed to prison violence), *cert. denied,* 450 U.S. 1041 (1981); Williams v. Edwards, 547 F.2d 1206, 1213 (5th Cir. 1977) (number of guards must bear reasonable relation to number of inmates to assure inmate safety); Finney v. Mabry, 534 F. Supp. 1026, 1038 (E.D. Ark. 1982) (lack of adequate staffing at prison historically contributed to prison problems); McMurry v. Phelps, 533 F. Supp. 742, 763 (W.D. La. 1982) (inadequate staffing for prisoners' protection violates eighth and fourteenth amendments); Ruiz v. Estelle, 503 F. Supp. 1265, 1303 (S.D. Tex. 1980) (officials failed to provide adequate supervision to protect inmates from violence), *modified,* 650 F.2d 555 (5th Cir. 1981), *aff'd in part and rev'd in part,* 666 F.2d 854 (5th Cir.), *modified,* 679 F.2d 1115 (5th Cir. 1982); Palmigiano v. Garrahy, 443 F. Supp. 956, 968 (D.R.I. 1977) (inadequate number of guards at prison contributed to inmate fear and violence), *remanded,* 599 F.2d 17 (1st Cir. 1979), *aff'd,* 616 F.2d 598 (1st Cir.) *cert. denied,* Garrahy v. Palmigiano, 449 U.S. 839 (1980); Barnes v. Gov't of Virgin Islands, 415 F. Supp. 1218, 1232 (D.V.I. 1976) (court ordered prison to maintain sufficient qualified staff to meet institutional needs).

[FN101]. NATIONAL ADVISORY COMMISSION ON CRIMINAL JUSTICE STANDARDS AND GOALS, CORRECTIONS 300 (1973).

[FN102]. *See* MANUAL OF STANDARDS, *supra* note 2 at § 4063.

[FN103]. As James V. Bennett, former director of the United States Bureau of Prisons, writes:
> The task of supervising and guiding prisoners is no job for amateurs . . . . It is necessary to look for skills, talents, and unusual capabilities in persons recruited for this work. This means not only the necessary skill and capacity for doing a particular job, but also the ability to instill the same skill and capacity in untrained and frequently hostile inmates . . . . There is no substitute for personality, genuine interest, judgment, and understanding in personal relationships between workers and inmates.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bennett, *The Selection and Training of Correctional Personnel with Special Reference to the Federal System of the United States of America,* in OF PRISONS AND JUSTICES 262-63 (J. Bennett ed. 1964).

[FN104]. Jacobs, *Prison Violence and Formal Organization,* in PRISON VIOLENCE 79, 83 (A. Cohen, G. Cole & R. Bailey eds. 1976).

[FN105]. *See, e.g.,* Martin v. White, 742 F.2d 469, 471 (8th Cir. 1984) (prison design prevented guards from observing inmate activity unless on patrol); Ramos v. Lamm, 639 F.2d at 573 (prison design contributed to inmate violence); Benjamin v. Malcolm, 564 F. Supp. 668, 672 (S.D.N.Y. 1983) (prison design frustrated attempts to provide security to inmates); Fischer v. Winter, 564 F. Supp. 281, 292-93 (N.D. Cal. 1983) (prison guard testified as to inadequacy of prison design); Palmigiano v. Garrahy, 443 F. Supp. at 968 (no one at prison safe due to poor building design).

[FN106]. *See* H. TOCH, *supra* note 10, at 169 (some prisoners will "fight" rather than face "flight option" of protective custody); *see also* PROTECTIVE CUSTODY, *supra* note 5, at 129 (21% of surveyed protection inmates indicated they did not voluntarily enter protective custody).

[FN107]. Where fight is subculturally admired one can infer that flight is subculturally despised. While manliness is equated with fearlessness, flight-- which implies a deficit of bravery--is unmanly. Protection companies are labeled "homo companies," not because they contain homosexuals, but because "weak" persons (nonmen) seek refuge there. This negative connotation is advertised and is known to victims.

H. TOCH, *supra* note 10, at 170; *see also* Anderson, *supra* note 1, at 10 ("[T] hey are the objects of a contempt shared by the whole prison community-- staff as well as inmates."). The stigma of being unmanly cannot readily be shed even if one returns to the general prison population. This stigma alone can then mark the former protection inmate for victimization. *See* M. Tellier, J. Wormith & P. Gendreau, *supra* note 23, at 30.

[FN108]. For description of confinement, see *infra* notes 219-20 and accompanying text.

[FN109]. *See, e.g.,* Hewitt v. Helms, 459 U.S. 460, 469 (1983) (although no independent due process right, state-created liberty can trigger due process); Montayne v. Haymes, 427 U.S. 236, 242 (1976) (transfer of prisoner to another prison does not violate due process absent a right rooted in state law); Grubbs v. Bradley, 552 F. Supp. 1052, 1124 (M.D. Tenn. 1982) (no constitutional right to security classification absent implication of independent right); Seibert v. McCracken, 387 F. Supp. 275, 278 (E.D. Okla. 1974) (summary treatment may be necessary; no constitutional right to be held in a particular facility).

The fifth amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ," U.S. CONST. amend. V. The fifth amendment applies exclusively to actions of the federal government and thereby does not directly protect state inmates. *See* Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 247 (1883). The due process clause of the fourteenth amendment, on the other hand, explicitly applies to the states, and consequently protects state inmates. It provides: "No *State* shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." U.S. CONST.amend. XIV, § 1 (emphasis added).

[FN110]. *See* Morrissey v. Brewer, 408 U.S. 471, 482 (1972) (addressing liberty interest of parolees); *see, e.g.,* Gray v. Creamer, 465 F.2d 179, 185 (3d Cir. 1972) (substantial punishment of prisoner invokes certain safeguards). A "grevious loss" consists of "*any* change in the conditions of confinement having a substantial adverse impact on the prisoner." Meachum v. Fano, 427 U.S. 215, 224 (1976) (emphasis in original). Consequently, this form of analysis has been called "impact analysis." Note, *Two Views of a Prisoner's Right to Due Process: Meachum v. Fano,* 12 HARV. C.R.-C.L. L. REV. 404, 421-22 (1977) [hereinafter Note, *Two Views of a Prisoner's Right*].

[FN111]. *See* Note, *Two Views of a Prisoner's Right, supra* note 110, at 421-22.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

[FN112]. *See, e.g.,* Gray v. Creamer, 465 F.2d 179, 185 (3d Cir. 1972) (citing with approval, Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971)) (prisoner transfer to solitary confinement was substantial deprivation requiring due process), *cert. denied,* 404 U.S. 1049 (1972); Diamond v. Thompson, 364 F. Supp. 659, 664 (M.D. Ala. 1973) (prisoners in administrative segregation had grievous loss), *aff'd,* 523 F.2d 1201 (5th Cir. 1975); United States *ex rel.* Walker v. Mancusi, 338 F. Supp. 311, 318 (W.D.N.Y. 1971) (segregation substantial deprivation of prisoners' rights, requiring due process), *aff'd,* 467 F.2d 51 (2d Cir.).

[FN113]. Diamond v. Thompson, 364 F. Supp. at 665.

[FN114]. 427 U.S. 215 (1976).

[FN115]. *Id.* at 223-25.

[FN116]. *Id.* at 224.

