UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| DAVID LEE JACKSON, | ) | |
| *Movant,* | ) | |
| | ) | |
| v. | ) | CASE NO. 1:09-CV-01039-RC |
| | ) | (Judge Clark) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| *Respondent.* | ) | |

---

**Petitioner David Lee Jackson's Renewed Motion for Leave to Compel Production of
Records In the Custody of the United States Bureau of Prisons**

---

LA2:916742.4

**MOTION**

David Lee Jackson, by undersigned counsel, respectfully moves the Court to compel certain discovery, as set forth in detail below.  The materials sought include Bureau of Prisons ("BOP") records pertaining to the death of Daryl Brown on December 16, 1999, records related to Mr. Jackson's incarceration showing his limited capacity and ineligibility for capital punishment, records related to the false testimony of government witnesses at trial, and records showing both the substantial violence and inadequate procedures at USP Beaumont in the years before it was downgraded to a medium security institution.  This discovery is authorized by Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6").  The requested discovery is "reasonably fashioned to elicit facts necessary to help the court dispose of" Mr. Jackson's petition under 28 U.S.C. § 2255 "as law and justice require."  *See Harris v. Nelson*, 394 U.S. 286, 290 (1969).

## I.    MEMORANDUM OF LAW

Under Habeas Rule 6(a), "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  "Good cause" for discovery in habeas proceedings exists "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . .'" *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris*, 394 U.S. at 300).

A petitioner seeking discovery need not establish a prima facie case or that he will ultimately prevail on the merits of the claim prior to seeking discovery.  *Bracy*, 520 U.S. at 908. Rather, as the Fifth Circuit explained, "[w]hile the district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is 'indispensable to a fair, rounded, development of the material facts." *East v. Scott*, 55 F.3d 996, 1001 (5th Cir. 1995) (internal citations omitted).  For example, it is often the case that prior to discovery, the evidence needed to prove a claim is only accessible by the prosecutor.  *Id.* at 1002 (finding the district court abused its discretion in denying discovery

1

to a habeas petitioner where the evidence that could shed light on the claim was accessible only to the district attorney).

Pursuant to Rule 6(a), the BOP should be ordered to produce the following materials to Mr. Jackson:

### A.    Physical Evidence and Records Related to the December 16, 1999 Death of Daryl Brown

Mr. Jackson's trial counsel was ineffective in presenting his case during both the guilt and penalty phases of trial, as discussed in Claims 4 and 5 of Mr. Jackson's petition.  Unlike in later capital representations in which Mr. Jackson's trial counsel retained prison experts to explain to the jury the uniquely violent conditions at USP Beaumont, and sought discovery from the Bureau of Prisons regarding USP Beaumont protocols and the offense, such as *United States v. Snarr*, 1:09-CR-0015, in this trial Mr. Jackson's counsel failed to seek any relevant discovery from the Bureau of Prisons.[1]  The only files contained in trial counsels' records were Mr. Jackson's personal records, obtained by the mitigation specialist, Pamela Stites.  As the prison expert retained by post-conviction counsel has noted, "[t]here should be a great deal more investigative material … there is a glaring lack of reports concerning the investigation itself and any follow-up reviews of the incident."  *See* Declaration of Mark Bezy ¶ 3 (attached as Exhibit J to the concurrently filed Declaration of Christopher Craig).

The BOP should be ordered to produce to Mr. Jackson all materials created by the Bureau of Prisons in relation to the death of Daryl Brown on December 16, 1999.  This includes the following:

---

[1]    Although trial counsels' efforts were unsuccessful in *Snarr*, that failure does not show that BOP records would have been immaterial in Mr. Jackson's case.  In *Snarr*, Mr. Jackson's trial counsel represented inmates who assaulted and stabbed two guards and broke into a secure cell in the USP Beaumont Special Housing Unit ("SHU"), stabbing and killing another inmate in protective custody.  Under those facts, prison records were far less likely to sway a jury that the conditions at USP Beaumont lessened the defendants' culpability.  Here, however, the evidence showed—and the jury agreed—that Daryl Brown attacked Mr. Jackson first.  Due to trial counsel's ineffectiveness, however, the jury was given the picture that Mr. Jackson was a kingpin and perpetrator of much of the violence and illicit activity that occurred at USP Beaumont, rather than its victim.

