# EXHIBIT J

<u>Declaration of Mark A. Bezy</u>

I, Mark A Bezy, declare as follows:

1.    I live in Queen Creek, Arizona. I am retired from the Federal Bureau of Prisons. I worked for BOP for approximately twenty-eight years. I started as a correctional officer in 1978. I became a Lieutenant in 1983 and a Captain in 1988. From 1995 to 1999, I was Correctional Services Administrator at the North Central Regional Office in Kansas City, Kansas. From 1999 to 2002, I was the Assistant Warden at U.S. Penitentiary in Leavenworth, Kansas. From 2002 to 2004, I was the Chief Executive Officer (Warden) at Elkton, Ohio. From 2004 to 2006, I was C.E.O. of the Federal Correctional Complex in Terre Haute, Indiana. From 2006 to 2008, I was the Warden of a 1,000 bed privately-managed sex offender prison in Florence, Arizona. From 2008 to 2009, I worked as a consultant for Creative Corrections, LLC, based in Beaumont, Texas.

2.    At the request of counsel for David Lee Jackson, I have reviewed a number of materials pertaining to Mr. Jackson's homicide case, including: the BOP investigation of the homicide; Mr. Jackson's BOP file and institutional record; portions of Mr. Jackson's 2006 trial; declarations of Harold Jones, Darrell Evans and Reginald Carr; and a surveillance video of the end of the homicide incident at USP Beaumont in December, 1999.

3.    Based on my review of the above listed materials, I am struck by the absence of information concerning the investigation of the homicide of Daryl Brown. It is my understanding that the investigative material provided to me is all that was made available to trial counsel and subsequently to current counsel. There should be a great

deal more investigative material than what has been produced to counsel.  For example, there is a glaring lack of reports concerning the investigation itself and any follow-up reviews of the incident.

4.    Additionally, in my experience, the lead investigative agency in a prison homicide is the Federal Bureau of Investigation.  In this case, from what I can tell, the FBI was very much in the background and the investigation was mostly the work of BOP. This is highly unusual given the severity of the incident.

5.    It is routine after an incident of this severity to interview every inmate in the institution about what they saw or knew about the incident.  These are known as "mass interviews."  In this particular case, there were large numbers of inmates close to the events, both in the yard where the incident began and inside the unit where the surveillance video shows a number of inmates present in the area at the time.  All of these inmates should have been interviewed, and reports of the interviews should be available, or at least referred to, in the report of the investigation.  In this case there are very few statements from inmates despite the proximity of so many inmates to the events in question and the fact that the incident occurred during a period of "movement" when there would be the largest number of inmates in the yard and moving from one place to another within the prison.  Given the seriousness of this incident, there should have been many interviews with inmates conducted, yet there is no record of them that I am aware of.

6.     Normally, after a major incident, especially a homicide, the BOP conducts an extensive review of the incident to determine the causes and to make thorough recommendations for preventing the recurrence of such incidents in the future. It is sound correctional policy after an incident of this nature to determine exactly what happened and why. The natural question is: "will there be more incidents?" These reviews are called "After Action" reviews or "Board of Inquiry" reports and they are normally done after a prison homicide. Typically, such reviews would be initiated by the Director of the BOP or the Regional Director and would be conducted by a team of individuals from outside the institution to provide greater objectivity and integrity to the review. It is normal protocol to look into causal factors for the incident and make recommendations for institutional corrective measures. Here, too, I see no reference to any such effort, which I find to be remarkable.

7.     With regard to the incident itself, based on the descriptions of how the incident began, it appears that Mr. Brown initially assumed a posture of aggression when he took off his shirt and called out to Mr. Jackson on the yard. Without getting into the issue of who was armed and who was not at the outset, by initiating the confrontation in that manner, Mr. Brown was clearly drawing a line in the sand and saying "we have something to resolve." In a prison, when such an incident occurs, it is not over until the staff takes control of the situation. The staff did not have control of this situation until after Mr. Brown emerged from the cell with a knife in his hand and was subdued by

3

officers. There are even contradictory reports as to whether Mr. Brown dropped the knife or had it taken from him.

