1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DAVID LEE JACKSON                | DOCKET 1:09CV1039
                                 |
                                 | JANUARY 20, 2011
VS.                              |
                                 | 2:09 P.M.
                                 |
UNITED STATES OF AMERICA  | BEAUMONT, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 36

REPORTER'S TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE RON CLARK
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------

FOR THE PLAINTIFF:          STEVEN J. OLSON (BY TELEPHONE)
                            STEVEN H. BERGMAN (BY TELEPHONE)
                            O'MELVENY & MYERS
                            400 SOUTH HOPE STREET
                            LOS ANGELES, CALIFORNIA  90071

                            JAMES C. LOHMAN (BY TELEPHONE)
                            ATORNEY AT LAW
                            1806 E. 39TH STREET
                            AUSTIN, TX 78722


FOR THE DEFENDANT:          KERRY M. KLINTWORTH
                            U.S. ATTORNEY'S OFFICE
                            350 MAGNOLIA AVENUE
                            SUITE 150
                            BEAUMONT, TEXAS  77701


IN ATTENDANCE:              DOUGLAS M. BARLOW
                            ATTORNEY AT LAW
                            485 MILAM
                            BEAUMONT, TEXAS   77701

Christina L. Bickham, RMR, CRR
409/654-2891

COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RMR
                         FEDERAL OFFICIAL REPORTER
                         300 WILLOW, SUITE 221
                         BEAUMONT, TEXAS   77701


  PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
 TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

(REPORTER'S NOTES 1-20-2011\JACKSON,

2:09 P.M., THURSDAY, 01/20/2011, BEAUMONT, TEXAS,

HON. RON CLARK PRESIDING)

(OPEN COURT, MS. KLINTWORTH IS NOT PRESENT, ALL OTHER PARTIES PRESENT BY TELEPHONE)

THE COURT:  Okay.  This is Judge Clark; and I'm calling *Jackson versus USA*, 1:09cv1039.

All right.  Who do we have on the phone for Mr. Jackson?

MR. OLSON:  Your Honor, this is Steve Olson with O'Melveny & Myers.

THE COURT:  Okay.

MR. BERGMAN:  Good afternoon, your Honor. Steven Bergman also from O'Melveny & Myers.

THE COURT:  Are you in the same office there or on different phones?

MR. BERGMAN:  We are on different phones, your Honor.

(Ms. Klintworth enters the courtroom.)

THE COURT:  Okay.

MR. LOHMAN:  And James Lohman.  I'm on a different phone as well, and I'm actually in New York City at the moment.

THE COURT:  Okay.  Well, I didn't expect you to be in the same office with the O'Melveny & Myers

people; but it would be possible that they are just down the hall from each other or something.

Okay.  Anyone else, then, here on behalf of Mr. Jackson?

UNIDENTIFIED SPEAKER:  No.

THE COURT:  Okay.  We also have Mr. Barlow who is in the courtroom.

Would you step up to one of the microphones so that the people on the phone can hear you, maybe there at the podium or --

MR. BARLOW:  Yes, your Honor.  I'm Doug Barlow.  I'm here, having been summoned by the court.

THE COURT:  Okay.  And we also have for the government?

MS. KLINTWORTH:  Kerry Klintworth for the United States, your Honor.

THE COURT:  All right.  It's very important for those in the court to speak right into a microphone like I'm doing so people on the phone can hear you, and it will be very important that people on the phone say their name first so that the court reporter will know who you are when we have something in here.

I have before me the Government's Motion For Extension of Time to Respond to Claim 2 of the Petition For Collateral Relief.  And what caused me some concern

Christina L. Bickham, RMR, CRR
409/654-2891

was an indication in here -- and this is in paragraph 2 -- (reading) on today's date the undersigned -- namely, Ms. Klintworth -- spoke with Douglas Barlow and was advised that neither his case files from Jackson's criminal conviction nor those of co-counsel Robert Morrow have been returned to them from petitioner's attorney and that he would need to review both of them and the case files before he would be able to complete an affidavit.

Now, at an *ex parte* hearing -- which the government was not present; so, they wouldn't know this, but I was -- the transcript indicates Mr. Barlow saying, (Reading) my complete file has been turned over to current counsel for Mr. Jackson.  I think they have everything.  I no longer have my file.  They did send me CDs that is supposed to contain everything in my file, but I'm not sure it does.  I think Mr. Morrow did the same thing.

And I'm a little concerned over this alleged problem that, gee, nobody knows where these files are. We've had this come up before that -- let me put it this way.  If I didn't know Mr. Barlow and I didn't know Ms. Klintworth and I didn't know some of the people involved in this case and the reputation of O'Melveny & Myers, I'd almost get the impression that everybody is

playing, "Oh, I don't have the files" in order to delay.

