STATE OF ARIZONA                §

COUNTY OF MARICOPA            §

AFFIDAVIT

Before me, the undersigned authority, personally appeared James D. Seward, Ph.D., who, being by me duly sworn, deposed as follows:

My name is Dr. James D. Seward.  I am over twenty one years of age, and of sound mind, capable of making this affidavit.  The facts in this affidavit are true and correct and within my personal knowledge.

1.  I received my Ph.D. in Counseling Psychology from Temple University in Philadelphia, PA. In addition, my training includes a Master of Arts in Forensic Psychology from John Jay College, where I was honored as a Distinguished Alumnus in 2000.  My primary assignment for my predoctoral psychology internship was at the Regional Forensic Psychiatric Center at Norristown State Hospital in Pennsylvania.  I completed a postdoctoral fellowship in clinical neuropsychology at the Bryn Mawr Rehabilitation Hospital.  I also completed a part time Postdoctoral Fellowship in Forensic Psychiatry at the University of Pennsylvania under the direction of Robert Sadoff, MD.  I am Board Certified in Clinical Neuropsychology by the American Board of Professional Psychology, and I am a Fellow of the National Academy of Neuropsychology.  I am licensed as a psychologist in Arizona.

2.  Since 1995, I have maintained a private practice as a forensic psychologist/neuropsychologist. I have also been employed as a neuropsychologist in Pennsylvania by the Bryn Mawr Rehabilitation Hospital and the Devereux Foundation and in Arizona by the Sun Health Research Institute and the Banner Alzheimer's Institute.  In addition, I have been employed as a forensic psychologist by the State of Delaware, and in Arizona by Maricopa County and the State of Arizona.

1

3. I have done examinations in both criminal and civil cases to appraise level of intellectual, cognitive, and adaptive functioning. I have testified in criminal, civil, and immigration matters in state and federal court.

4. In addition to the preceding, I have published and presented on issues related to neuropsychology, brain damage, forensic psychology, malingering, and mental retardation. My qualifications are fully detailed in my curriculum vitae (Exhibit A).

5. I am a neuropsychologist in The Forensic Panel, a practice of over thirty eminent physicians and forensic scientists (including forensic psychiatry, forensic psychology, and forensic neuropsychology) from different parts of the United States. The Forensic Panel was developed to provide peer-reviewed forensic consultations to courts, in order to specifically ensure the diligence needed to inform psychiatric certainty, accountability to updated standards of the sciences, and to minimize bias and safeguard objectivity. The importance of minimizing bias and of strengthening the integrity of the forensic sciences is underscored in the recent report to Congress from the National Academy of Sciences.

6. In The Forensic Panel, when someone is retained by an attorney to serve as a lead examiner or testifying expert in a criminal case and required to conduct an evaluation, the examiner must answer to peer reviewers about the nature of sources reviewed and the method in which the examination was conducted, nature of possibilities considered in the assessment, nature of questions asked and topics explored, in order to ensure the objectivity and diligence of the examination and its adherence to standards of the involved science discipline.

7. The Forensic Panel works under the precondition that we have access to all information made available by the court and that we are able to conduct examinations independent of outside interference and any concealment of relevant information.

8. The Forensic Panel has been retained by the United States District Attorney's Office, Eastern District of Texas, in Beaumont, Texas in the matter of David Lee Jackson. I have been asked to serve as The Panel's primary examiner relating to the investigation and

2

evaluation of the defendant's mental capabilities and diagnosis of Mental Retardation.

9. My understanding is that the defense is requesting to have an observer present during this evaluation. In the psychology profession such a person is referred to as a third party observer, defined by one group of commentators as "an individual whose sole purpose is to observe (and perhaps document) -- *but not affect* -- the psychological evaluation" (Otto, R. K., & Krauss, D. A. (2009). Contemplating the presence of third party observers and facilitators in psychological evaluations. *Assessment, 16*(4), 362-372., emphasis in original).

