UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| DAVID LEE JACKSON,<br>    *Petitioner,* | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO. 1:09-CV-01039-RC |
| | ) | (Judge Clark) |
| | ) | |
| UNITED STATES OF AMERICA,<br>    *Respondent.* | ) | |
| | ) | |

---

**Petitioner David Lee Jackson's Motion for Reconsideration on Recording of Government's *Atkins* Evaluation**

---

## I.   INTRODUCTION

In its June 20, 2011 Order, this Court wrote, "[a]lthough the court stated at the June 13 hearing that it was inclined to permit videotaping of the entire evaluation, for the protection of the Government expert, subsequent submissions from the Government have indicated that Dr. Seward will not administer the tests even with an unobtrusive video monitor and restrictions on who will view the video." This is defense counsel's first opportunity to research and provide the Court with full briefing on videotaping, and counsel is now aware, and seeks to bring to the Court's attention, that Dr. Seward's position appears to be unique to these proceedings. Counsel has now learned that Dr. Seward has, in fact, recorded parts of neuropsychological exams of his own accord. In

1

addition, because the Court indicated at the June 14, 2011 hearing that it was inclined to permit videotaping, and as Mr. Jackson was conceding the acceptability of videotape only as an alternative to the preferable physical presence of his counsel and/or expert, there was no opportunity to bring to this Court's attention the many courts that have ordered videotaping in order to provide a means of insuring reliability of testing and a check on potential bias or error.  In light of these new facts and law, outlined herein and previously unknown to Mr. Jackson's counsel, Mr. Jackson respectfully requests that this Court reconsider its position, and order videotaping of the Government's entire *Atkins* evaluation.

## II.    <u>FACTUAL BACKGROUND</u>

As motions for reconsideration are unusual, an overview of the concerns that necessitate observation or recording of the Government's testing is essential.

Dr. James D. Seward has been retained by the Government to perform an evaluation of Mr. Jackson.  In his prior declaration to this Court, he noted, "I am a neuropsychologist in The Forensic Panel, a practice of over thirty eminent physicians and forensic scientists."  (Seward Decl. at ¶5, Dkt. No. 98-1.)  He went on to state, "[i]n the Forensic Panel, when someone is retained by an attorney to serve as a lead examiner or testifying expert in a criminal case and required to conduct an evaluation, the examiner must answer to peer reviewers… ."  (*Id*. at ¶6.)  The bias of experts from the Forensic Panel, however, was recently criticized by another Federal District Court.  *See United States v. Shields*, No. 04-20254 (W.D. Tenn. May 11, 2009) (Dkt. No. 557) (criticizing the work of other Government experts from the Forensic Panel, and precluding the

2

Government from seeking the death penalty as to Defendant Shannon Shields on the basis of mental retardation).[1]  In particular, the Court stated, "[c]ontrary to the assertion of the Government's experts that Dr. Greiffenstein's report qualifies [as] a 'peer reviewed' assessment, the Court finds that The Forensic Panel's use of that term is misleading and that there was no 'peer review' performed that would be consistent with the generally accepted understanding of that term."  *Id*. at 7 n.3.  Mr. Jackson's counsel have concerns about Dr. Seward's partiality, which they have raised previously.  These concerns were heightened when, on May 27, 2011, Dr. Seward attempted to examine Petitioner David Lee Jackson without prior notice to Mr. Jackson, his counsel, or leave of this Court.

Moreover, although Mr. Jackson has yet to receive any discovery regarding Dr. Seward, including even his curriculum vitae, counsel has reason to doubt Dr. Seward's qualifications to conduct testing for intellectual disability/mental retardation.  On June 13, 2011, this Court held a hearing at which Mr. Jackson's counsel voiced concerns about Dr. Seward's reliability as an expert, which this Court acknowledged.  In light of these concerns, the Court indicated that it was inclined to permit non-obtrusive videotaping of Dr. Seward's evaluation of Mr. Jackson, pending further consultation with Dr. Seward.

On June 16, 2011, Dr. Seward wrote to the Court that "performing psychological testing which is videotaped, audiotaped, or otherwise observed would not serve the purposes of the Court in obtaining an assessment of the defendant's intellectual functioning that is as valid as possible, and I will not do psychological testing under these

---

[1] Attached hereto as Exhibit A.

