# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-20254 |
| | ) | |
| SHANNON SHIELDS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR
## PRETRIAL DETERMINATION OF MENTAL RETARDATION
## AND PRECLUDING GOVERNMENT FROM SEEKING
## DEATH PENALTY AS TO DEFENDANT SHANNON SHIELDS

Before the Court is Defendant Shannon Shields's ("Defendant") motion for pretrial determination of mental retardation. (D.E. #312.) In his motion, Defendant asks the Court to determine prior to his trial whether he is mentally retarded and thus ineligible to face the death penalty should he be convicted, see 18 U.S.C. § 3596(c), rather than have the question of mental retardation submitted to the jury at trial. Although the Government's response makes clear its position that Defendant is not mentally retarded, the Government did not oppose the Court's making a determination prior to trial as to Defendant's asserted mental retardation. (D.E. #339.)

The Court held an evidentiary hearing on November 3-7, 2008 and again on January 26-30, 2009. Afterwards, Defendant submitted a post-hearing memorandum (D.E. #533), as did the Government (D.E. #537). Considering the testimony of the witnesses for the Government and for Defendant, the exhibits submitted, the arguments of counsel, and the applicable law, the Court finds by a preponderance of the evidence that Defendant is mentally retarded and that he is

tenured academic appointments, first at the Université du Québec à Montréal and then at the University of North Carolina at Chapel Hill, where he was also a staff psychologist at that university's center for developmental disabilities. (Id. at 2053-54.) Dr. Tassé then accepted his current position at the University of South Florida. (Id. at 2059.) He now spends approximately seventy percent of his time on administrative matters and the balance of his time performing research related to mental retardation and autism. (Id. at 2059-62.) In addition to being a member of the American Psychological Association, Dr. Tassé holds positions and has performed important work with the American Association on Intellectual and Developmental Disabilities ("AAID") (formerly known as the American Association on Mental Retardation). (Id. at 2066-67.) He is a co-author of the AAIDD's diagnostic manual and of its user's guide— both of which are important texts on mental retardation. (Id. at 2073-74; see Ex. 59.)

Dr. Tassé has spent his professional career focused on the areas of mental retardation and autism, and in that time he has performed more than 200 mental retardation assessments. (Tr. at 2047-62; see id. at 2051; see generally Ex. 60.) He has conducted study in the area of mental retardation, including research into ways of diagnosing this condition, and he has trained psychology students to diagnose mental retardation. In the course of his career, he has interacted extensively with and provided clinical services to mentally retarded individuals, and he has authored or co-authored various curricula on teaching cooperative living skills to persons with mental retardation. (Tr. at 2047-51.) Dr. Tassé has previously testified as an expert in judicial proceedings only three or four times, and he had never met or worked with Dr. Cunningham prior to meeting him at the Court's hearing. (Id. at 2074, 2108-09.)

The Government offered as its first expert Manfred Greiffenstein, Ph.D., a psychologist licensed in the state of Michigan. (Id. at 1151.) Dr. Greiffenstein specializes in two areas:

neuropsychology and sleep disorders medicine. (Id. at 1151-54.) He has also published extensively, though he has never published on the topic of mental retardation. (Id. at 1164, 1417.) Dr. Greiffenstein maintains a practice in Michigan performing mostly one time assessments. (Id. at 1160.) Many, if not most, of Dr. Greiffenstein's mental retardation evaluations have been provided in the context of litigation,[2] and his forensic work typically comes at the request of an insurer. (Id. at 1161, 1407-12.) After his evaluation in this case, Dr. Greiffenstein concluded that Defendant does not have mental retardation, but rather only borderline intellectual functioning combined with conduct disorder. (Id. at 1361-62.)

The Government's second expert witness was Joel Morgan, Ph.D., a board certified clinical neuropsychologist licensed and practicing in the state of New Jersey. (Id. at 1791-93.) Dr. Morgan began full time private practice after working as a V.A. staff neuropsychologist. (Id. at 1794.) Approximately half of his practice involves clinical diagnoses such as may be necessary to make recommendations for schooling or for further treatment. (Id. at 1795.) The other half of his practice is forensic and involves making diagnoses for purposes of litigation. (Id. at 1796.) Early in his career, Dr. Morgan interned for one year as a school psychologist. (Id. at 1791.) Dr. Morgan has published extensively and is active in professional organizations. (Id. at 1796-98.) He serves as an oral examiner for the American Board of Clinical Neuropsychology and as an accreditation site examiner for the American Psychological Association. (Id. at 1797.) This latter role involves visiting educational institutions to assess compliance with that organization's standards for academic accreditation. (Id.) Dr. Morgan does not work specifically in the area of mental retardation, nor has he specifically published in this area. (Id. at 1907-08, 1910.)

---

[2] Dr. Greiffenstein's testimony in this regard was remarkably vague and evasive. Suffice it to say, Dr. Greiffenstein did not establish to the Court's satisfaction that he has substantial experience performing mental retardation evaluations other than at the request of an insurance company or in the context of litigation.

Case 1:09-cv-01039-MJT   Document 107-1   Filed 06/23/11   Page 5 of 5 PageID #:
7584
Case 2:04-cr-20254-BBD-tmp   Document 557   Filed 05/11/2009   Page 7 of 33

Drs. Greiffenstein and Morgan are linked by The Forensic Panel, which provided the Government its assessment of Defendant in this case. (Id. at 1167.) Headed by Michael Welner, M.D., The Forensic Panel is a business providing various experts for litigation. (Id. at 1393-94.) In this case, Drs. Greiffenstein, Morgan, and Welner conferred three times by telephone to discuss Defendant's diagnosis. (See id. at 1173-75, 1920, 1927-28.) Dr. Greiffenstein interviewed Defendant in person, administered Defendant some tests (though no tests of IQ), reviewed records and notes from an FBI investigator, and interviewed a few individuals with some knowledge of Defendant. (See id. 1186-88.) Drs. Morgan and Welner countersigned as concurring in Dr. Greiffenstein's finding that Defendant is not mentally retarded.[3] Dr. Morgan's knowledge of Defendant has come entirely from Dr. Greiffenstein and from a review of records, not by personally interviewing Defendant or others. (Id. at 1943, 1944.) While Dr. Greiffenstein found that Defendant suffers from no adaptive deficits, Dr. Morgan testified that he believes Defendant likely suffers from a deficit in one area: functional academic skills. (Id. at 1882.) (Of course, Criterion B of the DSM-IV-TR's definition is not satisfied unless there are significant concurrent deficits in two areas of adaptive functioning.) Dr. Morgan otherwise agreed with Dr. Greiffenstein's analysis of Defendant. (Id. at 1816-17.) Dr. Welner did not testify at the Court's hearing.

## III. FINDINGS AND CONCLUSIONS

### A. Evaluation of Expert Witnesses

Resolution of Defendant's motion necessarily entails evaluation of the credibility of the expert witnesses who have testified. Having assessed each one's qualifications and testimony,

---

[3] Contrary to the assertion of the Government's experts that Dr. Greiffenstein's report qualifies a "peer reviewed" assessment, the Court finds that The Forensic Panel's use of that term is misleading and that there was no "peer review" performed that would be consistent with the generally accepted understanding of that term. (See Tr. 602-08.)