UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DAVID LEE JACKSON         | DOCKET 1:09CV1039
                          |
                          | JUNE 13, 2011
VS.                       |
                          | 1:32 P.M.
                          |
UNITED STATES OF AMERICA  | BEAUMONT, TEXAS

----------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 38

REPORTER'S TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE RON CLARK
UNITED STATES DISTRICT JUDGE

----------------------------------------------------------------

APPEARANCES:

FOR THE PETITIONER:    JAMES CHARLES LOHMAN
                       JAMES C. LOHMAN - ATTORNEY AT LAW
                       1806 E. 39TH STREET
                       AUSTIN, TEXAS  78722

                       CHRISTOPHER BRENDAN CRAIG
                       O'MELVENY & MYERS - LA
                       400 SOUTH HOPE STREET
                       LOS ANGELES, CALIFORNIA 90071

                       STEVEN HARRIS BERGMAN
                       LAW OFFICE OF STEVEN BERGMAN
                       P. O. BOX 951
                       DRAPER, UTAH 84020

FOR THE RESPONDENT:      JOSEPH R. BATTE
                         ROBERT L. HOBBS
                         CHRISTOPHER TORTORICE
                         U.S. ATTORNEY'S OFFICE
                         350 MAGNOLIA
                         SUITE 150
                         BEAUMONT, TEXAS   77701


COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RMR
                         FEDERAL OFFICIAL REPORTER
                         300 WILLOW, SUITE 221
                         BEAUMONT, TEXAS   77701


    PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
  TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

(REPORTER'S NOTES 6-13-2011\JACKSON HEARING, 1:32 P.M., MONDAY, JUNE 13, 2011, BEAUMONT, TEXAS, HON. RON CLARK PRESIDING.)

(OPEN COURT, ALL PARTIES PRESENT VIA TELEPHONE.)

THE COURT:  All right.  This is Judge Clark; and I'm calling *Jackson versus United States*, 1:09cv1039. I've received this motion dealing with the government wanting to examine Mr. Jackson, and I've received the government's response.  It seems some of the issues are not opposed.  For example, all of the notes taken by the government's experts will be preserved for later production to Mr. Jackson's counsel.

My understanding from the government's response, the government does not oppose this request. Is that correct, Mr. Batte?

MR. BATTE:  Yes, your Honor.  This is Joe Batte for the government, and we have no objection to that request.

THE COURT:  Okay.  And just for record purposes, you're there for the government.

And, Mr. Lohman, you and Mr. Craig and Mr. Bergman are here for Mr. Jackson?

MR. LOHMAN:  This is Mr. Lohman speaking. Yes, your Honor.

4

THE COURT:  Okay.  Then another one is that the government's testing be limited to that relevant to *Atkins* hearings.  The government doesn't oppose that, but let's be very sure.  I mean, I suppose if later on some particular test was introduced that has nothing to do with mental retardation, there could be an objection; but I am not going to try to sit now in advance and tell psychologists or psychiatrists exactly which test is or is not appropriate or which question is or is not appropriate.

Luckily, for purposes of how is the material going to be used, the trial has already been held; and a finding of guilty has already been had.  In fact, there's already been the sentencing hearing; and we're now talking about should the sentence even be carried out or can the sentence be carried out, in view of mental retardation.  So, some of the concerns about a defendant not wanting to speak because not wanting to prejudice trial on the merits are not at issue here.  Now, I suppose if there was a complete retrial, then there may have to be some motions *in limine*.

So -- but as the government has agreed that it's just going to be testing for *Atkins*, that doesn't seem to be much of an issue.  Is that correct, Mr. Batte?

MR. BATTE:  Yes, your Honor.  We do not object

5

to their Request Number 7.

THE COURT:  Okay.  Then on Number 8 --

MR. BATTE:  But as far as -- I'm sorry.

THE COURT:  Go ahead.

MR. BATTE:  I think you had touched on the issue of the statement, is that correct, the Request Number 6?

THE COURT:  No.  I haven't done that yet.

MR. BATTE:  Oh, okay.  Okay.  Well, then --

THE COURT:  Okay.

MR. BATTE:  -- I'm finished.

THE COURT:  Then Number 8, disclosure of all the records reviewed by the government's expert, I understand, Mr. Batte, the government doesn't oppose that, either, right?

MR. BATTE:  We do not, and we are in the process of getting them together to send to defense counsel.

THE COURT:  Okay.  All right.  Then let's take a look at the ones that there may be some question about, one of them being that government provide reasonable notice of at least ten days of any intention -- well, there's now notice.

Mr. Jackson wants the opportunity to seek an order blocking a particular test or instrument sought to

be used.  And then "reasonable notice" is defined as conducting the testing, who will be present, what tests are to be administered.

