IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DAVID LEE JACKSON | § | |
| | § | NO. 1:09-CV-1039 |
| v. | § | (JUDGE RON CLARK) |
| | § | |
| UNITED STATES OF AMERICA | § | (1:06-CR-51, JUDGE M. CRONE) |

**GOVERNMENT'S RESPONSE IN OPPOSITION - LIMITED TO CLAIM TWO
OF PETITIONER'S MOTION TO VACATE CONVICTION AND SENTENCE
PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL
<u>RULES OF CRIMINAL PROCEDURE</u>**

The United States of America, by and through the United States Attorney for the

Eastern District of Texas, files this response in opposition to claim number two of

Petition for Collateral Relief by David Lee Jackson to Vacate Conviction and Sentence

and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of

Criminal Procedure.

I.

**PROCEDURAL HISTORY PRIOR TO THE FILING OF THE
MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255.**

On April 20, 2005, a United States Grand Jury for the Eastern District of Texas

returned a two-count indictment against David Lee Jackson (Jackson) and Arzell Gulley

(Gulley).  (1 R. 32-35).[1]  Count One charged both defendants with murder and aiding and

---

[1] The record on appeal consists of three volumes of pleadings and 26 transcripts.  The pleadings volumes will be referred to by volume number, followed by "R" and the page number. The 13-volume transcript of the trial will be referred to by volume number, followed by "T Tr."

1

abetting, in violation of 18 U.S.C. §§ 1111 and 2. (1 R. 32). Count Two charged them with possession of a dangerous weapon in a prison and aiding and abetting, in violation of 18 U.S.C.§§ 930(c) and 2. (1 R. 32). With respect to Count One, the indictment alleged all four of the statutory intent elements for the death penalty under 18 U.S.C. § 3591[2] for each defendant. (1 R. 33-35). The indictment alleged one statutory aggravating factor for Jackson[3] and two for Gulley. (1 R. 34-35).

On January 4, 2006, the United States filed a Notice of Intent to Seek the Death Penalty against Jackson. (1 R. 120-22). The notice alleged the four statutory intent elements and one statutory aggravating factor alleged in the indictment.[4] (1 R. 120-21).

------

and page number. The 1-volume transcript of the sentencing will be referred to by "S Tr." and page number. References to the Public Docket in 1:09-cv-1039-RC will be referred to as "Docket, followed by the document number. Government exhibits will be referred to as "GX" and the exhibit number. Defense exhibits will be referred to as "DX" and the exhibit number.

[2] The indictment alleged that Jackson (1) intentionally killed the victim; (2) intentionally inflicted serious bodily injury that resulted in the death of the victim; (3) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a result of the act; and (3) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than a participant in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. (1 R. 34-35); see 18 U.S.C. § 3591(a)(2)(A)-(D).

[3] The indictment alleged that Jackson committed the offense after having been convicted of a federal or state offense punishable by a term of more than one year that involved the use or attempted or threatened use of a firearm against another person. (1 R. 35); see 18 U.S.C. § 3592 (c)(2).

[4] The notice specified two prior convictions punishable by a term of more than one year that involved the use or attempted or threatened use of a firearm against another person for which Jackson had been convicted before committing the offense alleged in the indictment. (1 R. 121).

It also alleged two non-statutory aggravating factors.[5]  (1 R. 122).  On March 9, 2006, Jackson moved to sever his trial from Gulley's.  (1 R. 148-59).  The Court granted the motion on April 6, 2006.[6]  (1 R. 190).

The grand jury returned a two-count superseding indictment against Jackson on August 16, 2006, charging the same substantive offenses as the original indictment and alleging the same statutory intent elements and statutory aggravating factor.  (2 R. 466-68).  Jackson pleaded not guilty to the superseding indictment on August 29, 2006.  (2 R. 497).

After numerous pretrial motions, jury selection commenced on October 2, 2006. The guilt/innocence phase of the trial began on October 23, 2006, and the jury returned guilty verdicts on both counts on October 30, 2006.  (1-6 T Tr. *passim*).  The punishment phase commenced on November 2, 2006, and ended on November 13, 2006, with a unanimous jury verdict that Jackson be sentenced to death for Count One.  (3 R. 819-37; 7-13 T Tr. *passim*).  The Court sentenced Jackson to death on Count One immediately after the verdict.  (13 T Tr. 1940).  On December 15, 2006, the Court sentenced Jackson to life imprisonment on Count Two.  (S Tr. 8).  On January 9, 2007, the Court entered a judgment sentencing Jackson to death on Count 1 and to life imprisonment on Count

---

[5]  The two non-statutory aggravating factors were (1) future dangerousness of the defendant and (2) a significant history of disciplinary violations while incarcerated.  (1 R. 122).

