1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DAVID LEE JACKSON            |   DOCKET 1:09CV1039
                             |
                             |   SEPTEMBER 14, 2011
VS.                          |
                             |   2:17 P.M.
                             |
UNITED STATES OF AMERICA     |   BEAUMONT, TEXAS

-----------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 21

REPORTER'S TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE RON CLARK
UNITED STATES DISTRICT JUDGE

-----------------------------------------------------------------

APPEARANCES (BY TELEPHONE):

FOR THE GOVERNMENT:      ROBERT L. HOBBS
                         U.S. ATTORNEY'S OFFICE
                         350 MAGNOLIA AVENUE
                         SUITE 150
                         BEAUMONT, TEXAS   77701


FOR DAVID LEE JACKSON:
                         CHRISTOPHER CRAIG
                         O'MELVENY & MYERS
                         400 SOUTH HOPE STREET
                         LOS ANGELES, CALIFORNIA   90071


COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RMR
                         FEDERAL OFFICIAL REPORTER
                         300 WILLOW, SUITE 221
                         BEAUMONT, TEXAS   77701



   PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
  TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

2

(REPORTER'S NOTES 9-14-2011\JACKSON, 2:17 P.M., WEDNESDAY, SEPTEMBER 14, 2011, BEAUMONT, TEXAS, HON. RON CLARK PRESIDING.)

(OPEN COURT, ALL PARTIES PRESENT BY TELEPHONE.)

THE COURT:  This is Judge Clark; and I call *David Lee Jackson versus United States*, Number 1:09cv1039.

Who is here for Mr. Jackson?

MR. CRAIG:  This is Christopher Craig for Mr. Jackson.  And we also have Christopher Holinger for Mr. Jackson, although he will be a silent participant.

THE COURT:  Okay.  Well, welcome, Mr. Holinger.

MR. HOLINGER:  Thank you.

THE COURT:  And for the government?

MR. HOBBS:  Good afternoon, judge.  Robert Hobbs for the government.

THE COURT:  Okay.  And there was a request made for a conference.  I guess it was a joint request for a conference.  So, who wants to tell me what it's about?

MR. HOBBS:  Robert Hobbs for the government, your Honor.  Let me lead off.  And I would certainly invite Mr. Craig, if I get any of this either worded in a

3

way that he's not comfortable with, to correct me.

What had happened, judge, if I may, since we got the court's email regarding the possible reset of the November date for the *Atkins* hearing, we have continued to coordinate regarding -- there's been some supplemental discovery.  It's things that have been produced both by the government's expert witness and things that have come in just -- they're not critical.  They just add to the picture, I suppose -- that it's taken a lot longer for the BOP to produce than when we had our production to defense -- excuse me -- to lead counsel several weeks ago.

But anyway, we've continued to coordinate on those matters; but I think, if I may speak for Mr. Craig for just a moment, the government's expert, Dr. James Seward -- the report that we filed with the government's response on the *Atkins* issue that was provided to the court and writ counsel was characterized by Dr. Seward as "preliminary."  That has been -- as we move toward the November date, that has been some concern to Mr. Jackson's counsel.

While I think it is unlikely that the conclusion would change, it obviously has some strategic implications for Mr. Jackson and his counsel; so, they have been very diligent and very polite in asking me for

4

periodic updates on when Dr. Seward, or the government's expert's, final report will be available. And the answer to that is I don't know. I've been in contact with our expert witness, and what he tells me is that they continue to look into the situation. They continue to explore the many materials that both we have produced and that they are looking into on their own and that it may be some time before that final report is available, although I think I am accurate in saying it is very unlikely that the conclusion would change from the expert witness. But I will let Mr. Craig speak as to how that affects their approach to the matter.

So, as we were considering that and in view of the court's recent email about the possibility of an update, Mr. Craig and myself took it on ourselves to try to start -- in the event a reset was needed, to try to start harvesting or gathering a number of dates that would be clear on both our calendars and the expert witnesses' calendars that we could then tender to the court, in the event of a reset, for the court's review.

