IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DAVID LEE JACKSON, | § | |
| | § | |
| *Petitioner,* | § | Civil Action No. 1:09-CV-1039 |
| | § | |
| v. | § | JUDGE RON CLARK |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Respondent.* | § | |

## MEMORANDUM ORDER DENYING MOTION FOR SUBSTITUTION OF COUNSEL

Petitioner David Lee Jackson was convicted of murder and the use of a dangerous weapon

to commit murder, in violation of federal law, and sentenced to death. His conviction and sentence

were affirmed by the United States Court of Appeals for the Fifth Circuit, and the Supreme Court

denied Mr. Jackson's petition for writ of certiorari.[1] *Pro bono* counsel from O'Melveny & Myers

first appeared on his behalf in this habeas proceeding on October 1, 2009. On the motion of trial

counsel, the court appointed James Lohman as habeas co-counsel on October 13, 2009.

Over the course of the next two years, Mr. Lohman submitted six CJA 30 vouchers totaling

$141,674.39 for services rendered between October 13, 2009 and September 27, 2011.[2]

---

[1] Mr. Jackson's lead counsel at trial had tried no fewer than 31 capital cases and handled some 24 capital cases on appeal or other post-conviction motions. Associate counsel had tried more than 20 capital cases and appeared in more than 15 capital cases post-trial.

[2] The court has discussed Mr. Lohman's CJA vouchers at length in seven sealed orders. *See* Docs. # 32, 89, 90, 97, 116, 135, 139.

This does not include the amount of money Mr. Lohman unsuccessfully requested specifically in connection with an *Atkins* hearing.[3]

To date, Mr. Lohman has been paid $85,755.29,[4] or about 60% of the funds for which he submitted CJA vouchers. As the court has pointed out in orders ruling on his CJA requests, his description of work performed was frequently inadequate.[5]

---

[3]Mr. Jackson's 2255 petition asserted that he was mentally retarded. Since this issue was not ruled on at trial, this court requested a proposed *ex parte* budget for an *Atkins* hearing. After receiving the budget, the court authorized an additional $8,424.00 in attorney's fees and expenses specifically for the *Atkins* hearing. Doc. # 89. The Fifth Circuit approved attorney's fees and expenses in the same amount. Doc. # 113. Mr. Lohman subsequently moved for an additional $31,328.00 in attorney's fees for the *Atkins* hearing, asserting that the hearing will last more than a week. The court denied the motion. Doc. # 135. Because the Government's expert agrees that IQ tests taken before and after age 18 are within the mentally retarded range, the hearing will focus on adaptive functioning. The court will read the expert reports and other exhibits before the hearing, so extensive time need not be spent rehashing the reports on direct. Accordingly the court does not agree with Mr. Lohman's assertion that a week or more will be needed for the *Atkins* hearing.

[4]Before the case was transferred to the undersigned on July 23, 2010, Mr. Lohman's December 15, 2009 and February 8, 2010 CJA 30 vouchers had been paid in the amount of $40,018.19. A comparison of Mr. Lohman's fee statements with the time records submitted at the court's direction by *pro bono* counsel leads the court to conclude that, with the exception of the October 10, 2010 voucher, much of the work performed by Mr. Lohman was the filing of lengthy requests for attorney's and expert fees. While the case was still assigned to Judge Crone, Mr. Lohman obtained authorization for the retention of mitigation specialist and investigator Rachel Rogers. Ms. Rogers has been paid $23,742.00. Unbeknownst to the court at the time, and certainly never mentioned in Mr. Lohman's papers seeking Ms. Rogers's appointment, Ms. Rogers was, and still is, married to Mr. Lohman. Putting aside the ethical concern of nepotism, it appears that the Lohman/Rogers family has already reaped $109,497.29 from this case.

[5]*Hensley v. Eckerhart*, 461 U.S. 424, 437 & n.12, 103 S. Ct. 1933, 1941 & n.12 (1983) ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended . . . The applicant should exercise 'billing judgment' with respect to hours worked . . . and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims . . . ."); *League of United Latin Am. Citizens No. 4522 (LULAC) v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1223 (5th Cir. 1997) (counsel "take their chances by submitting fee applications that are too vague to permit the district court to determine whether the hours claimed were reasonably spent.") (internal quotation omitted).

Mr. Lohman now seeks to withdraw as counsel, in favor of Morris H. Moon of the Federal Capital Habeas Project. The request is unopposed by Mr. Jackson, and seems to be based solely on Mr. Lohman's failure to receive all of the money he has requested in this case.

**Discussion**

Texas Disciplinary Rule of Professional Conduct 1.15(b)[6] states that a lawyer "shall not withdraw from representing a client" unless one of seven enumerated grounds are met. In this case, the court understands Mr. Lohman's request to be based on Rule 1.15(b)(6): "the representation will result in an unreasonable financial burden on the lawyer . . . ." However, Rule 1.15(c) goes on to state that "[w]hen ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."

