1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

DAVID LEE JACKSON          |   DOCKET 1:09CV1039
                           |
                           |   JULY 24, 2012
VS.                        |
                           |   11:02 A.M.
                           |
UNITED STATES OF AMERICA   |   BEAUMONT, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 18

REPORTER'S TRANSCRIPT OF TELEPHONE CONFERENCE

BEFORE THE HONORABLE RON CLARK
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------

FOR THE PETITIONER:      CHRIS A. HOLLINGER
                         O'MELVENY & MYERS
                         TWO EMBARCADERO CENTER, 28TH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94111

                         CHRISTOPHER CRAIG
                         O'MELVENY & MYERS
                         400 SOUTH HOPE
                         LOS ANGELES, CALIFORNIA  90071

FOR THE RESPONDENT:      ROBERT L. HOBBS
                         CHRIS TORTORICE
                         U.S. ATTORNEY'S OFFICE
                         350 MAGNOLIA AVENUE, SUITE 150
                         BEAUMONT, TEXAS  77701

COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RMR
                         FEDERAL OFFICIAL REPORTER
                         300 WILLOW, SUITE 221
                         BEAUMONT, TEXAS  77701

   PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
 TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

Telephone Conference, 7/24/2012

2

(REPORTER'S NOTES 7-24-2012, JACKSON, 11:02 A.M., TUESDAY, JULY 24, 2012, BEAUMONT, TEXAS, HON. RON CLARK PRESIDING.)

(OPEN COURT, ALL PARTIES PRESENT.)

THE COURT:  All right.  This is Judge Clark. I call *David Jackson versus United States*, 1:09cv1039.

Who is here for the government?

MR. HOBBS:  Robert Hobbs and Chris Tortorice for the government, your Honor.

THE COURT:  And who is here for petitioner?

MR. HOLLINGER:  Chris Hollinger and Chris Craig from O'Melveny & Myers, your Honor.

THE COURT:  Okay.  I'm concerned, of course, about the health of Ms. Swanson.  I understand from your letter, Mr. Hollinger, of July 2nd that as far as you can tell, she's still incapacitated by the chemo and the radiation, which is understandable.  And I had asked Ms. Frampton, my clerk, to check with her office and see if we could get any other information about her. Evidently she is in bad, bad shape.  Have you received any more information about her or have any thoughts about what we need to do?

MR. HOLLINGER:  We attempted, your Honor -- this is Chris Hollinger for Mr. Jackson.  We attempted, since the letter of early July, to try to get in contact

with her, both by e-mail and by phone and also through other professional colleagues of hers and have been completely unsuccessful. So, you know, it does appear that she is, you know, having a difficult time of it as best we can tell or at least is not spending time and energy on, you know, anything other than her medical condition.

THE COURT: Okay. All right. It seems to me, then, we need to be giving some thought to bringing in a substitute. Now, I have read her report and I've read the government's expert report and it seems that the government agrees that the IQ scores, both before and after 18, are within that range set out in the cases and set out by the psychological and psychiatric associations as being, I guess, the minimum or the trigger point for looking at whether or not someone is mentally retarded.

So, it would seem, then, that we've got that evidence and those reports in the record. I haven't seen any attempt by either side or by the government to file *Daubert* motions to knock that out. So, now what we're looking at is the testimony and evaluation of adaptive behavior. And given that, it would seem that any expert who was hired would not need to do a full-blown workup with IQ testing and so forth. And I'm going to give the government a chance to respond, but I don't see that

4

that's going to be the area that they're going to fight. They're going to be looking at the adaptive behavior section. And, of course, any new person who was hired would have, obviously, the work of Ms. Rogers, the work of Ms. Swanson, and then would need to do some investigation and preparation.

So, let me first ask the government: Do you disagree with my analysis of what the issue is going to wind up being in this case?

MR. HOBBS: Robert Hobbs for the government, your Honor. I have no disagreement with how you characterized it.

THE COURT: Okay. All right. Then let me return then to Mr. Hollinger and Mr. Craig. What are your thoughts, then, on how we can -- well, first of all, have you given any thought about who might be available or -- and I think it would be preferable to have someone closer to the court rather than further away, and that would help hold down costs and might make it easier to review records and so forth. My guess is that there would be a need at least for one visit to Mr. Jackson. I assume he is still there in Indiana at that facility.