[FN117]. 459 U.S. 460 (1983).

[FN118]. *Id.* at 463.

[FN119]. *Id.* at 463 n.1.

[FN120]. *Id.* at 465, 473, 476.

[FN121]. *Id.* at 466-68.

[FN122]. *Id.* at 468.

[FN123]. *Id.*

[FN124]. 777 F.2d 871 (2d Cir. 1985).

[FN125]. *Id.* at 876-77.

[FN126]. *Id.* at 875. A number of other lower federal courts have similarly read *Hewitt* as placing all nonpunitive uses of segregation outside the reach of due process liberty. *See, e.g.,* Walker v. Mintzes, 771 F.2d 920, 933-34 (6th Cir. 1985); Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir. 1984); Perez v. Neubert, 611 F. Supp. 830, 837 (D.N.J. 1985); King v. Jenkins, 607 F. Supp. 54, 57 (E.D. Pa. 1985); Morrison v. LeFevre, 592 F. Supp. 1052, 1071 (S.D.N.Y. 1984).

[FN127]. 459 U.S. 460, 466 (1983); *see also, e.g.,* King v. Jenkins, 607 F. Supp. 54, 58 (E.D. Pa. 1985) (liberty interest in continuing residence in general prison population); Conti v. Dyer, 593 F. Supp. 696, 698-99 (N.D. Cal. 1984) (liberty interest in not being segregated). Hinging due process safeguards on state-created liberty did not begin with the *Hewitt* decision. After the *Meachum* and *Montayne* decisions, several lower federal courts concluded that due process safeguards must accompany nonpunitive segregation when a state-created liberty interest is denied. *See, e.g.,* Gibson v. Lynch, 652 F.2d 348, 354 (3d Cir. 1981); Love v. Duckworth, 554 F. Supp. 1067, 1069-70 (N.D. Ind. 1983); Drayton v. Robinson, 519 F. Supp. 545, 549 (M.D. Pa. 1981); Hodges v. Klein, 421 F. Supp. 1224, 1232 (D.N.J. 1976), *aff'd,* 562 F.2d 276 (3d Cir. 1977).

[FN128]. Hewitt v. Helms, 459 U.S. at 470-71.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN129]. *Id.* at 471-72.

[FN130]. King v. Jenkins, 607 F. Supp. 54, 58 (E.D. Pa. 1985).

[FN131]. *See* Bills v. Henderson, 631 F.2d 1287, 1291 (6th Cir. 1980) (inmate liberty interests can be created by prison officials' policy statements and promulgations); Durso v. Rowe, 579 F.2d 1365, 1368 (7th Cir. 1978) (state-created liberty not limited to statutorily created rights; may also arise from official practices or polices), *cert. denied*, 439 U.S. 1121 (1979); Walker v. Hughes, 558 F.2d 1247, 1254-56 (6th Cir. 1977) (discussing problems with finding liberty interests in statements promulgated by executive officials, but concluding that prison policy statements in question sufficient to create liberty interest).

[FN132]. *See* Lucas v. Hodges, 730 F.2d 1493, 1503 (D.C. Cir.), *vacated*, 738 F.2d 1392 (1984).

[FN133]. Gurule v. Wilson, 635 F.2d 782, 785 (10th Cir. 1980).

[FN134]. 578 F. Supp. 1501 (S.D. Iowa 1983), *aff'd as modified*, 776 F.2d 26 (8th Cir. 1985); *see also* Toussaint v. McCarthy, 597 F. Supp. 1388, 1417 (N.D. Cal. 1984) (segregation deprives inmates of statutorily authorized full sentence credit, triggering due process protection).

[FN135]. 578 F. Supp. at 1503-06.

[FN136]. *Id.* at 1506.

[FN137]. *See* Hewitt v. Helms, 459 U.S. 460, 471-72 (1983) (when state-created liberty implicated by segregation, prisoner given certain procedural due process rights).

[FN138]. *See, e.g., id.* at 472 (court found due process in prison context to require only informal, nonadversary review); Spruytte v. Walters, 753 F.2d 498, 508 (6th Cir. 1985) (court must decide if inmate entitled to notice, chance to be heard, cross-examination, and assistance of counsel); Mims v. Shapp, 744 F.2d 946, 950 (3d Cir. 1984) (once protected interest found, court must determine if process given inmate satisfies fourteenth amendment); King v. Jenkins, 607 F. Supp. 54, 58 (E.D. Pa. 1985) (same).

[FN139]. 424 U.S. 319, 335 (1976).

[FN140]. 418 U.S. 539 (1974). For list of safeguards, see *infra* text accompanying note 143.

[FN141]. *See, e.g.,* Helms v. Hewitt, 655 F.2d 487, 503 (3d Cir. 1981) (inmates must receive minimum procedural safeguards), *rev'd*, 459 U.S. 460 (1983); Calloway v. Fauver, 544 F. Supp. 584, 600-01 (D.N.J. 1982) (inmates must receive hearing at least once per year); Hilliard v. Scully, 537 F. Supp. 1084, 1087-88 (S.D.N.Y. 1982) (prisoner must receive post-hearing copy of proceedings); Murphy v. Fenton, 464 F. Supp. 53, 57-58 (M.D. Pa. 1978) (prisoner has right to present evidence at hearing); Wright v. Enomoto, 462 F. Supp. 397, 403-04 (N.D. Cal. 1976) (no maximum security confinement for administrative convenience), *aff'd mem.,* 434 U.S. 1052 (1978).

[FN142]. 462 F. Supp. 397, 403-04.

[FN143]. Wolff v. McDonnell, 418 U.S. at 562-70.

[FN144]. *See, e.g.,* Kelly v. Brewer, 525 F.2d 394, 400 (8th Cir. 1975); Calloway v. Fauver, 544 F. Supp. at 602;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

Drayton v. Robinson, 519 F. Supp. 545, 552 (M.D. Pa. 1981); United States *ex rel.* Hoss v. Cuyler, 452 F. Supp. 256, 292-93 (E.D. Pa. 1978).

[FN145]. Kelly v. Brewer, 525 F.2d at 400.

[FN146]. Calloway v. Fauver, 544 F. Supp. at 602.

[FN147]. McCray v. Bennett, 467 F. Supp. 187, 193 (M.D. Ala. 1978).

[FN148]. Calloway v. Fauver, 544 F. Supp. at 602 (N.J.); Tyree v. Fitzpatrick, 325 F. Supp. 554, 556 n.1 (D. Mass.) (Mass.), *aff'd,* 445 F.2d 627 (1st Cir. 1971).

[FN149]. 459 U.S. 460, 476 (1983).

[FN150]. *Id.* at 477 & n.9.

[FN151]. *Id.* at 476-77.

[FN152]. *Id.* at 475.

[FN153]. *Id.* at 473.

[FN154]. *Id.*

[FN155]. *Id.*

[FN156]. *Id.* at 474.

[FN157]. For authority supporting this conclusion, see *supra* note 127.

[FN158]. For this case law, see *supra* note 141.

[FN159]. 598 F. Supp. 270 (D.C. 1984), *aff'd,* 786 F.2d 1182 (D.C. Cir. 1986).

[FN160]. *Id.* at 271.

[FN161]. *Id.* at 271-72.

[FN162]. 777 F.2d 871 (2d Cir. 1985).