1.     Any and all security camera video tapes, including any available audio recordings, made at USP Beaumont on Thursday, December 16, 1999, between and including 1700 Hours and 1900 hours Central Standard Time, as well as an inventory of all security cameras existing at that time.

2.     Any and all After Action reports or Board of Inquiry reports related to the December 16, 1999 incident, pursuant to Program Statement ("PS") 1210.21, all 583s and "shots" related to the incident, as well as any investigative report, Regional Inquiry Team Report, Local Inquiry Team Report, or any after action report conducted at USP Beaumont due to this incident and local response to include the corrective action plan to the recommendations.  Also, all documents, records, working papers or personal records created by members of the Boards or Teams.

3.     The results of any and all drug and alcohol testing, pursuant to PS 6590.07, conducted in response to the incident.

4.     Any and all records regarding weapons related to the incident, pursuant to PS 5521.05.

5.     Logbooks and any other records recording inmate and staff movements within USP Beaumont on December 16, 1999.

6.     All mass interview forms/sheets conducted after the incident.

7.     All documentation created and maintained by the SIS office of this incident, to include the materials required on SIS Inmate Investigation File Check List, i.e. inmate profile and inmate incident reports and final DHO report. Posted Picture File, STG file and AIMS information for the inmates, both victim and subject.

8.     All investigators notes of any and all inmate interviews conducted regarding this incident.

9.      Any and all other reports, statements, memoranda, correspondence, meeting notes, or any other documents of any kind related to the December 16, 1999 incident.

As explained in Mr. Jackson's petition for relief, due to ineffectiveness by trial counsel in investigating and presenting its case during the guilt phase of trial, the jury received an incomplete picture of the night that Mr. Brown died. Security tapes at the time of the incident should provide direct video footage of the area where the attack began. In the absence of such footage, an inventory of all security cameras existing at the time of the incident should offer some explanation of why a maximum security prison had no video coverage of substantial part of its grounds, preventing Mr. Jackson from conclusively establishing that it was Mr. Brown who first attacked him with a knife. Documents produced contemporaneously to the incident, such as After Action reports, Board of Inquiry reports, 583s, "shots," weapons reports pursuant to Program Statement ("PS") 5521.05, and any other reports, statements, correspondence or memoranda related to the incident, will reveal the observations of BOP personnel at the time of the incident, which were not investigated or presented by Mr. Jackson's trial counsel. The few records that exist in the records of trial counsel suggest that in 1999, the BOP had no evidence that Mr. Jackson pulled a knife first. At the time of the incident, therefore Mr. Jackson appeared far less culpable than was later presented by the government to the jury seven years later at trial.

### B.      Records Pertaining to Mr. Jackson's Incarceration

These file will further confirm, in support of Claims 4 and 5, that trial counsel's ineffectiveness painted a false picture to the jury of Mr. Jackson's role at USP Beaumont. Rather than an inmate running prison facilities, manning shops, and leading a Vegas-style sports book, Mr. Jackson's Central File will show that he had a low-level job at Unicor, and on occasion took $2 and $5 bets from other inmates on football games. To this end, the Bureau of Prisons should also be ordered to produce copies of the following materials:

10.     The Inmate Central File for Mr. Jackson, pursuant to PS 5800.11. This also known as Mr. Jackson's "Sentry" File.

11.     All inmate job descriptions for inmates assigned to Unicor at the time of the incident.

12.     Copies of all staff position/job descriptions for all staff members assigned to Unicor at the time of the incident.

These materials will show that trial counsel ineffectively allowed Mr. Jackson to be presented to the jury as a prison kingpin, in contradiction to available facts, and to Mr. Jackson's great detriment at sentencing.