8. Inmates have a right to protect themselves from other inmates, and I would advise prisoners of that. Mr. Jackson's response to the initial confrontation was to defend himself. In prison, if you do not fight back you are labeled as weak and you can become a permanent victim. Within the prison community, a prisoner has to maintain a reputation with his peers. Once branded as weak, he is doomed to spend his time looking over his shoulder and/or he may consigned to protective custody. This is seen by the vast majority of prisoners as an unacceptable fate. In addition, facing an attack from someone like Mr. Brown, even to disarm him does not end the matter because there is always the possibility that he has another weapon somewhere or can easily obtain one and it is only a matter of time until he attacks again perhaps when it is unexpected or when the person attacked is in a more vulnerable position.

9. It is reported in the trial testimony, the declarations and even in the BOP investigation that Mr. Brown was often drunk and some witnesses described him as appearing to be drunk at the time of the incident. Intoxicated prisoners are a very serious danger to staff and other prisoners.

10. I have reviewed Mr. Jackson's institutional record and disciplinary history. In my capacity as Correctional Services Administrator at the North Central Regional Office, I administered the disciplinary transfer program and reviewed some 4,000 cases. I have also reviewed thousands of other inmate files in the course of making

classification decisions and recommendations. While Mr. Jackson has certainly had some disciplinary problems through the years, he appears to me to be someone who could be managed and who was capable of extended periods without incident. He has a proven capacity for adjusting himself and working his way out of disciplinary restrictions and back into open population and less restrictive custody. There are very many prisoners within BOP with comparable institutional profiles to that of Mr. Jackson. Prior to the instant homicide, his record was no different from literally thousands of others and was by no means exceptional.

11.     I have also reviewed testimony and declarations pertaining to an incident in which Mr. Jackson was reported by a staff member to have made verbal threats concerning the placement of another inmate in his cell in the special housing unit (SHU) at Beaumont roughly two months after the homicide. Frankly, the whole episode makes absolutely no sense from an institutional management standpoint. As an initial matter, you have three or four prisoners in a two-man SHU cell. This is in and of itself problematic and inappropriate. Additionally, one of the inmates in this overcrowded cell is under investigation for killing another prisoner two months earlier. That is contrary to sound correctional practice. Indeed, in my experience it would be extraordinary to house anyone in a cell with an individual who was under investigation for homicide. Then, notwithstanding these apparently poor management practices, yet another prisoner is brought to the cell. The whole scenario is hard to imagine.

5

12.    Finally, I have reviewed the testimony of Mr. Jackson at his trial. Based on my thirty years in prisons as a line officer all the way up to Warden, his testimony as to his accomplishments and position within USP Beaumont appears to me to be delusional. There is absolutely no way that he "ran" the UNICOR operation as he claimed. Prisoners do not "run" UNICOR, especially a prisoner with a record like Mr. Jackson's who has only been in that particular prison for several months. There is nothing about him that would make him suitable for the high level position of responsibility that he described, essentially having total operating control over a factory. The functions he described such as ordering and receiving materials and supplies are generally performed by free world employees or by inmate clerks who have limited office responsibilities and who have no authority or control over another prisoner.

13.    At the time of Mr. Jackson's penalty phase in November of 2006, there were any number of experts in prisons who could have been called to testify on the issues addressed in this declaration.

14.    The opinions I have expressed are based on a lifetime of experience in this field and my observations are based on correctional principles and policy that are part of the stated mission of the Bureau of Prisons and that are consistent with generally

accepted practices of sound correctional management.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of September, 2010, in Queen Creek, Arizona.

Mark A. Bezy

State of Arizona _____
County of Pinal _____
On this 28th day of September, 20___, before me
personally appeared Mark A Bezy ,
whose identity was proved to me on the basis of satisfactory evidence
to be the person whose name is subscribed to this document, and who
acknowledged that he/she signed the above/attached document.

_____ M Cochennic
Notary Public

NOTARY PUBLIC
STATE OF ARIZONA
Pinal County
EILEEN M COCHENNIC
My Commission Expires 09/30/13

7