UNIDENTIFIED SPEAKER:  Your Honor --

THE COURT:  And, so, supposedly there were CDs and we talked about that a long time ago and now Mr. Barlow is saying he doesn't have anything.  What I want to do is get straightened out once and for all, since evidently the government thinks Mr. Barlow is going to be necessary and -- does he have CDs or not?  Were they provided?  Were these things copied?

My guess is that Mr. Lohman and Mr. Olson -- one of you has the original files, and one of you probably has a CD copy or something.  Is there some way we could solve this problem?

Let me start off with -- who just spoke?  Is that Mr. Olson?

MR. OLSON:  Yes, your Honor.  It's Mr. Olson.  And I would like to try to help your Honor and, for that matter, Mr. Barlow and the government in getting to the bottom of this.

We sent to Mr. Barlow, on March 9th and June 10th, copies of the files on a CD, on a disk.  So, he has everything.

THE COURT:  Okay.

MR. LOHMAN:  Your Honor, this is James Lohman if I may just add something to that.

THE COURT:  I'm sorry.  James who?

MR. LOHMAN:  Lohman.

THE COURT:  Okay.

MR. LOHMAN:  There isn't any mystery or confusion or uncertainty about where the actual files are.  The original files are well secured at the O'Melveny office in Los Angeles.

THE COURT:  Okay.  Good.

All right.  Then, Mr. Barlow and Ms. Klintworth, what is it that needs to be -- that he doesn't have or says he -- I mean, what don't you have? What are you asking him for that he thinks he doesn't have?  What's going on here?

MR. BARLOW:  I can respond.

THE COURT:  Okay.

MR. BARLOW:  The brief knowledge that I have, your Honor -- as I recall, I related in that previous *ex parte* hearing that I believe the CDs that they sent me are not in the form that my files were originally in; and I think those CDs did not contain some of the materials that are inside the files.

For example, I have copies of a file that will have perhaps an expert's name on it but not the contents of that manilla folder.  So, I think it's incomplete.  I haven't gone through every of the thousands of pages; but

8

at least the order I tried to pull it up in to assist me in another capital case, it appears that it's not the complete file.

Since that time there have been some emails back and forth where Mr. Morrow and myself have had contact with counsel for Mr. Jackson and told him that we need our files back. I know Mr. Morrow has done that, also; and we've been told that we will be getting those files back. That's happened over the past months or weeks, but I still haven't gotten anything. And that's really been the extent of my involvement, I think, since the last time we --

THE COURT: All right. I'm not sure why at this point you would need the original files. I could see appellate counsel needing them more than you.

But I would like counsel to work this out to the extent that Mr. Barlow is going to continue to be involved in all of this -- whether it's a copy on disk or whatever, he needs to be able to get to it -- because we can't constantly keep delaying because people are saying they don't have files.

All right. Now, as to the motion itself, I'm a little concerned about the fact that in November I put out the order as to the government would respond on this mental retardation issue and then in January we get this

Telephone Conference

9

motion for limited unsealing, just shortly before the hearing; and then right before the hearing, namely on the 19th -- I'm sorry -- right before the deadline of the 21st, on the 19th I get a motion for extension of time based on, "Oh, gee, nothing has been done. We can't do anything. We can't respond."

I realize that it seems to be the pattern in death penalty cases that both sides get endless extensions and delays. This is the first one I've had with the U.S. Government. The state Attorney General's Office and whoever's handling those cases, it's almost like a mutual agreement that 120-day delays will be just granted as of rote.

Just so everybody knows, I'm not interested in that. I don't want endless delays. If the government really thinks this is important enough to go for something as serious as the death penalty, then the government needs to put in the resources to get it done.

I understand, of course, that defense counsel want the delays; and to them, that's a victory. Every month or year you keep it going, you're winning. So, I don't -- I guess I can't in good conscience hold that against you since that's probably a tactic. But just so you know, I'm not happy with that.

But from the government's point of view, I

10

want you to move forward on these things.  All right?
This is, I guess, the first time this has come up; so,
enough said on that.

I do want to clear up, though, a question that
I have; and at this point I guess -- is there anything
else that we need to clear up, so as to not take up
Mr. Barlow's time, from the government's point of view,
about him and the files or what you need from him?  I
signed the order allowing the unsealing.  Do you think
that will be enough, that he can look at the petition and
the exhibits and give you -- or is that enough
information, do you think, or --

MS. KLINTWORTH:  He is going to need his file
because everything about this mental retardation are
things that the government never was privy to.  So, he
is -- clearly he needs to see what the allegations are in
the exhibits.  But then once he looks at that, he's going
to need to look at his files; and I'm in hopes that he
will have documents that he will be able to provide me so
I can be responsive at least as to the ineffective
assistance of counsel claim.