10. However, it cannot be guaranteed that the presence of such an observer <u>will not affect</u> the evaluation process in significant but unpredictable ways. Otto and Kraus summarize concerns regarding third party observers as relating to "(a) negative effects on the examinee's responses and participation, (b) interruption of the flow of information from the examinee to the examiner, (c) threats to the validity of conclusions that can be drawn from the evaluation, and (d) threats to the security (and future utility) of psychological assessment techniques and tests" (Otto, R. K., & Krauss, D. A. (2009). Contemplating the presence of third party observers and facilitators in psychological evaluations. *Assessment, 16*(4), 362-372.)

11. Similarly, a widely-referenced and respected text on neuropsychological evaluation notes, "It is not difficult to get a brain damaged patient to do poorly on a psychological examination, for the quality of the performance can be exceedingly vulnerable to external influences or changes in internal states. All an examiner need do is make these patients tired or anxious, or <u>subject them to any one of a number of distractions most people ordinarily do not even notice, and their test scores will plummet.</u>" (Lezak, M. D., Howieson, D. B., & Loring, D. W. (2004). *Neuropsychological Assessment* (4 ed.). Oxford: Oxford University Press, emphasis added)

12. Reflecting these concerns, professional organizations have issued statements on the presence of third party observers in psychological evaluations that are relevant to the matter at hand.

13. Writing in 2007, the American Psychological Association (APA) stated, "The use of uniform, standardized evaluation procedures is one of the fundamental canons upon which

3

psychological assessment and testing is founded.  Failure to adhere to requisite data gathering procedures may compromise the validity of inferences made from these observations.  Research in social psychology demonstrates that individuals' behavior frequently changes in the presence of a third party.  Therefore, there is substantial reason to suspect that the inclusion of a third party in an assessment my influence the examinee's behavior" (American Psychological Association Committee on Psychological Tests and Assessment. (2007). Statement on third party observers in psychological testing and assessment: A framework for decision making, citations omitted) (Exhibit B)

14. In addition to potentially compromising the validity of an evaluation, the presence of an observer may also compromise test security:  "With regard to test security and potential misuse of tests, the cautions that apply in allowing observation or recording of test administration are essentially the same as those that have been presented in the disclosure of test data.  These sources indicate that by creating a retrievable record of test items and responses and by making this record available to non-psychologists, the security of test materials and the copyright may be compromised.  Information contained in that record may also be subject to misuse.  For example, observers who learn the specific content of psychological tests could potentially use this information to "coach" or otherwise prepare subsequent clients" (American Psychological Association Committee on Psychological Tests and Assessment. (2007). Statement on third party observers in psychological testing and assessment: A framework for decision making, citations omitted) (Exhibit B).

15. Note that psychologists are ethically obligated to "make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with contractual obligations." (American Psychological Association (2002), Ethical Principals of Psychologists and Code of Conduct, *American Psychologist, 57*, 1060-1073).  Observation or recording of testing is incompatible with maintenance of test security.  Just as the College Board does not want high school or college students copying or recording SAT or LSAT questions, psychologists do not want specific psychological and neuropsychological test items and procedures disseminated to the legal profession or the public.  This dissemination may compromise the ability of these tests to assist the triers-of-fact in any subsequent proceedings.

4

16. The National Academy of Neuropsychology (NAN) issued an "official statement" regarding the presence of third party observers (Exhibit C). This statement indicates, in part, "The presence of a third party observer during the administration of formal test procedures is inconsistent with recommendations promulgated in The Standards for Educational and Psychological Testing (APA, 1985) and Anastasi (1988), that the psychological testing environment be distraction free. More recently, standardized test manuals (for example, The WAIS-III, WMS-III Technical Manual; The Psychological Corporation, 1977) have specifically stated that third party observers should be excluded from the examination room to keep it free from distraction. The presence of a third part observer in the testing room is also inconsistent with the requirements for standardized test administration as set forth in the APA's Ethical Principles Of Psychologists and Code of Conduct (APA, 1992) in that it creates the potential for distraction and/or interruption of the examination (McSweeney et al., 1998)" (National Academy of Neuropsychology. (2000). Presence of third party observers during neuropsychological testing. *Archives of Clinical Neuropsychology, 15*, 379-380.)