3

conditions." Although Dr. Seward discussed tests of intellectual functioning specifically in some parts of his submissions to this Court, he claims his position on this matter is one of principle: "The use of a third party observer during a forensic psychological and/or neuropsychological evaluation does not meet an acceptable standard of practice and is not permissible under current professional and ethical standards." (Seward Decl. at ¶ 22.) Dr. Seward further asserted that these principles would hold no matter who hired him: "Each of the assertions in this affidavit is offered without concern for the respective advocacy agendas of the defense or prosecution; specifically **I would not permit video or audio taping of psychological testing by—or in the presence of—attorneys or representatives for either side in these legal proceedings**." *Id.* at ¶ 23 (emphasis added). As a result of Dr. Seward's submission, on June 20, 2011, this Court, citing no authority other than Dr. Seward, ordered that Dr. Seward's testing of Mr. Jackson not be videotaped.

Subsequent to the Court's Order, counsel for Mr. Jackson has learned that as recently as September 22, 2010, Dr. Seward was asked at a deposition, "So it's your position that recording of these three tests is permissible under the standards for administration of the tests?" He responded, "Yeah. Well, for the Wechsler memory scale, definitely, because it's in the manual. The other two tests, there's kind of a tradeoff between, I guess -- I've never seen it written down anywhere. On the other hand, I may not be able to write down everything fast enough, so there's something to be gained from the accuracy." (Seward Dep., 11:4–13, Sept. 22, 2010.) At this deposition, as will be discussed in further detail below, Dr. Seward gave several pages of testimony

indicating that he both tapes some testing of his own accord, and also gave the impression

that he is not concerned about being taped during an evaluation.  Such deposition

testimony further calls into question the reliability of Dr. Seward as an expert in these

proceedings and the permissibility of allowing his evaluation to proceed without

monitoring or an objective record of his methods that can serve as a basis for objection,

should the need arise.

## III.    **ARGUMENT**

### A.    **Dr. Seward Has Agreed to Recording in Prior Proceedings**

Again, Dr. Seward's insistence that he would refuse to conduct a taped

examination appears to be unique to these proceedings.  Only nine months ago, Dr.

Seward was not only willing to record some neuropsychological tests himself, but he did

not appear concerned as to whether the prison where he was conducting the testing might

be independently recording the proceedings.  On September 22, 2010, Dr. Seward

testified as follows (Seward Dep. 9:1-12:6, Sept. 22, 2010)[2]:

"[Dr. Seward] A. Now, generally it's not standardized to record the actual neuropsychological test, and there's some reasons for that. I can send you some references, if you would like. However, there is one test, the Wechsler memory scale abbreviated logical memory subtest, where in the manual it says something to the effect that you can, tape record this or -- I believe it recommended tape recording -- in order to capture everything. Because in that test, I would read him a paragraph, a story, and he would say it back. And sometimes if I can't write fast enough, I might lose something. The other test -- the CD, I think, was only 15 minutes long or so. The other tests were a couple measures of verbal fluency. And that's where I would say like a letter of the alphabet or a category and ask him to say back as many of the -- ask him to say as many things in one minute that were either a member of that category or began with that letter.
    Q. Okay.

---

[2] In a deposition in Scott v. Ryan, a § 2254 proceeding in the United States District Court for the District of Arizona, with the relevant portion excerpted in its entirety here, and attached to this motion as Exhibit B.  Pursuant to L.R. CV-7(b), we attach only the relevant excerpt regarding recording, but will include the entire transcript if requested.

A. Does that make sense?

Q. Uh-huh.

A. So I tend to record that, again, in case I can't write down everything fast enough.

Q. And is the -- does the manual for that test or the -- does it -- does it discuss using recording?

A. It does not. There actually is no manual I'm aware of, but I've never seen that written anywhere. I picked it up from doing research protocols.

Q. Okay. Can you tell me again, what was the test that you -- the Wechsler memory scale? Is that correct?

A. Yeah.

Q. Abbreviated?

A. Yes, sir.

Q. And that -- that and the other test that you just mentioned were the only two that you used for record -- that you recorded?

A. Actually -- actually three. Hold on a second, please. Can you tell me what page that is? I get kind of scattered.

Q. 18.

A. Okay.

Q. Took me a minute to find it also.

A. Okay. So number -- second day, number 10 and number 11, letter fluency and category fluency, those were both recorded.