I've reviewed the cases on point.  And while on one hand notice -- which obviously Mr. Jackson and his counsel have now that the government's intending to do that and will have if I enter an order -- is reasonable, I do not find persuasive authority that the government has to say exactly which tests are going to be given or which instruments are going to be used or, for that matter, why we should have a series of mini hearings going over -- or having me decide which test or instrument should be used.

My understanding is that Dr. Swanson and Dr. Dudley have already administered some tests and examinations and provided opinions in the petition.  The government's experts will presumably do something similar.  At the hearing the experts can -- if they believe it is correct -- can say, "Well, this test or that test is clearly under the AAMR or the" --

UNIDENTIFIED SPEAKER:  AAIDD.

THE COURT:  Right, one of the other authorities saying, "No, that's just simply not appropriate."  Fine.  I'll listen to that.  But I'm not going to try to go through all of that in advance.  That

can be dealt with all at one time.

Looking at *Williams versus Lynaugh*, 809 F.2d 1063, Fifth Circuit 1987, the court points out -- and it almost makes logical sense in view of Federal Rule of Criminal Procedure 12.2(c) -- if the defendant's going to raise something like this as a defense, although many of the cases talk about insanity, it's a little difficult how the defendant can then say, "Oh, but yes, while on one hand I claim I'm mentally retarded and my experts have examined me, the other side can only do limited examinations or just precisely the examinations I want done."

This issue has been put into -- or this matter has been put into issue by defendant.  My understanding under Rule 12.2 and under 18 USC -- and these are used as a guide -- 18 USC, Section 4241, *et seq*, the statutes dealing with mental competency and so forth, once I've issued the -- I can order a mental competency exam and if defendants have some kind of in-good-faith argument that a particular test or the way the test was given was improper, that can be raised at the hearing and that's the purpose for the hearing.  And I'll also -- I mean, to similar effect is -- well, as I said, *Williams versus Lynaugh* and in particular at page 1068 of that case and then Rule 12.2, as I said.

8

So, as far as the motion that specific notice and so forth be provided, I'm going to deny that.

MR. LOHMAN:  Your Honor?

THE COURT:  Yes.

MR. LOHMAN:  This is James Lohman speaking. We actually haven't had an opportunity to say anything about this this afternoon.

THE COURT:  Well, Mr. Lohman, I presume that as competent counsel, you've provided me your very best arguments in writing.  And what I'm trying to do is move through my rulings on your written presentations, and then we will get to the items that I think there may be some need for some back and forth.  Okay?

MR. LOHMAN:  Well, can I put something on the record about some of the --

THE COURT:  Sir, I'll --

MR. LOHMAN:  -- matters --

THE COURT:  Sir, I'll -- Mr. Lohman, maybe you don't understand.  I'm going to give you a chance later on if you want to add some things to the record that, for some reason, you decided not to provide in writing because you wanted to hold them back as a magic surprise. Fine.  But I expect counsel on something like this to put in writing their best arguments.  So, let's move on to the next issue.

9

The next one is Dr. Swanson observing or monitoring the government's testimony *[sic]* in order to bring counsel's attention to discrepancies in testing or inappropriate testing.  I think it's important that Mr. Jackson's counsel and expert have a very good understanding, and for that matter the court, of exactly what the government's expert is doing.  But at the same time, Mr. Jackson seems to want to not have all of the testing and interviewing videotaped.

And here I am interested in some input from you, Mr. Lohman, because it seems on one hand you want -- and I think this is legitimate because you raise in one -- or at least in a footnote, you indicate that -- you make an inference that the government is trying one of these "Dr. Death" presentations and they've picked some guy who you know in advance exactly what he's going to say because he's always said death penalty, he's always been in favor of it and is likely to, therefore, give a prejudiced presentation and probably provide prejudiced and improper testing.

But then you say, "Oh, but we don't want to hold him in check by having everything he does videotaped."  And I do not understand that.  It would seem to me that if you're really concerned about the government taking advantage, one of the best safeguards

10

you could have in addition to having all of his notes is to have all of his contact with your client videotaped and on tape and so I don't have to listen to later on one witness saying, "Oh, but Dr. Death did this" and Dr. Death saying, "No, I didn't."

I mean, why should I go through that? Why not have it on tape, and that solves much of the problem of underhanded dealings by the government if that's the case you're trying to make? Why do you want to have it both ways, Mr. Lohman?

MR. LOHMAN: Your Honor, I don't think we want to have it both ways. I think that our position ideally was that we would be able to have in-person observation. But if that's not going to happen, then we would agree with your Honor that videotaping it -- if that's the only way to do this, then we would not object to that if that's, in a sense, a last resort for us for being able to observe this.