[6]  Gulley was tried first and convicted of both counts.  The Fifth Circuit Court of Appeals affirmed his conviction and life sentence in a published opinion.  *United States v. Gulley*, 526 F.3d 809 (5th Cir. 2008).

Two.  (3 R. 875-78).

On December 28, 2006, Jackson file a motion for new trial.  (3 R. 861-69).  The United States responded on January 19, 2007.  (3 R. 881-89).  The Court subsequently denied the motion.  (3 R. 892-905).

Jackson filed a direct appeal with the Fifth Circuit Court of Appeals.  Jackson's conviction and sentence were affirmed in a published opinion. *United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008)  Jackson's petition for writ of certiorari was denied by the United States Supreme Court, *David Lee Jackson v. United States*, --- U.S. ---, 130 S.Ct. 51 (2009).

On October 5, 2010, Jackson filed his petition for collateral relief and incorporated exhibits.  (Docket, documents 41-51).  Claim number two of the petition for collateral relief asserts that Jackson is mentally retarded and ineligible for the death penalty pursuant to statute and Supreme Court precedent.  Claim number two also asserts that Jackson's trial counsel were ineffective for having failed to raise an *Atkins*[7] defense as a bar to the death penalty.  (Docket, document 41).  On November 24, 2010, this Court issued an order directing the United States to file a response to  Jackson's request for a hearing on the issue of Jackson's mental retardation and its position on the merits of the issue. (Docket, document 54).  Following a series of motions and orders setting schedules for responses and mutual discovery obligations, this Court  entered an order on July 29,

---

[7] *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242 (U.S. 2002)

2011, directing that the United States response on this issue be filed on or before August 28, 2011. (Docket, document 115).

II.

**APPLICABLE LAW ON THE ISSUE OF MENTAL RETARDATION**

18 U.S.C. § 3596 provides that:

A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed upon that person.

It is unequivocal that Congress intended that a person, sentenced to death, not be executed if the person is mentally retarded. Indeed, the prohibition on execution of a mentally retarded person is not found in § 3591 which sets forth the requirements for the imposition of a death sentence, but rather in § 3596(c), which exclusively relates to the implementation of a death sentence. The statute however is devoid of any guidance regarding how or when the determination of mental retardation or competency is to be made.

Subsequent to the enactment of § 3596, the Supreme Court declared the execution of a mentally retarded person to be cruel and unusual punishment under the Constitution. *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins,* the Court concluded that the standards of decency have so evolved that there is now a national consensus against executing mentally retarded offenders. *Id* at 314. This conclusion was based on the number of states that had prohibited death sentences for the mentally retarded, the fact that changes

5

in legislative attitudes was consistently moving toward prohibiting such sentences for the mentally retarded, and the Court's own assessment of the Eighth Amendment in this context. *Id* at 314. The Supreme Court's opinion in *Atkins*, like the pertinent federal statute, designates mental retardation as a bar to execution. Neither § 3596 nor *Atkins* require the trial court to find a lack of mental retardation as a prerequisite for a jury's determination that a sentence of death is justified.

## III.

### THE MENTAL RETARDATION STANDARD TO BE APPLIED

Although in *Atkins* the Supreme Court struck down the execution of mentally retarded individuals, it recognized that "not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317. The Court left it to the states to determine how to differentiate those "offenders about whom there is a national consensus." Based on the Supreme Court's adoption of definitions of "mental retardation" provided by the American Association on Mental Retardation ("AAMR")[8] and the American Psychiatric Association, courts have used these definitions to determine what a defendant must prove in order to claim mental retardation. *Atkins*, 536 U.S. at 309 n.3; see *United States v. Davis*, 611 F. Supp. 2d 742, 474 (D. Md. 2009); *United States v.*

---

[8] The American Association on Mental Retardation is now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD"). For purposes of this response, counsel will refer to AAIDD by its former name to be consistent with prior case law.

*Nelson*, 419 F. Supp. 2d 891, 893-94, (E.D. La. 2006); *United States v. Sablan*, 461 F. Supp. 2d 1239, 1240, (D. Colo. 2006). The AAMR definition states:

> Mental retardation is a disability characterized by significant limitations in both intellectual functioning and in adaptive behavior, as expressed in conceptual, social and practical adaptive skills. This disability originates before age 18.

AMERICAN ASSOCIATION ON MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 8 (Robert L. Schalock and Ruth Luckasson, 10th ed. 2002) ("AAMR 2002"). The American Psychiatry Association defines mental retardation as "significantly sub-average general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 (Criterion C)." AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. Text Revision, 2000) ("DSM-IV-TR"). The DSM-IV-TR makes it clear that the while a sub-average general intellectual functioning as demonstrated by intelligent quotient ("IQ") is essential, it is not dispositive, stating:

> It is possible to diagnose Mental Retardation in individuals with IO's between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, mental retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.

*Id*. at 42-43.