And out of that conversation, counsel for Mr. Jackson requested this conference. I personally envisioned a conference just with Ms. Frampton on the court's staff, but Mr. Craig and Mr. Jackson's counsel thought it would be advantageous to have the court

5

participate as well.  So, that's kind of what gets us to where we are now.

THE COURT:  Okay.  Well, let me mention that it's not impressive to hear about an expert's report that is preliminary and that something will be coming out later.  Generally experts are limited to testify about what's in their report as a matter of fairness in this district.  That's just the way it is.  So, that does raise some concern.

Presumably your expert -- the way the BOP runs their facility, they're not letting him come in and visit on visiting days.  I assume that he's going over material -- when he talks about new material, where is this coming from?

MR. HOBBS:  Well, judge -- Robert Hobbs again. As it was explained to me, I'll give you an example.  And I'll just say I am dealing with experts at some distance. I don't offer that as an excuse, but it is not always easy to coordinate with them as well.

But what they explained to me is, for example, in Dr. Seward's interview with Mr. Jackson, they speak about many things including a relationship and some long-distance email relationships with people in Europe. And, so, Dr. Seward and the forensic panel, the government's expert, takes it upon themselves to follow

6

up on that; and they've started receiving correspondence as a result of that interview and interaction with people of that nature.

So, that leads to a request of -- they were asking me, you know, how does a person on death row access -- make international phone calls and how does a person on death row use the Internet and emails.  So, as they posed those questions to me, I've attempted to get answers to those; and that's kind of what I'm making reference to.

I don't think it's going to change the conclusion, but I certainly don't want to disadvantage the writ counsel in whatever strategic implication the "preliminary" characterization of Dr. Seward's report that was tendered to them has.  I'll let them speak to that on their own.

THE COURT:  Well, I guess the other concern -- it's not usually raised -- is because of the current administration's budget crisis, obviously funding is short on the CJA side and on the court's side.  And I presume also, based on what I've heard of the problems that the U.S. Attorney's Office is having around the country, you also -- I'm a little concerned about some expert running amuck -- although it's not out of my budget -- dealing with emails with somebody in Europe

and presumably billing at the princely fee that I'm sure he charges for each and every minute of email he reads. Maybe at some point it would be well to cut that report off just as a matter of saving your budget and the taxpayers. I mean, that's really more of, I guess, a budgetary concern of your office.

Okay. So, you're interested in, if the case does have to be moved, coming up with some other dates.

Mr. Craig, what are your concerns?

MR. CRAIG: Yes, your Honor. This is Christopher Craig.

I think largely Robert Hobbs has characterized the concerns that we have accurately. Even if the conclusion of the final report doesn't change, however, there is at least some concern on our end that a significant number of facts could change. We're still receiving discovery. In fact, we just received some new discovery items that Mr. Hobbs received today from the Bureau of Prisons and we're not sure what new facts that will raise but depending on the --

THE COURT: Well, what -- give me a hint --

MR. CRAIG: -- certainly prepared to respond to that at the hearing, and our time for that is running increasingly short.

THE COURT: Give me a hint as to what you just

8

received from the Bureau of Prisons.

MR. CRAIG: We don't actually know yet. I mentioned Mr. Hobbs sent it to us today, but it hasn't reached us yet by FedEx.

MR. HOBBS: If I may, judge, what I put in the FedEx delivery to defense *[sic]* counsel today was -- the government's expert had requested quite a long list of items, if you will, that they are familiar from previous experience with the BOP. They looked at Mr. Jackson's central file, and they saw that there were -- one example or one thing that's in the package that I FedExed today was adult education courses that he took at the BOP and wanting his grades and the course descriptions and so forth.

As it's explained to me, a lot of that comes from contractors and it took the BOP quite some time to gather that and I just recently received it. I received it last week and I summarized it, characterized it, and sent copies to my expert and to Mr. Craig today. It's that sort of thing.

THE COURT: Okay. All right.

MR. CRAIG: And if I could just interject again, your Honor. This is Christopher Craig again. In a number of places in the preliminary report from Dr. Seward, it mentions information about Mr. Jackson in

9

an institutional setting but mentions that he's still seeking information in other settings as to Mr. Jackson's adaptive abilities and deficits.  That could be significant.  I don't think there's really any area in the report yet where that sort of information is even covered.  I'm not sure if Dr. Seward has given up on that, but that's again another area that we would have to respond to.