While the court assumes that Mr. Moon is qualified, this habeas case has been pending for nearly three years. The petition has been filed, and discovery is all but complete. The *Atkins* hearing setting for July 2011 was continued at Mr. Lohman's request.[7] Doc. # 88 at 1. The hearing has since been continued several times because Mr. Jackson's mental retardation expert Dr. Victoria Swanson is currently undergoing debilitating radiation and chemotherapy cancer treatment.

Mr. Lohman has been involved from the beginning of this habeas case, and asserts that he is experienced in the field of mental retardation claims. Based on the billing requests, the work Mr.

---

[6]Under Eastern District of Texas Local Rule AT-2(a), "[t]he standards of professional conduct adopted as part of the Rules Governing the State Bar of Texas shall serve as a guide governing the obligations and responsibilities of all attorneys appearing in this court . . . [T]he attorney practicing in this court should be familiar with the duties and obligations imposed upon members of this bar by the Texas Disciplinary Rules of Professional Conduct . . . ."

[7]One ground stated for the continuance was that Mr. Lohman was "still awaiting instruction regarding payment of his outstanding fees, without which he cannot afford to continue working on this case." Doc. # 88 at 1.

Lohman has done on the merits involves the presentation of the *Atkins* claim; one would expect him to take the lead at the hearing. Since the *Atkins* hearing has been continued three times, Mr. Lohman presumably was, and is, prepared to present his client's position. Professions in the motion to the contrary, Mr. Moon would require time to prepare for the *Atkins* hearing, necessarily imposing more costs on the system.

Mr. Lohman's position is grounded on one of two equally unacceptable premises: (1) a CJA attorney may desert a client on death  row for "financial concerns" if a court dares to review a bill and declines to pay it in full;  or (2) a CJA attorney may draw from the well of public money without limit. In this case Mr. Lohman has been paid $85,755.29, and the Circuit Court has indicated that it will make a final review of additional amounts that have been retained at the close of the case. *See, e.g.*, Doc. # 113. In light of these payments, to say nothing of those to his wife, there has been no showing that the attorneys' fee of $8,424.00 approved for a hearing that should not last three full days, will be "an unreasonable financial burden" on Mr. Lohman.  It is not inequitable for the court to expect some return on the taxpayers' investment.

Mr. Lohman has  argued that he is entitled to compensation based on some average or median of fees paid to different lawyers, in unrelated cases before other courts. *See, e.g.*, Doc. # 86 Apps. A, B. The court rejects the notion that some minimum amount, say $500,000.00 or $1,000,000.00, is constitutionally required in every death penalty habeas case. While academics and litigators may disagree, experienced trial lawyers know from bitter experience that, on occasion, what appeared to be a simple case requires a great deal of time and effort. And sometimes, a complex case can be successfully concluded far more easily than expected. In the end, examination of attorney and expert fee bills must be conducted on a case by case basis. *See, e.g., Webb v. Bd. of Educ. of Dyer Cty.,*

*Tenn.*, 471 U.S. 234, 241-42, 105 S. Ct. 1923, 1928 (1985) (in the context of attorney's fees to a prevailing party in a civil rights action under 42 U.S.C. § 1988: "the amount to be awarded necessarily depends on the facts of each case . . . .") (internal quotation omitted).

**Conclusion**

After reading the petition, this court, without cutting off any right to later argue other issues raised in the petition, ordered counsel to focus on two  issues that had not been ruled on at trial,  one of them being mental retardation. The court has approved and paid for the services of mitigation investigator Rachel Rogers, fact investigator Joseph Thornton, psychiatrist Dr. Richard Dudley, psychologist Dr. Victoria Swanson, and prison expert Mark Bezy. A review of the papers makes it clear that *pro bono* counsel from O'Melveny & Myers spent long hours preparing most, if not all, of the petition, and have more than fulfilled their professional responsibilities. Except for the unfortunate illness of Dr. Swanson, the case is ready for the *Atkins* hearing.

Mr. Lohman, who is listed on the docket sheet as lead counsel, and has obviously been responsible for the presentation of *Atkins* claims, and who has been paid $85,755.29, with another $8,424.00 approved for the hearing itself, now wants to quit. The ethical ramifications of Mr. Lohman's position aside, three years into a case is not the time to substitute lead counsel. Having licked the cream off the scone, Mr. Lohman is not free to return it to the taxpayers' plate.

It is ORDERED that the Unopposed Motion for Substitution of Counsel [Doc. # 148] is DENIED.

So **ORDERED** and **SIGNED** this **23** day of **July, 2012.**

_____
Ron Clark, United States District Judge

5