But obviously -- and it is just a reality of life in the budget situation the country is facing. I mean, I recognize that this person is going to have to do

Telephone Conference, 7/24/2012

5

some work and needs to be properly compensated.  I'm not saying that.  But on the other hand, it's not as cases seem to used to be a few years ago where just endless spending was not worried about.  That is just not something that's realistic; and I'm sure, counsel, you've seen some of the various orders that have gone back and forth.

So, have you given any thought to who we might get, the possibility of coming up with a rational budget?  I think there is still actually already approved a little over $4,000; but I understand that some more might be called for if necessary to allow whoever it is to go meet with Mr. Jackson.  But as I've said before, I'm not so sure we need to be paying somebody to do a full IQ workup when the government's experts pretty much already agreed on that point.

So, let me hear your thoughts on that, Mr. Hollinger.

MR. HOLLINGER:  Sure.  Chris Hollinger for Mr. Jackson.  We have not identified potential alternative experts.  You know, we, frankly, had hoped that Dr. Swanson would be the one.  We do agree that we're reaching a point in the litigation where, you know, we just have to make a decision to either go with her if there is a basis to believe that she will be able to do

so or to switch.  We do agree that we've reached that point.

As I understand it, obviously a particular expert may have a different idea; but what your Honor described seems generally accurate in terms of the work a new expert would need to do.  I know there are some complications in terms of visiting Mr. Jackson in a prison.  A, it takes awhile to get the interview scheduled and, B, there are actually some licensure requirements, as I understand it, where the person who would testify as an expert needs to be licensed in both Indiana, the state of incarceration, and in Texas, the state where testimony would be given.

THE COURT:  Okay.  Let me ask about that.  Why would the person -- I mean, for example, you don't have to be licensed in Texas for me to accept you as an attorney.  We can bring you in *pro hac vice*.  Is that some requirement of the prison or some requirement, you think, of rules of evidence or what?

MR. HOLLINGER:  My understanding is it has got to do with state regulation of -- it's called the "psychologist/psychiatrist profession."  I just know that it is something that Dr. Swanson herself had to deal with.

THE COURT:  Okay.

Telephone Conference, 7/24/2012

7

MR. HOLLINGER:  It's unrelated to, you know, court rules or anything like that.  It's got to do with state regulation of the profession.

THE COURT:  Okay.

MR. HOLLINGER:  And I, honestly, don't know all the details.  I just know that it is something that Dr. Swanson had to deal with, and it is just a complicating factor.

THE COURT:  Okay.

MR. HOLLINGER:  If the government is prepared to, you know, formally agree that the IQ component of the test has been satisfied, obviously that does eliminate some issues and some work that an expert would need to do to prepare.  I do think the expert would want, obviously, to visit Mr. Jackson, probably visit and interview with people who knew Mr. Jackson throughout the course of his life but in particular, you know, early years to further work up the adaptive behaviors.

THE COURT:  Well, hasn't that pretty well been done by the investigators?  I mean, even Ms. Swanson, I don't think -- or Dr. Swanson -- spent much -- I mean, kind of the whole reason, in the original budget and in other similar cases that I've seen, that an investigator, slash, mitigation specialist, slash, adaptive behavior specialist goes out and does all these things is because

of the obvious saving in time and money, given the differential between the hourly rate of the investigator and the hourly rate of a qualified psychiatrist or psychologist.

And I would have to go back and take a look at Dr. Swanson's bills and, for that matter, the bills of anybody else I've seen in this business; but normally they don't spend a lot of time traveling around the country meeting all of the people.  They rely on the reports -- I mean, just like almost any other expert, they're relying on the reports of their investigators and so forth.

So, I mean, it's one thing to say, well, she really needs to talk to the mother or the brother or the sister, you know, an individual person with lots of contact.  But to talk in terms of a complete redo of everything that's been done, I'm not sure -- at best you could just get conflicting information, it would seem. She gets up and says, "Bob said X" and Ms. Rogers says, "No, Bob said Y" and I'm sitting there going, "Well, now we have a conflict in the testimony of the expert and the testimony of the investigator.  I guess this whole line of testimony can be discarded."  That would almost be counterproductive, wouldn't it?

MR. HOLLINGER:  Chris Hollinger again, your

9

Honor.