[FN163]. *Id.* at 873 (the inmates' segregation began in Dec. 1972 and they returned to general population in Sept. 1974).

[FN164]. *Id.*

[FN165]. It is likely that by the term "hearing" the inmates as well as the court were speaking of an opportunity for the inmates to appear personally before the prison staff charged with reviewing their assignment in protective custody. The term "hearing" can, however, have a more restrictive meaning. Judge Henry J. Friendly writes:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> The term "hearing," like "jurisdiction," is "a verbal coat of too many colors." Professor Davis has defined it as "any oral proceeding before a tribunal." Broad as that definition is, it may not be broad enough. Although the term "hearing" has an oral connotation, I see no reason why in some circumstances a "hearing may not be had on written materials only."

Friendly, *Some Kind of Hearing*, 123 U. PA. L. REV. 1267, 1270 (1975) (footnotes omitted).
[FN166]. Deane v. Dunbar, 777 F.2d at 876-77.

[FN167]. *Id.* (quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)).

[FN168]. *See* Wolff v. McDonnell, 418 U.S. 539, 558 (1974); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 162-63 (1951) (Frankfurter, J., concurring).

[FN169]. Rubin, *Due Process and the Administrative State*, 72 CALIF. L. REV. 1044, 1148 (1984) (footnote omitted).

[FN170]. 418 U.S. 539 (1974).

[FN171]. 419 U.S. 565 (1975).

[FN172]. *Id.* at 581.

[FN173]. *Id.* at 583.

[FN174]. Rubin, *supra* note 169, at 1148.

[FN175]. 419 U.S. at 581.

[FN176]. *See* Friendly, *supra* note 165, at 1280.

[FN177]. *See* Rubin, *supra* note 169, at 1165.

[FN178]. *See* Bills v. Henderson, 631 F.2d 1287, 1296 (6th Cir. 1980).

[FN179]. Grannis v. Ordean, 234 U.S. 385, 394 (1914).

[FN180]. Helms v. Hewittt, 459 U.S. at 476 ("an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation").

[FN181]. *Id.*

[FN182]. *Id.* at 490 (Stevens, J., dissenting).

[FN183]. *Id.* at 489. In indicating that prison administrators "may" permit oral presentations, the Court did not mandate them, but indicated the *possibility* that oral presentations would be more effective in some situations. In selecting the manner of permissible response, prison administrators should be guided by the Court's admonition in *Goldberg v. Kelly* that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." 397 U.S. 254, 268-69 (1970).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN184]. 418 U.S. at 567.

[FN185]. *Id.* at 566.

[FN186]. *Id.* at 570.

[FN187]. *Id.*

[FN188]. For a comparison, see *infra* note 199.

[FN189]. Hewitt v. Helms, 459 U.S. at 474. The Court has approved of the intuitive nature of other classifications decisions. *See* Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7-8 (1979) (parole-release); Meachum v. Fano, 427 U.S. 215, 225 (1976) (interprison transfer); *see also* Conn. Bd. of Pardons v. Dumschat, 452 U.S. 458, 464 (1981) (commutation decisions address "purely subjective evaluations").

[FN190]. *See, e.g.,* Mims v. Shapp, 744 F.2d 946, 953 (3d Cir. 1984); King v. Jenkins, 607 F. Supp. 54, 59 (E.D. Pa. 1985).

[FN191]. 607 F. Supp. at 59. Prior to the *Hewitt* decision, the District Court for New Jersey in Dozier v. Hilton, 507 F. Supp. 1299, 1307 (D.N.J. 1981), concluded that informed predictions of an inmate's future behavior provided a constitutionally sufficient basis to segregate him in protective custody even though no "demonstrable act or event" established vulnerability.

[FN192]. Various biases can affect administrative decisionmaking: (1) bias in point of view; (2) prejudgment; (3) bias toward the individual personally; and (4) a personal interest in the decision. 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE 12.01-.06 (1958). As Professor Carl Clements has written, inmate classification based on impressionistic judgments is seriously flawed:

> A major difficulty of this approach is its inconsistency. There are, no doubt, years of accumulated wisdom in various subjectively-held criteria. But unless these criteria are made explicit, each decision-maker or group is free to analyze and respond in its own unique and often undocumented way. Further, factors such as personal values, systems problems (e.g., overcrowding), and political consequences are quite likely to influence assessment of offenders and subsequent decisions about them. Unless classification assessments are pried loose from such considerations, inaccuracies and distortions will be perpetuated.

Clements, *Toward an Objective Approach to Offender Classification,* 9 L. & PSYCHOLOGY REV. 45, 49 (1985) (footnotes omitted).

[FN193]. *See* Meyers & Rabiej, *Burden of Proof and the Standard of Judicial Review in Prison Disciplinary Hearings Involving Decisions Predicated Upon Uncorroborated Hearsay Evidence,* 1979 S.I.U.L.J. 535, 545-52; *see also* Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 20 (1979) (Powell, J., concurring in part) (if predictive evaluations of inmate behavior are free of arbitrariness, they must be based on some fact-finding); *id.* at 28 (Marshall, J., dissenting) (same); Taylor v. Clement, 443 F. Supp. 585, 588 (S.D.N.Y. 1977) (requiring evidence that protection inmate is endangered prevents custodians from covertly using segregation as punitive measure).

[FN194]. 464 F. Supp. 53 (M.D. Pa. 1978).

[FN195]. 544 F. Supp. 584 (D.N.J. 1982).

[FN196]. *Murphy,* 464 F. Supp. at 59; *Calloway,* 544 F. Supp. at 605.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN197]. 472 U.S. 445 (1985).

[FN198]. *Id.* at 455.

[FN199]. *Compare* Wolff v. McDonnell, 418 U.S. 539, 563-70 (1974) *with* Hewitt v. Helms, 459 U.S. at 460 (1983) (unlike disciplinary hearings, nonpunitive segregation proceedings do not accord inmate explicit right to appear before decisionmaker, to call witnesses, and to receive written explanation of decision).

[FN200]. Mass. Correctional Inst. v. Hill, 472 U.S. at 456.

[FN201]. Hewitt v. Helms, 459 U.S. at 474.

[FN202]. *Id.*

[FN203]. Gibbs v. King, 779 F.2d 1040, 1044 (5th Cir.), *cert. denied,* 106 S. Ct. 1975 (1986); Mendoza v. Miller, 779 F.2d 1287, 1299 (7th Cir. 1985), *cert. denied,* 106 S. Ct. 2251 (1986). The current trend in the federal courts is to require a showing of the credibility and reliability of hearsay when it alone supports deprivation of a liberty interest. *See, e.g.,* Mendoza v. Miller, 779 F.2d at 1293; Kyle v. Hanberry, 677 F.2d 1283, 1390-91 (11th Cir. 1982); Smith v. Rabalais, 659 F.2d 539, 547 (5th Cir. 1981); Calloway v. Fauver, 544 F. Supp. 584, 604 (D.N.J. 1982).

[FN204]. Morrissey v. Brewer, 408 U.S. 471, 488-89 (1972).

[FN205]. Wolff v. McDonnell, 418 U.S. 539, 563 (1974).

[FN206]. 459 U.S. at 494-96 (Stevens, J., dissenting).