**C.     ADX Education Records**

In a similar vein, the Bureau of Prisons should be ordered to produce all copies of all education programs and classes offered at the ADX facility in Florence, Colorado, during the time of Jackson's incarceration at that institution.  Current records suggest that Mr. Jackson participated in some programming at that institution, and such records will further show Mr. Jackson's limited capacity and culpability, supporting that that Mr. Jackson is mentally retarded, and therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), as well as further supporting his ineffectiveness claims.  Specifically, these materials will show that the programs offered at ADX required no participation from Mr. Jackson, and that anyone could have completed these classes.

**D.     Materials Relating to Officer Testimony at Trial**

As described in Claim 9, the prosecution elicited false testimony from multiple witnesses, at minimum from Officer Raymond Chopane and Counselor Michael Mattes.  Trial counsel was additionally ineffective in failing to uncover the materials that would have exposed these false statements.  First, in order to shed light on the false testimony of Counselor Mattes, the BOP should be compelled to provide the following:

13.     Copies of the video tape and the supporting memorandums of the confrontation avoidance intervention conducted on February 24, 2000, by Michael Mattes in the Special Housing Unit ("SHU").

14. Logbooks and any other records recording inmate and staff movements within USP Beaumont on February 24, 2000.

15. Logbooks and any other records recording inmate and staff movements within the Special Housing Unit at USP Beaumont during the month of February, 2000.

16. The training record of the Acting SIA at the time of the purported February 24, 2000 conversation between Counselor Mattes and Mr. Jackson.

17. Special Housing Review Reports, including but not limited to Form BP-A295, for USP Beaumont between and including October 1, 1999 and February 29, 2000.

The Government argued at trial that Mr. Jackson requested to speak with Counselor Mattes in the SHU on February 24, 2000. (Tr. 670.) During the ensuing conversation, Mr. Jackson purportedly made numerous threats against inmate Harold "Pop" Jones. (*Id*.) As detailed in Claim 9, Mr. Jones—first contacted only by Mr. Jackson's current counsel—has declared that Mr. Jackson never threatened him in any way. *See* Declaration of Harold "Pop" Jones ¶¶ 4, 6–8 (attached as Exhibit I to the Craig Decl.) As prison expert and former warden Mark Bezy noted in his declaration, submitted with Mr. Jackson's petition, "[t]he whole scenario is hard to imagine." Bezy Decl., ¶ 11 (Craig Decl., Ex. J). Were Counselor Mattes testifying truthfully about this episode, a death threat from an inmate being investigated for homicide should have triggered a confrontation avoidance intervention. Records in the custody of the Bureau of Prisons will show that the testimony of Counselor Mattes was false. Effective trial counsel should have sought such records prior to trial, but at minimum such records should be produced now. Logbooks and other records should establish whether Counselor Mattes came to the SHU on February 24, 2000, or whether anyone else may have visited Mr. Jackson that could have witnessed his purported agitation about his crowded cell. Logbooks and program files from surrounding days will show that Mr. Jackson did not regularly interact with Counselor Mattes, and indeed may never have done so, further undermining the strained claim that Mr. Jackson summoned prison staff for the purpose of making a death threat. The training record of the Acting SIA at the time of the purported incident will establish what efforts the SHU at USP

Beaumont to establish inmate safety.  Special Housing Review reports will establish the standard practices in the SHU leading up to, and at the time of, the purported incident.  Collectively, these records are likely to show that proper protocol was ignored, and that either USP Beaumont was grossly negligent in failing to follow protocol, or that Mr. Jackson never made the purported threat.

Similar records are also necessary with respect to the false testimony of Officer Chopane. In addition, because the false statements of Officer Chopane and Counselor Mattes also raise the issue of the credibility of the other Officers testifying at trial, the BOP should also be compelled to provide:

18. Daily duty logs showing present and absent correctional officers at USP Beaumont between and including December 1, 1999 and December 31, 1999.

19. Daily duty logs showing present and absent staff, inclusive of all positions, at USP Beaumont between and including December 1, 1999 and December 31, 1999.

20. All logs, reports, and other daily or weekly compilations produced by USP Beaumont staff in the course of their duties between and including December 1, 1999 and December 31, 1999.