THE COURT:  Okay.

MS. KLINTWORTH:  And those don't exist
anywhere but defense counsel.

THE COURT:  All right.

Telephone Conference

11

MS. KLINTWORTH:  Other than that, I'm, you know, basically prepared to do the response.  I think once he's had an opportunity to review the petition, the exhibits, and his documents and get me an affidavit, I'm thinking within two days I'm ready.

THE COURT:  All right.  Okay.  Mr. Olson, if -- and again I realize it's a problem since I think you think you've sent these already.  But perhaps you could confer with Mr. Barlow, maybe looking at -- or maybe you want to send the files back.  But I can see why, Mr. Lohman and Mr. Olson, you don't want to actually get rid of the originals right now.

Would it be possible perhaps to confer with Mr. Barlow and Mr. Barlow -- I mean, either direct him to where on these disks these things are or maybe make a copy of the ones that pertain to the mental retardation?  From what I've seen of the file, there wasn't a whole lot of work that was done.  You had the expert who did some review, and she might have testified on mitigation or something or maybe --

MR. BARLOW:  We had several experts, some of which we used at trial and some that we did not use at trial.

THE COURT:  Okay.

MR. BARLOW:  And I was privy to that

Christina L. Bickham, RMR, CRR
409/654-2891

Telephone Conference

12

information, but Mr. Morrow was also privy to some of that information.  We probably have different notes in our files.

THE COURT:  All right.  Well, to the extent that that's going to become important, Mr. Olson, if you could -- or your partner -- if you could perhaps confer with Mr. Barlow and let's get that straightened out.  I'm not hearing that the entire file necessarily has to be gone through like that but at least that dealing with the mental retardation.  So, perhaps that might be one way of solving that particular problem so that we can move forward.

Other than that, any question or concern that would need Mr. Barlow here, from counsel for Mr. Jackson?

MR. OLSON:  Your Honor, this is Mr. Olson.  We have -- first of all, on the issue of working with Mr. Barlow, we will certainly work with Mr. Barlow to make sure to walk him through what we've provided him and to make sure that he has the complete copies of his files.  That's not a problem.  We will certainly do that.

To answer your question about whether Mr. Barlow's further presence is necessary, having said that, I don't think so from our perspective.

THE COURT:  All right.  Again, I'm sorry to drag you into this; but it seems to be you're --

Christina L. Bickham, RMR, CRR
409/654-2891

13

MR. BARLOW:  No problem.

THE COURT:  -- everybody's favorite witness so far.  So, you're excused at this time.

MR. BARLOW:  I guess I'm handy is the reason.

THE COURT:  Yeah.

MR. BARLOW:  Your Honor, may I make one inquiry?

THE COURT:  Sure.

MR. BARLOW:  Have I been directed to provide an affidavit yet?  That's what's happened in past cases and --

THE COURT:  No one's asked me to direct you to do anything so far.

Do you want me to direct him to draft an --

MS. KLINTWORTH:  If that is necessary.  I assumed that once he sees it's an ineffective assistance claim, that he would do that.  But I would like him to provide not only to this claim 2, mental retardation, but also to the rest of the petition -- I would like both him and Mr. Morrow to assist the government in providing affidavits or copies of documents that are responsive to the allegations in the petition.

THE COURT:  Okay.  Keep in mind that there is a little problem with asking counsel for Mr. Jackson to, quote, assist, end quote, the government because that's

14

not his job.  His job is to represent his client, or his former client.  He can be required, I guess, to provide information but -- and it is a ticklish, I would gather, position to be in.  No lawyer wants to have the label of "ineffective counsel" on him.  On the other hand, no lawyer wants to see his client be executed, even if it's a former client.  So, we want to be very careful about using words like "assist" or even "requiring assistance."

Mr. Barlow, what kind of direction would you want?

MR. BARLOW:  In the past, your Honor, I've just been served with directives by the court directing me to file a factual affidavit about what I actually did in the case in response to allegations of ineffective assistance of counsel; and that's not assisting other than it may assist the court in providing information.

THE COURT:  All right.  Any problem with that from your point of view, Mr. Olson or Mr. -- let me start with Mr. Olson, and then I'll go to Mr. Lohman.

MR. OLSON:  Your Honor, this is Mr. Olson. Our understanding from your Honor's order is that you have put the *Atkins* case first and foremost --

THE COURT:  Yes.