17. This document further states, "A second issue that relates to the potential influence of the presence of a third party observer is the reliance upon normative data. Neuropsychological test measures have not been standardized in the presence of an observer.... The presence of a third party observer introduces an unknown variable into the testing environment which may prevent the examinee's performance from being compared to established norms and potentially precludes valid interpretation of test results... Observer effects also extend to situations such as court reporters, attorneys, attorney representatives, viewing from behind one-way mirrors and to electronic means of observation, such as the presence of a camera which can be a significant distraction" (National Academy of Neuropsychology. (2000). Presence of third party observers during neuropsychological testing. *Archives of Clinical Neuropsychology, 15*, 379-380, references omitted).

18. In addition, "Copying test protocols, video and/or audio taping a psychological or neuropsychological evaluation for release to a non-psychologist potentially violates the Ethical Principles of Psychologists and Code of Conduct (APA, 1992; APA, 2002), by placing confidential test procedures in the public domain 2.10), and by making tests available

5

to persons unqualified to interpret them (APA, 1992; Codes 2.02, 2.06 and 2.10; APA, 2002; Codes 9.04 and 9.11)." (National Academy of Neuropsychology. (2003). Test security: An update.)

19. The Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) is a "gold standard" for the assessment of intellectual functioning. The test manual for the WAIS-IV cautions against the potentially deleterious effects of distractions, stating, "External distractions must be minimized to focus the examinee's attention on the tasks presented and not on outside sounds and sights..." The presence of an observer would constitute such an "external distraction."

20. The WAIS-IV is published by Pearson Assessments. They describe the validity of scores derived from nonstandardized administrations as "suspect," and write, "It is our opinion that the presence of a third party (audio- or videotaping or other non-standard condition) may not result in a statistically accurate or psychometrically sound scaled score. As you may know, norms for standardized tests are developed under strict conditions. If such conditions are not met, the scaled scores obtained by application of the test norms are not statistically defensible" (www.pearsonassessments.com/haiweb/Cultures/en-US/Site/general/LegalPolicies.htm, accessed May 28, 2011).

21. Pearson Assessments also maintains, "It is the position of Pearson that any copying of the tests or audio- or videotaping during test administration constitutes an infringement of the copyright and other proprietary rights..." (www.pearsonassessments.com/haiweb/Cultures/en-US/Site/general/LegalPolicies.htm, accessed May 28, 2011). Psychological Assessment Resources, another major test publisher, holds a similar position (www4.parinc.com/WebUploads/StaticPages/PhotocopyingTestMaterials.pdf, accessed May 28, 2011).

22. Therefore, in the opinion of professional organizations, supported by empirical research, and the test publishers, subjecting standardized psychological testing procedures to either direct observation or video or audio taping would operate to the detriment of the aforementioned

6

considerations. The use of a third party observer during a forensic psychological and/or neuropsychological evaluation does not meet an acceptable standard of practice and is not permissible under current professional and ethical standards.

23. Each of the assertions in this affidavit is offered without concern for the respective advocacy agendas of counsel for the defense or prosecution; specifically, I would not permit video or audio taping of psychological testing by —or in the presence of—attorneys or their representatives for either side in these legal proceedings.

24. Note that it is my intention to video and audio record the interview portion of this evaluation. Thus, the presence of an observer in the room would not add any value regarding the memorialization of this interview, and instead, as described above, would add the potentially deleterious effect of a distraction.

25. Each of the assertions in this affidavit is offered with a reasonable degree of scientific and professional certainty.

FURTHER AFFIANT SAYETH NOT

Dated June 1, 2011 in Phoenix, Arizona

James D. Seward, Ph.D., ABPP
Board Certified in Clinical Neuropsychology
American Board of Professional Psychology

RANDI GREER
Notary Public—Arizona
Maricopa County
Expires 04/30/2014

SUBSCRIBED AND SWORN TO before me
this 1 day of June, 20 11

Notary Public

7