Q. So those three are the only three that were recorded?

A. Yes, sir.

Q. Okay.

**A. At least by me. I can't speak to what, you know, the prison may have going unbeknownst.** [*Emphasis added*.]

Q. Right. I don't believe they do that, but -- no, that's fine. That was -- that was my question.  So it's your position that recording of these three tests is permissible under the standards for administration of the tests?

A. Yeah. Well, for the Wechsler memory scale, definitely, because it's in the manual.  The other two tests, there's kind of a trade off between, I guess -- I've never seen it written down anywhere. On the other hand, I may not be able to write down everything fast enough, so there's something to be gained from the accuracy.

Q. Okay. Okay. Would there be any professional or ethical concerns about a lawyer listening to these?

A. More I think with the Wechsler memory scale because that -- that has a specific story and the tests are normed on naive subjects, so it has a specific stimulus.  I don't see as much of a problem or maybe no problem with the letter or category fluency because you can find a description of the tests on the Internet, they're described in articles. And it's just letters or a category, animals in this case.

Q. I see. Okay. All right.

THE WITNESS: Could I get a glass of water?

6

(An off-the-record discussion ensued.)
BY MR. BURKE:
Q. Did Mr. Scott know that — for those three tests, that he was being recorded?
A. Yes, sir."

Dr. Seward should not be permitted to compromise the fairness and reliability of this Court's *Atkins* proceedings in Mr. Jackson's case by offering such a significant change in his outlook in less than a year, such that now he does not merely oppose recording, but is unwilling to proceed at all if his tests will be recorded. Defense counsel realizes that the tests at issue in this deposition may differ from the tests at issue in Mr. Jackson's evaluation, and allows that Dr. Seward notes at the beginning of this testimony, that recording is "not standardized." Nonetheless, Dr. Seward also concedes in his testimony that, where specific exam protocols do not mention recording, there is a "trade off," in recording the test—certainly a far cry from his current position that he "will not do psychological testing" if "videotaped, audiotaped, or otherwise observed." (Seward Letter, June 15, 2011.)

If Dr. Seward has specific objections to recording parts of his proposed tests today that he did not have on September 22, 2010, he should be ordered to make a specific showing for each test, supported by citations, that each specific proposed test or component of such test cannot be recorded, just as Mr. Jackson's counsel were ordered to make a specific showing in their own objections. Further, he should be ordered to disclose every instance in which he has recorded or allowed observation of psychological or neuropsychological testing, and the reasons for doing so. In particular, he should be ordered to disclose whether he has ever previously allowed videotaping while performing

7

any of the four tests he intends to administer to Mr. Jackson.  Since it is readily apparent that Dr. Seward believes that recording is permissible for at least some testing, he should also be ordered to provide reasons why, if the tests he has chosen are particularly harmed by recording, he has decided to limit his evaluation to such tests in the case of Mr. Jackson.

**B.    There Is No Consensus Against Recording Psychological Tests**

Mr. Jackson also notes that there is far from a consensus as to the harm of Third Party Observers in psychological evaluations.[3]  For example, a recent article notes that, "[i]n a recent survey of 160 forensic practitioners, approximately 75% reported having conducted a criminal forensic psychological evaluation with a third party present… ." Randy K. Otto & Daniel A. Krauss, *Contemplating the Presence of Third Party Observers and Facilitators in Psychological Evaluation*, ASSESSMENT, Dec. 2009, at 363, *available at* http://www.iapsych.com/iqmr/otto2009.pdf (59% were admittedly concerned about third party presence in this same survey—a majority, but hardly an overwhelming consensus).  Speaking in particular of the forensic context, the article notes that, "[t]o presuppose that psychologists and neuropsychologists can somehow account for the impact of the evaluation context (as evidenced by their regular use of and reliance on psychologists tests that were not developed in forensic evaluation contexts when they conduct forensic evaluations) yet that they cannot do the same when it comes to the presence of a third party is puzzling.  In other words, we think it inconsistent that

---

[3] It is exceedingly difficult for Mr. Jackson to engage in a more detailed explication of this dispute among psychologists without resources to consult additional experts.  As the Court is aware, the experts Mr. Jackson has retained have not been paid and the Court has curtailed the time for which they will be paid to prepare for Mr. Jackson's *Atkins* hearing.

psychologists who conduct forensic evaluations can argue that almost all of the tests they use—which were normed under conditions very different from those under which a forensic examinee completes them—provide valid data, but if psychologists administer these same tests in the presence of third parties not nominated by themselves, then the test data somehow become invalid." *Id.* at 368.