THE COURT: Okay.

MR. LOHMAN: There are other -- we think there are other ways short of that for third-party observation which was done, for example, in the *Nelson* case, a federal court case out of Missouri, where they evidently utilized an adjacent room at the very same prison where Mr. Jackson is and they were able to observe the testing

11

process by closed circuit television without disturbing that process.

We would prefer to do it that way; but if the court feels that the only thing that the court would consider would be videotaping, then we would accept that as a last resort option.

THE COURT:  Okay.  Well, I am very concerned about the idea of -- well, first of all, there's cases such as *United States versus Cohen*, 530 F.2d 43, Fifth Circuit 1976; and they reference at page 48 the problem of attorneys -- and I think therefore others -- present at a psychiatric examination might defeat the purpose of the examination.

Again, we are not at the critical stage at which assistance of counsel is needed.  We're not prior to trial.  We're post-trial, post-sentencing.  We're now dealing with the *Atkins* issue.  The idea of interruptions or your asking the wrong question or anything like that seems, based on the research I've done with this case and other similar cases, would be disruptive and a waste of time.

So, I'm going to deny the request to have observers or counsel present on those grounds; but on the other hand -- and the government said it didn't oppose not videotaping some things.  What's the government's

12

position if I order everything be videotaped so we eliminate this possibility that whatever expert -- or maybe not eliminate it, maybe prove up one way or the other?  This expert that you have, I want a way of the court knowing for sure whether he's been asking underhanded questions or not.

I mean, I presume your position is that your man or your woman will be completely aboveboard, highly qualified, run everything by the book, in which case it would seem that careful videotaping would be kind of like the police officers on the street with those video cameras in the car.  It darn well proves that they didn't take some improper action.

What's your position on that, Mr. Batte?

MR. BATTE:  Your Honor, Joe Batte here.  Our position was that we were asking for the interview portion only to be interviewed *[sic]*.

Now, I know that the doctors had mentioned that the reason that they hadn't asked for the actual testing part as well had something to do with the fact that there is some empirical data here that videotaping the actual testing could have some effect on the testing itself in the way it's completed.

I am not an expert in any way on that.  I don't particularly, as I think the court seems to think,

13

see that there is a compelling reason or difference between one or the other; but I would like to seek the counsel of my psychiatrist so if there is a real strong reason to not want to videotape the actual testing, that we could present it to the court.

THE COURT:  Well, I'd be interested --

MR. BATTE:  It's not something that we've talked about because we were only asking for the interview portion to be taped and the defense counsel, from my understanding from their motions, were wanting everything to not be taped.  So, I don't have what I feel is a real strong response to that question, judge.

THE COURT:  Well, I -- you know, if both counsel want to talk with their experts and both experts agree that -- and, yes, I can see ostentatiously setting up some huge video camera right in front of some prisoner and videotaping him while he's taking a test might have some effect; but it's hard to believe the federal government would have to go to that kind of taping. There could be a very unobtrusive camera up in the corner as there are in many interrogation rooms.  I presume that's the kind of place this testing will occur.  It could be made very, very unobtrusive.

I mean, if all the experts agree that, no, videotaping the testing is bad -- on the other hand, then

14

I don't want arguments being raised that the testing was performed improperly.  I'm really more concerned with -- and it was partly a footnote, I mean, just a passing reference in one of Mr. Lohman's papers that the government's expert was very likely to provide testimony that should not be relied upon by the court.

And it just seems to me that the best -- one of the best ways to handle this is make sure everything is carefully and unobtrusively videotaped; and then there won't be any question about, well, Mr. Jackson saying "This is when the examiner leaned over and pointed to the answer he wanted" or "This is when the examiner leaned over and poked me with his pencil" or -- and then you have the examiner going, "No, no.  I didn't do that" and Mr. Jackson saying, "Yes, yes, you did."  I would think they would want some protection like that.

Mr. Lohman, I mean, are your experts going to come in now and say the results are faulty because someone was observing or unobtrusively videotaping them?

MR. LOHMAN:  No, sir.  I think that we agree that we would prefer that the testing itself be videotaped if it cannot be monitored or observed by our expert.

THE COURT:  Okay.  Now, Mr. Batte --

MR. LOHMAN:  Also the APA guidelines and

15

criminal justice mental health standards also suggest that any videotaping is for the protection of the defendant and, therefore, obtainable by the defense for their own purposes; and if they don't intend to use the video for any purpose, that it would not necessarily be provided to the other side but that it would first be the duty and responsibility of the defense to utilize that and decide whether it is something that they want to present.

And, so, we would ask that the video -- any videotape be provided solely to the defense and then for us to decide whether or not it is of use to our case.  If so, then we would provide it to the government.