Essentially, there is a three-pronged test in determining whether a defendant is

mentally retarded thus making the defendant ineligible for capital punishment:

> An individual must have (1) significantly below average intellectual
> functioning, (2) significant deficits in adaptive behavioral skills, and (3) onset
> of the condition before age eighteen.

*United States v. Davis*, 661 F. Supp. 2d 472, 475 (2009).  A "significant"

limitation in intellectual functioning is best represented by an IQ score that is

approximately 70 or below.  *Nelson*, 419 F. Supp. 2d at 894.  A significant limitation in

adaptive behavior generally "requires performance of at least two standard deviations

below the mean of either (a) one of the following three types of adaptive skills;

conceptual, social, and practical, or (b) an overall score on a standardized measure of

conceptual, social, and practical skills." *Davis*, 661 F. Supp. 2d at 475.  Finally, people

with mental retardation do not acquire skills during the developmental stages (i.e., years

birth to 18) at the same rate as individuals without a developmental disability.  This is an

important factor because an individual who exhibits sub-average intellectual functioning

and adaptive deficits as an adult due to trauma would not be classified as mentally

retarded since that condition is not developmental in nature.  *Id.*   Thus, evidence of all

three prongs must be presented in order for the Court to classify a defendant as mentally

retarded.

**IV.**

**PETITIONER FAILS TO MEET THE CRITERIA FOR MENTAL RETARDATION/INTELLECTUAL DISABILITY AND IS THUS, ELIGIBLE FOR THE DEATH PENALTY**

Pursuant to conditions established by the Court, Jackson was recently evaluated by Dr. James D. Seward, Ph.D., a neuropsychologist[9] retained by the United States to determine if Jackson is intellectually disabled to the end that he has mental retardation.

Following testing of Jackson, an extensive review of collateral data, and Jackson's behavioral presentation during the evaluation, Dr. Seward concluded that Jackson is not intellectually disabled and therefore is not mentally retarded.

**INTELLECTUAL FUNCTIONING - IQ DATA**

Dr. Seward concludes that Jackson's current IQ scores are in the range that when accompanied by some supportive functional evidence, could potentially be consistent with mild mental retardation. On July 14, 2011, Dr. Seward administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) to Mr. Jackson. This examination resulted in a full scale IQ score of 70. In addition to his own testing, Dr. Seward notes in his report that Jackson's IQ and mental abilities have been tested on seven previous occasions from 1967 to 2006 - resulting in IQ scores of 76, 67, 80, 73, and 81. At both the low end score of 67, and the high end score of 81, Dr. Seward notes possible reasons included in the record or anecdotal history to question the validity of those scores. Rather than duplicating Dr. Seward's evaluation of Jackson in this response, the preliminary

---

[9] *See* Curriculum Vitae of James D. Seward, Ph.D., attached as GX #1.

report will be attached as GX # 2 and incorporated in it's entirety.

### ADAPTIVE FUNCTIONING

The DSM-IV-TR lists the following adaptive skill areas that must be considered when diagnosing mental retardation: Communication, Self-Care, Home Living, Social/Interpersonal Skills, Use of Community Resources, Self-Direction, Functional Academic Skills, Work, Leisure, Health, and Safety.

At the scheduled *Atkins* hearing, the United States will produce extensive evidence and testimony in regarding the following adaptive skills:

### Communication

Extensive evidence, both written and oral, clearly demonstrates that Mr. Jackson is able to effectively communicate in order to address his needs and desires. Mr. Jackson routinely communicates with prison officials to address medical needs, financial matters, disciplinary allegations, commissary, educational opportunities, and other personal needs. As noted in Dr. Seward's report, prominent examples of Mr. Jackson's ability to communicate effectively are Dr. Seward's video interview of Mr. Jackson in July 2011, and Mr. Jackson's testimony at his trial in 2006.

### Self-Care

Evidence from the Bureau of Prisons (BOP) show that Mr. Jackson is able to independently take care of his daily activities, seek medical assistance, and clearly explain the nature of his requests. Mr. Jackson's personal hygiene and care for his environment are evident in the records of the BOP.

### Home Living

Mr. Jackson has lived virtually his entire adult life in prison. The evidence is substantial that he is able to attend to his needs by the means available to him. Mr. Jackson has demonstrated an ability to adjust to his environment, produce income while incarcerated, and socialize both inside and outside his prison home. Jackson's own defense in his 2006 trial described a gambling operation

he organized to produce income in his "home" environment.

## Social/Interpersonal Skills

Dr. Seward's report evidences his expert opinion that his five hour interview with Mr. Jackson prior to testing is excellent documentation of his (Jackson's) social and interpersonal skills and the lack of deficit in this skill. Just as notable is Jackson's testimony during his trial in 2006, which shows clearly that he communicates and interacts with others in a clear, concise and articulate manner. Evidence from the BOP are relevant to multiple adaptive skill categories, and BOP officials will testify as to Mr. Jackson's social and interpersonal skills.