THE COURT:  Well, you would have to respond to it if he came up with it before the hearing.  If he didn't come up with it before the hearing, it wouldn't be in and --

I mean, it seems to me, Mr. Hobbs, that given the incentive of experts who know they're going to get paid to keep digging forever, especially if there's not much other work available -- we run into the possibility of this becoming a cash cow and, you know, every stone gets overturned and then rolled around and then painted and then polished and then turned over again and -- I mean, you've been -- you're well familiar with how some bureaucrats work and how sometimes the system can be gamed that way by outside people.

It would seem there is a point where we could just cut it off and say, "Okay.  Here's your deadline to provide your information to Mr. Jackson's attorneys.  If

10

you don't have it by now, then it can't be that important."

I really am concerned about that because it's a little unfair, given the constrictions that are obviously placed on Mr. Jackson and Mr. Jackson's experts. And your expert may think he's doing a wonderful, in-depth, to-the-max job; but at some point the comparison -- I mean, the value of what he's doing starts to become questionable.

Am I understanding that either side is asking for more time, or what is it that you're --

Let me ask you, Mr. Craig. What is it you're wanting?

MR. CRAIG: Yeah. Sorry, your Honor. This is Christopher Craig again. To make that explicit, we would at this point ask for a continuance. I think actually we're neutral between one of two things.

The expert report from the government was due on August 28th; and if we had received the report on August 28th, I don't think a continuance would have been necessary. I do think Mr. Hobbs is accurate that we've been talking in good faith and we don't want to necessarily cut them off as a strategic point, although we would be amenable to that, too. But we sort of need one or the other at this point. We need the expert

11

report as of two weeks ago when it was initially due, or we need more time now to respond to it.

THE COURT:  Okay.  Mr. Hobbs?

MR. HOBBS:  Well, let me say, judge -- this is Robert Hobbs.  Perhaps there is -- I will certainly convey the court's concerns.  Those are concerns that have occurred to me as well.  I do feel like I must let the court know, although I'm sure the court is already aware, that each U.S. Attorney in this particular area is not -- we have bosses in Washington, DC, at the Department of Justice that in some manner control these decisions.  I will certainly convey that.

It's the government's position that the conclusion that was contained in the preliminary report, that our expert has concluded that Mr. Jackson is not mentally disabled, is the position of the government.  If that is somehow unfair to characterize it as "preliminary," then I apologize for that.  It may be my own lack of depth in this area as I've attempted to educate myself in this kind of hearing.  I don't want to disadvantage Mr. Jackson in this regard.  It's too important of an issue.  I will do my best to cut this off as soon as I can get some guidance from Washington, DC.

THE COURT:  Well, it seems to me that when we're daily bombarded with the sorry news of our budget

and the U.S. Marshals, for example, can barely afford to keep prisoners at the local jail because of what they have to pay on a daily basis and training is going down the drain in some of our agencies in the justice system that -- and I know -- I mean, the hiring freezes -- I'm quite sure that -- I mean, it would be nice if there was budget increases that would allow you to have more administrative support staff -- that the people in Washington who perhaps feel no burden at all, perhaps they don't cut back at all, are willing to pour money into ever-diminishing marginal returns.

Contacting email people in Europe for their opinion or whatever on the mental capacity of somebody in a prison -- difficult for me to believe that most courts are going to come alive to that kind of testimony.

MR. HOBBS:  Well, judge --

THE COURT:  It just -- I mean, obviously the justice department and Mr. Holder can make any decision they want; and it's a little frustrating that that's what endless money is going to be spent on in a case like this and that we have an expert who is basically hemming and hawing saying, "Well, this is preliminary.  Maybe I can gild the lily a little bit more."  That's what it sounds to me like he's doing.  Maybe it's not.  Maybe he's done a full and correct report and he's not trying to

13

backfill, but at some time you've got to pull the trigger.  And if all he wants to do is wait, wait, wait, wait and then, after he hears the other side's testimony, come forward and say, "Oh, by the way, did I mention the European commission on whatever that I was in contact with," that is almost an unfairness to the taxpayer, let alone -- and I know you're not doing it, Mr. Hobbs, because you're one of the most ethical attorneys I know; and I'm always pleased to have you appear and work in the court.