I didn't mean to suggest that it would be a complete do-over.  I do think it's fair to say that when Dr. Swanson prepared her initial report at the time the petition was filed, which was a while ago, our best assessment or beliefs were that the IQ component would be relatively more significant.  And I think it's fair to say that in light of the government's expert's response, the focus would now be, as you noted, much more on adaptive behaviors; and I think there would be a little bit more drilling down, for lack of a better description, or focusing a little bit more on adaptive behaviors.  I don't think it would involve redoing the work that was previously done.

THE COURT:  Okay.  Well, why don't -- okay.  What I would like, then -- and obviously -- and you may need to be discussing this with Mr. Lohman.  I've issued my order saying he cannot withdraw.  I don't know what his response to that is going to be.

But how long do you think it would take -- I mean, do you think within the next week or so you could make a last effort to contact Dr. Swanson, find out what she is or is not going to do, and let me know about that?

And then after that, how long do you think it's going to take to consult with some other -- and I

understand this isn't an area that you and your firm do regularly.  At least I don't think it is.  But basically come up with another expert; and what I'd like to have is a proposed budget from that expert so that we can find out, you know, what they think is going to be necessary.

Mr. Hobbs has already agreed on the record with my analysis that -- and I don't see how the government's expert at this point could get up and start making a point about IQ given all the statements in his report, both pre-18 and after 18.  Then he says those IQs along with adaptive behavior.  I mean, he's hitting the point; and, so, in my mind petitioner has the -- if you call it a "magic number" or "the line" or whatever in terms of IQ scores.  I'm not going to listen to experts talking about that much at this point.  There is no point in plaintiff gilding the lily, and the government's expert would destroy his own credibility if he tried to backtrack now.  So, we really are on the adaptive behavior.

I think the expert has pointed out, I mean, a lot of it is going to be focused, I think, on a reading of the trial transcript -- petitioner's testimony at trial and testimony at sentencing and his activity while there in prison.  I mean, I'm not giving anything away here.  I can't imagine the government not focusing on

that, and I can't imagine petitioner's expert trying to explain that. And then there's the other things that are talked about by the investigators.

But I guess what I would like to have is, I guess, some kind of outline from an expert you propose to use and a proposed budget of what it is going to take to review what Dr. Swanson has done, review what the investigators have done, determine if something else needs to be done, meet with Mr. Jackson obviously, and then come to trial.

I was at a recent seminar where -- and I'm considering on doing something like this so that we have I guess, in effect, a -- not a third party exactly. But in the District of Delaware, for example, there is a person who is working with the Public Defender's Office and the courts who will review these kind of proposals and discuss with the experts and so forth what is reasonable in a particular case; and that might be possible. And it may be possible to get some assistance from one of the public defender groups on something like that.

I mean, I think you can tell that obviously budget is a concern; and I think it's going to be more and more so, based on what we're seeing from Congress and what's happening with CJA. So, I'm not trying to say

12

that I want to cut off Mr. Jackson's rights or not give him a full chance; but just as in any other case -- and I'm sure you've been in many of them -- there becomes a point where turning over rocks that are not going to make any legal difference or be of legal relevance is just simply running up a bill.

And that's what I'm concerned about, is making sure that we have presented and in the record a rational outline of what is to be accomplished and how much it will cost so that when that bill is approved and goes up and is being examined at higher levels or being examined by some Congressional committee, they can see that we've been protecting Mr. Jackson's rights and, at the same time, been good stewards of public money.

So, my questions are: First, do you think a week would be reasonable to make one last effort to contact Dr. Swanson and find out whether you think she is or is not available?

MR. HOLLINGER: Chris Hollinger again speaking. In terms of making the last efforts to contact Dr. Swanson, we think that is reasonable. I think it would take longer than a week to --

THE COURT: Oh, yeah.

MR. HOLLINGER: -- to identify an alternative expert and to put together that expert's views on what

13

would need to be done to address the court's concerns on --

THE COURT: No, no. I'm sorry if you misunderstood. I was breaking it into a two-part process. One week for Dr. Swanson, and then how long do you think -- do you think a month after that would be enough to maybe locate an expert and get an idea of -- I mean, you tell me the time.

MR. HOLLINGER: I would say that, just to be safe -- and, so, frankly -- Chris Hollinger again.

I would say that, to be safe, maybe six weeks just so that we don't --

THE COURT: Okay.

MR. HOLLINGER: -- ask the court again, you know, for further continuance.

THE COURT: All right. Then what I would ask is that, within a week, you let me know what the results are of your discussion with Dr. Swanson. If she says she's available, we do have some time set aside on the calendar --

When was that?