[FN207]. *See, e.g.,* Friendly, *supra* note 165, at 1292 (statement of reasons critical to appellate review); Morgan, *The Constitutional Right to Know Why,* 17 HARV. C.L.-C.R. L. REV. 297, 300 (1982) ("Reasons requirements reduce error, arbitariness, and reliance on inappropriate factors."); Note, *Due Process Behind Bars--The Intrinsic Approach,* 48 FORDHAM L. REV. 1067, 1108-09 (1980) (written statements necessary to promote consistency and expose arbitrariness).

[FN208]. 459 U.S. at 477 n.9.

[FN209]. *Id.*

[FN210]. Burton v. Shapp, 574 F. Supp. 637 (W.D. Pa. 1983), *rev'd sub. nom.* Mims v. Shapp, 744 F.2d 946 (3d Cir. 1984); Clark v. Brewer, 578 F. Supp. 1501 (S.D. Iowa 1983), *modified,* Clark v. Nix, 578 F. Supp. 1515 (S.D. Iowa 1984), *aff'd as modified,* 776 F.2d 226 (8th Cir. 1985). The average protective custody inmate spends 281 days in segregation in contrast to 57 days for the disciplinary detention inmate. *See* PROTECTIVE CUSTODY, *supra* note 5, at 16.

[FN211]. 574 F. Supp. at 640.

[FN212]. *Id.*

[FN213]. Mims v. Shapp, 744 F.2d 946, 953 (3d Cir. 1984) (citing Hewitt v. Helms, 459 U.S. 460, 472 (1983) (cit-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing Conn. Bd. of Pardons v. Dumschat, 452 U.S. 458, 464 (1981))).

[FN214]. 578 F. Supp. 1501 (S.D. Iowa 1983), *modified,* Clark v. Nix, 578 F. Supp. 1515 (S.D. Iowa), *aff'd as modified,* 776 F.2d 226 (8th Cir. 1985).

[FN215]. *Id.* at 1503.

[FN216]. *Id.* at 1509-14. The court did reject the plaintiff's request that segregated inmates be allowed to relitigate facts determined at the initial evidentiary review. *Id.* at 1514-15.

[FN217]. Clark v. Brewer, 776 F.2d 226, 233-36 (8th Cir. 1985).

[FN218]. *Id.* at 234.

[FN219]. *See, e.g.,* Cody v. Hillard, 599 F. Supp. 1025, 1034-35 (D.S.D. 1984) (in class action suit, court found general prison condition amounted to cruel and unusual punishment; conditions in protective custody areas worse than general population), *aff'd,* 799 F.2d 447 (8th Cir. 1986); Balla v. Idaho State Bd. of Corrections, 595 F. Supp. 1558, 1570-71 (D. Idaho 1984) ("[I] nmates in protective custody suffer under some of the most oppressive conditions at the prison apparently for no other reason than they are young and vulnerable and cannot protect themselves"); Calloway v. Fauver, 544 F. Supp. 584, 594 (D.N.J. 1982) (those in protective custody suffer same conditions as those confined for disciplinary reasons); MCI Advisory Bd. v. Hall, 447 F. Supp. 398, 401 (D. Mass. 1978) (protective custody prisoners allowed no recreation and cell conditions "are intolerable and a clear violation of Eighth Amendment standards"); Taylor v. Clement, 433 F. Supp. 585, 587 (S.D.N.Y. 1978) (conditions in protective custody "as severe as if they had been placed in punitive segregation").

[FN220]. H. TOCH, *supra* note 10, at 208; *see also* D. LOCKWOOD, PRISON SEXUAL VIOLENCE 73 (1980) (despite hardships of protective custody, most voluntary protection inmates expressed satisfaction with sanctuary).

[FN221]. For a comparison of the safeguards given to the two groups of inmates, see *supra* note 199.

[FN222]. *See, e.g.,* Little v. Walker, 552 F.2d 193, 195 (7th Cir. 1977) (protective custody inmates deprived of all privileges of general prison population and treated as disciplinary violators), *cert. denied,* 435 U.S. 932 (1978); Balla v. Idaho State Bd. of Corrections, 595 F. Supp. 1558, 1570-71 (D. Idaho 1984) (protective custody inmates treated subject to same deprivation of privileges as those in administrative segregation); Dozier v. Hilton, 507 F. Supp. 1299, 1301 (D.N.J. 1979) (isolation and lack of work, recreation, visitation, and educational opportunities approximate that endured by prisoners held in punitive confinement); Nelson v. Collins, 455 F. Supp. 727, 731 (D. Md.) (protective custody and punitive segregation prisoners confined virtually 24 hours a day), *modified on other grounds sub nom.* Johnson v. Levine, 588 F.2d 1378 (4th Cir. 1978); H. TOCH, *supra* note 10, at 221-23 (some protective custody prisoners consider confinement punishment in return for safety).

[FN223]. *See, e.g.,* Cody v. Hillard, 559 F. Supp. at 1026, 1028-29; Lovell v. Brennan, 566 F. Supp. 672, 676 (D. Me. 1983), *aff'd,* 728 F.2d 560 (1st Cir. 1984); Calloway v. Fauver, 544 F. Supp. at 587; Palmigiano v. Garrahy, 443 F. Supp. 956, 959 (D.R.I. 1977), *remanded,* 599 F.2d 17 (1st Cir. 1979), *aff'd,* 616 F.2d 598 (1st Cir. 1979), *cert. denied,* Garrahy v. Palmigiano, 449 U.S. 839 (1980); Nadeau v. Helgemoe, 423 F. Supp. 1250, 1254 (D.N.H. 1976), *aff'd in part, vacated and remanded in part,* 561 F.2d 411 (1st Cir. 1977); Smith v. Swenson, 333 F. Supp. 1258, 1259 (W.D. Mo. 1971). A survey conducted for the National Institute of Justice reveals that in several program areas protection inmates do not enjoy access on par with the general prison population. Those areas of unequal access are: (1) housing; (2) vocational education; (3) academic education; (4) work; and (5) recreation. Those areas of equal access are: (1) food; (2) mail; (3) television; and (4) parole. *Special Management Inmate, supra* note 4, at 23-24.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

80-036

[FN224]. *See* Berger, *supra* note 21, at 4 (courts permitted to disregard complaints based on deprivation of inmates' privileges).

[FN225]. *See, e.g.,* Board of Regents v. Roth, 408 U.S. 564, 571 (1972) ( "[T]he Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges.'"); Graham v. Richardson, 403 U.S. 365, 374 (1971) (distinction dispelled); Goldberg v. Kelly, 397 U.S. 254, 262 (1970) (same). *See generally* Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law,* 81 HARV. L. REV. 1439 (1968) (examination of Supreme Court's utilization of distinction).

[FN226]. The equal protection clause of the fourteenth amendment provides: "[N] or [shall any state] deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

[FN227]. U.S. CONST. amend. VIII. ("nor cruel and unusual punishments inflicted").

[FN228]. *See* Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir. 1984); Nadeau v. Helgemoe, 561 F.2d 411, 414 (1st Cir. 1977); Cody v. Hillard, 599 F. Supp. 1025, 1055 (D.S.D. 1984); Lovell v. Brennan, 566 F. Supp. 672, 692 (D. Me. 1983), *aff'd,* 728 F.2d 560 (1st Cir. 1984); MCI Advisory Bd. v. Hall, 447 F. Supp. 398, 405 (D. Mass. 1978).