21. The certified documents including curriculum vitae, demonstrating each correctional officer's training, experience, and qualifications.

22. All available files and records concerning BOP employees Nick Pasao, Scott Wilson, Michael Mattes, Kelvin Tims, David Kappaeris, Danny Wilhite, Gary Vann, Stephen Rice, Jason Marten, Joel Rogalsky, Raymond Chopane, and Larry Devereaux, during the period when such individuals were working at USP Beaumont.

As the limited available records cited in the petition show, statements provided to the BOP and the FBI in the immediate aftermath of the incident on December 16, 1999 reveal that Officer Chopane was out of position at the time of the offense, when he should have been

guarding the entrance to Unit 3-B-1.  As detailed in Claim 9, no other Officer providing a statement at the time of the incident even noted Officer Chopane's presence.  Staff rosters, duty logs, and other log books in the possession of the BOP will clarify Officer Chopane's location on the date of the incident, as well as the positions of other Officers who may have seen Officer Chopane at the time of the incident, or witnessed the incident itself.  Logbooks from the days preceding and following the incident will establish the standard practices around the time of the incident, and reveal whether the purported placements of officers at the time of the incident was unusual or suspicious.  Personnel files on the testifying correctional officers are vital in assessing the credibility of Counselor Mattes, as well as Officer Chopane and the other testifying correctional officers, as the petition makes clear that several of the testifying officers gave testimony at trial that contradicted or even refuted their initial statements at the time of the incident.

Lastly, after receipt and review of the above materials, Mr. Jackson seeks:

23.    Leave to subpoena Counselor Mattes and Officer Chopane for appearance at depositions.

Neither witness was effectively cross-examined by trial counsel, despite numerous inconsistencies that were clear even within the limited records obtained prior to trial.

**E.    Materials Relating to Conditions at USP Beaumont**

Evidence from the Bureau of Prisons will also establish additional penalty phase facts about Mr. Jackson's limited culpability when reacting in the environment at USP Beaumont and his limited role in that institution that should have been uncovered at trial, but was not obtained here due to the ineffectiveness of trial counsel at the penalty phase, as shown in Claim 5.  For one, such evidence will undermine the government's argument during the penalty phase that Mr. Jackson presented a future danger.  AUSA Jim Jenkins, for example, in his last line in closing arguments during the penalty phase, argued "now it's time to give the prison community a chance, the guards a chance, the press workers and other inmates a chance not to be victimized by the defendant."  (Tr. 1889:16–18.)  The records from the Bureau of Prisons will provide not

only a comprehensive look at Mr. Jackson's record during his incarceration, but also the culpability of the BOP in failing to maintain a safe institution. Under 18 U.S.C. § 3592(a)(8), in determining whether a death sentence is justified, the finder of fact "shall consider … any other circumstance of the offense that mitigate[s] against imposition of the death sentence." The pervasive, violent conditions at USP Beaumont were notorious, and extended far beyond the crime for which Mr. Jackson is on death row. Five of the fifty-nine male inmates on Federal death row are there for homicides committed at USP Beaumont. Public records confirm that USP Beaumont was so dangerous and unmanageable an institution that its maximum security prisoners were removed and the prison reclassified to a medium security institution in 2008. *See* Ryan Myers, <u>Hardcore Cons Move Out</u>, *Beaumont Enterprise* (Apr. 6, 2008) (*available at* http://www.beaumontenterprise.com/ news/hardcore_cons_move_out_06-24-2008_16_32_55.html). The conditions at Beaumont, if presented by effective trial counsel, would have served as mitigating evidence to put Mr. Jackson's crime in the context of an institution where inmates had to defend themselves from constant violence. As such, evidence regarding the 1999 crime, as well as other materials regarding USP Beaumont in the custody of the Bureau of Prisons, will further demonstrate the validity of Claim 5 of the petition.

To establish the violent history and conditions at USP Beaumont, the BOP should be ordered to produce copies of the following materials:

24. The Institution Character Profile report, pursuant to PS 1070.08, conducted of USP Beaumont at the time of the incident, as well as any other Institutional Character reports relating to USP Beaumont from January 1, 1996 through December 31, 2006.