MR. OLSON:  -- and stayed the ineffective case.

15

THE COURT:  Yes.

MR. OLSON:  So, I guess we're struggling to understand why it is that Mr. Barlow would need to be providing an affidavit at this stage in connection with the *Atkins* claim.

THE COURT:  Well, I'm going to --

MR. OLSON:  And I don't --

THE COURT:  I'm going to deal -- okay. Mr. Lohman, *[sic]* I will deal with that issue; and that will determine what kind of affidavits that I would direct or what kind of information I would direct Mr. Barlow to provide.  You're jumping ahead of an issue we'll deal with later, but I don't think we need to have Mr. Barlow hang around the court while we talk over that legal issue.

But to the extent that some factual information is needed from him, is there any problem from you with the court directing him to provide a factual affidavit as to what he did about Issue X or Issue Y?

MR. OLSON:  No, your Honor, not from Mr. Olson.

But let me, while Mr. Barlow is in the courtroom, express our general concern about the preservation of the attorney-client privilege.  And it just seemed to us from the government's filing that there

16

may have been conversations and communications between the government and Mr. Barlow or between the government and Mr. Morrow and those, of course, would be of great concern for us and we would ask your Honor to remind Mr. Barlow that those communications should not take place without us knowing about it.  And we do have concerns about, you know, any sort of informal discovery methods that may be going on here because we don't think that's proper.

THE COURT:  Well, I'm not gathering that there was informal discovery.  I'm gathering the government asked him for an affidavit and he says, "I don't have my files."

MR. BARLOW:  Actually I can clear that up, your Honor.

THE COURT:  Yeah.

MR. BARLOW:  The government hasn't actually asked me for anything.  We haven't had any discussions in that regard at all.  I only spoke to them briefly several days ago that's referred to in their motion about -- and I've said to respond to anything, I would need to read the allegations and I'd need my file.  That's been the extent of our conversation.

MR. LOHMAN:  Your Honor?

THE COURT:  Yes.

MR. LOHMAN:  James Lohman here.  I'd like to make a couple of points.

First of all, just for the record, I would like the court to be aware that Mr. Barlow and Mr. Morrow have already been provided with the 2255 petition by us several weeks ago.  So, even though your Honor has ordered it unsealed so that the government can go ahead and provide those, we've already provided those.  They've been reading those petitions for the last two weeks; so, I just wanted the court to know that.

Secondly, I think on this point of discovery, informal discovery or however one wants to characterize that, Ms. Klintworth referred earlier to obtaining documents from Mr. Barlow from his file; and I think that may be what Mr. Olson is referring to there.  We would strenuously object to that occurring.  I mean, these are highly privileged materials and if anything is even going to be considered along those lines, that would come under Rule 6 of discovery and we would -- it would be our position that any provision of documents to the government would have to be regarded as court-supervised discovery process.  And we would kind of shudder at the thought of the trial lawyers just kind of willy-nilly forking over documents from Mr. Jackson's file to the government.

THE COURT:  Okay.  I didn't hear anything about Mr. Barlow providing documents from his files to the government.  What I heard was Ms. Klintworth saying she wanted to give copies of the exhibits attached to the petition to Mr. Barlow and Mr. Barlow saying that before he could provide any kind of a factual affidavit, he actually had to look at the files.  So far, based on what I've said, I'm not seeing the problem.

I understand that you want to cover every possible contingency; but for what it's worth, the government is not to try to obtain copies of Mr. Barlow's file, which I'm sure they know.  Mr. Barlow isn't going to hand over copies of documents from his file to the government without court order, which I'm sure he knows.  And Mr. Olson has already said he'll talk with Mr. Barlow to be sure that Mr. Barlow can obtain access to the factual information he might need to provide a factual affidavit as to what he actually did.

Okay.  Anything else, then, from Mr. Olson that is needed from Mr. Barlow or in reference to Mr. Barlow?

MR. OLSON:  No, your Honor.

THE COURT:  Okay.  Mr. Lohman?

MR. LOHMAN:  No, sir.

THE COURT:  Okay.  Mr. Barlow -- I'm sorry?

Telephone Conference

19

MR. BARLOW:  May I point out one thing, your Honor?

THE COURT:  Sure.

MR. BARLOW:  I think counsel for Mr. Jackson just may be mistaken.  I have not seen and have not been provided a copy of the 2255 petition.  It's my understanding -- until I just heard the court speak saying that it's been unsealed -- that it's been sealed to this point, and I haven't been provided a copy of it and have not read it.