To date, in these proceedings, Dr. Seward has only provided a test-specific objection to recording in respect to the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS–IV"). (*See* Seward Decl. at ¶¶ 19–21.) Mr. Jackson notes, however, that all of the specific objections raised by Dr. Seward in regards to the WAIS–IV can be easily overcome by using a closed-circuit system, monitored solely by Dr. Swanson, to which Mr. Jackson is also amenable. As Dr. Swanson is also an authorized test administrator, the concerns about copyright and test security would be moot were she the sole authorized observer. As the Court has also noted, certainly the Government is capable of using non-intrusive video equipment, thereby overcoming the concern that "external distractions must be minimized...." (Seward Decl. at ¶ 19.)

Indeed, it is precisely because of the need to minimize distractions that observation or recording is so essential here, as it is certainly far easier for Dr. Seward to create distractions, suggest answers, or improperly record testing results than it is for an inert video camera or closed-circuit monitoring system to do so. In fact, such closed-circuit monitoring has been ordered in the *Atkins* context before. *See Nelson v. United States*, No. 4:04-CV-8005-FJG at 5 (W.D. Mo. May 18, 2010) (Dkt. No. 146). The *Nelson* Order also highlights the Government's inconsistencies in these proceedings, as

9

there the Government argued for both audio and video recording, citing the ABA

Criminal Mental Health Standards, which state that all Court ordered evaluations initiated

by the Government shall be recorded on audiotape or videotape, with a copy provided to

the defense attorney. *Id.* It is worth citing this standard in full:

> "(d) Recording the evaluation. All court-ordered evaluations of defendant initiated by the prosecution should be recorded on audiotape or, if possible, on videotape, and a copy of the recording should be provided promptly to the defense attorney. The defense may use the recording for any evidentiary purpose permitted by the jurisdiction. If the defense intends to use the recording at trial, it should notify the court. Upon receiving notice, the court should promptly provide to the prosecution a copy of the recording. Upon defense motion, the court may enter a protective order redacting portions of the recording before it is forwarded to the prosecution." ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS, Standard 7-3.6(d).

In prohibiting recording of Dr. Seward's evaluation, this Court is siding with a

disputed psychological standard advocated by a potentially unqualified and biased expert

over the recommendation of the American Bar Association, while preventing, by the

Court's funding orders, the ability of Mr. Jackson to seek equivalent psychological

opinions from his own experts.

### C.    Numerous Courts Have Permitted Recording

Many other Federal District Courts have ordered recording of a Government's

evaluation in capital proceedings. *See, e.g., United States v. Sampson*, 335 F.Supp.2d

166, 246–48 (D. Mass. 2004); *United States v. Johnson*, 362 F.Supp.2d 1043, 1089–90

(N.D. Iowa 2005); *United States v. O'Reilly*, 2010 WL 653188 at *4–5 (E.D. Mich. Feb.

19, 2010); *Ex Parte Brian Edward Davis*, No. 616522-E (Harris Co. D. Ct. Sept. 9, 2004)

(attached hereto as Exhibit C); *see also United States v. Minerd*, 197 F. Supp. 2d 272,

276 (W.D. Pa. 2002) (prohibiting government from audio- or video-taping its examination of the defendant absent express written consent of defense counsel).

In a recent Texas case, Mr. Daniel Plata was declared mentally retarded and his sentence reformed to life imprisonment after videotaping of a Government evaluation by Dr. George Denkowski revealed significant errors in scoring and other violations in testing protocols that would not have been captured absent video. *See Ex Parte Daniel Angel Plata*, 2008 WL 151296 (Tex. Crim. App. Jan. 16, 2008). In part as a result of the *Plata* case, Dr. Denkowski was reprimanded by the Texas State Board of Examiners of Psychologists and can no longer perform evaluations in capital cases. *See* Brandi Grissom, *Psychologist Who Cleared Death Row Inmates Is Reprimanded*, N.Y. TIMES, Apr. 14, 2011, *available at* http://www.nytimes.com/2011/04/15/us/15ttpsychologist.html.