THE COURT:  Well, I'm not so sure about providing it solely to you.  I don't see why the government shouldn't be -- the issue would come up, I would think, if defendant gets the tape -- and I think, yes, a complete copy of the tape needs to be given to defendant -- and Dr. Swanson says, "Well, look at textbook or test manual or test instrument instruction, page 5, your Honor.  It says exactly you shouldn't do exactly what government's doctor did."  And then we could all look at the tape, and there you would have your evidence of the mistake or whatever made by the doctor.

I'm not at all very likely to sit through the

16

government's witness testifying as to what his results are and then asking me to watch two or three hours of tape to see, I mean, what everyone agrees was a fairly vanilla presentation of the test instrument.

So, I agree with you that use of the tape is probably going to be determined as to whether you attempt to attack or impeach the government's expert.  I don't see -- I mean, since they were there -- not giving them a copy of it.  Doesn't make much sense.  I can't see the relevance of them putting it on unless they were first attacked, though.  I think you're right about that.

But let me get back to Mr. Batte.  I mean, if your -- I would have to see some pretty strong authority for the proposition that your doctor doesn't want to -- or that your doctor wants to give this test in secret. Now, I agree that an obtrusive, lights flashing, big camera, people moving around kind of videotaping is not what's needed.  Obviously Mr. Jackson should know that he's being recorded, and his attorney will probably tell him that.

But it needs to be, I think, you know, a professional and unobtrusive job; and that way your expert is protected.  And if some issue is raised about something being done improperly, it will be very simple for both sets of attorneys to show me the videotape, show

me the testing instruments and its instructions or whatever that say what should or should not have been done and we can deal with it on the spot.

But, Mr. Batte, I will give you an opportunity -- I mean, do you think you can get -- let's see.  Today is Monday.  Do you think you can get by Thursday a response from your expert as far as a reason why it shouldn't be carefully and unobtrusively taped even when he's doing the testing?

MR. BATTE:  I will get that answer for the court, judge; but I think that -- as I sit here, I think the main concern is that I think most psychologists agree that the testing portion should not be videotaped.  And my only concern, you know, at this point is I don't want the defense's experts to come back and say, "Well, these tests should not be validated because they were videotaped."  So --

THE COURT:  Well, if Mr. Lohman is planning on doing that -- I'll give Mr. Lohman until Thursday also; and if Dr. Swanson is going to come forward or some other expert and make such a claim, I want to know that by Thursday.

I mean, if the experts all agree it shouldn't be taped, I'll consider that.  But I'm very concerned about this claim being made -- and it's been used in

18

other cases and properly used in other cases -- that the government's expert -- I mean, not in the Eastern District.  But there was a state expert some years back who literally had the nickname of "Dr. Death," and we don't need that here.  We need to have -- I mean, I assume you're picking a good competent expert who doesn't mind his piers looking at how he gives tests -- he doesn't want them there in the room interfering with it -- and is then prepared to testify.

If all of the experts disagree and they all say, no, no, an unobtrusive camera up in a corner somewhere, unobtrusive sound system would somehow interfere, I would certainly consider that.  But there were a lot of arguments about that when the state mandated video cameras in patrol cars, and it's turned out to save an awful lot of officers from false complaints of misconduct because we can just look at the videotape and see exactly what happened.

So, that would be my preference.  But, Mr. Batte, I'll allow you to talk with your expert; and if he can come up with, you know, a solid reason, given the concerns I've expressed, then I want to hear it.

And, likewise, Mr. Lohman, by Thursday if your experts -- any one of them or yourself -- is going to say the testing is somehow tainted because it was taped, then

19

you need to notify the court and opposing counsel of that by Thursday.

Any problem --

MR. LOHMAN:  Judge, I think that the more likely scenario would be -- or the contingency that the court has not addressed would be if the government's expert opposes taping the testing and our expert thinks that it's okay to videotape the testing.  Then, you know, there is going to be a discrepancy there that has to be resolved.  I think that would be the most --

THE COURT:  Well, I'll deal --

MR. LOHMAN:  -- eventuality, frankly --

THE COURT:  I will deal with that discrepancy. That's my job.  If it comes up, it comes up.

That's what I want to know, is there an agreement between the experts one way or the other or is there disagreement and, if there is a disagreement, what is it and then I'll just have to decide.  But since both counsel -- I know you don't have your experts with you. I'll give you until Thursday to talk to them.

MR. LOHMAN:  Okay.

MR. BATTE:  Judge, this is Joe Batte again. How would you like us to get back to you on that?

THE COURT:  Well, why not in letter format with copies sent to opposing counsel?

20

MR. BATTE:  Okay.