## Use of Community Resources

The United States will produce evidence that shows Mr. Jackson utilizes numerous resources available to BOP inmates. These resources include reading materials, mail, Internet, use of the law library, educational opportunities, and medical services.

## Self Direction

The record demonstrates that Mr. Jackson effectively assisted his counsel at trial in 2006, monitors his own health, seeks medical treatment when needed, operates an illegal gambling operation to produce income, handles his own finances, and has invoked his constitutional rights. Mr. Jackson has utilized the Internet to solicit correspondence and establish relationships outside his prison environment. Particularly relevant to this adaptive skill, Mr. Jackson has not only committed serious crimes that required planning and initiative, he has escaped from custody on repeated occasions. Of particular note, in 2005, while awaiting trial for the offense of conviction, Jackson, his co-defendant, Arzell Gully, and another inmate named Todd Christopher perpetrated a sophisticated escape from custody. On that occasion, Jackson was able to manipulate an experienced corrections officer to open a door to receive written commissary slips. Once the door was opened, Jackson assaulted the officer, took his jail keys, and was able to operate an elaborate mechanical system to release Gulley from his cell. After handcuffing the officer, the three inmates went to a control room and armed themselves with mace and riot batons. Once armed, they proceeded downstairs to the inmate receiving area, assaulted other officers, disarmed radio equipment and activated electric controls to escape the corrections facility in downtown Beaumont.

11

**Functional Academic Skills**

Dr. Seward's report includes his extensive review of numerous written communications authored by Mr. Jackson for a variety of purposes. The report also details an assessment of Mr. Jackson's academic abilities in word reading, sentence comprehension, spelling, math computation and reading composite. Dr. Seward concludes that Mr. Jackson is not impaired in this skill and notes that he (Jackson) has completed a variety of adult education courses and successfully completed a GED.

**Work**

BOP records reflect that Mr. Jackson has qualified to work in a number of assignments available to inmates, including Federal Prison Industries. In addition to his BOP approved work assignments, Jackson operated a sports gambling operation while incarcerated. Within this environment, Jackson has a proven ability to work when he chooses.

**Leisure**

As noted in Dr. Seward's report, Mr. Jackson's opportunities for leisure are limited by his confinement. Evidence will show that Mr. Jackson keeps numerous books and publications, corresponds with persons outside the prison, and follows sports closely enough to maintain his gambling activities.

**Health**

As referenced previously in this response, Mr. Jackson effectively monitors his health, advocates for his medical needs, and maintains a good level of fitness. BOP medical records reflect that he complies with directions and treatment plans from BOP medical professionals.

**Safety**

As noted previously, Mr. Jackson's awareness of his health and medical needs evidences a concern for his own safety that would not be expected of a mentally retarded person.

The evidence the government will produce will reflect clearly that Mr. Jackson has adapted very well to the criminal life that he chose and has a demonstrated ability to communicate with others, care for himself, have social interaction when he chooses, and live relatively well within the "home" he has been in since he was sixteen years old. He is able to effectively utilize the community resources available to him, read, write and account for his finances. Such evidence fails to demonstrate any deficit in adaptive functioning as required for a diagnosis of mental retardation. Of the eleven adaptive skill areas, Dr. Seward concluded that Jackson was not impaired in any of the listed adaptive skills. Dr. Seward does note that in six of the eleven adaptive skills areas (Self-Care, Home Living, Use of Community Resources, Work, Leisure and Safety), Mr. Jackson was unimpaired while incarcerated and that further information is being sought regarding his functioning in the free world. If at any time before the November 2011 *Atkins* hearing, Dr. Seward reaches a different conclusion regarding adaptive skills that changes the position of the United States, counsel will advise the Court and opposing counsel immediately.

## V.

## CONCLUSION

As referenced above, the government's position on the merits of the issue is that Petitioner David Lee Jackson does not suffer intellectual disability and is not mentally retarded. Regarding Petitioner's request for an *Atkins* hearing, the United States joins in this request. A hearing on the request will allow the parties an opportunity present

sufficient evidence and testimony to provide this Court with all information needed to

rule on this critically important issue.

Respectfully submitted,

JOHN M. BALES
UNITED STATES ATTORNEY


/s/ Robert L. Hobbs
ROBERT L. HOBBS
Assistant United States Attorney
Texas Bar No. 00796764
350 Magnolia Ave., Suite 150
Beaumont, TX  77701
(409) 839-2538
(409) 839-2550 (fax)
(robert.hobbs@usdoj.gov)


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing response was delivered by electronic delivery to counsel of record, Christopher Craig, on August 25, 2011.


/s/ Robert L. Hobbs
ROBERT L. HOBBS
ASSISTANT U.S. ATTORNEY

14