          But what about if I say within seven days whatever report and supplements he has, that's final? Now, obviously you still have the duty -- if suddenly the Bureau of Prisons comes up with something that would indicate that Mr. Jackson's retarded, I know that you, of course, would share that because the government doesn't want to execute a retarded individual.

          And I know that Mr. Bales -- I mean, I feel fortunate to work in a district where people like you and Mr. Bales are here and you're not going to do that.  But on the other hand, at some point the expert maybe needs to just, you know, cut to the chase.

          MR. HOBBS:  Robert Hobbs, judge.

          Judge, I take your point on that; and I'm not in total disagreement with it.  I do think that many of

14

their efforts -- I think they're trying to address adaptive skills as much as you can in this situation for skills outside of the prison setting.  Emails, international correspondence, that sort of thing is something that's been raised in their efforts so far. And, so, I think that's one of the things -- as Mr. Craig characterized it, I think Dr. Seward's report, while characterized as "preliminary," is complete to the point of what he feels about his adaptive skills and his adaptive behavior in a prison environment; and he will continue his efforts to try to address adaptive skills outside of that environment.  I think that's what he is attempting to do.  There is limited opportunities to do that for a man who has spent his adult life in the penitentiary.

THE COURT:  Right.

MR. HOBBS:  But obviously the government will -- and I appreciate your complements, judge.  If the court sets that sort of deadline, then I'm going to convey that to my expert; and we will abide by the court's position in that regard.  I don't think that they're just trying to bill for these; although, I will tell you they don't hesitate to send bills.  But I don't think that's their purpose.  I do think they're trying -- at least that's my impression dealing with them on the

15

phone and emails, that they are trying to build a comprehensive picture.

THE COURT:  Okay.

MR. CRAIG:  Your Honor, this is Christopher Craig.  I just would like to make one other point.

THE COURT:  Sure.

MR. CRAIG:  Basically when this report was initially due on August 28th, we had roughly 11 weeks until November 8 when the hearing was going to start; and each week we delay cuts into that time that we have to prepare.  I mean, we can speculate as to what might be new or what other information might be uncovered by Dr. Seward; but the basic position of Mr. Jackson is that we'd still like to have the benefit of those full 11 weeks to prepare for whatever the government is going to say.  Now that we're already a couple weeks past and may be further past, we would like a continuance to make up that time.

THE COURT:  Well, on the other hand, you've had the report itself which contains presumably the bulk of the opinions and the bulk of the basis of the opinions to look at and figure out where he is coming from.  Many of these reports -- I mean, they follow a pattern.

What I'm going to do is this, is I'm going to direct that the government's time to add supplemental

16

material to or supplemental opinions to the report will end on September 23rd.

Now, if between then and now some startling new change comes in, Mr. Craig, bring that to my attention in terms of the need for a continuance.  If it's just more of the same-old same-old items bolstering what he's already said that -- if it doesn't appear to me to have somehow prejudiced you, then it seems it's fair to go forward.

One of the problems with a continuance is that you wind up with the other side bulldozing their case even further.  I mean, just strategically I'm trying to think in fairness here that -- at some point it seems to me the experts in this field basically know what they're going to say.  They've done the research they need to do. They've had the testing.  Endless more time to think is not likely to be very productive, from either side.  That still gives the full month of October and a couple of extra weeks to get prepared for the hearing.  I'm still at this time unable to just grant a continuance based on the fact that the *Groce* case is there.  Under the law criminal cases take precedence, but that is kind of the situation most trial attorneys are in.  Very seldom can you get a completely special setting, especially not for a hearing, because at any time a criminal case may come

17

along and the court is required by law to give that precedence.

On the other hand, I am aware that you have to make arrangements.  Your expert has to make arrangements.  And I'm going to closely be watching this other criminal case; and at some point I will come to the conclusion that, okay, nothing's happened on it.  We're going forward.  And then I'll let you know -- try to let you know at least a couple of weeks in advance that, okay, we're not going to have this hearing when it's scheduled and move it on.