MR. HOLLINGER: Chris Hollinger. I believe September 18, your Honor.

THE COURT: Right. I mean, if she's going to be available, that would be great. If she's not and if

14

you find out -- and having lived through this with people, if she's in the middle of chemo and radiation, she's probably not thinking too much about work.  I can understand that.  So, then, let's -- you know, six weeks after that, let's be taking a look at who might be available.

In one of the earlier motions, there was a reference that some people at the death penalty project had been following or assisting on this case, helping petitioner, the Federal -- I'm sorry -- the Federal Capital Habeas Project.  Perhaps they know of some -- and as I say, I'm assuming that you and your firm don't do this every day.  Perhaps the Federal Capital Habeas Project people would know of a witness who might fill the bill.

MR. HOLLINGER:  Chris Hollinger again.  Yes, your Honor.  I can guarantee you those will be some of the people we will be contacting.

THE COURT:  Okay.

MR. HOLLINGER:  Do you have a sense, your Honor -- and really this is just -- if we're in a position where we need to identify an alternate expert, we would, at least in a general sense, want to make sure that expert was available at the time the hearing was going to take place obviously.  You know, I don't think

the September 18 time slot, you know, is feasible if we end up needing a new expert.

Is there a sense from the court's calendar, sort of ballpark, what the -- you know, sort of the range of possible alternate hearing dates would be so that we could, you know, confirm with -- if we need an alternate expert, to make sure that person was available?

THE COURT:  My guess is, based on our calendar, that December or January is going to be the first available time.  I mean, this person is going to need some time.  It won't be the only thing they're doing.

One of the reasons I'd want to see their proposal is that would give us an idea of how much time it's going to take.  I mean, as you pointed out, there's always some difficulties setting up the interviews with Mr. Jackson and so forth.  But it would appear to me that we would be looking probably at December or maybe January.

What are your thoughts on that?

MR. HOLLINGER:  Chris Hollinger again.  That was actually sort of the time frame we were contemplating.  And what we can do is make sure if we have to select an alternate expert -- you know, make sure and advise the court of that person's availability, you

know, during that time frame; and hopefully something will work with everyone's schedule.

THE COURT:  Right.  Just so you know, generally like everybody else in the holiday season, when you start getting right around, oh, December 22nd through January 1st, law clerks and court reporters and deputy clerks and judges aren't -- just like attorneys and experts, no one is jumping up and down to be in court during those days.  Most people want to be with their families and taking advantage of days off and so forth; so, we're not likely to do it then.  But sometime in December or probably January is -- and, you know, that may depend on availability and also obviously your schedules, the schedules of the government's attorneys, and the docket that I have.  Okay?

MR. HOLLINGER:  Thank you.  Yes, your Honor.

THE COURT:  All right.  Mr. Hobbs, anything, then, from the government's point of view?  Anything you might have to add in on this?

MR. HOBBS:  Your Honor, the only thing that I would add is something I believe the lawyers can address as we put together this -- once counsel for Mr. Jackson are confident one way or the other of Dr. Swanson's availability, we will work together to put together an estimate on when -- how much time would be needed as the

court requested.

The only thing that crossed my mind at the time is that both experts had previously been strong in their desire to interview people cited in these adaptive behaviors by the other party, and Dr. Swanson's illness has prevented -- that's, I guess -- correct me if I'm wrong, counsel. That's really the last part of the discovery that's remaining to be done, is that. So, we will build that into our discussions to communicate back to the court regarding the time. That's the only thing the government has, your Honor.

THE COURT: Okay. And that sounds reasonable if you can work together on that. That does seem reasonable.

Okay. Anything else, Mr. Hollinger or Mr. Craig, that you think is important or would even just be helpful to be discussed while we're talking?

MR. HOLLINGER: Nothing from us, your Honor. Chris Hollinger again.

THE COURT: Okay. All right. I appreciate it, and I'll look forward to hearing from you in a week about Dr. Swanson. I certainly wish her the best.

And if necessary, then six weeks after that, I would like to be hearing from you on who you might be proposing as an alternate. Okay?

Telephone Conference, 7/24/2012

18

MR. HOLLINGER:  Very good.  Thank you, your Honor.

THE COURT:  All right.  Thank you.  Counsel are excused.  Court's adjourned.

(Proceedings concluded, 11:28 a.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 22, 2012, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

_____
CHRISTINA L. BICKHAM,     CRR,     RMR