[FN229]. *See* Lovell v. Brennan, 566 F. Supp. at 692; MCI Advisory Bd. v. Hall, 447 F. Supp. at 405-06.

[FN230]. *See supra* note 228. *See generally* Bice, *Standards of Judicial Review Under the Equal Protection and Due Process Clauses,* 50 S. CAL. L. REV. 689, 693-07 (1977) (discussing constitutional standards of review). When the state imposes a classification that is "suspect," that is, one based on race, alienage, or nationality, the classification will be upheld only if a "compelling state interest" is to be achieved. *See* Graham v. Richardson, 403 U.S. 365, 376 (1971). Hence, if the security of the prison allegedly requires classification based on race, the Court will subject the classification to "strict scrutiny." *See* Washington v. Lee, 390 U.S. 333, 334 (1968) (per curiam), in which the Court found de jure racial segregation of prisoners to be unconstitutional. The Court indicated, however, that "the necessities of prison security and discipline" could justify short-term racial segregation. *Id.* Lower federal courts have narrowly applied this caveat so as to prohibit prison security from becoming a ready justification for racial segregation. *See, e.g.,* Finney v. Mabry, 534 F. Supp. 1026, 1043 (E.D. Ark. 1982) ("For those individuals as to which violence is a real threat, if celled with an individual of a different race, segregation for that reason is acceptable"); Stewart v. Rhodes, 473 F. Supp. 1185, 1189 (S.D. Ohio 1979) (segregation allowed only for security and order); Mickens v. Winston, 462 F. Supp. 910, 912 (E.D. Va. 1978) (lack of funds not adequate to overcome "unconstitutional conditions of incarceration"); Holt v. Hutto, 363 F. Supp. 194, 203 (E.D. Ark. 1973) (segregation must be for real, rather than just perceived, security threat). Nevertheless, a disproportionate number of white or black inmates housed in protective custody is not per se unconstitutional. *See* Harris v. Greer, 750 F.2d 617, 619 (7th Cir. 1984): "Racial separation brought about by policies founded exclusively on a bonafide, colorblind concern for safety of prisoners in our nation's prisons does not violate the equal protection clause."

[FN231]. *See* Nadeau v. Helgemoe, 561 F.2d at 417; Lovell v. Brennan, 566 F. Supp. at 692.

[FN232]. Lyon v. Farrier, 730 F.2d at 527 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

[FN233]. MCI Advisory Bd. v. Hall, 447 F. Supp. at 405; *see* Lyon v. Farrier, 730 F.2d at 527; Cody v. Hillard, 599 F. Supp. at 1055.

[FN234]. 566 F. Supp. 672 (D. Me. 1983), *aff'd,* 728 F.2d 560 (1st Cir. 1984).

[FN235]. *Id.* at 692.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN236]. *Id.*

[FN237]. *Id.*

[FN238]. *Id.*

[FN239]. *See* Cody v. Hillard, 599 F. Supp. 1025, 1054-55 & 1054-55 n.7 (D.S.D. 1984); Calloway v. Fauver, 544 F. Supp. 584, 598-99 (D.N.J. 1982); Wojtczak v. Cuyler, 480 F. Supp. 1288, 1298-99 (E.D. Pa. 1979); United States *ex rel* Hoss v. Cuyler, 452 F. Supp. 256, 284-85 (E.D. Pa. 1978); Palmigiano v. Garrahy, 443 F. Supp. 956, 982 (D.R.I. 1977), *remanded*, 599 F.2d 17 (1st Cir. 1979), *aff'd*, 616 F.2d 598 (1st Cir.), *cert. denied,* Garrahy v. Palmigiano, 449 U.S. 839 (1980); *see also* Nadeau v. Helgemoe, 423 F. Supp. 1250, 1261-64 (D.N.H. 1976), *rev'd in relevant part,* Nadeau v. Helgemoe, 561 F.2d 411 (1st Cir. 1977) (for discussion of the First Circuit's ruling in *Nadeau*, see *infra* note 242).

[FN240]. *See* Calloway v. Fauver, 544 F. Supp. at 598; Wojtzcak v. Cuyler, 480 F. Supp. at 1303.

[FN241]. 480 F. Supp. 1288, 1304-06; *see also* Westen, *Incredible Dilemmas: Conditioning One Constitutional Right on the Forfeiture of Another,* 66 IOWA L. REV. 741 (1981) (examination of constitutional conditions). *See Generally* Note, *Unconstitutional Conditions,* 73 HARV. L. REV. 1595 (1960).

In *Wojtczak,* 480 F. Supp. 1288, the defendants argued that when the plaintiff voluntarily entered protective custody, he thereby waived any right he might have to enjoy the privileges accorded the general prison population. The court rejected this argument as a violation of the doctrine of unconstitutional conditions. *Id.* at 1305-06. Writing in 1980, one commentator contended that many courts had embraced the waiver argument, but the commentator failed to cite cases or other sources supporting her conclusion. Note, *Gay Prisoners, supra* note 23, at 1264. The opinions of two judges of the court of appeals indicate that the waiver argument has influenced courts. *See* Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 867 (4th Cir. 1975) (Butzner, J., concurring) (district court dismissed plaintiff's suit on grounds that he voluntarily entered protective custody); Breeden v. Jackson, 457 F.2d 578, 581 (4th Cir. 1972) (Craven, J., dissenting) (circuit court attached importance to plaintiff's request for protection). Courts that subsequently addressed this waiver argument have rejected it. *See* Wojtzcak v. Cuyler, 480 F. Supp. at 1304-06 (doctrine of unconstitutional conditions); MCI Advisory Bd. v. Hall, 447 F. Supp. 398, 401 (D. Mass. 1978) (protection inmates "opt between the lesser of two evils, and in no way can those inmates requesting protective custody be characterized as having exercised voluntary relinquishment of a known right to be free from . . . conditions which are intolerable and a clear violation of Eighth Amendment Standards"); Nadeau v. Helgemoe, 423 F. Supp. at 1260, *aff'd in relevant part,* 561 F.2d 411 (1st Cir. 1977) (Inmates seeking protective custody "have no real choice," electing "sterility and boredom . . . simply because the alternative option is life in a place of terror and possible death.").

[FN242]. *See* Wojtczak v. Cuyler, 480 F. Supp. at 1303; United States *ex rel.* Hoss v. Cuyler, 452 F. Supp. at 286. This interpretation of the eighth amendment ban on cruel and unusual punishments is grounded on the penological objectives test, which posits that punishments failing to promote a legitimate penal objective are unconstitutional. The penological objectives test finds its contemporary origins in several landmark capital punishment cases decided by the Supreme Court. *See* Coker v. Georgia, 433 U.S. 584, 592 (1977) (capital punishment cruel and unusual punishment if it "makes no measurable contribution to the acceptable goals of punishment"); Gregg v. Georgia, 428 U.S. 153, 183 (1976) ("The sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering."); Furman v. Georgia, 408 U.S. 238, 280 (1972) (Brennan, J., concurring) (punishment inflicts impermissible suffering when it "serves no penal purpose more effectively than a less severe punishment").