25. All formal and informal materials and investigative materials maintained by the SIS/SIA office at the Beaumont Complex regarding inmate Jackson and inmate Brown and their actions while housed at USP Beaumont.

26. Any and all reports, statements, memoranda, correspondence, meeting notes, or any other documents, related to the reclassification of USP Beaumont from a high- to a medium-security FCC institution in 2008.

27. Any and all records related to the Administrative Remedy Program at the Beaumont facilities, pursuant to PS 1330.16, between January 1, 1999 and December 31, 2006.

28. Any and all reports, statements, memoranda, correspondence, meeting notes, or any other documents, including after action reports or board of inquiry reports, as well as all 583s and "shots," related to assaults or other violent incidents, whether involving inmates or staff, at USP Beaumont between and including January 1, 1999 and December 31, 2006.

29. Any and all reports, statements, memoranda, correspondence, meeting notes, or any other documents, including after action reports or board of inquiry reports, as well as all 583s and "shots", related to weapons possession at USP Beaumont between and including January 1, 1999 and December 31, 2006.

30. Any and all complaints, grievances, and other documents regarding USP Beaumont filed by any employees' union or other group of organized labor, with any level of the Federal Bureau of Prisons, between and including January 1, 1996, and December 31, 2006.

Institutional Character reports are rarely compiled, so the production of these reports from the time of the opening of USP Beaumont to the time of Mr. Jackson's trial will not be cumbersome. Although the remaining materials are more voluminous, Mr. Jackson and his prison expert, Mr. Bezy, expect that this discovery will show that USP Beaumont was an institution with inadequate staff, poor training, and excessive violence, largely left in the hands of the inmates rather than prison staff. The institution never functioned safely and effectively, and the Bureau of Prisons ultimately transferred USP Beaumont's high-security prisoners and downgraded the institution because of the unremitting violence. Moreover, these have already

LA2:916742.4                                    10

been requested from the Bureau of Prisons under the Freedom of Information Act. As detailed in Mr. Jackson's pre-petition discovery motion, these materials have already been collected, and are in the office of Larry Collins at the South Central Regional Office of the Federal Bureau of Prisons, 4211 Cedar Springs Road, Suite 300, Dallas, Texas 75219. As such, the burden on the Government to produce these materials now will be slight, and but for the dilatory response of the BOP to a proper FOIA request, would already be in the possession of habeas counsel.

### F. *Brady* Materials

Finally, as described in Claim 10, significant physical evidence appears to be missing in the case, including surveillance videos from the beginning of the fight, blood and other evidence from Daryl Brown, and several articles of clothing. The Bureau of Prisons should be required to search for and provide any other security tapes, audio recordings, drug and alcohol tests, and other *Brady* materials described in Claim 10 of the petition, and not otherwise enumerated herein.

## II.   CONCLUSION

For the foregoing reasons, Mr. Jackson respectfully requests that this Court grant leave for counsel to propound a *subpoena duces tecum* compelling the production by the Bureau of Prisons of the materials by no later than January 31, 2011.

Dated: December 8, 2010                         RESPECTFULLY SUBMITTED,


                                            _____/s/ Steven H. Bergman_____

STEVEN J. OLSON (Cal Bar #182240)
STEVEN H. BERGMAN (Cal Bar #180542)     JAMES C. LOHMAN (Fl Bar #0570214)
O'MELVENY & MYERS LLP                    1806 East 39th Street
400 S. Hope St.                          Austin, TX 78722
Los Angeles, CA 90071

                                         Attorneys for Defendant/Petitioner
                                         DAVID LEE JACKSON

## CERTIFICATE OF CONFERENCE

This motion is opposed, and filed in accordance with the "meet and confer" requirement of L.R. CV-7(h), pursuant to a conversation between Steven H. Bergman, undersigned counsel for Mr. Jackson, and Assistant United States Attorneys Kerry Klintworth on December 1, 2010.

/s/ *Steven H. Bergman*
Steven H. Bergman

LA2:916742.4