I did receive a brief summary several months ago, I believe, from one of the counsel that just listed topics; but it wasn't in any type of useful information form that I could --

THE COURT:  Okay.

MR. BARLOW:  But I haven't seen it.

THE COURT:  All right.  Well, it will be unsealed; and the government can provide that to you. Obviously it's only unsealed for purposes in this case, and obviously neither you -- and I guess I'll need to mention this to -- or make this clear to Mr. Morrow; although, I'm sure he knows.  It's not to be published or handed around for any other reason.

MR. BARLOW:  I understand that, your Honor.

THE COURT:  Okay.  Thank you.

Christina L. Bickham, RMR, CRR
409/654-2891

Telephone Conference

20

MR. BARLOW:  Thank you, your Honor.

THE COURT:  You're excused, sir.

MR. BARLOW:  Thank you.

(Mr. Barlow exits the courtroom.)

THE COURT:  Now to get back to the point -- I think Mr. Lohman started to bring this up, on this *Atkins* issue --

MR. LOHMAN:  (Indiscernible.)

THE COURT:  I'm sorry?

MR. LOHMAN:  Mr. Olson actually brought that up.

THE COURT:  Okay, Mr. Olson.

From the government's point of view -- and you, you know, have a deadline here.  The first thing that I'm very interested in is -- because I don't think there is a precise case on point, and it's really more of a legal issue than anything Mr. Barlow can provide.  At some point in the case, it became clear and there was information that there was an IQ test of Mr. Jackson before the age of 18 -- I think actually in fourth grade -- at a level of 67 and other information in his file indicating that by the time he was reaching high school, he was operating at a second grade level.

Under *Atkins*, which refers to the standard -- or requires or refers to or says we should use the

Christina L. Bickham, RMR, CRR
409/654-2891

Telephone Conference

21

standard texts dealing with psychology by the associations in this country, an IQ test under 70 and deficits such as that might be one, operating at a second grade level when you're in high school, manifesting themselves before age 18 are indicative of mental retardation.  And, in fact, unless there is some evidence of that, I think it might be very hard for a court to find mental retardation.  So, you've got what might be called a "*prima fascia* case."  It's not exactly that but at least some indication of here's a serious issue.

I understand that there was another IQ test that might have been a little higher, maybe above 70, back before he was 18.  But the problem comes down -- and maybe -- I mean, this will be the legal issue.  *Atkins* says we don't execute people who are mentally retarded. The definition of "mentally retarded" is aimed at manifestation before the age of 18.

Nobody -- even with that in the record, nobody asked the judge to decide the *Atkins* issue.  There was no decision made.  Not by defendants, not by the government. I'm not sure that can be waived.  I think the Supreme Court says we don't execute people like that.  And, so, at some point it appears to me that that's the first thing I've got to decide is do I need to have an *Atkins* hearing at all or is there some point of law that says,

"Oh, no, that's a waivable thing.  They didn't bring it up.  They lost it."

The way I've analogized it up until now is it's kind of like age.  If you're under the age of 17 or whatever when you commit the crime, we don't execute you, even though by the time you go to trial you might be 21 or whatever.  I mean, I think -- I may be misstating that, but I think that's true.  Mental retardation is something that is or isn't -- or a finding can be made.  I don't know if it is or isn't.  That's argued by the experts.

So, in terms of where we go next and in terms of managing the costs in this case and focusing on one issue that almost has to be addressed, before we spend a lot of time on discovery and responses and so forth, I'd like to have the government address do they agree or not agree that I have to have an *Atkins* hearing before we can go -- you know, regardless.  And I'm not asking you necessarily to say "yes" or "no" right now, but that's what I'm -- if you're prepared to, fine.  But that's the issue that I'm first looking at.

MS. KLINTWORTH:  And you're absolutely correct.  That has been my focus.  And unless I'm surprised as to what defense counsel tells me, I'm assuming -- looking at what we do know and then what is

Telephone Conference

23

in the petition as related to this, I suspect that is probably the safest thing to do is for us to request that we have an expert do an evaluation of Mr. Jackson as to mental retardation and then have a full hearing on it as though we were in the beginning of a death penalty case, because you're absolutely right.  If the court makes a determination that he is mentally retarded, then that changes the whole game.  The death penalty is gone at that point, and we would be looking at whatever else is remaining in the petition that would be applicable.

THE COURT:  Well, obviously if I was to decide he was retarded, the death penalty is gone; but the question is because nobody made that decision and, in fact, neither side -- I don't even know whether we're really dealing with ineffectiveness of counsel analysis. The government didn't ask for it.  The trial counsel -- defense counsel didn't ask for it.  The court didn't pick up on it.  Nobody did it.