As it currently stands, however, this Court is permitting an evaluation to go forward in which there is a strong possibility that honest mistakes will be missed and in which, even if Dr. Seward's evaluation of Mr. Jackson presents problems on the scale of those revealed by the *Plata* tapes, there will be no record of such violations of testing protocols.

### D.      Influence of Video Recording on Testing

Mr. Jackson is not retracting his position in his original moving papers that videotaping is less than ideal. Properly positioned, the presence of a defense lawyer or expert already known to Mr. Jackson would be preferable than a recording that can later be shared with an audience unknown to Mr. Jackson. Mr. Jackson has always conceded

that videotaping is not the best option.  However, the psychological research merely questioning the possible impact of observation does not outweigh the need for heightened scrutiny in capital proceedings, in which the potential taint of a biased expert or errors in testing creates far more of a risk of faulty results than third party observation.  Moreover, as we stated at the hearing, if the Court orders videotaping of the Government evaluation, Mr. Jackson will not raise an objection to the validity of the testing based solely on such videotaping.

The parties and the Court share an interest in reaching as reliable a conclusion as possible concerning Mr. Jackson's intellectual disability and possible exemption from the death penalty so as to minimize the grave risk that a mentally retarded person will be put to death in violation of the Eighth Amendment.  By comparison, procedures such as third-party observation or, in the alternative, videotaping of the psychological testing pose a minor and speculative risk of test result distortion.  Dr. Seward himself recognized as much in his deposition nine months ago.  (Seward Dep. at 11:9–13.) [4]

---

[4] In addition, and as noted above, recent funding orders have created an untenable restraint on the ability of Mr. Jackson's counsel to properly meet their adversarial duties.  This Court has authorized only 16 hours of attorney time for Mr. Lohman, Mr. Jackson's lead counsel on the *Atkins* claim, prior to the *Atkins* hearing.  Moreover, notwithstanding recent orders from this Court, Mr. Lohman still has not been paid for his work on this case in more than one year and neither of Mr. Jackson's mental health professionals have been compensated for their pre-petition work.  When faced with issues such as the Government's recent attempt to conduct a surprise examination of Mr. Jackson, Mr. Lohman has been forced to weigh whether to allow continued abuse of Mr. Jackson's rights or to perform forced pro bono work.  Similarly, while not compensating Dr. Swanson, this Court expected Mr. Jackson's counsel to consult with her on critical issues on short notice.  This inequitable funding deficit is even more prejudicial in situations such as this, where Mr. Jackson must act on short notice to address Government actions that infringe Mr. Jackson's constitutional and statutory rights.  For example, the Court was unwilling to hear Mr. Jackson's counsel on several critical issues at the June 13, 2011 hearing and then reversed itself and decided the issue of videotaping essentially on an *ex parte*

## IV.  <u>CONCLUSION</u>

For the reasons expressed above, Mr. Jackson respectfully requests that the Court

order videotaping of the entire evaluation by the Government's expert, Dr. Seward.

Dated:  June 23, 2011                    RESPECTFULLY SUBMITTED,


                                         _____*/s/ Christopher Craig*_____

CHRISTOPHER CRAIG (Cal Bar # 257108)     JAMES C. LOHMAN
christophercraig@omm.com                 (Fl Bar #0570214)
O'MELVENY & MYERS LLP                    jimmylohman@gmail.com
400 S. Hope St.                          1806 East 39th Street
Los Angeles, CA 90071                    Austin, TX 78722
Phone: 213.430.6029                      Phone/Fax: 512.542.9947
Fax: 213.430.6407

                                         Attorneys for Petitioner
STEVEN H. BERGMAN (Cal Bar #180542)      DAVID LEE JACKSON
steven@bergmanesq.com
Law Office of Steven H. Bergman
P.O. Box 951
Draper, Utah 84020
Phone: 801.601.1087

---

basis, as Mr. Jackson had no opportunity to address Dr. Seward's contradictory positions before the Court issued an order that potentially undermines Mr. Jackson's rights.  The recent addition to this case of four attorneys for the Government makes these funding issues and the disparity in resources ever more clear and urgent.

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2011, I sent a true and correct copy of the foregoing instrument, using the Court's CM/ECF, to John Bales, Robert Hobbs, Joseph Batte, Alan Jackson, and Traci Kenner, U.S. Attorney's Office -- Beaumont, 350 Magnolia, Suite 150, Beaumont, TX 77701.

/s/ *Christopher Craig*

CHRISTOPHER CRAIG