THE COURT:  And attach it to an email so it's actually here on Thursday and not mailed on Thursday.

MR. BATTE:  Yes, sir.

MR. LOHMAN:  Your Honor, I wonder if I might address briefly the issue of our wanting to know in advance what tests are going to be used.

THE COURT:  Is this Mr. Lohman?

MR. LOHMAN:  Yes, sir.

THE COURT:  Okay.  Well, I understand the argument of wanting to know and then wanting to be able to file motions to block them; but that could go on almost endlessly.  We've already agreed that the testing has to be related to mental retardation, the *Atkins* hearing.  Given all of that, go ahead.

MR. LOHMAN:  Judge, you referred to --

THE COURT:  Is this Mr. Lohman?

MR. LOHMAN:  -- and I couldn't agree more that if the defense raises a mental health issue and uses experts to substantiate their claims, of course, the other side should be able to do the same kind of assessment and evaluation.  And I think that when you referred to the *Williams v. Lynaugh* case, that that's the gist of that; and we couldn't agree more on that.

But I think that in terms of the mental

retardation evaluation, for the state to say simply, "We agree that we will only do tests and interviews that relate to mental retardation," that doesn't give us any assurance at all that that will really happen.  And, so, there is a little bit of gray area there; and I think we can dispose of that gray area quite easily.  It's not going to go on for a lot of back and forth on that.

There are specific tests for mental retardation, and then there are a lot of tests that have nothing to do with mental retardation that government doctors and psychologists often employ for all sorts of other reasons.  I would be not a bit surprised if the array of tests contemplated by Dr. Seward would include, for example, an MMPI which has nothing whatsoever to do with mental retardation.  They have a psychopathy test that they often do that has nothing whatsoever to do with mental retardation.

So, maybe it would make sense for us to simply specify -- you know, we can't do an exhaustive laundry list of what would be acceptable and what would not; but that should give the court an example of the kind of thing that we're concerned about.  Personality testing is not -- has nothing to do with this assessment.

THE COURT:  Mr. Batte?

MR. BATTE:  Your Honor, my experts have told

22

me that they don't have any objection to letting the defense counsel know the tests ahead of time.

THE COURT:  All right.

MR. BATTE:  But the issue of which --

THE COURT:  How far ahead?

MR. BATTE:  -- ones should not be given and which should, I think that's unnecessary; and I think it's going to be very lengthy.  And I'm not familiar enough with these tests as of right now to say okay.  In a week I'll be enough up to speed on it to make an argument for or against it; and we've got a deadline right now of, I think, sometime next month to have this interview done and have the response done.

THE COURT:  Well --

MR. LOHMAN:  Your Honor --

THE COURT:  Wait.

MR. LOHMAN:  -- it's not going to be --

THE COURT:  Mr. Lohman --

MR. LOHMAN:  Yes, sir.

THE COURT:  -- wait.

Mr. Batte --

MR. BATTE:  Yes, sir.

THE COURT:  And, again, both of you please remember to say your name before you start to speak.

But, Mr. Batte, when can your -- I mean,

you've said your expert doesn't mind turning over the lists of tests that he or she -- is it a he or a she?

MR. BATTE:  It is a he.

THE COURT:  Okay.

-- that he plans on using.  When can you provide that list of tests?

MR. BATTE:  Judge, I can provide those to you by Thursday in the same letter that I'm going to have for you in any case.

THE COURT:  All right.  So, Mr. Lohman, you'll have this list of tests by Thursday.  And, you know, keeping in mind Ms. Frampton, my law clerk, and I have done a fair amount of research in this area and I'm not really interested in marginal arguments about this test is better than that test.  If one of them or some of them stick out as completely inappropriate for mental retardation and nothing in the literature indicates they should be used for that, then include that in your letter along with a citation to the authority saying they should not be used.

But -- I mean, it's almost like a *Daubert* issue in terms of is the expert using the appropriate instruments.  But if it's really a matter of Dr. Swanson saying, "No, I prefer to use Version 1 or Version 2 or this test" and "Other experts like the other one, but I

24

think I'm better," that I'll just deal with at the hearing.  Okay?

MR. LOHMAN:  Sure.

THE COURT:  All right.  And then --

MR. LOHMAN:  Your Honor --

THE COURT:  -- Number 6 --

MR. LOHMAN:  -- one additional issue.

THE COURT:  Well, wait.  Let me get to the next issue.  And, again, please remember to say your name.

MR. LOHMAN:  Yes, sir.

THE COURT:  That was Mr. Lohman, I believe.

MR. LOHMAN:  Correct.