So, I'm trying to balance out your need to plan and your experts' need to plan with the inevitable problems of a crowded schedule and the priority that must be given to criminal cases.  Not the best situation, but it's one that almost every trial attorney faces on a monthly if not weekly basis, depending on what kind of docket you have.

It occurs to me that some of this information you're getting is some of the information that Mr. Lohman had asked for in the past, especially dealing with his prison files.  So, I also have to take into consideration that some of this may be working to the advantage of your client in that it's information that I believe Mr. Lohman had indicated in the past that his expert -- or your

18

expert wanted.  I don't know what was actually FedExed to you, but that sounded like it might be some of that.

Okay.  Anything else, then, from point of view of the government?

MR. HOBBS:  Robert Hobbs, your Honor.  No, sir.

THE COURT:  Okay.  What about from point of view of Mr. Jackson?

MR. CRAIG:  This is Christopher Craig.  No, your Honor.  I don't believe so; although, again, I reserve the opportunity to -- in light of what the government may produce on September 23rd -- ask for a further continuance if there are new facts that we need to respond to or investigate.

THE COURT:  Sure.  And I just told you that. I mean, I'm not going to hold it against you to try to represent your client.  I mean, that's your job.

Why don't you take a look and see what he comes up with; and let's see if it is some really new or different change or a little extra gild on the lily, in effect, before we make that decision.  And for that matter, it may work out that eventually I'm just going to have to say we're going to have to move you, just for scheduling purposes.

All right.  Then anything else from

19

Mr. Jackson's point of view?

MR. CRAIG:  Just following up on your last point, your Honor, would it be helpful at this point if we give you new dates?  I know at least when we responded to Ms. Frampton's email a couple weeks ago, our expert had already filled the rest of November and December.  So, we worked with her to get additional dates.  I don't know if they're helpful at --

THE COURT:  Oh, we wouldn't be -- the problem -- for some odd reason I suddenly have a number of major criminal cases directed against local politicians; and as you can imagine, those are in the two- to three-week variety as opposed to the two- or three-day cookie of crack cocaine case.  It's going to be April before I next have a block of time of as much as three days.  And what I would try to do then is set aside some time that I was very -- or not very sure but pretty sure that you weren't going to get bumped.  I don't want to keep doing this to you forever.

So, it would be probably in the range of April 3rd, 4th and 5th, so that you don't wind up riding the docket with the Walker case and then riding the docket with another major case, Tri-Century, and then -- you know, that's not fair to you or fun for a lawyer.

So, what counsel on both sides might file away

20

in the back of their mind, that the next open times I have are April 3rd, 4th, and 5th of 2012.

MR. HOBBS:  Robert Hobbs, judge.  I will go ahead just as a precaution and ask my witnesses to block that time out until further notice.

THE COURT:  Okay.

MR. CRAIG:  This is Christopher Craig.  I will do the same, your Honor.  We had only asked our experts about February and January; so, I will let them know.

THE COURT:  Right.  No.  To set you in February or January would leave you almost in the same position of I've got these other criminal cases and other large cases that take precedence that I'm pretty sure are going to go to trial, and nobody likes doing that.  At least I never did when I was in practice, and I'm assuming you don't either.  So, let's not do that.

Okay.  That covers everything for you, Mr. Hobbs?

MR. HOBBS:  Yes, your Honor.

THE COURT:  And for you also, Mr. Craig?

MR. CRAIG:  Yes, your Honor.

THE COURT:  All right.  And to our silent participant, Mr. Holinger, I appreciate your attendance also.

MR. HOLINGER:  Thank you, your Honor.  The

21

reason is because my paperwork to be admitted to the Eastern District of Texas has not yet been completed so --

THE COURT:  Oh, okay.

MR. HOLINGER:  I will be making an appearance on behalf of Mr. Jackson shortly.

THE COURT:  We'll look forward to that.

I appreciate all of you attending and you are excused and the court is adjourned.

(Proceedings concluded, 2:46 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, SEPTEMBER 20, 2011, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

_Christina Bickham_
CHRISTINA L. BICKHAM,    CRR,    RMR

Christina L. Bickham, RMR, CRR
409/654-2891