In Nadeau v. Helgemoe, 561 F.2d 411, 417 (1st Cir. 1977), the First Circuit Court of Appeals rejected the use of the penological objectives test in gauging the constitutionality of protective custody conditions, but Rhodes v.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

Chapman, 452 U.S. 337 (1981), indicates that the penological objectives test is a constitutional measure of prison conditions. Writing for the Court, Justice Powell stated, "Conditions must not involve the wanton and unnecessary infliction of pain." *Id.* at 347.

[FN243]. *See* Calloway v. Fauver, 544 F. Supp. at 598. *But see* Nadeau v. Helgemoe, 423 F. Supp. 1250, 1272 (D.N.H. 1972), *rev'd in relevant part,* 561 F.2d 411 (1st Cir. 1977), in which the court applied the penological objectives test without apparent consideration of administrative convenience and expense of achieving parity in conditions encountered in protective custody and the general prison population. On appeal, the circuit court concluded that the district court's action constituted "too austere a standard." Nadeau v. Helgemoe, 561 F.2d 411, 417 (1st Cir. 1977). The court explained that although convenience and cost cannot justify infringement of a fundamental right or use of a suspect category, the greater restrictions placed on protection inmates did not impose either infirmity. *Id.*

[FN244]. *See* Calloway v. Fauver, 544 F. Supp. at 598; Wojtczak v. Cuyler, 480 F. Supp. at 1298 ("[C]ourts should accord great deference to correctional officals' decisions about the security needs of their institutions."); United States *ex rel.* Hoss v. Cuyler, 452 F. Supp. at 285 (same).

[FN245]. 544 F. Supp. 584 (D.N.J. 1982).

[FN246]. *Id.* at 598.

[FN247]. *Id.*

[FN248]. *Id.* at 598-99.

[FN249]. *Id.* at 599.

[FN250]. *See* Cantwell v. Connecticut, 310 U.S. 296, 303 (1940) (fourteenth amendment safeguards free exercise of chosen form of belief).

[FN251]. *See, e.g.,* St. Claire v. Cuyler, 634 F.2d 109, 116 (3d Cir. 1980) (prohibition of religious head covering); Sweet v. South Carolina Dep't of Corrections, 529 F.2d 854, 863 (4th Cir. 1975) (exclusion from religious services when individual guard protection necessary); Cooper v. Pate, 382 F.2d 518, 522-23 (7th Cir. 1967) (exclusion from religious services where a high probability of repeated misconduct).

[FN252]. *See* Sweet v. South Carolina Dep't of Corrections, 529 F.2d at 863 (protective custody inmate denied right to attend religious services with general prison population); Tyler v. Rapone, 603 F. Supp. 268, 271 (E.D. Pa. 1985) (same); Wojtczak v. Cuyler, 480 F. Supp. 1288, 1300 (E.D. Pa. 1979) (same).

[FN253]. Diamond v. Thompson, 364 F. Supp. 659, 667 n.7 (M.D. Ala. 1973).

[FN254]. *See* Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam) (discrimination by state against Buddhist religion is violation of first and fourteenth amendments).

[FN255]. 603 F. Supp. 268, 271.

[FN256]. *See* Wojtczak v. Cuyler, 480 F. Supp. 1288, 1300 (E.D. Pa. 1979); *see also* Sweet v. South Carolina Dep't of Corrections, 529 F.2d 854, 864 (4th Cir. 1975) (individual religious counseling in lieu of religious services not unconstitutional deprivation).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91                                                                 Page 40

[FN257]. 480 F. Supp. 1288.

[FN258]. *Id.* at 1300.

[FN259]. *See* Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970) (state may not unreasonably restrict inmates' free exercise of religion, but has no affirmative duty to supply every inmate with choice of clergyperson).

[FN260]. *See, e.g.,* Bounds v. Smith, 430 U.S. 817, 829 (1977) (prisoners have constitutional right of access to courts); Younger v. Gilmore, 404 U.S. 15, 15 (1971) (per curiam) (prisoner access to courts is constitutional imperative), *aff'g mem.,* Gilmore v. Lynch, 319 F. Supp. 105-09 (N.D. Cal. 1970) (per curiam); Johnson v. Avery, 393 U.S. 483, 485 (1971) (prisoners' access to courts cannot be denied or impaired); Douglas v. California, 372 U.S. 353, 357-58 (1963) (indigent's right to counsel on appeals of right); *Ex parte* Cleio Hull, 312 U.S. 546, 549 (1941) (prisoner's right to petition for writ of habeas corpus).

[FN261]. 430 U.S. at 828.

[FN262]. *Id.*

[FN263]. *Id.* at 832.

[FN264]. For examples of trained individuals, see *infra* text accompanying notes 274-75.

[FN265]. *See* Nadeau v. Helgemoe, 561 F.2d 411, 418 (1st Cir. 1977) (protective custody inmates and general prison population cannot use library at same time).

[FN266]. Bounds v. Smith, 430 U.S. at 822.

[FN267]. Martino v. Carey, 563 F. Supp. 984, 1003 (D. Or. 1983); *see also* Williams v. Leeke, 584 F.2d 1336, 1339 (4th Cir. 1978) (unrealistic to expect prisoner to know in advance exactly what materials he needs), *cert. denied,* 442 U.S. 911 (1979); Johnson v. Galli, 596 F. Supp. 135, 138 (D. Nev. 1984) (same).

[FN268]. "Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate in *Bounds.*" Williams v. Leeke, 584 F.2d at 1339.

[FN269]. *See* Ramos v. Lamm, 639 F.2d 559, 583 (10th Cir. 1980) (limitations on law library accessibility to be considered in determining adequacy of library), *cert. denied,* 450 U.S. 1041 (1981); Cruz v. Hauck, 627 F.2d 710, 720 (5th Cir. 1980) (availability must be such as to allow for "meaningful legal research"); Twyman v. Crisp, 584 F.2d 352, 357 (10th Cir. 1978) (restricted access to law library is not per se denial of access to courts).

[FN270]. *See, e.g.,* Cruz v. Hauck, 627 F.2d at 720 (2-3 hours per week); Williams v. Leeke, 584 F.2d at 1340 (45-minute intervals per week); *cf.* Twyman v. Crisp, 584 F.2d 352, 358 (9th Cir. 1978) (2 hours per week sufficient when inmates permitted legal materials in their cells).

[FN271]. *See* Cruz v. Hauck, 627 F.2d at 720-21 (simple provision of books inadequate).

[FN272]. *See* Ryan, *Access to the Courts: Prisoners' Right to a Law Library,* 26 HOW. L.J. 91, 103-04 (1986) (listing materials that comprise minimally adequate prison law library).

[FN273]. *E.g.,* Tate v. Carlson, 609 F. Supp. 7, 9 (S.D.N.Y. 1984) (no sixth amendment violation when prisoner had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

competent counsel); Falzerano v. Collier, 535 F. Supp. 800, 803 (D.N.J. 1982) (state may provide trained lawyers instead of law library); Carter v. Kamka, 515 F. Supp. 825, 833 (D. Md. 1980) (same). Providing professional or quasi-professional assistance to inmates is more effective and efficient than simply opening a law library to prisoners. As the *Falzerano* court observed:

> [A]ccess to the fullest law library anywhere is a useless and meaningless gesture in terms of the great mass of prisoners. The bulk and complexity have grown to such an extent that even experienced lawyers cannot function efficiently today without the support of special tools, such as the computer research systems . . . . To expect untrained laymen to work with entirely unfamiliar books, whose content they cannot understand, may be worthy of Lewis Carroll, but hardly satisfies the substance of the constitutional duty.