And isn't that almost something that has to be done when -- and I'm not going to say that in every single case.  But in a case where you've got that kind of a below 70 IQ test plus some problems with adaptive functioning, depending on which expert and which term you use, all of it manifesting before 18 -- does the government see a way around the court having to decide

Telephone Conference

24

it?

I mean, obviously I could ignore it and the Fifth Circuit could ignore it and then we're up to the Supreme Court and they're looking at it saying, "Wait a minute. We thought we told you in *Atkins* to deal with this issue."

It appears to me it's that kind of issue. Is there any -- well, I'll start off with Mr. Olson. Do you see it any different? I mean, is it something that needs to be dealt with regardless of the other things?

MR. OLSON: This is Mr. Olson, your Honor. I would agree that it needs to be dealt with, and I think the court has analyzed it exactly right. I would take issue, though, with the government's suggested procedure for dealing with that. And our central point here would be it's the defendant's condition before the age of 18 that your Honor has emphasized here, and you're right. And, so, it would seem to us that any expert analysis obtained at this point would be of very little value. He is certainly well beyond the age of 18.

THE COURT: Well, in the cases that deal with this and the ones I've handled, I mean, frequently there is very little information from 18. And before 18 isn't the be-all and end-all. It is -- the requirements indicate that there must be manifestation before 18. I

Christina L. Bickham, RMR, CRR
409/654-2891

25

don't think I've seen a case that precisely -- or, for that matter, a psychological study that indicates, well, there are some problems or deficits before 18 but clearly after the age of 18, no, it wasn't mentally retarded it was X or Y or something else.  I don't know if that's possible.

I don't know if they talk about cure of mental retardation or remission of mental retardation or, "No, that might have indicated it; but in reality it was something else."  And, so, I wouldn't, I don't think, willy-nilly up-front say, "No.  No examination of what he is now," although clearly the authorities indicate that some focus has to be given, as you gave, on what went on before he was 18.

So, you'd have to have some pretty strong authority on the idea that the only evidence to be looked at was prior to 18 before a decision is made.  I mean, if you've got it, fine.  I'll be glad to look at it.  But I've not seen that particular -- any kind of ruling or authority or even anything from the field of psychology or psychiatry that says we look at nothing after the age of 18.  I mean, do you have some authority for that proposition?

MR. OLSON:  Your Honor, we'd like the opportunity to at least brief that.  I'm not prepared on

Telephone Conference

26

this call to cite the authority to you now.

THE COURT:  Okay.  Was that Mr. Olson?

MR. OLSON:  Sorry.  That was Mr. Olson.

THE COURT:  Okay.  You can take a look at that.  But I can tell you I am somewhat familiar with the field, and I have not seen that.  I mean, it's something that's passed through my mind.  It was just the idea of could you have these manifestations earlier and then turn out later on that, oh, no, it was due to something else; that wasn't really retardation.

And my guess is most experts who are honest will tell you, yeah, that's conceivable.  So, unless something pretty powerful came up, I would be likely to grant the government's request if we were going to get to the hearing stage.  But I guess more -- what I would first be interested in from the government is -- or are you already willing to concede that we are that far?  I mean, I suppose there could be a waiver argument.  Are you thinking that, "Oh, no, this is all waived.  Don't even need to worry about it.  We don't need a hearing at all"?  I mean, what's your position there?

MS. KLINTWORTH:  I think we need to do what's justice; and if the defendant really is mentally retarded, then we certainly should not be assessing the death penalty.  I think we need to take the high road on

these things.

I don't believe he's mentally retarded; but I certainly think -- based upon the evidence that's available to the court to make that decision, I think it's lacking in giving you the full scope and -- and I'm assuming we're going to end up with dueling experts, as we would in any case.

THE COURT:  Okay.  So, you're -- and I guess to cut through it, you don't -- because one thing I would have proposed is first I'd like to hear from you as to if you -- all right.  So, you think that what we need to do is go forward, let you start preparing the *Atkins* response and then put that all together and then I decide whether there's going to be a hearing or whether I can decide it on the papers.

And obviously if it's going forward to a full *Atkins* determination, my guess is the Supreme Court is not too interested in judges reading a few papers and making a determination like that without ever setting eyes on the person.  That would be unusual.

Or are you anticipating looking at the papers and saying, "No, actually this was well covered at trial and it was waived" or "It's too late" or "By statute it's barred" or something like that?