THE COURT:  Number 6 dealt with the statements of Mr. Jackson not being used for other purposes, although a mental retardation hearing is somewhat broad-ranging in that we have to have the intelligence testing and the social adaptive behavior.  Mr. Batte, would you agree that in the -- well, let's say the higher court or the Supreme Court, somewhere along the line, although this is already -- the conviction has already been affirmed.  But let's just assume the unlikely possibility that some higher court overturns the conviction itself and he has to be retried.  Would you agree that this mental health testing -- the statements

25

he makes aren't going to be allowed on the guilt/innocence phase?

MR. BATTE:  This is Joe Batte, your Honor. Judge, I have a problem with giving that broad of -- what it amounts to is immunity to Mr. Jackson.  I don't think this is going to come up, and hopefully it won't.

But there's going to be an interview portion, and there's no way to control what Mr. Jackson is going to say in that.  So, to just go ahead and, in effect, give him blanket immunity for any statement he makes for any proceeding -- there's no telling what he could admit. He could admit to having committed other murders.  I think that's unrealistic, but it's possible.

He would not have this broad protection if this was a pretrial setting, if he was having it like in the ordinary course where if they would have filed a motion -- if there would have been a motion filed under 12.2 and he was being interviewed by the government expert, any statements he made to that government expert in that interview would be -- could be used against him in his trial.  I don't see any compelling reason or any authority to give him that much more latitude in this hearing.

THE COURT:  Well, keep in mind -- and maybe you didn't listen closely to the grounding for many of my

26

earlier rulings this afternoon, many of which are grounded in the idea that he's already been convicted and already sentenced and the appeal on the conviction anyway has gone up and down and it's over.  So, the need to have an attorney there to be sure that his Constitutional rights to counsel are protected -- the reason for that is pretty much limited, as is stated out in *United States versus Cohen*.

But if we're now going to have this possibility that these statements could wind up being used against him in other criminal proceedings, you're, in effect, telling me that yes, you do want the lawyer sitting next to him and telling him not to answer.

Believe me, if this was pretrial, I'd be thinking about this much differently.  In my mind my decisions here are much easier; and I don't have to parse things as closely because you've won.  You upheld it on appeal.  We're now just trying to decide is he mentally retarded or not and, if so, that's one issue out of the way and, if not, then I'll have all of the other things that you-all will be dealing with on the paper.

But I'm very concerned with this idea of you want him fully open to this psychiatrist or psychologist, this expert.  You want him tested properly.  But you want him to have in the back of his mind "Don't say anything

because I may get convicted again later"?  That doesn't -- that really does sound like a "have my cake and eat it, too," argument.  Tell me why I'm wrong there.

MR. BATTE:  Well, judge -- this is Joe Batte. I'm not necessarily saying that you're wrong.  And if we knew for sure that there would never be another trial or there would never be another sentencing hearing, I think that, you know, that argument becomes extremely compelling; and I would probably be inclined to agree with it.  But I don't see at this stage that there's no possibility that at least the sentencing hearing could be -- could come back.

Now, let's say, for instance, the court denies the *Atkins* claim.  There's almost 200 more claims in his petition, all of which could open up this case, in my understanding, to possible retrial or retrial on a sentencing hearing.

Now, put that aside.  You know, what if -- and, again, I know this is an extreme example; but I think that I have to be somewhat responsible.  What if this is someone who has committed other crimes or other murders and they admit them in this interview?  We've given him blanket immunity for those statements.  And I don't see it being a -- I think it's him that we're giving him his cake and having him eat it, too, not the

28

government.  So, I'm cautious about that.

I don't want counsel to be present during it. I think that outweighs -- I think that outweighs my interest or our interest in letting the statements be admissible.  And if the court is going to look at it as one or the other, then I would prefer that the court not have counsel there.  But I just don't see a compelling reason to give this man blanket immunity when there is no other situation that we would.

MR. LOHMAN:  Your Honor?

THE COURT:  Yes.

MR. LOHMAN:  This is James Lohman.  Might I respond to that?

THE COURT:  Yes.

MR. LOHMAN:  You know, we've -- there are a lot of other mental health issues in this case besides mental retardation, which is why we had our own psychiatrist do a separate assessment from the mental retardation assessment.  Those psychiatric issues are not in play in the *Atkins* hearing, which is why Dr. Dudley is not going to be with the court in the *Atkins* hearing.

Should a broader psychiatric profile become necessary for a future proceeding in this case, then I think we would be in a somewhat different position. Let's talk about a hypothetical of just simply

29

Mr. Jackson talking about this offense.  Forget about other things.  We're not worried about other offenses.

But should this Dr. Seward decide to go into asking Mr. Jackson his version of the offense that's at issue here, I would consider that to be off limits for the mental retardation assessment.  And I would hope that the court would agree with that and that we could establish some reasonable and clear parameters for his interview taking those kinds of concerns into it.