Falzerano v. Collier, 535 F. Supp. at 803.

[FN274]. Bounds v. Smith, 430 U.S. 817, 831 (1977).

[FN275]. *See* Carter v. Kamka, 515 F. Supp. 825, 832 (D. Md. 1980) (prison officials must empirically test effectiveness of legal services program provided Maryland prisoners).

[FN276]. *See* Williams v. United States Dep't of Justice, 433 F.2d 958, 960 (5th Cir. 1970) (speedy adjudication required in habeas corpus cases) (citing 28 U.S.C. § 2243 (West 1971)).

[FN277]. Kendrick v. Bland, 586 F. Supp. 1536, 1551 (W.D. Ky. 1984).

[FN278]. A reporter investigating the lives of protective custody inmates commented:

> There he is likely to find that he has substituted crushing boredom for paralyzing fears. He remains in his cell nearly 24 hours a day, eating from a tray on his cot, staring at the walls and contemplating his misfortune. A few times a week he may be let out for a half-hour shower, or an hour of exercise in a securely fenced-in postage-stamp yard adjacent to his unit. In the main protective custody unit at Jackson [State Prison of Southern Michigan], the only amenity is television: rows of sets line the wall facing the cell galleries; their cacophony echoes in the cavernous hall throughout the day.

Anderson, *supra* note 1, at 10. For statistics, see *infra* note 285.

[FN279]. *See* PROTECTIVE CUSTODY, *supra* note 5, at 21 (35% of surveyed institutions provided work programs to protection inmates); *Special Management Inmate, supra* note 4, at 24 (most respondents indicated that protection inmates have less access than general population inmates to vocational training, academic education, and work).

[FN280]. *See* Hoptowit v. Ray, 682 F.2d 1237, 1254-55 (9th Cir. 1982) (idleness does not violate Constitution); Johnson v. Galli, 596 F. Supp. 135, 139 (D. Nev. 1984) (same); Capps v. Atiyeh, 559 F. Supp. 894, 908 (D. Or. 1982) (same).

[FN281]. *See* Robbins v. South, 595 F. Supp. 785, 791 (D. Mont. 1984) (no constitutional right to employment, educational, or self-improvement programs); Johnson v. Galli, 596 F. Supp. 135, 139 (D. Nev. 1983) (lack of work programs does not violate Constitution); *cf.* Wojtczak v. Cuyler, 480 F. Supp. 1288, 1302 (E.D. Pa. 1979) (applying state law, court held that idle pay given general prison population inmates must be given protection inmates).

[FN282]. *See, e.g.,* Rhodes v. Chapman, 452 U.S. 337, 349 (1981) (Constitution does not mandate comfortable prisons); Bono v. Saxbe, 620 F.2d 609, 615 (7th Cir. 1980) (lack of rehabilitation programs not cruel and unusual punishment); Newman v. State of Alabama, 559 F.2d 283 (5th Cir. 1977) (same), *rev'd in part and remanded sub nom.* Alabama v. Pugh, 438 U.S. 781, *dismissed,* 568 F.2d 204 (5th Cir. 1978); Ramos v. Lamm, 485 F. Supp. 122, 156 (D. Colo. 1979) (no constitutional right to rehabilitation), *aff'd in part, vacated in part, and remanded,* 639 F.2d 559 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91
56 U. CIN. L. Rev. 91

[FN283]. The totality of conditions approach calls for the court to aggregate the harmful effects of the entire prison environment to determine if their sum inflicts cruel and unusual punishment. *See* Holt v. Sarver, 309 F. Supp. 362, 373 (E.D. Ark. 1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971). The Supreme Court has indicated approval of the totality of conditions approach: "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

[FN284]. 443 F. Supp. 956, 970 (D.R.I. 1977), *remanded*, 599 F.2d 17 (1st Cir. 1979), *aff'd*, 616 F.2d 598 (1st Cir.), *cert. denied*, 449 U.S. 839 (1980).

[FN285]. *Id.* at 976.

[FN286]. *Id.* at 982.

[FN287]. *Id.* at 989.

[FN288]. *See, e.g.,* Touissant v. McCarthy, 597 F. Supp. 1388, 1315 (N.D. Cal. 1984) (exercise for inmates a constitutional requirement), *aff'd in part, rev'd in part, vacated in part, and remanded*, 801 F.2d 1080 (9th Cir. 1986); Ruiz v. Estelle, 503 F. Supp. 1265, 1367 (S.D. Tex. 1980) (long term confinement without recreation violates eighth amendment), *modified*, 650 F.2d 555 (5th Cir.), *aff'd in part and rev'd in part*, 666 F.2d 854 (5th Cir. 1981), *modified*, 679 F.2d 1115 (5th Cir. 1982); Hardwick v. Ault, 447 F. Supp. 116, 125 (M.D. Ga. 1978) (long term, segregated lock-up without exercise seriously harms mental health); Laaman v. Helgemoe, 437 F. Supp. 269, 309 (D.N.H. 1977) (lack of physical exercise threatens well-being); Rhem v. Malcom, 371 F. Supp. 594, 627 (S.D.N.Y. 1974) (long term confinement without exercise violates eighth amendment) (quoting Sinclair v. Henderson, 331 F. Supp. 1123, 1130-31 (E.D. La. 1971)), *aff'd in relevant part*, 507 F.2d 333 (2d Cir. 1974).

[FN289]. *See* Touissant v. McCarthy, 597 F. Supp. at 1412 (10 days); Ruiz v. Estelle, 503 F. Supp. at 1367 (3 days).

[FN290]. *See* Miller v. Carson, 401 F. Supp. 835, 893 (M.D. Fla. 1976) (exposure to fresh air most important), *aff'd in part, modified in part, and remanded*, 563 F.2d 741 (5th Cir. 1977).

[FN291]. *See* Ruiz v. Estelle, 503 F. Supp. at 1367 (need one hour of "strenuous and active physical movement").

[FN292]. 408 F. Supp. 534, 547 (N.D. Cal. 1976), *aff'd in part, modified in part, and rev'd in part*, 600 F.2d 189 (9th Cir. 1979).

[FN293]. 408 F. Supp. 869, 876-77 (M.D. Pa. 1976).

[FN294]. Touissant v. McCarthy, 597 F. Supp. 1388, 1412 (N.D. Cal. 1984), *aff'd in part, rev'd in part, vacated in part, and remanded*, 801 F.2d 1080 (9th Cir. 1986).

[FN295]. Ruiz v. Estelle, 679 F.2d 1115, 1152 (5th Cir. 1982); Miles v. Bell, 621 F. Supp. 51, 63 (D. Conn. 1985).

[FN296]. 679 F.2d at 1151-52.

[FN297]. *Id.*

[FN298]. Schembri, *The Victim and the Criminal Justice System*, in VICTIMS AND SOCIETY 348, 354-58 (E. Viano ed. 1976).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN299]. For discussion of causes of prison violence, see *supra* note 9.

[FN300]. For cases showing hardships encountered by protection inmates, see *supra* note 222.