MS. KLINTWORTH:  Based upon what was in the

petition regarding the defense experts that the trial counsel had, I will be surprised if I come to that conclusion that it's waived or whatever.  I'm guessing that once we have an opportunity to talk to Mr. Barlow and Mr. Morrow, that I'm going to come to the conclusion that we need to take the high road and actually request the court to have an *Atkins* hearing to give us an opportunity to have our own expert and then actually come to court and make that determination before we move forward.

THE COURT:  All right.  Okay.  Mr. Olson, any response to that?

MR. OLSON:  No, your Honor, other than we would, you know, like the opportunity to address the process.  But I don't -- we have no issue with the way your Honor has set out the order of things with the *Atkins* first, and I think that makes absolute sense.

THE COURT:  All right.  Well, obviously one of the issues will be -- because, like I say, I have not seen it authoritatively decided.  But almost every hearing I've read about or been involved in or heard about, there is evidence from the experts to their examination after 18, especially -- I mean, in a lot of cases it's very hard to find information on what they were like before 18 -- in fact you, yourselves, have had

29

to go through some difficult investigative efforts to find that out -- and, so, the experts are almost forced to rely on current examination.  But if you find that white horse authority, sure, bring it up.

All right.  Mr. Lohman, any --

MR. LOHMAN:  This is Mr. Lohman.

THE COURT:  Yeah.

MR. LOHMAN:  It's basically what's described in the profession and the literature as a "retrospective assessment."  And because -- and unique really to this *Atkins* context where, you know, you have a subject or a patient that is in many cases 40 or 50 years old and it's decades after he was 18, decades in many cases after the offense, it becomes necessary almost unique to the *Atkins* contest to make this so-called "retrospective diagnosis."

At that point basically you just have to use whatever is available, and that includes interviewing people ideally who did know the person before 18.  In some cases that is very difficult to find.  Fortunately in our case we were able to find a lot of people who could speak to his functioning before the age of 18, as is presented in the appendix.

But you're exactly right.  I mean, it is difficult to do this retrospective assessment; but there are ways to do so.

Telephone Conference

30

THE COURT:  Right.  But I guess the question I was discussing with Mr. Olson, is there any authority for the proposition that an expert simply may not rely on today's testing or observation in any way, shape, or form or, for that matter, discussions with people who knew him at the age of 25 in any way, shape, or form?

I'm not talking about weight now.  I'm talking about, "No, that's completely out of the picture.  Has to be done prior to 18."

I don't think that's the case.  I mean, Mr. Lohman, if you have some authority to the contrary, let's hear it.

MR. LOHMAN:  As Mr. Olson said, I don't really have any at my fingertips today; but we'll certainly be looking into that issue.  But I think you're right. There is -- as you point out, the weight issue is a whole separate issue and -- which is also a part of the calculation.

THE COURT:  All right.  Well, I'm familiar with the idea of weighting.  I don't -- providing weight and -- weighting and weight -- evaluating these based on when the testing and the observations were done, of course.  But I think the government should be allowed to have someone talk with him, examine him, examine the evidence; and then I'll listen to whatever the testimony

Telephone Conference

31

is.

All right.  Any questions, then -- and as I've said in my order, what I want both sides to do, partly as a cost- and time-saving measure, is hold up on other activity because this may wind up mooting the whole case; or it may not.  I mean, if it doesn't, then we can move forward.  And I realize that would wind up being some delay, but this is an awful -- I mean, a very serious issue.  And allowing counsel to focus just on that, as complicated as it is, would seem to be helpful both to the government and to defendant.

Any objection to that approach, from the government?

MS. KLINTWORTH:  No, your Honor.

THE COURT:  And from defendant?  I'm sorry --

MR. OLSON:  No, your Honor.

THE COURT:  I'm sorry, from Mr. Jackson, not defendant.  From Mr. Jackson?

MR. OLSON:  No, your Honor.

THE COURT:  And that was Mr. Olson?

MR. OLSON:  Yes.

THE COURT:  Okay.  All right.  In that case, then, I've got a little bit of a discussion I need to have with counsel for Mr. Jackson regarding fees and fee requests; and probably that needs to be *ex parte*.  So, if

Telephone Conference

32

there is no objection, Ms. Klintworth, unless you have something else that would be helpful to be discussed at this time, I'll go ahead and excuse you.

MS. KLINTWORTH:  Judge, based upon this conversation, the claim 2 was twofold.  It was is the defendant mentally retarded and were the lawyers ineffective for not raising that.  Do you want me to forego right now the ineffective and just simply concentrate on making a decision internally as to whether or not we're going to request the hearing?

THE COURT:  Well, and I guess that's the first part of the issues that I raised.  So, let me ask Mr. Olson and Mr. Lohman:  Does it really matter?  I mean, if he's -- do I really get into the ineffective assistance of counsel analysis if it turns out that we're going to have an *Atkins* hearing on this issue?