THE COURT:  Well, unfortunately, Mr. Batte, I think this is getting back into the other issue that Mr. Lohman raised; and that was the -- I guess the parameters of what testing and interviewing is to be done and the government's agreement that everything would be related to the *Atkins* hearing.  I'm a little concerned about the idea of the good doctor taking advantage and, "Oh, by the way, let's pin him down on everything else," at which he would be entitled to have his attorney and that starts coming out.

All right.  What I'm going to do is, again, I am going to limit the government's questioning and testing to that directly relevant to the *Atkins* hearing. And if it turns out that later on a series of questions or testing -- and, of course, you're turning over the list of tests that will be given.  But if it turns out

30

that a series of questions or any questions and testing were not relevant to the *Atkins* hearing, I'll consider that as the doctor being in contempt of my order and will entertain a motion to strike that in any future proceeding and obviously not to be considered in this proceeding.

And at this time I will state that statements made by Mr. Jackson in the course of this examination and in his testing are not admissible as evidence against Mr. Jackson on other issues, especially as to any kind of resentencing or retrial.  I don't in my mind right now see how that could possibly happen, given the fact that the conviction and sentence was affirmed on appeal; although I suppose on *habeas*, you know, sentencing could be reopened.

But the idea that we would use this *Atkins* hearing as a way to bolster or plug up gaps in the guilt/innocence phase if that had to be redone or in the sentencing phase should he be found to be not retarded but there is some other issue which requires resentencing, I don't see the need for that.

So, the government's expert will be limited to questioning and testing related to mental retardation; and the statements and answers and test results of Mr. Jackson will be limited to the Adkins hearing.

31

Now, it's difficult for me to foresee that -- what other mental problem questions may come up on all of the other issues.  I've been focusing most of my attention on the *Atkins* hearing.  And I don't know for sure but I suppose that it's possible that some of the tests given by the doctor may be equally applicable to other issues and it may be the experts really don't disagree on that.  And, so, in terms of a savings of time and money all around, I would indicate that I might be willing to entertain a motion to use them at that point.  But that's really more the testing instruments, and many of these are used for different purposes.

But absent that -- and, you know, the government could make that motion should it be necessary in the future.  Absent that, my ruling is that these interviews and this testing will be for purposes of this issue, mental retardation, and not for others and that the government's examiner will limit himself to questions, interview, and testing dealing with mental retardation and no other.

Keeping in mind, Mr. Lohman, that should Mr. Jackson be clever enough to figure out, boy, if he just starts blurting things out, it will make the doctor look bad, that might actually be indication that he's not mentally retarded.

32

MR. LOHMAN:  Your Honor, that leads to another point I was going to raise.

THE COURT:  Well, I mean, I'm not going to allow him to sandbag the government by suddenly blurting things out saying, "Oh, gee, I thought that was the answer."  That will be one of the value -- another value of having the videotape there, because I'll be able to watch that.  But if we get into that issue, I'll be able to look at the video and be able to figure out if I think it's the doctor trying to take unfair advantage or maybe Mr. Jackson demonstrating just how clever he is.

All right.  I think we've gone over the eight issues that were raised in the motion.  Okay. Mr. Lohman, are there some -- is there some other issue or statement you want to make?

MR. LOHMAN:  Yes, your Honor.  There is just one additional point.  It really relates to the last concern of your Honor's.  And what that is is aside from being really the standard practice for me, it is also addressed again in those ABA Criminal Justice Mental Health Standards.  And in Standard 7-3.6(a) there is a very specific discussion -- actually it's (a) and (b) -- about counsel's duty to explain in great detail and clarity to the defendant the nature of the testing that's going to occur, the purposes of it, et cetera.  And that

would -- in essence, that's part of what your Honor was addressing in terms of the defendant's cooperation and compliance with the whole testing process.

Whenever I have testing of my clients, I sit down with them; and I go over with them the purpose of it.  I tell them that they have to make a genuine effort on this testing, and basically to prepare them emotionally and mentally to do what they need to do during this process.  So, I would like to go to -- to sit down with Mr. Jackson and explain this to him.  I don't think it's something that's really amenable to a telephone conversation.  And, so, I guess that gets into an additional funding issue that perhaps we should discuss *ex parte*.

THE COURT:  Well, do you want to discuss it *ex parte* or right now?

MR. LOHMAN:  Well, I mean, basically I would be asking for the court to supplement the court's earlier ruling as to --

THE COURT:  Okay.  But I -- Mr. Lohman, I'm gathering you would prefer to do this *ex parte*?

MR. LOHMAN:  Yes, sir.

THE COURT:  Okay.  That's fair.