[FN301]. Cressey, *Forward* to J. IRWIN, *supra* note 11, at vii-viii; *see* D. ROTHMAN, CONSCIENCE AND CONVENIENCE: THE ASYLUM AND ITS ALTERNATIVES IN PROGRESSIVE AMERICA 152 (1980) (inadequate and unrealistic prison rules turned prisons into "places of pervasive brutality").

[FN302]. J. CONRAD & S. DINITZ, *supra* note 4, at 123.

[FN303]. Not until the late 1960s did federal courts begin to repudiate the hands-off doctrine and thus open the prison to the restraints of the Bill of Rights. *See supra* text accompanying notes 21-22.

[FN304]. Richard Cloward observes that custodians and inmate elites reached certain adaptive, unofficial agreements. In exchange for assistance in maintaining order, custodians accomodated the inmate elites by providing them with goods and services, information, and status. Cloward, *Social Control in Prison*, in THE SOCIOLOGY OF CORRECTIONS 110, 122-27 (R. Leger & J. Stratton eds. 1977); *see also, e.g.,* McCleery, *The Government Process and Informal Social Control*, in THE PRISON: STUDIES IN INSTITUTIONAL ORGANIZATION AND CHANGE 149, 153-57 (D. Cressey ed. 1961) (cooperation between guards and inmates for their mutual benefit); Sykes, *The Corruption of Authority and Rehabilitation*, 34 SOC. FORCES 257 (1956) (same).

[FN305]. Gresham Sykes in his landmark study of a maximum security prison observed that inmates suffer a number of deprivations: (1) the loss of liberty; (2) the deprivation of autonomy; (3) the scarcity of goods and services; (4) the absence of heterosexual relationships; (5) and diminished security from criminal victimization. G. SYKES, THE SOCIETY OF CAPTIVES 53-83 (1958). As a functional response to these deprivations, argued Sykes, there evolved an inmate code consisting of five major tenets: (1) do not interfere with the interests of other inmates; (2) do not quarrel with other inmates; (3) do not take advantage of other inmates; (4) do not complain about prison life; and (5) do not accord respect to the prison staff. *Id.*

[FN306]. J. CONRAD & S. DINITZ, *supra* note 4, at 122.

[FN307]. For examples of these rights, see *supra* note 22.

[FN308]. *See* R. JOHNSON, HARD TIME 45 (1987).

[FN309]. *See* J. CONRAD & S. DINITZ, *supra* note 4, at 123.

[FN310]. Engel & Rothman, *supra* note 16, at 430-33; *see also* Note, *Bargaining in Correctional Institutions: Restructuring the Relation Between the Inmate and the Prison Authority*, 81 YALE L.J. 726, 732-33 (1972) (judicial intervention curtailed administrative discretion, encouraged inmates to challenge institutional solidarity, and diminished time and resources available for maintaining order).

[FN311]. Engel & Rothman, *supra* note 16, at 433.

[FN312]. *See supra* note 92 and accompanying text.

[FN313]. *See* Anderson, *supra* note 1, at 9-10. "It's easier to let the predator run around than to lock up the guy who needs protection, and many administrators are willing to take that course." *Id.* (quoting Charles Fenton, consultant to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Massachusetts Department of Correction).

[FN314]. For comparison of procedural safeguards, see *supra* note 199 and accompanying text.

[FN315]. *See supra* note 222 and accompanying text.

[FN316]. *See supra* notes 233 & 242 and accompanying text.

[FN317]. United States v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938); *see also* Ball, dicial Protection of Powerless Minorities, *59 IOWA L. REV. 1059, 1071 (1974) ("It is true that the Court's duties and the dictates of authority comprehend more than protection of minorities. Also, the judiciary is not the only branch of government which is to be constitutionally conscientious. But the Court is the seat of the national authority, and the protection of minorities is integral to the content as well as the exercise of that authority.") (footnote omitted).* See generally *San-dalow,* Judicial Protection of Minorities, *75 MICH. L. REV. 1162 (1977) (judicial activism in protecting minorities vs. power of majority in democratic society).*

[FN318]. *See* Robertson, *Federal Courts and Prison Reform,* CASE & COMMENT, July-Aug. 1984, at 36, 38-39.

[FN319]. H. TOCH, *supra* note 10, at 170. In *Trop v. Dulles,* the Supreme Court held that the punishment of dena-tionalization for wartime desertion inflicted cruel and unusual punishment. 356 U.S. 86, 93-104 (1958) (plurality opinion). The Court wrote that while "no physical mistreatment" occurred, "[t]here is instead the total destruction of the individual's status in organized society." *Id. at 101.* This Article does not contend that the emasculation of the protective custody inmate also imposes cruel and unusual punishment, but it does argue that the injury is severe and analogous to denationalization in that both harms constitute significant deprivations of status.

[FN320]. *See* PROTECTIVE CUSTODY, *supra* note 5, at 16 (average length of stay for protective custody inmates is 281 days in contrast to 62 days for administrative segregation inmates and 57 days for disciplinary detention inmates).

[FN321]. *See supra* note 222 and accompanying text.

[FN322]. The segregation of protection inmates and the resulting restrictions are justified only when undertaken to safeguard vulnerable offenders. *See supra* notes 233 & 242.

[FN323]. *See supra* notes 35-61 and accompanying text.

[FN324]. *See generally* Wormuth & Mirkin, *The Doctrine of Reasonable Alternative,* 9 UTAH L. REV. 254, 254-57 (1964) (when legislative power and individual rights conflict, government need choose least restrictive means to accomplish objective); Zlotnick, *First Do No Harm, Least Restrictive Alternative Analysis and the Right of Mental Patients to Refuse Treatment,* 83 W. VA. L. REV. 375, 384-91 (1981) (history of least restrictive means alternative doctrine); Note, *The Least Restrictive Alternative in Constitutional Adjudication: An Analysis, a Justification, and Some Criteria,* 27 VAND. L. REV. 971, 972-16 (1974) (least restrictive means alternative doctrine applied).

[FN325]. Zlotnick, *supra* note 324, at 381 (footnote omitted).

[FN326]. *See Special Management Inmate, supra* note 4, at 40-45.

[FN327]. *See id.* at 47.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

56 UCINLR 91                                                                                                    Page 45
56 U. CIN. L. Rev. 91

[FN328]. *See id.*

[FN329]. The American Correctional Association also recommends that programs enjoyed by the general prison population should be available to protection inmates. *See* PROTECTIVE CUSTODY *supra* note 5, at 34. Whereas some prison administrators believe that protective custody housing should be sufficiently uncomfortable as to deter its use by inmates, the isolation and stigma experienced by protection inmates should alone dissuade potential candidates. *See Special Management Inmate, supra* note 4, at 48.

[FN330]. 459 U.S. 460, 476 & 477 n.9 (1983).

[FN331]. *See* Friendly, *supra* note 165, at 1292 ("[N]ecessity for justification is a powerful preventive of wrong decisions."); Rabin, *Job Security and Due Process: Monitoring Administrative Discretion Through a Reasons Requirement,* 44 U. CHI. L. REV. 60, 79 (1976) ("[T]he core safeguard against arbitrariness is the right to meaningful explanation.").

56 U. CIN. L. Rev. 91

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.