I mean, it's something that wasn't done.  But do we have to also try to prove there was some kind of ineffectiveness involved, or do we just say there is this -- what I call a "*prima fascia* case" of mental retardation?  Someone needs to decide it.  There has to be a hearing.  Let's have it done without worrying about he should have brought it up, she should have brought it up, they should have brought it up.  I mean, is there --

Let me hear from Mr. Olson.  Any need to

Telephone Conference

33

address both issues?

MR. OLSON:  This is Mr. Olson.  Your Honor, I think you're correct.  I don't think there is a need to address both issues.  I think the pure mental retardation issue can be -- the pure *Atkins* issue can be addressed first without going into the ineffective assistance of counsel for failing to raise it.

THE COURT:  Okay.

MR. OLSON:  So, I have no objection to that.

THE COURT:  Mr. Lohman, do you, in your experience, see it any differently?

MR. LOHMAN:  I would agree with that.

THE COURT:  Okay.  All right.  So, no, let's first look at whether the government -- how long do you think it's going to take on this?  Because we want to keep this moving along.  In terms of, I guess, one, are you going forward and, two, what do you need to do it.

MS. KLINTWORTH:  Once Mr. Barlow has had an opportunity to look at the files -- and assuming he's not in trial or anything, I'm guessing he's going to get back with me fairly quickly.  And I've already had about three conversations with supervisors in my office about this specific topic; so, I think we're, you know, going to be moving along very quickly, within a couple of days once we've made that determination.  And I'll simply advise

Telephone Conference

34

the court of that.

THE COURT:  Okay.  Then what I would ask you to do is within two weeks from today, two calendar weeks from today, advise the court as to whether you're going forward or not and, if so, what you -- basically a proposal of what you anticipate is needed from the government's point of view in terms of evaluation, meeting, and so forth.

MS. KLINTWORTH:  Very well.

THE COURT:  Okay?

MS. KLINTWORTH:  Thank you, your Honor.

THE COURT:  And then if necessary -- and you might talk with counsel about it.  If y'all can agree on times and terms of examinations and so forth -- my guess is an order will probably be needed for the facility holding him.  If you can agree on it, great.  If you can't, I'll decide it.  Okay?

MS. KLINTWORTH:  Very good.

THE COURT:  All right.  You're excused at this time.

MS. KLINTWORTH:  Thank you.

MR. LOHMAN:  Before we finish with that one issue, can I just raise one point?  Because I'm a little unclear, and this is Mr. Lohman.

What would be the purpose of Mr. Barlow's

Telephone Conference

35

input to the *Atkins* issue in light of the foregoing discussion we had about how it's irrespective of the ineffective assistance of counsel?

THE COURT:  Ms. Klintworth?

MS. KLINTWORTH:  Really, your Honor, it's a question of what information trial counsel may have had about the mental retardation that would explain why they did not go forward.  And whether or not they've got multiple doctors' reports -- you know, I don't know what they have; and obviously I haven't talked to Mr. Barlow. That's why I'm thinking it should be a fairly quick conversation once he's looked at the file.  But that's sort of the sum.  I'm guessing there is not going to be anything in the file and I will be requesting *Atkins*, your Honor.  I just -- I don't know.

THE COURT:  It would seem reasonable, since the issue is to decide whether or not Mr. Jackson is mentally retarded, that we get all the cards out on the table and if there are people and doctors who have examined him, that everybody knows about it.

I'm going to go ahead since -- in the context of this, I'm going to go -- I will allow her to request -- or I will direct Mr. Barlow to furnish an affidavit on what he factually did or didn't do or had or didn't have as regarded the issue of mental retardation.

36

And if there is some kind of limiting language, Mr. Olson, you think ought to be in there or you've seen used as a standard measure, you can provide that as a suggestion to the court.  But you'd want to get that in fairly quickly because we're going to go that far to get this moved along.

Does that answer the question, Mr. Lohman?

MR. LOHMAN:  Yes, sir.  I think if he addresses what's in the petition, I mean, that certainly makes all the sense in the world.

THE COURT:  Okay.  Very good.  All right.  Thank you, ma'am.  You're excused.

And if you'll hold on for just a minute, counsel.

MR. LOHMAN:  Yes, sir.

THE COURT:  We don't need to be on the record now.

(Proceedings concluded, 2:53 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, FEBRUARY 8, 2011, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

*Christina Bickham*
CHRISTINA L. BICKHAM,    CRR,    RMR

Christina L. Bickham, RMR, CRR
409/654-2891