All right.  I've covered the eight issues, I think, that were raised.  Let me ask the government:

34

Mr. Batte, any questions about the rulings?  I think most of it has been -- or much of it has been in line with your agreements, which I appreciate very much.  And hopefully your expert can get up there to conduct the testing.  Do you have any questions or any issues you think need to be brought up?

MR. BATTE:  I don't have any questions, your Honor.  I do have one issue -- this is Joe Batte.

Again, your Honor, I feel like making the doctor's notes, the tests, the results, and the videotaping as transparent as we can get from the government's side.  However, there has been no reciprocity on behalf of the defense.  And my experts have asked me continually, "Are we going to have the opportunity to look at Dr. Swanson's raw data?"

She's made conclusions and rendered an opinion based on tests that she's given the defendant.  They have not been videotaped.  We have not been provided any data on that.  We're at an extreme disadvantage in terms of cross-examination or trying to get to the matter here because we don't have access to the same data that we're readily making available to defense counsel; and I don't think, for purposes of this fact-finding mission, that that's being fair.

THE COURT:  All right.  Mr. Lohman, after the

35

government has done its testing, is there any reason that Dr. Swanson's raw data on the tests -- I mean, obviously I doubt it was videotaped; so, you're not turning that over.  But why shouldn't the actual testing data be turned over so it can be compared with her results and opinions?

MR. LOHMAN:  I agree that it should be.  I'm not sure that there is anything beyond her report, frankly.  But if there is, then I would agree.

THE COURT:  Okay.  All right.  Then I will order that after defendant's testing is completed, that Mr. Jackson -- or his counsel will turn over the raw data, which I would think would include interview notes, the test instruments, however the tests were done, the data from which she then derived her scoring and her results so that the experts can look at it.

One would hope these are in fairly standard-type formats with fairly standard-type tests and the experts can look at the instructions provided for each of these instruments and probably be in agreement that yes, this is typically the way it is done and, in those instances where they think there is some discrepancy, can bring that to my attention so my time can be focused on the incongruities or the disagreements rather than what the experts actually agree upon.  So,

36

I'll add that order to it.

Okay.  Anything else, then, from the government's point of view?

MR. BATTE:  No, your Honor.

THE COURT:  Okay.  Thank you.  Then all sides are excused.

Mr. Lohman, to avoid a problem with the phones and just one side hanging up, what I'd like to do is go ahead and hang up; and we'll just --

(Off-the-record discussion between the court and deputy clerk.)

THE COURT:  What's your number right now, Mr. Lohman?

MR. LOHMAN:  Could we use the call-in number again?  Because that way the O'Melveny folks will be able to join us for this.

DEPUTY CLERK:  We could just have the folks who are not going to participate hang up.

(Off-the-record discussion between the court and deputy clerk.)

THE COURT:  We can -- if you'll give us the numbers or if you-all will call this -- the three of you will call this court, we can handle that conference right here.  Okay?

MR. LOHMAN:  Okay.  What would that number be

37

to call you?

DEPUTY CLERK:  They need to give me the numbers if I'm going to conference them.

THE COURT:  Okay.  Well, you just give us the phone numbers, and we'll call you from here.

MR. LOHMAN:  Okay.  Should I give it to you right now?

THE COURT:  Yes.

MR. LOHMAN:  It's 1-800-201-2375, and the code is 590906 pound.

THE COURT:  No, no, no, no, no.  What we're talking about is your phone number.

MR. LOHMAN:  Oh, okay.

THE COURT:  We won't be on a conference call.

MR. LOHMAN:  Okay.  My number in Austin is 512-542-9947.

THE COURT:  Okay.  Mr. Craig and Mr. Bergman, you're with O'Melveny & Myers?

MR. CRAIG:  This is Mr. Craig.  I am with O'Melveny & Myers.  Mr. Bergman is in Utah.  He has left the firm.

THE COURT:  Okay.  Would each of -- Mr. Craig, would you go ahead and give your number, please?

MR. CRAIG:  Yes, your Honor.  My number is 213-430-6029.

38

THE COURT:  And, Mr. Bergman, what's your phone number?

MR. BERGMAN:  I can be reached at 801-553-2152.

THE COURT:  Okay.  And when everybody hangs up, we will call the three of you directly; and we'll continue the *ex parte* part of this.

MR. LOHMAN:  Your Honor, can we keep the court reporter on hand for the *ex parte* portion?

THE COURT:  She's here.

MR. LOHMAN:  Okay.  Thank you.

THE COURT:  All right.  With that, everyone is excused; and this part of the hearing is in recess.

(Proceedings concluded, 2:26 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, JUNE 22, 2011, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

_Christina Bickham_
CHRISTINA L. BICKHAM,    CRR,    RMR